# EXHIBIT 1



NDA # 20,303
Preliminary MOR, 2/19/93

Page 8

dosing) than that approved for osteoporosis prevention (Premarin® 0.625 mg/day x 21 days/28 day cycle).

Also, because the requested indication of treatment of urethritis is not an approved indication in the estrogen class labeling, the NDA must contain specific evidence of efficacy from adequate and well controlled trials to be evaluable. Since such evidence is not included in the current submission, the NDA is not evaluable for this indication.

In addition, the long term safety profile of combination Premarin®/MPA treatment, especially regarding breast cancer and cardiovascular disease incidence, are not evaluable from the data here submitted. However, significant long term tumorigenic toxicity at pancreatic islet cells is certainly suggested by the submitted preclinical studies. Thus, the long term safety of the combination treatment for human use cannot be assured based on the current submission.

Lastly, per the Division of Biopharmaceutics preliminary review, the NDA lacks essential bioequivalence data linking the studied formulations of both Premarin® and MPA to the respective formulations proposed for marketing.

7.   Recommended regulatory action

Because of the Biopharmaceutics deficiencies, it is recommended that the NDA not be filed. Please refer to Mr. Hunt's 2/12/93 memo to Dr. Sobel for details of the additional studies needed for filing.

After the Biopharmaceutics deficiencies are corrected, however, the NDA will remain unevaluable for the indications of prevention of osteoporosis and treatment of atrophic urethritis, as described above, unless additional Phase III clinical studies are submitted which assess appropriate bone density and urologic endpoints. Therefore, after the Division of Biopharmaceutics recommends filing, it is recommended that the NDA be filed for the indications of treatment of moderate-to-severe vasomotor symptoms and vaginal atrophy associated with menopause.

Linda J. Golden, M.D.                    2/19/93
Medical Officer                          Date

cc:  Orig NDA Arch.
     HFD-510/
     HFD-510/LGolden/PCorfman/SDutta/LLutwak/SMoore
     HFD-425/JHunt
     Div Sci Investigations

Confidential Pursuant to Confidentiality Order

W-MDL303-00083805

# EXHIBIT 2

## DECLARATION &
## EXPERT REPORT OF SUZANNE PARISIAN, M.D.

Date: **September 16, 2011**

I have been asked to summarize the opinions and conclusions that I have already expressed in the Hormone Therapy Litigation. This report is meant to condense and clarify my opinions and conclusions, as expressed already in my prior expert reports as well as deposition and trial testimony.  All of my opinions are made to a reasonable degree of medical, scientific and professional certainty.

## QUALIFICATIONS & BACKGROUND

1.      I received my medical degree from the University of South Florida in 1978 and Board Certification in Anatomic and Clinical Pathology in 1989.  I also received a Masters in Biology from the University of Central Florida.  I have been a general practitioner and emergency physician, and President of Mountain Emergency Physicians.  I am currently licensed to practice medicine in the States of Virginia and Arizona.

2.      From 1991 to 1995, I served as a Commissioned Officer in the United States Public Health Service, ending with the final rank of Lt. Commander.  During that time, I was a Medical Officer, and then Chief Medical Officer, at the Food & Drug Administration (FDA) in the Center for Devices and Radiological Health ("CDRH").  At FDA, I reviewed product inserts, labeling, advertising, promotional materials, published and unpublished clinical and preclinical study data as well as corporate documents and deposition testimony and advised FDA on steps needed to help protect patients.  As the primary clinician, I presided over 262 health hazard evaluations/health risk assessments;[1] the majority of which involved "voluntary" recalls of prescription and non-prescription products.

3.      As one of the first clinical instructors in FDA's CDRH Staff College, I taught FDA reviewers about study design and scientific evaluation of clinical data.  I also instructed them about the applicable rules and regulations of the FDA.  My training and experience in clinical trial review was based upon my prior medical training and experience in medicine and science, including my pathology training, my research in graduate school in developmental biology and the training I received while at FDA for pre- and post-market safety and efficacy issues for the FDA.

4.      I was one of FDA's liaisons with the National Institutes of Health ("NIH") for issues involving women's health.  I was sent by FDA to serve as an official Agency representative to medical meetings and seminars to help it identify and monitor conduct of manufacturers for potential deviations from regulations governing promotional activities.  At those events, I was required to provide official guidance to industry and health care professionals as to FDA's interpretation of Food, Drug and Cosmetic Act and implementing regulations as it relates to the

---

[1] 21 CFR§ part 7

roles of manufacturers and health care providers.  While at FDA I received various citations and honors including two individual commendation medals and FDA and Health and Human Services Employee of the Month.

5.      Concurrent with my tenure at the FDA, I was also assigned clinical responsibilities at the Armed Forces Institute of Pathology, Office of the Medical Examiner for the Armed Forces, Washington, D.C. At the Armed Forces Institute of Pathology, Office of the Medical Examiner, I was responsible for making medical causation assessments and determinations as well as recommending further steps to be taken by the military or another agency of the federal government to ensure safety.

6.      In August 1995, I founded MD Assist, Inc., ("MDA") a regulatory and medical consulting firm specializing in matters involving the FDA, regulation of medical products and issues regarding public health.  At MDA, I help  companies design, conduct and review clinical studies, design and market new medical products, present marketing applications to the FDA, create and evaluate marketing applications, draft product labeling, investigate potential adverse events, review biocompatibility data and instruct companies about the requirements of the FDA. I help manufacturers (including startup companies) with initial product design, clinical investigation, labeling and marketing of new drugs and devices.  I have consulted with companies regarding clinical and laboratory investigation, review of data including risk and adverse event information, medical literature, labels and promotions.

7.      I have lectured about the FDA and the drug and device approval process to medical students, graduate students and law students.  I am the author of *FDA Inside and Out*, a textbook about the history and rules and regulations of the FDA.  The book has been used as a graduate school textbook at universities for courses relating to the FDA.  As of January 2011, it is listed as a library reference book about the FDA at 71 libraries, including the FDA's libraries.

8.      I have training and experience in the following areas:  FDA regulations and requirements, standards of the pharmaceutical industry, pre- and post-market drug development and testing, evaluation and analysis of clinical studies, analysis of safety signals, pharmacovigilance and pharmacosurveillance, assessments of the risks and benefits of prescription drugs, evaluations of increased risk from drugs including specific sub-populations most at risk as well as drug labeling and communications from manufacturers to physicians and the public.

9.      Since 1997, I have been involved in providing education and support as a FDA and regulatory / liability expert in various litigations.  My primary focus in this area has been to review and evaluate corporate documents and testimony, medical and scientific literature and relevant FDA documents.  In that capacity, I use the same methodology that I employed while at the FDA and which I use when providing expert assistance to medical product manufacturers. For a class of products or a single marketed product, I first assess the relevant FDA requirements and documents in terms of history of marketing, procedures and the role and requirements of manufacturers.  I then relate the actions of the company (or companies) for the products involved in terms of known and knowable information, actions and regulatory requirements based on my training and experience.  I also review all FDA documents, manufacturer's documents, scientific and medical literature, product history, adverse event reports as well as pre-clinical and clinical

information to formulate opinions made to a degree of reasonable and professional certainty regarding the documented actions of a manufacturer in terms of duties, obligations and compliance with the Act and implementing regulations.

## PRIOR TESTIMONY / HOURLY RATES / MATERIALS REVIEWED

10.    I have attached a list of my last four years of deposition and court testimony as Appendix A.  A copy of my most recent *Curriculum Vitae* is attached at Appendix B.  I am charging $400/ hour for document review and $600/ hour for deposition or court testimony.

11.    Materials reviewed:  In reaching my opinions in this case, I have reviewed the history of Premarin (Estrogen or "E"), medroxyprogesterone acetate ("MPA" or "P") and Prempro (Estrogen plus progestin or "E+P"),  FDA's regulations, relevant medical literature, clinical trials, preclinical data, Wyeth's communications with FDA, documents produced by Wyeth in this litigation, deposition and trial testimony of Wyeth employees and Wyeth's experts, expert reports of plaintiffs' and defendants' experts as well as databases of sales representative Call Notes and IMS data.

12.    When citing to documents or medical literature, I reference those materials by the trial exhibit number for that document and have attached as Exhibit C a summary of each document cited.

## ROLE AS AN EXPERT

13.    To date, I have been asked to do the following actions in this litigation:

(a)    Provide education and context for the jury on regulatory, FDA, science and corporate documents relating to hormone therapy including describing terminology, explaining regulatory concepts and helping the jury understand FDA's regulations and process, describing the requirements for drug product inserts, labels, labeling and drug advertising as well as the purpose of clinical trials designed to obtain FDA's approval, how available study data is used to develop an initial risk versus benefit assessment for a product insert, and how post market performance of the commercial drug  is intended to be used to voluntarily update product labels and promotions to ensure the safety of the public.

(b)    Evaluate Wyeth's documents as to support for what it knew at various time periods about the risks and benefits of combination hormone therapy (E+P) and (P) to compare the information Wyeth had with what it communicated to FDA, physicians and the public about the risk and benefits of E+P therapy.

(c)    Assess what information would have been available to Wyeth about E+P at various time periods if Wyeth had voluntarily chosen to ensure compliance with the Act and conducted studies necessary to evaluate the safety of this drug regimen, analyze the post market safety signals of which Wyeth was aware, evaluate the feasibility of conducting the necessary studies in the 1980s and 1990s as well as reviewing the type and significance of information generated by various study designs.

(d)     Review the design of E+P and evaluate whether its design was defective, its risks outweigh its benefits and /or there were safer alternatives available.

e)     Use my expertise and experience to measure Wyeth's acts and omissions against the standards of care that govern pharmaceutical manufacturers in the testing, studying, and labeling of drug products.  Those standards include regulations and guidances from the FDA, industry standards, and Wyeth's own admitted standards. To do so, I reviewed the lengthy and complex history of hormone replacement therapy from 1942 until the present day, including testing, studying, research, product labeling, medical communications and promotional or marketing efforts.  My review in this case is the same kind of review that I undertook while at the FDA or which experts in my field typically undertake in order to render "standard of care" regulatory opinions in pharmaceutical products cases.

## OPINIONS

14.     I intend to offer education as well as explanation of the context of Wyeth and FDA's documents and provide opinions on the following topics based on my training and experience:

(a)     The FDA's role and authority, including background of FDA's regulatory history with hormone therapy drugs, the "grandfathered" status of E and P drugs, unapproved and off-label promotion and use of E+P, and limitations on the FDA's ability to require clinical safety testing of E+P.  The FDA consistently and repeatedly expressed concerns to Wyeth about the safety of E+P and requested that Wyeth conduct further assessment to help identify safety issues and create adequate labeling.  Based on the Agency's written and stated concerns, the FDA conditionally approved Prempro, hinging that approval of E+P on Wyeth's commitment to the Agency to do a "comprehensive investigation" of the breast cancer risk of Prempro and to perform additional dosing studies.[2]

(b)     Explain the various types of studies available to investigate a drug's risks, the purpose of clinical trial studies, and the manner in which study data can be used to develop a risk-benefit assessment for a drug and the complex regulatory scheme and standards of care that governed Wyeth's conduct as a drug company.  In my opinion, Wyeth failed to adequately test and study combination hormone therapy (E+P).  Beginning in the 1970s, Wyeth was aware, or should have been aware, that E+P could pose a significant increased risk of breast cancer for menopausal women and that there was no adequate study to confirm, deny, or clarify that risk.  Despite that knowledge about the potential risk and its marketing, Wyeth conducted no study to investigate the breast cancer risk of E+P, even though there were numerous different study designs that Wyeth could have used.

(c)     Educate the jury on the ways that a drug company can provide post market information to doctors and patients about risks and benefits of a drug and Wyeth's use of those methods for hormone therapy. In my opinion, Wyeth failed to provide adequate, accurate or complete information about the risks and benefits of E+P to physicians based on over-promoting and misrepresenting the benefits while minimizing and downplaying the association of breast cancer risks in terms of information that Wyeth had about these drugs at various time periods and

---

[2]      PX 287

information Wyeth could have had if Wyeth had conducted the necessary and appropriate studies. By way of example, Wyeth's product labeling fell short of: (1) the FDA's regulations, which require a drug company to warn about a risk based on "reasonable evidence of an association of a serious hazard with the drug" and make clear that "a causal relationship" need not be proven"; (2) industry standards, which obligate drug companies to provide accurate, fair, and objective drug product information; and (3) Wyeth's own admitted duty to warn about drug risks.

(d)     In my opinion, Prempro is defective as designed in that its risks of use outweigh its benefits and there are safer alternatives available that did not convey the same breast cancer risk to the patient.


## FOOD & DRUG ADMINISTRATION

15.     Part of my role as an expert is to educate the jury about the regulatory issues involving prescription drugs generally and hormone therapy in particular and to help the jury understand the scope and authority of the FDA, regulatory terms as well as the context and relevance of Wyeth's documents concerning E+P.[3]

16.     Congress mandates that the FDA provide oversight of marketing, manufacturing and labeling of new drugs sold in the United States. FDA approves drugs for specific uses (indications) based upon its review of sponsor's studies and other information submitted to the FDA by the drug's manufacturer.[4] The Federal Food, Drug and Cosmetic Act ("FDCA") provides a minimal standard to allow a manufacturer sell human drugs in the United States.

17.     The FDA has a limited scope of authority as the FDA conducts no independent clinical testing of drugs, does not write drug labels and cannot "simply dictate proposed language for an applicant's labeling."[5] The FDA regulations prohibited a drug company from selling a drug that is not adequately labeled[6] and the drug manufacturer, not the FDA, is responsible for the accuracy and adequacy of representations made about its drug. The FDA relies on the manufacturer to be the knowledgeable expert for its drugs. It is the manufacturer, and not the FDA, that is responsible for voluntarily updating its own drug's product insert warnings and labeling to provide stronger or amended warnings about potential hazards. For this reason, drug manufacturers must have adequate trained pharmacovigilance personnel and procedures to be able to identify, investigate, evaluate and address safety issues with its drug.[7] The entire drug safety surveillance system relies upon an Honor System. The FDA must trust the drug manufacturers to voluntarily conduct the necessary pre-marketing and post-marketing scientific

---

[3]     See generally: 21 USC §331(a), (b); 21 CFR§ 314.80; 21 CFR§ 314.81; 21 CFR§ 201.57 (after 2006 21 CFR§ 201.80); 21 CFR§ 202.1; 21 CFR§ 201.128; 21 USC§ 352(a), (f)(1),(2), (n); 21 USC§ 321(n)

[4]     21 C.F.R. § 314

[5]     21 U.S.C. § 321(k) and (m); PX 10425

[6]     21 U.S.C. § 321(n)

[7]     21 USC§ 331; 21 CFR§ 314.80; 21 CFR§ 314.81; 21 CFR §201.57; 21 CFR§ 202.1; 21 CFR§ 211.198

and clinical studies to ensure a safe and effective drug product.   The agency must also rely on each manufacturer to voluntarily monitor and update its commercial label and promotions with any new findings.

18.     Prescription drug labels and labeling[8] are broadly construed to include all promotional materials, advertising, press releases, websites, and all representations made by the manufacturer or its agents.[9] The FDA has limited authority and resources to be able to oversee the regulation of prescription drug advertising.

19.     The drug manufacturer, not the FDA, remains responsible for the accuracy and adequacy of the contents of its drug label as well as for its representations made to doctors and patients. FDA's regulations require the drug manufacturer to revise its labeling to include a new or stronger warning as soon as there is reasonable evidence of an association of a serious hazard with the drug.  A causal relationship need not be proven[10]. A drug company can voluntarily add or strengthen its warnings or delete false and misleading information from its label without first obtaining FDA's approval.  This is called a "Changes Being Effected" or "CBE" and the drug company files an NDA supplement notifying FDA of the changes that have been made and the reasons for the changes with its request for Agency approval.[11]

20.     Until recently, the FDA had no authority to require a company to perform safety studies for an already marketed drug.[12]  Combination hormone therapy is the combination of two drugs: estrogen (E) plus a progestin (P).  For a long time, the combination involved a woman taking two pills: E, Premarin or conjugated equine estrogen (CEE) and for P, Upjohn's Provera or Wyeth's Cycrin (Medroxyprogesterone acetate, or MPA).  Both categories of E+P drugs were "grandfathered" products as they were both on the market  before the 1962 Kefauver Harris Amendments to the Food Drug and Cosmetic Act .[13]  Thus, neither drug group underwent the clinical trials for support of substantial evidence of efficacy and safety, and the review process in place today for new drugs pursuant to 21 CFR§ 314.  Both E+P went through an alternative public review process before an advisory panel and FDA to determine indications for efficacy.[14] P was not given any indication for use specific for treatment of menopause symptoms or for combination effects opposing administered estrogen.  The FDA was not given a regulatory means to force manufacturers of grandfathered E and P drugs, each supported by DESI as effective for separate individual indications and commercially available,  to conduct additional new clinical trials to support safety and/or efficacy when used together as E+P combination therapy.

21.     In 1994, Wyeth obtained FDA's approval to legally sell a combination of E+P together as one labeled combination hormone therapy.  In 1995, the two pills were combined into a single

---

8       21 USC§ 321(m)
9       21 USC§ 321(n)
10      21 CFR § 201.57 ( after 2006, 21 CFR§ 201.80)
11      21 CFR§ 314.70
12      *See* PX 8070A(IOM report); PX 8068 (GAO report); PX 8069 (Inspector General report); PX 10425
13      Premarin was first marketed in 1942 and Provera in 1959
14      Drug Efficacy Study Implementation or DESI review process; 21 CFR §310.6

daily pill known as Prempro. From the documents reviewed, the FDA had repeatedly and consistently told Wyeth that it had remaining safety concerns about the daily use of E+P by postmenopausal women.  However, the FDA could not require Wyeth to do safety studies and approval was based on support of short-term efficacy for P to oppose the effects of E in the uterus.  For example:

   **1977**:  FDA tells Wyeth that the agency is concerned about "an additional risk of increased breast cancer" with hormone drugs but the link is "unsubstantiated" at that time because of lack of studies.[15]

   **1986**:  FDA meets with Wyeth to discuss human studies on E+P and reminds Wyeth that "safety data on the combination [E+P] is limited" and that the FDA "would very much like to see" studies completed.[16]

   **1990**:  Before the 1990 FDA Advisory Committee meeting, Wyeth reviewed the worldwide literature on E+P and breast cancer and provided "an exhaustive review of the world's literature published since 1976 examining the possible relationship between breast cancer and hormone replacement therapy."[17]  Dr. Golden, an FDA medical officer, "presented evidence" at the meeting demonstrating that E+P "can produce breast cancer."[18] The FDA's Advisory panel of experts, after review of all materials, voted unanimously that there was "insufficient data" to answer the question of whether taking combination therapy increased the risk of breast cancer.[19]

   **1990**:  During a 1990 meeting with FDA, Wyeth was told by a senior FDA official that the FDA remains "unconvinced of the overall safety and effectiveness of combined estrogen/progestin therapy." And "without definitive clinical data from adequate and well-controlled clinical trials to evaluate the overall benefit/risk ratio," an E+P combination product will not be approved.[20]

   **1991**:  In preparation for an FDA Advisory Committee meeting in 1991, Wyeth again reviewed the worldwide literature and provided to the FDA a "comprehensive review of the literature regarding the effects of E+P."[21] The FDA's Advisory Committee again found that "the data are not yet adequate" to allow them to assess the breast cancer risk of E+P.[22]

   **1991**:  Dr. Linda Golden, the FDA medical officer assigned to the review of the Prempro marketing application, noted that recent epidemiological data suggests that E+P "may further increase" the breast cancer risk seen with long-term use of E alone.[23]

---

[15]     PX 41
[16]     PX 92
[17]     PX 123
[18]     PX 135
[19]     PX 134A
[20]     PX 144
[21]     PX 21055
[22]     PX 165
[23]     PX 934

**1992**: In a 1992 meeting with Wyeth, FDA's Dr. Golden "expressed concern" over long-term use of hormone drugs because the risk of breast cancer may be "related to both dose and duration of treatment."[24]

**1993**: At the 1993 ACOG meeting, Dr. Linda Golden presented that she was not "comfortable with the risk/benefit ratio with respect to breast cancer" for E+P.[25]

**1993**:   In a meeting with Wyeth in 1993, Dr. Golden re-emphasized her "concerns about the safety of adding excess progestin, i.e. breast cancer."[26]

**1994**:  Dr. Golden noted in her medical officer's review that due to the lack of sufficient studies, "the true effect of HRT on breast cancer incidence and mortality must be considered the single most important safety issue concerning this class of drugs."[27]

**1994**:  The FDA granted Prempro approval only as a "conditional approval" for sale with the requirement and commitment from Wyeth that it would "conduct a comprehensive investigation of breast cancer risk" to get definitive answers.[28]  Wyeth did not conduct the case control study asked for by the FDA to investigate breast cancer risk. Instead, after years of Wyeth not having started the requested study or even providing a full protocol, the FDA agreed that Wyeth could use the WHI and the WISDOM study results to fulfill its commitment.[29] However, both studies were discontinued prematurely based on unacceptable risk and no comprehensive investigation was ever conducted by Wyeth.

## WYETH'S REPRESENTATIONS TO PHYSICIANS AND PATIENTS

22.    As described in detail in this report, drug companies have many ways to provide information about a drug's risks and benefits to physicians and patients.[30]  All information provided to healthcare providers and patients must be accurate, truthful, fair and balanced[31]. Although Wyeth used many communication methods to convey effectiveness information about E+P, Wyeth failed to provide adequate safety and warnings information about E+P's risks and instead used these resources to minimize the risk of breast cancer  and  exaggerate  E+P's 'unproven benefits.' . In my opinion, Wyeth failed to provide adequate warnings about the association of a risk of use of combination hormone therapy based upon information that Wyeth

---

[24]     PX 201
[25]     PX 239
[26]     PX 247
[27]     PX 288 at p. 7
[28]     PX 287
[29]     PX 324; PX 381
[30]     21 U.S.C. § 321(n); 21 C.F.R. § 202.1(e)(1); Parisian trial testimony in *Singleton v. Wyeth*, 1/27/10AM at p. 25:9-23
[31]     21 CFR §202.1

knew internally as well as information that Wyeth could have known if it had conducted appropriate studies and analysis.[32]

23.     The Food Drug and Cosmetic Act and the FDA's implementing regulations anticipate that each drug company will provide adequate and accurate information about its drugs[33] and will voluntarily update its own drug labels and representations to protect the public, provide stronger warnings about an association of risk and improve instructions for use as well to delete false and misleading information.[34] Drug companies are thus required to monitor the post-approval safety of its own drugs (pharmacovigilance).[35]  There are also mandatory requirements for each drug sponsor to report adverse events associated with its drugs to the FDA,[36] as well as to file Annual Reports with FDA to help update the Agency on new issues with its commercial drug.[37]

24.     To determine whether a company's representations about risk and benefits are appropriate, fair and balanced, and not misbranded, FDA looks at all representations made or suggested by statement, word, design, device or any combination thereof, as well as, "to the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertised or under such conditions of use as are customary or usual."[38]

25.     A drug company's labels and representations are not permitted to deviate from the FDA's approved indications and a drug company may not promote a drug for an indication or use for which it is not FDA-approved or for which there is not substantial evidence.  To obtain new indications for marketing, a drug sponsor or manufacturer must first submit and obtain FDA's approval of an NDA supplement.   Despite the required process, Wyeth consistently promoted hormone therapy for off-label benefits of heart protection and cognitive benefits, even though the FDA repeatedly told Wyeth to stop making such misrepresentations, demanded Wyeth stop all off-label promotion and explained that such promotion was prohibited for these "yet to be proven" benefits.[39]  FDA informed Wyeth of its position in over a dozen meetings, telephone conferences and official letters.  Even when Wyeth asked to just discuss Prempro's impact on lipid levels in labeling as a "health benefit" of the drug, the FDA refused the request.[40]  The FDA indicated that such conduct was prohibited because "promoting off-label use will diminish the

---

[32]     See Parisian trial testimony in *Singleton v. Wyeth*, 1/27/10PM at p. 132:11-24

[33]     *See generally*: 21 CFR §1.21; 21 CFR§ 1.3; 21 CFR § 314.50; 21 CFR§ 314.70; 21 CFR§ 314.80; 21 CFR §314.81; 21 CFR§ 201.57 (after 2006 21 CFR 201.80); 21 CFR §202.1; 21 CFR §201.128; 21 CFR §201.56; 21 USC§ 321(n); 21 USC§ 331(a), (b); 21 USC§ 352(a), (f)(1),(n)

[34]     21 C.F.R. § 314.70

[35]     21 C.F.R. § 314.80

[36]     21 C.F.R. § 314.80

[37]     21 C.F.R. § 314.81

[38]     *See also* 21 USC § 352(a); 21 USC. § 352 (n)(3) (information summarizing side effects, contraindications, and effectiveness)

[39]     PX 377A, PX 112, PX 967, PX 154, PX 20875, PX 168, PX 192, PX 194, PX 199, PX 205, PX 208, PX 213, PX 395, PX 406, PX 470

[40]     PX 20950, PX 20857

sponsor's incentive to study the indication, it could result in harm to patients, the treatment could be ineffective, it would diminish the use of evidence-based medicine and could ultimately lead to erosion of the efficacy standard."[41]

26.   Without having the benefit of evidence-based science to support its representations for new benefits of E+P, Wyeth told physicians and patients that Prempro was safe for long-term use,[42] encouraged doctors to prescribe combination hormone therapy to all menopausal women[43] even though only a minority of women suffered from significant menopausal symptoms to justify hormone treatment,[44] represented that E and E+P had equivalent risk/safety profiles and that Prempro did not have a real or significant breast cancer risk and might even reduce the risk of a woman getting breast cancer.[45] Wyeth's documents show that it promoted the prescription of hormone therapy by physicians for unsupported off-label and unproven benefits of heart and brain protection.[46] These representations were inaccurate, lacked fair balance, were inappropriate and contributed to physicians forming inaccurate risk versus benefit assessments of hormone therapy. Furthermore, the FDA admonished Wyeth repeatedly about the inaccuracy of these representations.

27.   In forming my opinions, I rely upon the FDA regulations, FDA guidances and recommendations,[47] the pharmaceutical industry's adopted standards[48] as well as the admissions of Wyeth's executives about the responsibilities and duties of this drug company.[49] Wyeth's President, Dr. Michael Dey, admits that Wyeth has an obligation to keep abreast of the medical science and to evaluate safety signals and conduct studies, if necessary, to answer open risk questions.[50] Wyeth's Vice President of Research & Development, Dr. Ginger Constantine, agrees that Wyeth has a duty to conduct, support or monitor adequate research on its drugs[51] since it is the company's responsibility to make sure its drugs are adequately studied.[52] Justin Victoria, Wyeth's Vice President of Regulatory Affairs, acknowledges that drug companies have

---

[41]   PX 377

[42]   PX 378, PX 1565A, PX 3956, PX 22J

[43]   PX 1565A, PX 145

[44]   PX 1206 (17.5% of women have significant symptoms), PX 6479, PX 269, PX 304

[45]   Trial testimony of former Wyeth sales trainer and sales representative, Brett Hendricks in *Singleton v. Wyeth* and *Rowatt v. Wyeth,* PX 8019A, PX 7422A

[46]   PX 379,PX 6902, PX 21016, PX 423, PX 21035, Trial testimony of former Wyeth sales trainer and sales representative, Brett Hendricks in *Singleton v. Wyeth* and *Rowatt v. Wyeth*

[47]   FDA HRT Working Group, *Guidance for Clinical Evaluation of Combined Estrogen/Progestin-Containing Drug Products use for Hormone Replacement Therapy of Postmenopausal Women*, Menopause: Journal of the North American Menopause Society, Vol. 2, No. 3: 131-136 (2005)- PX 21127, FDA Guidance for Industry: *Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines* (2001), FDA Guidance: *Risk Assessment of Observational Data: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment* (2005)

[48]   PX 1651

[49]   PX 20801 (Testimony on this issue from Dr. Michael Dey, Fred Hassan and Robert Essner)

[50]   Trial transcript, *Daniel v. Wyeth*, 1/9/07 at p. 34; Trial transcript, *Reeves v. Wyeth*, 8/24/06 at p. 683

[51]   Trial transcript, *Scroggin v. Wyeth*, 2/15/08 at p. 1788:5-8

[52]   Trial transcript, *Scroggin v. Wyeth*, 2/15/08 at p. 1854:20-1855:11

a duty to monitor the safety of their commercial products post-approval[53] and that a duty to test is part of the company's duty to warn of risks.[54]  Dr. Lisa Rarick, Wyeth's regulatory expert, has admitted that a company's duty to ensure its product is well-studied continues after approval. Dr. Rarick also admitted that drug companies have a duty to investigate the risks of their products when used in combination with other products.[55]

28.    ***PREMPRO LABELS***

One way that a drug company can warn physicians about the risks and benefits of a drug is through its drug label/product insert which a manufacturer can elect to publish in the annual Physician's Desk Reference (PDR).  The Prempro warning for breast cancer in the approved product insert was not amended, updated or changed by Wyeth between 1995 and 2002. Wyeth drafted the initial label.  The FDA requested only a few changes to Wyeth's requested language. In fact, the one sentence that the FDA asked Wyeth to include (which discussed the development of breast cancer in Wyeth's one year pivotal trial) Wyeth both changed the proposed language and inserted a follow-up sentence which essentially nullified the value of the warning.[56]  Each sentence of the Prempro warning for breast cancer for E+P therapy was inadequate, inaccurate and misleading in light of what Wyeth knew about the risks and benefits of E+P at that time of approval and what Wyeth could have known if Wyeth had conducted breast cancer studies.  The Prempro label warning for breast cancer read:

WARNINGS:  ALL WARNINGS BELOW PERTAIN TO THE USE OF THIS COMBINATION PRODUCT.
Based on experience with estrogens and/or progestins:
1. Induction of malignant neoplasms

Breast cancer.  Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2.0) in those women on estrogen replacement therapy taking higher doses, or in those taking lower doses for prolonged periods of time, especially in excess of 10 years. The majority of studies however, have not shown an association in women who have ever used estrogen replacement therapy.

The effect of added progestins on the risk of breast cancer is unknown, although a moderately increased risk in those taking combination estrogen/progestin therapy has been reported. Other studies have not shown this relationship.

In a one year clinical trial of PREMPRO, PREMPHASE and Premarin alone, 5 new cases of breast cancer were detected among 1377 women who received the combination treatments, while no new cases were detected among 347 women who received Premarin alone. The overall incidence of breast cancer in this clinical trial does not exceed that expected in the general population.

---

[53]     Trial transcript, *Scroggin v. Wyeth*, 2/6/08 at p. 424:8-425:9; 537:17-538:1; and 564:24-563:3
[54]     Trial transcript, *Scroggin v. Wyeth*, 2/6/08 at p. 537:9-13
[55]     Trial transcript, *Scroggin v. Wyeth*, 2/20/08 at p. 2303:10-21
[56]     PX 8059, PX 8081, PX 207

In the three year clinical Postmenopausal Estrogen Progestin Intervention (PEPI)[57] trial of 875 women to assess differences among placebo, unopposed Premarin, and three different combination hormone therapy regimens, one(1) new case of breast cancer was detected in the placebo group (n=174), one in the Premarin alone group (n=175), none in the continuous Premarin plus continuous medroxyprogesterone acetate group (n=174) and two (2) in the continuous Premarin plus cyclic medroxyprogesterone acetate group (n=174). [58]

29.     Wyeth's executives agree that all information in its warning for breast cancer prior to 2002 was designed to apply to both use of E+P and E alone.[59] As Senior Vice President of Wyeth, Joseph Mahady, explained, "Every single element of the warning in here, whether it's described for estrogen alone or estrogen in combination" pertains to the use of the combination product.  "I think that's extremely clear."[60]

30.     Even though Wyeth learned more information about E+P and its breast cancer risk between 1995 and 2002, Wyeth never updated or amended its Prempro label to make the breast cancer warnings adequate or accurate. Consider each sentence in turn

31.     _Sentence # 1:_ *"Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2.0) in those women on estrogen replacement therapy taking higher doses, or in those taking lower doses for prolonged periods of time, especially in excess of 10 years."*

       Wyeth's document show that Wyeth knew, even before creating this sentence, that (a) clinical data showed an increased risk of breast cancer in women on any dose of E+P, not just high doses[61] and (b) Studies showed an increased breast cancer risk for E+P after only a short time of exposure, not only after 10 years of use.[62]

32.     _Sentence # 2:_  *"The majority of studies however, have not shown an association in women who have ever used estrogen replacement therapy."*

---

[57]     This sentence was added in 1997.

[58]     PX 6492, 1997 Prempro Label

[59]     Trial testimony of Dr. Marc Deitch, Wyeth's Senior Vice President for Medical Affairs and Medical Director, *Nelson II v. Wyeth*, 1/22/07PM at p. 33:17-35:4 ("'Everything' in the Prempro breast cancer warning section "refers to combination therapy according to the labeling."); Trial testimony of Dr. Ginger Constantine, Wyeth's Vice President of Clinical Research and Development, *Reeves v. Wyeth*, 9/9/06 at p. 3319 - 3320. (Doctors would "obviously" apply the language of the Prempro label that the risk is seen with "taking higher doses than those taking lower doses for prolonged periods of time, especially in excess of ten years" to Prempro because of "this language up here that the warnings below pertain to Prempro)

[60]     Deposition of Wyeth executive, Joseph Mahady, 11/16/05 at p. 205:13-206:18

[61]     PX 8638

[62]     PX ML 600 (Bergkvist, 1989: 2 years); PX 285 (Wyeth's Pivotal Trial, 1994: One year); PX ML 671 (Schairer, 1994: 2 years); PX ML 866 (Gapstur, 1999: Less than 5 years); PX ML 63 (Schairer, 2000: 4 years)

This statement was inaccurate for E+P in 1994 and became increasingly more inaccurate as time went on.  Contrary to the language in the label, the majority of the published studies before the WHI study actually reported an increased risk of breast cancer with E+P, i.e. the researchers documented an association between hormone therapy and breast cancer.[63]  Four of the five reviews or meta-analysis publications reported an increased risk of breast cancer associated with E+P[64] and the only review article that did not report an increased risk was an article by Dr. Trudy Bush, a long-time Wyeth consultant which was ghostwritten by Wyeth[65] and then, at Wyeth's direction, was disseminated to thousands of prescribing physicians.[66]

33.    From 1994 on, Wyeth was aware of published articles which showed an increased association of risk of breast cancer with E+P.[67]  Rather than update or amend the Prempro label, Wyeth instead took active steps to dismiss these studies, downplay their findings and minimize the results.  Wyeth did not provide accurate information from these studies to doctors and patients.  For example:

**1995**: Dr. Graham Colditz (a breast cancer researcher whom Wyeth had earlier hired as a consultant) published that there was a "significant increase in the risks of breast cancer and of death due to breast cancer among women over 55 who are currently taking hormones."[68]  Wyeth's Medical Director, Dr. Mark Deitch telephoned Dr. Colditz to express frustration that Dr. Colditz's presentation of this data caused Wyeth's stock price to fall.[69]  Rather than help publicize this data to physicians and patients, Wyeth instead created a strategy with Burson Marstellar (Wyeth's public relations consultant) to "shift media focus" away from the study and to "undermine / cast doubt on validity of data."[70]  Wyeth's stated strategy was to create "Letters to the Editors and / or Op-Ed pieces" and to find "appropriate authors" to sign their names to the Wyeth articles.  Wyeth also decided to disseminate a dissenting piece in which one of its consultants (either Dr. Leon Speroff or Dr. Trudy Bush) would opine that there was "no definitive answer" regarding hormone therapy and breast cancer "even after 40 observational studies."  A week later, Wyeth sent a "*Dear Doctor*" letter in which Wyeth purportedly quoted Dr. Leon Speroff as saying that despite some 40 observational studies, there was no consistent data of a link between hormone therapy and breast cancer.[71] The reassuring quote provided to doctors in this letter is verbatim to the message created by Wyeth's marketing group and its PR consultants a week earlier.  No doctor received a Wyeth letter with accurate information about the risk.  In response to Dr. Colditz's article, Wyeth started a study (not to evaluate the breast cancer risk) but rather to assess whether patients were aware of the study and whether such

---

[63]    Ex. D - Analysis of pre-2002 E+P studies.  While some of these study findings did not reach statistical significance proving causation, in each identified study the author clearly reports an increased risk with E+P or an "association" between the drug and increased risk.

[64]    Ex. D - Analysis of pre-2002 Review Articles on E+P

[65]    PX ML 1933 (Bush Review article), PX 8155Z (Documents confirming Wyeth's substantial involvement in the creation, editing and publication of Dr. Bush's Review Article), PX 21024

[66]    PX 672

[67]    21 CFR§ 201.57

[68]    PX ML 3

[69]    PX 21007 - Deposition excerpt of Dr. Graham Colditz

[70]    PX 8744A, PX 21118

[71]    PX 1579

awareness impacted her decision to stay on hormone therapy.[72] Wyeth's Colditz Awareness Study "estimated the impact on business" of the article.[73] Wyeth congratulated its senior executives for helping to "manage" the Colditz crisis.[74]   As stated, Wyeth believed that its reaction to the Colditz article "was a great example of how the organization can pull together for the good of the business."

    **1996**:   The Cummings / Cauley study was a 10-year research project sponsored by the National Institutes of Health (NIH) which showed that E+P particularly increased the risk of breast cancer among women who took the drug for osteoporosis.  As Dr. Cummings' abstract stated: "Our findings suggest that the risk of breast cancer associated with hormone replacement therapy may have been substantially underestimated."[75]   Wyeth and its PR consultant Burson Marstellar immediately created a plan to combat the Cummings study.[76]  This strategy included getting Wyeth's consultants to discredit the authors' approach or attack the study, soliciting third party organizations (to which Wyeth had provided funding support) such as ACOG, to criticize or rebut the study, distracting attention from the study and highlighting flaws with Cummings' data.[77]  As the Wyeth memos show: "Track One – To be implemented from the outset: Dismissive Strategy – Downplay value of study by dismissing its contribution."  In the handwriting of Wyeth's own executive and product director for Prempro, Jeffrey Buchalter, Wyeth's Breast Cancer Task Force was to adopt a policy of "Dismiss/Distract" to "keep the U.S. press busy."[78]   Wyeth's PR consultants recommended, as potential key message points, that Wyeth "shift" the media's attention to other issues and "highlight flaws in Cummings methodology."[79]   Wyeth even formed a Breast Cancer Working Group specifically to help Wyeth rebut the Cummings data: "we must be prepared to deal with press so headlines do not read 'Warnings.'"  As Mr. Buchalter reminded the group, the Cummings study was to be kept "confidential- do not discuss with anyone outside of Wyeth."[80]  In Europe, but not the United States, Wyeth updated its risk information and provided warnings to European doctors that prescribing E+P to women of normal or thinner build could create a particularly increased risk of breast cancer.[81]   Wyeth's Regulatory Vice-President, Justin Victoria, agrees that it would be inappropriate to not provide complete information or "hide stuff from doctors or women if it's bad about your drug," yet Wyeth never updated its risk information in America to tell American doctors that there was a particular increased risk for women taking the drug for osteoporosis because they were thin or normal build or had lower bone density.[82]

---

[72]     PX 1583, PX 20958, PX 322
[73]     PX 1587
[74]     PX 1584, PX 1585
[75]     PX 346
[76]     PX 347
[77]     PX 345
[78]     PX 349
[79]     PX 341A
[80]     PX 348
[81]     PX 811 at p. 6
[82]     Trial transcript from *Daniel v. Wyeth*, 1/22/07 PM at p. 12-15

**1997**:   In 1997, an international research group, The Collaborative Group, published a review in the Lancet showing an increased risk with E+P for breast cancer.[83] Wyeth prepared a global response to this study[84] and told its sales representatives to not "raise" or discuss this article "with your doctors unless they mention them to you."[85] Wyeth cautioned its sales force to "not engage physicians in a discussion about the Lancet article" but rather "continue to focus your presentation on the benefits of HRT."[86]

**1997**:   To counteract the negative publicity, Wyeth and its PR consultants launched the "Myths and Misperceptions" campaign.[87]   As part of this campaign, Wyeth agreed to fund certain organizations to educate the public about menopause and age-related diseases, but only if the group first agreed "to take the position that HRT does not cause breast cancer."[88] This program was designed to "Reposition the Breast Cancer Issue" and to change patients' perceptions from an appreciation that E+P could cause breast cancer to a "desired perception" of uncertainty or doubt, i.e. patient would be encouraged to think "I'm not sure if HRT causes breast cancer."[89] Wyeth budgeted $12 million for the "Myths & Misperceptions" campaign[90] and paid Burson Marstellar $200,000 to "coordinate seminar roll-out" of this educational effort.[91]

**1998**:   Dr. Graham Colditz published a second article in 1998 and, this time, he directly stated: "it is evident that postmenopausal hormones cause breast cancer."[92] Although aware of this study, Wyeth took active steps to reassure doctors of the opposite: that there was no risk of breast cancer from E+P.  Two months after the publication of Dr. Colditz's article, Wyeth funded a newsletter intended for Ob / Gyns called 'Ob Gyn Rounds'.  This educational piece – which was part of the Myths & Misperceptions program discussed  above – represented that there was "almost uniform agreement regarding the absence of effect on relative risk" when P is added to E[93]

**1999**:   In 1999, a German researcher, Dr. Lippert, published that Wyeth's hormone therapy products had unique characteristics that might explain why these drugs were linked to higher breast cancer rates in the published literature than other hormone drugs.  Dr. Lippert wrote: "One striking fact that emerges from a review of the literature is that almost all the patients in whom an increase in breast cancer had been noted has been treated with products containing Premarin."[94] Wyeth tracked whether this article was being discussed outside of

---

83      PX ML 22
84      PX 21025
85      PX 20957
86      PX 8306
87      PX 21074
88      PX 7422A, Trial testimony of Wyeth's regulatory executive, Justin Victoria, in *Rowatt v. Wyeth*, 10/4/07 at p. 4608:15-4609:24
89      PX 5677
90      PX 7422A at p. 10
91      PX 8171A
92      PX ML 3862
93      PX 427 at p. 5, Trial testimony of Wyeth's regulatory executive, Justin Victoria, in *Rowatt v. Wyeth*, 10/4/07 at p 4610:1-4614:19
94      PX ML 4251

Germany[95] and then decided to not respond to the article because "*there may be some advantage to "letting sleeping dogs lie.*"[96]  Internal Wyeth emails warned executives to "be very cautious with Prof. Lippert" because "he often expressed a very negative opinion concerning conjugated estrogens in the public."[97]  Wyeth thus planned to "expose" Dr. Lippert to two Wyeth internal experts to "neutralize" his opinions.[98]

    **2000**:  Drs. Ross and Schairer published two articles in consecutive months in early 2000. Both articles had findings associated with an increased risk of breast cancer with combination hormone therapy.[99]  Wyeth internally expressed concern that the accumulating "weight of evidence" about risk would create uncertainty with doctors and women would demand "to be removed from therapy or decline to start therapy."[100]  Rather than inform and warn doctors about these new findings of risk, Wyeth created a "breast cancer containment and communication" with a plan to overshadow and distract from the conclusions of these articles.  The PR plan included sending reassuring letters about the conflicting and inconclusive risk to prescribing physicians.  Wyeth thus issued a "Dear Doctor" letter that told physicians that these studies provided no new information and "the risk data reported in these and other studies over the preceding 25 years are conflicting and inconclusive."[101]  Further, Wyeth attached to its letter a chart purportedly a summary of the breast cancer study data to date on E and E+P.  In this chart, Wyeth provided the E only data from the Bergkvist study and did not report the Bergkvist E+P relative risk of 4.4.  Wyeth also trained its sales representatives to not discuss the outcomes of these two studies and informed its employees that "If the issue has not received a great deal of attention and neither physicians or patients are expressing concern about these two studies," the sales rep should not give the doctor a copy of the letter "as it would have the effect of drawing increased attention" to the studies."[102]

34.    *Sentence # 3*.  **The effect of added progestins on the risk of breast cancer is unknown, although a moderately increased risk in those taking combination estrogen/progestin therapy has been reported.  Other studies have not shown this relationship.**

    Wyeth documents show that it knew that there was an increased breast cancer risk for E+P users and that the E+P risk was higher than for estrogen (E) alone. These were not "unknown" facts. Yet, Wyeth did not accurately, adequately or fairly reveal that risk information to doctors and patients. Wyeth preferred for the medical community to continue to have doubt, i.e. an uncertainty about whether there really was an increased risk or not.  Wyeth continued to describe the risk as "unknown."  This is particularly disturbing since Wyeth consistently refused to evaluate or study the potential association of E+P with breast cancer despite being aware of a number of significant safety signals or red flags. Wyeth's executives, medical doctors and

---

| | |
|---|---|
| [95] | PX 499 |
| [96] | PX 506 |
| [97] | PX 921 |
| [98] | PX 634 |
| [99] | PX ML 98 (Ross, 2000), PX ML 63 (Schairer, 2000) |
| [100] | PX 519 |
| [101] | PX 5775 |
| [102] | PX 527, PX 527A |

scientists, despite marketing a product intended for post-menopausal women, acknowledge that Wyeth never conducted a breast cancer study to evaluate or understand this risk.[103]   And the studies that Wyeth did do were not powered or designed to evaluate an association of E+P with increased breast cancer risk.[104] Wyeth was well aware that critics of E+P felt Wyeth was not "doing enough studies to prove safety or address the breast cancer issues."[105] From the following examples from Wyeth's own documents it is clear that Wyeth knew that additional studies were needed, but refused to conduct such studies:

**1961:** A French male rat study looked at the impact of E alone, P alone and E+P use on breast tissue and found that only the E+P group developed mammary tumors.[106]

**1975**:   In 1975, it was discovered that use of estrogen alone was causing an epidemic of endometrial (uterine) cancer. At that time in 1975, Premarin, Wyeth's conjugated equine estrogen (CEE) was the most commonly prescribed formulation of estrogen used by United States postmenopausal women.   Although Wyeth started selling Premarin in 1942, it was not until the publication of an article and then a book called "*Feminine Forever*" by Dr. Robert Wilson in 1966 that estrogen (Premarin) sales really took off.[107]   The book celebrated the benefits of hormones for the treatment of menopausal symptoms and reassured women that hormone drugs would decrease a woman's risk of development breast and genital cancer.[108]  In 1975, two articles were published linking the use of E alone to cancer of the lining of the womb.[109]  The FDA held an FDA Advisory Committee meeting in December to discuss these findings.[110] Wyeth thus became aware that its hormone drug was associated by physicians with hormone dependent uterine cancer in their patients in a hormone sensitive tissue.[111]  After the Advisory Committee meeting, Wyeth sent out a "Dear Doctor" letter in which Wyeth claimed

---

[103]      PX 20802A - Deposition of Dr. Marc Deitch, Wyeth's medical director and senior scientific advisor, 10/26/05 and 10/27/05 (Dr. Deitch could not recall "even a single study done by Wyeth that would answer the question about the connection between hormone replacement therapy and breast cancer"), Deposition of Dr. Harold Marder, Wyeth's senior vice-president, global medical director and head of Global Medical Affairs, 1/17/06 (Dr. Marder could not name "any study" done by Wyeth to "determine whether combination estrogen and progestin could cause cancer"),  Deposition of Dr. Gerald Fisher, Wyeth's Senior Vice President of Drug Safety & Metabolism, 11/22/04 (Dr. Fisher could not cite to any study that Wyeth "sponsored, supported, developed or executed" in humans or animals to assess the breast cancer risk),  Deposition of Dr. Pamela Cobb, Wyeth's director of Global Medical Affairs, 6/23/06 ("Wyeth never did a breast cancer trial")

[104]      Pivotal: PX 20963, PX 288; HERS: PX 475, PX 20998, PX 21009 (Testimony of Dr. Harold Marder),PX 1150; PEPI: PX 20941; HOPE: PX 21008 (Testimony of Dr. James Pickar)

[105]      PX 20871

[106]      PX ML 539

[107]      PX 9144 (Article), PX 10 (*Feminine Forever* book), Deposition of Robert Wilson, Jr., 7/13/06 (Dr. Wilson's son explained Wyeth's involvement in the creation and promotion of *Feminine Forever*), PX 121

[108]      PX 10

[109]      PX ML 2046, PX ML 2068

[110]      PX 21

[111]      Sworn testimony of Robert Essner, Wyeth's CEO, 6/28/06 (Use of Premarin causes endometrial cancer), Sworn testimony of Dr. Ginger Constantine, Vice President of Research & Development for Prempro, 11/1/05 (Premarin causes endometrial cancer in women who have not had a hysterectomy).

(despite the scientific data to the contrary) that it would be simplistic to attribute the endometrial cancer epidemic to Wyeth's drug.[112]  This letter incensed the FDA. The agency called Wyeth in for a meeting and informed the company that the FDA expected Wyeth to study its drugs, to know the risks and to take active steps to inform doctors about such risks.[113] After 1975, doctors started using E+P in combination so the E would treat a woman's menopausal symptoms and the P would protect a woman's endometrium from the adverse effects of E. The introduction of a 'P' drug was to oppose the effects of the 'E' drug alone.  However, Wyeth provided no - or inadequate - breast cancer warnings for such use[114] and Wyeth never conducted any studies to evaluate the risk of breast cancer in another hormone sensitive tissue for women.

**1976**:  Because of the endometrial cancer issue, Wyeth's scientists and researchers started questioning internally whether hormones could similarly impact hormone receptor positive breast cancer.[115] As Wyeth's scientists wrote, "the presence of both estrogen and progesterone receptors in a tumor indicates that a tumor can and does respond to estrogen" and expressed that more studies were needed to evaluate this issue.  Wyeth's executives acknowledged that they needed to start studies on this issue quickly because Wyeth could not "afford to wait for the axe to start its descent before we give serious attention to how we might blunt its edge."[116]

**1977**:  Wyeth's scientists reviewed the available literature on use of E+P and confirmed that "unfortunately, the number of published, well-designed studies is small or practically non-existent."[117]

**1980**:  Wyeth met with Dr. Brian MacMahon, a renowned epidemiologist from Harvard, to discuss the fact that some studies were showing an increased risk of breast cancer in hormone therapy users and "consistency of data from several papers starts to be meaningful."[118] Dr. MacMahon felt that, from Wyeth's standpoint, "the picture looks bleak" as more studies were showing an increased breast cancer risk.[119]

**1983 (March):**  In 1983, Wyeth filed an IND application (Investigational New Drug Application) with the FDA requesting permission to conduct human clinical studies of E+P. Wyeth represented to the FDA that the company intended to "initiate a definitive study to demonstrate the efficacy and safety of E+P" so that before the "use of combined therapy becomes established, risks of the various progestins could be adequately evaluated."[120] The FDA approved Wyeth's IND request, giving Wyeth the agency's permission to conduct comprehensive safety studies on E+P. Wyeth never performed  these approved IND studies intended to gain FDA's eventual approval of Wyeth to legally market and label a combination E+P therapy to be sold in the United States.

---

[112]   PX 22
[113]   PX 24, PX 22
[114]   Premarin Label
[115]   PX 28
[116]   PX 30
[117]   PX 1057
[118]   PX 54
[119]   PX 55
[120]   PX 66A

**1983 (April):**  Even though Wyeth recommended long-term combination E+P use to physicians, as an unapproved combination therapy,  Wyeth's scientists confirmed that "there is no adequate evidence in the literature to support an E+P regimen."[121]

**1983 (Nov):**    Wyeth's medical director (Dr. Perdue) attended an NIH workshop in 1983 and informed Wyeth's management that the attending experts felt a "relatively large, long-term, NIH-type study" was needed to evaluate the effects of hormone therapy.   Wyeth management, rather than commit to doing the clearly needed study, noted that "in view of the impact that such a study could have on the future of HRT, we should monitor the plans for the study."[122]

**1983 (Sept):**    Wyeth acknowledged that, in order to get a combination E+P hormone therapy product approved, the FDA would require combination E+P studies to support safety and efficacy.  Wyeth executives opined that to do such studies "would be very costly, would take many years, and might in the end not prove successful. In fact, the results of the study that would be needed could turn out to be embarrassing."[123]

**1985 (May)**:  When Wyeth filed a "paper NDA" to obtain approval of  E+P therapy (an application that sought permission for Wyeth to sell a combination E+P product based solely on already published studies and not  based on any new research or clinical data obtained by Wyeth), the FDA "denied the filing." The basis for the denial was FDA's opinion "that clinical trials will be necessary prior to approval."[124]

**1985 (August)**:  In 1985, FDA officials informed Wyeth that "there is inadequate data in the literature" to support approval of a combination product[125] and studies are needed.

**1986**:  Dr. Barrett-Connor published an article in 1986 in which she noted that there were many studies on the risks and benefits of E alone but, in contrast, there were "no studies of adequate design, duration and sample size to determine the risks and benefits of any prolonged estrogen – progestin combination."[126] Dr. Barrett-Connor called for immediate evaluation of the risks of E+P, especially in light of the rising popularity of prescribing E+P.

**1988**:  Dr. Pennywise Budoff wrote to Wyeth's head scientist, Dr. James Pickar in 1988 offering Wyeth access to her own extensive patient population to do a study assessing the breast cancer risk of E+P.  As Dr. Budoff explained, "since 1979 many more patients have been placed on hormone replacement therapy" but "long term data on combined therapy is difficult to find in the literature."[127] Since her patients adhered to strict follow-up criteria, a study involving her patient population "would be able to greatly improve the present fund of knowledge, including

---

[121]    PX 8019
[122]    PX 68
[123]    PX 69
[124]    PX 83
[125]    PX 1657
[126]    PX ML 3428
[127]    PX 935

factors such as the prevalence of breast cancer." There is no evidence that Wyeth responded to her request.

**1989**:  Wyeth conducted invitation-only annual international conferences called "Estrogen Deprivation" conferences.  At these conferences, Wyeth invited researchers to present new research on hormone therapy.  At the 1989 conference, speakers informed Wyeth's management that "additional studies are needed to determine whether risk of breast cancer is altered in women who receive combined estrogen-progestin therapy" especially because "prolonged exposure" to estrogen and a progestin "might enhance the risk."[128] Dr. Malcolm Pike, a well-known breast cancer researcher, noted that recent data showed a doubling of the risk of breast cancer from E+P. A Wyeth executive wrote "Dr. Pike continued to bring up the subject of menopause therapy and breast cancer.  It was mentioned by some Wyeth-Ayerst executives that this would be the last meeting sponsored by Wyeth-Ayerst to which Dr. Pike would be invited".[129] Dr. Pike was prominent in this area and could not be easily left out of the Estrogen Deprivation conferences. Wyeth invited Dr. Pike back to at least one subsequent meeting. However, Wyeth never pursued, evaluated, tried to replicate or publicized the data.

**1989**:  Dr. Bergkvist published an article in 1989 in the Lancet journal which showed a 4.4 relative risk for E+P users after six years of use and concluded that "further research must investigate the possibility that the addition of progestins to estrogen therapy may increase the risk of breast cancer."[130]

**1990 (Feb)**:  In February of 1990, the FDA convened a panel of independent experts to review all of the available science on E+P.  In preparation for this FDA Advisory Committee meeting, Wyeth provided the FDA with "an exhaustive review of the world's literature published since 1976 examining the possible relationship between breast cancer and hormone replacement therapy."[131] At the Advisory Committee meeting, Dr. Linda Golden, the FDA medical officer, presented human and animal study evidence suggesting that E+P "can produce breast cancer."[132] The FDA's panel of experts, after review of all materials, voted unanimously that there was "insufficient data" to answer the question of whether taking combination therapy increased the risk of breast cancer.[133]  Rather than Wyeth starting a study or investigation to address the acknowledged scientific void with its product for breast cancer risk, Wyeth's executives instead circulated a memo congratulating the hormone therapy team on the "success" of the meeting because it had not attracted media attention.  As Wyeth's executive wrote: "Our goal was to ensure that this meeting was a "non-event," and that's exactly what happened."[134] Wyeth's management declared that the company was on its "way to making Premarin a $1 billion drug."[135]

---

[128]     PX 111
[129]     PX 1567
[130]     PX ML 600, PX ML 3906
[131]     PX 123
[132]     PX 135
[133]     PX 134A
[134]     PX 133
[135]     PX 962

**1990 (April)**: In 1990, Drs. Glass and Hoover published a study based upon the review of a Kaiser insurance database. This article found a 131% increased incidence of hormone-dependent breast cancers since 1976 (when E+P use first started) in women 60 years of age.[136] The researchers concluded that increased use of hormone therapy could be implicated in this finding.  Wyeth could have elected to perform its own follow-up evaluation of the Kaiser insurance database to determine if the women in the database who developed hormone dependent breast cancer had been E+P users.  Wyeth did not perform a follow-up study to determine if there had been an increased association of breast cancer with E+P in the Kaiser database with postmenopausal women.

**1990 (May)**:  In 1990, Dr. Graham Colditz, a renowned breast cancer researcher, presented study data showing an increased breast cancer risk for hormone therapy at the Society of Epidemiologic Research (SER) meeting.  Wyeth created a strategy, not to publicize these results or to evaluate risk, but instead to "take a responsive stance" towards any media covering the cancer story.  Wyeth sent media liaisons to the meeting prepared to "react to any negative messages" and "counter-balance" such information.[137]

**1990 (Dec)**: In late 1990, Wyeth became aware that International Agency for Research on Cancer ("IARC") planned to review hormone therapy and its association with breast cancer. Wyeth formed a small task force (including Dr. Pickar) to "preempt any negative fall-out from this process."  The task force was "charged" with ensuring that IARC "does not develop a position on a definitive relationship between breast cancer and estrogen replacement therapy."[138] When IARC did finally review E+P in 2007, it found "sufficient evidence" that E+P is carcinogenic in the human breast.[139]

**1991**:  Dr. Barrett-Connor published another article in 1991 acknowledging that whether the use of combination E+P hormone therapy causes breast cancer was an important and unanswered issue.  As Dr. Barrett-Connor noted "unfortunately, there are few data concerning the effect of estrogen plus a progestin on breast cancer risk" and "additional data on the effect of combination hormone therapy on breast cancer risk are urgently needed."[140]

**1991(June)**:  The FDA held another Advisory Committee meeting in the summer of 1991 to review the medical literature on hormone therapy.  In advance of that meeting, Wyeth again compiled a "comprehensive review" of the worldwide literature relating to the breast cancer risk of hormone therapy and forwarded it to the FDA.[141] After reviewing all evidence and hearing presentations, the panel of experts once more concluded that "the data are not yet adequate to permit an answer" to the question of the breast cancer risk with E+P.[142]

---

[136]     PX  ML 192
[137]     PX 1265
[138]     PX 146
[139]     PX 866B
[140]     PX ML 1965
[141]     PX 21055
[142]     PX 165

**1991 (Aug)**: In 1991, Wyeth had concerns about the effects of Dr. Ron Ross' breast cancer study data and the publicity that might be generated if his data was released. "Because of the size of the study and the credibility of USC, when the data is finally published, it will achieve a great deal of attention." The "new" data from this study showed that combination use of E+P had a higher relative risk of breast cancer than estrogen alone. Wyeth's management noted with relief that: "It is not likely that this data will be published anytime in the near future since according to the transcript Krauss claims it is only half done. We should start discussing how to handle this now and when it finally hits from a sales force and public relations point of view."[143]

**1991(Sept)**: Dr. Marc Deitch, Wyeth's Chief Medical Advisor and Scientific Director, attended a multi-day conference at the Royal Society of Medicine on hormone therapy and breast cancer risk in late 1991. Dr. Deitch reported that the experts at this conference considered the breast cancer risk data on combined therapy and dose / response data "lacking."[144] In addition, the preliminary data from a study was showing an increased breast cancer risk with E+P. Dr. Deitch also reassured management that Dr. Ross would keep Wyeth "informed of the publication date" of his study and had agreed to let Wyeth "work with him to manage the Press when the time comes."

**1992-1993**: In 1992, the FDA Advisory Committee recognized that breast cancer survivors were being prescribed off-label E+P therapy and that there were no studies on the safety of this practice. Dr. Haney "expressed the views of nearly all members" when he announced that clinical trials were needed to evaluate the safety of this use.[145] The Eastern Cooperative Oncology Group ("ECOG") contacted Wyeth in 1993 about providing free drug supply for a study to evaluate this exact safety issue. ECOG had retained Dr. Trudy Bush, Wyeth's long-term consultant and advisor, as co-principle investigator.[146] Wyeth however refused the ECOG request to receive an E+P drug supply "consistent with company policy."[147] Wyeth management explained that the company policy was to refuse such requests as "customary apparently for studies involving breast cancer."[148]

**1994**: In 1994, Wyeth executives had to select a chair person for a continuing medical education program for Ob Gyns. Wyeth used the opportunity of this panel meeting to create slides and presentation documents for CME programs to be used throughout the country to educate private practice physicians.[149] When a Wyeth executive suggested using an oncologist as the program chair, Wyeth's management wrote back "no way an oncologist chairs this…NO, NO, NO and NO."

**1994**: At Wyeth's 1994 Consensus Conference, Dr. Trudy Bush presented on "HRT dosing regimens and breast cancer." Wyeth's long-term advisor confirmed that "insufficient

---

[143]     PX 172
[144]     PX 175
[145]     PX 188
[146]     PX 1090
[147]     PX 251
[148]     PX 265
[149]     PX 8024A

data are available to determine whether progestins added to estrogen alter risk of breast cancer."[150]

**1995**:  Dr. Fiona Gilbert, a British researcher approached Wyeth in 1995 requesting help with a mammogram study she proposed to conduct on hormone therapy users.[151]  Dr. Gilbert opined that since natural hormones were "known promoters of breast cancer" more studies were needed to evaluate whether E+P also promoted the development of breast cancer.   She asked Wyeth for access to some mammographic data collected in a prior study. Wyeth refused unless Dr. Gilbert agreed that she would not review any connection between HRT and breast cancer and that Wyeth could have "absolute and final right to comment on the content, emphasis and conclusion of any publication."  Wyeth demanded that "in the event of significant differences of opinion," Dr. Gilbert must agree to accept the views of Wyeth's study review committee.

**2000**:  Following publication of the Drs. Ross'[152] and Schairer's[153] articles, the FDA requested that Wyeth change its Prempro label to remove language that the risk of adding progestin to estrogen was "unknown."  The FDA indicated it felt that the breast cancer risk from E+P was proven to be 24-40% higher.[154]  Dr. Susan Allen, Director, Division of Reproductive and Urologic Drug Products, FDA, thus requested that Wyeth update the breast cancer warning for Prempro within 90 days.  Rather than implement the new warning as ordered by Dr. Allen and FDA, Wyeth refused and never updated the Prempro label with that risk information available to Dr. Allen in 2000 until after the release of the Woman's Health Initiative (WHI) study results in July 2002.  Instead, to respond to Dr. Allen, Wyeth created its own proposed language that it wanted for a label instead of the FDA's proposed language.  In the first draft of the response, Wyeth noted - prominently – data from a recent study (Gapstur) which showed a breast cancer relative risk for E+P users of 4.42.[155]  Three days later, by the time that Wyeth actually sent a response letter to the FDA, this E+P statistic was removed and the Gapstur article was not included in the list of references.[156]  In addition to the deletion of a mention of Gapstur, Wyeth also had its lawyer write to the FDA to explain that the FDA could not require specific language in a drug's label.[157]  Wyeth then had Trudy Bush, Ph.D., write to the FDA.[158]  Dr. Bush did not reveal her financial relationship with Wyeth but objected to the FDA's proposed new warnings claiming that stronger warnings might "frighten" women.  She said that it was her opinion that no changes should take place without the opportunity for public comment.  In the end, Wyeth did not update its warnings as requested by FDA in 2000.

**2000**:  In the summer of 2000, Wyeth hired a firm called ATTL to conduct a review of the published literature on E+P and breast cancer and advise Wyeth on the state of the science.[159]

---

[150]    PX 1046
[151]    PX 7871
[152]    PX ML 98
[153]    PX ML 63
[154]    PX 20878
[155]    PX 560, PX ML 866
[156]    PX 1659 and PX 1659A
[157]    PX 10425
[158]    PX 20879
[159]    PX 8302

ATTL notified Wyeth that "to date, no published study has included a sample size of estrogen-progestin users large enough from which to definitively make conclusions regarding the relationship between estrogen-progestin combination use and the risk of breast cancer."[160]  The group pointed out that "in addition to having insufficient sample sizes of estrogen-progestin users from which to derive breast cancer risk conclusions, all of the published studies that have included estrogen-progestin users have lacked sufficient information" regarding type and dosage of drug used and regimen of use. ATTL recommended that Wyeth update its Prempro warning and remove the representation that the risk of estrogen-progestin use was "unknown" since it was not accurate to say the risk is "unknown." ATTL also questioned how Wyeth wanted to define an appropriate length of use for E+P and treatment of vasomotor symptoms since "the incidence of hot flashes is highest in the first two postmenopausal years" and lessens over time.

**2002**:  In 2002, the NIH prematurely stopped the WHI randomized clinical trial because the breast cancer rate in the E+P group had crossed the study's pre-determined safety index.[161] Wyeth did not conduct the WHI but had contributed a free E+P drug supply in order to achieve "notoriety" and good PR.[162] On July 9, 2002, the NIH announced that they "have stopped early a major clinical trial early due to an increased risk of invasive breast cancer."[163]  The WHI study also did not show any heart benefit, but rather an increased incidence of heart events[164] as well as no brain benefit but rather an increase in clinically meaningful cognitive decline in E+P users.[165] The WHI investigators concluded that the harms exceed the benefits of E+P as "a 26 percent increase in breast cancer risk is too high a price to pay, even if there were a heart benefit."[166] News of the WHI study results changed the menopausal market forever.  Sales for E+P plummeted and, in lock-step, so did the breast cancer rates for hormone receptor positive cancers in older women.[167]  The lead investigator for the WHI, Dr. Rowan Chlebowski, estimated that E+P caused 200,000 excess breast cancers in this country.[168]

35.    After the discontinuation and negative publicity of the WHI study, and as a result of FDA's condition for it to finally perform lower dosing studies for Prempro, Wyeth was able to introduce a new E+P product to market: Low Dose Prempro.  Wyeth filed for patent protection on this product and even asked the FDA for permission to call this drug by a new name, Premia.[169]

36.    Wyeth had a number of different study designs available to it to evaluate the breast cancer risk of E+P including database studies,[170] questionnaire studies,[171] patient population

---

[160]    PX 8303
[161]    PX 727; PX 8155; PX 22M
[162]    PX 337, PX 221, PX 1117, PX 20923
[163]    PX 8155
[164]    PX ML 19
[165]    PX ML 29
[166]    PX 8155
[167]    PX ML 5500; PX ML 5838; PX ML 4881; PX ML 4743
[168]    PX 21094
[169]    PX 490
[170]    PX ML 192, PX 8010
[171]    PX ML 79, PX 342

studies,[172] case control studies,[173] or randomized clinical trials.[174] These studies were all feasible and could have been conducted at any time after 1985.[175] Certainly Wyeth had the personnel and resources to conduct such studies or it could have retained a coordinating center such as the Fred Hutchinson Center, just like the government did for the WHI.[176] With annual sales of $1-2 Billion, Wyeth generated significant profits from its hormone therapy drugs that could have been used to fund such safety studies.[177] Wyeth had a multi-billion dollar annual research budget, spent more than $200 million per year in research efforts just in the women's healthcare division and had a marketing budget of more than $220 million each year for hormone therapy drugs.[178] Wyeth admits it had sufficient financial resources to fund any needed study.[179] If such studies had been done beginning in the 1980s, Wyeth would have generated safety data for E+P approval and an adequate label. Wyeth would have been able to disseminate adequate and fair balanced risk versus benefit information to physicians and patients by the end of the 1980s.[180]

37.     _Sentence # 4_. **"In a one year clinical trial of Prempro, Premphase and Premarin alone, 5 new cases of breast cancer were detected among 1377 women who received the combination treatments, while no new cases were detected among 347 women who received Premarin alone. The overall incidence of breast cancer in this clinical trial does not exceed that expected in the general population."**

These statements about Wyeth's pivotal trial (a one year study done to look at the impact of E+P on endometrial thickening or hyperplasia and cancer) were inaccurate, false and misleading.  First, the pivotal trial was never designed or powered to evaluate the breast cancer risk.  Indeed, Wyeth specifically told the FDA that "an evaluation of breast cancer risk would not be a subject" of this study.[181]  Wyeth did not disclose this fact to doctors. Second, the FDA summarized the results of this study as showing that five "new" breast cancers **developed"** after just a year of E+P use.[182]  All women enrolled in the pivotal study had a negative mammogram at the start of the study.  Despite, FDA's request, Wyeth refused to use the word "developed" in its label's warnings and changed the language to "was detected."[183]  Third, Wyeth did not tell doctors that the "clustering" of these five new cases in the E+P arm caused the FDA's medical officer concern.[184]  Fourth, Wyeth's own study investigator assessed that one of the five new cases was possibly caused by the drug after just one year of E+P use.[185]   Rather than inform doctors of the fact that Prempro might cause breast cancer after as little as one year of use,

---

[172]     PX 935, PX 251, PX 265
[173]     PX 287
[174]     PX 228, PX 1215
[175]     PX 66A
[176]     PX 228, PX 289R
[177]     PX 398, PX 492, PX 702, PX 824, PX 858, PX 904, PX 905
[178]     PX 651R; PX 21013 (Testimony of Dr. Michael Dey and Bernard Poussot)
[179]     Sworn Testimony of Poussot and Dey
[180]     PX 8155
[181]     PX 288 at p. 14, PX 20963, Trial transcript from _Barton v. Wyeth,_ 10/07/09AM at p. 100-101
[182]     PX 8081
[183]     PX 8081
[184]     PX 288 at p. 56, Trial transcript from _Barton v. Wyeth,_ 10/21/09AM at p. 117-118
[185]     PX 285 at p. 26-27, PX 1680, PX 8031, PX 20267, Trial transcript from _Barton v. Wyeth,_ 9/21/09AM at p. 68-71

Wyeth's label  instead reassured doctors with E only information that the only risk seen was for longer than 10 years of use.  Fifth, in a last minute inaccurate addition to its final Prempro launch label, Wyeth represented that this E+P study showed no higher incidence of breast cancer in E+P users than the expected background rate.[186]  But, Wyeth's own internal statistical analysis revealed that the incidence of breast cancer for E+P users in the study was actually one-third higher than the incidence of breast cancer reported in the background rate of the general population.[187]

38.   **_Sentence #5._**  **_In the three year clinical Postmenopausal Estrogen Progestin Intervention (PEPI) trial of 875 women to assess differences among placebo, unopposed Premarin, and three different combination hormone therapy regimens, one(1) new  case of breast cancer was detected in the placebo group  (n=174), one in the Premarin alone group (n=175), none in the continuous Premarin plus continuous medroxyprogesterone acetate group (n=174) and two (2) in the continuous Premarin plus cyclic medroxyprogesterone acetate group (n=174)._"**

This sentence implies that the PEPI trial provides some scientific evidence regarding E+P's breast cancer risk.  But Wyeth knew that the PEPI trial was not designed or powered to provide any breast cancer information.[188]

39.   **_PREMARIN LABELS_**

In 1983, Dr. Sidney Wolfe filed a Citizen's Petition which called for stronger and more definitive warnings in the Premarin labeling regarding the increased breast cancer risk of E and off-label E+P.  Dr. Wolfe wanted warnings that would inform a woman to only use hormone therapy "when absolutely necessary" and "at the lowest dose for short periods of times."[189] Before the publication of the WHI study, Wyeth provided either no - or inadequate - breast cancer warnings in the Premarin label about the use of E in combination with P.[190] The P label provided no human breast cancer warning.

40.   **_DEAR DOCTOR LETTERS_**

Drug companies use "Dear Doctor" or "Dear Healthcare Professional" letters to quickly and effectively communicate new risk or benefit information to health care professionals about a drug. These letters are sent to all prescribing physicians for that drug. Wyeth sent out "Dear Doctor" letters about hormone therapy a number of times over the years but those letters did not provide accurate and adequate information about hormone therapy, did not correct the inaccuracies of Wyeth's label and actually misrepresented the state of the science on the drug. For example:

---

[186]   Trial transcript from *Barton v. Wyeth,* 10/15/09AM at p. 99-102
[187]   PX 830 - at 18
[188]   PX 20941
[189]   PX 70 (Citizen Petition), PX 71
[190]   See, for example, PX 6479

**1989**: When the Bergkvist study was published showing a 4.4 increased breast cancer risk in long-term E+P users, Wyeth sent out a "Dear Doctor" letter which highlighted only the unopposed estrogen (E only) results and represented that  the study confirmed that "estrogen use was not associated with an increased risk of breast cancer… even with prolonged duration of therapy."[191] Wyeth buried a passing reference to the E+P findings in its letter and did not reveal that the relative risk for long-term use was reported as 4.4.  At the same time, Wyeth reassured doctors that "as the world leader" in this market, Wyeth was "dedicated to further research in the field to reach a more complete understanding of the risk-benefit equation."

**1995**:  When Dr. Colditz published in 1995 that there was a "significant increase in the risks of breast cancer and of death due to breast cancer" among hormone therapy users, Wyeth created a strategy with Burson Marstellar (Wyeth's public relations consultant) to "shift media focus" away from the study and to "undermine / cast doubt on validity of data."[192] Wyeth sent a "Dear Doctor" letter in which Wyeth cited Dr. Leon Speroff (who was not identified as a paid Wyeth consultant) as saying that despite some 40 observational studies, there was no consistent data of a link between hormone therapy and breast cancer.[193] Wyeth did not disclose that this reassuring quote had actually been generated a week earlier by Wyeth and its PR consultants and attributed to Dr. Speroff.

**1998:**   When Wyeth got a second higher P dosage formulation of  Prempro approved, Wyeth sent out a "Dear Doctor" letter to promote Prempro's daily use with higher P.[194]  In that letter, Wyeth listed the side effects of E+P as  "mastalgia, headache, and abdominal pain." Today, Wyeth warns that breast cancer is a side effect of E+P.[195]

**2000**:  Wyeth sent out a "Dear Doctor" letter in response to the publication of two studies (Ross and Schairer)[196] in early 2000. Both studies concluded that the risk of E+P was higher than the risk for E alone. Wyeth immediately formed the "Breast Cancer Containment" committee to craft an appropriate reaction for doctors and patients.[197]  For patients, the plan was to emphasize E+P's "bundle of benefits" including off-label (unapproved/unsupported) heart and brain benefits. An additional $40 million marketing budget was requested to "counter breast cancer news" and the plan was to use the off-label and unbranded Lauren Hutton Direct-to-Consumer campaign to help promote heart and brain benefit from E+P.[198]  For doctors, Wyeth generated a "Dear Doctor" letter.[199]  In this letter Wyeth reassured doctors that the breast cancer risk data from all of the published literature was "conflicting and inconclusive" and "more studies" were needed to get an answer.  In violation of FDA regulations – and in direct contravention to a specific promise made to the FDA by Wyeth a year earlier to stop any and all heart promotion[200]

---

[191]        PX 22C
[192]        PX 8744A, PX 21118
[193]        PX 1579
[194]        PX 22F
[195]        PX 862C
[196]        PX ML 98, PX ML 63
[197]        PX 519
[198]        PX 8151
[199]        PX 5775
[200]        PX 470, See also discussion above re: promotion for cardiac benefits

– Wyeth also told doctors that HRT is "associated with a reduced risk for developing heart disease" and that "Clearly, the most reassuring message is that these long-term benefits alone far outweigh the potential increased risks reported in the studies."  Wyeth attached to this letter a chart that purported to summarize the published literature on E and E+P as to the breast cancer risk. While Wyeth included the 1989 Bergkvist article on this list, Wyeth reported only the E alone results and did not note that the E+P relative risk from that study was 4.4.  A 4.4 relative risk would have been literally "off the charts" in the graphic provided by Wyeth.

**2001:**   In 2001, Wyeth wrote a letter to every member of American Congress of Obstetricians and Gynecologists ("ACOG") reassuring the members in the medical professional group that hormone replacement therapy was safe for very long-term use and stating that "women tend to stay on hormone replacement therapy (HRT) for a considerable period of time" with the "average time on HRT being 7.8 years" with one quarter of that group taking HRT "for more than 11 years."[201]  This letter encouraged doctors to be more proactive about placing all of their newly menopausal women on hormone therapy and leaving her on the therapy.  Wyeth reported to them that the most common side effects of E+P were "metrohagia, mastalgia, and alopecia." The letter did not mention the increased risk of breast cancer associated with long-term use.

41.    **_MEDICAL ARTICLES_**

Wyeth ghost-wrote dozens of published medical articles on HRT through its work with various consulting companies, including DesignWrite. [202]  In 1997, DesignWrite developed a publication plan with Wyeth to publish articles on two important marketing messages: (i) convince doctors that hormone therapy provides a multitude of benefits including the off-label and unproven heart and brain benefits; and (ii) dispel any negative perception about hormone therapy and breast cancer risk.[203]  The articles would focus on Wyeth's key marketing messages: 1) The benefits of hormone therapy outweigh the risks; 2) 3) hormone therapy provided a "bundle of benefits" including heart and brain protection and 3) there was no data to support a real breast cancer risk with hormone therapy.[204]

Wyeth's ghostwriting process involved the following course:  First, Wyeth outlined a message that it wanted delivered and prepared an outline for the needed article. Second DesignWrite would hire a technical writer (who was usually not a physician) to prepare a first draft of the article based upon provided citations from Wyeth.  Wyeth would review and edit the draft manuscript. Third, a physician would be approached about signing off on the article and publishing it under his or her name. DesignWrite would then finalize and submit the article to an appropriate journal for publication.  If the journal rejected the article, DesignWrite would resubmit it to another journal within 10 working days.[205]

---

[201]    PX 22J
[202]    Nacthtigall article: PX 8034, Bush article: ML 1933, PX 8155Z, PX 672, Eden article: PX 950Z, Freitas Article: PX 355, PX 356, PX 357, PX 358, DiSaia article: PX 20852, PX 8166, Fillit article: PX 20858
[203]    PX 937 at p.3
[204]    PX 938 at p. 5
[205]    PX 937 at p.8

As an example of Wyeth's goal to "dispel the perception" of hormones causing cancer," Wyeth developed the outline for an 8- to 10-page manuscript entitled, "Breast Cancer and Progestins." The design of the review article was to cast doubt on any association between E+P and breast cancer.[206] DesignWrite paid a technical writer to draft the manuscript[207] and selected Dr. John Eden as the "author."[208] Wyeth edited and approved each draft of the manuscript. DesignWrite sent the finished manuscript to Dr. Eden for his signature. Dr. Eden then submitted the paper for publication to a journal widely read by Ob/Gyns, as if he were the sole author. The final published article did not disclose either Wyeth's or DesignWrite's involvement in the creation, design, editing or approval of the article.

In the first quarter of 1998, Wyeth paid for five ghostwritten articles to "dispel the perception" of hormones causing cancer.[209] Wyeth hailed this program "as vital" and "a carefully designed media plan in overall public marketing."[210] Wyeth boasted that its Strategic Publications Development Program "set the scientific agenda through publications for ERT/HRT as a first line therapy for menopausal women." The ghostwriting plan's core messages enabled Wyeth to "disseminate messages that fill the gaps not addressed by current studies." At one point in time, Wyeth was tracking its involvement in 51 ghost-written articles.[211] Wyeth management even ordered its Publications Planning Committee to get at least "one positive piece" published each month. [212] Wyeth also "ghost-wrote" clinical expert reports used to get E+P approved.[213] Wyeth paid approximately $25,000 per article for DesignWrite's assistance.[214]

Wyeth took the dissemination of ghostwritten articles to a new level. For example, Wyeth played an active role in the development and editing of a review paper published by Dr. Trudy Bush.[215] In this review, Dr. Bush reassured physicians that there was no real evidence showing an increased risk of breast cancer for either E or E+P and that additional studies "are unlikely to alter this conclusion."[216] Wyeth then informed the FDA that it intended to copy and hand out to every prescribing physician a copy of Dr. Bush's article[217] but Wyeth did not disclose to the FDA – or any of the doctors – that it had played a critical role in the creation of the article.[218]

Wyeth did not disclose to the FDA or physicians that it was generating published literature through ghost-writing. Without such disclosure, Wyeth hid its involvement in the contents and conclusions of these articles.

---

[206]     PX 3296, PX 950Z
[207]     PX 0950Z
[208]     PX 950Z
[209]     PX 390
[210]     PX 585
[211]     PX 8155G
[212]     PX 1654, PX 954, PX 956
[213]     PX 8089
[214]     PX 4393
[215]     PX 8155Z
[216]     PX ML 1933
[217]     PX 672
[218]     Trial transcript from *Singleton v. Wyeth,* 2/4/10AM-p.103:12-114:2.

42. ***SALES REPRESENTATIVES***

Wyeth had a large and very active sales representative force that called regularly on prescribing physicians of E+P. The FDA cannot (and does not) regulate the daily interaction between Wyeth's sales representatives and physicians but Wyeth sales representatives, as agents of Wyeth, are required  to voluntarily self-police their own conduct and present a "fair and balanced" overview of prescription drugs, i.e. spend equal time discussing benefits as risks and present such risks in a truthful and accurate manner.[219]  Wyeth's sales representatives are prohibited from commercial promotion of drugs to healthcare providers for new and unapproved indications and claims.

Wyeth's sales representatives were trained in a standardized manner using a series of nationwide manuals and training programs.[220] They were told to "sell Prempro first on every call."[221]  Even though there was no long-term safety data on E+P, Wyeth trained its sales representatives to "increase sales by convincing Ob/Gyns" to prescribe hormone therapy for "all women for life."[222] At the launch of Prempro, Robert Essner, the President for Wyeth, spoke to the entire sales force.  He described the expected sales efforts for Prempro as a "Crusade" and not just a "typical pharmaceutical effort" and told the sales representatives that there were "no boundaries" and "no limits" to their sales efforts for the drug.   Robert Essner explained that the sales force were "embarking on a mission" to create a world in which "the vast majority of women would begin taking HRT at menopause and continue on it for the rest of their lives."[223]

I have reviewed the Wyeth database of Call Notes from its sales representatives as to what was discussed with physicians nationwide.[224] Wyeth's sales representatives promoted hormone therapy for unapproved benefits for heart and brain and downplayed the breast cancer risk in discussions with physicians. Several sales representatives and sales trainers even wrote Wyeth's management complaining that they were being told to promote for off-label benefits, a practice that made them feel uncomfortable.[225]

When new articles were published in the medical literature showing increased breast cancer risk, Wyeth instructed its sales representatives to not discuss those articles with the physicians or to "initiate discussion" about the study findings but instead to focus on the benefits of therapy.  For example:

**1989**: A Swedish research group, led by Dr. Bergkvist, published one of the first studies differentiating between E alone and E+P use and risk of breast cancer with prolonged use.  The

---

[219]     PX 1651

[220]     PX 179, PX 293, Testimony from John Ryan, Wyeth executive in charge of sales representative training, Testimony of Brett Hendricks, Wyeth sales trainer.

[221]     PX 711

[222]     PX 1565A

[223]     PX 920A

[224]     Leapfrog and SalesWorks Call Notes Database

[225]     PX 557, PX 1450, PX 1449, PX 891, PX 892, PX 890, Wyeth's Call Notes Database, Deposition of former sales representative Edward DeAngelo,  Trial testimony of Brett Hendricks in *Singleton v. Wyeth* and *Rowatt v. Wyeth*,  Deposition of sales representative Charles Payne

Bergkvist study showed a 4.4 increased breast cancer risk in E+P users.[226]  Wyeth instructed its sales representations: "Under no circumstances should you initiate discussions concerning this study."[227]

     **1997**: The Collaborative Group published a review in the Lancet showing an increased risk with E+P for breast cancer.[228] Wyeth told its sales representatives to not "raise" or discuss this article "with your doctors unless they mention them to you."[229]

     **2000**: Drs. Ross and Schairer published two articles in consecutive months early in 2000. Both studies showed increased risk of breast cancer with combination hormone therapy and that E+P had a higher risk than E alone.[230] Wyeth instructed its sales representatives to tell doctors that, despite these studies, the breast cancer risk was "not proven" whereas the "the long and short term benefits" including heart and brain were proven.[231]

## 43. *PROMOTIONAL PIECES: TO PHYSICIAN*

     Wyeth used both branded and unbranded promotional pieces to convey its marketing messages to physicians.  Wyeth also advertised heavily in medical journals and provided many patient education promotional pieces which were designed to educate both the physician and patient and assist in the counseling discussions.[232]  In 1996, Wyeth recognized a need to train or "coach" their sales representative on how to "insure effective delivery of the unbranded message with a smooth transition" to the "specific selling message" for Wyeth's drugs.[233] Wyeth's sales representatives were trained that "when using one of the growth time tools (i.e. unbranded)" they should "always transition to the branded tools and the "Say Yes" message."[234]  This blending of unbranded and branded messages is not appropriate when not fairly balanced and accurate.

## 44. *PHYSICIAN EDUCATION / CMES / TELECONFERENCES*

     Wyeth used physician speakers or Opinion Leaders to educate and lecture to other physicians about the risks and benefits of hormone therapy. For example:

     (a)     Wyeth sales representatives identified high prescribing and hormone therapy advocate doctors in every area and recruited those physicians for membership on Wyeth's Visitor Speaker Bureau ("VSB"). Sales representatives were trained to be "selective" and to "evaluate physicians carefully" to ensure that the speakers were true product advocates.[235] Wyeth wanted physicians who "would do a good job of selling that medication" since Wyeth

---

[226]     PX ML 600

[227]     PX 114

[228]     PX ML 22

[229]     PX 20957

[230]     PX ML 98 (Ross, 2000), PX ML 63 (Schairer, 2000)

[231]     PX 520

[232]     For Example, PX 379 (Patient Action Counseling Center pieces)

[233]     PX 361

[234]     PX 711 at p. 22

[235]     PX 1093

was "essentially hiring these physicians to sell for them."[236] Once selected, the speakers were flown to resorts for training.[237]   At these training sessions, Wyeth provided physicians and educators with standardized speaker training manuals and Wyeth's pre-prepared slide kits for use at all the VSB lectures.[238]  The VSB speakers would then do speeches at dinners or lunch-n-learn events to educate other physicians about menopause, hormone therapy and Wyeth's drugs. Wyeth provided visual aides and slides for use at these presentations which highlighted heart and brain benefit and discounted or did not address breast cancer risk.

(b)     Wyeth also arranged teleconferences where physicians could earn CME hours by listening to a presentation on the phone.[239]  These teleconferences gave Wyeth an opportunity (without FDA review or oversight) to educate doctors on "cardiovascular effects of menopause" and were an "opportunity to downplay breast cancer."[240] There were teleconferences focused on the off-label use of hormone therapy for heart benefit.[241]

## 45.     *MEDICAL ASSOCIATIONS*

Wyeth had a strong and long-standing relationship with ACOG including decades of significant financial support.[242] Wyeth considered ACOG an ally in Wyeth's defense of HRT and described ACOG as a third party that Wyeth could "tap" for support if a negative study was published.[243]  Wyeth was successful at getting the ACOG Patient Education Pamphlets on menopause and hormone use changed to include discussion of unproven heart benefit.[244] The revised ACOG patient pamphlet reassured patients that hormone therapy drugs "can guard against the risk of heart disease, which tends to increase after menopause."[245] Wyeth acknowledged influence over the inclusion and retention of cardiac benefit representations for hormone drugs "in official statements of key organizations such as AHA and ACOG."[246]

Because of Wyeth's positive relationship with ACOG, Wyeth had access to ACOG members and the media at ACOG meetings[247] and was permitted to use ACOG's mailing lists to send out letters to all Ob /Gyns which promoted hormone therapy for long term use (7-11 years)[248], providing copies of selected abstracts or published articles for review by the physicians.[249]  Wyeth also provided financial support for ACOG's newsletters and CME

---

[236]     Testimony of former Wyeth sales trainer, Brett Hendricks in *Singleton v. Wyeth*, 1/22/10 AM at p. 77-79

[237]     *Id.*

[238]     PX 9200

[239]     PX 667

[240]     PX 20967, PX 411

[241]     PX 771 at p. 33

[242]     PX 458, PX 662, PX 5733

[243]     PX 341, PX 683

[244]     PX 1097

[245]     PX 982

[246]     PX 473

[247]     PX 1315, PX 1662

[248]     PX 22J

[249]     PX 1311

publications for doctors.[250]  Wyeth sponsored programs for new Ob / Gyn residents at ACOG conventions.[251]

46.    ***REFERENCE MATERIALS / TEXTBOOKS***

Wyeth participated in the editing, creation, content and distribution of various reference materials and textbooks for physicians and patients.  Wyeth would purchase large volumes of these books and materials to distribute them to residents and physicians.  Rather than use this outlet of information to provide accurate details about the risks and benefits of hormone therapy, Wyeth instead emphasized off-label and unproven benefits, while minimizing the risk of breast cancer. For example:

(a)    Wyeth influenced the content of Novak's Gynecology, the most frequently used reference textbook for Ob/Gyns.  As Wyeth acknowledged, "pursuant to Medical Affairs' interaction with the author, the latest edition of Novak's Gynecology ("the gynecologists' Bible") contains information regarding the benefits of estrogen in cognitive functioning as well as Alzheimer's disease."[252]

(b)    Wyeth sponsored a Menopause Handbook for distribution to prescribing physicians.  Wyeth noted that the menopause handbook authored by Dr. Frances Batzer was "available for sponsorship" and could be a 2001 marketing "tactic" since "the handbook will be updated before the next printing, and the sponsor will have input into that process." Plus, Dr. Batzer seemed "open to collaborating with other experts" selected or suggested by Wyeth. Wyeth had its sales representatives distribute copies of the handbook to prescribing physicians.[253]

(c)    Wyeth had a textbook program in which Wyeth purchased reference texts and gave them to internal medicine and family practice residents. One such book, "A Clinical Guide for the Care of Older Women" was written by a Wyeth consultant, Dr. Leon Speroff, but his on-going relationship with Wyeth was not disclosed to the readers.[254]

(d)    Wyeth produced free newsletters that were distributed to physicians.  In these publications, Wyeth reassured doctors that there was no breast cancer risk with hormone therapy and stated that the Government approved labeling "says flatly" that "the majority of studies have not shown an association" for breast cancer with the usual doses used.[255] Wyeth also used these newsletters to promote hormone therapy for cardiac prevention and stated "many medical experts agree that HRT provides another kind of long- term benefit: protection against heart attacks and strokes due to atherosclerosis, the No. 1 killer of women after age 50."

---

[250]    PX 1341, PX 1326, PX 1311
[251]    PX 1665
[252]    PX 1061
[253]    PX 21038
[254]    PX 202
[255]    PX 242E

(e)     For lay/patient reference materials, Wyeth and its PR consultants "worked directly" with the medical writer for the Good Housekeeping Guide to Women's Health (a "comprehensive guide to women's health") and "contributed much of the information in the book's "Menopause" chapter." Because of this involvement, heart disease, memory loss and Alzheimer's disease are "focused on" in the reference materials for women as menopause-related disorders that hormone therapy "can prevent."[256]

47.     ***PROMOTIONAL PIECES / ADVERTISEMENTS DIRECTED TO PATIENTS***

Wyeth spent tens of millions of dollars annually on direct-to-consumer ("DTC") advertising to educate patients about menopause and hormone therapy and to promote hormone therapy to menopausal women.  Wyeth had DTC ad campaigns that were "multi-million dollar blitz in every sense of the world" since "9 out of 10 women in the country reading these magazines will see our new campaign not once, but almost 13 times."[257] The DTC advertisements described great benefits of E+P hormone therapy but did not list breast cancer as a possible risk of the drug and reassured women that the only issue needed to be discussed with their physician on that topic was whether or not they had a family history of breast cancer.[258] Wyeth utilized unbranded advertisements because its research showed that, since Wyeth dominated the hormone therapy field, any advertisement that solely discussed menopause and hormone treatment in general would "drive" patient's into their doctor's offices and 80-90% of the time the patient would end up receiving a Wyeth hormone therapy drug prescription.[259]

48.     ***MEDIA / LAY PRESS***

Physicians and patients both usually read or are exposed to messages in the newspaper or on TV.  Press releases, advertorials,[260] letters to the editor and news articles are an easy and often utilized way to convey information about a drug.  Drug companies can, and have, bought full page ads in newspapers to convey important new safety or efficacy information.[261]  Wyeth was able to utilize this information method for hormone therapy and ghost-wrote Letters to the Editor on behalf of its physician consultants to respond to negative press.  For example:

(a)     In 1998, Wyeth and its PR consultants worked closely and "supplied much information" to the author of an article published in *Good Housekeeping*.[262] As reported, "We are pleased with the results. You will note that this article includes much information surrounding HRT and ERT, and cardiovascular disease, Alzheimer's disease." There is a further discussion on "how to merchandise this publication both internally and externally."

---

[256]     PX 307, PX 307B
[257]     PX 5609
[258]     Wyeth's TV advertisements (PX 7224, PX 7227), PX 9256, PX 9299A, PX 9257, PX 9260, PX 497
[259]     PX 461
[260]     PX 512
[261]     Wyeth purchased a full page ad in every major newspaper after the WHI study to discuss its findings.
[262]     PX 21003

(b)      When *USA Today* published a negative article about the risks and benefits of hormone therapy, Wyeth had its consultant, Susan Wysocki, President of National Association of Nurse Practitioners in Women's Health, write a letter to the editors complaining about the negative information.[263]  Ms. Wysocki did not disclose that she was a paid consultant of Wyeth.

(c)      When Wyeth internally felt that the medical journal *JAMA* was publishing "consistently negative" articles about hormone therapy, Jeanne Marie Durocher (Wyeth's marketing executive) requested a meeting with the JAMA editorial board to discuss its coverage. [264]  While "it is unusual for a JAMA editor to meet with pharma," Wyeth noted that how much money Wyeth has spent on advertising in JAMA is "good leverage" to get a meeting and the publisher and VP of publishing "will work behind the scenes to make sure that the meeting happens." [265]  Wyeth asserts that "as a consistent supporter of JAMA and other AMA publications over the years, we believe a meeting of both sides is called for at this time."[266]

49.      *ACCURATE AND ADEQUATE WARNINGS*

Wyeth should have provided additional information and warnings to physicians in order to accurately and adequately convey the risks and benefits of E+P such as:[267]

- Include a black box warning of the risk of association of invasive breast cancer;
- Use of E+P can cause breast cancer;[268]
- Breast cancer is a side effect of E+P use;
- The elevated risk occurs at all doses of E+P (not just higher dose);
- E+P has a different and higher risk for breast cancer than use of E alone;
- The elevated risk of breast cancer from E+P use occurs quickly (and sooner than before 10 years of use);
- The increased breast cancer risk from E+P use rises with each year of use;
- E+P can cause an increase in breast density which can obscure the detection of breast cancer on mammography;[269]
- Breast cancer in E+P users can be found as larger lesions and at a more advanced stage when diagnosed;

---

[263]      PX 684, PX 696

[264]      PX 708

[265]      PX 712

[266]      PX 713

[267]      Parisian trial testimony in *Singleton v. Wyeth*, 1/27/10PM at p. 116:25- 127:3

[268]      PX 21027, PX 21028, PX ML 4681 (Colditz: E+P causes breast cancer), PX ML 4196 (MacMahon: E+P is one of three known causes of breast cancer), PX ML 2980 (Li: WHI study showed that E+P was "causally related to breast cancer"),  PX 8078B (Dr. Larry Norton from Sloan Kettering: 30% of the breast cancers in post-menopausal women "were caused by E+P"), PX 866B (IARC:  E+P is carcinogenic in the human breast), PX ML 5087 (Fournier:  Many epidemiological studies have concluded that  E+P is carcinogenic in the human breast), PX 10556 (Wyeth website: HRT increases the risk of developing and dying from breast cancer), Deposition and trial testimony of Dr. Michael Dey (President of Wyeth).

[269]      PX 3496

- There is an increased chance of dying from E+P induced breast cancer;[270]
- The breast cancer risk is further increased for susceptible populations[271] such as women with thin or normal build;[272] women with a lower bone mass density;[273] women with natural breast density;[274] women who develop breast tenderness when they start taking E+P;[275] women who start E+P at the time of menopause or within a short time frame from the start of menopause (no gap time);[276] and women who are current users at the time of diagnosis;[277]
- E+P is not appropriate for all women and has serious side effects;
- E+P should be used only as second line treatment and only after other alternatives have failed;
- Hormone therapy should be prescribed only at lowest doses and for the shortest possible duration;[278]
- MPA or medroxyprogesterone acetate is not natural human progesterone; the biological effects of MPA are more diffuse and more potent than natural progesterone ;
- E+P does not convey any heart benefit and the regimen should not be prescribed for this purported benefit;
- E+P can increase a woman's risk of having a cardiovascular event;
- E+P does not convey any cognitive benefit or prevent dementia and the regimen should not be prescribed for this purported benefit;
- Women treated with E+P have a greater risk of developing dementia; and
- There is a higher incidence of mammographic abnormalities requiring medical attention and follow-up in E+P users.


## <u>RISKS OUTWEIGH THE BENEFITS</u>


50.    E+P was defectively designed because the risks of use of combination hormone therapy outweigh its benefits.[279]  Wyeth documents show that it was aware that a true description of the risks and benefits of E+P would negatively tip the scales for physicians and prevent them from prescribing this drug.[280]  E+P has a real, significant and substantial risk of causing breast cancer

---

[270]    PX 10556
[271]    PX 172
[272]    PX ML 671, PX ML 22, PX ML 117, PX ML 2486, PX ML 63, PX ML 4580, PX ML 4681, PX ML 6105, PX ML 6062, PX 354, PX 550, PX 811, PX 21048, PX 8077, Trial testimony of Dr. Cheryl Blume in *Daniel v. Wyeth,* 1/10/07 PM at p. 22-23, p. 36-44.
[273]    PX 346
[274]    PX ML 6105, PX ML 6042, PX ML 5656, ML 3422
[275]    PX ML 532
[276]    PX ML 5753, PX ML 5167
[277]    PX ML 6062
[278]    PX 3493
[279]    *See,* for example, PX ML 30
[280]    PX 910R

by promotion as well as increases the risk of blood clots, heart events[281] and clinically meaningful cognitive decline.[282]  The requirement for Wyeth to update its Prempro label to warn of the risk of breast cancer was not 'medical causation' but rather 'causal association.'[283]  Long before the WHI in July 2002 and before the Prempro pivotal study, there was data in the medical literature to support a 'causal association' of E+P with increased risk of breast cancer. Yet, Wyeth failed to update its own labels to warn physicians and women of the potential increased risk.  E+P has limited benefits and does not provide any heart protection benefit or protection from the development of Alzheimer's disease or cognitive decline.  E+P is only indicated for a limited group of women as second line treatment.[284]

51.     There were a number of safer alternatives available for women who took E+P[285] including (a) Using no therapy at all since menopausal symptoms are a part of the natural aging process, are transient and not life-threatening;[286] (b) Using herbal alternatives; (c) Using topical creams or gels for vaginal issues; (d) Using cardiovascular drugs  for heart protection; (e) Using alternative drugs for treatment of patients at identified risk of osteoporosis;[287] (f) Using combination therapy at lowest doses for the shortest periods of time;[288] and (g) Using natural progesterone instead of synthetic progestin or medroxyprogesterone acetate.[289]

52.     In summary, after careful review of sworn testimony and thousands of documents, it is my opinion that (i) Wyeth knew or could have known that E+P was associated with an increased risk of breast cancer by promotion but failed to adequately warn of the increased risk[290];  (ii) Had Wyeth conducted studies designed to look specifically at breast cancer risk, it would have appreciated E+P's true risks by the late 1980s and could have provided adequate warnings of those risks; (iii) Wyeth promoted E+P for off-label purposes which encouraged long-term use of E+P for illusory cardiovascular and cognitive benefits, thus placing patients at risk of developing breast cancer, since the breast cancer risk increases with duration of use; (iv)  Instead of adequately warning physicians and consumers of the risk of breast cancer, as Wyeth understood from the current science, Wyeth downplayed, dismissed or minimized this data thereby preventing physicians and patients from making an accurate and informed risk v. benefit assessment of E+P; and (v) Prempro was defective as designed.

---

[281]     PX ML 19
[282]     PX ML 29
[283]     21 CFR§ 201.57 (after 2006 21 CFR §201.80)
[284]     PX 862B and 862C
[285]     Parisian trial testimony in *Singleton v. Wyeth*, 1/27/10PM at p. 129:14-132:10
[286]     PX 188
[287]     PX ML 8
[288]     As recommended for use today, PX 862B and 862C, FDA recommendations for hormone therapy – PX 21129
[289]     See, Parisian report on natural progesterone dated March 2007, PX ML 2099
[290]   21 CFR§ 201.57, after 2006 21 CFR § 201.80

53.     I am over the age of 21 years, am of sound mind and body, have never been convicted of a crime and am capable of making this declaration. I affirm based on personal knowledge and under the penalty of perjury that the foregoing statements and opinions contained in this declaration are true and correct.


Suzanne Parisian, M.D.

September 16, 2011

Exhibit A

Exhibit A

# LEGAL TESTIMONY HISTORY
## Suzanne Parisian, M.D.
## COURT TESTIMONY
## 2006- September 1, 2011

**08/11/11**   Stuart A. Davis, et al. v Breg, Inc.
       Case No. CV-09-144-BLG-RFC
       United States District Court
       District of Montana
       Billings Division, MT

**07/13-4/11**  Leah Royce Hines v Wyeth, et al
       Civil Action No.: 2:04-cv-0690
       United States District Court
       Southern District of West Virginia
       Charleston Division, WV

**06/20/11**   Talley v Novartis Pharmaceuticals Corporation Returning Trial
       Case 3:08-cv-00361-GCM
       United States District Court,
       Western District of North Carolina
       Charlotte, NC

**05/18/11**   S. Johansen vs. Baxter International, Inc. and Baxter Healthcare Corp.
       RE: Heparin Products Liability Litigation
       Circuit Court of Cook County
       Illinois County Depart. Law Division
       Chicago, IL

**05/02/11**

**04/11/11**   Samuel Deutsch, Beth Forman vs. Novartis Pharmaceuticals Corp.
       09-CV-4678 (ADS)/(WDW)
       United States District Court
       Eastern District of New York
       Central Islip, NY

**01/27/11**   Alison Rosenberg & Herbert Rosenberg vs. Merck Sharp & Dohme Corp.
       Docket No. ATL-L-3644-08-MT
       Superior Court of New Jersey Law Division: Atlantic, City
       Atlantic City, NJ

12/13-4/10 Helen Rivera Adams, et al. vs. Wyeth, Inc, et al.
      Civil Action No.3:03-cv-1713-JAF
      United States District Court
      District of Puerto Rico
      San Juan, PR

11/21-23/10 Georgia Torkie-Tork vs. Wyeth, Inc., et al.
      Cause No. 1:04cv945
      United States District Court,
      Eastern District of Virginia
      Alexandria Division, VA

11/8-12/10 Anna C. Blyth, a Minor, by Dennis Blyth, Guardian vs. GlaxoSmithKline LLC
      Court of Common Pleas Philadelphia County
      September Term 2007, No. 3305
      First Judicial District of Pennsylvania
      Philadelphia, PA

11/05/10 Judith Graves vs. Merck & Co., Inc.
      Case No. 1:06-md-05513 JFK
      United States District Court
      Southern District of New York
      New York, NY

11/02-3/10 Estate of Rita Fussman vs. Novartis Pharmaceuticals Corporation
      06-CV-000149
      US District Court,
      Middle District of North Carolina
      Winston-Salem, NC

09/29/10 Jane Bessemer vs. Novartis Pharmaceuticals Corporation
      In RE: Zometa/Aredia Litigation
      Civil Action Case No. 278 MY
      Superior Court of New Jersey
      Law Division: Middlesex County
      Newark, NJ

09/22/10 J. Huerta, C. McClellan, D. Avidson  vs. DJO,  I-Flow Inc, Pacific Medical, Inc.
      United States District Court
      District of Oregon
      Portland, OR

08/12/10 Christopher Thorpe vs. Davol, Inc. and C.R. Bard, Inc

2

CA No. 08-463ML
United States District Court,
District of Rhode Island
Providence, RI

**06/16/10**    Shirley Boles vs. Merck & C., Inc.
Case No. 1:06-CV-09455-JFK
United States District Court
Southern District of New York
New York, NY

**4/23-&26/10**    Susan Bush, as Executrix of the Estate of Michael Bush vs. Ethicon, Endo-
Surgical, Inc., Ethicon Inc and Johnson and Johnson
County of Queens
Supreme Court of the State of New York, NY

**04/21/10**    Louise H. Maley vs. Merck & Co., Inc.
In RE: Fosamax Product Liability Litigation
Case No. 1:06-CV-4110-JFK
United States District Court,
Southern District of New York
New York, NY

**04/13/10**    In RE: Trasylol Products Liability Litigation-MDL-1928
Case No. 08-MD-01928-Middlebrooks/Johnson
United States District Court,
Southern District of Florida
Palm Beach County, FL

**03/29-30/10**    John Whitfield vs. Davol, Inc. et al.
In RE: Kugel Mesh Hernia Repair Patch Litigation
MDL Docket No. 07-1842-ML
Case No. 1:07-CV-01918-ML-LDA
United States District Court,
District of Rhode Island
Providence, RI

**03/01/10**    RE: St. Jude Medical, Inc and St. Jude Medical Canada, Inc.
Court File No. 00-CV-195906CP
Superior Court of Justice
Ontario, Canada

**01/29-2/2/10**    Cheryl Foust vs. Wyeth, Pfizer
Court of Common Pleas Philadelphia County

3

First Judicial District of Pennsylvania
Philadelphia, PA

01/25-28/10    Singleton vs. Wyeth, Pfizer
Court of Common Pleas Philadelphia County
First Judicial District of Pennsylvania
Philadelphia, PA

01/08/2010    Matthew Beale vs. I-Flow
Multnomah County Circuit
Portland, OR

10/26-8/09    Donna Kendall vs. Wyeth, Upjohn, Pfizer Pharmacia
Court of Common Pleas Philadelphia County
First Judicial District of Pennsylvania
Philadelphia, PA

10/15/09    Peggy L Stevens vs. Novartis Pharmaceuticals Corporation & John Does 3-5
Montana Fourth Judicial District Court
Missoula County, MT

9/18&22/09    Lyam Kilker, A Minor, Michelle David, As Next Friend and Individually vs.
SmithKline Beecham Corp d/b/a  GlaxoSmithKline
Court of Common Pleas Philadelphia County
February 2007, No. 001813
First Judicial District of Pennsylvania
Philadelphia, PA

08/31/09    Jodi McGookin, As Mother of the deceased Samantha McGookin, et al. vs.
Guidant Corporation, et al.
No. 71D07-0608-CT-00192
State of Indiana, County of St. Joseph
St. Joseph Superior Court, IN

8/19-20/09    Shirley Boles vs. Merck & C., Inc.
RE: Fosamax Products Liability Litigation
Case No. 1:06-CV-09455-JFK
United States District Court,
Southern District of New York
New York, NY

07/9/09    RE: Fosamax Products Liability Litigation
Master File 1:06-MD-1789(JFK)

United States District Court,
Southern District of New York
New York, NY

**2/26, 23/09**    D. Grossnickel, et al. vs. Stryker Corporation, et al.
Multnomah County Circuit
Court Case No. 0703-0284
Portland, OR

**1/29-30/09**    Kimberly Zundel & Charles Zundel, Stephanie Zundel vs. Johnson & Johnson;
McNeil Consumer Healthcare
Middlesex County Docket No. MID-L-6854-05
Superior Court of New Jersey, NJ

**12/01/08**    Lisa Ann Seeno vs. Mentor Corporation and Does One through 100, inclusive
Case No.: RG06264787
County of Alameda
Superior Court of California, CA

**08/19-20/08**    Wesley Webster vs. Body Dynamics, Inc., The Pantry Inc., Nittany
Pharmaceuticals, Inc.
Case No: 01-01-CA-137, Division J
Circuit Court of the Eight Judicial Circuit,
Alachua County, FL

**07/21-24/08**    A. Woods vs. Pfizer, Upjohn, Pharmacia
Clark County District Court of Nevada
Eight Judicial District
Las Vegas, NV

**02/15/2008**    P. Singh & H. Kaur vs. Edwards Lifesciences Corporation, et.al.
No: 05-2-12213-5
County of Snohomish
Superior Court State of Washington, WA

**2/12-13/08**    Donna Scoggins vs. Wyeth, Pfizer
United States District Court,
Eastern District of Arkansas
Western Division,

Little Rock, AR

04/26/07   Carolyn Reece vs. AstraZeneca Pharmaceuticals, LP; AstraZeneca LP
           Case No. C-1-05-322
           U S District Court,
           Southern District of Ohio
           Western Division, OH

4/18-19/07   Merle Simon vs. Wyeth, Pfizer
             Case No: 040604229
             Court of Common Pleas
             Philadelphia, PA

02/28/07   Becky Masters vs. Eniva Corporation
           Fourth Judicial District Personal Injury
           District Court, Court No. 27-CV-06-6071
           County of Hennepin,
           State of Minnesota
           Minneapolis, MN

6/7-9/06   E. Doherty and D. Doherty vs. Merck & Co, Inc
           Docket No.: ATL-L-0638-05-MT
           RE: Vioxx Litigation
           Case Code No. 619
           Superior Court of New Jersey Law Division: Atlantic, City
           Atlantic City, NJ

03/20/06   V. Buonocore, Estate of C. Buonocore vs. Cardeon Corporation, et al.
           CIV 438695
           Superior Court of State of California
           County of San Mateo, CA

03/16/06   Martha Stewart vs. Sulzer, LTD
           No. BC 262780
           Superior Court State of California for the County of Los Angeles
           Los Angeles, CA


## DEPOSITION TESTIMONY
## 2006- September 1, 2011

08/23/11   Heygood,Orr & Pearson

William Ratliff et al. Mylan, Inc., Mylan Pharmaceuticals, Inc. et al
Case No. 10-C-6
Circuit Court of Gilmer County, West Virginia

08/01/11  The Doyle Firm PC
Lindsay Miller v I-Flow Inc., a Delaware Corporation; and DJO LLC, et al
No. 2:09-CV-09-0813-PHX-SRB
United States District Court
District of Arizona, AZ

07/20/11  Hersh & Hersh
Ellen Ambroff et al v American Medical Systems, Inc.
Case No. C08-04289 JL
United States District Court
San Francisco-ECF Program, CA

08/18/11
07/06/11  Matthew L. Sharp
Michael Washington, et al. v Endoscopy Center of Southern Nevada, LLC et al.
Case No. A558164
District Court
Clark County, NV

04/28/11  McGlynn, Glisson &Mouton
Gary Pierce, et al. v. Lemuel Granada, MD, Mental health Resources, Inc. and
Janssen Pharmaceuticals Products, LP and Johnson and Johnson, Inc.
D-0905-CV-0200300174
Ninth Judicial District Court
County of Curry, NM

04/01/11  ER Centers of America, Inc. vs. Sybaritic, Inc., et. al.
Cause No. DC-10-04558
D-95th Judicial District Court of Dallas County, TX
Dallas, TX

01/23/11  Motley Rice LLC
Steven M. Ingrams & Kelley Dawn Ingram vs. Davol, Inc., & C.R. Bard, Inc.
C.A. No: PC-07-4701
In the Superior Court of Rhode Island
Providence, RI

**01/21/11**      In RE: Heparin Products Liability Litigation
                 MDL No. 1953
                 Case No.:1:08-he-6000
                 United States District Court
                 Northern District of Ohio, OH

**01/17/11**      Carter Law Firm
                 Dawn Ingold, et al. vs. Kindred, LLC and Novartis Pharmaceuticals Corp
                 Case No. 06 L 415
                 Circuit Court of the Tenth Judicial Circuit
                 Peoria County, IL

**01/10/11**      Luvera Law firm
                 Jennifer Bailey vs. Medtronic, Inc, Medtronics MiniMed, Inc, et al
                 No. 08-2-33955-6KNT
                 Superior Court of Washington for King County
                 Seattle, WA

**12/3/10**       Miller, Curtis & Weisbrod, LLP
                 Colleen & Steve Lyman vs. Pfizer, Inc., Wyeth, Inc, Schwarz Pharma, Inc et al.
                 C.A. No. 2:09-CV-262
                 United States District Court for the District of Vermont, VT

**10/12/10**      Motley Rice LLC
                 In RE: Kugel Mesh Hernia Repair Patch Litigation
                 Delza Ozell Cain Young vs. Davol, Inc. and C.R. Bard, Inc.
                 Civil Action No.: PC07-3666
                 In the Superior Court of Rhode Island
                 Providence, RI

**09/02/10**      In RE: Avandia Marketing, Sales Practices and Products Liability Litigations
                 MDL No. 1871 07-MD-01871-CMR
                 United States District Court,
                 Eastern District of Pennsylvania
                 Philadelphia, PA

**12/17/10**
**08/31/10**      Toma  Zensen
                 Donna M. O'Brien vs. Johnson & Johnson, Ethicon, Inc.
                 Superior Court Department
                 Docket No.: PLCV2004-01069

Commonwealth of Massachusetts
Plymouth, MA

08/26/10     Law Offices of William S. Druckman
             Shirlean Meade vs. Deidre Parsley DO, Wyeth, Inc.; Schwarz Pharma, Inc.
             PLIVA, Inc; TEVA Pharmaceuticals, Inc.
             Case No.: 2:09-0388
             United States District Court,
             Southern District of West Virginia
             Charleston, WV

08/26/10     Miller, Curtis & Weisbrod, LLP
             Odessa Mosley vs. Wyeth, Inc; Schwarz Pharma, Inc.; PLIVA USA, Inc. Actavis-
             Elizabeth, LLC
             Civil Action No. 1:09-cv-00284-M
             United States District Court,
              Southern District of Alabama
             Mobile, AL

07/07/10     Janet, Jenner, & Suggs, Inc.
             Frederick Scaccia and Jean Scaccia vs. Sgarlato, Inc, Hospira Inc.,  Abbott
             Laboratories
             Case N: 312486V
             Circuit Court
             Montgomery County, MD

07/02/2010   Childers, Schlueter & Smith, LLC
             Amy Clanton, et al, vs. Mylan Pharmaceuticals Inc., et al
             In the Circuit Court of Kanawha County
             No. 08-C-918, WV

06/04/2010   Williams, Love, O'Leary & Powers
             Adam Phillipi vs. Stryker Corporation
             Case No. 2:08-CV-024450-JAM-KJN
             United States District Court,
             Eastern District of California
             Sacramento Division, CA

05/14/2010   Meyerson & O'Neill, Inc.
             Patricia Munion et al. vs. Advanced Medical Optics, et al.
             C.A. No. 07-cv-5377
             United States District Court, NJ

04/09/10       Miller, Curtis and Weisbrod, LLP
Susan Schrock & Steve Schrock vs. Wyeth, Inc., Schwarz Pharma, Inc., Pliva
USA, Inc. Barr Pharmaceuticals, Inc. Actavis, Inc & Actavis Elizabeth, Inc.
Case No.: 5:08-CV-00453M
United States District Court,
Western District of Oklahoma
Oklahoma City, OK

02/19/10       Motley Rice LLC
In RE: Kugel Mesh Hernia Repair Patch Litigation
John Whitfield vs. Davol, Inc. et al.
MDL Docket No. 07-1842-ML
CA No. 1:07-CV-01918-ML-LDA
United States District Court,
District of Rhode Island,
Providence, RI

02/03/2010    Seeger & Weiss LLP
RE: Zometa/Aredia Litigation
CA Case No. 278 MY
Superior Court of New Jersey
Law Division: Middlesex County
Newark, NJ

11/21/09       Weltchek, Mallahan & Weltchek LLC
Travis Ring, Minor, by his Parents & Next Friends, John & Karen Ring, et al., vs.
Anne Arundel Health Systems, Inc. et al.
Case No. 02-C-04-101741
Circuit Court for Anne Arundel County, MD

11/04/09       Tracey Law Firm
Shauna McMurray, as Natural Parent I.K.M and M.A.M, Minor Children vs.
SmithKline Beecham Corporation d/b/a GlaxoSmithKline
Case No.:08-CV-381-GKF-TLW
United States District Court,
Northern District of Oklahoma, OK

11/02/09       Levin Simes Kaiser & Gornick LLP
Gerber, et al. vs. Bayer Corporation, et al.
Case No. CGC-07-468577
Superior Court of the State of California- Complex
Judicial Council Coordination Proceeding No. 4546
County of San Francisco, CA

10/30/09  Lee Smart P.S., Inc.
     Julie Lee and on behalf for minor child Dakota Lee vs. Clinical Innovations, Inc.
     No. 08-2-20132-5SEA
     Superior Court of the State of Washington
     King County, WA

10/13/09  In RE: Gadolinium Based Contrast Agent Products Liability Litigation
     Case No. 1:08 GD 50000 MDL N. 1909
     United States District Court,
     Northern District of Ohio Eastern District
     Cleveland, OH

10/07/09  In RE Trasylol Products Liability Litigation- MDL-1928
     Case No. 1:08-MD-01928-Middlebrooks/Johnson
     United States District Court,
     Southern District of Florida
     West Palm Beach, FL

10/02/09  In RE: Boston Scientific Corporation Securities Litigation
     Master File No. No. 0:05-cv-11934(DPW)
     United States District Court,
     District of Massachusetts
     Boston, MA

09/29/09  Williamson & Rusnak
     Tara Vitatoe, individually and as next friend and natural mother of Jacobie
     Vitatoe, a minor vs. Mylan Pharmaceuticals, Inc., Mylan, Inc., and Mylan
     Laboratories, Inc.
     Civil Action No. 1:08CV85-IMK
     United States District Court,
     Northern District of West Virginia,
     Charleston, WV

08/22/09  Worden & Thane P.C.
     Peggy L Stevens vs. Novartis Pharmaceuticals Corporation & John Does 3-5
     Montana Fourth Judicial District Court
     Missoula County, MT

07/28/09  Neblett Beard & Arsenault

Robert G. Vidrine, et al vs. Bausch & Lomb Incorporated
Civil Action No. : 6:08-CV-0213
United States District Court,
Western District of Louisiana, LA

7/22-23/09   Williams, Love, O'Leary, Powell, PC
Law Offices of Jeffrey B. Wihtol
D. Cox, A. McGinness, David Doolittle, J. Huerta, K. Forrest; cross-notice
Jessica N. Lopez (Arizona) , C. Owens (Indiana), C. McClellan (Oregon), G.
Addis (Oregon) vs. DJO, LLC, I-Flow Inc, McKinley Medical LLC, Moog, Inc.,
Curlin Medical, Inc, Astrazeneca PLA, Astrazeneca Pharmaceuticals LP, APP
Pharmaceuticals, LLC, Abraxis Bioscience, Inc. Hospira, Inc, Corporation "X"1-
10, Pacific Medical, Inc.
United States District Court,
District of Oregon
Portland, OR

07/10/09   Childers & Schlueter, LLP
Carlos Howard and Tanjanika Newton, surviving children of Mazelle Howard et
al. vs. Mylan Pharmaceuticals, Inc, et al
Civil Action No. 1:07-CV-2091-CC
United States District Court,
Northern District of Georgia
 Atlanta Division, GA

06/10/09   Janet Jenner & Suggs, LLC
Jensen Meharg, Robin Meyer& Michael Meharg vs. I-Flow Corporation,
AstraZeneca Pharmaceuticals, LP, et al.
Cause No. 1:08-CV-0184-DFH-TAB
United States District Court,
Southern District of Indiana
Indianapolis Division, IN

05/21/09   Motley Rice, LLC
Denise Poole vs. Matrixx Initiatives, Inc.
Case No. CV 2006-016722
Superior Court of the State of Arizona
County of Maricopa
Phoenix, AZ

**05/15/09**       Searcy, Denney, Scarola, Barnhart & Shipley
                      D. Kilpatrick vs. Breg, Inc.
                      Case No. 08-10052-CIV-Moore/Simonton
                      United States District Court,
                       Southern District
                      West Palm Beach, FL

**7/26/10**
**4/16-17/09**     Aredia & Zometa Products Liability Litigation MDL No. 1760
                      No. 3:06-MD-1760
                      United States District Court,
                      Middle District of Tennessee
                      Nashville, TN

**06/02/09**
**03/26/09**       Bubalo, Hiestand & Rotman
                      C. Vance vs. Rite Aid of West Virginia, et al.
                      Civil Action No. 06-C-351-P
                      Circuit Court of Logan County, WV

**03/12/09**       Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor, P.A.
                      United States District Court, Southern District of New York
                      In RE: FOSAMAX Litigation
                      No. 1:06-MD-01789-JFK-JCF
                      New York, NY

**02/19/09**       Harrell & Nowak, L.L.C.
                      Betty Mason Slicho, et al vs. Boston Scientific Corporation
                      24th Judicial District Court
                      No. 607-594, Division "C"
                      Parish of Jefferson, State of Louisiana, LA

**05/04/09**
**02/16/09**       Childers & Schlueter, LLP
                      Patricia Ingram, parent of deceased minor Rakesh Dorsey vs. Mylan
                      Pharmaceuticals, Inc, et al
                      Civil Action No. 1:08-CV-0574
                      In the United States District Court,
                      Northern District of Georgia
                      Atlanta Division, GA

2/5-5/09        Curry & Tolliver
                J. Higginbotham et. al. vs. J. King, DO, et. al.
                Civil Action No. 04-C-470
                Circuit Court of Putnam County, WV

01/10/09        Kershaw, Cutter & Ratinoff, LLP
                Panacryl Sutures Products Liability Litigation
                Civil Action N. 5:08-MD-01959
                United States District Court,
                Western Division
                Eastern District of North Carolina, NC

02/09/09
12/18/08        May Oberfell Lorber; O'Koon & Hintermeister PLLC
                Jodi McGookin, As Mother of the deceased Samantha McGookin, et al. vs.
                Guidant Corporation, et al.
                No. 71D07-0608-CT-00192
                State of Indiana, County of St. Joseph
                St. Joseph Superior Court, IN

10/16/08        Walkup, Melodia, Kelly, Wecht & Schonenberger
                Lisa Ann Seeno vs. Mentor Corporation and Does One through 100, inclusive
                Case No.: RG06264787
                County of Alameda
                Superior Court of California, CA

10/10/08        Wilentz, Goldman & Spitzer
                Kimberly Zundel & Charles Zundel, Stephanie Zundel vs. Johnson & Johnson;
                McNeil Consumer Healthcare
                Middlesex County Docket No. MID-L-6854-05
                Superior Court of New Jersey, NJ

09/16/08        Laszlo & Associates, LLC
                Jack Kelley, et al. vs. Unico Holdings Company, Inc.
                Case No. C:1-07-8
                Western Division in the United States District Court,
                Southern District of Ohio, OH

09/09/08        Tracey Law Firm
                Radford Steele & Lisa Collins, and as Next Friend of Chase Steel, a Minor Child
                vs. GlaxoSmithKline, PLC et al.

Cause No. 37373
23rd Judicial District
District Court of Brazoria County, TX

07/31/08 Mayfield & Ogle, P.A.
Wesley Webster vs. Body Dynamics, Inc., The Pantry Inc., Nittany
Pharmaceuticals, Inc.
Case No: 01-01-CA-137, Division J
Circuit Court of the Eight Judicial Circuit, Alachua County, FL

09/22/08
06/30/08 Filan & Associates, LLC
Dan Oliva vs. Bristol-Myers Squibb and Company
UWY CV 05 4009606
Superior Court
Judicial District of Waterbury
Waterbury, CT

06/03/08 Williams, Kastner & Gibbs, PLLC
William Dussault as Guardian Ad Litem for S.P, a minor, Eugene and Clarissa
Patnode vs. Children's Hospital& Regional Medical Center, Shelhigh,Inc.
No. 05-2-36911-6 SEA
King County
Superior Court of the State of Washington
Seattle, WA

04/21/08 Feldman, Shepherd, Wohlgelernter, Tanner & Weinstock
Lorraine Dubzak and Gerald Dubzak vs. Boston Scientific Corporation
No: 04- CV-6083
United States District Court,
Eastern District of Pennsylvania, PA

03/17/08 Bextra Marketing Sales Practices and Product Liability Litigation
Beverly Haslam vs. Pfizer, Inc.
MDL M:05-cv-01699
United States District Court,
Northern District of California, CA

03/04/08 Ortho Evra Products Liability Litigation
N.D. Ohio Case No. 1:06-CV-4000
MDL Docket No. 1742
US District Court, Western Division

For the Northern District of Ohio, OH

**02/28/08**       Searcy, Denney, Scarola, Barnhardt & Shipley,PA
Carolyn Runner-Bradden vs. Bausch & Lomb, Inc.
Case No. 50 2007 CA6046XXXXMB AG
Circuit Court 15th Judicial Circuit
Palm Beach County, FL

**08/17/10**
**02/01/08**       Hollis, Wright & Harrington, PC
Mellisa Rix vs. Gilberto Sanchez, M.D., Abbott Laboratories, Inc.
Case No: CV 05-1219
Circuit Court
Montgomery, AL

**11/8/2007**      Luvera Law Firm
P. Singh & H. Kaur vs. Edwards Lifesciences Corporation, et.al.
No: 05-2-12213-5
County of Snohomish
Superior Court State of Washington, WA

**10/15/07**       Schlichter, Bogard & Denton
Binth Lewis, Guardian of Ashley Lewis, and Binth T.Lewis, representative of the
estate of Ashley Lewis vs. Ortho-McNeil Pharmaceutical, et al.
Case No. 052-11741
Circuit Court of the City of St. Louis
St. Louis, MO

**10/02/07**       Foley & Mansfield PLLP
Eva Hays & Ram Hays vs. C.B. Fleet Holding Company, Inc., etc.
Case No. 1-05-CV-048258
Superior Court of the State of California
County of Santa Clara, CA

**08/20/07**       Human Tissue Products Liability Litigation
Civil Action No. 2:06-135 (WJM); MDL No.1763
United States District Court, District of New Jersey, NJ

**12/20/07**
**11/14/07**
**07/20/07**       Prempro Products Liability Litigation
MDL. Docket No. 4:03CV1507 WRW
United States Eastern District of Arkansas,
Western Division
Little Rock, AR

07/10/07        The Mack Law Firm
                Dawn Pryor vs. Bon-Secours-St. Joseph Health Resources, Tyco International,
                United States Surgical, Surgical Dynamics, Inc. et al.
                Case No.: 02-2229-CA
                Circuit Court of the Twentieth Judicial Circuit
                Charlotte County, FL


06/14/2007      Lynch Daskal Emery, LLP
                Fleet® Phospho-soda® Litigation
                New York Consolidated Cases
                New York, NY


02/20/07        Motley Rice, LLC
                Mayda Nix surviving mother of Christopher Nix v GlaxoSmithKline PLC
                No. CV 06-0043-PHX-EHC
                United States District Court,
                District of Arizona
                Phoenix, AZ


02/09/07        Becnel Law Firm, LLC
                Sandra Jacob, Kirt Jacob, Sr. vs. Caesars Entertainment, Inc.
                Civil Action No. 05-0805 Section "L"
                United States District Court,
                Eastern District of Louisiana, LA


12/18/06        The Stone Law Firm, PLC
                Nancy Matareese vs. Tom Reese and Ruth Reese
                Case No. CV 2002-003954
                Superior Court State of Arizona
                County of Maricopa
                Phoenix, AZ


10/11/06        Guidant Corp Implantable Defibrillators
                Products Liability Litigation  MDL N. 05-1708
                U.S. District Court, Third Division, MN


09/21/06        Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.

Carolyn Reece vs. AstraZeneca Pharmaceuticals, L.P.
Case Number 1:05-CV-00322
U.S. District Court,
Southern District of Ohio
Western Division, OH

**08/18/06**     The McNair Law Firm
Monica Weston vs. Kim's Dollar Store and CIBA Vision, a Division of Novartis
Company
Civil Action No. 05-CP-40-0655
In the Common Court State of South Carolina
Pleas County of Richland
Columbia, SC

**07/28/06**     The Kim Law Firm
Charles McCullough vs. Aventis Pasteur Inc.
C.A. No. A-04-CV-525-LY
United States District Court,
Western District of Texas
Austin Division, TX

**07/21/06**     Kershaw, Cutter, Ratinoff & York
Barbara Black vs. Ethicon, Inc (dba Gynecare Worldwide), Johnson & Johnson,
Lifecore Biomedical Inc., Vital Pharma, Inc.
Civil Division
Circuit Court of the 15th Judicial Circuit in and for
Palm Beach County, FL

**5/8-9/06**     Locks Law Firm
E and D. Doherty vs. Merck & Co, Inc.
Vioxx Litigation
Superior Court of New Jersey Law
Division- Atlantic County
Docket No. ATL-L-0638-05-MT, Case No. 619
Atlantic City, NJ
**12/20/07**
**11/14/07**
**07/19/07**
**04/19/06**     Janet, Jenner & Suggs, LLC
Prempro Products Litigation
In the Court of Common Pleas Philadelphia County

In Re: Hormone Therapy Case MDL Docket No. 4:03CV1507 WRW
United States District Court,
Eastern District of Arkansas,
Western District
Little Rock, AR

03/27/06    Carter Morey, Esq
Edna R. Judd vs. TMC Healthcare dba Tucson Medical Center
No. C20043079
In and For the County of Pima
Superior Court of the State of Arizona
Tucson, AZ

01/16/06    Wallace & Graham, P.A.
John and Jane Doe2, Individually & as Guardians ad litem of Minor Child Doe 2
vs. Ortho-Clinical Diagnostics, Inc.
Case No. 1:03CV00669
United States District Court,
Middle District of North Carolina
Charlotte, NC

01/04/06    Philip K Fife Law Office
Martha Stewart vs. Sulzer, LTD
No. BC 262780
Superior Court State of California for the County of Los Angeles
Los Angeles, CA


04/4/06
07/11/05    Fowler, White, Boggs, & Banker, P.A.
Grother, Bender , Williams vs. M. Meriwether; Doctor's Hospital of Sarasota;
Clarus Medical Systems, Inc. and Surgical Innovations & Service Company
Case No. 98-6451-CA-01
Circuit Court of the Twelfth Judicial Circuit in and For Sarasota County, FL
Sarasota, FL

Exhibit B

Exhibit B



# SUZANNE PARISIAN, M.D.

## *CURRICULUM VITAE*

## EMPLOYMENT HISTORY:

**8/95-**     **PRESIDENT**
              **MD ASSIST, Inc.**
              7117 N. 3rd Street
              Phoenix, Arizona 85020


**12/1993-7/95 CHIEF MEDICAL OFFICER**
              Division of Reproductive, Abdominal, Ear, Nose and
              Throat, and Radiology (DRAERD)
              OFFICE OF DEVICE EVALUATION (ODE)
              CENTER FOR DEVICES AND RADIOLOGICAL HEALTH (CDRH)
              FOOD AND DRUG ADMINISTRATION (FDA)

**8/1991-7/95 Lt. Commander**
              United States Public Health Service

**8/1991-3/1993 Medical Officer**
              Office of Health Affairs (OHA)
              Center for Devices and Radiological Health (CDRH)
              FOOD AND DRUG ADMINISTRATION (FDA)

**4/1993-11/93 Medical Officer**
              Division of Reproductive, Abdominal, Ear, Nose &
              Throat, and Radiology (DRAERD)
              Office of Device Evaluation (ODE)
              Center for Devices and Radiological Health (CDRH)
              Food and Drug Administration (FDA)

**8/1991-7/95 Clinical Staff Appointment**
> Office of the Medical Examiners for Armed Forces
> Armed Forces Institute of Pathology (AFIP)
> Washington, D.C.

**4/1985-6/1987 General Practice**
> AVTEX Fibers, INC
> Front Royal, Virginia

**4/1980-7/1981 Emergency Medicine**
> President
> Mountain Emergency Medical
> Caldwell Memorial Hospital
> Lenoir, North Carolina

**10/1979-3/1980 General Practice**
> Caldwell County Health Department
> Lenoir, North Carolina

## CDRH / FDA /HHS & USPHS HONORS:

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Employee of the Month** August l993

**FOOD AND DRUG ADMINISTRATION**
**Employee of the Month** August 1993

**CENTER FOR DEVICES AND RADIOLOGICAL HEALTH**
**Employee of the Month** August 1993

**Public Health Service's Achievement Medal- 1992**

**Public Health Service's Unit Commendation Medals**
> Acupuncture Workshop- 1995
> Total Parenteral Nutrition Complications Group- 1995
> Night Vision Equipment Radiation Leak Group- 1995
> Anesthesia Heated Wire Circuit-1994
> Small-Bore Anesthesia Group-1992
> Corporate-Wide Injunctions Groups-1993, 1994, 1995

**Public Health Service's Commendation Medal**
> Neonatal Ventilators-1992
> Hemodialyzer Reuse Labeling-1995

2

**Public Health Service's Unit Citations- 1992, l992**
Latex Allergy-1993

**Nominee for FDA Honor Award**
FDA's Policy for Hyperthermia Clinical Trials-1995

**Certificate of Appreciation CDRH's Staff College**
Clinical Trials Course, Spring, 1995

**Other Honors**

University of Central Florida, *Cum Laude*, l974

University of Central Florida, *Summa Cum Laude*, l975

# REGULATORY ACTIVITIES:

**OFFICE OF DEVICE EVALUATION (ODE) PRIMARY RESPONSIBILITY:**
**Primary responsibilities included:**

1) **Review of FDA Premarket applications-**
510Ks,Investigational Device Exemption(IDEs), Premarket
Approval Applications (PMAs)) including design, labeling,
health issues and quality systems requirements for
manufacturing issues; INDs.
2) **Review and evaluation of clinical trials, etc;**
3) **Design of Post Marketing Clinical Studies;**
4) **Health Risk Assessments and management for  Office of
Compliance and the FDA District Field Offices;**
5) **Liaison for manufacturers, clinical investigators,
government agencies, medical community, press, Congress,
patient advocate groups, public, and manufacturers
organizations;**
6) **Training of ODE clinical reviewers;**
7) **Quality Assurance design;**
8) **Identification and resolution of safety and efficacy issues;**
9) **Presentation of clinical device issues to FDA Advisory Panels;**
10) **Presentation of Device-related issues to
Health Care Financing Administration's Technology
Assessment Committee (HCFA, TAC);**
11) **Investigator and Manufacturer Guidances from CDRH
for Clinical Protocols;**

3

**12) Clinical support for FDA regulatory actions and hearings.**

**CLINICAL DEVICE RESPONSIBILITY AREAS in ODE:**

**ENT -** Cochlear implants, brainstem implants;

**Radiology -** Magnetic Resonance  Imaging, Ultrasonography, Mammography, Radiation Hyperthermia Therapy, Neurosurgical Imaging Systems, Interventional Radiology, Thermography, Radiotherapy;

**Urology-** cryosurgery, lasers, stents, penile prostheses, urethral implants, lithotripsy**;**

**Extracorporeal circulation -** Hemodialysis, LDL-Apheresis, Plasmapheresis**,** Immunadsorption, Cell Harvest; Organ Preservation;

**Pulmonary-** bronchoscopy, stents;

**Gynecology-** infertility, PAP smear technology;

**Obstetrics-** chorionic villus sampling, amniocentesis, fetal monitoring;

**Gastroenterology-** biliary stents, neuromuscular stimulators**;**

**Endoscopy & Laparoscopy; Lasers;**

**Alternative Medicine for FDA;**

**Immunology;**

**In vitro diagnostics; Toxicology; Cytology;**

**Biological Artificial Organ Assist Devices (Center for Biologics Evaluation and Review (CBER);**

**Implanted Neuroelectrical Stimulators;**

**Genetics; Perinatology;**

**Transfusion Medicine;  Electromagnetic Fields  and Interference;**

**Tissue and Organ Transplantation (CBER);**

**Forensics**

**Combination Products-Drug/Device, Biologics/Device**

**Contrast Agents**

*100 Health Risk Assessments while in ODE*

**OFFICE OF HEALTH AFFAIRS PRIMARY RESPONSIBILITY :**

**1) Primary support for Office of Compliance-**

Health Risk Assessments & Health Hazard Evaluations;  review of  Labeling, Mandatory  Device Reports (MDRs), Adverse Experience Reports (AERs)

2) Interaction with manufacturers, investigators, health care providers, professional organizations;

3) Interaction with FDA District Offices, other government agencies, the Office of Device Evaluation;

4) Identification of public health and safety issues**.**

4

**Primary Clinical Responsibility Areas for OHA:**
Cardiovascular; Anesthesia; Pulmonary;
Orthopedics; Unconventional Therapies;
Rehabilitative Medicine; Pathology; Home Health;
Emergency Medicine; Hemodialysis; Toxicology; Radiology

*162 Health Risk Assessments while in  OHA*

## FORENSIC MEDICINE CLINICAL ACTIVITIES:

Evaluation of Patient Cause of Death & Injury with FDA-Regulated Products
  Review and Final Sign-Out Cause of Death  Military, Dependent,
FBI and CIA
Armed Forces Institute of Pathology
Office of Medical Examiner
Washington, D.C.

**Center for Devices and Radiological Health (CDRH) Assigned  Support:**

Anesthesia Post Market Surveillance Chairman (l992- May, l993)
FDA and CDRH's Liaison for Alternative Medicine
CDRH Staff College Instructor, Clinical Trials
Temple Tier II Report-ODE's Internal Quality Assurance (QA) Review

**CDRH's Representative**
National Kidney and Urological Diseases Advisory  Board
National Institutes of Health
Health Care Financing Administration's Technology Assessment Committee
Ad Hoc Working Group CDRH Transfusion Medicine

**CDRH's  Support for FDA's Office of Legislative Affairs (OLA) and Press Office for:**
Extracorporeal Hyperthermia and treatment of patients with AIDS;
Alternative Medicine;
Hemodialysis

**LECTURES While at FDA:**

Armed Forces Institute of Pathology
Essentials of Medical Devices and Death Investigations
Washington, D.C.
**October, 1993**

Third World Conference of Acupuncture
FDA's Viewpoint of Acupuncture
Kyoto, Japan
**November, l993**

Alternative Medicine Conference
FDA's Viewpoint of Acupuncture
Smithsonian Museum of Medicine
National Museum of Medicine
Washington, D.C.
**December, 1993**

Reuse of Hemodialyzers
Office of Device Evaluation
Presentation and Review of CDRH's Draft Guidance Document
Rockville, Maryland
**December, 1993**

Panel Chairman
Office of Alternative Medicine/National  Institutes of Health (OAM/NIH)
Workshop for Acupuncture Needle Reclassification
Provided FDA's Viewpoint
Rockville, Maryland
**April, 1994**

National Acupuncture and Oriental Medicine  Alliance
Annual Conference
FDA's Viewpoint - Acupuncture
Crystal City, Virginia
**May, 1994**

OAM/NIH and FDA's Workshop Planning Group
for Herbs Conference,
FDA's and CDRH's policy
For Alternative Medicine Providers
Rockville, Maryland
**May, 1994**

American Association for Medical Instrumentation (AAMI)
FDA's perspective Hemodialysis Reuse Labeling Guidance
Washington, D.C.
**June, 1994**

6

AAMI Conference
FDA's Recommendation for Hemodialyzer Reprocessing Labeling
Hemodialysis Reuse Section
Washington, D.C.
**June, 1994, November 15, 1994**
**& May 9, 1995** (Joint AAMI/HIMA Workshop)

FDA's Genitourinary Advisory Panel
Presentation Hemodialysis Reuse Labeling Guidance
Rockville, Maryland
**July, 1994 & January 1995**

FDA Urology Devices Advisory Panel Meeting
Presentation of LDL-Apheresis Premarket Applications
Kaneka's Liposorber LA-15 System
B. Braun of America's H.E.L.P. System
Rockville, Maryland
**April, 1995**

FDA's ENT Advisory Panel Meeting
Presentation of Cochlear's Nucleus 22 Cochlear Implant
PMA application- expansion of patient population
Rockville, Maryland
**April, 1995**

Second Symposium of Society for Acupuncture Research (SAR)
Georgetown University Conference Center
Government's perspectives on clinical trials for acupuncture
Washington, D.C.
**September 17, 1994**

## FDA's CHAIRMAN
Reuse of Hemodialyzer,
Rockville, Maryland
**December 10, 1993**
**May 1995**


**LECTURES, INTERVIEWS & ACTIVITIES <u>After</u> FDA:**

**FDA and Acupuncture**
ABC News Interview
Los Angeles, CA
**Summer 1995**

7

**Dealing with Adverse Events**
1996 National Sales Meeting
Johnson & Johnson Medical Inc.
Dallas, Texas
**April 1, l996**

**Dialyzers Labeled for Reuse**
The Manufacturer's Responsibilities
Fifth Annual Spring Clinical Nephrology Meeting
National Kidney Foundation
Anaheim, CA
**April 27, l996**

**Challenges with Infusion Therapy Complications**
Intravenous Nursing Society
Charlotte, North Carolina
**May 7, 1996**

**510(k) Tutorial**
Food Drug and Law Institute
40th Annual Educational Conference
Washington, D.C.
**December 9, l996**

**FDA Expert Panel Member**
Medical Devices: Device Labeling Requirements
Center for Devices and Radiological Health
Food and Drug Administration
Rockville, MD
**September 5, l997**

**Science and Art of Designing Successful Medical Device
Clinical Trials for the FDA**- A Workshop
Institute for International Research, Pharmaceutical Division
Santa Monica, CA
**September 22-24, l997**

8

**What You May Need to Know about Medical Devices
And FDA But Never Would Have Thought to Ask.**
22nd Annual Great Lakes Biomedical Conference
Engineering in Medicine and Biology Society
Milwaukee School of Engineering
Milwaukee, Wisconsin
**April 3, l998**

**ABC News Interview with Ron Regan**
Medical Device Reporting for Surgical Trocar Injuries
WEWS ABC - Channel 5 News
Cleveland, Ohio
**May 17, 2001**

Interview in**: The *Trouble with Trocars***
By Linda Carroll & Alfred Lubrano
Smart Money
**The Wall Street Journal Magazine of Personal Business,** Hearst Communications
New York, NY
**November 2001**

**FDA Inside and Out- Public Health Issues in Cervical Cancer Screening**
Global Vista Medical Foundation
Sponsored by President Medical technologies Co., LTD
Taipei, Taiwan, R.O.C.
**March 3, 2002**

**Inside the FDA**
Presentation to Kent County Medical Society
Grand Rapids, MI
**May 14, 2002**

**Clinical Trials
What physicians need to know about FDA.**
Medical Grand Rounds
St. Mary's Hospital
Grand Rapids, MI
**May 15, 2002**

9

Interview in *The Risky World of Medical Implants*
A Three Part Series
Robert Cohen and J. Scott Orr
<u>Star Ledger</u>
Morris Edition, New Jersey
**August 11-13, 2002**

NBC's **Dateline** Interview with Lea Thompson
Special Investigations- **Do No Harm-Sulzer's Hip Recall**
NBC News Washington
Washington, D.C.
*2004 Emmy Outstanding Investigative Reporting Business News Story
*2004 Edward R. Morrow Television Investigative Reporting
**July 25, 2003**

Interview with Author Barbara Seaman
**History of FDA's Clearance of Bone Densitometers**, page 78
<u>The Greatest Experiment Ever Performed on Women</u>
Published by Hyperion, New York, New York
**Fall 2003**

Interview **Is This Any Way to Have a Baby? The Terrifying Truth About Fertility Drugs.**
Barbara Seaman and Joanna Perlman
<u>OPRAH Magazine</u>, beginning page 188
Published by Hearst Communications Inc., New York, New York
**February 2004**

Interview **Warning! The Medical "Miracles" That May Be Hazardous to Your Health.**
Alexis Jetter
<u>Good Housekeeping Magazine,</u> beginning page 138
Published by Hearst Communications Inc., New York, New York
**March 2004**

Interview **Investigation of FDA's Oversight of Mammography Facilities**
Producer Mary Schwager
Investigative News
WHDHTV-NBC
Boston, MA
**October 19, 2004**

10

**Bayer Stroke Trial Continues**
Tim Gurrister
<u>Top of Utah</u>
Salt Lake City, UT
**January 22, 2005**

**Drugs, Informed Consent and Monitoring to Ensure Safety of Women for Stem Cell Donation**
Open Letter of Suzanne Parisian, MD
Presented to California Legislature and Massachusetts Legislature
Released **February 2005**

**Open Letter Suzanne Parisian, MD**
Chapter 25- **Infertility and Assisted Reproduction**
Emerging Biotechnologies: Cloning
**<u>Our Bodies Ourselves</u>**
Boston Women's Health Book Collective, Inc.
Boston, MA
**March 2005**

Interview **Stem Cell Research & Egg Donation**
Martha Bebinger
WBUR NPR Radio
Boston, MA
**April 2, 2005**

Interview in **Exposed Nerve**
Craig Malisow
<u>Houston Press</u>
Houston, TX
**April 7, 2005**

**Public Statement-Regarding Two Pending PMAs**
On Behalf of ProChoice Alliance for Responsible Research (PROCARR)
General & Plastic Surgery Devices Panel
Center for Devices and Radiological Health
Food and Drug Administration
Gaithersburg, MD
**April 11, 2005**

11

**FDA's History of Silicone-Gel Filled Breast Implants**
Briefing of US House of Representatives and US Senate Staff
Washington, DC
**April 25, 2005**


**Conference - Two Pending PMAs**
Presentation to FDA Commissioner Dr. L. Crawford
Food and Drug Administration
Washington, DC
**April 26, 2005**

**Public Statement – Two Pending License Applications**
Health Canada Therapeutic Products Expert Review Panel
Ottawa, Canada
**September 29, 2005**

**FDA & CLIA**
**Trends in Medical Diagnostic Commercialization**
Arizona Biotechnology Association
Phoenix, AZ
**February 7, 2006**

ABC Interview **Nightline**
**Fertility Myth**
Producer Mary C. Foster
**May 30, 2006**

Interview **FDA and IVF Donor Safety**
Penumbra Films
Documentary Name TBD
**March 17, 2007**

**Regulatory Affairs Professional Society (RAPS)**
Web-Based Class
Faculty
Medical Devices: Definition and Lifecycle
**January 2008**

**The Pathologist's Role in Preserving Implanted Cardiac Pacemakers
And Defibrillators or "How Not to get Shocked!"**
American Academy of Forensic Sciences Annual Meeting
Washington DC
**February 22, 2008**

Interview **IVF**
Producer Jack Hafer
Boulevard Pictures
Documentary
**Lines That Divide The Great Stem Cell Debate**
**May 21, 2008**

KHPO NEWS FOX Network
Interview Kara Liu
FDA: Beware Tainted Weight Loss Drugs
**March 23, 2009**

**A New Washington- The Impact on the Bioscience Industry
Trends at the FDA**
BIOZONA 2009
Arizona's Annual Bioscience Industry Conference
**April 7, 2009**

**Your Role with New Drugs/Medical Devices**
Wayne State University
Department of Biomedical Engineering & Wayne State Medical School
**June 24, 2009**

**How Did That Drug/Medical Device Ever Get to Market? Legal Aspects of Drug and
Device Approval**.
Wayne State University Law School
**June 25, 2009**

**Consultation for FDA Issues**
Center for Arizona Policy
House Engrossed Senate Bill
Amending Title 36, Arizona Revised Statutes, By Adding Chapter 11; Relating to Human
Eggs
Forty-ninth Legislature, Second Regular Session 2010
State of Arizona, Phoenix, AZ
**March 18, 2010**

13

**VOLUNTARY STANDARDS COMMITTEE INVOLVEMENT**

Has been an active member of the following committees for
**AMERICAN SOCIETY for TESTING MATERIALS (ASTM)**
> Medical and Surgical Material and Devices
> Occupational Health and Safety
> Search and Rescue
> Anesthetic and Respiratory Equipment
> Forensics
> Biotechnology

**AMERICAN ASSOCIATION FOR THE ADVANCEMENT
OF MEDICAL INSTRUMENTATION (AAMI)**
> Renal Disease and Detoxification Committee

## PUBLICATIONS:

***Homoeotic Effect of the Tumorous-Head Mutant and Differential Effect of an
Enhancer Gene in the Tumorous-Head Strain of <u>Drosophila</u> <u>Melanogaster</u>,***
*Canadian J Genet. and Cytology*, 1975; 17:423-432.

***Latex Allergy and Anesthesiology.***
*Anesthesia Patient Safety Foundation Newsletter*
Spring, l992.

***The Potential for Adverse Reactions Due to the Presence of Additives and
Preservatives in Intravenous Solutions and Medications***; *Journal Vascular Access
Devices*, Winter 1996, Vol 1 (1): 5-14.
*Sponsored by Johnson & Johnson Medical, Inc.

***Letter to the Editor, Midline Catherization in Hospitalized Patients.***
*Annals of Internal Medicine*, October 15, l996; Vol 125, No 8: p 697.
*Sponsored by Johnson & Johnson Medical, Inc.

<u>**FDA INSIDE and OUT,**</u>
S. Parisian, M.D.
Publication May, 2001
***Fast Horse Press, Inc.***

## DATE AND PLACE OF BIRTH:
September 20, 1952,
Rapid City, Pennington County, South Dakota

## MARITAL STATUS:
Married- August 26, 1977

## FAMILY:
Son          02/09/1985
Daughter    09/12/1986

## MEDICAL LICENSURE:
State of Virginia
State of Arizona

## EDUCATION:
**6/1970-6/1974**  Bachelors of Science
University of Central Florida
Orlando, Florida

**7/1994-6/1975**  Masters of Science
University of Central Florida
Orlando, Florida

**7/1975-6/17/1978**  Medical Doctorate
University of South Florida
Tampa, Florida

## TRAINING:

**7/1/1978-6/30/1979** Flexible Internship
Greenville Hospital System
Greenville, South Carolina

**9/14/1981-6/30/1982** Pathology Resident
University of California, San Diego
San Diego, California

**7/1/1982-2/29/1984** Pathology Resident
University of Southern California
Los Angeles County Medical Center
Los Angeles, California

**1/4/1988-1/30/1990** Pathology Resident
Grand Rapids Area Medical Education Center
Grand Rapids, Michigan

15

## BOARD CERTIFICATION:

Board Certified in Anatomic and Clinical Pathology, 1989, American Board of Pathology
College of American Pathologists, Fellow (FCAP)
American Society of Clinical Pathologists, Fellow (FASCP)

## SOCIETIES:

American Medical Association
Arizona Medical Association
Arizona BioIndustry Association
Maricopa County Medical Society
American Advancement for Medical Instrumentation
American Society for Testing Materials
Regulatory Professionals Society
Food and Drug Law Institute
College of American Pathologists
Food and Drug Alumni Association
International Society of Pharmacoepidemiology
Drug Information Association

## OFFICE ADDRESS:

**MD ASSIST, Inc**.
7117 N. 3rd Street
Phoenix, Arizona 85020
Phone: (602) 354-8491
FAX: (602) 354-8696
E-Mail: info@mdassist.com

**WEBSITE:**
http://www.mdassist.com

7/12/10

16

Exhibit C

Exhibit C

# APPENDIX OF CITED EXHIBITS

| PX | Date | Description |
|---|---|---|
|  |  |  |
| 10 | 1966 | Wilson, *Feminine Forever*<br><br>p. 6 -   The book is dedicated to "a physician whose name must remain unknown."  Deposition testimony from Dr. Wilson's son (Robert Wilson, Jr.) confirms that this physician was Dr. Jewell, Wyeth's medical director.<br><br>p. 64- Still another misconception concerning hormone therapy is the notion that estrogen predisposes toward cancer. The truth is exactly the opposite.  There is increasing evidence that estrogen has a preventative effect on breast and genital cancers. |
| 21 | 12/16/75 | Transcript of Advisory Committee Meeting re: Endometrial Cancer and Estrogen Drug Use<br>p. 5 – The increase in endometrial cancer risk was "substantial." |
| 22 | 12/75 | Wyeth's Dear Doctor letter re: endometrial cancer<br><br>Tell doctors that FDA had an advisory committee to look at the issue but it would be "simplistic" to attribute rise in endometrial cancers solely to estrogen use. |
| 22C | 8/4/89 | Wyeth's "Dear Doctor" Medigram re: Bergkvist letter<br><br>Letter highlighted estrogen only results which showed that "estrogen use was not associated with an increased risk of breast cancer"… "even with prolonged duration of therapy." Buried in the third paragraph is a passing reference to the E+P findings with reassurance that the authors claimed that "some findings could be due to chance" and a commitment to physicians that "as the world leader" in this market, Wyeth was "dedicated to further research in the field to reach a more complete understanding of the risk-benefit equation." |
| 22F | 3/98 | Wyeth's "Dear Healthcare Provider" letter re: Approval of Prempro with 5mg of MPA<br><br>Wyeth lists the side effects of E+P as only "mastalgia, headache, and abdominal pain"  Today, Wyeth warns that breast cancer is a side effect of E+P. |
| 22J | 7/01 | Wyeth's letter to all doctors who were members of ACOG<br><br>Wyeth reassures doctors that long-term use of E+P is safe and "women tend to stay on hormone replacement therapy (HRT) for a considerable period of time-a survey of current users indicated that the average time on HRT is 7.8 years and one quarter of that group has been on therapy for more than 11 years." |

| | | This letter again reported side effects of E+P as "metrohagia, mastalgia, and alopecia." |
|---|---|---|
| 22M | 7/02 | Wyeth's "Dear Doctor" letter re: WHI study results<br><br>p. 1- The Data and Safety Monitoring Board (DSMB) of WHI has decided to discontinue the combination HRT arm of the study, citing as the main factor an increased risk of invasive breast cancer in the group receiving continuous combined HRT compared to the placebo group after an average follow-up of 5.2 years.<br>WHI shows "the need for individual risk / benefit assessment for all patients, particularly when physicians are considering continuing patients on combo HRT beyond 4 years, the point at which there was found to be an increase in the relative risk of breast cancer in the study." |
| 24 | 1/12/76 | Memorandum of Conference from when Ayerst and FDA met to discuss a Dear Doctor letter re: Endometrial cancer<br><br>FDA told Wyeth that, as leading manufacturer of estrogens prescribed for postmenopausal use, FDA expects a sound medical and scientific response to new risk information and not a passive response. FDA informs Wyeth that it has the obligation to send a letter to physicians specifically dealing with the information and "should know its drug, be aware of positive developments regarding its use and be responsible." |
| 28 | 6/21/76 | Wyeth memo re: Breast cancer and hormone use<br><br>p. 1 - "In view of the widespread use of estrogens with or without progestins, there is valid concern as to whether or not the use of exogenous estrogen leads to an increase in the incidence of breast cancer"<br>p. 2 - "One might consider that the presence of both estrogen and progesterone receptors in a tumor indicates that a tumor can and does respond to estrogen." |
| 30 | 7/16/76 | Wyeth memo re: Strategy to respond to Hoover study<br><br>p. 2 – Wyeth plans to retain a public relations firm to help them deal with press associated with the Hoover study showing an increased breast cancer risk with hormone use.<br>Wyeth's medical director, Dr. Hoover, writes: "Whether we do or do not go to an outside group, I feel it is crucial for us to formulate some plans on what, if anything, can be done to mitigate the possible adverse effects of publication of the Hoover study on menopausal and postmenopausal use of estrogens. Perhaps efforts of which I am not aware are being made. If not, I believe this area should be given intensive attention. In my opinion, we cannot afford to wait for the |

2

| | | |
|---|---|---|
| | | axe to start its descent before we give serious attention to how we might blunt its edge." |
| 41 | 2/18/77 | FDA Advisory Committee recommendation and action report<br><br>There is insubstantial evidence that there may be additional risk of increased breast cancer but this is at this time unsubstantiated. |
| 54 | 3/10/80 | Wyeth memo re: meeting with Dr. Brian MacMahon to discuss new studies including Dr. Ross' paper<br><br>Dr. MacMahon's own data shows a 2-fold increased risk in breast cancer with hormone therapy drugs and "consistency of data from several papers starts to be meaningful." |
| 55 | 3/17/80 | Wyeth memo re: meeting with Dr. Brian MacMahon to discuss new studies including Dr. Ross' paper<br><br>Dr. MacMahon believes that from Wyeth's "standpoint, the picture looks bleak" as more studies are showing an increased breast cancer risk. |
| 66A | 3/9/83 | Wyeth's IND Application for E+P<br><br>p. 4 -   Two major consensus groups have recommended the concomitant usage of estrogen and a progestin.<br>Before the use of combined therapy becomes established, risks of the various progestins must be adequately evaluated."<br>p. 4 – Wyeth thus wants to "initiate a definitive study conducted to demonstrate the efficacy and safety of E+P" |
| 68 | 9/15/83 | Wyeth memo summarizing what Dr. Perdue learned from attending the NIH workshop<br><br>Overall impression was that the participants in the workshop were favorably disposed to the conduct of a relatively large, long-tern, NIH-type study.  Study would need to have three arms (placebo, estrogen alone, and E+P).  "In view of the impact that such a study could have on the future of HRT, we should monitor the plans for the study and exercise whatever influence we can to assure the study is properly designed, conducted, and evaluated." |
| 69 | 9/22/83 | Wyeth internal memo re: PremPak (Combination therapy)<br><br>FDA has informed Wyeth that in order to get combination regimen approved, Wyeth will need to do actual studies.  To conduct the necessary studies "would be very costly, would take many-years, and might in the end not prove successful. In fact, the results of the study that would be needed could turn out to be embarrassing." |
| 70 | 12/8/83: | Wolfe Citizen Petition calling for black box warning for hormone therapy on breast cancer risk<br>p. 5 – In many cases, hot flashes are not severe or subside after a few |

| | | months and the benefit achieved by hormone therapy may be minor in comparison to the risk of cancer. |
|---|---|---|
| 71 | 12/20/83 | Wyeth Memo attaching a copy of the Wolfe Citizen Petition<br>Dr. Wolfe is concerned about "Lack of data and additional risk associated with the use of estrogens" in combination with progestin. |
| 83 | 5/2/85 | Wyeth's memo re: FDA's refusal to accept Wyeth's "paper NDA" for filing because FDA wants clinical trials conducted prior to approval. |
| 92 | 7/21/86 | Wyeth memo re: Meeting with FDA to discuss combination therapy studies.<br><br>FDA officer, Dr. R. Bennett stated that efficacy and safety data on the combination is limited and he would very much like to see Wyeth's proposed study come to completion.   Dr. Bennett still has concerns about the optimal dose of progestin when used in combination.<br>Dr. Sobel discusses the possibility of initiating a national study to evaluate the cardiovascular risk associated with combination therapy. |
| 111 | 6/27/89 | Wyeth's Annual Hormone Therapy Conference<br>3rd annual long-term effects of estrogen deprivation symposium – Estoril, Portugal<br><br>p. 19 - The Impact of Estrogen on the Breast – David Thomas<br>Additional studies are needed to determine whether risk of breast cancer is altered in women who receive combined estrogen-progestin therapy<br>p. 20 - However, prolonged exposure to a progestin perhaps in the presence of estrogen, might enhance the risk.<br>p. 23 - Little is known of the mechanism by which endogenous hormones influence the development of breast cancer, and the effects may be long delayed. It is, therefore, important that studies be conducted to monitor women for possible carcinogenic effects on the breasts. |
| 112 | 6/29/89 | Wyeth memo re: Cardiac promotion by competitor (Estrace)<br><br>Wyeth became aware that Estrace was being promoted as cardiac protective and was considering whether to report this activity to the FDA.  Justin Victoria "strongly cautions" Wyeth again "instituting any action at this time.  As you well know, we are currently placing much emphasis on the cardiovascular effects of conjugated estrogens in our promotion" and "the promotion of the cardiovascular effects of Premarin is of critical importance to Wyeth-Ayerst and our approaches to date, while acceptable, due indeed push the edge of the envelope." |
| 114 | 8/4/89 | Memo to Wyeth sales force re: Bergkvist article<br>Under no circumstances should you initiate discussions concerning |

| | | this study |
|---|---|---|
| 121 | 1990 | Training manual for sales representative detailers<br><br>p. 6 –In 1940s, Premarin sales were low because people did not understand menopause. Wyeth thus started a major educational program so that by the 1960s the sales were higher as women realized that they could be "feminine forever." |
| 123 | 1/3/90 | Wyeth's letter to FDA re: the upcoming Advisory Committee Meeting<br><br>In anticipation of the upcoming Advisory Committee Meeting, Wyeth has done "an exhaustive review of the world's literature published since 1976 examining the possible relationship between breast cancer and hormone replacement therapy." Wyeth provides this review to the FDA for circulation to the panel of experts. |
| 133 | 2/2/90 | Email from Wyeth executive (Fred Hassan) to hormone therapy team re: 2/1/90 Advisory Committee meeting<br><br>"I want to personally congratulate you for your contribution to our success at the 2/1/90 Advisory Committee Meeting on Premarin. Our goal was to ensure that this meeting was a "non-event," and that's exactly what happened." |
| 134A | 2/1/90 | Summary of resolutions from 2/1/90 Advisory Committee meeting<br><br>Question 2:  Does the addition of progestins to estrogen therapy alter the risk of breast cancer in postmenopausal women?  If so, are there differences in this regard among different progestins?<br>Answer:   The Committee responds unanimously that there are insufficient data to answer these questions at this time. |
| 135 | 2/15/90 | Wyeth Memo summarizing presentations at 2/1/90 Advisory Committee Meeting on 2/1/90<br><br>p. 2 –Dr. Linda Golden (FDA Medical Reviewer) presented evidence of a correlation between endogenous estrogen and breast cancer as well as animal evidence suggesting that exogenous estrogens as well as progestins can produce breast cancer. |
| 144 | 8/22/90 | Wyeth memo re: Regulatory executive's discussion with FDA about combination therapy<br><br>Dr. Sobel of FDA informed Wyeth that FDA remains "unconvinced of the overall safety and effectiveness of combined estrogen/progestin therapy."  Without definitive clinical data from adequate and well-controlled clinical trials to evaluate the overall benefit/risk ratio of combination estrogen/progestin therapy, that he cannot approve a combination<br>Mr. Hamilton agreed about the lack of a resolution of the overall |

| | | |
|---|---|---|
| | | benefit/risk ratio of combination estrogen/progestin therapy Clearly, without adequate clinical data to address the benefit/risk ratio of combined estrogen/progestin therapy, Dr. Sobel and his Division will not approve such a combination. |
| 145 | 10/11/90 | Letter from FDA to Wyeth re: promotional pieces<br><br>Osteoporosis claims: The FDA does not want Wyeth to use the word "crippling" to describe osteoporosis as it is a scare tactic "to coerce the reader into visiting the doctor."<br>Also wants Wyeth to have better fair balance in their promotion and to revise their statement implying that "all women" are eligible for treatment. |
| 146 | 12/3/90 | Wyeth memo re: IARC review of hormone therapy<br><br>Wyeth is aware that IARC (International Agency for Research on Cancer) will be reviewing estrogen therapy and its association with breast cancer. Wyeth has formed a small task force (including Dr. Pickar) to guide Wyeth's efforts to "preempt any negative fall-out from this process." Task force is to ensure that IARC does not develop a position on a definitive relationship between breast cancer and estrogen replacement therapy as well as to ensure that conjugated estrogens are not singled out from other estrogen replacement therapies as any different in terms of carcinogenic risk. |
| 147 | | |
| 154 | 2/25/91 | FDA letter to Wyeth re: Season's magazine<br><br>FDA considers Seasons as a piece of promotional labeling and has identified a number of potentially false and misleading points in the submitted material. For example, it discusses cholesterol and fats and appears to imply that hormone drugs will decrease cardiovascular events. "Since this type of indication is not an approved indication for the product, this would potentially cause Premarin to be misbranded."<br>The FDA views this campaign "in its entirety to be a form of extremely insidious hidden persuasion. To entice the consumer into a situation that requires use of one brand of drug is an insidious marketing ploy masquerading as concern for women." |
| 165 | 6/20/91 | Summary of FDA's June 1991 Advisory Committee meeting<br><br>Question for panel:<br>4.   To what degree does the progestogen in HRT affect:<br>4.2  The possible risk of breast cancer induced by  ERT?<br>Answer:<br>4.2. The data are not yet adequate to permit an answer to this question but such information will be forthcoming. |

| 168 | 7/16/91 | Wyeth memo re: Meeting with FDA<br><br>FDA noted that the agency had "particular concern regarding the discussion of the cardiovascular benefits of ET."  Promotion of a cardiac benefit is "clearly a problem" for the agency. |
| --- | --- | --- |
| 172 | 8/19/91 | Wyeth Memo between management re: Re: Ron Ross breast cancer data<br><br>Wyeth is concerned about Dr. Ross' study. "Because of the size of the study and the credibility of  USC, when the data is finally published, it will achieve a great deal of attention"<br>The "new" data from this study suggests that combination use of estrogen and progestin has a higher relative risk of breast cancer than even estrogen alone and a particularly elevated risk (RR=3.6) for women with a positive family history of breast cancer.<br>"It is not likely that this data will be published anytime in the near future since according to the transcript Krauss claims it is only half done."   We should start discussing how to handle this now and when it finally hits from a sales force and public relations point of view." |
| 175 | 9/30/91 | Wyeth memo: From Medical Direction, Dr. Marc Deitch to senior management (Fred Hassan) re: Royal Society of Medicine conference on HT and breast cancer risk<br><br>p. 1 - Current ongoing study (Ron Ross) should be assessed carefully since preliminary data suggest an increased risk with combo therapy<br>p. 2 – Date on combined therapy and dose/response data is lacking<br>p. 5 – "Dr. Ross is sensitive to the impact that any misinterpretation will have, and agreed to keep me informed of the publication date. Further he will allow us to work with him to manage the Press when the time comes." |
| 179 | 1997 | 1997 Wyeth sales training manual |
| 188 | 3/17/92 | Wyeth memo summarizing presentations at FDA's February 1992 Advisory Committee Meeting re: HRT<br><br>p. 3 - Dr. Ruth Macklin, Professor of Bioethics at Albert Einstein College of Medicine, spoke about the risks and benefits of HRT/ERT from an ethical perspective. She stated that while menopausal symptoms are discomforting, they are not life-threatening and there exists alternate therapies to HRT. She posed the question "Is the risk of a potentially fatal occurrence (i.e.  breast cancer) worth the relief of menopausal symptoms that are ultimately transient?"<br>p. 3 - FDA explained that studies were needed on the use of E+P for women who have had breast cancer. "Committee member Dr. Arthur Haney expressed the views of nearly all members when he stated that Questions 1 and 2 were essentially asking for the results of clinical trials that have yet to be performed, and that the trials would have to |

| | | be conducted before these answers could be provided" |
|---|---|---|
| 192 | 4/20/92 | Wyeth memo: FDA position on cardiac benefit promotion<br><br>FDA criticizes Premarin advertising for over-promotion of CV benefits and scare tactics. FDA does not want Wyeth is not to use the wheelchair graphic. FDA claims that the tabular list discussing changes in cholesterol levels which occur in the menopause is misleading because it implies that estrogen treats cholesterol changes and that there is cardiovascular benefit with the use of Premarin. |
| 194 | 1/23/92 | Wyeth memo: FDA position on cardiac benefit promotion<br><br>Wyeth has asked the FDA for permission to include statements in the Premarin labeling regarding the beneficial cardiovascular effects. FDA informs Wyeth that the information must be included in the Precaution Section of the labeling. FDA executive, "Dr. Corfman readily acknowledged that the only reason they are presently not willing to allow this information to appear in the other sections, e.g. Additional Health Benefits, is to prevent Wyeth-Ayerst from promoting Premarin for what FDA considers to be a "yet to be proven' benefit." |
| 199 | 6/8/92 | Wyeth letter to FDA re: Cardiac representations<br><br>FDA objects to Wyeth including information in its promotional pieces about cholesterol changes with menopausal symptoms for which estrogen is indicated implying that estrogen treats cholesterol changes since this implies that "there is cardiovascular benefit with Premarin use." Wyeth agrees to delete cholesterol changes from the tabular graphic so as to avoid any implication that estrogen treats cholesterol changes and assures the FDA that all brochures and language sheets will be revised and replaced. |
| 201 | 6/26/92 | Wyeth memo re: meeting between Wyeth and FDA<br><br>Dr. Golden expressed concern over potential increased long-term estrogen exposure because she believes that the risk of breast cancer is related to both dose and duration of treatment.  Dr. Golden stated that in her view, because Wyeth's pivotal study did not utilize the lowest effective dose currently approved for the prevention of osteoporosis, an NDA which included this indication may not be file-able |
| 202 | 6/29/92 | Memo re: Textbook program<br><br>Wyeth will purchase textbooks and give them to internal medicine and family practice residents. The book, "A Clinical Guide for the Care of Older Women" is written by Wyeth's consultant Dr. Leon Speroff. |
| 205 | 7/24/92 | FDA letter to Wyeth re: Cardiac promotion |

| | | FDA informs Wyeth that information in Wyeth's promotional booklet "regarding estrogen and cholesterol may misleadingly imply that there is a proven benefit of Premarin in regard to risk of coronary heart disease. For these reasons, the brochure should not be used unless or until it is revised." |
|---|---|---|
| 207 | 8/92 | Labeling Guidance Text for Non-Contraceptive Estrogen Drug Products – Physician Labeling |
| | | p. 6 - While the majority of studies have not shown an increased risk of breast cancer in women who have ever used estrogen replacement therapy,  some have reported a moderately increased risk (relative risks of 1.3-2.0)  in those taking higher doses or those taking lower doses for prolonged periods of time, especially in excess of 10 years. Other studies have not shown this relationship. |
| 208 | 8/6/92 | Wyeth letter to FDA re: cardiac promotion |
| | | In light of FDA's admonition to Wyeth to stop all cardiac promotion, Wyeth will quarantine and not distribute all remaining inventory of the proposed promotional piece.  "All text and graphic material contained in this booklet relating to cholesterol will be deleted. Similarly, Wyeth-Ayerst has been taking steps to assure deletion of information regarding cholesterol from all other Premarin promotional items." |
| 213 | 8/14/92 | Wyeth internal memo: Summarizing FDA's position on promotional pieces that implied cardiac benefit for hormone therapy |
| | | FDA found misleading info in several physician-directed promotional pieces, FDA finds misleading including that  graphs which listed cholesterol changes with menopausal symptoms since "this implies that estrogen treats cholesterol changes".  FDA has concluded that information on cholesterol and estrogens "may misleadingly imply that there is a proven benefit of Premarin in regard to risk of coronary heart disease."  Wyeth-Ayerst agrees to delete all text and graphic material relating to estrogens and cholesterol all promotional materials and to quarantine and destroy such pieces. |
| 221 | 9/10/92 | Wyeth Letter Re WHI Drug Supply |
| 228 | 1/12/93 | Wyeth memo re: WHI study |
| | | The Fred Hutchinson Cancer Research Center in Seattle has been selected as the coordinating center for WHI.  Wyeth could have utilized this facility to conduct a similar study for Wyeth. |
| 239 | 5/25/93 | Wyeth memo re: Dr. Linda Golden's presentation on "Quandaries in HRT Therapy" at ACOG  meeting |

9

| | | |
|---|---|---|
| | | While it appears that Dr. Golden does believe that estrogens provide a cardioprotective benefit to women, she is not convinced that the estrogen/progestin combination will afford the same degree of protection as do estrogens alone.<br>Nor is she comfortable with the risk/benefit ratio with respect to breast cancer and prolonged estrogen therapy.  Dr. Golden noted that most breast cancer studies were epidemiologic studies not based on randomized groups.  Dr. Golden is concerned that the non-estrogen control groups were not on estrogen because of a breast cancer family risk, which would thus place more "at risk" women in the control group. |
| 242E | 1993 | Wyeth's newsletter for physicians: HealthWords, Vol 2, Issue 2<br>What Every Woman Should Know About Estrogen And Breast Cancer<br><br>p. 1 – The Government approved labeling says flatly: "The majority of studies have not shown an association [of breast cancer] with the usual doses used for estrogen-replacement therapy."<br>p. 1 – Many medical experts agree that HRT provides another kind of long- term benefit: protection against heart attacks and strokes due to atherosclerosis, the No. 1 killer of women after age 50. |
| 247 | 10/5/93 | Wyeth memo re: Meeting with FDA<br><br>p. 7 – Dr. Golden indicated that although the addition of the progestin is to protect the endometrium, she still has concerns about the safety of adding excess progestin, i.e. breast cancer. |
| 251 | 12/8/93 | Wyeth internal memo re: ECOG breast cancer trial<br><br>The Eastern Cooperative Oncology Group has received funding to conduct a study of HRT in women post-breast cancer, taking Tamoxifen. Wyeth "previously refused a request for drug supply, consistent with company policy." |
| 265 | 2/9/94 | Wyeth internal memo re: ECOG breast cancer trial<br><br>Medical Affairs has reviewed the ECOG breast cancer study proposal and there appears to be little risk in terms of potential negative outcome for Premarin. We continue to request support for this study.<br>ECOG first requested drug from us many months ago, and, after some time, were rejected (as is customary apparently for studies involving breast cancer).<br>The study has now been referred to the Premarin Studies Review Committee for evaluation. Because, however, approval requires somewhat of a change in "company policy" it is expected that senior management review will also be required. |

| 269 | 4/26/94 | FDA letter to Wyeth re: promotional pieces<br><br>FDA asks Wyeth to revise the discussion about irritating symptoms for menopause to state that although some women develop uncomfortable symptoms, most women have, only mild menopausal symptoms or none at all. |
|---|---|---|
| 285 | 12/15/94 | Letter from Wyeth to FDA discussing breast cancer findings from Wyeth's one year endometrial hyperplasia study (Pivotal Trial)<br><br>p. 26 – Patient # 30155-019:  After one year on E+P (0.625 mg E / 5 mg P) patient developed infiltrating ductal cancer.  "In the investigator's opinion, the carcinoma was possibly drug related." |
| 287 | 12/30/94 | FDA letter to Wyeth conditionally approving Prempro<br><br>Approval is based upon (a) Wyeth's "commitment to conduct a comprehensive investigation of breast cancer risk in users and non-users of the NDA regimes at appropriate and reasonable cost.  The most feasible approach appears to be a case control study in areas of the US when and where the NDA regimens are used extensively.  It is essential that this Phase 4 Study be designed with adequate statistical power to detect the lowest feasible relative risks in the comparison of unopposed Premarin and Premarin / MPA treated women and an effort should be made to evaluate differences between Premarin / MPA groups by treatment regime (i.e. Prempro versus Premphase) and (b) Wyeth's previous commitment to conduct a Phase 4 study to determine whether concomitant MPA may reduce the lowest effective dose of Premarin at bone target tissue when administered to women on adequate calcium  intake. |
| 288 | | Medical Officer's Review for Prempro (Dr. Linda Golden)<br><br>p. 7– Recent studies indicate that "concomitant progestins do not reduce and may exacerbate the risk of breast cancer associated with ERT.  In the postmenopausal population even small increments in the relative risk of breast cancer have great public significance.  Since many more years are still needed before the relationship between HRT and breast cancer can be definitively determined, the public health impact of this safety concern increases with the growing popularity of HRT.  As such, the true effect of HRT on breast cancer incidence and mortality must be considered the single most important safety issue concerning this class of drugs."<br>p. 8 – Although the WHI Randomized Clinical Trial is adequately designed to definitively answer the ERT / HRT cardiovascular question (i.e. whether efficacy or selection bias account for observed risk reduction), it is doubtful that even the WHI / RCT has sufficient statistical power to clearly define the relationship between HRT and breast cancer. |

| | | |
|---|---|---|
| | | p. 14 – Wyeth acknowledges that the company discussed the pivotal trial with the FDA and "an agreement was reached that an evaluation of breast cancer risk would not be the subject of evaluation in this program"<br><br>p. 56 – Overview of safety – Breast cancer developed in 5 subjects during study drug treatment, with all cases occurring in the E+P groups. Although there were no statistically significant differences, **the clustering of cases** in the E+P groups (especially in the continuous treatment regimen)  raises concern that concomitant progestin may exacerbate the increment in breast cancer risk that has repeatedly been observed with prolonged unopposed estrogen treatment.  This concern should be addressed post-approval by the sponsor, by conducting a comprehensive Phase IV investigation of breast cancer risk in users and non-users. It is essential that this study be designed with adequate statistical power to rule out relative risks dose to 1.0.<br><br>p. 72: "Because emerging epidemiologic data increasingly suggests that concomitant progestin therapy may exacerbate the increased breast cancer risk ..., it is essential that the doses of both estrogen and progestin HRT components be reduced to the lowest effective dose ..." |
| 289R | 12/30/94 | Wyeth press release announcing approval of Prempro<br><br>Wyeth is a major research-oriented pharmaceutical company with leading products in the areas of women's health care, cardiovascular arid metabolic disease therapies, central nervous system drugs, anti-inflammatory agents, vaccines, infant nutritionals and generic pharmaceuticals. As a world leader in women's health care, the company is committed to improving the health-care options available to women through ongoing research efforts and patient education programs. Wyeth is the only U.S. company with a major research facility devoted exclusively to women's health. The Wyeth Women's Health Research Institute is actively engaged in research that spans the health-care needs women face during all phases of their lives. |
| 293 | 1995 | 1995 Sales Training Manual |
| 304 | 3/10/95 | FDA letter to Wyeth re: promotional pieces<br><br>FDA acknowledges that "not all women experience uncomfortable symptoms.  Many women have mild or no symptoms." |
| 307 | 4/26/95 | Memo re: Re:      The Good Housekeeping Guide to Women's Health<br><br>Wyeth and its PR consultants "worked directly" with the medical writer and "contributed much of the information in the book's "Menopause" chapter." Because of this, heart disease, memory loss and Alzheimer's disease are "focused on" as menopause-related |

| | | disorders that hormone therapy "can prevent." |
|---|---|---|
| 307B | | The Good Housekeeping Guide to Women's Health – Menopause Chapter |
| 322 | 7/20/95 | Colditz Breast Cancer Report:  Patient Awareness Study<br><br>Budget for additional surveying of patients because "Senior management has requested continued monitoring." |
| 324 | 8/24/95 | Wyeth's letter to FDA re: draft protocol for Phase IV commitment breast cancer study<br><br><br>After 8 months, Wyeth has created only a 1 ½ page draft protocol that barely sketches out the design of its proposed study.  Wyeth's proposal is to conduct a case-control study is to determine the risk of breast cancer in users of Prempro and Premphase versus Premarin users. |
| 337 | | James Pickar Powerpoint:  Premarin: The most studied estrogen |
| 341 | 1/31/96 | Wyeth memo re: Breast Cancer task force meeting |
| 341A | 1/31/96 | Wyeth memo re: Breast cancer task force meeting re: Cummings Abstract<br><br><br>Action steps include visiting Dr. Cummings and "Tap advocates as potential speakers for media including Drs. DuPont, Bush, Nachtigall and Ravnikar.<br><br>Tap" 3rd party source for support – ACOG, NIH, AMWA, NOF<br><br>Potential key message points are: Shift attention to other cancers; emphasize that "this is just one more paper" (WHI doing definitive, prospective trial) and "highlight flaws in Cummings methodology." |
| 342 | 2/96 | Wyeth's slides about Seasons magazine<br><br>Season's magazine was a bi-monthly free magazine sent by Wyeth to more than 1 million hormone therapy users.  Wyeth could have used this database to gather questionnaire data for a study. |
| 345 | 3/27/96 | Memo re: Outlines how Wyeth intends to deal with Dr. Cummings Study: Revised |

| | | |
|---|---|---|
| | | Wyeth intends to "cast doubt on validity and value of study", institute a "dismissive strategy" by "downplaying value of study and dismissing its contribution to the literature." Wyeth will "utilize third-parties as much as possible to distance Wyeth from the study, which is not Premarin-specific." <br><br> p. 2- Use Dr. Trudy Bush to emphasize heart benefit of hormone therapy and Dr. Shumaker or Birge to discuss Alzheimer's benefit <br><br> p. 2 – Wyeth will hold a Consultant conference and select third-party groups to issue, specifically, AGOG, NAMS as well as appropriate third-party spokespeople, specifically, Trudy Bush, Leon Speroff. |
| 346 | | Wyeth's copy of abstract of article by Cauley / Cummings <br><br> "Our findings suggest that the risk of breast cancer associated with hormone replacement therapy may have been substantially underestimated since osteoporosis is a primary indication for its use." |
| 347 | 4/25/96 | Memo re: Strategy to handle Cummings abstract <br><br> Plan is to "counter the potential presentation of the Cummings data in Amsterdam" by "overshadowing Cummings data with focus on an unconventional approach to HRT therapy – using HRT in breast cancer survivors" <br><br> p.2 – Other considerations – "Although intelligence indicates that Cummings will present NOT his data in Amsterdam, a statement from N. Davidson will be valuable in helping address future study findings indicating a negative relationship between HRT and breast cancer." <br><br> Next steps – Wyeth contact N. Davidson as to position, willingness and availability and media training |
| 348 | 4/96 | Handwritten memo from Wyeth executive Jeff Buchalter re: Cummings study <br><br> Wyeth employees are cautioned to keep the study data "confidential" and not "discuss with anyone outside Wyeth."  Management needs to be prepared to deal with the conclusions of the article in case the press gets wind of its findings and headlines read "warning." |
| 349 | 4/96 | Handwritten memo from Wyeth executive Jeff Buchalter re: Cummings study <br><br> Plan is to "dismiss/distract" from the Cummings abstract by "keeping the U.S. press busy" with news releases about a different medical convention going on at the same time and to plant Wyeth consultant, Dr. Leon Speroff in the audience in Amsterdam to speak up for Wyeth. |
| 354 | 7/21/96 | Wyeth program for 10th annual symposium on the long-term effects of estrogen deprivation in Santa Fe, New Mexico |

|  |  | p. 19 – For leaner women, who are at an otherwise lower risk of breast cancer after menopause, HRT increases their risk. |
| --- | --- | --- |
| 355 | 1996 | Dr. Freitas' article "Breast cancer and HRT: A medical judgment" (a Wyeth's ghost-written article)<br><br>Dr. Freitas' article reassures doctors that "based on a review of the scientific literature on HRT and breast cancer, hormone replacement therapy, with estrogen alone or in combination with progesterone, does not raise, in significant statistical levels, the incidence of breast cancer" and the "medical literature is ambiguous with regard to estrogen and progesterone's actions on breast cells." |
| 356 | 8/22/96 | Toltzis Communications memo<br><br>Explains what this company can do for Wyeth to help ghost-write an article and get a manuscript ready for publication. |
| 357 | 8/27/96 | Wyeth's Purchase Order<br><br>Wyeth pays Toltzis Communications $5,750 for this company to prepare Dr. Freitas' manuscript for publication, edit, check references |
| 358 | 9/9/96 | Wyeth memo<br><br>Dr. Freitas wants Wyeth to sponsor him to travel from Brazil to Australia for a menopause symposium. |
| 361 | 12/20/96 | Wyeth Memo from Steve Strickland (Marketing executive) to Marmontello<br><br>"I have spoken with Jeff and he agrees that a coaching issue may exist to insure effective delivery of the unbranded message with a smooth transition to a Premarin specific selling message" |
| 377 | 6/30/97 | Wyeth memo: DIA Meeting in Montreal at which the FDA presented its position on off-label promotion of benefits |
| 377A | 6/30/97 | Wyeth memo: DIA Meeting in Montreal at which the FDA presented its position on off-label promotion of benefits<br><br>Dr. Janet Woodcock reinforced that a drug company's promotional materials is limited by the approved labeling. FDA believes that promoting off-label use will diminish the sponsor's incentive to study the indication, it could result in harm to patients, the treatment could be ineffective, diminish the use of evidence-based medicine and could ultimately lead to erosion of the efficacy standard |
| 378 | 7/97 | Wyeth's promotional piece for physicians to use to educate patients about impact of menopause and benefits of hormone therapy<br><br>p. 5 – Wyeth demonstrates visually how, for some women, |

| | | |
|---|---|---|
| | | menopause causes a "steep drop in estrogen levels" causing her to become estrogen deficient<br>p. 7 –Information about long-term consequences of lack of estrogen, including heart and brain issues, supports why "treatment can last throughout the rest of a woman's life" |
| 379 | | Wyeth's promotional materials re:  Body of Evidence Campaign<br><br>Wyeth had an extensive Body of Evidence promotional campaign where sales representatives were given large volumes of patient education pieces that discussed the long-term consequences of estrogen loss after menopause (including heart and brain issues) and encouraged to use hormone therapy to protect against those consequences. |
| 381 | 9/25/97 | Letter from Wyeth to FDA re: Wyeth's commitment at approval of Prempro to do a Phase IV "comprehensive investigation of breast cancer risk in users and nonusers of the NDA regimens at appropriate and reasonable costs."<br><br><br>Two years and 9 months after approval, Wyeth still has not even started the required case control study.  Wyeth states that "the study proposed is unlikely to provide definitive information regarding breast cancer risk among estrogen plus progestin users versus users of estrogen alone" and asked that the FDA agree that Wyeth can instead rely on the data from the WHI study and WISDOM study to "fulfill Wyeth's Phase IV commitment to conduct a breast cancer investigation." |
| 390 | | Internal Wyeth Document – Dispel the Perception of Estrogens Causing Cancer |
| 395 | 1/14/98 | Wyeth memo re: Wyeth's attempt to get cardiac information identified "other health benefits" in its label<br><br><br>Wyeth had asked the FDA for permission to include cardiac information in its label as an "other health benefit."  The FDA "formally" asks Wyeth to withdraw its request "since the Division does not plan to approve it." |
| 398 | 2/2/98 | Wyeth memo |

16

| | | |
|---|---|---|
| | | Hormone therapy net sales exceeded $1.1 billion for calendar 1997. 93% of all hormone therapy new users received a Wyeth drug |
| 406 | 4/30/98 | Wyeth memo re: Wyeth's request to have cardiac benefit put in "other health benefits" section of the label.<br><br>Wyeth acknowledges that the FDA is going to send them a Not-Approvable letter for this request because "However, burden of proof required for an Indication, is to conduct two adequate and well-controlled clinical studies, or, for example, the conduct of a multi-year, very large-scale, multi-center mortality trial to support a prevention claim." |
| 411 | 1998 | Memo re: Creation of Long Term Business Partnerships Through the Development of Local HRT Advocates<br><br>p. 6 - Teleconferences ensure a "focused message" to doctors and can be effectively used if the "product advocates" are well-prepared by Wyeth for their presentations. |
| 423 | 9/98 | Wyeth's sponsored CME program through Duke University<br><br>Wyeth handed out copies of the Duke monograph (a summary of a Wyeth sponsored CME program through Duke).<br>p. 12 – Discusses long-term benefits of hormone therapy including heart and brain benefit.<br>p. 20, 23 – Represents that hormone therapy could be "an effective alternative to treatment with statins" for heart protection<br>p. 26 – Represents that hormone therapy "delay the onset and progression of Alzheimer's disease"<br>p. 35, 37 – Represents that there is no clear or compelling evidence that there is an increased breast cancer risk with hormone therapy |
| 427 | 9/98 | Newsletter funded by Wyeth for Ob/Gyn (Rounds OB – Gyn)<br><br>This newsletter is part of Wyeth's "Myths and Misconceptions" program<br>p. 5 – Wyeth represents to prescribing physicians that there is "Almost uniform agreement regarding the absence of effect on relative risk when P is added to E" |
| 458 | 1999 | Wyeth's 1999 Marketing Spending for HRT<br><br>Money assigned for Seasons  magazine (Brand Loyalty/Persistence); ACOG, Alzheimer's Association, Duke University, AHA |
| 461 | 1998 | Wyeth document re: Direct to Consumer advertising and "The Role of the Consumer"<br><br>Wyeth intends to expand DTC efforts with the consumer in 1999 to "drive patients into the office." Unbranded advertising avoids FDA |

| | | |
|---|---|---|
| | | oversight and "because we are the HRT market we have the unique opportunity to benefit through unbranded messages. Unbranded messages allow us to expand knowledge and educate about the evolving science and discoveries related to estrogen loss and menopause."<br><br>p. 8 – Even when HRT was not mentioned, 85% of surveyed views thought the commercial referenced HRT which drove women into the doctor's offices asking about HRT.<br><br>p. 9 – "We know that 92% of women who get a prescription will get a Premarin Family product." |
| 464A | 1996 | 1996 Prempro Label |
| 470 | 2/22/99 | Memorandum of meeting between Wyeth and FDA re: Cardiac benefit promotion<br><br>In light of the results from the HERS study, FDA tells Wyeth again that its "promotional materials should not contain claims regarding lipid or cardiovascular benefits."<br><br>p. 3- Wyeth agrees to "refrain" from any cardiac representations |
| 475 | 5/7/99 | Wyeth memo: Confidential Draft Post-HERS Publication Plan<br><br>HERS was not designed to look at the difference in cancer incidence. |
| 473 | 4/5/99 | Wyeth memo re: Responding to the HERS Study results<br><br>Wyeth organized a team to "lead the HERS debate" when the HERS study did not show any heart benefit with E+P.<br>Key objectives are to:<br>1. Protect the benefit of cardiac prevention<br>2. Explore all plausible explanations for the study result and defend MPA from being cast as the villain<br>3. Minimize any legitimization of other estrogen / progestin combinations<br>Measures of success include "retention of primary CVD prevention benefit" in official statements of key organizations such as AHA and ACOG<br>Plan to use CME programs for marketing purposes so tea charged with "identification of appropriate thought leaders" so they can "communicate" Wyeth's message of hear benefit "through CME and other programs." |
| 490 | 2000 | Rationale for using "Premia" Trade Name<br><br>To allow for less market confusion between various doses of Prempro and drive shift to low dose prescribing of Prempro to take advantage of safety and efficacy of low dose hormone therapy. |
| 492 | | Wyeth memo<br><br>Hormone therapy drugs "clearly this is Wyeth's and AHP's most |

| | | important product" |
|---|---|---|
| 497 | 1/00 | Wyeth promotional piece:  Past Her Prime<br><br>Lauren Hutton advertisement |
| 499 | 1/10/00 | Wyeth memo re: Dr. Lippert's article<br><br>Wyeth is tracking to see if the publication is already being cited or discussed outside Germany. "This article if picked up by US competitors could also be used to their advantage here |
| 506 | 1/13/00 | Wyeth memo re: German Anti-Premarin article by Lippert<br><br>Wyeth's Premarin Core team met and decided that "there may be some advantage to "letting sleeping dogs lie." |
| 512 | 2/7/00 | Wyeth's Memo re: Breast Cancer Communications – Action Summary<br><br>This memo lists all of Wyeth's plans to respond to the Ross and Schairer articles and the negative breast cancer press that it anticipates including placing any advertorial, identifying media spokesperson; collaborating on authoring / placing op-ed pieces. |
| 519 | 2/2/00 | Wyeth memo: "Breast cancer containment and communication"<br><br>Context: Second article in a month associating E+P use with increased breast cancer risk.  Trend will continue of women demanding to be removed from therapy or declining to start therapy.  Accumulating weight of "evidence" creates uncertainty/inaction among physicians.<br><br>Proposed reaction:<br>Communicate with doctors that these articles provide no new data<br>Consumers: Emphasize "bundle of benefits" (which includes heart and brain benefit)<br>Sales reps: Send voicemail on how to handle |
| 520 | 2/3/00 | Teleconference Feedback Report<br><br>Sales representatives have received a teleconference training program on how to respond to questions about the JAMA article showing breast cancer risk.  Sales reps are to emphasize that "breast cancer is not proven with ERT / HRT however, the long and short term benefits are proven." |
| 527 | 2/25/00 | Wyeth letter from George Mills (Global Strategic Marketing Director of HT) to all general managers and HRT product managers, and medical marketing directors.<br><br>Wyeth will issue educational pieces for sales reps to use "to defray patients' worries that may have arisen since the debilitating JAMA |

| | | |
|---|---|---|
| | | and JNCI studies which showed a correlation between HRTs and breast cancer." Tells sales reps that "If the issue has not received a great deal of attention and neither physicians or patients are expressing concern about these two studies, you should not deliver the letter as it would have the effect of drawing increased attention to them." |
| 527A | 2/25/00 | Draft Questions and Answers for use by sales force in answering questions about Ross and Schairer articles<br><br>Question: I am afraid of breast cancer – should I stop my hormone therapy?<br>Answer: No. We advise you to continue your Therapy.  ET and HRT will prevent osteoporosis. Additionally, these therapies are associated with reduced risk of developing cardiovascular disease.  We believe these long-term benefits far outweigh your potential risk of developing breast cancer. |
| 550 | 6/9/00 | Wyeth Memo re: Summary of "Perspectives in ERT / HRT Advisory Board"<br><br>In 2000, Wyeth brought a group of renowned hormone experts together to review the state of the science and counsel Wyeth.<br>p. 8 – Definition of causal impact of a drug: "If the outcome is a disease, then we should consider any agent that has some effect on that disease as causative, even if it is not the initiator"<br>p. 9 -  Other Breast Cancer discussion points:<br>1.  Leaner women may be at increased risk for breast cancer because they have less circulating estrogen and addition of ERT/HRT makes significant change; larger women have greater source of natural estrogen.<br>p. 20 – Discussing Swedish population-based case-control study (Magnusson 1999):  Risk is higher for lean women |
| 557 | 7/18/00 | Letter from Wyeth sales representative and trainer, Charles Payne, to Wyeth's Ethics Division re: Reporting inappropriate off-label promotion by Wyeth sales representatives<br><br>Mr. Payne wrote to Wyeth's home office that "as a Wyeth rep, I have been instructed with written presentations from company management to promote to physicians out of labeling indications such as Alzheimer's Disease, reduction of cardiac disease and vanity issues with Premarin and Prempro.  Since many recent studies have shown increased incidence of breast cancer, heart attack and little effect on Alzheimer, and many physicians have been influenced by reps when detailing out of labeling," this could be a problem for Wyeth later on if  patients be prescribed these products for out of labeling indications and experience any medical problems. "This is potentially life threatening situation for the women." |

| | | |
|---|---|---|
| | | "We are not selling used cars.  We are selling pharmaceuticals that effect the lives of every woman that takes them.  The desire for increased sales has overruled our company's ethical responsibilities to promote our products safely." |
| 560 | 8/9/00 | Wyeth's draft of its submission to the FDA  in response to Dr. Allen's proposed increased breast cancer warning<br><br><br>p. 21 – Table 9: Wyeth notes the findings from the Gapstur study of a relative risk of 4.42 for the development of favorable histologic type breast cancers in E+P users of less than 5 years. |
| 585 | | Powerpoint slides on Publication Planning and Management<br><br><br>Scientific publication plan is as vital as a carefully designed media plan in overall product marketing |
| 605 | 3/7/01 | Memo re: Telephone conference between FDA and Wyeth re: Using tradename "Premia" for low dose Prempro.<br><br><br>FDA does not like the concept of having two tradenames for products with the same active ingredients and denies Wyeth's request. |
| 634 | 8/16/01 | E-mail titled Fwd: German criticism of Premarin (From Ernst to Michael Dey)<br><br><br>Wyeth planned to "expose" Dr. Lippert to two Wyeth internal experts to "neutralize" his opinions. |
| 651R | 11/01 | Marketing Plan for hormone therapy<br><br><br>p. 43- Marketing budget is $237 million for 2001.  Only 4% of this budget is allocated for clinical trials |
| 662 | 2002 | Wyeth's 2002 Marketing Budget for HRT<br><br>Money assigned for Seasons magazine ($2,000,000); Issue management- managing negative press and crisis ($1,000,000); |

21

|  |  | Grants for ACOG, AHA<br>p. 4 - $154,322,000 as total budget |
| --- | --- | --- |
| 667 | 2001 | Premarin Family Medical Education: A Guide to 2002<br><br>Lists all of the CME teleconferences that Wyeth is sponsoring  in 2002 |
| 672 | 1/16/02 | Wyeth informs FDA that Wyeth is distributing copies of Dr. Trudy Bush's Review article to prescribing physicians. |
| 683 | 2/7/02 | Memo from Wyeth's PR consultant, Ketchum re: Strategy for responding to  negative USA Today editorial<br><br>Ketchum is working on getting several people / organizations to issue statements or contact the editor of USA Today: Lauren Hutton, Dr. Nachtigall, ACOG, NAMS |
| 684 | 2/8/02 | Letter to the Editor at USA Today<br><br>Susan Wysocki (President of National Association of Nurse Practitioners in Women's Health) responds to a negative USA Today article about hormone therapy.  Ms. Wysocki says that has such confidence in these drugs, she would recommend hormone therapy to her own family. Wysocki does not reveal that she is a paid consultant for Wyeth at this time and only blind-copies Wyeth |
| 696 | 3/6/02 | Consulting contact for Susan Wysocki<br><br>Agreement between Wysocki and Wyeth's PR consultant, Ketchum, re: Wysocki being paid $15,000 to respond to media inquiries. This agreement "supersedes the previously signed agreement letter, dated January 28,2002." |
| 702 | 4/02 | Wyeth Annual Meeting April 2002: General Corporate Questions / Issues for Year 2001<br><br>p. 1-2 – Premarin is "cornerstone product" ($2 Billion), a "proven blockbuster product that still has significant growth potential. " Combination HRT is "best in class" product<br>p. 4 – 2001 Earnings - $2.9 Billion<br>p. 4 – "Leading product" |
| 708 | 4/23/02 | Memo re: Wyeth's marketing department wants a meeting with NEJM, JAMA and Lancet<br><br>Jeanne Marie Durocher (Wyeth's marketing executive) wants a meeting with the editorial board of JAMA to discuss "consistently negative" coverage.  Wyeth feel that "there is a clear and persistent pattern emerging in JAMA's coverage of ERT/HRT issues.. it's consistently negative."  Wants to know how much Wyeth has spent on advertising in JAMA and whether that could force the Editorial Board to meet with her. |

| 711 | 2002 | Premarin Family POA Leader's Guide – POA2

p. 9 – Plan of action is to make "an effort to strongly link" Wyeth's Direct to Consumer and physician education or professional campaigns.
p. 11 – Sales reps should "Sell Prempro first on every call."
p. 22 – When using one of the growth time tools (i.e. Unbranded), should always transition to the branded tools and the "say yes" message. |
|---|---|---|
| 712 | 5/1/02 | E-mail between Wyeth's Marketing executives re: Arranging a meeting with JAMA's editorial board to discuss its negative articles on hormone therapy

While "it is unusual for a JAMA editor to meet with pharma," the amount that Wyeth spent on advertising is "good leverage" to get a meeting. A draft letter to "get their attention" is attached and the publisher and VP of publishing "will work behind the scenes to make sure that the meeting happens." |
| 713 | 5/1/02 | Draft letter to the Catherine DeAngelis, the editor of JAMA, from Wyeth's marketing executive

Wyeth has observed a "clear and persistent pattern" of negative press in JAMA's coverage of HRT/ERT and thus Wyeth wants to meet with the editorial staff of JAMA to address their concerns.  Wyeth says "as a consistent supporter of JAMA and other AMA publications over the years, we believe a meeting of both sides is called for at this time." |
| 727 | 5/31/02 | Minutes of Data and Safety Board for WHI

WHI safety board votes to prematurely stop the study because "the weighted z-value for invasive breast cancer, the prespecified endpoint, had now crossed the boundary for harm." |
| 771 | 8/12/02 | Premarin Family of Products – 2003 Budget |
| 811 | 2002 | Wyeth's Core Data Sheet or SPC for Prempro

p. 6 – "Increased risk was found mostly for women with a lean or normal body build rather than for obese women." |
| 824 | ½/03 | Wyeth's Hormone Therapy US Marketing Plan |

| | | |
|---|---|---|
| | | p. 6 - Total net sales of Wyeth's hormone therapy drugs:<br>2000: $1.57 Billion<br>2001: $1.76 Billion |
| 830 | 1/7/03 | Wyeth document re: Wyeth's epidemiologists (Pinnizotti and Xue) assess the clinical trial data for Wyeth's studies<br><br>p. 18 – For the Wyeth pivotal trial, when comparing the incidence rate for breast cancer in the E+P group to the SEER database as background rate, the E+P users had a higher incidence (E+P = 0.41 per 100 and 0.29 for SEER). |
| 858 | | Handwritten memo by Dr. Michael Dey<br><br>p. 1 – Premarin has been a major contributor to this corporation since its approval in 1942. It was the principle project for Ayerst labs and people worried about the viability of the company when estrogen therapy was found to increase the risk of endometrial hyperplasia and cancer. At the time Premarin was the leading estrogen therapy on the market and selling $300MM. It fell more than 50%. As the role of progestin in modulating the effects of unopposed estrogen on the endometrium, Prempro was launched. The Premarin family regained its legs and grew to $2 Billion annually. It was again the #1 product. Premarin is the #2 product in terms of profit. Even after WHI, it still makes more than $1 Billion per year.<br>p. 2 – WHI changed the way many physicians prescribe hormone therapy |
| 862B and 862C | 2010 | 2010 Prempro Label |
| 866B | 2007 | IARC Monograph<br><br>p. 24 – There is sufficient evidence that E+P is carcinogenic in the human breast. |
| 890<br>891<br>892 | | Nationwide call notes database |
| 904 | 4/30/04 | List of total annual hormone therapy sales (domestic) from 1994 – 2004 |
| 905 | | Hormone Therapy Drug sales (gross) from 1941 to 2001 |
| 910R | 3/10/98 | PowerPoint of Wyeth marketing executive, Jamie Durocher: US Market: A case study in the success of changing the HRT paradigm<br><br>Ms. Durocher visually explains that there was a paradigm shift from the 1940s-1970s where the only benefit considered was vasomotor symptoms to the 1980s and beyond, where cardiac, cognitive and Alzheimer's benefit became important.<br>p. 15 – 16 – Shows how changing perceptions of the physicians resulted in large sales. |

| 920A | 4/4/95 | Robert Essner, President of Wyeth's, speech to the entire sales force at the Prempro Launch party.

Mr. Essner described the sales efforts for Prempro as a "Holy Crusade" and not just a "typical pharmaceutical effort" and told the sales representatives that there were "no boundaries" and "no limits" to their sales efforts for this drug.  He explained that they were "embarking on a mission" where "the vast majority of women would begin taking HRT at menopause and continue on it for the rest of their lives." |
|------|--------|------------------------------------------------------------------------------|
| 921 | 3/1/99 | Email from Solvay to Wyeth

Email warned executives to "be very cautious with Prof. Lippert" because "he often expressed a very negative opinion concerning conjugated estrogens in the public." |
| 934 | 11/20/91 | Memo from FDA medical officer re: Use of E+P in WHI study

Dr. Golden explains that "recent epidemiological data" suggests that HRT "may further Increase the long-term estrogen- induced risk of breast cancer." |
| 935 | 1/22/88 | Letter from Dr. Budoff to Wyeth

Dr. Budoff asks Wyeth to help her conduct a study on the breast cancer risk of E+P by providing a research assistant to tabulate data on her patient population.  As Dr. Budoff explained, "since 1979 many more patients have been placed on hormone replacement therapy"  but "long term data on combined therapy is difficult to find in the literature."  She closely monitors her patients, including doing estrogen level tests, and her patients "adhere to strict follow-up criteria."  Thus this study "would be able to greatly improve the present fund of knowledge, including factors such as the prevalence of breast cancer."  Wyeth never provided funding to Dr. Budoff. |
| 937 | 3/15/97 | Publication Program proposal from DesignWrite re: A comprehensive publication program in support of hormone therapy

Objective of the program is to increase physician awareness on the multitude of benefits that hormone replacement therapy provides and diminish the negative perceptions associated with estrogens and cancer.
p. 3 – The rationale for the publication program was a recognition of "high clinician reliance on journal articles for credible product information."
p. 5 – The plan proposed support for a combination of peer-reviewed, freestanding primary research articles, opinion-leader-endorsed review articles and journal supplements.  Wyeth had advised DesignWrite of the key issues and message strategies to be addressed |

| | | in the Publication Plan. |
|---|---|---|
| | | p. 6 – The key issues and message strategies include "dispel the Perception of Estrogen Causing Cancer." |
| | | p. 7 – DesignWrite management team noted its extensive experience in developing integrated strategic publication programs.  It promised to "provide a back-up plan so a valued paper always has another publication option" |
| | | Regarding Journal Submission of Articles: "the first step is to choose the target journal best suited …. We will then analyze the data and write the manuscript, recruit a suitable well-recognized expert to lend his/her name as author of the document, and secure his/her approval of its content. |
| | | After Wyeth has reviewed and released the manuscript for submission, DesignWrite will see it through the necessary production stages …  Any revisions requested by the journal will be handled by DesignWrite in conjunction with the client and the author.  Should the journal reject the manuscript, DesignWrite will restyle it for submission to another journal within 10 working days." |
| 938 | 11/20/98 | DesignWrite's 1998 Publication proposal for Wyeth <br><br> Study Management Plan includes development and dissemination of review article  that highlight important disease management issues in postmenopausal women including Alzheimer's disease. <br> Cost for services: $130,000 |
| 950Z | 6/00 | Compilation of documents showing Wyeth's involvement in the ghost-writing of Dr. John Eden's article <br><br> To "dispel the perception of estrogens causing cancer," Wyeth decided to publish an article entitled "Breast Cancer and Progestins." Wyeth's intent was to cast doubt on an association between E+P and breast cancer. Wyeth, through its publication consultants DesignWrite, paid a technical writer to draft the manuscript, provided all citations for the article and then selected Dr. John Eden as the "author."  Wyeth's marketing executives edited and approved the draft manuscript and the finished manuscript was sent to Dr. Eden for his signature.  The article was submitted to the ACOG journal as a John Eden article and did not disclose either Wyeth's or DesignWrite' s involvement in the creation, design, editing or approval of the article. |
| 954 | 5/13/02 | Email re: publication plans <br><br> "Please note that Mike Dey has charged the Publication Committee with increasing the number of positive Premarin related publications (Mike would like us to publish at least 1 study per month). This increase in publications is necessary to challenge the media's recent focus on the HERS trial and on negative information on HRT." |

| 956 | | Wyeth memo<br><br>To address challenges of negative press due to HERS study results, "upper management mandated that the publications committee generate at least one positive publication (or facilitates the publication process) per month to maintain and strengthen the role of HRT in women's health." |
|---|---|---|
| 962 | 6/19/90 | Memo from Wyeth executive (Fred Hassan) to hormone therapy team<br><br>"Congratulations on the success you achieved at the recent FDA Advisory Committee meeting.   We are on our way to making Premarin a $1 billion drug." |
| 967 | 1/26/90 | Wyeth memo re: Cardiac promotion<br><br>Wyeth is considering sponsoring a symposium on cardiovascular protection associated with hormone therapy at the upcoming American Heart Association meeting.  Justin Victoria advises against such action because he has concerns that if he raises the issue with the FDA, the agency "may very likely inquire as to what additional promotional activities have and is Wyeth—Ayerst conducting with respect to cardiovascular effects of Premarin. Given the current regulatory climate with respect to Wyeth—Ayerst advertising, this may not be the time that we would wish to invite such an inquiry." |
| 982 | 1990 | ACOG Patient Piece: The Menopause Years<br><br>p. 11- Also some doctors now think that estrogen can guard against the risk of heart disease, which tends to increase after menopause |
| 1005 | 1995 | 1995 Prempro Label |
| 1046 | 7/16/94 | Wyeth's Consensus Conference in 1994<br><br>p. 2 – HRT dosing regimens and breast cancer by Dr. Trudy Bush Consensus Statement: Insufficient data are available to determine whether progestins added to estrogen alter risk of breast cancer. |
| 1057 | 8/24/77 | Wyeth memo re: Use of combination therapy<br><br>Many practicing gynecologists are introducing sequential progestins into their estrogen replacement regimens in postmenopausal women. Unfortunately, the number of published, well-designed studies is small or practically non-existent. |
| 1061 | 12/2/97 | Memo re: textbook: Novak's Gynecology<br><br>Memo notes that "pursuant to Medical Affairs' interaction with the author, the latest edition of Novak's Gynecology ("the gynecologists' Bible") contains information regarding the benefits of estrogen in |

| | | cognitive functioning as well as Alzheimer's disease." |
|---|---|---|
| 1090 | 11/22/93 | Communication from ECOG to Wyeth<br><br>ECOG has retained Dr. Trudy Bush is a co-principle investigator on the ECOG proposed study. |
| 1093 | 10/21/93 | Wyeth Memo re:  Selecting Visitor Speaker Bureau Speakers<br><br>"We have done an excellent job in providing speakers that educate other professionals about osteoporosis and in general ERT.   While these remain important goals, the competitive environment suggests modifying our selection criteria for speakers" so that the company recruits "those physicians and pharmacists that are of the opinion that "all estrogens are not the same" and "Nothing else is Premarin." The current environment dictates that we be more selective of speakers and evaluate them more carefully. |
| 1097 | 9/14/93 | Wyeth memo re: Proposed revisions for ACOG Patient Education brochures<br><br>I recently had occasion to look again at the ACOG Patient Education Pamphlets on The Menopause Years and Estrogen Use. I noticed that the ERT brochure has not been revised since April 1989, and the menopause booklet since April 1990.<br><br>Could we suggest to ACOG that the booklets should be revised (there's no mention of heart disease)? If appropriate, we could offer to assist them with revisions under their direction. |
| 1117 | 10/5/92 | Wyeth Internal Correspondence from David Colasante, M.D. to Robert Levy, M.D. re: WHI Drug Supply Specifics |
| 1150 | 6/18/92 | Wyeth Internal Correspondence from: Carrie Smith-Cox to: Bob Essner, re: Hulley Study ROI |
| 1206 | 7/22/91 | Wyeth memo re: NFO Consumer Survey<br><br>Wyeth's research shows that menopausal symptoms occurred in 17.5% of women in the 50-59 year old range. |
| 1215 | 6/14/91 | Wyeth memo re: Perspectives on Premarin Cardiovascular Prevention Trials<br><br>Wyeth executives assess how much it would cost and how long it would take to conduct a clinical trial to evaluate the heart benefit |

| | | |
|---|---|---|
| | | with E+P.  Such a study, if it also evaluated for breast cancer risk, would have produced similar results to the WHI (and been shut down prematurely) after an average use of 4.4 years. |
| 1265 | 5/31/90 | Wyeth memo re: Dr. Colditz's Presentation of Breast Cancer Study Results<br><br>Wyeth received new information that Dr. Graham Colditz (is scheduled to present the results of a study that shows that hormone therapy increases the risk of breast cancer 30 percent in current users. The meeting -- of the Society of Epidemiologic Research (SER) - -is scheduled the same day as the June FDA meeting, in Snowbird, Utah. According to Burson—Marstellar contacts at SER, no media have been invited and no media attendance is expected. However, media interest in the issue is high.<br>Wyeth prepares to be "reactive on cancer issue" and have media liaisons on-site to "counter-balance" any negative news. |
| 1311 | | Wyeth's "Dear Doctor Letter" to ACOG members<br><br>Wyeth is pleased to sponsor the ACOG's newsletter as part of its continuing service to obstetricians and gynecologists. "We hope you find these abstracts from current publications informative and helpful in your practice."<br>Wyeth tells doctors that "today's published literature also provides increasing support" for the doctor's continued use of hormone drugs. |
| 1315 | 1/6/89 | Media Relations Plan for Wyeth at ACOG meeting<br><br>Outlines all of Wyeth's media plans at the ACOG meeting including "Pitch Wyeth's messages to reporters onsite" at the meeting and "Facilitate media interviews with speakers (Drs. Andrews, Hammond, Lindsay, Sherwin, Wild, Sullivan, Speroff) |
| 1326 | 9/21/88 | Wyeth memo re: Financially Supporting Publications for physicians<br><br>Several publications have been approved for Wyeth financial support and for use in hormone drug promotion during 1989 including ACOG Prelude and Ob Gyn Lit. News |
| 1341 | 9/13/88 | Wyeth Meme re: financial support for Publications<br><br>In 1989, Wyeth will financially support four publications re: hormone therapy: OB/GYN Literature News ($170,000); American Fertility Society (AFS)($115,000); Menopause Management ($340,000); American College of Gynecology (ACOG)($40,000) |
| 1355 | 2/21/79 | Letter from Dr. Austin to Wyeth<br><br>Dr. Austin asks Wyeth to produce sales data for estrogen in order to track the increase in endometrial cancer incidence in connection with the sales. |

29

| 1418 | 10/28/97 | Letter from ACOG to Wyeth re: Wyeth continuing to pay for ACOG newsletter

ACOG and Wyeth "have a long-established tradition of working together. This union has produced many results such as the ACOG Newsletter, the College's most popular publication. Wyeth-Ayerst's generous support has made distribution of this popular tool possible. In keeping with the tradition, and the terms outlined in our 1981 agreement, ACOG requests Wyeth's continued support for 1998. Through your generous support, ACOG will be able to continue distribution of this highly informative publication. The level of sponsorship will increase to S20,000 per issue with each sponsor having four regular monthly issues and one two-month combined issue. The cost increase is due to the substantial increase of our membership. In fact, our membership has increased by over 4,500 since 1993. |
|---|---|---|
| 1428 | 8/1/89 | Wyeth memo re: Dr. Lippman's review of the Bergkvist article

Methodologically, the study involves a mixed cohort-case control design.   Well accepted methods of statistical analysis and techniques for controlling for bias and confounders are employed.
This study suggests that the progestin may have some carcinogenic potential in the breasts. |
| 1449 | 7/31/00 | Letter from Wyeth sales representative Carl Whatley re: Reporting inappropriate off-label promotion by Wyeth sales representatives

Wyeth sales representative reports that: "Company Management developed a core selling presentation" for hormone therapy "focusing on the preventative benefits in Alzheimer's disease." States that  he was given "a scripted, written presentation" as well as copies of the Duke Monograph to use in detailing  and these materials discussed hormone therapy's purported ability to "delay the onset of Alzheimer's disease. This was how I was to begin every detail." |
| 1450 | 7/27/00 | Letter from Wyeth sales representative Cynthia Waldrep re: Reporting inappropriate off-label promotion by Wyeth sales representatives

Sales representative writes: "I would like to take this time to express a very serious concern I have.  Instruction from my management for promotion of products in the Wyeth has included information outside of labeling."
Specifically, sales representatives have been trained to encourage promote the use of hormone therapy "for the prevention/treatment of cardiovascular disease, and Alzheimer's disease." "Additionally, the issue of potential side effects has been minimized such as the risk of |

| | | |
|---|---|---|
| | | breast cancer." <br> "My most critical concern is the lives of the women that may be at risk due to these promotions. Many physicians have been persuaded to use these products for uses that have not been proven. I fear that their lives may be placed in serious potential danger." <br> "Somewhere along the way, the goal of providing the most credible information for physicians became a mute point. It appears the only thing that matters now is increasing market  share. I can no longer stand by silently and allow this to continue." |
| 1565A | 1993 | Wyeth's 1993 Marketing Plan <br><br> To increase sales, encourage Ob/Gyns to prescribe hormone therapy "for all women for life." |
| 1567 | 7/17/89 | Wyeth memo re: Annual conference in Estoril, Portugal (Hormone Deprivation Conference) <br><br> Wyeth reports that: Dr. Malcolm Pike took his usual position in this issue and stated that he is aware that a publication in the August issue of the NEJM will provide data that shows the addition of a progestogen to hormone replacement therapy doubles the risk of breast cancer in women receiving HRT. <br> p. 2- D. Dr. Malcolm Pike: <br> Yes, Dr. Pike continued to bring up the subject of menopause therapy and breast cancer.  It was mentioned by some Wyeth Ayerst executives that this would be the last meeting sponsored by Wyeth-Ayerst to which Dr. Pike would be invited |
| 1579 | 6/9/95 | Wyeth's Dear Doctor Letter re: Colditz 1995 published article <br><br> p. 1 – Leon Speroff, M.D., a leading research expert from Oregon Health Sciences University, commented on the data at the March 1995 meeting of the Society of Gynecologic Investigation, saying that despite some 40 observational studies, no consistent data linking estrogen use and breast cancer exist, and none of these studies have ever shown causality between ERT and mortality due to breast cancer. He further added that the data from the studies have been inconsistent and ultimately inconclusive, which is unlike the relationship between ERT and cardiovascular benefits where there is uniform and consistent data. <br> p. 2- Majority of studies show no association <br> p. 2 - p. 2 - Given this large body of scientific data, you can appreciate how important it is to counsel patients on the overall benefits and risks of HRT, and how studies of this kind need to be evaluated in the proper perspective. |
| 1583 | 6/16/95 | Colditz Breast Cancer Awareness Study <br><br> Results from patient survey where patients were asked whether |

| | | |
|---|---|---|
| | | knowledge of the Colditz 1995 article would make them not want to take hormone therapy "for as long a time" or impact their assessment of the risks versus benefits of treatment. |
| 1584 | 6/19/95 | Congratulatory letter for senior Wyeth executive Steve Strickland for helping to "manage" the Colditz article and the ensuing crisis.<br><br>This was a great example of how organization can pull together "for the good of the business." |
| 1585 | 6/19/95 | Memo re: Dr. Wile's Breast Cancer Paper<br><br>Due to "relationship with editor," Wyeth is able to get Wile's Grand Rounds paper published. This paper opines that Premarin is anti-promoter of breast cancer, is breast cancer protective and results in a better survival rate if woman does develop breast cancer. |
| 1587 | 7/5/95 | Colditz Breast Cancer Report:  Patient Awareness Study<br><br>p. 2 - Wyeth used study to "estimate impact on business" of Colditz article |
| 1651 | 3/95 | Pharma: Code of Pharmaceutical Marketing Practices<br><br>p. 2 - The pharmaceutical industry, conscious of its special position arising from its involvement in public health, have an obligation to "ensure that all products it makes available for prescription purposes to the public are backed by the fullest technological service,"  to base all claims "on valid scientific evidence," "to provide scientific information with objectivity and with scrupulous regard for truth, and with clear statements with respect to indications, contraindications, tolerance and toxicity; to use complete candor in dealings with public health officials, healthcare professionals and the public, and to comply with the regulations and policies issued by the Food and Drug Administration."<br>p. 3 - #2.  Information on pharmaceutical products should be accurate, fair and objective.<br>p. 3 - #3.  Information should be based on an up-to-date evaluation of all the available scientific evidence and should reflect this evidence clearly.<br>p. 3 - #4. No public communication should be made with the intent of promoting a pharmaceutical product as safe and effective for any use before the required approval of the pharmaceutical product for marketing for such use is obtained.<br>p. 3 - #5.  5. Statements in promotional communications should be based upon substantial scientific evidence or other responsible medical opinion. Claims should not be stronger than such evidence warrants. Every effort should be made to avoid ambiguity.<br>p. 3 - # 6. Particular care should be taken that essential information as to pharmaceutical products' safety,  contraindications and side |

| | | |
|---|---|---|
| | | effects or toxic hazards is appropriately and consistently communicated. Should use "fair balance in promotional communications<br><br>p. 4 - # 8.  Post-marketing and surveillance studies should be conducted on a scientific or educational basis.<br><br>p. 4 - #9. Where companies assist in the conduct of public/patient disease awareness programs, such activities should adhere to the highest standards of accuracy and support the role of the healthcare provider. |
| 1654 | 6/6/02 | Minutes from the Menopausal Health Publication Management Brainstorming Meeting<br><br>Objective is to "identify strategies to meet the goal of one positive Premarin /HRT publication per month" |
| 1657 | 8/6/85 | Wyeth's memo re: Meeting with FDA<br><br>Wyeth informs FDA that they are going to discontinue |
| 1659 and 1659A | 8/11/00 | Wyeth's Letter to FDA with final version of Proposed Draft Label language in response to Dr. Susan Allen's order for a stronger breast cancer warning<br><br>This letter does not highlight the Gapstur study data or even include Gapstur in its references. |
| 1662 | 4/7/95 | Wyeth memo to all employees representing Wyeth at the ACOG Annual Clinical Meeting in San Francisco on May 6-10, 1995.<br><br>"The ACOG- Annual Clinical Meeting represents WA's largest financial investment.   The expected professional attendance is 5,000.  You will have the opportunity to promote the new members of the Premarin Family: Prempro and Premphase. |
| 1665 | 5/4/95 | Wyeth Memo re: the ACOG/Wyeth Resident Reporter program.<br><br><br>Wyeth is sponsoring a dinner for the new residents at an ACOG convention. The new president of ACOG will be there to welcome all of the residents.  "As in the past, this program looks to be another success and further demonstrates our world leadership in women's health." |
| 1680 | | ADMINISTRATIVE POLICY 405: Wyeth internal policy for assessing causality<br><br>Global Adverse Event Data Collection and Safety Reporting |

| | | Procedures |
|---|---|---|
| 3296 | 6/15/00 | Strategic Publications Development Meeting |
| 3493 | 4/1/03 | Postmenopausal Hormone Therapy:  Focusing on the Appropriate Use and User for E+P |
| 3496 | 7/8/01 | Wyeth document re: 15th Annual Symposium – Long Term Effects of Estrogen Deprivation at Elbow Beach Resort, Bermuda<br><br>p. 26 Mammographic breast density is a strong independent risk factor for breast cancer. Studies (including PEPI) show that an increase in breast density is more frequent among women on combined estrogen-progestogen treatment than those receiving estrogen alone. |
| 3956 | 2002 | Product Strategy Input Template<br><br>p. 2 – Wyeth is concerned that there is a "growing perception that HRT should be discontinued after 4-5 years.  We need a strategic plan to keep current users on therapy for longer periods." |
| 4078B | 2010 | Dr. Larry Norton, Medical director and chief oncologist at Sloan Kettering's breast center:  re: Educational speech about WHI and breast cancer findings with E+P.<br><br>p. 33-34, p. 45- As high as one third of the breast cancers in post-menopausal women were caused by E+P. |
| 4393 | 5/16/01 | Design Write plan for helping Wyeth get medical articles published<br><br>p. 3 – Cost of 5 articles = $125,000 |
| 5609 | 1/6/95 | Wyeth memo re: Direct to Consumer Print Media campaign<br><br>Wyeth's campaign will be a "multi-million dollar blitz in every sense of the world." "9 out of 10 women in the country reading these magazines will see our new campaign not once, but almost 13 times." |
| 5677 | 12/22/97 | Memo from Wyeth's PR consultant Burson Marstellar re: Reshaping public's perspective about HRT and breast cancer<br><br>Wyeth's goal is to create doubt so that patient does not believe that there is really a breast cancer risk but merely accepts that she does |

| | | |
|---|---|---|
| | | not know if HRT causes breast cancer and her fear of dying from heart attack is greater and a more legitimate threat.<br>p. 3- Message Track - Motivate - "Women who use HRT are less likely to develop Alzheimer's disease, cardiovascular disease or osteoporosis. Women are denying themselves of these benefits if they allow unfounded misperceptions to drive their decision-making process."<br>p. 6 - "Shame on You" campaign - Advocates outraged and outspoken about "misleading women at the expense of their health" Concerned about the consequences of breast cancer messages based in emotion and drama. Messages only serve to "scare women to death," undermine the physician- patient relationship and the physician's effort to provide health care that is based on experience and knowledge of all the data |
| 5733 | 1999 | 1999 Marketing Budget for HRT<br><br>Millions in grants for ACOG and NAMS; ACOG newsletter; Money to fund the University of Maryland (Trudy Bush) |
| 5775 | 2/00 | Wyeth's "Dear Healthcare Professional" Letter in response to Ross and Schairer published articles<br><br>p. 2 – Tells doctors that breast cancer risk data is "conflicting and inconclusive"<br>p. 3 – Promotes E+P for off-label benefit: E+P is "associated with a reduced risk for developing heart disease."<br>p. 5 – Attaches a chart to the letter that purports to summarize the published literature on E and E+P as to the breast cancer risk. While Wyeth includes the 1989 Bergkvist article on this list, Wyeth does not note the E+P relative risk from that study of 4.4. Instead, Wyeth records only the E data. (A 4.4 relative risk would be literally "off the chart"). |
| 6479 | 1994 | 1994 Premarin Label<br><br>p. 3 –Most women have none or only mild menopausal symptoms and do not need estrogen. |
| 6485 | 1999 | 1999 Prempro Label |
| 6492 | 1997 | 1997 Prempro Label |
| 6493 | 1998 | 1998 Prempro Label |
| 6902 | | Wyeth promotional piece: Tip of the Iceberg<br><br>Wyeth promotional piece featuring a photograph of an iceberg and representing that "menopausal symptoms re just the tip of the iceberg" because the below-the-surface consequences of estrogen loss includes the development of cardiovascular and Alzheimer's disease |

| | | |
|---|---|---|
| 7224 | | Wyeth TV Ad: Walk On |
| 7227 | | Wyeth TV Ad: Lauren Hutton |
| 7422A | 1997 | Wyeth's plan for "Myths & Misperceptions" educational program<br><br>Wyeth is proposing to fund various grass roots organizations for them to provide educational programs on menopause and hormone therapy.  However, the "first criteria" to being funded by Wyeth is that the organization must "be willing to take position that HRT does not cause breast cancer" |
| 7871 | 6/8/95 | Wyeth documents re: Request for help with breast cancer study by Dr. Fiona Gilbert (UK researcher)<br><br>Dr. Gilbert wants to do a mammographic density study using mammograms obtained from a previous Wyeth placebo-controlled study.  Wyeth refuses to allow her access to this data unless she agree "that there should be no review of issues currently under discussion in the literature elsewhere reviewing HRT and breast cancer" and she "agrees that the Premarin Study Review Committee has an absolute and final right to comment on the content, emphasis and conclusions of any publication(s)" so that "in the event of any significant differences of opinion, Dr. Gilbert will agree to accept the views of the Premarin Study Review Committee." |
| 8010 | 9/7/77 | Agreement between Wyeth and Kaiser<br><br>Wyeth had access to Kaiser's insurance database to conduct studies. |
| 8019 | 4/1/83 | Wyeth memo re: E+P<br><br>1.  There is no adequate evidence in the literature to support an E+P regimen |
| 8019A | 6/6/94 | Overview of work done for Wyeth by Wyeth's PR consultant group Burson Marstellar<br><br>p. 3 – Was able to change perspective on osteoporosis and turn it into a "serious disease"<br>p. 5 – Held deal with Scientific / Regulatory Issues Management (1989-1991) including "pre-empt negative press" and "neutralize impact of negative news"<br>p. 6 – Was able to help deflect criticism of hormone therapy, for example on issue of breast cancer |
| 8024A | 12/1/94 | Wyeth memo: Wyeth's upcoming Consultant's meeting and CME program<br><br><br>p. 1 - Wyeth is "hand picking" attendees for OB Gyn conference |

36

| | | |
|---|---|---|
| | | p. 2 – Concept is to have the attendees create slides and educational materials to use with all other Ob Gyns and for CME programs |
| | | p. 5 – Suggestion is to use Dr. Arthur Herbst, an oncologist who is also chair of U of Chicago's Ob Gyn Dept.  Handwritten notes says "No way an oncologist chairs this…no, no, no, no, no, no" |
| 8031 | | FDA Manual – FDA causation |
| | | FDA asks drug companies to include items in ADEs |
| 8034 | 9/97 | Compilation of documents showing Wyeth's involvement in the ghost-writing of Dr. Nachtigall's SHBG article: *Sex Hormone Binding Globulin and Breast Cancer Risk* |
| | | Dr. Nachtigall's article opines that "no substantial breast cancer risk has been consistently associated with" hormone therapy use" and "extensive epidemiologic studies provide conflicting evidence" as to whether there is any significant increase in risk from hormone therapy.  Dr. Nachtigall even postulates that hormone therapy may decrease a woman's risk of breast cancer and reminds doctors of the heart benefit of these drugs. |
| | | p. 1 - After the outline for this paper was completed and edited by Wyeth, Wyeth's management suggested Dr. Nachtigall as a possible author and talked about "initiating contact" with her. |
| | | p. 2 – The proposed outline for the article opines that "epidemiological studies have not confirmed that exogenous estrogens or progesterone play a role in the development of breast cancer" |
| | | p. 4 - SHBG impact by hormones may actually decrease breast cancer incidence and article should emphasize the benefits of hormone therapy. |
| | | p. 7 - "What mechanism has been established to remunerate the authors?" |
| | | p. 8 – The article is completed when it is sent to Dr. Nachtigall for |

| | | |
|---|---|---|
| | | the first time<br><br>p. 10 – Wyeth's consultant group drafts the response to the peer reviewers<br><br>p. 13 – The "writer" of this article is noted to be a PhD, Ann Contijoch. |
| 8059 | 9/30/94 | Wyeth files draft labeling for Prempro with FDA<br><br>p. 16 –Based on experience with estrogens and/or progestins:<br>1.  Induction of malignant neoplasms.<br>Breast cancer. Some studies have suggested a possible increased incidence of breast cancer in those women on estrogen replacement therapy taking high doses, or in those taking lower doses for prolonged periods of time, especially in excess of 10 years. The majority of studies, however, have not shown an association with the usual doses used for estrogen replacement therapy. |
| 8068 | 3/06 | Government Accountability Office Investigation into FDA: "*Drug Safety: Improvement Needed in FDA's Postmarket Decision-making and Oversight Process*"<br><br>p. 14 – FDA has no explicit authority to require drug companies to take safety action.<br>p. 31-32 - FDA does not have authority to require that a drug company conduct a study for the purpose of investigating a specific post-marketing concern. In the absence of specific authority, FDA often relies on drug sponsors voluntarily agreeing to conduct studies FDA has little leverage to ensure that these studies are carried out. |
| 8069 | 3/03 | Inspector General Report on FDA: *FDA's Review Process for New Drug Applications: A Management Review* |
| 8070A | 2007 | Institute of Medicine report on FDA: *The Future of Drug Safety: Promoting and Protecting the Health of the Public*<br><br>The IOM conducted this review upon request and funding in part by the FDA. IOM focused on CDER (Center for Drug Evaluation & Review).<br>p. 130 – 131 - FDA has no authority to compel the completion of Phase 4 clinical trials and industry could be reluctant to conduct them because of the possibility that unfavorable results would negatively influence market share<br>p. 172 - FDA cannot unilaterally compel label changes, addition of boxed warnings, or fulfillment of post-marketing study commitments. Nor can it unilaterally restrict marketing, change the |

| | | |
|---|---|---|
| | | content of a package insert (including Medication Guides), or change the content of other documents intended for the public. |
| | | p. 173 - If safety problems are identified, FDA can ask the sponsor to propose label language but cannot require specific language to describe the newly identified risks. Often, companies argue strongly against label changes, limitation of marketing, boxed warnings, and so on. |
| | | p. 174 – FDA has no authority to approve drug advertising |
| | | p. 85 - It has become increasingly clear that the credibility of FDA is intertwined with that of the industry it regulates. The user-fee funding procedures increases the agency's dependence on industry funding for its drug review activities, severely skewing CDER's focus to facilitating review and approval |
| | | p. 88 - The user-fee system has exacerbated concerns about the relationship between FDA and the regulated industry by creating the appearance of conflict of interest in the regulators—critics assert that PDUFA gives sponsors inappropriate leverage or influence over regulation because FDA is obliged to please sponsors, now its "clients," in return for fees for service. |
| 8077 | 2003 | Wyeth memo re: Core SPC for HT products<br><br>p. 3 - The increased breast cancer risk "was found mostly for women with a lean or normal body build." |
| 4078B | 2010 | Dr. Larry Norton, Medical director and chief oncologist at Sloan Kettering's breast center:  re: Educational speech about WHI and breast cancer findings with E+P.<br><br>p. 33-34, p. 45- As high as one third of the breast cancers in post-menopausal women were caused by E+P. |
| 8081 | 12/28/94 | FAX from FDA to Wyeth with proposed label language for Prempro and Wyeth's response<br><br>p. 5 – FDA's proposed addition of a warning about Wyeth's pivotal trial which describes the pivotal trial data as "five new cases developed" after one year of E+P use.  Wyeth changes the language to "was detected."<br>p. 1- Wyeth adds sentence that there was no increased rate of breast cancer in pivotal trial than expected background rate. |
| 8089 | 5/4/92 | Wyeth's document (Email between Dr. Dey and Dr. Pickar) re: getting approval for E+P<br><br>Information on the progress/potential problems re: Premarin MPA.<br>p. 2 – The clinical report will receive "ghost writing" support from clinical with the signing expert to be identified at a later date. |
| 8151 | 4/28/00 | Finance Committee Form |

| | | Additional budget of $40 Million to "counter breast cancer news." Plan is to launch Lauren Hutton "Vitality" campaign which includes off-label and unbranded promotion of heart and brain benefit |
|---|---|---|
| 8155 | 7/9/02 | NIH Press Release on the day that they stopped the WHI study.<br><br>NIH announces that they "have stopped early a major clinical trial early.. due to an increased risk of invasive breast cancer." Conclusion is that the harms exceed the benefits of E+P as "a 26 percent increase in breast cancer risk is too high a price to pay, even if there were a heart benefit." |
| 8155G | 3/15/01 | Wyeth memo re: Tracking 51 ghost-written articles<br><br>Listing, according to various categories, of articles for which Wyeth is providing technical writing assistance (Breast Cancer Message, Cardiovascular Message, CNS Message (Alzheimer's), Bundle of Benefits Message) |
| 8155Z | 1997-2001 | Composite exhibit of documents confirming Wyeth's ghost-writing of and technical writing support for Dr. Trudy Bush's Review Article. |
| 8166 | 5/16/01 | Memo re: requested endowment for Dr. DiSaia<br><br>University of California wants to endow a chair for Dr. DiSaia but need $1 million.,  They have $500,000 from corporate sponsorship but are looking to Wyeth for a "generous gift." Wyeth really wants to give something because of the "strong advocacy we have enjoyed in the past with Dr. DiSaia" Given that Dr. DiSaia is a "national figure of importance to the brand team" and Wyeth is "facing breast cancer risk labeling changes this year," management wants to re-allocate 2001 funds for this purpose. |
| 8171A | 1998 | Budget for Wyeth's PR consultants Burson Marstellar for 1998<br><br>Wyeth paid $200,000 for the PR aspects of the Myths & Misperceptions campaign |
| 8302 | 7/27/00 | Agreement between Wyeth and ATTL Communications<br><br>Wyeth hires ATTL to conduct an analysis and literature review on HRT and Breast Cancer |
| 8303 | 7/31/00 | ATTL Analysis of E+P and Breast Cancer<br><br>p. 1 –To date, no published study has included a sample size of estrogen-progestin users large enough from which to definitively make conclusions regarding the relationship between estrogen-progestin combination use and the risk of breast cancer. Since 1997, only three studies have evaluated the relationship between estrogen-progestin use and breast cancer risk (i.e., Collaborative Study 1997, Schairer et al. 2000, and Ross et al. 2000). |

| | | p. 2 - In addition to having insufficient sample sizes of estrogen-progestin users from which to derive breast cancer risk conclusions, all of the published studies that have included estrogen-progestin users have lacked sufficient information regarding type and dosage of drug used and regimen of use<br><br>p. 10 –Justification for revision: A review of the literature substantiates that the risk of breast cancer and estrogen-progestin use is "limited" rather than "unknown." I would recommend modifying "unknown" in the above-referenced sentence to "limited" since the literature documents a total of 741 cases of breast cancer among ever users of estrogen-progestin. If "limited" is not an acceptable substitution, perhaps "undefined" or another word along those lines because it is not 100% accurate to say the risk is "unknown".<br><br>p. 13 – ATTL questioned length of use of E+P since "the incidence of hot flashes is highest in the first two postmenopausal years" and lessens over time. |
|---|---|---|
| 8306 | 10/8/97 | Voice mail to sales force from Wyeth marketing executive (Jeff Buchalter) re: Responding to Collaborative Group study<br><br>"You should not engage physicians in a discussion about the Lancet article" but should "continue to focus your presentation on the benefits of HRT." |
| 8420 | 2007 | 2007 Prempro Label |
| 8638 | 10/17/94 | Wyeth memo re: Telephone conference with Wyeth consultant Dr. Trudy Bush re: breast cancer risks associated with E+P<br>Dr. Bush reported that data from National Cancer Institute study showed increased risk of breast cancer in women on E+P "any dose" as compared to E alone. |
| 8744A | 6/2/95 | Memorandum re-confirming strategy of Wyeth and its PR consultants as to how to deal with Colditz 1995 published article:<br><br>p. 1 - Primary goal is: Shift media focus from study. Dissent by opinion leaders, Drs. Speroff or Bush<br>p. 2 - Undermine / cast doubt on validity of data |
| 8746 | 6/2/95 | Memo re: Colditz 1995 article<br>p. 2 – Drs. Speroff and Bush identified as Wyeth spokespeople |
| 9078 | 2000 | 2000 Prempro Label |
| 9144 | 4/63 | Wilson, *The fate of the nontreated postmenopausal woman:  A Plea for the maintenance of adequate estrogen from puberty to grave*<br><br>Dr. Robert Wilson is the author of "Feminine Forever"<br>p. 12 - Estrogen and progesterone may actually reduce (or "be prophylactic") in relation to breast cancer. |
| 9200 | | Visitor Speaker's Bureau slide kit<br><br>Wyeth's prepared slides for use by Opinion Leaders at educational |

| | | |
|---|---|---|
| | | presentations. |
| 9256 | 1996 | Wyeth's "The Necklace" Direct to Consumer ad<br><br>Wyeth used the visual of a necklace made up on one side of Premarin tablets and on the other side of progestin tablets to remind women that Prempro was the combination of both pills.<br>Breast cancer is not included as a side effect and the only issue mentioned about breast cancer is if a woman had a family history of breast cancer, she should discuss that issue with her physician. |
| 9257 | 1998 | Wyeth's Direct to Consumer ad: "I'm Glad I Take My Premarin"<br><br>Breast cancer is not included as a side effect and the only issue mentioned about breast cancer is if a woman had a "personal or family history of breast cancer," she should discuss that issue with her physician. |
| 9260 | 1997 | Wyeth's Direct to Consumer ad: "Menopause: A Time to Look Ahead"<br><br>Breast cancer is not included as a side effect and the only issue mentioned about breast cancer is if a woman had a "personal or family history of breast cancer," she should discuss that issue with her physician. |
| 9299A | 2000 | Wyeth Direct to Consumer Advertisement featuring Lauren Hutton<br><br>Unbranded promotional piece: Emphasizes that heart disease and cognitive decline is due to loss of natural hormones at menopause and encourages use of Wyeth's "therapies" for menopause. |
| 10023 | 1997 | 1997 Prempro Label |
| 10425 | 11/7/00 | Letter from Wyeth's counsel to FDA<br><br>As you know, under the NDA review system, applicants propose labeling language, which the FDA reviews. Thus, as a practical matter, changes in labeling generally result from a negotiation process that recognizes and respects the different expertise and perspectives of the applicants and the agency. It is not consistent with the law for the FDA simply to dictate proposed language for an applicant's labeling without providing a meaningful opportunity for dialogue between the applicant and the agency |
| 10555 | | Wyeth website |
| 10556 | | Wyeth Website:<br><br>HRT increases the risk of developing and dying from breast cancer |
| 20267 | 9/21/09 | Trial Transcript from *Barton v. Wyeth*, 9/21/09 |
| 20801 | | Testimony from Dr. Michael Dey, Fred Hassan and Robert Essner re responsibilities and duties of this drug company. |

| 20802A | | Deposition of Dr. Marc Deitch, Wyeth's medical director and senior scientific advisor, 10/26/05 and 10/27/05 (Dr. Deitch could not recall "even a single study done by Wyeth that would answer the question about the connection between hormone replacement therapy and breast cancer"), Deposition of Dr. Harold Marder, Wyeth's senior vice-president, global medical director and head of Global Medical Affairs, 1/17/06 (Dr. Marder could not name "any study" done by Wyeth to "determine whether combination estrogen and progestin could cause cancer"), Deposition of Dr. Gerald Fisher, Wyeth's Senior Vice President of Drug Safety & Metabolism, 11/22/04 (Dr. Fisher could not cite to any study that Wyeth "sponsored, supported, developed or executed" in humans or animals to assess the breast cancer risk), Deposition of Dr. Pamela Cobb, Wyeth's director of Global Medical Affairs, 6/23/06 ("Wyeth never did a breast cancer trial") |
| 20852 | 4/30/01 | Compilation of documents showing Wyeth's involvement in the ghost-writing of Dr. DiSaia |
| 20857 | 7/10/95 | Wyeth's letter to FDA

Wyeth acknowledges that the FDA does not want Wyeth to discuss Prempro's effect on lipid levels as a "health benefit" of the drug. |
| 20858 | 1/12/98 | Compilation of documents showing Wyeth's involvement in the ghost-writing of Dr. Fillit's article on hormone therapy and Alzheimer's disease |
| 20871 | 12/26/91 | Audit Report by Wyeth's PR consultants Burson Marstellar

PR group's assignment was to review Wyeth's crisis management capability and create manageable system for Premarin issues / crisis preparedness
p. 7 – Key Issues that they anticipate: Breast cancer
p. 14 – Wyeth is noted to be fear critics' charges that:  Wyeth is not doing enough studies to prove safety, address issues/ How much is the company reinvesting in research? |
| 20875 | 5/3/91 | FDA letter to Wyeth re:  Wyeth's support for Dr. Gotto's program

FDA does not want Wyeth to support Dr. Gotto because his program discusses heart benefit and would thus be considered promotion of cardiac prevention (an unproven and off-label benefit). |
| 20878 | 8/10/00 | Letter from FDA (Susan Allen) to Wyeth re: requesting stronger breast cancer warnings for hormone therapy

Dr. Allen orders Wyeth to add new breast cancer warnings because of the Ross and Schairer papers. She wants Wyeth to tell doctors that the breast cancer risk from E+P is not "unknown" or the same as E alone but rather 24-40% higher than the risk of E alone. |
| 20879 | 9/26/00 | Dr. Trudy Bush's letter to FDA re: Susan Allen's new proposed |

| | | stronger breast cancer warnings |
| | | Dr. Bush believes that stronger warnings may "frighten" women |
| 20923 | 9/21/92 | **WHI  Funding** – Finance Committee Authorization |
| | | $2.7 million for pills and patient recruitment assistance |
| 20928 | 5/26/95 | Wyeth evaluates Burson Marstellar: |
| | | Raises its rating to "Excellent" |
| 20941 | 1/10/01 | Wyeth email |
| | | PEPI study was not powered or designed to evaluate the risk or incidence of breast cancer |
| 20950 | 6/23/95 | Wyeth's letter to FDA |
| | | Wyeth wanted to include Prempro's effect on lipid levels as a "health benefit" of the drug. The FDA refused Wyeth's request because cardiac benefit is not an approved indicate for the drug. |
| 20957 | 10/6/97 | Wyeth memo re: Training sales representatives to respond to Collaborative Group Study |
| | | Wyeth informed its sales representative: "Do not raise this article with your doctors unless they mention it to you. If mentioned, highlight that these reports say nothing new about ERT and breast cancer and that the long term benefits of HRT still by far outweigh any risks." |
| 20958 | 6/23/95 | 1995 Colditz Article: Colditz Breast Cancer Awareness Study Questions asked in patient survey identified |
| 20961 | 2001 | 2001 Prempro Label |
| 20963 | 12/22/92 | Letter from Wyeth to FDA re: Pivotal Trial |
| | | p. 2 -    It was acknowledged during discussions between FDA and Wyeth that this study could not resolve the issues related to breast cancer. An agreement was reached that an evaluation of breast cancer risk would not be a subject of evaluation in this program. |
| 20967 | 12/98 | Wyeth memo re: Teleconferences to educate physicians |
| | | The teleconferences allow Wyeth to educate doctors on |

| | | |
|---|---|---|
| | | "cardiovascular effects of menopause" and gives opportunity to downplay breast cancer." |
| 20998 | 8/12/98 | Wyeth memo re: Meeting with Wyeth and FDA on HERS study <br><br> p.5 – Wyeth emphasized to the FDA that the study was not designed nor powered to detect differences for cancer. |
| 21003 | 8/7/98 | Memo re: Article published in "Good Housekeeping" <br><br> Noted is that Wyeth and its PR consultants "supplied much information" to the author of this article and "we are pleased with the results. You will note that this article includes much information surrounding HRT and ERT, and cardiovascular disease, Alzheimer's disease." There is a further discussion on "how to merchandise this publication both internally and externally |
| 21007 | 1995 | Preservation Deposition of Dr. Graham Colditz (Date: 12/18/06/ 12/29/06 / 12/30/06) at p. 809 <br> 2     A.   The medical director called <br> 3  me to complain that the stock had fallen <br> 4  two points and he didn't know about it <br> 5  ahead of time, and really asked why was I <br> 6  presenting these results at the AAAS <br> 7  meeting. |
| 21008 | | Testimony of Dr. James Pickar |
| 21009 | | Testimony of Dr. Harold Marder |
| 21013 | | Testimony of Dr. Michael Dey and Bernard Poussot |
| 21016 | 8/15/00 | Wyeth's promotional piece called the "Lives saved" piece <br><br> Wyeth promotional piece which emphasizes that hormone therapy conveys a heart protection benefit and women who take hormone drugs "following <br> menopause have basically no more risk of developing breast cancer" than women who do not take such drugs. |
| 21024 | 2/13/96 | Memorandum from Wyeth's PR consultant (Burson Marstellar) proposing that group "ghost-write" articles for Dr. Bush and seek placement for those articles in various publications. |
| 21025 | 9/26/97 | Wyeth memo re: Collaborative Group study <br><br> It appears that the manuscript is close to publication. We have been advised that it may appear in the Lancet as early as October 8. A global public relations response plan is being prepared |
| 21027 | | Thalidomide package insert <br><br> Thalidomide "can cause serious birth defects" |
| 21028 | | Accutane package insert <br><br> Accutane can cause birth defects |

| 21035 | 2/18/00 | Wyeth district manager writing to a sales representative (Carl Whatley) |
| | | Wyeth management is angry that the sales representative will not discuss Wyeth's "core message" of Alzheimer's benefit with physicians. |
| 21038 | 5/15/00 | Memo re: Sponsoring Menopause Handbook |
| | | Wyeth notes that "The menopause handbook authored by Dr. Frances Batzer which is available for sponsorship" and is considering this as a 2001 marketing "tactic" since "the handbook will be updated before the next printing, and the sponsor will have input into that process" and seems "open to collaborating with other experts" selected or suggested by Wyeth.  Wyeth intends to have its sales representatives distribute copies of the handbook to prescribing physicians. |
| 21042 | 3/02 | Wyeth's Core date sheet for Prempro |
| | | p. 2 - Epidemiological studies have reported an increased risk of breast cancer in women taking E+P. "This increased risk was found mostly for women with a lean or normal body build." |
| 21048 | 3/19/02 | Core Data Sheet |
| | | European label |
| 21055 | 6/10/91 | Wyeth's letter to FDA re: June 1991 Advisory Committee Meeting |
| | | Wyeth sends the FDA a "comprehensive review of the literature regarding the effects of the E+P" for review by the FDA advisory Committee in anticipation of the 1991 Advisory Committee meeting |
| 21074 | 11/24/97 | Wyeth memo re: Myths & Misperceptions campaign |
| | | Confirms that Wyeth created and implemented the "Myths & Misperceptions" campaign. "We are pleased to share with you the results of yesterday's successful launch of Myths and Misperceptions, a public relations program that we presented at tacticals last week…This program is funded through an unrestricted educational grant from Wyeth Ayerst…. The program focused on women's misperceptions of getting breast cancer when compared to their actual risk for other age-related diseases." |
| 21094 | | Interview with Dr. Rowan Chlebowksi, lead investigator for WHI |
| | | Dr. Chlebowski estimates that E+P caused 200,000 excess breast cancers in America. |
| 21118 | 1/11/96 | Memorandum showing that Wyeth's strategies for reacting to the 1995 Colditz article were "spearheaded" by Wyeth executive, Nick |

| | | |
|---|---|---|
| | | Marmontello who also "directly oversaw the field efforts" |
| 21127 | 2005 | FDA HRT Working Group, *Guidance for Clinical Evaluation of Combined Estrogen/Progestin-Containing Drug Products use for Hormone Replacement Therapy of Postmenopausal Women*, Menopause: Journal of the North American Menopause Society, Vol. 2, No. 3: 131-136 (2005) |
| | | |
| | | **MEDICAL LITERATURE** |
| | | |
| ML 3 | | Colditz, *The Use of Estrogens and Progestins and the Risk of Breast Cancer in Postmenopausal Women*, NEJM, Vol. 332, No. 24 (1995)<br><br>Statistically significant increased breast cancer risk with E+P (RR = 1.41)<br>Significant increase in the risks of breast cancer and of death due to breast cancer among women over 55 who are currently taking hormones. |
| ML 8 | 2003 | Greenspan, *Combination Therapy with Hormone Replacement and Alendronate for Prevention of Bone Loss in Elderly Women,* JAMA, Vol 289 No 19 (2003)<br><br>Conclusions:  Fosamax provides superior osteoporosis protection to combination hormone replacement |
| ML 19 | 2003 | Manson, *Estrogen Plus Progestin and the Risk of Coronary Heart Disease,* NEJM, Vol. 349, No. 6 (2003)<br><br>p. 1 – Conclusion: Estrogen plus progestin does not confer cardiac protection and may generally increase the risk of CHD among generally healthy postmenopausal women, especially during the first year after the initiation of hormone use. This treatment should not be prescribed for the prevention of cardiovascular disease. |
| ML 22 | 1997 | Collaborative Group on Hormonal Factors in Breast Cancer, *Breast cancer and hormone replacement therapy: Collaborative Reanalysis of data from 51 Epidemiological Studies of 52,705 women with Breast Cancer and 108,411 Women without Breast Cancer*, Lancet, Vol. 350 (1997).<br><br>Breast cancer risk was higher for women with lower body mass index (BMI) |
| ML 29 | 2005 | Rapp, *Effect of Estrogen Plus Progestin on Global Cognitive Function in Postmenopausal Women The Women's Health Initiative Memory Study: A Randomized Controlled Trial*, JAMA, Vol. 289, No. 20 (2005)- PX ML 29<br><br>Conclusions: Estrogen plus progestin did not improve cognitive function when compared with placebo. A "small increased risk of clinically meaningful cognitive decline occurred in the estrogen plus |

| | | progestin group." |
|---|---|---|
| ML 30 | 2002 | Writing Group of the Women's Health Initiative Investigators, *Risks and Benefits of Estrogen Plus Progestin in Healthy Postmenopausal Women: Principal Results from the Women's Health Initiative,* JAMA, Vol. 288, No. 3 (2002) - PX ML 30 <br><br> p. 1 - Conclusions: Overall health risks exceeded benefits from use of combined estrogen plus progestin |
| ML 63 | 2000 | Schairer, *Menopausal Estrogen and Estrogen-Progestins Replacement Therapy and Breast Cancer Risk,* JAMA, Vol, 282, No. 4 (2000) <br><br> p. 1 – Conclusion: E+P increases breast cancer risk beyond that associated with estrogen alone. <br> p. 5 – For E+P, there was a significant increase in risk among lean women. |
| ML 79 | 2003 | Million Women Study Collaborators, Beral, *Breast cancer and hormone-replacement therapy in the Million Women Study*, Lancet, Vol. 362, p. 419 (2003) <br><br> Questionnaire study conducted by British government on just over 1 million women that showed a doubling of the risk after just 2.6 years of follow up with E+P users. |
| ML 98 | 2000 | Ross, *Effect of Hormone Replacement Therapy on Breast Cancer Risk: Estrogen Versus Estrogen Plus Progestin*, J. of National Cancer Institute, Vol. 92, No. 4 (2000) <br><br> p. 1 - Conclusions: This study provides strong evidence that the addition of a <br> progestin to HRT enhances markedly the risk of breast cancer relative to estrogen use alone. These findings have important implications for the risk-benefit equation for HRT in women using combination therapy. |
| ML 117 | 1999 | Magnusson, *Breast-cancer risk following long-term oestrogen- and oestrogen-progestin-replacement therapy,* Int. J Cancer. Vol. 81:339-344 (1999)- PX ML 117 <br><br> E+P increases risk of breast cancer especially in women with lower body mass index (BMI). <br> Table VI – More than doubling of the relative risk for thinner women with more than 60 months of hormone use. |
| ML 133 | 1982 | Austin & Roe, *The decreasing incidence of endometrial cancer: public health implications*, Am J. Pub. Health, Vol 72: 65-68 (1982) – PX ML 133 <br><br> Figure 2 – Shows that the endometrial cancer rates increased in lock |

| | | |
|---|---|---|
| | | step with increased estrogen sales and fell when estrogen use fell. p. 2 - Opines that estrogen may be acting as a tumor promotor rather than a tumor initiator. |
| ML 192 | 4/18/90 | Glass, *Rising Incidence of Breast Cancer: Relationship to Stage and Receptor Status*, J. of the National Cancer Institute: Vol. 82, No. 8 (1990)<br><br>This study, using the Kaiser Permanente tumor registry, analyzed breast cancer incidence from 1960 to 1985 and found a dramatic increase(131%) in the incidence of hormone receptor positive breast cancer for older women since mid-1970s (when E+P use started). The authors noted that the increase was prominent in estrogen receptor-positive tumors, "perhaps implicating hormonal factors in the rising incidence of breast cancer." |
| ML 532 | 2009 | Crandall, *New-Onset Breast Tenderness after Initiation of Estrogen Plus Progestin Therapy and Breast Cancer Risk*, Arch. Intern. Med., Vol. 169(18):1684-1691 (2009).<br><br>p. 1 - Conclusions: New-onset breast tenderness during E+P use is associated with increased breast cancer risk. |
| ML 539 | 1961 | Riviere, *Appearance of mammary tumors in the male rat subjected to a combination treatment of estrogen and progesterone,* Societe de Biologie, No. 11: 2102-04 (1961).<br><br>Only the combined treatment of estrogen and progesterone induced mammary tumors showing a "synergistic action" of the combination that does not occur with estrogen or progesterone alone**.** |
| ML 600 | 1989 | Bergkvist, *The Risk of Breast Cancer After Estrogen and estrogen-progestin Replacement*, NEJM, Vol. 321(5):293-7 (1989)<br><br>Increase in risk after only 2 years of E+P use. Relative Risk of 4.4 after 6 years of use.<br>The relative risk was 4.4 (95 percent confidence interval, 0.9 to 22.4) in women who used only E+P for more than six years.<br>p. 5 – Further research must investigate the possibility that the addition of progestins to estrogen therapy may increase the risk of breast cancer. |
| ML 671 | 1994 | Schairer, *Menopausal Estrogen and Estrogen-Progestins Replacement Therapy and Risk of Breast Cancer,* Cancer Causes Control, Vol, 5: 491-500 (1994) – PX ML 671<br><br>p. 5 – Table 3 - Statistically significant RR of 1.5 for all breast cancers after less than two years of E+P use<br>p. 6 - In recent users with normal or thinner BMS, use of E+P was "associated with significant increases in risk of invasive tumors with ductal and/or lobular histologies." |

| ML 714 | 1993 | Colditz, *Hormone replacement therapy and risk of breast cancer: Results from epidemiologic studies*, Am J. Obstet Gyn, (1993) <br><br> In spite of the suggestion that the addition of progestins to estrogen therapy may reduce the risk of breast cancer, the combined data do not support this hypothesis. The summary relative risk for combination therapy was 1.13. |
|---|---|---|
| ML 866 | 1999 | Gapstur, *Hormone Replacement Therapy and Risk of Breast Cancer with Favorable Histology*: *Results of Iowa Women's Health Study*, JAMA, Vol. 281, No. 22 (1999) <br><br> p. 1 – Statistically significant increased risk of invasive ductal or lobular carcinoma associated with current use (less than 5 years) of E+P (RR= 1.38 (95% Cl, 1.03-1.85)). |
| ML 1933 | 2001 | Bush, *Hormone Replacement Therapy and Breast Cancer: A Qualitative Review*, Obstetrics & Gynecology, Vol. 98, No. 3 (1992) <br><br> Conclusions: The evidence did not support the hypotheses that estrogen use increases the risk of breast cancer and that combined hormone therapy increases the risk more than estrogen only. Additional observational studies are unlikely to alter this conclusion. Article does not acknowledge Wyeth's involvement in its creation and editing but does disclose that Dr. Bush received honoria from Wyeth for speaking on this topic. |
| ML 1965 | 1991 | Grady, *Invited Commentary: Does Postmenopausal Hormone Therapy Cause Breast Cancer?* Am. J. of Epidemiology, Vol. 134, No 12: 139 (1991) <br><br> p. 1 – A question that needs answering is whether use of combination hormone therapy causes breast cancer. <br> p. 3 - Unfortunately, there are few data concerning the effect of estrogen plus a progestin on breast cancer risk. <br> p. 4 - At present, we do not know how the addition of a progestin to long-duration estrogen therapy will affect breast cancer risk. <br> …Additional data on the effect of combination hormone therapy on breast cancer risk are urgently needed. |
| ML 2046 | 1975 | Smith, *Association of exogenous estrogen and endometrial cancer*, NEJM, Vol. 293, No. 23 (1975) |
| ML 2068 | 1975 | Ziel, *Increased Risk of Endometrial Cancer Among Users of Conjugated Estrogens*, NEJM, Vol 293, No. 23 (1975) |
| ML 2099 | 2005 | Fournier, *Breast cancer risk in relation to different types of hormone replacement therapy in the E3N-EPIC cohort*, Int. J Cancer, Vol. 114,:448-454 (2005) |

| | | French E3N prospective study showed an increased risk of breast cancer associated with E+P use but saw little or no increase in breast cancer risk with combination therapy using micronized progesterone |
|---|---|---|
| ML 2486 | 2004 | Chen, *Association of Hormone Replacement Therapy to Estrogen and Progesterone Receptor Status in Invasive Breast Carcinoma*, Cancer, Vol. 101, No. 7 (2004)<br><br>p. 9 - HRT use elevated breast carcinoma risk to a greater extent in leaner women |
| ML 2980 | 2004 | Li, *Postmenopausal Hormone Therapy and the risk of breast cancer: the view of an epidemiologist,* Maturitas 49, 44-50 (2004)<br><br>p. 1 – WHI study showed that "E+P is causally related to breast cancer." |
| ML 3422 | 2005 | Yaffe, *Is mammographic density, as currently measured, a robust surrogate marker for breast cancer?* Gynecological Epidemiology, Vol. 21 (Supp. 1): 17-21 (2005)<br><br>Consensus statement of radiology experts:  For women with high breast density, E+P should be "contra-indicated." |
| ML 3428 | 1986 | Barrett Connor, *Post-Menopausal Estrogens – Current Prescribing Practices of San Diego Gynecologists,* Western Journal of Medicine, Vol. 144, No. 5 (1986)<br><br>p. 2 – Numerous studies of risk and benefit of long-term unopposed estrogen use in postmenopausal women have been published.<br>In contrast, there are no studies of adequate design, duration and sample size to determine the risks and benefits of any prolonged estrogen-progestin combination in postmenopausal women.<br>Given the high prescribing rates reported for progestin, any possible untoward effects should be quickly researched and analyzed in relation to the benefits of such use. |
| ML 3862 | 6/3/98 | Colditz,  *Relationship between Estrogen Levels, Use of Hormone Replacement Therapy and Breast Cancer*, Journal of the National Cancer Institute, Vol. 90, No. 11 (1998) – PX ML 3862<br><br>p. 6 - It is evidence that post-menopausal hormone drugs cause breast cancer.  Long term use substantially increases the risk of this cancer. |
| ML 3906 | 1992 | Bergkvist, *Combined oestrogen-progestogen replacement and breast cancer risk*,<br>Letter to the Editor, The Lancet, Vol. 340: 1044 (1992)<br><br>Statistically significant increase in breast cancer for E+P users (RR=1.3)<br>p. 1 - These data provide further evidence that the addition of a progestogen does not protect against an increased breast cancer risk |

| | | associated with oestrogen replacement therapy and increases our level of concern that this regimen might be more hazardous. More research on the long-term consequences of progestogens on the breast merits a high priority, given the current levels of exposure in the population. |
|---|---|---|
| ML 4196 | 2006 | MacMahon, *Epidemiology and the causes of breast cancer*, Int. J. Cancer, 118, 2373-2378 (2006) - PX ML 4196<br><br>p. 1 – E+P is one of three known causes of breast cancer |
| ML 4251 | | Dr. Lippert wrote: "One striking fact that emerges from a review of the literature is that almost all the patients in whom an increase in breast cancer had been noted has been treated with products containing Premarin."[1] |
| ML 4580 | 2006 | Reeves et al for the Million Women Study Collaborators, *Hormonal therapy for menopause and breast-cancer risk by histological type: a cohort study and meta-analysis*, Lancet Oncol., Vol. 7, p. 910 (2006) – PX ML 4580<br><br>Increased risk for E+P seen in leaner women |
| ML 4681 | 2007 | Colditz, *Decline in breast cancer incidence due to removal of promoter: combination estrogen plus progestin*, Breast Cancer Research 2007: Vol 9, No. 108 (2007)<br><br>"Combination E+P causes breast cancer"<br>p. 1 - Combination E&P therapy significantly increases the breast cancer risk, and this increase is "most evident among leaner women." |
| ML 4743 | 2007 | Ravdin, *The Decrease in Breast-Cancer Incidence in 2003 in the United States*, N. England J Med Vol. 356;16, (2007)- PX ML 4743<br><br>p. 3- Discontinuation of E+P could have caused a decreased incidence of breast cancer by direct hormonal effect on the growth of occult breast cancer. |
| ML 4881 | 2009 | Chlebowski, *Breast Cancer after Use of Estrogen plus Progestin in Postmenopausal Women*, NEJM, Vol 360:6 (Feb. 2009) – PX ML 4881<br><br>p. 1 – Conclusion:  The increased risk of breast cancer associated with E+P declined markedly soon after discontinuation of combined HT and was not related to changes in frequency of mammogram. |
| ML 5087 | 2008 | Fournier, *Use of different postmenopausal hormone therapies and risk of histology- and hormone receptor-defined invasive breast cancer*, J. Clinical Oncology, 26(8): 1260-68 (2008)- PX MA 5087<br><br>Many epidemiological studies have concluded that E+P is |

---

[1]      PX ML 4251

| | | carcinogenic in the human breast. |
|---|---|---|
| ML 5167 | 2008 | Prentice, *Estrogen Plus Progestin Therapy and Breast Cancer in Recently* Postmenopausal Women, Am. J. of Epidemiology (March 2008) p. 6 –Breast cancer risk for women who began hormone therapy immediately following menopause (gap time of zero) were elevated after the first 2 years of E+P use. |
| Ml 5500 | 2010 | Banks, Canfell, Recent declines in breast cancer incidence: *Mounting evidence that reduced use of menopausal hormones is largely responsible*, Breast Cancer Research, Vol 12: 103 (2010) p. 1- Abstract: Substantial reductions in breast cancer incidence in women 50 years old or older have been observed recently in many developed countries, and falling use of menopausal hormone therapy (HT) remains the most plausible explanation. |
| ML 5656 | 2010 | Kerlikowske, *Breast Cancer Risk by Breast Density, Menopause and Postmenopausal Hormone Therapy Use,* J. of Clinical Oncology, (2010) p. 1 – Conclusion: Postmenopausal women with high breast density are at particular increased risk of developing breast cancer if take E+P. |
| ML 5753 | 2011 | Taylor & Manson, *Update in Hormone Therapy Use in Menopause*, J Clin. Endo. Metabolism, Vol. 96: 255–264 (2011) p. 4 – Increased breast cancer risk when E+P is initiated at or within three years from the onset of menopause. |
| ML 5838 | 2010 | Marshall, *Recent Breast Cancer Incidence Trends According to Hormone Therapy use: The California Teacher's Study Cohort*, Breast Cancer Research, (2010) p. 12 – Conclusions: Along with other studies showing similar conclusions, our data provide further evidence that recent declines in invasive breast cancer incidence in the US are explained predominantly by decreased HT use. |
| ML 6042 | 2010 | Byrne, Chlebowski, Boyd, Yaffe, *Change in mammographic density with estrogen and progestin therapy: A measure of breast cancer risk in the Women's Health Initiative*, Poster Presentation at ACCR, 101St Annual Convention, April 17-21 (2010) Conclusions: In this nested study within the WHI randomized trial, change in breast density was a significant predictor of breast cancer risk and statistically accounted for the increased breast cancer risk associated with E+P. Thus change in density may be a useful intermediate marker of increased breast cancer risk with use of E+P. |

| ML 6062 | 2010 | Saxena, *Menopausal Hormone Therapy and Subsequent Risk of Specific Invasive Breast Cancer Subtypes in the California Teachers Study*, Cancer Epidemiol Biomarkers Prey; 19(9) (September 2010) <br><br> p. 9 - Breast cancer risk elevations for E+P users was especially seen in current users and women of lower BMI. |
|---|---|---|
| ML 6105 | 2011 | Narod, *Hormone replacement therapy and the risk of breast cancer*, Nat. Rev. Clin. Oncol (August 2011 <br><br> p. 2 - Women with a lean body mass or high breast density face a higher risk of HRT-associated breast cancer than other women |
| | | |
| | | |
| | | |
| | | |
| | | |

Exhibit D

Exhibit D

**E+P Studies Before July 2002**

| | Author/Publication | Date | Increased Breast Cancer Risk | NO Breast Cancer Risk | Authors' Conclusions / Results |
|---|---|---|---|---|---|
| | | | | | |
| 1 | Nachtigall, Obstetr & Gynecol (PX ML 437) | 1979 | | *** | P given only 7 days of the month |
| 2 | Gambrell, Obstet & Gynecol (PX ML 1958) | 1983 | | *** | P given only cyclically (not continuous) |
| 3 | Lauritzen, Climateric (PX ML 2795) | 1983 | | *** | P given 10 days per month |
| 4 | Vakil, Cancer Detection and Prevention (PX ML 3091) | 1983 | | *** | |
| 5 | La Vecchia Int'l J. Cancer (PX ML 3163) | 1986 | *** | | Compared with never-users, the age-adjusted relative risk for "ever-users was 1.93 (CI, 1.35-2.75) The risk of breast cancer increased with longer duration of use. The positive findings of this study cannot be dismissed as due to obvious bias |
| 6 | Ewertz Int'l J. Cancer (PX ML 1955) | 1988 | *** | | Study showed "increasing risk with increasing duration" of menopausal hormone use. E+P was associated with "an increased risk" for breast cancer. The present study provides further epidemiologic evidence that sex hormones influence a woman's risk of developing breast cancer. |
| 7 | Bergkvist N Engl. J Med (PX ML 600) | 1989 | *** | | We conclude that use of estrogen is associated with a slightly increased risk of breast cancer, which is not prevented and may even be increased by the addition of progestins. The relative risk was 4.4 (95% CI, 0.9 to 22.4) in women who used E+P for more than six years. |
| 8 | Kaufman, Am. J of Epi | 1991 | *** | | Relative risk of E+P was 1.7 (95% CI, 0.9-3.3) but there was little use of E opposed by P |

| | | | | | |
|---|---|---|---|---|---|
| | (PX ML 1988) | | | | in this study |
| 9 | Colditz<br>Cancer Causes &<br>Control<br>(PX ML 569) | 1992 | *** | | Current use of estrogen and progestin was associated with an age-adjusted increased breast cancer risk. |
| 10 | Harris,<br>J. Nat'l Cancer Inst.<br>(PX ML 5575) | 1992 | *** | | Our observation was that hormone therapy may be a significant risk factor in lean postmenopausal women.<br>In lean women, significantly elevated breast cancer risk (OR=2.0, CI, 1.1-3.5)<br>There was a significantly significant dose response of breast cancer risk with duration (adjusted ORs = 2.0 for < 5 years and 2.2 for > 5 years of use). |
| 11 | Nachtigall,<br>Obstet & Gynecol<br>(PX ML 401) | 1992 | | *** | P given only for 7 days per month |
| 12 | Persson,<br>The Lancet<br>(PX ML 3906) | 1992 | *** | | Data provide further evidence that the addition of a progestogen does not protect against an increased breast cancer risk associated with oestrogen replacement therapy and increases our level of concern that this regimen might be more hazardous.<br>E+P overall relative risk was statistically significant. With more than 7 years of follow-up, the relative risk was 1.6 (CI, 1.1-2.1). |
| 13 | Risch,<br>Am. J. Epidem<br>(PX ML 693) | 1994 | | *** | |
| 14 | Schairer,<br>Cancer Causes &<br>Control<br>(PX ML 671) | 1994 | *** | | This study showed a "further enhancement of risk with combined E+P than use of estrogen alone."<br>Increased overall risk for E+P was 1.2 (CI, 1.0-1.6) |
| 15 | Colditz,<br>N Engl J Med<br>(PX ML 3) | 1995 | *** | | The risk of breast cancer was significantly increased among women who were currently using E+P (RR=1.41; 95 % CI, 1.15 to 1.74) as compared with postmenopausal women who had never used hormones.<br>The substantial increase in the risk of breast cancer among older women who take hormones suggests that the trade-offs between the risks and benefits should be carefully assessed. |
| 16 | La Vecchia,<br>British J. Cancer | 1995 | *** | | Study results are "consistent with the elevated risk observed in several studies" for E+P. |

|    |                                              |      |     |     |                                                                                                                                                                                                                                                                                                                                                                                      |
|----|----------------------------------------------|------|-----|-----|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|    | (PX ML 659)                                  |      |     |     | The risk increased with increasing duration of use.                                                                                                                                                                                                                                                                                                                              |
| 17 | Newcomb, Am J Epidem (PX ML 41)              | 1995 |     | *** | Small sample size of study cannot preclude the possibility of a modest association between use of replacement hormones and breast cancer (RR=1.11, 95% CI, 0.87-1.43)                                                                                                                                                                                                              |
| 18 | Stanford, JAMA (PX ML 658)                   | 1995 | *** |     | Marked elevation in relative risk for E+P users who had undergone hysterectomy with bilateral oophorectomy (RR = 19, CI, 1.8-199.4).                                                                                                                                                                                                                                              |
| 19 | Persson, Int'l J. Cancer (PX ML 735)         | 1996 | *** |     | E+P therapy increases the breast cancer risk. Increased breast cancer risk was confined to women receiving E+P and risk climbed with years of follow-up to a 40% excess risk.                                                                                                                                                                                                     |
| 20 | Levi, European J of Cancer Prevention (PX ML 760) | 1996 | *** |     | In conclusion, the present study confirms that the risk of breast cancer is moderately related to the use of HRT.                                                                                                                                                                                                                                                                 |
| 21 | Persson, Int'l J. Cancer (PX ML 787)         | 1997 | *** |     | Our results indicate a moderately increased risk of breast cancer that is further enhanced when progestins are included in the hormone therapy. In this cohort of Swedish women HRT for more than 10 years was linked to a doubled risk of breast cancer.                                                                                                                          |
| 22 | Sellers, Ann. Int. Med. (PX ML 800)          | 1997 | *** |     | Multivariate adjusted relative risks for current short-term (< 5 years) and long-term (>5 years) users of HRT were 1.34 (CI, 0.98-1.82) and 1.17 (CI, 090-1.51)                                                                                                                                                                                                                   |
| 23 | Collaborative Group, The Lancet (PX ML 22)   | 1997 | *** |     | The risk of having breast cancer diagnosed is increased in women using HRT and increases with increasing duration of use.  There was a significant increase in the relative risk of breast cancer associated with ever-use of HRT.  Relative risk after 5 or more years of HRT use was 1.35 (1.21-1.49)  Increase is risk was greater for women with lower body mass index |
| 24 | Brinton, Menopause (PX ML 830)               | 1998 | *** |     | Women who used oral contraceptives for more than 10 years and hormone replacement for 3 or more years had a relative risk of 3.2 (95% CI, 1.4-7.4) compared with nonusers.                                                                                                                                                                                                         |

3

| 25 | O'Conner, J. Clin. Path (PX ML 39) | 1998 | *** | | Incidence of lobular cancer was higher in HRT users than non-users. |
|---|---|---|---|---|---|
| 26 | Magnusson, Int'l J. Cancer (PX ML 117) | 1999 | *** | | Long-term use of E+P substantially increases the incidence of post-menopausal breast cancer, particularly among non-obese women. |
| 27 | Persson, Cancer Causes & Control (PX ML 2028) | 1999 | *** | | For breast cancer, women reporting use of estrogens combined with progestins had evidence of an increased risk relative to women denying intake or taking hormones for less than 1 year. Relative risk for recent use of conjugated estrogen with progestin: 1-6 years of use: RR = 1.6 (CI, 1.0-2.5) 6+ years of use: RR = 1.9 (CI, 1.3-2.8). We conclude that long-term recent use of estrogen-progestin combined replacement therapy may increase the risk of breast cancer. |
| 28 | Gapstur, JAMA (PX ML 866) | 1999 | *** | | Exposure to HRT was associated most strongly with an increased risk of invasive breast cancer with a favorable prognosis. Current HRT use associated with risk of invasive carcinoma with a favorable histology (papillary, tubular, mucinous): For less than 5 years: RR = 4.42 (95% CI, 2.00-9.76) For more than 5 years: RR = 2.63 (95% CI, 1.18-5.89) (These RR were after adjustment for age and other breast cancer risk factors) |
| 29 | Li, Cancer (PX ML 49) | 2000 | *** | | In the majority of studies, recent use of hormone replacement therapy has been associated with an increased risk of breast cancer. Increased risk for lobular cancer in current users who took E+P for more than 6 months, RR = 2.6 (CI, 1.1-5.8) |
| 30 | Moorman, Am J Pub health (PX ML 2103) | 2000 | | *** | Odds ratio for ever use of hormones were less than 1 for both Black and White women, however the confidence intervals around these point estimates were consistent with modestly increased risk. |
| 31 | Li, | 2000 | *** | | Increased risk for lobular cancer in ever users |

| | | | | |
|---|---|---|---|---|
| | Cancer<br>(PX ML 48) | | | | of E+P, RR = 3.1 (CI, 1.8-5.3)<br>(Newcomer 2000) |
| 32 | Ross,<br>J. Nat'l Cancer Inst<br>(PX ML 98) | 2000 | *** | | This study provides strong evidence that the addition of a progestin to HRT enhances markedly the risk of breast cancer relative to estrogen use alone.<br><br>HRT was associated with a 10% higher breast cancer risk for each 5 years of use (OR = 1.10; CI, 1.02-1.18).  Risk was substantially higher for E+P use than E alone<br>Risk increased consistently with increasing duration of use, OR for more than 10 years of use = 1.51<br><br>In fact, this study provides the strongest evidence to date that progestins not only do not protect the breast from the carcinogenic effects of estrogen but also increase substantially the small ERT-related increase in breast cancer risk. |
| 33 | Schairer,<br>JAMA<br>(PX ML 63) | 2000 | *** | | For recent users of E+P, RR = 1.4 (CI, 1.1-1.9)<br><br>Our data suggests that the estrogen-progestin regimen increases breast cancer risk beyond that associated with estrogen alone.<br><br>Among women with a BMI of 24.4 kg/m or less, use of E+P for more than 4 years, RR = 2.0 (1.3-3.0) |
| 34 | Manjer,<br>Int'l J. Cancer<br>(PX ML 1241) | 2001 | *** | | Our prospective study shows a considerable increase in breast cancer incidence, and hence increased morbidity, in women who used HRT at baseline.<br><br>Stage I tumors, RR = 2.33 (CI, 1.44-3.76)<br>Lobular cancer, RR = 4.38 (CI, 1.6-12.0)<br>Tubular cancer, RR = 4.81 (CI, 1.37-16.8) |
| 35 | Olsson,<br>British Journal of<br>Cancer<br>(PX ML 3577) | 2001 | *** | | Among HRT users, there was a significant excess of breast cancer. SIR=1.35 (CI, 1.09-1.65)<br>Breast cancer increased with duration of use. For 4-12 years, SIR=1.92 (CI, 1.32-2.70)<br><br>A significantly higher risk was seen for longer |

| | | | | duration of HRT use compared with never users. |
|---|---|---|---|---|
| | | | | In conclusion our investigation confirms a rather high risk for breast cancer after at least 4 years of HRT use. |
| 36 | Chen, JAMA (PX ML 53) | 2002 | *** | Recent long-term use of HRT is associated with an increased risk of breast cancer |
| | | | | For lobular cancer, current use of HRT (OR = 3.91; 95% CI, 2.05-7.44) and use of HRT for more than 57 months (OR = 3.07; 95% CI, 1.55-6.06) For non-lobular cancer, use of HRT for more than 57 months (OR =1.52; 95% CI, 1.01-2.29). |
| | | | | Risk was higher for estrogen or progestin receptor-positive cancer and among women who were leaner. |
| | | | | E+P was associated with high risk of lobular breast cancer (OR = 6.07; 95% CI, 2.13-17.3) for 11 or more months of use. |
| | | | | The association with HRT was considerably stronger for lobular breast cancer, with an approximately 3-fold increased risk associated with longer duration of HRT and a 4-fold risk for current use of combination therapy. |
| 37 | Daling, Cancer (PX ML 47) | 2002 | *** | Postmenopausal women who take E+P appear to be at an increased risk of lobular cancer. |
| | | | | Risk of invasive lobular breast carcinoma increased among women currently using E+P (OR =2.2; 95% CI, 1.4-3.3).  Risk was even greater for mixed lobular-ductal cancer. Higher risk if E+P use was continuous versus sequential for more than 5 years (OR=2.5, CI, 1.4-4.3) |
| | | | | Women who had ever used continuous E+P for $\geq$ 6 months were at increased risk of lobular cancer (OR=1.8; 95% CI, 1.2-2.6) and with $\geq$ 5 years of use had a 2.0 fold |

| | | | | | greater risk of lobular carcinoma (95% CI, 1.3-3.2). |
|---|---|---|---|---|---|
| 38 | Kirsh, Cancer Causes & Control (PX ML 97) | 2002 | *** | | These data suggest that long-term use of HRT increases the risk of breast cancer and that estrogen-progestin therapy may be more detrimental than estrogen use alone.<br><br>Risk among long-term estrogen-progestin users was substantially higher (OR = 3.48, 95% CI, 1.00-12.11) than users of E alone).<br><br>The mounting evidence raises concern about the long-term use of EPRT. |
| 39 | Newcomb, Cancer Epidem, Biomarkers & Prevention (PX ML 44) | 2002 | *** | | Estrogen-progestin use, both sequential and continuous, appears to be more strongly associated with risk of breast cancer than use of estrogen alone.<br><br>Ever use of E+P was associated with increased risk of cancer:<br>Lobular cancer: (RR=2.01; 95% CI, 1.25-3.22)<br>Ductal cancer: (RR =1.43; 95% CI, 1.14-1.79) |
| 40 | Porch, Cancer Causes & Control (PX ML 2780) | 2002 | *** | | In conclusion, this study shows that current users of E+P, especially users of five or more years, have an increased risk of breast cancer on the order of 70%, compared with women who do not use postmenopausal hormones.<br><br>Use of HRT significantly increased the risk of breast cancer (multivariable-adjusted relative risk 1.37; 95% CI, 1.05-1.78).<br><br>Use of 5 or more years of HRT was associated with a statistically significant increased risk (multivariable-adjusted relative risk 1.76; 95% CI, 1.29-2.39). |
| 41 | Ursin J. of Clinical Oncology (PX ML 33) | 2002 | *** | | The risk of breast cancer with E+P use was in general consistent across strata of other risk factors. We found that women who used E+P were at especially high risk of developing receptor-positive cancer.<br><br>Combination E+P increased breast cancer risk of all stages. |

| | | | | |
|---|---|---|---|---|
| | | | | Use of E+P for 61-120 months<br>Lobular: OR = 2.36 (CI, 1.12-4.75)<br>Ductal: OR= 1.52 (CI, 1.03-2.25) |
| | | | | |
| | **TOTAL** | | **33** | **8** | |
| | | | | |

## REVIEW ARTICLES / META-ANALYSIS

| | Author/Publication | Date | Breast Cancer Risk | NO Breast Cancer Risk | Authors' Conclusions / Results |
|---|---|---|---|---|---|
| | | | | | |
| | **REVIEW PAPERS** | | | | |
| 1 | Hunt, British J. Obstet and Gynecol | 1987 | *** | | |
| 2 | Grady, Ann. Intern. Med. | 1992 | | | **NOT ENOUGH DATA** |
| 3 | Sillero-Arenas, Obstet & Gynecol | 1992 | *** | | |
| 4 | Staffa, Fertility & Sterility | 1992 | | | **NOT ENOUGH DATA** |
| 5 | Colditz, Am J. Obstet & Gynecol | 1993 | *** | | |
| 6 | Collaborative Group, Lancet | 1997 | *** | | |
| 7 | Bush, Obstet & Gynecol | 2001 | | *** **(Ghost written)** | |
| | | | | | |
| | **TOTAL** | | **4** | **1** | |
| | | | | | |
| | | | | | |

# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GEORGIA TORKIE-TORK,          )
                              )
          Plaintiff,  )
                      )
v.                    )  CIVIL ACTION
                      )
WYETH,                )  1:04-cv-945
                      )
          Defendant.  )

REPORTER'S TRANSCRIPT
JURY TRIAL
VOLUME 5 - AFTERNOON SESSION
(No Morning Session)
Monday, November 22, 2010
---
BEFORE:     THE HONORABLE T.S. ELLIS, III
          Presiding
APPEARANCES:  LITTLEPAGE BOOTH
          BY:  ZOE LITTLEPAGE, ESQ.
              RAYMOND BOOTH, ESQ.
          2043A W. Main St.
          Houston, TX 77098
          KOPSTEIN & PERILMAN
          BY:  PHILIP KULJURGIS, ESQ.
          8633 Cross Chase Ct.
          Fairfax Station, VA 22039
              For the Plaintiff
              ---
          MICHAEL A. RODRIGUEZ, RPR/CM/RMR
              Official Court Reporter
          USDC, Eastern District of Virginia
              Alexandria Division

Page 2

1 APPEARANCES (Continued):
2
3       PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
        BY:  BETH WILKINSON, ESQ.
4
        BRIAN STEKLOFF, ESQ.
        2001 K Street, NW
5       Washington, DC 20006-1047
6       WILLIAMS & CONNOLLY, LLP
        BY:  RYAN SCARBOROUGH, ESQ.
7       725 12th St NW
        Washington, DC 20005
8
        For the Defendant
9
10          ---
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
              (Afternoon Session)
2
3 PRELIMINARY MATTERS                    4
4 WITNESS (Plaintiff)    DIRECT  CROSS  REDIRECT  RECROSS
5 Suzanne Parisian (Cont.)   4    113 (Not completed)
6
      (Court recessed)
7
8              ---
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              PROCEEDINGS
              (Afternoon Session)
2
3       (Court called to order at 1:07 p.m.)
4       (Jury not present.)
5          PRELIMINARY MATTERS
6       THE COURT:  Now, Ms. Littlepage, is the list
7 that you want to read, the list of exhibits, already
8 submitted?
9       ATTORNEY LITTLEPAGE:  That have already been
10 discussed in the trial in testimony, but the Court has not
11 said the word "admitted" on the record.  So the appellate
12 record is not clear at the moment.
13       THE COURT:  Let's bring the jury in, please.
14       (Jury impaneled at 1:10 p.m.)
15       THE COURT:  All right.  You may be seated.
16       Good afternoon, ladies and gentlemen.
17       Were the lunches there?
18       Good.
19       Again, let me confirm that you were all
20 successful in avoiding discussion of this with anyone of
21 this case.
22       Good.
23       We'll begin as usual with the calling of the
24 roll.
25       (Roll call, all jurors present.)

1 Q.    In your opinion, would that have been appropriate for
2 Wyeth to do?
3 A.    Yes.
4 Q.    I want to turn next --
5          THE COURT:  My question was -- was there -- is
6 there evidence in this case of this plaintiff having
7 osteoporosis?
8          ATTORNEY LITTLEPAGE:  Yes, sir.
9          THE COURT:  I don't recall any evidence of it
10 in the prescribing physician's --
11          ATTORNEY LITTLEPAGE:  Yes, sir. It's actually
12 in --
13          THE COURT:  In fact, my recollection is that
14 the prescribing physician didn't conduct the physical
15 examination.
16          ATTORNEY LITTLEPAGE:  It's in the medical
17 record which is already in evidence.  But I think you will
18 hear Ms. -- the plaintiff herself talk about it.
19          THE COURT:  My point is that you had two
20 treating physicians; is that right?
21          ATTORNEY LITTLEPAGE:  Yes, sir.
22          THE COURT:  My question is:  Did either one of
23 those indicate that they examined her for osteoporosis?
24          ATTORNEY LITTLEPAGE:  No, sir.
25          THE COURT:  Next question.

1 BY ATTORNEY LITTLEPAGE:
2 Q.    If we turn to Tab 21.  Plaintiff's Exhibit ML 22.
3 First of all, can you are tell us what year we are in with
4 this article?
5 A.    1997.
6 Q.    And can you tell the jury what is important, if
7 anything, about this article and what this article stands
8 for?
9 A.    This is a collaborative study where 51 different
10 epidemiological studies were reviewed to try to determine
11 the risk of breast cancer.
12 Q.    And when you say the collaborative group, was that
13 actually the name of study, the collaborative study?
14 A.    Yes.
15 Q.    And if you look at the study, what was the finding of
16 the study of the risk of breast cancer in women taking E+P?
17 A.    That the longer the woman is on E+P, the higher the
18 risk of breast cancer.
19 Q.    Was there any --
20          THE COURT:  Just a moment.  Go back if you
21 would.  What is right before that?
22          THE WITNESS:  About what?
23          THE COURT:  I'm sorry, the quote.
24          ATTORNEY LITTLEPAGE:  "Whether HRT affects
25 mortality from breast cancer is  not known."

1          THE COURT:  All right.
2 BY ATTORNEY LITTLEPAGE:
3 Q.    Was there any information in the collaborative group
4 study about women who were thinner or of normal build?
5 A.    Yes.
6 Q.    What did the collaborative group find on that issue?
7 A.    That women of thinner build, the risk of breast cancer
8 went down.
9 Q.    If a woman was thinner, her risk went down as she
10 entered menopause or throughout her life?
11 A.    As she entered menopause.  So it was making a group of
12 women -- this is not in terms of estrogen but just women in
13 general.  When a woman went into menopause and she was
14 thinner, she was at lower risk for breast cancer.
15 Q.    And then if that woman who was at lower risk took E+P,
16 what happened to her risk?
17 A.    Her risk increased.
18 Q.    And was there actually a chart in this collaborative
19 group study that talks about years from menopause and
20 whether a woman who was thinner's risk goes up or down the
21 older she gets past menopause?
22          THE COURT:  It's leading.  It's all leading.
23 BY ATTORNEY LITTLEPAGE:
24 Q.    Can you tell the jury what the table that dealt with
25 this issue indicated?

1 A.    Her risk went down in terms of her time of menopause
2 and her body weight.  The lower her body weight, the lower
3 her risk over time.
4 Q.    And is this finding from the Collaborative Group that
5 repeated in studies from 1997 on?
6 A.    Yes.
7 Q.    And what is important about this finding in your
8 opinion in terms of E+P and breast cancer for a thin or a
9 normal built woman?
10 A.    Yes.  Those women, in terms of the different studies,
11 the thinner women tended to be the women also put on
12 estrogen-plus-progestin, E+P, and thereafter the women that
13 would have the lower BMD.
14          So you are identifying a group of women who
15 were at low risk of breast cancer, but if you increase the
16 amount of estrogen and progestin, then you are now placing
17 them at increased risk of breast cancer.
18 Q.    Is there a connection between a thinner or normal
19 built woman and the development of osteoporosis?
20 A.    Yes.  And if you look at the population who
21 develops -- who are at risk for osteoporosis, they tend to
22 be thinner women.
23          And so you have this population that is getting
24 E+P for very -- for long duration, which would be the
25 treatment -- the prevention of osteoporosis.  So you are

1 actually taking women at low risk and raising them to high

2 risk of breast cancer.

3 Q.   Would it be appropriate, in your opinion, for a drug

4 company to warn doctors about a subgroup of women like this

5 that were at a particular increased risk?

6 A.   Yes.  Plus, they are required to do that in terms of

7 updating their labeling.

8 Q.   If you turn to tab 24, Plaintiff's Exhibit 811-R, can

9 you tell the jury whether you have seen documents where

10 Wyeth deals with this issue of thinner women and the risk of

11 breast cancer?

12 A.   What exhibit?

13 Q.   Tab 24, Plaintiff's Exhibit 811-R.

14       THE COURT:  What was this, this particular tab

15 before you?

16       And take this one down.

17       I just want to know what tab it was.

18       ATTORNEY LITTLEPAGE:  It was tab 21.

19       THE COURT:  All right.  Go on.

20       THE WITNESS:  There is a comment there by

21 Wyeth.

22       ATTORNEY LITTLEPAGE:  And Judge, we move to

23 admit Plaintiff's Exhibit 811-R.

24       ATTORNEY WILKINSON:  We object, your Honor.

25       Can I discuss it with Ms. Littlepage?

1       Maybe we can resolve it.

2       THE COURT:  Yes.

3       Don't display it yet.

4       (Counsel conferring.)

5       ATTORNEY WILKINSON:  We agree.  We will let it

6 in, your Honor.

7       THE COURT:  All right.  But just -- I want to

8 go back to number 21 for just a moment.

9       ATTORNEY LITTLEPAGE:  Yes, sir.

10       ATTORNEY WILKINSON:  Your Honor, can I make

11 clear, on 21, that Ms. Littlepage and I have an agreement

12 that when we don't object to medical literature.  It's only

13 for publishing to the jury, not to openly be admitted to any

14 exhibits.

15       We both agree medical literature does not go

16 into evidence for the jury.

17       THE COURT:  Well, that's --

18       ATTORNEY LITTLEPAGE:  And we are probably not

19 using the right language with you.  We mean to say we don't

20 object to publishing it, not to the actual admission of

21 evidence.

22       THE COURT:  I will deal with that out of the

23 hearing of the jury.

24       Go back to tab 21.

25       ATTORNEY LITTLEPAGE:  Yes, sir.

1       THE COURT:  Is that the Colditz article?

2       ATTORNEY LITTLEPAGE:  No, sir.  It's

3 Collaborative Group.

4       THE COURT:  Well, his name is on there, isn't

5 it?

6       ATTORNEY LITTLEPAGE:  No, sir.

7       THE COURT:  Am I looking -- I have a book and

8 it says tab 21, and it has a Colitz article.

9       ATTORNEY LITTLEPAGE:  Judge, you should have a

10 book that says November 22, 2010.  I think it's to your

11 left.  I think you have the -- I had rearranged them to try

12 and go quickly this morning -- this afternoon.

13       On tab 21, is that the Collaborative Group?

14       THE COURT:  All right.  Just a moment.

15       Let me have counsel at the bench.

16       (Sidebar conference held as follows:)

17       THE COURT:  I am a little troubled by the fact

18 that we are proceeding by snippets here and there out of

19 these articles and they are highlighted for purposes of the

20 plaintiff.

21       The plaintiff's counsel is an advocate, I can

22 understand that.  But now you tell me that these are not

23 going to go to the jury.

24       This Collaborative article has both an

25 interpretation and findings.  And it says:

1       Among current users of HRT are those who

2 cease to use one to four years previously, the

3 relative risk of having breast cancer diagnosed

4 increased by a factor of 1.023.

5       ATTORNEY LITTLEPAGE:  "For each year of use."

6       THE COURT:  (Continuing.)

7       For each year of use, relative risk was 1.35

8 for women who had used HRT for five years or

9 longer.  This increase is comparable with the

10 effect of breast cancer in delaying menopause.

11 Since among never users of HRT, the relative risk

12 of breast cancer increases by a factor of 1.028.

13       Now, you know, I am a big fan of the adversary

14 system and I am a big fan of an advocate -- and you doing a

15 good job being an advocate for your client, but it is also

16 my obligation of fairness.

17       I don't know whether -- perhaps this physician

18 who is on the stand is pretty good with statistics.  I am

19 not so bad at it, either.  And I doubt whether the people on

20 the jury are bad at it.  But it seems to me that they ought

21 to be able to read this.  This does not, as I read it -- and

22 I know a little bit about statistics, this is not some

23 horrible finding.

24       ATTORNEY LITTLEPAGE:  Well, Judge, the

25 purpose -- the importance of the Collaborative Group is that

Page 57

1 they found that the people who had the increased risk were
2 thinner women.  That is what they found.
3        THE COURT:  The impression that's been created
4 thus far goes beyond that, using this article.  So I am not
5 going to preclude these things from going to the jury and
6 you may go into this as much as you see fit.  I don't do
7 your job for you.  You have to ferret out what you think
8 is -- but --
9        ATTORNEY WILKINSON:  Judge, I want to point out
10 one example that we have gone by that is much more
11 misleading than the one you took from --
12        THE COURT:  Well, then you would better cover
13 it.
14        ATTORNEY WILKINSON:  And so we don't waste your
15 time, I'm going to object in advance to even showing medical
16 literature.  This is from England of a million women
17 study --
18        ATTORNEY LITTLEPAGE:  I am not using this.
19 That's a redirect offer.
20        ATTORNEY WILKINSON:  Can the order then -- can
21 you put them in the order --
22        ATTORNEY WILKINSON:  I know.  I am skipping it.
23 In fact, I am skipping a bunch because I am rushing.
24        ATTORNEY WILKINSON:  If you are going to list
25 it, the same drug with the same treatment.

Page 58

1        THE COURT:  All right.  So, the point of this
2 bench conference is that I have admitted documents that
3 include articles.  They will go to the jury.  And I plan to
4 send all of it to the jury unless there is a specific
5 agreement about a specific document.
6        ATTORNEY WILKINSON:  Understood.
7        THE COURT:  But it seems to me that if all you
8 are going to do, both sides; if are you going to pick and
9 chose and you are going to pick and choose out of articles,
10 I am prepared to let the jury have the whole thing and let
11 them decide.
12        ATTORNEY LITTLEPAGE:  Yes, sir.
13        ATTORNEY WILKINSON:  Thank you, your Honor.
14        (End of sidebar conference, open court as
15 follows:)
16        THE COURT:  You will have the articles.  You
17 are not required to read anything if you don't want to.  But
18 I am going to ensure that you have it the articles that are
19 discussed.
20        All right.  You may proceed.
21        ATTORNEY LITTLEPAGE:  We were on Plaintiffs'
22 Exhibit 811-R, tab 24.
23 BY ATTORNEY LITTLEPAGE:
24 Q.    Are you with me, Dr. Parisian?
25 A.    Yes.

Page 59

1 Q.    And can you tell me, does -- did you review documents,
2 including 811-R, that indicate that there was -- indicated
3 an understanding from Wyeth about this issue?
4 A.    Yes.
5 Q.    And what was Wyeth's understanding?
6 A.    That there was an increased risk found in women of
7 lean and normal body build of breast cancer.  If there were
8 sub-population at increased risk.
9 Q.    And has a number of studies looked at this issue;
10 rather, thinner or lean or normal built women are at an
11 increased risk of breast cancer from taking E+P?
12 A.    Yes.
13 Q.    Can you give the jury some idea of how many studies?
14 A.    I can think about maybe seven or eight.
15 Q.    And do those studies find an increased risk for
16 thinner or leaner women?
17 A.    Yes.  And It's relative risk, that they were lower to
18 begin with, and it would raise this group.
19        THE COURT:  What do you mean by "relative
20 risk"?
21        THE WITNESS:  Relative risk would be compared
22 to Never users of hormone therapy, so that would be your
23 normal population.  If you look at the Collaborative study,
24 the relative risk there is never users.  So in terms of this
25 group of women, since they are lower to begin with, it's a

Page 60

1 relative risk compared to women who don't take any hormone
2 at all.
3        THE COURT:  So if the relative risk was
4 1.026 --
5        THE WITNESS:  Okay.
6        THE COURT:  What does that mean?
7        THE WITNESS:  That means that you would have
8 not even one new patient in terms of the relative risk.
9        THE COURT:  And that was one of the relative
10 risk figures in the Collaborative study?
11        THE WITNESS:  I don't recall where you got that
12 one from, but in terms of the conclusions of the authors,
13 they said that the relative risks is increased in terms of
14 lean women.
15        THE COURT:  Yes, but it's the quantity of the
16 use -- never mind.  Next question.
17        THE WITNESS:  No, it's met an analysis.
18        THE COURT:  No, there is no question before
19 you.
20        THE WITNESS:  Okay.
21        THE COURT:  Next question.
22 BY ATTORNEY LITTLEPAGE:
23 Q.    Turning to 1998 if you turn to tab 27 in your book,
24 Plaintiff's Exhibit 22-F, can you tell the jury what
25 happened, if anything, with Prempro in 1998, in terms of

1 approved for, the warnings, the precautions, the information

2 that a physician needs to know about prescribing a drug.

3 Q.   And who creates the label?

4 A.   The manufacturer.

5 Q.   And does the FDA have a role in supervising or

6 approving the label?

7 A.   All labels that are out in the -- used in the United

8 States must be approved by the FDA.

9 Q.   Does the FDA write the label for the drug company?

10 A.   No.

11 Q.   If a label is approved and a study comes out like the

12 ones we've just talked about, Dr. Colditz or Dr. Cummings or

13 the collaborative group, is there a mechanism for the drug

14 company to add that information into the label?

15 A.   Yes.  The manufacturer can voluntarily add any of that

16 information at any time using a process called a change is

17 being effected supplement to improve and strengthen their

18 warnings or to remove information that's not correct.

19 Q.   And I want to talk a little bit about the Prempro

20 label.

21        When was the Prempro label first approved?

22 A.   The first approval was in 1994.

23 Q.   And did the language of the Prempro label change in

24 any substantial way as to breast cancer from 1994 all the

25 way through to June of 2002?

1 A.   No.

2 Q.   So let's look at -- Plaintiff's Exhibit 6493 is the

3 1998 label.

4 A.   Yes.

5 Q.   And would it be fair to say that the 1998 label

6 language stayed the same until June of 2002?

7 A.   Yes.

8 Q.   And is there, first of all, a "Warnings" section?

9 A.   Yes.

10 Q.   Why is there a "Warnings" section?

11 A.   A "Warnings" section is to highlight information

12 that's important to the physician making a

13 risk-versus-benefit determination whether to prescribe the

14 drug.  So it's the information that a physician needs to

15 have to consider about whether to use this drug or not for a

16 patient.

17 Q.   And is the Prempro label printed in the Physician's

18 Desk Reference or the PDR?

19 A.   Yes.  The approved version is supposed to be in the

20 PDR.

21 Q.   And is the Prempro label attached to the back of a

22 "Dear Doctor" letter if it is sent to doctors by the drug

23 company?

24 A.   It can be.

25 Q.   Is this the breast cancer warning for Prempro from

1 1998 to 2002?

2 A.   Yes.

3 Q.   I want to go through sentence by sentence.

4       The first sentence indicates that:

5        Some studies have reported a moderately

6       increased risk of breast cancer (relative risk of

7       1.3 to 2), in those women on estrogen replacement

8       therapy taking higher doses or in those taking

9       lower doses for a prolonged period of time,

10       especially in excess of ten years.

11        Can you tell the jury what is significant, if

12 anything, about that sentence in the forming of your

13 opinion?

14 A.   That sentence comes from the FDA's guidance for

15 noncontraceptive estrogen products.  So it's a statement

16 that has been around -- it was in the Premarin label, and

17 it's now in this label.  It's reflecting estrogen

18 replacement therapy.

19 Q.   And --

20       THE COURT:  And indeed it says that, doesn't

21 it?

22       THE WITNESS:  Yes, sir.

23       THE COURT:  All right.

24 BY ATTORNEY LITTLEPAGE:

25 Q.   And does the warning start with a sentence that says,

1 "All warnings below pertain to the use of the combination

2 product based on experience with estrogens and/or

3 progestins"?

4 A.   Yes.

5 Q.   Have you reviewed documents or sworn testimony of

6 Wyeth employees about why estrogen information was put into

7 the E+P label?

8       THE COURT:  All right.  That's not something an

9 expert is called on to testify to.  If you have that

10 testimony, you may admit it and argue it.

11       ATTORNEY LITTLEPAGE:  Yes, sir.

12       THE COURT:  But it's not pertinent through an

13 expert giving opinions.

14       ATTORNEY LITTLEPAGE:  Yes, sir.

15 BY ATTORNEY LITTLEPAGE:

16 Q.   By 1995 -- 1998 when I want you to assume

17 Ms. Torkie-Tork started taking Prempro, was there

18 information in the documents you've reviewed that for E+P,

19 there was an increased risk at all doses or just high doses?

20 A.   There was -- in terms of the documents reviewed, the

21 medical literature, at all doses, there was an increased

22 risk of E+P.  So that is not being discussed here.

23       THE COURT:  Come to the bench, please.

24       (Sidebar conference held as follows:)

25       THE COURT:  Dr. Parisian, put it back on,

1 please.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  They're talking there about breast
4 cancers in women on estrogen, right?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Isn't farther down -- isn't there a
7 statement about E+P?

8          THE WITNESS:  There is some statement about
9 progestins, yes, sir.  She asked me specifically about this
10 sentence.

11          THE COURT:  Yes, but is there a statement in
12 here about E+P?

13          The answer is "Yes."

14          THE WITNESS:  Yes.

15          THE COURT:  All right.  Now, what was the last
16 question asked, Mr. Rodriquez, of this witness, by
17 Ms. Littlepage?

18          (Record read as requested.)

19          THE COURT:  That's your question?

20          ATTORNEY LITTLEPAGE:  Yes, sir.

21          THE COURT:  We'll put aside it was leading.

22          ATTORNEY LITTLEPAGE:  Okay.

23          THE COURT:  That's all right.

24          And then what was the answer, Mr. Rodriquez?

25          Never mind.  It's taking too much time.

1          As I recall, Dr. Parisan, you're not saying
2 that that sentence that says "some studies" is inaccurate?

3          THE WITNESS:  No, sir.

4          THE COURT:  You're not saying it shouldn't have
5 been in there?

6          THE WITNESS:  No sir.

7          THE COURT:  All right.  So let's get to it.
8 She has an opinion on whether the label is accurate or not.
9 Let's get to the heart of it.

10          ATTORNEY LITTLEPAGE:  Yes, sir.

11          (End of sidebar conference, open court as
12 follows:)

13 BY ATTORNEY LITTLEPAGE:

14 Q.   Do you believe, Dr. Parisian, whether this label
15 should have included information about E+P and dose issues?

16 A.   Yes.

17 Q.   And do you have an opinion whether it was appropriate
18 or inappropriate for a drug company to continue to talk
19 about this information in the first sentence in light of
20 what they knew about E+P?

21 A.   I do have an opinion.

22 Q.   What's that opinion?

23 A.   That it is not appropriate because it begins out by
24 talking about based on experience with estrogens and/or
25 progesterones.  And so it doesn't begin by discussing the

1 new information about E+P.  It begins talking about old
2 information on E.

3          THE COURT:  So is it your opinion that maybe it
4 would be all right at the end or somewhere, but not at the
5 beginning?

6          THE WITNESS:  The estrogen section?

7          THE COURT:  Yes.

8          THE WITNESS:  It would be appropriate further
9 down, not to start.

10          THE COURT:  All right.  But you think doctors
11 aren't capable of understanding it where it is?

12          THE WITNESS:  No, sir.  In terms of the design
13 of the labeling, if you have new information, you want to
14 put it first because the doctor is going to focus on the
15 very first sentence.

16          As he moves down the paragraph, he's going to
17 look at the other information.  But the most important new
18 information should go first.

19          THE COURT:  All right.

20          Next question.

21 BY ATTORNEY LITTLEPAGE:

22 Q.   In your opinion, Dr. Parisian, should Wyeth have
23 provided any information to doctors about E+P and dose?

24 A.   Yes.

25 Q.   Did Wyeth provide any information to doctors in this

1 label in 1998 about E+P and whether it can cause breast
2 cancer at any dose?

3 A.   No, they did not.

4 Q.   And does this document indicate a length of time
5 before the estrogen studies showed a breast cancer risk?

6 A.   In excess of ten years, yes, ma'am.

7 Q.   By 1998, did Wyeth know whether for E+P that length of
8 time was necessary for the increase in breast cancer risk?

9 A.   Yes.

10 Q.   And what did it know?

11 A.   It knew that it was far less than ten years.

12          THE COURT:  And what study showed that?

13          THE WITNESS:  You can begin with the Bergkvist
14 study, which was six years, the E+P.  So in terms of the
15 studies --

16          THE COURT:  I just asked you to name the study.

17          Bergkvist.

18          THE WITNESS:  There's a Collaborative Study, in
19 terms of Colditz's studies with the nurses.

20          All right.  Next question.

21 BY ATTORNEY LITTLEPAGE:

22 Q.   Did Wyeth ever --

23          THE COURT REPORTER:  Excuse me.

24          (Off the record.)

25          (Witness stood aside.)

Page 97

1     (Court recessed.)
2     (Court called to order at 3:40 p.m.)
3     THE COURT:  You may bring the jury in, please.
4     (Jury in at 3:41 p.m.)
5     THE COURT:  You may be seated.
6     And we may bring in the witness, please.
7     I regret having to take the recess, but it was
8 necessary.
9     You may resume the stand, please.  You'll
10 recall you're still under oath.
11     (Witness resumed stand.)
12     All right.  Ms. Littlepage, you may complete
13 your examination.
14     ATTORNEY LITTLEPAGE:  Yes, sir.
15 BY ATTORNEY LITTLEPAGE:
16 Q.   Dr. Parisian, we were talking about length of use, and
17 my question is, did Wyeth provide information to doctors
18 from 1998 to June of 2002 on E+P as to whether the breast
19 cancer risk was seen in less than ten years?
20 A.   No, sir -- no, ma'am.
21 Q.   And if we go to the next sentence, the next sentence
22 of the Prempro warning reads, "The majority of studies,
23 however, have not shown an association in women who have
24 ever used estrogen-replacement therapy."
25     Did Wyeth ever provide an assessment to the

Page 98

1 doctors as to what the E+P studies showed?
2 A.   Not in terms of an association, no, ma'am.
3 Q.   And if we turn to the next sentence, is this the part
4 of the label that talks about E+P?
5 A.   Yes.
6 Q.   And does it say, "The effect of added progestins on
7 the risk of breast cancer is unknown.  Although a moderately
8 increased risk in those taking combination
9 estrogen-progestin therapy has been reported, other studies
10 have not shown this relationship"?
11 A.   Yes.
12 Q.   Do you have an opinion whether Wyeth had information
13 at this time about E+P that would have been important to
14 tell doctors in the Prempro label?
15 A.   Yes.
16 Q.   And what sort of information is that?
17 A.   That there had been an association in the literature
18 of E+P and increased breast cancer risk, particularly in
19 certain subgroups, women who were lean and also women who
20 had low bone mineral density, so that is a specific subgroup
21 of patients that had shown an increased risk.
22 Q.   And if we turn to the next sentence, does Wyeth
23 indicate in the Prempro label some information about the
24 one-year clinical trial of Prempro, Premphase and Premarin?
25 A.   Yes.

Page 99

1 Q.   Is that the Pivotal Trial that we had talked about?
2 A.   Yes.
3 Q.   And what did Wyeth tell doctors about the Pivotal
4 Trial?
5 A.   That the incidence of breast cancer in that population
6 does not exceed that which would be expected for the
7 background population.
8 Q.   If you turn to tab 37 in your book, Plaintiff's
9 Exhibit 285 --
10     ATTORNEY LITTLEPAGE:  We move to admit
11 Plaintiff's Exhibit 285.
12     ATTORNEY WILKINSON:  No objection.
13     THE COURT:  Admitted.
14 BY ATTORNEY LITTLEPAGE:
15 Q.   Dr. Parisian, does that document discuss some of the
16 findings of the one-year clinical trial that is referenced
17 in the Prempro label?
18 A.   Yes.
19 Q.   And was there in fact some breast cancers that showed
20 up in the Pivotal Trial?
21 A.   Yes, referred to as a cluster.
22 Q.   And what was the finding on at least one of those
23 breast cancers as to whether after just a year the
24 investigator found that the cancer was related to the use of
25 the drug?

Page 100

1 A.   That the carcinoma was possibly drug-related in terms
2 of the causal association.
3 Q.   And this person would have been on E+P for a year?
4 A.   For a year.
5 Q.   Did Wyeth ever provide information from 1998 to 2002
6 to doctors that at least in this clinical trial there was
7 one breast cancer after just a year that was possibly
8 related to the drug?
9 A.   Not that it was possibly related.  There is a
10 statement that breast cancer was detected in this clinical
11 study.
12 Q.   And have you seen documents as to whether "was
13 detected" was an appropriate way to describe the Pivotal
14 Trial results?
15 A.   Well, the document I have seen was the FDA had
16 requested that the word "developed" be put in the label, and
17 it was changed by Wyeth to "detected."
18 Q.   And had the -- the FDA had asked that the label read
19 "five new cases of breast cancer were developed"?
20 A.   Yes.
21 Q.   And if the FDA wanted that information how come it's
22 not in the final label?
23 A.   Because the responsibility for the label rests with
24 the manufacturer, and it's a negotiation process.  The
25 company wanted the word "detected."

Page 101

1        THE COURT:  I take it if the FDA thought that
2 it was crucial it doesn't have to approve the label.
3        THE WITNESS:  It does not have to approve the
4 label.
5        THE COURT:  Next question.
6 BY ATTORNEY LITTLEPAGE:
7 Q.    And is there a final sentence where Wyeth indicates
8 there was a three-year clinical trial call the PEPI trial?
9 A.    Yes.
10 Q.    What information about the PEPI trial does Wyeth
11 provide to the doctors in the Prempro label?
12 A.    They are discussing breast cancer in the PEPI trial.
13 Q.    And was there any breast cancer seen in the E+P
14 Prempro arm of the PEPI trial?
15 A.    Yes.
16 Q.    And what was the finding?  One -- I'm sorry, let's see
17 if I can find you -- one new case was detected in the
18 placebo group, one in the Premarin only, none in the
19 continuous Premarin plus continuous MPA, and two in the
20 Premarin plus cyclic MPA group.
21 A.    Yes.
22 Q.    Which of those groups is Prempro?
23 A.    Prempro would be the continuous.  It would be
24 continuous Premarin and MPA.
25 Q.    And Wyeth reports that there was no breast cancer in

Page 102

1 that study after number N 174?
2 A.    Correct, in the PEPI study.
3 Q.    What does N 174 mean in this context?
4 A.    Out of 174 patients.
5 Q.    Have you seen documentation as to whether the PEPI
6 trial was designed or powered to look for breast cancer?
7 A.    It was not designed to look for breast cancer.
8 Q.    And is that indicated in Wyeth's documents, that it
9 was not powered or designed --
10 A.    In its own intern al documents, not in the label.
11 Q.    If we turn to tab 38, is that one of the documents you
12 reviewed, Plaintiff's Exhibit 20941?
13 A.    Yes.
14        ATTORNEY LITTLEPAGE:  Judge, we move to admit
15 Plaintiff's Exhibit 20941.
16        ATTORNEY WILKINSON:  No objection.
17        THE COURT:  Admitted.
18 BY ATTORNEY LITTLEPAGE:
19 Q.    And does this internal document indicate that the PEPI
20 study was not designed to evaluate --
21        THE COURT:  You are leading, but in the hope of
22 getting it over with, go ahead.
23        ATTORNEY LITTLEPAGE:  Okay.
24        THE COURT:  But you understand the proper --
25 what does it reflect.

Page 103

1        ATTORNEY LITTLEPAGE:  What does this reflect.
2        THE COURT:  You have gone ahead and read it.
3 It's in evidence, so go ahead and do it because it's all
4 right.
5 BY ATTORNEY LITTLEPAGE:
6 Q.    Does this document indicate that the PEPI study was
7 not designed to evaluate the risk or incidence of breast
8 cancer?  The study was not powered to answer this question?
9 A.    Yes, and that's the correct statement from the review
10 of the PEPI document.
11 Q.    Did Wyeth ever tell doctors that the PEPI study that
12 it talked about in the label wasn't powered or designed to
13 look at breast cancer?
14 A.    No, not in the label.
15 Q.    In your opinion, from 1998 to June of 2002, what would
16 an adequate warning have said to relate to doctors about the
17 breast cancer risk and E+P based solely on the science and
18 the knowledge known by Wyeth in that time frame?
19 A.    Based on the information I've reviewed, the label,
20 adequate label would have informed the physician that there
21 was a increased risk of breast cancer identified in -- in
22 the studies, various clinical studies, E+P; that the dose
23 wasn't the determinant as to the risk; and that there were
24 certain subpopulations of patients, particularly thin women,
25 lean women and women with lower BMD, that were at increased

Page 104

1 risk of having breast cancer.
2 Q.    Now, in the year 2000 was there some more studies that
3 came out dealing with E+P and breast cancer?
4 A.    Yes.
5 Q.    Turn to tab 39 and tab 40.  Can you tell us if those
6 were the two studies that came out?
7 A.    Yes.
8 Q.    And can you tell us just the lead author of those two
9 studies?
10 A.    One would be referred to as the Ross study, R-o-s-s.
11 The other would be the Scherrer, S-c-h-e-r-r-e-r.
12        ATTORNEY LITTLEPAGE:  And the Scherrer study,
13 ML 63, we would like to publish.  Is there any --
14        ATTORNEY WILKINSON:  No objection.
15        THE COURT:  All right.  It's admitted.  You may
16 do so.
17 BY ATTORNEY LITTLEPAGE:
18 Q.    And, can you tell the jury what date this was
19 published in and where?
20 A.    It was published in JAMA, I believe, yes, American
21 Medical Association, in 2000.
22 Q.    And, were there findings in the Scherrer study about
23 thin or lean women and whether they were at a particularly
24 increased risk of breast cancer from E+P?
25 A.    Yes.

# EXHIBIT 4

Michael R. Tesoro, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

************************************

MARGARET B. FRASER AND JOSEPH T.

FRASER,

Case No.
3:04-CV-01373-JBA

Plaintiffs,

v.

WYETH, INC. and WYETH

PHARMACEUTICALS, INC.,

Defendants.

************************************

VIDEOTAPED DEPOSITION OF MICHAEL R. TESORO, M.D.

Monday, April 11th, 2011

11:16 a.m.

Interlaken Inn

74 Interlaken Road

Lakeville, Connecticut

REPORTED BY:

Maureen O'Connor Pollard, RPR, CLR, Lic #473

Michael R. Tesoro, M.D.

Page 2

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFFS:
 4      PAULA S. BLISS, ESQ.
 5         BUBALO ROTMAN PLC
 6         9300 Shelbyville Road, Suite 215
 7         Louisville, Kentucky 40222
 8         508-655-5458
 9         pbliss@bubalorotman.com
10
11   FOR THE DEFENDANTS:
12      RICHMOND T. MOORE, ESQ.
13         WILLIAMS & CONNOLLY LLP
14         725 Twelfth Street, NW
15         Washington, DC 20005
16         202-434-5688
17         rmoore@wc.com
18
19   ALSO PRESENT:  Maureen Scannell Bateman, Esq.
20
21   VIDEOGRAPHER:  Robert Sweig
22
23
24
25
```

Page 4

```
 1   Exhibit 7    Hartford Hospital Radiation
 2               Oncology Consultation Note,
 3               Bates FRA-000219 and 220......    91
 4   Exhibit 8    12/3/01 letter, Bates
 5               FRA-000432 through 434........    93
 6   Exhibit 9    Two page document from
 7               Housatonic Valley
 8               Radiological Associates.......   93
 9   Exhibit 10   Copy of label, Bates
10               FRA-000352 and 353............   95
11   Exhibit 11   Excerpt of 1996 PDR...........   96
12   Exhibit 12   Five page document titled
13               Menopause Isn't Gone in a
14               Flash.........................  108
15   Exhibit 13   Document Bates
16               PAYNC201-001154...............  112
17   Exhibit 14   Document Bates
18               CORRA302-000066...............  113
19   Exhibit 15   Dear Doctor Letter, Bates
20               W-MDL527-00048274.............  124
21   Exhibit 16   Prempro label.................  130
22   Exhibit 17   Copy of 10/11/97 Lancet
23               article......................  141
24
25
```

Page 3

```
 1               INDEX
 2   EXAMINATION                    PAGE
 3   MICHAEL R. TESORO, MD
 4   BY MR. MOORE                    6
 5   BY MS. BLISS                   84
 6   BY MR. MOORE                  148
 7   BY MS. BLISS                  180
 8
 9               EXHIBITS
10   NO.      DESCRIPTION           PAGE
```
```
11   Exhibit 1    Third Amended Notice to take
12               Videotaped Discovery
13               Deposition...................    8
14   Exhibit 2    Certification of Records,
15               Bates MFraser-MTesoro-000001..   10
16   Exhibit 3    Excerpt from PDR, Bates
17               W-LABELS-005345 through 5352..   45
18   Exhibit 4    Article titled Risks and
19               Benefits of Estrogen Plus
20               Progestin in Health
21               Postmenopausal Women..........   76
22   Exhibit 5    11/12/10 letter...............   84
23   Exhibit 6    Cytology GYN Report, Bates
24               MFraser-SFH&MC-MD-000011 and
25               12...........................   90
```

Page 5

```
 1               P R O C E E D I N G S
 2
 3          THE VIDEOGRAPHER:  We are now on the
 4   record.  My name is Robert Sweig, and I am a
 5   videographer for Golkow Technologies.
 6          Today's date is April 11th in the year
 7   2011, and the time is 11:16 a.m..
 8          This video deposition is being held in
 9   Lakeville, Connecticut in the matter of Margaret
10   B. Fraser, Et Al versus Wyeth, Inc., Et Al,
11   pending in the United States District Court for
12   the District of Connecticut, Case No.
13   3:04-CV-01373-JBA.
14          The deponent is Michael R. Tesoro, MD.
15          Would counsel and those present please
16   identify themselves for the record.
17          MS. BLISS:  Paula Bliss for
18   Plaintiffs, Maggie Fraser.
19          MR. MOORE:  Richmond T. Moore from
20   Williams & Connolly for Wyeth.
21          MS. BATEMAN:  Maureen S. Bateman, I am
22   sitting in as a friend of Dr. Tesoro's.
23          THE VIDEOGRAPHER:  Thank you.
24          The court reporter is Maureen Pollard,
25   and she will now swear in our witness.
```

2  (Pages 2 to 5)

Michael R. Tesoro, M.D.

Page 6

1       MICHAEL R. TESORO, MD,
2  having been first duly sworn, was examined and
3  testified as follows:
4       DIRECT EXAMINATION
5       BY MR. MOORE:
6   Q.  Good morning, Doctor.
7   A.  Good morning.
8   Q.  Would you please state your name for
9  the record?
10  A.  I will.  Michael R. Tesoro, MD.
11  Q.  What's your current residence?
12  A.  152 East Street, Sharon, Connecticut,
13  06069.
14      Before we proceed, I believe Paula was
15  going to make a statement, and I ask you to make
16  the same statement that you were going to.
17      MS. BLISS:  For the record, I wanted
18  to put on the record the fact that Dr. Tesoro is
19  not a target whatsoever as far as the Plaintiffs
20  are concerned, and I understand the same to be
21  true for Wyeth.
22      MR. MOORE:  That is correct.  That was
23  my next statement actually.
24      BY MR. MOORE:
25   Q.  I just -- you understand you're not

Page 7

1  being sued by anyone in this case?
2   A.  Mm-hmm.
3   Q.  And you understand that Wyeth is not
4  claiming that you did anything wrong?
5   A.  Mm-hmm.
6   Q.  And that brings me to my next point,
7  you have to say yes or no.
8   A.  Oh, yes.
9   Q.  Okay.  Have you ever had your
10  deposition taken before?
11  A.  Have I ever had a deposition taken
12  before.  Not of a medical nature, no.
13  Q.  Any kind of deposition?
14  A.  A personal nature which I am bound by
15  confidentiality not to reveal.
16  Q.  Okay.  Was that the only time you've
17  had your deposition taken?
18  A.  Correct.
19  Q.  Before we get started then, let me
20  just go over some of the ground rules for
21  depositions just to refresh your recollection.
22      First, as we said, you have to say yes
23  or no so the court reporter can record what
24  you're saying.  And you have to give an audible
25  answer, okay?

Page 8

1   A.  Yes.
2   Q.  Only one person can talk at a time, so
3  even though it's a little unnatural, it's not
4  the way we normally talk, you have to wait until
5  I finish, and then you give your answer, and
6  then I'll wait until you finish with your
7  answer, and then I'll give my next question.
8  Okay?
9   A.  Yes.
10  Q.  And if you don't understand something,
11  just ask me to repeat it, and I will.  Okay?
12  A.  Yes.
13  Q.  And let me know if you need a break at
14  any time, and we can stop.
15  A.  Yes.
16  Q.  Okay.
17      (Whereupon, Tesoro Exhibit Number 1
18      was marked for identification.)
19      BY MR. MOORE:
20  Q.  Doctor, I'm handing you what's been
21  marked as Exhibit Number 1.  This is a copy of
22  your notice of deposition.
23      Have you seen this before?
24  A.  I believe I received this not too long
25  ago.  I believe it was when I -- probably about

Page 9

1  a week ago I received this information.
2   Q.  Have you had a chance to review it?
3   A.  As far as what's listed there, yes,
4  that I'm to be here at 11:00 a.m., which I am.
5   Q.  Did you have an opportunity to review
6  Exhibit A which is attached to the end of the
7  notice?
8   A.  I did.  I do not have any medical
9  records of Ms. Fraser.  I do not have my
10  curriculum vitae with me in hand.  I don't have
11  any educational materials.  I do not have any
12  literature from Wyeth.  I do not have any
13  materials or possessions provided by counsel for
14  Ms. Fraser.  I do not have any documents
15  relating to the action, notes, reports,
16  correspondence or research.  And I do not have
17  any or all publications, written, quoting,
18  mentioning me as relevant to this issue in the
19  litigation.
20  Q.  Okay.  So, Doctor, you've gone through
21  the items one through seven on Exhibit A, and
22  confirmed you don't have any such material,
23  correct?
24  A.  Correct.
25  Q.  Let's talk first -- I want to go

3  (Pages 6 to 9)

Michael R. Tesoro, M.D.

Page 10

1  through them just individually just to make sure
2  I understand what you're saying.
3        (Whereupon, Tesoro Exhibit Number 2
4        was marked for identification.)
5        BY MR. MOORE:
6        Q.  Let me hand you what's been marked as
7  Exhibit Number 2.  This is a Certification of
8  Records.
9        (Witness reviewing document.)
10       A.  Okay.  That's my signature.
11       BY MR. MOORE:
12       Q.  Right.  So this is a no records
13 certification, right?
14       A.  Correct.
15       Q.  And it was signed by you on
16 March 13th, 2009?
17       A.  Correct.
18       Q.  And also signed by Maureen Tesoro.  Is
19 that your wife?
20       A.  Correct.
21       Q.  And as I understand it, you destroyed
22 the records after seven years, and that's what
23 happened to Ms. Fraser's record, is that
24 correct?
25       MS. BLISS:  Objection.

Page 11

1        A.  Correct.
2        BY MR. MOORE:
3        Q.  Well, can you tell me what happened to
4  her records?
5        THE WITNESS:  I'm sorry, what did you
6  say?
7        MS. BLISS:  I objected.  I'm sorry,
8  just keep going.
9        BY MR. MOORE:
10       Q.  Right.  We should go over that.
11       In terms of ground rules of a
12 deposition, if I give a question and she
13 objects, then you can answer, just let her say
14 her objection and then you can answer.
15       So the question is; what happened to
16 Ms. Fraser's records?
17       A.  I imagine her records were included
18 with all the other records at the end of my
19 active practice career, and the statute of
20 limitation limit, I had them shredded.  I had
21 nowhere to keep those records.
22       Q.  And so when you said "at the end of
23 your practice career," when was that?
24       A.  My active practice actually ended in
25 the year 2000, 2001, and I consulted until 2003

Page 12

1  to 2004, and worked as a locum for a friend of
2  mine who is in Massachusetts until about, just
3  about 2008, 2009 on a daily basis while he was
4  taking care of his wife who had a brain cancer.
5        And since then all I've been doing is
6  medical missions to the Dominican Republic.
7  I've done about six of them.
8        Q.  And so when was it that you destroyed
9  the records for Ms. Fraser?
10       MS. BLISS:  Objection.
11       A.  I can't really give you a date because
12 I don't recall the exact date, but it's within
13 that period of time, and I imagine it would have
14 been 2009, 2008, in that range.
15       BY MR. MOORE:
16       Q.  Did you notify Ms. Fraser at the time?
17       A.  I don't believe she was seeing me as a
18 patient at that time.
19       Q.  I'm just trying to make sure there's
20 no possible way we could find the records from
21 any other source.
22       A.  Correct.
23       Q.  So did you notify --
24       A.  I did not notify any of the patients
25 that I destroyed the records, because if I

Page 13

1  haven't seen them they were put into a hold
2  file, and after a certain number of years they
3  were not seen, and it would require me sending
4  like 3,000 notices out.
5        Q.  Okay.  Now, you stopped seeing
6  Ms. Fraser, as I understand it, in 2001, 2002
7  when you moved to Rhode Island, is that correct?
8        A.  I can't recall that, but if you say
9  that, yes, that's probably correct.
10       Q.  Okay.  And at that time did you notify
11 her about the existence of her records and
12 transfer them to another doctor?
13       A.  I may have if she hadn't seen me at
14 the consulting position that I had in Rhode
15 Island, as you just said.  I don't recall if she
16 did or not.
17       Q.  But you would have taken her records
18 with you to Rhode Island, is that right?
19       A.  I would have taken those records.
20 They were stored in a location, and at that time
21 I had availability of a storage location in,
22 actually it was in Connecticut where the storage
23 location was for all of those charts.
24       Q.  And that's where they stayed until,
25 according to your record, seven years later, at

Michael R. Tesoro, M.D.

Page 14

1    which time you destroyed them?
2        A.   Exactly, which was not an easy task.
3        Q.   Now, just going back through these
4    quickly, item number three asks for "Any
5    educational materials, counseling materials,
6    handouts, or consent forms in your possession
7    regarding hormone replacement therapy."
8            You don't currently have any of those,
9    is that right?
10       A.   I do not.
11       Q.   And you don't have any literature from
12   Wyeth regarding hormone replacement therapy in
13   your possession?
14       A.   I do not.
15       Q.   Now, have you spoken with Plaintiffs'
16   counsel before today?
17       A.   I have.
18       Q.   How many times?
19       A.   On two occasions.
20       Q.   And when was that?
21       A.   Today, and the day before we cancelled
22   the last one because of snowstorm.
23       Q.   Okay.  The first time you spoke with
24   her, was that in person or by telephone, the day
25   before the snowstorm?

Page 15

1        A.   It was in person.
2        Q.   Where was that?
3        A.   Here at the Interlaken.
4        Q.   Was that with Ms. Bliss?
5        A.   Correct.
6        Q.   And did she show you any documents at
7    that meeting?
8        A.   Literature at that time, that's the
9    only documents that I saw.
10       Q.   Okay.  And what literature did she
11   show you?
12       A.   Documents that go back to -- I believe
13   it was the PDR back in 1995-96, and then most
14   recent documents that were somewhere, I can't
15   recall the year, maybe it was 2002, 2003.
16       Q.   When you say "literature," do you mean
17   medical journal articles, medical literature, in
18   addition to the label?
19       A.   I don't know if there was any -- I
20   can't recall if there was a medical article
21   issue, but I recall that there was a PDR
22   document, PDR meaning Physician Desk Reference.
23       Q.   Right.
24           So other than the PDR, and you said
25   perhaps a more recent journal article, you don't

Page 16

1    recall her showing you anything else?
2        MS. BLISS:  Objection.  I don't think
3    he said journal article.
4        BY MR. MOORE:
5        Q.   What else did she show you in addition
6    to the PDR?
7        A.   I can't recall, but there may have
8    been an article that might have been written in
9    the Massachusetts journal, Mass -- New England
10   Journal of Medicine, I believe.  But that's, you
11   know, over three months ago, two months ago.
12       Q.   And the next time you talked to
13   Ms. Bliss was today you said?
14       A.   Correct.
15       Q.   And was that in person or over the
16   phone?
17       A.   No, that was in person.
18       Q.   And that was here at the hotel?
19       A.   Correct.
20       Q.   And did she show you any documents at
21   that time?
22       A.   No.
23       Q.   Was anyone else present during that
24   meeting?
25       A.   My friend.

Page 17

1        Q.   And what did you talk about this
2    morning?
3        A.   We talked about procedure mostly.
4        Q.   Okay.  Anything else?
5        A.   Procedure, and type of questioning
6    that might occur by her or by you.
7        Q.   Okay.  Doctor, since we don't have
8    your CV, I'm going to take a little bit of time
9    and walk through your medical education,
10   training, and practice, okay?
11       A.   Okay.
12       Q.   So let's start with your education.
13          Where did you go to medical school?
14       A.   New York Medical College, graduated in
15   1967.
16       Q.   Okay.  And then after that, did you do
17   a residency?
18       A.   I did an internship at Greenwich
19   Hospital, Greenwich, Connecticut, from '67 to
20   '68.
21       Q.   Was that in a particular area?
22       A.   At that time internships were
23   considered rotating internships, so you rotated
24   through various services.
25       Q.   What happened next?

5 (Pages 14 to 17)

Michael R. Tesoro, M.D.

Page 18

1    A.   Then I did my residency at St. Clare's
2  Hospital & Medical Center in New York City until
3  1972.
4    Q.   And was that in a particular area?
5    A.   Obstetrics and gynecology.
6    Q.   So when you finished your residency,
7  did you go into private practice?
8    A.   I served two years in the United
9  States Air Force at Dover Air Force Base, and I
10  was commander of the department of OB/GYN at the
11  air base from '72 until 1974.
12    Q.   And where did you go after that?
13    A.   At that time I got out of the Air
14  Force, and I started my practice in Sharon,
15  Connecticut, private practice in obstetrics and
16  gynecology, solo.
17    Q.   So are you board certified in what
18  areas?
19    A.   Board certified in obstetrics and
20  gynecology, and recertified.  Certified in
21  1975-76, and recertified in 1993.
22    Q.   And are you board certified in any
23  other specialty?
24    A.   No.
25    Q.   When you started your private practice

Page 19

1  in Sharon, Connecticut in 1975 --
2    A.   No, '74.
3    Q.   -- '74, how long did you maintain that
4  practice?
5    A.   I was in private practice from 1974
6  until approximately 1989.  In 1990, I closed
7  that practice and I went to work as a physician
8  on the administrative staff at St. Francis
9  Hospital & Medical Center in Hartford,
10  Connecticut.
11    Q.   And how long did you stay in that
12  position?
13    A.   I was in that position until the year
14  2000.
15    Q.   What was the nature of your practice
16  at St. Francis?
17    A.   At St. Francis I was the assistant to
18  the associate director of the residency program
19  and director of the department, and also brought
20  -- some of my patients who wanted to from Sharon
21  saw me there in a private practice capacity.
22    Q.   Do you remember Ms. Fraser, the
23  Plaintiff in this case?
24    A.   Do I know her?
25    Q.   Yes.

Page 20

1    A.   I know her from the area, yes.
2    Q.   And was she a patient who also
3  continued to see you when you went to Hartford?
4    A.   I believe she did, yes.
5    Q.   So you said you were in that position
6  from 1990 until 2000.  What was your next
7  position?
8    A.   At that point in time, then I went to
9  become a consultant for various hospitals to try
10  and resurrect their obstetrics and gynecological
11  department where they were losing their OB/GYNs
12  who were deciding to not practice any longer,
13  and they had to either close the department or
14  recruit somebody.
15    Q.   So where was your office during that
16  time?
17    A.   Well, it depended on the institution.
18  In 2000 to approximately 2001, 2000 -- probably
19  December or January of 2002 I was at Wesley in
20  Wesley, Rhode Island at Wesley Hospital, I
21  reorganized their obstetrical department, and I
22  also recruited two obstetricians for them in
23  that reorganized department.
24    Q.   Okay.  What month in 2000 did you
25  begin your consultant position, do you know?

Page 21

1    A.   You know, honestly I can't really
2  recall.  It had to be somewhere between June or
3  August of 2000 and before December of 2000 --
4  before December, 2000 or January, 2001,
5  somewhere in that range.
6    Q.   Okay.
7    A.   And I also saw patients there to build
8  up the practice that they had.
9    Q.   When you say "there," that was in
10  Wesley, Rhode Island?
11    A.   In Wesley, Rhode Island.
12    Q.   Do you recall whether Ms. Fraser saw
13  you in --
14    A.   She may have been a patient that may
15  have come at that point in time, I don't recall
16  specifically.
17    Q.   Where were you living at the time?
18    A.   I was living in a rented house close
19  to the hospital so I could be close to the
20  hospital.  I kept my permanent residence here in
21  Connecticut.
22    Q.   When you were at St. Francis, did you
23  move to Hartford?
24    A.   I commuted.
25    Q.   So you maintained your permanent

6 (Pages 18 to 21)

Michael R. Tesoro, M.D.

Page 22

1   residence in this area?
2       A.   Correct.
3       Q.   This being the Lakeville/Sharon area?
4       A.   Correct.
5       Q.   And then you rented an apartment and
6   worked in Wesley, Rhode Island --
7       A.   Wesley.
8       Q.   -- Wesley, Rhode Island until January
9   of 2002?
10      A.   Approximately.
11      Q.   And then what was your next position?
12      A.   And then I was asked to resurrect a
13  hospital where the OB/GYN had left to move out
14  of the country with her husband, who was
15  actually a previous resident of mine, in Ware,
16  Massachusetts, and I reorganized that department
17  and recruited for them.  That took about a year
18  and a half to do.
19      Q.   So from January, '02 to mid '03, is
20  that right?
21      A.   I can say that's approximate, yes.
22      Q.   Fair enough.  Just trying to get
23  general timeline.
24      A.   I think it was October of 2003.
25      Q.   And did you say you were at a hospital

Page 23

1   at this point?  What was the nature of the
2   practice at Ware?
3       A.   It was a similar to Wesley where they
4   had lost their OB/GYN, they needed someone to
5   resurrect the department, they had just spent
6   some money to renovate the OB department, and
7   both obstetricians left so it left them without
8   taking care of their patients.
9       Q.   But what was the institution, the name
10  of the institution?
11      A.   Mary Lane Hospital.
12      Q.   And what was the name of the
13  institution back in Rhode Island?  I don't know
14  if I asked.
15      A.   Wesley Hospital.
16      Q.   Wesley Hospital.
17           Okay.  So in October, 2003, you left
18  that position, and what was your next position?
19      A.   I was asked by another hospital in
20  Massachusetts by the name of Nashoba Hospital, I
21  went from Ware to Ayer, Massachusetts.  You've
22  got to smile at that one.
23      Q.   So what was your position at Nashoba?
24      A.   Similar.  I was the, sort of like the
25  person to recruit, to organize the department of

Page 24

1   OB/GYN.  And they didn't have obstetrics at all,
2   so we just organized the gynecological
3   department there.  And I did that probably, I
4   can't recall if it was 2004, somewhere in that
5   range.  I recruited someone to come into that
6   practice.
7       Q.   Latter part of 2004, do you think?
8       A.   Probably.  I don't have the exact date
9   in my head.
10      Q.   Okay.  And then when you left that
11  position, what was your next position?
12      A.   Then I did what's called locums.  And
13  this is where I had a friend in Massachusetts
14  whose wife had a brain cancer, and he had asked
15  me if I could come and work in his office while
16  he helped her two to three days a week in her
17  rehab.  And I did that for approximately three
18  years.
19      Q.   What is locums?  I'm not familiar.
20      A.   That's where a physician who works for
21  another position for coverage.  L-O-C-U-M
22  T-E-N-E-N-S, locum tenens it's called.
23      Q.   So from sometime in 2004 until
24  sometime in 2007?
25      A.   2008 probably, because that's about

Page 25

1   the time when I was winding down.  And actually
2   his wife died in April, I think it was April,
3   2008 or 2009, I can't be absolutely sure, at
4   which point then he continued to work full-time
5   again.
6       Q.   And you were practicing OB/GYN during
7   that time period for him?
8       A.   I was practicing in his office,
9   correct.
10      Q.   Right.
11      A.   Yes.
12      Q.   But you were treating patients and
13  seeing patients during that time?
14      A.   Correct.
15      Q.   And did that include menopausal
16  patients?
17      A.   They had specific patients that would
18  come to them.  It was mostly new young patients
19  that they had me fill in, which made sense.
20      Q.   Okay.  And then in 2008 what happened?
21      A.   Again I might have worked periodically
22  for them, and then at one point in time I
23  decided that we have to retire.
24      Q.   So you moved back here, even though
25  you maintained your --

7 (Pages 22 to 25)

Michael R. Tesoro, M.D.

Page 26

1      A.  I commuted from here to there, they
2  had housing for me there for the three days that
3  I stayed up in Massachusetts, which was minimal
4  60 miles from here, north of here, and always
5  kept my residence here.
6      Q.  And so since 2008, have you been
7  seeing patients at all?
8      A.  No.  Except as I said, I do medical
9  mission projects in the Dominican Republic.
10     Q.  In what states are you licensed to
11 practice medicine?
12     A.  Connecticut and Massachusetts right
13 now.
14     Q.  Has your license ever been suspended
15 or revoked?
16     A.  Never.
17     Q.  Now, as an OB/GYN, you specialize in
18 the care and medical treatment of women
19 including menopausal women, correct?
20     A.  Correct.
21     Q.  What percentage of your patients would
22 you say in your private practice were menopausal
23 women?
24         MS. BLISS:  Objection.
25     A.  I can't really recall that number.

Page 27

1         BY MR. MOORE:
2      Q.  More than half or less than half?
3         MS. BLISS:  Objection.
4      A.  I can't really recall that number.
5         BY MR. MOORE:
6      Q.  But did you actively treat menopausal
7  women during this entire time period we talked
8  about?
9      A.  Yes.
10     Q.  As an OB/GYN, do you regularly attend
11 continuing medical education seminars, did you?
12     A.  CME credits?
13     Q.  Correct.
14     A.  Yes.
15     Q.  Did you have a certain number of
16 required hours that you were required to
17 complete?
18     A.  As all physicians do, yes.
19     Q.  Were some of those courses related to
20 hormone therapy?
21     A.  It may have been.  Most courses that
22 are put together are a combination of subjects.
23     Q.  And did you receive and try to read
24 any medical journals on a regular basis?
25     A.  Mostly the Green Journal, which is the

Page 28

1  journal from the Obstetrics & Gynecological
2  College, which we get once a month.
3      Q.  What about the New England Journal of
4  Medicine?
5      A.  Not really.  When you're in private
6  practice you don't really have time to do all
7  that reading.
8      Q.  Were there any other publications that
9  you subscribed to and regularly read?
10     A.  Other than the Green Journal, no.
11     Q.  Now, were you a member of ACOG?
12     A.  Yes, I was, and I still am.
13     Q.  Were you an officer in ACOG at some
14 point?
15     A.  I was.
16     Q.  What was your title?
17     A.  My title initially was chair of the
18 Connecticut section.
19     Q.  When was that?
20     A.  You're going to ask me the years.
21     Q.  Not to be exact, I'm just trying to
22 get a rough estimate.
23     A.  It had to be when I was at
24 St. Francis, so maybe '93, '94, '95.  You're in
25 that position for three years.

Page 29

1      Q.  And before that you'd been a member?
2      A.  Before that I was a member of the -- I
3  was a member since I became board certified.
4      Q.  Did you hold any other positions in
5  ACOG after that position?
6      A.  I did.  I was the vice-chair of the
7  New England section, District 1, and I was chair
8  of District 1, which is all of eight New England
9  states including Nova Scotia and Quebec.
10     Q.  And would you say that ACOG provides
11 current reliable information to OB/GYNs
12 practicing in the United States?
13         MS. BLISS:  Objection.
14     A.  Based on what they were given, yes,
15 they would analyze that data and then transfer
16 that data to us, and we to the members of the
17 College.
18         BY MR. MOORE:
19     Q.  And are you aware that some ACOG
20 activities are funded in part by donations from
21 pharmaceutical companies?
22     A.  That occurred until, I'm trying to
23 think of the name of the Act recently where ACOG
24 no longer accepted any more funds, and it had to
25 be in the year 2000 or so, 2002, where all the

8 (Pages 26 to 29)

Michael R. Tesoro, M.D.

Page 30

1    pharmaceutical companies pulled back.
2        Q.  But the fact that they made grants to
3    ACOG, does that in any way affect your opinion
4    about the reliability of the ACOG publications?
5        MS. BLISS:  Objection.
6        A.  Well, the publications that were
7    produced by ACOG were certainly analyzed by
8    committees when they were produced.  They
9    weren't just given and accepted verbatim.
10       BY MR. MOORE:
11       Q.  ACOG is an independent institution,
12   correct?
13       A.  Correct.
14       Q.  So when they publish a bulletin or a
15   publication, that's been vetted and considered
16   to be reliable by ACOG, right?
17       MS. BLISS:  Objection.
18       A.  It's considered to be reliable by
19   ACOG?  I don't think I understand your question.
20       BY MR. MOORE:
21       Q.  That was a bad question.
22       What I'm trying to say is the ACOG
23   materials you consider to be reliable whether or
24   not ACOG received grants from pharmaceutical
25   companies, correct?

Page 31

1        A.  I would say that it depended on
2    whether it was an opinion that they were making,
3    or whether it was a protocol that they were
4    suggesting, pretty reliable.
5        Q.  Are you a member of the -- scratch
6    that.
7            Were you a member of the North
8    American Menopause Society?
9        A.  No.
10       Q.  Have you ever been?
11       A.  No.
12       Q.  Did you ever receive publications from
13   NAMS?
14       A.  Not that I recall.
15       Q.  Can you describe to me a little bit
16   more about what your duties and responsibilities
17   were as chairman of ACOG?
18       A.  Well, essentially we would run
19   educational meetings, we would work with the
20   national office, I was on the board of the
21   American College of OB/GYN as chair, and
22   transfer data that was needed for the
23   obstetricians within my district to have for
24   their practices.
25       Q.  And that information came from medical

Page 32

1    literature, I assume?
2        A.  Most of the literature that we
3    transferred was strictly from the American
4    College of Obstetrics & Gynecology.
5        Q.  Okay.  And they get their information
6    from reviewing the medical literature available
7    at the time, correct?
8        MS. BLISS:  Objection.
9        A.  They got their information from
10   analysis of literature through committees that
11   were formed within the American College of
12   Obstetrics & Gynecology.
13       BY MR. MOORE:
14       Q.  Do you have any training or expertise
15   in the manufacturing, testing or marketing of
16   pharmaceutical products?
17       A.  No.
18       Q.  So is it fair to say you don't feel
19   comfortable rendering opinions here about how
20   pharmaceutical companies should manufacture,
21   test, or market its products?
22       MS. BLISS:  Objection.
23       A.  I don't think I understand what you're
24   saying.
25       BY MR. MOORE:

Page 33

1        Q.  Do you feel comfortable rendering any
2    opinion on how a pharmaceutical company should
3    manufacture, test or market --
4        A.  Should?
5        Q.  Yes.
6        A.  I don't think I'm qualified for that.
7        Q.  And do you have any experience in the
8    design of clinical trials?
9        A.  I have never been involved with a
10   clinical trial except with residents who were
11   doing studies when they were residents, which
12   none of them specifically were on a
13   pharmaceutical company type program.
14       Q.  So is it fair to say you don't feel
15   qualified to render an opinion on the design of
16   clinical trials as well?
17       A.  I'd say so.
18       Q.  I am correct, you're not --
19       A.  You're correct.
20       Q.  Now, I just want to talk a little bit
21   about some of the education and training you
22   received over the time about menopause and the
23   treatment of menopausal symptoms, okay?
24       A.  Mm-hmm.
25       Q.  Is it correct you first started

9  (Pages 30 to 33)

Michael R. Tesoro, M.D.

Page 34

1   learning about menopause and the treatment of
2   symptoms in medical school?
3       A.  Oh, I would have to say that medical
4   school, that was a long time ago.  I don't know
5   specifically.  We had a very strong obstetrics
6   department, but when you're in medical school
7   you're not really thinking of specifics like
8   that.
9       Q.  So when was it that you started
10  learning about specifically the treatment of --
11      A.  I feel when I was --
12      Q.  I'm sorry, I've got to finish my
13  question.
14          When was it that you specifically
15  started to learn about menopause and the
16  treatment of menopausal symptoms?
17      A.  That would have to be when I was in my
18  residency program, toward the tail end of my
19  residency program.
20      Q.  So what are some of the symptoms that
21  you consider to be menopausal related symptoms?
22      A.  Specifically hot flashes, urinary
23  symptoms, anxiety sometimes will be expressed by
24  some women.  You know, I've been out of the
25  picture so I'd have to really pull my brain to

Page 35

1   recall everything, it's been about four years.
2       Q.  I understand.
3          Is vaginal atrophy?
4       A.  Sorry, yes, vaginal atrophy would go
5   along with the urinary symptoms.
6       Q.  And night sweats you would consider to
7   be part --
8       A.  I said that.
9       Q.  Night sweats and hot flashes you
10  consider to be --
11      A.  Yes.
12      Q.  Osteoporosis?
13      A.  At that time there was a question as
14  to whether osteoporosis in low estrogen women
15  was related, so yes, that would be one of them.
16      Q.  And based on your knowledge,
17  experience and training, do menopausal related
18  symptoms affect a woman's quality of life?
19      MS. BLISS:  Objection.
20      A.  I would have to say that would depend
21  on the person, the woman.
22      BY MR. MOORE:
23      Q.  Every woman is different, right, in
24  terms of their medical condition and how you
25  treat it?

Page 36

1       A.  Everybody is different according to
2   their medical condition, men included.
3       Q.  Right.
4          And many women, is it fair to say that
5   in many women menopausal related symptoms affect
6   their quality of life?
7       MS. BLISS:  Objection.
8       A.  It would be dependent on a particular
9   individual, as I just said.
10      BY MR. MOORE:
11      Q.  Okay.  So in some of your patients
12  that you treated, has it been your experience
13  that their menopausal symptoms were affecting
14  their quality of life?
15      A.  I don't know specifically if that was
16  the issue but, you know, it may affect, may not
17  affect, it would depend on the individual.
18      Q.  So, for example, if a woman's
19  experiencing hot flashes and night sweats, that
20  can be disturbing in a woman's life, right?
21      MS. BLISS:  Objection.
22      A.  It may be.  I can't specifically say
23  yes to that.  I mean it may, no different than
24  symptoms that a man may have of those issues.
25      BY MR. MOORE:

Page 37

1       Q.  Well, I'm talking specifically here
2   now about menopausal symptoms.
3       A.  Correct.
4       Q.  And so certainly you agree that in
5   some women hot flashes and night sweats can
6   affect their quality of life, in some women,
7   correct?
8       A.  I can't say 100 percent.  I don't
9   believe I can -- you can talk me into saying I
10  agree to that because I really don't, I don't
11  fully agree to that.
12      Q.  Has any woman ever told you that her
13  hot flashes and menopausal symptoms were --
14      A.  They may have, but I don't
15  specifically recall any particular cases.
16      Q.  Okay.  Now, a woman's exposed to
17  hormones, estrogen and progesterone, throughout
18  her life, right?
19      MS. BLISS:  Objection.
20      A.  Say that again?
21      BY MR. MOORE:
22      Q.  A woman is exposed to her own internal
23  hormones, estrogen and progestin, throughout her
24  life?
25      A.  Right, from the age of menarche until

10  (Pages 34 to 37)

Michael R. Tesoro, M.D.

Page 38

1  her ovary ceases to function.
2      Q.   And even after those ovaries cease to
3  function, there is some?
4      A.   There's estrogen produced, correct.
5      Q.   And progestin?
6      A.   Correct.
7      Q.   And have you ever heard it suggested
8  that a woman with menopausal symptoms such as
9  hot flashes or vaginal atrophy are at a reduced
10  risk for breast cancer?
11      A.   I don't recall that at all.
12      Q.   Have you ever told a patient that she
13  has a lower risk of breast cancer because she
14  has menopausal symptoms?
15      A.   I can't recall that I did, no.
16      Q.   Have you ever heard any doctor at your
17  clinic or medical conference or anywhere else
18  say that a woman with menopausal symptoms are at
19  a lower risk for breast cancer?
20      A.   No.
21      Q.   Have you ever told a patient who has
22  been diagnosed with breast cancer while taking
23  hormone therapy that stopping her hormone
24  therapy is enough to make her breast cancer stop
25  growing, or shrink?

Page 39

1      A.   I never made that statement.
2      Q.   Now, there's several options available
3  to physicians such as yourself to choose from
4  for the treatment of menopausal symptoms, is
5  that fair to say?
6          MS. BLISS:  Objection.
7  Various options?
8          BY MR. MOORE:
9      Q.   Let's limit it, let's talk about a
10  certain timeframe.
11          When you were practicing, there were
12  several options available to physicians such as
13  yourself to choose from for the treatment of
14  menopausal symptoms, is that right?
15      A.   That possibly is correct.
16      Q.   Premarin is an example of an
17  estrogen-only product, correct?
18      A.   Yes.
19      Q.   And Provera is an example of a
20  progestin?
21      A.   Correct.
22      Q.   And Prempro is the trade name or
23  product that contains estrogen and progestin,
24  right?
25      A.   Correct.

Page 40

1      Q.   The progestin is MPA, right,
2  medroxyprogesterone acetate?
3      A.   Correct.
4      Q.   And the estrogen is conjugated equine
5  estrogen?
6      A.   Which estrogen are you talking about?
7      Q.   Premarin.
8      A.   Yes.
9      Q.   So Prempro is the combination of
10  conjugated equine estrogen and
11  medroxyprogesterone acetate, right, MPA?
12      A.   Yes.
13      Q.   It's a mouthful.
14          So the estrogen is prescribed to
15  relieve the menopausal symptoms, and the
16  progestin is designed to protect the risk of
17  endometrial cancer associated with the estrogen
18  alone, is that right?
19      A.   Not only cancer of the lining, but
20  changes that might take effect.
21      Q.   Now, there are other estrogens and
22  progestins on the market, right?
23      A.   I believe so.
24      Q.   And there were during the time that
25  Ms. Fraser took the product in the late 1990s,

Page 41

1  right?
2      A.   There were.  I can't recall all of
3  them, or any of them as a matter of fact.
4      Q.   Well, Climara, Climara, is that one?
5      A.   Climara?
6      Q.   Yes.
7      A.   Give me the generic of the Climara.
8      Q.   I don't know the generic name, sorry.
9      A.   Was that the patch?
10      Q.   Well, let me just keep going through,
11  tell me if you recognize any of these.
12          Estrace?
13      A.   Yes.
14      Q.   FemHRT?
15      A.   Which one?
16      Q.   FemHRT, does that sound familiar?
17      A.   Well, that's a term meaning hormonal
18  replacement, feminine hormonal replacement
19  therapy, it depends on what the ingredient is.
20      Q.   There's also a product.  Are you
21  familiar with the product called FemHRT?
22      A.   No.
23      Q.   Prometrium?
24      A.   I never specifically remember using
25  that.

11 (Pages 38 to 41)

Michael R. Tesoro, M.D.

Page 42

1    Q.  Okay.  Now, Prempro is a prescription
2  drug that can only be obtained with a
3  prescription, right?
4    A.  That's correct.
5    Q.  So a woman can't just walk into the
6  pharmacy and get Prempro, right?
7    A.  As far as I know.
8    Q.  Now, there are pros and cons related
9  to treatments of menopausal related symptoms,
10  right?
11      MS. BLISS:  Objection.
12    A.  Are there pros and cons of treating?
13  I believe so, yes, that's a fair statement.
14      BY MR. MOORE:
15    Q.  By the way, birth control pills, they
16  also have estrogen and progestin in them, right?
17    A.  That's correct.
18    Q.  In higher doses than hormone therapy,
19  right?
20    A.  And they're synthetic as opposed to
21  the natural that you mentioned.
22    Q.  The birth control pills are synthetic?
23    A.  I'm sorry?
24    Q.  The birth control -- the hormones in
25  the birth control pills are synthetic, is that

Page 43

1  what you're saying?
2    A.  The last time I prescribed one of
3  those was over six years ago, they were then.
4    Q.  But what I'm saying it's the same E+P
5  that's in hormone therapy, right?  Both of them
6  have estrogen and progestin, right?
7    A.  Yes, significantly lower dose.
8    Q.  In the hormone therapy?
9    A.  In the birth control pill.
10    Q.  There's a lower dose of E+P in the
11  birth control pill than the hormone therapy?
12    A.  In its synthetic configuration there
13  is, yes, when you look at the dosage labelling.
14    Q.  Now, would you agree it's important
15  for women to have as many options as possible
16  available to help with their menopausal
17  symptoms?
18    A.  I would agree that everybody should
19  have options in their medical care.
20    Q.  And based on your experience and
21  training, do most of the women who take hormone
22  therapy get relief from their menopausal
23  symptoms?
24    A.  When you say "most," that's sort of a
25  nebulous statement.  I would say that most,

Page 44

1  majority of women who might have taken that may
2  have had some symptom relief.  I wouldn't say it
3  was 100 percent that I recall.
4    Q.  And Prempro is still approved today
5  for treatment of menopausal symptoms?
6    A.  I believe so.
7    Q.  Did you prescribe Prempro up until the
8  time that you stopped seeing patients in 2008?
9    A.  I would say probably back when I was
10  at St. Francis and when I left Westerly, where
11  probably from the position I had at Nashoba,
12  which was Ayer, and that had to be 2003, 2000 --
13  I can't recall exactly the date, but in that
14  range of time.  I don't think I have
15  prescribed -- I can't recall prescribing
16  anything hormonally for the last six years.
17    Q.  Okay.  But you continued to prescribe
18  it up until your time at Nashoba, which would
19  have been 2003 to 2004 range?
20    A.  Possibly.  I can't recall 100 percent.
21  I can say possibly.
22    Q.  And then since then you haven't been
23  prescribing hormone therapy to any of your
24  patients, any kind of hormones?
25    A.  I don't have any more patients.

Page 45

1    Q.  But after you left Nashoba, you're
2  saying you stopped treating menopausal patients
3  at that time?
4    A.  I would have to say so.
5    Q.  Okay.  But up until the point where
6  you stopped seeing and treating menopausal
7  patients, you continued to prescribe Prempro?
8    A.  Possibly.  I can't recall.
9    Q.  But to the best of your recollection?
10    A.  Possibly.
11      (Whereupon, Tesoro Exhibit Number 3
12      was marked for identification.)
13      BY MR. MOORE:
14    Q.  Doctor, I'm going to hand you what's
15  been marked as Exhibit Number 3, it's also Trial
16  Exhibit Number 43, it's a Physician Desk
17  Reference from 1999 (handing).
18    A.  Okay.
19    Q.  Now, you were generally familiar with
20  the Prempro label at the time you prescribed
21  Prempro for Ms. Fraser, right?
22    A.  Yes.
23    Q.  And that was from 1998 until 2001,
24  right?
25      MS. BLISS:  Objection.

12  (Pages 42 to 45)

Michael R. Tesoro, M.D.

Page 46

1     A.  I can't recall, but possibly.
2        BY MR. MOORE:
3     Q.  So if she said in her fact sheet that
4  she took it from 19 -- was prescribed Prempro
5  from 1998 until 2001 when she was diagnosed with
6  breast cancer, you don't --
7     A.  Who are we talking about?
8     Q.  Ms. Fraser.
9     A.  Yes.  What's your question?
10    Q.  If she said in her fact sheet that she
11 was prescribed Prempro by you from November,
12 1998 until 2001 when she was diagnosed with
13 breast cancer, is that consistent with your
14 recollection?
15       MS. BLISS:  Objection.
16    A.  That's possibly.  Again, I don't have
17 those records, and I can't 100 percent recall
18 that.  But if she was my patient, possibly I
19 could have done that.
20       BY MR. MOORE:
21    Q.  Let me ask you this.
22       What recollection do you have sitting
23 here today about your treatment and care of
24 Ms. Fraser?
25    A.  Frankly, I can't recall very much.

Page 47

1     Q.  Because we don't have the record,
2  right?
3     A.  Correct.
4     Q.  So you remember who she is, right?
5     A.  Correct.
6     Q.  And what else do you remember about
7  your care and treatment of her?
8     A.  I just told you I can't recall very
9  much.
10    Q.  Doctor, I'm going to ask you to please
11 turn to the page that's marked in the bottom
12 left-hand corner DX43-0004.  Do you see that?
13    A.  Okay.
14    Q.  I'm going to use those page numbers
15 and refer to that as Page 4, just because
16 there's a couple of different page numbers.
17       So on Page 4, you'll see that there is
18 a section in the third -- bottom of the middle
19 column that's entitled "Indications and Usage."
20       Do you see that?
21    A.  Yes, "Indications and Usage."
22    Q.  And so it says that Prempro was
23 indicated for the "Treatment of moderate to
24 severe vasomotor symptoms associated with
25 menopause"?

Page 48

1     A.  Yes.
2     Q.  What are vasomotor symptoms?
3     A.  Those might be described as hot
4  flashes.
5     Q.  It was also indicated for "Treatment
6  of vulvar and vaginal atrophy," correct?
7     A.  Yes.
8     Q.  And also indicated for "Prevention of
9  osteoporosis"?
10    A.  I see that.
11    Q.  And so are these the reasons that you
12 prescribed Prempro?
13    A.  Those may be some of the reasons,
14 correct.
15    Q.  Those are the reasons that it was --
16    A.  Indicated for that usage, correct.
17    Q.  As a physician, you're free to
18 prescribe off-label if you want, that's within
19 your rights as a physician, correct?
20    A.  I believe so.
21    Q.  But this is what's been indicated and
22 approved by the FDA, right?
23    A.  Mm-hmm.
24    Q.  And so is it fair to say that these
25 are the indications for which you prescribe

Page 49

1  hormone therapy?
2     A.  Possibly.
3     Q.  The three that we've talked about,
4  treatment of moderate to severe vasomotor
5  symptoms, treatment of vulvar and vaginal
6  atrophy, and treatment of osteoporosis, correct?
7     A.  Yes.
8     Q.  And did you prescribe for any
9  off-label use?
10    A.  I never did that I can recall.
11    Q.  On the next page, Page 5, there is a
12 "Warnings" section in the left-hand column.
13       Do you see that?
14    A.  Yes.
15    Q.  And is the Warnings section designed
16 to be the place in the label where risks of the
17 product are listed?
18    A.  Are they -- say again?
19    Q.  I'm sorry.  As risks -- is that the
20 place in the warning -- in the label where
21 risks of the product are listed?
22    A.  I believe so.  I'm reading down here
23 and it says "Warnings.  All warnings pertain to
24 the use of this combination product."
25    Q.  Right.  So I want to go through these

13 (Pages 46 to 49)

Michael R. Tesoro, M.D.

Page 50

1    warnings with you.
2         As you just said, the first thing
3    below the Warnings is "All warnings below
4    pertain to the use of this combination product."
5    So that means that these warnings pertain to
6    E+P?
7         MS. BLISS:  Objection.
8         BY MR. MOORE:
9    Q.   Estrogen plus progestin, right?
10        MS. BLISS:  Objection.
11   A.   I believe so.  This particular drug.
12        BY MR. MOORE:
13   Q.   Which is Prempro?
14   A.   Correct.
15   Q.   And Prempro contains -- when they say
16   combination product, that means combination
17   hormone therapy, estrogen plus progestin, right?
18   A.   If that's what you say they mean.  I
19   don't know if that's what they mean.
20   Q.   Is that how you interpret this?
21   A.   I interpret it as being the
22   combination of those two drugs as you just said.
23   Q.   And so the first heading under
24   Warnings is "Induction of malignant neoplasms."
25        Do you see that?

Page 51

1    A.   Yes.
2    Q.   That's cancer, right?
3    A.   That's correct.
4    Q.   And the first type of cancer listed is
5    endometrial cancer, correct?
6    A.   That's correct.
7    Q.   And then a few paragraphs down there's
8    a warning related to breast cancer, right?
9    A.   It would be the next paragraph, is
10   that what you're saying, "the effect"?  Is that
11   what you're talking about?
12   Q.   No, it's right above that.  Do you see
13   where it says --
14   A.   Yes, I see that, yes.
15   Q.   So about halfway down there's a
16   warning for breast cancer, right?
17   A.   Correct.
18   Q.   And the first part of that warning
19   says "Some studies have reported a moderately
20   increased risk of breast cancer (relative risk
21   of 1.3 to 2.0) in those women on estrogen
22   replacement therapy taking higher doses, or in
23   those taking lower doses for prolonged periods
24   of time, especially in excess of ten years.  The
25   majority of studies, however, have not shown an

Page 52

1    association in women who have ever used estrogen
2    replacement therapy."
3         Did I read that correctly?
4    A.   I believe so.
5    Q.   And is it your understanding that that
6    first paragraph relates to estrogen therapy?
7    A.   To this particular combination,
8    correct.
9    Q.   And then if you look at the next
10   paragraph below that, it says "The effect of
11   added progestins on the risk of breast cancer is
12   unknown, although a moderately increased risk in
13   those taking combination estrogen/progestin
14   therapy has been reported.  Other studies have
15   not shown this relationship."
16        Do you see that?
17   A.   Yes.
18   Q.   So is it fair to say that that second
19   paragraph is saying that there may be an
20   additional risk associated with the addition of
21   progestin above and beyond the estrogen risk?
22        MS. BLISS:  Objection.
23   A.   Possibly.
24        BY MR. MOORE:
25   Q.   When you say "possibly," is that how

Page 53

1    you interpret that?
2         MS. BLISS:  Objection.
3    A.   I would have to really go into the
4    study to give you a definite answer on that.
5         BY MR. MOORE:
6    Q.   In terms of your interpretation of
7    what the warning label says, why don't you tell
8    me how you interpret what they're saying there.
9    A.   Well, it's saying that there's a
10   moderate increased risk when you take the
11   combination of estrogen and progestin therapy,
12   it's been reported.
13   Q.   So at the time you prescribed Prempro
14   to Ms. Fraser, you were aware of the information
15   in this warning label, correct?
16   A.   Yes.
17   Q.   So you were aware of the moderate
18   increased risk that you discussed, right?
19        MS. BLISS:  Objection.
20   A.   Yes.
21        BY MR. MOORE:
22   Q.   But as we discussed earlier, you make
23   the decision as to whether to prescribe a
24   product based on the individual characteristics
25   of that woman, right?

14  (Pages 50 to 53)

Michael R. Tesoro, M.D.

Page 54

1    A.  Based on certain clinical data that I
2  had, not just on a whim of a history.
3    Q.  Okay.  So when you say certain
4  clinical data, what are you referring to?
5    A.  All of my patients that were involved
6  with any kind of replacement therapy or hormonal
7  therapy or whatever you want to call it had an
8  initial general physical examination, it
9  included a Pap smear, breast examination, and I
10  would not put them on it if they were over the
11  age of 40 and did not have a mammogram on a
12  yearly basis, and if there was any abnormal
13  bleeding I would sample the endometrium before I
14  put them on any hormonal treatment.  That was a
15  routine that I followed.  I will never forget
16  that routine.
17    Q.  Okay.  Was it part of your routine to
18  discuss with your patient the risks and benefits
19  of the product?
20    A.  Absolutely.  And also would do a blood
21  test including liver enzyme test and follicle
22  stimulating hormone test which would indicate
23  whether the level of that hormone was lower or
24  increased, which would indicate a lack of a
25  particular hormone in a woman's body.

Page 55

1    Q.  Okay.
2    A.  Because a woman had symptoms, you
3  would not just put her on a medication without
4  that study, in my book.
5    Q.  So you would do, even though -- in
6  addition to the fact that she had symptoms, you
7  would also do FSH test to determine whether her
8  hormone levels had indeed dropped before
9  prescribing the --
10    A.  Well, I would see if, the combination
11  is the follicle stimulating hormone, is it
12  increased with the lower estrogen level in her
13  body.  But I would not put anyone on any of
14  those, any hormonal replacement unless I had all
15  the data back from that information of that
16  testing.
17    Q.  And if you --
18    A.  And my patients knew that.
19    Q.  And if you determined that based on
20  that information they were an appropriate
21  candidate to receive hormone therapy, you would
22  discuss with them the risks of hormone therapy,
23  right?
24    A.  Absolutely.
25    Q.  And that would include the moderate

Page 56

1  increased risk of breast cancer, right?
2    MS. BLISS:  Objection.
3    A.  Absolutely.
4    BY MR. MOORE:
5    Q.  And you would make the determination
6  that the benefits outweighed the risks for that
7  particular patient?
8    A.  It would depend on patient by patient
9  basis.  They would have to make that choice.
10    Q.  Now, the next warning in the warning
11  section relates to "Thromboembolic Disorders and
12  Other Vascular Problems," it's at the beginning
13  of the second column on Page 5.
14    Do you see that?
15    A.  Yes, number two.
16    Q.  Correct.
17    And that's also -- that's another
18  serious risk associated with hormone therapy,
19  correct?
20    A.  Yes.
21    Q.  And was that a risk that you also
22  would have taken into consideration?
23    A.  Included an ophthalmology exam of
24  their eyes at the same time using an
25  ophthalmoscope.  The complete physical

Page 57

1  examination is what I do.
2    Q.  Okay.  I guess what I'm asking,
3  though, is; you would take into consideration
4  the risk of thromboembolic disorders as part of
5  your risk/benefit calculation, correct?
6    A.  Totally.
7    Q.  Now, in addition to the information
8  that's in the PDR for the physician, there's
9  also a section at the end that's called
10  "Information For the Patient," and that starts
11  on Page 7.
12    Do you see where I'm talking about?
13    A.  Yes, at the bottom of the page.
14    Q.  And this was a patient information
15  sheet that the patients actually received when
16  they received the Prempro, right?
17    A.  Mm-hmm.
18    Q.  And if you turn over to the third
19  column, about a little more than halfway down it
20  says "Cancer of the breast."
21    Do you see that?
22    A.  Yes.
23    Q.  And that warning says "Most studies
24  have not shown a higher risk of breast cancer in
25  women who have ever used estrogens.  However,

15  (Pages 54 to 57)

Page 58

1  some studies have reported that breast cancer
2  developed more often (up to twice the usual
3  rate) in women who used estrogens for long
4  periods of time (especially more than ten
5  years), or who used high doses for shorter time
6  periods.  The effects of added progestin on the
7  risk of breast cancer are unknown.  Some studies
8  have reported a somewhat increased risk, even
9  higher than the possible risk associated with
10  estrogen alone.  Others have not."
11       Do you see that?
12     A.  Yes.
13     Q.  And is that an accurate statement of
14  the scientific information available at that
15  time?
16     A.  I believe so.
17     Q.  And that's not designed to reassure
18  the patient, right?
19       MS. BLISS:  Objection.
20     A.  To reassure them about what?
21       BY MR. MOORE:
22     Q.  It says "Cancer of the breast."  Would
23  you say that's designed to reassure the patient?
24       MS. BLISS:  Objection.
25     A.  Cancer of the breast, is that a sign

Page 59

1  to reassure the patient about what?
2       BY MR. MOORE:
3     Q.  About their risk of breast cancer.
4     A.  Well, it's an indication that they
5  should be aware of that information.
6     Q.  So it's an indication that they should
7  be aware of the risk of breast cancer associated
8  with Prempro, correct?
9       MS. BLISS:  Objection.
10     A.  Possibly.
11       BY MR. MOORE:
12     Q.  When you say "possibly," I mean is
13  that how you interpret that?
14       MS. BLISS:  Objection.
15     A.  I'd say possibly that's how I
16  interpret that.
17       BY MR. MOORE:
18     Q.  And this information is, both in the
19  physician and the patient warning, is approved
20  by the Food & Drug Administration, right?
21     A.  I believe so.
22     Q.  And do you have any reason to believe
23  that the FDA or Wyeth was trying to downplay the
24  risk of breast cancer in these warnings?
25       MS. BLISS:  Objection.

Page 60

1     A.  I have no knowledge of that.
2       BY MR. MOORE:
3     Q.  Do you have any reason to dispute that
4  this was an accurate summary of the information
5  available?
6     A.  Do I have any reason to believe that
7  this was not accurate?
8     Q.  Right.
9     A.  I have no knowledge of whether it was
10  accurate or not accurate.  It's the literature
11  that was presented at the time.
12     Q.  Now, Doctor, was it always your
13  practice to prescribe medications for the lowest
14  effective dose for the shortest period of time?
15     A.  That usually was my practice, yes.
16  That was my practice.
17     Q.  Throughout your medical career?
18     A.  Yes.
19     Q.  And that includes with respect to
20  hormone therapy, correct?
21     A.  Yes.
22     Q.  Now, do you believe that this warning
23  section regarding the breast cancer risk along
24  with this patient information sheet were
25  adequate to assist you in forming your clinical

Page 61

1  judgment in prescribing Prempro for Ms. Fraser?
2       MS. BLISS:  Objection.
3     A.  That, including my physical
4  examination and laboratory data, and the
5  knowledge that the patient agreed to that
6  treatment, yes.  And included in that was the
7  follow-up that the patient had to come in every
8  either six months or a year, or if she developed
9  any of those symptoms to return for a revisit.
10       BY MR. MOORE:
11     Q.  So it was your practice to have the
12  patient come in every six months or every year
13  for re-evaluation, is that right?
14     A.  I usually -- if I recall, it was every
15  six months specifically for hormonal therapy.
16     Q.  And in that visit would you do a
17  reassessment of the risk and benefits again?
18     A.  Complete history, re-evaluation, and
19  exam.
20     Q.  And you would determine at that time
21  again whether or not the risks outweighed the
22  benefits in terms of whether to continue the
23  patient on the treatment?
24     A.  Yes, giving the patient the option to
25  continue or not to continue.

16 (Pages 58 to 61)

Michael R. Tesoro, M.D.

Page 62

1    Q.  So in addition to information in the
2  product labelling, you also received information
3  on hormone therapy from other sources, correct?
4    A.  Like what, for instance?
5    Q.  Well, like published medical and
6  scientific literature.
7      MS. BLISS:  Objection.
8    A.  Other than what the American College
9  of Obstetrics & Gynecology, other than the Green
10  Journal, no, I never received anything.
11      BY MR. MOORE:
12    Q.  Well, you also had your previous
13  clinical experience with patients, and that's
14  certainly -- well, let me ask you in a
15  non-leading way.
16      Did your previous clinical experience
17  and treatment of patients also inform your
18  treatment decisions and your knowledge of
19  hormone therapy?
20    A.  When you say my "previous treatment,"
21  what are we talking about?
22    Q.  Okay.  You treated menopausal patients
23  for many years, right?
24    A.  Yes.
25    Q.  And so you developed a body of

Page 63

1  knowledge through your treatment of those
2  patients about the risks and benefits of --
3    A.  Yes.
4    Q.  And that would be something that you'd
5  also take into consideration as you make a
6  treatment decision for a particular patient,
7  right?
8    A.  Yes.
9    Q.  And your continuing medical education,
10  conferences and seminars were part of your
11  educational training, correct?
12    A.  Yes.
13    Q.  And that's something that you would
14  consider when you were making a determination as
15  to whether --
16    A.  You evaluate that information and make
17  a medical judgment on it, dependent on
18  individual patients.
19    Q.  And you made the decision -- when you
20  made the decision to prescribe Prempro for
21  Ms. Fraser, you did it based on all the
22  information we just talked about, right?
23    A.  When you say Ms. Fraser, I can say
24  that I used the same protocol for all patients.
25    Q.  And I assume, you correct me if I'm

Page 64

1  wrong, but that your knowledge of medicines
2  evolves over time as you continue to treat
3  patients, correct?
4    A.  It would have to with anyone, so
5  obviously I would have to say yes to that,
6  possibly.
7    Q.  New information becomes available on
8  medicines over time and that just -- that
9  happens with lots of medications?
10    A.  Everything changes, including the
11  weather.
12    Q.  So over the course of time with your
13  medications, you continue to learn more and more
14  in many cases, right?
15    A.  When I was in active practice, yes.
16    Q.  Science and medicine evolve, right?
17    A.  Everything evolves.
18    Q.  And you continued to prescribe
19  Prempro, as we talked about, throughout the time
20  that you were seeing patients, menopausal
21  patients, right?
22      MS. BLISS:  Objection.
23    A.  It would be one of the medication,
24  yes.
25      BY MR. MOORE:

Page 65

1    Q.  One of the hormone therapy
2  medications, right?
3    A.  Yes.
4    Q.  And so even as more and more
5  literature became available, you still made your
6  prescribing decision based on the
7  characteristics of the individual woman, right?
8    A.  Depending on, you know, what interval
9  of time when I stopped prescribing that
10  particular medication, and I'm telling you that
11  I think it's probably around 2003 or before.
12    Q.  And so if Ms. Fraser -- you don't
13  think you did anything wrong in terms of
14  prescribing Prempro for her, correct?
15    A.  Do I think so?
16    Q.  Right.
17    A.  Absolutely not.
18    Q.  So if she came in with the same
19  symptoms that she was having even today, you
20  would consider hormone therapy as a treatment
21  option for her?
22      MS. BLISS:  Objection.
23    A.  It would depend on her history, on her
24  physical exam, and laboratory data.
25      BY MR. MOORE:

17 (Pages 62 to 65)

Michael R. Tesoro, M.D.

Page 66

1    Q.  And you would make that determination
2   and you would consider whether or not to
3   prescribe Prempro for her?
4       A.  I would make the decision that she may
5   need that medication.  I may prescribe that
6   medication, but she would have to make the
7   choice.
8       Q.  And that would have been the same --
9   you would have given her that option up until
10  the time you stopped in 2003, 2004, whenever you
11  stopped prescribing Prempro, Prempro would have
12  still been an option that you would have --
13      A.  For whom are we talking?
14      Q.  For Ms. Fraser.
15      A.  Well, I can't say because you just
16  said that she had a test done in 2000, 2001.
17      Q.  Fair enough.
18          After she's already had breast cancer,
19  it's not -- it's contraindicated for women who
20  have already had breast cancer?
21      A.  That's correct.
22      Q.  I'm just saying had she not had breast
23  cancer, had she come in to you in 2003, 2004
24  just as she did in 1998 without breast cancer,
25  you would have considered Prempro as one option

Page 67

1   to treat her menopausal symptoms?
2       MS. BLISS:  Objection.
3       A.  It would depend on the number of years
4   she's been on it.
5       BY MR. MOORE:
6       Q.  Right.
7           If she had come in brand new and never
8   taken it at all in 2003, 2004, you would have
9   considered Prempro as one option?
10      A.  It would depend on her age and the
11  physical exam, laboratory data at the time.
12      Q.  Correct.
13          Now, she says in her fact sheet, "she"
14  being Ms. Fraser, that she took the .625/5.0
15  dose of Prempro.
16          Do you have any reason to dispute
17  that?
18      A.  I can't recall.
19      Q.  That was one of the treatment options
20  that you used in your practice?
21      A.  Possibly.  I can't recall if that was
22  the dose I gave her.
23      Q.  But do you recall that you gave that
24  to some of your patients?
25      A.  The .625?

Page 68

1       Q.  .625 estrogen/5.0 progestin.
2       A.  That was a pretty high dose, I
3   believe.
4       Q.  Why would you have given her the 5.0?
5       A.  The progesterone?
6       Q.  Yes.
7       A.  That was the protocol, to give
8   progesterone if someone had a uterus with the
9   estrogen.
10      Q.  Right.
11          But there's a .625/2.5 dose, and then
12  there's a .625/5.0 dose.
13      A.  I don't recall which dose I gave her.
14      Q.  Okay.  So --
15      A.  I don't even recall if that's the
16  dose.
17      Q.  Do you recall -- so you don't recall
18  why you would have given her the 5.0 MPA rather
19  than the 2.5 MPA?
20      A.  No.  I don't recall that I even gave
21  her that.
22      Q.  Okay.  Fair enough.  We don't have the
23  records so you can't testify to that.
24          But I guess I'm just trying to get an
25  idea for why that higher dose of MPA is

Page 69

1   prescribed.  Does it have to do with the
2   bleeding?
3       A.  I have no idea.
4       Q.  Now, do you recall your conversation
5   with Ms. Fraser in September of 2001 when she
6   was diagnosed with breast cancer?
7       A.  I don't.
8       Q.  Okay.  Prempro is contraindicated in
9   women with known or suspected breast cancer,
10  right?
11      A.  I believe so.
12      Q.  So that doesn't mean it caused her
13  breast cancer, right?  The fact that it's
14  contraindicated doesn't mean that it caused her
15  breast cancer?
16      A.  I can't say yes or no to that
17  question.
18      Q.  Right.  Because you don't, science
19  doesn't -- can't determine what causes an
20  individual woman's breast cancer, is that fair?
21      MS. BLISS:  Objection.
22      A.  I can't be sure about that.
23      BY MR. MOORE:
24      Q.  When you say you can't be sure about
25  that, have you ever told any of your patients

18 (Pages 66 to 69)

Michael R. Tesoro, M.D.

Page 70

1    what caused their breast cancer?
2        A.  Have I told any of my patients?
3        Q.  Yes.
4        A.  I can't recall saying anything like
5    that.
6        Q.  So you never told them that hormone
7    therapy or Prempro caused their breast cancer?
8        A.  I can't recall any statement like
9    that.
10       Q.  And because the biggest risk factor
11   for breast cancer is being a woman, right?
12       MS. BLISS:  Objection.
13       A.  Well, 50 percent of men also get
14   breast cancer.
15       BY MR. MOORE:
16       Q.  Breast cancer can happen in women, but
17   it's a much higher -- I mean in men, but it's a
18   much, much higher rate among women, right?
19       MS. BLISS:  Objection.
20       A.  Correct.
21       BY MR. MOORE:
22       Q.  And so breast cancer occurs in women
23   who have never taken Prempro?
24       A.  Yes.
25       Q.  And most women who take Prempro don't

Page 71

1    develop breast cancer?
2        MS. BLISS:  Objection.
3        A.  I don't know what the statistic
4    numbers are.
5        BY MR. MOORE:
6        Q.  Can you say whether most women who get
7    breast cancer have taken hormone therapy?
8        MS. BLISS:  Objection.
9        A.  I can't answer that question one way
10   or the other.
11       BY MR. MOORE:
12       Q.  But a woman could get breast cancer
13   whether or not she's taking hormone therapy;
14   you'll agree with that?
15       A.  That's correct.
16       Q.  And you don't know of any way to
17   determine the cause of a woman's breast cancer?
18       MS. BLISS:  Objection.
19       A.  No, that I know of.
20       MR. MOORE:  Why don't we take a break.
21   We're at five minutes.
22       THE VIDEOGRAPHER:  This is the end of
23   tape number one of the videotaped deposition of
24   Michael R. Tesoro, MD.  We're going off the
25   record, and the time is 12:33 p.m..

Page 72

1        (Whereupon, a recess was taken.)
2        THE VIDEOGRAPHER:  This is the
3    beginning of tape number two of the videotaped
4    deposition of Michael R. Tesoro, MD.  We are
5    back on the record, and the time is 12:42 p.m..
6        BY MR. MOORE:
7        Q.  Doctor, you're aware that
8    pharmaceutical companies publish and distribute
9    marketing, advertising and promotional
10   materials, right?
11       A.  Yes.
12       Q.  Did you review those when you were
13   practicing medicine?
14       A.  Most of the time, yes.
15       Q.  Is that something that you relied on
16   in terms of how you made your prescribing
17   treatments for patients?
18       A.  That, and the guidelines and protocols
19   that we followed through the American College of
20   Obstetrics & Gynecology.
21       Q.  And the warning label we just
22   discussed as well, right?
23       A.  The one that you showed me.
24       Q.  Yes.
25       A.  Yes.

Page 73

1        Q.  Okay.  But do you recall any specific
2    marketing materials for Prempro?
3        A.  Not really.  I mean there was
4    marketing material, so much marketing material
5    that I would have to say yes partially and no
6    partially to that answer.
7        Q.  Okay.  What do you mean by that?  Do
8    you remember generally that there was marketing?
9        A.  From all pharmaceutical companies.
10       Q.  But with respect to Prempro in
11   particular, do you remember any particular
12   marketing materials?
13       A.  No.
14       Q.  And in terms of what you relied on in
15   deciding whether to prescribe a product for a
16   patient, you said you relied on the PDR?
17       A.  Mm-hmm.
18       Q.  The Green Journal?
19       A.  Mm-hmm.
20       Q.  ACOG?
21       A.  Yes.
22       Q.  But would you rely, so those we talked
23   about, but would you rely on an advertisement?
24       MS. BLISS:  Objection.
25       A.  No.

Michael R. Tesoro, M.D.

Page 74

1           BY MR. MOORE:
2       Q.  And would you rely on their
3   promotional material from a pharmaceutical
4   company?
5           MS. BLISS:  Objection.
6       A.  No.
7           BY MR. MOORE:
8       Q.  Now, pharmaceutical companies also
9   employ sales representatives, right?
10      A.  Very much so.
11      Q.  Not just Wyeth, many companies,
12  correct?
13      A.  Yes.
14      Q.  And was it something -- was it your
15  practice to meet with pharmaceutical
16  representatives?
17      A.  I rarely had the time in solo
18  practice, rarely met specifically with them.
19      Q.  And would you rely on what they said
20  in terms of how you made your --
21      A.  No.
22      Q.  I'm sorry, let me get that question
23  out.
24          Would you rely on what a
25  pharmaceutical representative said in terms of

Page 75

1   deciding whether to prescribe Prempro for a
2   woman?
3           MS. BLISS:  Objection.
4       A.  No.
5           BY MR. MOORE:
6       Q.  And do you know what call notes are?
7       A.  With what?
8       Q.  Are you familiar with call notes,
9   which are notes that pharmaceutical sales
10  representatives record based on visits with
11  doctors?  Do you know about that practice?
12      A.  I don't recall that, no.
13      Q.  So you can't -- you've never seen
14  those notes, and you couldn't verify whether or
15  not they were accurate or not, right?
16      A.  Correct.  I never heard that term.
17      Q.  And so if a pharmaceutical
18  representative left a gift like a pad or a pen
19  or birthday cake or something like that, would
20  that ever influence your medical judgment?
21      A.  No.
22      Q.  Did you ever receive speaking like
23  honorariums for speaking on behalf of a
24  pharmaceutical company?
25      A.  I can't recall.

Page 76

1       Q.  If you had, would that influence your
2   medical judgment decisions?
3       A.  No, it would be based on material.
4       Q.  And if you were speaking to your
5   colleagues, is it fair to say that the
6   information that you would be providing would be
7   what you believed to be an accurate
8   representation of the science?
9       A.  Based on what?
10      Q.  I'm just saying do you recall ever
11  speaking and receiving an honorarium?  You said
12  you didn't recall.
13      A.  I don't recall that, no.  I really
14  don't.
15      Q.  Doctor, do you recall the Women's
16  Health Initiative study?
17      A.  Is that the one out of Massachusetts?
18      Q.  The Women's Health -- let me show you
19  what's been marked as Exhibit Number 4.
20          (Whereupon, Tesoro Exhibit Number 4
21          was marked for identification.)
22          BY MR. MOORE:
23      Q.  I'm handing you an article that's
24  entitled "Risks and Benefits of Estrogen Plus
25  Progestin in Healthy Menopausal Women" from JAMA

Page 77

1   dated July 17, 2002 (handing).
2           I'm sorry, Doctor, I need to switch
3   that out, I've got highlighting on that copy.  I
4   apologize.
5           Does this refresh your recollection
6   about the Women's Health Initiative study and
7   the results, preliminary results that were
8   released in July of 2002?
9           MS. BLISS:  Objection.
10          BY MR. MOORE:
11      Q.  Perhaps we could just go through.
12      A.  Okay.
13      Q.  If you look at the "Results" section
14  of the first page of this article.
15          Do you see where I'm talking about?
16      A.  Yes.
17      Q.  This provides data available at the
18  time about the results of this study, right?
19      A.  I haven't read it, but I'm assuming
20  that's what it does, yes.
21      Q.  And maybe if you take a minute just to
22  read that.
23          MS. BLISS:  Read what?
24          BY MR. MOORE:
25      Q.  I'm sorry, if you take just a minute

20 (Pages 74 to 77)

Michael R. Tesoro, M.D.

Page 78

1  to read the Results section before I ask you a
2  question.
3       (Witness reviewing document.)
4       BY MR. MOORE:
5  Q.  Okay.  In the middle of that paragraph
6  when it talks about "Estimated hazard ratios,"
7  it's the third sentence, "Estimated hazard
8  ratios"?
9  A.  Yes.
10 Q.  Hazard ratios means essentially a
11 relative risk, is that right?
12 A.  I'm not really clear on that.
13 Statistics was one of my -- not a very strong
14 subject of mine.
15 Q.  But when it talks about the hazard
16 ratio of breast cancer, it reports a hazard
17 ratio of 1.26.
18      Do you see that?
19 A.  Yes, I see that.
20 Q.  Okay.  And so that's consistent with
21 the information that we talked about in the PDR,
22 right?
23      MS. BLISS:  Objection.
24 A.  I don't recall.
25      BY MR. MOORE:

Page 79

1  Q.  Well, if you turn back to Exhibit
2  Number 3, in the Warnings section of the
3  Physician Label, under "Breast cancer" it says
4  "Some studies have reported a moderately
5  increased risk of breast cancer (relative risk
6  of 1.3 to 2.0)."
7       Do you remember talking about that?
8  A.  Yes.
9  Q.  Okay.  And my question then is; this
10 relative risk of 1.26 that's reported in the WHI
11 is consistent with the moderate risk reported in
12 the label?
13      MS. BLISS:  Objection.
14      BY MR. MOORE:
15 Q.  The 1999 label.
16 A.  Possibly.  But the number of cases is
17 significantly lower.  I mean 290 is not a, to
18 me, not a statistic value.
19 Q.  But in terms of the general level of
20 risk, they're consistent, right?
21      MS. BLISS:  Objection.
22      BY MR. MOORE:
23 Q.  Are they consistent?
24 A.  Possibly.
25 Q.  Well, you say "possibly," I'm sorry,

Page 80

1  anything is possible.  Is that more likely than
2  not?
3       MS. BLISS:  Objection.
4  A.  It's more, I would have to have
5  someone -- I would have to go over the
6  statistical value of that, both of those, to
7  give you an absolute yes or no, which I can't
8  do.
9       BY MR. MOORE:
10 Q.  So, well, let me ask you; do you
11 recall when the WHI study came out, and the
12 patients' reaction to the study?
13 A.  No, I really don't recall the actual
14 timing of it.  I was probably very busy
15 organizing a practice at that point up in
16 Massachusetts.  But --
17 Q.  So you don't -- this is not something
18 that you have any independent recollection of?
19 A.  Well, I believe from what I can
20 gather, without picking my brain to recall, was
21 that it was a tremendous amount of news data
22 just on a public media concerning it.  I never
23 read this particular article.
24 Q.  So was it your --
25 A.  I don't get JAMA.

Page 81

1  Q.  Okay.  Was it your experience then,
2  because of the news media and the amount of
3  publicity that the study received, that some
4  patients wanted to go off of hormone therapy?
5  Do you recall that?
6  A.  I would say possibly.
7  Q.  And at the time, hormone therapy was
8  believed by many to have a cardiovascular
9  benefit.  Do you recall that?
10 A.  At this time in 2002?
11 Q.  Right.
12 A.  Again, possibly.  I don't fully recall
13 that data.
14 Q.  And do you recall that it was a
15 surprise that the study didn't show a
16 cardiovascular benefit?  Is that something that
17 you recall?
18      MS. BLISS:  Objection.
19 A.  Honestly I don't really recall this
20 particular article, the data in this article
21 because I never read it, but I imagine the
22 public media certainly transferred that message
23 to the public.
24      BY MR. MOORE:
25 Q.  When you say "that message," I'm

21 (Pages 78 to 81)

Michael R. Tesoro, M.D.

Page 82

1  sorry.
2      A.  The message that's in here concerning
3  the risks and benefits of estrogen/progesterone
4  in healthy postmenopausal women.
5      Q.  Okay.  But this WHI study didn't cause
6  you to stop prescribing hormone therapy, right?
7          MS. BLISS:  Objection.
8          BY MR. MOORE:
9      Q.  Let me ask you; did the WHI study
10 cause you to stop prescribing hormone therapy?
11         MS. BLISS:  Objection.
12     A.  If the patient followed the protocol
13 that I had set up, and they understood the
14 protocol, if that was the situation, I would
15 have them go through the routine that I followed
16 for every patient, and let them make that
17 choice.
18         BY MR. MOORE:
19     Q.  And that choice, one of the choices --
20     A.  Pros or cons against it, or stopping
21 it or not taking it.
22     Q.  But they would have the option of
23 taking it even after WHI?
24     A.  If they were at a higher risk
25 category, they wouldn't get a prescription from

Page 83

1  me.
2      Q.  When you say "higher risk category,"
3  what do you mean by that?
4      A.  Well, a number of risks that we
5  mentioned in this earlier article up here.
6      Q.  But if you determined even after WHI
7  that the risks of that particular patient were
8  outweighed by the potential benefits of Prempro,
9  then you would make that an option available to
10 that patient, is that right?
11     A.  Possibly.
12     Q.  Actually I noticed in your call note,
13 one of your call notes, that your wife had been
14 on Climara and Prometrium, and then she switched
15 back to Prempro in '03.  Do you recall that?
16         MS. BLISS:  Objection.
17     A.  What does my wife have to do with
18 this?
19         BY MR. MOORE:
20     Q.  I'm just saying you did continue to
21 prescribe, even to your wife, would make
22 available even after WHI --
23     A.  I never prescribed anything to my
24 wife.  And I object that you bring her into the
25 subject.

Page 84

1          MS. BLISS:  And I need to object to
2  any further questions on any of her health
3  history or any of her medications or any medical
4  history whatsoever.
5          BY MR. MOORE:
6      Q.  I don't want to get into --
7      A.  I do object to that.
8      Q.  Doctor, I don't want to get into your
9  wife's history.  I was trying to ask generally
10 about the general question of you would continue
11 to make Prempro an option for your patients,
12 let's just say.
13     A.  If I was in an active practice and
14 they followed the protocol, I would have to say
15 yes.
16     Q.  Okay.
17         MR. MOORE:  That's all I have.
18         CROSS EXAMINATION
19         BY MS. BLISS:
20     Q.  Dr. Tesoro, thank you for coming
21 today.  I have a few questions, and I do want to
22 add some exhibits into the record.
23         (Whereupon, Tesoro Exhibit Number 5
24         was marked for identification.)
25         BY MS. BLISS:

Page 85

1      Q.  The first exhibit I've just handed
2  you, which is marked Exhibit 5, do you recall
3  receiving this letter from me back in November
4  of 2010?
5      A.  Honestly I don't recall it, Paula, but
6  obviously you may have sent it to me.
7      Q.  Well --
8      A.  Did I answer it?
9      Q.  You called me.
10     A.  Okay.  I thought it was in January.
11     Q.  Well, let me ask you a few questions.
12     A.  Okay.
13     Q.  I will represent that I did mail this
14 letter to you back in November of 2010, and
15 you'll agree with me that in this letter I state
16 "You are in no way a target in this lawsuit."
17         Do you see that?
18     A.  Yes.
19     Q.  And in response to my letter, do you
20 recall that you called me on the telephone?
21     A.  I may have, yes.
22     Q.  And then we met shortly thereafter,
23 maybe a couple months later?
24     A.  Was that in January?
25     Q.  Correct.

Michael R. Tesoro, M.D.

Page 86

1    A. Yes.
2    Q. Okay. And you understand that
3 Mrs. Fraser has no desire whatsoever to bring
4 you into this lawsuit?
5    A. Yes.
6    Q. In fact, she appreciates all the care
7 and treatment that you gave to her over the
8 course of the year.
9    A. Okay.
10    Q. Now, as part of your practice, you
11 were a busy practitioner. Would you agree with
12 me?
13    A. Yes.
14    Q. And part of your practice, or most of
15 your practice involved seeing patients on a
16 daily basis?
17    A. Yes.
18    Q. And you did no research, you didn't
19 have time during your practice to research
20 drugs, is that correct?
21    A. Yes.
22    Q. And you did not do any writing about
23 drugs, publishing about drugs?
24    A. Not during my active practice in
25 Sharon.

Page 87

1    Q. And did you, were you -- did you do
2 any teaching?
3    A. In Sharon? No.
4    Q. At any time that you were a physician,
5 practicing physician.
6    A. When you say "practicing physician,"
7 you've got to change it into two categories.
8    In Sharon, no.
9    Q. In Hartford?
10    A. In Hartford, to the residents and
11 medical students.
12    Q. And when you were teaching residents
13 in Hartford, did you teach them about any
14 pharmaceutical drugs?
15    A. Not specifically. Mostly anatomy and
16 surgical skills, ultrasound.
17    Q. Over the course of your practice, you
18 prescribed drugs? We talked about that today.
19    A. Yes.
20    Q. And in order to prescribe drugs, is it
21 necessary to first understand those drugs?
22    A. Obviously, yes.
23    Q. And you need to understand the drugs
24 so that you can provide accurate information to
25 your patients?

Page 88

1    A. Yes.
2    Q. Because it is the patient's decision
3 whether or not to take that drug?
4    A. Yes.
5    Q. And you have, as we discussed already,
6 many sources of information from which you get
7 information about drugs to pass on to your
8 patients?
9    A. Yes.
10    Q. And one of them is the PDR, correct?
11    A. Correct.
12    Q. Do you know who writes or prepares the
13 label that's found in the PDR?
14    A. I imagine they come from the specific
15 pharmaceutical companies that produce the
16 different drugs.
17    Q. And do you trust that the drug
18 companies put accurate information in those
19 labels?
20    A. Do I believe they put accurate
21 information?
22    Q. Well -- strike that. Let me ask it
23 this way.
24    Do you have to trust that the drug
25 companies put accurate information in those

Page 89

1 labels?
2    MR. MOORE: Object to the form.
3    A. I'd say yes to that.
4    BY MS. BLISS:
5    Q. Because if they don't give you
6 accurate information, you can't pass on that
7 accurate information to your patients, correct?
8    A. Correct.
9    Q. And if the information in the label is
10 old or unclear, it's incomplete or misleading,
11 or just plain wrong, you are not able to pass
12 along accurate information to your patients?
13    MR. MOORE: Object to the form.
14    A. Correct.
15    BY MS. BLISS:
16    Q. I will represent to you, Doctor, that
17 Mrs. Fraser had her deposition taken, and in her
18 deposition she testified that she began
19 menopause at the age of 49 or 50, and that that
20 was when she was prescribed Prempro, and that
21 was about 1996. I'm letting you know that it
22 was about 1996 that she testified that she began
23 taking Prempro.
24    MR. MOORE: Object to the form.
25    BY MS. BLISS:

23 (Pages 86 to 89)

Michael R. Tesoro, M.D.

Page 90

1      Q.  Do you have any reason to doubt
2  Mrs. Fraser's testimony in that regard?
3      A.  I do not.
4          (Whereupon, Tesoro Exhibit Number 6
5          was marked for identification.)
6  BY MS. BLISS:
7      Q.  What I've just handed you, Doctor, is
8  something that's been marked as Exhibit 6.
9          And do you recognize what this is?
10     A.  Do I recognize what?
11     Q.  What this document is.
12     A.  It's a Pap smear report.
13     Q.  And do you see the date collected?
14     A.  1997.
15     Q.  And if you turn to the second page
16  under "Clinical Diagnosis."
17     A.  Yes.
18     Q.  Do you see "Hormone use"?
19     A.  Yes.
20     Q.  What does that tell you?
21     A.  On the cytology is within normal, but
22  it shows that the cells of the lining probably
23  of the vagina have changes that would be
24  indicative of hormone use, or since it's
25  clinical data it's data that was provided at the

Page 91

1  time of the Pap smear.
2      Q.  So either that information was found
3  in the clinical --
4      A.  History.
5      Q.  -- history from the patient or --
6      A.  From the patient that was then placed
7  on the report that's sent with the smear, of the
8  Pap smear.  In other words, you give that
9  information along with the Pap smear.
10     Q.  And you have no reason to believe that
11  this report is inaccurate?
12         MR. MOORE:  Object to the form.  Lack
13  of foundation.
14     A.  No.
15         (Whereupon, Tesoro Exhibit Number 7
16         was marked for identification.)
17  BY MS. BLISS:
18     Q.  Doctor, I've just placed in front of
19  you what's been marked Exhibit 7.
20         Do you recognize this?
21     A.  I don't really recall it, but it's
22  from Dr. Salner.
23     Q.  Do you know Dr. Salner?
24     A.  I do not.
25     Q.  Do you know Dr. Kern?

Page 92

1      A.  Dr. Kern was a surgeon at Hartford
2  Hospital who did specifically breast surgery.
3      Q.  And do you recall whether -- do you
4  have any specific recollection of Ms. Fraser
5  seeing Dr. Kern?
6      A.  I don't, except that it may have been
7  a referral that I made based on some studies
8  that she may have had done to see him
9  specifically for the breast, if the breast was
10  involved.
11     Q.  If you look at that first large
12  paragraph on the first page, several sentences
13  down, it's the second to last sentence, it says
14  "The patient has been on hormone replacement for
15  the last five years, and this has been
16  discontinued."
17         Do you see that?
18     A.  Yes.
19     Q.  Okay.  Do you have any reason to doubt
20  the accuracy of that sentence?
21     A.  No.  A history like that would have to
22  be accurate.  And especially this is a
23  consultation to whom?  I guess Dr. Salner.  I
24  don't know who that physician is.
25

Page 93

1          (Whereupon, Tesoro Exhibit Number 8
2          was marked for identification.)
3  BY MS. BLISS:
4      Q.  I've just handed you Exhibit 8.  Do
5  you recognize this document?  Have you ever seen
6  this before?
7      A.  No, I have not.
8      Q.  Do you know who Dr. Nerenstone is?
9      A.  I do not.
10     Q.  On the first page, the very last
11  sentence begins "The patient underwent menopause
12  approximately five years ago, and has been
13  maintained on Prempro."
14         Do you see that?
15     A.  Yes.
16     Q.  Do you have any reason to doubt the
17  accuracy of that statement?
18     A.  No, I do not.
19         (Whereupon, Tesoro Exhibit Number 9
20         was marked for identification.)
21  BY MS. BLISS:
22     Q.  I have just handed you what's been
23  marked as Exhibit 9.  These records, I will
24  represent, were obtained through the Housatonic
25  Valley Radiological Associates.

24 (Pages 90 to 93)

Michael R. Tesoro, M.D.

Page 94

1      Are you familiar with that entity?
2      A.  No.
3      Q.  If you look on Page 2 of that
4  document, have you ever seen that before?
5      A.  No, I have not.
6      Q.  Do you see where it's dated 9/10/01?
7      A.  Yes.
8      Q.  Okay.  And under "Hormones" it says
9  "Prempro times five years"?
10     A.  Yes.
11     Q.  Do you have any reason to doubt the
12  accuracy of this document?
13             MR. MOORE:  Object to the form.  Lack
14  of foundation.
15     A.  It depends on where this is, but no, I
16  do not doubt the indication.  I don't know what
17  this sheet is, it doesn't say.
18             BY MS. BLISS:
19     Q.  I'll -- it came from Housatonic Valley
20  Radiological Associates, but I understand you
21  are not familiar with that entity.
22       So I was just wondering if you have
23  any reason to doubt that Mrs. Fraser --
24     A.  No, I don't.
25             MR. MOORE:  Object to the form.

Page 95

1      A.  I do not have reason to doubt it.
2             MS. BATEMAN:  Housatonic.
3             MS. BLISS:  See, I lived in New York
4  City for a while, it's Houston Street.  Sorry
5  about that.
6             (Whereupon, Tesoro Exhibit Number 10
7  was marked for identification.)
8             BY MS. BLISS:
9      Q.  I have just handed you what's been
10  marked as Exhibit 10.
11       And if you look at Page 2, do you know
12  what that is?
13     A.  Looks like the labelling on a bottle
14  for a prescription, which was probably a
15  telephone prescription because the telephone
16  that I see there, I believe.
17     Q.  And is that a prescription that you
18  may have called in, or is it likely that your
19  office called in?
20     A.  I may have called it in, yes, or
21  office, yes.
22     Q.  So with respect to this document, you
23  have no reason to doubt the accuracy of the
24  information provided here that you prescribed
25  Prempro to Mrs. Fraser?

Page 96

1             MR. MOORE:  Object to the form.
2      A.  Yes.
3             BY MS. BLISS:
4      Q.  You do have a doubt as to the accuracy
5  of that?
6      A.  No, I don't.
7      Q.  Okay.
8             (Whereupon, Tesoro Exhibit Number 11
9  was marked for identification.)
10             BY MS. BLISS:
11     Q.  Doctor, what I've just handed you has
12  been marked as Exhibit 11, and it is the
13  Physicians' Desk Reference from 1996 related to
14  Prempro.
15       Do you see that?
16     A.  Yes.
17     Q.  Okay.  First of all, what is a black
18  box warning?
19     A.  Where is that?
20     Q.  I'm actually just asking you
21  generally; what is your understanding of a black
22  box warning?
23     A.  You know, frankly I don't recall.
24     Q.  Do you recall whether black box
25  warnings are the strongest warning possible for

Page 97

1  a drug?
2      A.  Possibly.
3      Q.  Are black box warnings intended to
4  bring to our attention the presence of a serious
5  risk or harm?
6             MR. MOORE:  Object to the form.
7      A.  Usually, yes.
8             BY MS. BLISS:
9      Q.  And do these warnings alert us to
10  risks that can cause serious injury or even
11  death?
12     A.  Possibly.
13     Q.  Do you see a black box warning on that
14  Exhibit 11, 1996 Prempro label?  Page 2, Doctor.
15     A.  If it's on Page 2, is that correct?
16     Q.  That's correct.
17     A.  That's the only thing I can see is a
18  highlighted area, if you're calling that the
19  black box.
20     Q.  Yes.
21     A.  I never use that term, but that's
22  possibly what you're saying.  Underneath the
23  word "Prempro.  Caution:  Federal law prohibits
24  dispensing without prescription" and those
25  boxes?

25 (Pages 94 to 97)

Michael R. Tesoro, M.D.

Page 98

1    Q.  Correct.
2    A.  Okay.
3    Q.  Do you see a breast cancer warning in
4  that black box?
5    A.  I do not see it.
6    Q.  Does the black box warn of endometrial
7  cancer?
8    A.  I don't see that either.
9    Q.  The first sentence right in that box,
10  Doctor.  I think we're looking at a different
11  column.  The first column right in the --
12    A.  "Endometrial CA."
13    Q.  So do you see that the black box warns
14  of endometrial cancer?  See the first sentence,
15  it says "Estrogens have been reported to
16  increase"?
17    A.  Yes.
18    Q.  Okay.  But after reviewing that black
19  box now, there is no warning of breast cancer,
20  correct?
21    A.  I don't see it, correct.
22    Q.  Okay.  If you turn to the third page
23  up in the right-hand corner, it says -- it's
24  2803 is the page number, okay?
25    A.  Yes.

Page 99

1    Q.  And halfway down the last column is
2  "Warnings."
3    Do you see that?
4    A.  Yes.
5    Q.  Okay.  Number one, "Induction of
6  malignant neoplasms"?
7    A.  Yes.
8    Q.  Okay.  The first sentence reads "Some
9  studies have reported a moderately increased
10  risk of breast cancer (relative risk of 1.3 to
11  2.0) in those women on estrogen replacement
12  therapy taking higher doses, or in those taking
13  lower doses for prolonged periods of time,
14  especially in excess of ten years."
15    Does this sentence address estrogen
16  therapy or hormone replacement therapy?
17    MR. MOORE:  Object to the form.
18    A.  It says "estrogen replacement
19  therapy."
20    BY MS. BLISS:
21    Q.  Is there a difference in your mind
22  between estrogen therapy and hormone replacement
23  therapy?
24    A.  It's a term that's used for estrogen
25  replacement and hormonal replacement.  But

Page 100

1  hormonal can mean any kind of hormonal
2  replacement.
3    Q.  If we're talking about estrogen
4  therapy alone versus estrogen plus progestin
5  therapy, how would you characterize estrogen
6  plus progestin therapy?
7    A.  As a combination hormonal therapy.
8    Q.  Okay.  So as far as that first
9  sentence, is that first sentence discussing
10  combination -- excuse me.
11    Does that first sentence discuss
12  combination hormone therapy?
13    MR. MOORE:  Object to the form.
14    A.  The induction of malignant neoplasm?
15    BY MS. BLISS:
16    Q.  That first warning sentence that I
17  just read.
18    A.  It talks specifically about estrogen
19  replacement therapy, so progesterone is not
20  mentioned in that paragraph.
21    Q.  So it doesn't address the risk of
22  breast cancer from estrogen plus progestin?
23    MR. MOORE:  Object to the form.
24    A.  No, it does not.
25    BY MS. BLISS:

Page 101

1    Q.  Does it limit the warning to only
2  long-term use or high doses?
3    A.  In that paragraph, I don't see -- ten
4  years, in excess of ten years, prolonged use.
5    Is that what you mean?
6    Q.  Yes.
7    My question was does that warning,
8  that first section of the warning, does it limit
9  the warning to only long-term use or high doses?
10    MR. MOORE:  Object to the form.
11    A.  Taking -- for taking higher doses than
12  those in lower doses for prolonged periods of
13  time, especially in excess of ten years, so the
14  answer to that is yes.
15    BY MS. BLISS:
16    Q.  So the warning is not talking about
17  any risk of breast cancer related to estrogen
18  therapy on short duration or years less than
19  ten?
20    MR. MOORE:  Object to the form.
21    A.  No.
22    BY MS. BLISS:
23    Q.  Does that warning -- does that label
24  warn of any risk for usage less than ten years?
25    MR. MOORE:  When you say "that label,"

26 (Pages 98 to 101)

Michael R. Tesoro, M.D.

Page 102

1  you're talking about --
2          MS. BLISS:  That section.
3          MR. MOORE:  That one sentence of that
4  warning?
5          MS. BLISS:  That section.
6          MR. MOORE:  When you say "section,"
7  are you talking about the whole section, or are
8  you just reading --
9          MS. BLISS:  I'm asking the doctor the
10  questions.
11     A.  Repeat the question.
12          BY MS. BLISS:
13     Q.  Sure.
14          In that section that we just read,
15  does that warn of, does that label warn, does
16  that section warn of any risk related to usage
17  under ten years?
18          MR. MOORE:  Object to the form.
19     A.  No, it does not that I can see.
20          BY MS. BLISS:
21     Q.  Let me go to the second sentence,
22  okay, still continuing on in that paragraph, it
23  says "The majority of studies, however, have not
24  shown an association in women who have ever used
25  estrogen replacement therapy."

Page 103

1          Does this sentence in your opinion
2  seem to neutralize or negate the previous
3  warning from sentence one?
4          MR. MOORE:  Object to form.
5     A.  It's a little confusing.
6          BY MS. BLISS:
7     Q.  In what way?
8     A.  Well, in one way they're saying that
9  there is if you use it for excess of ten years,
10  and it's talking about other studies but they
11  don't outline those studies.
12     Q.  By stating that "the majority of
13  studies show no risk," was this reassuring that
14  the risks were minimal if not absent?
15          MR. MOORE:  Object to the form.
16     A.  Yes.
17          BY MS. BLISS:
18     Q.  Going on to the next two sentence,
19  "The effect of added progestins on the risk of
20  breast cancer is unknown, although a moderately
21  increased risk in those taking combination
22  estrogen/progestin therapy has been reported.
23  Other studies have not shown this relationship."
24          Do you see that?
25     A.  Yes.

Page 104

1     Q.  What does -- what do these sentences
2  say about the risk of adding progestins?
3     A.  It shows that there's moderate
4  increased risk in those combination drugs.
5     Q.  And then the last, the fourth sentence
6  says "Other studies have not shown this
7  relationship," correct?
8     A.  Yes.  It's sort of a double-edged
9  sword, confusing.
10     Q.  In your opinion, does this provide any
11  actual warning of breast cancer?
12     A.  It does not.
13     Q.  Does this second sentence tend to
14  neutralize or negate any warning made by the
15  first?
16          MR. MOORE:  Object to the form.
17     A.  Possibly.
18          BY MS. BLISS:
19     Q.  And moving on to the fifth and sixth
20  sentence there, it says in one year -- "In a one
21  year clinical trial of Prempro, Premphase and
22  Premarin alone, five new cases of breast cancer
23  were detected among 1,377 women who received the
24  combination treatments, while no new cases were
25  detected among 347 women who received Premarin

Page 105

1  alone."
2     A.  Yes.
3     Q.  "The overall incidence of breast
4  cancer in this clinical trial does not exceed
5  that expected in the general population."
6          Do you see that?
7     A.  Yes.
8     Q.  If incidence is no more than expected
9  in the general population, what does that mean?
10          MR. MOORE:  Object to the form.
11     A.  You know, that's a statistical data
12  that would have to be analyzed.
13          BY MS. BLISS:
14     Q.  Does it say that the risk of breast
15  cancer is the same as people not taking Prempro?
16     A.  It possibly says that, yes.
17     Q.  Do these sentences reassure you that
18  there is not really a breast cancer risk?
19          MR. MOORE:  Object to the form.
20     A.  Yes.
21          BY MS. BLISS:
22     Q.  And moving on to the next sentence,
23  "In the three year clinical postmenopausal
24  estrogen/progestin intervention trial of 875
25  women to assess differences among placebo,

27 (Pages 102 to 105)

Michael R. Tesoro, M.D.

Page 106

1  unopposed Premarin, and three different
2  combination hormone therapy regimens, one new
3  case of breast cancer was detected in the
4  placebo group, one in the Premarin alone group,
5  none in the continuous Premarin plus continuous
6  Medroxyprogesterone acetate group, and two in
7  the continuous Premarin plus cyclic
8  medroxyprogesterone acetate group."
9       Did I read that correctly.  That's a
10 long-winded sentence.
11     A.  I don't see that on this page.
12     Q.  Okay.
13     A.  Is it after the Premarin?
14     Q.  I'm sorry.  Strike that.  Strike that.
15 I'm sorry.  That was the next year.  Strike that
16 question.
17          From what we've just reviewed, are
18 there any warnings that the risk of developing
19 breast cancer can occur even after just a year
20 or two on estrogen and progestin use?
21          MR. MOORE:  Object to the form.
22     A.  Possibly.
23          BY MS. BLISS:
24     Q.  From what we just read?
25     A.  Is there any indication?  No.

Page 107

1      Q.  Is there, in what we just read, is
2  there a warning that risk increases each year
3  that the patient stays on these drugs?
4           MR. MOORE:  Object to the form.
5      A.  Not that I can see, no.
6           BY MS. BLISS:
7      Q.  Is there a warning of an increased
8  risk of developing breast cancer if the woman is
9  thin or lean in what we just read?
10          MR. MOORE:  Object to the form.
11     A.  I do not see that, no.
12          BY MS. BLISS:
13     Q.  Is there a warning that breast cancers
14 in women who use estrogen plus progestin are
15 larger and diagnosed at a more advanced stage
16 than cancers in women who do not use estrogen
17 plus progestin?
18     A.  No.
19     Q.  Is there a warning that estrogen plus
20 progestin can cause breast cancer?
21          MR. MOORE:  Object to the form.
22     A.  No.
23          BY MS. BLISS:
24     Q.  Is there a warning that the risks of
25 taking estrogen plus progestin outweigh the

Page 108

1  benefits?
2      A.  No.
3      Q.  Would you expect that if Wyeth knew
4  these things that they would have given you that
5  information?
6           MR. MOORE:  Object to the form.
7      A.  Yes.
8           BY MS. BLISS:
9      Q.  That information would have been
10 important to you?
11     A.  Very important.
12     Q.  And if you had that information, you
13 would have passed that on to your patients?
14     A.  Absolutely.
15     Q.  Now, earlier you were asked a few
16 questions about whether you recalled any
17 marketing pieces that were supplied to your
18 office from sales representatives of Wyeth.
19     A.  Mm-hmm.
20     Q.  I'm just going to show you something
21 to see if you recall that.
22          MS. BLISS:  If you could mark that.
23          (Whereupon, Tesoro Exhibit Number 12
24          was marked for identification.)
25          BY MS. BLISS:

Page 109

1      Q.  I have just handed you I think a
2  several page document that's been marked
3  Exhibit 12, and I will represent that these were
4  produced to us by Wyeth in the discovery in this
5  litigation.
6           And my question to you is whether you
7  recall this marketing material at all in your
8  office, or have you ever reviewed this before?
9      A.  I can't recall that I have reviewed
10 it, but certainly marketing material like this
11 does come through from every pharmaceutical
12 company that you can think of.  Do I have a
13 chance to go through it all all the time?  I
14 can't recall if I did or not.
15     Q.  Okay.  But looking at this front page,
16 is that something you recognize?
17     A.  Is that something what?
18     Q.  You recognize.
19     A.  Yes, I've seen something like this
20 before.  I can't recall exactly when.
21     Q.  Okay.  Now, looking at that front
22 page, is this marketing information consistent
23 with your understanding of the benefits of
24 hormone replacement therapy back when you were
25 prescribing hormone replacement therapy to

28  (Pages 106 to 109)

Michael R. Tesoro, M.D.

Page 110

1    Ms. Fraser?
2        A.  Are you talking about the image with
3    the data along the side?
4        Q.  Yes.
5        A.  I don't recall anything about
6    Alzheimer's back in the nineties.
7        Q.  Do you recall anything about cognitive
8    functioning?
9        MR. MOORE:  Object to the form.
10       A.  I do not.
11       BY MS. BLISS:
12       Q.  When you were prescribing hormone
13   replacement therapy to Ms. Fraser, did you have
14   a belief that hormone replacement therapy could
15   aid with vision problems?
16       A.  No.
17       Q.  What about tooth loss?
18       A.  Don't recall that.
19       Q.  What about heart disease?
20       A.  There was information about that.
21       Q.  And what about colon cancer?
22       A.  Don't recall that specifically.
23       Q.  And you've already testified that you
24   understood HRT to help with urogenital problems
25   as well as osteoporosis, correct?

Page 111

1        A.  Correct.
2        Q.  If you can read just the first, the
3    written statement at the top, it says
4    "Uncomfortable symptoms such as hot flashes are
5    often the earliest signs of menopausal estrogen
6    loss, but there are also long-term effects of
7    estrogen loss that may lead to potentially
8    serious medical conditions."
9        Do you see that?
10       A.  Yes.
11       Q.  "Research continues to explore the
12   relationship between menopause and a number of
13   age-related conditions."
14       A.  Yes.
15       Q.  Does this statement indicate the
16   presence of any long-term effects from
17   menopause?
18       A.  They are associating certain
19   conditions with menopause, if that's what you
20   mean.
21       Q.  And those are what we just talked
22   about, the Alzheimer's, vision problems, tooth
23   loss, heart disease, colon cancer, urogenital
24   problems, and osteoporosis, correct?
25       MR. MOORE:  Object to the form.

Page 112

1        A.  Yes.
2        (Whereupon, Tesoro Exhibit Number 13
3        was marked for identification.)
4        BY MS. BLISS:
5        Q.  What I've just handed you has been
6    marked as Exhibit 13.  Do you recall ever seeing
7    this?
8        A.  No, but I can tell you I recall seeing
9    that slide of the iceberg.
10       Q.  Where do you recall seeing that?
11       A.  A friend of mine has a picture of
12   that, that particular slide.  I don't recall
13   this image, no.
14       Q.  Used in marketing with respect to
15   hormone therapy?
16       A.  I do not recall it.
17       Q.  This document states that "Menopausal
18   Symptoms Are Just the Tip of the Iceberg."  And
19   above the "C" where the iceberg is seen is
20   insomnia, hot flushes, mood disturbances,
21   vaginal atrophy and night sweats?
22       A.  Yes.
23       Q.  My question to you is; are those the
24   menopausal symptoms that you described earlier
25   as the ones you understood to be indicative of

Page 113

1    menopause?
2        A.  Yes.
3        Q.  And the ones below the line,
4    osteoporosis, Alzheimer disease, macular
5    degeneration, cardiovascular disease, colon
6    cancer, vaginal infections, stress incontinence,
7    skin atrophy, dementia, tooth loss, and
8    mortality, did you have an understanding at any
9    time whether hormone therapy could provide
10   benefits beyond the information listed above?
11       A.  No.
12       Q.  Did you believe that there were
13   long-term consequences of hormone deficiency
14   that HRT could prevent?
15       A.  Yes, possibly.
16       Q.  Like?
17       A.  The vaginal dryness, the symptoms of
18   the menopause.  There was some question -- you
19   know, you mentioned osteoporosis, which is below
20   that line, the calcium re-absorption.  That's
21   what I recall.
22       (Whereupon, Tesoro Exhibit Number 14
23       was marked for identification.)
24       BY MS. BLISS:
25       Q.  I've just handed you what's been

29 (Pages 110 to 113)

Michael R. Tesoro, M.D.

Page 114

1  marked as Exhibit 14.  Have you ever seen this
2  chart before?
3      A.  I have not.
4      Q.  Looking at this information, is this
5  information reflected in this graphic consistent
6  with your belief at that time about the
7  preventative benefits of hormone therapy?
8          MR. MOORE:  Object to the form.
9      A.  Well, it appears that there seems to
10 be, according to this, an increase of benefit to
11 heart disease and osteoporotic fractures, and a
12 slight decrease or increase in lives lost to
13 breast cancer.
14         BY MS. BLISS:
15     Q.  Is this consistent with your
16 understanding at the time you were treating
17 Mrs. Fraser?
18     A.  I've never seen this.  This is 1986.
19 I don't recall, but I believe it was at that
20 time that estrogen was an estrogen-only drug
21 without the progesterone secondary medication.
22     Q.  Okay.  And did you believe you could
23 prevent heart disease by giving hormone therapy?
24     A.  Did I believe --
25         MR. MOORE:  Object to form.

Page 115

1      A.  No.
2          BY MS. BLISS:
3      Q.  Did you believe that hormone therapy
4  provided a cardiovascular benefit?
5      A.  Possibly.
6      Q.  Did you believe that the risk of
7  breast cancer was minimal in relation to the
8  potential heart risk without hormone therapy?
9          MR. MOORE:  Objection.
10     A.  As long as parameters were followed
11 for clinical evaluation of the patient prior to
12 going on that medication.
13         BY MS. BLISS:
14     Q.  Were you ever asked by Wyeth to speak
15 on behalf of them in any luncheon or dinner?
16     A.  I may have many, many years ago.
17     Q.  You don't recall any?
18     A.  I don't recall exactly.
19     Q.  Do you recall going to any Lunch and
20 Learn meetings presented by Wyeth or paid for by
21 Wyeth?
22     A.  Possibly during the annual meeting of
23 the American College of Obstetrics & Gynecology
24 which I would go to as a member.
25     Q.  But you don't remember anything

Page 116

1  specifically?
2      A.  No.
3      Q.  Now, we've talked a lot about the
4  risks and benefits that you discuss with your
5  patients when prescribing a drug.  And you do
6  this -- and you did this, I'm sorry, with all of
7  your patients, you discussed the risks and
8  benefits of the medication that you would
9  prescribe to them?
10     A.  Yes.
11     Q.  And you would allow your patients to
12 perform their own risk/benefit analysis,
13 correct?
14     A.  Yes.
15     Q.  And when you're counseling your
16 patients on risks and benefits of a drug, do you
17 incorporate information about that particular
18 patient that may be important with respect to
19 the drug?
20     A.  Yes.
21     Q.  And before making a prescribing
22 decision, would you want to know how many people
23 would be affected by a potential injury or risk?
24     A.  Of what now?  I don't believe I
25 understand your question.

Page 117

1      Q.  Of a risk to a drug, would it be
2  important to you to know how many people may be
3  affected by that risk?
4      A.  Yes, statistically.
5      Q.  Would it be important for you to know
6  whether some patients are more at risk for
7  injury than others?
8      A.  Yes.
9      Q.  And would it also be important for you
10 to know whether a longer exposure to the drug
11 increases risks for particular patients?
12     A.  Yes.
13     Q.  Is the severity of a particular side
14 effect important in your consideration?
15     A.  Yes.
16     Q.  For example, a headache is not as
17 important to your analysis as a serious side
18 effect maybe?
19     A.  Yes.
20     Q.  And analyzing side effects, would
21 vasomotor symptoms be as serious as a risk of
22 breast cancer?
23     A.  No.
24     Q.  So are life threatening side effects
25 very important to your risk/benefit analysis?

30 (Pages 114 to 117)

Michael R. Tesoro, M.D.

Page 118

1    A.  Yes.
2    Q.   And are you more careful when
3  analyzing potential life threatening side
4  effects?
5    A.  I usually did, yes.
6    Q.   And are the benefits of a drug
7  important to consider in your prescribing
8  decision?
9    A.  Yes.
10    Q.   And without information about drug
11  benefits, can you perform a proper risk/benefit
12  analysis?
13    A.  If you know the risks involved, yes.
14    Q.  If you don't -- I'm sorry?
15    A.  If you know the risks involved, the
16  benefits of taking the drug versus the risk of
17  what it may cause.
18    Q.  Okay.  So it's important for you to
19  have accurate information --
20    A.  Correct.
21    Q.  -- on both risks and benefits?
22    A.  Yes.
23    Q.  Are you familiar with the term hormone
24  deficient?
25    A.  Am I familiar with?

Page 119

1    Q.  The term hormone deficient.
2    A.  Yes.
3    Q.  And what does that term mean to you?
4    A.  That the particular individual may be
5  lacking certain of her own body organic
6  production of hormones.
7    Q.  And earlier you described that it was
8  your practice to do an FSH test on women before
9  putting them on a hormone therapy medication,
10  correct?
11    A.  That's correct.
12    Q.  And if that FSH test came back
13  indicating that the woman is hormone deficient,
14  would you then put them on hormone therapy?
15    A.  I would go through a complete physical
16  examination, laboratory data, and inform the
17  patient of the particulars of a particular drug,
18  medication or whatever, and then let them make a
19  choice of whether to go on it or not.
20    Q.  But if the woman was not hormone
21  deficient, you wouldn't prescribe hormone
22  therapy, correct?
23    A.  Normally not.
24    Q.  In what instance would you?
25    A.  I rarely did, so I would say no to

Page 120

1  that answer.
2    Q.  What is a Dear Doctor Letter?
3    A.  Dear Doctor Letter?
4    Q.  Are you familiar with that term?
5    A.  No.
6    Q.  Over the course of your practice, did
7  you often receive letters from pharmaceutical
8  companies?
9    A.  I may have.  Even to this day I'm sure
10  I receive some.
11    Q.  And was it your practice if you
12  received them, was it your practice to read
13  them?
14    A.  When I had the time.  More than likely
15  not.
16    Q.  Would you be more careful to read
17  these letters from drug companies if the letter
18  said on the top that it contained important
19  safety information?
20    A.  Yes.
21    Q.  When you were prescribing hormone
22  therapy to Ms. Fraser, did you believe that it
23  was appropriate to prescribe hormone therapy for
24  long-term, meaning more than five years?
25    A.  No, I never did.  It would be an

Page 121

1  interval of time that I would prescribe the
2  medication, no more than five year interval.
3    Q.  Okay.  And why not?
4    A.  Mainly because some of the wording and
5  the statistics that were written at that time
6  indicated that prolonged use may be a cause of a
7  number of clinical abnormalities.
8    Q.  So for instance, if a patient came to
9  you and she had been on hormone therapy for five
10  years, what would your practice have been?
11    A.  Prior to seeing me she went on
12  hormonal therapy?
13    Q.  No.  In Ms. Fraser's case, she
14  testified that she was on hormone therapy for
15  five years --
16    A.  Yes.
17    Q.  -- at the time she was diagnosed with
18  breast cancer?
19    A.  Yes.
20    Q.  If she had not been diagnosed with
21  breast cancer, what would your practice have
22  been?
23    A.  Again, as I said over and over again,
24  I'd go through a complete history, complete
25  physical examination, complete laboratory data

31  (Pages 118 to 121)

Michael R. Tesoro, M.D.

Page 122

1  including mammogram, any kind of a menstrual
2  history if she's still functioning and having
3  some kind of bleeding, and analyze that, and
4  then give them a choice whether this is for her
5  to take, whether it's for one six month interval
6  or one year interval, but never for prolonged
7  periods.  She insisted that a lot of the
8  symptoms, hot flashes are probably the most
9  common symptom that women get, and some of them
10  are unbearable, and the estrogen did decrease
11  those hot flashes.
12      Q.  If a woman doesn't take estrogen
13  replacement therapy or hormone replacement
14  therapy, generally do you have an understanding
15  of how long menopause lasts?
16      A.  No.
17      Q.  It can vary between women, obviously?
18      A.  Yes.  Menopause is indicated by
19  cessation of the period for more than a year to
20  a year -- six months to a year with no menstrual
21  cycle, indicating that the ovulation is not
22  taking place, therefore the cycling of the
23  menstrual cycle is no longer there, follicle
24  stimulating hormone is elevated, and I would
25  have to give you a whole talk on menstrual cycle

Page 123

1  and menopause to explain it more in detail.
2      Q.  Well, let me ask you this then.
3          Is there a general understanding of
4  how long menopausal symptoms last in a woman?
5      A.  I can't say, because I believe from my
6  knowledge it has varied from one person to
7  another.
8      Q.  Have you seen it as short as six
9  months?
10      A.  I've seen it as short as not even
11  having any.
12      Q.  Okay.  And how long -- what's the
13  longest you've seen a woman experience
14  menopausal symptoms without hormone replacement
15  therapy?
16      A.  You know, I really can't recall.
17      Q.  Was it longer than five years?
18      A.  I can't recall.
19      Q.  Do you recall ever receiving documents
20  assuring you that long-term use was safe?
21          MR. MOORE:  Object to the form.
22      A.  Which document?
23          BY MS. BLISS:
24      Q.  Did you ever receive any documents
25  indicating that long-term use of the product was

Page 124

1  safe?
2          MR. MOORE:  Object to the form.
3      A.  I can't recall.
4          (Whereupon, Tesoro Exhibit Number 15
5          was marked for identification.)
6          BY MS. BLISS:
7      Q.  This one, I apologize because it's
8  very small, so take the highlighted one because
9  it's really small.
10          MR. MOORE:  I object to using a
11  highlighted version.  If you want to show him a
12  clean document.
13      A.  I can read it without the highlight.
14          MR. MOORE:  Okay.
15          MS. BLISS:  Okay.  That's fine.  I was
16  only doing it, that's the only sentence I'm
17  going to ask about, to make it easy.
18          MR. MOORE:  To keep a clean record of
19  the actual documents that were produced in the
20  form that they were produced.
21          BY MS. BLISS:
22      Q.  I apologize for the size of the font
23  on this letter and the way it printed out, but I
24  just want to ask you if you recall ever seeing
25  this Dear Doctor Letter.

Page 125

1      A.  I do not.
2      Q.  Okay.  And if you just look at the
3  first paragraph, it says "Current research shows
4  us that women tend to stay on hormone therapy
5  (HRT) for a considerable period of time - a
6  survey of current users indicated that their
7  average use on HRT is 7.8 years, and one
8  quarter of that group has been on therapy for
9  more than eleven years."  And there is a
10  reference to data on file with Wyeth.
11  "Furthermore, these women indicate an extremely
12  high level of satisfaction with therapy such as
13  Prempro."
14          Do you see that?
15      A.  Yes.
16      Q.  Does that portion reassure you that
17  long-term use, again meaning longer than five
18  years, was safe for your patients?
19          MR. MOORE:  Objection to form.
20      A.  It would indicate that, yes.
21          MR. MOORE:  What's the date of this
22  document?
23          MS. BLISS:  I don't know if it's on
24  there.  It was produced by your client.
25          BY MS. BLISS:

32 (Pages 122 to 125)

Michael R. Tesoro, M.D.

Page 126

1    Q.  Is that paragraph consistent with your
2   understanding of hormone replacement therapy
3   before 2002?
4    A.  I can't recall if it was before 2002,
5   but probably it was because I don't recall it.
6   I really don't recall it.
7    Q.  Okay.  As far as the understanding of
8   allowing a woman to stay on for 7.8 years or
9   even eleven years, was that your understanding
10  as to the -- was that consistent with your
11  understanding that long-term use was safe?
12       MR. MOORE:  Object to the form.
13   A.  Yes.
14       BY MS. BLISS:
15   Q.  Well, does this letter in that section
16  that we just read, does this suggest that you
17  have any reason to believe that long-term use of
18  hormone therapy led to dangers?
19   A.  I'm just reading the third paragraph
20  down.
21       Repeat your question again?
22   Q.  Sure.
23       Does this letter suggest to you that
24  you have any reason to believe that long-term
25  use of hormone therapy led to dangers?

Page 127

1    A.  No.
2        MR. MOORE:  I object also.  This is
3   not a complete version of this document, it says
4   Page 2 of 9.  Under the rule of completeness, I
5   demand that you show him the rest of this
6   document.
7        MS. BLISS:  I don't have it.  This
8   came from your client.
9        MR. MOORE:  It came as Page 2 of 9.
10       MS. BLISS:  Okay.  You can assert your
11  objection.
12       MR. MOORE:  The warnings are attached.
13       MS. BLISS:  Objection is fine,
14  Counsel.
15       MR. MOORE:  Rule of completeness, it
16  doesn't include the warning.
17       MS. BLISS:  Objection is fine.
18  Speaking objections are not.
19       MR. MOORE:  It's misleading to show it
20  without the full document.
21       MS. BLISS:  If you would like to talk
22  about misleading, we can talk about misleading.
23       BY MS. BLISS:
24   Q.  We've talked about the WHI.  Actually
25  going back to the WHI, I know you were asked

Page 128

1   several questions about the WHI, but did you
2   know that the WHI Study was terminated early?
3    A.  Not 100 percent aware of that, no.
4    Q.  Do you know the reason why it was
5   stopped?
6    A.  No.
7    Q.  Did you -- are you aware that the WHI
8   concluded that the overall risks of long-term
9   hormone therapy outweigh the benefits?
10       MR. MOORE:  Object to the form.
11   A.  I believe that was what the public
12  data was showing --
13       BY MS. BLISS:
14   Q.  And if you actually --
15   A.  -- through the media.
16   Q.  If you look at Exhibit Number 4, if
17  you look at the WHI Study.  There it is.  If you
18  look at the "Conclusions," first sentence of the
19  Conclusions on the first page.
20   A.  Yes.
21   Q.  It says "Overall health risks exceeded
22  benefits from use of combined estrogen plus
23  progestin for an average of 5.2 year follow-up
24  among healthy postmenopausal US women."
25       Do you see that?

Page 129

1    A.  Yes.
2    Q.  And does that refresh your memory as
3   to why this was halted early?
4        MR. MOORE:  Object to the form.
5    A.  Again, it was a news media that
6   brought it to attention.  I was not in -- did
7   not receive this article or read this article.
8   But yes, that would indicate that they would
9   stop it because they found out there were
10  problems --
11       BY MS. BLISS:
12   Q.  Okay.
13   A.  -- with the estrogen hormone
14  replacement.
15   Q.  Because you've never read this
16  particular study yourself, you're not familiar
17  with the makeup of the participants, the study
18  participants, are you?
19   A.  No.
20   Q.  And you're not familiar with whether
21  the makeup of the participants, you're not
22  familiar with their weight, for instance?
23   A.  No.
24   Q.  And you're also not familiar with the
25  compliance rate for the participants in this

33  (Pages 126 to 129)

Michael R. Tesoro, M.D.

Page 130

1  study?
2      A.  No.
3      Q.  And are you familiar with the type of
4  breast cancer that was studied in the WHI?
5      A.  No.
6          (Whereupon, Tesoro Exhibit Number 16
7          was marked for identification.)
8          THE VIDEOGRAPHER:  We're going off the
9  record, and the time is 1:46 p.m..
10         (Off the record discussion.)
11         THE VIDEOGRAPHER:  We're back on the
12 record, and the time is 1:48 p.m..
13         BY MS. BLISS:
14     Q.  Doctor, what I've just handed you is a
15 label for Prempro dated 2005, and this is
16 something I've pulled off the FDA website, just
17 so you know.
18         Do you see a black box warning on this
19 label?
20     A.  Yes.
21     Q.  Does it now warn of breast cancer in
22 the black box?
23     A.  Well, in parenthesis, if that's what
24 you mean, there's the term "See Clinical
25 Pharmacology, Clinical Studies and Warnings,

Page 131

1  Cardiovascular disease, Malignant neoplasms and
2  Breast Cancer."
3      Q.  Right.  That paragraph reads "The
4  Women's Health Initiative (WHI) study reported
5  increased risks of myocardial infarction --"
6      A.  Yes.
7      Q.  "-- stroke, invasive breast cancer --"
8      A.  Yes.
9      Q.  "-- pulmonary emboli, and deep vein
10 thrombosis in post-menopausal women (50 to
11 79 years of age) during five years of treatment
12 with conjugated estrogens combined with
13 medroxyprogesterone acetate relative to
14 placebo."
15     A.  Yes.
16     Q.  Does that black box warning now warn
17 of breast cancer risk?
18     A.  Yes.
19         What was the year you said, may I ask?
20     Q.  2005.  If you look on the last page it
21 should have the date.
22         After the WHI, did Wyeth tell you or
23 did you learn consistent with the WHI that
24 Prempro should not be used for the prevention of
25 cardiovascular disease?

Page 132

1      A.  I never spoke to anybody from Wyeth.
2      Q.  Okay.  Did you learn otherwise that
3  Prempro was not -- I'm sorry, that Prempro
4  should not be used for the prevention of
5  cardiovascular disease?
6      A.  No.
7      Q.  But that's something you don't -- you
8  believe is not true today, correct?
9      A.  That it's --
10         MR. MOORE:  Object to the form.
11     A.  Prevention?
12         BY MS. BLISS:
13     Q.  Do you believe that Prempro is still a
14 benefit that -- strike that.
15         Do you believe today that
16 cardiovascular disease can be prevented by
17 Prempro?
18     A.  No.
19     Q.  Prior to the WHI, did Wyeth ever tell
20 you that Prempro should not be used as a first
21 line treatment for vaginal atrophy?
22     A.  Don't recall that.
23     Q.  If you turn to Page 20, under
24 "Indications and Usage."  Do you see that?
25     A.  Yes.

Page 133

1      Q.  Okay.  Number two, the second
2  sentence, says "When prescribing solely for the
3  treatment of symptoms of vulvar and vaginal
4  atrophy, topical vaginal products should be
5  considered."
6          Was that your understanding prior to
7  the WHI?
8      A.  Where are you reading now?  I'm sorry.
9      Q.  Are you on Indications and Usage,
10 number two?
11     A.  On Page 20?
12     Q.  Yes.
13     A.  Yes.
14     Q.  Okay.  It says "Treatment of moderate
15 to severe symptoms of vulvar and vaginal atrophy
16 associated with the menopause."
17     A.  Yes.
18     Q.  "When prescribing solely for the
19 treatment of symptoms of vulvar and vaginal
20 atrophy, topical vaginal products should be
21 considered."
22         Do you see that?
23     A.  Yes.
24     Q.  Okay.  Prior to this, prior to the
25 WHI, was that your understanding that you

34 (Pages 130 to 133)

Michael R. Tesoro, M.D.

Page 134

1  prescribed topical creams first?
2      A.  For vaginal atrophy?
3      Q.  Correct.
4      A.  I recall that may have been the case.
5      Q.  Okay.  Do you recall whether you
6  prescribed vaginal creams to Ms. Fraser?
7      A.  I don't.
8      Q.  Okay.  And if she testified that she
9  was experiencing menopausal symptoms including
10 vaginal atrophy and vaginal dryness, would you
11 have recommended a cream instead of Prempro to
12 her?
13     A.  I can't recall what I prescribed for
14 her.
15     Q.  Do you recall prescribing a lot of
16 creams in your practice?
17     A.  It would be dependent on the patient
18 and the symptoms of the patient.
19         MR. MOORE:  Object to the form.
20         BY MS. BLISS:
21     Q.  In what instance would you prescribe a
22 vaginal cream instead of Prempro, for example?
23     A.  Specifically if one had vaginal
24 atrophy, I would tend to use a local treatment
25 rather than a generalized treatment.

Page 135

1      Q.  And if she -- so just for if she
2  was -- that was her only symptom, that's what
3  you would recommend?
4          MR. MOORE:  Object to the form.
5      A.  Vaginal atrophy, yes.
6          BY MS. BLISS:
7      Q.  Going back to this black box warning
8  in Exhibit 15, would you agree with me that the
9  warning here regarding breast cancer is much
10 stronger than any warning?
11     A.  Yes, it would have to.
12         MR. MOORE:  Object to the form.
13         BY MS. BLISS:
14     Q.  That we have discussed already?
15     A.  Yes.
16         MR. MOORE:  Object to the form.
17         BY MS. BLISS:
18     Q.  Does this warning state that the
19 breast cancer risk from estrogen plus progestin
20 is greater than for those using estrogen alone?
21     A.  I don't see that.
22     Q.  I'm sorry, let me point you to the
23 right direction.  I'm getting ahead of myself
24 here.  If you go to Page 23.  I'm looking on the
25 second paragraph.

Page 136

1          Do you see that?
2      A.  Yes.
3      Q.  "After a main follow-up of 5.6 years,
4  the WHI trial reported an increase risk of
5  breast cancer in women who took estrogen plus
6  progestin.  Observational studies have also
7  reported an increased risk for
8  estrogen/progestin combination therapy, and a
9  smaller increased risk for estrogen alone
10 therapy, after several years of use."
11     A.  Mm-hmm.
12     Q.  "For both findings, the excess risk
13 increased with duration of use, and appeared to
14 return to baseline over about five years after
15 stopping treatment."
16     A.  Mm-hmm.
17     Q.  "(Only the observational studies have
18 substantial data on risk after stopping).  In
19 these studies, the risk of breast cancer was
20 greater, and became apparent earlier, with
21 estrogen/progestin combination therapy as
22 compared to estrogen alone therapy."
23         Do you see that?
24     A.  Yes.
25     Q.  And is this -- would you agree with me

Page 137

1  that this warning is very different from the
2  warning that we read earlier?
3          MR. MOORE:  Object to the form.
4      A.  It is, yes.
5          BY MS. BLISS:
6      Q.  And it indicates that breast cancers
7  were larger and diagnosed at a more advanced
8  stage for estrogen plus progestin users?
9      A.  Yes.
10     Q.  And this warning indicates that breast
11 cancer risk became apparent earlier on estrogen
12 plus progestin than on estrogen-only?
13     A.  Yes.
14     Q.  And this language is not included in
15 the earlier label that we looked at earlier,
16 correct?
17         MR. MOORE:  Object to the form.
18     A.  Correct.
19         BY MS. BLISS:
20     Q.  Would this information have been
21 important to you when you were prescribing
22 Prempro to Ms. Fraser?
23         MR. MOORE:  Object to the form.
24     A.  I'm sorry, Paula, repeat that again?
25         BY MS. BLISS:

35 (Pages 134 to 137)

Michael R. Tesoro, M.D.

| Page 138 | Page 140 |
|---|---|

**Page 138**

1    Q.  Sure.
2       Would this information have been
3  important to you when you were prescribing --
4    A.  Yes.
5    Q.  Actually let me just finish my
6  sentence.
7       Would this information have been
8  important to you when you were prescribing
9  Prempro to Mrs. Fraser?
10    A.  Yes.
11    Q.  And you would have in your practice,
12  because of your habits, you would have
13  communicated this information to Mrs. Fraser?
14    A.  Yes.
15    Q.  And based upon this information that
16  we've just read, and based upon your memory, if
17  any, on Mrs. Fraser, if you don't remember
18  that's fine, would your habits have changed with
19  respect to prescribing Prempro to Mrs. Fraser?
20      MR. MOORE:  Object to the form.
21    A.  If I had this information?
22      BY MS. BLISS:
23    Q.  Yes.
24    A.  Yes.
25    Q.  In what way?

**Page 139**

1    A.  I would have probably given her less
2  of an option to go on it if she didn't -- if she
3  continued to want to go on it she would have to
4  be willing to agree that these side effects and
5  symptoms possibly could occur.
6    Q.  Okay.  So it's possible that you would
7  have not even recommended this product to her?
8      MR. MOORE:  Object to the form.
9    A.  Possibly.
10      BY MS. BLISS:
11    Q.  But this information that we just read
12  would have made a difference in the way you
13  prescribed hormone therapy generally?
14    A.  Yes.
15    Q.  When you were prescribing hormone
16  therapy to Mrs. Fraser, were you aware of any
17  studies showing that thin or lean women were at
18  an increased risk of breast cancer from estrogen
19  plus progestin?
20    A.  No.
21    Q.  If there were studies showing this,
22  would that be information you would want to
23  know?
24    A.  Yes.
25    Q.  Because that would be the type of

**Page 140**

1  information you would need to pass on to your
2  thin or lean patients?
3    A.  To all patients.
4    Q.  And is this so that they could take
5  into account when deciding whether to take these
6  drugs and perform their risk/benefit analysis?
7    A.  Yes.
8    Q.  Do you recall whether you believed
9  Mrs. Fraser needed bone protection?
10    A.  I do not.
11    Q.  Okay.  So do you recall whether she
12  needed cardiac protection?
13    A.  I do not.
14    Q.  Do you recall whether Prempro worked
15  for her?
16    A.  I do not.
17    Q.  Do you recall discussing with
18  Ms. Fraser that she should go off of Prempro?
19    A.  The only time I might have done that
20  is when the mammogram came back and before she
21  had her evaluation, until she had that by
22  Dr. Kern.
23    Q.  And you would have told her to
24  discontinue her Prempro until the studies came
25  back?

**Page 141**

1    A.  Immediately, yes.
2    Q.  And is that because it's
3  contraindicated in the label?
4    A.  What's contraindicated?
5    Q.  That a woman that has suspected or has
6  breast cancer should not take Prempro?
7    A.  No.  The indication is that the
8  hormone may stimulate a breast cancer if it's
9  there.  So if there is an indication by the
10  radiologist that there's a lesion, you stop any
11  kind of stimulation, external or otherwise, to
12  that area until it's studied properly.
13    Q.  I see.
14       If Mrs. Fraser had called you when she
15  was diagnosed with breast cancer and asked you
16  what you believed the cause of her breast cancer
17  was, what would you have told her?
18    A.  I don't know.
19    Q.  This is it.  I'm almost done.
20      (Whereupon, Tesoro Exhibit Number 17
21      was marked for identification.)
22      BY MS. BLISS:
23    Q.  What I've just handed to you,
24  Doctor, has been marked as Exhibit 17.  Have you
25  ever seen this article before?

36 (Pages 138 to 141)

Michael R. Tesoro, M.D.

Page 142

1       A.   No, I do not, I never read Lancet.
2       Q.   If you go to the second to last page,
3   and if you look at the contributors to the
4   Collaborative Group on Hormonal Factors in the
5   left-hand column, do you see some of the
6   collaborators are the American Cancer Society,
7   Johns Hopkins, Brisbane, British Columbia Cancer
8   Agency, there's a number of all the way down
9   worldwide institutions?
10      A.   Yes.
11      Q.   And they're very highly regarded
12  institutions?
13      A.   I would say so, yes.
14      Q.   Doctor, in your practice, was it
15  important for drug companies to report to you
16  the most current information concerning risks of
17  drugs?
18      A.   I would say yes.
19      Q.   If you look on the first page, this
20  document, "Breast cancer and hormone replacement
21  therapy:  collaborative reanalysis of data from
22  51 epidemiological studies of 52,705 women with
23  breast cancer and 108,411 women without breast
24  cancer," and this is dated October 11, 1997.  If
25  you look at the "Interpretation," it says "The

Page 144

1   months, other than my office?
2       A.   No.  I got a call from some person
3   from his group telling me about the meeting that
4   would occur on -- in January.  It was a
5   secretary, I can't recall her name.  And then
6   when I called there I got, believe it or not, I
7   got some Arabic guy and he said "there's nobody
8   here by that name."  I called back because it
9   said to call, it actually was a voicemail on my
10  home phone.
11      Q.   Do you know if you ever spoke with any
12  representatives from the drug company, including
13  the law firm?
14      A.   No.
15      Q.   Okay.  You didn't -- did you ever
16  speak with the woman who called you?
17      A.   When they transferred the call to me
18  they transferred it to an attorney, and she said
19  "I can't speak to you, I'll have to transfer it
20  back to my secretary."
21      Q.   Okay.
22      A.   I asked her what this was all about,
23  and she said "I cannot speak to you."  So she
24  transferred it back to the secretary, which I
25  believe is on one of these sheets that you gave

Page 143

1   risk of having breast cancer diagnosed is
2   increased in women using HRT and increases with
3   increasing duration of use.  This effect is
4   reduced after cessation of use of HRT and has
5   largely, if not wholly, disappeared after about
6   five years.  These findings should be considered
7   in the context of the benefits and other risks
8   associated with the use of HRT."
9       A.   Mm-hmm.
10      Q.   Do you see -- would you agree with me
11  that the findings and the interpretation tell us
12  that breast cancer is diagnosed -- that risk of
13  breast cancer increases with the increase in
14  duration of hormone therapy use?
15      A.   It appears that's what it says there,
16  yes.
17      Q.   Did anyone ever bring this article to
18  your attention in 1997?
19      A.   No.
20      Q.   Would this information have been
21  important to you back then when you were
22  prescribing hormone therapy?
23      A.   Yes.
24      Q.   Doctor, do you remember getting any
25  calls from any attorneys within the last few

Page 145

1   me, the name of the -- the first -- I didn't
2   recall the name.
3       Q.   Was it Tiffany Christian?
4       A.   Tiffany Christian might have been the
5   attorney, I think.  But it was her secretary
6   that she transferred me back to, because whoever
7   the main person transferred me to was to her
8   office, and then she immediately transferred me
9   back to the secretary, who I can't recall her
10  name.  It was a foreign name.
11      Q.   Did that office ever offer you
12  compensation for reviewing medical records?
13      A.   It was something that she said to me
14  about to review records there would be
15  compensation, she mentioned something about 300
16  some odd dollars.  And when I got the subpoena I
17  got a check for $14, which is -- or $40 or
18  whatever, no, it's $14, which is still not
19  cashed.
20      Q.   And other than that communication, you
21  have not spoken with any other attorney from
22  that office?
23      A.   No.
24           MS. BLISS:  I have nothing further.
25           MR. MOORE:  We have to put another

37 (Pages 142 to 145)

Michael R. Tesoro, M.D.

Page 146

1  tape on.  I do have some follow-up, Doctor.
2         THE VIDEOGRAPHER:  This is the end of
3  tape number two of the videotaped deposition of
4  Michael R. Tesoro, MD.  We are going off the
5  record, and the time is 2:05 p.m..
6         (Pause.)
7         THE VIDEOGRAPHER:  This is the
8  beginning of tape number three of the videotaped
9  deposition of Michael R. Tesoro, MD.  We are
10 back on the record and the time is 2:09 p.m.
11        MS. BLISS:  I'm sorry, I just have one
12 more question before I turn the witness over.
13        BY MS. BLISS:
14    Q.   There was some discussion earlier
15 today about the records of Mrs. Fraser, and
16 perhaps they may have been shredded, correct?
17 Do you remember that testimony?
18    A.   My charts of her?
19    Q.   Yes.
20    A.   Yes, if she -- yes, with all the other
21 patients I had, correct.
22    Q.   Is it also possible that at some point
23 those records were transferred or forwarded to
24 another doctor?
25    A.   I don't recall that.

Page 147

1     Q.   Okay.  Do you have any specific
2  recollection of actually shredding her chart?
3     A.   She would have to have been in the
4  pile of according to years, that's how I
5  shredded those charts, it had to be in it,
6  because I no longer have any charts available --
7     Q.   Okay.
8     A.   -- at all.
9     Q.   If they were forwarded to another
10 doctor they wouldn't have been shredded,
11 correct?
12    A.   Copies of them maybe.
13        MR. MOORE:  Object to the form.
14    A.   But I don't recall if they were.
15        BY MS. BLISS:
16    Q.   Okay.  So if at some point she moved
17 to a different doctor, copies of your chart may
18 have been forwarded to that doctor?
19    A.   Possibly.
20    Q.   Okay.  And you have no specific
21 recollection of actually shredding her chart?
22        MR. MOORE:  Object to the form.
23        BY MS. BLISS:
24    Q.   Unless it was --
25    A.   That question doesn't really make that

Page 148

1  much sense, because I had all of my charts,
2  3,500 charts, and they had to be carried out to
3  the shredder, and I didn't go through every name
4  to see who was being shredded, it was according
5  to the years they were last seen.
6     Q.   That's fine.  That's all I wanted to
7  know.
8         REDIRECT EXAMINATION
9         BY MR. MOORE:
10    Q.   Doctor, I have a few follow-up
11 questions.
12        If you start with the last exhibit,
13 and this was the Exhibit Number 17, you recall
14 that article from the Lancet?
15    A.   Yes.
16    Q.   That article was 1997, right?
17    A.   Yes.
18    Q.   And the Interpretation is "The risk of
19 having breast cancer diagnosed is increased in
20 women using HRT and increases with increasing
21 duration of use."
22        Do you see that?
23    A.   Yes.
24    Q.   So as of 1997, there was published
25 medical literature reporting an increased risk

Page 149

1  of breast cancer associated with combination
2  hormone therapy, right?
3     A.   Possibly.
4     Q.   Well, there was, right?
5     A.   Yes, in this article.
6     Q.   Right.
7         And this information is available for
8  medical practitioners to read, correct?
9     A.   Well, this particular journal is a
10 journal that's used by internal medicine.  We
11 never read this particular journal.
12    Q.   But you may not have read it, but this
13 was publicly available information?
14    A.   Yes, if you went to the library and
15 you had time to sit down and you could pick it
16 up and read it, yes.
17    Q.   And the Findings, if you look at the
18 Findings of this article, it talks about "The
19 relative risk of having breast cancer diagnosed
20 increased by a factor of 1.023."
21        Do you see that?
22    A.   Yes.
23    Q.   And then it says "The relative risk
24 was 1.35 for women who had used HRT for five
25 years or longer."

38  (Pages 146 to 149)

Michael R. Tesoro, M.D.

Page 150

1       Do you see that?
2     A.   Where is the 1.35?
3     Q.   It's a little bit farther down after
4  the semicolon, "The relative risk was 1.35"?
5     A.   Yes, I see that now.
6     Q.   Okay.  If you go to the warning label
7  that was showed to you by Ms. Bliss, and that's
8  Exhibit Number 11.
9     A.   This one?
10     Q.   Yes.
11     A.   Yes.
12     Q.   And if you turn to Page 3 on the
13  right-hand column, there is warnings there.
14       Do you see those?
15     A.   Yes.
16     Q.   And do you see where it says "Some
17  studies have reported a moderately increased
18  risk of breast cancer (relative risk of 1.3 to
19  2.0)"?
20     A.   Yes.
21     Q.   So let me ask you this first of all;
22  is a relative risk of 1.3, how would you
23  characterize that, a small or moderate risk?
24       MS. BLISS:  Objection.
25       BY MR. MOORE:

Page 151

1     Q.   How would you characterize it, Doctor?
2     A.   I really am not qualified to comment,
3  except to me the numbers look smaller.
4     Q.   Okay.  So this smaller risk that is
5  being reported in the label is consistent with
6  the risk that was in the medical literature at
7  the time, right?
8       MS. BLISS:  Objection.
9     A.   Possibly, yes.
10       BY MR. MOORE:
11     Q.   And so this label was accurately
12  reporting -- well, let me just back up for a
13  second.
14       This Lancet article, this reviewed
15  literature from 51 epidemiologic studies
16  involving 52,705 women.
17     A.   Mm-hmm.
18     Q.   Right?
19     A.   Yes.
20     Q.   And so this was a very large
21  meta-analysis, correct?
22     A.   Yes.
23     Q.   And so the information that Wyeth
24  included in its label was consistent with this
25  large volume of data that we had available at

Page 152

1  the time, right?
2       MS. BLISS:  Objection.
3     A.   Yes.
4       BY MR. MOORE:
5     Q.   And in looking at the warning, this is
6  a warning related to breast cancer, right?
7       MS. BLISS:  Objection.
8       What are you talking about, "this"?
9       BY MR. MOORE:
10     Q.   I'm talking about, this is Exhibit
11  Number 11, the warning on the right-hand side.
12     A.   Yes.
13     Q.   That's a warning related to breast
14  cancer?
15     A.   Yes.
16       MS. BLISS:  Objection.
17       BY MR. MOORE:
18     Q.   I thought you said earlier it wasn't a
19  breast cancer warning.
20       But this is a breast cancer warning,
21  right?
22       MS. BLISS:  Objection.
23     A.   It's a warning of induction of
24  malignant neoplasms.
25       BY MR. MOORE:

Page 153

1     Q.   Right.
2       And the next thing below that that she
3  didn't read says breast cancer, right?
4     A.   Right.  And then endometrial cancer
5  below that.
6     Q.   Right.
7       So this is a breast cancer warning,
8  right?
9       MS. BLISS:  Objection.
10     A.   Yes.
11       BY MR. MOORE:
12     Q.   And we talked about the two
13  paragraphs.  The first paragraph talked about
14  estrogen use, right, in higher doses in
15  longer -- well, let me just read what it says
16  exactly.  It talks about the risks in "estrogen
17  replacement therapy taking higher doses, or in
18  those taking lower doses for prolonged periods
19  of time, especially in excess of ten years."
20       Do you see that?  That's the first
21  paragraph.
22     A.   Where it says "Contraindications"?
23     Q.   I'm sorry, this is under the breast
24  cancer warning.
25     A.   Yes.

Michael R. Tesoro, M.D.

Page 154

1    Q.  And the first paragraph talks about
2  estrogen replacement therapy, and it talks about
3  higher doses or lower doses for prolonged
4  periods of time?
5    A.  Yes.
6    Q.  Now, the next paragraph, however, is
7  talking about the effect of added progestins on
8  the risk of breast cancer, right?
9    A.  Mm-hmm.
10    Q.  It doesn't say anything about higher
11  doses or longer periods of time, does it?
12    A.  No.
13    Q.  It says that "The effect of added
14  progestins is unknown, although a moderately
15  increased risk in those taking combination
16  estrogen/progestin therapy has been reported,"
17  right?
18    A.  Yes.
19    Q.  So there's no limitation ion that
20  paragraph.
21      And that's talking about combination
22  hormone therapy, right?
23    A.  Yes.
24    Q.  So there's no limitation with respect
25  to combination hormone therapy related to dosage

Page 155

1  or length of time, right?
2      MS. BLISS:  Objection.
3    A.  I don't see that, no.  I mean yes.
4      BY MR. MOORE:
5    Q.  I am correct?
6    A.  You're correct.
7    Q.  And so information, information in a
8  breast cancer warning is not reassuring to you
9  as a doctor, is it?
10      MS. BLISS:  Objection.
11    A.  I'm sorry.
12      BY MR. MOORE:
13    Q.  Let me phrase it another way.
14      Companies don't put information in the
15  warning section in order to reassure doctors,
16  right?
17      MS. BLISS:  Objection.
18    A.  Well, I think they put the warnings in
19  there to alert the physicians to certain areas
20  that might be of concern.
21      BY MR. MOORE:
22    Q.  And so we talked about how -- and let
23  me back up a second.
24      At the time, when it talks about how
25  there were some studies that showed a risk of

Page 156

1  breast cancer and other studies that didn't show
2  a risk of breast cancer, that was true, right?
3      MS. BLISS:  Objection.
4    A.  Yes.
5      BY MR. MOORE:
6    Q.  And so when you said it was confusing,
7  the data at the time was conflicting, right?
8      MS. BLISS:  Objection.
9    A.  Which data?
10      BY MR. MOORE:
11    Q.  The data on the risk of breast cancer,
12  there was some studies that showed a risk and
13  other studies that didn't show a risk, right?
14    A.  But that wasn't what was on the
15  warning label of the particular medications.
16    Q.  Okay.  That's what I'm talking about.
17  On the warning label it says that some studies
18  had shown a risk and other studies had not,
19  right?
20    A.  Yes.
21    Q.  So, but that was accurate?
22      MS. BLISS:  Objection.
23    A.  You're asking me if the data was
24  accurate?  I can't say yes or no to that.
25      BY MR. MOORE:

Page 157

1    Q.  Okay.  It's consistent with the
2  article that we just saw?
3    A.  Yes.
4    Q.  And that article was the Lancet 1997
5  article, right?
6    A.  Mm-hmm.
7    Q.  Now, as far as the warning label in
8  2005, that was after the Plaintiff stopped
9  taking hormone therapy, right?
10      Bad question.  I'm going to refer you
11  to Exhibit Number 16.  This is the 2005 warning
12  label.
13    A.  Where is 16?
14    Q.  It's a larger document, 45 pages or
15  so.  That's it right there.
16    A.  This one?
17    Q.  No, a couple down.  That one.
18    A.  Okay.
19    Q.  If you'll turn to Page 23, please.
20    A.  20 --
21    Q.  23.
22    A.  Okay.
23    Q.  And this is the information from the
24  WHI trial that we talked about earlier, right?
25    A.  Yes.

40  (Pages 154 to 157)

Michael R. Tesoro, M.D.

Page 158

1     Q.  In the third paragraph?
2     A.  Yes.
3     Q.  And it talks about "The overall
4  relative risk of invasive breast cancer was
5  1.24."
6        Do you see that?
7     A.  Yes.
8     Q.  And that's something you would also
9  characterize as a lower risk, right?
10    A.  Yes.
11    Q.  And that's consistent with the
12 relative risk that was reported in the 1997
13 article, correct?
14       MS. BLISS:  Objection.
15       BY MR. MOORE:
16    Q.  The 1.35 relative risk?
17    A.  Yes.
18    Q.  So the WHI certainly provided more
19 information about the risk of breast cancer,
20 right?  We agree on that, right?
21    A.  Yes, you'd have to say that.
22    Q.  But it was -- the level of risk that
23 it reported was consistent with what we thought
24 before, right?
25       MS. BLISS:  Objection.

Page 159

1     A.  You mean the percentage?
2        BY MR. MOORE:
3     Q.  Right.  The level of risk.
4     A.  The 1.24 versus the 1.35?
5     Q.  Correct.
6     A.  Well, 1.35 is a little bit higher than
7  1.24.
8     Q.  But they were both -- you'd
9  characterize both of them as lower risk?
10    A.  Yes.
11    Q.  And I just want to be clear, you're
12 not saying that this information would cause you
13 to never prescribe Prempro?
14    A.  Which one?
15    Q.  The information in the 2005 label.  I
16 just want to be clear about your testimony.
17 That's Exhibit Number 16.
18       You would still give the patient the
19 option of taking Prempro, understanding the
20 risks, right?
21    A.  If I was in full active practice, they
22 would have to follow certain parameters, and
23 risk -- and understand those risks and it would
24 be a choice of theirs.  And sometimes they may
25 make that choice or they may not make that

Page 160

1  choice, and I may give that prescription or may
2  not based on the data I have before me.
3     Q.  But you're not saying that under no
4  circumstances would you prescribe Prempro, you
5  would under certain circumstances depending on
6  the individual woman?
7     A.  Possibly.
8     Q.  Okay.  Now, if you turn to Page 18 of
9  that warning label.
10    A.  That warning label.
11    Q.  I'm sorry, this is the 2005 Prempro
12 label, Exhibit Number 16.
13    A.  Page 13 you said?
14    Q.  18.
15    A.  Okay.
16    Q.  Now, this is more information on the
17 WHI Study.  But I want to call your attention to
18 the last sentence of the first paragraph where
19 it says "The study did not evaluate the effects
20 of Prempro or Premarin on menopausal symptoms."
21       Do you see that?
22    A.  Mm-hmm.
23    Q.  So the WHI Study didn't evaluate the
24 benefit of menopausal symptoms, according to
25 this, right?

Page 161

1        MS. BLISS:  Objection.
2     A.  That's what it says, yes.
3        BY MR. MOORE:
4     Q.  And that's the main reason women take
5  hormone therapy, correct?
6     A.  Yes.
7     Q.  So when they stopped the study,
8  because the cardiovascular benefit didn't
9  exist --
10       MS. BLISS:  Objection.
11       BY MR. MOORE:
12    Q.  -- that didn't take into account --
13 they weren't saying the overall benefits
14 exceeded the risks, they were saying not
15 counting menopausal symptoms?
16    A.  That's one sentence out of it.  I
17 can't say yes or no to that.
18    Q.  Okay.  Well, let me just back up and
19 ask that question.
20       So the study, the WHI Study didn't
21 study the effects of menopausal symptoms, right?
22    A.  According to that sentence, no.
23    Q.  So therefore it's not -- when you're
24 talking about whether the benefits outweigh the
25 risk of the product, it wouldn't be fair to say

41 (Pages 158 to 161)

Michael R. Tesoro, M.D.

Page 162

1  the benefits outweigh the risk if you're not --
2  excuse me, it wouldn't be fair the say the risks
3  outweighed the benefits if you're not
4  considering menopausal symptoms, right?
5       MS. BLISS: Objection.
6       A.  I don't believe I would say that
7  completely, no.
8       BY MR. MOORE:
9       Q.  Okay.  So just let me ask a clearer
10  question.
11       The WHI does not evaluate menopausal
12  symptoms?
13       A.  According to that one sentence, and I
14  haven't read the full article, so I don't know
15  if they have some other wording in there.
16       Q.  We can look at the article.  This is
17  Exhibit Number 4.
18       But before we do that, if you need to
19  look at Exhibit Number 4 you're welcome to go
20  back and look at that, my question to you is; if
21  the study does not evaluate menopausal symptoms
22  as a benefit, okay --
23       A.  Mm-hmm.
24       Q.  -- then it's not accurate to say the
25  risks outweigh the benefits because you're not

Page 163

1  taking into account the main benefit of the
2  product, right?
3       MS. BLISS:  Objection.
4       You're asking him to opine on an
5  epidemiological result of a study that he has
6  already indicated he has no expertise in
7  statistics and design of studies.
8       MR. MOORE:  That's an improper
9  speaking objection.
10       BY MR. MOORE:
11       Q.  Can you answer, Doctor?
12       A.  Yes, I sort of agree with what
13  Ms. Bliss said, that I really don't have the
14  wherewithal to interpret that.
15       Q.  Okay.  But she asked you -- she was
16  asking you questions about this study, and I
17  thought you said that --
18       A.  No, according to certain areas of the
19  study.
20       Q.  Right.
21       I just want to make sure, I thought
22  what you said was that the risks outweighed the
23  benefits, and what I'm trying to clarify is
24  that's not really accurate because they weren't
25  taking into consideration the number one benefit

Page 164

1  of the product, right?
2       MS. BLISS:  Objection.  You're being
3  completely misleading, you are --
4       MR. MOORE:  State your, either state
5  your objection.
6       MS. BLISS:  You're misstating the
7  conclusion.
8       MR. MOORE:  State your objection,
9  please.
10       A.  I can't answer that question.
11       BY MR. MOORE:
12       Q.  Okay.  Well, let me go back then to
13  Exhibit Number 4, and we can look at the actual
14  study.
15       A.  What is Number 4.
16       Q.  Exhibit Number 4 is the WHI Study.
17       A.  Here we go.  All right.
18       Q.  If you draw your attention to where it
19  says the "Main Outcomes Measures."
20       Do you see that?
21       A.  What page are you on?
22       Q.  This is on the first page.  On the
23  first page, on the right-hand side it says "Main
24  Outcomes"?
25       A.  Got it.

Page 165

1       Q.  It says "The primary outcome was
2  coronary heart disease (non-fatal myocardial
3  infarction and CHD death), with invasive breast
4  cancer as the primary adverse outcome."
5       Do you see that?
6       A.  Yes.
7       Q.  "A global index summarizing the
8  balance of risks and benefits included the two
9  primary outcomes plus stroke, pulmonary
10  embolism, endometrial cancer, colorectal cancer,
11  hip fracture, and death due to other causes."
12       Do you see that?
13       A.  Yes.
14       Q.  So they are not measuring menopausal
15  symptoms as a benefit in that study, right?
16       A.  According to that, no.
17       Q.  So when they say the overall risks
18  exceeded the benefits, they're not taking into
19  account the potential benefit of menopausal
20  symptoms, right?
21       A.  Unless the indication is that the
22  purpose of the particular hormonal therapy was
23  for menopausal symptoms, and that's sort of a
24  given you might say.
25       Q.  Well, you're familiar the WHI was

42 (Pages 162 to 165)

Michael R. Tesoro, M.D.

Page 166

1    conducted on women that are much, much beyond
2    menopause?
3        A.   Yes.  But if you look at the sentence
4    above where it says "Context," it sort of
5    explains that, "Despite decades of accumulated
6    observational evidence, the balance of risks and
7    benefits for hormonal use in healthy
8    postmenopausal women remains uncertain."
9        Q.   Right.
10           My question to you is simply; when you
11   do a study, and you evaluate certain benefits
12   and certain risks, right, that's what this study
13   was designed to look at?
14       A.   Yes.
15       Q.   And when you talk about the risks
16   outweighing the benefits, you're talking about
17   the risks and benefits that were measured in
18   that study, right?
19       A.   Yes.
20       Q.   Okay.  So if the study doesn't measure
21   menopausal symptoms as a benefit, that's not one
22   of the benefits that it's considering in the
23   risk/benefit equation?
24       MS. BLISS:  Objection.
25       A.   Without reading the full article and

Page 167

1    understanding all the data, I don't know if
2    there might be a sentence in there that
3    describes that, so I can't answer that question
4    for you.
5        BY MR. MOORE:
6        Q.   Okay.  So you can't say based on your
7    knowledge without having read this article
8    whether they found that the risks, the overall
9    risks of hormone therapy including -- I mean,
10   excuse me, let me back up.
11           You can't say based on this article
12   whether the WHI investigators found that the
13   overall risks of hormone therapy outweighed the
14   overall benefits?  You can't say that?
15       MS. BLISS:  Objection.
16       A.   I haven't read the article, so I'm
17   obviously not going to comment on that.
18       BY MR. MOORE:
19       Q.   Okay.  And one other thing I just want
20   to be -- to clarify before we leave the warning
21   label, you said you prescribed for the
22   prescribed indications, right?  Excuse me, for
23   the indicated usages?
24       A.   What are we talking about?
25       Q.   Going back to Exhibit Number 16, the

Page 168

1    2005 label.  You were asked -- I just want to be
2    clear, you only prescribed for the indicated
3    usages of the product, right?
4        A.   Yes.
5        Q.   So you may have -- whatever you may
6    have believed or thought about other potential
7    benefits, the reason you prescribed the product
8    was for the indicated usages, right?
9        A.   Usually.  But in 2005 I wasn't
10   prescribing very much.
11       Q.   Right.
12           But back when you were prescribing,
13   you prescribed for the indicated usages?
14       A.   Yes.
15       Q.   Okay.  And so you were asked a series
16   of questions about some exhibits.  I just want
17   to go through them quickly here.  We'll go
18   backwards.  Actually we can start with this one.
19           This is Exhibit Number 13 on the top
20   of your stack.  It shows an iceberg?
21       A.   Yes.
22       Q.   You've never seen this before, right?
23       A.   This picture of the iceberg?
24       Q.   Yes.  I want to clarify; you've seen
25   the picture of the iceberg?

Page 169

1        A.   I've never seen this before, this
2    whole thing about menopausal symptoms.
3        Q.   So you may have seen the picture of
4    the iceberg, but it wasn't something that was
5    used --
6        A.   Correct.
7        Q.   -- to detail you or influence your
8    prescribing?
9        A.   Correct.
10       Q.   So this has nothing to do with why
11   you -- this has no influence whatsoever on
12   how --
13       A.   I've never seen it, can't comment.
14       Q.   And the same is true with Exhibit
15   Number 14, you've never seen that before.
16           I can hand you my copy if you'd like?
17       A.   No, I have never seen this before.
18       Q.   That had no influence whatsoever on
19   your prescribing decisions for Ms. Fraser or any
20   other woman, right?
21       A.   No, that looks like something, it says
22   here 1986.
23       Q.   And you said you can't recall
24   specifically seeing Exhibit 12?
25       A.   Not really, no.

43 (Pages 166 to 169)

Michael R. Tesoro, M.D.

Page 170

1    Q.  Okay.
2    A.  I cannot.
3        Is that the one with the picture
4  there?
5    Q.  Right.
6    A.  Correct.
7    Q.  So that's not something that you
8  relied on in terms of making your prescribing
9  decisions for women?
10   A.  Not that I recall, no.
11   Q.  Okay.  So I am correct?  We had a
12  double negative there.  I'm correct when I say
13  this is not something that you used in making
14  your prescribing decisions?
15   A.  Correct.
16   Q.  Okay.  Now, you were asked some
17  questions and shown some medical records.
18       Let me just ask you generally; you
19  can't testify based on your personal knowledge
20  how long Ms. Fraser took Prempro, correct?
21   A.  I can't recall.
22   Q.  Okay.  Because we don't have your
23  records?
24   A.  Correct.
25   Q.  So based on your personal knowledge as

Page 171

1  you sit here today, you're not able to say how
2  long you prescribed the product for her?
3    A.  I can't recall.
4    Q.  Okay.  And the records that you were
5  shown, these aren't your records, correct?
6    A.  Which records?
7    Q.  Well, we can go through them one by
8  one.
9    A.  A couple were letters from different
10  physicians.
11   Q.  Right.
12       So like Exhibit 6, if we can start off
13  with Exhibit Number 6.
14   A.  Well, there's one of them there which
15  is a Pap smear.
16   Q.  Right.
17   A.  At the time I was working with
18  Dr. Gibbons, who is the Chair of the department
19  and we shared an office.  So you look on the
20  label of the Pap smear, it has his name on
21  there, and that was probably from the secretary,
22  because when we shared our office we shared the
23  same secretary.
24   Q.  Okay.  But you didn't, this is, you
25  didn't -- you don't have any personal knowledge

Page 172

1  of this record?  You didn't complete this
2  record, it's not your record?
3    A.  Of this particular one?
4    Q.  Right.
5    A.  The only thing I can say is that I was
6  there at St. Francis in 1997, and she came there
7  for a Pap smear.  I would have done it.
8  Dr. Gibbons would not have done it.
9    Q.  Okay.  And so when it says on the
10  second page "Hormone use," are you able to say
11  whether that was Prempro use or whether that was
12  another type of hormone?
13   A.  If you look at the wording on top of
14  it, it says "Clinical data."  That means that
15  that was put on the sheet, the lab data sheet,
16  that she was on hormonal medication, so when the
17  pathologist reads it he or she knows that a
18  particular individual whose Pap smear it is was
19  on hormonal medication.
20   Q.  Who would have actually noted that she
21  was on hormonal medication?
22   A.  It would have been either the clinical
23  doctor who did the Pap smear.
24   Q.  But you can't say whether that was
25  Prempro or another type of hormone therapy,

Page 173

1  right?
2    A.  From seeing that, no.
3    Q.  And we can just go through these
4  quickly.
5        But Exhibit Number 7, again this is
6  not a record that you prepared.  Am I right
7  about that?
8    A.  Let me find the exhibit.
9    Q.  I can hand you my copy if you'd like
10  (handing).
11   A.  Correct.  It was prepared by obviously
12  Dr. Salner.
13   Q.  Was he in a different -- he was in a
14  different practice, right?
15   A.  I have no idea where that doctor is
16  from.  Probably Hartford Hospital.
17   Q.  Okay.  So when it says "The patient
18  has been on hormone replacement for the last
19  five years and this has been discontinued,"
20  that's not based on your personal knowledge,
21  right?  You're just reading what it says here?
22   A.  It's probably in the history when the
23  patient was initially referred to Dr. Kern.
24   Q.  What I'm saying is; you're not
25  testifying to that based on your knowledge,

44 (Pages 170 to 173)

Michael R. Tesoro, M.D.

Page 174

1  you're just reading what's on the record, right?
2      A.  I'm reading what is on the record,
3  correct.  However, the record indicates the
4  history that went with the patient to the
5  referral -- referring doctor.
6      Q.  Right.
7      A.  So it's not a history that's
8  accumulated without it being followed through.
9  In other words, you said something, you're
10 sending it to this person, she's going to say
11 something, but she's going to include what you
12 said about it.
13     Q.  Okay.
14     A.  Follow?
15         If I refer you to a physician, I'm
16 going to refer the physician with a history, and
17 then that physician in writing to other
18 physicians is going to write that same history,
19 collaborating the history.
20     Q.  Okay.  So it's based on a series of
21 statements?
22     A.  Collaboration of the history.
23     Q.  Okay.
24     A.  It's not changing the history.
25     Q.  And that one doesn't say whether it

Page 175

1  was Prempro or another type of hormone therapy,
2  right?
3      A.  I don't have that article before me.
4      Q.  (Handing).
5      A.  No.
6      Q.  That's right, it doesn't say that?
7      A.  Correct.
8      Q.  Okay.  And just quickly, Exhibit
9  Number 8 and Number 9.
10     A.  Okay.
11     Q.  These aren't your medical records,
12 right?
13     A.  These are what?
14     Q.  These aren't your medical records?
15 You didn't create these, these didn't come from
16 your office?
17     A.  Correct.
18     Q.  And so you don't have any firsthand
19 knowledge about whether this is accurate or not?
20     A.  Again, this is the referring physician
21 writing to Dr. Kern, looks like the Oncology
22 Center in Hartford was the center where she was
23 sent.  And again, that physician would include
24 the previous history, not adding or subtracting
25 from it.

Page 176

1      Q.  I understand.
2          I'm just saying; you can't testify
3  based on your knowledge as to whether or not
4  it's accurate or not?  That's all I'm asking.
5      A.  I would doubt that it's inaccurate.
6      Q.  But you don't know, that's all I'm
7  saying, you don't know based on your personal
8  knowledge whether or not this is accurate?
9      A.  Only knowing the way physicians do
10 things, I would have to say that it is, to my
11 knowledge you're right, it is not -- I can't say
12 yes or no, except that the way the history
13 follows, if you follow this history and you
14 follow the history on the previous chart, it's
15 the same.
16     Q.  I understand.  I'm just trying to make
17 a narrow point here, which is based on your
18 personal knowledge --
19     A.  I can't comment.
20     Q.  -- you can't comment on whether or not
21 this is true, right?
22     A.  Can't comment.
23     Q.  And the same is true with Exhibit
24 Number 8?
25     A.  Can't comment.

Page 177

1      Q.  Okay.  Now, Exhibit Number 15 was an
2  excerpt of a Dear Doctor Letter.
3          Do you recall that?
4      A.  Yes.
5      Q.  Now, is it -- do you see where it says
6  "Page 2 of 9" at the bottom?
7      A.  Yes.
8      Q.  So this doesn't appear to contain the
9  entire document?
10     A.  I can't comment.  I don't know where
11 that's --
12     Q.  Let me ask you this.
13         Typically is it your recollection that
14 when Wyeth or any other pharmaceutical company
15 distributes promotional literature, they
16 typically attach the warning label along with
17 it?
18     A.  I can't comment what they do.
19     Q.  Okay.  So you can't say whether or not
20 the warning label which included the risks we
21 talked about earlier was attached to this or
22 not?
23     A.  I can't comment.
24     Q.  So when you said before -- when you
25 were asked before whether or not this talks

45 (Pages 174 to 177)

Page 178

1  about the risks, you can't say one way or
2  another, because you don't know whether or not
3  there was other information?
4       A.  I can't comment on that.
5       Q.  Okay.  You said earlier that there was
6  some literature about possible cardiovascular
7  benefit at some point relating to --
8       A.  I don't recall saying that.
9       Q.  Okay.  Maybe I misunderstood you.  I
10  thought you said that at some point there was a
11  thought that hormone therapy could have a
12  cardiovascular benefit.  Is that not your
13  testimony?
14       A.  I don't recall saying that.
15       Q.  Okay.  So you never -- it was never
16  your belief that it had a cardiovascular
17  benefit?
18       MS. BLISS:  Objection.
19       A.  I believe the literature that came out
20  in the early nineties was that there was a
21  possible benefit, yes.
22       BY MR. MOORE:
23       Q.  Okay.  And that literature, my
24  question is, that literature came from published
25  studies, not just Wyeth, right?

Page 179

1       MS. BLISS:  Objection.
2       A.  I don't recall where those studies
3  came from.
4       BY MR. MOORE:
5       Q.  Okay.  But there was published medical
6  literature that suggested a possible
7  cardiovascular benefit?
8       A.  I don't recall that.
9       Q.  Okay.  Has anything you've heard here
10  today changed your testimony that you made the
11  appropriate prescribing decision for Ms. Fraser?
12       A.  Is there anything here today that
13  would change my --
14       Q.  You believe you made the appropriate
15  prescribing --
16       A.  At the time.
17       Q.  And is there anything you've heard
18  here today that's changed that?
19       A.  Based on the literature after 2005?
20       Q.  Well, I'm asking; you still believe,
21  you still believe you made the appropriate
22  prescribing decision for her, right?
23       MS. BLISS:  Objection.
24       A.  Yes.
25       MR. MOORE:  Okay.  No further

Page 180

1  questions.
2       MS. BLISS:  Just one thing.
3       RECROSS EXAMINATION
4       BY MS. BLISS:
5       Q.  Who referred Mrs. Fraser to Kern, if
6  you know?
7       A.  I probably did.
8       MS. BLISS:  That's all I have.
9       THE VIDEOGRAPHER:  This concludes the
10  video deposition of Michael R. Tesoro, MD,
11  consisting of three tapes.  The time is 2:44
12  p.m., and we are now off the record.
13       (Whereupon, the deposition was
14  concluded.)

Page 181

1  ATTACH TO DEPOSITION OF MICHAEL R. TESORO, MD
2  CASE:  Margaret Fraser v Wyeth, Inc.
3  DATE TAKEN:  April 11th, 2011
4
5       ERRATA SHEET
6  PAGE    LINE    CHANGE     REASON
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14       I have read the foregoing transcript
15  of my deposition and except for any corrections
16  or changes noted above, I hereby subscribe to
17  the transcript as an accurate record of the
18  statements made by me.
19
20       Executed this____day of_____, 2011.
21
22
23       _____
24       MICHAEL R. TESORO, MD
25

46 (Pages 178 to 181)

Michael R. Tesoro, M.D.

Page 182

```
 1         CERTIFICATE OF OFFICER
 2         I, MAUREEN O'CONNOR POLLARD, LSR #473,
 3   RPR, CLR, and Notary Public in and for the State
 4   of Connecticut, do hereby certify that there
 5   came before me on the 11th day of April, 2011,
 6   the person hereinbefore named, who was duly
 7   sworn to testify to the truth of their knowledge
 8   concerning the matters in this cause, and their
 9   examination reduced to typewriting under my
10   direction and is a true record of the testimony.
11         I further certify that I am neither
12   attorney for or related or employed by any of
13   the parties to the action, and that I am not a
14   relative or employee of any attorney or counsel
15   employed by the parties hereto or financially
16   interested in the action.
17         In witness whereof, I have hereunto
18   set my hand this 18th day of April, 2011.
19
20   _____
21   MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22   License SHR-473
23
24
25
```

47 (Page 182)

**A**

**able** 89:11 171:1 172:10
**abnormal** 54:12
**abnormalities** 121:7
**absent** 103:14
**absolute** 80:7
**absolutely** 25:3 54:20 55:24 56:3 65:17 108:14
**accepted** 29:24 30:9
**account** 140:5 161:12 163:1 165:19
**accumulated** 166:5 174:8
**accuracy** 92:20 93:17 94:12 95:23 96:4
**accurate** 58:13 60:4,7,10,10 75:15 76:7 87:24 88:18,20,25 89:6 89:7,12 92:22 118:19 156:21,24 162:24 163:24 175:19 176:4,8 181:17
**accurately** 151:11
**acetate** 40:2,11 106:6,8 131:13
**acog** 28:11,13 29:5 29:10,19,23 30:3 30:4,7,11,16,19 30:22,24 31:17 73:20
**act** 29:23
**action** 9:15 182:13 182:16
**active** 11:19,24 64:15 84:13 86:24 159:21
**actively** 27:6
**activities** 29:20

**actual** 80:13 104:11 124:19 164:13
**add** 84:22
**added** 52:11 58:6 103:19 154:7,13
**adding** 104:2 175:24
**addition** 15:18 16:5 52:20 55:6 57:7 62:1
**additional** 52:20
**address** 99:15 100:21
**adequate** 60:25
**administration** 59:20
**administrative** 19:8
**advanced** 107:15 137:7
**adverse** 165:4
**advertisement** 73:23
**advertising** 72:9
**affect** 30:3 35:18 36:5,16,17 37:6
**age** 37:25 54:11 67:10 89:19 131:11
**agency** 142:8
**agerelated** 111:13
**ago** 8:25 9:1 16:11 16:11 34:4 43:3 93:12 115:16
**agree** 37:4,10,11 43:14,18 71:14 85:15 86:11 135:8 136:25 139:4 143:10 158:20 163:12
**agreed** 61:5
**ahead** 135:23
**aid** 110:15
**air** 18:9,9,11,13
**al** 5:10,10
**alert** 97:9 155:19

**allow** 116:11
**allowing** 126:8
**alzheimer** 113:4
**alzheimers** 110:6 111:22
**amended** 3:11
**american** 31:8,21 32:3,11 62:8 72:19 115:23 142:6
**amount** 80:21 81:2
**analysis** 32:10 116:12 117:17,25 118:12 140:6
**analyze** 29:15 122:3
**analyzed** 30:7 105:12
**analyzing** 117:20 118:3
**anatomy** 87:15
**annual** 115:22
**answer** 7:25 8:5,7 11:13,14 53:4 71:9 73:6 85:8 101:14 120:1 163:11 164:10 167:3
**anxiety** 34:23
**anybody** 132:1
**apartment** 22:5
**apologize** 77:4 124:7,22
**apparent** 136:20 137:11
**appear** 177:8
**appearances** 2:1
**appeared** 136:13
**appears** 114:9 143:15
**appreciates** 86:6
**appropriate** 55:20 120:23 179:11,14 179:21
**approved** 44:4 48:22 59:19
**approximate** 22:21

**approximately** 19:6 20:18 22:10 24:17 93:12
**april** 1:16 5:6 25:2 25:2 181:3 182:5 182:18
**arabic** 144:7
**area** 17:21 18:4 20:1 22:1,3 97:18 141:12
**areas** 18:18 155:19 163:18
**arent** 171:5 175:11 175:14
**article** 3:18 4:23 15:20,25 16:3,8 76:23 77:14 80:23 81:20,20 83:5 129:7,7 141:25 143:17 148:14,16 149:5,18 151:14 157:2,4,5 158:13 162:14,16 166:25 167:7,11,16 175:3
**articles** 15:17
**asked** 22:12 23:14 23:19 24:14 108:15 115:14 127:25 141:15 144:22 163:15 168:1,15 170:16 177:25
**asking** 57:2 96:20 102:9 156:23 163:4,16 176:4 179:20
**asks** 14:4
**assert** 127:10
**assess** 105:25
**assist** 60:25
**assistant** 19:17
**associate** 19:18
**associated** 40:17 47:24 52:20 56:18 58:9 59:7 133:16 143:8 149:1
**associates** 4:8

93:25 94:20
**associating** 111:18
**association** 52:1 102:24
**assume** 32:1 63:25
**assuming** 77:19
**assuring** 123:20
**atrophy** 35:3,4 38:9 48:6 49:6 112:21 113:7 132:21 133:4,15 133:20 134:2,10 134:24 135:5
**attach** 177:16 181:1
**attached** 9:6 127:12 177:21
**attend** 27:10
**attention** 97:4 129:6 143:18 160:17 164:18
**attorney** 144:18 145:5,21 182:12 182:14
**attorneys** 143:25
**audible** 7:24
**august** 21:3
**availability** 13:21
**available** 32:6 39:2 39:12 43:16 58:14 60:5 64:7 65:5 77:17 83:9,22 147:6 149:7,13 151:25
**average** 125:7 128:23
**aware** 29:19 53:14 53:17 59:5,7 72:7 128:3,7 139:16
**ayer** 23:21 44:12

**B**

**back** 14:3 15:12,13 23:13 25:24 30:1 44:9 55:15 72:5 79:1 83:15 85:3 85:14 109:24

110:6 119:12
127:25 130:11
135:7 140:20,25
143:21 144:8,20
144:24 145:6,9
146:10 151:12
155:23 161:18
162:20 164:12
167:10,25 168:12
**backwards** 168:18
**bad** 30:21 157:10
**balance** 165:8
166:6
**base** 18:9,11
**based** 29:14 35:16
43:20 53:24 54:1
55:19 63:21 65:6
75:10 76:3,9 92:7
138:15,16 160:2
167:6,11 170:19
170:25 173:20,25
174:20 176:3,7,17
179:19
**baseline** 136:14
**basis** 12:3 27:24
54:12 56:9 86:16
**bateman** 2:19 5:21
5:21 95:2
**bates** 3:15,16,23
4:3,4,9,15,17,19
**began** 89:18,22
**beginning** 56:12
72:3 146:8
**begins** 93:11
**behalf** 75:23
115:15
**belief** 110:14 114:6
178:16
**believe** 6:14 8:24
8:25 12:17 15:12
16:10 20:4 37:9
40:23 42:13 44:6
48:20 49:22 50:11
52:4 58:16 59:21
59:22 60:6,22
68:3 69:11 80:19
88:20 91:10 95:16

113:12 114:19,22
114:24 115:3,6
116:24 120:22
123:5 126:17,24
128:11 132:8,13
132:15 144:6,25
162:6 178:19
179:14,20,21
**believed** 76:7 81:8
140:8 141:16
168:6
**benefit** 57:5 81:9
81:16 114:10
115:4 116:12
117:25 118:11
132:14 140:6
160:24 161:8
162:22 163:1,25
165:15,19 166:21
166:23 178:7,12
178:17,21 179:7
**benefits** 3:19 54:18
56:6 61:17,22
63:2 76:24 82:3
83:8 108:1 109:23
113:10 114:7
116:4,8,16 118:6
118:11,16,21
128:9,22 143:7
161:13,24 162:1,3
162:25 163:23
165:8,18 166:7,11
166:16,17,22
167:14 168:7
**best** 45:9
**beyond** 52:21
113:10 166:1
**biggest** 70:10
**birth** 42:15,22,24
42:25 43:9,11
**birthday** 75:19
**bit** 17:8 31:15
33:20 150:3 159:6
**black** 96:17,21,24
97:3,13,19 98:4,6
98:13,18 130:18
130:22 131:16

135:7
**bleeding** 54:13
69:2 122:3
**bliss** 2:4 3:5,7 5:17
5:17 6:17 10:25
11:7 12:10 15:4
16:2,13 26:24
27:3 29:13 30:5
30:17 32:8,22
35:19 36:7,21
37:19 39:6 42:11
45:25 46:15 50:7
50:10 52:22 53:2
53:19 56:2 58:19
58:24 59:9,14,25
61:2 62:7 64:22
65:22 67:2 69:21
70:12,19 71:2,8
71:18 73:24 74:5
75:3 77:9,23
78:23 79:13,21
80:3 81:18 82:7
82:11 83:16 84:1
84:19,25 89:4,15
89:25 90:6 91:17
93:3,21 94:18
95:3,8 96:3,10
97:8 99:20 100:15
100:25 101:15,22
102:2,5,9,12,20
103:6,17 104:18
105:13,21 106:23
107:6,12,23 108:8
108:22,25 110:11
112:4 113:24
114:14 115:2,13
123:23 124:6,15
124:21 125:23,25
126:14 127:7,10
127:13,17,21,23
128:13 129:11
130:13 132:12
134:20 135:6,13
135:17 137:5,19
137:25 138:22
139:10 141:22
145:24 146:11,13

147:15,23 150:7
150:24 151:8
152:2,7,16,22
153:9 155:2,10,17
156:3,8,22 158:14
158:25 161:1,10
162:5 163:3,13
164:2,6 166:24
167:15 178:18
179:1,23 180:2,4
180:8
**blood** 54:20
**board** 18:17,19,22
29:3 31:20
**body** 54:25 55:13
62:25 119:5
**bone** 140:9
**book** 55:4
**bottle** 95:13
**bottom** 47:11,18
57:13 177:6
**bound** 7:14
**box** 96:18,22,24
97:3,13,19 98:4,6
98:9,13,19 130:18
130:22 131:16
135:7
**boxes** 97:25
**brain** 12:4 24:14
34:25 80:20
**brand** 67:7
**break** 8:13 71:20
**breast** 38:10,13,19
38:22,24 46:6,13
51:8,16,20 52:11
54:9 56:1 57:20
57:24 58:1,7,22
58:25 59:3,7,24
60:23 66:18,20,22
66:24 69:6,9,13
69:15,20 70:1,7
70:11,14,16,22
71:1,7,12,17
78:16 79:3,5 92:2
92:9,9 98:3,19
99:10 100:22
101:17 103:20

104:11,22 105:3
105:14,18 106:3
106:19 107:8,13
107:20 114:13
115:7 117:22
121:18,21 130:4
130:21 131:2,7,17
135:9,19 136:5,19
137:6,10 139:18
141:6,8,15,16
142:20,23,23
143:1,12,13
148:19 149:1,19
150:18 152:6,13
152:19,20 153:3,7
153:23 154:8
155:8 156:1,2,11
158:4,19 165:3
**bring** 83:24 86:3
97:4 143:17
**brings** 7:6
**brisbane** 142:7
**british** 142:7
**brought** 19:19
129:6
**bubalo** 2:5
**bubalorotman** 2:9
**build** 21:7
**bulletin** 30:14
**busy** 80:14 86:11

---
**C**
---
**ca** 98:12
**cake** 75:19
**calcium** 113:20
**calculation** 57:5
**call** 54:7 75:6,8
83:12,13 144:2,9
144:17 160:17
**called** 24:12,22
41:21 57:9 85:9
85:20 95:18,19,20
141:14 144:6,8,16
**calling** 97:18
**calls** 143:25
**cancelled** 14:21
**cancer** 12:4 24:14

38:10,13,19,22,24
40:17,19 46:6,13
51:2,4,5,8,16,20
52:11 56:1 57:20
57:24 58:1,7,22
58:25 59:3,7,24
60:23 66:18,20,23
66:24 69:6,9,13
69:15,20 70:1,7
70:11,14,16,22
71:1,7,12,17
78:16 79:3,5 98:3
98:7,14,19 99:10
100:22 101:17
103:20 104:11,22
105:4,15,18 106:3
106:19 107:8,20
110:21 111:23
113:6 114:13
115:7 117:22
121:18,21 130:4
130:21 131:2,7,17
135:9,19 136:5,19
137:11 139:18
141:6,8,15,16
142:6,7,20,23,24
143:1,12,13
148:19 149:1,19
150:18 152:6,14
152:19,20 153:3,4
153:7,24 154:8
155:8 156:1,2,11
158:4,19 165:4,10
165:10
**cancers** 107:13,16
137:6
**candidate** 55:21
**cant** 12:11 13:8
15:14,20 16:7
21:1 24:4 25:3
26:25 27:4 36:22
37:8 38:15 41:2
42:5 44:13,15,20
45:8 46:1,17,25
47:8 66:15 67:18
67:21 68:23 69:16
69:19,22,24 70:4

70:8 71:9 75:13
75:25 80:7 89:6
109:9,14,20 123:5
123:16,18 124:3
126:4 134:13
144:5,19 145:9
156:24 161:17
164:10 167:3,6,11
167:14 169:13,23
170:19,21 171:3
172:24 176:2,11
176:19,20,22,25
177:10,18,19,23
178:1,4
**capacity** 19:21
**cardiac** 140:12
**cardiovascular**
81:8,16 113:5
115:4 131:1,25
132:5,16 161:8
178:6,12,16 179:7
**care** 12:4 23:8
26:18 43:19 46:23
47:7 86:6
**career** 11:19,23
60:17
**careful** 118:2
120:16
**carried** 148:2
**case** 1:5 5:12 7:1
19:23 106:3
121:13 134:4
181:2
**cases** 37:15 64:14
79:16 104:22,24
**cashed** 145:19
**categories** 87:7
**category** 82:25
83:2
**cause** 71:17 82:5,10
97:10 107:20
118:17 121:6
141:16 159:12
182:8
**caused** 69:12,14
70:1,7
**causes** 69:19

165:11
**caution** 97:23
**cease** 38:2
**ceases** 38:1
**cells** 90:22
**center** 18:2 19:9
175:22,22
**certain** 13:2 27:15
39:10 54:1,3
111:18 119:5
155:19 159:22
160:5 163:18
166:11,12
**certainly** 30:7 37:4
62:14 81:22
109:10 158:18
**certificate** 182:1
**certification** 3:14
10:7,13
**certified** 18:17,19
18:20,22 29:3
**certify** 182:4,11
**cessation** 122:19
143:4
**chair** 28:17 29:7
31:21 171:18
**chairman** 31:17
**chance** 9:2 109:13
**change** 87:7 179:13
181:6
**changed** 138:18
179:10,18
**changes** 40:20
64:10 90:23
181:16
**changing** 174:24
**characteristics**
53:24 65:7
**characterize** 100:5
150:23 151:1
158:9 159:9
**chart** 114:2 147:2
147:17,21 176:14
**charts** 13:23
146:18 147:5,6
148:1,2
**chd** 165:3

**check** 145:17
**choice** 56:9 66:7
82:17,19 119:19
122:4 159:24,25
160:1
**choices** 82:19
**choose** 39:3,13
**christian** 145:3,4
**circumstances**
160:4,5
**city** 18:2 95:4
**claiming** 7:4
**clares** 18:1
**clarify** 163:23
167:20 168:24
**clean** 124:12,18
**clear** 78:12 159:11
159:16 168:2
**clearer** 162:9
**client** 125:24 127:8
**climara** 41:4,4,5,7
83:14
**clinic** 38:17
**clinical** 33:8,10,16
54:1,4 60:25
62:13,16 90:16,25
91:3 104:21 105:4
105:23 115:11
121:7 130:24,25
172:14,22
**close** 20:13 21:18
21:19
**closed** 19:6
**clr** 1:25 182:3
**cme** 27:12
**cognitive** 110:7
**collaborating**
174:19
**collaboration**
174:22
**collaborative** 142:4
142:21
**collaborators**
142:6
**colleagues** 76:5
**collected** 90:13
**college** 17:14 28:2

29:17 31:21 32:4
32:11 62:8 72:19
115:23
**colon** 110:21
111:23 113:5
**colorectal** 165:10
**columbia** 142:7
**column** 47:19
49:12 56:13 57:19
98:11,11 99:1
142:5 150:13
**com** 2:9,17
**combination** 27:22
40:9 49:24 50:4
50:16,16,22 52:7
52:13 53:11 55:10
100:7,10,12
103:21 104:4,24
106:2 136:8,21
149:1 154:15,21
154:25
**combined** 128:22
131:12
**come** 21:15 24:5,15
25:18 61:7,12
66:23 67:7 88:14
109:11 175:15
**comfortable** 32:19
33:1
**coming** 84:20
**commander** 18:10
**comment** 151:2
167:17 169:13
176:19,20,22,25
177:10,18,23
178:4
**committees** 30:8
32:10
**common** 122:9
**communicated**
138:13
**communication**
145:20
**commuted** 21:24
26:1
**companies** 29:21
30:1,25 32:20

72:8 73:9 74:8,11
88:15,18,25 120:8
120:17 142:15
155:14
**company** 33:2,13
74:4 75:24 109:12
144:12 177:14
**compared** 136:22
**compensation**
145:12,15
**complete** 27:17
56:25 61:18
119:15 121:24,24
121:25 127:3
172:1
**completely** 162:7
164:3
**completeness** 127:4
127:15
**compliance** 129:25
**concern** 155:20
**concerned** 6:20
**concerning** 80:22
82:2 142:16 182:8
**concluded** 128:8
180:14
**concludes** 180:9
**conclusion** 164:7
**conclusions** 128:18
128:19
**condition** 35:24
36:2
**conditions** 111:8
111:13,19
**conducted** 166:1
**conference** 38:17
**conferences** 63:10
**confidentiality**
7:15
**configuration**
43:12
**confirmed** 9:22
**conflicting** 156:7
**confusing** 103:5
104:9 156:6
**conjugated** 40:4,10
131:12

**connecticut** 1:2,21
5:9,12 6:12 13:22
17:19 18:15 19:1
19:10 21:21 26:12
28:18 182:4
**connolly** 2:13 5:20
**cons** 42:8,12 82:20
**consent** 14:6
**consequences**
113:13
**consider** 30:23
34:21 35:6,10
63:14 65:20 66:2
118:7
**considerable** 125:5
**consideration**
56:22 57:3 63:5
117:14 163:25
**considered** 17:23
30:15,18 66:25
67:9 133:5,21
143:6
**considering** 162:4
166:22
**consistent** 46:13
78:20 79:11,20,23
109:22 114:5,15
126:1,10 131:23
151:5,24 157:1
158:11,23
**consisting** 180:11
**consultant** 20:9,25
**consultation** 4:2
92:23
**consulted** 11:25
**consulting** 13:14
**contain** 177:8
**contained** 120:18
**contains** 39:23
50:15
**context** 143:7
166:4
**continue** 61:22,25
61:25 64:2,13
83:20 84:10
**continued** 20:3
25:4 44:17 45:7

64:18 139:3
**continues** 111:11
**continuing** 27:11
63:9 102:22
**continuous** 106:5,5
106:7
**contraindicated**
66:19 69:8,14
141:3,4
**contraindications**
153:22
**contributors** 142:3
**control** 42:15,22,24
42:25 43:9,11
**conversation** 69:4
**copies** 147:12,17
**copy** 4:9,22 8:21
77:3 169:16 173:9
**corner** 47:12 98:23
**coronary** 165:2
**corra302000066**
4:18
**correct** 6:22 7:18
9:23,24 10:14,17
10:20,24 11:1
12:22 13:7,9 15:5
16:14,19 22:2,4
25:9,14 26:19,20
27:13 30:12,13,25
32:7 33:18,19,25
37:3,7 38:4,6
39:15,17,21,25
40:3 42:4,17 47:3
47:5 48:6,14,16
48:19 49:6 50:14
51:3,5,6,17 52:8
53:15 56:16,19
57:5 59:8 60:20
62:3 63:11,25
64:3 65:14 66:21
67:12 70:20 71:15
74:12 75:16 85:25
86:20 88:10,11
89:7,8,14 97:15
97:16 98:1,20,21
104:7 110:25
111:1,24 116:13

118:20 119:10,11
119:22 132:8
134:3 137:16,18
146:16,21 147:11
149:8 151:21
155:5,6 158:13
159:5 161:5 169:6
169:9 170:6,11,12
170:15,20,24
171:5 173:11
174:3 175:7,17
**corrections** 181:15
**correctly** 52:3
106:9
**correspondence**
9:16
**couldnt** 75:14
**counsel** 5:15 9:13
14:16 127:14
182:14
**counseling** 14:5
116:15
**counting** 161:15
**country** 22:14
**couple** 47:16 85:23
157:17 171:9
**course** 64:12 86:8
87:17 120:6
**courses** 27:19,21
**court** 1:1 5:11,24
7:23
**coverage** 24:21
**cream** 134:11,22
**creams** 134:1,6,16
**create** 175:15
**credits** 27:12
**cross** 84:18
**current** 6:11 29:11
125:3,6 142:16
**currently** 14:8
**curriculum** 9:10
**cv** 17:8
**cycle** 122:21,23,25
**cyclic** 106:7
**cycling** 122:22
**cytology** 3:23 90:21

## D

**daily** 12:3 86:16
**dangers** 126:18,25
**data** 29:15,16
31:22 54:1,4
55:15 61:4 65:24
67:11 77:17 80:21
81:13,20 90:25,25
105:11 110:3
119:16 121:25
125:10 128:12
136:18 142:21
151:25 156:7,9,11
156:23 160:2
167:1 172:14,15
**date** 5:6 12:11,12
24:8 44:13 90:13
125:21 131:21
181:3
**dated** 77:1 94:6
130:15 142:24
**day** 14:21,24 120:9
181:20 182:5,18
**days** 24:16 26:2
**dc** 2:15
**dear** 4:19 120:2,3
124:25 177:2
**death** 97:11 165:3
165:11
**decades** 166:5
**december** 20:19
21:3,4
**decided** 25:23
**deciding** 20:12
73:15 75:1 140:5
**decision** 53:23 63:6
63:19,20 65:6
66:4 88:2 116:22
118:8 179:11,22
**decisions** 62:18
76:2 169:19 170:9
170:14
**decrease** 114:12
122:10
**deep** 131:9
**defendants** 1:11

2:11
**deficiency** 113:13
**deficient** 118:24
   119:1,13,21
**definite** 53:4
**degeneration** 113:5
**demand** 127:5
**dementia** 113:7
**department** 18:10
   19:19 20:11,13,21
   20:23 22:16 23:5
   23:6,25 24:3 34:6
   171:18
**depend** 35:20
   36:17 56:8 65:23
   67:3,10
**depended** 20:17
   31:1
**dependent** 36:8
   63:17 134:17
**depending** 65:8
   160:5
**depends** 41:19
   94:15
**deponent** 5:14
**deposition** 1:14
   3:13 5:8 7:10,11
   7:13,17 8:22
   11:12 71:23 72:4
   89:17,18 146:3,9
   180:10,13 181:1
   181:15
**depositions** 7:21
**describe** 31:15
**described** 48:3
   112:24 119:7
**describes** 167:3
**description** 3:10
**design** 33:8,15
   163:7
**designed** 40:16
   49:15 58:17,23
   166:13
**desire** 86:3
**desk** 15:22 45:16
   96:13
**despite** 166:5

**destroyed** 10:21
   12:8,25 14:1
**detail** 123:1 169:7
**detected** 104:23,25
   106:3
**determination** 56:5
   63:14 66:1
**determine** 55:7
   61:20 69:19 71:17
**determined** 55:19
   83:6
**develop** 71:1
**developed** 58:2
   61:8 62:25
**developing** 106:18
   107:8
**diagnosed** 38:22
   46:5,12 69:6
   107:15 121:17,20
   137:7 141:15
   143:1,12 148:19
   149:19
**diagnosis** 90:16
**didnt** 24:1 76:12
   81:15 82:5 86:18
   139:2 144:15
   145:1 148:3 153:3
   156:1,13 160:23
   161:8,12,20
   171:24,25 172:1
   175:15,15
**died** 25:2
**difference** 99:21
   139:12
**differences** 105:25
**different** 35:23
   36:1,23 47:16
   88:16 98:10 106:1
   137:1 147:17
   171:9 173:13,14
**dinner** 115:15
**direct** 6:4
**direction** 135:23
   182:10
**director** 19:18,19
**disappeared** 143:5
**discontinue** 140:24

**discontinued** 92:16
   173:19
**discovery** 3:12
   109:4
**discuss** 54:18 55:22
   100:11 116:4
**discussed** 53:18,22
   72:22 88:5 116:7
   135:14
**discussing** 100:9
   140:17
**discussion** 130:10
   146:14
**disease** 110:19
   111:23 113:4,5
   114:11,23 131:1
   131:25 132:5,16
   165:2
**disorders** 56:11
   57:4
**dispensing** 97:24
**dispute** 60:3 67:16
**distribute** 72:8
**distributes** 177:15
**district** 1:1,2 5:11
   5:12 29:7,8 31:23
**disturbances**
   112:20
**disturbing** 36:20
**doctor** 4:19 6:6
   8:20 9:20 13:12
   17:7 38:16 45:14
   47:10 60:12 72:7
   76:15 77:2 84:8
   89:16 90:7 91:18
   96:11 97:14 98:10
   102:9 120:2,3
   124:25 130:14
   141:24 142:14
   143:24 146:1,24
   147:10,17,18
   148:10 151:1
   155:9 163:11
   172:23 173:15
   174:5 177:2
**doctors** 75:11
   155:15

**document** 4:6,12
   4:15,17 10:9
   15:22 78:3 90:11
   93:5 94:4,12
   95:22 109:2
   112:17 123:22
   124:12 125:22
   127:3,6,20 142:20
   157:14 177:9
**documents** 9:14
   15:6,9,12,14
   16:20 123:19,24
   124:19
**doesnt** 69:12,14,19
   94:17 100:21
   122:12 127:16
   147:25 154:10
   166:20 174:25
   175:6 177:8
**doing** 12:5 33:11
   124:16
**dollars** 145:16
**dominican** 12:6
   26:9
**donations** 29:20
**dont** 8:10 9:10,22
   12:12,17 13:15
   14:8,11 15:19,25
   16:2 17:7 21:15
   23:13 24:8 28:6
   30:19 32:18,23
   33:6,14 34:4
   36:15 37:8,10,10
   37:14 38:11 41:8
   44:14,25 46:6,16
   47:1 50:19 53:7
   65:12 68:13,15,17
   68:20,22 69:7,18
   70:25 71:3,16,20
   75:12 76:13,14
   78:24 80:13,17,25
   81:12,19 84:6,8
   85:5 89:5 91:21
   92:6,24 94:16,24
   96:6,23 98:8,21
   101:3 103:11
   106:11 110:5,18

110:22 112:12
   114:19 115:17,18
   115:25 116:24
   118:14 125:23
   126:5,6 127:7
   132:7,22 134:7
   135:21 138:17
   141:18 146:25
   147:14 155:3,14
   162:6,14 163:13
   167:1 170:22
   171:25 175:3,18
   176:6,7 177:10
   178:2,8,14 179:2
   179:8
**dosage** 43:13
   154:25
**dose** 43:7,10 60:14
   67:15,22 68:2,11
   68:12,13,16,25
**doses** 42:18 51:22
   51:23 58:5 99:12
   99:13 101:2,9,11
   101:12 153:14,17
   153:18 154:3,3,11
**double** 170:12
**doubleedged** 104:8
**doubt** 90:1 92:19
   93:16 94:11,16,23
   95:1,23 96:4
   176:5
**dover** 18:9
**downplay** 59:23
**dr** 5:22 6:18 84:20
   91:22,23,25 92:1
   92:5,23 93:8
   140:22 171:18
   172:8 173:12,23
   175:21
**draw** 164:18
**dropped** 55:8
**drug** 42:2 50:11
   59:20 88:3,17,24
   97:1 114:20 116:5
   116:16,19 117:1
   117:10 118:6,10
   118:16 119:17

120:17 142:15
144:12
**drugs** 50:22 86:20
86:23,23 87:14,18
87:20,21,23 88:7
88:16 104:4 107:3
140:6 142:17
**dryness** 113:17
134:10
**due** 165:11
**duly** 6:2 182:6
**duration** 101:18
136:13 143:3,14
148:21
**duties** 31:16
**dx430004** 47:12

**E**

**earlier** 53:22 83:5
108:15 112:24
119:7 136:20
137:2,11,15,15
146:14 152:18
157:24 177:21
178:5
**earliest** 111:5
**early** 128:2 129:3
178:20
**east** 6:12
**easy** 14:2 124:17
**education** 17:9,12
27:11 33:21 63:9
**educational** 9:11
14:5 31:19 63:11
**effect** 40:20 51:10
52:10 103:19
117:14,18 143:3
154:7,13
**effective** 60:14
**effects** 58:6 111:6
111:16 117:20,24
118:4 139:4
160:19 161:21
**eight** 29:8
**either** 20:13 61:8
91:2 98:8 164:4
172:22

**elevated** 122:24
**eleven** 125:9 126:9
**emboli** 131:9
**embolism** 165:10
**employ** 74:9
**employed** 182:12
182:15
**employee** 182:14
**ended** 11:24
**endometrial** 40:17
51:5 98:6,12,14
153:4 165:10
**endometrium**
54:13
**england** 16:9 28:3
29:7,8
**entire** 27:7 177:9
**entitled** 47:19
76:24
**entity** 94:1,21
**enzyme** 54:21
**epidemiologic**
151:15
**epidemiological**
142:22 163:5
**equation** 166:23
**equine** 40:4,10
**errata** 181:5
**especially** 51:24
58:4 92:22 99:14
101:13 153:19
**esq** 2:4,12,19
**essentially** 31:18
78:10
**estimate** 28:22
**estimated** 78:6,7
**estrace** 41:12
**estrogen** 3:19
35:14 37:17,23
38:4 39:23 40:4,5
40:6,10,14,17
42:16 43:6 50:9
50:17 51:21 52:1
52:6,13,21 53:11
55:12 58:10 68:1
68:9 76:24 82:3
99:11,15,18,22,24

100:3,4,5,18,22
101:17 102:25
103:22 105:24
106:20 107:14,16
107:19,25 111:5,7
114:20 122:10,12
128:22 129:13
135:19,20 136:5,8
136:9,21,22 137:8
137:11 139:18
153:14,16 154:2
154:16
**estrogenonly** 39:17
114:20 137:12
**estrogens** 40:21
57:25 58:3 98:15
131:12
**et** 5:10,10
**evaluate** 63:16
160:19,23 162:11
162:21 166:11
**evaluation** 115:11
140:21
**everybody** 36:1
43:18
**evidence** 166:6
**evolve** 64:16
**evolves** 64:2,17
**exact** 12:12 24:8
28:21
**exactly** 14:2 44:13
109:20 115:18
153:16
**exam** 56:23 61:19
65:24 67:11
**examination** 3:2
6:4 54:8,9 57:1
61:4 84:18 119:16
121:25 148:8
180:3 182:9
**examined** 6:2
**example** 36:18
39:16,19 117:16
134:22
**exceed** 105:4
**exceeded** 128:21
161:14 165:18

**excerpt** 3:16 4:11
177:2
**excess** 51:24 99:14
101:4,13 103:9
136:12 153:19
**excuse** 100:10
162:2 167:10,22
**executed** 181:20
**exhibit** 3:11,14,16
3:18,22,23 4:1,4,6
4:9,11,12,15,17
4:19,21,22 8:17
8:21 9:6,21 10:3,7
45:11,15,16 76:19
76:20 79:1 84:23
85:1,2 90:4,8
91:15,19 93:1,4
93:19,23 95:6,10
96:8,12 97:14
108:23 109:3
112:2,6 113:22
114:1 124:4
128:16 130:6
135:8 141:20,24
148:12,13 150:8
152:10 157:11
159:17 160:12
162:17,19 164:13
164:16 167:25
168:19 169:14,24
171:12,13 173:5,8
175:8 176:23
177:1
**exhibits** 3:9 84:22
168:16
**exist** 161:9
**existence** 13:11
**expect** 108:3
**expected** 105:5,8
**experience** 33:7
35:17 36:12 43:20
62:13,16 81:1
123:13
**experiencing** 36:19
134:9
**expertise** 32:14
163:6

**explain** 123:1
**explains** 166:5
**explore** 111:11
**exposed** 37:16,22
**exposure** 117:10
**expressed** 34:23
**external** 141:11
**extremely** 125:11
**eyes** 56:24

**F**

**fact** 6:18 30:2 41:3
46:3,10 55:6
67:13 69:13 86:6
**factor** 70:10 149:20
**factors** 142:4
**fair** 22:22 32:18
33:14 36:4 39:5
42:13 48:24 52:18
66:17 68:22 69:20
76:5 161:25 162:2
**familiar** 24:19
41:16,21 45:19
75:8 94:1,21
118:23,25 120:4
129:16,20,22,24
130:3 165:25
**far** 6:19 9:3 42:7
100:8 126:7 157:7
**farther** 150:3
**fda** 48:22 59:23
130:16
**federal** 97:23
**feel** 32:18 33:1,14
34:11
**femhrt** 41:14,16,21
**feminine** 41:18
**fifth** 104:19
**file** 13:2 125:10
**fill** 25:19
**financially** 182:15
**find** 12:20 173:8
**findings** 136:12
143:6,11 149:17
149:18
**fine** 124:15 127:13
127:17 138:18

148:6
**finish** 8:5,6 34:12
  138:5
**finished** 18:6
**firm** 144:13
**first** 6:2 7:22 9:25
  14:23 33:25 50:2
  50:23 51:4,18
  52:6 77:14 85:1
  87:21 92:11,12
  93:10 96:17 98:9
  98:11,14 99:8
  100:8,9,11,16
  101:8 104:15
  111:2 125:3
  128:18,19 132:20
  134:1 142:19
  145:1 150:21
  153:13,20 154:1
  160:18 164:22,23
**firsthand** 175:18
**five** 4:12 71:21
  92:15 93:12 94:9
  104:22 120:24
  121:2,9,15 123:17
  125:17 131:11
  136:14 143:6
  149:24 173:19
**flash** 4:14
**flashes** 34:22 35:9
  36:19 37:5,13
  38:9 48:4 111:4
  122:8,11
**flushes** 112:20
**follicle** 54:21 55:11
  122:23
**follow** 159:22
  174:14 176:13,14
**followed** 54:15
  72:19 82:12,15
  84:14 115:10
  174:8
**follows** 6:3 176:13
**followup** 61:7
  128:23 136:3
  146:1 148:10
**font** 124:22

**food** 59:20
**force** 18:9,9,14
**foregoing** 181:14
**foreign** 145:10
**forget** 54:15
**form** 89:2,13,24
  91:12 94:13,25
  96:1 97:6 99:17
  100:13,23 101:10
  101:20 102:18
  103:4,15 104:16
  105:10,19 106:21
  107:4,10,21 108:6
  110:9 111:25
  114:8,25 123:21
  124:2,20 125:19
  126:12 128:10
  129:4 132:10
  134:19 135:4,12
  135:16 137:3,17
  137:23 138:20
  139:8 147:13,22
**formed** 32:11
**forming** 60:25
**forms** 14:6
**forwarded** 146:23
  147:9,18
**found** 88:13 91:2
  129:9 167:8,12
**foundation** 91:13
  94:14
**four** 35:1
**fourth** 104:5
**fra000219** 4:3
**fra000352** 4:10
**fra000432** 4:5
**fracture** 165:11
**fractures** 114:11
**francis** 19:8,16,17
  21:22 28:24 44:10
  172:6
**frankly** 46:25
  96:23
**fraser** 1:5,6 5:10,18
  9:9,14 12:9,16
  13:6 19:22 21:12
  40:25 45:21 46:8

46:24 53:14 61:1
  63:21,23 65:12
  66:14 67:14 69:5
  86:3 89:17 92:4
  94:23 95:25 110:1
  110:13 114:17
  120:22 134:6
  137:22 138:9,13
  138:17,19 139:16
  140:9,18 141:14
  146:15 169:19
  170:20 179:11
  180:5 181:2
**frasers** 10:23 11:16
  90:2 121:13
**free** 48:17
**friend** 5:22 12:1
  16:25 24:13
  112:11
**front** 91:18 109:15
  109:21
**fsh** 55:7 119:8,12
**full** 127:20 159:21
  162:14 166:25
**fulltime** 25:4
**fully** 37:11 81:12
**function** 38:1,3
**functioning** 110:8
  122:2
**funded** 29:20
**funds** 29:24
**further** 84:2
  145:24 179:25
  182:11
**furthermore**
  125:11

-----

**G**

**gather** 80:20
**general** 22:23 54:8
  79:19 84:10 105:5
  105:9 123:3
**generalized** 134:25
**generally** 45:19
  73:8 84:9 96:21
  122:14 139:13
  170:18

**generic** 41:7,8
**getting** 135:23
  143:24
**gibbons** 171:18
  172:8
**gift** 75:18
**give** 7:24 8:5,7
  11:12 12:11 41:7
  53:4 68:7 80:7
  89:5 91:8 122:4
  122:25 159:18
  160:1
**given** 29:14 30:9
  66:9 68:4,18
  108:4 139:1
  165:24
**giving** 61:24
  114:23
**global** 165:7
**go** 7:20 9:25 11:10
  15:12 17:13 18:7
  18:12 35:4 49:25
  53:3 77:11 80:5
  81:4 82:15 102:21
  109:13 115:24
  119:15,19 121:24
  135:24 139:2,3
  140:18 142:2
  148:3 150:6
  162:19 164:12,17
  168:17,17 171:7
  173:3
**going** 6:15,16 11:8
  14:3 17:8 28:20
  41:10 45:14 47:10
  47:14 71:24
  103:18 108:20
  115:12,19 124:17
  127:25 130:8
  135:7 146:4
  157:10 167:17,25
  174:10,11,16,18
**golkow** 5:5
**good** 6:6,7
**graduated** 17:14
**grants** 30:2,24
**graphic** 114:5

**greater** 135:20
  136:20
**green** 27:25 28:10
  62:9 73:18
**greenwich** 17:18,19
**ground** 7:20 11:11
**group** 106:4,4,6,8
  125:8 142:4 144:3
**growing** 38:25
**guess** 57:2 68:24
  92:23
**guidelines** 72:18
**guy** 144:7
**gyn** 3:23 18:10
  22:13 23:4 24:1
  25:6 26:17 27:10
  31:21
**gynecological**
  20:10 24:2 28:1
**gynecology** 18:5,16
  18:20 32:4,12
  62:9 72:20 115:23
**gyns** 20:11 29:11

-----

**H**

**habits** 138:12,18
**hadnt** 13:13
**half** 22:18 27:2,2
**halfway** 51:15
  57:19 99:1
**halted** 129:3
**hand** 9:10 10:6
  45:14 169:16
  173:9 182:18
**handed** 85:1 90:7
  93:4,22 95:9
  96:11 109:1 112:5
  113:25 130:14
  141:23
**handing** 8:20 45:17
  76:23 77:1 173:10
  175:4
**handouts** 14:6
**happen** 70:16
**happened** 10:23
  11:3,15 17:25
  25:20

**happens** 64:9
**harm** 97:5
**hartford** 4:1 19:9
  20:3 21:23 87:9
  87:10,13 92:1
  173:16 175:22
**havent** 13:1 44:22
  77:19 162:14
  167:16
**hazard** 78:6,7,10
  78:15,16
**head** 24:9
**headache** 117:16
**heading** 50:23
**health** 3:20 76:16
  76:18 77:6 84:2
  128:21 131:4
**healthy** 76:25 82:4
  128:24 166:7
**heard** 38:7,16
  75:16 179:9,17
**heart** 110:19
  111:23 114:11,23
  115:8 165:2
**held** 5:8
**help** 43:16 110:24
**helped** 24:16
**hereinbefore** 182:6
**hereto** 182:15
**hereunto** 182:17
**high** 58:5 68:2
  101:2,9 125:12
**higher** 42:18 51:22
  57:24 58:9 68:25
  70:17,18 82:24
  83:2 99:12 101:11
  153:14,17 154:3
  154:10 159:6
**highlight** 124:13
**highlighted** 97:18
  124:8,11
**highlighting** 77:3
**highly** 142:11
**hip** 165:11
**history** 54:2 61:18
  65:23 84:3,4,9
  91:4,5 92:21

121:24 122:2
173:22 174:4,7,16
174:18,19,22,24
175:24 176:12,13
176:14
**hold** 13:1 29:4
**home** 144:10
**honestly** 21:1 81:19
  85:5
**honorarium** 76:11
**honorariums** 75:23
**hopkins** 142:7
**hormonal** 41:17,18
  54:6,14 55:14
  61:15 99:25 100:1
  100:1,7 121:12
  142:4 165:22
  166:7 172:16,19
  172:21
**hormonally** 44:16
**hormone** 14:7,12
  27:20 38:23,23
  42:18 43:5,8,11
  43:21 44:23 49:1
  50:17 54:22,23,25
  55:8,11,21,22
  56:18 60:20 62:3
  62:19 65:1,20
  70:6 71:7,13 81:4
  81:7 82:6,10
  90:18,24 92:14
  99:16,22 100:12
  106:2 109:24,25
  110:12,14 112:15
  113:9,13 114:7,23
  115:3,8 118:23
  119:1,9,13,14,20
  119:21 120:21,23
  121:9,14 122:13
  122:24 123:14
  125:4 126:2,18,25
  128:9 129:13
  139:13,15 141:8
  142:20 143:14,22
  149:2 154:22,25
  157:9 161:5 167:9
  167:13 172:10,12

172:25 173:18
175:1 178:11
**hormones** 37:17,23
  42:24 44:24 94:8
  119:6
**hospital** 4:1 17:19
  18:2 19:9 20:20
  21:19,20 22:13,25
  23:11,15,16,19,20
  92:2 173:16
**hospitals** 20:9
**hot** 34:22 35:9
  36:19 37:5,13
  38:9 48:3 111:4
  112:20 122:8,11
**hotel** 16:18
**hours** 27:16
**housatonic** 4:7
  93:24 94:19 95:2
**house** 21:18
**housing** 26:2
**houston** 95:4
**hrt** 110:24 113:14
  125:5,7 143:2,4,8
  148:20 149:24
**husband** 22:14

---

**I**

**iceberg** 112:9,18,19
  168:20,23,25
  169:4
**id** 33:17 34:25
  59:15 89:3 121:24
**idea** 68:25 69:3
  173:15
**identification** 8:18
  10:4 45:12 76:21
  84:24 90:5 91:16
  93:2,20 95:7 96:9
  108:24 112:3
  113:23 124:5
  130:7 141:21
**identify** 5:16
**ill** 8:6,7 94:19
  144:19
**im** 8:20 9:4 11:5,7
  12:19 17:8 24:19

28:21 29:22 30:22
33:6 34:12 37:1
42:23 43:4 45:14
47:10,14 49:19,22
57:2,12 63:25
65:10 66:22 68:24
74:22 76:10,23
77:2,15,19,25
78:12 79:25 81:25
83:20 89:21 96:20
102:9 106:14,15
108:20 116:6
118:14 120:9
124:16 126:19
132:3 133:8
135:22,23,24
137:24 141:19
146:11 152:10
153:23 155:11
156:16 157:10
160:11 163:23
167:16 170:12
173:24 174:2,15
176:2,4,6,16
179:20
**image** 110:2 112:13
**imagine** 11:17
  12:13 81:21 88:14
**immediately** 141:1
  145:8
**important** 43:14
  108:10,11 116:18
  117:2,5,9,14,17
  117:25 118:7,18
  120:18 137:21
  138:3,8 142:15
  143:21
**improper** 163:8
**inaccurate** 91:11
  176:5
**incidence** 105:3,8
**include** 25:15
  55:25 127:16
  174:11 175:23
**included** 11:17
  36:2 54:9 56:23
  61:6 137:14

151:24 165:8
177:20
**includes** 60:19
**including** 26:19
  29:9 54:21 61:3
  64:10 122:1 134:9
  144:12 167:9
**incomplete** 89:10
**incontinence** 113:6
**incorporate** 116:17
**increase** 98:16
  114:10,12 136:4
  143:13
**increased** 51:20
  52:12 53:10,18
  54:24 55:12 56:1
  58:8 79:5 99:9
  103:21 104:4
  107:7 131:5 136:7
  136:9,13 139:18
  143:2 148:19,25
  149:20 150:17
  154:15
**increases** 107:2
  117:11 143:2,13
  148:20
**increasing** 143:3
  148:20
**independent** 30:11
  80:18
**index** 3:1 165:7
**indicate** 54:22,24
  111:15 125:11,20
  129:8
**indicated** 47:23
  48:5,8,16,21
  121:6 122:18
  125:6 163:6
  167:23 168:2,8,13
**indicates** 137:6,10
  174:3
**indicating** 119:13
  122:21 123:25
**indication** 59:4,6
  94:16 106:25
  141:7,9 165:21
**indications** 47:19

47:21 48:25
132:24 133:9
167:22
**indicative** 90:24
112:25
**individual** 36:9,17
53:24 63:18 65:7
69:20 119:4 160:6
172:18
**individually** 10:1
**induction** 50:24
99:5 100:14
152:23
**infarction** 131:5
165:3
**infections** 113:6
**influence** 75:20
76:1 169:7,11,18
**inform** 62:17
119:16
**information** 9:1
29:11 31:25 32:5
32:9 53:14 55:15
55:20 57:7,10,14
58:14 59:5,18
60:4,24 62:1,2
63:16,22 64:7
76:6 78:21 87:24
88:6,7,18,21,25
89:6,7,9,12 91:2,9
95:24 108:5,9,12
109:22 110:20
113:10 114:4,5
116:17 118:10,19
120:19 137:20
138:2,7,13,15,21
139:11,22 140:1
142:16 143:20
149:7,13 151:23
155:7,7,14 157:23
158:19 159:12,15
160:16 178:3
**ingredient** 41:19
**initial** 54:8
**initially** 28:17
173:23
**initiative** 76:16

77:6 131:4
**injury** 97:10
116:23 117:7
**inn** 1:19
**insisted** 122:7
**insomnia** 112:20
**instance** 62:4
119:24 121:8
129:22 134:21
**institution** 20:17
23:9,10,13 30:11
**institutions** 142:9
142:12
**intended** 97:3
**interested** 182:16
**interlaken** 1:19,20
15:3
**internal** 37:22
149:10
**internship** 17:18
**internships** 17:22
17:23
**interpret** 50:20,21
53:1,8 59:13,16
163:14
**interpretation** 53:6
142:25 143:11
148:18
**interval** 65:8 121:1
121:2 122:5,6
**intervention**
105:24
**invasive** 131:7
158:4 165:3
**investigators**
167:12
**involved** 33:9 54:5
86:15 92:10
118:13,15
**involving** 151:16
**ion** 154:19
**island** 13:7,15,18
20:20 21:10,11
22:6,8 23:13
**isnt** 4:13
**issue** 9:18 15:21
36:16

**issues** 36:24
**item** 14:4
**items** 9:21
**ive** 12:5,7 34:12,24
77:3 85:1 90:7
91:18 93:4 96:11
109:19 112:5
113:25 114:18
123:10 130:14,16
141:23 169:1,13

_____

**J**

**jama** 76:25 80:25
**january** 20:19 21:4
22:8,19 85:10,24
144:4
**johns** 142:7
**joseph** 1:5
**journal** 15:17,25
16:3,9,10 27:25
28:1,3,10 62:10
73:18 149:9,10,11
**journals** 27:24
**judgment** 61:1
63:17 75:20 76:2
**july** 77:1,8
**june** 21:2

_____

**K**

**keep** 11:8,21 41:10
124:18
**kentucky** 2:7
**kept** 21:20 26:5
**kern** 91:25 92:1,5
140:22 173:23
175:21 180:5
**kind** 7:13 44:24
54:6 100:1 122:1
122:3 141:11
**knew** 55:18 108:3
**know** 8:13 15:19
16:11 19:24 20:1
20:25 21:1 23:13
34:4,24 36:15,16
41:8 42:7 50:19
65:8 71:3,16,19
75:6,11 88:12

89:21 91:23,25
92:24 93:8 94:16
95:11 96:23
105:11 113:19
116:22 117:2,5,10
118:13,15 123:16
125:23 127:25
128:2,4 130:17
139:23 141:18
144:11 148:7
162:14 167:1
176:6,7 177:10
178:2 180:6
**knowing** 176:9
**knowledge** 35:16
60:1,9 61:5 62:18
63:1 64:1 123:6
167:7 170:19,25
171:25 173:20,25
175:19 176:3,8,11
176:18 182:7
**known** 69:9
**knows** 172:17

_____

**L**

**lab** 172:15
**label** 4:9,21 15:18
45:20 49:16,20
53:7,15 72:21
79:3,12,15 88:13
89:9 97:14 101:23
101:25 102:15
130:15,19 137:15
141:3 150:6 151:5
151:11,24 156:15
156:17 157:7,12
159:15 160:9,10
160:12 167:21
168:1 171:20
177:16,20
**labelling** 43:13
62:2 95:13
**labels** 88:19 89:1
**laboratory** 61:4
65:24 67:11
119:16 121:25
**lack** 54:24 91:12

94:13
**lacking** 119:5
**lakeville** 1:21 5:9
22:3
**lancet** 4:22 142:1
148:14 151:14
157:4
**lane** 23:11
**language** 137:14
**large** 92:11 151:20
151:25
**largely** 143:5
**larger** 107:15
137:7 157:14
**lasts** 122:15
**late** 40:25
**law** 97:23 144:13
**lawsuit** 85:16 86:4
**lead** 111:7
**lean** 107:9 139:17
140:2
**learn** 34:15 64:13
115:20 131:23
132:2
**learning** 34:1,10
**leave** 167:20
**led** 126:18,25
**left** 22:13 23:7,7,17
24:10 44:10 45:1
75:18
**lefthand** 47:12
49:12 142:5
**length** 155:1
**lesion** 141:10
**letter** 3:22 4:4,19
85:3,14,15,19
120:2,3,17 124:23
124:25 126:15,23
177:2
**letters** 120:7,17
171:9
**letting** 89:21
**level** 54:23 55:12
79:19 125:12
158:22 159:3
**levels** 55:8
**library** 149:14

lic 1:25
license 26:14
  182:22
licensed 26:10
life 35:18 36:6,14
  36:20 37:6,18,24
  117:24 118:3
limit 11:20 39:9
  101:1,8
limitation 11:20
  154:19,24
line 113:3,20
  132:21 181:6
lining 40:19 90:22
listed 9:3 49:17,21
  51:4 113:10
literature 9:12
  14:11 15:8,10,16
  15:17 32:1,2,6,10
  60:10 62:6 65:5
  148:25 151:6,15
  177:15 178:6,19
  178:23,24 179:6
  179:19
litigation 9:19
  109:5
little 8:3 17:8 31:15
  33:20 57:19 103:5
  150:3 159:6
lived 95:3
liver 54:21
lives 114:12
living 21:17,18
llp 2:13
local 134:24
location 13:20,21
  13:23
locum 12:1 24:21
  24:22
locums 24:12,19
long 8:24 19:3,11
  34:4 58:3 115:10
  122:15 123:4,12
  170:20 171:2
longer 20:12 29:24
  117:10 122:23
  123:17 125:17

147:6 149:25
  153:15 154:11
longest 123:13
longterm 101:2,9
  111:6,16 113:13
  120:24 123:20,25
  125:17 126:11,17
  126:24 128:8
longwinded 106:10
look 43:13 52:9
  77:13 92:11 94:3
  95:11 125:2
  128:16,17,18
  131:20 142:3,19
  142:25 149:17
  151:3 162:16,19
  162:20 164:13
  166:3,13 171:19
  172:13
looked 137:15
looking 98:10
  109:15,21 114:4
  135:24 152:5
looks 95:13 169:21
  175:21
losing 20:11
loss 110:17 111:6,7
  111:23 113:7
lost 23:4 114:12
lot 116:3 122:7
  134:15
lots 64:9
louisville 2:7
low 35:14
lower 38:13,19
  43:7,10 51:23
  54:23 55:12 79:17
  99:13 101:12
  153:18 154:3
  158:9 159:9
lowest 60:13
lsr 182:2
lunch 115:19
luncheon 115:15

---
**M**

macular 113:4

maggie 5:18
mail 85:13
main 136:3 145:7
  161:4 163:1
  164:19,23
maintain 19:3
maintained 21:25
  25:25 93:13
majority 44:1
  51:25 102:23
  103:12
makeup 129:17,21
making 31:2 63:14
  116:21 170:8,13
malignant 50:24
  99:6 100:14 131:1
  152:24
mammogram
  54:11 122:1
  140:20
man 36:24
manufacture 32:20
  33:3
manufacturing
  32:15
march 10:16
margaret 1:5 5:9
  181:2
mark 108:22
marked 8:18,21
  10:4,6 45:12,15
  47:11 76:19,21
  84:24 85:2 90:5,8
  91:16,19 93:2,20
  93:23 95:7,10
  96:9,12 108:24
  109:2 112:3,6
  113:23 114:1
  124:5 130:7
  141:21,24
market 32:21 33:3
  40:22
marketing 32:15
  72:9 73:2,4,4,8,12
  108:17 109:7,10
  109:22 112:14
mary 23:11

mass 16:9
massachusetts 12:2
  16:9 22:16 23:20
  23:21 24:13 26:3
  26:12 76:17 80:16
material 9:22 73:4
  73:4 74:3 76:3
  109:7,10
materials 9:11,13
  14:5,5 30:23
  72:10 73:2,12
matter 5:9 41:3
matters 182:8
maureen 1:25 2:19
  5:21,24 10:18
  182:2,21
mcmd000011 3:24
md 3:3 5:14 6:1,10
  71:24 72:4 146:4
  146:9 180:10
  181:1,23
mean 15:16 36:23
  50:18,19 59:12
  69:12,14 70:17
  73:3,7 79:17 83:3
  100:1 101:5 105:9
  111:20 119:3
  130:24 155:3
  159:1 167:9
meaning 15:22
  41:17 120:24
  125:17
means 50:5,16
  78:10 172:14
measure 166:20
measured 166:17
measures 164:19
measuring 165:14
media 80:22 81:2
  81:22 128:15
  129:5
medical 7:12 9:8
  12:6 15:17,17,20
  17:9,13,14 18:2
  19:9 26:8,18
  27:11,24 31:25
  32:6 34:2,3,6

35:24 36:2 38:17
  43:19 60:17 62:5
  63:9,17 75:20
  76:2 84:3 87:11
  111:8 145:12
  148:25 149:8
  151:6 170:17
  175:11,14 179:5
medication 55:3
  64:23 65:10 66:5
  66:6 114:21
  115:12 116:8
  119:9,18 121:2
  172:16,19,21
medications 60:13
  64:9,13 65:2 84:3
  156:15
medicine 16:10
  26:11 28:4 64:16
  72:13 149:10
medicines 64:1,8
medroxyprogest...
  40:2,11 106:6,8
  131:13
meet 74:15
meeting 15:7 16:24
  115:22 144:3
meetings 31:19
  115:20
member 28:11 29:1
  29:2,3 31:5,7
  115:24
members 29:16
memory 129:2
  138:16
men 36:2 70:13,17
menarche 37:25
menopausal 25:15
  26:19,22 27:6
  33:23 34:16,21
  35:17 36:5,13
  37:2,13 38:8,14
  38:18 39:4,14
  40:15 42:9 43:16
  43:22 44:5 45:2,6
  62:22 64:20 67:1
  76:25 111:5

112:17,24 123:4
123:14 134:9
160:20,24 161:15
161:21 162:4,11
162:21 165:14,19
165:23 166:21
169:2
**menopause** 4:13
31:8 33:22 34:1
34:15 47:25 89:19
93:11 111:12,17
111:19 113:1,18
122:15,18 123:1
133:16 166:2
**menstrual** 122:1,20
122:23,25
**mentioned** 42:21
83:5 100:20
113:19 145:15
**mentioning** 9:18
**message** 81:22,25
82:2
**met** 74:18 85:22
**metaanalysis**
151:21
**mfrasermtesoro0...**
3:15
**mfrasersfh** 3:24
**michael** 1:14 3:3
5:14 6:1,10 71:24
72:4 146:4,9
180:10 181:1,23
**mid** 22:19
**middle** 47:18 78:5
**miles** 26:4
**mind** 99:21
**mine** 12:2 22:15
78:14 112:11
**minimal** 26:3
103:14 115:7
**minute** 77:21,25
**minutes** 71:21
**misleading** 89:10
127:19,22,22
164:3
**mission** 26:9
**missions** 12:6

**misstating** 164:6
**misunderstood**
178:9
**mmhmm** 7:2,5
33:24 48:23 57:17
73:17,19 108:19
136:11,16 143:9
151:17 154:9
157:6 160:22
162:23
**moderate** 47:23
49:4 53:10,17
55:25 79:11 104:3
133:14 150:23
**moderately** 51:19
52:12 79:4 99:9
103:20 150:17
154:14
**monday** 1:16
**money** 23:6
**month** 20:24 28:2
122:5
**months** 16:11,11
61:8,12,15 85:23
122:20 123:9
144:1
**mood** 112:20
**moore** 2:12 3:4,6
5:19,19 6:5,22,24
8:19 10:5,11 11:2
11:9 12:15 16:4
27:1,5 29:18
30:10,20 32:13,25
35:22 36:10,25
37:21 39:8 42:14
45:13 46:2,20
50:8,12 52:24
53:5,21 56:4
58:21 59:2,11,17
60:2 61:10 62:11
64:25 65:25 67:5
69:23 70:15,21
71:5,11,20 72:6
74:1,7 75:5 76:22
77:10,24 78:4,25
79:14,22 80:9
81:24 82:8,18

83:19 84:5,17
89:2,13,24 91:12
94:13,25 96:1
97:6 99:17 100:13
100:23 101:10,20
101:25 102:3,6,18
103:4,15 104:16
105:10,19 106:21
107:4,10,21 108:6
110:9 111:25
114:8,25 115:9
123:21 124:2,10
124:14,18 125:19
125:21 126:12
127:2,9,12,15,19
128:10 129:4
132:10 134:19
135:4,12,16 137:3
137:17,23 138:20
139:8 145:25
147:13,22 148:9
150:25 151:10
152:4,9,17,25
153:11 155:4,12
155:21 156:5,10
156:25 158:15
159:2 161:3,11
162:8 163:8,10
164:4,8,11 167:5
167:18 178:22
179:4,25
**morning** 6:6,7 17:2
**mortality** 113:8
**mouthful** 40:13
**move** 21:23 22:13
**moved** 13:7 25:24
147:16
**moving** 104:19
105:22
**mpa** 40:1,11 68:18
68:19,25
**myocardial** 131:5
165:2

─────── **N** ───────

**name** 5:4 6:8 23:9
23:12,20 29:23

39:22 41:8 144:5
144:8 145:1,2,10
145:10 148:3
171:20
**named** 182:6
**nams** 31:13
**narrow** 176:17
**nashoba** 23:20,23
44:11,18 45:1
**national** 31:20
**natural** 42:21
**nature** 7:12,14
19:15 23:1
**nebulous** 43:25
**necessary** 87:21
**need** 8:13 66:5 77:2
84:1 87:23 140:1
162:18
**needed** 23:4 31:22
140:9,12
**negate** 103:2
104:14
**negative** 170:12
**neither** 182:11
**neoplasm** 100:14
**neoplasms** 50:24
99:6 131:1 152:24
**nerenstone** 93:8
**neutralize** 103:2
104:14
**never** 26:16 33:9
39:1 41:24 49:10
54:15 62:10 67:7
70:6,23 75:13,16
80:22 81:21 83:23
97:21 114:18
120:25 122:6
129:15 132:1
142:1 149:11
159:13 168:22
169:1,13,15,17
178:15,15
**new** 16:9 17:14
18:2 25:18 28:3
29:7,8 64:7 67:7
95:3 104:22,24
106:2

**news** 80:21 81:2
129:5
**night** 35:6,9 36:19
37:5 112:21
**nineties** 110:6
178:20
**nonfatal** 165:2
**nonleading** 62:15
**normal** 90:21
**normally** 8:4
119:23
**north** 26:4 31:7
**notary** 182:3,21
**note** 4:2 83:12
**noted** 172:20
181:16
**notes** 9:15 75:6,8,9
75:14 83:13
**notice** 3:11 8:22 9:7
**noticed** 83:12
**notices** 13:4
**notify** 12:16,23,24
13:10
**nova** 29:9
**november** 46:11
85:3,14
**number** 8:17,21
10:3,7 13:2 14:4
26:25 27:4,15
45:11,15,16 56:15
67:3 71:23 72:3
76:19,20 79:2,16
83:4 84:23 90:4
91:15 93:1,19
95:6 96:8 98:24
99:5 108:23
111:12 112:2
113:22 121:7
124:4 128:16
130:6 133:1,10
141:20 142:8
146:3,8 148:13
150:8 152:11
157:11 159:17
160:12 162:17,19
163:25 164:13,15
164:16 167:25

168:19 169:15
171:13 173:5
175:9,9 176:24
177:1
**numbers** 47:14,16
71:4 151:3
**nw** 2:14

**O**

**ob** 18:10 20:11
22:13 23:4,6 24:1
25:6 26:17 27:10
29:11 31:21
**object** 83:24 84:1,7
89:2,13,24 91:12
94:13,25 96:1
97:6 99:17 100:13
100:23 101:10,20
102:18 103:4,15
104:16 105:10,19
106:21 107:4,10
107:21 108:6
110:9 111:25
114:8,25 123:21
124:2,10 126:12
127:2 128:10
129:4 132:10
134:19 135:4,12
135:16 137:3,17
137:23 138:20
139:8 147:13,22
**objected** 11:7
**objection** 10:25
11:14 12:10 16:2
26:24 27:3 29:13
30:5,17 32:8,22
35:19 36:7,21
37:19 39:6 42:11
45:25 46:15 50:7
50:10 52:22 53:2
53:19 56:2 58:19
58:24 59:9,14,25
61:2 62:7 64:22
65:22 67:2 69:21
70:12,19 71:2,8
71:18 73:24 74:5
75:3 77:9 78:23

79:13,21 80:3
81:18 82:7,11
83:16 115:9
125:19 127:11,13
127:17 150:24
151:8 152:2,7,16
152:22 153:9
155:2,10,17 156:3
156:8,22 158:14
158:25 161:1,10
162:5 163:3,9
164:2,5,8 166:24
167:15 178:18
179:1,23
**objections** 127:18
**objects** 11:13
**observational**
136:6,17 166:6
**obstetrical** 20:21
**obstetricians** 20:22
23:7 31:23
**obstetrics** 18:5,15
18:19 20:10 24:1
28:1 32:4,12 34:5
62:9 72:20 115:23
**obtained** 42:2
93:24
**obviously** 64:5 85:6
87:22 122:17
167:17 173:11
**occasions** 14:19
**occur** 17:6 106:19
139:5 144:4
**occurred** 29:22
**occurs** 70:22
**oconnor** 1:25 182:2
182:21
**october** 22:24
23:17 142:24
**odd** 145:16
**offer** 145:11
**office** 20:15 24:15
25:8 31:20 95:19
95:21 108:18
109:8 144:1 145:8
145:11,22 171:19
171:22 175:16

**officer** 28:13 182:1
**offlabel** 48:18 49:9
**oh** 7:8 34:3
**okay** 7:9,16,25 8:8
8:11,16 9:20
10:10 13:5,10
14:23 15:10 17:4
17:7,10,11,16
20:24 21:6 23:17
24:10 25:20 32:5
33:23 36:11 37:16
42:1 44:17 45:5
45:18 47:13 54:3
54:17 55:1 57:2
62:22 68:14,22
69:8 73:1,7 77:12
78:5,20 79:9 81:1
82:5 84:16 85:10
85:12 86:2,9
92:19 94:8 96:7
96:17 98:2,18,22
98:24 99:5,8
100:8 102:22
106:12 109:15,21
114:22 118:18
121:3 123:12
124:14,15 125:2
126:7 127:10
129:12 132:2
133:1,14,24 134:5
134:8 139:6
140:11 144:15,21
147:1,7,16,20
150:6 151:4
156:16 157:1,18
157:22 160:8,15
161:18 162:9,22
163:15 164:12
166:20 167:6,19
168:15 170:1,11
170:16,22 171:4
171:24 172:9
173:17 174:13,20
174:23 175:8,10
177:1,19 178:5,9
178:15,23 179:5,9
179:25

**old** 89:10
**once** 28:2
**oncology** 4:2
175:21
**ones** 112:25 113:3
**ophthalmology**
56:23
**ophthalmoscope**
56:25
**opine** 163:4
**opinion** 30:3 31:2
33:2,15 103:1
104:10
**opinions** 32:19
**opportunity** 9:5
**opposed** 42:20
**option** 61:24 65:21
66:9,12,25 67:9
82:22 83:9 84:11
139:2 159:19
**options** 39:2,7,12
43:15,19 67:19
**order** 87:20 155:15
**organic** 119:5
**organize** 23:25
**organized** 24:2
**organizing** 80:15
**osteoporosis** 35:12
35:14 48:9 49:6
110:25 111:24
113:4,19
**osteoporotic**
114:11
**outcome** 165:1,4
**outcomes** 164:19
164:24 165:9
**outline** 103:11
**outweigh** 107:25
128:9 161:24
162:1,25
**outweighed** 56:6
61:21 83:8 162:3
163:22 167:13
**outweighing**
166:16
**ovaries** 38:2
**ovary** 38:1

**overall** 105:3 128:8
128:21 158:3
161:13 165:17
167:8,13,14
**ovulation** 122:21

**P**

**pad** 75:18
**page** 3:2,10 4:6,12
47:11,14,15,16,17
49:11,11 56:13
57:11,13 77:14
90:15 92:12 93:10
94:3 95:11 97:14
97:15 98:22,24
106:11 109:2,15
109:22 127:4,9
128:19 131:20
132:23 133:11
135:24 142:2,19
150:12 157:19
160:8,13 164:21
164:22,23 172:10
177:6 181:6
**pages** 157:14
**paid** 115:20
**pap** 54:9 90:12
91:1,8,9 171:15
171:20 172:7,18
172:23
**paragraph** 51:9
52:6,10,19 78:5
92:12 100:20
101:3 102:22
125:3 126:1,19
131:3 135:25
153:13,21 154:1,6
154:20 158:1
160:18
**paragraphs** 51:7
153:13
**parameters** 115:10
159:22
**parenthesis** 130:23
**part** 24:7 29:20
35:7 51:18 54:17
57:4 63:10 86:10

86:14
**partially** 73:5,6
**participants**
  129:17,18,21,25
**particular** 17:21
  18:4 36:8 37:15
  50:11 52:7 54:25
  56:7 63:6 65:10
  73:11,11 80:23
  81:20 83:7 112:12
  116:17 117:11,13
  119:4,17 129:16
  149:9,11 156:15
  165:22 172:3,18
**particulars** 119:17
**parties** 182:13,15
**pass** 88:7 89:6,11
  140:1
**passed** 108:13
**patch** 41:9
**pathologist** 172:17
**patient** 12:18 20:2
  21:14 38:12,21
  46:18 54:18 56:7
  56:8,8 57:10,14
  58:18,23 59:1,19
  60:24 61:5,7,12
  61:23,24 63:6
  73:16 82:12,16
  83:7,10 91:5,6
  92:14 93:11 107:3
  115:11 116:18
  119:17 121:8
  134:17,18 159:18
  173:17,23 174:4
**patients** 12:24
  19:20 21:7 23:8
  25:12,13,16,17,18
  26:7,21 36:11
  44:8,24,25 45:2,7
  54:5 55:18 57:15
  62:13,17,22 63:2
  63:18,24 64:3,20
  64:21 67:24 69:25
  70:2 72:17 80:12
  81:4 84:11 86:15
  87:25 88:2,8 89:7

89:12 108:13
  116:5,7,11,16
  117:6,11 125:18
  140:2,3 146:21
**paula** 2:4 5:17 6:14
  85:5 137:24
**pause** 146:6
**paync201001154**
  4:16
**pbliss** 2:9
**pdr** 3:16 4:11 15:13
  15:21,22,24 16:6
  57:8 73:16 78:21
  88:10,13
**pen** 75:18
**pending** 5:11
**people** 105:15
  116:22 117:2
**percent** 37:8 44:3
  44:20 46:17 70:13
  128:3
**percentage** 26:21
  159:1
**perform** 116:12
  118:11 140:6
**period** 12:13 25:7
  27:7 60:14 122:19
  125:5
**periodically** 25:21
**periods** 51:23 58:4
  58:6 99:13 101:12
  122:7 153:18
  154:4,11
**permanent** 21:20
  21:25
**person** 8:2 14:24
  15:1 16:15,17
  23:25 35:21 123:6
  144:2 145:7
  174:10 182:6
**personal** 7:14
  170:19,25 171:25
  173:20 176:7,18
**pertain** 49:23 50:4
  50:5
**pharmaceutical**
  29:21 30:1,24

32:16,20 33:2,13
  72:8 73:9 74:3,8
  74:15,25 75:9,17
  75:24 87:14 88:15
  109:11 120:7
  177:14
**pharmaceuticals**
  1:10
**pharmacology**
  130:25
**pharmacy** 42:6
**phone** 16:16
  144:10
**phrase** 155:13
**physical** 54:8 56:25
  61:3 65:24 67:11
  119:15 121:25
**physician** 15:22
  19:7 24:20 45:16
  48:17,19 57:8
  59:19 79:3 87:4,5
  87:6 92:24 174:15
  174:16,17 175:20
  175:23
**physicians** 27:18
  39:3,12 96:13
  155:19 171:10
  174:18 176:9
**pick** 149:15
**picking** 80:20
**picture** 34:25
  112:11 168:23,25
  169:3 170:3
**pieces** 108:17
**pile** 147:4
**pill** 43:9,11
**pills** 42:15,22,25
**place** 49:16,20
  122:22
**placebo** 105:25
  106:4 131:14
**placed** 91:6,18
**plain** 89:11
**plaintiff** 19:23
  157:8
**plaintiffs** 1:7 2:3
  5:18 6:19 14:15

**plc** 2:5
**please** 5:15 6:8
  47:10 157:19
  164:9
**plus** 3:19 50:9,17
  76:24 100:4,6,22
  106:5,7 107:14,17
  107:19,25 128:22
  135:19 136:5
  137:8,12 139:19
  165:9
**point** 7:6 20:8
  21:15 23:1 25:4
  25:22 28:14 45:5
  80:15 135:22
  146:22 147:16
  176:17 178:7,10
**pollard** 1:25 5:24
  182:2,21
**population** 105:5,9
**portion** 125:16
**position** 13:14
  19:12,13 20:5,7
  20:25 22:11 23:18
  23:18,23 24:11,11
  24:21 28:25 29:5
  44:11
**positions** 29:4
**possession** 14:6,13
**possessions** 9:13
**possible** 12:20
  43:15 58:9 80:1
  96:25 139:6
  146:22 178:6,21
  179:6
**possibly** 39:15
  44:20,21 45:8,10
  46:1,16,18 49:2
  52:23,25 59:10,12
  59:15 64:6 67:21
  79:16,24,25 81:6
  81:12 83:11 97:2
  97:12,22 104:17
  105:16 106:22
  113:15 115:5,22
  139:5,9 147:19
  149:3 151:9 160:7

**postmenopausal**
  3:21 82:4 105:23
  128:24 131:10
  166:8
**potential** 83:8
  115:8 116:23
  118:3 165:19
  168:6
**potentially** 111:7
**practice** 11:19,23
  11:24 17:10 18:7
  18:14,15,25 19:4
  19:5,7,15,21
  20:12 21:8 23:2
  24:6 26:11,22
  28:6 60:13,15,16
  61:11 64:15 67:20
  74:15,18 75:11
  80:15 84:13 86:10
  86:14,15,19,24
  87:17 119:8 120:6
  120:11,12 121:10
  121:21 134:16
  138:11 142:14
  159:21 173:14
**practices** 31:24
**practicing** 25:6,8
  29:12 39:11 72:13
  87:5,6
**practitioner** 86:11
**practitioners** 149:8
**preliminary** 77:7
**premarin** 39:16
  40:7 104:22,25
  106:1,4,5,7,13
  160:20
**premphase** 104:21
**prempro** 4:21
  39:22 40:9 42:1,6
  44:4,7 45:7,20,21
  46:4,11 47:22
  48:12 50:13,15
  53:13 57:16 59:8
  61:1 63:20 64:19
  65:14 66:3,11,11
  66:25 67:9,15
  69:8 70:7,23,25

73:2,10 75:1 83:8
83:15 84:11 89:20
89:23 93:13 94:9
95:25 96:14 97:14
97:23 104:21
105:15 125:13
130:15 131:24
132:3,3,13,17,20
134:11,22 137:22
138:9,19 140:14
140:18,24 141:6
159:13,19 160:4
160:11,20 170:20
172:11,25 175:1
**prepared** 173:6,11
**prepares** 88:12
**prescribe** 44:7,17
45:7 48:18,25
49:8 53:23 60:13
63:20 64:18 66:3
66:5 73:15 75:1
83:21 87:20 116:9
119:21 120:23
121:1 134:21
159:13 160:4
**prescribed** 40:14
43:2 44:15 45:20
46:4,11 48:12
53:13 69:1 83:23
87:18 89:20 95:24
134:1,6,13 139:13
167:21,22 168:2,7
168:13 171:2
**prescribing** 44:15
44:23 55:9 61:1
65:6,9,14 66:11
72:16 82:6,10
109:25 110:12
116:5,21 118:7
120:21 133:2,18
134:15 137:21
138:3,8,19 139:15
143:22 168:10,12
169:8,19 170:8,14
179:11,15,22
**prescription** 42:1,3
82:25 95:14,15,17

97:24 160:1
**presence** 97:4
111:16
**present** 2:19 5:15
16:23
**presented** 60:11
115:20
**pretty** 31:4 68:2
**prevent** 113:14
114:23
**preventative** 114:7
**prevented** 132:16
**prevention** 48:8
131:24 132:4,11
**previous** 22:15
62:12,16,20 103:2
175:24 176:14
**primary** 165:1,4,9
**printed** 124:23
**prior** 115:11
121:11 132:19
133:6,24,24
**private** 18:7,15,25
19:5,21 26:22
28:5
**probably** 8:25 13:9
20:18 24:3,8,25
44:9,11 65:11
80:14 90:22 95:14
122:8 126:5 139:1
171:21 173:16,22
180:7
**problems** 56:12
110:15,24 111:22
111:24 129:10
**procedure** 17:3,5
**proceed** 6:14
**produce** 88:15
**produced** 30:7,8
38:4 109:4 124:19
124:20 125:24
**product** 39:17,23
40:25 41:20,21
49:17,21,24 50:4
50:16 53:24 54:19
62:2 73:15 123:25
139:7 161:25

163:2 164:1 168:3
168:7 171:2
**production** 119:6
**products** 32:16,21
133:4,20
**progesterone** 37:17
68:5,8 82:3
100:19 114:21
**progestin** 3:20
37:23 38:5 39:20
39:23 40:1,16
42:16 43:6 50:9
50:17 52:13,21
53:11 58:6 68:1
76:25 100:4,6,22
103:22 105:24
106:20 107:14,17
107:20,25 128:23
135:19 136:6,8,21
137:8,12 139:19
154:16
**progestins** 40:22
52:11 103:19
104:2 154:7,14
**program** 19:18
33:13 34:18,19
**prohibits** 97:23
**projects** 26:9
**prolonged** 51:23
99:13 101:4,12
121:6 122:6
153:18 154:3
**prometrium** 41:23
83:14
**promotional** 72:9
74:3 177:15
**proper** 118:11
**properly** 141:12
**pros** 42:8,12 82:20
**protect** 40:16
**protection** 140:9
140:12
**protocol** 31:3 63:24
68:7 82:12,14
84:14
**protocols** 72:18
**provera** 39:19

**provide** 87:24
104:10 113:9
**provided** 9:13
90:25 95:24 115:4
158:18
**provides** 29:10
77:17
**providing** 76:6
**public** 80:22 81:22
81:23 128:11
182:3,21
**publication** 30:15
**publications** 9:17
28:8 30:4,6 31:12
**publicity** 81:3
**publicly** 149:13
**publish** 30:14 72:8
**published** 62:5
148:24 178:24
179:5
**publishing** 86:23
**pull** 34:25
**pulled** 30:1 130:16
**pulmonary** 131:9
165:9
**purpose** 165:22
**put** 6:18 13:1 27:22
54:10,14 55:3,13
88:18,20,25
119:14 145:25
155:14,18 172:15
**putting** 119:9

**Q**

**qualified** 33:6,15
151:2
**quality** 35:18 36:6
36:14 37:6
**quarter** 125:8
**quebec** 29:9
**question** 8:7 11:12
11:15 30:19,21
34:13 35:13 46:9
69:17 71:9 74:22
78:2 79:9 84:10
101:7 102:11
106:16 109:6

112:23 113:18
116:25 126:21
146:12 147:25
157:10 161:19
162:10,20 164:10
166:10 167:3
178:24
**questioning** 17:5
**questions** 84:2,21
85:11 102:10
108:16 128:1
148:11 163:16
168:16 170:17
180:1
**quickly** 14:4
168:17 173:4
175:8
**quoting** 9:17

**R**

**radiation** 4:1
**radiological** 4:8
93:25 94:20
**radiologist** 141:10
**range** 12:14 21:5
24:5 44:14,19
**rarely** 74:17,18
119:25
**rate** 58:3 70:18
129:25
**ratio** 78:16,17
**ratios** 78:6,8,10
**reabsorption**
113:20
**reaction** 80:12
**read** 27:23 28:9
52:3 77:19,22,23
78:1 80:23 81:21
100:17 102:14
106:9,24 107:1,9
111:2 120:12,16
124:13 126:16
129:7,15 137:2
138:16 139:11
142:1 149:8,11,12
149:16 153:3,15
162:14 167:7,16

181:14
**reading** 28:7 49:22
  102:8 126:19
  133:8 166:25
  173:21 174:1,2
**reads** 99:8 131:3
  172:17
**really** 12:11 21:1
  26:25 27:4 28:5,6
  34:7,25 37:10
  53:3 73:3 76:13
  78:12 80:13 81:19
  91:21 105:18
  123:16 124:9
  126:6 147:25
  151:2 163:13,24
  169:25
**reanalysis** 142:21
**reason** 59:22 60:3,6
  67:16 90:1 91:10
  92:19 93:16 94:11
  94:23 95:1,23
  126:17,24 128:4
  161:4 168:7 181:6
**reasons** 48:11,13
  48:15
**reassessment** 61:17
**reassure** 58:17,20
  58:23 59:1 105:17
  125:16 155:15
**reassuring** 103:13
  155:8
**recall** 12:12 13:8
  13:15 15:15,20,21
  16:1,7 21:2,12,15
  24:4 26:25 27:4
  31:14 35:1 37:15
  38:11,15 41:2
  44:3,13,15,20
  45:8 46:1,17,25
  47:8 49:10 61:14
  67:18,21,23 68:13
  68:15,17,17,20
  69:4 70:4,8 73:1
  75:12,25 76:10,12
  76:13,15 78:24
  80:11,13,20 81:5

81:9,12,14,17,19
  83:15 85:2,5,20
  91:21 92:3 96:23
  96:24 108:21
  109:7,9,14,20
  110:5,7,18,22
  112:6,8,10,12,16
  113:21 114:19
  115:17,18,19
  123:16,18,19
  124:3,24 126:4,5
  126:6 132:22
  134:4,5,13,15
  140:8,11,14,17
  144:5 145:2,9
  146:25 147:14
  148:13 169:23
  170:10,21 171:3
  177:3 178:8,14
  179:2,8
**recalled** 108:16
**receive** 27:23 31:12
  55:21 75:22 120:7
  120:10 123:24
  129:7
**received** 8:24 9:1
  30:24 33:22 57:15
  57:16 62:2,10
  81:3 104:23,25
  120:12
**receiving** 76:11
  85:3 123:19
**recertified** 18:20
  18:21
**recess** 72:1
**recognize** 41:11
  90:9,10 91:20
  93:5 109:16,18
**recollection** 7:21
  45:9 46:14,22
  77:5 80:18 92:4
  147:2,21 177:13
**recommend** 135:3
**recommended**
  134:11 139:7
**record** 5:4,16 6:9
  6:17,18 7:23

10:23 13:25 47:1
  71:25 72:5 75:10
  84:22 124:18
  130:9,10,12 146:5
  146:10 172:1,2,2
  173:6 174:1,2,3
  180:12 181:17
  182:10
**records** 3:14 9:9
  10:8,12,22 11:4
  11:16,17,18,21
  12:9,20,25 13:11
  13:17,19 46:17
  68:23 93:23
  145:12,14 146:15
  146:23 170:17,23
  171:4,5,6 175:11
  175:14
**recross** 180:3
**recruit** 20:14 23:25
**recruited** 20:22
  22:17 24:5
**redirect** 148:8
**reduced** 38:9 143:4
  182:9
**reevaluation** 61:13
  61:18
**refer** 47:15 157:10
  174:15,16
**reference** 15:22
  45:17 96:13
  125:10
**referral** 92:7 174:5
**referred** 173:23
  180:5
**referring** 54:4
  174:5 175:20
**reflected** 114:5
**refresh** 7:21 77:5
  129:2
**regard** 90:2
**regarded** 142:11
**regarding** 14:7,12
  60:23 135:9
**regimens** 106:2
**regular** 27:24
**regularly** 27:10

28:9
**rehab** 24:17
**related** 27:19 34:21
  35:15,17 36:5
  42:8,9 51:8 96:13
  101:17 102:16
  152:6,13 154:25
  182:12
**relates** 52:6 56:11
**relating** 9:15 178:7
**relation** 115:7
**relationship** 52:15
  103:23 104:7
  111:12
**relative** 51:20
  78:11 79:5,10
  99:10 131:13
  149:19,23 150:4
  150:18,22 158:4
  158:12,16 182:14
**released** 77:8
**relevant** 9:18
**reliability** 30:4
**reliable** 29:11
  30:16,18,23 31:4
**relied** 72:15 73:14
  73:16 170:8
**relief** 43:22 44:2
**relieve** 40:15
**rely** 73:22,23 74:2
  74:19,24
**remains** 166:8
**remember** 19:22
  41:24 47:4,6 73:8
  73:11 79:7 115:25
  138:17 143:24
  146:17
**render** 33:15
**rendering** 32:19
  33:1
**renovate** 23:6
**rented** 21:18 22:5
**reorganized** 20:21
  20:23 22:16
**repeat** 8:11 102:11
  126:21 137:24
**replacement** 14:7

14:12 41:18,18
  51:22 52:2 54:6
  55:14 92:14 99:11
  99:16,18,22,25,25
  100:2,19 102:25
  109:24,25 110:13
  110:14 122:13,13
  123:14 126:2
  129:14 142:20
  153:17 154:2
  173:18
**report** 3:23 90:12
  91:7,11 142:15
**reported** 1:24
  51:19 52:14 53:12
  58:1,8 79:4,10,11
  98:15 99:9 103:22
  131:4 136:4,7
  150:17 151:5
  154:16 158:12,23
**reporter** 5:24 7:23
**reporting** 148:25
  151:12
**reports** 9:15 78:16
**represent** 85:13
  89:16 93:24 109:3
**representation**
  76:8
**representative**
  74:25 75:18
**representatives**
  74:9,16 75:10
  108:18 144:12
**republic** 12:6 26:9
**require** 13:3
**required** 27:16,16
**research** 9:16
  86:18,19 111:11
  125:3
**residence** 6:11
  21:20 22:1 26:5
**residency** 17:17
  18:1,6 19:18
  34:18,19
**resident** 22:15
**residents** 33:10,11
  87:10,12

**respect** 60:19 73:10
  95:22 112:14
  116:18 138:19
  154:24
**response** 85:19
**responsibilities**
  31:16
**rest** 127:5
**result** 163:5
**results** 77:7,7,13,18
  78:1
**resurrect** 20:10
  22:12 23:5
**retire** 25:23
**return** 61:9 136:14
**reveal** 7:15
**review** 9:2,5 72:12
  145:14
**reviewed** 106:17
  109:8,9 151:14
**reviewing** 10:9
  32:6 78:3 98:18
  145:12
**revisit** 61:9
**revoked** 26:15
**rhode** 13:7,14,18
  20:20 21:10,11
  22:6,8 23:13
**richmond** 2:12
  5:19
**right** 10:12,13
  11:10 13:18 14:9
  15:23 22:20 25:10
  26:12 30:16 35:23
  36:3,20 37:18,25
  39:14,24 40:1,11
  40:18,22 41:1
  42:3,6,10,16,19
  47:2,4 48:22
  49:25 50:9,17
  51:2,8,12,16
  53:18,25 55:23
  56:1 57:16 58:18
  59:20 60:8 61:13
  62:23 63:7,22
  64:14,16,21 65:2

65:7,16 67:6
68:10 69:10,13,18
70:11,18 72:10,22
74:9 75:15 77:18
78:11,22 79:20
81:11 82:6 83:10
98:9,11 131:3
135:23 148:16
149:2,4,6 151:7
151:18 152:1,6,21
153:1,3,4,6,8,14
154:8,17,22 155:1
155:16 156:2,7,13
156:19 157:5,9,15
157:24 158:9,20
158:20,24 159:3
159:20 160:25
161:21 162:4
163:2,20 164:1,17
165:15,20 166:9
166:12,18 167:22
168:3,8,11,22
169:20 170:5
171:11,16 172:4
173:1,6,14,21
174:1,6 175:2,6
175:12 176:11,21
178:25 179:22
**righthand** 98:23
  150:13 152:11
  164:23
**rights** 48:19
**risk** 38:10,13,19
  40:16 51:20,20
  52:11,12,20,21
  53:10,18 56:1,18
  56:21 57:4,5,24
  58:7,8,9 59:3,7,24
  60:23 61:17 70:10
  78:11 79:5,5,10
  79:11,20 82:24
  83:2 97:5 99:10
  99:10 100:21
  101:17,24 102:16
  103:13,19,21
  104:2,4 105:14,18
  106:18 107:2,8

115:6,8 116:12,23
117:1,3,6,21,25
118:11,16 131:17
135:19 136:4,7,9
136:12,18,19
137:11 139:18
140:6 143:1,12
148:18,25 149:19
149:23 150:4,18
150:18,22,23
151:4,6 154:8,15
155:25 156:2,11
156:12,13,18
158:4,9,12,16,19
158:22 159:3,9,23
161:25 162:1
166:23
**risks** 3:18 49:16,19
  49:21 54:18 55:22
  56:6 61:21 63:2
  76:24 82:3 83:4,7
  97:10 103:14
  107:24 116:4,7,16
  117:11 118:13,15
  118:21 128:8,21
  131:5 142:16
  143:7 153:16
  159:20,23 161:14
  162:2,25 163:22
  165:8,17 166:6,12
  166:15,17 167:8,9
  167:13 177:20
  178:1
**rmoore** 2:17
**road** 1:20 2:6
**robert** 2:21 5:4
**rotated** 17:23
**rotating** 17:23
**rotman** 2:5
**rough** 28:22
**routine** 54:15,16,17
  82:15
**rpr** 1:25 182:3
**rule** 127:4,15
**rules** 7:20 11:11
**run** 31:18

| | S |
|---|---|
**safe** 123:20 124:1
  125:18 126:11
**safety** 120:19
**sales** 74:9 75:9
  108:18
**salner** 91:22,23
  92:23 173:12
**sample** 54:13
**satisfaction** 125:12
**saw** 15:9 19:21
  21:7,12 157:2
**saying** 7:24 10:2
  32:24 37:9 43:1,4
  45:2 51:10 52:19
  53:8,9 66:22 70:4
  76:10 83:20 97:22
  103:8 159:12
  160:3 161:13,14
  173:24 176:2,7
  178:8,14
**says** 47:22 49:23
  51:13,19 52:10
  53:7 57:20,23
  58:22 67:13 79:3
  92:13 94:8 98:15
  98:23 99:18
  102:23 104:6,20
  105:16 111:3
  125:3 127:3
  128:21 133:2,14
  142:25 143:15
  149:23 150:16
  153:3,15,22
  154:13 156:17
  160:19 161:2
  164:19,23 165:1
  166:4 169:21
  172:9,14 173:17
  173:21 177:5
**scannell** 2:19
**school** 17:13 34:2,4
  34:6
**science** 64:16 69:18
  76:8
**scientific** 58:14

62:6
**scotia** 29:9
**scratch** 31:5
**second** 52:18 56:13
  90:15 92:13
  102:21 104:13
  133:1 135:25
  142:2 151:13
  155:23 172:10
**secondary** 114:21
**secretary** 144:5,20
  144:24 145:5,9
  171:21,23
**section** 28:18 29:7
  47:18 49:12,15
  56:11 57:9 60:23
  77:13 78:1 79:2
  101:8 102:2,5,6,7
  102:14,16 126:15
  155:15
**see** 20:3 47:12,17
  47:20 48:10 49:13
  50:25 51:12,14
  52:16 55:10 56:14
  57:12,21 58:11
  77:15 78:18,19
  85:17 90:13,18
  92:8,17 93:14
  94:6 95:3,16
  96:15 97:13,17
  98:3,5,8,13,14,21
  99:3 101:3 102:19
  103:24 105:6
  106:11 107:5,11
  108:21 111:9
  125:14 128:25
  130:18,24 132:24
  133:22 135:21
  136:1,23 141:13
  142:5 143:10
  148:4,22 149:21
  150:1,5,14,16
  153:20 155:3
  158:6 160:21
  164:20 165:5,12
  177:5
**seeing** 12:17 13:5

25:13 26:7 44:8
45:6 64:20 86:15
92:5 112:6,8,10
121:11 124:24
169:24 173:2
**seen** 8:23 13:1,3,13
75:13 93:5 94:4
109:19 112:19
114:1,18 123:8,10
123:13 141:25
148:5 168:22,24
169:1,3,13,15,17
**semicolon** 150:4
**seminars** 27:11
63:10
**sending** 13:3
174:10
**sense** 25:19 148:1
**sent** 85:6 91:7
175:23
**sentence** 78:7
92:13,20 93:11
98:9,14 99:8,15
100:9,9,11,16
102:3,21 103:1,3
103:18 104:5,13
104:20 105:22
106:10 124:16
128:18 133:2
138:6 160:18
161:16,22 162:13
166:3 167:2
**sentences** 92:12
104:1 105:17
**september** 69:5
**series** 168:15
174:20
**serious** 56:18 97:4
97:10 111:8
117:17,21
**served** 18:8
**services** 17:24
**set** 82:13 182:18
**seven** 9:21 10:22
13:25
**severe** 47:24 49:4
133:15

**severity** 117:13
**shared** 171:19,22
171:22
**sharon** 6:12 18:14
19:1,20 22:3
86:25 87:3,8
**sheet** 46:3,10 57:15
60:24 67:13 94:17
172:15,15 181:5
**sheets** 144:25
**shelbyville** 2:6
**shes** 66:18 67:4
71:13 122:2
174:10,11
**short** 101:18 123:8
123:10
**shorter** 58:5
**shortest** 60:14
**shortly** 85:22
**show** 15:6,11 16:5
16:20 76:18 81:15
103:13 108:20
124:11 127:5,19
156:1,13
**showed** 72:23
150:7 155:25
156:12
**showing** 16:1
128:12 139:17,21
**shown** 51:25 52:15
57:24 102:24
103:23 104:6
156:18 170:17
171:5
**shows** 90:22 104:3
125:3 168:20
**shr473** 182:22
**shredded** 11:20
146:16 147:5,10
148:4
**shredder** 148:3
**shredding** 147:2,21
**shrink** 38:25
**side** 110:3 117:13
117:17,20,24
118:3 139:4
152:11 164:23

**sign** 58:25
**signature** 10:10
**signed** 10:15,18
**significantly** 43:7
79:17
**signs** 111:5
**similar** 23:3,24
**simply** 166:10
**sit** 149:15 171:1
**sitting** 5:22 46:22
**situation** 82:14
**six** 12:7 43:3 44:16
61:8,12,15 122:5
122:20 123:8
**sixth** 104:19
**size** 124:22
**skills** 87:16
**skin** 113:7
**slide** 112:9,12
**slight** 114:12
**small** 124:8,9
150:23
**smaller** 136:9
151:3,4
**smear** 54:9 90:12
91:1,7,8,9 171:15
171:20 172:7,18
172:23
**smile** 23:22
**snowstorm** 14:22
14:25
**society** 31:8 142:6
**solely** 133:2,18
**solo** 18:16 74:17
**somebody** 20:14
**somewhat** 58:8
**sorry** 11:5,7 34:12
35:4 41:8 42:23
49:19 74:22 77:2
77:25 79:25 82:1
95:4 106:14,15
116:6 118:14
132:3 133:8
135:22 137:24
146:11 153:23
155:11 160:11
**sort** 23:24 43:24

104:8 163:12
165:23 166:4
**sound** 41:16
**source** 12:21
**sources** 62:3 88:6
**speak** 115:14
144:16,19,23
**speaking** 75:22,23
76:4,11 127:18
163:9
**specialize** 26:17
**specialty** 18:23
**specific** 25:17 73:1
88:14 92:4 147:1
147:20
**specifically** 21:16
33:12 34:5,10,14
34:22 36:15,22
37:1,15 41:24
61:15 74:18 87:15
92:2,9 100:18
110:22 116:1
134:23 169:24
**specifics** 34:7
**spent** 23:5
**spoke** 14:23 132:1
144:11
**spoken** 14:15
145:21
**st** 18:1 19:8,16,17
21:22 28:24 44:10
172:6
**stack** 168:20
**staff** 19:8
**stage** 107:15 137:8
**start** 17:12 148:12
168:18 171:12
**started** 7:19 18:14
18:25 33:25 34:9
34:15
**starts** 57:10
**state** 6:8 85:15
135:18 164:4,4,8
182:3
**statement** 6:15,16
6:23 39:1 42:13
43:25 58:13 70:8

93:17 111:3,15
**statements** 174:21
181:18
**states** 1:1 5:11 18:9
26:10 29:9,12
112:17
**stating** 103:12
**statistic** 71:3 79:18
**statistical** 80:6
105:11
**statistically** 117:4
**statistics** 78:13
121:5 163:7
**statute** 11:19
**stay** 19:11 125:4
126:8
**stayed** 13:24 26:3
**stays** 107:3
**stimulate** 141:8
**stimulating** 54:22
55:11 122:24
**stimulation** 141:11
**stop** 8:14 38:24
82:6,10 129:9
141:10
**stopped** 13:5 44:8
45:2,6 65:9 66:10
66:11 128:5 157:8
161:7
**stopping** 38:23
82:20 136:15,18
**storage** 13:21,22
**stored** 13:20
**street** 2:14 6:12
95:4
**stress** 113:6
**strictly** 32:3
**strike** 88:22 106:14
106:14,15 132:14
**stroke** 131:7 165:9
**strong** 34:5 78:13
**stronger** 135:10
**strongest** 96:25
**students** 87:11
**studied** 130:4
141:12
**studies** 33:11 51:19

51:25 52:14 57:23
58:1,7 79:4 92:7
99:9 102:23
103:10,11,13,23
104:6 130:25
136:6,17,19
139:17,21 140:24
142:22 150:17
151:15 155:25
156:1,12,13,17,18
163:7 178:25
179:2
**study** 53:4 55:4
76:16 77:6,18
80:11,12 81:3,15
82:5,9 128:2,17
129:16,17 130:1
131:4 160:17,19
160:23 161:7,20
161:20,21 162:21
163:5,16,19
164:14,16 165:15
166:11,12,18,20
**subject** 78:14 83:25
**subjects** 27:22
**subpoena** 145:16
**subscribe** 181:16
**subscribed** 28:9
**substantial** 136:18
**subtracting** 175:24
**sued** 7:1
**suggest** 126:16,23
**suggested** 38:7
179:6
**suggesting** 31:4
**suite** 2:6
**summarizing** 165:7
**summary** 60:4
**supplied** 108:17
**sure** 10:1 12:19
25:3 69:22,24
102:13 120:9
126:22 138:1
163:21
**surgeon** 92:1
**surgery** 92:2
**surgical** 87:16

**surprise** 81:15
**survey** 125:6
**suspected** 69:9
141:5
**suspended** 26:14
**swear** 5:25
**sweats** 35:6,9 36:19
37:5 112:21
**sweig** 2:21 5:4
**switch** 77:2
**switched** 83:14
**sword** 104:9
**sworn** 6:2 182:7
**symptom** 44:2
122:9 135:2
**symptoms** 33:23
34:2,16,20,21,23
35:5,18 36:5,13
36:24 37:2,13
38:8,14,18 39:4
39:14 40:15 42:9
43:17,23 44:5
47:24 48:2 49:5
55:2,6 61:9 65:19
67:1 111:4 112:18
112:24 113:17
117:21 122:8
123:4,14 133:3,15
133:19 134:9,18
139:5 160:20,24
161:15,21 162:4
162:12,21 165:15
165:20,23 166:21
169:2
**synthetic** 42:20,22
42:25 43:12

---

**T**

**tail** 34:18
**take** 3:11 17:8
40:20 43:21 53:10
57:3 63:5 70:25
71:20 77:21,25
88:3 122:5,12
124:8 140:4,5
141:6 161:4,12
**taken** 7:10,11,17

13:17,19 44:1
56:22 67:8 70:23
71:7 72:1 89:17
181:3
**talk** 8:2,4 9:25 17:1
33:20 37:9 39:9
122:25 127:21,22
166:15
**talked** 16:12 17:3
27:7 49:3 63:22
64:19 73:22 78:21
87:18 111:21
116:3 127:24
153:12,13 155:22
157:24 177:21
**talking** 37:1 40:6
46:7 51:11 57:12
62:21 66:13 77:15
79:7 100:3 101:16
102:1,7 103:10
110:2 152:8,10
154:7,21 156:16
161:24 166:16
167:24
**talks** 78:6,15
100:18 149:18
153:16 154:1,2
155:24 158:3
177:25
**tape** 71:23 72:3
146:1,3,8
**tapes** 180:11
**target** 6:19 85:16
**task** 14:2
**teach** 87:13
**teaching** 87:2,12
**technologies** 5:5
**telephone** 14:24
85:20 95:15,15
**tell** 11:3 41:11 53:7
90:20 112:8
131:22 132:19
143:11
**telling** 65:10 144:3
**ten** 51:24 58:4
99:14 101:3,4,13
101:19,24 102:17

103:9 153:19
**tend** 104:13 125:4
134:24
**tenens** 24:22,22
**term** 41:17 75:16
97:21 99:24
118:23 119:1,3
120:4 130:24
**terminated** 128:2
**terms** 11:11 35:24
53:6 61:22 65:13
72:16 73:14 74:20
74:25 79:19 170:8
**tesoro** 1:14 3:3
5:14 6:1,10,18
8:17 10:3,18
45:11 71:24 72:4
76:20 84:20,23
90:4 91:15 93:1
93:19 95:6 96:8
108:23 112:2
113:22 124:4
130:6 141:20
146:4,9 180:10
181:1,23
**tesoros** 5:22
**test** 32:21 33:3
54:21,22,22 55:7
66:16 119:8,12
**testified** 6:3 89:18
89:22 110:23
121:14 134:8
**testify** 68:23
170:19 176:2
182:7
**testifying** 173:25
**testimony** 90:2
146:17 159:16
178:13 179:10
182:10
**testing** 32:15 55:16
**thank** 5:23 84:20
**thats** 10:10,22 13:9
13:24 15:8 16:10
22:21 24:20,25
30:15 41:17 42:4
42:13,17 43:5,24

46:16 47:11,19
48:18 50:18,19
51:2,3,6 56:17,17
57:8,9 58:17,23
59:15 62:13 63:13
66:21 68:15 71:15
76:23 77:20 78:20
79:10 82:2 84:17
88:13 90:8 91:7
97:16,17,21 99:24
105:11 106:9
109:2 111:19
113:20 119:11
124:15,16 130:23
132:7 135:2
138:18 143:15
147:4 148:6,6
149:10 150:7
152:13 153:20
154:21 156:16
157:15 158:8,11
159:17 161:2,4,16
163:8,24 165:23
166:12,21 170:7
173:20 174:7
175:6 176:4,6
177:11 179:18
180:8
**theirs** 159:24
**therapy** 14:7,12
27:20 38:23,24
41:19 42:18 43:5
43:8,11,22 44:23
49:1 50:17 51:22
52:2,6,14 53:11
54:6,7 55:21,22
56:18 60:20 61:15
62:3,19 65:1,20
70:7 71:7,13 81:4
81:7 82:6,10
99:12,16,16,19,22
99:23 100:4,5,6,7
100:12,19 101:18
102:25 103:22
106:2 109:24,25
110:13,14 112:15
113:9 114:7,23

115:3,8 119:9,14
119:22 120:22,23
121:9,12,14
122:13,14 123:15
125:4,8,12 126:2
126:18,25 128:9
136:8,10,21,22
139:13,16 142:21
143:14,22 149:2
153:17 154:2,16
154:22,25 157:9
161:5 165:22
167:9,13 172:25
175:1 178:11
**theres** 12:19 38:4
39:2 41:20 43:10
47:16 51:7,15
53:9 57:8 68:11
68:12 104:3
130:24 141:10
142:8 144:7
154:19,24 171:14
**theyre** 42:20 53:8
79:20 103:8
142:11 165:18
**thin** 107:9 139:17
140:2
**thing** 50:2 97:17
153:2 167:19
169:2 172:5 180:2
**things** 108:4
176:10
**think** 16:2 22:24
24:7 25:2 29:23
30:19 32:23 33:6
44:14 65:11,13,15
98:10 109:1,12
145:5 155:18
**thinking** 34:7
**third** 3:11 47:18
57:18 78:7 98:22
126:19 158:1
**thought** 85:10
152:18 158:23
163:17,21 168:6
178:10,11
**threatening** 117:24

118:3
**three** 14:4 16:11
24:16,17 26:2
28:25 49:3 105:23
106:1 146:8
180:11
**thromboembolic**
56:11 57:4
**thrombosis** 131:10
**tiffany** 145:3,4
**time** 5:7 7:16 8:2
8:14 12:13,16,18
13:10,20 14:1,23
15:8 16:12,21
17:8,22 18:13
20:8,16 21:15,17
25:1,7,13,22 27:7
28:6 32:7 33:22
34:4 35:13 40:24
43:2 44:8,14,18
45:3,20 51:24
53:13 56:24 58:4
58:5,15 60:11,14
61:20 64:2,8,12
64:19 65:9 66:10
67:11 71:25 72:5
72:14 74:17 77:18
81:7,10 86:19
87:4 91:1 99:13
101:13 109:13
113:9 114:6,16,20
120:14 121:1,5,17
125:5,7 130:9,12
140:19 146:5,10
149:15 151:7
152:1 153:19
154:4,11 155:1,24
156:7 171:17
179:16 180:11
**timeframe** 39:10
**timeline** 22:23
**times** 14:18 94:9
**timing** 80:14
**tip** 112:18
**title** 28:16,17
**titled** 3:18 4:12
**today** 14:16,21

16:13 44:4 46:23
65:19 84:21 87:18
132:8,15 146:15
171:1 179:10,12
179:18
**todays** 5:6
**told** 37:12 38:12,21
47:8 69:25 70:2,6
140:23 141:17
**tooth** 110:17
111:22 113:7
**top** 111:3 120:18
168:19 172:13
**topical** 133:4,20
134:1
**totally** 57:6
**trade** 39:22
**training** 17:10
32:14 33:21 35:17
43:21 63:11
**transcript** 181:14
181:17
**transfer** 13:12
29:15 31:22
144:19
**transferred** 32:3
81:22 144:17,18
144:24 145:6,7,8
146:23
**treat** 27:6 35:25
64:2 67:1
**treated** 36:12 62:22
**treating** 25:12
42:12 45:2,6
114:16
**treatment** 26:18
33:23 34:1,10,16
39:4,13 44:5
46:23 47:7,23
48:5 49:4,5,6
54:14 61:6,23
62:17,18,20 63:1
63:6 65:20 67:19
86:7 131:11
132:21 133:3,14
133:19 134:24,25
136:15

**treatments** 42:9
72:17 104:24
**tremendous** 80:21
**trial** 33:10 45:15
104:21 105:4,24
136:4 157:24
**trials** 33:8,16
**true** 6:21 132:8
156:2 169:14
176:21,23 182:10
**trust** 88:17,24
**truth** 182:7
**try** 20:9 27:23
**trying** 12:19 22:22
28:21 29:22 30:22
59:23 68:24 84:9
163:23 176:16
**turn** 47:11 57:18
79:1 90:15 98:22
132:23 146:12
150:12 157:19
160:8
**twelfth** 2:14
**twice** 58:2
**two** 4:6 14:19 16:11
18:8 20:22 24:16
50:22 56:15 72:3
87:7 103:18 106:6
106:20 133:1,10
146:3 153:12
165:8
**type** 17:5 33:13
51:4 130:3 139:25
172:12,25 175:1
**typewriting** 182:9
**typically** 177:13,16

— **U** —

**ultrasound** 87:16
**unbearable** 122:10
**uncertain** 166:8
**unclear** 89:10
**uncomfortable**
111:4
**underneath** 97:22
**understand** 6:20
6:25 7:3 8:10

10:2,21 13:6
30:19 32:23 35:2
86:2 87:21,23
94:20 116:25
159:23 176:1,16
**understanding**
52:5 96:21 109:23
113:8 114:16
122:14 123:3
126:2,7,9,11
133:6,25 159:19
167:1
**understood** 82:13
110:24 112:25
**underwent** 93:11
**united** 1:1 5:11
18:8 29:12
**unknown** 52:12
58:7 103:20
154:14
**unnatural** 8:3
**unopposed** 106:1
**urinary** 34:22 35:5
**urogenital** 110:24
111:23
**usage** 47:19,21
48:16 101:24
102:16 132:24
133:9
**usages** 167:23
168:3,8,13
**use** 47:14 49:9,24
50:4 90:18,24
97:21 101:2,4,9
103:9 106:20
107:14,16 121:6
123:20,25 125:17
126:11,17,25
128:22 134:24
136:10,13 143:3,4
143:8,14 148:21
153:14 166:7
172:10,11
**users** 125:6 137:8
**usual** 58:2
**usually** 60:15 61:14
97:7 118:5 168:9

uterus 68:8

**V**

vagina 90:23
vaginal 35:3,4 38:9
48:6 49:5 112:21
113:6,17 132:21
133:3,4,15,19,20
134:2,6,10,10,22
134:23 135:5
valley 4:7 93:25
94:19
value 79:18 80:6
varied 123:6
various 17:24 20:9
39:7
vary 122:17
vascular 56:12
vasomotor 47:24
48:2 49:4 117:21
vein 131:9
verbatim 30:9
verify 75:14
version 124:11
127:3
versus 5:10 100:4
118:16 159:4
vetted 30:15
vicechair 29:6
video 5:8 180:10
videographer 2:21
5:3,5,23 71:22
72:2 130:8,11
146:2,7 180:9
videotaped 1:14
3:12 71:23 72:3
146:3,8
vision 110:15
111:22
visit 61:16
visits 75:10
vitae 9:10
voicemail 144:9
volume 151:25
vulvar 48:6 49:5
133:3,15,19

**W**

wait 8:4,6
walk 17:9 42:5
want 9:25 33:20
48:18 49:25 54:7
84:6,8,21 116:22
124:11,24 139:3
139:22 159:11,16
160:17 163:21
167:19 168:1,16
168:24
wanted 6:17 19:20
81:4 148:6
ware 22:15 23:2,21
warn 98:6 101:24
102:15,15,16
130:21 131:16
warning 49:20 51:8
51:16,18 53:7,15
56:10,10 57:23
59:19 60:22 72:21
96:18,22,25 97:13
98:3,19 100:16
101:1,7,8,9,16,23
102:4 103:3
104:11,14 107:2,7
107:13,19,24
127:16 130:18
131:16 135:7,9,10
135:18 137:1,2,10
150:6 152:5,6,11
152:13,19,20,23
153:7,24 155:8,15
156:15,17 157:7
157:11 160:9,10
167:20 177:16,20
warnings 49:12,15
49:23,23 50:1,3,3
50:5,24 59:24
79:2 96:25 97:3,9
99:2 106:18
127:12 130:25
150:13 155:18
warns 98:13
washington 2:15
wasnt 152:18

156:14 168:9
169:4
way 8:4 12:20 30:3
42:15 62:15 71:9
71:16 85:16 88:23
103:7,8 124:23
138:25 139:12
142:8 155:13
176:9,12 178:1
wc 2:17
weather 64:11
website 130:16
week 9:1 24:16
weight 129:22
welcome 162:19
went 19:7 20:3,8
23:21 121:11
149:14 174:4
wesley 20:19,20,20
21:10,11 22:6,7,8
23:3,15,16
westerly 44:10
weve 49:3 106:17
116:3 127:24
138:16
whats 6:11 8:20 9:3
10:6 24:12 45:14
46:9 48:21 76:19
91:19 93:22 95:9
113:25 123:12
125:21 141:4
174:1
whatsoever 6:19
84:4 86:3 169:11
169:18
whereof 182:17
wherewithal
163:14
whi 79:10 80:11
82:5,9,23 83:6,22
127:24,25 128:1,2
128:7,17 130:4
131:4,22,23
132:19 133:7,25
136:4 157:24
158:18 160:17,23
161:20 162:11

164:16 165:25
167:12
whim 54:2
wholly 143:5
wife 10:19 12:4
24:14 25:2 83:13
83:17,21,24
wifes 84:9
williams 2:13 5:20
willing 139:4
winding 25:1
witness 5:25 10:9
11:5 78:3 146:12
182:17
wlabels005345
3:17
wmdl52700048274
4:20
woman 35:21,23
37:12,22 38:8,18
42:5 53:25 55:2
65:7 70:11 71:12
75:2 107:8 119:13
119:20 122:12
123:4,13 126:8
141:5 144:16
160:6 169:20
womans 35:18
36:18,20 37:16
54:25 69:20 71:17
women 3:21 26:18
26:19,23 27:7
34:24 35:14 36:4
36:5 37:5,6 43:15
43:21 44:1 51:21
52:1 57:25 58:3
66:19 69:9 70:16
70:18,22,25 71:6
76:25 82:4 99:11
102:24 104:23,25
105:25 107:14,16
119:8 122:9,17
125:4,11 128:24
131:10 136:5
139:17 142:22,23
143:2 148:20
149:24 151:16

161:4 166:1,8
170:9
womens 76:15,18
77:6 131:4
wondering 94:22
word 97:23
wording 121:4
162:15 172:13
words 91:8 174:9
work 19:7 24:15
25:4 31:19
worked 12:1 22:6
25:21 140:14
working 171:17
works 24:20
worldwide 142:9
wouldnt 44:2 82:25
119:21 147:10
161:25 162:2
write 174:18
writes 88:12
writing 86:22
174:17 175:21
written 9:17 16:8
111:3 121:5
wrong 7:4 64:1
65:13 89:11
wyeth 1:9,9 5:10,20
6:21 7:3 9:12
14:12 59:23 74:11
108:3,18 109:4
115:14,20,21
125:10 131:22
132:1,19 151:23
177:14 178:25
181:2

**X**

**Y**

year 5:6 11:25
15:15 19:13 22:17
29:25 61:8,12
86:8 104:20,21
105:23 106:15,19
107:2 121:2 122:6
122:19,20,20

Michael R. Tesoro, M.D.

128:23 131:19
**yearly** 54:12
**years** 10:22 13:2,25
18:8 24:18 28:20
28:25 35:1 43:3
44:16 51:24 58:5
62:23 67:3 92:15
93:12 94:9 99:14
101:4,4,13,18,24
102:17 103:9
115:16 120:24
121:10,15 123:17
125:7,9,18 126:8
126:9 131:11,11
136:3,10,14 143:6
147:4 148:5
149:25 153:19
173:19
**york** 17:14 18:2
95:3
**youd** 29:1 63:4
158:21 159:8
169:16 173:9
**youll** 47:17 71:14
85:15 157:19
**young** 25:18
**youre** 6:25 7:24
10:2 28:5,20,24
32:23 33:18,19
34:6,7 43:1 45:1
48:17 51:10,11
72:7 97:18,22
102:1 116:15
129:16,20,21,24
155:6 156:23
159:11 160:3
161:23 162:1,3,19
162:25 163:4
164:2,6 165:25
166:16 171:1
173:21,24 174:1,9
176:11
**youve** 7:16 9:20
23:21 75:13 87:7
110:23 123:13
129:15 168:22,24
169:15 179:9,17

---
**Z**
---

---
**0**
---

**0** 51:21 67:14 68:1
68:4,12,18 79:6
99:11 150:19
**00** 9:4
**000** 13:4
**01** 4:4 94:6
**02** 22:19
**023** 149:20
**03** 22:19 83:15
**04cv01373jba** 1:6
5:13
**05** 146:5
**06069** 6:13
**09** 146:10

---
**1**
---

**1** 3:11 8:17,21 29:7
29:8 51:21 78:17
79:6,10 99:10
104:23 130:9,12
149:20,24 150:2,4
150:18,22 158:5
158:16 159:4,4,6
159:7
**10** 3:15,22 4:9,22
94:6 95:6,10
**100** 37:8 44:3,20
46:17 128:3
**108** 4:14 142:23
**11** 1:17 3:22 4:11
4:22 5:7 9:4 96:8
96:12 97:14
142:24 150:8
152:11
**112** 4:16
**113** 4:18
**11th** 1:16 5:6 181:3
182:5
**12** 3:22,25 4:4,12
71:25 72:5 108:23
109:3 169:24
**124** 4:20
**13** 4:15 112:2,6
160:13 168:19

**130** 4:21
**13th** 10:16
**14** 4:17 113:22
114:1 145:17,18
169:15
**141** 4:23
**148** 3:6
**15** 4:19 124:4 135:8
177:1
**152** 6:12
**16** 1:17 4:21 5:7
130:6 157:11,13
159:17 160:12
167:25
**17** 4:22 77:1 141:20
141:24 148:13
**18** 160:8,14
**180** 3:7
**18th** 182:18
**19** 46:4
**1967** 17:15
**1972** 18:3
**1974** 18:11 19:5
**1975** 19:1
**197576** 18:21
**1986** 114:18 169:22
**1989** 19:6
**1990** 19:6 20:6
**1990s** 40:25
**1993** 18:21
**199596** 15:13
**1996** 4:11 89:21,22
96:13 97:14
**1997** 90:14 142:24
143:18 148:16,24
157:4 158:12
172:6
**1998** 45:23 46:5,12
66:24
**1999** 45:17 79:15

---
**2**
---

**2** 3:14 10:3,7 51:21
68:11,19 79:6
94:3 95:11 97:14
97:15 99:11 127:4
127:9 128:23

**3**

146:5,10 150:19
177:6 180:11
**20** 132:23 133:11
157:20
**2000** 11:25 19:14
20:6,18,18,24
21:3,3,4 29:25
44:12 66:16
**20005** 2:15
**2001** 11:25 13:6
20:18 21:4 45:23
46:5,12 66:16
69:5
**2002** 13:6 15:15
20:19 22:9 29:25
77:1,8 81:10
126:3,4
**2003** 11:25 15:15
22:24 23:17 44:12
44:19 65:11 66:10
66:23 67:8
**2004** 12:1 24:4,7,23
44:19 66:10,23
67:8
**2005** 130:15 131:20
157:8,11 159:15
160:11 168:1,9
179:19
**2007** 24:24
**2008** 12:3,14 24:25
25:3,20 26:6 44:8
**2009** 10:16 12:3,14
25:3
**2010** 85:4,14
**2011** 1:16 5:7 181:3
181:20 182:5,18
**2024345688** 2:16
**215** 2:6
**220** 4:3
**23** 135:24 157:19
157:21
**24** 158:5 159:4,7
**26** 78:17 79:10
**2803** 98:24
**290** 79:17

---
**3**
---

**3** 1:6 3:16 4:4 5:13
13:4 45:11,15
51:21 79:2,6
99:10 148:2
150:12,18,22
**300** 145:15
**33** 71:25
**347** 104:25
**35** 149:24 150:2,4
158:16 159:4,6
**353** 4:10
**377** 104:23

---
**4**
---

**4** 3:18 47:15,17
76:19,20 128:16
162:17,19 164:13
164:15,16
**40** 54:11 145:17
**40222** 2:7
**411** 142:23
**42** 72:5
**43** 45:16
**434** 4:5
**44** 180:11
**45** 3:17 157:14
**46** 130:9
**473** 1:25 182:2
**48** 130:12
**49** 89:19

---
**5**
---

**5** 3:22 49:11 56:13
67:14 68:1,4,11
68:12,18,19 84:23
85:2 128:23 136:3
**50** 70:13 89:19
131:10
**500** 148:2
**5086555458** 2:8
**51** 142:22 151:15
**52** 142:22 151:16
**5352** 3:17

---
**6**
---

**6** 3:4,23 90:4,8
136:3 171:12,13

Michael R. Tesoro, M.D.

**60** 26:4
**625** 67:14,25 68:1
  68:11,12
**67** 17:19
**68** 17:20

### 7

**7** 4:1 57:11 91:15
  91:19 125:7 126:8
  173:5
**705** 142:22 151:16
**72** 18:11
**725** 2:14
**74** 1:20 19:2,3
**76** 3:21
**79** 131:11

### 8

**8** 3:13 4:4 93:1,4
  125:7 126:8 175:9
  176:24
**84** 3:5,22
**875** 105:24

### 9

**9** 4:6 93:19,23 94:6
  127:4,9 175:9
  177:6
**90** 3:25
**91** 4:3
**93** 4:5,8 28:24
**9300** 2:6
**94** 28:24
**95** 4:10 28:24
**96** 4:11
**97** 4:22

# EXHIBIT 5

Page 1

1      IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF ARKANSAS
2           WESTERN DIVISION
3
   ----------------------)
4   In re:     ) MDL Case No. 4:03-cv-1507 WRW
          )
5   PREMPRO PRODUCTS   )    Fraser v. Wyeth
   LIABILITY LITIGATION )   4:04-cv-01443-WRW
6   ----------------------)
7
8
9   VIDEOTAPED DEPOSITION OF:  MARGARET BROCKMAN FRASER
10       DATE:  JULY 21, 2009
11        HELD AT:
       URY & MOSKOW, LLC
12      883 Black Rock Turnpike
      Fairfield, Connecticut
13        - - -
14
15
16
17
18
19
20
21
22   Reporter:  Sandra V. Semevolos, RMR, CRR, LSR #74
23      GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph|917.591.5672 fax
24       deps@golkow.com
25

Page 2

1 APPEARANCES:
2 Representing the Plaintiff:
3    URY & MOSKOW, LLC
     883 Black Rock Turnpike
4    Fairfield, Connecticut  06825
     203.610.6393
5
     BY:  NEAL LEWIS MOSKOW, ESQ.
6     E-MAIL:  neal@urymoskow.com
7
   Representing the Defendant Wyeth:
8
     WILLIAMS & CONNOLLY, LLP
9    725 Twelfth Street, N.W.
     Washington, D.C.  20005
10   202.434.5182
11    BY:  LISA M. DUGGAN, ESQ.
     E-MAIL:  lduggan@wc.com
12
13 Also Present:
14    Michael Mammana, Video Operator
15
16
17
18
19
20         - - -
21
22
23
24
25

Page 3

1          INDEX
   EXAMINATION
2 Witness Name          Page
   Margaret Brockman Fraser
3
     Direct By Ms. Duggan ....................... 6
4
5     FRASER EXHIBITS (marked for identification)
6
   Exhibit No. 1 Marked ........................... 5
7 Notice to take Videotaped Discovery Deposition
8 Exhibit No. 2 Marked ........................... 5
   Plaintiff's Fact Sheet
9
   Exhibit No. 3 Marked ........................... 31
10 Prescription Box
11 Exhibit No. 3-A Marked ........................ 221
   Package Insert
12
   Exhibit No. 3-B Marked ........................ 221
13 One month supply of Prempro
14 Exhibit No. 3-C Marked ........................ 222
   One month supply of Prempro
15
16
17
18 (Fraser Exhibits 1 through 3-C were attached to
   original transcript.  Copies of exhibits were sent to
19 Lisa M. Duggan, Esq. and Neal L. Moskow, Esq.)
20
21
22
23
24
25

Page 4

1       S T I P U L A T I O N S
2      It is stipulated by counsel for the parties
3 that all objections are reserved until the time of
4 trial, except those objections as are directed to the
5 form of the question.
6      It is stipulated and agreed between counsel
7 for the parties that the proof of the authority of the
8 Notary before whom this deposition is taken is waived.
9      It is further stipulated that any defects in
10 the Notice are waived.
11      It is further stipulated that the reading
12 and signing of the deposition transcript by the
13 witness may be signed before any Notary Public.
14       - - -
15
16
17
18
19
20
21
22
23
24
25

Page 5

1       (Deposition commenced at 10:29 a.m.)
2         (Fraser Exhibit 1, Notice to take
3         Videotaped Discovery Deposition, marked
4         for identification. )
5         (Fraser Exhibit 2, Plaintiff's Fact
6         Sheet, marked for identification. )
7         THE VIDEO OPERATOR:  We are now on the
8   record.  My name is Michael Mammana.  I am a
9   videographer representing Golkow Technologies,
10  Incorporated of Philadelphia, Pennsylvania.  Today's
11  date is July 21st, in the year 2009 and the time is
12  10:29 a.m.
13        This video deposition is being held at
14  the Law Offices of Ury & Moscow, LLC, located on 883
15  Blackrock Turnpike in Fairfield, Connecticut, in the
16  matter of In Re Prempro Products Liability Litigation,
17  Fraser versus Wyeth, et al., In The United States
18  District Court For The Eastern District of Arkansas,
19  Western Division.  The deponent is Margaret Fraser.
20        Would counsel please identify
21  themselves for the record.
22        MR. MOSKOW:  Neal Moscow, Ury & Moscow
23  for the Plaintiff.
24        MS. DUGGAN:  Lisa Duggan from Williams
25  & Connolly here on behalf of the Defendant Wyeth.

Page 6

1         THE VIDEO OPERATOR:  The court reporter
2   is Sandie Semevolos, and she will now swear in the
3   witness.
4         MARGARET BROCKMAN FRASER, being first
5         duly sworn, deposes and states as follows:
6         DIRECT EXAMINATION BY MS. DUGGAN:
7   Q.   Good morning, Mrs. Fraser.
8   A.   Good morning.
9   Q.   As you know, we met a few minutes ago here.
10  My name is Lisa Duggan, and I'm here on behalf of the
11  drug company, in this case, Wyeth.
12        Before we get going with my examination, I
13  just want to make sure that we are on the same page in
14  terms of the rules of the road for the deposition, so
15  first let me just ask you, when we are having our
16  conversation today, will you please make sure that you
17  give me an oral or an audible response, a yes or no,
18  as opposed to a shake of the head or nod of the head.
19  That way we can have both our video record and our
20  paper record be clear as to your answers.
21        Is that okay with you?
22  A.   Yes.
23  Q.   Great.  Next, it's important as we proceed
24  today that only one of us talks at a time so that our
25  court reporter can keep up with who is saying what.

Page 7

1   So it's difficult sometimes in conversation, we think
2   we know where the other person is going, and we jump
3   in, but I'll do my best to make sure I've allowed you
4   to completely answer my question before I ask another
5   if you'll do your best to allow me to completely ask
6   my question before you answer.
7         Is that okay?
8   A.   Yes.
9   Q.   Great.  I'd also ask you if you don't
10  understand a question that I'm asking, if it's not
11  clear, if you would let me know that and give me an
12  opportunity to rephrase the question so that it's
13  something that we both understand, what I'm asking and
14  what you are answering.  Okay?
15  A.   Yes.
16  Q.   Finally, as we are going today, it will
17  probably be a fairly long day, but it's not a
18  marathon, and if you need to take breaks at any time,
19  please be sure to let Mr. Moscow or me know, and we
20  will be happy to do that.
21  A.   Thank you.
22  Q.   Okay, great.
23        MR. MOSKOW:  Lisa, I'm just going to
24  ask if it's possible, approximately every hour, hour
25  and fifteen minutes, I'll let you know, and when you

Page 8

1   come to a convenient stopping point just so
2   Mrs. Fraser can stretch her legs and use the facility.
3         MS. DUGGAN:  Absolutely, that's fine.
4   And if you need it sooner than that, you just let us
5   know.
6         THE WITNESS:  Okay, thank you.
7   BY MS. DUGGAN:
8   Q.   Okay.  Great.  Ms. Fraser, have you ever
9   given a deposition before?
10  A.   No.
11  Q.   Have you ever been a party to a lawsuit
12  other than this one?
13  A.   I was in a class action suit in the early
14  seventies.  It had to do with the Department of
15  Defense and I did have -- what was the other one?  I
16  don't even recall what it was.  If it comes back to
17  me, can I tell you?
18  Q.   Sure.  Now, just tell me just briefly about
19  the Department of Defense matter.
20  A.   I was a teacher overseas, and they wanted
21  our salary to be comparable to state-side salary.  So
22  it was part of a group action.  It was in the -- I
23  taught over there in the early seventies, and so they
24  won the suit, and we were all paid the difference is
25  what it was.

Page 9

1    Q.    So you had not been making as such as the
2 people here?
3    A.    Yes.
4    Q.    I see.
5    A.    Yes.
6    Q.    Where were you at that time?
7    A.    I was in Germany.  I was on an Army base in
8 Erlangen, Germany, near Nuremberg.
9    Q.    And were you ever -- I take it you were
10 never deposed in that case?
11    A.    No, no.
12    Q.    You just filled out the forms, and that was
13 the extent of your involvement?
14    A.    Yes.
15    Q.    And then were you ever involved in a
16 litigation related to a car accident?
17    A.    Yes.  That's what it was.  My stepdaughter
18 was driving in our little town in Lakeville, and she
19 was hit by a car -- an elderly lady, and I was part of
20 that, and that was in April of 2002.
21    Q.    When you say you were part of it, were you a
22 passenger in the car?
23    A.    I was a passenger, and -- yes, I was a
24 passenger.
25    Q.    And were you physically injured in the

Page 10

1 accident?
2    A.    The airbags deployed, and I was in the front
3 seat, and I was un -- yes, I got hit in the chest.  It
4 was my -- it hit me in the chest, face and chest.
5    Q.    And that was shortly after you'd had the
6 lumpectomy?
7    A.    Yes, because I was under chemo at the time.
8    Q.    How was that litigation resolved, if you
9 know?
10    A.    It was a settlement.  It was mostly Vanessa
11 and the lawyer.  I just was a passenger.
12    Q.    Were you ever interviewed or asked to give
13 sworn testimony in that case?
14    A.    I don't remember.
15    Q.    Do you know if a lawsuit was actually filed
16 or if it had all happened before that stage?
17    A.    It was a settlement, as far as I -- as I
18 recall, it was a settlement from the lady's
19 insurance company and my daughter, my stepdaughter.
20    Q.    Have you ever testified at a trial, any kind
21 of trial?
22    A.    No.
23    Q.    Have you ever gone by any other name other
24 than Fraser?
25    A.    My maiden name is Brockman, Margaret

Page 11

1 Brockman.
2    Q.    And did you change your name at the time
3 that you got married?
4    A.    Yes.
5    Q.    Have you just been married one time?
6    A.    Yes.
7    Q.    I probably should have said this right at
8 the beginning.  But let me just tell you up-front that
9 because of the nature of the allegations in this case,
10 I'm going to have to ask you some pretty personal
11 questions at some point during the day, and I just
12 want to let you know about that and tell you I'm not
13 trying to do it to embarrass you or make you feel
14 uncomfortable, but I need to do it in order to do my
15 job.  So I apologize for that in advance, but we will
16 try to handle things as delicately as we can.
17    A.    Thank you.
18    Q.    How are you feeling today?
19    A.    I'm fine.  I feel good.  I'm fine.
20    Q.    Good.  You got enough sleep last night?
21    A.    I did, other than drive -- yes, other than
22 driving down here.
23    Q.    It was a challenge this morning, I know.
24        Is there any reason that you would be unable
25 to give me complete and accurate answers to my

Page 12

1 questions today?
2    A.    No.
3    Q.    Let me just check a couple of things.
4        Have you had any alcohol in the last 24
5 hours?
6    A.    No.
7    Q.    How about, have you taken any medications in
8 the last 24 hours?
9    A.    No, other than a vitamin.
10    Q.    Is that just an over-the-counter vitamin?
11    A.    Yes, Centrum Silver.
12    Q.    Is Mr. Moscow here today your lawyer?
13    A.    Yes.
14    Q.    When did you first meet Mr. Moscow?
15    A.    I don't recall the exact date.  I read an
16 article in the new -- I don't recall the exact date.
17    Q.    Okay.  Well, let me ask you how you ended up
18 getting in touch with Mr. Moscow.  It sounds like
19 maybe you saw something in the paper.
20    A.    There was.  There was something in the
21 newspaper.
22    Q.    And was that a newspaper that you get at
23 your home?
24    A.    Yes.
25    Q.    What paper was that?

Page 13

1    A.    The Waterbury Republican.
2    Q.    Is that a daily newspaper?
3    A.    Yes.
4    Q.    And you have it delivered at home?
5    A.    Not anymore.  Not to my home, no.
6    Q.    When did you see the article in The
7  Waterbury Republican?
8    A.    Again, I don't remember the date.  I don't
9  remember -- honest, I don't remember.
10    Q.    Okay, that's fine.  And throughout the day,
11  if you don't remember something, just let me know, and
12  then if it does come back to you, just please fill me
13  in on that.
14    A.    Yeah.
15    Q.    When did you stop getting The Republican at
16  home?
17    A.    We moved to Florida, so I stopped getting it
18  actually officially in spring of 2008, I stopped it.
19    Q.    About when do you think you started getting
20  it at home, delivered?
21    A.    Seventies.  Since the seventies.  Since we
22  moved there.  Excuse me, just to correct it, we moved
23  in '83, so probably early eighties.
24    Q.    And what was it that you saw in the
25  newspaper that led you to Mr. Moscow?

Page 14

1    A.    It was an article that just had some
2  questions on it regarding if you had been diagnosed
3  with breast cancer and if you had been taking Prempro,
4  which I had been.
5    Q.    Was it an article that a reporter wrote or
6  an advertisement?
7    A.    I believe it was an advertisement.
8    Q.    And what do you remember specifically, if
9  anything, about what the advertisement said?
10    A.    That they were -- if I felt that, if a
11  person felt that they were harmed in any way by taking
12  Prempro -- I don't remember the exact words, but it
13  had to do with being on a certain medication, which
14  was Prempro, and being diagnosed with breast cancer,
15  which I was.
16    Q.    And when you saw the advertisement, did you
17  think you had been harmed by Prempro?
18    A.    Yes.
19    Q.    And what did you do in response to seeing
20  the advertisement?
21    A.    I called down here and made an appointment
22  to see Mr. Moscow and to speak with Attorney Parr.
23    Q.    Okay.  Now, I'm sure Mr. Moscow will caution
24  you not to answer any questions and I'm not trying to
25  elicit any answers from you that relate to your

Page 15

1  communications with your attorney.
2    A.    Uh-huh.
3    Q.    But I do want to ask you some more questions
4  about your circumstances.
5    A.    Uh-huh.
6    Q.    So be careful in your answer that you don't
7  tell me things that your attorney told you.
8        About how long was it between the time that
9  you saw the advertisement and the time you placed the
10  call?
11    A.    I don't remember.
12    Q.    Was it pretty close in time, or was it
13  something where you just sort of cut it out and let it
14  sit there for a while and --
15    A.    I believe I probably responded to it.  I
16  gave it obviously a bit of thought, some thought, and
17  felt why shouldn't I at least look into it for myself,
18  because I did feel that I had been injured.
19    Q.    Okay.  And was that something that -- your
20  decision to make the phone call, was that something
21  that you had discussed with your husband before you
22  called?
23    A.    Oh, yes.
24    Q.    And was he in agreement with your decision
25  to call?

Page 16

1    A.    Yes.
2    Q.    And at the time that you made the call
3  initially, had you decided that you wanted to file a
4  lawsuit if that was what Mr. Moscow was offering?
5    A.    Would you repeat that?
6    Q.    Sure.  You said you saw the advertisement;
7  you thought about it; you discussed it with your
8  husband, and then you decided to make the phone call
9  to the law offices here.
10    A.    Uh-huh.
11    Q.    At the time that you made that initial phone
12  call when you thought that you were injured because of
13  the Prempro that you'd taken, had you decided that you
14  wanted to be involved in a lawsuit at that time?
15    A.    Yes.
16    Q.    Now, you said that at the time you saw the
17  advertisement, you thought that you'd been harmed by
18  Prempro.
19    A.    Yes.
20    Q.    Had you formulated that belief prior to
21  seeing the advertisement?
22    A.    Well, yes, but -- yes.
23    Q.    When did you first start to think that you
24  had been injured because of Prempro?
25    A.    At some point during my diagnosis and then

Page 17

1  the subsequent surgery and the subsequent taking me
2  off of the Prempro immediately, and then after I
3  started suffering from it.  I was injured.  I had an
4  injury.
5      Q.   You said that you were taken off of Prempro
6  immediately.
7          Let's just talk about that a little bit.
8  When you -- who told you to stop taking the Prempro?
9  Do you remember?
10     A.   Doctor -- well, let me -- give me a second.
11     Q.   Sure.
12     A.   My -- Dr. Tesoro did.  The GYN.
13     Q.   And Dr. Tesoro had been your gynecologist
14  for many years at that point; correct?
15     A.   Yes.
16     Q.   And he advised you to stop taking Prempro
17  immediately?
18     A.   Yes.
19     Q.   Can you help me figure out when in time that
20  was?  I know that from your medical records that you
21  had a mammogram that was suspicious on September 10th,
22  2001, the day before the September 11th attacks.
23     A.   Uh-huh.
24     Q.   When after that was it that Dr. Tesoro
25  advised you to stop taking the Prempro?

Page 18

1      A.   To my memory, it was immediately.  As soon
2  as he learned that there was something suspicious on
3  that mammogram, from the doctor who read the
4  mammogram, that there was something suspicious, and we
5  spoke, and I don't remember when the date was, but I
6  know it was very, very soon after the 11th or on the
7  11th of September.
8      Q.   So within three or four days.
9      A.   Yes.  That's to my memory, yes.
10     Q.   And what did you do when he told you to stop
11  taking the Prempro?  Did you stop?
12     A.   I absolutely.  I trusted him.
13     Q.   You trusted Dr. Tesoro?
14     A.   (Nodding in the affirmative.)
15         MR. MOSKOW:  You have to answer out
16  loud.
17     A.   I'm sorry, yes.
18  BY MS. DUGGAN:
19     Q.   And when he told you to stop taking the
20  Prempro and you followed his instruction, was it at
21  that point in time that you thought, well maybe the
22  Prempro had something to do with my breast cancer?
23     A.   Yes.
24     Q.   All right.  Going back to the sequence of
25  events that led you to Mr. Moscow, was he -- was his

Page 19

1  firm the first firm you spoke to in connection with
2  possibly filing a lawsuit relating to Prempro?
3      A.   Yes.
4      Q.   And you said that you also met with an
5  attorney named Parr here.
6      A.   Yes.
7      Q.   In preparation for your deposition today,
8  have you reviewed any documents?
9      A.   The fact sheet.
10     Q.   Anything other than the fact sheet?
11     A.   I had been shown that you all were going to
12  depose me, you know, it was going to be videotaped,
13  and the complaint.
14     Q.   Okay.  Did you see any other materials in
15  preparation for your deposition?
16     A.   No.
17     Q.   For example, were you shown any of your
18  medical records?
19         MR. MOSKOW:  I'm going to object as to
20  what she was shown.  You can ask her what she
21  reviewed, but I think when you ask her what she was
22  shown, that goes into the attorney-client
23  relationship.
24         MS. DUGGAN:  Okay, well, we will
25  probably disagree about that, but let me rephrase my

Page 20

1  question.
2  BY MS. DUGGAN:
3      Q.   Have you reviewed any of your medical
4  records in connection with your deposition today?
5      A.   To -- I don't remember seeing specific
6  medical records from Dr. Tesoro.  I don't remember
7  seeing anything specific.
8      Q.   Okay.
9      A.   I don't -- I don't remember seeing anything
10  specific from my doctors.
11     Q.   Okay, well, I appreciate that, particularly
12  with respect to Dr. Tesoro who is someone whose
13  records we are looking for, but more broadly than
14  that, have you seen -- at any point, have you seen any
15  of your medical records?
16         MR. MOSKOW:  At any point?
17  BY MS. DUGGAN:
18     Q.   Since you were diagnosed with breast cancer.
19     A.   I've seen the ones from The Cancer Center,
20  my blood work, because I asked for all of those, so
21  that's from Dr. Levine.  I've seen those because I was
22  very interested in where I was with the cancer markers
23  and all.  I've seen those.  Dr. Janelli, who is my
24  regular doctor, not -- other than in his office, where
25  he's gone back and checked on things, I don't remember

Page 21

1  seeing any other medical records.
2      Q.   Okay.  And so I take it you don't have any
3  medical records at home that you haven't already given
4  to your attorney?
5      A.   No, no.
6      Q.   And have you reviewed any advertisements or
7  promotional materials relating to Prempro prior to
8  today?
9           MR. MOSKOW:  You are including
10  television commercials and that kind of thing?
11           MS. DUGGAN:  Uh-huh.
12      A.   The few -- I remember one or two just from
13  the time, but I've seen them since my diagnosis.  I
14  paid attention to them since my diagnosis.
15  BY MS. DUGGAN:
16      Q.   Okay.
17      A.   Very much so.  But prior to, there was one,
18  the one I basically remember was the one with the
19  actress with her tooth.  I remember she also I think
20  was cosmetics.  It was Lauren Hutton.  But other than
21  that, I don't -- I don't pay much attention to
22  advertisements.
23      Q.   Okay.  That's fine.  So the only -- is it
24  fair to say that the only type of advertisements for
25  Prempro that you remember seeing before your breast

Page 22

1  cancer diagnosis were television commercials?
2      A.   Yes, it's fair to say that.
3      Q.   You don't recall seeing any advertisements
4  in magazines or newspapers, anything like that?
5      A.   I rip them out of magazines because, I mean,
6  that's not very consumer conscious, but that's what I
7  do.  I don't pay that much attention to them.
8      Q.   You mean you rip them out and throw them
9  away?
10      A.   Uh-huh.
11      Q.   You find them distracting and don't want to
12  look at them?
13      A.   Uh-huh.
14      Q.   Okay, that's fine.  In terms of the universe
15  of things you recall seeing prior to your diagnosis,
16  it's limited to television advertisements, television
17  commercials?
18      A.   I would say that's fair, yes.
19      Q.   And your recollection with respect to
20  television commercials is that you may have seen an
21  advertisement with Lauren Hutton; is that fair to say?
22      A.   Yes.
23      Q.   Do you remember anything about that
24  advertisement?
25      A.   Basically what every women looks for is, you

Page 23

1  know, it would take away what was -- I was suffering
2  from.  It would alleviate the hot flashes that you
3  have when you are in menopause, the elasticity of your
4  skin, and I do not recollect the osteoporosis that I
5  believe -- that wasn't in my memory, but the skin and
6  the hot flashes.
7      Q.   And you said that even though you may
8  remember seeing this advertisement, that it's not --
9  you are not the type of person who is influenced by
10  advertisements; is that fair to say?
11      A.   For the most part, yes, I think that's fair
12  to say.
13      Q.   When you say "for the most part," let me ask
14  you this:  Do you mean that when you decide about
15  taking a medication, you would rely on something more
16  authoritative than an advertisement, such as your
17  doctor's recommendation; is that fair to say?
18      A.   Yes.  Absolutely.
19      Q.   And at the time that you think that you saw
20  the Lauren Hutton advertisement, were you already
21  taking Prempro?
22           Do you remember?
23      A.   I don't recall.  No, I don't recall.
24      Q.   Let me show you what we've previously marked
25  as Fraser Exhibit Number 1.  This is the Notice of

Page 24

1  Deposition, which I think you mentioned a moment ago.
2      A.   Yes.
3      Q.   Would you just take a look at that for a
4  minute, and particularly take a look at the very last
5  page of it that's called Exhibit A, items to be
6  produced.
7           Do you see that?
8           Now, this morning Mr. Moscow produced some
9  documents to me in response to this, but I'd like you
10  to just take a minute, read through it, and see if
11  there is anything else that you think you have that
12  needs to be produced.
13           MR. MOSKOW:  Just so the witness is
14  aware, I provided counsel with a copy of the white
15  binder that you gave me, except for copies of the
16  various pamphlets, which I gave her the originals of
17  to review.
18           MS. DUGGAN:  Actually, may I see the
19  front of the binder?
20           MR. MOSKOW:  Sure.  (Handing.)  It's a
21  reused binder.
22           MS. DUGGAN:  Recycling, okay, that's
23  fine.  It had some writing on it, okay.  (Handing.)
24      A.   Okay.
25  BY MS. DUGGAN:

Page 25

1    Q.    Ms. Fraser, having read through Exhibit A
2  here, is there anything else that you think you have
3  at home that you haven't given to your attorneys that
4  would respond to any of these requests?
5    A.    No, no.
6    Q.    Well, let me just quickly go through them
7  one by one to make sure we are clear.
8        Are you -- do you have any photographs,
9  drawings, videotapes, DVDs or slides which you contend
10 are relevant to this lawsuit?
11   A.    I don't, but -- and I didn't even tell
12 Dr. Brown, the photograph -- the photographs of my
13 breast from --
14   Q.    What do you mean?
15   A.    I had -- you were going to get those from
16 Dr. Brown.
17         MR. MOSKOW:  Please just answer the
18 question.
19   A.    Okay.  My -- I've had reconstruction and he
20 has photographs of my breast.
21 BY MS. DUGGAN:
22   Q.    Dr. Brown does?
23   A.    Yes, yes.  And I don't have them, but he
24 would have them.
25   Q.    So those would be with Dr. Brown?

Page 26

1    A.    Right.
2    Q.    Okay.
3    A.    Other than that, no.  I don't have anything
4  else.
5    Q.    Okay.  How about number 2, which asked for
6  diaries, journals, calendars, notes, letters, or other
7  written documentation kept by you evidencing your
8  physical, mental or emotional condition or showing any
9  conversations with any of your health care providers
10 for a period of five years before filing of this
11 lawsuit to the present.
12   A.    I didn't keep any journals -- everything was
13 in the white notebook.  Anything and everything was in
14 that white notebook.
15   Q.    So you didn't keep a journal or diary,
16 calendar or anything that was your thoughts about
17 breast cancer or anything like that?
18   A.    No.
19   Q.    All right.  Number 3 asks for correspondence
20 or other communications between you and any other
21 person or entity regarding the claims underlying this
22 lawsuit, other than of course your communications with
23 your attorneys.
24   A.    No.  I don't have anything.  Everything is
25 in the white, that --

Page 27

1    Q.    Okay.  Now, I did see, I just want to ask
2  you a question about one of the documents, and I
3  believe we will mark this as Fraser Exhibit 3.  They
4  are a little bit out of order here.
5        These are the materials that I understand
6  are what was inside the white binder.  I saw some
7  e-mails, or at least one.  I did want to ask you who
8  this person was.
9        Who is Sandra Carpenter?
10   A.    Oh, she is a friend, and she was a former
11 teacher, and she is a cancer -- she had breast cancer.
12   Q.    So she is a breast cancer survivor?
13   A.    Yes.
14   Q.    Does she have any kind of medical training
15 or --
16   A.    No, no.  She was a teacher and just a friend
17 and so she --
18   Q.    And did you save all of your e-mails that
19 related to your breast cancer diagnosis or treatment?
20   A.    No, unless I put it in there, no.
21   Q.    Do you have e-mail at home?
22   A.    Yes.
23   Q.    And do you regularly e-mail regarding your
24 breast cancer, your treatment?
25   A.    No.

Page 28

1    Q.    No, okay.  And your e-mails, do you discard
2  them or delete them as they come in, or do you save
3  them in a file?
4    A.    Yes.  Now I pretty -- well, I have files for
5  different subjects, but I don't have a file for the
6  cancer.
7    Q.    So anything that, I guess, at the time you
8  thought was significant, you would actually print out
9  and keep in your binder.
10       Is that fair to say?
11   A.    Yes, yes.
12   Q.    All right.  Number 4 talked about documents
13 regarding or showing any comments or statements made
14 by you to -- sorry, made to you at any time by any
15 representative or employee of the Defendant in this
16 lawsuit, in this case Wyeth.
17       Have there been any such statements?
18   A.    Not to my memory.
19   Q.    Okay.
20   A.    If -- it would be in the white box, the
21 white binder.
22   Q.    As far as you know, you never have spoken to
23 anyone who works for or is associated with Wyeth?
24   A.    No.
25   Q.    Number 5 asks for newspaper articles or

1 magazine articles, advertisements or recordings of TV
2 or radio interviews relating to your allegations or
3 claims in this lawsuit.
4          Have you ever been interviewed or given --
5 been featured in an article or any kind of TV
6 publication?
7    A.    No.
8    Q.    No?
9    A.    No.  Not that I remember, no.  I'm trying to
10 think.
11    Q.    Do you think that's something you would
12 remember?
13    A.    Well, I would think so.  I would definitely
14 think so.  I would definitely think so, but --
15    Q.    Have you been interviewed or featured in an
16 article -- oh, there is a siren.
17          Have you been interviewed or featured in an
18 article relating to other things than your breast
19 cancer?
20    A.    Well, my job, I was -- you know, I would be
21 interviewed, I would be taped in the little local
22 television.  There were other instances where I might
23 be quoted.
24    Q.    And your job was -- you were a principal?
25    A.    When I was a teacher and then when I became

1 a principal, yes.
2    Q.    Okay.  Number 6 asks for any or all other
3 documents on which you relied to support your claim
4 for damages other than medical records and expenses.
5          Have you given anything that you might have
6 to your attorneys?
7    A.    If it's in the white binder.
8    Q.    All right.  Number 7 asks for products,
9 brochures, leaflets, packet inserts, pharmacy
10 handouts, package labels, packaging, or other written
11 or printed information regarding any hormone therapy
12 in your possession, including materials provided to
13 you by physicians, hospitals, pharmacies or other
14 sources as well as materials that you obtained
15 yourself through your own research.
16    A.    It's, again, it's all in the white binder.
17    Q.    Okay.  I also received photocopies of, and
18 Mr. Moscow was kind enough to bring this box, which I
19 guess came from you.
20    A.    Yes.
21          MS. DUGGAN:  Can we just go ahead and
22 get it marked so that we keep track of it.
23          MR. MOSKOW:  Sure.  I just want to make
24 sure that I'm going to keep possession of it.
25          MS. DUGGAN:  That's fine.  Let's just

1 go ahead and put a number on it.
2          (Fraser Exhibit 3, Prescription Box,
3          marked for identification. )
4 BY MS. DUGGAN:
5    Q.    Let me have you hold it for just a minute,
6 Ms. Fraser, like a hot potato.
7          Mrs. Fraser, can you tell us, please, what
8 is this that's been marked as Fraser Exhibit 3?
9    A.    They -- it was what was left over from the
10 last time I had gotten my prescription filled, and it
11 was a three-month -- I got it every three months.  It
12 was the last time.
13    Q.    What is the date on the top of the sticker
14 there?
15    A.    It's 8/24/2001.
16    Q.    And would you just show us for the record
17 here what is inside the box?
18    A.    Two packages.  Two packages of the monthly
19 pills that I took.
20    Q.    And those packages are unopened?
21    A.    Correct.
22    Q.    And there is also a paper?
23    A.    There is a leaflet.
24    Q.    And when you picked up your prescription for
25 Prempro, is this how you always received it, in a box

1 with three packets inside?
2    A.    Always, I'm not -- I don't remember.  The
3 last time I got it, it was in three-month supplies,
4 but always, I'm not sure.  I don't remember.  I truly
5 don't remember whether it was a one packet and I went
6 every month and then we did it two or three months.
7 I'm not -- I don't have a recollection of it.
8    Q.    Okay.  And there is -- there was a third
9 packet that came in this box?
10    A.    Yes.
11    Q.    But what happened to that packet?
12    A.    Well, I was taking it because -- when I
13 stopped, when he told me to stop taking it, I stopped
14 taking it.  I don't remember what I did with it.
15    Q.    Do you remember if there were some pills
16 left in it and you threw it out or --
17    A.    I don't remember.
18    Q.    And then you hung on to the box and the
19 remaining two packets that were inside of it; right?
20    A.    Uh-huh.
21    Q.    Why did you do that?
22    A.    I don't know.  I don't know.  It was under
23 the cabinet, and I don't know why I held on to it.
24    Q.    So at least for some period of time, you are
25 not sure exactly how long, when you picked up your

Page 33

1 Prempro prescription, it came looking like that; is
2 that fair?
3    A.   Uh-huh, uh-huh.  Yes, yes.
4    Q.   When you picked it up at the pharmacy, this
5 one was from the Salisbury Pharmacy, according to the
6 sticker on the top; right?
7    A.   Yes, sure.
8    Q.   Do you remember ever picking up your
9 prescription for Prempro anywhere other than the
10 Salisbury Pharmacy?
11    A.   No.
12    Q.   So it's in your memory, the only place you
13 picked up Prempro prescriptions was at Salisbury
14 Pharmacy; correct?
15    A.   In my memory, yes.  I also used CVS
16 Pharmacy, but I don't remember anywhere else.
17    Q.   Do you have a specific recollection of
18 picking up Prempro at any CVS?
19    A.   I don't have a specific recollection, no.  I
20 do not.
21    Q.   Now, when you would pick up your Prempro
22 prescription, and we will use the Salisbury Pharmacy,
23 since you do recall picking them up there, did it come
24 in a bag when you picked up the box or was it just --
25 did they just hand you the box?

Page 34

1    A.   I'm sure they put it in the box, but I don't
2 specifically recollect that.  But I would -- I don't
3 specifically remember, but they would put it in a bag,
4 I'm pretty sure.
5    Q.   Okay.  Now, did Salisbury Pharmacy do what
6 some pharmacies do, which is to staple some other
7 information about the product to the outside of the
8 bag?
9         MR. MOSKOW:  Objection to form.
10        You can answer.
11        THE WITNESS:  Pardon?
12        MR. MOSKOW:  You can answer.
13    A.   I don't remember.  I don't remember.
14 BY MS. DUGGAN:
15    Q.   Let me, so our question is clear and I think
16 I can address Mr. Moscow's objection, at the time that
17 you were picking up the Prempro prescriptions, do you
18 recall if there was additional information that was
19 stapled to or attached in some way to the bag that
20 your prescription came in?
21    A.   I don't remember if there was any, no.  I
22 don't remember that.
23    Q.   Going back to our deposition notice here,
24 Exhibit 8 had asked for all literature in your
25 possession obtained from Wyeth.

Page 35

1         Do you know if there is anything that you
2 have that you've obtained from Wyeth, other than the
3 Prempro box and materials that we've marked as Fraser
4 Exhibit 3?
5    A.   No, I don't.
6    Q.   And then number 9, all literature in your
7 possession as a result of research or Internet
8 research, based on issues involved in this lawsuit.
9    A.   Again, it's all contained in the material.
10    Q.   In the white binder material?
11    A.   Yes, yes.
12    Q.   And that -- the material that was in the
13 white binder of materials that there are some things
14 it looks like you printed that off on the Internet.
15 Were there other things that you looked at on the
16 Internet, but you didn't choose to print?
17    A.   I don't remember that I would -- that I did
18 that, no, I don't have a recollection.  Anything that
19 I felt I needed was in that.  I put in there, to my
20 memory.
21    Q.   Let me move on to another document for a
22 minute.
23         Would you take a look at what we've marked
24 as Fraser Exhibit 2, please.
25         Have you seen this document before?

Page 36

1    A.   Yes.
2    Q.   Is this the fact sheet you mentioned a few
3 minutes ago that you reviewed in preparation for your
4 deposition?
5    A.   Yes.
6    Q.   And if you'll turn to page 27 of the
7 document, there are some unnumbered pages at the back.
8         Do you see page 27?
9    A.   Uh-huh.
10    Q.   Verification at the top?
11    A.   Uh-huh.
12    Q.   Is that your signature there?
13    A.   It is.
14    Q.   And what was the date that you signed it?
15    A.   January 24th, 2005.
16    Q.   And did you understand when you signed this
17 page that you were verifying that the information in
18 the preceding pages was truthful and accurate to the
19 best of your recollection?
20    A.   Yes.
21    Q.   Now, since the date that you signed this
22 document, I know that you've had the chance to review
23 this more recently, is there anything in any of the
24 answers that you gave back then that you've noticed
25 was incorrect that you'd like to clarify?

Page 37

1    A.   Well, on page 2, my permanent address has
2  changed.
3    Q.   What is your new permanent address?
4    A.   16655 Southeast 85th Langham, L-a-n-g-h-a-m,
5  Court.  It's The -- it's two words -- The Villages,
6  Florida, 32162.
7    Q.   And do you spend part of the year in Florida
8  and part of the year in Connecticut?
9    A.   Yes.
10   Q.   How does that work over the course of a
11  year?
12   A.   As of last September -- October, as of last
13  October, we were in Florida from October 31st through
14  April 30th.  So it's mainly October through April in
15  Florida.
16   Q.   The first time that you did this --
17   A.   Was this past winter.
18   Q.   -- was this past year, okay.
19        So is it your intention going forward to
20  spend a similar amount of time --
21   A.   Yes.
22   Q.   Yes?
23   A.   Yes.
24   Q.   So you will be leaving for Florida then
25  sometime in --

Page 38

1    A.   September.
2    Q.   -- September.
3    A.   This year, late September, because we have
4  to be down there for October.  It's just a little bit
5  different this year.  But generally, it will be
6  October through April, early May.  It's iffy on
7  exactly when we will be leaving.
8    Q.   Okay.  Any other corrections or changes to
9  this document?
10   A.   Yes.  I am now retired.
11   Q.   When did you retire from your position?
12   A.   June 2008.  June 30th was my -- and my --
13  well, my husband is retired too.  I don't know if you
14  need that.
15        MR. MOSKOW:  You just skipped over page
16  6.  Did you cover what you wanted to there?
17        THE WITNESS:  I believe so.
18        MR. MOSKOW:  Okay.
19        THE WITNESS:  Because he is retired.
20  He is no longer working, page 6.
21  BY MS. DUGGAN:
22   Q.   Let me stop you actually for a second on
23  page 6.  Up in your employment history, let me first
24  clarify, before we came on the record this morning,
25  your counsel indicated to me that you were not going

Page 39

1  to be pursuing any claim for lost wages.
2    A.   Correct.
3    Q.   Okay.  I just want to make sure we've got
4  that clear.
5        Then with respect to your employment history
6  that you have here on the page, just so I have a
7  better understanding, it looks like you said you were
8  a classroom teacher from '72 to '97.
9    A.   Uh-huh.
10   Q.   That's with the Connecticut Board of
11  Education.
12   A.   Uh-huh.
13   Q.   And then on the next line, you indicated
14  you -- for the Connecticut Board of Education,
15  Watertown Public Schools, you were a principal.
16   A.   Right.
17   Q.   And that started in '97.  Here you've listed
18  just through 2000.
19   A.   Right.  It should be Connecticut Board of
20  Education, Region 6, from 2000 to 2008.
21   Q.   I see.  So you just changed schools, is that
22  what that means?
23   A.   Yeah, I changed regions.  Yes, schools,
24  regions.  And I was a principal there as well.  So it
25  should be Board of Education, Region 6, and it would

Page 40

1  be from 2000 to 2008.
2    Q.   So is it accurate to say that from 1972
3  through '97, you were a classroom teacher, and then
4  basically from '97 until June of this past year, 2008,
5  you were a principal?
6    A.   Right.  Correct.  And it's not on here, but
7  I did teach in Germany, and I taught in Kentucky prior
8  to that.  I don't know if you want that.
9    Q.   I think we talked about that a little bit
10  earlier, so that's fine.
11   A.   Okay.
12   Q.   And so there weren't any gaps in your
13  employment between '72, at least, and 2008?
14   A.   Eighty-one, I took a maternity leave for --
15  well, a family leave, in 1981 to '82, to raise my son.
16  I was home one year.
17   Q.   Were there any other corrections or
18  additions you wanted to make to your fact sheet?
19   A.   Yes.  Let's see.  It had to do with a -- I
20  had a miscarriage, and I think the fact sheet says
21  1980 and 1983.
22   Q.   Yes, I noticed that.  Was there just one
23  miscarriage?
24   A.   Yes, just one.  And I had a D and C, and
25  that was with Dr. Tesoro.  It might be highly

Page 41

1 irregular, '83 was after Caleb was born.  My son
2 born in '81.  This was in '83.  And I'm about -- I
3 don't know what page.
4     Q.   I've seen that, so I'll find it for you.
5 But just so we are clear, your testimony is, I take it
6 you were pregnant two times?
7     A.   Uh-huh.
8     Q.   One time resulting in the birth of Caleb.
9     A.   Yes.
10    Q.   Then in 1983, you had a pregnancy that
11 resulted in a miscarriage; is that right?
12    A.   That is the year I -- I guess it's kind of
13 crazy, a woman doesn't remember what year she was
14 pregnant, but I know I wasn't pregnant in '80.  It was
15 after he was born, so it was '83.  I don't remember
16 the exact year.
17    Q.   But it was within a couple of years of Caleb
18 being born?
19    A.   Yes.
20    Q.   All right.  I'll find the page where that
21 correction is.
22         MR. MOSKOW:  It's on page 19, counsel,
23 although it's correctly stated on page 7, so there --
24         MS. DUGGAN:  Right, okay.
25 BY MS. DUGGAN:

Page 42

1     Q.   So on page 19 then, number 1 at the bottom
2 where condition is ectopic pregnancy, it should only
3 say 1983, which is the best of your recollection;
4 correct?
5     A.   Yes, Yes.
6     Q.   Were there any other corrections or changes
7 you noticed that you wanted to make to the fact sheet?
8     A.   One, I had a sister.  She had a basal cell
9 carcinoma on her face, and that was subsequent to me
10 filling this out.  This has been since -- I printed it
11 for her, but then subsequent to that, another
12 sibling -- two male siblings have had the same exact
13 thing.
14    Q.   Okay.  So this is on page 22, I believe, at
15 the time you identified your sister Angela as having a
16 melanoma?
17    A.   That's incorrect, it should be Lynda.  Lynda
18 Quesnel.
19    Q.   So the last name is right, but the first
20 name should be Lynda?
21    A.   Yes.  And then -- this is -- they talked to
22 me about it in passing.  It wasn't like, it was just,
23 oh, I had one of those too.  So my brother Jim and my
24 brother Jerry both have had either squamous cell or
25 basal cell removed from their nose.  I don't remember

Page 43

1 which one.  And they are both fine.
2     Q.   All right.  How about, is there anything
3 else you wanted to update on your fact sheet?
4     A.   Well, on any other surgery, on page 22,
5 okay.  I had a eyebrow -- I had my -- I had very
6 droopy eyelash -- eyelids, and I had a -- what is it
7 rhinoplasty?  I had that.  And I honestly don't
8 remember the year.  It was Dr. Ruchman at the Opticare
9 Center in Waterbury.
10    Q.   Okay.
11    A.   And then I had a necklift, a facelift, a
12 necklift with Dr. Brown, and then I had a second one
13 of those.
14    Q.   Okay.
15    A.   I care about what I look like.  I'm vain, I
16 guess.
17    Q.   You are lovely, so it's paying off.
18    A.   And then I had a reconstruction on my left
19 breast where the lump -- because it was very ugly.
20 That's how it all came about.  That's how that came
21 about.
22    Q.   I know you don't remember exact dates, but
23 if we can try to pin down a little bit more the year,
24 maybe tie it to certain events.
25         Did you have the eyebrow -- I'll just call

Page 44

1 it the eyebrow lift because I don't know what the
2 proper term is for that, prior to your breast cancer
3 diagnosis or after?
4     A.   I don't remember.  I don't remember.
5     Q.   Do you remember if you were teaching in
6 Watertown or Region -- had you switched to Region 6 at
7 the time?
8     A.   I don't remember.  I went to Opticare.
9     Q.   Where is Opticare located?
10    A.   It was in Waterbury, but Dr. Ruchman is --
11 he is no longer with them.  Mark Ruchman is his name.
12 R-u-c-h-m-a-n.
13         I'm just remembering these things, to be
14 honest.  I didn't even tell Neal.
15         MR. MOSKOW:  Don't talk about what we
16 discussed.
17         THE WITNESS:  All right.
18 BY MS. DUGGAN:
19    Q.   That's okay.  I just want to try to get your
20 best recollection today.
21    A.   Okay.
22    Q.   So if things come back to you, by all means,
23 please --
24    A.   It's just, you know, when you look at any
25 other surgeries, so I --

Page 45

1    Q.    So you really can't remember anything about
2    when the eyebrow lift happened, whether it was before
3    the breast cancer or after?  No?
4    A.    I don't remember.  I don't remember.
5    Q.    And you said you've had two facelifts.
6    A.    Well, yes.  Necklifts.
7    Q.    Neck, okay, neck.  And those were both with
8    Dr. Brown?
9    A.    Yes.
10    Q.    Do you remember when you had the first one?
11    Was that before you had breast cancer?
12    A.    No, no.  Because I saw him and talked to him
13    about the reconstruction.  The first one was in -- the
14    second one was in 2007.  I'm trying to remember.  Yes,
15    the second one was in 2007, and that's when I had --
16    oh, my goodness -- yes, that's when I had the first
17    reconstruction, was in August of 2007.  And the first
18    necklift was in, must have been 2006, 2005.  2005.  It
19    must have been 2005.  And they are in the summer.
20    They were all in -- they were in the summer months.
21    Q.    Is that because you were not working during
22    that time?
23    A.    Right, right.
24    Q.    You had the first necklift in you think 2005
25    before you actually had the breast reconstruction;

Page 46

1    correct?
2    A.    Yes.
3    Q.    Then you had, was it at the same time, the
4    breast cancer and the second necklift?
5    A.    Yes.
6    Q.    You think that was August of '07?
7    A.    Yes.  It was August, August 6th.  I'm pretty
8    close to -- August 6th.  And then I broke my leg.
9    Q.    Yes, I saw that in your records.  You've had
10    a number of falls.
11    A.    I have.  I've fallen and I had surgery on my
12    left tibia.  It was a tibia plateau fracture.
13    Q.    And that was --
14    A.    That was September 9th, 2008.
15    Q.    That was the date of the surgery or the date
16    of the fall?
17    A.    Yes.  The fall was the 6th and the surgery
18    was the 9th in Hartford Hospital.
19    Q.    And have you had any other surgeries that
20    you can recall?
21    A.    I think I'm pretty well set.
22    Q.    Okay, you've had a few.  The leg surgery,
23    have you recovered fully from that?
24    A.    It's -- yes, about as fully as I can.
25    Q.    Does it still cause you pain today?

Page 47

1    A.    Yes.  But, you know, you work through that.
2    Q.    What are you doing?  Physical therapy?
3    A.    I did.  I had physical therapy.  And I have
4    a brace when I walk for long periods of time.
5    Q.    Are you wearing that brace today?
6    A.    No.
7    Q.    About how much do you wear it, would you
8    say?
9    A.    When I take walks down, you know, I might
10    wear it three times a week for a walk, a short walk.
11    Q.    Do you walk for exercise?
12    A.    Yes.
13    Q.    Do you do that at a gym, or do you do it
14    around your neighborhood?
15    A.    At home.
16    Q.    At home?
17    A.    At home.
18    Q.    Do you have a home gym set up?
19    A.    No.  Outside, just down, up and down the
20    road.
21    Q.    Is there anything else about your fact sheet
22    that you wanted to update or correct?
23    A.    Oh, again, on page --
24    Q.    Page 24.
25    A.    -- page 25.  Here I do have Connecticut

Page 48

1    Board of Ed 6, Region 6 on there.  And that's under
2    the injury claim.  That was my employer.  That's their
3    address.  But I am not --
4    Q.    So on page 24, you are saying now you are
5    not --
6    A.    That's who I was hired by, just so you have
7    that information, that's who I was employed by at the
8    time of my injury.
9    Q.    And at this time, you are no longer making a
10    claim for lost earnings?
11    A.    Correct, correct.
12        The only -- this other thing, have you had
13    any discussion with any physician about whether your
14    condition is related?  As far as having a
15    conversation, it was that he took me off of the
16    medication.
17    Q.    You're on page 24.
18    A.    Yes.
19    Q.    And you are talking about your discussion
20    with Dr. Tesoro?
21    A.    Yes.
22    Q.    Right after your mammogram?
23    A.    Yes, yes.  And just that he took me off of
24    them, so as far -- I don't have a recollection of a
25    conversation with him per se, but he took me off of

1 them.

2    Q.   So you don't recall asking him why at that

3 point?

4    A.   No.  I do recall with Dr. Kern that he

5 discussed with me that it was estrogen-positive.  But

6 that was in October, before the lumpectomy.  That was

7 in October.

8    Q.   That was in October of '01?

9    A.   That was of '01.

10    Q.   And did Dr. Kern talk to you about Prempro

11 in connection with telling you that the cancer was

12 estrogen-positive, or did he not talk about Prempro?

13    A.   He just -- I don't recall.  I don't recall

14 the exact words or the conversation.  I just -- he did

15 say that the tumor was an estrogen-positive tumor.  I

16 just remember that.  That's what I remember.

17         As far as specifically talking about a

18 product, I don't have any recollection of that.

19    Q.   Do you recall if Dr. Kern discussed with you

20 at that time or any other time what he thinks caused

21 your breast cancer?

22    A.   I don't recall.  I don't.  I don't recall.

23    Q.   Do you recall ever asking Dr. Kern or any of

24 your doctors what caused your breast cancer?

25    A.   Could I just have a minute to ask --

1         MR. MOSKOW:  You have to answer the

2 question first.

3    A.   I don't recall asking specific questions of

4 my doctor, no.  Of course I would want to know why.

5 BY MS. DUGGAN:

6    Q.   So as you sit here today, up until today,

7 you have never, to the best of your recollection,

8 asked any of your doctors what caused my breast

9 cancer; is that correct?

10    A.   I don't remember.  I don't remember asking.

11    Q.   Do you recall any of your doctors ever

12 telling you that Prempro caused your breast cancer?

13    A.   I don't recall that either.  I recall -- I

14 don't remember about it.  That may have been caused

15 by the pills I was -- it may have been caused, but

16 there was no way for them to know.  I do not remember

17 which doctor.

18    Q.   So if I'm understanding what you are saying,

19 you think that some -- one of your doctors may have

20 said to you, your hormone therapy use may have caused

21 your breast cancer; is that right?

22    A.   After the fact because it was

23 estrogen-positive.

24    Q.   And you don't have any recollection as you

25 sit here today as to who told you that?

1    A.   No.

2    Q.   But you do remember that it was after you

3 had already stopped taking the hormone therapy; right?

4    A.   Yes.

5    Q.   Have you finished telling me everything that

6 you think needed to be updated in the fact sheet?

7    A.   I have another gynecologist.  I don't know

8 if you need that.

9    Q.   Yes.  Which page are you on there?

10    A.   Twenty-six.

11    Q.   Okay.

12    A.   Her name is Dr. Susan Parisi, P-a-r-i-s-i,

13 and she is in Sharon, Connecticut.

14    Q.   How long have you been seeing Dr. Parisi?

15    A.   A year.

16    Q.   And who were you seeing up until a year ago?

17    A.   I saw Loretta Richardson.

18    Q.   For your gynecology care?

19    A.   Yes.

20    Q.   And how long were you seeing, I guess,

21 Physician Assistant Richardson?

22    A.   Approximately -- it was three -- three, four

23 years.  Three -- I'm trying to think when because

24 she's since left.  I kind of followed her around too.

25 I would say four years.  Three to four years.

1    Q.   Okay.  It might be easier if we walk forward

2 from Dr. Tereso.  Is that how you --

3    A.   Tesoro.

4    Q.   Okay.  When did you stop seeing Dr. Tesoro?

5    A.   Around 2002.

6    Q.   And why did you stop seeing him?

7    A.   He moved to -- he went to -- I followed him

8 to Hartford.  He moved to Warwick, Rhode Island, and

9 it was just too far.  I went once to see him, and it

10 was just too far, and then I started seeing Loretta.

11 I think I saw Dr. Schnurr once in Sharon.

12    Q.   I'm sorry, Dr. who?

13    A.   Schnurr.  Then Loretta Richardson.  Because

14 after Loretta -- all along I've seen Bruce Janelli and

15 Dr. Levine, since I started my chemo treatments.  I'm

16 still seeing Dr. Levine.  I go see him once a year at

17 The Cancer Center.  Loretta Richardson and Dr. Parisi.

18 I believe I just started with her last spring.

19    Q.   And did you start with Dr. Parisi because

20 Ms. Richardson had moved?

21    A.   Yes.

22    Q.   Is that right?

23    A.   She went to Waterbury.

24    Q.   And so that was no longer convenient for

25 you?

Page 53

1    A.    Right, correct.
2    Q.    And when you decided to switch from
3  Dr. Tesoro to maybe Ms. Richardson or Dr. Schnurr, was
4  the only reason that you decided not to keep seeing
5  Dr. Tesoro that he had moved to Rhode Island?
6    A.    Yes.  He had moved far away.  He had moved
7  to -- he was a teaching professor, and he had moved,
8  and it was just to go far away for him, because he was
9  a wonderful doctor.
10    Q.    That's what I wanted to ask.
11    A.    Yes.
12    Q.    Do you have any criticisms of his care of
13  you?
14    A.    Not even a little bit, no.
15    Q.    So he was someone that you trusted as a
16  medical professional?
17    A.    Explicitly.
18    Q.    And you felt like you could ask him
19  questions if you needed to?  Yes?
20    A.    Yes, yes.
21    Q.    And he would always answer your questions if
22  you had them?
23    A.    Yes.
24    Q.    So you have -- if Dr. Tesoro were still
25  conveniently located to you, you would be seeing him

Page 54

1  today; is that right?
2    A.    Yes, yes.
3    Q.    If we are finished updating the fact
4  sheet --
5    A.    I believe everything is -- if you don't
6  mind.
7    Q.    Sure.  No, take your time.
8    A.    Okay.  I believe I've got everything.
9    Q.    I'll propose that we just take a short break
10  at this point.  We've been going about an hour.
11         MR. MOSKOW:  I appreciate that very
12  much.  Thank you.
13         MS. DUGGAN:  Okay.  Can we go off the
14  record?
15         THE VIDEO OPERATOR:  We are going off
16  the record at 11:34 a.m.
17    (Recess taken from 11:34 a.m. to 11:49 a.m.)
18         THE VIDEO OPERATOR:  We are now back on
19  the record at 11:49 a.m.
20  BY MS. DUGGAN:
21    Q.    Ms. Fraser, are you ready to resume after
22  our break?
23    A.    Yes.
24    Q.    Okay, great.  This -- in this next section,
25  I just want to get to know you a little bit better.  A

Page 55

1  lot of the information I'm going to be asking you
2  about is in your fact sheet, so we've got it here.  If
3  you need to refer to it to refresh your recollection
4  or look at dates or anything like that, it's available
5  to you should you want to do that, but I don't want to
6  have us page through it.
7         So let me first start by asking you to tell
8  us your date of birth.
9    A.    11/21/1946.
10    Q.    So you are currently sixty-two years old; is
11  that right?
12    A.    Yes.
13    Q.    And where were you born?
14    A.    In Hopkinsville, Kentucky.
15    Q.    How did you get to Connecticut?
16    A.    My sisters were living up here, and I came
17  to visit them and decided to apply for a job, a
18  teaching job.
19    Q.    And approximately when was that?
20    A.    It was April 1971 I was hired, and I began
21  in August of '71.
22    Q.    And prior to that time, had you lived your
23  whole life in Kentucky?
24    A.    Yes.
25    Q.    And you did mention earlier you spent some

Page 56

1  time in Germany.
2    A.    Yes.
3    Q.    Was that after you relocated to Connecticut?
4    A.    Yes.
5    Q.    And what is your current -- I guess you gave
6  me your permanent address now, an address in Florida.
7    A.    Yes.
8    Q.    Do you still maintain an address in
9  Connecticut?
10    A.    Yes.
11    Q.    What address is that?
12    A.    50 Farnam Road, Lakeville, Connecticut.
13    Q.    How long had you lived at the Lakeville
14  address?
15    A.    Since 1983.
16    Q.    Have you ever lived in New Milford?
17    A.    No.
18    Q.    In your fact sheet, you had identified an
19  address for your husband in New Milford, and I wasn't
20  sure if that was maybe a work address.
21    A.    That was his work address.
22    Q.    So your husband has lived with you at the
23  Farnam Road address since 1983 until you bought the
24  place in Florida; is that right?
25    A.    Yes.

Page 57

1    Q.    And could you just briefly give us a summary
2  of your educational background, where you went to high
3  school, where you went to --
4    A.    I went to high school in Hopkinsville and
5  graduated 1964.  I went to Western Kentucky University
6  and graduated in 1968.
7    Q.    And what was your degree in there?
8    A.    It was a B.S. in elementary education.  And
9  then I went to Central Connecticut State University,
10  it was college, and I got my Master's degree in
11  elementary education.  I graduated from there in 1988.
12  And -- no, '81.  '81, yes.  And I was pregnant with
13  Caleb.  And then I graduated -- I got a Sixth Year in
14  administration supervision from Southern Connecticut
15  State University in 1988.
16    Q.    And what does it mean to be a Sixth Year?
17    A.    That certified me -- it's another year, it's
18  like a Master's, and it certified me to become an
19  administrator.
20    Q.    Do you have any medical training?
21    A.    No.
22    Q.    Is there anyone in your family that has
23  medical training?
24    A.    I have one sister who is a CNA, I believe.
25    Q.    Do you know what that stands for?

Page 58

1    A.    She worked in the hospital.
2    Q.    Which of your sisters was that?
3    A.    Lynda.  And I have brothers who are
4  pharmacists.
5    Q.    Okay.  Which brother -- more than one?
6    A.    Jim and my youngest brother Chris.
7    Q.    Both of them are pharmacists?
8    A.    Yes.
9    Q.    And where do they live?
10    A.    Jim lives in Lexington, Kentucky, and Chris
11  lives in Houston.
12    Q.    Houston, Texas?
13    A.    Yes.
14    Q.    Have you ever consulted with Jim or Chris
15  regarding your physical health?
16    A.    After my diagnosis, Jim, because his wife
17  had a mastectomy many years ago.
18    Q.    Did you talk to Jim about medications that
19  you were taking?
20    A.    I don't recall.
21    Q.    Did you ever talk with Jim about your use of
22  Prempro?
23    A.    I don't recall.  I don't.
24    Q.    Was it your practice to talk to Jim or to
25  Chris about medications that you were taking at any

Page 59

1  point in your life?
2    A.    No.
3    Q.    No, okay.  So when you talked to Jim
4  about -- after you were diagnosed with breast cancer,
5  was that primarily related to your breast cancer
6  diagnosis and treatment?
7    A.    Yes.  Mostly the treatment.
8    Q.    Did he make recommendations to you regarding
9  treatment options?
10    A.    No.
11    Q.    Was it more, he was talking about his wife's
12  experience and that sort of thing?
13    A.    Yes, yes.
14    Q.    How about your sister Lynda, did you ever
15  talk about medications you were taking with your
16  sister Lynda?
17    A.    Not that I recall.  Not that I -- no.
18    Q.    Is that it in terms of your family members
19  who have medical training, your two brothers and your
20  sister?
21    A.    Yes.
22    Q.    How about, do you have any close friends who
23  are doctors, who have medical training?
24    A.    No.
25    Q.    Let me ask you a little bit about your

Page 60

1  marriage to Mr. Fraser.
2          His name is Joseph Fraser?
3    A.    Yes.
4    Q.    And what is his date of birth?
5    A.    11/28/1945.
6    Q.    When did you all get married?
7    A.    We got married in June of '79.
8    Q.    And you mentioned earlier that he is
9  retired --
10    A.    Yes.
11    Q.    -- now, but what was he doing before he
12  retired?
13    A.    He was a hydroelectric supervisor.
14    Q.    For what company?
15    A.    He worked for HELCO.  He worked for CL&P,
16  and then for Northeast Utilities, all under the
17  umbrella of Northeast Utilities, and then they were
18  bought out by First Light Power.
19    Q.    And when did he retire?
20    A.    He retired from Northeast Utilities in '06.
21  But he retired from First Light in February of 2008.
22  It was officially April 2008.
23    Q.    So when did he actually stop working?
24    A.    February of 2008.
25    Q.    All right.  And what is a hydroelectric

1 supervisor?

2    A.    There are several hydroplants, dams on the
3 Housatonic River, and he oversaw the operations.  He
4 was operations supervisor.

5    Q.    And you mentioned a number of different
6 entities, I guess, that were his employer.

7    A.    Uh-huh.

8    Q.    Over what time period was he working for
9 those?

10    A.    He began in 1972.

11    Q.    How is Mr. Fraser's health?

12    A.    It's good.

13    Q.    Does he have any health conditions that you
14 are aware of?

15    A.    Well, he did have prostate cancer in 2006
16 and was treated for that, and he has had bypass
17 surgery.

18    Q.    Do you recall when that was?

19    A.    It was like 12 years ago.  He was 49.

20    Q.    Today his health is good?

21    A.    Yes.

22    Q.    And no recurrence of the prostate cancer?

23    A.    No.

24    Q.    Great.  Does Mr. Fraser smoke?

25    A.    No.

1    Q.    Did he ever smoke during your marriage?

2    A.    He did.

3    Q.    For how long did he smoke while you were
4 together?

5    A.    He quit about 16, 17 years ago.  Maybe
6 longer.

7    Q.    Did he smoke in the house when he was
8 smoking?

9    A.    Yes, yes.

10    Q.    For how many years did he smoke while you
11 were living together?

12    A.    I would say 18, 19 years.

13    Q.    And during those 18 or 19 years, how much
14 would he smoke a day?

15    A.    Half a pack.

16    Q.    Does Mr. Fraser drink alcohol?

17    A.    Yes.

18    Q.    Approximately how much does he drink, say,
19 in a week?

20    A.    Just average.  Is this like an average?
21 Six, I don't know.  Maybe six beers over the course of
22 a week.

23    Q.    Has there ever been a time when he's drunk
24 alcohol in amounts that caused concern to you?

25    A.    No.

1    Q.    Other than the prostate cancer, which you
2 just mentioned, and the bypass surgery, has Mr. Fraser
3 had any other serious health problems since you've
4 known him?

5    A.    That was enough.

6    Q.    That does sound like enough.

7          Would you say that you have a good marriage?

8    A.    Yes, yes.

9    Q.    Is he a good husband?

10    A.    Yes.

11    Q.    Do you feel like you have a good
12 partnership?

13    A.    Yes.

14    Q.    I warned you at the beginning I was going to
15 have to ask you some questions.  Has there ever been a
16 time when you and Mr. Fraser have chosen to live
17 apart?

18    A.    No, no.  I -- no.  Well, he was in Florida
19 and I was still up here, but that was -- I hadn't
20 retired yet, so --

21    Q.    So I guess what I'm asking is, was there a
22 time when you were separated in your relationship?

23    A.    No, no.

24    Q.    Have you ever gone to marriage counseling
25 with Mr. Fraser?

1    A.    Yes.

2    Q.    When was that?

3    A.    Caleb was 11, so it was -- he was born in
4 '81, so what would that make it?  Early nineties?  It
5 was family counseling.

6    Q.    And just briefly, what were the issues that
7 had you go to family counseling?

8    A.    Well, we have a stepfamily.  My husband has
9 two children, and it was just family dynamics were
10 tough, teenagers and then this 11-year-old just being
11 11.

12    Q.    Did your stepchildren live with you?

13    A.    Not officially, but yes.

14    Q.    Okay, what do you mean by that?

15    A.    They had joint custody and the children
16 chose to -- they wanted to go to school where we
17 lived, in the town we lived in, so they were at our
18 house more often than not, and they had their own
19 bedrooms and his ex-wife was very open to this.

20    Q.    And you said there were two children.  I
21 know two stepchildren.  One I know is Vanessa who was
22 in the car accident with you.

23    A.    Right.

24    Q.    Who is the other?

25    A.    Trevor.

Page 65

1    Q.   Trevor.  And how old are Trevor and Vanessa?
2    A.   Vanessa is 39 and Trevor is 37.
3    Q.   How old is Caleb today?
4    A.   He will be 28 next month, a month.  One more
5    month.
6    Q.   And the family counseling that you went to
7    back in the early nineties, approximately how long did
8    you do that?
9    A.   The best I can remember, we had maybe four
10   or five sessions.
11   Q.   Other than that time period, have you ever
12   gone to counseling in connection with your
13   relationship with Mr. Fraser?
14   A.   No.
15   Q.   Have you lived with anyone other than your
16   husband in the past ten years since --
17   A.   No.
18   Q.   No.  When did Caleb move out of your house?
19   A.   He went to high school in Georgia the last
20   two years of his high school, so that would be like
21   '98, '99, he moved to Georgia for school, and then
22   since then, he was in college and on his own.
23   Q.   So he -- would he come back over breaks and
24   vacations?
25   A.   Yes.

Page 66

1    Q.   But in terms of full-time living with you,
2    that stopped around 1998 when he went away to high
3    school?
4    A.   Yes.
5    Q.   And then no one else has lived with you and
6    your husband since that time period on a daily basis?
7    A.   No.
8    Q.   All right.  Let me find out a little bit
9    more about Caleb.  His birth date, that was August 21
10   of '81; is that right?
11   A.   Correct.
12   Q.   Where does he live now?
13   A.   He lives in Meriden.
14   Q.   Is that in Connecticut?
15   A.   Yes.
16   Q.   How far away is that from your home in
17   Connecticut?
18   A.   About an hour and a half.
19   Q.   Is he employed?
20   A.   Yes.
21   Q.   What does he do?
22   A.   He is a bank manager for People's Bank.
23   Q.   Does he have any health problems that you
24   are aware of?
25   A.   No.

Page 67

1    Q.   As a child, did he have any serious health
2    problems?
3    A.   No.
4    Q.   How is your relationship with Caleb?
5    A.   I'd say excellent.
6    Q.   You mentioned a moment ago that you had gone
7    to family counseling in connection with family
8    dynamics, and I saw a couple of references in the
9    medical records to stress with your son at various
10   points in time.
11       Can you explain a little bit about what
12   caused you stress in your relationship with your son?
13   A.   Basically he was -- he wanted to do
14   everything his way instead of the way we felt it
15   should be done.
16   Q.   And over what time period was that going on?
17   A.   Not until he was 11 and a couple of years.
18   But it wasn't huge issues, it was typically kids.
19   Q.   And you said your relationship with him
20   today is excellent.
21   A.   Uh-huh.
22   Q.   How often do you see him?
23   A.   About every six weeks, eight weeks.
24   Q.   And approximately how often do you speak to
25   him?

Page 68

1    A.   At least once a week.
2    Q.   Does he have any children?
3    A.   No.
4    Q.   Do your stepchildren have any children?
5    A.   Yes.  Vanessa.
6    Q.   How many kids does she have?
7    A.   She has two.
8    Q.   How is your relationship with those
9    children?  Do you have a relationship with them?
10   A.   Yes.
11   Q.   Do you spend time with them?
12   A.   Yes, we do.
13   Q.   And your only child is Caleb; correct?
14   A.   Yes.
15   Q.   Your only blood child?
16   A.   Uh-huh.
17   Q.   Let me ask you a little bit about other
18   members of your family.
19   A.   Okay.
20   Q.   Let's talk about your parents for a minute.
21   What was your father's name?
22   A.   George.  George Weatherford, II.
23   Q.   His last name was Brockman?
24   A.   Yes.  I'm sorry, yes, Brockman.
25   Q.   And he's passed way, I understand?

Page 69

1    A.   Yes.
2    Q.   What did he die of?
3    A.   He actually fell and broke his hip and came
4 out of the operation and then had a heart -- they got
5 him up and he had heart -- he died of his heart.
6    Q.   Had he had heart disease prior to that?
7    A.   Yes.  He had -- he had had three bypasses a
8 number of years before that.
9    Q.   How old was he when he died?
10   A.   Approximately 87.
11   Q.   And was your mother alive at that time?
12   A.   Yes.
13   Q.   And where were they living then?
14   A.   They were living in Hopkinsville, Kentucky.
15   Q.   Now, your father, did he have any other
16 health problems that you are aware of?
17   A.   Well, he had skin cancer, but I just
18 remember him being treated for it.  I don't remember
19 it being overwhelming.
20   Q.   Anything other than the skin cancer and the
21 heart disease?
22   A.   Not to my knowledge.
23   Q.   Now, what was your mother's name?
24   A.   Emma Louise McShane Brockman.
25   Q.   And she's passed away as well?

Page 70

1    A.   Yes.
2    Q.   And what did she die of?
3    A.   She had a heart -- she did have a heart
4 condition as well, a pacemaker put in, but some mass
5 was found in her chest or -- not her chest.  There was
6 never an autopsy so we don't know.  We don't know.  I
7 don't know.
8    Q.   Now, in some of the medical records, I saw
9 references to possible colon cancer.
10       Is that what you are talking about?
11   A.   Yes.
12   Q.   But not diagnosed?
13   A.   No.
14   Q.   And how old was your mother when she died?
15   A.   Eighty-six.
16   Q.   Are you aware of any other health conditions
17 that your mother had?
18   A.   No.
19   Q.   No, okay.  Do you know anything about your
20 mother's experience with menopause?
21   A.   Not really, no.  I don't believe she -- no,
22 I don't.  I don't really.
23   Q.   You don't know anything about whether or not
24 she had any menopausal symptoms, for example?
25   A.   I don't know.  I don't remember complaints.

Page 71

1    Q.   Do you know whether she was taking any
2 hormone therapy medications at the time of menopause?
3    A.   No.  I don't know.
4    Q.   You don't know, okay.
5        You said with respect to menopausal
6 symptoms, you don't remember any complaints.
7    A.   Uh-uh.
8    Q.   Did you see your parents in person much?
9    A.   No, not after I moved up here.  I mean, once
10 a year.  At first once a year.  After that, it wasn't
11 that often.
12   Q.   Now let's talk about your siblings.  We've
13 talked about a couple of them throughout the
14 discussion so far.  If I counted correctly, you were
15 one of eight children; is that right?
16   A.   Correct, yes.
17   Q.   And you had four brothers and three sisters;
18 is that right?
19   A.   Correct.
20   Q.   Are they all still living?
21   A.   Yes.
22   Q.   Okay, great.  Let's see.  I'm going to ask
23 you to give them to me, if you could, by name and
24 birth order.  Okay.  So who is first?
25   A.   We call him Jerry, but it's George

Page 72

1 Weatherford Brockman, III and then Mary Angela
2 Brockman DeAngelis, Michael Hugh Brockman, James
3 Melvin Brockman, Lynda Louise Brockman, myself,
4 Margaret Lee Brockman, and Eileen McShane Brockman,
5 and Christopher Lyle Brockman.
6    Q.   Eileen, was her name ever Graham?
7    A.   It is Graham now, yes.
8    Q.   It is Graham, okay.
9    A.   It is Graham now.
10   Q.   Okay.  So you are the third from the end?
11   A.   Yes.
12   Q.   Now, your siblings, you said they are all
13 still living.  Where do they live?
14   A.   My brother -- my oldest brother lives in
15 Hopkinsville.  My sister Angela lives in Stamford.  My
16 brother Mike lives in Tulsa, Oklahoma.  My brother Jim
17 lives in Lexington, Kentucky.
18   Q.   He is the pharmacist, one of the
19 pharmacists?
20   A.   Yes.  My sister Eileen lives in
21 Hopkinsville, Kentucky, and my brother Chris lives in
22 Houston.
23   Q.   I think we might have skipped Lynda.
24   A.   Lynda lives in Torrington, Connecticut.
25   Q.   Lynda is the one who is the CNA?

1    A.   It's CNA or LPN.  One or the other.

2    Q.   It's some kind of nursing certification; is
3 that right?

4    A.   Yes, yes.

5    Q.   Now, we've talked about, I guess, skin
6 cancers or skin cell issues for Lynda, James, and --

7    A.   Jerry.

8    Q.   -- Jerry, okay.

9         Do you know anything about whether any of
10 your other siblings have other health problems?

11    A.   No.

12    Q.   And as to those three, are you aware of any
13 other health problems other than the skin cancer
14 issues?

15    A.   No.

16    Q.   No, okay.  So to your knowledge, have any of
17 them had any form of cancer other than possibly the
18 skin issues we discussed?

19    A.   No.  You know, I want to correct something.
20 Angela and Lynda, I do know they are on blood pressure
21 medicine, so they have high blood pressure.  I don't
22 know about the others.  And all three of the girls are
23 on either Boniva or Actonel or Fosamax.

24    Q.   Is that for osteoporosis-related conditions?

25    A.   Yes.

1    Q.   Are all of your siblings petite like you,
2 your sisters in particular?

3    A.   Well, I am the smallest.

4    Q.   But all four of you have some sort of bone
5 or osteo concerns; is that right?

6    A.   Yes.

7    Q.   Do you know as to your sisters, do you know
8 anything about any of their experiences with
9 menopause?

10    A.   Not really, no, no.

11    Q.   Are health issues something generally that
12 you all don't discuss?

13    A.   Not really.

14    Q.   That's fine.  So do you know whether any of
15 your sisters have ever taken hormone therapy
16 medication such as Prempro?

17    A.   I don't know.  I don't know.

18    Q.   Have you ever talked with any of your
19 sisters about the fact that you used Prempro and now
20 don't use it anymore?

21    A.   I don't -- I don't recall any specific
22 situation where I talked to my sisters about any of my
23 medications, other than my Fosamax.

24    Q.   Do you know -- do all of your siblings know
25 that you've had breast cancer?

1    A.   Oh, yes.

2    Q.   Let me ask you about cancer history relating
3 to your family, not just your siblings, but beyond
4 that as well.

5         Do you know how many brothers and sisters
6 your father had, if any?

7    A.   He had a brother and a sister by his mother
8 and father, and he had two half sisters by his father.

9    Q.   Are any of those siblings or half siblings
10 still living?

11    A.   No.

12    Q.   Do you know if any of them have ever been
13 diagnosed with any type of cancer?

14    A.   No.

15    Q.   You don't know?

16    A.   No, I don't know.

17    Q.   Do you know if any of your father's siblings
18 or half siblings had children?

19    A.   Neither one of them did.  The halves I'm not
20 clear on, I'm not sure.  But the fulls, no.

21    Q.   No kids?

22    A.   Uh-uh.

23    Q.   How about your mother's side of the family,
24 do you know if she had any brothers and sisters?

25    A.   She had ten brothers and sisters.

1    Q.   Okay.  Are any of them still living?

2    A.   No.

3    Q.   Do you know if any of them were ever
4 diagnosed with any type of cancer?

5    A.   I don't know.

6    Q.   Do you know if any of them had children?

7    A.   Yes.

8    Q.   Do you know anything about whether any of
9 your, I guess those would be your cousins, whether any
10 of them have ever had cancer?

11    A.   I know this is the most recent one.  One of
12 her sister's son had throat cancer.  But I don't know
13 of any others.  I don't know.

14    Q.   Do you know that man's name, the son who had
15 throat cancer?

16    A.   Doremus.

17    Q.   Do you know how to spell that?

18    A.   D-o-r-e-m-u-s.

19    Q.   What was his last name?

20    A.   That was his last name.

21    Q.   Oh, okay.

22    A.   Jay Doremus.  I don't -- I just remember it
23 was throat cancer.

24    Q.   Do you know if he was treated and recovered
25 from the throat cancer?

Page 77

1    A.   I know he was treated.  He was treated, but
2  he died, so I don't --
3    Q.   Do you know if he died because of the throat
4  cancer, or you just know that he's died?
5    A.   I don't know.  I mean, I don't.
6    Q.   That was your cousin then?
7    A.   Yes.  And not a close cousin.
8    Q.   Okay.  Any other cousins on your mother's
9  side who you know of that had any type of cancer?
10   A.   No.
11   Q.   Now let me ask you specifically about breast
12 cancer.  I saw in the medical records that you have a
13 niece who has breast cancer.
14   A.   Yes, yes.
15   Q.   Whose daughter is she?
16   A.   Lynda.
17   Q.   Do you know what type of breast cancer she
18 has or was diagnosed with?
19   A.   It was fast-growing.  She was thirty-seven.
20   Q.   Thirty-seven when diagnosed?
21   A.   (Nodding in the affirmative.)
22   Q.   Okay.  Did she have treatment for it?
23   A.   Oh, yes, yes.
24   Q.   And --
25   A.   Mastectomy and chemo.

Page 78

1    Q.   One side?
2    A.   Yes.  Then she ended up -- oh, God, I cannot
3  remember.  She had -- I'm pretty sure she had both
4  breasts removed.
5    Q.   And do you know the outcome of her cancer?
6    A.   Right now she is still undergoing -- she has
7  chemo once a month.  She is in her forties.
8    Q.   Do you know what her prognosis is?
9    A.   It's pretty good.  One reason they are
10 keeping her on the chemo is because she had two spots
11 on her liver, but they've been held at bay basically.
12   Q.   Do you know whether -- I'm sorry, what is
13 her name, Lynda's daughter?
14   A.   Michel Lynne Quesnel Capello is her last
15 name.
16   Q.   Does she go by -- what name does she go by?
17   A.   Michel Lynne Capello.
18   Q.   Michel Lynne Capello, okay.
19        And do you know whether Michel Lynne took
20 any hormone therapy medications prior to her
21 diagnosis?
22   A.   I don't know.  I don't know.  She had four
23 children at the time, all under the age of nine.
24   Q.   Where does she live?
25   A.   She lives in Litchfield, Connecticut.

Page 79

1    Q.   And are you close with her?
2    A.   Reasonably so.
3    Q.   Have you talked with her about her
4  experience with breast cancer?
5    A.   Yes.
6    Q.   Was that before or after you were diagnosed
7  that she was diagnosed?
8    A.   Well, let's see.  Oh, God.  I don't remember
9  exactly.  If I could figure back, I could -- I would
10 know, I would be able to tell you before or after, but
11 everybody in the family was concerned about her and
12 talked to her.
13   Q.   Do you remember if when you learned that you
14 had breast cancer you already knew that your niece had
15 breast cancer, or was that something that came later?
16   A.   I believe she had it first.  I believe she
17 had it first.
18   Q.   Is there anyone else in your family that has
19 been diagnosed with breast cancer other than you and
20 your niece?
21   A.   No, no.
22   Q.   How about ovarian cancer, do you know --
23   A.   No.
24   Q.   No one else, as far as you know?
25   A.   No.  Not to my knowledge.

Page 80

1    Q.   Do you know of any family members of yours
2  who are currently or who have taken hormone therapy
3  such as Prempro?
4    A.   Do I -- would you -- do I know of any?
5    Q.   Sure.  I think I asked you about your
6  sisters in particular, but broadening it past your
7  sisters, do you know of any family members of yours
8  who have -- who are currently using Prempro or who
9  have used it in the past?
10   A.   No.  I don't know of any, no.
11   Q.   Are any members of your family, other than
12 your husband, aware that you've brought a lawsuit in
13 this case?
14   A.   I'm not sure.
15   Q.   How about your son Caleb, does he know?
16   A.   It's not something I discussed.  Perhaps
17 when it first came about, but I don't remember
18 talking -- I don't know.  I don't remember talking to
19 any of the kids about it.
20   Q.   And how about any of your brothers and
21 sisters, do you remember talking to them about it?
22   A.   No, I don't remember talking to anybody
23 about it at all.
24   Q.   So is it just --
25   A.   Except my neighbor.  I was down here in

1 Fairfield with her, and I just said I was coming in to
2 meet with -- I was looking for directions.  That's it.
3 But that was it.  It wasn't in detail.
4     Q.    So other than your neighbor who knew you
5 were coming to Fairfield, do you have friends, anybody
6 who knows about the lawsuit other than you and your
7 husband?
8     A.    Not to my knowledge.  Not to my
9 recollection, no.
10    Q.    And just why is it that you haven't shared
11 that with anyone?
12    A.    It just, it wasn't -- I don't think it's
13 anybody's business but mine.
14    Q.    You consider yourself to be a private person
15 generally?
16    A.    Generally, yes.  Yes.
17    Q.    Let me ask you a little bit about your
18 smoking history, a little bit.
19         I know that you do not currently smoke.
20    A.    Right.
21    Q.    And that it's been several years, I believe,
22 since you smoked; right?
23    A.    Yes.
24    Q.    When did you stop smoking, roughly?
25    A.    Here we go.  Thirteen, fourteen years.  I

1 cannot pinpoint a year.
2    Q.    That's fine.  Were you still smoking after
3 your husband had quit?
4    A.    Yes.
5    Q.    For some number of years?
6    A.    Yes.
7    Q.    When you were actively smoking,
8 approximately how much did you smoke and for how long?
9    A.    About a half a pack a day.
10    Q.    And about what time period were you smoking
11 a half a pack a day?
12    A.    Could you clarify?  You want the beginning
13 to the --
14    Q.    Yes, that wasn't a very clear question.
15 But, yes, I'm just trying to get a sense of how long
16 you smoked and how much.
17    A.    I started smoking a little bit after
18 college.  I didn't smoke until -- or in college, I
19 guess, a little bit in college, which would be, what,
20 the sixties.  And I probably smoked maybe 20 years
21 maybe.  I'm just trying to figure out how much --
22 because I know when was the kids, they hated it, so
23 that would be -- probably I smoked 17, 18, 20 years.
24    Q.    Okay.  Did you smoke while you were pregnant
25 with Caleb?

1    A.    No.
2    Q.    So during the whole pregnancy, you stopped
3 smoking?
4    A.    Right.
5    Q.    Why did you stop then?
6    A.    Just didn't seem like the right thing to do.
7    Q.    And then after he was born, you started
8 smoking again?
9    A.    After I stopped nursing.
10    Q.    And how long did you nurse?
11    A.    At 14 months.  He was about 14 months.
12    Q.    And you had stopped smoking before you
13 started taking Prempro; correct?
14    A.    Yes.
15    Q.    When you first started smoking, were you
16 aware that there had been warnings issued about health
17 risks associated with smoking?
18    A.    Well, there was an awareness, people
19 talking.  It just smelled bad and -- yes.
20    Q.    And over time while you were smoking, did
21 you come to understand that there were health risks
22 associated with it?
23    A.    Yes.
24    Q.    In addition to the smelling bad and tasting
25 bad, but yet you continued to smoke; is that right?

1    A.    For a while after, yes.
2    Q.    And why did you continue to smoke when you
3 knew that there were possible health consequences?
4    A.    It was an addiction.  I did try to stop a
5 number of times, but the addicting nature.  But I did
6 try to stop a number of times.
7    Q.    Did you ever -- did any doctors ever
8 recommend that you quit smoking?
9    A.    I'm sure all of them did.
10    Q.    Did you do anything -- you said you tried to
11 quit a number of times.  Did you do anything to help
12 you when you quit smoking?  Did you take medicine or
13 things like that?
14    A.    No.
15    Q.    No.  Hypnosis, anything like that?
16    A.    Pardon?
17    Q.    Hypnosis?  Some people try hypnosis.
18    A.    No, no.
19    Q.    How was it that you were able to stop
20 finally?
21    A.    I got smart.  Basically I just stopped.
22    Q.    So cold turkey, you quit?
23    A.    That's -- yes.
24    Q.    Let's talk a little bit about your alcohol
25 consumption.  In your fact sheet, you indicated that

1 you would drink maybe one to six drinks a week. I
2 think that was one of the boxes you could check, and
3 that was back in 2005 when you filled out the form.
4        Was that amount of alcohol, one to six
5 drinks a week, representative of how much alcohol
6 you've consumed as an adult?
7    A.   That or less, yes.
8    Q.   Has there ever been a time when you have
9 consumed more alcohol than that on -- over a prolonged
10 period?
11        MR. MOSKOW:  Objection to form.
12        You can answer.
13 BY MS. DUGGAN:
14   Q.   You can answer.
15   A.   Could you repeat the question?
16   Q.   Sure. I'm not interested in finding out if,
17 you know, one night at a Christmas party you had too
18 much to drink, but has there ever been a time when
19 your consumption of alcohol has been of such an amount
20 that it caused you concern or others who cared about
21 you concern?
22   A.   No, no.
23   Q.   Do you remember if you had alcohol to drink
24 while you were pregnant?
25   A.   I had wine, yes.

1    Q.   And how often did you have wine during your
2 pregnancy?
3    A.   Maybe two or three times a week.
4    Q.   And would that have been one glass or more
5 than one glass?
6    A.   One, one.
7    Q.   Has there ever been a period of time when
8 you drank one or two drinks a day over a prolonged
9 period?
10   A.   No, no.
11   Q.   Have you ever used illegal drugs?
12   A.   Yes.
13   Q.   What drug did you use?
14   A.   I've smoked pot.
15   Q.   Okay.  When was the last time you smoked
16 pot?
17   A.   Oh, years ago.
18   Q.   Okay.  Before you had children, before you
19 had Caleb?
20   A.   Yes, yes.
21   Q.   And was that something that you did more
22 than one time?
23   A.   Yes, but very occasionally.
24   Q.   Okay.  Any other illegal drugs that you've
25 used?

1    A.   No.
2    Q.   Do you know approximately how old you were
3 when you smoked pot or over the years if they spanned
4 more than one year?
5    A.   Probably -- I was 25, 26.
6    Q.   And if you can approximate, approximately
7 how many times do you think you smoked pot?
8    A.   At a party, I don't know, four or five times
9 maybe.
10   Q.   Now, when you smoked pot, did you understand
11 that it was illegal at the time?
12   A.   Yes.
13   Q.   And you realized that there was a risk that
14 you could get into legal trouble if you were caught?
15   A.   Yes.
16   Q.   Did you realize that there were also health
17 risks associated with smoking pot?
18   A.   No.
19   Q.   Has there ever been a time when you have
20 thought that you had a problem with illegal drugs?
21   A.   No.
22   Q.   Have you ever used prescription medications
23 that weren't prescribed for you?
24   A.   No.
25   Q.   Have you ever used prescription medications

1 in a way other than the way in which they were
2 prescribed to you?
3    A.   No.
4    Q.   Let me shift gears a little bit and ask you
5 about your reproductive history.  We will start with
6 when you first started to get your period.
7        How old were you when you first got your
8 period?
9    A.   Between 12 and 14.  Some -- I was later than
10 some of the other girls.
11   Q.   When you first started to get your period,
12 did you have it regularly?
13   A.   Yes.
14   Q.   Did it come once a month?
15   A.   Yes.
16   Q.   Did you have any problems that required
17 medical attention in connection with your periods?
18   A.   No.
19   Q.   Did you have any symptoms, sometimes we call
20 them PMS, things like that, that you associated with
21 getting your period?
22   A.   No.  Back cramps.  That was about it.
23   Q.   How about any weight gain or moodiness?  Do
24 you recall anything like that?
25   A.   No.

1   Q.   Have you ever been treated for
2   endometriosis?
3   A.   No.
4   Q.   And I understand that you have had a D and C
5   procedure in connection with your miscarriage --
6   A.   Yes.
7   Q.   -- in the '83 time frame?
8   A.   Yes.
9   Q.   Have you ever had any other D and C, that
10  you know of?
11  A.   No.
12  Q.   Did you ever use oral contraceptives?
13  A.   I did.
14  Q.   Approximately when did you use them?
15  A.   In the mid-seventies.
16  Q.   Do you remember what brand of contraceptives
17  you used?
18  A.   I don't.
19  Q.   Do you remember for how many years you used
20  them roughly?
21  A.   Roughly seven.  I'm not sure.
22  Q.   And did you use -- have you used other
23  contraceptives other than the birth control pill over
24  the years?
25  A.   Occasionally a condom.

1   Q.   How about an IUD, did you ever have an IUD?
2   A.   Yes, I did.  Yes.
3   Q.   When was that?
4   A.   I don't remember.  In the seventies.
5   Q.   Before your son was born?
6   A.   Yes.
7   Q.   Did you ever use a diaphragm?
8   A.   It was either the IUD or the diaphragm.  I
9   don't remember.
10  Q.   You don't remember, okay.
11  A.   One or the other.
12  Q.   Do you remember which doctor prescribed the
13  diaphragm or the IUD for you?
14  A.   I'm pretty sure it was Dr. Tesoro.
15  Q.   Going back to the birth control pills, when
16  you first started taking the birth control pills, did
17  you understand that there were risks associated with
18  the medication?
19  A.   I basically don't ever recall questioning my
20  doctor.  I trusted him explicitly, and I just took
21  what he prescribed.  It was something I needed, and he
22  prescribed it.
23  Q.   And the "he," was that Dr. Tesoro also?
24  A.   Yes.  I believe it was.  I did go to
25  Dr. John Pearce, which I put in, and I went to him

1   before I went to Dr. Tesoro, so I'm not exactly
2   positive which one of those two doctors prescribed the
3   initial oral contraceptives.
4   Q.   How about your relationship with Dr. Pearce,
5   did you similarly trust Dr. Pearce?
6   A.   Yes, yes.
7   Q.   And why did you stop seeing him and start
8   seeing Dr. Tesoro?
9   A.   I don't remember.
10  Q.   Well, while you were -- either before you
11  started taking it or while you were taking the birth
12  control pill, did you ever come to learn that there
13  were risks associated with the medication?
14  A.   I don't recall that that was an issue with
15  me.
16  Q.   Do you recall when you picked up your
17  prescriptions of the oral contraceptives, did you
18  receive a folded-up piece of paper that had
19  information about the product in it?
20  A.   I don't recall.  I don't generally -- I
21  throw them out.
22  Q.   Okay.  So is that your practice with the
23  information sheets that come with medication, is to
24  not read them and throw them out; is that right?
25  A.   I trust the doctors, and I just didn't

1   feel -- yes.
2   Q.   And why did you decide to stop using the
3   birth control pill?
4   A.   Well, I got married, and I wanted children.
5   Q.   Did you ever have any problems conceiving
6   when you wanted to conceive?
7   A.   No.
8   Q.   So you've never been treated for
9   infertility?
10  A.   No.
11  Q.   And I think you told me earlier you've
12  had -- your first pregnancy was your pregnancy with
13  your son Caleb; correct?
14  A.   Yes.
15  Q.   And then a couple of years later, you became
16  pregnant again, but you lost that pregnancy; correct?
17  A.   Yes.
18  Q.   Other than those two, have you ever been
19  pregnant since?
20  A.   No.
21  Q.   Did you try to become pregnant again after
22  that and were unsuccessful?
23  A.   Yes.
24  Q.   Did you ever have any examinations done or
25  treatments done or testing done, I should say, to try

1 to determine why you were having trouble?

2    A.    No.

3    Q.    Okay.  Now, how old were you when you were
4 pregnant with Caleb?

5    A.    Thirty-four.

6    Q.    And where did you deliver Caleb?

7    A.    Sharon Hospital.

8    Q.    And was Dr. Tesoro your treating physician
9 for the pregnancy?

10    A.    Yes.

11    Q.    Did you have any complications with either
12 the pregnancy or the delivery for Caleb?

13    A.    No.  I didn't deliver naturally.  I had an
14 epidural.

15    Q.    Did you have a C-section?

16    A.    No.

17    Q.    And when Caleb was born, how much did he
18 weigh?

19    A.    Seven fourteen.

20    Q.    You mentioned that you'd had the miscarriage
21 after Caleb was born.  Have you ever had an abortion?

22    A.    No.

23    Q.    Let me ask you a little bit now more
24 generally about your medical history.

25          Your primary care physician is Dr. Janelli;

1 correct?

2    A.    Yes.

3    Q.    How long have you been seeing Dr. Janelli?

4    A.    That's a good question.  Long time.  The
5 eighties, early eighties.  Late -- I don't recall the
6 exact date.  I don't know when I started seeing
7 Dr. Janelli.

8    Q.    Did you have a good relationship with
9 Dr. Janelli?

10    A.    Yes.

11    Q.    You trust his medical judgment?

12    A.    Yes.

13    Q.    Did Dr. Janelli ever prescribe hormone
14 therapy or Prempro to you?

15    A.    I don't recall.  I don't recall.  He -- I
16 don't recall, because that would be gynecological.

17    Q.    Right.  So is that something you would have
18 discussed with Dr. Tesoro?

19    A.    Yes.

20    Q.    So as you sit here today, you don't recall
21 Dr. Janelli ever prescribing Prempro to you; is that
22 fair to say?

23    A.    That's fair to say, yes, I don't recall
24 whether he did or not.

25    Q.    Do you recall whether or not you discussed

1 any of your menopausal symptoms with Dr. Janelli?

2    A.    I don't recall.

3    Q.    Is that something you most likely would have
4 discussed with your gynecologist?

5    A.    Yes.

6    Q.    Do you have any allergies?

7    A.    I have seasonal allergies.  They are getting
8 better.  It's the stuffy nose.  When I take -- I don't
9 take them all the time, but Claritin, and I have had
10 Albuterol for some -- and some nasal sprays, but it's
11 mostly seasonal and animal allergies, cats.

12    Q.    Are you allergic to any medications that you
13 know of?

14    A.    Penicillin is the only thing I know I'm
15 allergic to, and now morphine.  I know I'm allergic to
16 that.

17    Q.    Do you have any food allergies?

18    A.    No.

19    Q.    Are you allergic to peanuts?

20    A.    No.

21    Q.    Have you ever been treated in an emergency
22 room?

23    A.    Yes.

24    Q.    How many times?

25    A.    Maybe four, maybe five times.

1    Q.    Let's talk about those times, what you can
2 remember.

3    A.    Okay.  One was down in New Jersey, and it
4 was an airborne allergy.  I had a really bad allergy,
5 allergic reaction.  I was visiting a friend, and I did
6 go to the emergency room for that, and they actually
7 put me on a nebulizer for that.  I was having a lot of
8 trouble breathing.  But that was after I got into
9 New Jersey.  It was where I was.

10    Q.    You are allergic to New Jersey?

11    A.    I was allergic to Old Bridge, New Jersey.

12    Q.    Okay.

13    A.    And after I was there, all that cleared up.

14    Q.    Did you end up staying overnight at the
15 hospital on that visit?

16    A.    No, no.

17    Q.    When was that, roughly?

18    A.    Oh, geez.  You are asking tough questions.
19 In the seventies.  It was after -- she was a high
20 school friend.  It was after college, before I got
21 married.

22    Q.    Okay.  How about one of the other times you
23 were at an emergency room?

24    A.    I was at my -- let's see.  Well, when I
25 broke my leg, I was in the emergency room.

1    Q.    That was in the fall of 2008?
2    A.    Right.
3    Q.    Okay.
4    A.    I don't know the exact circumstances, but I
5 was in -- gosh.  I was in the emergency room in
6 October of 2007 from an automobile accident that I had
7 had.
8    Q.    Was this the accident with your stepdaughter
9 Vanessa or a different accident?
10   A.    No, no.  This was another one.
11   Q.    Okay.
12   A.    And the accident with Vanessa, I was in the
13 emergency room, that was in April.  And then in June
14 of that same year, 2002, I just remember that I fell
15 down steps at home, and I broke my collar bone and
16 ribs.  And then I had an automobile accident in
17 October of '07.
18   Q.    And were you injured in that accident?
19   A.    No.
20   Q.    But you did go to an emergency room?
21   A.    They took me by ambulance.
22   Q.    Okay.  Other than in connection with your
23 breast cancer and when you gave birth to Caleb, have
24 you ever been hospitalized overnight?
25   A.    Well, that fall, in April, I was

1 hospitalized.  I broke the ribs.
2    Q.    Oh, I'm sorry, I thought you said June for
3 that.  Of 2002?
4    A.    It was June, June 19, I'm sorry.
5    Q.    So you were hospitalized overnight there?
6    A.    Yes.
7    Q.    Okay.  And which hospital was that, do you
8 know?
9    A.    Sharon.
10   Q.    So there is the fall where you broke your
11 ribs; there is your breast cancer; there is having
12 Caleb --
13   A.    And then my leg.
14   Q.    Okay.  Other than those four times, you've
15 not been hospitalized overnight?
16   A.    Not that I recall.
17   Q.    Have you ever been treated for emotional
18 troubles other than the family counseling that we
19 talked about earlier?
20         MR. MOSKOW:  I object to form.
21         You can answer if you are able.
22   A.    No -- well, would you ask the question
23 again?
24 BY MS. DUGGAN:
25   Q.    Sure.  Have you ever had psychological

1 counseling, let me put it that way, instead -- let me
2 rephrase it.
3         Have you ever had psychological counseling
4 other than the family counseling that we've already
5 discussed?
6    A.    No.
7    Q.    Have you consulted with anyone, maybe not a
8 psychologist or psychiatrist, but anyone else in a
9 sort of mental health capacity?
10   A.    My priest.
11   Q.    And what did you consult with your priest
12 about?
13   A.    Just that I was feeling low about the cancer
14 and the treatment I was going to be going through and
15 what it was -- you know, just emotional things I was
16 going through.
17   Q.    Was this all after your breast cancer
18 diagnosis?
19   A.    Yes.
20   Q.    And about how long did you see your priest
21 about that?
22   A.    Just a few times, just to --
23   Q.    Did you find that to be helpful, talking to
24 your priest?
25   A.    Uh-huh.

1    Q.    Have you ever taken any medication to
2 address any psychological or mental health issues?
3    A.    No.
4    Q.    Let's talk about screening tests that you
5 may have had over the years.
6         Do you receive any type of periodic
7 screening test, for example, to screen cholesterol or
8 blood pressure?
9    A.    Yes.
10   Q.    Do you get both of those checked regularly?
11   A.    Yes.
12   Q.    Have you ever had any cholesterol problems?
13   A.    No.
14   Q.    How about any blood pressure problems?
15   A.    No.
16   Q.    Have you had your blood sugar checked for
17 diabetes?
18   A.    Specifically you would have to refer to my
19 medical records because -- No.  To my knowledge, no.
20   Q.    Have you ever had a colonoscopy?
21   A.    Yes.
22   Q.    About how many times you had that?
23   A.    One.
24   Q.    Usually those are pretty memorable.
25         Were the results good?

1   A.   It was good.

2   Q.   And do you have your skin checked for skin
3 cancer?

4   A.   Yes.

5   Q.   And do you have that done regularly?

6   A.   Yes.

7   Q.   How often is regularly?

8   A.   Yearly.

9   Q.   We will talk about your mammograms
10 separately.

11      Do you use over-the-counter medications?

12   A.   Aspirin, Tylenol.

13   Q.   Do you ever use cold medicine or cough
14 medicine?

15   A.   I've been prescribed it from time to time,
16 but I don't really take it, no.  I mean, I know I've
17 had hydrocodone when I have had this bronchitis,
18 that's it, and a prescription.

19   Q.   Have you ever purchased the over-the-counter
20 types of cold medicines, allergy medicines, anything
21 like that?

22   A.   No.

23   Q.   Have you ever taken any medication to help
24 you sleep, either over the counter or prescription?

25   A.   No.

1   Q.   No.  And you said you've used some pain
2 relievers such as aspirin and Tylenol.  Do you take
3 either of those on a regular basis?

4   A.   No.  And it's not aspirin, it's the Tylenol.
5 I call Tylenol aspirin.  But it's Tylenol.

6   Q.   Okay, that's fine.  Have you ever -- on the
7 aspirin point, have you ever taken baby aspirin?
8 Sometimes people take baby aspirin every day, anything
9 like that?

10   A.   No.

11   Q.   So your pain medication that's over the
12 counter, that's Tylenol; is that right?

13   A.   Yes.

14   Q.   And how often do you take Tylenol?

15   A.   Just as needed.

16   Q.   You told me this morning you took a vitamin.

17   A.   Yes.

18   Q.   Do you take other vitamins other than
19 Centrum?

20   A.   I take Fish Oil and I take, it's a calcium
21 supplement with D.

22   Q.   And how long have you been taking that
23 calcium with Vitamin D?

24   A.   I've started the -- I've been taking that
25 for probably seven years.

1   Q.   And the Fish Oil, how often have you been
2 using that or how long have you been taking that?

3   A.   Oh, maybe a year.

4   Q.   What do you use that for?

5   A.   It's just the Omega 3s.

6   Q.   Did a doctor recommend that you use it?

7   A.   No.  I -- well, Dr. Oz on Oprah.

8   Q.   But not one of your own personal physicians?

9   A.   No.

10   Q.   And the calcium with D, are you taking that
11 at the suggestion of one of your health care
12 providers?

13   A.   Yes.

14   Q.   Who recommended that?

15   A.   Dr. Levine.

16   Q.   And that's to help with your bones; is that
17 right?

18   A.   Yes.  Actually, I would -- I just
19 specifically said Dr. Levine, but they all have said
20 calcium with D is a good thing.

21   Q.   Is that something you take every day?

22   A.   Yes.

23   Q.   Let me ask you about other herbal remedies
24 that you may have taken.

25      Have you ever taken Ginkgo Biloba?

1   A.   No.

2   Q.   How about soy, have you ever used soy?

3   A.   No.

4   Q.   How about Evening Primrose Oil?

5   A.   No.

6   Q.   Flax Seed?

7   A.   No.

8   Q.   Ginseng, have you ever used that?

9   A.   No.

10   Q.   Black Cohosh?

11   A.   No.

12   Q.   No, you haven't?

13   A.   No.  Actually, my sister did recommend that.
14 I may have tried it once.  I don't take it regularly
15 or have on hand.  It may have been a recommendation
16 for hot flashes.

17   Q.   That's what I was going to ask you, what it
18 was recommended for.

19   A.   Yes.

20   Q.   And you said hot flashes?

21   A.   Yes.

22   Q.   But are not sure if you ever took it?

23   A.   No, I don't recall ever taking it.

24   Q.   Let me ask you about your prescription
25 medications other than hormone therapy, which we will

Page 105

1  take separately.

2        Have you ever used antibiotics on an

3  extended basis?

4     A.   No, no.  Not past what it was recommended.

5     Q.   And in terms of that, let me just pick a

6  number.  Have you ever used antibiotics for more than

7  10 days in a row?

8     A.   No.

9     Q.   How about pain medications, have you ever

10 been prescribed pain medication?

11    A.   I have, but -- yes, no.  I've taken it, but

12 not for extended periods of time.

13    Q.   I already asked you about sleeping pills and

14 you said you hadn't ever used any of those?

15    A.   No.

16    Q.   Have you ever taken any tranquilizers or

17 antidepressants?

18    A.   Not for antidepression.  I took Effexor for

19 hot flashes.

20    Q.   Did the Effexor help with the hot flashes?

21    A.   Not really.

22    Q.   How long did you take it?

23    A.   That was Dr. Levine.  I don't recall.  It

24 wasn't a terribly long period of time.

25    Q.   You think it was more than a year?

Page 106

1     A.   No.

2     Q.   Less than a year?

3     A.   Yes.

4     Q.   More than six months?

5     A.   I would guess, yes.  I would guess yes, more

6  than six months.

7     Q.   Somewhere between --

8     A.   Between six months and a year.

9     Q.   Okay.  All right.  Have you ever taken any

10 high blood pressure medication?

11    A.   No.

12    Q.   And any medicines for high cholesterol?

13    A.   No.

14    Q.   Have you ever taken insulin or other

15 medications for diabetes?

16    A.   No.

17    Q.   Now, when you take prescription medications,

18 such as painkillers, or the antidepressant Effexor,

19 did you understand that there were risks associated

20 with those medications?

21    A.   Not really.  No.

22    Q.   Do you have an understanding about why some

23 drugs you need to have a prescription in order to take

24 them?

25    A.   Yes, I understand that.

Page 107

1     Q.   And what is your understanding of why that

2  is?

3     A.   Well, they might injure you.  And especially

4  if you don't take them correctly.

5     Q.   Right, okay.  So do you understand that

6  prescription medications have some risks associated

7  with them?

8     A.   Yes.

9     Q.   And that's true of all prescription

10 medications; you understand that?

11    A.   I would guess, yes.

12    Q.   Have you ever had a side effect or reaction

13 to medication that you've been prescribed?

14    A.   Would you repeat that, please?

15    Q.   Sure.  You mentioned earlier that you've had

16 allergies to Penicillin and Morphine, for example.

17    A.   Uh-huh.

18    Q.   And I'm wondering more broadly than that, if

19 you've ever had a side effect or a negative reaction

20 to a prescription medication that you've taken?

21    A.   Not that I -- those are -- not that I

22 remember.  Not that I recall having any, any kind of

23 side effects, any kind of --

24    Q.   Do you ever remember taking a medication

25 that a doctor prescribed for you, and then deciding

Page 108

1  not to take the full course of the medication?

2     A.   Yes.

3     Q.   What were the circumstances when you did

4  that?

5     A.   I felt better so I stopped taking it.

6     Q.   And did you stop taking it on the advice of

7  your doctor, or did you not check with your doctor

8  first?

9     A.   Basically I just felt better.

10    Q.   And what medication are you thinking of in

11 that instance?

12    A.   It was after the surgery.  It was for my

13 breast.  It was a heavy painkiller, Vicodin, and I did

14 call him and ask if I could take Tylenol instead.  I

15 think it was -- medical issues are left to the medical

16 people.  That's my -- so I'm not sure, but it was a

17 heavy medicine that I didn't want to take.  I didn't

18 really need it.  I asked if the Tylenol or he may have

19 even said if the Tylenol is better for you, if the

20 Tylenol works, use that.  And that was even for the

21 leg.  I ended up going on Motrin before I took the --

22 after I took the heavier stuff, I didn't like it.  It

23 upset my stomach.  And I called that doctor to ask if

24 I could take something different.

25    Q.   Which doctor was that?

Page 109

1    A.   That was Dr. Burns.
2    Q.   That was connected with your --
3    A.   Leg.
4    Q.   -- leg surgery, okay.
5        Have you ever stopped and restarted
6 medication without checking with your doctor first?
7    A.   I don't recall.  I don't recall if I've ever
8 done that.
9    Q.   Have you ever adjusted the dosage of
10 medication that's been prescribed for you without
11 talking to your doctor?
12   A.   Not -- no, I don't generally do that.
13   Q.   Have you ever done that?
14   A.   I don't recall if I have or not.  I don't
15 have any specifics.
16   Q.   When you are taking a medication, do you
17 feel that you have some responsibility to learn about
18 what the medication is and what its side effects and
19 benefits are, or do you rely entirely on your doctors?
20       MR. MOSKOW:  Objection to form.
21   A.   Well, I've always just relied on my doctors.
22 They take care of me.
23       MS. DUGGAN:  Why don't we go off the
24 record here.
25       THE VIDEO OPERATOR:  Going off the

Page 110

1 record at 12:59 p.m.
2        (Whereupon, the witness was excused and a
3 lunch recess was taken at 12:59 p.m.)
4
5            * * *
6        AFTERNOON SESSION
7            1:44 P.M.
8        THE VIDEO OPERATOR:  We are now back on
9 the record at 1:44 p.m.
10       MARGARET BROCKMAN FRASER, having been
11 previously duly sworn, resumed the stand,
12 testifying further on her oath as follows:
13 DIRECT EXAMINATION BY MS. DUGGAN (continued):
14   Q.   Ms. Fraser, are you ready to resume after
15 our lunch break?
16   A.   Yes.
17   Q.   And as your attorney just told you, if you
18 feel like you need to take a break at any point this
19 afternoon before I do, absolutely let us know that and
20 we will do it.
21   A.   Thank you.
22   Q.   Let me ask you a few more questions
23 generally about your health and your medical history.
24       Would you describe for us the condition of
25 your health today?

Page 111

1    A.   It's good.
2    Q.   Are there any conditions that you have that
3 require medical attention?
4    A.   No.  I have osteoporosis I just was
5 diagnosed with.  I had osteopenia before and it went
6 to osteoporosis.  But other than that, nothing.
7    Q.   When were you diagnosed with osteopenia?
8    A.   2002.
9    Q.   And when was the diagnosis changed to
10 osteoporosis?
11   A.   I had another bone density done in May.
12 Actually, yes, it was May of 2009, and I got a call
13 from Dr. Parisi, and she said I had lost enough bone.
14   Q.   And you mentioned earlier that you are
15 taking Fosamax.  Are you taking anything else for your
16 osteoporosis condition?
17   A.   I was on Fosamax, and I was just, on June
18 30th, I just had Reclast, the one-year intravenous
19 treatment.
20   Q.   Who administered that for you?
21   A.   Dr. Levine.
22   Q.   And the way that works is that you only are
23 supposed to have to get this treatment one time a
24 year?
25   A.   Yes.

Page 112

1    Q.   And are you taking anything else, other than
2 your calcium and Vitamin D for your osteoporosis --
3    A.   No.
4    Q.   -- during that year?
5    A.   No.
6        MR. MOSKOW:  I'm just going to ask you
7 again, that was a perfect example of allowing counsel
8 to finish her question before you respond.  You knew
9 what she wanted to say, but it's better if you wait
10 until she is done, okay?
11       THE WITNESS:  All right.  Thank you.
12 BY MS. DUGGAN:
13   Q.   It's very hard.  I'll try to do better
14 myself.  I think I've stepped on you a bit as well
15 today.  Okay.  Now, again, these are one of those
16 questions I never like to ask ladies, but I need to
17 ask you.
18       Can you tell us what is your weight today,
19 roughly?
20   A.   It's about 127.
21   Q.   What has been your average weight during
22 your adulthood?
23   A.   Between 120 and 127, 128.
24   Q.   What is the most that you've weighed since
25 puberty?

Page 113

1      MR. MOSKOW:  Other than during
2 pregnancy or including?
3      MS. DUGGAN:  Yes, carving out
4 pregnancy.  You get a big allowance for pregnancy, as
5 much as you want.
6   A.   133 is the most I've ever weighed.
7 BY MS. DUGGAN:
8   Q.   And let's talk about pregnancy.  Do you
9 remember how much you gained when you were pregnant
10 with Caleb?
11   A.   Almost 40 pounds.
12   Q.   And how tall are you?
13   A.   Five feet.
14   Q.   What do you mean by that?
15   A.   I've lost some bone, so it's about four
16 eleven, but five feet.
17   Q.   Your average height during your adulthood
18 was five feet tall?
19   A.   Yes.
20   Q.   And you think you've lost about an inch at
21 this point?
22   A.   Yes.
23   Q.   Do you know, over what period has that
24 height loss --
25   A.   Over the course of the last seven years.

Page 114

1   Q.   When you reached menopause, did you notice
2 any weight gain that followed?
3   A.   Yes.  Yes, some.
4   Q.   Approximately how much do you think?
5   A.   Seven pounds.  Seven to ten.
6   Q.   Has any doctor ever told you you need to
7 lose weight?
8   A.   Yes, they have.
9   Q.   When was that?
10   A.   It hasn't been a specific, you need to lose
11 weight, but it would be a good thing, good idea if you
12 took a few pounds off.
13   Q.   And which doctor advised you to do that?
14   A.   To my recollection, it would be Dr. Janelli.
15   Q.   Do you remember when the last time he had
16 said something like that to you was?
17   A.   No, I don't remember.  I just saw him and he
18 didn't say anything.
19   Q.   So that's good.
20      MR. MOSKOW:  You could answer that yes
21 or no.
22      THE WITNESS:  I can?
23 BY MS. DUGGAN:
24   Q.   Have you ever been on a diet?
25   A.   Yes.

Page 115

1   Q.   How many times have you been on a diet?
2   A.   When I wanted to get -- I don't know.  Yes,
3 once on a true diet.
4   Q.   And when you say "a true diet," what do you
5 mean by that?
6   A.   I did Weight Watchers.
7   Q.   And how did that work out for you?
8   A.   It worked out very well for me.
9   Q.   Great.  When did you do that?
10   A.   When I got up to 133.  I did Weight
11 Watchers, I cannot remember the dates.  I reached my
12 goal.  I don't remember the years.
13   Q.   Was it in the last five years, the last ten
14 years?  Do you have any idea?
15   A.   I'd say the last ten years.  The last ten
16 years.
17   Q.   Have you ever taken any medication for
18 weight loss?
19   A.   No.
20   Q.   Do you exercise?
21   A.   Yes.
22   Q.   What type of exercise do you do?
23   A.   Mainly walking.
24   Q.   Is this the walking you described earlier,
25 two, three times a week?

Page 116

1   A.   Yes.
2   Q.   Around your neighborhood?
3   A.   Yes.
4   Q.   And apart -- excuse me, go ahead.
5   A.   I'm sorry, I'm sorry.  It was prior really
6 to my injury.  So my injury has had an effect on how
7 much I'm out now, but I'm slowly getting out there
8 once a week now.
9   Q.   And when you say your injury in this
10 context, you are talking about your leg injury last
11 fall?
12   A.   Yes.
13   Q.   And prior to that, prior to your injury, how
14 much were you walking and how often?
15   A.   I was walking four times a week, and I would
16 do up to four miles.
17   Q.   And how long of a time period were you doing
18 that kind of walking?
19   A.   In months, in years?  What do you mean?
20   Q.   Yes, in years.  Or months if that's more
21 accurate.
22   A.   Probably four years, five years.
23   Q.   So after -- you started doing the walking
24 after you were diagnosed with breast cancer; is that
25 correct?

1   A.   Pretty much, yes.
2   Q.   And you had gotten up to four times a week,
3   up to four miles each time?
4   A.   Uh-huh.
5   Q.   Prior to your leg injury last year?
6   A.   Yes.
7   Q.   Before you were diagnosed with breast
8   cancer, were you doing any sort of regular exercise?
9   A.   Other than walking, just walking.
10  Q.   So you were still walking even before that?
11  A.   I did.  I walked.
12  Q.   How much were you walking then?
13  A.   Two or three miles when I would go out.
14  Q.   And were you going on a regular schedule?
15  A.   Pretty much, three or four times a week.
16  Q.   So if I'm understanding you right, is it
17  fair to say that you've been walking for exercise for
18  many years, including before your breast cancer, and
19  then after your breast cancer, you actually have done
20  a little bit more walking than you were doing before
21  you were diagnosed.
22       Is that fair?  Prior to your leg injury.
23  A.   Once -- I needed to feel good about myself,
24  so I -- that is fair to say.  I probably did get out
25  more after the fact.

1   Q.   And did walking help you feel better about
2   yourself?
3   A.   Yes.
4   Q.   In what way?
5   A.   It seemed to increase my energy, and I was
6   losing some weight.
7   Q.   The food that you eat today, would you say
8   that you eat a well-balanced diet?
9   A.   Yes.
10  Q.   Do you drink caffeine, caffeinated
11  beverages?
12  A.   A couple of coffees a day and maybe a soda a
13  day.  Depends on the day, where I am.
14  Q.   But it wouldn't be unusual for you to have
15  two or three caffeinated drinks a day; is that right?
16  A.   With coffee and Diet Coke, yes.
17  Q.   Which doctors do you currently see on an
18  annual or more often basis?
19  A.   Dr. Levine.
20  Q.   And Dr. Levine is your oncologist?
21  A.   Yes.  And Dr. Parisi, the gynecologist, and
22  when I need something in general health issues,
23  Dr. Janelli.
24  Q.   Let me ask you about -- is that it, that you
25  can think of?

1   A.   Yes.
2   Q.   Let me ask you about a couple of specialties
3   just to see if any of this triggers your recollection.
4        Do you see a dermatologist on a regular
5   basis?
6   A.   Oh, yes, yes, yes.
7   Q.   Which dermatologist do you see?
8   A.   I'm sorry, I forgot about him.  Dr.  -- his
9   name was Dr. Jeffrey Nisspell, the Dermatology
10  Associates in New Milford.
11  Q.   Let me ask if you've seen, ever seen any of
12  these other types of doctors.
13       Have you ever seen a cardiologist?
14  A.   I did, yes.
15  Q.   When was that?
16  A.   It's within -- I believe in the last five,
17  six years.
18  Q.   What prompted you to go see a cardiologist?
19  A.   I was just having a lot of chest pain, and
20  it was -- it wasn't -- I was having some chest pain,
21  and it was -- I felt my heart muscle tightening, and
22  Dr. Janelli felt I should go see Dr. Sosayer.
23  Q.   How many times did you see Dr. Sosayer?
24  A.   Just once.  I did a stress test.
25  Q.   And how did that come out?

1   A.   Fine.
2   Q.   That's the only other time you've consulted
3   a cardiologist?
4   A.   Yes.
5   Q.   How about a pulmonologist, a lung
6   specialist, have you ever seen one of those?
7   A.   No.
8   Q.   How about a neurologist?
9   A.   No.
10  Q.   I think I may have covered this already, but
11  have you ever consulted a psychiatrist?
12  A.   No.
13  Q.   How about a gerontologist or a doctor who
14  specializes in aging?
15  A.   No.
16  Q.   Now let me ask you about some other medical
17  conditions that you may have had over the years, and
18  there was a pretty long list in the fact sheet, so
19  I'll just call out the ones that you had identified
20  there, and then I want to ask you about a few others
21  in particular.
22       You have been treated, as you've mentioned,
23  for osteoporosis; correct?
24  A.   Yes.
25  Q.   All right.  Have you ever been treated for

1 blood clots or thrombosis?
2    A.   No.
3    Q.   How about blood disorders or abnormal blood
4 cells?
5    A.   No.
6    Q.   Have you ever been treated for any heart
7 disease or condition, other than what you mentioned,
8 the chest pains you were having?
9    A.   No.
10   Q.   Have you ever had any type of stroke?
11   A.   No.
12   Q.   Have you ever been tested for the breast
13 cancer gene, it's called Braca 1 or Braca 2?
14   A.   No.
15   Q.   You have not?
16   A.   No.
17   Q.   Have you considered it, having that testing?
18   A.   No.
19   Q.   Why not?
20       MR. MOSKOW:  Objection to form.
21   A.   Never felt a need.
22 BY MS. DUGGAN:
23   Q.   Have you ever had any type of arthritis?
24   A.   No.
25   Q.   How about any type of deep vein thrombosis?

1    A.   No.
2    Q.   Have you ever had migraines?
3    A.   No.
4    Q.   How about varicose veins?
5    A.   No.
6    Q.   Have you ever had an ovarian cyst?
7    A.   No.
8    Q.   Have you ever had an abnormal Pap smear?
9    A.   No.
10   Q.   Do you get regular annual Pap smears?
11   A.   Yes.
12   Q.   Have you done that throughout your
13 adulthood?
14   A.   Yes.
15   Q.   Have you ever had any gallbladder disease or
16 gallstones?
17   A.   No.
18   Q.   Any thyroid disease or thyroid problems?
19   A.   No.
20   Q.   Now let me ask you some questions about your
21 experience with menopause.
22       How old were you when you first started
23 having menopausal symptoms?
24   A.   Mid-forties.
25   Q.   And what symptoms were you experiencing

1 then?
2    A.   Hot flashes mostly.
3    Q.   If we define menopause as a year, going a
4 year without having your period, at what age would you
5 say that you had experienced menopause?
6    A.   Forty-six.
7    Q.   Now, you said that you had hot flashes as a
8 symptom of menopause.
9    A.   Uh-huh.
10   Q.   How often were you having hot flashes?
11   A.   Frequently.  Night sweats.
12   Q.   And when you say "frequently," do you
13 mean -- how many times a day do you mean?
14   A.   A lot.  Once an hour, twice an hour.  A lot.
15   Q.   Can you describe how they felt?  As you are
16 doing so, think about if you were trying to explain to
17 someone who never had a hot flash, what does that feel
18 like?
19   A.   From the top of your head to your toes, you
20 are wet, you are clammy, very, very sweaty.  Your
21 hair -- the base of your hair, you've just done your
22 hair, and then it just feels like your hair is falling
23 limp because you are wet, you are sweaty.  Your makeup
24 feels like it's running.  You feel like you are hoping
25 your deodorant is holding up.  Everything gets wet.

1 It's awful.  Oftentimes you want to change mostly your
2 top.  Your bra can be wet, actually feel like you've
3 been in a shower.
4    Q.   Did you experience any color change?  Did
5 you get flushed or red?
6    A.   Red, yes.
7    Q.   Did you find that having hot flashes
8 interfered with your ability to concentrate on what
9 you were doing?
10   A.   It interfered with everything.
11   Q.   Did you have to -- what did you do to try to
12 cope with them while you were experiencing them?  Did
13 you fan --
14   A.   Fan, go in front of a window.  If it was the
15 season, find a fan and stand in front of it.  Wait
16 'til the very last minute to get dressed.
17   Q.   So it would sometimes happen as you were
18 trying to get ready in the morning?
19   A.   Yes.  Well, they happened hourly, sometimes
20 twice an hour.
21   Q.   Did you ever have an occasion when you felt
22 embarrassed by the fact that you were having a hot
23 flash?
24   A.   Yes, because people would -- you felt people
25 were noticing.  I felt people were noticing me.  And

Page 125

1 it was uncomfortable. And you are wet. You are
2 uncomfortable.
3    Q.   And this would happen to you while you were
4 working?
5    A.   It happened, yes, all the time.
6    Q.   All the time. Did you have to change your
7 clothes at work? Did you bring extra clothes?
8    A.   I don't remember doing that. I just got out
9 of the situation where I could cool down.
10    Q.   And you mentioned that these happened to you
11 at night as well?
12    A.   Yes.
13    Q.   What would happen overnight when you had one
14 of these hot flashes?
15    A.   The bed clothes would often have to be
16 changed. My gown would be changed. It was
17 uncomfortable for my husband. He would notice it
18 right away.
19    Q.   Did it wake you up when you --
20    A.   Oh, yes.
21    Q.   -- were sleeping?
22        And it sometimes woke up your husband as
23 well?
24    A.   Yes.
25    Q.   Did that mean that you would be tired the

Page 126

1 next day because you'd woken up during the night?
2    A.   I would -- no, no, no.
3    Q.   Were you always able to go back to sleep
4 after you had one pretty quickly?
5    A.   After the bed was changed, yes.
6    Q.   Now when you say "after the bed was
7 changed," you actually mean the sheets and everything?
8    A.   Oh, I'd put a towel down on top of the wet
9 sheet, wet, my side.
10    Q.   And how long was that happening, that you
11 had the hot flashes and the night sweats so intensely?
12    A.   Could you clarify what you mean by "how
13 long?"
14    Q.   Sure. We will get to, in a minute, when you
15 started to take hormone therapy, Prempro in
16 particular, which is used to treat menopausal symptoms
17 like these.
18        But for how long were you having the hot
19 flashes and the night sweats before you started to
20 take medicine that was supposed to try to help you?
21        MR. MOSKOW: I think the problem the
22 witness is having is she is not sure about the
23 duration of the hot flash or the period of time in
24 which she was suffering hot flashes.
25        MS. DUGGAN: Thank you for clarifying,

Page 127

1 if that's what your confusion is.
2        THE WITNESS: Yes.
3 BY MS. DUGGAN:
4    Q.   I mean the period of time in which you were
5 experiencing the hot flashes or the night sweats, not
6 the duration of a particular one.
7    A.   A couple of years. I tried to work through
8 it.
9    Q.   And when you say you tried to work through
10 it, you mean you tried to do it without taking any
11 medicine; is that right?
12    A.   Yes.
13    Q.   I do want to know the answer to the other
14 question, which is, when you had a hot flash,
15 approximately how long did that sensation last before
16 it went away or subsided?
17    A.   Five, seven minutes.
18    Q.   Now, did you have any other symptoms that
19 you associated with menopause?
20    A.   Vaginal dryness.
21    Q.   And when did you start to notice the vaginal
22 dryness?
23    A.   About the same time the hot flashes started.
24    Q.   And did the vaginal dryness affect your
25 relationship with your husband?

Page 128

1    A.   Yes.
2    Q.   In what way?
3    A.   Well, it hurt to have intercourse,
4 therefore, I never initiated, and I shouldn't say
5 "never." I didn't tend to initiate intimacy. And
6 oftentimes, it was very difficult for him to -- he is
7 a very understanding man, but it hurt.
8    Q.   Now, prior to your starting to have the
9 vaginal dryness, would you sometimes initiate intimacy
10 with your husband?
11    A.   Yes.
12    Q.   So that was something that you -- the
13 decrease in your initiating you tied to the beginning
14 of the vaginal dryness?
15    A.   Yes.
16    Q.   And you said your husband is a very
17 understanding man?
18    A.   He is.
19    Q.   So he knew that you were having hot flashes,
20 and he knew that you were having vaginal dryness
21 issues?
22    A.   Uh-huh -- yes.
23    Q.   Did you try anything to help with the
24 vaginal dryness?
25    A.   We tried lubrication. Tried lubricated

1 condoms.
2    Q.   Did you get any relief from either of those?
3    A.   Not a lot.
4    Q.   Maybe you've already answered this in
5 connection with the vaginal dryness point, but did you
6 notice that there was any change in your libido, your
7 sex drive, that you associated with menopause, if
8 there is something separate than knowing that intimacy
9 would be painful?
10   A.   Yes, yes.
11   Q.   What did you notice?
12   A.   Just I -- mostly that it was going to hurt,
13 so I just really didn't want to get intimate
14 vaginally.
15   Q.   Did you experience anything related to
16 moodiness or mood swings that you associated with
17 menopause?
18   A.   No.  Not that I associated it.
19   Q.   We will get to ask your husband at some
20 point if he noticed any moodiness or mood swings, but
21 nothing that you attributed to hormone changes, okay.
22        A couple of other possible symptoms.  Did
23 you notice any increase in your forgetfulness during
24 the time that you were menopausal?
25   A.   I don't recall.

1    Q.   And weight gain, I think we talked about a
2 few minutes ago.  You think you maybe put on seven
3 pounds or so.
4    A.   Uh-huh.
5    Q.   Right, okay.  Did you read any books or do
6 any research at that time to find out more about your
7 menopausal symptoms and what was happening with your
8 body?
9    A.   I don't remember if I did.
10   Q.   Now, at that time, when you were
11 experiencing the hot flashes and you were trying to
12 work through it on your own, were any of your children
13 at home, living at home?  Why don't we wait just a
14 second.
15        (Pause.)
16   A.   Caleb would have been there.
17 BY MS. DUGGAN:
18   Q.   Do you think that Caleb had any idea that
19 you were experiencing hot flashes or other menopausal
20 symptoms?
21   A.   Well, he probably saw me get hot, you know,
22 pull a jacket off or something, but I don't know that
23 he knew what was going on.
24   Q.   That's not something you would have
25 discussed with him?

1    A.   No, no.
2    Q.   And at that time, what was your job?
3    A.   I was teaching.
4    Q.   That was before you became a principal?
5    A.   Yes.
6    Q.   And I meant to ask you this earlier, when
7 you were teaching, what subjects were you teaching, or
8 what grade?
9    A.   Mostly first grade generally.  Elementary
10 Ed.
11   Q.   Did you ever teach any specialized classes,
12 like only teach math or only teach science, that kind
13 of thing?
14   A.   Prior to -- this was in the -- I taught
15 social studies and all the language arts to 6th grade,
16 but that was in another school, and it was like -- it
17 was in the early seventies.
18   Q.   So primarily you were teaching first grade
19 and then you went into administration; is that right?
20   A.   Right.  Most of my years were in first
21 grade.
22   Q.   And at the time that you were officially
23 experiencing the menopausal symptoms, were your
24 parents still alive?
25   A.   Yes.

1    Q.   And were there any -- did you have any
2 responsibility for taking care of them or anything
3 like that at that time?
4    A.   No.
5    Q.   And at that time, were things good in your
6 marriage?
7    A.   Yes.
8    Q.   And how about your financial situation at
9 that time, was it stable?
10   A.   Yes.
11   Q.   Okay.  Now let's move on to talking about
12 your use of hormone therapy.  When were hormone
13 medications first prescribed for you?
14   A.   I was around -- between 49 and 50.
15 Ninety-five, ninety-six, to the best of my
16 recollection.  That's what I remember.
17   Q.   And who would have prescribed them to you?
18   A.   It would have been Dr. Tesoro.
19   Q.   And what do you remember him prescribing to
20 you initially?
21   A.   I don't remember anything other than the
22 Prempro.
23   Q.   Now, in your fact sheet, you identified a
24 date of November 19th of '98 as when you first started
25 taking Prempro.

1      Do you know where you got that date from?
2      A.   I'm not sure if that was from the pharmacy,
3  but I, I am sure I took it before I became -- before I
4  was fifty years old.  That would be '96.  So that's to
5  the best of my recollection, I took it that early.
6      Q.   And you think that you took Prempro starting
7  in -- that would have been sometime --
8      A.   I think that's what I -- I'm pretty sure
9  that's what I took.
10     Q.   Okay.  Let me just refresh you with your
11 fact sheet just to see if you remember when you filled
12 this out what you might have been looking at to make
13 you think that it was '98 instead of '96.
14     Would you look at Fraser Exhibit 2.  It's
15 page 23 towards the back.
16     A.   Twenty-three.
17     Q.   Yes.  Do you see that chart in the middle of
18 the page?
19     A.   Uh-huh.
20     Q.   And it identifies Prempro, and then in the
21 fourth column, it says first use and it has a November
22 19, '98 date.
23     A.   Uh-huh, I see that.
24     Q.   Do you -- when you prepared the fact sheet,
25 did you fill out all the information in it or did some

1  of it get filled out by your attorneys from maybe your
2  medical records?
3      A.   It could have been -- well, this was typed
4  by the attorneys.  I didn't type this, so -- and I
5  don't have a copy in my handwritten one.  I -- the
6  best of my recollection, I started on hormone
7  replacement for the hot flashes between my 49th and
8  50th year.  That's the best I can remember.  And that
9  would have been -- let's see, I was born in -- it
10 would have been '96.  I would have been 50.  That's
11 what I remember.
12     Q.   Okay.
13     A.   That was my recollection.
14     Q.   If your medical records show something
15 different, would you have any reason not to defer to
16 what it says in your medical records?
17     A.   No.  That's just what I remember, what my
18 recollection was is that I was in my late forties,
19 early fifties.  That's what I remember, but I --
20     Q.   Let's talk about when you first got
21 prescribed the Prempro, which you think is the first
22 hormone therapy medication you were prescribed.
23     Do you remember that appointment that you
24 had with Dr. Tesoro at which the hormones were first
25 prescribed?

1      A.   No.
2      Q.   Do you remember any specific appointment
3  that you've ever had with Dr. Tesoro?
4      A.   No.  Just -- no.
5      Q.   Do you remember if the first time you talked
6  with Dr. Tesoro about hot flashes and night sweats
7  that you got a prescription that time?
8      A.   I don't remember.
9      Q.   Sometimes folks, you know, talk to a doctor
10 for a while about a condition before they actually
11 start taking medication for it.  I'm just wondering if
12 you recall doing that.
13     A.   I don't recall.  I don't recall.
14     Q.   When you were prescribed with the hormone
15 medication, do you remember whether you specifically
16 asked the doctor to give you something to help you
17 with the hot flashes or if that was something that he
18 suggested to you?
19     A.   I don't remember.  I complained, but I don't
20 remember.
21     Q.   Now, when you got the prescription that you
22 think was for Prempro, do you remember whether that
23 was a medication you'd ever heard of by that name
24 before?
25     A.   I don't remember.  No, I don't remember.

1      Q.   So is it possible that you went in to him
2  and said, Dr. Tesoro, I'm having these symptoms, I
3  want you to give me some Prempro, or is that not
4  likely?
5      MR. MOSKOW:  Objection to form.
6      You can answer.
7      A.   I don't think -- it's not -- knowing me,
8  it's not likely.
9  BY MS. DUGGAN:
10     Q.   That's not something you would do, is go in
11 and ask for a particular medication?
12     A.   No.
13     Q.   What, if anything, do you remember
14 Dr. Tesoro telling you about the benefits to you of
15 taking the Prempro?
16     A.   What I mostly went in for was the hot
17 flashes, and that it would reduce or eliminate them.
18 My exact memory of the conversation, exact words he
19 used, I have no recollection.  It was primarily -- my
20 biggest concern was the vaginal dryness and the hot
21 flashes.
22     Q.   And did he tell you that you would get
23 relief from the hot flashes and the vaginal dryness if
24 you tried Prempro?
25     A.   I trusted that he would -- based on

Page 137

1 everything I knew about him, that that was what it
2 would do.
3    Q.   Now, did you have any discussion with him
4 about possible bone benefits from taking Prempro?
5    A.   In my memory of it, no, no.
6    Q.   So is it fair to say that when you first
7 started taking Prempro, the reasons you understood
8 that you were taking it was to address your hot
9 flashes, your night sweats and your vaginal dryness?
10   A.   Yes.
11   Q.   And nothing else that you can think of?
12   A.   Not that I recall.
13   Q.   What do you remember Dr. Tesoro telling you
14 about the possible risks or side effects of Prempro?
15   A.   I don't have any recollection.  I have
16 trusted him, and he said it was safe, and I -- that's
17 what I believed.
18   Q.   Let's just wait a second.
19   A.   I mean, I don't --
20   Q.   Hang on a second.  It's just noisy outside.
21        (Pause.)
22        MR. MOSKOW:  It's gone.
23        MS. DUGGAN:  Can't tell when the end
24 is.
25 BY MS. DUGGAN:

Page 138

1    Q.   I'm sorry, I cut you off due to the noise.
2    A.   You'd have to repeat the question for me
3 right now.
4    Q.   Okay, sure.
5    A.   What he said.
6    Q.   I think it was, what did he tell you about
7 the risks or the potential side effects?
8    A.   Yeah, he, from my recollection of whatever,
9 it was a safe alternative to my hot flashes, and that
10 it would help with the dryness.
11   Q.   It sounds to me like you are not saying he
12 absolutely did not have that discussion with me.  You
13 are saying, I don't remember if he had that discussion
14 with me.  Is that fair to say?
15        MR. MOSKOW:  Objection to form.
16        You can answer.
17        THE WITNESS:  I can answer.
18   A.   It's fair to say -- if you'll repeat what
19 you are saying.
20 BY MS. DUGGAN:
21   Q.   Sure.
22   A.   I just want to make sure that I'm clear.
23   Q.   That's fine.  I appreciate your letting me
24 clarify.
25        In terms of discussion of risks of taking

Page 139

1 Prempro, I hear you saying you trusted Dr. Tesoro to
2 make the right decisions for you, make the right
3 recommendations for you; correct?
4    A.   Yes.
5    Q.   In terms of any discussion of risks, are you
6 saying he definitely did not discuss risks with you,
7 or that if he did discuss them with you, you don't
8 recall it as you are sitting here today?
9    A.   As I'm sitting here today, I do not recall
10 any discussion of the risks.
11   Q.   But you are not denying that such a
12 discussion could have taken place?
13   A.   Knowing Dr. Tesoro and knowing how he took
14 care of me, he would -- if it was unsafe, he would
15 tell me.
16   Q.   Okay.  And that's the best of your
17 recollection as you sit here today?
18   A.   Yes, yes.
19   Q.   Do you remember if you asked Dr. Tesoro any
20 questions about the medicine, Prempro, that he was
21 recommending?
22   A.   No, I don't recall.
23   Q.   Do you remember if he gave you any samples
24 to get you started when you first started taking it?
25   A.   I don't remember that, no.

Page 140

1    Q.   How about at any time while you were taking
2 the medicine, do you remember anyone ever giving you
3 any samples of it?
4    A.   No, I don't remember that.  I don't remember
5 if they did, if he did.
6    Q.   Now, after you got the prescription from
7 Dr. Tesoro, did you take it and get it filled at the
8 pharmacy?
9    A.   That's what I would have done, yes.
10   Q.   You don't remember waiting for any longer
11 period of time before you got it filled?
12   A.   No.
13   Q.   Had you ever heard of Prempro prior to him
14 giving you a prescription for it?
15   A.   Well, it was kind of everywhere in it, you
16 know.  I mean, it was -- yes, I'd heard of it.
17   Q.   And how do you think you'd heard of it?
18   A.   It was on television.  There were ads, but I
19 don't remember specifically listening to anything.
20   Q.   I think we talked about this earlier today.
21 You said that you really didn't rely on anything you
22 saw in any advertisements in your decision to take it;
23 correct?
24   A.   No.
25        MR. MOSKOW:  Objection to form.

Page 141

1 BY MS. DUGGAN:
2    Q.   Is your answer, no, you didn't rely on
3 anything that you saw on an advertisement when
4 deciding to take Prempro?
5    A.   I relied on my doctor.
6    Q.   And is that true for while you were
7 continuing to take the medication, that you relied on
8 your doctor as opposed to relying on any
9 advertisements in deciding to continue taking it?
10        MR. MOSKOW:  Objection to form.
11    A.   Well, my doctor trusted -- I trusted my
12 doctor, and my doctor trusted you, the Wyeth, I would
13 guess, because he didn't give me any indication that
14 there was anything that would be harmful to me.
15 BY MS. DUGGAN:
16    Q.   Okay.  And I appreciate that, but my
17 question is actually:  In your deciding to continue
18 taking the medication over the time period that you
19 took it, is it fair to say that you relied on your
20 doctor's judgment in deciding to continue to take it
21 rather than anything you may have seen in any type of
22 advertisement for the medicine?
23        MR. MOSKOW:  Objection to form.
24        You can answer.
25    A.   My, my reliance on taking anything from my

Page 142

1 doctor is on his knowledge.  He is the expert, and I
2 depended on him to let me know if there was any harm
3 that was going to come to me.
4        If there had been huge, black, bold don't
5 take this, it's going to cause cancer or it may cause
6 cancer, I would not have taken it.
7 BY MS. DUGGAN:
8    Q.   Okay.
9    A.   But I'm relying on my doctor, and I did rely
10 on my doctor.
11    Q.   Okay, and I appreciate that, and I
12 understand that.  I'm just really trying to narrow
13 down this one issue relating to advertising.
14        I think based on what you told me, it sounds
15 like it's fair for me to say that you relied on your
16 doctor in deciding to take and continue to take
17 Prempro as opposed to anything you saw in any type of
18 advertisement; is that fair to say?
19        MR. MOSKOW:  Objection to form.
20        You can answer.
21    A.   Yeah, I guess, that's --
22 BY MS. DUGGAN:
23    Q.   You said yes?
24    A.   I said -- tell me your question again.  I'm
25 not understanding your question.

Page 143

1    Q.   I'm not sure why we are having --
2    A.   I feel like I'm -- okay.
3    Q.   Okay.  My question is I think simple, though
4 I may be overcomplicating it.
5        My question is in deciding -- let me back it
6 up a little bit, in deciding to take Prempro
7 initially, did you rely entirely on your doctor in
8 making that decision as opposed to anything you may
9 have seen in any type of advertisement for the
10 medication?
11        MR. MOSKOW:  Objection to form.
12        You can answer.
13    A.   I have to say I relied on Dr. Tesoro's
14 judgment in the safety of taking this medication for
15 my health.
16 BY MS. DUGGAN:
17    Q.   Okay.  And so you did not rely on anything
18 that you may have seen in any type of advertisement
19 for Prempro in deciding to start to take it?
20    A.   No, I did not rely on the advertisement.
21    Q.   Okay, great.  Then the second part of the
22 question is:  In continuing to take Prempro, in
23 deciding year after year to continue taking Prempro,
24 did you also rely exclusively on your doctor's
25 judgment in continuing to write you prescriptions and

Page 144

1 make that recommendation to you in deciding to take
2 that medication?
3    A.   Yes, I relied on him.
4    Q.   Okay.  So is it fair to say that you did not
5 rely on anything that you may have seen in any
6 advertisements in deciding to continue to take the
7 Prempro?
8    A.   If I had seen in anyplace in the
9 advertisement or on the packaging, if I had seen
10 something that said don't take this or you may be
11 running the risk of injury to yourself, cancer being
12 the big C word, I would not have taken it.  But I
13 relied on my doctor totally.  I mean, I relied on him.
14 I trusted him, I still trust him.
15    Q.   Okay, I think I understand what you are
16 saying.  So it is fair for me to say that it wasn't
17 anything in any advertisement that you saw that you
18 relied on in deciding to continue to take Prempro?
19    A.   Even though I saw an advertisement once,
20 that I remember, that just enhanced it.
21    Q.   Okay, I don't understand what you mean.
22    A.   Well, it's going to bring the elasticity
23 back to your skin, and it was going to get rid of
24 your -- which it did.  It was working.  It was working
25 for what I wanted it to do, it worked.  So that's why

1 I continued to take it, and because my doctor felt it
2 was safe, and I felt it was safe because my doctor
3 did.
4    Q.   So you continued to take it because your
5 doctor recommended it and because it was working for
6 you; is that fair to say?
7    A.   That's fair to say, yes.
8    Q.   And those are the reasons you continued to
9 take it?
10   A.   Yes.
11   Q.   And not because some actress recommended the
12 medication?
13   A.   Not -- no.  That just enhanced it.
14   Q.   But you are not the type of person who would
15 rely on the judgment of an actress as opposed to your
16 doctor --
17   A.   No.
18   Q.   -- in deciding to take prescription
19 medicine; correct?
20   A.   Exactly.
21   Q.   Now, when you were first prescribed the
22 Prempro, what, if anything, do you remember Dr. Tesoro
23 telling you about how long you would need to take the
24 medication?
25   A.   I don't remember any specific conversation

1 we had about that.
2    Q.   When you first got the Prempro, do you know
3 what dosage you were taking?
4    A.   It was 625, 625 milligrams, .625 milligrams.
5    Q.   Can you describe what the medication looked
6 like?
7    A.   It was in a little round container that you
8 clicked for the day you were taking it, and it was a
9 little tiny pill.  It was blue, a little blue pill.
10   Q.   What was the shape of the blue pill?
11   A.   Tiny, ovally, roundy.
12   Q.   Do you remember if the pill had any writing
13 on it?
14   A.   It had a letter.  It had a letter.
15   Q.   Do you remember what letter?
16   A.   The "W."  A "W," and I'm not -- I don't
17 know.  That's about all I remember.
18   Q.   I'm sorry, it had --
19   A.   It had a "W" on it.
20   Q.   Just "W," okay.  And during the time that
21 you were taking Prempro, were you always taking the
22 same pill, the blue color pill with the "W" on it?
23   A.   To my memory, yes.
24   Q.   Do you recall if at any point in time
25 Dr. Tesoro changed the dosage of the medication you

1 were taking?
2    A.   I don't recall.
3    Q.   Now, I asked you earlier about Exhibit 3,
4 which is the box that had three separate packages in
5 it, and now yours only has two in it.
6         Did the medication when you first started
7 taking it come in a similar individual packet?  Even
8 if you didn't get it in a box of three, did the packet
9 look the same?
10   A.   To my memory, yes.  As I remember it, yes.
11   Q.   Okay.  Did you -- go ahead.
12   A.   No, sorry.
13   Q.   That's okay.  Do you ever remember getting
14 the medication in a form other than in the circular
15 dial pack, which is what we call the thing that
16 clicks?
17   A.   I don't remember.
18   Q.   You don't ever remember getting it in a
19 bottle of, just a bottle with pills in it?
20   A.   I don't remember.
21   Q.   And the package that you do remember
22 getting, the package that's sealed that we have a
23 couple of in your Fraser 3 here, when you ripped open
24 the package, what was inside?
25   A.   The little plastic container with -- you had

1 to -- if I remember this, you broke a piece off to
2 start the process, and it was dated.  I don't remember
3 the exact details of it.
4    Q.   Okay.  And was there a little folded-up
5 sheet of paper packaged in with the medication that
6 you could unfold and read if you chose to?
7    A.   I know there is in this, because that's --
8 you know, I know that's in there, the folded-up paper.
9 I don't remember if there were any individually
10 wrapped ones.  No, I don't recall.
11   Q.   You don't recall, okay.
12        Do you remember if, when you were first
13 prescribed the Prempro, if Dr. Tesoro mentioned any
14 other medications that you could take instead of the
15 Prempro?
16   A.   I don't.
17   Q.   Do you remember if he offered you other
18 options, other than taking a pill, such as using a
19 cream or using a patch, something like that?
20   A.   I don't specifically remember that.  No
21 patch.  I never heard of that.  I've heard of over the
22 counter, but I'm not sure Dr. Tesoro recommended
23 those.
24   Q.   You don't recall him ever recommending a
25 patch to you?

1    A.    For vaginal dryness, no.

2    Q.    Creams for vaginal dryness?

3    A.    Uh-huh.

4    Q.    Was that something he had ever suggested to

5 you?

6    A.    I don't remember.  I don't recall.

7    Q.    When Dr. Tesoro initially prescribed Prempro

8 to you, did he give you any information about either

9 menopause or hormone therapy at that time?

10    A.    I don't remember.

11        MR. MOSKOW:  Object to form.

12        THE WITNESS:  I'm sorry.

13    A.    I don't remember.

14 BY MS. DUGGAN:

15    Q.    What I'm asking about here is not a

16 discussion which you may or may not have had, but did

17 he give you any pieces of paper, any literature, or

18 any material for you to look at in connection with

19 menopause or hormone therapy?

20    A.    I don't have memory of it at all if he did.

21    Q.    When you were in his office, in his waiting

22 room, for example, did he have any types of materials

23 sitting around that you could look at, other than

24 magazines and that sort of thing, materials that

25 related to physical conditions or medicines or

1 anything like that?

2    A.    Uh-huh.

3        MR. MOSKOW:  Is that a yes or a no?

4        MS. DUGGAN:  I think she is just saying

5 she understood my question.

6    A.    I'm trying to -- yes, I would guess so.

7 BY MS. DUGGAN:

8    Q.    You guess so or do you actually remember?

9    A.    I don't remember.

10    Q.    Okay, that's fine.  And it's fine if you

11 don't remember something, just tell me that.

12    A.    I don't remember.  I don't remember.

13    Q.    Do you ever remember while you were -- maybe

14 Dr. Tesoro is much better than my doctors, but there

15 is often some down time when I go to the doctor and

16 I'm waiting to get called back.

17        Do you ever remember picking up any

18 pamphlets or materials in his office that related to

19 health conditions or medications?

20    A.    I'm sure -- well, I'm going to have to say

21 there was, but remembering to pick it up, I don't

22 remember.  I don't remember.  I mean, I just --

23    Q.    That's fine.  So there may have been

24 materials there, but they weren't things that you

25 remember picking up and reading from there?

1    A.    Right.  That's what I'm saying.  I'm sure

2 there were materials, yes.  Yes, there were materials.

3 Did I pick them up?  I don't remember.

4    Q.    Okay.  And it sounds like you are actually

5 not sure that there were materials there.

6    A.    No, you know, I -- can we take a break right

7 now?

8        MR. MOSKOW:  Answer the question, and

9 then we can take a break.

10    A.    Materials around a doctor's office,

11 Dr. Tesoro's office were there.  Yes, I'm sure they

12 were there.

13 BY MS. DUGGAN:

14    Q.    Okay.

15    A.    Did I pick them up?  I don't remember.  I'm

16 getting confused about a lot of doctors' offices.

17    Q.    That's fine and I understand that.  I just

18 really want you to focus in on Dr. Tesoro, and if you

19 don't remember, that's a fine answer.

20    A.    I don't remember picking anything up to

21 read.

22    Q.    So as you sit here today, you don't have any

23 specific recollection of any materials you may have

24 picked up to read while you were at Dr. Tesoro's

25 office; is that fair to say?

1    A.    It's fair to say, and I know if I had and it

2 had anything to do with medicines being at risk, I

3 would have read them.  I feel like I would have read

4 them.

5    Q.    Okay.  And if you had had questions about

6 anything that you saw while you were sitting in his

7 waiting room, would you have felt comfortable asking

8 Dr. Tesoro about those?

9    A.    Yes.

10        MR. MOSKOW:  Is that a good point for a

11 break?  Are you done with that?

12        MS. DUGGAN:  You still need to take a

13 break?  We can do that if you need to.

14        THE WITNESS:  Yes.  I need to go to the

15 ladies' room.

16        MS. DUGGAN:  Sure.

17        THE VIDEO OPERATOR:  We are going off

18 the record at 2:36 p.m.

19    (Recess taken from 2:36 p.m. to 2:42 p.m. )

20        THE VIDEO OPERATOR:  We are back on the

21 record at 2:42 p.m.

22 BY MS. DUGGAN:

23    Q.    Ms. Fraser, are you ready to continue?

24    A.    Yes.

25    Q.    Let me ask you a few more questions about

1 Dr. Fraser -- I mean Dr. Tesoro and his practice and
2 discussions with you.
3        Do you remember if Dr. Tesoro had you --
4 made available a video to you to watch about hormone
5 therapy or menopause?
6    A.   I don't remember.
7    Q.   All right.
8    A.   I don't recall.
9    Q.   Do you recall if there were any posters or
10 things hanging on the wall in his examining rooms that
11 talked about menopause or hormone therapy?
12    A.   Specifically those topics, no.  Posters of
13 women's anatomy and all.
14    Q.   Did you discuss hormone therapy when you
15 first started taking it with your husband?
16    A.   I don't remember.
17    Q.   Do you know if he knew that you were taking
18 Prempro?
19    A.   Yes, he knew that.
20    Q.   Do you remember if you discussed it,
21 Prempro, with your women friends?
22    A.   I don't remember, no.
23    Q.   Now, after you started taking the Prempro,
24 did you notice a difference in the way that you felt?
25    A.   Yes.

1    Q.   Can you please describe for me the
2 difference in the way that you felt?
3    A.   Well, the hot flashes diminished, and then
4 basically my memory of it, they disappeared, and my
5 intimacy with my husband was more comfortable and more
6 frequent.
7    Q.   And did your waking up at night due to night
8 sweats, did that disappear as well?
9    A.   Yes.
10    Q.   Now, after you started taking the Prempro --
11 well, let me ask you this, when you first got the
12 Prempro prescription, do you remember how long the
13 prescription was good for, how many months?
14    A.   I don't remember.  I don't remember.
15    Q.   Do you remember needing to go back to
16 Dr. Tesoro on a regular basis in order to get renewals
17 of your prescriptions for Prempro?
18    A.   It would be yearly if that was the case,
19 yes, because I went back to him every year.
20    Q.   And at that time, were you getting annual
21 mammograms?
22    A.   Yes.  I started -- I don't -- yes.
23    Q.   When do you think you started getting
24 mammograms?
25    A.   I was in -- gosh.  In my forties, late

1 forties.  It seemed like at the onset.  May I look --
2    Q.   Sure, if that would help refresh you, go
3 ahead.
4    A.   It seems it was at the onset of my --
5 everything kind of started at the same time.  In my
6 forties.  Mammograms before I reached menopause.  It
7 was in my early to mid-forties.  I don't have the
8 date.  But Sharon Hospital would.  Correct?
9    Q.   Is Sharon Hospital the place that you got
10 your mammograms?
11    A.   I got them there.  I got them at Saint
12 Francis.  I got them at Kent Imaging and back to
13 Sharon.  My last one was at Sharon.
14    Q.   Are those the only three places that you've
15 had mammograms done?
16    A.   Yes.
17    Q.   And once you started doing the mammograms,
18 did you have them every year?
19    A.   You know what, I think maybe I might have
20 had one with Dr. Pearce.  Yes, I must have had one
21 with Dr. Pearce, John Pearce, in Torrington.  I don't
22 have that on here, from Charlotte Hungerford.
23    Q.   From where?
24    A.   Charlotte Hungerford Hospital in Torrington.
25    Q.   You saw Dr. Pearce before you started to see

1 Dr. Tesoro; right?
2    A.   Yes.  Yes.
3    Q.   So what were the circumstances that led you
4 to have a mammogram with Dr. Pearce?
5    A.   I had a -- calcifications at about 11:00 on
6 the left breast.  And that would have been -- and he
7 did a needle biopsy and it was fine.
8    Q.   Now, when was that?
9    A.   In the seventies.  I'm not positive on the
10 dates.
11    Q.   So that was long before you started taking
12 Prempro; correct?
13    A.   Yes.
14    Q.   And you said that he did a needle biopsy of
15 you?
16    A.   Yes.
17    Q.   And the results were good?
18    A.   Yes.
19    Q.   And then did he remove all the
20 calcifications, or was that something that was just
21 monitored over time?
22    A.   Monitored.
23    Q.   So do you think you just had the one
24 mammogram that led to the needle biopsy with
25 Dr. Pearce and then some number of years went by

Page 157

1  before you started getting annual mammograms?
2     A.   That I don't remember.  I don't remember
3  whether I got them every year after that.  I do not
4  remember.  I have no memory of that.
5     Q.   Okay.  Now, if you had gotten them every
6  year starting in the 1970s, would you have gotten
7  those mammograms at Charlotte Hungerford Hospital?
8     A.   I'm not sure.  I'm not sure.
9     Q.   Can you think of any other place that you
10  remember going to to get a mammogram --
11    A.   No.
12    Q.   -- other than the four we've discussed?
13    A.   Uh-uh, uh-uh.
14    Q.   That's a no?
15    A.   No, I'm sorry.  Excuse me.
16    Q.   That's okay.
17         Did you do regular breast self-exams?
18    A.   Yes.
19    Q.   How often did you do that?
20    A.   Usually when I took a shower.  Not every
21  single day, but three or four times -- three or four
22  times a week I did it.
23    Q.   And starting when did you do that?
24    A.   I'm not sure of the date, but I would guess
25  it was after that mammogram.

Page 158

1     Q.   And that mammogram is the one we are talking
2  about where Dr. Pearce then found the calcifications
3  that led to the biopsy sometime in the seventies; is
4  that right?
5     A.   Yes.
6     Q.   So you think since the 1970s, three or four
7  times a week you did a breast self-examination?
8     A.   Well, yes.  Yes.  I'm not real good about
9  doing them.  I mean, I'm really not that -- I do them,
10  but I'm not -- I'm going to be very accurate about
11  this.  I can't say that I do them every week, I can't
12  say I do them every two or three days.  I have.  There
13  have been periods of time.  I do things in spurts, so
14  I would say.
15    Q.   Okay.  Have you ever felt anything when
16  you've done your own self-exam that you thought was of
17  concern?
18    A.   No.
19    Q.   And is the only -- well, are the only
20  mammograms that you've had that have had abnormal
21  results the one with Dr. Pearce back in the seventies
22  and the one in September of 2001, which led to your
23  breast cancer diagnosis?
24    A.   Yes.  To my -- yes.
25    Q.   So you don't recall any other mammogram

Page 159

1  report or hearing about a mammogram that was --
2     A.   No.
3     Q.   -- had abnormal results other than those
4  two; correct?
5     A.   I don't recall.
6     Q.   Do you think that's something that you would
7  remember?
8     A.   I would pray, I would hope so, yes.
9     Q.   All right.  During the time that you were
10  taking Prempro, do you ever remember any times -- time
11  periods where you stopped taking it and then restarted
12  it again?
13    A.   I don't remember doing that.  I would doubt
14  that I would do that, but I don't remember.
15    Q.   Was it your understanding that you were
16  supposed to take the Prempro every single day?
17    A.   Yes.
18    Q.   And your recollection is that you did that?
19    A.   That's what I recall, yes.
20    Q.   Do you ever remember having a prescription
21  lapse and then there being some period of time before
22  you got the next set of pills?
23    A.   I don't remember that.
24    Q.   Now I want to ask you some questions about
25  the information that came with the medication when you

Page 160

1  were taking it?
2     A.   Uh-huh.
3     Q.   I think you told me earlier that it wasn't
4  your practice to read the, what we call the patient
5  package insert, the folded up piece of paper that
6  comes with the medication; is that correct?
7     A.   I have -- I think I -- yes, I told you that,
8  but that depends.  I mean, I have read some things.
9  There is one in there.  I don't throw them all out.
10  But I've scanned some, but not all.
11    Q.   Okay.  Well, thank you for clarifying that
12  for me.
13         Do you remember when you first started
14  getting the Prempro, did you read the insert that came
15  with your first prescription?
16    A.   I may have.  I don't recall.
17    Q.   Do you understand that that information is
18  there with the medication so that you can look at it
19  to see if you have any questions or to give you
20  information about the medication you will be taking?
21         MR. MOSKOW:  Objection to form.
22         You can answer.
23    A.   I understand?  Would you repeat the
24  question.
25  BY MS. DUGGAN:

Page 161

1   Q.   Sure.  Do you understand that the reason
2   that that information is put in with the medication is
3   for you to have information about the medicine that
4   you are taking?
5   A.   Yes.
6        MR. MOSKOW:  Objection.
7   A.   Oh, yes.
8   BY MS. DUGGAN:
9   Q.   You do, okay.
10       Do you recall ever asking your pharmacist
11  about anything that had to do with Prempro when you
12  picked up your prescription?
13  A.   No, I don't.  No, I don't remember.
14  Q.   Is that something that you would normally do
15  if you had a question about a medication, talk to your
16  pharmacist?
17  A.   Not generally.
18  Q.   It's more likely you'd talk to your doctor
19  if you had a question?
20  A.   Yes.
21  Q.   If I told you that the way Prempro is
22  packaged, it comes in one of these little foiled
23  wrapped packages, and then there is a dial pack
24  inside, and each one has a folded-up piece of paper
25  that's the patient package insert that just comes with

Page 162

1   it automatically, do you have -- do you have any
2   reason to think that that's not the case?
3   A.   No, I wouldn't.  I just don't recall.
4   Q.   Okay.  So you don't remember ever opening up
5   one of those packages and not having the patient
6   insert; you just don't recall whether it was there?
7   A.   I don't recall either way.
8   Q.   Okay.  So I'll represent to you that that's
9   the way it was packaged.  So the medicine should have
10  come and the patient insert should have come with each
11  prescription that you picked up.
12  A.   Uh-huh.
13  Q.   And you said that you may have read the
14  patient insert at various points in time; right?
15  A.   Right.
16  Q.   What would have led you to actually read the
17  paper instead of just throwing it away?
18  A.   Well, one of the things might have been what
19  would have led me was if it was in bold letters, if
20  there was something that said a side effect might be,
21  that it would be harmful, or that it could cause an
22  illness or cause cancer, I would read it.  If it was
23  bold, it was written that boldly.  But I didn't read
24  anything.  I don't remember reading anything.  I don't
25  remember reading that.  I would not have taken it if I

Page 163

1   thought I was going to be harmed by it.  I trusted the
2   drug maker and I trusted my doctor.
3   Q.   Okay.  Now, if, for example, you had read
4   that there were risks associated with taking estrogens
5   and progestins, would that have caused you concern?
6   A.   If I had read that, yes.
7   Q.   If you had read that one of the risks of
8   estrogens and progestins is abnormal blood clotting,
9   would that have caused you concern?
10  A.   If I had read it and had been told that,
11  yes.
12  Q.   Specifically if you had read that taking
13  estrogens may cause changes in your blood-clotting
14  system.  These changes allow the blood to clot more
15  easily, possibly allowing clots to form in your
16  bloodstream.  If blood clots do form in your
17  bloodstream, they can cut off the blood supply to
18  vital organs causing serious problem.  These problems
19  may include a stroke by cutting off blood to the
20  brain, a heart attack by cutting off blood to the
21  heart, a pulmonary embolus by cutting off blood to the
22  lungs or other problems.  And any of these conditions
23  may cause death or serious long-term disability.
24       Would that have concerned you if you had
25  read that?

Page 164

1   A.   Yes.
2   Q.   And would you have taken the medication if
3   you had read that?
4   A.   I would have questioned my doctor about it
5   had I read that and known that that was part of the
6   risk.
7   Q.   Okay.  And then after that discussion, you
8   would have decided whether or not to take the
9   medication?
10  A.   Yes.
11  Q.   If you had known that some studies have
12  reported that breast cancer developed more often up to
13  twice the usual rate in women who used estrogens for
14  long periods of time, especially more than ten years,
15  or who used high doses for shorter time periods, would
16  that have concerned you?
17       MR. MOSKOW:  Objection to form,
18  relevancy.  I'll leave it with those two.
19  A.   If I had read that, it would have concerned
20  me, and I would have spoken.
21  BY MS. DUGGAN:
22  Q.   Spoken to whom?
23  A.   My doctor.
24  Q.   Dr. Tesoro?
25  A.   Yes.

Page 165

1    Q.    And then based on that discussion, would you
2  have decided whether or not you were willing to take
3  the medication?
4    A.    Yes.
5    Q.    Now, earlier you mentioned that cancer was,
6  I think you said the big C.
7          What did you mean by that?
8    A.    Well, it just starts the word "cancer," and
9  the first time you hear it, you think of a death
10 knell.  That's what I mean by that.
11   Q.    So cancer is --
12   A.    It's scary.
13   Q.    -- something that you are scared of.  And is
14 that -- were you scared of cancer before you were even
15 diagnosed with cancer?
16   A.    Yes.
17   Q.    So that's something you would have been
18 paying attention to, the possibility of developing
19 cancer in connection with taking a medication?
20   A.    Uh-huh, uh-huh.  Yes.
21   Q.    Thank you.
22         At this point, I'd like to ask you about
23 your diagnosis and treatment of the breast cancer.
24         Can you walk me through how you learned that
25 you had breast cancer?

Page 166

1    A.    I went for my mammogram on Monday -- I can
2  remember this specifically.
3    Q.    Okay.
4    A.    Monday afternoon, I had my mammogram.
5    Q.    Just for putting our record into context --
6    A.    September of -- September 10th it was, 2001.
7  And September 11th of 2001 -- I tell you I can be
8  specific, and then here I am.
9    Q.    Let me ask you first about the 10th.  When
10 you went for your mammogram, while you were there
11 getting your mammogram, did you have any indication
12 that there was anything unusual going on?
13   A.    If I recall correctly, they wanted more
14 pictures, and there was a gray area of sorts.  I don't
15 specifically remember what was said.  And then the
16 next day was the 11th.  The 11th sticks in my mind as
17 the day that I heard more about the fact that I
18 should -- that I had -- that there was something
19 there.  See, that's gray for me too.  The 10th I had
20 it, the 11th is the day that I, in my mind, there was
21 something there, that they wanted Dr. Tesoro to know
22 that, and that was the day in my memory that I was
23 taken off the Prempro.
24   Q.    And that's when you started to think that
25 the Prempro might have caused your breast cancer?

Page 167

1    A.    Yes.
2    Q.    Did you hear about the mammogram results
3  from the place where you got the mammogram done or
4  from Dr. Tesoro?
5    A.    Seems to me it was from Dr. Tesoro.
6    Q.    Did you have an appointment with him or did
7  he call you?
8    A.    I got a call.  I believe I got a call at
9  school.  If I remember all of this, it was a very
10 stressful day in our lives, and I had, you know, 220
11 kids and parents I was concerned about, so I -- my
12 memory of that exact scenario is totally foggy,
13 totally.  I just remember the date so well.  And I was
14 taken -- that's what I remember.
15   Q.    Okay.  So what, if anything, do you remember
16 about the conversation that you had with Dr. Tesoro
17 that day?
18   A.    Just that I was to start -- stop taking the
19 Prempro.  That's what I basically remember.  I don't
20 remember anything else other than that.  I mean,
21 that's all I recall.  I don't remember a discussion.
22   Q.    What were you supposed to do next with
23 regard to the mammogram results?
24   A.    He wanted me to go see Dr. Ken Kern, in
25 Hartford, and I called Dr. Kern's office and set up an

Page 168

1  appointment.
2    Q.    And how quickly were you able to get in to
3  see Dr. Kern?
4    A.    It wasn't until October.
5    Q.    And what happened when you went for the
6  appointment with Dr. Kern?
7    A.    Dr. Kern set up a stereotactic biopsy.
8    Q.    Did you have to come back for that?
9    A.    Yes, yes.
10   Q.    And tell me about getting the stereotactic
11 biopsy.
12   A.    My husband brought me to a center, and it
13 was -- they lay you on a table.  It's very -- it's
14 very frightening, and they use a needle, a very long
15 needle that's about the diameter of a match, the
16 wooden match.  That's how I describe it.  And they
17 went in -- he used some kind of a digital imaging, and
18 he went to the site, and I -- if my memory serves me
19 correctly, I think he took 12 samples.
20   Q.    And then how long did you have to wait for
21 results from that?
22   A.    I went to see him again, it might have
23 been -- it was still October.  I don't have the dates
24 in my head.  It was still October, maybe a week, maybe
25 10 days.  It could have been sooner.  And I went to

1  see him again.
2     Q.   And what did he tell you the next time you
3  went to see him?
4     A.   He examined me, and then he came -- I got
5  dressed again, and in his office -- my husband was
6  with me -- and he met me in my office, and he told my
7  husband first that I had -- that I had a positive for
8  breast cancer.
9     Q.   He told your husband that before you came
10  into the room?
11     A.   Uh-huh.
12          MR. MOSKOW:  Is that a yes?
13     A.   Yes.  I'm sorry.  Yes.
14  BY MS. DUGGAN:
15     Q.   What do you remember about the discussion
16  that he had with you when your husband was present?
17     A.   First of all, I remember devastation and
18  just disbelief, and I mean, it's like, it can't happen
19  to me, this wasn't supposed -- you just, your world
20  changes.  You are thinking of how much longer -- you
21  are thinking of how much longer -- you know, what are
22  you going to do with your family, your kids, your
23  husband, your -- I mean, you just don't believe that
24  this is -- that this has happened.  It's just -- it
25  was a shock.  It was a total, total shock.  I'm

1  just generally a very positive person, and this was
2  just a real -- it was devastating to us.  And it was a
3  very sad time for us, and a scary time for us.
4     Q.   What did Dr. Kern recommend for you?
5     A.   He set up a lumpectomy.  He was going to do
6  a lumpectomy in November.  And that --
7     Q.   Did he discuss other treatment options with
8  you, such as a mastectomy versus a lumpectomy?
9     A.   He felt the size of the tumor and from what
10  he could detect and from what he could detect of the
11  tumor, he felt a lumpectomy would, and the location,
12  would be -- that would be fine, but that we would do a
13  stereotact -- not the biopsy, the sentinel node
14  treatment.  It's a diagnosis during the lumpectomy.
15     Q.   And what was the purpose of doing that?
16     A.   To see if the cancer had spread into my
17  lymph nodes.
18     Q.   And did you consult any other doctors to get
19  a second opinion before you had the lumpectomy?
20     A.   Not for the lumpectomy, no.
21     Q.   Was there a time when you did consult with
22  another doctor?
23     A.   After, after the lumpectomy, yes.
24     Q.   And that was to address what treatment to do
25  after that?

1     A.   Yes.
2          MS. DUGGAN:  I've got word that we need
3  to change the tape, so why don't we stop for a minute
4  here and do that.
5          THE VIDEO OPERATOR:  Going off the
6  record, end of tape 3, at 3:10 p.m.
7     (Recess taken from 3:10 p.m. to 3:14 p.m. )
8          THE VIDEO OPERATOR:  We are now back on
9  the record, beginning of tape 4, at 3:14 p.m.
10  BY MS. DUGGAN:
11     Q.   Ms. Fraser, are you ready to resume?
12     A.   Yes.
13     Q.   And I understand in the discussion we had a
14  few moments ago before we came back on the record that
15  there was something that you wanted to correct about
16  one of your prior answers.
17     A.   Yes.  Basically self-examination, it sounds
18  good, but I -- I'd rely again on Dr. Levine and my
19  gynecologist.  I do, but I don't really -- I can't say
20  that I do that faithfully, examine my breasts.
21     Q.   So in terms of your own doing, your doing
22  your breast self-examinations, you are not telling the
23  jury that you do them thoroughly and that you do them
24  a couple of times a week?
25     A.   I can't say -- no, I can't say that I do.

1     Q.   That's fine.  Thanks for clarifying that.
2          Let me ask you a couple of other questions
3  before we get into the line that we were in before.
4  You mentioned that your husband was with you when you
5  went to the -- when you went to meet with Dr. Kern
6  initially; right?
7     A.   Yes.
8     Q.   And then he went with you when you had your
9  biopsy as well.
10     A.   Yes.
11     Q.   Prior to your being diagnosed with breast
12  cancer, did your husband ever attend any doctor's
13  appointments with you?
14     A.   No.
15     Q.   So he never would have gone back with you
16  when you went to see Dr. Tesoro --
17     A.   No.
18     Q.   -- or anything like that?
19          Most husbands don't want to be anywhere near
20  a gynecology appointment, but I just thought I'd check
21  to see if your husband was different.  Okay.
22          And then you mentioned that when you -- on
23  September 11th Dr. Tesoro told you he wanted you to
24  stop taking the Prempro, and I wanted to ask you about
25  your menopausal symptoms once you stopped taking the

Page 173

1  Prempro.
2         Did your symptoms return again when you
3  stopped taking the medication?
4     A.   Yes.
5     Q.   Which of the symptoms returned?
6     A.   Well, the vaginal dryness and hot flashes.
7     Q.   Did you also have the hot flashes at night?
8     A.   Yes.
9     Q.   Now this time when you had the vaginal
10 dryness and the hot flashes and night sweats, were
11 they of the same intensity as before you started
12 taking the Prempro?
13    A.   No.
14    Q.   How did it differ?
15    A.   Just less --
16    Q.   Let's take one at a time.  Let's take the
17 hot flashes first.
18    A.   The hot flashes, they are fewer and farther
19 between, but I do still get them.
20    Q.   Even today?
21    A.   Yes.
22    Q.   And when you get them, are they -- do they
23 feel any different than the ones you described for me
24 earlier, or they just happen less often?
25    A.   They are mostly less often.

Page 174

1     Q.   But otherwise the same, you feel wet, you
2  feel flushed?
3     A.   Uh-huh.
4     Q.   And they last for several minutes?
5     A.   Uh-huh.
6     Q.   You need to say "yes."
7     A.   But they are less.  There are fewer of them.
8     Q.   And I'm sorry, you need to say "yes" to
9  answer the --
10    A.   Yes, I'm sorry.  Yes, I have them still.
11 Yes, they are -- they are fewer and farther between.
12 They are not as often.
13    Q.   Okay.  And what about the night sweats, does
14 that happen as often?
15    A.   No.
16    Q.   Do you sometimes still need to change your
17 bed clothes or put down the towel?
18    A.   No.  No, it hasn't -- no.
19    Q.   How about the vaginal dryness?
20    A.   That, I still have that.
21    Q.   And is it as bad as it was before?
22    A.   Yes.
23    Q.   And have you talked to your doctors about
24 the vaginal dryness?
25    A.   Yes.

Page 175

1     Q.   And they've not been able to come up with
2  anything that helps?
3     A.   Creams, over-the-counter creams.
4     Q.   Do you recall the name of any of those
5  creams?
6     A.   Replens and Vagisil.
7     Q.   I saw in your medical records at one point
8  it looked like you were prescribed Estring.
9         Does that ring a bell to you?
10    A.   Vaguely.
11    Q.   Okay.  Do you remember if that was something
12 that gave you any relief from the vaginal dryness?
13    A.   No.
14    Q.   And that's not something you took for very
15 long?
16    A.   No.
17    Q.   No?
18    A.   No.  Vagisil wouldn't be for vaginal
19 dryness, that would be for like itchy, so that would
20 be for itchy.
21    Q.   Okay.
22    A.   Itchiness.
23    Q.   We were talking about your -- going back to
24 your breast cancer treatment.
25    A.   Yes.

Page 176

1     Q.   You had the lumpectomy, and that was in
2  November of 2001?
3     A.   Correct.
4     Q.   And that was with Dr. Kern; correct?
5     A.   Yes.
6     Q.   And then what was the next thing that you
7  did in terms of your treatment of breast cancer?
8     A.   Well, Dr. Kern suggested two doctors for me
9  to go at least talk to about -- for my treatment, what
10 I was going to do, and one was a female oncologist,
11 Dr. Nerenstone.
12    Q.   Her name was Darren Stone?
13    A.   Neren, Nerenstone.
14    Q.   Okay.  Did you consult with Dr. Stone?
15    A.   Nerenstone, yes.  Stacy was her first name.
16 Dr. Stacy Nerenstone.
17         Yes, my husband and I both went.
18    Q.   And what did she recommend that you do next
19 in your treatment?
20    A.   Well, I could do nothing, that was something
21 I could do.  It's a gray area, because it was an early
22 tumor, and they felt like they got the edges, and it
23 wasn't in my nodes, my lymph nodes.  So I could do
24 nothing, or I could do some type of chemotherapy and
25 radiation.  Well, she said chemotherapy, and she

1  mentioned the radiation, as I recall.  Then we went to
2  a radiation doctor in Hartford, Dr. Salner.
3      Q.   Was Dr. Salner the second doctor that
4  Dr. Kern had suggested you see?
5      A.   Yes.
6      Q.   And what did Dr. Salner say?
7      A.   That I could -- I could do nothing, or that
8  I could do radiation treatments on the site.
9      Q.   And not chemotherapy?  He didn't recommend
10 chemotherapy?
11     A.   Well, he was the radiologist.  He was --
12 that was beside -- or I could do just radiation -- or
13 just radiation.  In fact, I'm remembering, just
14 radiation, or I was leaning towards the chemo and the
15 radiation.  He said you can do just radiation.  And
16 then I went to two other doctors for a second opinion.
17     Q.   Do you remember who they were?
18     A.   That was Dr. Levine, Jedd Levine, and
19 Elizabeth Whalen.  And they are both at The Cancer
20 Center.
21     Q.   How did you get referred to Dr. Levine and
22 Dr. Whalen?
23     A.   There is a cancer -- there was a connection
24 with them, with The Cancer Center in Torrington to
25 some doctors in Sharon, so they are all in the same

1  practice, and they said any one of them would be good.
2  And as a matter of fact, my niece goes to Dr. Levine.
3      Q.   And had she already been seeing him before
4  you started to see him?
5      A.   Yes.
6      Q.   Maybe she recommended that you check with
7  him?
8      A.   She could have, she could have.  She just
9  said she liked him.
10     Q.   And ultimately, you ended up going with
11 Dr. Levine and Dr. Whalen; is that right?
12     A.   Yes.
13     Q.   And what course of treatment did you pursue?
14     A.   I did chemotherapy starting in January and
15 that lasted -- April.  April or May.  Six months.  It
16 was six months.  June.  January to June.  And then I
17 started radiation therapy in August of that same year.
18 And that was 30 treatments.
19     Q.   Now, when you were having the chemotherapy,
20 did you have any problems with the chemo?
21     A.   No, other than tiredness, very tired.
22     Q.   You didn't have any nausea or vomiting,
23 anything like that?
24     A.   No, no nausea.  I was given an antinausea
25 before the chemotherapy started.

1      Q.   And did you lose your hair?
2      A.   No.  My hair thinned.  I did not lose my
3  hair.
4      Q.   So you never needed to wear a wig?
5      A.   No.
6      Q.   And then the radiation, you said you had 30
7  sessions beginning in August.  That would have been
8  August of 2002?
9      A.   Correct.
10     Q.   How did you do with the radiation?
11     A.   I did fine.  Very tired.  Very, very tired.
12 But I did okay.
13     Q.   And during both the -- well, during the
14 chemo, you continued to work as an elementary school
15 principal; is that right?
16     A.   Uh-huh.
17     Q.   You need to say "yes."
18     A.   Yes, I did.
19     Q.   And then the radiation, did that all take
20 place before school started again in the fall, or were
21 you doing it while you were working?
22     A.   It began in the middle of August, and we
23 started back to school in September.  So for about
24 two-and-a-half weeks I was in treatment.  There were
25 no children.

1      Q.   I'm not sure I understand what you mean.
2      A.   No kids.  I was -- I went back and forth to
3  work when I was doing my radiation.
4      Q.   I see.  So you were working even in August?
5      A.   Yes.
6      Q.   Now I understand what you mean.  I guess I
7  always thought principals got to take the summer off,
8  but maybe not.
9           So you were working throughout, but for
10 two-and-a-half weeks of that time, there were no
11 children at school?
12     A.   Right.  There were no big responsibilities.
13 It wasn't as intense as the very beginning of the
14 school year.
15     Q.   Okay.  And were you able to get yourself
16 back and forth to the chemo appointments, or did
17 someone need to drive you?
18     A.   My husband drove me.
19     Q.   And how about the radiation appointments?
20     A.   Someone drove me every day.
21     Q.   Was that your husband?
22     A.   No.  Actually, his parents.
23     Q.   Oh, that's nice.  Is there any reason that
24 your husband wasn't available during that time?
25     A.   Well, he was working and the parents were --

Page 181

1 they wanted to do something to support me, so they
2 were kind enough to drive me there.
3    Q.    Now, after you finished up the radiation,
4 what was the next part of your treatment?
5    A.    Nothing other than just monitoring me, going
6 to see Dr. Levine.  It started out every three months,
7 and then it became six months.
8    Q.    And now how often do you see him?
9    A.    Yearly.
10    Q.    At some point you started to take tamoxifen;
11 right?
12    A.    Oh, yes.
13    Q.    Was that while you were taking -- doing the
14 chemotherapy?
15    A.    You think I'd remember this.  I believe it
16 was after.  The chemotherapy was over, and then I was
17 on tamoxifen.
18    Q.    Did you have any reactions to the tamoxifen?
19    A.    Not -- no.
20    Q.    Were you having hot flashes that were
21 attributed to the tamoxifen or was that attributed to
22 your --
23    A.    The tamoxifen was a cancer blocker, and I
24 was still having hot flashes, but not to the degree
25 that -- although he did put me on the Effexor then.

Page 182

1    Q.    That's what I wanted to try to figure out,
2 when you started to take the Effexor, that was while
3 you were taking tamoxifen?
4    A.    Yes.  To my recollection, yes.  That was at
5 the same time.
6    Q.    Do you remember how long you took tamoxifen
7 for?
8    A.    I think the standard of care was going to be
9 five years, and then they took you off of it.  And I
10 was on it, I believe, for two-and-a-half, and then he
11 put me on something else.
12    Q.    Was that Aromasin?
13    A.    Yes.
14    Q.    Now, did the standard of care change, or
15 were you having a bad reaction to the tamoxifen?
16    A.    No.  He just felt like I should -- I don't
17 know why really he changed me.  It could have been
18 blood work.  I don't really know.
19    Q.    Well, did you have a bad reaction to
20 tamoxifen?
21    A.    No, no.
22    Q.    And how long did you take the Aromasin for?
23    A.    I finished out the next two-and-a-half
24 years.
25    Q.    And at this point in time, you are not

Page 183

1 taking any medications for your breast cancer; right?
2    A.    No.
3    Q.    That's not right?
4    A.    No, I'm not -- no, that's right.  Excuse me.
5 Would you repeat the question?
6    Q.    Sure.  I just wanted to confirm.  At this
7 point in time, you are not taking any medications to
8 treat your breast cancer; correct?
9    A.    Correct.
10    Q.    Have you been told what your prognosis is at
11 this point?
12    A.    Well, just that we hope we have it, that's
13 it.
14    Q.    Have you heard that if you've gone five
15 years or longer without a recurrence of cancer, that
16 generally your prognosis is pretty good?  Have you
17 ever heard that?
18        MR. MOSKOW:  Objection to form.
19    A.    I have heard that, yes.  I did ask him, why
20 ten.  He said that is now, they want to go out ten
21 years.
22 BY MS. DUGGAN:
23    Q.    Oh, ten years.  And which doctor told you
24 that?
25    A.    Dr. Levine.

Page 184

1    Q.    Now, for some period of time after you were
2 diagnosed with breast cancer, were you having
3 mammograms more often than once a year?
4    A.    Yes.  I was doing those every six months.
5    Q.    How about now, how often do you do them now?
6    A.    Once a year.
7    Q.    Do you remember when it switched back to
8 once a year?
9    A.    I don't.
10    Q.    Now, we talked about earlier how, I think
11 you said in 2007, you opted to have reconstructive
12 surgery on your breast?
13    A.    Yes.
14    Q.    And I don't think I ever asked you this to
15 be clear, but this is your left breast, right, you had
16 the lumpectomy?
17    A.    Yes.
18    Q.    And you just had the one reconstructive
19 procedure on your breast; is that right?
20    A.    I've had two.
21    Q.    Okay.  Tell me about the second one.
22    A.    The first one did not -- didn't get the
23 results, the aesthetic results that the doctor or I
24 was at all happy about, and so he worked -- he did it
25 again.

Page 185

1    Q.    Okay.  Which doctor was this?
2    A.    Dr. Brown.
3    Q.    Dr. Brown, okay.  And the first one, was
4 that the one that was in the -- I think it was the
5 summer of 2007, or is that the second?
6    A.    The first one.
7    Q.    Okay.  And you are saying that that first
8 one, both you and Dr. Brown were unhappy with how it
9 came out?
10    A.    Yes.
11    Q.    So when did you have the second
12 reconstructive procedure?
13    A.    May of 2009.
14    Q.    So just recently?
15    A.    Yes.
16    Q.    And have you been satisfied with the results
17 of the second procedure?
18    A.    Somewhat.  Somewhat.
19    Q.    Have you been back to see Dr. Brown?
20    A.    I have.  I've been back once, and I'm going
21 back again in August.
22    Q.    Now, what has, if anything, has Dr. Brown
23 said to you about his happiness with the results?
24    A.    Well, he was unhappy because the radiation
25 had scarred -- the scar tissue from the radiation was

Page 186

1 so thick, and that's why he couldn't -- what he did
2 was he opened up the original lumpectomy scar and
3 inserted -- he cleaned all that out and then put a
4 gel, saline.
5    Q.    An implant?
6    A.    Yes.  And it wasn't dropping like it was
7 supposed to, so they are not symmetrical.
8    Q.    That was the 2007 procedure?
9    A.    Yes.
10    Q.    And then what happened in May of 2009?
11    A.    No, that's -- 2009 is when -- he had told me
12 he was having a hard time in the 2007.  He originally
13 wanted to do the whole, where you take the flap of
14 skin off, but because I was working, he felt that he
15 could put in an implant, and it would fill in the
16 horrific scar and the look of the breast from my
17 original surgery.
18    Q.    But apparently that initial plan didn't work
19 out?
20    A.    No, it didn't.
21    Q.    So in May of 2009, he did what?
22    A.    That's when he went through the scar and
23 took out more breast -- more -- it was radiated --
24 scar tissue.  That's what he took out, as much as he
25 possibly could.  And he took the original implant out

Page 187

1 and put this one in.
2    Q.    And you are saying that even now the second
3 implant has not dropped the way it was supposed to?
4    A.    Right.  I have to wear a -- something at
5 night to kind of hopefully pull it down.
6    Q.    And I guess you won't know until August if
7 there is a need for another procedure?
8    A.    Right.
9    Q.    Is that right?
10    A.    Right.  Correct.
11    Q.    All right.  Can you describe for me the
12 effect that having breast cancer has had on your daily
13 living?
14    A.    Well, you -- I've become much more spiritual
15 and wondering about my life, dying.  I never thought
16 about dying.  I guess all of us think about dying, but
17 when you are diagnosed with having a cancer, it brings
18 you to the forefront of what you need to be doing with
19 your life, and I feel like I've become much more
20 spiritual that way.  I'm glad I have my faith, and I'm
21 glad I have my family.  I've depended on my family, my
22 husband particularly, a great deal.
23        It's definitely affected my son.  Even
24 though he was a teenager, he's become much more aware
25 of cancer, breast cancer in general, giving me little

Page 188

1 gifts, like bracelets that are from the breast cancer
2 foundation.  I've done a few of the cancer walks.  I
3 do contribute to the cancer foundation.
4        Going into The Cancer Center is, I feel
5 good, I'm pretty much of a survivor.  I feel good
6 about that, but then seeing others that are affected
7 by it, it's heart-wrenching, and it's been hard on my
8 husband to be so solicitous to me, although he is a
9 wonderful, warm guy, he really is, but this took a lot
10 out of him, that period of time, especially during the
11 chemotherapy sessions, and he was particularly -- you
12 know, you think of losing your life's partner, and it
13 really wasn't your fault, pretty devastating.
14        So as far as, you know, I can get out and
15 walk, I can do some of the things I did before, but
16 you are constantly reminded that you had cancer just
17 by everything, and you are constantly wondering, was
18 all the treatment, is it going to work, you know.  But
19 I feel like I was in really good hands with my
20 physicians for the most part, as far as my treatment.
21    Q.    Do you have any of those same concerns about
22 wondering if you've gotten all the cancer and what
23 your life is going to be like with respect to your
24 husband having had prostate cancer --
25    A.    Well, I don't think you ever really feel

Page 189

1  like you are cured.  There is always -- that's why I'm
2  going back for exams.  That's why I'm going back to
3  the oncologist.  So I'd like to say yes, you know, my
4  survival rate has gone beyond so many years, but you
5  always -- it's always in the back of your mind, is it
6  going to recur.
7      Q.   Now, you mentioned going into The Cancer
8  Center.
9         Do you -- have you participated in any
10 support groups or done anything with The Cancer Center
11 or other organizations to give you emotional support?
12     A.   No.  I -- no.  My church is very -- I'm very
13 active in my church, and I have lots of wonderful
14 friends that are my support group, but nothing --
15 other than donating money, I haven't donated time, no.
16     Q.   And you say you are very active with your
17 church.  Is that the church here in Connecticut or the
18 one in Florida?
19     A.   Both.
20     Q.   Which churches do you go to?
21     A.   Saint Mary's here in Lakeville, in
22 Connecticut, and I'm a lecture.  I've served on a
23 number of committees.  And then in Florida, it's Saint
24 Mark the Evangelist.  And again, that's what I -- I'm
25 a lecture, a reader at church, and plan to go back

Page 190

1  when we go back to be part of -- they have a huge
2  ministry and a lot of different areas.  I plan on
3  participating in some of those.
4      Q.   And that's in The Villages down where you
5  live?
6      A.   In The Villages, yes.
7      Q.   Now, going back to your husband for a
8  minute, you said that he is a warm, wonderful guy, but
9  that this was hard for him to support you while you
10 were going through your chemotherapy?
11     A.   Not to support me.  I'm sorry, I interrupted
12 you.
13     Q.   No, I appreciate that.  I didn't mean to
14 suggest that he was not being supportive, that it was
15 hard for him to watch you through your chemotherapy.
16        Is that fair to say?
17     A.   Yes.
18     Q.   Do you feel in any way that your experience
19 together as you struggle with breast cancer brought
20 you closer together?
21     A.   Well, in some ways, yes.
22     Q.   Okay.  What do you mean by that?
23     A.   Well, because you -- you know, you spend 20
24 years of your life together, and you have a family,
25 and then you worry about your partner not being there

Page 191

1  for you when you get to your 30th or 40th.  So in that
2  way, yes, a life's partner is just that.  That's what
3  the commitment is.  And it's hard to watch somebody
4  you love hurt and be scared for them, because you are
5  scared for yourself.  I mean, some of it is a little
6  bit of being selfish because you don't want to lose
7  them.
8      Q.   And did you have similar feelings about your
9  husband while he was going through his cancer
10 treatment?
11     A.   Yes.
12     Q.   Would you say that your breast cancer has
13 affected your relationship with any of your friends?
14     A.   Not negatively.
15     Q.   Okay.  So has it had a positive impact on
16 your relationship with some of your friends?
17     A.   Well, in that they -- they've been more
18 solicitous, just for physical needs, food, et cetera,
19 at the time.  Not now.
20     Q.   How about with your coworkers, did having
21 breast cancer affect your relationship with your
22 coworkers?
23     A.   Yes, I think it did.
24     Q.   In what way?
25     A.   I feel like most of them were women, and

Page 192

1  they, I believe, probably started taking a little bit
2  more note about cancer in general and about breast
3  cancer in particular.  We did a cancer walk, our
4  school did a cancer walk.  We formed a team.
5      Q.   Did you feel that your coworkers were
6  supportive of you during the time you were getting
7  treatment?
8      A.   Yes.
9      Q.   And thereafter, I assume?
10     A.   Yes.
11     Q.   Now, in your complaint and in your fact
12 sheet, you indicated that you are seeking recovery for
13 emotional injuries in connection with your breast
14 cancer, and you mentioned earlier today that you
15 consulted with your priest about feelings you were
16 having when you were initially diagnosed.
17        Is there anything more about your emotional
18 injuries that you'd like to share with me on top of
19 what we've just discussed?
20     A.   Just basically that I feel like people
21 should take responsibility for what they do, and I
22 didn't take a medicine that I thought was going to
23 harm me.  That's basically it.  And so it's been
24 emotionally draining for me physically during the time
25 I was going through it.

Page 193

1   Q.   Why did you decide to bring a lawsuit in
2 this case?
3   A.   Because I think Wyeth should take
4 responsibility for their actions in not warning women
5 that, from what I understand from research now,
6 post-cancer, and from my lawyers doing the research,
7 more so the research, that they should take
8 responsibility for the harm they did to me and to my
9 husband.
10   Q.   And do you -- can you be more specific about
11 what it is exactly that you think that Wyeth did
12 wrong?
13   A.   I think I didn't get the warning.  I don't
14 think that I was warned of the harmful effects.
15   Q.   And do you believe that Wyeth concealed
16 information from you or your doctors?
17   A.   I can't really answer whether they concealed
18 it or not.  I can't -- I don't know the research on it
19 all.  I just know I wasn't given any kind of a
20 warning, and I'm basing this on, they've made good.
21 The ad you see now, they warn people.
22   Q.   And what is it that you see in the ads now
23 that you feel is a warning?
24   A.   Well, that there is a chance you can have
25 cancer, that you could get cancer, estrogen-positive

Page 194

1 cancers.
2   Q.   And you believe that you didn't have any
3 warnings about that when you were taking the
4 medication?
5   A.   I believe the warning is not like you are
6 hearing now, and I didn't hear a warning.  I didn't
7 see a warning.  I wasn't given a warning.  That's my
8 view.
9   Q.   Do you know anything about what Wyeth said
10 to Dr. Tesoro --
11   A.   No.
12   Q.   So you have no information whatsoever as to
13 what Dr. Tesoro knew either from Wyeth or presumably
14 from other sources about the risk of breast cancer and
15 Prempro; is that fair to say?
16   A.   I wouldn't -- I don't know what anyone -- I
17 don't know what anyone said to Dr. Tesoro.
18   Q.   Have you ever heard of a study called The
19 WHI or The Women's Health Initiative?
20   A.   I have a vague, vague recollection, but
21 details, no.
22   Q.   Okay.  Would you remember anything about
23 that study that you've heard or learned?
24   A.   No, because I just -- the title of it, yes,
25 but not any specifics.  Nothing, no.

Page 195

1   Q.   Do you remember when you heard about The WHI
2 study?
3   A.   No.  I don't know.
4   Q.   Since you've been diagnosed with breast
5 cancer, do you find that you pay more attention to
6 articles or television programs that have to do with
7 breast cancer?
8   A.   Yes and no.  Can I say that?
9   Q.   Sure.  Can you explain what you mean by
10 that?
11   A.   Well, your ears perk up when you hear it,
12 and then you don't want to hear it.  It's sad to be
13 thinking that way, but it was just a horrific thing to
14 go through in my life, and I certainly don't want it
15 to recur.  Believe me, I don't want it to recur, but I
16 don't really dwell on it.  I guess that's the word
17 I -- I don't dwell on it, and I don't dwell on
18 situations.  That's why I'm saying yes and no.
19   Q.   You said earlier that you think you are
20 generally a positive person; is that right?
21   A.   Yes.
22   Q.   So it's your approach to be more positive
23 and not negative as you proceed through your life; is
24 that right?
25   A.   Yes.

Page 196

1   Q.   Now, earlier this morning, I got a copy of
2 things that we've been referring to as "the white
3 binder."
4   A.   Uh-huh.
5   Q.   And I would like to go ahead and have the
6 copy set that I got today marked.
7        MS. DUGGAN:  Sandie, if you would.  I
8 think we are up to number 4.
9        MR. MOSKOW:  Do you want me to make
10 copies of specific things so that you can both have
11 copies of it?
12        MS. DUGGAN:  I think we might be able
13 to just do it back and forth.  I don't want you to go
14 through that trouble.
15 BY MS. DUGGAN:
16   Q.   Ms. Fraser, would you just look at what's
17 been marked as Fraser Exhibit 4 and tell me if that's
18 what you had as the white binder.
19   A.   Yes.  Yes, I'm sorry.
20   Q.   That's okay.  I know it looks a little
21 different because it's photocopied as opposed to your
22 original pages.
23   A.   Okay.
24   Q.   Can you just tell me generally what kinds of
25 things are in what we will call "the white binder?"

Page 197

1    A.    These are things after I was diagnosed and
2  had my -- started my -- it was to look at my treatment
3  options.  That's what it was, after -- yes.
4    Q.    So --
5    A.    And the doctors that treated me or that I
6  talked to.
7    Q.    And all of these things were assembled and
8  put together in this binder after you'd already been
9  diagnosed with breast cancer; right?
10    A.    Yes.  To the best of my knowledge, what I
11  remember.  You know, that's how I set this up.  It
12  wasn't anything -- any rhyme or reason to it.  I just
13  kind of put things in.
14    Q.    Did you have a binder like this or a file
15  like this in which you kept information about your
16  medications before you were diagnosed with breast
17  cancer?
18    A.    No, no.
19    Q.    There were a couple of specific pages I
20  wanted to ask you about, so when you are ready, if
21  you'll pass it back to me, I can draw your attention
22  to those.
23    A.    Okay.  It's just been a while since I've
24  seen it.  (Handing.)
25    Q.    Let me show you a page here that has a

Page 198

1  business card on it what says Loboline.
2         Do you see this page?
3         My question is just, it looks like the
4  Loboline, and Ms. Lobo, or some type of -- well, she
5  was a breast cancer survivor.
6         Is she someone that you consulted with in
7  any way?
8    A.    I have no recollection whatsoever of that
9  name, of the card.  I just stuck it in there, it looks
10  like.
11    Q.    Do you know who gave you the card?
12    A.    I don't.  I don't.  No.  I was trying to
13  remember.
14    Q.    Okay.  And then on that same page, there is
15  a receipt from CVS, a number of items, and then some
16  handwritten notes on the right.
17         Is that your handwriting?
18    A.    Yes.
19    Q.    Can you tell me what you meant to indicate
20  when you wrote those things on the side?
21    A.    No.  "Hair coloring.  The joints aching."
22         MS. DUGGAN:  I see.  Mr. Moscow is
23  showing me that there are actually two separate -- it
24  looks like a yellow Post-it and then a receipt.  Maybe
25  it got copied together.

Page 199

1         THE WITNESS:  Yeah, I think it was --
2         MR. MOSKOW:  Just so the record is
3  clear, what we did is we took a lot of loose documents
4  that were collected, and they were not apparently
5  copied on individual pages, so I apologize to counsel.
6  But that's how it was.
7         MS. DUGGAN:  Okay, that's fine.
8  BY MS. DUGGAN:
9    Q.    Then separating, I guess, the receipt from
10  the notes, do you recall what prompted you to write
11  that list on the right-hand side?
12    A.    This, this, no.  It may be -- I don't know.
13  I don't know.
14    Q.    Okay.  That's fine.
15    A.    I have no clue.
16    Q.    Did you have questions about whether you
17  could use hair coloring while you were having your
18  treatment?
19    A.    That could have been part of it, yes.  That
20  could be.  The Claritin obviously for my breathing.
21  Those were just notes, and I don't know when they were
22  taken.  There is no -- well, I did -- I don't know
23  when that was.  It looks like it's dated December.
24    Q.    This is another handwritten page, it starts
25  with histology on the top.

Page 200

1         Do you see that?
2    A.    Uh-huh.
3    Q.    Are those your notes on that page?
4    A.    They are.
5    Q.    What was your -- what do you recall is the
6  purpose of writing those notes?
7    A.    I don't remember -- these are friends.  Peg
8  Hack had breast cancer.  Carolyn DeDominico --
9  DeDominico had breast cancer.  This might have been
10  something they, neither one of them are medical
11  experts, may have said, you can try this, you can try
12  that.  "No Vitamin E or C during radiation therapy."
13  I don't remember who -- you know, I just remember
14  talking to them in relation to what they did when I
15  was trying to decide -- Evelyn Marsino was a teacher
16  and Karen Whitbread in Kentucky, that was a friend's
17  sister.  She had breast cancer.  And she is a nurse.
18  I mean, she is a friend, she is a nurse.  But she was
19  a cancer, breast cancer --
20    Q.    Now, did you consult with her about what was
21  appropriate treatment for you, or were you more
22  getting her thoughts on her own experience?
23    A.    To my memory, it was what she was doing.
24    Q.    Okay.  Then there is a list at the bottom
25  there of some -- I think it says something like

Page 201

1 medicines I'm taking.
2    A.    Right.
3    Q.    And I just wanted to ask you about the Black
4 Cohosh, because we had talked about that earlier
5 today.
6        Does that refresh your recollection that you
7 at some point were taking Black Cohosh?
8    A.    I didn't take it.
9    Q.    Oh.
10    A.    I didn't take it.  This was -- well, it does
11 say I'm taking it.  Hmm, I don't remember taking it.
12 I don't remember taking this other one, psyllium husk
13 powder.  Oh, my goodness.  This is medicine?  This
14 might have been what Karen was taking, I have a
15 feeling, because I never took.  And then Saint John's
16 Wart, no, per the doctor.  But the Claritin, Vitamin
17 E, Vitamin C, I would have taken.  Now, the caltrate,
18 I didn't start taking that until recently.  So I don't
19 even know what this soy polysaccharides, I don't know
20 why there is a question mark.  But I didn't
21 take psyllium husk and powder.  I never even heard of
22 that.
23    Q.    It's not something you think you would take?
24    A.    With OJ, one or two tea spoons, never.  I
25 have a feeling that Karen said she was taking them.  I

Page 202

1 have no memory of taking that.  I have no memory at
2 all of taking that.
3    Q.    When you say "that," you need to tell us
4 what those things are.
5    A.    I have no memory at all of taking psyllium
6 husk powder, Black Cohosh, depending on what -- the
7 Saint John's Wart, and the caltrate.  I don't remember
8 taking caltrate, but I did take calcium.  So that
9 could have been where I got it.  I remember calcium,
10 but I always thought it was the calcium with Vitamin
11 D.
12    Q.    That's fine, thank you.
13        This couple of pages here, it looks like
14 it's dated on the bottom right as 11/12 of '01 at 9:35
15 p.m.  It says at the top "Patient info questions to
16 ask your health care provider."
17        Do you recall these two pages?  Do you
18 recall?  Did you print that out or did somebody send
19 it to you, or do you know?
20    A.    I don't remember.  I don't remember.
21    Q.    The second page has some handwritten notes,
22 which is what I wanted to ask you about.
23        Is that your handwriting?
24    A.    Yes.
25    Q.    What can you tell me about those notes there

Page 203

1 on the margin?
2    A.    This was -- I have no idea who I even asked
3 this of or where I came up with that.
4        MR. MOSKOW:  Are you asking her to read
5 her writing into the record, or are you just asking
6 her what she meant by it?
7        MS. DUGGAN:  Well, I guess I should ask
8 her to read it into the record.
9        Why don't you tell us what questions
10 you've written there in your handwriting.
11        THE WITNESS:  Do you have it, Neal?
12        MR. MOSKOW:  Yes.
13    A.    "Was my cancer estrogen receptor ER or
14 progesterone PR?  Is hormone therapy right for me?
15 Why?  And why not remove the ovaries?"
16 BY MS. DUGGAN:
17    Q.    Do you have any recollection of why you
18 wrote these questions down?
19    A.    None, none.
20    Q.    And you don't remember whether you asked
21 them of anyone?  And if so, who; is that right?
22    A.    No.  No.  This was after my surgery.
23    Q.    If you don't remember, that's fine.  I just
24 wanted to see if you did.
25    A.    Crazy.  (Handing.)

Page 204

1    Q.    Thank you.
2        Then towards the back of the binder, I
3 guess, there were some, it looks like medical
4 literature or articles authored by Dr. Kenneth Kern.
5        Is that the Dr. Kern that you saw?
6    A.    Yes.
7    Q.    There were two articles, one was called
8 "Breast Lymphatic Mapping Using Subareolar Injections
9 of Blue Dye and Radiocolloid:  Illustrated Technique"
10 from I guess the American College of Surgeons
11 Publication of 2001, and then another publication from
12 the American College of Surgeons from November of
13 2000, which I'm probably not going to be able to
14 pronounce correctly, but having to do with
15 preoperative lymphoscintigraphy, and I'm going to
16 leave the rest of it alone.
17        Did you read these two articles at some
18 point?
19    A.    Well, Dr. Kern gave them to me at our
20 meeting, and it was about the sentinel node, what it
21 involved, and reading it to a huge extent, no, but I
22 knew what was going to go on because he explained it
23 to me and then the illustrations, and he explained it,
24 because this is exactly what happened.
25    Q.    Okay.

1    A.   And this is -- the sentinel node was done
2  during -- at the surgery, on the surgery.  And this
3  was just an explanation of what it was.  I didn't read
4  this in any great depth.  I skimmed it.  In my memory,
5  I skimmed it.
6    Q.   Do you remember ever reading any other
7  medical literature in connection with your breast
8  cancer or your treatment?
9    A.   No, I don't remember.
10   Q.   Is that likely something you would not have
11 looked at because --
12   A.   This is basically --
13   Q.   For doctors?
14   A.   I would not -- the doctor -- if the doctor
15 gave me anything, in all likelihood, I didn't read it
16 unless it was something that was hugely written, like
17 this is going to get -- you are going to get hurt from
18 this or that kind of thing.  It's going to be some
19 kind of injury.  It was more for information, like
20 that.  I skimmed it.
21   Q.   Okay.  That's fine.
22        MR. MOSKOW:  Lisa, I'll hold on to this
23 folder just as it is, so if you need me to make copies
24 of things on an individual page at a later date, I can
25 do that.

1        MS. DUGGAN:  Okay.  That's great.
2  Thank you.
3  BY MS. DUGGAN:
4    Q.   Let me ask you some questions about your
5  understanding of risks for developing breast cancer in
6  general.
7        Do you have any understanding as to what
8  some of the risk factors are for women developing
9  breast cancer?
10   A.   Well, family history.  And now I know, after
11 the fact, that hormone replacement therapy can cause
12 breast cancer in certain women.
13   Q.   And you believe that it caused breast cancer
14 in you; correct?
15   A.   I believe it did, yes.
16   Q.   Do you know if there is any connection
17 between, for example, breast feeding and breast
18 cancer?  Do you have any knowledge about that?
19   A.   I believe, this is what I believe, that I
20 understand that it decreases breast cancer if you
21 breast feed.  It decreases the incidence.
22   Q.   Do you have any information about whether
23 smoking is a possible risk factor for breast cancer?
24   A.   In my mind, probably smoking, I don't know
25 it for a fact, but I would assume it does.

1    Q.   And here are some other risk factors, and
2  just let me know if you have any information one way
3  or the other as to whether they are a risk factor.
4  Having the Braca gene mutation, do you know if that's
5  a risk factor for developing breast cancer?
6    A.   I know that now.
7    Q.   We've already discussed that you have not
8  had that testing done.
9    A.   No.
10   Q.   You have no plans at the moment to have that
11 testing done?
12   A.   Not at this time, no.
13   Q.   You understand that having a personal
14 history of breast cancer, that is, having had at least
15 one type of breast cancer is possibly a risk factor
16 for developing breast cancer again?
17        Do you understand that?
18   A.   Yes.
19   Q.   Do you understand that or do you know
20 whether alcohol consumption has any relation to
21 developing breast cancer?
22   A.   I don't remember that that was something
23 that I remembered.
24   Q.   Do you know if radiation exposure is a risk
25 factor for developing breast cancer?

1    A.   I have -- yes, I do know that.
2    Q.   Is that something that you learned while you
3  were having radiation therapy?
4    A.   Yes.  Yes.
5    Q.   Other than filing this lawsuit, have you
6  made a complaint about Prempro to anyone?
7    A.   No.
8    Q.   For example, have you ever reported any
9  complaints to the FDA about Prempro?
10   A.   No.
11   Q.   How about to Wyeth, the company I'm here
12 representing?
13   A.   No.
14   Q.   How about any government agency at all?
15   A.   No.
16   Q.   Have you met with any other ladies who are
17 Plaintiffs in this litigation?
18   A.   No.
19   Q.   Have you had any communication whatsoever,
20 whether it was a face-to-face meeting or phone
21 conversation or e-mail exchange with anybody else who
22 is a Plaintiff in this litigation?
23   A.   No.
24   Q.   Have you ever attended any public meetings
25 discussing this litigation?

1    A.    No.

2    Q.    As a part of your damages in this lawsuit, I

3 understand that you are seeking recovery of various

4 medical expenses.  Is that your understanding as well?

5    A.    Yes.

6    Q.    Now, in your fact sheet, towards the back,

7 you actually were able to come up with a dollar

8 amount.  Let me see if I can find it.  On page 25, I

9 guess that's Exhibit 2.

10    A.    In this one?

11    Q.    Exhibit 2, page 25.

12    A.    Two five, 25.

13    Q.    Yes.  See up at the top?

14    A.    Yes.  Sorry.

15    Q.    As of that time, which I think we said was

16 January of 2005, you estimated your medical expenses

17 to be $23,714.14.  That's a pretty precise number.

18         Do you know how that number was calculated?

19    A.    I do not.

20    Q.    Do you know if there have been additional

21 expenses since that time?

22    A.    I'm sure there would be, because I would

23 think that reconstruction would have -- would be part

24 of this.

25    Q.    And have you turned over everything that you

1 have with respect to your medical expenses since the

2 date of your filling out the fact sheet to your

3 attorneys?

4    A.    Everything I have ever sent, I've always

5 turned everything in to the attorneys.  But the

6 breast -- the operations, not yet.

7    Q.    Do you have any idea what the amount is that

8 you would be claiming in connection with your

9 reconstructive procedures?

10    A.    I don't.

11    Q.    In your relationship, does your husband

12 handle more of the financial issues?

13    A.    Yes.

14    Q.    Yes, okay.  So would your husband maybe know

15 better about the medical expenses, you think?

16    A.    He probably would, yes.

17    Q.    Okay.

18    A.    But you know, on the medical expenses, could

19 you clarify what this is, as far as the medical

20 expenses that you are talking about?

21         The medical expenses were covered, except

22 for my co-pay, by my insurance.

23    Q.    Okay, right.  We are actually -- I think

24 putting aside whether or not it was covered by

25 insurance, we are looking to get a sense of what the

1 total amount was that was expended on your behalf,

2 whether you paid it or your insurance company paid it.

3         MR. MOSKOW:  Counsel, what I'll do,

4 based on the testimony today and the identification of

5 some treatments and some doctors, we will pull all

6 that together and I'll make an affirmative

7 representation that we will supplement the PFS with

8 that additional information.

9         MS. DUGGAN:  Great.  Okay.  That would

10 be terrific.

11 BY MS. DUGGAN:

12    Q.    Now, just in terms of clarifying, do you

13 have any idea how much you and your husband have paid

14 out-of-pocket for your co-pays or other expenses?

15    A.    I don't know.  I don't have that information

16 right now.  I don't know.

17    Q.    Okay, that's fine.

18         MS. DUGGAN:  Could we take like a

19 five-minute break?

20         MR. MOSKOW:  That would be great on my

21 side, too.

22         THE VIDEO OPERATOR:  Going off the

23 record at 4:11 p.m.

24    (Recess was taken from 4:11 p.m. to 4:19 p.m.)

25         THE VIDEO OPERATOR:  We are back on the

1 record at 4:19 p.m.

2 BY MS. DUGGAN:

3    Q.    Ms. Fraser, are you ready to go forward?

4    A.    Yes.

5    Q.    Okay.  I'm going to just skip around a

6 little bit here with this next group of questions, so

7 please bear with me.

8         Have you ever filed a workers' compensation

9 claim?

10    A.    No.

11    Q.    Have you ever filed a claim for

12 unemployment?

13    A.    No.

14    Q.    Have you ever filed a claim for medical

15 disability?

16    A.    No.

17    Q.    A little while ago we were talking about

18 your being very active in your church.

19         Are there other organizations that you are

20 active with?

21    A.    No, not at this time.  Uh-uh.

22    Q.    How about in the last ten years, have there

23 been any clubs or organizations that you've been

24 active with?

25    A.    I feel like I am a blank slate here.  No,

Page 213

1  not that I remember.  If I remember, I will let you
2  know.
3      Q.   Okay.  Well, tell me this, what was the name
4  of the school that you were the principal of and where
5  was that school?
6      A.   Goshen.  Goshen Center School.
7      Q.   And where was that school?
8      A.   Goshen, Connecticut.
9      Q.   It was called Goshen Center School?
10     A.   Yes.
11     Q.   What years were you there?
12     A.   I was there from 2000 to 2008.
13     Q.   And as a -- professionally, were you active
14  in any organizations?
15     A.   Well, administrative.  We had a local
16  administrative group, but I wasn't in any national
17  group.  I was in National Education Association and
18  Connecticut Education Association when I was a
19  teacher.
20     Q.   Did you ever have any leadership roles in
21  those organizations?
22     A.   When I was a teacher, I was a -- the
23  president of the teachers group, teachers association,
24  for Northwest Connecticut.
25     Q.   For what years were you the president of

Page 214

1  that group?
2      A.   We are talking in the mid-seventies.  It was
3  a while ago.  And then I was a team leader when I was
4  a -- I was a teacher team leader.  I led the K through
5  5 team from '87 to '97 at Salisbury Central School.
6      Q.   Were you teaching there?
7      A.   Yes, when I was teaching there.  And then
8  that's when I was working on my Sixth Year.
9      Q.   Okay.
10     A.   For administration.
11     Q.   And where were you teaching between '97 and
12  2000 or maybe you were principal at that time?
13     A.   I was principal in Watertown.
14     Q.   What was the name of that school?
15     A.   It was called Griffin, G-r-i-f-f-i-n.
16  Griffin School.
17     Q.   That was an elementary school?
18     A.   It was.  It's now closed, since closed.  And
19  I was the last principal there, and I -- we had a huge
20  celebration for that.
21     Q.   And then thereafter, you went to the Goshen
22  Center School?
23     A.   Yes.
24     Q.   Have you ever run for or held political
25  office?

Page 215

1      A.   No.
2      Q.   Do you have any hobbies or leisure
3  activities?
4      A.   Well, I love reading.  I love sailing.
5  Yoga.  And I'm going to try, sounds crazy, but
6  cheerleading down in The Villages.  They have
7  cheerleading and belly dancing.  These are my -- it's
8  on my Facebook.  And the other thing that I was going
9  to do -- well, I like golfing.  I do like to golf.
10  I'm not good at it, but I --
11     Q.   Most of us aren't.  You can probably get
12  away with that.
13     A.   That's basically -- oh, theater.  I was in
14  theater, not any leading roles, but in theater, like
15  in the late seventies.  In high school and then after
16  high school, in the summer.  And then in '78, when I
17  met my husband, I was in two plays that year.  And I'd
18  like to do that when I go back down to The Villages.
19     Q.   When you say you are in theater, you like
20  acting or you are behind the scene support?
21     A.   Acting and ensembles mostly.
22     Q.   All right.  You mentioned Facebook.
23          Do you have a Facebook account?
24     A.   Very recently.
25     Q.   I'm impressed.  I don't do that myself.

Page 216

1      A.   You know, my daughter-in-law -- my neighbor
2  wanted me to get on it, my daughter-in-law got me on
3  it.
4      Q.   Now, have you -- you all have a personal
5  computer at your home, I take it?
6      A.   Yes.
7      Q.   And you send and receive e-mails on that
8  computer?
9      A.   Yes.
10     Q.   Do you have any e-mails about hormone
11  therapy on your computer?
12     A.   No.
13     Q.   Have you ever visited any chat rooms about
14  hormone therapy?
15     A.   No.
16     Q.   Have you searched the Internet about hormone
17  therapy?
18     A.   Not that I remember doing, and it would have
19  been right after my -- and I wouldn't have done it.
20  No, I don't -- no, no.
21     Q.   Okay.  Do you -- we talked about your
22  newspaper subscription earlier today.
23          Do you subscribe to any magazines?
24     A.   Good Housekeeping.
25     Q.   How long have you subscribed to Good

1 Housekeeping?

2    A.   I don't know.  I rarely read it.  It was one

3 of those magazine subscriptions that your -- that you

4 did through your granddaughter.

5    Q.   You bought it for a fund-raiser thing?

6    A.   Right.

7    Q.   I see.  Do you remember how long you've been

8 getting it?

9    A.   I don't remember.

10   Q.   Was it five years, ten years, twenty years?

11   A.   It's not been a straight run.

12   Q.   Okay.  It's not something you really read, I

13 take it?

14   A.   No.

15   Q.   Do you watch any television programs

16 regularly?

17   A.   I hate to tell you which ones.

18   Q.   Well, now I'm curious.  What do you watch?

19   A.   The Bachelorette.

20   Q.   Okay.

21   A.   Dancing With The Stars.  Mindless, easy

22 funny ones.  I do watch Fox News.

23   Q.   I was going to ask you, okay.  Do you watch

24 any of the morning news programs, The Today Show, Good

25 Morning America, any of those?

1    A.   No.  I mean, occasionally I might.  But no,

2 not as a rule.

3    Q.   When you were teaching, when you were a

4 principal, did you regularly watch any of those

5 programs?

6    A.   No.

7    Q.   So your TV viewing is pretty much the same

8 as it was at the point before you retired?

9    A.   Pretty much.

10   Q.   It sounds like you don't watch a whole lot

11 of TV; is that right?

12   A.   No.

13   Q.   Speaking of television, earlier today you

14 mentioned that you recall seeing the advertisement

15 with Lauren Hutton.

16   A.   Uh-huh.

17   Q.   You saw that on television; correct?

18   A.   That was my memory of seeing it, was on

19 television.

20   Q.   Do you remember where you were when you saw

21 that, what city you were in?

22   A.   I don't.  I don't remember.  I don't

23 remember.

24   Q.   And I take it you don't remember when that

25 was?

1    A.   No.  I just -- no.  I just remember her --

2 vision of her.  That's all I remember.  I don't --

3    Q.   Do you remember how many times you saw that

4 advertisement?

5    A.   (Shaking head in the negative.)

6    Q.   No?  You have to say "yes" or "no."

7    A.   I don't, no.  I'm sorry.

8    Q.   That's okay.

9         Have you -- again, I apologize for skipping

10 around -- have you ever been told that you have

11 fibrocystic breasts?

12   A.   I have -- I've been told -- no.  I've been

13 told I had calcifications.

14   Q.   Okay.  Have you ever been told that you have

15 dense breasts?

16   A.   No.

17   Q.   In your fact sheet, which is this exhibit

18 here, number 2, at the top of page 15, you indicated

19 that Dr. Pearce and Dr. Tesoro had both told you that

20 you had fibrocystic breasts.  I'm wondering if maybe

21 there is a terminology issue here.

22        Do you see that, the top of 15?

23   A.   Where?

24   Q.   One five.

25   A.   I'm sorry.  16.

1         Then I -- is -- this is so bad.  Are

2 calcifications the same as fibrocystic breasts?

3    Q.   Well, when you answered this, were you

4 thinking about calcifications?

5    A.   Yes.  Because that's the only thing that

6 I've ever had any, anything told.

7    Q.   Okay.  So here you meant, yes, you've had

8 calcifications?

9    A.   I've had calcifications.

10   Q.   Okay.  That's fine.

11        I just have -- you can put that away.  I

12 think we've ended up covering all my questions from

13 that.

14   A.   Oh, I'm sorry.

15   Q.   I just wanted to wrap up by asking you some

16 closing questions.

17        Have you understood all of my questions that

18 I've asked today?

19   A.   Yes.

20   Q.   Do you want to correct or add to any of your

21 prior answers?

22   A.   No.

23   Q.   Have I been courteous to you and allowed you

24 to fully answer my questions?

25   A.   Yes.

Page 221

1          MS. DUGGAN:  I don't have anything else
2   at this point.
3          MR. MOSKOW:  Okay.  I know we discussed
4   on the record and maybe off the record as well that
5   there are some medical records that are going to be
6   produced, and based on that, I guess we will both
7   reserve any further questioning to the extent it's
8   necessary.
9          MS. DUGGAN:  Right, right.  If we need
10  to come back, Mr. Moscow has agreed that we can do
11  that, but --
12         MR. MOSKOW:  We will try to avoid it.
13         MS. DUGGAN:  -- we will try to avoid it
14  if we can.
15         THE VIDEO OPERATOR:  All set?
16         MS. DUGGAN:  Yes.
17         THE VIDEO OPERATOR:  This concludes
18  today's deposition of Margaret Fraser consisting of
19  four tapes.  We are now going off the record at 4:31
20  p.m.
21         (Fraser Exhibit 3-A, Package Insert,
22         marked for identification.)
23         (Fraser Exhibit 3-B, One month supply
24         of Prempro, marked for identification.)
25

Page 222

1          (Fraser Exhibit 3-C, One month supplyof
2          Prempro, marked foridentification.)
3          (Whereupon, the witness was excused and
4   the deposition concluded at 4:31 p.m.)
5
6                   - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 223

1          JURAT
2
3      I, MARGARET BROCKMAN FRASER, do hereby
4   certify that the foregoing testimony given by me on
5   JULY 21, 2009, is true and accurate, including any
6   corrections noted on the corrections page, to the best
7   of my knowledge and belief.
8
9
10         _____
11         MARGARET BROCKMAN FRASER
12         At_____in said County of
13  _____, this _____ day of _____, 2009, personally
14  appeared MARGARET BROCKMAN FRASER, and he/she made
15  oath to the truth of the foregoing corrections by
16  him/her subscribed.
17  Before me,_____, Notary Public.
18  My Commission Expires:  _____
19
20
21
22
23
24
25

Page 224

1   TRANSCRIPT CORRECTIONS
2   REPORTER:  SANDRA V. SEMEVOLOS, RMR/CRR
3   CASE NUMBER:  MDL Case No. 4:03-cv-1507 WRW
4       Fraser v. Wyeth 4:04-cv-01443-WRW
5   CASE STYLE:
6   In re:  PREMPRO PRODUCTS LIABILITY LITIGATION
7   PAGE LINE    CORRECTION       REASON
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24         NAME:_____
25         DATE:_____

Page 225

```
 1              C E R T I F I C A T E
 2   STATE OF CONNECTICUT
 3       I, SANDRA V. SEMEVOLOS, a Registered Merit
         Reporter/Notary Public within and for the State of
 4   Connecticut, do hereby certify that I reported the
     deposition of MARGARET BROCKMAN FRASER on JULY 21,
 5   2009, at the offices of URY & MOSKOW, LLC, 883 Black
     Rock Turnpike, Fairfield, Connecticut.
 6
         I further certify that the above-named
 7   deponent was by me first duly sworn to testify to the
     truth, the whole truth and nothing but the truth
 8   concerning his/her knowledge in the matter of the case
     In re:  PREMPRO PRODUCTS LIABILITY LITIGATION, Fraser
 9   v. Wyeth, now pending IN THE UNITED STATES DISTRICT
     COURT, FOR THE EASTERN DISTRICT OF ARKANSAS, WESTERN
10   DIVISION.
11       I further certify that the within testimony
     was taken by me stenographically and reduced to
12   typewritten form under my direction by means of
     COMPUTER ASSISTED TRANSCRIPTION; and I further certify
13   that said deposition is a true record of the testimony
     given by said witness.
14
         I further certify that I am neither counsel
15   for, related to, nor employed by any of the parties to
     the action in which this deposition was taken; and
16   further, that I am not a relative or employee of any
     attorney or counsel employed by the parties hereto,
17   nor financially or otherwise interested in the outcome
     of the action.
18
         WITNESS my hand and seal this 29th day of
19   July, 2009.
20
21   _____
22         Sandra V. Semevolos, RMR/CRR
           Notary Public
23
     My Commission Expires:  September 30, 2010
24   License Registration Number:  74
25
```

# EXHIBIT 6



**Collaborative Laboratory Services**

Saint Francis Campus
114 Woodland Street
Hartford, Connecticut
06105

860-714-4280
CT Lic. #CL-0623

**FRASER, MARGARET**                                        C97-27826

```
<<ELECTRONIC SIGNATURE, CS, CT(ASCP)>>
Routine QC Rescreen performed by TM, SCT(ASCP)
DATE: 11/25/97


GYN SPECIMEN ADEQUACY:
    Specimen is Satisfactory for Interpretation
    Endocervical component present
```

***Electronically Signed Out By Conversion***

ASUNCION,C.
ASUNCION,C.

## Clinical Diagnosis

```
CLINICAL DATA:
Hormone use
...
...
...
=========================================================================
```

MFraser-SFH&MC-MD-000012

# EXHIBIT 7

02/16/2011  03:55   8605452525          ONCOLOGY ASSOCIATES                    PAGE  05/21

# Oncology Associates, P.C.

**HELEN AND HARRY GRAY CANCER CENTER**
**85 RETREAT AVENUE  HARTFORD, CT 06106**
**(860) 249-6291  FAX (860) 728-0151**

STACY R. NERENSTONE, M.D.
PETER K. SCHAUER, M.D.
ROBERT D. SIEGEL, M.D.
W. JEFFREY BAKER, M.D.
MARK E. DAILEY, M.D.

December 3, 2001

Kenneth Kern, M.D.
85 Seymour St   Suite 1011
Hartford, Ct. 06106

RE:  Margaret Fraser

Dear Dr. Ken,

Thank you, very much for asking me to see your patient, Margaret
Fraser, in consultation.  As you know, she is a 55-year-old woman with
a recently diagnosed left breast cancer.

HISTORY OF PRESENT ILLNESS: The patient reportedly has had
yearly mammograms, and even had six-month mammograms for
calcifications on the right.  However, approximately 18 months have
lapsed since the last exam and she had a recent mammogram, which
showed abnormal calcifications in a new place on the left breast.  She
underwent stereotactic biopsy on October 26, 2001, at which time an
infiltrating ductal carcinoma was seen, nuclear grade-II.  She
underwent surgical excision on November 6, 2001, at which time 1.4 x
0.8 cm infiltrating ductal carcinoma was seen.  Margins were negative
with no lymphovascular invasion.  She had five sentinel nodes, which
were all negative for tumor.  This was an ER positive, PR positive,
nuclear grade-II, histologic grade-2, MIB intermediate, and C-erB-2
negative tumor.

The patient feels extremely well.  She only complains of having too
good an appetite.  Her sleeping has been fine.  The patient underwent
menopause approximately five years ago, and has been maintained on

80 CANAL COURT
AVON PARK NORTH
AVON, CT 06001

WINDHAM HOSPITAL
HATCH WING
WINDHAM, CT 06226

FRA-000432

Prempro.  She is gravida 3, para 1, AB 2, who had menarche at age 12 to 13.  The patient did breast-feed her son for over 15 months.

FAMILY HISTORY:  The family history is positive for breast cancer in her niece, age 33 who has inflammatory breast cancer.  There is no known family history of ovarian, colon or uterine cancer.  Her father had a melanoma on his arm, and a brother and sister have had squamous cell cancers on their face.

ALLERGIES/MEDICATIONS:  Claritin.  She is allergic to penicillin.

REVIEW OF SYSTEMS:  Entirely unremarkable, except for mild asthma, for which she gets p.r.n. inhalers.

SOCIAL HISTORY:  The patient has been married for 22 years.  She smoked half a pack of cigarettes a day for about 30 years, but quit five years ago.  She drinks a few cocktails a week.  She works as an elementary school principal.

PHYSICAL EXAMINATION:  The patient is a well-developed, well-nourished, middle-aged woman in no acute distress.  Blood pressure is 106/65, pulse is 74 and regular, height is 60 inches, weight is 118 pounds.  She has no palpable adenopathy.  Cardiopulmonary exam is normal.  She is status post excisional biopsy of the left breast, which is very well healed, as well as an axillary dissection scar, which is without induration or erythema.  Her abdominal exam is normal.  She has no clubbing, cyanosis or edema.

SUMMARY:  This is a patient with a stage I, good prognosis, ER, PR-positive tumor.  I explained that the patient will need tamoxifen for five years, and discussed the risks of that, including endometrial cancer and a blood clot.  The patient is very much in the gray zone pertaining to chemotherapy.  I explained that her prognosis is excellent with just tamoxifen and radiation therapy alone, but that CMF chemotherapy probably adds several points to improve her risk of recurrence.  Her risk of recurrence is probably between 10% and 15% without adding the CMF, but with tamoxifen and radiation.   That may improve 2% or 3% with chemotherapy. The patient, her husband, and I had a frank discussion about the pros and cons of chemotherapy.  I explained that

whatever she decides, she is in an excellent prognostic category, and is unlikely to have this tumor return in the future.  The patient wants to think about her options, and will probably seek a second opinion closer to her home.  Given that it takes her over an hour to get to my office, I think that if she opts for CMF chemotherapy, that a local oncologist would not be unreasonable.  Either way, she will call about her decision after she sees a local oncologist.

Thank you very much for allowing me to participate in the care of this lovely patient.  She will return to you for her surgical follow-ups, and will let me know what she decides about chemotherapy in the future.  Either way, she has her prescription for tamoxifen and knows to start that if she opts not to take chemotherapy.

Sincerely,

Stacy R. Nerenstone, MD

# EXHIBIT 8



**FRASER, MARGARET**                                                      8/31/07

Margaret Fraser underwent bilateral breast reconstructive surgery approximately three weeks ago. She tolerated the procedure without major difficulty. However over the past several days she has had increasing erythema involving the inferior portion of the left breast and increased edema of the left breast. The area has been quite tender. She has not had any associated fever.

On examination, the patient appears fairly well. Blood pressure is 130/80, pulse 80 and regular, afebrile. There is moderate erythema with slight warmth involving the inferior aspect of the left breast. There was also moderate edema of the left breast.

**ASSESSMENT:** Cellulitis of the left breast.

**PLAN:** The patient will be started on Rocephin followed by oral antibiotic therapy with Cephalexin. She was advised to contact her surgeon for continued follow up of the left breast infection.

Jedd F. Levine, M.D.

JFL/gmm

# HARTFORD HOSPITAL RADIATION ONCOLOGY CONSULTATION NOTE

| | | | |
|---|---|---|---|
| | | HHMR#: | 3112455 |
| NAME: | FRASER, MARGARET, B. | DATE: | 12/07/01 |
| ADDRESS: | ████████████████ | PHONE: | ████ |
| | | WORK: | ████████ |
| RELATIVE: | Joseph (Husband) | PHONE: | |
| REFERRING MD: | Kenneth Kern, M.D. | DOB: | ████ |
| DIAGNOSIS: | Carcinoma of the left breast (ICD9-174.5) | | |
| HISTOLOGY: | Invasive duct carcinoma | STAGE: | T1cN0M0, 1C |

Ms. Margaret B. Fraser is seen in consultation at the request of Dr. Kenneth Kern for evaluation of potential additional therapy for her left breast carcinoma.

This 55-year-old year old, G2, P1, five years postmenopausal, white female was found to have calcifications in the inferior left breast on routine mammography. Core biopsy by Dr. Kern on 10/26/2001 reveals invasive mammary ductal carcinoma, nuclear grade II, histologic grade II, rare foci of intraductal carcinoma, ER positive, PR positive, proliferative index intermediate/borderline, HER-2/neu negative. On 11/6/2001, she underwent sentinel node dissection and excision. Five sentinel lymph nodes were negative for neoplasm. Excision reveals invasive ductal carcinoma of the breast, nuclear grade II, histologic grade II, calculated tumor dimension 1.4 x 0.8 cm, minor intraductal component present, no lymphatic or vascular invasion, negative margins. Postoperatively, she has done well. She was seen by Dr. Nerenstone and felt to be a potential candidate for systemic adjuvant chemotherapy and potentially tamoxifen, and this is currently being considered. The patient has been on hormone replacement for the last five years, and this has been discontinued. She did have a needle aspiration for fibrocystic disease about 25 years ago and was followed several years ago for calcification in the left upper inner breast, which apparently was subsequently found to be negative.

**PAST MEDICAL HISTORY:** Sensitivity to pollen.

**MEDICATIONS:** Claritin p.r.n.

**ALLERGIES:** Penicillin, pollen.

**FAMILY HISTORY:** Father died at 87 of heart disease having had a melanoma in his 80s. Mother died of questionable colon lesion at 87. The patient's niece (her sister's daughter) had inflammatory breast carcinoma at 33.

**REVIEW OF SYSTEMS:** Appetite and weight are well maintained. Otherwise, noncontributory. Detailed review of systems is in the patient's chart for review.

**SOCIAL HISTORY:** The patient is married and has one son, age 20. She works as an elementary school principal.

**PHYSICAL EXAMINATION:** Physical exam reveals a well-developed white female. There is no palpable cervical, supraclavicular, or axillary lymphadenopathy. Left breast and axillary incisions healing well. No palpable masses in either breast. The abdomen is soft and nontender. No palpable abdominal masses or organomegaly.

**IMPRESSION:** T1cN0M0 stage IC left breast carcinoma.

# EXHIBIT 9

PRIVILEGED AND CONFIDENTIAL INFORMATION

Patient: Margaret Fraser
Records Provider:
Housatonic Valley Radiological Associates
 f/k/a Breast Imaging Center of Southbury, Inc.
67 Sand Pit Road, Suite 105
Danbury, CT 06810
203 -797-1770

Records Obtained: 09/27/2010

411671.130.0003 - 411671.130.0011
MFraser-HouVRA-000003 - MFraser-HouVRA-000011

EXHIBIT  9
WIT: _Tesoro_
DATE: _4/11/11_
MAUREEN O. POLLARD

Records provided by:
The Marker Group
13105 Northwest Fwy
Houston, TX 77040
713-460-9070
PDF version generated on 09/27/2010(NWF0010)
9 pages plus cover sheet

PRIVILEGED AND CONFIDENTIAL INFORMATION

12/08/1998  13:08   2037967839            HOUSATONIC VLY RADX                PAGE  05



Name: Fraser,
         Margaret T

Prev Mammo: St. Francis - 2000        Date: 9/10/01

Parity: /        Hormones: Prempro x 5 yrs.
Prev Breast surgery: No
Pregnant now?: No    Fam Hx NO

needle biopsy Lt. breast
1977. - benign.

| | R+ | | L+ |
|---|---|---|---|
| Lumps | | | |
| Pain | | | |
| Br. CA | | | |
| Discharge | | | |

MFraser-HouVRA-000003

# EXHIBIT 10

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF CONNECTICUT
3          Case No. 3:04-CV-01373-JBA
4  ************************************
5  MARGARET B. FRASER AND JOSEPH T.
6  FRASER,
7          Plaintiffs,
8       v.
9  WYETH, INC. and WYETH
10 PHARMACEUTICALS, INC.,
11         Defendants.
12 ************************************
13
14    VIDEOTAPED DEPOSITION OF CALEB C. FRASER
15
16       Tuesday, June 28th, 2011
17          12:45 p.m.
18
19          Held At:
20       Ury & Moskow, LLC
21       883 Black Rock Turnpike
22       Fairfield, Connecticut
23
24 REPORTED BY:
25 Maureen O'Connor Pollard, RPR, CLR, CSR

Page 2

1  APPEARANCES:
2
3  FOR THE PLAINTIFFS:
4    PAULA S. BLISS, ESQ.
5       BUBALO ROTMAN PLC
6       9300 Shelbyville Road
7       Louisville, Kentucky 40222
8       508-655-5458
9       pbliss@bubalorotman.com
10
11 FOR THE DEFENDANTS:
12    MATTHEW V. JOHNSON, ESQ.
13       WILLIAMS & CONNOLLY LLP
14       725 Twelfth Street, NW
15       Washington, DC 20005
16       202-434-5819
17       mjohnson@wc.com
18
19 Videographer:  Roderic Ross
20
21 Also Present:  Erick Cipau, Summer Intern
22
23
24
25

Page 3

1            INDEX
2  EXAMINATION                    PAGE
3  CALEB C. FRASER
4   BY MR. JOHNSON                    5
5
6           EXHIBITS
7  NO.        DESCRIPTION        PAGE
8  Exhibit 1    Notice of deposition..........    15
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1         P R O C E E D I N G S
2
3       THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Rod Ross, I'm a videographer
5  for Golkow Technologies.
6       Today's date is June 28th, 2011, and
7  the approximate time is 12:45 p.m..
8       This video deposition is being held in
9  Fairfield, Connecticut at the offices of Ury &
10 Mosklow in the matter of Margaret B. Fraser and
11 Joseph T. Fraser versus Wyeth, Incorporated and
12 Wyeth Pharmaceuticals, Incorporated, for the
13 United States District Court for the District of
14 Connecticut.
15       The deponent is Caleb Fraser.
16       Counsel will please now identify
17 themselves, and after which we'll have our court
18 reporter, Maureen Pollard, swear in the witness.
19       MS. BLISS:  Paula Bliss and Eric C.
20 Cipau of Bubalo Rotman on behalf of Mr. and Mrs.
21 Fraser.
22       MR. JOHNSON:  Matt Johnson of Williams
23 & Connolly on behalf of the Wyeth Defendants.
24
25

1 not they have had cancer?
2    A.   No, I would not know if they've had
3 cancer.
4    Q.   Okay.  Do you recall whether your
5 mother smoked or not when you were growing up?
6    A.   I don't.
7    Q.   Don't recall?
8    A.   I don't recall.
9    Q.   Do you recall whether your father
10 smoked when you were growing up?
11    A.   I don't.
12    Q.   Do you recall whether your mother
13 drank alcohol when you were growing up?
14    A.   She would have a beer.
15    Q.   Do you recall how often?
16    A.   No, no.
17    Q.   And you said beer; was that typically
18 what she would drink if she was drinking
19 something?
20    A.   As far as I remember, yes.
21    Q.   Are you aware of any prescription
22 medications your mother took while you were
23 growing up?
24    A.   No.
25    Q.   Did you take any medications prior to

1 leaving the house for Georgia?  And let me
2 qualify that question.
3        Other than an antibiotic or something
4 like that, did you take any medications
5 long-term for several months or more at a time
6 while you were growing up?
7    A.   No.
8    Q.   Do you ever recall a time when your
9 mother suffered from depression?
10    A.   I don't know if I'd qualify it as
11 depression, but after she was diagnosed I knew
12 that her demeanor had changed.
13    Q.   Any other time that your mother's
14 demeanor changed?
15    A.   No.
16    Q.   Do you ever recall a time when your
17 father suffered from depression?
18    A.   No.
19    Q.   Are you aware of any health issues
20 that your mother was experiencing prior to her
21 breast cancer diagnosis in 2001?
22    A.   No.
23    Q.   Did your, prior to her diagnosis, did
24 your mother ever discuss any issues of menopause
25 with you?

1    A.   Not discussed.  I mean I knew what was
2 happening, in the sense that we never discussed
3 in long detail.
4    Q.   And how did you know what was
5 happening?
6    A.   I knew that she was having hot flashes
7 and she would be extremely uncomfortable.  At
8 one point she looked fine, and then a minute
9 later she was extremely uncomfortable.
10    Q.   And would she get hot or sweaty
11 suddenly?
12    A.   Yes.
13    Q.   Did you discuss this with her?
14    A.   Not in great detail.
15    Q.   Did you have an understanding of what
16 it was that she was experiencing?
17    A.   Yes.
18    Q.   And how did you get that
19 understanding?
20    A.   I, you know, knew obviously through
21 sex education at school, women's bodies.
22    Q.   Okay.  Did you ever discuss your
23 mother's use of hormone therapy with her?
24    A.   No, I did not.
25    Q.   And at the time your mother started

1 taking hormone therapy, did you have any
2 discussions with her about it?
3    A.   No, I knew she was taking it, but we
4 never discussed it.
5    Q.   And how did you know she was taking
6 it?
7    A.   She would keep it next to her vitamins
8 that she took every day, it was in the cabinet,
9 and they were -- it was right next to each
10 other.
11    Q.   Did you use the same bathroom?
12    A.   What's that?
13    Q.   Did you use the same bathroom?
14    A.   There was only one bathroom in our
15 home.
16    Q.   Okay.  How did you become aware of
17 your mother's breast cancer diagnosis?
18    A.   She had called me and said that she
19 had been diagnosed.
20    Q.   And were you in college at that time?
21    A.   Yes, I was.
22    Q.   And did you become aware that she was
23 going to have surgery to have the lump removed?
24    A.   Yes.
25    Q.   How did that news affect you?

# EXHIBIT 11

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF CONNECTICUT
3          Case No. 3:04-CV-01373-JBA
4  **********************************
5  MARGARET B. FRASER AND JOSEPH T.
6  FRASER,
7            Plaintiffs,
8       v.
9  WYETH, INC. and WYETH
10 PHARMACEUTICALS, INC.,
11           Defendants.
12 **********************************
13
14    VIDEOTAPED DEPOSITION OF JOSEPH T. FRASER
15
16          Tuesday, June 28th, 2011
17            10:05 a.m.
18
19             Held At:
20           Ury & Moskow, LLC
21         883 Black Rock Turnpike
22          Fairfield, Connecticut
23
24 REPORTED BY:
25 Maureen O'Connor Pollard, RPR, CLR, CSR

Page 2

1  APPEARANCES:
2
3  FOR THE PLAINTIFFS:
4     PAULA S. BLISS, ESQ.
5        BUBALO ROTMAN PLC
6        9300 Shelbyville Road
7        Louisville, Kentucky 40222
8        508-655-5458
9        pbliss@bubalorotman.com
10
11
12 FOR THE DEFENDANTS:
13    MATTHEW V. JOHNSON, ESQ.
14       WILLIAMS & CONNOLLY LLP
15       725 Twelfth Street, NW
16       Washington, DC 20005
17       202-434-5819
18       mjohnson@wc.com
19
20 Videographer:  Roderic Ross
21
22 Also Present:  Erick Cipau, Summer Intern
23
24
25

Page 3

1                 INDEX
2  EXAMINATION                    PAGE
3  JOSEPH T. FRASER
4    BY MR. JOHNSON                 5
5    BY MS. BLISS                  76
6
7              EXHIBITS
8  NO.      DESCRIPTION         PAGE
9  Exhibit 1    Notice of deposition..........   10
10 Exhibit 2    Plaintiff's Fact Sheet,
11       Bates
12       Fra07107-064078-133290300001
13       through 31, and 6/29/06
14       letter, Bates
15       MFraser-PltfFS1-00001 and 2...    62
16
17
18
19
20
21
22
23
24
25

Page 4

1            P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  Today's date is
4  June 28th, 2011.  We are now on the record.  My
5  name is Rod Russ, I'm a videographer for Golkow
6  Technologies.  The approximate time is 10:05
7  a.m..
8        This video deposition is being held in
9  Fairfield, Connecticut at the offices of Ury &
10 Moskow, in the matter of Margaret B. Fraser and
11 Joseph T. Fraser versus Wyeth, Incorporated and
12 Wyeth Pharmaceuticals, Incorporated, for the
13 United States District Court for the District of
14 Connecticut, Civil Action Case Number
15 3:04-CV-01373-JBA.
16       The deponent is Joseph T. Fraser.
17       At this time, counsel please identify
18 yourselves for the record, after which our court
19 reporter, Maureen Pollard, will swear in the
20 witness.
21       MS. BLISS:  Paula Bliss and Erick
22 Cipau from Bubalo Rotman on behalf of Mr. and
23 Mrs. Fraser.
24       MR. JOHNSON:  Matt Johnson, Williams &
25 Connolly, for Wyeth Defendants.

Page 37

1 a very small dosage, in fact I cut the pill in
2 half.  And I just think with my health, I do the
3 right things, diet, exercise and the like, so --
4 and not -- I just, you know, I think I'm fine,
5 you know, it wouldn't be a risk.
6    Q.   You don't believe that the risk
7 applies to you?
8    A.   Not in my present dosage and taking it
9 as prescribed.
10    Q.   Have you discussed the risk with your
11 doctors?
12    A.   I have.
13    Q.   And have they told you that the risk
14 does not apply to you?
15    A.   I'm not sure they said it applies.  I
16 think they basically tell you what I just did,
17 that's kind of my information.
18    Q.   Do you or have you in the past read
19 product information for any medications that
20 Maggie either takes or has taken?
21    A.   Quite honestly, I have not.
22    Q.   Do you know whether Maggie read the
23 information that accompanied her prescriptions,
24 either currently or in the past?
25    A.   I don't know if she does or doesn't.

Page 38

1    Q.   Have you ever witnessed Maggie reading
2 the package information accompanying any of her
3 prescriptions?
4    A.   I just said I don't know.  No,
5 obviously I haven't if I --
6    Q.   Mr. Fraser, why did you decide to file
7 this lawsuit?
8    A.   Well, I feel a wrong has been done to
9 my wife and probably countless thousands of
10 other women, and I think that wrong needs to be
11 righted.  I think what we've experienced since
12 her cancer has just been a little overwhelming,
13 and I just think it needs to be righted.
14    Q.   And you believe that Wyeth is
15 responsible for that?
16    A.   I do.
17    Q.   And how did you come to decide to file
18 the lawsuit?  Did you seek out an attorney, did
19 you see an advertisement?
20    A.   You know, I don't actually recall the
21 initial.  I think it's probably in the records
22 from Maggie's deposition.  And at one point she
23 approached me and said "What do you think?", and
24 I said "By all means."  Now, how or where she
25 got started on it, I'm really not sure, you

Page 39

1 know, and I would be guessing to answer that.
2    Q.   Okay.  Is it fair to say, then, that
3 Maggie first brought the idea of filing a
4 lawsuit to you, and then you discussed it
5 together?
6    A.   Yes, she did approach me and say, you
7 know, "This is what's happened, what do you
8 think?", and I said "By all means, pursue it."
9    Q.   Do you know, what made contact with
10 the attorneys initially?
11    A.   Maggie.
12    Q.   And how did you come to the belief
13 that your wife's use of Prempro for less than
14 three years had something to do with her breast
15 cancer?
16       MS. BLISS:  Objection, objection.
17       BY MR. JOHNSON:
18    Q.   You can answer.
19    A.   First of all, I'm not sure I could
20 tell you exactly how long Maggie took it, the
21 Prempro.  Quite frankly, we believe it was
22 longer, and while we don't have the early on
23 records to indicate that with prescriptions, but
24 I have to believe Maggie knows when she started
25 and when she stopped.

Page 40

1    Q.   And when do you believe your wife
2 started taking Prempro?
3    A.   I honestly don't know.  I mean I could
4 guess.  But for me to just give you a year, I
5 would be, you know, out there, but it was in --
6 I could give you a rough, I'm going to say
7 probably about the mid-nineties.
8    Q.   And are you disputing the medical
9 records in this case with respect to the length
10 of use?
11       MS. BLISS:  Objection.  There is no
12 dispute in the medical records that she took it
13 for less than three years.  I'm not sure where
14 you're getting that misleading type of question.
15       MR. JOHNSON:  Your objection, stated
16 objection is fine.
17       MS. BLISS:  Okay.  But if you're going
18 to continue with the misleading questions I will
19 voice my objections in their entirety.
20       MR. JOHNSON:  I've simply asked if he
21 has any basis for disputing the medical records
22 in this case.
23       MS. BLISS:  No, you didn't.  You said
24 disputing the length of use.
25       MR. JOHNSON:  Let me ask the question

# EXHIBIT 12



# PHYSICIANS' DESK REFERENCE®

**Executive Vice President, Directory Services:** Paul Walsh

**Vice President, Sales and Marketing:** Dikran N. Barsamian
**National Sales Manager:** John A. Schmidt
**National Sales Manager, Custom Sales:** Anthony Sorce
**Senior Account Managers:** Marion Gray, RPh; Frank Karkowsky
**Account Managers:** Lawrence C. Keary; Eileen Sullivan;
Suzanne E. Yarrow, RN
**Director of Trade Sales:** Bill Gaffney
**Associate Product Manager:** Jason R. Springer
**Director of Financial Planning and Analysis:** Mark S. Ritchin
**Vice President, Clinical Communications and**
**New Business Development:** Mukesh Mehta, RPh
**New Business Development Manager:** Jeffrey D. Dubin
**Manager, Professional Data Services:** Thomas Fleming, PharmD
**Manager, Concise Data Content:** Christine Wyble, PharmD
**Drug Information Specialists:** Maria Deutsch, MS, PharmD, CDE;
Anu Gupta, PharmD
**Editor, Directory Services:** David W. Sifton
**Project Manager:** Edward P. Connor

**Senior Associate Editor:** Lori Murray
**Assistant Editor:** Gwynned L. Kelly
**Director of Direct Marketing:** Michael Bennett
**Direct Mail Managers:** Jennifer M. Fronzaglia, Lorraine M. Loening
**Senior Marketing Analyst:** Dina A. Maeder
**Promotion Manager:** Linda Levine
**Director of Production:** Brian Holland
**Senior Data Manager:** Jeffrey D. Schaefer
**Production Manager:** Amy Brooks
**Production Coordinators:** Gianna Caradonna, DeèAnn DeRuvo,
Melissa Johnson, Christina Klinger
**Index Editors:** Noel Deloughery, Shannon Reilly
**Format Editor:** Stu W. Lehrer
**Art Associate:** Joan K. Akerlind
**Digital Imaging Supervisor:** Shawn W. Cahill
**Digital Imaging Coordinator:** Frank J. McElroy, III
**Electronic Publishing Designers:** Rosalia Sberna, Livio Udina
**Fulfillment Managers:** Louis J. Bolcik, Stephanie Struble

**MEDICAL ECONOMICS**

**THOMSON HEALTHCARE**

Copyright © 2002 and published by Medical Economics Company, Inc. at Montvale, NJ 07645-1742.  All rights reserved.  None of the content of this publication may be reproduced, stored in a retrieval system, resold, redistributed, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording, or otherwise) without the prior written permission of the publisher. PHYSICIANS' DESK REFERENCE®, PDR®, Pocket PDR®, The PDR® Family Guide to Prescription Drugs®, The PDR® Family Guide to Women's Health and Prescription Drugs®, and The PDR® Family Guide to Nutrition and Health® are registered trademarks used herein under license. PDR for Ophthalmic Medicines™, PDR for Nonprescription Drugs and Dietary Supplements™, PDR Companion Guide™, PDR Pharmacopoeia™ Pocket Dosing Guide, PDR® for Herbal Medicines™, PDR® for Nutritional Supplements™, PDR® Medical Dictionary™, PDR® Nurse's Drug Handbook™, PDR® Nurse's Dictionary™, The PDR® Family Guide Encyclopedia of Medical Care™, The PDR® Family Guide to Natural Medicines and Healing Therapies™, The PDR® Family Guide to Common Ailments™, The PDR® Family Guide to Over-the-Counter Drugs™, The PDR® Family Guide to Nutritional Supplements™, and  PDR® Electronic Library™ are trademarks used herein under license.

**Officers of Thomson Healthcare:** *Chief Executive Officer:* Michael Tansey; *Chief Operating Officer:* Richard Noble; *Chief Financial Officer and Executive Vice President, Finance:* Paul Hilger; *Executive Vice President, Directory Services:* Paul Walsh; *Senior Vice President, Planning and Business Development:* William Gole; *Vice President, Human Resources:* Pamela M. Bilash

ISBN: 1-56363-411-2

**125 mg Act-O-Vial System (Single-Dose Vial)**
2 mL NDC 0009-0190-09
25 × 2 mL NDC 0009-0190-16
**500 mg Act-O-Vial System (Single-Dose Vial)**
4 mL NDC 0009-0765-02
**1 gram Act-O-Vial System (Single-Dose Vial)**
8 mL NDC 0009-3389-01
**500 mg (Multi-Dose Vial)**
8 mL NDC 0009-0758-01
**1 gram (Multi-Dose Vial)**
16 mL NDC 0009-0698-01
**2 gram Vial with Diluent**
NDC 0009-0796-01

### REFERENCES

1. Fekety R. Infections associated with corticosteroids and immunosuppressive therapy. In: Gorbach SL, Bartlett JG, Blacklow NR, eds. *Infectious Diseases*. Philadelphia: WBSaunders Company 1992:1050–1.
2. Stuck AE, Minder CE, Frey FJ. Risk of infectious complications in patients taking glucocorticoids. *Rev Infect Dis* 1989;11(6):954–63.

℞ only

Pharmacia & Upjohn Company • Kalamazoo, MI
49001, USA
Revised May 2001                        810 431 236
                                        0190-09
                                        691211

---

## VAGIFEM®

[*våg s' fěm*]
estradiol vaginal tablets
25μg
**PHYSICIAN PACKAGE INSERT**

---

ESTROGENS HAVE BEEN REPORTED TO IN-
CREASE   THE   RISK   OF   ENDOMETRIAL
CARCINOMA.
Three independent, case controlled studies have re-
ported an increased risk of endometrial cancer in post-
menopausal women exposed to exogenous estrogens for
more than one year. This risk was independent of the
other known risk factors for endometrial cancer. These
studies are further supported by the finding that inci-
dent rates of endometrial cancer have increased sharply
since 1969 in eight different areas of the United States
with population-based cancer-reporting systems, an in-
crease which may be related to the rapidly expanding
use of estrogens during the last decade.
The three case-controlled studies reported that the risk
of endometrial cancer in estrogen users was about 4.5 to
13.9 times greater than in nonusers. The risk appears to
depend on both duration of treatment and on estrogen
dose. In view of these findings, when estrogens are used
for the treatment of menopausal symptoms, the lowest
dose that will control symptoms should be utilized and
medication should be discontinued as soon as possible.
When prolonged treatment is medically indicated, the
patient should be reassessed, on at least a semi-annual
basis, to determine the need for continued therapy.
Close clinical surveillance of all women taking estrogens
is important. In all cases of undiagnosed persistent or
reoccurring abnormal vaginal bleeding, adequate diag-
nostic measures should be undertaken to rule out
malignancy.
There is no evidence at present that "natural" estrogens
are more or less hazardous than "synthetic" estrogens at
equi-estrogenic doses.

---

### DESCRIPTION

VAGIFEM® (estradiol vaginal tablets) are small, white,
film-coated tablets containing 25.8μg of estradiol hemihy-
drate equivalent to 25μg of estradiol.
Each tablet contains the following inactive ingredients: hy-
droxypropyl methylcellulose, lactose monohydrate, maize
starch and magnesium stearate. The film coating contains
hydroxypropyl methylcellulose and polyethylene glycol.
Each white tablet is 6 mm in diameter and is placed in a
disposable applicator.
Each tablet-filled applicator is packaged separately in a
blister pack. 17β-estradiol hemihydrate is a white, almost
white or colorless crystalline solid, chemically described as
estra-1,3,5 (10)-triene-3, 17 diol.
The chemical formula is $C_{18}H_{24}O_2 \cdot \frac{1}{2} H_2O$ with a molecu-
lar weight of 281.4.
The structural formula is:



### CLINICAL PHARMACOLOGY

*In vivo* estrogens diffuse through cell membranes, distribute
throughout the cell, bind to and activate the estrogen recep-
tors, thereby eliciting their biological effects. Estrogen re-
ceptors have been identified in tissue of the reproductive
tract, breast, pituitary, hypothalamus, liver and bone of
women.   The estrogen contained in VAGIFEM, 17

β-estradiol is chemically and biologically identical to the en-
dogenous human 17 β-estradiol and is, therefore, classified
as a human estrogen.
Estrogens regulate growth, differentiation and functioning
of many different tissues within and outside of the repro-
ductive system. Estrogens are intricately involved with
other hormones, especially progesterone, and during the ov-
ulatory phase of the menstrual cycle cause proliferation of
the endometrium. Most of the activity of estrogens appear
to be exerted via estrogen receptors in target cells of tissues
of the women's reproductive tract: breast, pituitary, hypo-
thalamus, brain, liver, and bone.
The steroid-receptor complex is bound to the cell's DNA and
induces synthesis of specific proteins.
Maturation of the vaginal epithelium is dependent on estro-
gen as it increases the number of superficial and intermedi-
ate cells as compared with basal cells. Estrogen keeps the
pH of the vagina at approximately 4.5 which enhances nor-
mal bacterial flora, predominately, *Lactobacillus däderlein*.

### Pharmacokinetics

**Absorption**
Estrogen drug products are well absorbed through the skin,
mucous membranes, and the gastrointestinal (GI) tract. The
vaginal delivery of estrogens circumvents first-pass metab-
olism.
A single-center, randomized, double-blind comparison study
conducted in the U.S. showed that vaginal application of
VAGIFEM® over a 12-week course demonstrated a mean
$C_{max}$ of estradiol of 50 pg/mL and that there was no signif-
icant accumulation of estradiol as measured by the $AUC_{0-24}$
(See Table 1 below).

**Table 1:**
MEAN (±STANDARD DEVIATION)
PHARMACOKINETIC PARAMETERS
FOR ESTRADIOL
(Uncorrected for base line)
Timepoint:

| PK Parameter: | Day 1 | Day 14 | Day 84 |
|---|---|---|---|
| AUC (pg.hr/mL) | 538 (±265) | 567 (±246) | 563 (±341) |
| $C_{max}$ (pg/mL) | 51 (±34) | 47 (±21) | 49 (±27) |

**Distribution**
Circulating, unbound estrogens are known to modulate
pharmacological response. Estrogens circulate in the blood
bound to sex-hormone binding globulin (SHBG) and albu-
min. A dynamic equilibrium exists between the conjugated
and the unconjugated forms of estradiol and estrone, which
undergo rapid interconversion.

**Metabolism**
Exogenously-delivered or endogenously-derived estrogens
are primarily metabolized in the liver to estrone and
estriol, which are also found in the systemic circulation.
VAGIFEM intravaginal administration avoids first-pass
metabolism that occurs with oral estrogens.
The levels of $E_1$ seen during 12 weeks of VAGIFEM admin-
istration do not show any accumulation of $E_1$, and the ob-
served values are within the postmenopausal range. See Ta-
ble 2 below.

**Table 2:**
MEAN
(±STANDARD DEVIATION)
PHARMACOKINETIC
PARAMETERS FOR ESTRONE
(Uncorrected for base line)
Timepoint

| E1: | Day 1 | Day 14 | Day 84 |
|---|---|---|---|
| AUC (pg.hr/mL) | 649 (±230) | 744 (±267) | 681 (±271) |
| $C_{max}$ (pg/mL) | 35 (±12) | 39 (±13) | 35 (±12) |

**Excretion**
Estrogen metabolites are primarily excreted in the urine as
glucoronides and sulfates.

**Drug-Drug Interactions**
No formal drug-drug interaction studies have been done
with VAGIFEM.

### CLINICAL STUDIES

A placebo-controlled comparison study was done in the U.S.,
in which 230 patients were randomized to receive either
placebo, VAGIFEM, or 10μg estradiol vaginal tablets.
Patients inserted one tablet intravaginally each day for 14
days, then one tablet twice weekly for the remaining 10
weeks. All patients were assessed for vaginal symptoms.
VAGIFEM® was superior to placebo in the relief of symp-
toms of the dryness, soreness, and irritation associated with
atrophic vaginitis. This change of symptoms was seen at
Week 2 and was maintained throughout Week 12. (See
Figure 1)
An open, controlled comparison study was done in Canada
in which 159 patients were randomized to receive either
VAGIFEM or the conjugated estrogen vaginal cream, com-
parator drug. Two (2) grams (= 1.25 mg conjugated estro-
gens) of the comparator drug, which is the highest approved
dose, was given daily for 3 weeks, withheld for 1 week, then
repeated cyclically (3 weeks on, 1 week off) for up to 24
weeks; VAGIFEM was administered daily for 2 weeks, then
twice weekly for the remaining 22 weeks. Of all patients en-

tering into treatment phase of the study 10% of patients dis-
continued their treatment in the VAGIFEM group and 32%
discontinued their treatment in the comparator group. In
this study, patients were assessed for relief of symptoms.
VAGIFEM 25pg was not less effective than the approved
comparator product at the 2.0 gm dose in the relief of symp-
toms.
Symptoms of dryness, soreness, and irritation were rated as
0 = none, 1 = mild, 2 = moderate and 3 = severe. The aver-
age severity score of the three symptoms over time for the
placebo controlled and comparator studies are shown in the
following figures:



**Figure 1**
**(Placebo controlled)**

**Figure 2**
**(Comparator)**

The endometrium was evaluated at the end of each study by
endometrial biopsy. See Tables 3 & 4 below.

**Table 3:**
ENDOMETRIAL BIOPSY RESULTS
COMPARING VAGIFEM WITH
PLACEBO OVER
12 WEEKS OF TREATMENT
(US Trial)

| | VAGIFEM | Placebo |
|---|---|---|
| Total Number of Patients enrolled | 91 | 47 |
| Patients with uterus (non-hysterectomized) | 48 | 24 |
| Total Biopsies | 32 | 21 |
| Atrophic Endometrium | 27 (84%) | 18 (86%) |
| Weakly Proliferative | 0 (0%) | 0 (0%) |
| Proliferative | 1 (3%) | 0 (0%) |
| Simple Hyperplasia | 1 (3%) | 0 (0%) |
| Complex Hyperplasia | 0 (0%) | 0 (0%) |
| Insufficient Tissue | 3 (9%) | 3 (14%) |

**Table 4:**
ENDOMETRIAL BIOPSY RESULTS
COMPARING VAGIFEM
TO COMPARATOR GIVEN OVER
24 WEEKS

| | VAGIFEM | Comparator |
|---|---|---|
| Total Number of Patients enrolled | 80 | 79 |
| Patients with uterus (non-hysterectomized) | 80 | 79 |
| Total Biopsies | 49 | 49 |
| Atrophic Endometrium | 34 (68%) | 15 (30%) |
| Weakly Proliferative | 0 (0%) | 4 (8%) |
| Proliferative | 1 (2%) | 7 (14%) |
| Simple Hyperplasia | 0 (0%) | 1 (2%) |
| Complex Hyperplasia | 0 (0%) | 1 (2%) |
| Insufficient Tissue | 14 (28%) | 21 (42%) |

### INDICATIONS AND USE

VAGIFEM® is indicated for the treatment of atrophic vagi-
nitis.

*Continued on next page*

Information on these Pharmacia & Upjohn products is based
on labeling in effect June 1, 2001. Further information
concerning these and other Pharmacia & Upjohn products
may be obtained by direct inquiry to Medical Information,
Pharmacia & Upjohn, Kalamazoo, MI 49001.

## Vagifem—Cont.

### CONTRAINDICATIONS

The use of VAGIFEM is contraindicated in women who exhibit one or more of the following:
1. Known or suspected breast carcinoma.
2. Known or suspected estrogen-dependent neoplasia; e.g. endometrial carcinoma.
3. Abnormal genital bleeding of unknown etiology.
4. Known or suspected pregnancy. (See PRECAUTIONS)
5. Porphyria.
6. Hypersensitivity to any VAGIFEM constituents.
7. Active thrombophlebitis or thromboembolic disorders.
8. A past history of thrombophlebitis, thrombosis, or thromboembolic disorders associated with previous estrogen use (except when used in treatment of breast malignancy).

### WARNINGS

1. *Induction of malignant neoplasms.* Long-term, continuous administration of natural and synthetic estrogens in certain animal species increases the frequency of carcinomas of the breast, cervix, vagina, and liver. There are now reports that estrogens increase risk of carcinoma of the endometrium in humans (See Boxed Warning).

At the present time there is no satisfactory evidence that estrogens given to postmenopausal women increase the risk of cancer of the breast, although a recent long-term follow-up of a single physician's practice has raised this possibility. Because of the animal data, there is a need for caution in prescribing estrogens for women with a strong family history of breast cancer or who have breast nodules, fibrocystic disease, or abnormal mammograms.

2. *Gallbladder disease.* A recent study has reported a 2- to 3-fold increase in the risk of surgically confirmed gallbladder disease in women receiving postmenopausal estrogens, similar to the 2-fold increase previously noted in users of oral contraceptives.

3. *Effects similar to those caused by estrogen-progestogen oral contraceptives.* There are several serious adverse effects of oral contraceptives, most of which have not, up to now, been documented as consequences of postmenopausal estrogen therapy. This may reflect the comparatively low doses of estrogens used in postmenopausal women. It would be expected that the larger doses of estrogen used to treat prostatic or breast cancer are more likely to result in these adverse effects, and, in fact, it has been shown that there is an increased risk of thrombosis in men receiving estrogens for prostatic cancer.

a. *Thromboembolic disease.* It is now well established that users of oral contraceptives have an increased risk of various thromboembolic and thrombotic vascular diseases, such as thrombophlebitis, pulmonary embolism, stroke, and myocardial infarction. Cases of retinal thrombosis, mesenteric thrombosis, and optic neuritis have been reported in oral-contraceptive users. There is evidence that the risk of several of these adverse reactions is related to the dose of the drug. An increased risk of postsurgery thromboembolic complications has also been reported in users of oral contraceptives. If feasible, estrogen should be discontinued at least 4 weeks before surgery of the type associated with an increased risk of thromboembolism, or during periods of prolonged immobilization.

While an increased rate of thromboembolism and thrombotic disease in postmenopausal users of estrogens has not been found, this does not rule out the possibility that such an increase may be present, or that subgroups of women who have underlying risk factors, or who are receiving large doses of estrogens, may have increased risk. Therefore, estrogens should not be used (except in treatment of malignancy) in a person with a history of such disorders in association with estrogen use. They should be used with caution in patients with cerebral vascular or coronary artery disease and only for those in whom estrogens are clearly needed.

Large doses of estrogens (5 mg conjugated estrogens per day), comparable to those used to treat cancer of the prostate and breast, have been shown in a large prospective clinical trial in men, to increase the risk of nonfatal myocardial infarction, pulmonary embolism, and thrombophlebitis. When estrogen doses of this size are used, any of the thromboembolic and thrombotic adverse effects associated with oral contraceptive use should be considered a clear risk.

b. *Hepatic adenoma.* Benign hepatic adenomas appear to be associated with the oral contraceptives.

Although benign and rare, these may rupture and may cause death through intra-abdominal hemorrhage. Such lesions have not yet been reported in association with other estrogen or progestogen preparations but should be considered in estrogen users having abdominal pain and tenderness, abdominal mass, or hypovolemic shock.

Hepatocellular carcinoma has also been reported in women taking estrogen-containing oral contraceptives. The relationship of this malignancy to these drugs is not known at this time.

c. *Elevated blood pressure.* Women using oral contraceptives sometimes experience increased blood pressure which, in most cases, returns to normal on discontinuing the drug. There is now a report that this may occur with the use of estrogens in the menopause and blood pressure should be monitored in estrogen users, especially if high doses are used.

d. *Glucose tolerance.* A worsening of glucose tolerance has been observed in a significant percentage of patients on es-

trogen-containing oral contraceptives. For this reason, diabetic patients should be carefully observed while using estrogens.

4. *Hypercalcemia.* Administration of estrogens may lead to severe hypercalcemia in patients with breast cancer and bone metastases. If this occurs, the drug should be stopped and appropriate measures taken to reduce the serum calcium level.

5. *Rare Event:* Trauma induced by the VAGIFEM® applicator may occur, especially in patients with severely atrophic vaginal mucosa.

### PRECAUTIONS

#### A. General Precautions.

1. A complete medical and family history should be taken prior to the initiation of any estrogen therapy.

The pretreatment and periodic physical examinations should include special references to blood pressure, breast, abdomen, and pelvic organs, and should include a Papanicolaou smear. As a general rule, estrogens should not be prescribed for longer than one year without another physical exam being performed.

2. Fluid retention—Because estrogens may cause some degree of fluid retention, conditions which might be influenced by this factor, such as asthma, epilepsy, migraine, and cardiac and renal dysfunction, require careful observation.

3. Familial Hyperlipoproteinemia—Estrogen therapy may be associated with massive elevations of plasma triglycerides leading to pancreatitis and other complications in patients with familial defects of lipoprotein metabolism.

4. Certain patients may develop undesirable manifestations of excessive estrogenic stimulation, such as abnormal or excessive uterine bleeding, mastodynia, etc.

5. Prolonged administration of unopposed estrogen therapy has been reported to increase the risk of endometrial hyperplasia in some patients.

6. Preexisting uterine leiomyomata may increase in size during estrogen use.

7. The pathologist should be advised of estrogen therapy when relevant specimens are submitted.

8. Patients with a history of jaundice during pregnancy have an increased risk of recurrence of jaundice while receiving estrogen-containing oral contraceptive therapy. If jaundice develops in any patient receiving estrogen, the medication should be discontinued while the cause is investigated.

9. Estrogens are poorly metabolized in patients with impaired liver function and should be administered with caution in such patients.

10. Because estrogens influence the metabolism of calcium and phosphorus, they should be used with caution in patients with metabolic bone diseases that are associated with hypercalcemia or in patients with renal insufficiency.

11. Because of the effects of estrogens on epiphyseal closure, they should be used judiciously in young patients in whom bone growth is not yet complete.

12. Insertion of the VAGIFEM® applicator—Patients with severely atrophic vaginal mucosa should be instructed to exercise care during insertion of the applicator. After gynecological surgery, any vaginal applicator should be used with caution and only if clearly indicated.

13. Vaginal infection—Vaginal infection is generally more common in postmenopausal women due to the lack of normal flora seen in fertile women, especially lactobacillic, hence the subsequent higher pH. Vaginal infections should be treated with appropriate antimicrobial therapy before initiation of VAGIFEM therapy.

#### B. Information for the Patient

See text of patient Package Insert which appears above.

#### C. Drug/Laboratory Test Interactions

Certain endocrine and liver function tests may be affected by estrogen-containing oral contraceptives. The following similar changes may be expected with larger doses of estrogens:

a. Increased prothrombin and factors VII, VIII, IX, and X, decreased antithrombin III; increased norepinephrine-induced platelet aggregability.

b. Increased thyroid binding globulin (TBG) leading to increased circulating total thyroid hormone, as measured by PBI, $T_4$ by column, or $T_4$ by radioimmunoassay. Free $T_4$ resin uptake is decreased, reflecting the elevated TBG, free $T_4$ concentration is unaltered.

c. Impaired glucose tolerance.

d. Reduced response to metyrapone test.

e. Reduced serum folate concentration.

f. Increased serum triglyceride and phospholipid concentration.

#### D. Carcinogenesis, Mutagenesis and Impairment of Fertility

Long term continuous administration of natural and synthetic estrogens in certain animal species increases the frequency of carcinomas of the breast, uterus, vagina and liver. (See CONTRAINDICATIONS and WARNINGS).

#### E. Pregnancy Category X

Estrogens are not indicated for use during pregnancy or the immediate postpartum period. Estrogens are ineffective for the prevention or treatment of threatened or habitual abortion. Treatment with diethylstilbesterol (DES) during pregnancy has been associated with an increased risk of congenital defects and cancer in the reproductive organs of the fetus, and possibly other birth defects. The use of DES during pregnancy has also been associated with a subsequent increased risk of breast cancer in the mothers.

#### F. Nursing Mothers

As a general principle, administration of any drug to nursing mothers should be done only when clearly necessary since many drugs are excreted in human milk. In addition, estrogen administration to nursing mothers has been shown to decrease the quantity and quality of the milk. Estrogens are not indicated for the prevention of postpartum breast engorgement.

#### G. Pediatric Use

Safety and effectiveness in pediatric patients have not been established.

#### H. Geriatric Use

Clinical studies of VAGIFEM® did not include sufficient numbers of subjects aged 65 and over to determine whether they respond differently from younger subjects. Other reported clinical experience has not identified differences in responses between the elderly and younger patients. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range, reflecting the greater frequency of decreased hepatic, renal, or cardiac function, and of concomitant disease or other drug therapy.

### ADVERSE EVENTS

Adverse events generally have been mild: vaginal spotting, vaginal discharge, allergic reaction and skin rash. Adverse events with an incidence of 5% or greater are reported for two comparative trials. Data for patients receiving either VAGIFEM or placebo in the double blind study are listed in Table 5, and data for patients receiving VAGIFEM in the open label comparator study are listed in Table 6.

**Table 5:**
**ADVERSE EVENTS REPORTED IN 5% OR GREATER NUMBER OF PATIENTS RECEIVING VAGIFEM® IN THE PLACEBO CONTROLLED TRIAL.**

|  | VAGIFEM | Placebo |
|---|---|---|
|  | (n=91) | (n=47) |
| ADVERSE EVENT | % | % |
| HEADACHE | 9 | 6 |
| ABDOMINAL PAIN | 7 | 4 |
| UPPER RESPIRATORY TRACT INFECTION | 5 | 4 |
| MONILIASIS GENITAL | 5 | 2 |
| BACK PAIN | 7 | 6 |

**Table 6:**
**ADVERSE EVENTS REPORTED IN 5% OR GREATER NUMBER OF PATIENTS RECEIVING VAGIFEM® IN THE OPEN LABEL STUDY.**

|  | VAGIFEM |
|---|---|
|  | (n=80) |
| ADVERSE EVENT | % |
| PRURITUS GENITAL | 6 |
| HEADACHE | 7 |
| UPPER RESPIRATORY TRACT INFECTION | 11 |

Other adverse events that occurred in 3–5% of VAGIFEM subjects included: allergy, bronchitis, dyspepsia, haematuria, hot flashes, insomnia, pain, sinusitis, vaginal discomfort, vaginitis. A causal relationship to VAGIFEM has not been established.

### OVERDOSAGE

Numerous reports of ingestion of large doses of estrogen containing oral contraceptives by young children indicate that acute serious ill effects do not occur. Overdosage with estrogens may cause nausea, and withdrawal bleeding may occur in females.

### DOSAGE AND ADMINISTRATION

VAGIFEM is gently inserted into the vagina as far as it can comfortably go without force, using the supplied applicator.
- **Initial dose:** One (1) VAGIFEM tablet, inserted vaginally, once daily for two (2) weeks. It is advisable to have the patient administer treatment at the same time each day.
- **Maintenance dose:** One (1) VAGIFEM tablet, inserted vaginally, twice weekly.

The need to continue therapy should be assessed by the physician with the patient. Attempts to discontinue or taper medication should be made at three to six month intervals.

### HOW SUPPLIED

Each VAGIFEM® (estradiol vaginal tablets), 25µg is contained in a disposable, single-use applicator, packaged in a blister pack. Cartons contain 8, 15, or 18 applicators with inset tablets.

8 applicators: NDC 0009-5173-03
15 applicators: NDC 0009-5173-02
18 applicators: NDC 0009-5173-04
STORAGE: Store at 25°C (77°F); excursions permitted to 15°C–30°C (59°F–86°F). [See USP Controlled Room Temperature.]
Rx only
818 280 001
Vagifem® is a trademark owned by Novo Nordisk A/S

Revised March 2001
Manufactured for
Pharmacia & Upjohn Company
Kalamazoo, MI 49001, USA
By
Novo Nordisk A/S
2880 Bagsværd, Denmark

## INFORMATION FOR PATIENTS

### Introduction

This leaflet describes when and how to use VAGIFEM® (estradiol vaginal tablets) and the risks and benefits of estrogen treatment. Please read this information carefully before starting treatment.

Estrogens have important benefits but also some risks. You must decide, with your doctor or health care provider, whether the risks to you of estrogen use are acceptable because of their benefits. If you use estrogens, check with your health care provider to be sure you are using the dose that is appropriate for you, and that you don't use them longer than necessary. How long you need to use treatment should be decided by you and your health care provider. Estrogens are hormones made by the ovaries of normal women. Between ages 45 and 55, the ovaries normally stop making estrogens. This leads to a drop in body estrogen levels which causes the "change of life" or menopause (the end of monthly menstrual periods). If both ovaries are removed during an operation before natural menopause takes place, the sudden drop in estrogen levels causes "surgical menopause."

When the estrogen levels begin dropping, some women develop very uncomfortable symptoms, such as feeling of warmth in the face, neck, and chest, or sudden intense episodes of heat and sweating ("hot flashes" or "hot flushes"). Using estrogen drugs can help the body adjust to lower estrogen levels and reduce these symptoms. Most women have only mild menopausal symptoms or none at all and may not need to use estrogen drugs. VAGIFEM DOES NOT PROVIDE ENOUGH ESTROGEN TO REDUCE THESE SYMPTOMS.

The declining estrogen levels associated with advancing age after menopause may also result in thinning and drying of the tissue in the vagina and urinary tract (urogenital atrophy). Vaginal symptoms of this condition include dryness in the vagina (atrophic vaginitis), genital itching and burning, and pain with intercourse. Urinary symptoms may include urinary urgency and pain on urination. Small amounts of estrogens delivered directly to the local tissue can be used to help reduce these symptoms.

### Use of VAGIFEM®

(estradiol vaginal tablets).

VAGIFEM is a local estrogen therapy designed to relieve vaginal symptoms, a major component of the urogenital symptoms found in post-menopausal estrogen deficiency. VAGIFEM® (estradiol vaginal tablets) exerts it effect locally in the lower urogenital tract, particularly the vagina, and has not been associated with significant effects in other estrogen-sensitive organs or tissues of the body. Consequently, VAGIFEM provides relief of local symptoms of menopause only.

### Description

VAGIFEM® (estradiol vaginal tablets) contains 25μg (micrograms) of estrogen (estradiol). VAGIFEM releases estradiol into the vagina. A gel layer forms when the tablet comes in contact with the vagina. The estradiol is released from this gel layer. See Figure 1.



Dry tablet

Upon contact with vaginal mucosa, a gel layer forms on surface.

As moisture permeates the tablet, it is eroded and soluble estradiol diffuses out of the gel layer.

Fig.1

### Dosage

One (1) VAGIFEM tablet inserted vaginally once daily for the first two (2) weeks. Then one (1) tablet twice weekly. (See table below).

#### Administration Regimen

| Days: | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|-------|---|---|---|---|---|---|---|
| Week 1<br>1 Vagifem tablet everyday | / | / | / | / | / | / | / |
| Week 2<br>1 Vagifem tablet everyday | / | / | / | / | / | / | / |
| Week 3 and Thereafter<br>1 Vagifem tablet twice weekly | / | | | / | | | |

### Directions for use of VAGIFEM®:

**Step 1:** Tear of a single applicator.



Fig.2

**Step 2:** Separate the plastic wrap and remove the applicator from the plastic wrap. See Figure 2.



Fig.3

**Step 3:** First select the best position for vaginal insertion of VAGIFEM® (estradiol vaginal tablets) that is most comfortable for you. See suggested reclining Figure 3 or standing Figure 4 position illustrated below:



Fig.4

**Step 4:** The applicator should be held so that the finger of one hand can press the applicator plunger. See Figure 5.

Fig.5

**Step 5:** The other hand should be used to guide the applicator gently and comfortably through the vaginal opening (see Figures 3 and 4 above). If the tablet has come out of the applicator prior to insertion, do not attempt to replace it. Use a fresh tablet-filled applicator.

**Step 6:** The applicator should be inserted (without forcing) as far as comfortably possible, or until half of the applicator is inside your vagina, whichever is less.

**Step 7:** Once the tablet-filled applicator has been inserted, gently press the plunger until a click is heard and the plunger is fully depressed. This will eject the tablet inside your vagina where it will dissolve slowly over several hours.

**Step 8:** After depressing the plunger, gently remove the applicator and dispose of it the same way you would a plastic tampon applicator. The applicator is of no further use and should be discarded properly. Insertion may be done at any time of the day. It is advisable to use the same time daily for all applications of VAGIFEM® (estradiol vaginal tablets). If you have any questions, please consult your health care provider or pharmacist.

### Who Should Not Use VAGIFEM®:

VAGIFEM® (estradiol vaginal tablets) should not be used:

During pregnancy—Women who are definitely postmenopausal cannot become pregnant. Women who believe they are postmenopausal because their menstrual cycles have recently stopped should confirm that they are not pregnant before using any form of estrogen-containing drug. Using estrogens while pregnant may cause the unborn child to have birth defects. Estrogens do not prevent miscarriage. In the presence of unusual vaginal bleeding which has not been evaluated by a health care provider. Unusual vaginal bleeding after menopause can be a warning sign of cancer of the uterus. Estrogens may increase the risk of cancer of the uterus in women who have had their menopause ("change of life"). If you use any estrogen-containing drug, it is important to visit your health care provider regularly and report any unusual vaginal bleeding right away. Your health care provider should evaluate any unusual vaginal bleeding to find out the cause.

If there is a history of certain types of cancer—Estrogens may increase the risk of certain types of cancer, usually uterine or breast. VAGIFEM has not been associated with an increased risk of uterine cancer. Although there are reports of increased risk of breast cancer in women on hormone replacement therapy, VAGIFEM is administered locally and is not expected to pose an increased risk.

After childbirth or when breast-feeding a baby—VAGIFEM should not be used to try to stop the breasts from filling with milk after a baby is born. Women who are breast-feeding should avoid using any drugs because many drugs pass through to the baby in the milk. While nursing a baby, drugs should only be taken on the advice of your healthcare giver.

### Possible Risks from Treatment with Estrogens

*The following risk factors apply to estrogens in general:*

Cancer of the uterus—Estrogens increase the risk of developing a condition (endometrial hyperplasia) that may lead to cancer of the lining of the uterus (endometrial cancer). The risk of endometrial cancer is greater in estrogen users than nonusers. Studies have shown that this increased risk depends on estrogen dose, duration of treatment, and treatment regimen.

Using progestin therapy together with estrogen therapy may reduce the higher risk of uterine cancer related to estrogen use.

If the uterus has been removed (total hysterectomy), there is no danger of developing cancer of the uterus.

Cancer of the breast—Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens. However, some studies have reported that breast cancer developed more often (up to twice the usual rate) in women who used estrogens for long periods of time (especially more than 10 years) or who used higher doses for shorter time periods. VAGIFEM® (estradiol vaginal tablets) is not expected to increase the risk since it is a low dose, applied topically in the vagina, is minimally absorbed into the systemic circulation and is used for relatively short periods of time. Regular breast examinations by a health professional and monthly self-examination are recommended for all women.

Gallbladder disease and abnormal blood clotting—Gallbladder disease and abnormal blood clotting are risk factors associated with medium to high doses of estrogen. Most studies of low-dose estrogen usage by women do not show an increased risk of these complications, and to date there have not been complications with VAGIFEM (estradiol vaginal tablets) treatment.

### Side Effects

Few side effects have been reported: vaginal spotting, vaginal discharge, allergic reaction and skin rash.

### Estrogens in General

In addition to the risks listed above, the following side effects have been reported with estrogen use:

Nausea and vomiting, breast tenderness or enlargement, enlargement of benign tumors ("fibroids") of the uterus, retention of excess fluid.

Estrogen may worsen some conditions, such as asthma, epilepsy, migraine, heart disease, or kidney disease. Spotty darkening of the skin, particularly on the face.

If you use estrogens, you may reduce your risks by doing these things: See your health care provider regularly. While you are using estrogens, it is important to visit your health care provider at least annually for a check-up. If you develop vaginal bleeding while taking estrogens, call your health care provider; you may need further evaluation. If

*Continued on next page*

---

Information on these Pharmacia & Upjohn products is based on labeling in effect June 1, 2001. Further information concerning these and other Pharmacia & Upjohn products may be obtained by direct inquiry to Medical Information, Pharmacia & Upjohn, Kalamazoo, MI 49001.

## Vagifem—Cont.

members of your family have had breast cancer or if you have ever had breast lumps or an abnormal mammogram (breast X-ray), you may need to have more frequent breast examinations. Reassess your need for estrogens. You and your health care provider should reevaluate whether or not you still need estrogens at least every six months.

Be alert for warning signs. If any of these warning signals (or any other unusual symptoms) happen while you are using estrogens, call your health-care provider immediately: Abnormal bleeding from the vagina (possible uterine cancer); pains in the calves or chest, sudden shortness of breath, or coughing blood (possible clot in the legs, heart, or lungs); severe headache or vomiting, dizziness, faintness, changes in vision or speech, weakness or numbness of an arm or leg (possible clot in the brain or eye); breast lumps (possible breast cancer); ask your health care provider to show you how to examine your breasts monthly; yellowing of skin or eyes (possible liver problem); pain, swelling, or tenderness in the abdomen (possible gallbladder problem).

1. Estrogens increase the risk of developing a condition called endometrial hyperplasia that may lead to cancer of the lining of the uterus. Progestin, another hormone drug, is usually prescribed with higher-dose estrogen preparations in order to lower the risk of developing endometrial hyperplasia. Progestins are not usually needed for women using VAGIFEM® (estradiol vaginal tablets) alone.

2. Vaginal infection is generally more common in postmenopausal women. Vaginal infections should be treated by your health care provider with the appropriate antimicrobial therapy before initiation of VAGIFEM. If a vaginal infection develops during use of VAGIFEM, it may be continued while the infection is being treated. See your health care provider if you have vaginal discomfort or suspect you have a vaginal infection.

3. Your health care provider has prescribed this drug for you and you alone. Do not give the drug to anyone else.

4. Keep this and all drugs out of the reach of children.

5. This leaflet provides a summary of important information about VAGIFEM. If you want more information, ask your health care provider or pharmacist to show you the professional labeling. The professional labeling is also published in a book called the "Physicians' Desk Reference" which is available in book stores and public libraries. Generic drugs carry virtually the same labeling information as their brand name versions.

**HOW SUPPLIED**

Each VAGIFEM® (estradiol vaginal tablets), 25µg is contained in a disposable, single-use applicator, packaged in a blister pack. Cartons contain 8, 15 or 18 applicators with inset tablets.

8 applicators: NDC 0009-5173-03
15 applicators: NDC 0009-5173-02
18 applicators: NDC 0009-5173-04
STORAGE: Store at 25°C (77°F); excursions permitted to 15°C–30°C (59°F–86°F). [See USP Controlled Room Temperature.]

Rx only
Vagifem® is a trademark owned by Novo Nordisk A/S
Revised March 2001
Manufactured for
Pharmacia & Upjohn Company
Kalamazoo, MI 49001, USA
By
Novo Nordisk A/S
2880 Bagsværd, Denmark

---

## VANTIN®
[văn-tin]
Tablets and Oral Suspension
cefpodoxime proxetil tablets and
cefpodoxime proxetil for oral suspension
For Oral Use Only

**DESCRIPTION**

Cefpodoxime proxetil is an orally administered, extended spectrum, semi-synthetic antibiotic of the cephalosporin class. The chemical name is (RS)-1(isopropoxycarbonyloxy)ethyl (+)-(6R,7R)-7-[2-(2-amino-4-thiazolyl)-2-(Z)methoxyimino]acetamido]-3-methoxymethyl-8-oxo-5-thia-1-azabicyclo [4.2.0] oct-2-ene-2-carboxylate.

Its empirical formula is $C_{21}H_{27}N_5O_9S_2$ and its structural formula is represented below:



The molecular weight of cefpodoxime proxetil is 557.6. Cefpodoxime proxetil is a prodrug; its active metabolite is cefpodoxime. All doses of cefpodoxime proxetil in this insert

are expressed in terms of the active cefpodoxime moiety. The drug is supplied both as film-coated tablets and as flavored granules for oral suspension.

VANTIN Tablets contain cefpodoxime proxetil equivalent to 100 mg or 200 mg of cefpodoxime activity and the following inactive ingredients: carboxymethylcellulose calcium, carnauba wax, FD&C Yellow No. 6, hydroxypropylcellulose, hydroxypropylmethylcellulose, lactose hydrous, magnesium stearate, propylene glycol, sodium lauryl sulfate and titanium dioxide. In addition, the 100 mg film-coated tablets contain D&C Yellow No. 10 and the 200 mg film-coated tablets contain FD&C Red No. 40.

Each 5 mL of VANTIN Oral Suspension contains cefpodoxime proxetil equivalent to 50 mg or 100 mg of cefpodoxime activity after constitution and the following inactive ingredients: artificial flavorings, butylated hydroxy anisole (BHA), carboxymethylcellulose sodium, microcrystalline cellulose, carrageenan, citric acid, colloidal silicon dioxide, croscarmellose sodium, hydroxypropylcellulose, lactose, maltodextrin, natural flavorings, propylene glycol alginate, sodium citrate, sodium benzoate, starch, sucrose, and vegetable oil.

**CLINICAL PHARMACOLOGY**
**Absorption and Excretion:**
Cefpodoxime proxetil is a prodrug that is absorbed from the gastrointestinal tract and de-esterified to its active metabolite, cefpodoxime. Following oral administration of 100 mg of cefpodoxime proxetil to fasting subjects, approximately 50% of the administered cefpodoxime dose was absorbed systemically. Over the recommended dose range (100 to 400 mg), approximately 29 to 33% of the administered cefpodoxime dose was excreted unchanged in the urine in 12 hours. There is minimal metabolism of cefpodoxime in vivo.
**Effects of Food:**
The extent of absorption (mean AUC) and the mean peak plasma concentration increased when film-coated tablets were administered with food. Following a 200 mg tablet dose taken with food, the AUC was 21 to 33% higher than under fasting conditions, and the peak plasma concentration averaged 3.1 mcg/mL in fed subjects versus 2.6 mcg/mL in fasted subjects. Time to peak concentration was not significantly different between fed and fasted subjects.
When a 200 mg dose of the suspension was taken with food, the extent of absorption (mean AUC) and mean peak plasma concentration in fed subjects were not significantly different from fasted subjects, but the rate of absorption was slower with food (48% increase in $T_{max}$).

**Pharmacokinetics of Cefpodoxime Proxetil Film-coated Tablets:**
Over the recommended dosing range, (100 to 400 mg), the rate and extent of cefpodoxime absorption exhibited dose-dependency; dose-normalized $C_{max}$ and AUC decrease by up to 32% with increasing dose. Over the recommended dosing range, the $T_{max}$ was approximately 2 to 3 hours and the $T_{1/2}$ ranged from 2.09 to 2.84 hours. Mean $C_{max}$ was 1.4 mcg/mL for the 100 mg dose, 2.3 mcg/mL for the 200 mg dose, and 3.9 mcg/mL for the 400 mg dose. In patients with normal renal function, neither accumulation nor significant changes in other pharmacokinetic parameters were noted following multiple oral doses of up to 400 mg Q 12 hours.
[See first table above]

**Pharmacokinetics of Cefpodoxime Proxetil Suspension:**
In adult subjects, a 100 mg dose of oral suspension produced an average peak cefpodoxime concentration of approximately 1.5 mcg/mL (range: 1.1 to 2.1 mcg/mL), which is equivalent to that reported following administration of the 100 mg tablet. Time to peak plasma concentration and area under the plasma concentration-time curve (AUC) for the oral suspension were also equivalent to those produced with film-coated tablets in adults following a 100 mg oral dose.
The pharmacokinetics of cefpodoxime were investigated in 29 patients aged 1 to 17 years. Each patient received a single, oral, 5 mg/kg dose of cefpodoxime oral suspension. Plasma and urine samples were collected for 12 hours after dosing. The plasma levels reported from this study are as follows:
[See second table above]

**Distribution:**
Protein binding of cefpodoxime ranges from 22 to 33% in serum and from 21 to 29% in plasma.
**Skin Blister:**
Following multiple-dose administration every 12 hours for 5 days of 200 mg or 400 mg cefpodoxime proxetil, the mean maximum cefpodoxime concentration in skin blister fluid

averaged 1.6 and 2.8 mcg/mL, respectively. Skin blister fluid cefpodoxime levels at 12 hours after dosing averaged 0.2 and 0.4 mcg/mL for the 200 mg and 400 mg multiple-dose regimens, respectively.
**Tonsil Tissue:**
Following a single, oral 100 mg cefpodoxime proxetil film-coated tablet, the mean maximum cefpodoxime concentration in tonsil tissue averaged 0.24 mcg/g at 4 hours post-dosing and 0.09 mcg/g at 7 hours post-dosing. Equilibrium was achieved between plasma and tonsil tissue within 4 hours of dosing. No detection of cefpodoxime in tonsillar tissue was reported 12 hours after dosing. These test demonstrated that concentrations of cefpodoxime exceeded the $MIC_{90}$ of S. pyogenes for at least 7 hours after dosing of 100 mg of cefpodoxime proxetil.
**Lung Tissue:**
Following a single, oral 200 mg cefpodoxime proxetil film-coated tablet, the mean maximum cefpodoxime concentration in lung tissue averaged 0.63 mcg/g at 3 hours post-dosing, 0.52 mcg/g at 6 hours post-dosing, and 0.19 mcg/g at 12 hours post-dosing. The results of this study indicated that cefpodoxime penetrated into lung tissue and produced sustained drug concentrations for at least 12 hours after dosing at levels that exceeded the $MIC_{90}$ for S. pneumoniae and H. influenzae.
**CSF:**
Adequate data on CSF levels of cefpodoxime are not available.
**Effects of Decreased Renal Function:**
Elimination of cefpodoxime is reduced in patients with moderate to severe renal impairment (<50 mL/min creatinine clearance). (See PRECAUTIONS and DOSAGE AND ADMINISTRATION.) In subjects with mild impairment of renal function (50 to 80 mL/min creatinine clearance), the average plasma half-life of cefpodoxime was 3.5 hours. In subjects with moderate (30 to 49 mL/min creatinine clearance) or severe renal impairment (5 to 29 mL/min creatinine clearance), the half-life increased to 5.9 and 9.8 hours, respectively. Approximately 23% of the administered dose was cleared from the body during a standard 3-hour hemodialysis procedure.
**Effect of Hepatic Impairment (cirrhosis):**
Absorption was somewhat diminished and elimination unchanged in patients with cirrhosis. The mean cefpodoxime $T_{1/2}$ and renal clearance in cirrhotic patients were similar to those derived in studies of healthy adults. Ascites did not appear to affect values in cirrhotic subjects. No dosage adjustment is recommended in this patient population.
**Pharmacokinetics in Elderly Subjects:**
Elderly subjects do not require dosage adjustments unless they have diminished renal function. (See PRECAUTIONS.) In healthy geriatric subjects, cefpodoxime half-life in plasma averaged 4.2 hours (vs 3.3 in younger subjects) and urinary recovery averaged 21% after a 400 mg dose when administered every 12 hours. Other pharmacokinetic parameters ($C_{max}$, AUC, and $T_{max}$) were unchanged relative to those observed in healthy young subjects.
**Microbiology:**
Cefpodoxime is active against a wide-spectrum of Gram-positive and Gram-negative bacteria.
Cefpodoxime is stable in the presence of beta-lactamase enzymes. As a result, many organisms resistant to penicillins and cephalosporins, due to their production of beta lactamase, may be susceptible to cefpodoxime. Cefpodoxime is inactivated by certain extended spectrum beta-lactamases.
The bactericidal activity of cefpodoxime results from its inhibition of cell wall synthesis.
Cefpodoxime has been shown to be active against most strains of the following microorganisms, both in vitro and in clinical infections, as described in the INDICATIONS AND USAGE section.
**Aerobic Gram-positive microorganisms:**
Staphylococcus aureus (including penicillinase-producing strains)
NOTE: Cefpodoxime is inactive against methicillin-resistant staphylococci.
Staphylococcus saprophyticus
Streptococcus pneumoniae (excluding penicillin-resistant strains)
Streptococcus pyogenes
**Aerobic Gram-negative microorganisms:**
Escherichia coli
Klebsiella pneumoniae
Proteus mirabilis

| Dose (cefpodoxime equivalents) | colspan | | | | | | |
|---|---|---|---|---|---|---|---|

**CEFPODOXIME PLASMA LEVELS (mcg/mL) IN FASTED ADULTS AFTER FILM-COATED TABLET ADMINISTRATION (Single Dose)**

| Dose (cefpodoxime equivalents) | 1hr | 2hr | 3hr | 4hr | 6hr | 8hr | 12hr |
|---|---|---|---|---|---|---|---|
| 100 mg | 0.98 | 1.4 | 1.3 | 1.0 | 0.59 | 0.29 | 0.08 |
| 200 mg | 1.5 | 2.2 | 2.2 | 1.8 | 1.2 | 0.62 | 0.18 |
| 400 mg | 2.2 | 3.7 | 3.8 | 3.3 | 2.3 | 1.3 | 0.38 |

**CEFPODOXIME PLASMA LEVELS (mcg/mL) IN FASTED PATIENTS (1 to 17 YEARS OF AGE) AFTER SUSPENSION ADMINISTRATION**

| Dose (cefpodoxime equivalents) | 1hr | 2hr | 3hr | 4hr | 6hr | 8hr | 12hr |
|---|---|---|---|---|---|---|---|
| 5 mg/kg[1] | 1.4 | 2.1 | 2.1 | 1.7 | 0.90 | 0.40 | 0.090 |

[1] Dose did not exceed 200 mg.