# EXHIBIT 19





This leaflet describes when and how to use estrogens and the risks of estrogen treatment.

## Estrogen Drugs

Estrogens have several important uses but also some risks. You must decide, with your doctor, whether the risks of estrogens are acceptable in view of their benefits. If you decide to start taking estrogens, check with your doctor to make sure you are using the lowest possible effective dose. The length of treatment with estrogens will depend upon the reason for use. This should also be discussed with your doctor.

## Uses of Estrogen

*To reduce menopausal symptoms.* Estrogens are hormones produced by the ovaries. The decrease in the amount of estrogen that occurs in all women, usually between ages 45 and 55, causes the menopause. Sometimes the ovaries are removed by an operation, causing "surgical menopause." When the amount of estrogen begins to decrease, some women develop very uncomfortable symptoms, such as feelings of warmth in the face, neck, and chest or sudden intense episodes of heat and sweating ("hot flashes"). The use of drugs containing estrogens can help the body adjust to lower estrogen levels.

Most women have none or only mild menopausal symptoms and do not need estrogens. Other women may need estrogens for a few months while their bodies adjust to lower estrogen levels. The majority of women do not need estrogen replacement for longer than six months for these symptoms.

*To prevent brittle bones.* After age 40, and especially after menopause, some women develop osteoporosis. This is a thinning of the bones that makes them weaker and more likely to break, often leading to fractures of vertebrae, hip, and wrist bones. Taking estrogens after the menopause slows down bone loss and may prevent bones from breaking. Eating foods that are high in calcium (such as milk products) or taking calcium supplements (1,000 to 1,500 milligrams per day) and certain types of exercise may also help prevent osteoporosis.

Defense Exhibit 94

W-LABELS-007816

DX00094.0001

000839

Since estrogen use is associated with some risk, its use in the prevention of osteoporosis should be confined to women who appear to be susceptible to this condition. The following characteristics are often present in women who are likely to develop osteoporosis: white race, thinness, and cigarette smoking.

Women who had their menopause by the surgical removal of their ovaries at a relatively young age are good candidates for estrogen replacement therapy to prevent osteoporosis.

*To treat certain types of abnormal uterine bleeding due to hormonal imbalance.*

*To treat atrophic vaginitis* (itching, burning, dryness in or around the vagina) and *atrophic urethritis* (which may cause difficulty or burning on urination).

*To treat certain cancers.*

### When Estrogens Should Not be Used

Estrogens should not be used:

*During pregnancy.* Although the possibility is fairly small, there is a greater risk of having a child born with a birth defect if you take estrogens during pregnancy. A male child may have an increased risk of developing abnormalities of the urinary system and sex organs. A female child may have an increased risk of developing cancer of the vagina or cervix in her teens or twenties. Estrogen is not effective in preventing miscarriage (abortion).

*If you have had any heart or circulation problems.* Estrogen therapy should be used only after consultation with your physician and only in recommended doses. Patients with a tendency for abnormal blood clotting should avoid estrogen use (see below).

*If you have had cancer.* Since estrogens increase the risk of certain cancers, you should not take estrogens if you have ever had cancer of the breast or uterus. In certain situations, your doctor may choose to use estrogen in the treatment of breast cancer.

*When they are ineffective.* Sometimes women experience nervous symptoms or depression during menopause. There is no evidence that estrogens are effective for such symptoms. You may have heard that taking estrogens for long periods (years) after menopause will keep your skin soft and supple and keep you feeling young. There is no evidence that this is so and such long-term treatment may carry serious risks.

W-LABELS-007817

DX00094.0002

**000840**

## Dangers of Estrogens

*Cancer of the uterus.* The risk of cancer of the uterus increases the longer estrogens are used and when larger doses are taken. One study showed that when estrogens are discontinued, this increased risk of cancer seems to fall off quickly. In another study, the persistence of risk was demonstrated for 10 years after stopping estrogen treatment. Because of this risk, *it is important to take the lowest dose of estrogen that will control your symptoms and to take it only as long as you need it.* There is a higher risk of cancer of the uterus if you are overweight, diabetic, or have high blood pressure.

If you have had your uterus removed (total hysterectomy), there is no danger of developing cancer of the uterus.

*Cancer of the breast.* The majority of studies have shown no association with the usual doses used for estrogen replacement therapy and breast cancer. Some studies have suggested a possible increased incidence of breast cancer in those women taking estrogens for prolonged periods of time and especially if higher doses are used.

Regular breast examinations by a health professional and self-examination are recommended for women receiving estrogen therapy, as they are for all women.

*Gallbladder disease.* Women who use estrogens after menopause are more likely to develop gallbladder disease needing surgery than women who do not use estrogens.

*Abnormal blood clotting.* Taking estrogens may increase the risk of blood clots. These clots can cause a stroke, heart attack, or pulmonary embolus, any of which may be fatal.

## Side Effects

In addition to the risks listed above, the following side effects have been reported with estrogen use:

- Nausea and vomiting.
- Breast tenderness or enlargement.
- Enlargement of benign tumors of the uterus.
- Retention of excess fluid. This may make some conditions worsen, such as asthma, epilepsy, migraine, heart disease, or kidney disease.
- A spotty darkening of the skin, particularly on the face.

## Reducing Risk of Estrogen Use

If you decide to take estrogens, you can reduce your risks by carefully monitoring your treatment.

*See your doctor regularly.* While you are taking estrogens, it is important that you visit your doctor at least once a year for a physical examination. If members of your family have had breast cancer or if you have ever had breast nodules or an abnormal mammogram (breast x-ray), you may need to have more frequent breast examinations.

*Reevaluate your need for estrogens.* You and your doctor should reevaluate your need for estrogens at least every six months.

W-LABELS-007818

DX00094.0003

**000841**

*Be alert for signs of trouble.* Report these or any other unusual side effects to your doctor immediately:

- Abnormal bleeding from the vagina.
- Pains in the calves or chest, a sudden shortness of breath or coughing blood (indicating possible clots in the legs, heart, or lungs).
- Severe headache, dizziness, faintness, or changes in vision, indicating possible clots in the brain or eye.
- Breast lumps.
- Yellowing of the skin.
- Pain, swelling, or tenderness in the abdomen.

## Other Information

Some physicians may choose to prescribe another hormonal drug to be used in association with estrogen treatment. These drugs, progestins, have been reported to lower the frequency of occurrence of a possible precancerous condition of the uterine lining. Whether this will provide protection from uterine cancer has not been clearly established. There are possible additional risks that may be associated with the inclusion of a progestin in estrogen treatment. The possible risks include unfavorable effects on blood fats and sugars. The choice of progestin and its dosage may be important in minimizing these effects.

Your doctor has prescribed this drug for you and you alone. Do not give the drug to anyone else.

If you will be taking calcium supplements as part of the treatment to help prevent osteoporosis, check with your doctor about the amounts recommended.

Keep this and all drugs out of the reach of children. In case of overdose, call your doctor, hospital, or poison control center immediately.

This leaflet provides the most important information about estrogens. If you want to read more, ask your doctor or pharmacist to let you read the professional labeling.

## How Supplied

Premarin® (conjugated estrogens tablets, USP)—tablets for oral administration.

Each oval purple tablet contains 2.5 mg.

Each oval yellow tablet contains 1.25 mg.

Each oval white tablet contains 0.9 mg.

Each oval maroon tablet contains 0.625 mg.

Each oval green tablet contains 0.3 mg.

The appearance of these tablets is a trademark of Wyeth-Ayerst Laboratories.

 Ayerst Laboratories Inc.
A Wyeth-Ayerst Company
Philadelphia, PA 19101
PI 4012-2   Revised September 16, 1992   Printed in USA

W-LABELS-007819

DX00094.0004

000842

# EXHIBIT 20



1395-1
INFORMATION
FOR THE PATIENT

# INFORMATION
# FOR
# THE PATIENT

**ESTROGENS INCREASE THE RISK OF CANCER OF THE UTERUS IN WOMEN WHO HAVE HAD THEIR MENOPAUSE ("CHANGE OF LIFE"). THIS FINDING REFERS TO ESTROGENS GIVEN WITHOUT PROGESTIN.**

Progestin drugs taken with estrogen-containing drugs significantly reduce but do not eliminate this risk. If you use any estrogen-containing drug, it is important to visit your doctor regularly and report any unusual vaginal bleeding right away. Vaginal bleeding after menopause may be a warning sign of uterine cancer. Your doctor should evaluate any unusual vaginal bleeding to find out the cause.

**ESTROGENS/PROGESTINS SHOULD NOT BE USED DURING PREGNANCY.**

Estrogens and progestins do not prevent miscarriage (spontaneous abortion) and are not needed in the days following childbirth. If you take estrogens during pregnancy your unborn child has a greater than usual chance of having birth defects. The risk of developing these defects is small, but clearly larger than the risk in whose mothers did not take estrogens during pregnancy. These birth defects may affect the baby's urinary system and sex organs. Daughters born to mothers who took DES (an estrogen drug) have a higher than usual chance of developing cancer of the vagina or cervix when they become teenagers or young adults. Sons may have a higher than usual chance of developing cancer of the testicles when they become teenagers or young adults.

There is an increased risk of birth defects in children whose mothers take this drug during the first four months of pregnancy. Several reports suggest an association between mothers who take these drugs in the first trimester of pregnancy and genital abnormalities in male and female babies. The risk to the male baby is the possibility of being born with a condition in which the opening of the penis is on the underside rather than the tip of the penis (hypospadias). Hypospadias occurs in about 5 to 8 per 1,000 male births and is about doubled with exposure to these drugs. There is not enough information to quantify the risk to exposed female fetuses. However, enlargement of the clitoris and fusion of the labia may occur, although rarely.

Therefore, since drugs of this type may induce mild masculinization of the external genitalia of the female fetus, as well as hypospadias in the male fetus, it is wise to avoid using the drug during the first trimester of pregnancy. These drugs have been used as a test for pregnancy, but such use is no longer considered safe because of possible damage to a developing baby. Also, more rapid methods for testing for pregnancy are now available. If you take PREMPRO™ and later find you were pregnant when you took it, be sure to discuss this with your doctor as soon as possible.

Your physician has prescribed PREMPRO, a combination of two hormones, an estrogen and a progestin. This leaflet describes the major benefits and risks of your treatment, as well as how and when treatment should be taken.

PREMPRO replaces the hormones in your body which naturally decrease at menopause. The hormone combination you will be taking has been shown to provide the benefits of estrogen replacement therapy while lowering the frequency of a possible precancerous condition of the uterine lining. This therapy is not intended for women who have had a hysterectomy (surgical removal of the uterus).

Estrogens have several important uses but also some risks. You must decide, with your doctor, whether the risks of estrogens are acceptable when weighed against their benefits. The length of treatment with estrogens can vary from woman to woman. Your doctor to make sure you are using the lowest possible effective dose.

With PREMPRO therapy several menstrual-like bleeding patterns may occur. These may range from absence of bleeding to irregular bleeding. If bleeding occurs, it is frequently light spotting or moderate menstrual-like bleeding, but it may be heavy. If you experience vaginal bleeding while taking PREMPRO, you should discuss your bleeding pattern with your doctor and set up an appropriate schedule for follow-up care.

*To reduce moderate to severe menopausal symptoms.* Estrogens are hormones produced by the ovaries of normal women. When a woman is between the ages of 45 and 55, the ovaries normally stop making estrogens. This leads to a drop in body estrogen levels that causes the "change of life" or menopause (the end of monthly menstrual periods). A sudden drop in estrogen levels also occurs if both ovaries are removed during an operation before natural menopause takes place. This is referred to as "surgical menopause."

When the estrogen levels begin dropping, some women develop very uncomfortable symptoms, such as feelings of warmth in the face, neck, and chest, or sudden intense episodes of heat and sweating ("hot flashes" or "hot flushes"). Using estrogen drugs can help the body adjust to lower estrogen levels and reduce these symptoms. In some women the symptoms are mild; in others they can be severe. These symptoms may last only a few months or longer. Taking PREMPRO can alleviate these symptoms. If you are not taking hormones for other reasons, such as the prevention of osteoporosis, you should take PREMPRO only as long as you need it for relief from your menopausal symptoms.

*To prevent thinning of bones.* Osteoporosis is a thinning of the bones that makes them weaker and allows them to break more easily. The bones of the spine, wrists and hips break most often in osteoporosis. Both men and women start to lose bone mass after about age 40, but women lose bone mass faster after the menopause. Using estrogens after the menopause slows down bone thinning and may prevent bones from breaking. Lifelong adequate calcium intake, either from diet (such as dairy products) or from calcium supplements (to reach a total daily intake of 1000 milligrams per day before menopause or 1500 milligrams per day after menopause), may help to prevent osteoporosis. Regular weight-bearing exercise (like walking and running for an hour, two or three times a week) may also help to prevent osteoporosis. Before you change your calcium intake or exercise habits, it is important to discuss these lifestyle changes with your doctor to find out if they are safe for you.

Since estrogen use has some risks, only women who are likely to develop osteoporosis should use estrogens for prevention. Women who are likely to develop osteoporosis often have the following characteristics:
• White or Asian race
• Small, slim body frame
• Cigarette-smoking habit
• Family history of osteoporosis (in a mother, sister, or aunt)
• Early menopause either natural or because of surgical removal of ovaries ("surgical menopause")

*To treat vulvar and vaginal atrophy* (itching, burning, dryness in or around the vagina, difficulty or burning on urination) associated with menopause.

**Who Should Not Use Estrogens**

*During pregnancy (see Boxed Warning).* If you think you may be pregnant, do not use any form of estrogen-containing drug. Using estrogens while you are pregnant may cause your unborn child to have birth defects. Estrogens do not prevent miscarriage.

*If you have unusual vaginal bleeding which has not been evaluated by your doctor (see Boxed Warning).* Unusual vaginal bleeding can be a warning sign of cancer of the uterus, especially if it happens after menopause. Your doctor must find out the cause of the bleeding so that he or she can recommend the proper treatment. Taking estrogens without visiting your doctor can cause you serious harm if your vaginal bleeding is caused by cancer of the uterus.

*If you have had cancer.* Since estrogens increase the risk of certain types of cancer, you should not use estrogens if you have ever had cancer of the breast or uterus.

*If you have any circulation problems.* Estrogen drugs should not be used except in unusually special situations in which your doctor decides that you need estrogen therapy so much that the risks are acceptable. Women with abnormal blood clotting conditions should avoid estrogen use (see Risks of Estrogens and/or Progestins).

*When they do not work.* During menopause, some women develop nervous symptoms or depression. Estrogens do not relieve these symptoms. You may have heard that taking estrogens for years after menopause will keep your skin soft and supple and keep you feeling young. There is no evidence for these claims and such long-term estrogen use may have serious risks.

*After childbirth or when breastfeeding a baby.* Estrogen should not be used to try to stop the breast from filling with milk after a baby is born. Such treatment may increase the risk of developing blood clots (see Risks of Estrogens and/or Progestins).

If you are breastfeeding, you should avoid using any drugs because many drugs pass through to the baby in the milk. While nursing a baby, you should take drugs only on the advice of your health-care provider.

**Risks of Estrogens and/or Progestins**

*Cancer of the uterus.* The risk of cancer of the uterus increases when estrogens are used alone, the longer they are used, and when larger doses are taken. There is a higher risk of cancer of the uterus if you are overweight, diabetic, or have high blood pressure. The hormone combination you will be taking contains estrogen and progestin. This combination has been shown to provide the benefits of estrogen replacement therapy for the Uses of Estrogen listed above, while reducing the risk of a pre-cancerous condition of the uterine lining (see Other Information, below).

However, additional risks may be associated with the inclusion of a progestin in estrogen treatment. The possible risks include less favorable effects on

W-INSERTS-000254

Defense - Wyeth
Trial Exhibit
No. 88



blood fats as compared to Premarin® alone, unfavorable effects on blood sugars, and a possible increase in breast cancer risk (see Cancer of the breast, below). Usually, the smaller the dose and the shorter the duration of treatment, the more these effects are minimized. Check with your doctor to make sure you are using the lowest effective dose and only for as long as you need it.

If you have had your uterus removed, there is no risk of developing cancer of the uterus and no benefit to be gained by using a combination estrogen/progestin product.

*Cancer of the breast.* Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens. However, some studies have reported that breast cancer developed more often (up to twice the usual rate) in women who used estrogens for long periods of time (especially more than 10 years), or who used high doses of estrogens for shorter time periods. The effects of added progestin on the risk of breast cancer are unknown. Some studies have reported a somewhat increased risk, even higher than the possible risk associated with estrogens alone. Others have not. Regular breast examinations by a health professional and monthly self-examination are recommended for all women. Regular mammograms are recommended for all women over 50 years of age.

*Gallbladder disease.* Women who use estrogens after menopause are more likely to develop gallbladder disease needing surgery than women who do not use estrogens.

*Inflammation of the pancreas.* Women with high triglyceride levels may have an increased risk of developing inflammation of the pancreas.

*Abnormal blood clotting.* Taking estrogens may cause changes in your blood clotting system. These changes allow the blood to clot more easily, possibly allowing clots to form in your bloodstream. If blood clots do form in your bloodstream, they can cut off the blood supply to vital organs, causing serious problems. These problems may include a stroke (by cutting off blood to the brain), a heart attack (by cutting of blood to the heart), a pulmonary embolus (by cutting off blood to the lungs), or other problems. Any of these conditions may cause death or serious long-term disability. However, most studies of low-dose estrogen use by women do not show an increased risk of these complications.

*Excess calcium in the blood.* Taking estrogens may lead to severe hypercalcemia in women with breast or bone cancer.

*During pregnancy.* There is an increased risk of birth defects in children whose mothers take this drug during the first four months of pregnancy. Several reports suggest an association between mothers who take these drugs in the first trimester of pregnancy and genital abnormalities in male and female babies. The risk to the male baby is the possibility of being born with a condition in which the opening of the penis is on the underside rather than the tip of the penis (hypospadias). Hypospadias occurs in about 5 to 8 per 1,000 male births and is about doubled with exposure to these drugs. There is not enough information to quantify the risk to exposed female fetuses. However, enlargement of the clitoris and fusion of the labia may occur, although rarely.

Therefore, since drugs of this type may induce mild masculinization of the external genitalia of the female fetus, as well as hypospadias in the male fetus, it is wise to avoid using the drug during the first trimester of pregnancy. These drugs have been used as a test for pregnancy, but such use is no longer considered safe because of possible damage to a developing baby. Also, more rapid methods for testing for pregnancy are now available. If you take PREMPRO™ and later find you were pregnant when you took it, be sure to discuss this with your doctor as soon as possible.

### Side Effects with Estrogens and/or Progestins

In addition to the risks listed above, the following side effects have been reported with estrogen and/or progestin use:
• Nausea, vomiting, pain, cramps, swelling, or tenderness in the abdomen.
• Yellowing of the skin and/or whites of the eyes.
• Breast tenderness or enlargement.
• Enlargement of benign tumors ("fibroids") of the uterus.
• Irregular bleeding or spotting.
• Change in amount of cervical secretion.
• Vaginal yeast infections.
• Retention of excess fluid. This may make some conditions worsen, such as asthma, epilepsy, migraine, heart disease, or kidney disease.
• A spotty darkening of the skin, particularly on the face; reddening of the skin; skin rashes.
• Worsening of porphyria.
• Headache, migraines, dizziness, faintness, or changes in vision (including intolerance to contact lenses).
• Mental depression.
• Involuntary muscle spasms.
• Hair loss or abnormal hairiness.
• Increase or decrease in weight.
• Changes in sex drive.
• Possible changes in blood sugar.

### Reducing the Risks of Estrogen/Progestin

If you decide to take an estrogen/progestin combination, you can reduce your risks by carefully monitoring your treatment.

*See your doctor regularly.* While you are taking PREMPRO, it is important to visit your doctor at least once a year for a checkup. If you develop vaginal bleeding while taking estrogens, you may need further evaluation. If members of your family have had breast cancer or if you have ever had breast lumps or an abnormal mammogram (breast X ray), you may need to have more frequent breast examinations.

*Reassess your need for treatment.* You and your doctor should reevaluate your need for this drug at regular intervals (for example, every 6 months) to determine if continued treatment is still necessary.

*Be alert for signs of trouble.* If any of these warning signals (or any other unusual symptoms) happen while you are using estrogen/progestin, call your doctor immediately:
• Abnormal bleeding from the vagina (possible uterine abnormality).
• Pains in the calves or chest, a sudden shortness of breath or coughing blood (indicating possible clots in the legs, heart, or lungs).
• Severe headache or vomiting, dizziness, faintness, or changes in vision or speech, weakness or numbness of an arm or leg (indicating possible clots in the brain or eye).
• Breast lumps (possible breast cancer; ask your doctor or health professional to show you how to examine your breasts monthly).
• Yellowing of the skin and/or whites of the eyes (possible liver problems).
• Pain, swelling, or tenderness in the abdomen (possible gallbladder problem).

### Other Information

1. Estrogens increase the risk of developing a condition (endometrial hyperplasia) that may lead to cancer of the lining of the uterus. Taking progestins, another hormonal drug, with estrogens lowers the risk of developing this condition. Therefore, since your uterus has not been removed, your doctor has prescribed PREMPRO, which includes both a progestin and estrogens.

You should know, however, that taking estrogens *with* progestins may have unhealthy effects on blood sugar, which might make a diabetic condition worse. Additional risks include a possible further increase in breast cancer risk which may be associated with long-term estrogen use.

Some research has shown that estrogens taken *without* progestins may protect women against developing heart disease. However, this is not certain. The protection shown may have been caused by the characteristics of the estrogen-treated women and not by the estrogen treatment itself. In general, treated women were slimmer, more physically active, and were less likely to have diabetes than the untreated women. These characteristics are known to protect against heart disease.

**You are cautioned to discuss very carefully with your doctor or health-care provider all the possible risks and benefits of long-term estrogen and progestin treatment as they affect you personally.**

2. Your doctor has prescribed this drug for you and you alone. Do not give the drug to anyone else.

3. If you will be taking calcium supplements as part of the treatment to help prevent osteoporosis, check with your doctor about the amounts recommended.

4. Keep this and all drugs out of the reach of children. In case of overdose, call your doctor, hospital, or poison control center immediately.

5. This leaflet provides the most important information about PREMPRO. If you want to read more, ask your doctor or pharmacist to let you read the professional labeling. The professional labeling is also published in a book called *The Physicians' Desk Reference*, which is available in bookstores and public libraries.

### How Supplied

Your doctor has prescribed PREMPRO™, a combination of the conjugated estrogens found in Premarin® tablets and medroxyprogesterone acetate (MPA). PREMPRO therapy consists of a single peach tablet to be taken once daily.

Each carton contains (2) blister cards. Each blister card contains 14 oval, peach tablets containing 0.625 mg of the conjugated estrogens found in Premarin tablets and 2.5 mg of medroxyprogesterone acetate for oral administration.

The appearance of PREMPRO™ tablets is a trademark of Wyeth-Ayerst Laboratories.

**Store at room temperature 20° C - 25° C (68° F - 77° F).**



Ayerst Laboratories Inc.
A Wyeth-Ayerst Company
Philadelphia, PA 19101

PI 4665-1    Issued November 15, 1995    Printed in USA

W-INSERTS-000255
DX00088.0002

000838

# EXHIBIT 21

Page 1

```
1 page 266
2  1         IN THE UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF ARKANSAS
3  2                 WESTERN DIVISION
   3 IN RE: PREMPRO PRODUCTS LIABILITY  MDL No. 1507
4             No. 4:03CV01507
   4
5         * * * * * * * * * *
   5 DONNA SCROGGIN,
6        Plaintiff,    Individual Case
   6   v.         No. 4:04CV01169 WRW
7 WYETH and its divisions; PHARMACIA
   7 & UPJOHN COMPANY LLC; WYETH
8 PHARMACEUTICALS, INC.; and ESI LEDERLE,
   8         Defendants.
9  9
   Wednesday, February 6, 2008 - Little Rock, Arkansas - 8:42 a.m.
10 10
   11      TRANSCRIPT OF TRIAL - VOLUME 3
11     BEFORE THE HONORABLE WILLIAM R. WILSON, JR.,
   12    UNITED STATES DISTRICT JUDGE, and a jury
12 13
   14 APPEARANCES:
13 15 On Behalf of the Plaintiff:
      MR. ERIK BRETT WALKER
14 16    Hissey, Kientz & Herron, P.L.L.C.
         16800 Imperial Valley Drive
15 17       Suite 130
         Houston, Texas  77070
16 18
17    MR. JAMES A. MORRIS, JR.
18 19    MR. STEVE M. FARIES
   19    Brent Coon & Associates
20 20    11614 Bee Caves Road, Suite 220
21    Austin, Texas  78738
22 21
23 22
24 23
25         [CONTINUED]
26 24
27 25
```

Page 2

```
1 page 267
2  1 APPEARANCES CONTINUED:
   2 On Behalf of the Wyeth Defendants:
3    MR. F. LANE HEARD, III
   3    MR. STEPHEN L. URBANCZYK
4    MR. RICHMOND MOORE
      Williams & Connolly
5  4    725 Twelfth Street, N.W.
   5    Washington, D.C.  20005-5901
6  6 MS. LYN PEEPLES PRUITT
      Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
7  7    425 West Capitol Avenue, Suite 1800
      Little Rock, Arkansas  72201-3525
8  8
   9
9    On Behalf of the Upjohn Defendants:
   10 MS. ELIZABETH ROBBEN MURRAY
10    Friday, Eldredge & Clark
   11    Regions Center
11    400 West Capitol Avenue, Suite 2000
   12    Little Rock, Arkansas  72201-3493
12 13 MR. CHARLES P. GOODELL, JR.
      Goodell, DeVries, Leech & Dann, LLP
13 14    Commerce Place
      One South Street
14 15    Suite 2000
      Baltimore, Maryland  21202
15 16
   MS. PAMELA YATES
16 17 MR. ANDREW K. SOLOW
      Kaye Scholer LLP
17 18    1999 Avenue of the Stars
   18    Suite 1700
      Los Angeles, California  90067-6048
19 19
20 20
21 21
22 Proceedings reported by machine stenography and displayed
23 22 in realtime; transcript prepared utilizing computer-aided
24    transcription.
25 23
26 24
27 25
```

Page 3

```
1 page 268
2  1       I N D E X - VOLUME 3 (February 6, 2008)
   2 WITNESSES
3 FOR THE PLAINTIFF:      Direct  Cross  Redirect  Recross
   3
4  4
5  4 DONALD FRANKLIN AUSTIN     269    295    401    416
   6   [Continued]
7  5
8  6 JUSTIN VICTORIA           417
   7
10 8
11 9
12 10
13 11
14 12
15 13 EXHIBITS:                    RECEIVED:
16 14 Plaintiff's Exhibit 1057....................... 428
17 15 Plaintiff's Exhibit 29......................... 431
18 16 Plaintiff's Exhibit 66......................... 442
19 17 Plaintiff's Exhibit 133....................... 446
20 18 Plaintiff's Exhibit 144....................... 448
21 19 Plaintiff's Exhibit 102....................... 453
22 20 Plaintiff's Exhibit 188....................... 454
23 21 Plaintiff's Exhibit 231....................... 457
24 22 Plaintiff's Exhibit 239....................... 460
25 23 Plaintiff's Exhibit 288....................... 463
26 24
27 25
```

Page 4

```
1 page 269
2
3  1    (Continuing at 8:42 a.m., jury not present.)
4  2       THE COURT:  Good morning.  With the "good" portion of
5  3 that in quotation marks.
6  4       MR. URBANCZYK:  Your Honor, is that a reference to the
7  5 weather or the election?
8  6       THE COURT:  You don't want the answer.
9  7       MR. URBANCZYK:  Or the fact that you've been working
10 8 hard this morning?
11 9       THE COURT:  You don't want the answer.
12 10      I've got this message from the jury by way of the courtroom
13 11 deputy, so I don't -- I'm just going to lay this before you.
14 12 The jury wants you to go a little -- talk a little slower, all
15 13 lawyers.  I think they meant all.  I don't know.  They didn't
16 14 specify anybody.  And they need -- I hesitate to say this, but
17 15 they need some definitions regiven, like HRT, some of the
18 16 simple -- I know y'all are all familiar with it.  I'm even
19 17 getting familiar with it by now, but they need a little more of
20 18 that.  Now, that's for whatever it's worth.  I don't want the
21 19 examinations to go any slower as far as the long run is
22 20 concerned.
23 21      All right.  Are there any other issues we can take up in
24 22 two minutes before we bring the jury out?
25 23      MR. WALKER:  Your Honor, just that the Court's order
26 24 this morning asked whether we intended to respond to the motion
27 25 regarding Dr. Parisian.  We do.  It was just filed yesterday,
```

Page 5

page 270

1 and we are working feverishly, and we will try to get that done.
2    THE COURT:  Working what?
3    MR. WALKER:  Feverishly.
4    THE COURT:  You're stealing terms from me.
5    MR. WALKER:  I'm sorry.
6    THE COURT:  Yes, ma'am.
7    MS. YATES:  Your Honor, at some point today, but it
8 doesn't need to be right now, we need to just resolve a couple
9 of remaining Upjohn objections to Dr. Colditz so that we can get
10 that resolved.
11    THE COURT:  All right.  Well, we can't do it -- we
12 don't have time to do it now.  What are the issues?
13    MS. YATES:  The issues are, your Honor, your Honor has
14 ruled on the testimony in terms of Wyeth's objections, but
15 Upjohn has two different, unruled-on objections, and they are
16 the testimony in question is cumulative of Dr. Austin, so
17 perhaps we can wait until Dr. Austin is done, and also that it's
18 beyond the scope of his expert report.
19    THE COURT:  All right.  I will think about those
20 issues, and we'll get to it today.
21    MS. YATES:  Thank you.
22    THE COURT:  Remind me when we break for dinner, lunch.
23    MR. WALKER:  Your Honor, for the record, when Wyeth
24 made the objection that it seeks the scope of the expert report,
25 Judge Jones --

Page 6

page 271

1    THE COURT:  Slower and louder.  I'm going to join the
2 jury in their request.
3    MR. WALKER:  I'm sorry.
4    Can I have this, Mary?
5    THE COURTROOM DEPUTY:  Yes.  Yes.  Hold on.
6    MR. WALKER:  Your Honor, the two objections, we did
7 not respond to those objections with Upjohn.  They were missed,
8 but they were responded to with Wyeth.  Had we responded, we
9 would have said, no, it's not cumulative.  No, it doesn't exceed
10 his expert report.  That wouldn't have been particularly
11 helpful.
12    When Judge Jones considered these same objections from
13 Wyeth, he overruled Wyeth's objections on exceeds expert report
14 13 times, and he overruled Wyeth's objection on repetitive five
15 times.  The testimony is not repetitive.  We have made a point
16 of having Dr. Austin testify separately from the excerpts that
17 we would have Dr. Colditz testify.
18    THE COURT:  You don't have to get into that before the
19 first break, do you?
20    MR. WALKER:  No, sir.
21    MS. YATES:  No.
22    THE COURT:  All right.  Any reason we shouldn't bring
23 the jury in?  Let's bring the jury in.
24    I'm serious about y'all reading General Forrest's response.
25 I know y'all have got somebody who can do some historical

Page 7

page 272

1 research on the Ouija board.
2    Everyone please rise while the jury enters.
3    (Jury entered the courtroom.)
4    THE COURT:  Be seated, please.
5    Good morning, ladies and gentlemen.  Before we do anything
6 else, with respect to this case alone, not any other subject,
7 are your hearts and minds just as pure as they were when you
8 left yesterday afternoon?  If not, raise your hand.
9    Let the record reflect that no hands are raised.
10    How many more six-packs of eggs do I need to bring in?  Who
11 hasn't gotten a six-pack that wants them?
12    One, two, three, four -- oh, six more.  I've already
13 brought six.  That's all of you.
14    I may have to take a stew pot out to the chicken yard this
15 afternoon to get them laying a little faster.  I'll get you all
16 a six-pack before we conclude the trial.  Of eggs.
17    You may proceed.
18    MR. MORRIS:  I am, your Honor.  May it please the
19 Court, counsel.
20    Dr. Austin, would you take the stand again.
21    THE COURT:  You're still under oath.
22    THE WITNESS:  Thank you.
23    DONALD FRANKLIN AUSTIN, PLAINTIFF'S WITNESS,
24       PREVIOUSLY DULY SWORN
25       DIRECT EXAMINATION [Continuing]

Page 8

page 273

1 BY MR. MORRIS:
2 Q.  Good morning.  Dr. Austin, I'd like to review just briefly,
3 if we can, some terms, and see if we can reach some agreements.
4 Q.  When we use the term ERT, what are we talking about?
5 A.  That's applied to estrogen replacement therapy.
6 Q.  And the product that contained estrogen was what?
7 A.  Well, in most of the studies we've looked at in the United
8 States, it's conjugated equine estrogen, which is a product made
9 from pregnant mare's urine.
10 Q.  And what is that called?
11 A.  Conjugated equine estrogen.
12 Q.  Do you know the brand name for it?
13 A.  Premarin.
14 Q.  Premarin.  When we use the term HRT, what are we talking
15 about?
16 A.  Very similar.  It means hormone replacement therapy, and
17 estrogen is a hormone, so it is sometimes applied to HRT and
18 sometimes applied to something a little different.
19 Q.  For years, did the studies in the '80s and '90s mix these
20 terms and sometimes call it ERT and sometimes call it HRT?
21 A.  You still see it in the literature sometimes with those
22 terms used interchangeably.
23 Q.  However, is HRT more often now applied to the concept of
24 estrogen plus progestin?
25 A.  It covers that, too, yes.

Page 9

page 274

1 Q.  And the most common progestin that was used was Provera; is
2 that correct?
3 A.  Yes.
4 Q.  Premarin is manufactured by Wyeth; correct?
5 A.  Correct.
6 Q.  Provera is manufactured by Upjohn; correct?
7 A.  I believe that's right.
8 Q.  Now, from 1949 when Premarin came on the market -- I'm
9 sorry.  1942.  I apologize.  And 1959, when Provera came on the
10 market, up until 1975, was there any -- I'm sorry, 1995.  Boy,
11 I'm having a hard time this morning.  Up until 1995, was there
12 any single product that combined both estrogen and progestin for
13 use in menopausal women?
14 A.  I haven't made an exhaustive study of that, but I -- the
15 one that's most commonly used now was not combined at that time.
16 Q.  All right.  And is that Prempro?
17 A.  That is Prempro.
18 Q.  All right.  And is Prempro also manufactured by Wyeth?
19 A.  Yes.
20 Q.  And is it estrogen plus progestin?
21 A.  It is.
22 Q.  Now, with regard to ERT, when did it become known that
23 estrogen replacement therapy was causing endometrial cancer?
24 A.  Became accepted, I believe, in December of 1975.
25 Q.  And as far as women are concerned, endometrial cancer

Page 10

page 275

1 occurs where in the body?  What part of the body does it occur
2 in?
3 A.  It's in the womb, it's the lining of the uterus.  The
4 endometrium is the lining.
5 Q.  So women that still had a uterus would be at a risk for
6 endometrial cancer after 1975; is that fair?
7 A.  If they received estrogen replacement therapy, yes.
8 Q.  And so to counter the effect of ERT on women who still had
9 a uterus, was a progestin added as a regular part of the therapy
10 about 1976, '77?
11 A.  Following that time, yes, in the late '70s or -- it was
12 used some, and it became found that these women were not
13 developing endometrial cancer, with the addition of a
14 progestational agent.
15 Q.  All right.  Now, for women who had had a hysterectomy,
16 would it still be appropriate to give them ERT, which is
17 estrogen alone?
18 A.  Yes.
19 Q.  So it wouldn't be necessary to give a woman who had had a
20 hysterectomy a progestin?  It wouldn't be necessary to give them
21 one?
22 A.  It would not be necessary.
23 Q.  But for a woman with a uterus, it became the standard of
24 care; correct?
25 A.  Gradually, it did, yes.

Page 11

page 276

1 Q.  Do we have any idea how many women had hysterectomies that
2 were taking these drugs versus those that did not?
3 A.  Well, somebody does, but I don't know the answer to that.
4 Q.  Now, as far as your opinions, we've talked yesterday
5 extensively about the relative risk numbers.  Do you remember
6 when we went through that?
7 A.  Yes.
8 Q.  And based on the subgroup analysis that we've seen both in
9 the Million Women Study and in the Women's Health Initiative, do
10 you have an opinion based upon reasonable scientific and medical
11 certainty as to whether or not Premarin, Wyeth's product, in
12 combination with Provera, Upjohn's product, causes breast
13 cancer?
14 A.  Yes.
15 Q.  And what is your opinion?
16 A.  It does.
17 Q.  Does that causality increase over a duration of years?
18 A.  The risk of breast cancer increases the longer a woman
19 takes the product.
20 Q.  Does the combination of Premarin and Provera and also
21 Prempro cause breast cancer?
22 A.  Yes, it does.
23 Q.  And does it cause all forms of hormone-positive breast
24 cancers?
25 A.  Probably so.  It causes the -- at least the types that we

Page 12

page 277

1 know most about, the more common types, ductal cancer, lobular
2 cancer, and tubular cancer.  There is a rare type, mucinous
3 cancer, which it may not.  Very rare type.
4 Q.  All right.  But when we're talking about causality, we're
5 talking about the combination, HRT, and I'm going to write
6 combo, and it is your opinion that it causes ductal cancer?
7 A.  Yes.
8 Q.  Lobular?
9 A.  Yes.
10 Q.  And tubular?
11 A.  Yes.
12 Q.  Now, in terms of the way that it causes cancer in the
13 breast, are you familiar with what's called the promotion
14 effect?
15 A.  I am.
16 Q.  And can you explain to the ladies and gentlemen on the jury
17 what the promotion effect is with regard to HRT.
18 A.  Well, the promotion effect is one part of the process of
19 becoming, developing a malignancy, developing a cancer.  The
20 first step is a change to the DNA, and that causes -- the DNA
21 carries with it -- it's almost like a blueprint of what that
22 cell is going to do, how it's going to operate, what products
23 it's supposed to make, and whether it's supposed to divide and
24 so on.
25     The genes that are in there are like a blueprint for

page 290

3 1    Q.  They also showed the jury a bar chart and suggested to the
4 2  jury that this is a very slight risk among the population.  If
5 3  that was based on the 1.24 number, is that a reliable number?
6 4  Is that a reliable graph?
7 5    A.  Again, it would be reflecting only the summary figure given
8 6  by -- given by the Women's Health Initiative.
9 7    Q.  And that summary figure, did it contain people who had
10 8  stopped using the drug and who had been noncompliant?
11 9    A.  It included all types of breast cancer, not broken down by
12 10  any specific type.  It included cases that -- all the cases that
13 11  happened in year one, year two, year three, year four, year
14 12  five, and until -- until they finished the project.  So it's an
15 13  average of all of those years.  And it includes those people who
16 14  were originally assigned their group, whether they stayed in
17 15  that group or not.
18 16    Q.  And what was the proportion, percentage-wise, of people who
19 17  failed to comply?
20 18    A.  It was about 38 or 40 percent.
21 19    Q.  40 percent.  Have doctors been able to look at the relative
22 20  risk numbers and compute in their own minds how many breast
23 21  cancers are potentially caused by HRT in a given year?
24 22    MS. MURRAY:  Objection, your Honor.
25 23    THE COURT:  On what ground?
26 24    MS. MURRAY:  Speculation and foundation for this
27 25  witness.

page 291

3 1    THE COURT:  Sustained on foundation.
4 2  BY MR. MORRIS:
5 3    Q.  Have you had an opportunity to review the Million Women
6 4  Study done by Dr. Beral?
7 5    A.  Yes.  I have.
8 6    Q.  Did Dr. Beral conduct an analysis of how many excess breast
9 7  cancers per year were being caused by HRT?
10 8    MR. HEARD:  Objection, your Honor.
11 9    THE COURT:  Just a minute.
12 10    On what ground?
13 11    MR. HEARD:  Your Honor's prior ruling.  Nathan Bedford
14 12  Forrest.
15 13    THE COURT:  Let's approach.
16 14    [Bench conference reported as follows:]
17 15    MR. HEARD:  Your Honor, this is exactly what you said
18 16  in your ruling this morning.  You ruled how evidence of excess
19 17  breast cancers through Dr. Colditz, now they're trying to put it
20 18  in through Dr. Austin.
21 19    MR. MORRIS:  It's my understanding that you ruled out
22 20  my ability to tell them the numbers, which I don't intend to
23 21  tell them.
24 22    THE COURT:  Objection sustained.
25 23    [Continuing in open court:]
26 24  BY MR. MORRIS:
27 25    Q.  In the FDA discussion with Wyeth concerning this issue of

page 292

3 1  whether or not HRT can cause breast cancer, there was a
4 2  suggestion made by one of the FDA officers that even a slight
5 3  change in relative risk that's seen in the studies has a
6 4  significant impact when you have a large cohort of people that
7 5  are exposed to the product.  Why is that so?
8 6    MR. HEARD:  Same objection, your Honor.
9 7    MR. WALKER:  May we approach on that, Judge?
10 8    THE COURT:  May we approach on that, please?
11 9    MR. WALKER:  May we approach on that, please?
12 10    THE COURT:  Yes.
13 11    [Bench conference reported as follows:]
14 12    MR. WALKER:  This is a different issue.  The Court's
15 13  order says that we can't talk about numbers, but we can talk
16 14  about relative risk and absolute risk.  Yesterday Wyeth
17 15  presented pie charts suggesting only 1/10 of 1 percent
18 16  difference in the overall population rates for breast cancer
19 17  caused by hormone therapy.  That's an absolute risk figure.  We
20 18  have the right to refute that.  They said that it's this tiny
21 19  fraction of women in the population who get hormone therapy-
22 20  related breast cancer.  We have to be able to rebut that.
23 21    MR. HEARD:  Your Honor, if I understood the question
24 22  correctly, he was asking the witness to convert the relative
25 23  risk into an absolute number.
26 24    MR. WALKER:  No, percentages.
27 25    MR. HEARD:  So this goes back to excess --

page 293

3 1    THE COURT:  The truth is, I didn't understand the
4 2  question.  I reread it and I still didn't understand it.  What
5 3  is it that you want to ask the witness?  Make it simple so I can
6 4  understand it.
7 5    MR. MORRIS:  Their argument is that relative risk can
8 6  be converted into absolute risk.  They did that with their pie
9 7  charts in opening statement.  I'm prohibited --
10 8    THE COURT:  What is the specific question you want to
11 9  ask?  Just ask me like I was Dr. Austin.
12 10    MR. MORRIS:  Why is it important to look at even minor
13 11  changes in relative risk when we consider the absolute risk to
14 12  the population?
15 13    MR. HEARD:  Your Honor --
16 14    THE COURT:  Objection overruled if that question is
17 15  asked.
18 16    MS. MURRAY:  As to, your Honor --
19 17    THE COURT:  What?
20 18    MS. MURRAY:  That question, as to his foundation, is
21 19  leading.
22 20    THE COURT:  Overruled.
23 21    [Continuing in open court:]
24 22  BY MR. MORRIS:
25 23    Q.  Dr. Austin?
26 24    A.  Yes.
27 25    Q.  Why is it important to look at even minor changes in

1 page 386

2

3 1  A.  Yes.

4 2  Q.  But as far as looking at cancer and the research into

5 3  cancer and potential risk factors and causes, that has evolved

6 4  with a lot of cancers, including breast cancer, over the past

7 5  30, 40 years?

8 6  A.  We have found new risk factors over the last 40 years, yes.

9 7  Q.  Doctor, I want to revisit a bit of your testimony

10 8  yesterday, if I could, sir.  Yesterday, I understood that you

11 9  were talking to the jury about interaction of different risk

12 10 factors for breast cancer --

13 11 A.  Yes.

14 12 Q.  -- at one point.

15 13 A.  Yes.

16 14 Q.  And you really focused in on family history and hormone

17 15 replacement therapy.

18 16 A.  Yes.

19 17 Q.  More specifically, combined hormone replacement therapy.

20 18 Correct?

21 19 A.  Yes.  Correct.

22 20 Q.  And Mr. Morris asked you some questions, and at one point

23 21 you seemed to indicate that the WHI said there was an

24 22 interaction between a family history risk factor and combined

25 23 hormone therapy risk factor.

26 24 A.  No, I don't believe I said that.

27 25 Q.  Okay.  You wouldn't want the jury or me to think that you

1 page 387

2

3 1  said that the WHI supported that premise?

4 2  A.  The WHI statement was that in their multiple logistic

5 3  regression analysis, that they did not find a statistical

6 4  interaction between the terms, that they were independent.

7 5  Q.  They were independent?

8 6  A.  Yes.

9 7  Q.  So there wasn't any interaction where those two risk

10 8  factors were combining to make matters worse.  Correct?

11 9  A.  No, that's not what it means.  It means --

12 10 Q.  They operate independent?

13 11 A.  They operated independently, yes.

14 12 Q.  And they did not find that hormone replacement therapy

15 13 modified the family history risk factor.  Correct?

16 14 A.  Modified, it did not.  But interaction --

17 15 Q.  And the same --

18 16     THE COURT:  One at a time.  One at a time, please.

19 17 I believe you're using the term "interaction" wrong.  When

20 18 two risk factors are entirely independent, that means that they

21 19 each have their own independent effect.  Like the length and the

22 20 width contributing to area, if you were trying to find the area

23 21 of a floor, both the length and the width contribute to it.

24 22 They're both independent measurements, and one of them doesn't

25 23 affect the other one.

26 24 Q.  All right.  One doesn't affect the other?

27 25 A.  One doesn't affect the other.

1 page 388

2

3 1  Q.  And you don't add them together?

4 2  A.  You don't add them together.

5 3  Q.  And one doesn't multiply the other?

6 4  A.  No.  They multiply together, yes.  That's "what

7 5  independent" means.  They have independent effects.

8 6  Q.  Independent effects?

9 7  A.  Yes.

10 8  Q.  And that's the same -- the evidence in the Million Women

11 9  study, that was the same finding they made, based on what they

12 10 looked at.

13 11 A.  Yes.

14 12 Q.  All right.  And that is consistent with Dr. Colditz's

15 13 writing on the subject.  Is that correct?

16 14 A.  I'm not familiar with all of his writing.  It may be

17 15 consistent with the more recent writings.

18 16 Q.  You haven't gone to look at it, at his testimony, or his

19 17 writings on that subject, have you?

20 18 A.  No.

21 19 Q.  And have you looked at any writings by Thomas A. Sellers

22 20 where they specifically studied the role of hormone replacement

23 21 therapy in the risks for breast cancer and total mortality in

24 22 women with a family history of breast cancer?

25 23 A.  I may have.  When was that published?

26 24 Q.  Let me see if I can put that up.

27 25     COURTROOM DEPUTY:  It should be there.

1 page 389

2

3 1  BY MS. MURRAY:

4 2  Q.  This, first of all, is the Annals of Internal Medicine a

5 3  publication you are familiar with?

6 4  A.  I'm familiar with it.  I don't look at it routinely.

7 5  Q.  You see this title.  Can you read that?

8 6  A.  Yes, I can.  "The Role of Hormone Replacement Therapy in

9 7  the Risk for Breast Cancer and Total Mortality in Women with a

10 8  Family History of Breast Cancer."

11 9  Q.  Just so we make sure you see and can confirm for me and the

12 10 jury, what is the date of publication?

13 11 A.  It's in 1997.

14 12 Q.  That is a peer-reviewed journal, isn't it?

15 13 A.  It is.

16 14 Q.  Thank you.  And let's look, if we can, first, at the

17 15 objective of their study.  It was a very focused study, was it

18 16 not?

19 17 A.  Yes.

20 18 Q.  And the focus of it was "To determine whether HRT is

21 19 associated with increased risks for breast cancer and total

22 20 mortality in women with a family history of breast cancer."  Is

23 21 that correct?

24 22 A.  That's what it says, yes.

25 23 Q.  And if we can move down to the "Results."  They found that

26 24 the rate of women who were currently using HRT -- and I believe

27 25 that means at least -- that says at least five years.

Page 149

page 414

MR. FARIES:  Yes.

BY MR. MORRIS:

Q.  I'd like to show you Plaintiff's Exhibit 288.  This is a
Wyeth document.  It's dated 1995.  And attached is the medical
officer's review for the Premarin MPA separate tablet
application.  And there's a lot of information in this, and
we're only going to go to two sections.

In discussing the PEPI study -- are you familiar with the
PEPI study?

A.  Yes, but I can't think of what PEPI stands for at the
moment.

Q.  All right.  Primary -- let's see.  I can't remember it
either, but we can find it in a minute.  In this document it
says that all women gained weight during the study without
regard to treatment group assignment.  Have you seen that in
other studies, that women on postmenopausal hormone therapy
tend to gain weight?

A.  If I have, I don't recall seeing it in other studies
besides this one.

THE COURT:  You need to wrap it up.

MR. MORRIS:  All right.  I have one last section in
here.

BY MR. MORRIS:

Q.  All right.  One last thing, this issue of cyclical versus
continuous, does the literature suggest that continuous

Page 150

page 415

administration, that means taking it every day, the
combination, both estrogen and progestin, causes breast
cancer?

MS. MURRAY:  Objection, Your Honor, leading and
foundation.

THE COURT:  Overruled to foundation.  It is an
objection to leading.

MR. MORRIS:  I asked him, does it?

THE COURT:  What?

BY MR. MORRIS:

Q.  Okay.  I can ask it a different way.  What does the
literature say about continuous hormone therapy and whether or
not it causes breast cancer?

A.  Yes, there are a number of studies that have separated
continuous versus cyclic administration of combined hormone
therapy.  I believe it's without exception that the continuous
shows a higher risk than the intermittent or cyclic.

Q.  And did many women take continuous HRT because they
preferred not to have a period every month or breakthrough
bleeding?

A.  Well, I don't know why they did, but, yes, it was much
more popular.

MR. MORRIS:  I believe those are all of the questions
I have, Your Honor.  Pass the witness.

THE COURT:  Is there recross?

MR. HEARD:  Yes, Your Honor, I think two questions.

Page 151

page 416

RECROSS-EXAMINATION

BY MR. HEARD:

Q.  Can you read this, Dr. Austin?

A.  No, it's not in my sight.  There.

Q.  Is that where you can see it?  Dr. Austin, I showed you

articles.  About six of them you took with you to lunch.  Did
any article that you read or were shown conclude that
menopausal women with menopausal symptoms have lower levels of
estrogen than women without symptoms?

A.  Not as it's written there.

Q.  Dr. Austin, is it fair for us to assume that the risk
factors for breast cancer published on the website of the
Oregon Health and Science University, the copyright of 2001 to
2007, is based on the best scientific evidence available as
the
university knows it at this time?

A.  I don't know that it is.  And, in fact, when I see that
smoking on there, I'm not sure that it is.  I was not one to
review that because I had given up my position as one of the
associate directors of the cancer center about that time.

Q.  Okay.  Thank you.

A.  So someone else is responsible for it.

Q.  Thank you.

THE COURT:  You may stand down.  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Wait a minute.  Jury questions?  All

Page 152

page 417

right.  You may stand down.  Thank you.

Next.

MR. MORRIS:  Plaintiff would next call Justin
Victoria.

THE COURT:  Come on up, if you will, raise your right
hand and be sworn, please.

JUSTIN VICTORIA, PLAINTIFF WITNESS, DULY SWORN

THE COURT:  I'll ask you to speak right into the
mike,
if you would, please, sir.

THE WITNESS:  Yes, sir.

DIRECT EXAMINATION

BY MR. MORRIS:

Q.  Good afternoon, Mr. Victoria.  How are you, sir?

A.  Well, thank you.

Q.  Where do you reside?

A.  My home is in a town called Mendham, New Jersey.

Q.  And how are you currently employed?

A.  I'm employed by Wyeth.

Q.  What do you do for Wyeth?

A.  I head the investor relations group for Wyeth.

Q.  When did you begin with Wyeth?

A.  I started with the Ayerst Laboratories division of Wyeth
back in 1984.

Q.  And when you were originally hired in 1984, what was your
position?

page 418

1    A.  I worked in the U.S. regulatory affairs department in
2    Ayerst Laboratories.  I believe the title was associate
3    director.
4    Q.  And did you work your way up in the regulatory affairs
5    division?
6    A.  I did.  I assumed the positions of increasing
7    responsibility over the years.
8    Q.  Regulatory affairs, what does that involve, if you can
9    explain to the jury?
10   A.  Sure.  Regulatory affairs is the department, the
11   individuals, who serve as the contact with -- principally with
12   FDA.  We bring the company's information, materials to FDA.  We
13   bring FDA's questions back to the experts within the company.
14   We serve as sort of the conduit, the communicator, between the
15   company and the regulatory agencies, principally FDA.
16   Q.  And how long did you remain in regulatory affairs before
17   you moved into investor relations?
18   A.  As I say, I started in regulatory affairs in 1984, and
19   stayed in that department until 1995.  And for two years, in
20   '95 and '96, I was assigned into a different area, the research
21   department.  And then starting in 1997, I came back to
22   regulatory affairs and was in that group up through 2000 when I
23   assumed my position in investor relations.
24   Q.  Now, does Wyeth manufacture the product called Premarin?
25   A.  Yes, we do.

page 419

1    Q.  And has Wyeth manufactured that product since 1942?
2    A.  Yes.
3    Q.  Does Wyeth manufacture the product called Prempro?
4    A.  Yes.
5    Q.  And has Wyeth manufactured that product since roughly
6    1995?
7    A.  Yes.
8    Q.  With regard to Wyeth as a pharmaceutical company, how many
9    employees does Wyeth have currently?
10   A.  My understanding is Wyeth on a worldwide basis has
11   approximately 50,000 employees.
12   Q.  And what was your level of compensation last year?
13       MR. URBANCZYK:  Objection, Your Honor.  You have had
14   prior rulings on that issue in the two prior trials.
15       THE COURT:  Let's approach.
16       (Bench conference reported as follows:)
17       THE COURT:  I understand you to say I ruled on this
18   before?
19       MR. URBANCZYK:  Yes, Your Honor.  You have
20   consistently prohibited questions about money.  You've allowed
21   them to ask about bonuses as a percentage of salary, about
22   stock options as a percentage of salary, but you have ruled
23   that they may not ask about dollars and salary.
24       THE COURT:  Well, I remember that I ruled.  I didn't
25   remember which way I had ruled.  How is this different from Mr.

page 420

1    Heard going over in some great detail the compensation to Dr.
2    Austin?
3        MR. URBANCZYK:  Dr. Austin was earning that
4    compensation as an expert witness in this litigation.  Mr.
5    Victoria is --
6        THE COURT:  What does this go to?
7        MR. WALKER:  For one thing, Judge, I believe Mr.
8    Urbanczyk -- I believe Mr. Urbanczyk will seek to elicit expert
9    testimony from this witness.  That may not be true, but I
10   suspect it will be.
11       THE COURT:  I mean, I understand how it goes to
12   credibility of a witness when they are getting paid, although
13   they all get paid a large amount.  I don't know how much -- how
14   effective it is, but I leave it up to the lawyers' judgment to
15   that, but someone's salary, an employee of the company, I would
16   see how that -- hard to go to his credibility how his
17   compensation will --
18       MR. WALKER:  If you make a lot of money, you're going
19   to be willing to say a lot of things just like an expert.  Just
20   like an expert, if you -- if your company is paying you a lot
21   of money and asking you to go to trials and to give testimony
22   on their behalf, that's an incentive for you to say something
23   that's going to help the company just the same as an
24   independent expert.
25       MR. URBANCZYK:  He's been subpoenaed here, Your Honor.

page 421

1    I didn't bring him here.  The plaintiffs did.
2        MR. WALKER:  He was on their witness list, too.
3        MR. URBANCZYK:  It doesn't matter the level of
4    salary.  The fact of the matter is he is an employee of the company.
5        THE COURT:  Since I ruled that way before, I'll take
6    your word for it, I'll be consistent because I do have a hard
7    time seeing how it's relevant.
8        (Proceedings continuing in open court as follows:)
9        THE COURT:  Remember, if that noise irritates you, be
10   irritated at me, not any of the parties or the lawyers.  It
11   kind of irritates me, as a matter of fact.
12   BY MR. MORRIS:
13   Q.  It's good to have those watch after you.
14       With regard to your employment, you've had an occasion to
15   testify before in cases involving HRT, correct?
16   A.  Yes, I have.
17   Q.  In fact, you testified last April or May in the Simon
18   case, correct?
19   A.  That case was where?  I'm sorry.
20   Q.  It was in Philadelphia.
21   A.  Yes.
22   Q.  Did you testify this fall in the Reno, Nevada, case?
23   A.  Yes, I did.
24   Q.  Did you testify last year in Philadelphia in the Nelson
25   and Daniel cases?

1 page 422

2 1    A.  At least one of them.

2    Q.  All right.  And did you have an occasion to testify in

3 3    either the Reeves or the Rush case that occurred here in Little

4 4    Rock?

5    A.  Yes, I did.

5 6    Q.  Both cases?

7    A.  Yes, sir.

6 8    Q.  All right.  And with regard to your testimony here today,

7 9    you're appearing as a corporate witness on behalf of Wyeth

8 and

9 10    you're here to answer some questions regarding the

10 corporation,

11 11    is that fair?

12 12    A.  I was asked to come by you.  My job is to answer the

13 13    questions to the best of my ability.

14 14    Q.  All right.  I just don't want to get into an area that

15 you

16 15    feel terribly uncomfortable with, so if we do, please let me

17 16    know.

18 17    A.  I will.

19 18    Q.  I want to talk to you a little bit about Wyeth's duties

20 as

21 19    a manufacturer of pharmaceutical products, if we can.  I want

22 20    to put this up here, and I'll try to back up this easel where

23 21    you can see it.

24 22    MR. URBANCZYK:  Your Honor, may we approach the bench

25 23    on this?

26 24    THE COURT:  Take it down -- bring that over with you,

27 25    if you will.

---

1 page 423

2 1    (Bench conference reported as follows:)

2    MR. URBANCZYK:  Your Honor, I have circled questions

3 3    which I believe have no relevance in this case because they

4 4    relate to marketing and fraud which are not in the case.  They

5 5    also relate to issues relating to cardiac and mental which are

6 6    not at issue in the case.  These are -- I don't have any

7 7    problem with any of the other ones --

8 8    MR. MORRIS:  I don't remember getting an objection to

9 9    this.  Did we get a written objection, Your Honor?  We

10 10    disclosed all of this, and they have a duty to file their

11 11    objections and let us know if they are going to object to --

12 we

13 12    haven't had a meet and confer regarding this.

14 13    MR. URBANCZYK:  You never -- you proffered a bunch of

15 14    slides.  I was -- you're not going to use all of these slides?

16 15    MR. WALKER:  Judge, one of the --

17 16    THE COURT:  I'm going to overrule the objection on

18 the

19 17    last two, no one ever approved for cardiac and never approved

20 18    for mental, but market, honesty, promotional materials --

21 19    MR. WALKER:  It is relevant to the Upjohn case as it

22 20    is to the Wyeth case.  Under Judge Jones' ruling, we are

23 21    allowed to present testimony from Dr. Parisian that Upjohn

24 22    marketed this product for use of hormone therapy with no

25 23    approval of the FDA, without studying.  He's allowed us to

26 24    introduce that testimony from Dr. Parisian.  If Wyeth's person

27 25    says this is a standard --

---

1 page 424

2 1    MR. MORRIS:  It's moot, Your Honor.  It's moot.  I

2    will use the other one.

3 3    MR. URBANCZYK:  I have no objection to this one.

4    THE COURT:  Wasted all of that energy.

4 5    MR. WALKER:  I'm sorry.

5 6    (Proceedings continuing in open court as follows:)

6 7    BY MR. MORRIS:

7 8    Q.  Mr. Victoria, I'd like to talk to you about some

8 different

9 9    duties that a manufacturer of pharmaceutical products may or

10 10    may not have, and ask you to tell the folks on the jury

11 whether

12 11    or not Wyeth will agree that they have these duties.

13 12    Does Wyeth agree to monitor and look for problems with

14 13    their pharmaceutical products after they are on the market?

15 14    A.  One of our obligations, one of our duties, once a product

16 15    is on the market -- in fact, it's per the regulations -- is to

17 16    continue to monitor available information and look for all

18 17    information, problems, positive and negative information about

19 18    the product.

20 19    Q.  Are you also supposed to review published articles that

21 20    may come out in peer-reviewed journals and so forth to

22 21    determine if they have any impact on your products?

23 22    A.  As part of that monitoring program, we are supposed to

24 23    review, and we do review published articles about our

25 products.

26 24    Q.  If one of these pieces of information, either monitoring,

27 25    looking for problems, or in a review of the published articles

---

1 page 425

2

3 1    you find that there is a problem being suggested about one of

4 2    your products, do you have a duty to follow up and find out

5 3    whether or not it's a valid concern, or an invalid concern?

6 4    A.  Well, as part of the monitoring, we need to evaluate the

7 5    information.  And the followup to that information is really

8 6    the determination of the medical experts.  What followup is

9 7    necessary can change from issue to issue.  But that is

10 8    really -- we do have to follow up, but that's really -- how to

11 9    follow up is the expertise in the medical department.

12 10    Q.  And when you find out information, whether it be

13 11    information about a new benefit, or information about a risk

14 12    that might be posed by the drug, is it your responsibility to

15 13    give fair and balanced information concerning that to the

16 14    medical community?

17 15    A.  Well, again, as part of the followup, one of the aspects

18 16    may be updating the labeling and providing fair and balanced

19 17    information about that issue.  But it very much depends upon

20 18    the issue and what is the appropriate course of followup.

21 19    Q.  You're familiar with the concept of fair balance, are you

22 20    not?

23 21    A.  Yes, sir.

24 22    Q.  And, in fact, in the FDA's regulations governing the

25 23    marketing of your products, the FDA has made it clear that you

26 24    have to have fair balance, correct?

27 25    A.  That's correct.

---

page 430

1   afternoon break.  We'll start back at 25 after by this clock on
2   the wall.  Don't talk about the case, anybody involved in it,
3   and consciously avoid starting to make up your mind.
4       Let the jury stand out.  Everyone else remain as you are.
5       (Jury exits the courtroom.)
6       THE COURT:  The jury is out.  We're in recess.
7       (Recess at 3:09 p.m.)
8       C E R T I F I C A T E
9       I, Judith A. Ammons, Official Court Reporter, do hereby
10  certify that the foregoing is a true and correct transcript of
11  proceedings in the above-entitled case.
12
13
14
15  _____  Date: February 6, 2008
16  Judith A. Ammons, RPR, CRR, CCR
17  United States Court Reporter
18
19
20
21
22
23
24
25

page 431

1   (Continuing at 3:28 p.m.)
2       THE COURT:  You may proceed.
3       MR. MORRIS:  Thank you, Your Honor.
4   BY MR. MORRIS
5   Q    Mr. Victoria, we established a moment ago that Wyeth
6   began manufacturing Premarin in 1942, correct?
7   A   Yes.
8   Q   And Premarin is made from the urine of pregnant mares,
9   right?
10  A   That's the source of the active ingredient, yes.
11  Q   When Wyeth had Premarin originally approved back in 1942,
12  did it have to go through any approval process through the FDA
13  during those years?
14  A   Yes.
15  Q   All right.  And did the manufacturer have to do clinical
16  studies to prove that it was safe to be used in humans back in
17  1942?
18  A   In 1942, manufacturers had to provide evidence of the
19  safety of the drug to FDA for FDA to approve the drug.
20  Q   I am being precise about my question though.  In 1942,
21  did Wyeth have to perform clinical trials in humans to
22  determine whether or not it was safe and effective?
23  A   I am not familiar with the precise standards.  I know
24  that the law required evidence to substantiate the safety of
25  the drug.  I don't know exactly what that entailed in 1942.

page 432

1   Q    Are you aware that in 1961 it went through what's called
2   the DESI approval?
3   A   Yes.  I am familiar with the DESI review process.
4   Q   And what was the DESI review process, just briefly for
5   the jury?
6   A   Sure.  The DESI process, again in 1942, and starting in
7   1938, drugs -- prescriptions were approved based on a showing
8   of safety.  In 1961, Congress said, Let's go back and look at
9   the efficacy of all drugs approved from 1938 to 1961, because
10  from that point forward drugs had to be shown as safe and
11  effective.  So they had to go back and recapture the efficacy
12  data in 1961.
13  Q   Are you familiar with any case control studies, cohort
14  studies, or RCTs that Wyeth performed between 1942 and 1961 to
15  study whether or not their drug was causing endometrial cancer?
16  A   I am familiar that Wyeth sponsored a number of case
17  control and cohort studies, but I don't recall the precise
18  endpoints.  Dr. Constantine will be here later and, I think, is
19  better equipped to answer questions about what studies had been
20  done when.
21  Q   All right.  Now, is it true that Premarin is approved for
22  use for menopausal symptoms and for prevention of osteoporosis?
23  A   Yes, that's true.
24  Q   So if the doctor was women that he would be prescribing it to

page 433

1   would be women generally over the age of 50?
2   A   I would agree with that general characterization, yes.
3   Q   In 1975, did Wyeth become aware that Dr. Ziel and Finkle
4   had determined that Premarin was associated with endometrial
5   cancer?
6   A   In 1975, the association of endometrial cancer with
7   estrogens became commonly known, yes.
8   Q   Now, following that, we -- let me look at one document
9   with you if we can.  I want to show you what has previously
10  been marked as Plaintiff's Exhibit No. 28.
11      MR. MORRIS:  It's been tendered to opposing counsel
12  for any objections.
13      MR. URBANCZYK:  No further objections.
14      MR. MORRIS:  Will it be admitted, Your Honor?
15      THE COURT:  I beg your pardon?
16      MR. MORRIS:  Will it be admitted, Exhibit No. 28?
17      MR. URBANCZYK:  No objections.
18      THE COURT:  Admitted.
19      (Plaintiff's Exhibit 28 received in evidence.)
20  BY MR. MORRIS
21  Q    This is Ayerst Laboratories' document dated June 14th,
22  1976, and it is to Drs. Givner and Deghenghi from Dr. M. Stern.
23  Have you seen this before?
24  A   Yes.  In preparation of today's testimony, I saw this
25  document.

1 page 434

2

3 1 Q And one of the questions that was being raised in this

4 2 document in 1976 was the role of estrogens and the etiology of

5 3 breast cancer, correct?

6 4 A Yes, that's correct.

7 5 Q And they say that in view of the widespread use of

8 6 estrogens, with or without progestin, there is valid concern as

9 7 to whether or not the use of exogenous estrogen leads to an

10 8 increase in the incidence of breast cancer, correct?

11 9 A That is the question that was being asked, yes.

12 10 Q On the second page of this, they said that one might

13 11 consider that the presence of both estrogen and progesterone

14 12 receptors in a tumor indicates that the tumor can and does

15 13 respond to estrogen; whereas, an E-plus PR-negative indicates

16 14 that the tumor, in spite of the presence of an estrogen

17 15 receptor, does not bring about estrogenic responses. Will you

18 16 agree with me that it looked like, during that time frame, that

19 17 they at least understood the presence of estrogen receptors in

20 18 the breast tissue?

21 19 A That seems to be the case of these scientists with those

22 20 animal models, yes.

23 21 Q And then they go on to state that there have been some

24 22 studies on estrogen breast cancer relationships, and all of

25 23 these show no significant increase in relative risk. These

26 24 studies on breast cancer were based on a relatively small

27 25 number of cases. Very recently, Weiss showed that there has

1 page 435

2

3 1 been a recent increase in the incidence of endometrial cancer

4 2 which parallels the rise in postmenopausal estrogen therapy.

5 3 And then they go down and say: Although estrogens may not

6 4 bring about breast cancer, they are capable of accelerating the

7 5 growth of previously established breast tumors.

8 6 Did I read that correctly?

9 7 A Yes, you did.

10 8 Q And then we looked a moment ago at Exhibit 1057, which is

11 9 the one where they noticed that many practicing gynecologists

12 10 are aware that the combination is being used together. So is

13 11 it fair for us to say that, in 1976, Wyeth was aware of the

14 12 potential relationship between estrogen and breast cancer?

15 13 A That was an area of interest, yes.

16 14 Q And in 1977, they were aware that the combination was

17 15 being used by practicing gynecologists, right?

18 16 A Again, that practice was really beginning at that point

19 17 in time, but yes, it was being used by at least some.

20 18 Q And then I showed the jury two studies that were

21 19 supported by grants from Wyeth, one in 1979 and one in 1982,

22 20 correct?

23 21 A Yes.

24 22 Q Now, when Wyeth gives a grant for a study, it's not a

25 23 restrictive grant, is it, in most cases?

26 24 A When we give a grant for a study, there is usually an

27 25 understanding of what the study is going to be and a general

1 page 436

2

3 1 design and the purpose and the objective. So it -- I would say

4 2 it is in a restrictive grant. There is some sense of, you

5 3 know, the grant, the moneys are being given to perform a

6 4 specific purpose.

7 5 Q And when Wyeth does that, does it have the ability to

8 6 review the manuscript before the manuscript is published?

9 7 A We may and we may not. That depends on a case-by-case

10 8 basis.

11 9 Q And certainly, since Wyeth is providing the money for the

12 10 study, even though it's being done outside Wyeth, it would be

13 11 perfectly appropriate for Wyeth to have some input about the

14 12 study and what the results are showing?

15 13 A Input about the design of the study. The results are the

16 14 results of the study. The results are incontrovertible.

17 15 Q Okay. Now, you will agree with me that between 1975 --

18 16 and I am out of paper. That's all right. Between 1975 and

19 17 1995 -- actually, December 30th of 1994 was when Prempro was

20 18 approved. Between that time, 1975 and 1995, the combination of

21 19 estrogen, Premarin, and Provera or some other progestin was not

22 20 approved by the FDA to be used in combination. You will agree

23 21 with that, won't you?

24 22 A There was no specific FDA approval of a combination

25 23 during that period of time.

26 24 Q So during those years from 1975 to 1995 when practicing

27 25 OB/GYNs or primary care physicians prescribed estrogen and

1 page 437

2

3 1 progestin, Premarin and Provera, together to their patients,

4 2 they were doing it in what we call an off-label fashion. Will

5 3 you agree with that?

6 4 A Yes.

7 5 Q Will you agree with me that if a drug company like Wyeth

8 6 knows that their product is customarily being used in

9 7 combination with another company's product, that they have a

10 8 duty to test that drug with the other drug to determine if

11 9 there is an interaction between the two? Can the combination

12 10 of the two harm a person? Will you agree with that?

13 11 A We have an obligation to consider that issue. Whether we

14 12 have a duty to test a specific combination depends on a lot of

15 13 different factors, the available information that is available

16 14 to consider that, what work may have gone on before.

17 15 Q And certainly, if that particular combination is

18 16 presenting a risk of harm in the public, that is something that

19 17 you would want to notify physicians about in your label,

20 18 correct?

21 19 A We -- again, to look at our obligations before -- we want

22 20 to make sure that the labeling is fair and balanced and covers

23 21 what risks that we think we can communicate to prescribers,

24 22 working in concert with FDA.

25 23 Q Now, I would like to show you the Premarin label from

26 24 1992. We can kind of read along. It says there that: Some

27 25 studies have suggested a possible increased incidence of breast

1 page 450

2

3 1 Q   All right.  He noted that since there is no approved

4 2 NDA -- and by NDA, he means new drug application?

5 3 A   Yes.

6 4 Q   Since there is no approved NDA for combination

7 5 Premarin/MPA therapy, that he could not approve a supplemental

8 6 packaging NDA and, thus, would be required to approve a full

9 7 NDA to allow for such a combination.  And he reminded me that

10 8 Wyeth-Ayerst had previously filed a paper NDA for a combination

11 9 Premarin/MPA therapy, which FDA ultimately denied due to lack

12 10 of published, adequate, and well-controlled clinical studies.

13 11        Did I read that correctly?

14 12 A   Yes, sir.

15 13 Q   So from 1977, when we can establish for sure Wyeth knew

16 14 that the combination was being used, to 1990, those 13 years,

17 15 there are no adequate studies that have been done on the

18 16 combination of estrogen and progestin to satisfy the FDA,

19 17 correct?

20 18 A   We had started studies, but they had not completed by

21 19 that time.

22 20 Q   You go on to state:  As I continue to explore other

23 21 options that Wyeth-Ayerst might propose to facilitate the

24 22 dispensing of combination E/P therapy in response to physician

25 23 prescriptions for such, as well as to improve patient

26 24 compliance, Mr. Hamilton very strongly admonished me that for

27 25 Wyeth-Ayerst to provide such packaging would represent

1 page 451

2

3 1 promotion of an unapproved combination and would clearly be

4 2 actionable by the FDA.  He also described the lack of a

5 3 resolution of the overall benefit/risk ratio of combination

6 4 estrogen/progestin therapy as had Dr. Sobel.

7 5        And then you state:  Clearly, without adequate clinical

8 6 data to address the benefit/risk ratio of combined

9 7 estrogen/progestin therapy, Dr. Sobel and his division will not

10 8 approve such combination.

11 9        Did I read that correctly?

12 10 A   Yes.

13 11 Q   Who was Nick Marmontello that you sent this to?

14 12 A   Mr. Marmontello was an individual in our commercial

15 13 organization.

16 14 Q   In your commercial organization.  So was he in the

17 15 marketing department?

18 16 A   Marketing or marketing services or something of that

19 17 nature.  I am not sure.

20 18 Q   This information concerning this important meeting with

21 19 the FDA, would that have trickled to other people at the top of

22 20 Wyeth, including people in the medical affairs department?

23 21 A   Perhaps.  I don't know.

24 22 Q   Because certainly you were aware, Mr. Victoria, in 1990,

25 23 that there were no adequate clinical studies on the combination

26 24 to either establish its dosage or to establish its risk/benefit

27 25 profile, and you knew that doctors out there were prescribing

1 page 452

2

3 1 it regularly.  And you knew, did you not, sir, that that was --

4 2 those were issues that needed to be resolved?  You knew that,

5 3 didn't you?

6 4 A   I knew that.  That's why we had the studies ongoing to

7 5 establish just that.

8 6 Q   And you knew that in 13 years of Wyeth's knowledge, they

9 7 had not been able to get that done, had they?

10 8 A   We were not done yet.

11 9 Q   Now, you can agree with me, can you not, that Wyeth never

12 10 conducted a human study that was specifically designed to look

13 11 at breast cancer risk of combination hormone therapy?  You can

14 12 admit that, can't you?

15 13 A   No.  I don't agree with that.

16 14 Q   All right.  Let me show you your testimony from

17 15 August 15th, '06.  You were asked the question:  Can you agree

18 16 that Wyeth never conducted a human study that was specifically

19 17 designed to look at the breast cancer risk of combination

20 18 hormone therapy?

21 19        And your answer was:  I am not familiar with any clinical

22 20 study that Wyeth did in which breast cancer was the only

23 21 specific prospectively designed endpoint.

24 22        That was your answer, correct?

25 23 A   That's correct.

26 24 Q   I would next like to show you what we will mark as

27 25 Plaintiff's Exhibit Number 102.

1 page 453

2

3 1        MR. URBANCZYK:  No objection.

4 2        THE COURT:  Admitted.

5 3        (Plaintiff's Exhibit 102 received in evidence.)

6 4 BY MR. MORRIS:

7 5 Q   This is internal correspondence from August 7th, 1992.

8 6 It's from Mark J. Mariani to Bea Blackman:  As per today's

9 7 telephone conversation, please find attached the Wyeth-Ayerst

10 8 minutes of a January 6, 1988, FDA meeting in which we informed

11 9 the FDA that the 82-028 Ayerst study would likely be

12 10 terminated, and these minutes were not submitted to the FDA.

13 11 So they do not -- cannot be considered as official

14 12 correspondence.

15 13        This correspondence in '92 is looking back at 1988

16 14 correspondence concerning the Prempak product, correct?

17 15 A   Yes, that's correct.  That was the subject of that

18 16 meeting.

19 17 Q   Okay.  And it says that the discussion closed with

20 18 Wyeth-Ayerst personnel noting that a review of the status of

21 19 the trial would be undertaken after which the study would

22 20 likely be terminated and analyzed for its support of a Prempak

23 21 NDA, correct?

24 22 A   Yes.  That's what it says.

25 23 Q   And this was a study that was stopped in the '80s because

26 24 you had difficulty with compliance, correct?

27 25 A   Yes.  This is when we began to focus on the new study.

Page 197

page 462

3 1  history there.
4 2  Q    And if we go back to this label from 1992, the Premarin
5 3  label, it doesn't tell doctors to be careful about prescribing
6 4  this to women with a history, family history of breast cancer,
7 5  does it?
8 6  A    I believe the label advises the physician to be sure that
9 7  they take a family history prior to prescribing.  It doesn't
10 8  give a precise warning about family history and breast cancer
11 9  risk, merely that they take such a history.
12 10  Q    But it doesn't tell them that there would be any reason
13 11  to consider the family history in combination with Premarin?
14 12  A    I don't know that that wasn't just a common medical
15 13  practice.  Labeling can't include all information about common
16 14  medical practice in the field.
17 15  Q    But nonetheless, it wouldn't have told them anything
18 16  about the relationship between family history and the
19 17  combination because the 1992 label doesn't even mention the
20 18  combination, correct?
21 19  A    The Premarin label in '92 does not refer to the
22 20  combination product, no.
23 21  Q    So we are up to 1993, and at this point you are working
24 22  on approval of the Prempro NDA, correct?
25 23  A    Yes.  The Prempro NDA had already been completed, the
26 24  study submitted, and --
27 25         MR. MORRIS:  I would like to propose 288.

Page 198

page 463

3 1         MR. URBANCZYK:  No objection.
4 2         THE COURT:  Admitted.
5 3     (Plaintiff's Exhibit 288 received in evidence.)
6 4  BY MR. MORRIS:
7 5  Q    I want to show you what is internal correspondence from
8 6  U.S. Regulatory Affairs, Wyeth-Ayerst, February 16th, 1995,
9 7  Premarin/MPA.  And it says:  Attached is the medical officer's
10 8  review for the Premarin/MPA separate tablets NDA.  This review,
11 9  which was prepared by Linda Golden, is a comprehensive
12 10  evaluation of the contents of the NDA.
13 11     Did I read that correctly?
14 12  A    Yes, sir.
15 13  Q    All right.  And in fact, you were copied on this
16 14  document, weren't you?
17 15  A    Yes, sir.
18 16  Q    I want to go through some sections with you.  Just for
19 17  the record, Prempro was the combination of Premarin and
20 18  medroxyprogesterone acetate, correct?
21 19  A    Yes.  That's what Prempro is.
22 20  Q    And in fact, Wyeth Pharmaceuticals made their own MPA, a
23 21  drug called Cycrin, correct?
24 22  A    That's correct.
25 23  Q    So Wyeth had in-house already their own MPA in
26 24  production, so it was no big deal to add two of their products
27 25  together?

Page 199

page 464

3 1  A    It was a big deal.  That's why we had to show to the FDA.
4 2  Q    You didn't have to go out and create your new MPA
5 3  manufacturing facility?
6 4  A    No.
7 5  Q    All right.  And in this review, she reviewed just about
8 6  everything that there is to know out there at that time in 1995
9 7  about the combination; is that fair?
10 8  A    Yes.  That was her goal.
11 9  Q    And she says that since the mid 1970s, observational data
12 10  have consistently documented a direct relationship between
13 11  unopposed ERT and increased risk of endometrial cancer with the
14 12  strength of association dependent upon dosage and duration.
15 13  And she cites Dr. Ziel, and we have talked about him before.
16 14  And I think Dr. Finkle is mentioned also.  And then she says:
17 15  Meanwhile, emerging reports in the '80s suggested a direct
18 16  relationship between ERT and increased risk of breast cancer.
19 17     Now, while she says the '80s, she cites a couple of
20 18  reports.  One is from 1976, Dr. Hoover's report that we have
21 19  already talked about, and then Dr. Brinton's.
22 20     It says:  Meta-analysis of these observational findings
23 21  failed to settle the controversy over the question.  And she
24 22  cites a number of articles, including Dupont and Colditz,
25 23  correct?
26 24  A    Yes.
27 25  Q    She then goes on to discuss the protective effect of HRT.

Page 200

page 465

3 1  And then she gets down, and she says:  Breast cancer is a major
4 2  public health problem in the United States.  The average
5 3  American women currently faces approximately one in ten total
6 4  lifetime risk of developing breast cancer with the vast
7 5  majority of cases occurring after menopause.  Thus, in the
8 6  postmenopausal population, even small increments in the
9 7  relative risk of breast cancer have great public health
10 8  significance.
11 9     And when she goes down, she says:  As such, the true
12 10  effect of HRT on breast cancer incidence and mortality must be
13 11  considered the single most important safety issue concerning
14 12  this class of drugs.
15 13     Did I read that correctly?
16 14  A    Yes, you did.
17 15  Q    Then she says:  Although recent observational data
18 16  strongly suggest that ERT reduces cardiovascular morbidity and
19 17  mortality, obvious selection bias permeates this literature
20 18  with treated women consistently slimmer, healthier, and less
21 19  likely to have diabetes mellitus than untreated women.
22 20  Although the WHI RCT is adequately designed to definitively
23 21  answer the ERT/HRT cardiovascular question, it is doubtful that
24 22  even WHI RCT has sufficient statistical power to clearly define
25 23  the relationship between HRT and breast cancer.
26 24     Did I read that correctly?
27 25  A    Yes, sir.

Page 201

page 466

3  1   Q    So knowing that, in 1995, that not even WHI may resolve
4  2   the issue of combination therapy and breast cancer -- nothing
5  3   else is occurring at that point in 1995.  You will agree with
6  4   me that Wyeth did not have any case control study underway
7  5   looking at the issue of combination in breast cancer, did they?
8  6   A    That was an obligation post-NDA, but we did not have a
9  7   specific study underway at that time.
10  8  Q    Wyeth did not have any cohort study underway in 1995 to
11  9  answer that issue?
12  10  A    Not that I am aware of.
13  11  Q    Wyeth did not have any RCT underway in 1995 to answer
14  12  that issue?
15  13  A    The WHI was underway to address that issue.
16  14  Q    But I am correct in reading -- what she says about WHI is
17  15  we're not even sure that that's going to have the statistical
18  16  power to find breast cancer.
19  17  A    She did not know if that study would be sufficient to
20  18  answer the question of the small risk to be able to detect that
21  19  and analyze it and quantify it precisely.
22  20  Q    So here we are, 18 years since 1977.
23  21       MR. URBANCZYK:  Your Honor, may we approach?
24  22       (Bench conference reported as follows:)
25  23       MR. URBANCZYK:  I am objecting to Mr. Morris writing
26  24  up on the board what is his testimony, not what is
27  25  Mr. Victoria's testimony.  Mr. Victoria did not say there were

Page 202

page 467

3  1   no studies.  They had already done the Prempro pivotal trial.
4  2        THE COURT:  Are you objecting to leading through
5  3   writing?
6  4        MR. URBANCZYK:  Yes.  And I am objecting to him
7  5   writing down his testimony and not Mr. Victoria's.
8  6        MR. MORRIS:  I can certainly summarize what I
9  7   believe the evidence to be on a board, show it to the jury.
10  8  It's not evidence.  It's not going back there, and they can
11  9  accept it and give it what weight they wish.
12  10       THE COURT:  I will have to take it off your closing
13  11  argument time.  I don't believe that you can put your position
14  12  up there anymore than you can ask him a leading question
15  13  orally.  So I believe it has to be something that he has said
16  14  or something that Wyeth has asserted, not just your
17  15  interpretation to ask him if he agrees with it.  If it's
18  16  leading --
19  17       MR. MORRIS:  I am on cross-examination.  This is
20  18  cross-examination.  This is Wyeth's corporate rep.  I am
21  19  allowed to do whatever I want with this witness.
22  20       THE COURT:  Well, not anything.
23  21       Overruled.
24  22       (Return to open court.)
25  23       THE COURT:  Let's take a stretch, if you want to.
26  24  We have 20 to 25 minutes to go.  You don't have to stretch if
27  25  you don't want to, but I want to.

Page 203

page 468

3  1        Did any of the jurors who live around Pope County get hit
4  2   by the tornado last night?  My daughter teaches emergency --
5  3   federal emergency relief at Tech, and she was out all night
6  4   with her students down around Adkins.
7  5   BY MR. MORRIS
8  6   Q    I want to go through some of the things in the NDA
9  7   because they do discuss things that Wyeth had been doing that
10  8  were unrelated to the breast cancer issue.  First of all, the
11  9  IND.  It says IND right here, and they start with the
12  10  discussion about the PEPI trial, correct?
13  11  A    Yes.
14  12  Q    Now, PEPI was a three-year study, right?
15  13  A    Yes, that's correct.
16  14  Q    And it was not a breast cancer study, was it?
17  15  A    I believe the PEPI study monitored for the risk of breast
18  16  cancer, but as we talked before, it was not a prospectively
19  17  designed study to look solely at breast cancer.  I think you
20  18  yourself had indicated such a study would be unethical.
21  19  Q    And on page 9, when they're discussing PEPI, all women
22  20  who are in PEPI gained weight, correct?
23  21  A    That's what it says, yes.
24  22  Q    And what we know about these hormone products, Premarin
25  23  and Prempro, is that they can cause either weight gain or
26  24  weight loss.  That's in the label, correct?
27  25  A    Yes.  I believe so.

Page 204

page 469

3  1   Q    Then they talk about the Women's Health Initiative
4  2   report, and going down on page 9, they talk about HERS.  And
5  3   HERS was a study that Wyeth did to look at secondary coronary
6  4   issues to see if the drug would benefit women who had had a
7  5   previous heart problem, correct?
8  6   A    That's correct.
9  7   Q    And the study did not find any benefit to these women
10  8  with the use of these drugs, correct?
11  9  A    Yes.  It did not show a benefit of additional coronary
12  10  protection in women with a previous heart attack.
13  11  Q    And then Wyeth did what is called the Prempro pivotal
14  12  trial, correct?
15  13  A    Yes, that's correct.
16  14  Q    And the duration of the Prempro pivotal trial was one
17  15  year, correct?
18  16  A    Yes.  All subjects in the trial were to be treated for
19  17  one year.
20  18  Q    So the Prempro pivotal trial was not a breast cancer
21  19  trial either, was it?
22  20  A    Again, the Prempro pivotal trial did monitor for breast
23  21  cancer risk, but it was not prospectively designed to answer
24  22  that specific question.
25  23  Q    Now, in her relevant background information, she says, in
26  24  1978, Ayerst submitted a labeling supplement for the
27  25  concomitant of Premarin and MPA tablets based on literature

page 474

1 disease.
2     Are you familiar with relative risks?
3 A   To some degree.
4 Q   When an epidemiologist looks at relative risk, you will
5 agree with me that baseline is 1.0, correct?
6 A   It's usually an untreated population that they say has a
7 risk of 1.0 or the risk of the group walking around.
8 Q   And if we go higher than 1.0 in this direction, say to
9 2.0, that's risk, and if we went from 1.0 to zero, that would
10 be benefit, correct?
11 A   Usually, it depends upon the factor you are looking at.
12 If you are looking at a risk factor, then the higher the
13 number, the more the risk; the lower the number, the less of
14 the risk.
15 Q   And so the available data that we had at that point,
16 according to this report, on the benefit that this would do to
17 the heart was between 20 and 50 percent, which if we reflected
18 it in one of these numbers would be .8 to .5. Will you agree
19 with that?
20 A   On coronary disease, yes.
21 Q   And the opposite of .8, in terms of risk, would be 1.2,
22 correct?
23 A   In terms of relative risk, yes.
24 Q   A lot of time and effort was spent on the HERS study
25 looking at coronary benefit, wasn't it?

page 475

1 A   Yes, certainly.
2 Q   HERS II, there was a second HERS study, correct?
3 A   There was a follow-up to the first study to follow the
4 patients being treated in the first study.
5 Q   A lot of time and effort was spent on HERS II?
6 A   Yes, certainly.
7 Q   And WHI was also looking at cardiac benefit, right?
8 A   That was one of the aspects of that study, yes.
9 Q   A lot of money was spent on WHI, correct?
10 A   Yes.
11 Q   A lot of time and effort?
12 A   Yes, sir.
13 Q   Because if you can prove that benefit, if you can prove
14 it's helpful to women in terms of their heart, you have got a
15 whole new group of customers, don't you?
16 A   If we had a product that helped women in terms of heart
17 disease, that would be an important benefit.  Yes, more
18 customers, with an important benefit to women.
19 Q   Now, they talk about the trial and it says:  These small,
20 ancillary, double-blind, randomized prospective trials were
21 conducted by Ayerst Laboratories in the early '80s.  Their
22 objective was to demonstrate the safety and efficacy of
23 concomitant MPA in reducing the incidence of endometrial
24 hyperplasia associated with unopposed Premarin treatment.
25 Since insufficient data were obtained to reach any conclusions

page 476

1 regarding efficacy of the studied regimens, the efficacy data
2 were not evaluated.  Then they go down, and they talk about how
3 many people were involved and so forth in those studies.
4     Were you aware at that time that Upjohn was also doing
5 studies trying to establish that their MPA helped guard against
6 endometrial hyperplasia?
7 A   Me personally?  No, I was not.
8 Q   And you are not aware of any coordination between the two
9 companies?
10 A   I am not, no.
11 Q   All right.  Now, on the breast cancer warnings, you will
12 agree with me that Wyeth drafted the labeling, submitted it to
13 the FDA, FDA recommended some changes, Wyeth wrote back and
14 either agreed with some changes or disagreed, and that was how
15 the label came to be for Prempro, through a collaborative
16 effort between Wyeth and the FDA.  You will agree with that,
17 won't you?
18 A   Not completely.  Again, the labeling first submitted was
19 based upon FDA's labeling recommendations for products.  So it
20 was not like Wyeth created the labeling out of whole cloth.  We
21 started with essentially FDA's recommendations, and then we did
22 have an exchange to finalize the labeling for Prempro.
23 Q   Well, let's read.  It says:  Warnings.  Induction of
24 malignant neoplasms.  Breast cancer section should be modified
25 to read, first paragraph, first sentence:  Some studies have

page 477

1 reported a moderately increased risk of breast cancer, relative
2 risks of 1.3 to 2.0 in those women on estrogen replacement
3 therapy taking higher doses or those taking lower doses for
4 prolonged periods of time.
5     First paragraph, second sentence:  The majority of
6 studies, however, have not shown this association in women who
7 have ever used estrogen replacement therapy.
8     Third paragraph -- or second paragraph, first sentence:
9 The effect of added progestins on the risk of breast cancer is
10 unknown; although, a moderately increased risk in those taking
11 combination estrogen/progestin therapy has been reported.
12     Now, this is the first time in the Prempro label that the
13 progestin -- the addition of a progestin is mentioned, correct?
14 A   I -- again, I would have to review the label.  I know
15 that the -- in the very beginning of the warning section, the
16 labeling indicates that everything in the labeling pertains to
17 the combination product.  So I think there were earlier
18 references to the combination therapy.
19 Q   Then it says:  Second paragraph, second sentence should
20 be added describing the NDA findings.  In a one-year clinical
21 trial of Prempro, Premphase, and Premarin alone, five new cases
22 of breast cancer developed among 1377 women receiving the
23 combination treatments while no new cases developed among 347
24 women receiving Premarin alone.  And it then says:  The
25 sponsor's 12/29/94 response proposing alternate text "were

Page 213

page 478

3 1  detected" instead of "developed" and an additional sentence,
4 2  the overall incidence of breast cancer in this clinical trial
5 3  does not exceed that expected in the general population are
6 4  acceptable.
7 5      So Wyeth was the one that proposed that particular
8 6  language, correct?
9 7  A   Yes. We proposed the FDA to include that language, and
10 8  they agreed with that.
11 9  Q   And "were detected" is different than "developed" for a
12 10  doctor. When a doctor is reading that, "were detected" means
13 11  to him, okay, they were detected. "Developed" might mean that
14 12  they occurred as a result of what was being taken. Will you
15 13  agree with that?
16 14  A   Perhaps, yes.
17 15  Q   And, in fact, this is the Prempro warning label, and it
18 16  does say "were detected," correct?
19 17  A   Yes. That's what the FDA agreed would be done.
20 18  Q   And it agreed. It does say what Wyeth wanted it to say
21 19  at the end, which is the overall incidence of breast cancer in
22 20  this clinical trial does not exceed that expected in the
23 21  general population, correct?
24 22  A   That's correct.
25 23  Q   So a doctor could read that and say, Well, if the risk
26 24  isn't any higher than that in the general population, there is
27 25  no relationship between this product and breast cancer. That

Page 214

page 479

3 1  would be a fair assessment, wouldn't it?
4 2  A   That could be an assessment. The information was there
5 3  for he or she to evaluate.
6 4  Q   And if he made that assessment and a patient came in to
7 5  see him and he had to counsel her about the risks and benefits
8 6  of this product after reading that warning label and that
9 7  information, it would be fair for him to either not mention it
10 8  at all or to tell her, I don't think there is really a breast
11 9  cancer risk. That would be reasonable, wouldn't it?
12 10  A   I think the label provided a great deal of information
13 11  about the breast cancer risk, and I don't know that that would
14 12  necessarily be an appropriate interpretation of all the
15 13  information in the labeling.
16 14  Q   You will agree with me that that particular label is not
17 15  a black box label, is it?
18 16  A   The Prempro labeling does not have a black box warning,
19 17  did not have a black box warning at that time.
20 18  Q   For breast cancer?
21 19  A   That's correct.
22 20  Q   It does have a black box warning for endometrial cancer,
23 21  correct?
24 22  A   Initially, yes.
25 23  Q   And what the black box told doctors was this product,
26 24  Premarin, can cause endometrial cancer. Be careful how you
27 25  prescribe it. Make sure you prescribe it in combination with a

Page 215

page 480

3 1  progestin -- in the Premarin label, correct?
4 2  A   I think that's the general characterization of it, yes.
5 3  Q   Now, it says: It is essential that the Phase IV study be
6 4  designed with adequate statistical power and -- I am jumping
7 5  ahead. In the approval of Prempro, the recommendations were
8 6  that this new drug application is recommended for approval
9 7  under the following conditions: The sponsor will conduct a
10 8  comprehensive Phase IV investigation of breast cancer risk in
11 9  users and nonusers of the NDA regimens. The most feasible
12 10  approach appears to be a large-scale case control study in
13 11  areas of the U.S. where the NDA regimens are used extensively.
14 12      Did I read that correctly?
15 13  A   Yes, sir.
16 14      THE COURT: All right. We are going to take our
17 15  evening recess. Ladies and gentlemen, I am going to let you go
18 16  in just a minute. I want you to drive home carefully, get a
19 17  good supper, and a good night's sleep, get up, and get a good
20 18  breakfast, and drive back safely, and we will start at 8:45
21 19  with the jury.
22 20      Now, don't talk about the case or anybody involved in it,
23 21  and consciously avoid making up your mind. So don't let your
24 22  ears -- your ears, your eyes, or your mouth touch on this case
25 23  until 8:45 in the morning.
26 24      Let the jury stand out. Everyone else remain seated.
27 25      (Jury exits the courtroom.)

Page 216

page 481

3 1      THE COURT: The jury is out. I will meet with the
4 2  lawyers at 8:15 in the morning, assuming I am not feverishly
5 3  working on an order backstage.
6 4      MR. GOODELL: Your Honor, may I mention something to
7 5  you?
8 6      THE COURT: Surely.
9 7      MR. GOODELL: Mr. Morris and I are going to have a
10 8  meet and confer now on the demonstrative slides and things that
11 9  he is going to use or has given to us for Dr. Parisian, as well
12 10  as exhibits. Assuming we are not able to work out everything,
13 11  which I anticipate we will not, we are going to need a little
14 12  bit of time to talk about that with you in the morning.
15 13      THE COURT: How about giving me a brief brief
16 14  tonight on what you can't agree on because I am going to meet
17 15  with my lawyer before 8:15, and I will have it in mind if you
18 16  have time to do that.
19 17      MR. GOODELL: We will make time to do that, Your
20 18  Honor. When do you need that over here? We are going to meet
21 19  now.
22 20      THE COURT: You-all need to meet also on time right
23 21  now.
24 22      MR. GOODELL: I'm sorry?
25 23      THE COURT: On time limits and how much time you
26 24  think we have. We need to do that before you leave the
27 25  courtroom.

# EXHIBIT 22A

Page 1352

```
 1  Code: 4185
 2
 3
 4
 5
 6     IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
 7           IN AND FOR THE COUNTY OF WASHOE
 8       BEFORE THE HONORABLE ROBERT H. PERRY, DISTRICT JUDGE
 9                 -oOo-
10   ARLENE ROWATT, PAMELA FORRESTER, and
     JERALDINE SCOFIELD,
11
           Plaintiffs,      Case No. CV04-01699
12
         vs.          Dept. No. 9
13
     WYETH,
14
           Defendant.      /
15
16       VOLUME VI, PAGES 1352 THROUGH 1660
17         TRANSCRIPT OF PROCEEDINGS
18            JURY TRIAL
19       Monday, September 17, 2007
20           RENO, NEVADA
21
22  Reported By: CECILIA VOHL, NV CCR #246, RPR, CRR, CCP
         JANET MENGES, NV CCR #206
23      DIANNE M. BRUMLEY, NV CCR #205
24
```

Page 1353

```
 1        A P P E A R A N C E S
 2  For the Plaintiffs:
 3              And
     LITTLEPAGE BOOTH         WHITE, MEANY & WETHERALL LLP
 4  BY: RAINEY C. BOOTH,     BY: PETER WETHERALL, ESQ.
     And ZOE LITTLEPAGE, ESQUIRE   3185 Lakeside Drive
 5  327 E. Romana Street      Reno, Nevada 89509
     Pensacola, FL 32502
 6
              ~*~
 7
     For the Defendant
 8  Wyeth Pharmaceuticals,
     Inc.:
 9              And
     LEWIS AND ROCA, LLP      WILLIAMS & CONNOLLY LLP
10  BY: LEIF REID, ESQUIRE    BY: HEIDI K. HUBBARD, ESQUIRE
     And NATHAN HOFFMAN, ESQUIRE   And MATTHEW V. JOHNSON,
11  5355 Kietzke lane       ESQUIRE 725 Twelfth Street,
     Suite 200          N.W.
12  Reno, NV 89511         Washington, D.C. 20005
13  And             And
14  WINSTON & STRAWN LLP      WILSON, SMITH, COCHRAN,
     BY: DAN K. WEBB, ESQUIRE    DICKERSON
15  And ERIK W. SNAPP, ESQUIRE   A Professional Corporation
     35 West Wacker Drive     BY: KATHY A. COCHRAN, ESQUIRE
16  Chicago, IL 60601       And JOHN SILK, ESQUIRE
                  1700 The Financial Center
17                1215 Fourth Avenue
                  Seattle, WA 98161-1007
18
19
            -oOo-
20
21
22
23
24
```

Page 1354

```
 1            I N D E X
 2  WITNESSES FOR THE PLAINTIFF        PAGE
 3  ROBERT JONES (Continued)
     Cross-Examination (resumed) by Mr. Reid   1384
 4  Redirect Examination by Ms. Littlepage   1441
     Recross-Examination by Mr. Reid      1481
 5  Further Redirect Examination by Ms. Littlepage  1494
 6  MARION CATHERINE REYNOLDS
     Direct Examination by Mr. Booth      1502
 7  Cross-Examination by Ms. Hubbard     1521
     Redirect Examination by Mr. Booth     1544
 8  Recross-Examination by Ms. Hubbard    1546
 9  MARSDEN RONALD AVERY, JR.
     Direct Examination by Ms. Littlepage    1548
10  Cross-Examination by Ms. Cochran     1578
     Redirect Examination by Ms. Littlepage   1611
11
     CHERYL BLUME
12  Direct Examination by Ms. Littlepage    1613
13        E X H I B I T S
14
     DESIGNATION          MARKED ADMITTED
15
     Plaintiffs' Exhibit ML 19      1454  1455
16
     Plaintiffs' Exhibit ML 29      1456  1456
17
     Plaintiffs' Exhibit ML 30      1452  1453
18
     Plaintiffs' Exhibit 8029      1442   -
19
     Plaintiffs' Exhibit 9000A       -   1554
20
     Plaintiffs' Exhibit 9002C       -   1509
21
     Plaintiffs' Exhibit 9091A       -   1475
22
     Plaintiffs' Exhibit 9093       -   1471
23
     Plaintiffs' Exhibit 9093A       -   1473
24
```

Page 1355

```
 1
       E X H I B I T S (CONTINUED)
 2
     DESIGNATION          MARKED ADMITTED
 3
     Defendant's Exhibit 260       -   1431
 4
     Defendant's Exhibit 1301      1396  1396
 5
     Defendant's Exhibit 1585      1400  1401
 6
     Defendant's Exhibit 1793      1402  1403
 7
     Defendant's Exhibit 7736      1397  1398
 8
     Defendant's Exhibit Unknown     1403  1404
 9
     Defendant's Exhibit 8122      1417  1418
10
     Defendant's Exhibit 8123      1418  1419
11
     Defendant's Exhibit 8124      1411  1412
12
     Defendant's Exhibit 8125      1419  1420
13
     Defendant's Exhibit 8127      1414  1415
14
     Defendant's Exhibit 8426       -   1540
15
16        -oOo-
17
18
19
20
21
22
23
24
```

Page 1612

1 was, yes, the benefits way outweighed the risk, but that wasn't
2 only with Bob Jones.
3     I could relate several CME articles that I went to
4 during 2000 and the reports came out that showed that this risk
5 outweighed the -- the benefits outweighed the risk.
6   Q.  And Wyeth's sales representative wasn't telling you
7 anything different than what you understood as the benefits and
8 the risks?
9   A.  He was just reinforcing what we already thought.
10   Q.  Thank you.  I have nothing else.
11   THE COURT:  Any re-cross?
12   MS. COCHRAN:  Nothing, your Honor.
13   THE COURT:  May this witness be excused?
14   MS. LITTLEPAGE:  He may.
15   THE COURT:  Dr. Avery, thank you for coming.  You're
16 excused.  Do you have another witness?
17   MS. COCHRAN:  Yes, Judge.  We call Dr. Cheryl Blume.
18   MR. WEBB:  May we approach briefly, your Honor, in
19 connection with this witness?  We don't need this on the
20 record.
21     (A discussion was held off the record.)
22       C H E R Y L   B L U M E,
23         having been duly sworn,
24       was examined and testified as follows:

Page 1613

1         DIRECT EXAMINATION
2 BY MS. LITTLEPAGE:
3   Q.  Dr. Blume, can you state your full name for the
4 record?
5   A.  Yes, Cheryl D. Blume, B-l-u-m-e.
6   Q.  And just to orient the jury, did you actually fly in
7 this afternoon from Tampa, Florida?
8   A.  I did.
9   Q.  And that's where you live?
10   A.  Yes.
11   Q.  And before we get into your qualifications, did you
12 used to work for the pharmaceutical industry, for a
13 pharmaceutical drug company?
14   A.  Yes.
15   Q.  For a number of years?
16   A.  Yes.
17   Q.  And were you an executive with a drug company for a
18 number of years?
19   A.  Yes.
20   Q.  And so are you here to talk to the jury as a drug
21 company insider about some of Wyeth's conduct and Wyeth's
22 documents?
23   A.  Yes.
24   Q.  Tell us your educational background.

Page 1614

1   A.  I received my bachelor's degree in biology, and then a
2 Ph.D. in pharmacology and toxicology from the Medical Center at
3 West Virginia University.
4   Q.  What is -- you said you got a Ph.D. in pharmacology.
5 What is the study of pharmacology?
6   A.  There's different types of pharmacology.  I focused
7 more on the study of design of new chemicals for possible use
8 as drug products and then the evaluation of those chemicals for
9 new studies, new indications primarily focused at the early
10 stages of development, and my research was looking at
11 receptors, receptor blockers for estrogen and progesterones.
12   Q.  Let me stop you there.  You said your research.  Were
13 you doing actual research in order to get your Ph.D.?
14   A.  Yes, I was in a clinical program where it was part a
15 research based program and part clinical studies.
16   Q.  So we talk about a Ph.D. in pharmacology, and is the
17 study of pharmacology basically how a drug works in the human
18 body?
19   A.  Yes.  It's the discovery, attempt to discover new
20 chemicals that makes it useful as drugs, and then if you think
21 you do have one that might be useful, it's the way you go about
22 studying it to see how it first reacts in animal models before
23 you're allowed to go into humans, and then if they look
24 successful and they look promising, then it's the study of

Page 1615

1 those chemicals in human beings for both effectiveness and for
2 safety.
3   Q.  Okay.  So does the field of pharmacology look to see
4 how drugs react in the human body both in terms of the risks
5 and the benefits of those products?
6   A.  Yes, in the design, the design of new drugs and their
7 risk and benefits, yes.
8   Q.  You told us that you were working on, I think you said
9 receptors to do with your thesis.  Tell us what that is.
10   A.  Right, I received a fellowship from NIH, and I don't
11 know if the jury has heard about that yet or not.
12   Q.  Please tell us.
13   A.  NIH stands for National Institutes of Health, and I
14 was given a scholarship for graduate school which is how I
15 really got to go to graduate school, and they were interested
16 at that time in looking at different chemicals that might prove
17 to be blocking agents to estrogens and progesterone, and to the
18 male sex hormones as well, testosterone, dehydrotestosterone,
19 so they were looking at various experimental models to see if
20 they could find a way to block the actions of those chemicals,
21 of those sex steroids in tissues that they thought they might
22 be able to block the actions and it would have a positive
23 clinical effect.
24   Q.  And did you actually work with estrogen and

1 progesterone receptors as a part of your thesis?

2    A.  Right, as well as the male sex hormone receptors.  We

3 were interested in looking at various blocking agents for a

4 variety of estrogens, progesterones and male sex hormones.

5    Q.  And when you -- what year did you finish your Ph.D.?

6    A.  1977.

7    Q.  And so after 1977, what did you do next?

8    A.  I immediately went into industry.

9    Q.  And industry being the drug industry?

10    A.  Yes, pharmaceutical industry.

11    Q.  And what was your first job in the drug industry?

12    A.  My very first position was in regulatory affairs.

13    Q.  And what company?

14    A.  At Mylan Laboratories.

15    Q.  Is Mylan Laboratories a drug company making drugs?

16    A.  Yes.

17    Q.  And when you said your first job was in regulatory,

18 what does that mean?  What is the regulatory department?

19    A.  The regulatory affairs, it's pretty much what it

20 sounds like.  It's the group at the company that interacts

21 between the company and with the various government agencies.

22 In my instance, it was primarily the Food and Drug

23 Administration and the Drug Enforcement Agency.

24    Q.  So as a regulatory -- as someone working in the

1 regulatory department of a drug company, did you receive

2 training about FDA regulations and what rules a drug company

3 should follow?

4    A.  Oh, yes, of course.

5    Q.  And what does a regulatory department do when it

6 interacts with the FDA?

7    A.  Well, it can take a variety of actions.  We develop

8 the applications if we want to ask permission to market a new

9 drug product.  We prepare the applications, the permission to

10 the agency.

11        We also submit applications if we want to start

12 setting a new chemical in human beings, so we have to prepare

13 those applications, meet with the agency, discuss what we know

14 about the studies, what we know about the chemical and get

15 their permission to first study it, and then if studies were

16 successful, then submit it for approval.

17        After approval, the job really keeps going long after

18 the product is approved.  You're tracking your product once it

19 gets into the marketplace for new safety information, and

20 you're continually interacting with the FDA on those

21 assignments, and as you acquire additional information for a

22 new product, you're changing your professional labeling.

23        I don't know if they've heard about inserts or product

24 labeling yet, but as you gather new information, you're always

1 modifying your labeling to reflect that new information.

2    Q.  Let me stop you and ask you a couple things about what

3 you said.  You said that FDA regulations, are there rules by

4 which a drug company has to live by, has to follow that are FDA

5 rules?

6    A.  Well, there's both government rules and government

7 guidance, yes.

8    Q.  And you said that after a drug is approved, the

9 regulatory department continues to track the product?

10    A.  Yes, you track a product after it's approved forever.

11    Q.  Looking at what?  Why are you tracking the product?

12    A.  Well, generally when a product is first approved, the

13 studies are fairly limited before a product is first launched.

14 Generally between 5000 and 7000 patients have been in trials

15 before a new drug product is launched, and up to a third or 40

16 percent of those may have been not on the drug, but on the

17 actual placebo, so it's not a very big data base, especially

18 for adverse events that may occur in one in 10,000.

19        So the real work for safety monitoring often begins

20 after the drug is marketed, because once it's marketed, that's

21 when you start seeing everything that you couldn't see in your

22 clinical trials.

23        Remember, in the clinical trials, things were fairly

24 tightly controlled and you know the patients that are in the

1 trials and they've been specially selected to be in those

2 trials.

3        Once it gets in the real world, patients take it who

4 shouldn't get the drug, patients take more than they should

5 take, or they take it if they have a problem liver, even if the

6 drug shouldn't be used if you have a problem liver, so once you

7 get in the real world is when you really begin to canvass the

8 true safety of your drug product.

9    Q.  So when you say you're tracking the product, are you

10 tracking the product for safety issues?

11    A.  Primarily, primarily.  Now, a company can also choose

12 to look for new uses of the product after it's approved.

13    Q.  And would that be something that you have experience

14 in, looking at new ways to use a product after it's approved?

15    A.  Yes.  Oftentimes once a product is in the field, you

16 see new areas in which you want to look and see if you might

17 inherent benefits that you hadn't looked at in your

18 initial trials.

19    Q.  Okay.  And about how many new drugs do you think --

20 well, we started off with regulatory.  Let me ask another

21 question.  Did you stay in the regulatory department throughout

22 your time with Mylan?

23    A.  I always was involved with regulatory affairs, but I

24 was promoted at various points in time where I had

Page 1620

1 responsibility for areas additional to regulatory affairs.

2     Q.   Let me ask you first, how long were you with Mylan?

3     A.   I was with Mylan Laboratories until 1995.

4     Q.   And tell us some of the other responsibilities or

5 departments that you worked with at Mylan.

6     A.   I think it was in 1980, I was promoted to technical

7 director and that was the first job that I had that allowed me

8 to interact both with regulatory affairs and in the new drug

9 development area.

10         In that capacity, I was designing studies for

11 potential new drugs, responsible for making sure the studies

12 were done, and then the most important part I guess was

13 evaluating those study data once they were generated.

14     Q.   So you said that with drug development, you were

15 designing studies.  What type of studies would you be talking

16 about, animal studies or human studies?

17     A.   We did -- we had to do some animal studies, but

18 primarily I'm discussing clinical trials.

19     Q.   So in your capacity here, are you getting training and

20 experience of how to design a study, how to look at a safety

21 issue and get an answer?

22     A.   Oh, yes, of course.

23     Q.   Any other -- looking at your time at Mylan, any other

24 area that you worked with in your time with Mylan?

Page 1621

1     A.   From technical director, I was named an officer of the

2 company, and in that capacity I had corporate responsibilities

3 as well as new product development and regulatory affairs

4 responsibilities.

5     Q.   And what does it mean to be an officer of the company,

6 like you're a vice-president, or --

7     A.   Yes, I was vice-president of scientific affairs.

8     Q.   And can you tell us some of your responsibilities as

9 vice-president of scientific affairs for this drug company?

10     A.   In addition to trying to get products approved and the

11 studies necessary to get them approved and interacting with the

12 agency, I was involved in issues with licensing of potential

13 new products, interacting with other companies on joint venture

14 projects in line of product development.

15         I interacted at some level -- we were a publicly held

16 company.  I did interact at some level at the Board of

17 Directors levels in explaining scientific affairs, what

18 projects we were looking forward to doing, providing status

19 reports at the Board of Directors meetings.

20     Q.   I have a question for you.  In the regulatory part,

21 you said you remained having some regulatory responsibility

22 throughout your time with Mylan?

23     A.   Yes.

24     Q.   Does the regulatory department also interact with the

Page 1622

1 FDA on marketing or advertising with interacting with

2 understanding the FDA rules on what a drug company can say when

3 they promote or advertise their drug?

4     A.   Yes.  When it comes to the marketing, there's really

5 two arms, the regulatory oversight of the materials, and then

6 the sales and promotions group that are doing the actual

7 marketing of the drug product.

8     Q.   Okay.  And when you left Mylan Labs in 1995, what did

9 you do next?

10     A.   I went to Somerset Pharmaceuticals which is a

11 subsidiary of Mylan.  It's half owned by Mylan and half owned

12 by another company.

13     Q.   And is Somerset a drug company?

14     A.   Yes.

15     Q.   How long did you stay with Somerset?

16     A.   1999.

17     Q.   And can you tell us a little bit about your

18 responsibilities and what you did at Somerset, the second drug

19 company?

20     A.   At Somerset, it was a little different.  I was chief

21 operations officer and executive vice-president and I was

22 responsible for operations, manufacturing facilities.  In

23 essence, I was responsible for everything but finance and

24 sales.

Page 1623

1     Q.   So at Somerset, you were one of the top, top heads of

2 that drug company?

3     A.   Yeah, I was a member of the Board of Directors.

4     Q.   And in this capacity as being one of the highest

5 officers of that drug company, did you have interaction with

6 regulatory people, marketing people, scientific affairs in this

7 drug company, Somerset?

8     A.   Yes.

9     Q.   And what happened in 1999?

10     A.   Well, I had decided in 1999 that I was going to

11 retire.

12     Q.   You were going to --

13     A.   I was going to retire.  I was done, yes.

14     Q.   And that didn't work out for you?

15     A.   Not for very long.

16     Q.   How long did you actually stay retired?

17     A.   I think it was about a year-and-a-half, almost two

18 years.

19     Q.   And then what happened?

20     A.   I was approached by two different groups.  One was a

21 foreign drug company who was beginning to do drug development

22 in the United States.  Most of their work had primarily to that

23 point been in Japan and west Europe, and the FDA had given them

24 my name because they needed help in interfacing with the FDA,

1 understanding United States rules and guidance and they came to

2 me and that was to be a fairly limited assignment to just try

3 to get them into the waters of the United States regulatory

4 world.

5     Q.  Did you come out of retirement?

6     A.  Yeah, they're still a client of ours, so yes.

7     Q.  So the first contact was a drug company came to you

8 and said FDA has given us your name, will you help us interact

9 with the FDA on our products we want to bring to the U.S.?

10        MR. WEBB:  Your Honor, I'm just going to object on the

11 leading.  I try not to object on leading, but I object -- it's

12 a leading question.  She's leading the witness throughout the

13 questioning.

14        THE COURT:  Try not to lead quite so much.  Like I've

15 said to both sides, I tend to allow leading questions when

16 we're not talking about issues that are issues that are central

17 to the case, but try not to ask it that way.

18 BY MS. LITTLEPAGE:

19     Q.  When you came out of retirement, what year was that?

20     A.  Actually -- yeah, I think it was around 2000.  I'd

21 have to check my C.V.  I think it was around 2000.

22     Q.  And at that point did you form a company?

23     A.  I did.  Once I realized that our relationship with the

24 Japanese company was going to be more long-term and would need

1 more than just my attention for their product development work,

2 I did start a company and hired a couple people to try to help

3 with that regulatory affairs work.

4     Q.  What was the name of the company?

5     A.  It's the current name as well, Pharmaceutical

6 Development Group.

7     Q.  And what was the purpose of this company when you

8 formed it?  What was your plan of what you were going to do at

9 this company?

10     A.  Well, it was formed initially with the idea of helping

11 foreign companies who were just starting in the United States

12 in a pattern similar to what we started with our very first

13 client, and we have done that.

14        We have worked with a significant number of foreign

15 companies, but over the years we've also worked with United

16 States -- or domestic companies for parts of their product

17 development program or giving them assistance in safety

18 surveillance for products already approved.

19     Q.  Okay.  So let me ask you, do you still do regulatory

20 stuff, interact with the FDA?

21     A.  Yes.  Oh, yes.

22     Q.  And this time on behalf of various drug companies?

23     A.  Yes.

24     Q.  Okay.  And are your clients now over the last seven

1 years both foreign and American drug companies?

2     A.  Yes.

3     Q.  What else -- I think you said studies.  Do you still

4 design studies or help them design studies?

5     A.  We do.  It takes a variety of forms.  For some

6 clients, we do it all.  We design the study, we submit their

7 applications for them to the agency, and essentially act as

8 their agent, their contact with the FDA.

9        For others, we may assist on one project and then come

10 back a year later and assist on another project.  It varies.

11     Q.  And for these companies, do you still, like you did

12 for Somerset and Mylan, have interactions about labeling and

13 how to warn --

14     A.  Oh, yes, yes.

15     Q.  And what about like marketing materials, would you

16 help these companies review their marketing materials and

17 give --

18     A.  From a regulatory perspective.  I don't design

19 marketing pieces.  Once the marketing group has designed them,

20 we will review them for compliance and for consistency with the

21 agencies actions relating to various marketing pieces, yes.

22     Q.  So basically looking to see if the marketing materials

23 followed the FDA rules?

24     A.  Yeah, of course, yes.

1     Q.  And from coming out of retirement, how big has this

2 corporation grown?  Is it still just you, or do you have other

3 employees?

4     A.  No.  I think we're at 12 right now, 12 scientists.

5     Q.  That you employ?

6     A.  Yes.

7     Q.  And give us an idea of what in a regular month you and

8 the other scientists that work for Pharmaceutical Development

9 Group might do?

10     A.  Well, last month we were working with a company who

11 has -- in fact, we submitted their new drug application form.

12 They have received an approvable letter.  We are helping them

13 do the final stages of work necessary to obtain their final

14 approval letter.

15        We are also working with a new company, a new foreign

16 company who is developing four products in parallel for the

17 U.S. marketplace, so we are working on all four of those IND's

18 at the initial stage.

19        An IND is your permission.  It's an application you

20 submit to the FDA as permission to study a new chemical.  We're

21 not allowed to just start studying new chemicals in human

22 beings.  We have to have permission, and that application is an

23 IND, so we worked on that last month.

24        We also did training for a company who was just

1 launching a product and they are new to safety surveillance and
2 adverse event monitoring, so we did their training program and
3 set up their standard operating procedures for them to begin
4 monitoring adverse event reports with their new drug.
5     Q.   Let me stop you there and go through a couple things.
6 IND, you said that was basically a company asking permission to
7 study the drug in humans?
8     A.   Right.  It stands for Investigational New Drug
9 exemption, because you have to actually receive permission or
10 an exemption from the law.  The law says a drug has to be
11 approved before -- or you have to have permission to study a
12 drug, and it's an exemption that the FDA says, okay, I've
13 reviewed your plan, you may go ahead and start studying the
14 drug.
15     Q.   Then you said NDA, what's an NDA?
16     A.   It stands for New Drug Application, and that's the big
17 application that you put together when your studies are done
18 and you ask FDA to review it and see if you've done enough work
19 to be allowed to start marketing the drug, actually selling the
20 drug.
21     Q.   So an NDA would be your request for approval to sell
22 the drug?
23     A.   Yes, to manufacture and sell.
24     Q.   And then I think you said that you've also got clients

1 where you work after they're approved following up on safety
2 issues, surveillance.  What's that?
3     A.   Right.  As I mentioned earlier, much of the safety
4 work really begins once a drug is approved and we talked about
5 that a little bit and we work with companies in setting up
6 systems to track adverse event reports as they receive them, or
7 for them to do studies or to investigate potential adverse
8 events and monitor them to see if they see any new signals or
9 any blips with new adverse events.
10     Q.   And an adverse event is what?
11     A.   An adverse -- when you take a drug product, you take
12 it for an intended benefit.  Sometimes they're called side
13 effects, but it's a side effect or a problem that you have when
14 you take a drug.
15     Q.   Okay.  And you talked about Pharmaceutical Development
16 Group working with drug companies.  Do you also, on a few
17 occasions, agree to testify in court as you have here?
18     A.   Yes, and we work with attorneys in different ways.  In
19 fact, that was our second client.  I said that two came in
20 almost immediately when I decided that I wasn't in retirement
21 any more, and one was an attorney firm who needed help with
22 regulatory consulting.
23         They were involved with a case.  It was fairly
24 detailed driven with the submissions and they needed help in

1 going through the records and developing a regulatory opinion.
2     Q.   And have you since 2000 worked with attorneys that
3 represent drug companies and attorneys that represent people
4 who are injured by drugs dealing with some of the regulatory
5 issues and explaining what was going on?
6     A.   Yes.  We work -- most of our work is in product
7 development with the drug companies, that end of it, but we do
8 work in a variety of ways with attorneys.
9         As I mentioned with the first group, we work to be
10 regulatory tutor, if you will, to assist -- go through the
11 files, go through the paperwork, explain to them, especially if
12 they aren't familiar with those types of documents.
13         We work with attorneys who may have two drug companies
14 who are mad at each other and they're fighting with each other
15 and we work with drug companies -- with an attorney's group who
16 may be representing one of those drug companies.
17         We work with law firms who are involved with
18 submitting patent applications for pharmaceutical products, and
19 then we work with attorneys who are involved when there has
20 been reports of patient harm.
21     Q.   Going back to before you formed Pharmaceutical
22 Development Group, when you were in the drug industry, did you
23 ever have an occasion to work actually with Wyeth on a joint
24 project?

1     A.   Yes.
2     Q.   And what was that project?
3     A.   Well, it was my very first new drug application.  A
4 subsidiary of Wyeth was going to be the marketing arm,
5 marketing and promotions arm of that drug product.
6         Mylan at that time was not equipped with a big enough
7 sales force.  It was -- the product competed with what is now
8 Glaxo, but at that time was Smith Kline which had a huge sales
9 force.
10     Q.   Let me stop and ask you a couple questions.  You said
11 that Mylan was going to make the drug?
12     A.   Yes, Mylan did the new drug application.  It was going
13 to manufacture the drug.
14     Q.   And what was Wyeth going to do?
15     A.   Wyeth was going to do the sales, marketing and
16 detailing, sales and promotion.
17     Q.   And would that mean using Wyeth's sales
18 representatives to go out to doctors and talk to doctors about
19 the drug?
20     A.   Yes.
21     Q.   And tell us a little bit about that drug and your
22 experience on that project.
23     A.   For that particular --
24     Q.   Uh-huh.

Page 1632

1     MR. WEBB:  Your Honor, I'm going to object.  This
2 doesn't have to do with qualifications I don't think, and I
3 just don't know how this relates to qualifications and is
4 totally unrelated to this case.
5     THE COURT:  I think it has to do with the background
6 of dealing with the FDA and dealing with the issue of
7 marketing.  I'll allow it to go a little further, but I want to
8 see where it's going before we get too far into it.
9 BY MS. LITTLEPAGE:
10    Q.  Let me ask you a question.  Is there anything about
11 that experience with Wyeth that you believe is important and
12 relevant to the issues that we're here on today?
13    A.  Well, there's actually quite a few similarities to the
14 combination product.  The product that I worked on with Wyeth
15 was another combination product, and it was also one in which a
16 second ingredient was needed to counteract the side effects of
17 the first ingredient.
18    Q.  So let me stop you there.  Was this -- what was the
19 name of the project?
20    A.  Maxzide, M-a-x-z-i-d-e.
21    Q.  So for Maxzide, was it like we have here, two
22 different products that were going to be put together and used
23 as one?
24    A.  Yes.

Page 1633

1     Q.  And what else do you see as similarities?
2     A.  Well, another similarity is the ingredients were
3 actually old.  They were old ingredients that had been around
4 for awhile.  In fact, one of the ingredients similar to the
5 estrogen is a DESI product, meaning that it came before the FDA
6 had the review responsibilities that it has today.
7     Q.  And we're going to talk a lot tomorrow about what that
8 means, but can you tell the jury just briefly, is that what's
9 called a grandfathered drug?
10    A.  Yeah.  The FDA has been given by Congress more and
11 more authority over the years, and prior to 1962, the FDA did
12 not review drugs for effectiveness, only safety.  It didn't
13 even start safety reviews until 1938, so from 1938 to 1962, it
14 was safety only.
15    Well, after '62, FDA had to review effectiveness and
16 safety, so there was this big group of drugs that were approved
17 based on safety only, what to do with these because now you
18 have to do safety and effectiveness.  They were grandfathered
19 in.
20    Q.  And in fact in this case, was Premarin a grandfathered
21 drug?
22    A.  Yes.
23    Q.  So again, another similarity?
24    A.  Yes, very similar.

Page 1634

1     Q.  What else about this project do you think is similar
2 to the issues we have here?
3     A.  Well, one of the -- as I said, one of the ingredients
4 is primarily -- this is a blood pressure lowering drug and a
5 hypertensive diuretic drug, and one of the ingredients of the
6 old one, the DESI one, is responsible for the drug pressure
7 lowering.
8     The problem with it is it causes a side effect that
9 can be a problem while it's lowering the blood pressure, so the
10 second drug is added, the triamterene component, and its job is
11 to raise the body's potassium level, so hydrochlorothiazide is
12 lowering the blood pressure, but you're losing potassium, so
13 you add the triamterene to bring the potassium back up again.
14    Q.  So at least one ingredient was added just to stop the
15 side effect of the first ingredient?
16    A.  Yes.
17    Q.  And why is that issue similar to the issues we have
18 here?
19    MR. WEBB:  Your Honor, I'm going to object.  We're not
20 talking about the FDA regulation.  I guess this is some kind of
21 other act evidence, and --
22    THE COURT:  Yeah, I'm concerned about where this may
23 be going.  We're almost at 5:00.  I'd like -- before you go any
24 further with this line of questioning, I'd like to hear

Page 1635

1 something about that because I don't want to go into what
2 happened in this other study, what were the results, what was
3 the conduct, all that sort of thing without some real
4 foundation for that.
5     MS. LITTLEPAGE:  You want me to move on and we can
6 talk about it?  I'll move on and we'll come back to this.
7 BY MS. LITTLEPAGE:
8     Q.  Let me ask you about the Prempro litigation and Wyeth.
9 In this litigation, the Prempro litigation, did Wyeth contact
10 you and ask you if you would be their expert in this
11 litigation.
12    A.  Yes.
13    Q.  Tell us about that.
14    MR. WEBB:  Your Honor, I'm going to object again.  It
15 appears to me to be hearsay, and therefore I object to it.  I
16 don't know what the conversation was.
17    THE COURT:  I don't know who it was with or when it
18 occurred.  I'd like to know that before we get into it.
19    THE WITNESS:  I can tell you.
20 BY MS. LITTLEPAGE:
21    Q.  Well, tell us.
22    MR. WEBB:  My objection is foundation questions need
23 to be asked as opposed to the witness just rambling as to what
24 happened.

1    THE COURT:  Well, I just directed her to ask
2  foundation questions, and I think she was starting to do that.
3    MR. WEBB:  Thank you.
4  BY MS. LITTLEPAGE:
5    Q.  Did you receive a phone call from someone representing
6  Wyeth in the Prempro litigation?
7    A.  Yes.
8    Q.  And was there a request that was a part of that phone
9  call?
10    A.  Yes.
11    Q.  And was the request whether you would be interested in
12  being an expert on behalf of Wyeth in this litigation?
13    MR. WEBB:  Objection, hearsay.  If we're going to go
14  into a conversation without a court declaration with other
15  people --
16    THE COURT:  Well, I think it depends upon who the
17  other person was.  It's not hearsay if it's a statement by a
18  party or their authorized representative.
19    MR. WEBB:  I don't know who it was.
20    THE COURT:  That's my point.
21  BY MS. LITTLEPAGE:
22    Q.  Was it your understanding that this person represented
23  Wyeth?
24    A.  Yes.  He told me that he was working with Wyeth in

1  their West Virginia cases and he was an attorney with --
2  Jackson Kelly I think is the name of the law firm.
3    Q.  You understood him to be an attorney?
4    A.  Yes.
5    Q.  Representing Wyeth?
6    A.  Yes.
7    Q.  And did this person ask if you were willing to be an
8  expert on behalf of Wyeth in this litigation?
9    MR. WEBB:  Your Honor, unless we have the name of the
10  person, I can't identify whether this is an agent of Wyeth and
11  I object to the question.
12    THE COURT:  I think it implicates some other things,
13  too, that cause me a little concern.  It's one minute until
14  5:00, so why don't we do this.
15    Why don't we go ahead and give the jury a big break
16  and let them out of here about a minute early.
17    Ladies and gentlemen, we're going to be in recess
18  until 9:00 tomorrow morning.  During this recess, please do not
19  discuss this case among yourselves or anyone else.  Do not
20  read, look at or listen to any media coverage should there be
21  any.  Please do not form or express any opinions about the
22  ultimate outcome of this case until it's submitted to you for
23  your decision, and finally, do not look at any outside
24  resources for any information about any of the issues in this

1  case.
2    I think we're moving along pretty good.  We'll see you
3  at 9:00 in the morning.  Counsel, remain, please.
4    (The following proceedings were had outside the
5    presence of the jury:)
6    THE COURT:  I don't see there's any need to keep the
7  witness here.  You're excused until 9:00 tomorrow morning.
8  Thank you.
9    Be seated, please.
10    There are two issues that come up that cause me some
11  concern.  The first one, of course, is the issue about how
12  Wyeth may have handled the marketing, et cetera, of another
13  unrelated product at some other time.
14    I think that if we're going to do that, I'm compelled
15  to have a little bit of a hearing on that if we're going to be
16  talking about other act evidence to prove motive, common
17  scheme, knowledge, intent, any of the things that 480.45,
18  subsection three I think it is, mentions, and we have to look
19  at issues like similarity, confusing the issues, misleading the
20  jury, prejudice and that sort of thing, and I have to consider
21  those outside the presence of the jury.
22    MS. LITTLEPAGE:  Let me be clear.  This has nothing to
23  do with Wyeth.  The only reason Wyeth was even mentioned is
24  because Wyeth was aware -- Mylan is the one that's

1  manufacturing the drug.  Mylan is the one that actually goes
2  and does extensive studies on these two grandfathered drugs
3  because they're going to be used together.
4    The reason why it's important is because Wyeth is
5  there sort of observing another drug company do these extensive
6  studies.  It's very similar to this case because Dr. Blume's
7  opinion is that Wyeth in this context should have done
8  extensive studies on these two grandfathered drugs when they
9  knew they were being used together.
10    She's not here to indict Wyeth's conduct.  Wyeth was
11  the marketing arm.  She's just here to use that as an example
12  of a drug company dealing with a combination drug, doing
13  studies on the combination, why that's important, and that
14  Wyeth was clearly aware of that example in the drug industry
15  because they were the partner in the project.  Wyeth didn't do
16  the studies or finance the studies.  That wasn't their role.
17  She's not here to indict Wyeth in any way on that, just that
18  they had knowledge of the issue.
19    THE COURT:  Let me expand my concern a little bit
20  then.  Is there any argument that there is some dissimilarity
21  between the two products which would explain why it might have
22  been reasonable to have conducted the study with regard to the
23  first drug and maybe not so reasonable with regard to the drug
24  in this case, Prempro?

1      In other words, what I'm concerned about is comparing

2  conduct with regard to another drug that is not the same as the

3  drug involved in this case.  In other words, I could see why

4  somebody might put a lot more study into a childhood vaccine as

5  opposed to an aspirin or a nonsteroid anti-inflammatory,

6  something like that.

7      MS. LITTLEPAGE:  Judge, what I can tell you is that

8  the similarities -- this Maxzide was one of the best selling

9  drugs.  It was a very well-received drug.  It has some of the

10  similar characteristics.

11      It's not a drug that nobody used or nobody cared about

12  or only ten patients took, so the similarities of when a drug

13  company has a drug that is well-received and a lot of patients

14  are taking it, that they have the obligation to follow-up on

15  safety signals and do studies that sort of run down and get

16  answers to those safety signals, and that's sort of the purpose

17  of the Maxzide example is here was a drug company, Mylan, who

18  had some safety issues arise, went and did the studies,

19  answered the questions, and Wyeth was aware of that conduct

20  because they were a part of the project.

21      THE COURT:  My question, though -- in other words, for

22  me to feel comfortable about it, I want to make sure that

23  there's not some dramatic distinction between the type of drug

24  involved and the issues involved in each of those two

1  instances, one of which might justify more studies and another

2  may not justify more studies.  That's my concern.

3      In other words, if you're talking about conduct that

4  you're saying should have occurred in this case and it did

5  occur in another instance by another drug company involving

6  another drug, then I think you've got to tie those two fairly

7  closely together in terms of the drugs, what the issues were,

8  what the concerns were, and why having done that in the case of

9  the first drug, why that would tend to prove because of the

10  similarities between the drugs and the circumstances and the

11  risks and the benefits, why that would tend to prove it should

12  have been done in this case.  So I need to hear that evidence

13  outside the presence of the jury from your witness.

14      MS. LITTLEPAGE:  Would you like to do that first thing

15  in the morning?

16      THE COURT:  I think so.  At 8:30 if that's enough

17  time.  Is that enough time?

18      MS. LITTLEPAGE:  I think so.  I don't know the answers

19  to the Court's questions, but I'm sure the witness does.

20      THE COURT:  I think if there really isn't a close tie,

21  then we are off on all the concerns that are expressed in the

22  statute, prejudice, misleading, confusing, and so I want to be

23  satisfied about that before I let it in.

24      The next issue that I have concern about is the

1  contact from an unknown person about Wyeth.  First of all, I do

2  have a concern about the unknown person, but I more have a

3  concern about the fact that now it's been mentioned that there

4  was some litigation in West Virginia.

5      Now, I don't think that that's in and of itself going

6  to -- I think that probably went in one ear and out the other

7  with most of the jurors, but if we were to have more questions

8  in this area, I don't want questions about how it was in some

9  other place and somebody has been sued because I've already

10  pretty much ruled that we're not going to get into issues about

11  other lawsuits and other litigation, so I'd be really careful

12  about that, and I think that if I were you, I'd just move on.

13      I don't think that -- I suppose if you could come up

14  with the name of the person, but then I suppose Wyeth might

15  want to get ahold of them and have them come here and testify.

16      MS. LITTLEPAGE:  I believe she's named him in her

17  deposition, but I will check that.  Obviously this has been

18  fully discovered, but I'll go check the deposition.  I think

19  she named the person.

20      THE COURT:  You might want to check it, but I'm not

21  sure that I'd want to spend much time on it.  I think it would

22  probably be -- and of course with Wyeth, it's been brought up,

23  if Wyeth wants to pursue it, I'm going to allow it.

24      MR. WEBB:  I'm not trying to pursue it, your Honor.

1      THE COURT:  I'm just saying I'm giving you that

2  option.  I'm not making a ruling, but I am telling you that I

3  would be inclined probably to prefer that you not go there

4  because of your risk of the implication that this is a lawyer

5  from West Virginia and he wants her to talk about the issues in

6  this case on behalf of Wyeth.

7      It doesn't take a brain surgeon to figure out that

8  there might have been a lawsuit just like this one in West

9  Virginia.  That's my worry about that.  So I'd prefer that you

10  leave that one alone.  It's out there, leave it alone and we'll

11  go from there.

12      A couple other things.  There's been a lot of

13  discussion today with Mr. Jones and with other witnesses about

14  what a drug manufacturer can and cannot do, and I think -- I

15  suspect this witness is going to testify about that as well,

16  and that's fine.

17      I think somebody that's in a particular given field,

18  just like an architect has to know what the building codes

19  require in order to practice his or her profession.  People in

20  the business of selling drugs have to know what the law is with

21  regard to that and allowed to testify to it, but the ultimate

22  determiner on what the law is fortunately or unfortunately is

23  me and the law itself.

24      I've put together a couple of instructions that are

1 really preliminary, but I want to give them to you so you can

2 look at them and see if you agree or disagree, if you would add

3 or subtract from them, and I freely invite and in fact welcome

4 changes, deletions, criticisms, but I think it's appropriate

5 that I give some instructions on that either now or at the time

6 of instructions so that we don't rely strictly on experts who

7 may and probably do know more about it than I do in general,

8 but I did do some research on it and I've come up with two

9 potential instructions here.  I'll give one to each side.

10      MR. WEBB:  Thank you, your Honor.

11      THE COURT:  Just look at them and we'll talk about

12 them -- we don't need to talk about them tonight.

13      A couple other quick issues.  I got a motion, I don't

14 know, I hope that the plaintiffs got a copy of it, to bar or

15 limit photographs of some of the surgical results of -- some of

16 the results of the surgery in this case.  Have you seen that?

17      MS. LITTLEPAGE:  I have not, Judge.

18      THE COURT:  Let me just say that there's an objection

19 first as to the content, period, and second as to the number,

20 and what I would recommend, it will be helpful to me in this

21 instance and in the future with similar motions if you would

22 provide me with what it is you object to so I can see it rather

23 than guess about what they look like, and I would probably be

24 inclined if -- I think there was a mention there were 68

1 photographs.  I thought I saw -- or 72 photographs, and there

2 was an objection to the number.

3      Probably without seeing them I can't say, but probably

4 those would be cumulative, so you might want to pick out a

5 smaller number, but at any rate, let me see those sometime

6 before we get to the point where those might be offered so I

7 can make a decision about them.

8      MS. LITTLEPAGE:  Judge, may I ask for some guidance on

9 that?  What we had proposed -- I haven't seen the motion, but

10 as to the scarring photographs, we have got two of them for

11 each plaintiff in a closed folder so they would not go up on

12 the screen that we would ask to be introduced into evidence and

13 then it could be passed for the jurors to just open and look

14 at, two per plaintiff.  One is sort of a frontal shot, one is a

15 side shot of the mastectomy scarring.

16      THE COURT:  That's all?

17      MS. LITTLEPAGE:  Of the scarring photographs.  I

18 haven't seen what the motion is, but in terms of disfigurement,

19 I was only going to offer two and I was going to do it in a way

20 that was more private.

21      THE COURT:  Do you have -- somebody for Wyeth, do you

22 have a copy of the motion that you're talking about?  If you

23 could give it to Miss Littlepage or Mr. Booth.

24      MR. SNAPP:  I don't think we have it in court, but

1 we'll get it to them as soon as we can.

2      THE COURT:  Just send it to them this evening and let

3 them look at it, because it's hard for me to guess exactly what

4 they are.  It looks like they're saying photographic evidence

5 of the plaintiffs' breast cancer surgery, so I don't know if it

6 means the surgery itself.  I didn't know that it was

7 photographed, I guess some of them are.

8      MS. LITTLEPAGE:  It's not.

9      MR. SNAPP:  I think the motion addresses just a few

10 photographs with respect to the surgery -- I'm sorry, a few

11 scarring photographs, and the rest are family photos and I

12 think the argument is that the family photos are just

13 cumulative of each other and cumulative of the testimony that

14 witnesses can give, so we'll get them the motion this evening

15 and be prepared to talk about it tomorrow.

16      THE COURT:  And if you can get me a copy of those

17 photographs, I'll look at them myself and have a pretty good

18 idea what we're talking about.  Otherwise, we'll just take a

19 lot of court time dealing with those, so if you'll give me a

20 copy, I'll look at them.

21      MS. LITTLEPAGE:  I'll try and bring a copy.  We've

22 asked plaintiff to go through and get photographs of every

23 couple of years, if not every decade of their life, because

24 there is an issue here, as you've heard already, of obesity and

1 weight gain and when the weight was gained and what risk

2 factors are associated with weight gain in different era's of a

3 woman's life, so I had asked each woman to try and bring me a

4 sampling of photographs so the jury can assess for themselves

5 weight issues throughout the woman's life, including childhood

6 because there's also a risk factor or whether you're overweight

7 as a child or not, but I'll bring you the photographs tomorrow.

8      THE COURT:  Yeah, I just won't be able to do much with

9 them until I see them.

10      Finally, I hate to keep you after 5:00, but I think it

11 saves us all a little time and work.  I have a pretty good

12 idea, I've reviewed the objections to the testimony, deposition

13 testimony of Jodie Heitzman, H-e-i-t-z-m-a-n, J-o-d-i-e, and

14 Dr. Colditz, C-o-l-d-i-t-z, when do you plan on reading this

15 testimony and when do you want my ruling on these?

16      MS. LITTLEPAGE:  Doctor, Jodie Heitzman is going to be

17 read, so we can get those right at the end because that's easy

18 to adapt to.

19      Dr. Colditz is going to be played to the jury on

20 Wednesday, so that's the one if we can get your rulings as

21 quickly as possible, we need to cut the tape if there's going

22 to be things that are going to have to be taken out.

23      THE COURT:  When do you want it?

24      MS. LITTLEPAGE:  You tell me, Judge.  Can we get it

1 tomorrow so we have tomorrow night to finalize the tape?

2    THE COURT:  Yeah, I could probably give it to you now.

3    MS. LITTLEPAGE:  Now would be even better.

4    THE COURT:  Jodie Heitzman as I understand it, and

5 correct me if I'm wrong, is -- Jodie Heitzman, the only

6 objections are to pages 105 through 106 where she testifies

7 about having read popular renditions of the WHI I think, or no,

8 it was -- yeah, I think it was the WHI, the women's health

9 study which I think is the same one you're talking about.

10    MS. LITTLEPAGE:  It is, Judge.

11    THE COURT:  And she said no, I didn't.  Did you read

12 the popular press?  Yes, I did.  What did you glean from that?

13 I don't think that's sufficient foundation to allow her to talk

14 about that.  I'm going to sustain that objection, and it's from

15 Page 105, line nine, to Page 106, line 18.

16    And I notice just by coincidence, it may not be in the

17 part of the testimony that's been designated, but the next

18 question on Page 106, line 21, we're talking about

19 multi-district litigation.  I think we're starting to get -- if

20 that's in the testimony, you might want to think about

21 redacting that part because, again, we're talking about

22 something that obviously includes more than this case.

23    MS. LITTLEPAGE:  Okay.

24    THE COURT:  All right.  You want me to tell you about

1 Dr. Colditz?

2    MS. LITTLEPAGE:  Yes, Judge.

3    THE COURT:  Let me just start on the first page of the

4 list of objections.  I've already ruled that the evidence to

5 bar argument about the history and events leading to

6 endometrial cancer is admissible.  I've already stated that

7 evidence of potential adverse reactions other than cancer is

8 admissible, and both sides have offered evidence on that.

9    With regard to Upjohn's motion to exclude evidence

10 based on relative risk, I haven't granted or denied that.  I've

11 reserved ruling on that until somebody lays a foundation, some

12 expert lays a foundation for the admissibility of that

13 evidence, so with regards to Page 35, line 11 to 36, line nine,

14 without a foundation I don't want that to be read.

15    With regard to -- again, the next objection is history

16 of the events leading to endometrial cancer.  I've already

17 denied that motion.  If you want me to put the pages and lines

18 in the record, I will, although this motion has -- well, maybe

19 it doesn't.

20    Let me start over.  Page 32, line five, to Page 32,

21 line two is permitted; Page 33, line 14 to 17 is permitted;

22 Page 35, line 11 to page 36, line nine is okay, with

23 foundation.  In other words, some foundation from an expert

24 that the mathematical and statistical basis in the underlying

1 facts are such that the evidence of that relative risk

2 statistics would be admissible.

3    As far as Page 53, line 21 to Page 53, line 23, I'm

4 going to allow that; Page 54, line 15 to Page 54, line 16, I'll

5 allow that; page 56, line two, to Page 56, line nine, I'll

6 allow that because I've already admitted into evidence about

7 endometrial cancer warnings.

8    The next objection has to do with adverse reaction to

9 other than breast cancer.  I've already allowed that evidence.

10    Then the next objections are the same previous ones,

11 endometrial cancer and other adverse reactions other than

12 breast cancer.  I'm going to allow that, so Pages 84, line ten

13 to Page 84, line 18 are permitted; Page 84, line 22 to Page 85,

14 line 24 is permitted.

15    Again, the next two objections are the same that we've

16 already dealt with, history of endometrial cancer and other

17 reactions than breast cancer.  Page 86, line seven to 86, line

18 nine is appropriate; page 86, line 13 to 86, line 19 is

19 appropriate.

20    We've already had evidence of sales trends for

21 Premarin and Prempro, and then the other objection has to do

22 with relative risks, so as far as Page 87, line 14, to 99, line

23 three, that will be allowed, but only after a proper and

24 adequate foundation as to the application of relevant risk

1 statistics is laid.

2    Same way with Page 87, line 14, to Page 92, line four

3 which would have been included in previous pages, those would

4 be permitted only after foundation is laid as to relative risk

5 statistics.

6    Page 99, line 19, to Page 101, line seven, that again

7 has to do with relative risk statistics.  I'll allow it only

8 after there's foundation laid and the reliability of those

9 statistics.

10    The next group, again, also depends at least to some

11 extent on relative risk statistics.  Page 101, line 19 to Page

12 102, line one; Page 102, line four, to Page 103, line four, and

13 Page 103, line 21, to Page 104, line 20.  Again, those pages

14 and lines will be admitted if there is adequate foundation with

15 regard to the reliability of the relative risk statistics.

16    The same is true with regard to Page 105, line 16, to

17 Page 106, line 18.  The foundation for relative risk statistics

18 has to be first laid by an appropriate expert.

19    Now, the next -- the last objections are to four sets

20 of pages and the objection first recites the prejudice,

21 confusing, misleading statute, and also the statute on

22 relevance, but then it also says beyond the scope of expert

23 testimony/report.  I don't know what's in the report, so I

24 don't have a way of evaluating that unless you included it, but

Page 1652

1 I didn't see it, so maybe I should hear about that.

2       MR. SNAPP:  Your Honor, this testimony, referring to 8

3 07 21 going on from there, it has to do with Dr. Colditz's

4 interactions, someone from Wyeth.  It's factual testimony that

5 has nothing to do with his opinions, and it's just intended to

6 inflame the jury and talk about what he considers to be a snub

7 by Wyeth.  It has nothing to do with his actual opinion

8 testimony that he's giving in this case.

9       We're happy to give your Honor a copy of his expert

10 report and we can get that to you first thing in the morning if

11 it would help with respect to those particular objections.

12       MS. LITTLEPAGE:  Judge, I can assure you it's not in

13 his expert report because it's factual testimony.  Wyeth has

14 already told the jury that they founded Dr. Colditz, Dr.

15 Colditz's studies are on their charts, and Dr. Colditz

16 testified that when the studies that Wyeth funded ended up

17 showing a breast cancer risk, he got a call from the medical

18 director with a clear discussion about you're impacting Wyeth,

19 this is not -- this is detrimental to Wyeth, certainly at least

20 some evidence different from what Wyeth has presented to this

21 jury, that they always told about the risk, they were happy to

22 tell doctors about breast cancer issues.

23       Dr. Colditz says factually he got a different reaction

24 when his studies showed breast cancer and it was a phone call

Page 1653

1 from the medical director of Wyeth that he relates factually.

2       MR. SNAPP:  That phone call had nothing to do with the

3 exact study that Wyeth has talked about that Wyeth funded is my

4 understanding.  I could be wrong about that.  But regardless,

5 this is not within his expert report, it has nothing to do with

6 his opinions, it's truly just factual testimony about a phone

7 call that he supposedly had with someone from Wyeth.

8       THE COURT:  Well, I think if you applied the standard

9 you guys cite the relevant statute which is NRS 48.025, if you

10 look at the definition of relevance, it's evidence that has any

11 tendency to make more or less likely any contention that any

12 party makes, and I think under the relevance standard, it's

13 admissible, but I'm not sure about prejudice, misleading the

14 jury or confusing the issues, and I'm not concerned that it's

15 not in the expert report because it's not an opinion.

16       It's just something that was said and it was said in a

17 deposition subject to cross-examination, but I kind of am

18 concerned about the prejudice, confusing, misleading issues.

19 Would you address those, Miss Littlepage?

20       MS. LITTLEPAGE:  Yes, Judge.  The position that Wyeth

21 has taken, and I understand their position both in opening

22 statement and throughout the first couple of days of this trial

23 is that this was a company who was up front, told doctors about

24 risk, had no issues talking to doctors about breast cancer.

Page 1654

1       Dr. Colditz's factual testimony puts that in a little

2 bit of a different light in that he says when I did the study

3 and my study results showed breast cancer, I didn't get a phone

4 call from Wyeth saying can you come and lecture at the ACOG

5 meeting about your results, can we pay you to come and talk to

6 doctors about breast cancer issues, but instead, he got a phone

7 call from the medical director, Dr. Deach, saying something

8 different.

9       Now, Dr. Deach, obviously Wyeth can call Dr. Deach in

10 here in their case in chief and Dr. Deach can say that he

11 misinterpreted my phone call, what I meant to say was we love

12 your study and we're happy we understand breast cancer now, but

13 at least Dr. Colditz's factual testimony I think is relevant,

14 certainly in light of the positions Wyeth has taken in the

15 trial.

16       MR. SNAPP:  I was just going to say, just to clarify

17 the record, the testimony at issue here at Pages 808, 14

18 through 16, Dr. Colditz testified that this conversation

19 supposedly took place in 1995 or '96.

20       Colditz meta analysis that we've talked about, that

21 Wyeth has talked about in this case that Wyeth funded and found

22 a small increased risk of breast cancer is in 1993.  This is

23 truly just confusing the issues and creating all kinds of

24 collateral issues that could very easily confuse the jury as

Page 1655

1 your Honor said.

2       THE COURT:  Well, it specifically says where this

3 presentation took place at the American Association for the

4 Advancement of Science meeting in San Francisco.  That's on

5 Page 808.

6       Let me do this.  I don't want to take your time right

7 now to do this.  I've read it previously and I want to read it

8 again.  Let me read it again and I'll tell you in the morning

9 what I have decided to do.

10       It doesn't look to me as though this evidence is

11 clearly and directly related to some attempt by the medical

12 director, Dr. Deach, to discourage or -- in here he says, I

13 don't want you to publish it.  The only thing that he mentions

14 is a decrease in a couple of points, I think, if I remember the

15 number of the stock and I'm not sure about that part.  Address

16 that for me, Miss Littlepage, and then I'll be quiet.

17       MS. LITTLEPAGE:  If it's not -- if it doesn't show

18 what -- if it doesn't show Wyeth not reacting, then what's the

19 prejudice I guess?  Why is it so prejudicial?

20       It's Dr. Colditz just saying I gave this speech and

21 Wyeth called and they didn't say can I fund you for more

22 studies, or can you come talk about your breast cancer risk?

23 Instead, they said something that he interpreted as that they

24 weren't real happy with what he was saying.

1        Now, again, what he says is what he says, you know.
2 Either we're here because it's unduly prejudicial or it's not
3 so prejudicial, it's just him saying Dr. Deach called me and
4 this is what he said.
5        THE COURT:  Well, the part I don't like about it is
6 without getting into the substantive aspect of it, in other
7 words, if he called up and said, look, Doctor, if you want to
8 work for us again, you need to change the study, or you need to
9 do something else, or you need to let us know, you need to do
10 something like that, may be, but just simply mentioning the
11 couple drops in the point of the stock emphasizes things like
12 read and without really evaluating that in a more
13 confrontational type of an evaluation subject to
14 cross-examination on that subject and other evidence, I'm not
15 inclined to allow it, but if you can convince me otherwise,
16 I'll let you try.
17        MS. LITTLEPAGE:  Judge, I have a document that I'd
18 like to bring tomorrow where Wyeth actually writes to Dr.
19 Coldtiz and actually puts in that letter a very similar issue
20 that's raised in his deposition where they say after the
21 Bergvkist article came out, we took a stock hit where people
22 thought E plus P caused breast cancer, and so it's not that I
23 don't have other evidence that supports what Dr. Coldtiz is
24 saying.

1        Is it the most prejudicial evidence?  Probably not,
2 but at least it is some evidence that implies that Wyeth may
3 not be as happy to hear about breast cancer risk information as
4 the implication has been to this jury.
5        THE COURT:  Let me see the over evidence.  Let me see
6 the letter you're talking about.
7        MS. LITTLEPAGE:  I'll bring it in the morning.  Judge,
8 I have one other question.  You said in a number of your
9 objections that you wanted to see more foundation.
10       I guess my question is, do you want us to go back and
11 designate for the jury to hear that foundation, or is it just
12 something that we can show to the Court?
13       THE COURT:  Well, I think, if I understand the way
14 that the rules work, the evidence itself and the foundation for
15 the evidence needs to be presented to the finder of fact so
16 they can evaluate not only the evidence, but they can evaluate
17 the foundation and they can evaluate the expert's
18 qualifications, they can evaluate the material and the methods
19 that were used, they can evaluate the reliability of the
20 underlying information, so it has to be presented to me, of
21 course, because I have to rule on that, but it has to be
22 presented to the jury and --
23       MS. LITTLEPAGE:  Some judges do it different ways.  I
24 just wanted to --

1        THE COURT:  I don't care if you -- I ordinarily
2 wouldn't care depending on the content.  If you were to try to
3 lay that foundation in front of the jury because you'll either
4 get it in or you won't, and if you don't get it in, you'll take
5 the risk that you've done that because ordinarily that kind of
6 foundation is not going to get into the substance of it, and if
7 you want to try to lay the foundation, that's fine, but I think
8 the jury -- I think the better practice is to allow the jury to
9 hear it because they have to evaluate not only what's said, but
10 why it's said, and if the information came as in the one ruling
11 I made with regard to Miss Heitzman, the nurse, if it came from
12 a newspaper article as opposed to the real article, then the
13 jury might not give it as much weight as they would if it came
14 from the actual study itself, so I would present it to the
15 jury.  That's my preference.
16       MR. WEBB:  Your Honor, just a quick issue.  As far as
17 your Honor's desire to keep out of the case that there's other
18 hormone therapy cases, we agree with that.
19       This will be the first witness.  She's testified on
20 some prior occasions in other trials.  I may or may not ever
21 need to impeach something she says here.  What I plan on doing,
22 and I'll just alert the Court and Miss Littlepage, I've got a
23 binder of her prior testimony.
24       I simply have marked them as one, two, three, four,

1 five and six so I don't have to say in the Daniels case or in
2 the -- I would just say in prior testimony, if you look at tab
3 three, go to Page 18, and I'll never mention another case, I'll
4 simply refer to them by number, and that way -- and I may never
5 have to do it at all, but that was my approach if that seems
6 acceptable to your Honor.
7        THE COURT:  I think if you call it prior testimony,
8 the jury may not pick up on the fact you're not talking about a
9 deposition, but I don't think it will be appropriate to call it
10 a deposition because that wouldn't be right.
11       MR. WEBB:  That's exactly what I thought.
12       THE COURT:  I would just say in prior testimony, but
13 be careful of the content, though, because some of that prior
14 testimony might say, well, you've said that in Mr. Daniels'
15 case, that the literature blah blah blah.  Make sure you don't
16 put that kind of stuff in there.  Just be real careful.
17       MR. WEBB:  I'll be careful.
18       THE COURT:  Anything else we need to do tonight?
19 Kickoff is not for 25 minutes.
20       We're in recess.  We're going to come back at 8:30 and
21 talk about Maxzide and the photographs perhaps, and let me know
22 about the instructions, if you don't want to give them now, you
23 want to give them later, if you don't want to give them at all.
24       (The proceedings adjourned at 5:35 p.m.)

Page 1660

1  STATE OF NEVADA.   )
            ) ss.
2  COUNTY OF WASHOE   )

3

4      WE, CECILIA VOHL, JANET MENGES, and DIANNE BRUMLEY,

5  Official Reporters of the Second

6  Judicial District Court of the State of Nevada, in and for

7  the County of Washoe, do hereby certify:

8      That as such reporter, we were present in Department

9  No. 9 of the above court on said date, time and hour, and we

10  then and there took verbatim stenotype notes of the

11  proceedings had and testimony given therein.

12      That the foregoing transcript is a full, true and

13  correct transcription of my said stenotype notes, so taken

14  as aforesaid.  That the foregoing transcript was taken down

15  under our direction and control, and to the best of our

16  knowledge, skill and ability.

17      DATED:  At Reno, Nevada, this 17th day of September,

18  2007.

19

              Cecilia Vohl
20          CECILIA VOHL, NV CCR #246

21            Janet Menges
            JANET MENGES, NV CCR #206

22

              Dianne Brumley
23          DIANNE BRUMLEY, NV CCR #205

24

# EXHIBIT 22D

Page 1661

```
 1  Code: 4185
 2
 3
 4
 5
 6     IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
 7            IN AND FOR THE COUNTY OF WASHOE
 8        BEFORE THE HONORABLE ROBERT H. PERRY, DISTRICT JUDGE
 9                    -oOo-
10  ARLENE ROWATT, PAMELA FORRESTER, and
    JERALDINE SCOFIELD,
11
          Plaintiffs,      Case No. CV04-01699
12
          vs.           Dept. No. 9
13
    WYETH,
14
          Defendant.       /
15
16      VOLUME VII, PAGES 1661 THROUGH 1940
17
         TRANSCRIPT OF PROCEEDINGS
18
            JURY TRIAL
19
       Tuesday, September 18, 2007
20
           RENO, NEVADA
21
22  Reported By: CECILIA VOHL, NV CCR #246, RPR, CRR, CCP
          STEPHANIE KOETTING, NV CCR #207
23        JANET MENGES, NV CCR #206
24
```

Page 1663

```
 1              I N D E X
 2  WITNESSES FOR THE PLAINTIFF          PAGE
 3  CHERYL BLUME
      Direct Examination (resumed) by Ms. Littlepage   1692
 4    Cross-Examination by Mr. Webb          1881
 5
          E X H I B I T S
 6
    DESIGNATION              MARKED ADMITTED
 7
    Plaintiffs' Exhibit 28        -   1743
 8
    Plaintiffs' Exhibit 66A        1760  1762
 9
    Plaintiffs' Exhibit 68        -   1766
10
    Plaintiffs' Exhibit 69        -   1772
11
    Plaintiffs' Exhibit 188        -   1781
12
    Plaintiffs' Exhibit 194        -   1724
13
    Plaintiffs' Exhibit 251        -   1784
14
    Plaintiffs' Exhibit 265        -   1785
15
    Plaintiffs' Exhibit 288        -   1803
16
    Plaintiffs' Exhibit 345        -   1792
17
    Plaintiffs' Exhibit 346        -   1788
18
    Plaintiffs' Exhibit 349        -   1792
19
    Plaintiffs' Exhibit 377A       -   1718
20
    Plaintiffs' Exhibit 811        -   1799
21
    Plaintiffs' Exhibit 935        -   1778
22
    Plaintiffs' Exhibit 1057       -   1757
23
    Plaintiffs' Exhibit 1680       -   1734
24
```

Page 1662

```
 1          A P P E A R A N C E S
 2  For the Plaintiffs:
 3        And
    LITTLEPAGE BOOTH          WHITE, MEANY & WETHERALL LLP
 4  BY: RAINEY C. BOOTH, ESQUIRE   BY: PETER WETHERALL, ESQ.
    And ZOE LITTLEPAGE, ESQUIRE   3185 Lakeside Drive
 5  327 E. Romana Street      Reno, Nevada 89509
    Pensacola, FL 32502
 6
            ~*~
 7
    For the Defendant
 8  Wyeth Pharmaceuticals,    WILLIAMS & CONNOLLY LLP
    Inc.:            BY: HEIDI K. HUBBARD, ESQUIRE
 9              725 Twelfth Street, N.W.
              Washington, D.C. 20005
10
            And
11
    WINSTON & STRAWN LLP
12  BY: DAN K. WEBB, ESQUIRE
    And ERIK W. SNAPP, ESQUIRE
13  And NATHAN HOFFMAN, ESQUIRE
    35 West Wacker Drive
14  Chicago, IL 60601
15
16
            -oOo-
17
18
19
20
21
22
23
24
```

Page 1664

```
 1     E X H I B I T S (CONTINUED)
 2  DESIGNATION            MARKED ADMITTED
 3  Plaintiffs' Exhibit 192      -    1812
 4  Plaintiffs' Exhibit 228      -    1828
 5  Plaintiffs' Exhibit 242      -    1819
 6  Plaintiffs' Exhibit 287      -    1807
 7  Plaintiffs' Exhibit 3406      -    1853
 8  Plaintiffs' Exhibit 8010      -    1815
 9  Plaintiffs' Exhibit 8420      -    1837
10  Defendant's Exhibit 29       -    1900
11  Defendant's Exhibit 195      -    1904
12  Defendant's Exhibit 1589      -    1886
13  Defendant's Exhibit 7969      -    1894
14  Defendant's Exhibit 18741      -    1920
15  Court's Exhibit F         -   1750
16  Court's Exhibit G         -   1750
17
            -oOo-
18
19
20
21
22
23
24
```

Page 1665

1    RENO, NEVADA, TUESDAY, SEPTEMBER 18, 2007, 8:30 A.M.
2              -oOo-
3
4        (Note: Mr. Reid nor Ms. Cochran are present at
5    this time.)
6        (Whereupon, the following proceedings were had outside
7    the presence of the jury.)
8        THE COURT:  Morning.  Be seated, please.
9        We're here outside the presence of the jury.  What do
10   you want to talk about first?
11       MR. WEBB:  Well, Your Honor, maybe -- I'm sorry, did
12   you want to go first?
13       MS. LITTLEPAGE:  No, go ahead.
14       MR. WEBB:  The two issues that we were talking about
15   at the end of the day yesterday, I thought I might pick up with
16   those.  The one issue that we were talking about is when they
17   started getting into questions about the West Virginia lawyer
18   that had contacted Dr. Blume about representing Wyeth in
19   connection with the Prempro hormone therapy litigation.
20       Your Honor, overnight, I've gone back and checked on
21   this.  I actually have an affidavit that we had in our files.
22   Here's what the issue is.  I could tender this to the Court.
23   This entire inquiry about whether a Wyeth lawyer contacted
24   Dr. Blume adds nothing to her credibility one way or the other.

Page 1666

1    And it's not -- it's not properly relevant.  I object.
2        And now here's where we are.  It's partially in the
3    record at this point, and then we stopped it.  Okay.  The facts
4    are -- and I have an affidavit -- this West Virginia lawyer did
5    contact Dr. Blume's office, did not talk to her but did leave a
6    message or messages, because he wanted to talk to her about a
7    case involving oral contraceptives which also contain estrogen,
8    but he did not contact her about the Prempro case.
9        And he's sworn to an affidavit.  So, here's where we
10   are.  Either -- I'm going to make a motion to strike the
11   testimony.  The alternative is that I be given permission
12   from the Court to expand my witness list, because this clearly
13   is unexpected.  In prior testimony, Dr. Blume has been very
14   cagey, where she was -- testified that she was contacted by
15   Wyeth in connection with an estrogen-receptor type of matter,
16   which could be oral contraceptives.  But now she's changed her
17   testimony to where she's contacted on this case on Prempro, and
18   I have a West Virginia lawyer that says that's just wrong.
19       So my first motion is to strike.  It's irrelevant.
20   You talk about a collateral issue where I now have to bring in
21   a lawyer from West Virginia to contradict an expert on an issue
22   that doesn't add anything to credibility.  My first motion is
23   to strike.
24       MS. LITTLEPAGE:  Can I see your affidavit?

Page 1667

1        MR. WEBB:  You can.  I'm sorry.  I'll give a copy to
2    the Court too.
3        MS. LITTLEPAGE:  Judge, this issue came up almost 18
4    months ago in Dr. Blume's deposition.  It came up again in
5    every trial that she has testified in.  And she has always said
6    the exact same thing.
7        She received two phone calls from this Jackson
8    Pollack -- Jackson Kelly -- Jackson Kelly lawyer.  The lawyer
9    left his name, left the fact that he wanted to talk to
10   Dr. Blume about estrogen and progestin and receptor issues.
11   She did not return the call because she was already working for
12   the plaintiffs.
13       It has -- I'm a little surprised to hear that this is
14   something that's new or shocking to Mr. Webb.  This has been an
15   issue with Dr. Blume since her initial deposition 15 months
16   ago.
17       MR. WEBB:  Ms. Littlepage, I agree it's not new.  The
18   only thing that's new is that -- I agree; in fact, her earlier
19   deposition testimony dealt with being contacted regarding
20   estrogen- and progestin-receptor testing, which was oral
21   contraceptives, not this drug.
22       Yesterday, she put in the record that she was
23   contacted on Prempro, this hormone therapy.  And that's what
24   I'm saying is totally different.  It wasn't in her testimony

Page 1668

1    before, and it clearly -- this lawyer completely contradicts
2    that, and it's not -- and the fact that she was contacted on
3    this other drug, it's not relevant, and I respectfully move to
4    strike or, in the alternative, to be able to call David
5    Myerburg and add his name to our witness list.  Maybe -- should
6    Dr. Blume be in the courtroom when we're arguing this type of
7    issue?
8        THE COURT:  I don't really care.  If you want to ask
9    her to leave --
10       MR. WEBB:  Well, I just respectfully would ask her to
11   be excused.
12       THE COURT:  All right.  Please, Doctor, be excused for
13   a few minutes.  We're going to need your testimony in a minute,
14   though.
15       Well, you know, I don't want to expand this whole
16   issue, I really don't.  I don't think it's a big deal one way
17   or another.
18       What do you want to do, Ms. Littlepage?  You want
19   to --
20       MS. LITTLEPAGE:  I was going to do nothing, because
21   the Court told me that -- you advised me to do nothing further,
22   and I haven't even gotten an answer from my actual question.
23   And I was going to move on, under the Court's advice.
24       THE COURT:  Well, I'll grant the motion to strike.

1    MR. WEBB:  Thank you, Your Honor.  The next issue was
2  this other drug, Maxzide, where we ended the day yesterday with
3  Your Honor saying that you wanted to know about whether there
4  were similarities, because they're, in effect, offering this, I
5  guess, as other act evidence to show that Wyeth was on notice
6  of certain types of testing that should have been done, because
7  Wyeth interacted with Dr. Blume's company, Mylan, in connection
8  with the effort to, I guess, develop and market a drug called
9  Maxzide, which was a diuretic, blood pressure medicine.
10    Here's what I found out over the evening.  And I went
11  back and I checked Dr. Blume's testimony.  Dr. Blume has
12  testified about this Maxzide issue in her deposition.  She's
13  testified she cannot pinpoint the dates by which this was going
14  on.  We know she left the company in 1996 or '97.  Was it '97?
15  Anyway, she left the company in 1996.  The company Lederle,
16  L-e-d-e-r-l-e, was a company that was in the joint arrangement.
17  That company was not part of Wyeth at that time.  That company
18  did not become part of the Wyeth until 1995.
19    So, first of all, there's no foundation laid that this
20  was part of Wyeth because Lederle was not part of Wyeth prior
21  to '95; number two, there's no similarity between these two
22  situations.  In our case, the issue was whether Wyeth should
23  have done safety testing.  The plaintiffs' position -- and this
24  witness is going to testify -- Wyeth should have done more

1  safety testing to determine breast cancer risk, et cetera,
2  regarding this drug, Prempro.
3    Here's what we're dealing -- and Maxzide -- the issues
4  they were dealing with had nothing to do with safety testing;
5  it had to do whether you put these two doses together, these
6  two drugs; they needed to do some testing, which is called
7  "dose response studies," in order to see if you have the right
8  dosage levels so you're using the right dosage levels when
9  people take the medication.
10    So as far as similarity, there is no similarity.
11  They're completely different.  Again, we're going to be
12  litigating an extraneous collateral issue, and I -- we did stop
13  this at an early point.  I objected, and I would just -- I'm
14  not even asking to strike.  I just want my -- not to go any
15  further into it.
16    MS. LITTLEPAGE:  Judge, I'd like to be heard.
17    THE COURT:  Certainly.  I have a couple questions too.
18  Let me hear what you have to say, and then I want to ask you a
19  couple things about what's customary and whether or not there
20  are any objective standards by which a drug manufacturer would
21  determine the need to test or not to test.
22    MS. LITTLEPAGE:  Yes and no.  There are some Pharma --
23  the pharmaceutical industry has Pharma, which is a
24  pharmaceutical association that drafts guidelines.  They're

1  pretty broad; the guidelines are like if there's a safety
2  signal, follow up; if necessary, do a study.  I mean, they're
3  not -- they're not really at the level of detail that you would
4  like.
5    But obviously, Dr. Blume is going to talk about that
6  as one thing that the drug company will hold itself to.  And
7  we've got some deposition testimony coming up where Mr. Essner
8  says, "I was president of big Pharma.  I know these rules."
9  Wyeth holds themselves to these standards or more."  She'll
10  also say the FDA standards are a minimum standard.  And
11  obviously, the FDA standards are, if you see a safety issue,
12  you need to follow up, and if you find something, you need to
13  tell the doctors.
14    But she's also going to testify that after decades in
15  the drug industry, she has information as to what is the
16  standard of care of drug companies, including her own decision
17  she made when she ran Mylan.
18    And that's all this testimony is, is an example of an
19  issue coming up, and a drug company responding in the exact
20  right time frame, because Wyeth has made an issue that back in
21  -- we're saying these studies should have been done in the '80s
22  and '90s instead of us getting the results in 2002.  Wyeth said
23  we could have done them back then.  We've got all these steps
24  with WHI.  You've got to go through all these steps before you

1  can go through a study like WHI.  Dr. Blume says, well, yes and
2  no.  There are some steps, but some of them can be very easily
3  done.  And let me give you an example, which is this Maxzide
4  example, where we did them, and they weren't cost-prohibitive,
5  they didn't take a very long time, and we got the results
6  pretty quickly.  And so it's a direct, real-world example of
7  the standards she's here to talk about, which is, if you see a
8  safety issue -- and Mr. Webb is not correct.  There were two
9  issues at Maxzide:  One was a dosing issue, and one asks a
10  safety issue.  Mylan responded to both of them.
11    Interestingly, both these issues are in this case
12  because Wyeth has these steps to WHI they talked about in
13  opening, where they say they couldn't have done WHI until they
14  did dosing studies.  So she's here to address how quickly and
15  easily you can do dosing studies.  Then after they had done the
16  dosing studies, there actually were safety issues that showed
17  up where people were getting, I think, heart arrhythmias and
18  heart attacks, and they had to go back and do a whole new study
19  to understand why and what the levels of the risk was.
20    So, the Maxzide example is a good example for a lot of
21  reasons.  They're grandfather drugs.  It's the exact right time
22  frame in the '80s.  It's two drugs being used together in
23  combination, and either drug on their own doesn't have the same
24  impact as the two together.

1    Dose -- the right dose was an issue that they quickly
2  addressed and could -- Wyeth could have quickly addressed.  It
3  was a popular drug, so there was enough people on the drug that
4  you get denominators for these studies so issues could show up.
5  There was a significant side effect, heart attack versus breast
6  cancer.  I mean, you wouldn't have the same thing if it was
7  causing dry mouth versus breast cancer.  The responsibility
8  levels would be different.
9    And this is not bad acts.  Wyeth didn't do anything in
10  this.  It's not about Wyeth being good or bad.  The Lederle
11  division that she worked for, those people became Wyeth
12  employees a couple years later and were with Wyeth through the
13  same time frame that we're talking about.  So, they brought
14  their knowledge in to Wyeth about what had happened with
15  Maxzide.
16    THE COURT:  Well, now, yesterday, I thought you told
17  me that they -- that this actually was Wyeth.  Now I'm hearing
18  that it wasn't Wyeth.
19    MS. LITTLEPAGE:  I've always believed Lederle was a
20  division.  I'm not in any way -- Mr. Webb says he's done his
21  research, and at this point in time, Lederle was not a division
22  yet.  I trust what he says to be true.  I have not known -- I
23  thought Lederle was already a division of Wyeth at this time.
24  He says now that they aren't.  I know that, in the past, when

1  Dr. Blume has talked about this, she has talked about people
2  she worked with in Lederle that she still worked with later on
3  when they were called Wyeth, because Wyeth at one point had all
4  these different divisions with different names, and then they
5  assumed them all into the Wyeth name.
6    I don't distrust what Mr. Webb is saying, if that's
7  what he says.  I will withhold that Lederle was already a
8  division, but it wasn't -- it became a division, and those
9  people moved into Wyeth.
10    MR. WEBB:  I accept Ms. Littlepage's -- yesterday,
11  when she asked the question, she asked if it was part of Wyeth.
12  I assume it was a mistake, and I accept that.  But it wasn't
13  part of Wyeth.  Okay?  And that's why it shouldn't come in.  It
14  shouldn't come in for this reason:  She's doing this in the
15  qualification section of her qualifications, as if to somehow
16  then introduce substantive evidence at this point that
17  because -- anyway, I'm repeating myself.  It shouldn't come in
18  because Lederle was not part of Wyeth at the time, and it does
19  not come into evidence to show similarity between what happened
20  there, and therefore, Wyeth is on notice of what should be done
21  here.
22    MS. LITTLEPAGE:  Judge, what I would say is, I was
23  doing it because I was running out of things to do without
24  documents, so I sort of skipped ahead, but of course, I can

1  leave this alone and move into the right chronology.  This was
2  an issue that didn't need a document, but I can move into the
3  right chronology.  So, obviously, there's going to be a time
4  when I ask Dr. Blume, you know, you're here saying Wyeth should
5  have done studies.  Why do you expect that from a company?  And
6  she's going to give me several examples of companies in
7  the '80s and '90s that did studies and reaction to different
8  issues so that -- you know, Wyeth has certainly made this claim
9  that enough was known and outside researchers were doing
10  studies, and they didn't need to do studies.  And she has a
11  different opinion.  And she's going to give a real-world
12  example.  Maxzide is one of those examples.
13    MR. WEBB:  Well, she was giving the real-world example
14  yesterday based on a factual predicate that's not true, and
15  that's my objection.
16    THE COURT:  I think we ought to leave Maxzide out of
17  this, I really do.  I think that we get into areas where I
18  think the probative value is not altogether that strong, and
19  then we're going to be litigating collateral issues:  What was
20  Maxzide about, what were the tests about, what kind of drug was
21  it.  I think I'm going to rule in favor of that objection.
22    MR. WEBB:  Your Honor --
23    MS. LITTLEPAGE:  Judge, may I ask one clarification?
24  First of all, she has other real-world examples that don't

1  involve Wyeth or her company that I'd like to use.  Second of
2  all, in the past, Wyeth has been pretty aggressive on cross
3  with Dr. Blume saying no drug company would do this, no drug
4  company would respond like this, you're expecting stuff from us
5  that nobody would do.
6    I mean, I'm not going to tell her, don't mention
7  Maxzide, but I think if those questions are asked, it's
8  legitimate for her to say, well, we did it, and we were much
9  smaller, and we did it.  And I think that would be -- I mean,
10  in the past --
11    THE COURT:  Well, it depends on what the questions
12  are.  If the questions are asked, then maybe that door opens
13  up, but right now, I don't think it's open.
14    MR. WEBB:  Your Honor, then on the first issue of the
15  Wyeth -- to some extent, the damage has been done on the issue
16  about Wyeth contacting her to hire her on this case.
17    Will you at least tell the jury that's been struck?
18    THE COURT:  If you want me to.
19    MR. WEBB:  I do.
20    THE COURT:  I don't know.  All right.  If you want me
21  to.
22    MR. WEBB:  Thank you.
23    THE COURT:  All right.  As long as we're here,
24  anything else?

1      MS. LITTLEPAGE:  Yes, Judge.  We have two issues.

2  We've got photographs.

3      THE COURT:  I need to run into my room here.  I left a

4  notebook on my desk.  Just give me a second.  I'll be right

5  back.

6      (Whereupon, the judge leaves and then returns to the

7  bench.)

8      THE COURT:  Let's look at the pictures.

9      MS. LITTLEPAGE:  Judge, what I did is, I have a

10  package of pictures for each of the women, and then here are

11  the actual scarring pictures, and I put them separately.

12      MR. SNAPP:  Your Honor, if it's all right with you,

13  could we address that issue tomorrow?  There are some other

14  issues with respect to Dr. Blume that we should try to address

15  today, and we certainly don't want the jury to be left in the

16  room, if that's okay with you, if you want a chance to look

17  through the photos.

18      THE COURT:  Can I hang on to these?

19      MS. LITTLEPAGE:  Yes, of course.  They're copies.

20      Judge, the other thing is, you had asked me yesterday

21  about a letter concerning Dr. Colditz, and I went back and

22  looked at it last night, and I didn't remember two things:

23  First of all, the letter is from the same person, Dr. Deitch

24  that Dr. Colditz talked about.  The second thing is, Dr. Deitch

1  doesn't write him about a stock drop.  He writes about a

2  prescription report.

3      THE COURT:  What do you want to take up?

4      MR. SNAPP:  Yes, Your Honor.  In your ruling on

5  Wyeth's motion to exclude Dr. Blume's testimony, you left a few

6  things open, and Mr. Webb is going to address the marketing

7  issue after the qualifications are done.

8      I wanted to raise with Your Honor another point, which

9  is Dr. Blume's opinion about Wyeth's intent, and your ruling

10  was "probably not admissible, offer of proof required."  We now

11  have some disclosures of exhibits and demonstratives for use

12  with Dr. Blume that lead us to believe that they are clearly

13  going to be doing this.

14      Let me show you a couple of them, Your Honor.  I'm

15  handing you what's been marked as Plaintiffs' Exhibit 349.

16  These are handwritten notes without a date on them.  They don't

17  indicate anywhere on the face who authored them.  What

18  Dr. Blume will say about these notes, she'll point to the two

19  words right in the middle, scribbled, where it says

20  "dismiss/distract."  And Dr. Blume wants to testify, and has

21  testified in depositions and otherwise, that Wyeth had an

22  intent to dismiss and distract from scientific research that

23  didn't go its way.  And this is clearly the type of intent

24  testimony that is not allowed under the law.  We cited a number

1  of cases in our briefing on this issue.

2      It certainly doesn't require any scientific expertise

3  or specialized knowledge.  It's purely inferring from this

4  document and other documents what she believes Wyeth's intent

5  was.

6      If Counsel wants to argue that in closing argument,

7  that's one thing.  But for an expert to stand up and talk about

8  a corporation's intent, is just not allowed under the law.

9      And let me show you one other example, Your Honor.

10  This is a slide -- one of the demonstratives slides that

11  Plaintiffs intend to use.  And the top one you see has four

12  puzzle pieces, and one of those puzzle pieces is "Did Wyeth act

13  with malice?"

14  That not only is a statement of Wyeth's intent, but

15  it's also asking her to talk about a legal conclusion.  That's

16  certainly beyond any expertise she has disclosed in her expert

17  report and something that she should not be allowed to talk

18  about, Your Honor.

19      THE COURT:  All right.  Let me hear from the other

20  side.

21      MS. LITTLEPAGE:  Judge, first of all, the slide is

22  actually just the opening statement slide, and I was just going

23  to show that she was here to talk about the first two.  The

24  pieces of puzzle she's talking about is warnings and

1  "unreasonably dangerous."

2      THE COURT:  All right.

3      MS. LITTLEPAGE:  On the handwritten document, first of

4  all, we all know who wrote it.  Wyeth knows who wrote it.  In

5  fact, Wyeth has refused to identify who wrote it, so we hired a

6  handwriting expert to go back and look at a number of

7  handwriting documents.  Wyeth had agreed in the deposition that

8  a number of documents were written by a man called Buchalter,

9  Jeff Buchalter.  And because Wyeth had agreed that his

10  handwriting was on certain documents, we took those documents,

11  and the document's in the Court's hand, sent them to a

12  handwriting expert.  The handwriting expert confirmed that Jeff

13  Buchalter, an executive at Wyeth, is the one that wrote that.

14      Since we've produced that handwriting expert, we have

15  never heard an objection again about handwriting.  But because

16  it was raised, I wanted the Court to know that we typed that up

17  in the discovery process.

18      The issue --

19      MR. SNAPP:  Your Honor -- I'm sorry.  Go ahead.

20      MS. LITTLEPAGE:  Okay.  The issue is that in 1996, a

21  man called Steven Cummings from the University of California --

22  I think Davis -- did a study involving women with low bone mass

23  density; so basically, women who were subject to osteoporosis.

24  In that study, he was comparing osteoporotic women and normal

Page 1681

1 women and their breast cancer rates and, also, whether the
2 women were on or off hormone therapy. And he found a study
3 finding. He found that women who are thin-build, who are at a
4 much more increased risk of getting breast cancer from hormone
5 therapy than thin women who didn't take hormone therapy and
6 more overweight women who didn't take hormone therapy.
7       It actually leads right into the same issues that
8 we've been talking about. Thin women are very
9 estrogen-deficient. They're very susceptible to hormone
10 therapy. And what he found with them is that the breast cancer
11 risk for them is even greater.
12      He went to present his findings at a large
13 international meeting in Amsterdam. Wyeth heard that he was
14 going to be presenting and got an advance copy of his abstract.
15 And in response to that, knowing that this issue was going to
16 potentially hit the press, that he was going to present on the
17 exact type of women they were targeting for the drug being at
18 an increased risk of the drug -- sort of a susceptibility
19 issue -- they actually formed sort of a work group of how to
20 deal with this issue, how to deal with Dr. Cummings's abstract.
21 And here's one of the documents, PX 345, where the Court can
22 see, at the bottom of the page, they set out a strategy of what
23 to do with the Cummings study and how to respond to the
24 Cummings study. The first item under "Strategy" is a

Page 1682

1 dismissive strategy to downplay the value of the results, a
2 head-to-head strategy. And they have a number of different
3 things: Who should they hire, should they send spokespeople
4 over there, should they react -- what kind of press release
5 should they do.
6       Now, in reaction to -- and as you can see, Jeff
7 Buchalter is one of the people in these meetings. There's
8 probably five or six documents that deal with the Cummings
9 issue. In the middle of all these documents, we found a
10 handwritten note, which is that one, which, as you can see,
11 Judge, deals with Cummings and lists all the people that
12 they're thinking about bringing as spokespeople, lists some of
13 the alternatives they're talking about and the typed document.
14      And then Mr. Buchalter writes "dismiss/distract." So
15 this is a Wyeth executive taking notes, writing down bullets on
16 the exact issue of Cummings, breast cancer, thin women like
17 Ms. Scofield, and their increased risk.
18      Dr. Blume is not here to talk about any intent. She's
19 here to say this is what happened, here are the Cummings
20 documents. They were all Wyeth documents, they were all
21 produced in litigation. And one of them is a handwriting
22 document that we prove for a fact is a Wyeth executive, and it
23 addresses the exact same names, people, issues, as some of the
24 typed documents.

Page 1683

1       THE COURT: Well, she's not going to say, in my
2 opinion, Wyeth intended to do blah, blah, blah?
3       MS. LITTLEPAGE: Of course not.
4       THE COURT: Okay. That's the objection. If she's not
5 going to do that, then that's not a problem.
6       MR. SNAPP: So just to be clear, Your Honor, we're not
7 going to hear from Dr. Blume that Wyeth wanted to do something,
8 Wyeth intended to do something, Wyeth had a plan to do
9 something. None of that will come out of Dr. Blume's mouth
10 under this intent ruling. Is that accurate?
11      THE COURT: Well, I don't know about all of that. I
12 mean, I don't think an expert is able to say what is in
13 somebody's else's mind, whether they had a plan or not; I'm not
14 so sure about that. Just have to hear the question and rule on
15 it at that time.
16      MR. SNAPP: Fair enough.
17      THE COURT: You know, experts and the laywitnesses can
18 give opinions about things that are readily perceptible to the
19 average layperson. They can do that on some circumstances. In
20 other circumstances, if you have to have special knowledge
21 about the industry, or whatever, you might be able to analyze
22 conduct and characterize it as a plan. I don't know. I'll
23 have to hear the evidence.
24      MR. SNAPP: Very good. Your Honor, one other issue,

Page 1684

1 and then a very quick housekeeping matter. We have seen in
2 disclosures that were given to us late last night a 2007
3 Prempro label that Plaintiffs apparently intend to use with
4 Dr. Blume. Your Honor has ruled that "counselor is to advise
5 the Court before offering such evidence." And you reserved
6 your ruling on whether that's appropriate.
7       Wyeth -- we reiterate our arguments in our motion on
8 this. This is clearly evidence of subsequent remedial measures
9 that is being offered to prove culpability or negligence, Your
10 Honor, and it's forbidden under NRS --
11      THE COURT: This does show feasibility.
12      MR. SNAPP: Your Honor, we looked at that, and the
13 feasibility exception to 48.095 does not play here. It has to
14 do with technological feasibility. There's no dispute in this
15 case that Wyeth could have changed the words in its label.
16 That's the technological feasibility that exception
17 addresses, and that is not in dispute here. We could have
18 changed the words that were on the page.
19      THE COURT: Let me see the new label.
20      MR. SNAPP: Well, this is actually a different version
21 than the one that the plaintiffs disclosed to us, but this is
22 the 2007 -- this is the PDR. They want to use a 44-page label
23 that has much bigger type that they pulled off the Internet,
24 and this is the one that we have.

Page 1685

1    THE COURT:  All right.  You plan to use that or do you
2  want to use that?
3    MS. LITTLEPAGE:  I'm sorry, what, Judge?
4    THE COURT:  Do you intend to use this or a similar
5  document?
6    MS. LITTLEPAGE:  Yes, Judge.
7    THE COURT:  All right.  And what's the basis for it?
8    MS. LITTLEPAGE:  Okay.  Number of bases.  I was
9  actually going to do some qualifications before I came to the
10  bench for a sidebar, but we can do it now.
11    A couple of things, Judge:  In opening statement --
12  let's just start about things Wyeth has said.  In opening
13  statement, Wyeth has said that Prempro is still on the market.
14  The FDA still decides, to date, that it's good enough to stay
15  on the market as safe and effective to date.
16    And that was their language, bringing the jury right
17  to today.  Well, today, what is on the market is a low-dose
18  product with very different -- the very different label.  And
19  Dr. Blume is going to testify this morning, as she's testified
20  in every trial, that a drug is both a chemical composition plus
21  the label.  A drug is defined by the label because the FDA
22  doesn't have authority to actually approve drugs; they only
23  have the authority to approval labels.  So the label has to go
24  with the drug, and the drug and the label together is the

Page 1686

1  product.  And that's uncontested.
2    So what she says is that the old Prempro is no longer
3  on the market today because not only is there a new dose, but
4  there's a new label, which makes it a completely different
5  product.  This label, for example, has --
6    THE COURT:  So that's the technological change that --
7  the drug and the label?
8    MS. LITTLEPAGE:  The drug and the label.
9    The second thing, Judge, is that this label now says
10  that the drug can only be used in women as a measure of last
11  resort.  If you're going to take it for osteoporosis, you have
12  to have a significant risk of osteoporosis and have tried other
13  drugs.  If you're going to be taking it for vaginal atrophy,
14  you have to have tried vaginal creams first.  You may not take
15  it for cardiac.  You may not take it for brain.
16    So, if this label had been on the drug 10, 15 years
17  ago, none of these women would have taken it because they
18  wouldn't have qualified for the indications that are in the
19  drug now.
20    Wyeth claims it's a subsequent remedial measure, but
21  it isn't, because Wyeth didn't do the study that created this
22  label; the government did.  You don't get to hide behind the
23  government and say that now I claim this as my subsequent
24  remedial measure.  Once the government study was released, the

Page 1687

1  FDA said, well, you must give that information to doctors, and
2  the label changed, and we have the label we have now.
3    It's not that Wyeth did a study.  I mean, the public
4  policy of subsequent remedial measures is, we don't want to
5  allow subsequent remedial measures because it won't encourage
6  drug companies to do studies.  Well, it wasn't their study.  It
7  was the government's study; that when the government study was
8  released, FDA said, okay, you got to have a new label.  But
9  more importantly, Dr. Blume is here to say that if the right
10  studies had been done, this label, this limitation, these
11  indications, these issues would have been on the product when
12  Dr. Avery looked at it, when Dr. Reynolds looked at it, when
13  Dr. Chacon looked at it, and you would have seen the exact same
14  reaction to the proper information from those doctors that you
15  heard in this courtroom.
16    So it's a critical link to our proximate cause burden,
17  because we have to prove that the proximate cause of an
18  adequate warning is that a different warning would have made a
19  difference.  And here, we have a different warning that's not
20  based on the subsequent remedial measure but was completely
21  feasible 10, 15 years earlier because it's based on a study
22  that could have been done 10 or 15 years later.
23    And, you know, the Court had said in your motion to me
24  that you wanted to hear the feasibility foundation first, so I

Page 1688

1  was going to lay that first, the concept that a drug is both
2  the chemicals and the label, FDA can only approve the label,
3  and then the fact that what's in this label was obviously
4  feasible and appropriate 10 or 15 years earlier, the studies
5  have been done.
6    MR. SNAPP:  Your Honor, may I respond very briefly?
7    THE COURT:  Uh-huh.
8    MR. SNAPP:  Dr. Blume can testify about what she
9  thinks should have been on the label 15 years ago without
10  showing this label.  She's done it in the past in another case
11  where this label and post-WHI labels were excluded.  It's not
12  something that's needed in this case.  It's unduly prejudicial,
13  it violates NRS 48.095, and it's, frankly, completely
14  irrelevant to this case, as well, because not all of these
15  plaintiffs stopped taking the drug in 2002.  And to now be
16  showing a 2007 label has nothing to do with prescribing
17  decisions that had to do with those plaintiffs.  So she can do
18  it without the label.  She doesn't need this subsequent
19  remedial measure to make the point that Ms. Littlepage is
20  making.
21    MS. LITTLEPAGE:  Judge, we're happy to offer -- sorry.
22    THE COURT:  Jacobson v. Manfredi, 100 Nevada 226.  It
23  was case where a little boy drank some solder, if I remember
24  the case.  A friend of mine had that case.  And in that case,

Page 1689

1 the Court said that "changes in labeling and packaging are
2 admissible to prove feasibility of precautionary measures."
3 And I think that's what we're talking about here. I'm going to
4 allow it.
5     MR. SNAPP: Your Honor, respectfully, can I just make
6 the record on this? That case dealt with a subsequent remedial
7 measure where the defendant actually contested the feasibility
8 of the subsequent remedial measure at issue. And Wyeth is not
9 contesting the fact that it could have changed the print in its
10 label. If the only new drug that we're talking about here --
11 apparently, there's a new theory here that the label and the
12 drug, itself, is the new drug. Wyeth is not contesting the
13 feasibility of changing the wording in its label. And if you
14 look at that case, that's -- that was the distinction between
15 that case and this case, Your Honor, between Jacobson v.
16 Manfredi and the case here.
17     THE COURT: Well, I'm not sure that the manufacturer
18 in this case isn't contesting what's in the label today as
19 being what could have been in the label before.
20     MR. SNAPP: My understanding, Your Honor, is that
21 case, the Manfredi case, dealt with the technological
22 feasibility of the information that was available, and it had
23 to do with -- I'm looking at a summary of the case right now,
24 Your Honor. In that case, the defendant-manufacturer, quote,

Page 1690

1 "contested the utility and safety provided by the original
2 container and labels versus the subsequent product container
3 and labels." That's just not the case here. So that's our
4 argument, Your Honor.
5     THE COURT: Well, I also am aware that when you're
6 talking about strict liability, you're not necessarily talking
7 about concerns about negligence or subsequent remedial
8 measures. I did entertain an instruction that deals with that
9 issue. I'm going to allow it.
10     MR. SNAPP: One final issue, Your Honor, very quick
11 one. I'm handing to Your Honor what we've styled "Wyeth
12 Defendant's Objections to Exhibits to Be Used With Plaintiffs'
13 Expert Cheryl Blume." And what we'd like to do, Your Honor, is
14 rather than having Mr. Webb jump up every time one of these
15 exhibits comes up, we'd like to have a standing objection on
16 the three motions in limine that the Court has already ruled on
17 in different contexts. We object to the documents listed here
18 on those grounds.
19     THE COURT: Have you filed this in?
20     MR. SNAPP: We'll file it right away, Your Honor.
21     THE COURT: Why don't you file it in. You'll have a
22 standing objection.
23     Are we ready?
24     MR. BOOTH: Can I give you a couple things, just on

Page 1691

1 Colditz?
2     THE COURT: Yeah.
3     MR. BOOTH: I went through the deposition. We can
4 talk about it later. I would like to read the least amount of
5 foundation possible, but I want to give it to you so you see
6 where we are from that.
7     THE COURT: Ready for the jury, folks?
8     MS. LITTLEPAGE: Yes, Judge.
9     (The jury is now present.)
10     THE COURT: Good morning, everybody. Please be
11 seated.
12     A couple of quick housekeeping things. I think I told
13 you that I had 35 criminal cases tomorrow morning. I lucked
14 out. One of the other judges said that they would take them
15 for me, so I don't have all of those, so we can start at 9:00
16 tomorrow too.
17     Also, I don't think I told both panels, but I know I
18 told one, that this Friday I'm going to be gone. I'm going to
19 be in a seminar for other lawyers. And I don't have to be a
20 judge; I get to be a lawyer. We're having a mock trial, and
21 I'm one of the lawyers, and I signed up for it a long time ago
22 before we had this set, and so I've got to do that, just to
23 give you a heads-up about timing.
24     So, we won't have court on Friday, and tomorrow, we'll

Page 1692

1 be able to start as usual.
2     Ready to go?
3     MS. LITTLEPAGE: Yes, Judge.
4     THE COURT: All right.
5     MS. LITTLEPAGE: Come on up. I was wondering where
6 you were.
7
8     C H E R Y L  D.  B L U M E,
9     called as a witness, having been previously
10     duly sworn, testified as follows:
11
12     DIRECT EXAMINATION (RESUMED)
13
14 BY MS. LITTLEPAGE:
15   Q.  Good morning, Dr. Blume.
16   A.  Good morning.
17   Q.  When we left off yesterday afternoon, we were starting
18 to talk about what you did to get involved in the Prempro
19 litigation.
20     Can you tell us sort of when we called you and said,
21 will you look at these issues. What did you look at? What
22 documents did you receive? How did you go about looking at the
23 issues in this case?
24   A.  Well, initially, I think --

1    Q.   Hold the mike a little closer to you.

2    A.   Initially, as is our practice, a call was made to our

3 office, and our operations person takes those calls and

4 discussed the content of what the testimony would be and as is

5 our initial practice, we review the literature first.  We do

6 our own independent literature searches.

7    Q.   And when you say "review the literature," what do you

8 review?

9    A.   We keep a repository of medical and scientific

10 literature for the work that we do in pharmaceutical product

11 development.  So we went to that repository, updated it for

12 information relating to estrogen, progesterone, tumorigenic

13 effects, receptor-related tumorigenic properties, new clinical

14 studies, new safety studies, everything that would be

15 tangentially involved, perhaps, in the case that had been

16 proposed to us.

17    Q.   Medical articles, published stuff, unpublished stuff?

18    A.   Yes.  It is the published literature; both

19 peer-reviewed and non-peer-reviewed literature is collected.

20    Q.   And you had had some -- we talked yesterday.  You did

21 a thesis on estrogen and progesterone receptors, so you had

22 some understanding of these issues?

23    A.   Yes, we did.  And from earlier work, we had a basic

24 library of estrogen and progesterone, but it was updated at

1 that point in time, a year and a half or two years ago, for

2 anything that we may not have specifically searched for.

3    Q.   What's your next step to start looking at the issues

4 to decide whether you are willing to come and testify?

5    A.   The next step we do is go from the scientific world

6 into the regulatory world, and we access information regarding

7 the new drug applications that would be the focus of this

8 litigation.

9         So in this case, it would have been the Prempro NDA

10 and a Premarin NDA.  And just to become current on what the

11 regulatory status was, review the current labeling for the

12 product, any information available on the FDA website.  We also

13 can access foreign regulatory sites, so we access those to see

14 if anything interesting is happening relating to your call

15 in -- primarily, in western Europe.

16    Q.   So we looked at the literature, we looked at

17 regulatory filings, the labels.  Then what?

18    A.   Then it usually, at that point, assuming that we can

19 support -- that we think that we can scientific support

20 whatever concern that has been presented to us by the

21 attorneys, the next step is we generally meet with the

22 attorneys -- or, I meet with the attorneys at that point.

23    Q.   And when you met with us, did you ask us to provide a

24 huge amount of documents?

1    A.   Yes, I asked the attorneys what was -- had been

2 produced, what was available to them.  There was discussions of

3 what type of -- between the IT people, the electronic format

4 for those databases, and from those, I requested information --

5 certain information depositions, a wide variety of issues.

6    Q.   Okay.  Let's start with documents.  Did you receive

7 from us an entire hard drive --

8    A.   Yes.

9    Q.   -- with hundreds of thousands of pages of documents?

10    A.   Oh, yes, yes.

11    Q.   And that were produced by Wyeth, so Wyeth's documents?

12    A.   Right, of course, uh-huh.

13    Q.   Did you also receive from us databases that Wyeth had

14 produced in litigation, so the actual electronic databases?

15    A.   Yes, I specifically asked for those.

16    Q.   And then I think you said "depositions."  Tell the

17 jury what those are and what why you would want to look at

18 them.

19    A.   Right.  A deposition is the opportunity for attorneys

20 to meet with witnesses, as I understand it, or perhaps

21 employees of the company prior to trial, and transcripts are

22 made of those discussions, and I was sent a huge number of

23 depositions from -- primarily from Wyeth employees.

24    Q.   Okay.  And so after receiving a hard drive with

1 documents and databases and depositions, what do you do next?

2    A.   Well, then there was another meeting then.  At that

3 point, there was another meeting with the attorneys once I

4 familiarized myself with the database to understand

5 specifically what the issues were going to be that would be

6 related to me.  I don't do the case specifics -- specific

7 patients.  I do the overall regulatory reviews.  So at that

8 point, I was current enough with the information to see where

9 they were going with this information and, at that point, to

10 decide whether we thought we could go along with it or agreed

11 with it or we didn't agree with it.

12    Q.   And along in this process, have you, on a number of

13 occasions, asked us to provide more documents or documents of a

14 certain kind or could we update information as you've needed

15 it?

16    A.   Yes.  It is our convention to -- when we come upon a

17 question that we can't access in the database that has been

18 provided to us, that we ask the attorneys to get that

19 information.  And if we know that there is a new event or a new

20 database that might be publicly available either from the

21 European or U.S. authorities, we also will just access those

22 data and information independently.

23    Q.   And has it been about two years that -- 18, 19 months

24 that you have been involved, doing all this work, coming to the

1 point where you're here?

2  A.  I think it's been over two years, yes.

3  Q.  Now, I want to talk to the jury about what pieces of

4 the puzzle you played.  And are you here today to talk to the

5 jury about Wyeth's warnings and whether you have opinions about

6 the adequacy of those warnings?

7  A.  Yes.

8  Q.  And are you here today to talk about whether E plus P

9 is unreasonably dangerous, the risks outweigh its benefits, in

10 your opinion?

11  A.  Yes, over time, yes.

12  Q.  So, just so we know where you fit into the case, let

13 me ask you now about -- about the FDA.  Tell us a little bit

14 about what the FDA does, what it doesn't do, and what its sort

15 of authority is.

16  A.  Okay.  The Food & Drug Administration is located

17 primarily in Maryland, Washington, D.C., area over several

18 campuses, and it also has district offices and regional offices

19 throughout the country.

20     The main scientific review of clinical data or animal

21 data takes place in the Washington and Maryland offices, and

22 there are scientists there of different disciplines who are

23 charged with reviewing information that is provided to the FDA

24 by -- generally by drug sponsors, by drug manufacturers.  And

1 as I said yesterday, that information can come at the very

2 beginning of the process when a company first thinks they want

3 to study a drug in the form of permission-seeking.

4     And then after, if that progresses well, then the firm

5 of the company submits to the FDA their request to market the

6 product in the form of the FDA that we discussed yesterday.

7 And the FDA scientists will review those data and information

8 along those steps.

9     And then if the product is approved, the FDA is

10 charged with reviewing the information that the -- that we, as

11 companies, have to submit after approval dealing with safety

12 issues and our safety surveillance.

13     The other part of the FDA is charged with the actual

14 manufacturing facilities, and that's where the district and

15 regional offices come into play.  The FDA maintains control of

16 the germane factory practices.  And you are subject to on-site

17 inspection by them at any time, and it is generally conducted

18 by your district office or regional office.  And they will come

19 in and make sure that you are manufacturing -- your products

20 are consistent with what we call -- the little acronym is

21 GMP's, but it stands for general manufacturing practices.  So,

22 those are the two main components.

23  Q.  Okay.  So let's focus on the first one, which is the

24 drug review division.  The jury has heard from a Wyeth vice

1 president already that the FDA doesn't do testing, doesn't do

2 animal studies, doesn't do human testing and didn't for hormone

3 therapy; is that true?

4  A.  It's true, and it's true in general.  The FDA does not

5 do your testing for you.  The government doesn't do the trials

6 so that you can seek an approval.  The FDA reviews the data

7 that the company generates and submits.

8  Q.  So no testing.  Would that be true, too, that there

9 would be no studies -- no human studies done by the FDA on

10 hormone therapy?

11  A.  Right.  And in almost 30 years, I've never had the FDA

12 do a study for me, never.

13  Q.  So what they do is they review the drug company's

14 data?

15  A.  Yes.

16  Q.  And I think you told us yesterday there's also a

17 division of the FDA that reviews marketing materials because

18 you had to deal with them when you were at Mylan?

19  A.  Yes.  That's one of the groups.

20  Q.  Let me ask you this about the marketing review

21 division:  Do they create the ads for the drug companies, or

22 again, do they just review what the drug companies give them?

23  A.  The FDA is not very much -- they're not in creation.

24 They're just in to review and acceptance or rejection of that

1 review, but the companies develop materials they would like to

2 use for marketing or for educational purpose for their product,

3 and there's a system set up that the different -- a system of

4 different steps along the way of what the companies have to

5 submit to the FDA for clearance for approval before they're

6 allowed to use it.  And the FDA maintains a very -- an active

7 activity after approval, too, where they go out independently

8 and try to find advertising pieces to see -- to make sure

9 they're complying, or if they're not complying, to find out

10 about it.

11  Q.  Okay.  FDA -- the FDA rules as minimum standards.  Can

12 you talk to the jury about what are the standards of the FDA

13 and are they considered minimum standards by the industry?

14  A.  The FDA, as I said, is charged -- authorized by

15 Congress to review the data that are provided to them, and they

16 make a decision whether they're going to approve a product.

17 And they may say, you know, it's not going to be approved or,

18 yes, it's approved, it can be approved today, or maybe, but you

19 have to go back and do more work.  Those are sort of the three

20 decisions you can get from the FDA.

21     However, the drug company -- once a product is

22 approved, the drug company -- as I mentioned yesterday, the

23 drug company knows their product better than anyone else,

24 obviously, in the world.  The drug company receives the data

1 from the field, from adverse meds.  The drug company is
2 charged -- a sponsor who is marketing the product is charged
3 with watching the product, monitoring the safety efforts
4 approved.  And I think I told you yesterday in here that much
5 of what we learn about safety of the information -- safety
6 information about drug products comes after the product is
7 launched.
8       So the company is charged with maintaining awareness
9 of what's going on, awareness of safety, and then doing
10 whatever they need to do to address a safety signal, a red flag
11 that may pop up, just for -- responsible for design studies,
12 whatever type of study they may want to design to examine a
13 safety signal.
14      So, the requirements for approval are not the end of
15 the story.  It is up to the company after that to be on the
16 watch for signals.  They may independently do studies to
17 address those signals.  They interact with the agency regarding
18 those signals.  But it's up to the company to do that.
19   Q.  Is it enough for a drug company, when it's faced with
20 a number of signals, to just say, well, we did what the FDA
21 told us to do, and that's all we did?
22      MR. WEBB:  Your Honor, I'm going to object to the form
23 of that question.  There's no foundation laid yet as far as
24 what the objective standard is that we're -- in other words,

1 this question is assuming there's an objective standard.
2 There's been no foundation as to what standard this witness has
3 applied to judge her conduct, and I object to this question on
4 that grounds.
5      THE COURT:  Ask a couple questions about foundation.
6 BY MS. LITTLEPAGE:
7   Q.  Sure.  Let's talk about some of the standards first.
8 We talked about there are FDA rules, those standards.
9   A.  Right.
10   Q.  Sort of -- I think you said minimum standards the drug
11 company must meet?
12   A.  Exactly.
13   Q.  Does the drug industry have pharmaceutical
14 associations that create guidelines and standards for the drug
15 industry?
16   A.  Yes.  There's really three levels of standards.  The
17 first is the FDA standards, what you need to do to keep out of
18 trouble and be compliant with FDA.  The second that I can think
19 of are the ones that -- the pharmaceutical companies have
20 associations where they have scientists representing each
21 company, administrative people in each company, where together,
22 that association forms standards.
23      I saw in the Wyeth database copies of the standards
24 that have been espoused by the association to which they belong

1 in which studies need to be done -- often need to be done that
2 exceed FDA standards, that FDA standards are the minimum, are
3 the starting points.  And then the third level obviously is for
4 the drug company -- every drug is different -- their own
5 internal standards that they must comply with when they market
6 a drug for the first time, and then safely continue its
7 marketing.  So we sort of look at it as three levels.
8   Q.  Hold on.  I messed it up.  Let me start again.
9      Okay.  So the FDA has rules that are minimums that the
10 drug companies must do?
11   A.  Yes.  And again, those rules, of course, apply to the
12 drug products for which FDA has jurisdiction.  We talked a
13 little bit yesterday that the FDA does not have jurisdiction
14 over all products, so -- but FDA would be for those products
15 for which they get a say.
16   Q.  Okay.  And then you said, above that is more detailed
17 standards that are put out by the drug industry?
18   A.  Yes.
19   Q.  These associations?
20   A.  Right.
21   Q.  And then you said, above that are the drug company's
22 own standards, where the drug company, for themselves, says
23 this is how we're going to act?
24   A.  Yes, recognizing that every company does things a

1 little bit differently, and it has to do, in part, that they
2 manufacture different products.  You may have a different set
3 of standards for a cancer drug for children than you might for
4 a drug that can be used for adults for just three or four days.
5   Q.  And have you reviewed depositions of Wyeth executives
6 that talk about the standards Wyeth holds themselves to?
7   A.  Yes.
8   Q.  And have you reviewed the drug industry standards and
9 seen the copies of those standards are in Wyeth's own
10 documents?
11   A.  Yes.  I found them in there and reviewed them.
12   Q.  Now, why can a drug company not just do the minimum?
13 Why can they not just meet the FDA standards and do nothing
14 more?
15   A.  The FDA is very clear.  In fact, it's very active in
16 the news right now that FDA does not have the responsibility or
17 the capabilities at this point to follow a product for safety
18 post-marketing.  The FDA has long been asking for additional
19 personal power and authority for this.  It hasn't come.  And at
20 this time, the FDA is very clear that it is not responsible for
21 post-marketing pharmaco vigilance.  They're not designed to do
22 that.  They don't have the personal power to do that; although,
23 they have been asking over the last several years for more of
24 that.

1    Q.   You said post-market pharmaco vigilance.  What is
2 that?
3    A.   Well, it's just the term that means, after approval,
4 you're watching the safety signals.
5    Q.   And that is not the FDA's job?
6    A.   Yeah, I know it sounds kind of odd that the Food &
7 Drug Administration wouldn't have that authority, but they
8 don't.  I mean, it's not much different than what you learn
9 about automobiles.  I mean, the National Highway Safety Board
10 does not have the authority to mandate all of the safety
11 features on a car.  They only -- I just learned they can only
12 do front crash and back crash.  Any car manufacturer that does
13 side crash, that was all voluntarily.  So when you see side
14 airbags, they didn't have to do that.  So it's a
15 minimum-standard agency, in a way similar to the car agency --
16 car review -- National Highway Safety Board.
17    Q.   All right.  The jury saw in opening statement my FDA
18 Island.  Let me ask you this:  Do drug companies in this
19 country know, first, the FDA regulations; do drug companies
20 have regulatory departments that educate them on the
21 regulations of the FDA?
22    A.   Oh, yeah, everyone that I've worked with, yes.  You
23 need a regulatory department.
24    Q.   And Wyeth has a regulatory department?

1    A.   Oh, yes.
2    Q.   And does a drug -- can the FDA tell a drug company
3 what to do always or only if the drug company is within the
4 authority of the FDA?
5    A.   We kind of call it, if you're on FDA Island or you're
6 off FDA Island.  And I know it seems kind of, you know, strange
7 but because of the way power was afforded to the agency, to the
8 FDA -- as I mentioned, they're still trying to get more power
9 and authority over various assignments -- the FDA does not have
10 jurisdiction over all products.  And their jurisdiction over
11 products varies, even among the products for which they do have
12 jurisdiction.
13    Q.   Okay.  Let's talk now about grandfather drugs.  We
14 touched on it briefly yesterday.  And -- when we talk about
15 when the FDA first got authority over drugs, what year did the
16 FDA first get a say in drugs?
17    A.   Well, their very first one was in 1938.  And they were
18 given the authority to assess drugs at that point for safety
19 issues.
20    Q.   All right.  And then when was the next change in the
21 FDA's authority?
22    A.   The next major change was in 1962 as it relates to
23 this topic.
24    Q.   And what happened in 1962?

1    A.   In 1962, FDA was empowered or authorized that before a
2 new product can be approved for marketing, they have to check
3 both the safety of the product and ensure that the product is
4 effective for whatever the company wants to market it for.
5    Q.   And what happened to drugs that were being sold before
6 the FDA got this authority in 1962?
7    A.   Right.  There was a system that was set up -- and I
8 think we referred to it yesterday with the acronym DESI, and
9 that stands for Drug Efficacy Study Implementation.  And
10 basically, what that means is the government put together a
11 panel, what to do with all these drugs that were approved for
12 safety between 1942.  And now we have this authority for
13 effectiveness.  What do we do?  We have to find some way to
14 decide if these products were ever effective, are they
15 effective now, and if they are effective for anything, what are
16 they effective for?  So this panel was put together with the
17 National Academy of Science, and they used many independent
18 scientists to go and review available data for this bundle of
19 products that were approved during this window, this time
20 frame.
21         And they -- the DESI review, if you will, then gave
22 various categories.  You might be effective if the drugs were
23 marketed for a long laundry list of items; they would say
24 effective for this, probably effective for this and not

1 effective at all for this.
2         And then based on that, labeling was changed to
3 reflect the findings of those various committees.
4    Q.   Okay.  So for the E and the P -- the E and the
5 original P, because there were more Ps later on -- were both of
6 those drugs grandfathered into the DESI process?
7    A.   Yes.  They were approved -- the originals were
8 approved, yes, before 1962.
9    Q.   So neither of those drugs would have gone through the
10 same safety and efficacy testing as if a drug was being
11 approved today?
12    A.   No, there's a new system in place.  For example, the
13 Premarin NDA was submitted for safety, and two months later, it
14 was approved.  I mean, today, you don't get your receipt -- the
15 FDA doesn't send you your receipt whether you even received
16 your NDA in two months or less -- or review a whole NDA.  So
17 the review is much different.
18    Q.   Let's talk a little bit about labels and warnings.
19 And when we talk about a label or a package insert, the jury
20 has already heard that's basically the same thing.  It's
21 information about the drug that the drug company creates.
22    A.   Yes.
23    Q.   Now, let's talk first about creating a label.  Who
24 actually writes out the first draft of the proposed language

Page 1709

1 for the package insert?

2    A.  As a product, once the NDA has been submitted and the

3 FDA has had a chance to review all the data and there's

4 interactions back and forth between the company and the FDA, if

5 it looks like the product is going to be approved or is going

6 to be declared approvable, then the label becomes an issue, and

7 the first -- the way it's done is, the company -- who, again,

8 knows more about the drug than anyone -- the company sits down,

9 at least, in my experience, and does the first draft of the

10 package insert, and we send it to the agency.  Generally, it's

11 very long and very detailed, because for every sentence we have

12 in the insert, we have to annotate our justification for that

13 sentence.  So you'll see a sentence, and then on the side here,

14 we think this is appropriate because of this study that you saw

15 or this data we have or this publication that someone did.  So

16 it's this long, involved, annotated insert that kind of

17 jump-starts, kicks off the whole labeling review.

18    Q.  All right.  And after the company sent that to the

19 FDA, does the FDA have an opportunity to edit it, revise it,

20 put comments in?

21    A.  There's several -- at least, in my experience, there's

22 several back-and-forth discussions, negotiations, between DNA

23 and the company, yes.

24    Q.  All right.  So then after this, are there sort of

Page 1710

1 back-and-forth negotiations on the label?

2    A.  Yes.

3    Q.  So, does the FDA write a company's label, or do they

4 edit and negotiate and approve what the company has written?

5    A.  It's never been my experience that the FDA has been in

6 the creating mode.  They're always in the review mode -- the

7 review and comment mode.

8    Q.  All right.

9    A.  So they don't write the inserts.

10    Q.  Let me ask you another question.  We've heard the

11 concept that, obviously, there's a drug, and coming with the

12 drug is the label.  Now, together, the drug and the label, does

13 that make up a drug product?

14    A.  Yeah.  If you look at the -- my understanding of the

15 regulations over the years, if you look at the U.S. code and

16 the -- and I mentioned earlier GMP's, the Good Manufacturing

17 Code of Federal Regulations, the U.S. Code -- I think it's

18 352 -- a drug product is the tablets or capsules, or patch,

19 whatever it is.  It's the container system that it will be

20 shipped in for interstate commerce, with FDA's authority,

21 because drugs are shipped across state lines with a sort of --

22 FDA's authority, and the material that must go with it that

23 define its conditions of use.

24    Q.  And can the FDA just approve a drug and have no

Page 1711

1 authority over the label?

2    A.  No.  No.  I'm certain -- not in my experience.  I have

3 not seen that.

4    Q.  And does the FDA's concept -- I think you said the

5 statute's concept of what a drug is these two parts:  The

6 actual pills plus the label that goes with it?

7    A.  Yes, when FDA cites 352 or 210 and 211, they will cite

8 the material -- you can't ship a product without affixing it to

9 it or combining with it the conditions for its safe use, what

10 -- the approved conditions, what you can use it for, and what

11 you might expect -- any problems you might expect with the

12 product.

13    Q.  Does the FDA approve both for pills and the label in

14 order to make up this single drug?

15    A.  Yes.  When you get your NDA approved, it will be an

16 NDA-approved for this antibiotic, and with that original

17 approval, what's approved is your manufacturing steps, how you

18 plan to make it, and what your label says about that product.

19    Q.  Now, you said that there was -- sticking, still, with

20 the FDA issues -- okay.  We were talking about marketing review

21 with the FDA, and I wanted to just ask you, does the FDA have

22 authority over everything a drug company says?  And I want to

23 sort of deal with branded and unbranded.  And can you explain

24 to the jury what's branded and what's unbranded and what the

Page 1712

1 FDA has authority and its rules over?

2    A.  Okay.  Branded is pretty much what it sounds like.

3 Prempro is the brand name for a product that contains estrogen

4 and progesterone.  So, branded advertising is the advertising

5 that's developed -- or marketing materials developed for that

6 particular product.  So we may see advertisements in magazines,

7 or now you see them on television about a particular product.

8 That's branded advertising.

9       Unbranded, companies are allowed to do unbranded

10 advertising not so much product-directed, but disease-awareness

11 protected.  So if you ever see -- on television you'll see a

12 commercial -- usually, kind of a long commercial about signs of

13 depression or signs that you may need a cholesterol-lowering

14 agent.  Those are not directed specifically to a product but as

15 to that disease or a condition which a drug might be used for,

16 but not specifically for that drug.

17    Q.  And does the FDA have any power or authority over

18 unbranded messages that a drug company creates?

19    A.  If -- no.  The FDA does not regulate unbranded

20 advertising.  If a company, however, engages in unbranded

21 advertising, and FDA believes it has gone -- specifically, it's

22 clearly leading to their product, then FDA will step in.  But

23 in general, unbranded advertising is not specifically regulated

24 on an advertisement-by-advertisement basis, no.

1   Q.  All right.  And let me talk to you a little bit about
2  FDA rules on on-label versus off-label promotion.  Can you tell
3  the jury what's the distinction between these two types of
4  marketing or representations?
5   A.  Yes.  Promoting on-label is pretty much what it sounds
6  like.  You're allowed to promote for what you're approved, and
7  I don't know if the jury has seen an insert yet, but it's the
8  standard format.  And one of the sections are what we call
9  indications, and that's its use.  So if it's an antibiotic, it
10 will say something like, this drug can be used for sore throats
11 and urinary tract infections.  You're allowed to advertise and
12 market consistent with what you're approved for on your label.
13 Promote for those indications.  You've been approved for those
14 indications.
15      Off-label is advertising or promoting or detailing a
16 product for uses that aren't specifically approved, that
17 haven't been approved by FDA, and that's considered off-label
18 promotional activities.
19  Q.  Okay.  And what I want to talk about now is off-label
20 promotion before 1997 and off-label promotion after 1997.
21  A.  Okay.
22  Q.  Okay?  First of all.  Why is 1997 important?
23  A.  1997 is important because it's sort of the watershed
24 year.  In 1997, in conjunction with a couple of laws and some

1  new requirements for the drug companies, FDA gave what they
2  called a safe harbor.  Prior to that, off-label promotion was
3  not allowed.
4   Q.  Let me stop you there.  Before 1997, could a drug
5  company go and talk to a doctor, or anybody, about a use that
6  was not approved?
7   A.  You couldn't promote for a use that hadn't been
8  approved.  And FDA -- today, but especially then -- went to
9  great lengths to see if that was going on.  Oftentimes at
10 medical conventions, FDA will pretend at a convention that they
11 are a doctor or a dentist, or whatever that convention is for,
12 and they will go to a booth where a company has their product,
13 and they will specifically ask questions and try to say, well,
14 I've heard that you could use this product for X and X, and it
15 may not be approved for that, depending on how the company
16 responds to that question.  If they, in any way, promote --
17 said it was okay to use it for that, you would get a letter
18 from the FDA -- a violation letter saying that's an off-label
19 use, so the FDA is always at conventions for that issue.
20  Q.  Let me ask you that:  Does the FDA have to sort of go
21 to those conventions and pretend to be doctors because when a
22 sales rep goes to visit a doctor and talks to them, the FDA is
23 not standing there?
24  A.  Exactly.  So what they do -- FDA -- in addition to

1  going to conventions, the FDA is always reviewing medical
2  journal advertisements, and the pharmaceutical company is a
3  great police -- they turn each other in all the time.  So one
4  drug company will turn in a competitor if they see an ad that's
5  off-label.  So, the FDA relies on companies to turn in other
6  drug companies, or competitors.  So there's a wide variety of
7  ways which the FDA accrues this information relating to
8  off-label promotion.
9   Q.  Now, what happened in 1997?  What's this safe harbor
10 thing?
11  A.  Well, the FDA set up a situation for drug companies
12 where they gave a very specific program by which they could
13 talk about off-label uses.  If a doctor or a healthcare
14 provider -- not just a doctor, a dentist, or whatever, asked
15 about an off-label, a company was allowed to discuss it
16 under very strict requirements.
17      The company would be -- the company representatives
18 would have a packet that the company had prepared, and it would
19 have a complete discussion.  If the -- bibliography, any
20 articles written about this drug for this off-label use, the
21 good articles, the bad articles, summarized; it would have an
22 overview of what the company was doing, if they were doing
23 trials trying to examine this off-label use, and it would give
24 a forum by which the doctor -- it was not a quick detail:  Hey,

1  Doc, this antibiotic is not used for in ear infections.  We
2  hear a doctor down the street who -- it's not that kind of
3  thing.  It's a discussion.
4      Some companies wouldn't have their reps do that.  They
5  would send it back to headquarters so the healthcare center
6  headquarters could do that.
7      So, under those very tight, proscribed conditions, the
8  safe harbor said, if you've got a packet developed for that
9  antibiotic for ear infections and you've given all the good
10 news about -- potential good news about it, all the bad news
11 about, you've said what we don't know, what we do know, you've
12 given an opportunity for the healthcare provider to call
13 headquarters, that was the system that was sort of the safe
14 harbor they created in '97.
15  Q.  Okay.  So after 1997, the first thing is the doctor
16 had to ask; you couldn't raise it?
17  A.  There is some -- some companies believe that if they
18 actively had that product with a filed IND and they were
19 actively doing a trial for that off-label indication, and that
20 doctor may have patients or may be interested in participating,
21 that they could talk to them about that off-label, using the
22 same format of it.  But some companies interpret that the
23 doctor has to ask first; others say, wait a minute, if I have a
24 big trial going on right now with ear infections, and I know

Page 1717

1 this doctor has a big population of this, that they're allowed
2 to use it. So companies look at that a little differently.
3     Q.  Okay. But whether they could raise it or the doctor
4 had to ask, what they could provide was only an approved
5 package of information that showed the good and the bad?
6     A.  Yeah. They're very elaborate, these safe harbor
7 packages. The ones that I have seen have been prepared by the
8 scientists, vetted through by regulatory affairs, and are
9 consistently updated so that the doctor -- if it's an
10 off-label, all he's getting, anything new that's in the world
11 literature, good or bad, or an update of where the company may
12 be with it.
13     Q.  Whether before 1997 or after 1997, could a drug
14 company train its sales reps to just go out and talk to doctors
15 about off-label uses, heart, brain, just go talk to doctors
16 about it?
17     A.  Yeah. I've never known that to be -- you mean, to
18 encourage them to do off-label advertising?
19     Q.  Train them.
20     A.  Oh, no, that's not my understanding.
21     Q.  And why is it inappropriate? Why is it not allowed by
22 the FDA for a drug company to train its sales reps to just go
23 out and talk to doctors about off-label uses?
24     A.  Well, the FDA has actually written an opinion about

Page 1718

1 why they don't want that -- didn't want it. And the reason is,
2 is that it doesn't -- it doesn't provide any control over what
3 the representative would be saying. They could be saying
4 anything about the product to encourage the use. It also
5 doesn't encourage the company to seek to do the real studies
6 that they would need to get that indication. And it doesn't
7 maintain control.
8         There isn't any -- when you have a product label,
9 that's your control. If you have 3,000 reps all out there
10 saying something different about 20 different off-label
11 indications, it kind of becomes the Wild West. There's no
12 regulatory oversight.
13     Q.  Let me hand you what's been marked as Plaintiffs'
14 Exhibit 377A and ask you if this is a Wyeth document that you
15 reviewed in your review of Wyeth documents.
16     A.  Yes, this is --
17         MS. LITTLEPAGE:  Wait, don't talk about it yet.
18         Judge, we move to admit Plaintiffs' Exhibit 377A.
19         MR. WEBB:  I have no objection.
20         THE COURT:  It's admitted.
21         (Plaintiffs' Exhibit 377A was admitted into evidence.)
22         THE WITNESS:  Yes, this is -- Wyeth personnel
23 evidently attended a meeting of the Drug Information
24 Association, DIA, annual meeting in 1997, and a couple -- two

Page 1719

1 or three of FDAers were there, and FDA frequently attends these
2 kinds of meetings. And one of the topics of discussion was
3 off-label uses and promotional practices. And this particular
4 document is an -- yeah, internal Wyeth document discussing
5 this.
6     Q.  Okay. Let me stop you here a minute. Go to the top,
7 and let's look at the date. June 30th, 1997, was the date?
8     A.  Right.
9     Q.  So we're right here at the time frame of FDA giving
10 you safe harbor packages?
11     A.  Yes.
12     Q.  And there apparently is an annual meeting in Montreal?
13     A.  It changes. Yeah.
14         MS. LITTLEPAGE:  And can you highlight right up here.
15 BY MS. LITTLEPAGE:
16     Q.  And there's a number of names of senior Wyeth
17 executives.
18         And I want to just highlight "Justin Victoria."
19         I want you to assume that Wyeth has said that
20 Mr. Victoria is going to be testifying in this case.
21     A.  All right.
22     Q.  So there's an annual meeting, and there's a number of
23 senior FDA staff present, right?
24     A.  Yes.

Page 1720

1     Q.  And one of them is Dr. Janet Woodcock?
2     A.  Yes.
3     Q.  Do you know Dr. Woodcock?
4     A.  Yes.
5     Q.  Let's go down a little bit. And Dr. Woodcock
6 apparently gives a speech at this meeting about off-label uses.
7     A.  Yes.
8         MS. LITTLEPAGE:  And can you highlight from "in
9 addition" all the way down to "standard."
10 BY MS. LITTLEPAGE:
11     Q.  Let's talk about what Dr. Woodcock said at this
12 meeting and that Wyeth summarized and put in its own document:
13 "The FDA believes promoting off-label use will diminish the
14 sponsor's incentive to study the indication."
15         Let's stop there. What does that mean?
16     A.  Well, this is similar to what's been said many times
17 by the FDA. If you're allowed to promote your product for an
18 unapproved indication, it takes way your incentive to study it
19 for that indication, because you're already marketing it for
20 that indication.
21     Q.  So you've already got the sales; you don't really need
22 to prove it's safe?
23     A.  Right.
24     Q.  "It could result in harm to patients." And that would

1 be the same thing that there's no studies to support it.

2   A.   Right.

3   Q.   The treatment could be ineffective because there's no

4 studies to support it, and it could diminish the use of

5 evidence-based medicine.  And what's evidence-based medicine?

6   A.   Medicine decisions regarding use of the drug product

7 that are developed following well-controlled scientific

8 studies, scientific evidence.

9   Q.   So, it might stop drug companies from doing

10 well-designed studies because they can promote anyway?

11   A.   Right.

12   Q.   And could ultimately lead to the erosion of the

13 efficacy standpoint?

14   A.   Right.

15   Q.   Now, is this document that you found in Wyeth's file

16 cabinets consistent with your understanding of why off-label

17 use or promotion wasn't -- wasn't looked at favorably by the

18 FDA?

19   A.   Yes.

20   Q.   All the same reasons you told us?

21   A.   Exactly.  They're pretty consistent in their

22 criticisms of it.  Another company just had -- just another

23 drug company just was huge -- hugely penalized by FDA for

24 off-label advertising multiple hundreds of millions of dollars

1 in fines.

2   Q.   Can you be penalized -- can you actually be fined by

3 the FDA if you do off-label promotion?

4   A.   Yes.  FDA has -- over the last several years, FDA has

5 taken a fairly severe stand, 2001, 2002, and current.  I mean,

6 one company -- another pharmaceutical company -- I think it was

7 a $600 million fine.  And then they have to provide a corporate

8 integrity statement that it won't happen again.  So it's a

9 serious offense now.

10   Q.   So it's not something -- this promoting off-label use

11 isn't something that's trivial or frivolous.  It's something

12 that's considered very serious by the drug industry and by the

13 FDA?

14   A.   Well, the FDA certainly considers it serious, and it

15 is an area of fear all the time with drug companies.

16   Q.   And ultimately, the questionnaire of the FDA that

17 would be the basis for the fines would be that patients could

18 be harmed -- take a drug for an unapproved use and end up

19 getting harmed?

20   A.   And it takes away the ability to learn.  Every study

21 gives you useful information.  And even if you do a study for

22 the ear infections and it doesn't prove to be helpful for ear

23 infections, that's important, but you also have a population

24 where you're looking at the safety of the drug, so you may gain

1 safety information from a study, even if it fails for a new

2 use.

3   Q.   Now, I want to talk about off-label promotion in the

4 context of hormone therapy.  And specifically, I want to talk

5 to you about -- our first topic is going to be cardiac

6 promotion.

7       Now, did Wyeth ever receive an indication for heart

8 benefit?

9   A.   No.

10   Q.   Okay.  Did Wyeth apply to the FDA and ask the FDA to

11 allow them to have a heart indication?

12   A.   I think they applied a couple times to the FDA and

13 attempted to have their labeling increased to include a

14 cardiovascular benefit based on what they believed was adequate

15 information in the literature.

16   Q.   Let me hand you --

17   A.   And FDA declined.

18   Q.   Let me hand you what's been marked as Plaintiffs'

19 Exhibit 194 and ask you if this is an internal Wyeth document.

20   A.   Yeah, this is one of them, yes.

21       MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'

22 Exhibit 194.

23       MR. WEBB:  No objection.

24       THE COURT:  It's admitted.

1       (Plaintiffs' Exhibit 194 was admitted into evidence.)

2 BY MS. LITTLEPAGE:

3   Q.   And let's look, first, at the top paragraph on the top

4 and see what we have going on here.

5       Go a little bit higher because we can see there's some

6 internal correspondence.

7       So it's a Wyeth document, and it's internal, which

8 means it came out of their file cabinets.  And what's the

9 date on this document?

10   A.   April 26th, 1992.

11   Q.   And just to orient ourselves, it's Dr. Steven Sasson

12 from Wyeth, and he's talking about Premarin and cardiovascular

13 labeling.

14   A.   Yes.

15   Q.   And it appears he has met with two people before the

16 FDA, Drs. Corfman and Dr. Cheever?

17   A.   Yes.

18   Q.   And let's go to the second paragraph.  In this

19 document, does Dr. Sasson record what the FDA has told Wyeth

20 about this application -- Wyeth has asked the FDA to let him

21 have a heart indication, and the FDA is telling him what the

22 FDA's response is, right?

23   A.   Yes.  Second paragraph.  Wyeth had asked that new

24 information be included in the Premarin label because Prempro

1 wasn't approved yet, and FDA had said that it had gone back and

2 forth at the FDA, and the FDA was proposing that this

3 information be contained within the precaution section of the

4 labeling.

5    Q.   Let me stop you there.  Originally, the FDA was

6 pushing for the cardiac information to be in the warning

7 section, right?

8    A.   Yes.

9    Q.   And then there had been a negotiation between Wyeth

10 and the FDA, and the FDA agreed it could go to precaution?

11       MR. WEBB:  Your Honor, I'm going to object to leading.

12 I've tried not to be objecting to this.  She's constantly

13 leading her own witness, and that's not proper.  I object to

14 question.

15       THE COURT:  The question is leading.  Rephrase,

16 please.

17 BY MS. LITTLEPAGE:

18    Q.   What had the negotiations between Wyeth and the FDA

19 ended up?

20    A.   Well, as I mentioned before, Wyeth had attempted to

21 have a use -- some usage sentences in the labeling for

22 cardiovascular benefit over the years, and the FDA had told

23 them, no, a study had to be done, you cannot have a use

24 indication without doing a study that was designed to be a

1 cardiovascular-use study.  And in 1992, there was a request to

2 put some additional information in regarding cardiovascular --

3 regarding cardiovascular information.  And initially, the FDA

4 had suggested that Wyeth put that in the warning section of the

5 label, the insert.  And it appears at this time there had been

6 a negotiation that they could put information in the label --

7 it would not be in the warnings -- it certainly wouldn't be in

8 the uses; it would be in the precautionary information.

9    Q.   Okay.  So you said that over the years, Wyeth kind of

10 had, on several occasions, asked the FDA to put in the Use --

11 or, in the Indications section cardiac information, heart

12 information?

13    A.   Yes.

14    Q.   And each time that Wyeth asked this, the FDA had

15 refused?

16    A.   Right.  They had refused the supplements.

17    Q.   And each time that Wyeth asked this, did the FDA say

18 you need to do a study?

19    A.   It was very similar to what it says here, that a study

20 needs to be done because the FDA still considers it an unproven

21 or yet-to-be-proven benefit.

22    Q.   And does this document indicate that, on this date,

23 Wyeth was specifically told --

24    A.   Exactly.

1    Q.   -- Dr. Corfman readily acknowledged that the only

2 reason they are presently not willing to allow this information

3 to appear in other sections, e.g., additional health benefits,

4 is to prevent Wyeth from promoting Premarin for what FDA

5 considers to be a yet-to-be-proven benefit?

6    A.   Yeah.  It's consistent with what they had been told

7 when they actually submitted an FDA supplement.

8    Q.   With this document, was Wyeth put on notice that the

9 FDA did not want Wyeth promoting these drugs for cardiac

10 benefit?

11    A.   Right.  It was then and is now an unapproved use.

12    Q.   We talked about this a little bit this morning, but I

13 want to make sure that we understand.  We talked about the

14 different standards for drug companies and FDA drug industry

15 drug companies.

16       You said that you had read some depositions of Wyeth

17 executives about Wyeth's own responsibilities and duties that

18 they assume themselves.  So let's talk about that, the duties.

19       Now, does a drug company have a duty to monitor their

20 drugs?

21    A.   Yes.  It's required.  As I said earlier today, that

22 once a product is in the marketplace, a drug company has to be

23 tracking its product for any new -- any new safety information.

24    Q.   And from looking at the depositions, did Wyeth accept

1 that they had a duty to monitor their drugs?

2       MR. WEBB:  Your Honor, I'm going to object.  I object

3 as -- I don't object if we're going to pinpoint a deposition.

4 There's no foundation without showing her some deposition, and

5 I'm going to object to the form of the question without

6 foundation.

7       THE COURT:  I think an expert can be asked an opinion,

8 and then foundation can be laid.  But perhaps it might be

9 helpful if you'd lay a little bit of foundation.

10 BY MS. LITTLEPAGE:

11    Q.   Sure.  I know, for example, you and I have discussed

12 Dr. Michael Dey's testimony.

13    A.   Yes.

14    Q.   Have you reviewed Dr. Michael Dey's testimony?

15    A.   I have.

16    Q.   And just so that we can orient ourselves, Dr. Dey is

17 the president of Wyeth Pharmaceutical?

18    A.   Right.

19    Q.   And I know that -- because you and I talked about it,

20 that you've reviewed Robert Essner's deposition?

21    A.   Yes.

22    Q.   And the jury has already heard there's nobody higher

23 in Wyeth than Robert Essner?

24    A.   Right, exactly.

Page 1729

1   Q.   So based on the testimony -- the sworn testimony of
2   these two very senior executives for Wyeth, do you have an
3   understanding that Wyeth accepts that it has a duty to monitor?
4        MR. WEBB:   Your Honor -- I object, Your Honor.  Unless
5   Counsel shows her the testimony that she's relying on to reach
6   this conclusion, the foundation is not laid.  I have no idea
7   what testimony she's talking about, and I think the foundation
8   has to be laid before the opinion comes in.  Show her the
9   testimony.
10       THE COURT:   Well, I think she can testify about what
11  she's read.  I don't think she has to actually show her
12  testimony.  I'm going to allow the question.
13  BY MS. LITTLEPAGE:
14  Q.   In your opinion, does Wyeth accept that it has a duty
15  to monitor its drugs?
16  A.   Yes.
17  Q.   And --
18  A.   In fact, I think Mr. Essner was actually president of
19  the association that we mentioned earlier of all the
20  pharmaceutical companies during this time frame.
21  Q.   That drafted --
22  A.   That drafted these, yes.
23  Q.   That's not an unusual duty for a drug company to
24  accept, is to at least look at their own product?

Page 1730

1   A.   No, it's required.  If you're going to market it, you
2   have to monitor it.
3   Q.   All right.  What about following medical literature,
4   does a drug company have to follow what's going on in the --
5   A.   Yes, you are required to do that and submit anything
6   new to the agency.
7   Q.   And from your review of the testimony and the
8   documents, did Wyeth follow the -- monitor the literature and
9   have a whole division that monitored the literature?
10  A.   Yes, I believe they monitored the literature.  I think
11  in one of the depositions, somebody said they had a staff of
12  150 people who monitored the literature.
13  Q.   Now, if safety signals show up, if a problem shows up
14  with the drug, does the drug company have a responsibility to
15  react or respond or --
16  A.   Yes.  It's your product.  You are the one who is
17  selling the product, and you get most of the information.  Many
18  times, a drug company gets information that the FDA hasn't even
19  seen.  So, the drug company is required to set up a program
20  within their organization for pharmaco vigilance, which is
21  nothing more than post-market safety to monitor, and if they
22  see something, to react to it.
23  Q.   Okay.  So if you see a safety problem, react?
24  A.   Right.

Page 1731

1   Q.   Yes?  And again, in your review of the materials, did
2   Wyeth accept that it had a responsibility to see safety
3   problems and react to them?
4   A.   Yes.
5   Q.   Now, when we talk about reacting, if a drug company
6   sees safety problems, should they go out and do a study?  I
7   mean, how should they react?
8   A.   Yeah, and again, it -- FDA does not give you specific
9   rules on how you do your safety program, and they can't,
10  really, because it would depend on what event you're seeing in
11  the field and, also, on the type of drug that you're marketing
12  and what kind of people it is being marketed to.
13       Safety signals are different in a pediatric -- in a
14  little person population than it might be for an adult
15  population.  So, there aren't consistent rules.  Rather, each
16  company is mandated, is required to develop a program for their
17  product and for the indications for the patient populations
18  that are using their product and to develop safety surveillance
19  techniques, signal detection techniques, and standard
20  procedures on how they react when they see these issues.  And
21  it eclipses a wide variety of activities across different
22  companies simply because they market all different types of
23  products.
24  Q.   And what studies be one of available -- and we're

Page 1732

1   going to talk about all the different kinds of studies, but
2   just the concept that you see a safety signal, and you react by
3   studying, getting to the bottom of it?
4   A.   Exactly.  When you see a signal and it's not -- a
5   signal is simply defined as something you spot in your data
6   that makes you think a little differently.  It's not a rule, a
7   laborious, detailed definition.  It's just something that makes
8   you think about it.
9        Most companies say, if you see an event that doubles
10  over a period of time, that's a signal.  So you if saw two
11  events one quarter and the next quarter you saw four or five,
12  you've seen a signal.  And then you react to it.  And that
13  reaction really depends on what you've seen and what type of
14  drug it is and what has to be done.  Some signals have to be
15  examined immediately, life and death kind of circumstances.
16  They have to be addressed immediately.  And FDA gives companies
17  leeway when they see those types of signals to do certain
18  things if it's a serious event.
19  Q.   And if the reaction is to do a study, are there lots
20  of different ways that a company can do a study to answer a
21  safety question?
22  A.   Yes, there are many different ways to do a study.
23  Prior to approval, you've probably heard that sponsors, to get
24  a drug approved -- I mean, they're looking at effectiveness of

1 a drug, does it work, does it not work -- they did a control
2 trial where they compare the drug with a placebo and monitor
3 and see if the patients get better or the condition improves.
4 That's called the randomized clinical trial.  You can certainly
5 do that after approval to examine a safety signal, but there
6 are a wide variety of other types of studies you can do to try
7 to look at -- or, tease a little bit more into this observed
8 safety signal.
9      Q.  All right.  From looking at the depositions and
10 documents, did Wyeth understand that if a safety signal shows
11 up, one of the options is to go do a study?
12     A.  Yeah, of course.  And just to add a point, the reason
13 they have to look independently for the signal is it's been
14 stated that of all the adverse events that occur, only -- it
15 used to be -- the calculation was only 10 percent are ever
16 reported.  The FDA has now refined that to say, we think it's
17 somewhere between 1 and 10 percent of all the adverse events
18 that occur are ever reported.  So most adverse events are not
19 reported to safety surveillance databases.  So a company has to
20 be proactive and has to go out and search to see if the signal
21 they observed is really there.
22     Q.  Let me hand you what's been marked as Plaintiffs'
23 Exhibit 1680.  And on this issue, does this document indicate
24 whether Wyeth, in fact, had some of the systems in place that

1 we've been talking about?
2      A.  Yes.  I have seen this.
3          MS. LITTLEPAGE:  We move to admit Plaintiffs'
4 Exhibit 1680.
5          MR. WEBB:  I have no objection.
6          THE COURT:  It's admitted.
7          (Plaintiffs' Exhibit 1680 was admitted into evidence.)
8 BY MS. LITTLEPAGE:
9      Q.  Does this -- I don't want any details.  I just wanted
10 to establish that this document establishes Wyeth has a whole
11 system in place for monitoring adverse events and how to react
12 to adverse events?
13     A.  Yes.
14     Q.  That would be standard?
15     A.  Yeah, required.
16     Q.  Okay.  We've talked a lot about signals, and we've
17 already described what is a signal and what would make up a
18 signal.  And if we use the word "signal" or "a red flag," what
19 does that mean?
20     A.  I know it doesn't sound very scientific, but
21 literally, a signal is just something that makes you think
22 differently, something that catches your attention and you need
23 to react to.
24     Q.  And is it part of a drug company to constantly be

1 looking and seeing what's going on all around, and should we be
2 aware of something new?
3      A.  Of course, yes.
4      Q.  All right.  Have you looked at Wyeth's documents and
5 seen signals that there were a breast cancer issue with these
6 drugs?
7      A.  Yes.
8      Q.  And the jury saw this slide in opening statement that
9 a signal would be a risk issue, right, a signal of there being
10 a problem with the drug?
11     A.  Yes.  Signals generally do refer to safety concerns.
12     Q.  Okay.  And the jury has seen this slide, too, from
13 opening statement that after 1975, that there were a number --
14 and we're going to go through some of them, not all of them,
15 but a number of red flags or signals to this company that there
16 was a need for breast cancer studies; do you agree with that?
17     A.  Yes.
18     Q.  Let's start with the first point on our chart, which
19 is 1975.  And why is the endometrial cancer issue a signal to
20 Wyeth that they may need to do breast cancer studies?
21     A.  In 1975, information became available from a couple
22 different sources.  1975, this would be primarily Premarin use
23 because Prempro hadn't been approved yet, and their jury
24 developed that women who were using estrogen -- postmenopausal

1 women who were using estrogen replacement therapy, there was an
2 increase of cases of cancer, specifically endometrial cancer.
3      Q.  Okay.  So one part of their drug has been found to
4 cause cancer below the waist.  Why would that be any
5 information to a company about cancer anywhere else?
6          MR. WEBB:  Your Honor, may I object?  She's not been
7 qualified as a medical doctor to opine about the effect that
8 hormones have on different parts of the body, so there's no
9 qualification for this opinion whatsoever.
10         THE COURT:  Well, I think she has the background and
11 qualifications.  I'll allow it.
12         THE WITNESS:  It's -- go ahead?
13         MS. LITTLEPAGE:  Yes, please.
14         THE WITNESS:  It's known in a woman -- in a female
15 body, that certain tissues, certain organs -- body organs are
16 responsible for development of puberty, onset of periods,
17 development, able to become pregnant, carry a baby, deliver a
18 baby, beginning of menopause.  And of course, those tissues
19 change.  Those organs change at various points in life.
20 Obviously, the uterus, the womb, is one of them; another is a
21 woman's breasts.  Both of those organs are sensitive to what I
22 call -- what we mentioned yesterday, are the sex hormones which
23 are estrogen and progesterone.
24     Q.  Okay.  So the fact that the womb is a

1 hormone-sensitive organ --

2   A.   Responsive, yes.

3   Q.   The breasts are a hormone-sensitive organ?

4   A.   Exactly.

5   Q.   And so cancer -- hormone-positive cancer in a

6 hormone-sensitive organ like the womb, would that at least

7 raise a red flag for cancer in another hormone-sensitive organ?

8   A.   Yes, at that time, in the '70s, which I mentioned

9 yesterday, when I was doing my dissertation, we were learning

10 not only in females, in males also, with the male sex hormones,

11 there were certain body organs that are responsive to the sex

12 hormones.  In a male, that's the prostate and the testes and

13 various portions of their bladder, and they have receptors

14 there that respond to the male sex hormone.  Similarly, in a

15 female, there are certain tissues that respond to the female

16 sex hormones.

17         So if you were treating men and your concern was if

18 there's an increase in their prostate cancer, do we need to be

19 looking at other tissues that also have the same sort of

20 receptors, male sex hormone receptors?  Similar in a female; it

21 would follow that if the uterus -- in a menopausal woman,

22 you're giving extra estrogen, you're giving extra -- above and

23 beyond what their body is making, so if the uterus is sensitive

24 to it and there's estrogen receptors, it's a logical step that

1 you would be concerned about the breasts, because we know that

2 breasts have estrogen receptors.

3   Q.   Let me hand you what's been marked as Plaintiffs'

4 Exhibit 21.  And it's already in evidence.  And I just want to

5 talk to you about a couple of pages, so I'm just going to hand

6 you a couple of pages, because it's a big document.

7         Okay.  Blow it up a little bit.

8         The jury has seen this document when Dr. Austin was

9 here.  It's a transcript of a proceeding of an advisory

10 committee.  But let me stop and ask you some questions.  First

11 of all, what's an advisory committee?

12   A.   FDA has an interesting practice.  They will convene

13 what they call advisory committees, which are pretty much what

14 they sound like, where they're seeking advice from outsiders.

15 FDA recognizes they don't have specialists in all fields for

16 all drugs necessarily within the FDA, so they will convene a

17 meeting, and they'll call in people who are working in this

18 area.  They may be academicians, they may be research

19 specialists outside the government, whatever, and they will

20 have a meeting, where -- and the FDA will prepare an agenda,

21 and they will put topics.  And they ask for the opinions.  They

22 ask for these outside experts to review the data that FDA has,

23 and they seek guidance from them.  They seek advice.  Kind of a

24 tutorial session.  They oftentimes invite the sponsor of a

1 pending drug who might be impacted by this decision or the

2 sponsor of a drug that's already being marketed that somehow is

3 impacted by this particular data, and that's what happened with

4 this.

5   Q.   And do they actually transcribe the proceedings so you

6 can read what everybody said?

7   A.   Yes.  They do transcribe it, and oftentimes, the

8 public may attend the meetings.

9   Q.   And this copy of this transcript came from Wyeth's

10 documents, so we know that Wyeth had a copy of this transcript?

11   A.   Yes.

12       MS. LITTLEPAGE:  Let's go to the third page, April.

13 No, this one.  Okay.  And pull up, like, the first three or

14 four.

15 BY MS. LITTLEPAGE:

16   Q.   The jury has seen this too, that of the speakers that

17 came to speak at the FDA in 1975, Dr. Don Austin, who they

18 already met from Oregon, was one of the speakers.

19   A.   Okay.

20   Q.   What I want to talk to you about, though, is if you

21 turn to page 58, on the top right-hand corner -- I think it's

22 the third or the fourth page in the book.

23       Can you go back to -- okay.  Let's blow this up.

24       Was there a question asked at this meeting about why

1 these studies had come about, these endometrial cancer studies,

2 and whether they were -- they had come about because the drug

3 companies had done them, whether they had come about because

4 independent doctors had picked up this association?

5   A.   You know, this is kind of an interesting situation.

6 This information was actually generated by two or three

7 independent physicians who had been treating women with

8 Premarin and had noticed, over time, that they seemed to be

9 seeing higher-than-usual numbers of endometrial cancer.

10   Q.   So this is not a situation where Wyeth, by doing this

11 safety surveillance and watching their product, had found the

12 endometrial cancer crisis; independent doctors had discovered

13 it?

14   A.   Yeah.  That is my understanding, yes.

15   Q.   And in fact, was the question asked whether

16 Dr. Finkle, one of those researches, was acting at the prodding

17 of a government agency or a state agency or even a manufacturer

18 of the drugs, and his response was no, he did it himself?

19   A.   No; right.

20   Q.   So then, if you turn to the page marked 85, there

21 indicates that there was a reporter in the audience from the

22 Washington Post.  Is that customary, that there can be press at

23 advisory committees?

24   A.   Yeah.  If FDA opens it to the public, yes, you will --

1 oftentimes, the press are there.

2    Q.   And did he ask a question about how much the study

3 cost that had been done to find the endometrial cancer?

4    A.   That was an interesting question.  Yes, he did.

5    Q.   Let's go to the next page and see what the answer was.

6 And let's start up here where he asks Dr. Finkle and see what

7 the answer is.

8         Now, does Dr. Finkle give a number as to what the

9 study costs to do, to discover endometrial cancer and to stop

10 that crisis from happening?

11   A.   It -- in his -- with his practice, it was $1900.

12   Q.   So these independent doctors had spent $1900 to

13 discover that Premarin, Wyeth's E pill, was causing cancer

14 below the waist?

15   A.   Yeah, there was a signal of that, yes.

16   Q.   And did the reporter say -- and then Dr. Smith, the

17 other person, the other group, did he say that his study had

18 cost less than a thousand dollars?

19   A.   Yes.

20   Q.   And that's the second group of doctors that discovered

21 cancer below the waist from Wyeth's product.  And Mr. Mintz

22 says, "I'd like to ask if there's a representative of Ayerst

23 Labs here who might tell us why they did not undertake these

24 studies.  Is there anyone here from Ayerst?  Are they not

1 interested in this subject?"  And then the presentation goes

2 on.  Nobody from Ayerst answers that question.

3    A.   Yes.  There's no transcript entry.

4    Q.   And Ayerst is Wyeth, right?  We talked about this,

5 that Wyeth changes it name over time, and at this point, it was

6 called Ayerst Labs?

7    A.   Yes.

8    Q.   All right.  And you said that this was our first red

9 flag.  And I did arts and crafts this weekend, so I have arts

10 and crafts red flags.  Let me put our first red flag, and tell

11 the jury what, in your opinion, should Wyeth have got from this

12 experience, the endometrial cancer crisis experience, what

13 should they have known?

14   A.   Well, with any signal, a flurry of activities begins

15 to either study the signal to either address if its real,

16 address if it's a problem; if it is, how one is going to

17 resolve it.  Address the problem.

18        So at that point, in addition to getting a handle on

19 the extent of endometrial cancer reports and if -- importantly,

20 if there were particularly vulnerable subgroups, companies,

21 once they know -- once they suspect a problem, is it more in a

22 certain type of woman, a certain age of woman, a certain dose;

23 a variety of questions are posed, and efforts go out to answer

24 those questions.  Do we need to do additional studies to

1 further define this signal?  With the information that we have

2 right now, what should we do immediately to warn prescribers

3 and their patients about this?  What is going to be our plan of

4 interacting with the agency on new labeling?  All these happen

5 in parallel.

6         Another issue is, is this an isolated signal or is

7 this a signal to something else, and should we be looking at

8 other drug products we might manufacture?  Should we be looking

9 at other parts of other potential body parts, organs, that

10 might be impacted by this same sort of phenomenon?

11   Q.   I'm going to hand you what's been marked as

12 Plaintiffs' Exhibit 28 and ask you if this is an internal Wyeth

13 document.  Is it an internal Wyeth document?

14   A.   I'm sorry, yes.

15        MS. LITTLEPAGE:  Judge, move to admit Plaintiffs'

16 Exhibit 28.

17        MR. WEBB:  I have no objection.

18        THE COURT:  28 is admitted.

19        (Plaintiffs' Exhibit 28 was admitted into evidence.)

20 BY MS. LITTLEPAGE:

21   Q.   All right.  And let's look at this document.  Let's go

22 to the top right.

23        Now, this document is dated June of 1976, right?

24   A.   Right.

1    Q.   So it's about six months after the advisory committee

2 in December that we just talked about?

3    A.   Right.

4    Q.   And it is an internal correspondence, goes into the

5 file cabinets of Wyeth.  And it talks about estrogens and

6 breast cancer?

7    A.   Right.

8    Q.   Let me ask you this:  This document states "In view of

9 the widespread use of estrogens with or without progestin,

10 there is valid concern as to whether or not the exogenous

11 estrogen leads to an increase in the incidence of breast

12 cancer."

13        Let me stop and ask you a couple questions.  As soon

14 as the endometrial cancer became known, did doctors start

15 prescribing a P, or progestin, to go with the estrogen?

16   A.   Right.

17   Q.   Why?

18   A.   Well, the idea was that that progesterone component

19 could change the -- the construction -- the construct of the

20 milieu of the endometrium and make it less vulnerable to the

21 estrogen effects.  So by prescribing them together,

22 progesterone would counteract the mycotic cell division effect

23 of the estrogen.  The progesterone actions would help prevent

24 the problematic actions of estrogen on cell division in the

Page 1745

1 uterus.

2    Q.   Okay.  So was the P being given to give a benefit to
3 the woman or just to counteract the risk of the E?

4    A.   Exactly -- no, it's not a benefit -- well, it was to
5 counteract the increased cancer risk associated with the
6 estrogens.  It was not for a clinical effectiveness benefit,
7 no.

8    Q.   This doesn't help hot flashes; it didn't give a
9 benefit?

10   A.   No, sorry, it was only there to counteract the
11 estrogen effect on the uterine cell division.

12   Q.   And so by June of 1976, does this internal document
13 indicate that Wyeth is already looking at the breast as a
14 possible -- and a possible cancer issue?

15   A.   Yeah, of course, yes, they are aware in this memo of
16 the presence of the estrogen receptors in both tissues.

17   Q.   All right.  If we go down to the next part -- April,
18 let's look at the bottom of this page.  Let's pull up --

19        THE COURT:  Excuse me, Counsel.  Is this a good time
20 to take our recess?

21        MS. LITTLEPAGE:  Yes.

22        THE COURT:  All right.  There have been a couple
23 questions from the jury.  What I'm going to do is discuss those
24 with counsel during the recess, and then we'll take care of

Page 1746

1 them when you come back.  Ladies and gentlemen, we'll be in
2 recess for 20 minutes, until 20 minutes of 11:00.

3        During this recess, please do not discuss this case
4 amongst yourselves or with anyone else; please do not read,
5 look at, or listen to any media coverage, should there be any;
6 please do not form or express any opinion about the ultimate
7 outcome until it's finally submitted to you for decision; and
8 finally, do not consult any outside resources for any
9 information about any of the issues about this case.

10       We'll be in recess for 20 minutes.

11       Counsel, remain.

12       (The following proceedings were had outside the
13 presence of the jury.)

14       THE COURT:  All right.  The jury has retired.
15 Counsel, if you'd approach, please.

16       MR. WEBB:  Your Honor, on the question I read about
17 yesterday, the jury says "Yesterday we were hearing about
18 Wyeth's attorneys contacting witnesses.  Was this unrelated?"
19 And I would like them to be instructed that it's being struck
20 from the record and that's it.  That's the end of it.

21       It's obviously on their mind.  They heard part of the
22 story, and I respectfully follow through with my request.

23       THE COURT:  All right.  I would say to them that that
24 portion of the testimony has been stricken from the record and

Page 1747

1 they're not to consider it in their deliberation.

2        MR. WEBB:  Thank you.

3        THE COURT:  Is that adequate?

4        MR. WEBB:  Yes, it is.  And the second one is, "Are
5 the unbranded also called the generic?"

6        And I assume you want to deal with that.

7        MS. LITTLEPAGE:  Yes.  I should have dealt with it
8 already.  Shows how we don't know what we're actually --

9        THE COURT:  Okay.  I'll hand this to the clerk to be
10 marked.

11       All right.  Anything else?

12       MS. LITTLEPAGE:  No, Judge.

13       THE COURT:  We're in recess, then, until 20 of.

14       (A brief recess was taken at the hour of 10:22 a.m.)

15       THE COURT:  Be seated, please.

16       (The following proceedings were had outside the
17 presence of the jury.)

18       THE COURT:  We're in session outside the presence of
19 the jury.

20       What's up?

21       MS. LITTLEPAGE:  Judge, over the break, I got a chance
22 to go talk to Dr. Blume about this contact from the Wyeth
23 lawyer, and now it's come back up in the juror's note.  I
24 wanted to talk to the Court about it.  What the Wyeth lawyer

Page 1748

1 said when he called her office and what's written on the call
2 slip is that he was calling to see if Wyeth could hire
3 Dr. Blume to be an expert in a case involving E, estrogen, and
4 progestin, and tumor growth.  Now, she assumed it was Prempro
5 because that's what she was working on.  Wyeth has now
6 indicated it wasn't; it was oral contraceptives.

7        She's happy, on the stand, to say Wyeth called me on E
8 plus P, but my understanding now is it was hormone therapy.

9        My concern is for the Court to strike her testimony
10 where it implies she was lying or making something up when it
11 was an honest mistake, that until this moment, in two years of
12 litigation, Wyeth has never produced this affidavit.  They have
13 never had any different position than what Dr. Blume believed
14 from the phone call.

15       Now that we have this affidavit, which I presume is a
16 hundred percent right, I think it's unfair to punish the
17 witness in front of the jury by striking her testimony like she
18 did something wrong.

19       She's happy to clarify it or to be crossed on it, but
20 the jurors are obviously listening for it, and, you know, I
21 have a concern that she's going to take a hit when it was,
22 honestly, an honest mistake that Wyeth has never corrected in
23 two years.

24       MR. WEBB:  Well, Your Honor, the reason I've asked for

1 it to be struck is because, right now, in the record, she said

2 she was contacted by a Wyeth lawyer on this case.  And I think

3 all Your Honor is doing is striking it and telling the jury to

4 disregard it, and it's in response to a direct question from a

5 juror, and it's out of the case.

6     THE COURT:  All right.  That's what I'm going to do.

7     MS. LITTLEPAGE:  Judge, the other issue is -- it's

8 sort of a related issue -- is the Court ruling that these sorts

9 of inquiries don't have any relevance, because Wyeth's

10 regulatory expert, I believe, is going to come in and say that

11 she was contacted by the other side and tried to be hired.  And

12 I mean, if we're going to keep it out, that's fine.  I

13 understand the Court has ruled.  I just don't want to be

14 blind-sided on the other side.

15     THE COURT:  Well, the reason this is not in is because

16 what the testimony was, was that she was called on this case.

17     MS. LITTLEPAGE:  Well, that was her understanding -- I

18 mean, I walked out and said, Mr. Webb has an affidavit, that it

19 wasn't on this case, and she said, well, it was -- my telephone

20 note says "E plus P and tumors."  And I'm happy to say that --

21 I'm happy to say, look, I now realize I was wrong, it wasn't

22 this product.  But you're penalizing her like she lied.  And

23 she has said this numerous times, and Wyeth has never corrected

24 her until now.

1     MR. WEBB:  Well, Your Honor, she's never said Prempro

2 before; that's why we did it this way.  And otherwise -- well,

3 anyway, I think if Your Honor is going to strike it, that's

4 what we want.

5     THE COURT:  That's what I'm going to do.

6     All right.  Are we ready for the jury?

7     MS. LITTLEPAGE:  Yes, Judge.

8     THE COURT:  Bring in the jury.

9     (The jury is now present.)

10     THE COURT:  Be seated, please.

11     Ladies and gentlemen, before we begin, there was a

12 question with regard to some testimony yesterday about

13 Dr. Blume having been contacted by Wyeth.  There was some

14 confusion about that, and so I've decided that what I'm going

15 to do with regard to that is to simply strike that issue from

16 the jury's consideration and instruct you that you're not to

17 consider that one way or another, for or against, in favor of

18 or against any side or any party or any witness.

19     THE CLERK:  Your Honor, one housekeeping issue:  The

20 juror notes will be marked Court's Exhibits F and G.

21     THE COURT:  All right.

22     (Court's Exhibits F and G were marked for

23 identification.)

24     MS. LITTLEPAGE:  Judge, do you want me to read now the

1 second note?  I don't know where it is.

2     THE COURT:  The clerk has it, I think.

3 BY MS. LITTLEPAGE:

4     Q.  Dr. Blume, there is a juror question and it relates

5 back, I think, to this issue of branded and unbranded.  What

6 did I do -- well, anyway, the question says "Are the unbranded

7 also called generic products?"

8     A.  I've never heard it referred to in that way.

9 Unbranded is also a term used for generic products, which are

10 the chemical equivalent of a branding drug.  So, if you're

11 taking, let's see, erythrosine, and the doctor -- and you're

12 allowed a generic equivalent, you might get erythromycin.

13     But when I talk about unbranded advertising, I'm

14 generally referring to the advertising that is not directed to

15 a particular product but is directed to a disease,

16 hypertension, high cholesterol, those types of -- I've never

17 heard it referred to as unbranded advertising for generic

18 products.

19     Q.  Okay.  So when we talk about unbranded, we're not

20 talking about whether the drug is generic or not; we're talking

21 about an ad that deals with a disease process?

22     A.  Yeah, that's a good question.  Unbranded does refer to

23 generic drugs, but unbranded advertising is -- refers to

24 advertising that is not unique, that is not directly pointing

1 to one drug product, but to a disease.

2     Q.  And, for example, would that be, an ad that says

3 "Prempro" would be branded?

4     A.  Yes.

5     Q.  And an ad that talks about hormone therapy and

6 menopause would be unbranded?

7     A.  Yes.  The television is just peppered today with the

8 long commercials that you see for family members who may have

9 symptoms of depression.  And it goes on.  That's an unbranded

10 advertising.  If you watch TV for a little longer and see an ad

11 that may be specific to a product, that would be a branded ad.

12 But when they talk about depression, that's an unbranded

13 advertisement.

14     Q.  Okay.  We were talking about Plaintiffs' Exhibit 28.

15 Do you still have that in front of you?

16     A.  I do.

17     MS. LITTLEPAGE:  Okay.  April, can we go from below

18 the highlighting.

19 BY MS. LITTLEPAGE:

20     Q.  Let's look at what the next paragraph deals with.  And

21 the title of this paragraph is "Estrogen Receptors."  I know

22 you did your thesis on this.  Tell the jury a little bit about

23 what a receptor is.

24     A.  In our bodies, we have, in various tissues and organs,

1 what we call receptors. And again, it's not really a very

2 scientific term, but it's a chemical, sometimes an enzyme,

3 sometimes a protein, and it's what links with a product or with

4 a hormone. And then that linkage is what's responsible for the

5 actions that that drug may have in your body.

6       You'll hear people who are taking certain drugs for

7 their heart; the drug actually binds with the calcium

8 channel -- a receptor in the heart that allows changes in flow

9 of different electrolytes into your heart and may alter the

10 heart rate.

11      There are receptors in male sex tissues, in female sex

12 tissues that bind to either the sex male sex hormones or the

13 sex -- female sex hormones. And it's thought that much

14 receptor binding is then responsible for taking the hormone or

15 taking a drug product to an area of the cell where it will then

16 have its effect. So it sort of transports it in there.

17  Q.  Does this document, this June of 1976 document,

18 indicate that Wyeth is looking at the issue of estrogen

19 receptors?

20  A.  Yes.

21  Q.  Let's turn to the next page and look at what they're

22 discussing.

23      Hold on. Stop right here. Let's highlight this.

24      The study that they're discussing found that about

1 half of the receptor-positive tumors were hormone-dependent;

2 i.e., responded to hormonal manipulation, right? That's sort

3 of the things we're discussing?

4   A.  Yes.

5   Q.  And let's go to the next page, and let's look at the

6 top paragraph first.

7       Now, does this indicate that, in 1976, the Wyeth

8 researchers understood that the presence of both estrogen and

9 progesterone receptors in a tumor indicates that the tumor can

10 and does respond to estrogen?

11  A.  Yes, of course.

12  Q.  Okay. So this is an understanding by Wyeth that a

13 hormone-positive cancer responds to hormones?

14  A.  Yes.

15  Q.  We talked about, before the break, this document deals

16 with breast cancer, so what they're talking about is that

17 hormone-positive breast cancers respond to the presence of

18 hormones?

19  A.  Yes, that's the topic of this conversation.

20  Q.  And if you go down a little bit -- let's highlight,

21 yeah, to about here (indicating) -- does the next paragraph,

22 "estrogen formation in breast cancer patients," does it

23 indicate that the possible role of progesterone in the etiology

24 of breast cancer is another area that needs clarification?

1   Q.  First of all, what's etiology?

2   A.  The cause, the genesis of it, the cause of the breast

3 cancer.

4   Q.  So, does this document indicate that Wyeth, in 1976,

5 is also looking at whether the progesterone, the second part of

6 the puzzle, may be playing a role in the formation of breast

7 cancer?

8   A.  Right. At that point in time, researchers had begun

9 to believe that there could be a communication or an

10 interaction between estrogen and progesterone in various body

11 organs. At one point, they were even thinking that the

12 presence of progesterone may synthesize progesterone receptors

13 or progesterone may inhibit progesterone formation. There was

14 quite a flurry of work initiating at that point.

15  Q.  And does it indicate that there's a need for further

16 clarification?

17  A.  There was, yes.

18  Q.  And why is this document important for the jury to

19 consider when it looks at what Wyeth is seeing in this year

20 after endometrial cancer?

21      MR. WEBB:  Your Honor, I'm going to object. My

22 objection -- expert witnesses are supposed to -- documents that

23 aren't, on their face, clear, self-explanatory, experts are not

24 supposed to be able to sit there and -- as if they're expert

1 readers. There's no expertise involved here, and I object to

2 this line of questioning.

3      THE COURT:  I think the interpretation of many

4 documents that deal with scientific issues is within the realm

5 of expert testimony. I'll allow a little of it. If it's

6 something that's very common knowledge, I'll revisit it, but

7 I'll allow this.

8 BY MS. LITTLEPAGE:

9   Q.  In your opinion, what's important about this document

10 the jury can see?

11  A.  Well, from a regulatory perspective, I think I

12 mentioned earlier that when a company gets some news from a

13 field or sees a signal about an adverse event, many things

14 start to begin at one time -- or, should begin at one time.

15 And one of the issues that a company looks at is, I've seen

16 this event, do I need to be worried about anything else related

17 to this event? Could it be that I've seen this event in one

18 tissue and it may be happening in another tissue?

19      The reason that I had looked at this document and had

20 specifically noted this document is, it was clear that that

21 also was going on at Wyeth during the mid-'70s, that they had

22 noted that there was this link between estrogen and endometrial

23 cancer, and they'd go to some discussion that the same

24 receptors may be involved and there may be a combination of

1 effects of estrogen and progesterone.  So it indicates that
2 they were on notice that the breast was affecting their -- it
3 was affecting a second body part, second organ of concern, as
4 it relates to Premarin use.
5   Q.  And would this be a signal that they have now
6 recognized that the endometrial cancer, they should be looking
7 at the breast?
8   A.  Yes, and that's why, in my report, that I linked this
9 topic.
10   Q.  Let me hand you what's been marked as Plaintiffs'
11 Exhibit 1057 and ask you, again, is this an internal Wyeth
12 document?
13   A.  Yes.
14       MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'
15 Exhibit 1057.
16       MR. WEBB:  I have no objection.
17       THE COURT:  It's admitted.
18       (Plaintiffs' Exhibit 1057 was admitted into evidence.)
19 BY MS. LITTLEPAGE:
20   Q.  And again, a Wyeth internal correspondence.  And can
21 you tell us what the date is?
22   A.  It's a little -- same time frame, a little later.
23 We're now in 1977.  August 24th, 1977.
24   Q.  And does this Wyeth document indicate that by 1977,

1 many practicing gynecologists were using progestins with the
2 estrogen?
3   A.  Right.  They -- what the document is saying is that,
4 luckily, it was discovered that if you add progesterone to
5 estrogen, you diminish, or decrease, the problem of the
6 endometrial cancer by combining those two together.
7       The data were somewhat empirical.  There were not
8 full, well-controlled studies on that, but there was
9 observational kinds of information.  And I believe that what
10 this memo is saying is that --
11       MR. WEBB:  Your Honor, I would object to what it's
12 saying other than what it says.  I don't think -- for her to
13 then try to imply something else that's not in the memo, I
14 object to it.
15       MS. LITTLEPAGE:  Let me ask the question.
16       THE COURT:  Ask the question.
17 BY MS. LITTLEPAGE:
18   Q.  Does this memo prove that Wyeth knew by 1977 that many
19 practicing gynecologists were using E plus P?
20   A.  Exactly, exactly, of course.
21   Q.  And does this Wyeth memo also indicate that the number
22 of published, well-designed studies on E plus P is small or
23 practically nonexistent?
24   A.  Correct.

1   Q.  So, does the memo, in Wyeth's own words, indicate
2 Wyeth's knowledge of the combination use and the fact that that
3 use had not been studied?
4   A.  Yes.  And studied, yes.
5   Q.  And why is this document important for a drug company
6 to be acknowledging that there's no real studies done on this
7 combination?
8   A.  Well, as I indicated earlier, when a signal is first
9 observed and discovered, this flurry of activity begins, and
10 you reach out to look at different populations or perhaps
11 different body parts, organs, that may be impacted by the
12 observed event.  And then the next step is, what information is
13 there available?  What do we have in our own databank and
14 what's out in the world's literature?
15       And part of your safety-gathering information is, how
16 do we study this signal?  How do we assess it?  Is there enough
17 data in the world's literature to give us an answer?  And if
18 not, what type of studies do we design to get that answer?
19       And I like this document because it shows that the
20 prescribers had realized that the addition of progesterone was
21 helpful for the endometrium and the need for controlled studies
22 with the combined therapy.
23   Q.  And would this be a red flag to a drug company that
24 your product is now being used in combination, but there's

1 really not any studies out there about the safety for that
2 combination?
3   A.  Well, it's fortunate that it appears to decrease the
4 uterine cancer.  There really are no studies to support that.
5 This is data from largely practicing gynecologists.
6   Q.  Okay.  Let me hand you what's been marked as
7 Plaintiffs' Exhibit 66A.
8       (Plaintiffs' Exhibit 66A was marked for
9 identification.)
10 BY MS. LITTLEPAGE:
11   Q.  And again, Dr. Blume, is this an internal Wyeth
12 document?
13   A.  It is.
14       MS. LITTLEPAGE:  We move to admit Plaintiffs'
15 Exhibit 66A.
16       MR. WEBB:  Your Honor, my only objection is, it looks
17 like this is just a partial document, and I don't have a full
18 document.
19       MS. LITTLEPAGE:  Correct.  It's only the first four
20 pages.  It's a 990-page document, of which I only want to talk
21 about the first four pages.  If you want to bring it in --
22       MR. WEBB:  Your Honor, I'm just objecting.  It's an
23 incomplete document.  That's my objection.
24       THE COURT:  You want all 900 pages?

1     MR. WEBB:  Your Honor, I'm not trying to be difficult.

2 I don't know whether there's something on the page before or

3 the page after that is relevant to what is -- all I have is a

4 Xerox with paragraphs -- well, I don't know whether -- if I

5 read the page before or the page after to put it in context.

6     THE COURT:  Do you have the document?

7     MR. WEBB:  All I have is the plaintiffs' exhibit.

8     MS. LITTLEPAGE:  Judge, may I respond?

9     THE COURT:  Yes.

10     MS. LITTLEPAGE:  66 and 66A are on our exhibit list.

11 66 is a very long document, most of which has nothing to do

12 with the issues here.  So we have always designated 66A as just

13 the first four pages, which are relevant to the issues here.

14 Both of them appear in my exhibit list.  I'm offering only 66A.

15 If there's optional completeness, obviously, they can bring up

16 whatever documents they want.

17     THE COURT:  But my question is -- since I don't have

18 them, I don't know -- is there a complete document marked with

19 the clerk?

20     MR. WEBB:  Marked with what, Your Honor?  I'm sorry.

21     THE COURT:  With the clerk.  Has the clerk marked the

22 complete document?

23     MR. WEBB:  No.

24     THE COURT:  Is the complete document here in court and

1 available?

2     MS. LITTLEPAGE:  We can print it out.  It's very -- a

3 very long document, which is why we identified on our pre- --

4 48-hour disclosures, that we were only going to be using 66A,

5 the first four pages.

6     MR. WEBB:  I'll look at it over the lunch hour and

7 I'll go find the document.  If I think there's something before

8 or after I need, I'll ask that it be added; otherwise, let's

9 just go forward.

10     THE COURT:  Go ahead.  I'll allow it.

11 BY MS. LITTLEPAGE:

12     Q.   Okay.  Let's highlight the product and look at the

13 date.

14     THE CLERK:  So, Your Honor, is it admitted, 66A?

15     THE COURT:  Yes.

16     THE CLERK:  Thank you.

17     (Plaintiffs' Exhibit 66A was admitted into evidence.)

18 BY MS. LITTLEPAGE:

19     Q.   All right.  First of all, tell us what the date is.

20     A.   March 9th, 1983.

21     Q.   And what does this mean, IND, Premarin, conjugated

22 estrogens, with medroxyprogesterone acetate tablets?  What does

23 that mean?

24     A.   This is a cover sheet that I talked about yesterday,

1 the IND, which is the document that we prepare when we want to

2 do trials for a product not already approved.  And this IND

3 number was assigned by the agency to study Premarin, the

4 estrogen component, with a synthetic progesterone called MPA,

5 or medroxyprogesterone acetate.

6     Q.   So, is Wyeth, in 1983, asking the FDA for permission

7 to do human studies using Premarin and the P,

8 medroxyprogesterone acetate, MPA?

9     A.   Yes.

10     Q.   And is this the right thing to do, is to file this

11 application?

12     A.   For them to begin the work to have a combination

13 product, they have to submit a permission application.  So yes,

14 they would need to do this to conduct trials with the

15 combination.

16     Q.   All right.  And if we turn to page 4, does Wyeth

17 provide a basis for initiating the trial?

18     A.   Yes.

19     Q.   And is that common?

20     A.   It's common to do a summary at the beginning to -- an

21 overview:  Why are you submitting this?  What is it you want to

22 do?  So --

23     MS. LITTLEPAGE:  Okay.  Can we just pull up right to

24 there (indicating).  That's perfect.

1 BY MS. LITTLEPAGE:

2     Q.   So they give a summary to why they're asking to do

3 this study.

4     A.   They say, at the beginning, that there's two products

5 involved here; Premarin is approved for -- at that time, it was

6 approved for vasomotor symptoms and atrophic vaginitis.

7     Q.   Which is -- hold on -- hot flashes and the vaginal

8 issue?

9     A.   Yeah, uh-huh, dryness.  And they also note that this

10 synthetic -- MPA is a synthetic progesterone, and it's been

11 approved for abnormal uterine bleeding.

12     Q.   That's the E plus P?

13     A.   Right, two singles.

14     Q.   Both of these drugs have been on the market even

15 before the FDA -- they're both grandfather drugs?

16     A.   Right.

17     Q.   And what are they asking?

18     A.   And they note at this time -- and we're in 1983, so

19 we've gone into -- six or seven years into the future here --

20 that there are reports in the literature that support that

21 there might be a treatment for endometrial overgrowth and then

22 the term for that is "hyperplasia" with a progesterone.

23     Q.   And do they indicate that, in fact, some consensus

24 groups are now recommending the use of E and P?

1    A.   Yes.  This is part of their rationale for why they
2  want to go forward.
3    Q.   And that were the use of combined therapy becomes
4  established, risks of the various progestins must be adequately
5  evaluated?
6    A.   Of course.  They need to do a trial -- do a control
7  trial to look at the combination, to assess whether the
8  combination does make sense, is it effective, and if effective,
9  is it safe?
10    MS. LITTLEPAGE:  Can we go to the last paragraph,
11  April?  If you can bring it back up.
12  BY MS. LITTLEPAGE:
13    Q.   Let's look at this paragraph here.
14    And does Wyeth indicate "We believe it is reasonably
15  safe to initiate a definitive study conducted to demonstrate
16  the efficacy and the safety of using the combination drug"?
17    A.   Right.  And was there justification for wanting to --
18  for submitting the IND, and asking FDA's permission to go
19  forward with such a study.
20    Q.   All right.  So let me ask you about this signal.  Does
21  this signal establish that Wyeth knows that there are
22  unanswered safety questions and is asking permission to
23  actually study and answer those questions?
24    A.   Right.  In the little scenario that I outlined

1  earlier:  Once you know the problem -- and they obviously
2  looked at the literature; they talk about different consensus,
3  and now they're preparing to address that signal with the
4  study.
5    Q.   And what they say is they're going to actually want to
6  do a definitive study to demonstrate the efficacy and the
7  safety?
8    A.   Correct.
9    Q.   Okay.  Now, let me hand you what's been marked as
10  Plaintiffs' Exhibit 68 and ask you if this is a Wyeth document.
11    A.   Yes.
12    MS. LITTLEPAGE:  We move to admit Plaintiffs'
13  Exhibit 68.
14    MR. WEBB:  I have no objection.
15    THE COURT:  68 is admitted.
16    (Plaintiffs' Exhibit 68 was admitted into evidence.)
17  BY MS. LITTLEPAGE:
18    Q.   And let's look at the top of this one; again, a Wyeth
19  internal correspondence from Dr. Perdue.  We've seen his name
20  on several of the documents.
21    A.   Correct.
22    Q.   And what's the date?
23    A.   A little later in 1983, September 15th, 1983.
24    Q.   And what has Dr. Perdue done in the fall of '83?

1    A.   He has -- he's reporting on the first day of a
2  workshop that NH -- there's some changes in the names now, but
3  an NIH workshop to look at estrogens and progesterones.
4    Q.   What is an NIH workshop?
5    A.   The National Statutes of Health is another government
6  agency.  And the National Institutes of Health are a group of
7  scientists that examine a variety of disease issues,
8  epidemiology issues, potential therapies, separate from the
9  FDA, the NIH, and they will oftentimes have workshops.
10  Sometimes they're combined with FDA.  Sometimes they'll be
11  separate workshops where they call in people, similar to what I
12  described earlier today, who are leaders noted in the field or
13  who have done research recently in the field, and get together
14  in a scientific kind of conclave to discuss issues that they
15  define ahead of time that they believe are worthy for debate
16  and opinion statements.
17    Q.   Okay.  And at this workshop, would there be experts --
18  and it's an estrogen workshop, right?
19    A.   Yes.
20    Q.   That's the subject.  And at this workshop, would there
21  be experts talking about estrogens and hormone therapy and some
22  of the issues?
23    A.   Yes.  Sometimes experts in the field, researchers in
24  the field; sometimes the public is allowed to attend.  It

1  depends.
2    Q.   Let's turn to the last page of this document and see
3  Dr. Perdue's summary.
4    Now, Dr. Perdue summarizes that his overall impression
5  was that the participants, these experts in the workshop, were
6  favorably disposed to a relatively large, long-term NIH-type
7  study -- right?
8    A.   Yes.
9    Q.   -- on the effects of estrogen on morbidity and
10  mortality.
11    Now, first of all, tell me -- let me -- "If mounted,
12  the design of such a study might well parallel that of our
13  current PREM-PAK study with groups receiving placebo, estrogen
14  alone, and E plus P."
15    Let me stop and ask you, why would a study have three
16  arms, an estrogen arm, a placebo arm, and an E plus P arm?
17    A.   Well, there's a lot of ways to design a study.  And
18  when you have -- generally, for a preapproval study or a
19  randomized clinical trial type study, you will include a group
20  that are not receiving a drug.  They are receiving placebo
21  therapy.  So they were -- that that's commonly used in studies,
22  to have one group, who, for the period of time, are getting the
23  placebo.  Generally, people don't know what they're getting
24  because the studies are blind; all the drugs look the same.

Page 1769

1 That's the placebo group.  In this case --

2    Q.   Let me ask you this:  A placebo is a sugar pill?

3    A.   Yeah, sugar pill.  But you don't know if you're

4 getting a sugar pill because it looks just like the drug.

5    Q.   So one group is getting the sugar pill, one is getting

6 estrogen, one is getting estrogen plus progestin?

7    A.   Right.

8    Q.   And this group of experts at the workshop have

9 indicated that a study would be needed with three arms --

10   A.   Right.

11   Q.   -- and that it should be long-term.

12        Why would it be important to do a long-term study on a

13 product that's being taken long-term?

14   A.   Well, when you design your studies, you design them

15 for how they'll be used or how you will label them to be used.

16 If we're doing -- back to the antibiotic example, if we're

17 doing an antibiotic study and children are only going to get

18 the drug for five days or ten days, we generally don't keep the

19 kids on the drug for two years.

20        If it's a lifetime type of drug, Lipitor, you'll see

21 the studies are longer and longer because people may go on this

22 drug and stay on it for long periods of time.  You cannot

23 assess long-term safety if a person is going to be on it for

24 years and decades by just looking at data for just two months.

Page 1770

1        For long-term drugs, you're expected to justify the

2 safety over the period of time that parallels how long our

3 patients will be taking the drugs.

4    Q.   It says again that the experts at this workshop had

5 talked about a relatively large study.

6        If you're looking for a risk of breast cancer, would

7 you need a large study to assess that type of risk?

8    A.   Right.  The -- I don't know if the jury has heard yet

9 about how we design studies.  But one of the considerations

10 that we have to go through each time as statisticians is, how

11 many patients need to be in a study, and what makes that

12 decision?

13        Well, the decision depends on what you're trying to

14 look for.  And guiding that decision is what effect do you want

15 to see and what effectiveness do you want to see, what safety

16 effects are you trying to track for.

17        If half of the patients get an effect -- I mean, if we

18 know that if we give Benadryl to a bunch of people, 60 percent

19 of them are going to get tired.  They'll be tired if they take

20 Benadryl.  You wouldn't need as big a study for an effect that

21 occurs in 60 percent of the people as you might for an effect

22 that may not occur one in ten people, one in a hundred people,

23 one in a thousand people.  So that guides how big our study is.

24        Also, guiding a study is the number of people and how

Page 1771

1 variable the response is.  If there's a great variability of

2 people in their response -- in the depression trials -- we use

3 big numbers in depression trials because people's responses to

4 antidepressants are fairly variable, so you need big studies so

5 -- because what you're trying to study is, is there really an

6 effect with the drug as compared with the placebo, so you might

7 need a bigger trial.

8    Q.   By this time, Wyeth has permission from the IND to

9 study in humans, correct?

10   A.   Correct.

11   Q.   Okay.  So by this time, Wyeth could start a human

12 study with permission from the FDA?

13   A.   Yes.

14   Q.   Does this document indicate that by this date, Wyeth

15 knew that at least experts felt there needed to be a large,

16 long-term, three-arm study done with this combination drug?

17   A.   Yes, that was the conclusion -- well, at least, in

18 this one, a Wyeth employee's memorandum.

19   Q.   All right.  Let me hand you what's been marked as

20 Plaintiffs' Exhibit 69 and ask you if this document is a Wyeth

21 document.

22   A.   Yes.

23        MS. LITTLEPAGE:  We move to admit Plaintiffs'

24 Exhibit 69.

Page 1772

1        MR. WEBB:  Your Honor, my only objection -- I don't

2 really object to the document.  There are some hearsay

3 statements in this document, according to Dr. Sobel of the FDA,

4 so I object to those statements because those are hearsay.

5        THE COURT:  Well, I don't know yet what they're being

6 offered for, so it's hard for me to evaluate.

7        MR. WEBB:  I don't know either.

8        THE COURT:  They may be offered to show knowledge on

9 the part of the hearer or the reader, that being Wyeth.  In

10 that case, I'd allow it.  I don't know what they're offered

11 for.

12        MS. LITTLEPAGE:  They're being offered for notice as

13 we move through what they knew at certain time frames.

14        THE COURT:  All right.  I'll allow it.  You want me to

15 instruct on that, I will.

16        MR. WEBB:  That's fine, Your Honor.

17        (Plaintiffs' Exhibit 69 was admitted into evidence.)

18 BY MS. LITTLEPAGE:

19   Q.   All right.  Let's look at this document, and first of

20 all, let's establish that it's a Wyeth internal document --

21   A.   Yes.

22   Q.   -- again, from a Dr. Perdue.  We've seen him several

23 times.

24   A.   Correct.

Page 1773

1    Q.  And what's the date of this document?

2    A.  It's a week later, September 22nd, 1983.

3    Q.  Okay.  And had Wyeth submitted a request to the FDA to

4  be allowed to sell E plus P?

5    A.  Yes.  Yes.

6    Q.  And had Wyeth gotten some information from the FDA as

7  to their response to this request that Wyeth could sell these

8  two drugs in a blister pack format?

9    A.  Well, there had been -- there had been various

10  discussions back and forth between the company and the agency,

11  and they needed to -- they were going to first go with two

12  separate products, Premarin and a progesterone product, and

13  that they were discussing the various study requirements.

14    Q.  Okay.  So they wanted to sell E plus P in two separate

15  pills but together in a package so you popped them both out

16  each morning?

17    A.  Convenience package, yes.

18    Q.  And when they made that request to the FDA, did the

19  FDA indicate that before the FDA would permit them to sell the

20  two drugs in one package, the FDA would require some studies to

21  be done?

22    A.  Yes.

23    Q.  And does this document indicate, "To attempt such

24  demonstration, those studies would be very costly, would take

Page 1774

1  many years, and might, in the end, not prove successful.  In

2  fact, the results of the studies that would be needed could

3  turn out to be embarrassing"?

4    A.  Embarrassing.

5    Q.  That's Wyeth's words?

6    A.  Yes.

7    Q.  So when the FDA said, we want studies, what was

8  Wyeth's response to that request from the FDA?

9    A.  Even though it's a convenience pack, the discussion

10  that's ongoing now is regarding justification of such a

11  combination and why are you combining two products?  You must

12  have a reason for doing that.

13        FDA requires that, and the discussion ensuing is that

14  that's -- the progestin that's being added will help decrease

15  the occurrence of the endometrial -- the uterine problems that

16  were observed with Premarin alone.

17        Additional discussions were ongoing about additional

18  studies that would be required in addressing this combination.

19  They knew it was going to be a convenience pack and whether

20  they would be looking at additional uses of the combination for

21  other indications.

22    Q.  Okay.  So up to now, up to 1983, Wyeth is out here

23  with Premarin, a grandfathered drug, right?

24    A.  Yes.

Page 1775

1    Q.  Now, Wyeth, at this point, asks the FDA, comes --

2  approaches the FDA Island and says, "We'd like to sell,

3  essentially, a new product the same pills but packaged

4  together"?

5    A.  Exactly.

6    Q.  And when Wyeth approaches FDA Island, would that

7  request have given the FDA the right to ask Wyeth to do

8  studies?

9    A.  Yes.  The combination, even though it was being used

10  in the field, as we've seen from the earlier documents, the

11  combination of the two ingredients had never been officially

12  reviewed or approved by the agency.  With this IND and with the

13  proposal to even have the convenience package together, they

14  would move to FDA Island, because FDA would have jurisdiction

15  over that combination.

16    Q.  Okay.  So as they approached FDA Island, did FDA say,

17  for us to approve these two drugs together, you need to do

18  studies?

19    A.  Yes, of course, yes.

20    Q.  And this document indicates that when FDA made that

21  request, Wyeth felt like it could be costly, would take a

22  number of years, could be unsuccessful?

23        MR. WEBB:  Your Honor, asked and answered twice

24  already.

Page 1776

1        THE COURT:  Well, I'll allow it.  I allow people to

2  cover the same ground a little bit.

3  BY MS. LITTLEPAGE:

4    Q.  And did Wyeth's own document indicate that such

5  studies could end up being embarrassing?

6    A.  They did.

7    Q.  And is it, in your opinion, appropriate for a drug

8  company to decide to not do a study because the results might

9  be unsuccessful or embarrassing?

10    A.  Well, no, it's not appropriate, especially when the

11  combination of ingredients is already being used.

12    Q.  And you know that?

13    A.  And they know it, yes.

14    Q.  They're selling the product, knowing their product is

15  being used --

16    A.  As one of the combination, yes.

17    Q.  And so is this a red flag, that the FDA was asking for

18  studies of the combination before they could be put in the

19  blister pack?

20    A.  Yes.

21    Q.  Let me hand you now what's been marked as Plaintiffs'

22  Exhibit 935 and ask you if this is a document that was received

23  by Wyeth and that appeared in Wyeth's files.

24    A.  Yes.

1    MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'
2 Exhibit 935.

3    MR. WEBB:  Your Honor, I object.  There's no basis.
4 This is not a Wyeth document and it's hearsay, and it's --
5 there's no basis for the admission of this document.

6    THE COURT:  Let me see the document.

7    THE CLERK:  And what number is that?

8    MS. LITTLEPAGE:  935.

9    THE CLERK:  Thank you.

10    MS. LITTLEPAGE:  Judge, it's being offered only for
11 notice that this document appeared in their files and was --
12 obviously deals with the issues that we're here about, the need
13 for studies on these issues.

14    THE COURT:  All right.  How about that?

15    MR. WEBB:  Well, it's not containing any admission by
16 Wyeth whatsoever of anything.  It's a third-party document, and
17 it's hearsay, and it has no relevancy.

18    THE COURT:  Well, I think it's being offered for
19 notice.  So if it was in their files, I think -- excuse me a
20 minute.  I have never seen it before, so I have to read it real
21 quickly.

22    MS. LITTLEPAGE:  Judge, would you like the highlighted
23 version to see what parts I'm going to --

24    THE COURT:  Well, no.  That's all right.

1    MS. LITTLEPAGE:  Okay.

2    THE COURT:  Is there any argument that wasn't in
3 Wyeth's files?

4    MR. WEBB:  No, Your Honor, that's not the issue.

5    THE COURT:  It's admitted for the purpose of notice
6 only.

7    (Plaintiffs' Exhibit 935 was admitted into evidence.)

8    MS. LITTLEPAGE:  Let's go to the first part up here.
9 Let's just look.

10 BY MS. LITTLEPAGE:

11    Q.  Okay.  First of all, can you tell me the date of this
12 document?

13    A.  Yes.  We move forward to January of 1988.

14    Q.  And is this a letter from Dr. Pennywise Budoff -- who
15 has a terrible name -- to Dr. Pickar, associate director for
16 clinical research for Wyeth Laboratories?

17    A.  I just can't imagine being named Pennywise.

18    Q.  Isn't it terrible?  And to be a doctor too.

19    And what does Dr. Pennywise Budoff -- she's obviously
20 had a conversation with Dr. Pickar that she's following up
21 with.

22    A.  Yes.  And what she's proposing -- and I don't know yet
23 if the jury has heard about all the different studies you can
24 do, but she's proposing a study regarding women who are already

1 -- even though it's not approved yet, it's been discussed --
2 many women are on the combination of estrogen and progesterone
3 therapy.  And at her center, she has what she considers a
4 database of women who have been receiving this therapy, and she
5 was asking Wyeth if they were interested, and her following
6 that database to study these women, especially with respect to
7 breast cancer and the uterine cancer.

8    Q.  Okay.  So does Dr. Budoff indicate that long-term data
9 on the combination therapy is difficult to find in the
10 literature, and so she considers her patient population to be
11 very valuable?

12    A.  Yes.

13    Q.  So this at least tells Wyeth that there's not much out
14 there in the literature that Dr. Budoff could find?

15    A.  Exactly, exactly.

16    Q.  And let's talk about this one.  She has a -- what she
17 considers to be a valuable patient base because all of her
18 patients still have a uterus, right?

19    A.  Right.  So they're on the combination P.

20    Q.  So they're on the combination?

21    A.  Uh-huh.

22    Q.  And that she does a number of tests and studies on
23 them every year?

24    A.  Yeah, she has a fairly detailed treatment plan for

1 those patients.

2    Q.  "Because my patient population adheres to strict
3 follow-up criteria, I feel that we would be able to greatly
4 improve the present fund of knowledge, including factors such
5 as the prevalence of breast and uterine cancer," right?

6    A.  Correct.

7    Q.  And is this a rational thing for a doctor to be
8 asking, is funding for a study, that she's got this patient
9 population, they strictly adhere, and it could provide more
10 information?

11    A.  Right.  Firms frequently receive requests such as
12 this, especially from physician who believe their own database
13 would be important.

14    Q.  Now, did Dr. Budoff ask that Wyeth help fund this
15 study just by paying for a research associate to pull the files
16 and track the data?

17    A.  And establish a criteria for the control group that
18 would be used as a base for their comparison.

19    Q.  Okay.  So does this document indicate that there is an
20 opportunity here by just giving enough money to fund a research
21 associate, that Wyeth could look at this patient population,
22 follow them with Dr. Budoff, and get some more breast cancer
23 information?

24    A.  Yes.

1    Q.   And did Wyeth ever fund Dr. Budoff to do this study?

2    A.   It is my understanding they did not.

3    Q.   Now, let me hand you what's been marked as Plaintiffs'

4  Exhibit 188 and again ask you if this is a Wyeth document.

5    A.   It is.

6        MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'

7  Exhibit 188.

8        MR. WEBB:  Your Honor, I have no objection, other than

9  -- my same objection is, there's internal hearsay in this

10  document from FDA officials that should not be admissible.

11       THE COURT:  I need to see it.

12       All right.  Response?

13       MS. LITTLEPAGE:  Goes to notice only.  It's in their

14  files, it's their summary, it's what they've heard and

15  summarized about this event, and it goes to their knowledge.

16       THE COURT:  Notice of knowledge.  It's admitted only

17  for those purposes.

18       (Plaintiffs' Exhibit 188 was admitted into evidence.)

19  BY MS. LITTLEPAGE:

20    Q.   Now, Dr. Blume, again, is this a Wyeth document that

21  deals with an advisory committee meeting in March of 1992?

22    A.   Yes, this is -- we moved forward to '92, and this is a

23  meeting we discussed earlier today about -- an advisory

24  committee meeting, and this is one such advisory committee.

1    Q.   And is it customary for drug companies to be at the

2  advisory committee, not only get the transcript, but also

3  summarize what happens at the advisory committee and circulate

4  it?

5    A.   Yes.  And sometimes their representatives are

6  permitted to speak at the advisory meeting and become part of

7  the transcript.

8    Q.   And did this advisory committee deal with the question

9  of whether women who had already had breast cancer -- could

10  they take estrogen or E plus P?

11    A.   Right.  This meeting was directed to women who had

12  already been treated for breast cancer, and would it be

13  appropriate or safe?  Does it require additional study to allow

14  them, following the treatment for breast cancer, to receive

15  estrogen therapy or combination estrogen-progesterone therapy?

16    Q.   Now, it looks here like the committee considers a

17  series of questions.  Is that common?

18    A.   Generally, they are developed ahead of time so that

19  all of the speakers and attendees can consider them before it

20  comes time for public discussion or a vote, if a vote is going

21  to be taken, yes.

22    Q.   All right.  And at this committee, was the -- let's

23  look at it.  Committee member Dr. Author Heaney expressed the

24  view that nearly all the members -- so he's sort of talking for

1  all the members -- that the questions that were being asked

2  were essentially asking for the results of clinical trials --

3  and that's studies, right?

4    A.   Yes, a trial is a study.

5    Q.   -- that had yet to be performed and that the trials

6  would have to be conducted before the committee could answer

7  the question --

8    A.   Yes.

9    Q.   -- right?

10    A.   So -- and did they say that, in fact, the committee

11  felt like studies were justified, that studies were needed and

12  justified to answer this question?

13    A.   In the subgroup of patients who had already had breast

14  cancer and the studies were needed -- studies could be

15  justified to determine the use of estrogen in those patients.

16    Q.   And if we turn to the next page, page 4, did they also

17  indicate that the committee felt like the sponsors should make

18  their own decision as to how to design these studies to get

19  these answers?

20    A.   That's pretty standard for FDA.  They generally tell a

21  sponsor to develop a design and bring it to them for review.

22    Q.   Okay.  Let me hand you now what's been marked as

23  Plaintiffs' Exhibit 251.  And is this a Wyeth document?

24    A.   Yes.

1        MS. LITTLEPAGE:  We move to admit Plaintiffs'

2  Exhibit 251.

3        MR. WEBB:  No objection.

4        THE COURT:  It's admitted.

5        (Plaintiffs' Exhibit 251 was admitted into evidence.)

6  BY MS. LITTLEPAGE:

7    Q.   Wyeth internal correspondence.  Let's get at least a

8  date so we can look at what the date is.

9    A.   Next year, December 8th, 1993.

10    Q.   And I didn't fill this in, but the committee here

11  decided that studies were needed, right?

12    A.   The advisory committee, yes.

13    Q.   Okay.  Now, here we are a year later, and as a group

14  the ECOG, the Eastern Cooperative Oncology Group, approached

15  Wyeth about funding a breast cancer study?

16    A.   Yes.  Yeah, they had received funding.

17    Q.   Okay.  So they're funded.  All they want is Wyeth to

18  give drug?

19    A.   Right.

20    Q.   And what does that mean when a drug company "gives

21  drug" to a study?

22    A.   Oftentimes, study investigators will approach the

23  company and ask if a company -- they're going to do a study

24  that involves a company's product, and they will ask the

Page 1785

1 company if they will provide the drug supplies to be used in
2 that study. And sometimes the company will also be asked to
3 provide the identically matching sugar pills for the study, and
4 sponsors will usually give the study drug. Sometimes they'll
5 make the placebo, and sometimes they'll even package the drug
6 for the actual study for them. So it's quite common.
7    Q.  Now, this document indicates that Wyeth had refused
8 that request consistent with company policy, right?
9    A.  Yes.
10   Q.  And I want to show you next what's been marked as
11 Plaintiffs' Exhibit 265 and ask you again if this is a Wyeth
12 document.
13   A.  Yes.
14      MS. LITTLEPAGE:  We move to admit Plaintiffs'
15 Exhibit 265.
16      MR. WEBB:  I have no objection.
17      THE COURT:  It's admitted.
18      (Plaintiffs' Exhibit 265 was admitted into evidence.)
19 BY MS. LITTLEPAGE:
20   Q.  Okay. And let's look at the date first, February the
21 9th, 1994.
22   A.  Right.
23   Q.  And does this also deal with the same issue we were
24 talking about before, the ECOG breast cancer?

Page 1786

1    A.  Right. It's a couple months later.
2    Q.  And ECOG has called back and said -- requested again
3 that Wyeth fund this study?
4    A.  Yes.
5    Q.  Now, if we go down a little bit -- I want to blow up
6 right in here, April. Let's go up a little bit. Blow up right
7 in here.
8       And does -- let's start with "ECOG" down to "breast
9 cancer."
10      Do you see that, "ECOG" right here? Does this
11 document indicate that ECOG first requested drug from many
12 months ago and, after some time, were rejected, as is
13 customary, apparently, for studies involving breast cancer; is
14 that what the document says?
15   A.  Yes.
16      MS. LITTLEPAGE:  And if we go down to the last
17 paragraph -- let's highlight from about here down so we can see
18 both highlighting at the same time.
19 BY MS. LITTLEPAGE:
20   Q.  Does the last paragraph indicate that the study has
21 now been reviewed to -- referred to a committee because
22 approval of the study requires somewhat of a change in company
23 policy, right?
24   A.  Yes.

Page 1787

1    Q.  Now, Dr. Blume, we've gone through, this morning, a
2 number of red flags, or signals, this company had about
3 potential breast cancer issues.
4       Would it be appropriate for a company, in light of
5 these signals, to have a company policy to not fund breast
6 cancer studies?
7    A.  Well, not after the advisory committee. I don't
8 believe the FDA advisory committee had indicated there was a
9 need, and breast cancer patients were being treated with
10 estrogen and tamoxifen and various ingredients. So I think
11 that since the product was being used and FDA had indicated
12 there was a need for additional information, that it would have
13 been prudent to consider participating in the study.
14   Q.  And again, in your opinion, in light of everything
15 that had happened, would it be appropriate for Wyeth at this
16 time to have sponsored or funded studies like Dr. Budoff's
17 study or like the ECOG study that we just talked about?
18   A.  Well, certainly, with Dr. Budoff's study, that was
19 looking through records. Yes, that would have been a quick way
20 to gain some additional information in her patients.
21      The ECOG, Wyeth had a policy that they weren't going
22 to fund breast cancer studies with estrogen because of concerns
23 that it might exacerbate the breast cancer and other issues,
24 and I understand that, but after the FDA had suggested the need

Page 1788

1 for that, and the risk appeared to justify that, the study was
2 going to be done. They were going to go to a different
3 estrogen. I think that they should have sponsored --
4 participated in both the Budoff as well as the ECOG study.
5    Q.  Let me hand you now what's been marked as Plaintiffs'
6 Exhibit 346 and ask you if this is a document from Wyeth's
7 files that actually has some handwriting from Wyeth employees
8 on the top of it.
9    A.  Yes.
10      MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'
11 Exhibit 346.
12      MR. WEBB:  Your Honor, my only objection to this
13 document -- I don't object to this document. I have no
14 objection to this document.
15      THE COURT:  Admitted.
16      (Plaintiffs' Exhibit 346 was admitted into evidence.)
17 BY MS. LITTLEPAGE:
18   Q.  Now, first of all, let's orient ourselves. What date
19 are we talking about?
20   A.  April of '96.
21   Q.  And in April of '96, had a Dr. Cummings done a study
22 that dealt with breast cancer and bone mineral density and
23 hormones?
24   A.  Exactly.

1   Q.   And can you tell the jury what Dr. Cummings had found

2   on -- first of all, what's bone mineral density?

3   A.   Bone mineral density is a measure of the density that

4   the size, the thickness, solidity of bone that changes in women

5   over time -- watch any TV at all, and you see Sally Fields in a

6   Boniva commercial and all that.  There are many drugs that are

7   being researched and already approved to address bone mineral

8   density losses in women as they get older and have the loss of

9   natural estrogen.  And the reason they do that is, you want to

10  avoid these bone mineral losses, or osteoporosis, as it's

11  called, because these women are at increased risk if they fall

12  for fracture and a particular concern about hip fractures.

13  Q.   Okay.  So this was a study in -- would you agree with

14  me that at least one of the indicated uses of E plus P is for

15  women who have osteoporosis?

16  A.   Yes.

17  Q.   So, this is a study actually in the target group of

18  women that would be taking E plus P?

19  A.   Yes.

20  Q.   And what did Dr. Cummings find in terms of women who

21  have low bone mineral density and breast cancer and the use of

22  hormones?

23  A.   Yeah, it was an interesting finding.  What they're

24  putting forth here is that all osteoporosis risk -- all risk is

1   not equal and that perhaps tiny, slender, narrow-framed -- I

2   guess was the word -- narrow-framed women are more likely to be

3   taking -- more likely to be prescribed the Prempro therapy for

4   osteoporosis -- at a greater risk for osteoporosis.  And when

5   one looks at their vulnerability to adverse events with

6   Prempro, you have to look at those women differently than the

7   whole group of women; i.e., you can't just combine them all

8   together, large frame, small frame, medium frame.  And this

9   abstract is saying the tiny-frame, the slender-frame women may

10  be at more risk for the breast cancer than the general

11  population of women.

12      MS. LITTLEPAGE:  Let's go down, April, will you, and

13  let's look -- go down past the chart.  Let's look here, the

14  part that has been underlined in the Wyeth copy.

15  BY MS. LITTLEPAGE:

16  Q.   "Our findings suggest that the risk of breast cancer

17  associated with hormone replacement therapy may have been

18  substantially underestimated since osteoporosis is a primary

19  indication for its use."

20  A.   Yes.

21  Q.   And did this study find that for thin or lean or

22  small-framed women, they had a greater risk of getting breast

23  cancer from these drugs than other women?

24  A.   Yes, from their baseline risk, their change, their

1   increase in risk was greater than the risk for women as a

2   whole.

3   Q.   Is it common to find that there are certain groups of

4   people taking a drug that might be at a greater risk than other

5   groups of people?

6   A.   Yes.  I mentioned that earlier, that you're aware of

7   looking at signals.  Well, looking at effectiveness in certain

8   subgroups as well as safety signals in certain subgroups, yes.

9   Q.   And is it important to look and see whether everybody

10  responds the same or whether there's a particular group of

11  women that are at extra risk?

12  A.   Yes, it's important to do subgroup analyses, gender,

13  age, whatever, for both effectiveness, as well as safety end

14  points, because then your labeling can reflect that.

15  Q.   Let me hand you what's been marked as Plaintiffs'

16  Exhibit 348 and Plaintiffs' Exhibit 349 and ask you to confirm

17  that both of these documents -- I'm sorry, Mr. Webb is right,

18  345 and 349.  I was totally wrong.

19      Plaintiffs' Exhibit 345 and 349, is that what you

20  have?

21  A.   I do.

22  Q.   Okay.  And can you confirm that both of these

23  documents are documents relating to the Cummings issue that

24  were in Wyeth's files?

1   A.   They are.

2      MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'

3   Exhibits 345 and 349.

4      MR. WEBB:  Your Honor, we made this argument this

5   morning about these handwritten notes, and so we'll stand on

6   our objections that were made this morning.

7      THE COURT:  All right.  I'm going to admit the

8   document based upon the evidence that was submitted to me at

9   the hearing we had this morning with regard to handwriting,

10  et cetera.

11  BY MS. LITTLEPAGE:

12  Q.   All right.  Let's talk first about 345.

13      THE COURT:  They're both admitted.

14      (Plaintiffs' Exhibits 345 and 349 were admitted into

15  evidence.)

16  BY MS. LITTLEPAGE:

17  Q.   But before -- pull it up.  Let me ask you a question

18  while she pulls this up.

19      Is this important information for a drug company to

20  find out that there is a group of women that are particularly

21  at risk with their drug?

22  A.   For -- yeah, women -- anytime you know you have a

23  particularly vulnerable or more at-risk subgroup, it's

24  important.

1    Q.   And would this be important information to do a study
2  to look further at the issue?
3    A.   Yes, to do a study and to update your labeling as the
4  information are generated.
5    Q.   That's my second question.  Would this be important
6  information to tell doctors and women, if you're small or
7  lean --
8    A.   Exactly.
9    Q.   -- you may have a different risk?
10   A.   Of course.
11   Q.   Okay.  Let's look at -- pull it back to the first --
12  okay.
13       And does this document deal with the Cummings study
14  that we just talked about?
15   A.   Yes, the abstract related to the Cummings study.
16   Q.   And does it indicate that the abstract has been
17  provided and reviewed?
18   A.   Yes.
19   Q.   And is Wyeth here considering their position and
20  formulating an appropriate publication-specific recommendation?
21   A.   Yes.
22   Q.   All right.  Let's go down and look at strategy right
23  here.  Does Wyeth put in place a two-track strategy as to how
24  they're going to respond to Dr. Cummings's information?

1  actually have experts to put in context Dr. Cummings's
2  findings, talk about cardiac benefit and Alzheimer's benefit,
3  right?
4    A.   That's included on this list, yes.
5    Q.   Now, if we turn to Exhibit 349, do you know,
6  Dr. Blume, that this has been established that's Jeff
7  Buchalter's handwriting?
8    A.   I understand that, right.
9    Q.   Jeff Buchalter being an executive at Wyeth?
10   A.   Yes.
11   Q.   And if we see here, he's talking about the Cummings
12  issue.  And if you go down a little bit more into the corner,
13  April -- he's talking about the Cummings analysis.  Do you see
14  that?
15   A.   I do.
16   Q.   And go up a little bit, and let's see -- in the middle
17  of this document, does Mr. Buchalter write in his own
18  handwriting the words "dismiss" and "distract"?
19   A.   Yes, he does.
20   Q.   And if you go down to the bottom, is there an
21  indication here in his notes "keep the U.S. press busy" by
22  hyping a different convention?
23   A.   Yes.
24   Q.   Do you see that?

1    A.   Yes.
2    Q.   The first strategy indicates dismissive strategy,
3  downplay the value of the study, right?
4    A.   Right.
5    Q.   Would that ever be appropriate for new information to
6  come out about a specific risk for women and a drug company
7  make the decision to dismiss or downplay that study?
8    A.   Yes -- it's one of the options that's under
9  discussion, but no, if employed, it would not be.  It would not
10  be appropriate.
11   Q.   If you turn the page -- let me ask you -- if you can
12  turn the page while we're trying to bring it up -- is there
13  also some discussion about getting consultants trained up to
14  answer questions and respond to media requests --
15   A.   Yes.
16   Q.   -- and to get ahead of criticism?
17       Do you see that under the benefit/risk session for the
18  press?
19   A.   I do.
20   Q.   And there's a discussion about talking to different
21  people and getting them ready to discuss this issue with the
22  press, should it come up?
23   A.   Correct.
24   Q.   And one of the things that Wyeth is proposing is to

1
2    A.   Yes.
3    Q.   If there was an important scientific finding like what
4  Dr. Cummings found in 1996, would it ever be appropriate to try
5  and deflect press from that finding by dismissing or
6  distracting?
7    A.   No.  It's not appropriate to dismiss that or attempt
8  to obviate people becoming aware of it.  I mean, firms can do a
9  variety of things.  Firms, when they receive this type of
10  information, can send a letter, they can send them -- I don't
11  know if the jury has heard about dear healthcare letters to
12  prescribers who use Premarin and Prempro and say this abstract
13  -- you may have heard about this abstract, and the company can
14  then give their review of that abstract and present their
15  position and cite different articles.  They can do that.  They
16  can approach and discuss labeling changes with the agency.
17       I mean, there's a variety of things that companies can
18  do, whether they agree or disagree with the data.  But it's not
19  appropriate to distract, deflect, but to share the information
20  and then share their opinion of the information.
21   Q.   And the jury has heard dear doctor letters, but I
22  don't know if they've heard what they are.  What is that
23  vehicle?
24   A.   It's -- pretty much, we now call them dear prescriber

1 letters because professionals, other than doctors, now
2 prescribe drugs. And basically, what it is, is we're allowed
3 to send a letter to prescribers about something new that's in
4 the -- that's appeared either in a medical finding that the
5 company has discovered or someone else has discovered, or it's
6 been in the press. And generally, a company will craft the
7 letter and alert the prescriber to this information; may give
8 us some additional information; may include some bibliography
9 of other scientific articles.
10       And you can send it to the doctors that you have on
11 record that are most likely to be using the product, or you can
12 send it to every gynecologist -- in this case, Wyeth may have
13 wanted to send it to every gynecologist who may be using
14 Premarin or may, in the future, use Premarin so that they have
15 the updated information.
16    Q.  And would that be an appropriate thing for a company
17 to do is to either start a study to figure it out or at least
18 send out a dear doctor letter saying this issue has been
19 raised?
20    A.  Yes, it's commonly used, and it's an effort to get the
21 information to everyone and to set up a forum for questions and
22 answers back and forth on it. Generally, the letter will say,
23 if you have questions or want more information, contact this
24 person at our company.

1    Q.  Let me hand you what's been marked as Plaintiffs'
2 Exhibit 811 and ask you if this is a Wyeth document.
3    A.  Yes.
4       MS. LITTLEPAGE:  We move to admit Plaintiffs'
5 Exhibit 811.
6       THE COURT:  Any objection?
7       MR. WEBB:  Yes, Your Honor. My objection is
8 relevancy. This actually is a document that deals with
9 European class labeling for HRT, and none of the plaintiffs
10 lived in Europe and would not have relied on it. I don't know
11 what its relevance is.
12       THE COURT:  Let me see it.
13       MS. LITTLEPAGE:  Sure. And, Judge, I can establish
14 with the witness this is what's called the core label. It
15 involves all the information the company knows about the
16 product in one document from which they pull out information
17 for the U.S. label, for the European label.
18       THE COURT:  Well, why don't you try to establish a
19 foundation, and we'll go from there.
20 BY MS. LITTLEPAGE:
21    Q.  Okay. Dr. Blume, tell me what a core SPC is, and what
22 does it involve?
23    A.  Many of the large companies market their product
24 worldwide, not just in the United States, but the same product

1 can be marketed all over. A core data sheet is -- is a
2 document that the company prepares. It's a succinct overview
3 of the information that they have about their product. And it
4 generally follows a standardized format, and that information
5 is -- it's to reduce to writing the -- and to be updated at
6 appropriate intervals what they know about the product, and it
7 does form the foundation of what -- whoever is marketing their
8 product in Europe, if it's them or if it's a sister company or
9 a licensee product, so that they have common information that
10 they are using across Europe for their product.
11    Q.  So, would this product be a summary of Wyeth's
12 information about hormone replacement therapy at this time?
13    A.  Yes.
14       MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'
15 Exhibit 811.
16       MR. WEBB:  Same objection, Your Honor.
17       THE COURT:  It's admitted.
18       (Plaintiffs' Exhibit 811 was admitted into evidence.)
19       THE COURT:  Just for clarification, at least for my
20 benefit -- perhaps for the jury too -- there are a lot of
21 initials in here, some of which I haven't seen before. You
22 might want to have the witness explain what SPC is and what
23 CPMP and things like that might be.
24 ////                        ////

1 BY MS. LITTLEPAGE:
2    Q.  Okay. Well, let's turn to page 3047, and I think some
3 of these issues can come up, and we can talk about them.
4       Should be the sixth page. Sorry. I didn't tell you
5 that.
6       Let's start right at the top. Does this document have
7 some information about breast cancer and, basically, a summary
8 of what Wyeth understands of breast cancer?
9    A.  Yes.
10       MS. LITTLEPAGE:  All right. And if we go down a
11 little bit -- can you go down to "addition of a progestin."
12 There we go.
13 BY MS. LITTLEPAGE:
14    Q.  Does it also talk about breast cancer in the context
15 of adding the two drugs together?
16    A.  Yes.
17    Q.  And does this document -- this Wyeth document indicate
18 what the level of risk is for women who are thin or lean or
19 normal body build?
20    A.  Let's see.
21    Q.  And it's --
22    A.  Yes, they do. They -- yes, they -- they're saying
23 there that an increased risk was found mostly for those women
24 with lean or normal body builds.

1    Q.   So does this document establish that Wyeth understood
2  Dr. Cummings's findings that these thin or lean women were at
3  an increased risk?
4    A.   Well, it certainly shows that they were aware that
5  there was difference of -- studies that had showed differences
6  among different female populations.
7    Q.   Did this risk information ever get into the label for
8  -- in America, for doctors and patients here to know that thin
9  or lean women had a greater risk?
10   A.   Not that I'm aware of.
11   Q.   Is that something that you can put in the label?  I
12 mean, are you allowed, as a drug company, to identify certain
13 populations that are most at risk with your drug?
14   A.   Oh, yes, you're encouraged to do that.
15   Q.   And in your opinion, would it have been appropriate
16 for Wyeth to give doctors and patients this type of
17 information?
18   A.   Well, I think so, because these are women who were
19 primarily getting it for osteoporosis and would be taking it
20 for the longer periods of time.
21   Q.   So they're thin or lean women, and they're going to
22 take it long term?
23   A.   Yes, because it's not for short-term heat flashes --
24 hot flashes.  It's for the prevention of osteoporosis, so it's

1  more for long-term use.
2    Q.   Now, we sort of skipped in the middle because we were
3  talking about red flags, but let me go back and talk to you
4  about 1994, 1995 and the approval of Prempro.
5        Now, you told us earlier that Wyeth had tried, on a
6  couple of occasions, to get the FDA to approve two pills in one
7  blister pack.
8    A.   Yes.
9    Q.   At some point, did Wyeth actually decide to put the
10 two pills into one pill?
11   A.   Yes, that would be the 1995 approval.
12   Q.   And let me hand you what's been marked Plaintiffs'
13 Exhibit -- hold on.  Before a drug is approved, does the FDA
14 assign a particular person at the FDA to review the materials,
15 looking at the company's data and stamp approval?
16   A.   Well, multiple people, depending on what's being
17 reviewed, are involved in the FDA.
18   Q.   And let me hand you what's been marked as Plaintiffs'
19 Exhibit 288 and ask you, first of all, is the cover page a
20 Wyeth document identifying that attached to the Wyeth document
21 is the medical officer's review for this drug?
22   A.   Right.
23       MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'
24 Exhibit 288.

1        MR. WEBB:  No objection.
2        THE COURT:  It's admitted.
3        (Plaintiffs' Exhibit 288 was admitted into evidence.)
4        MS. LITTLEPAGE:  Well, let's stop here.  I'm sorry.
5  Pull up just the top part, all the way down to about here
6  (indicating).  A little bit further.  Good.
7  BY MS. LITTLEPAGE:
8    Q.   Does this indicate, in February of 1995, Wyeth is
9  looking at the medical officer's review for Prempro?
10   A.   Correct.
11   Q.   And attached to that document is the medical officer's
12 review for Prempro?
13   A.   Yeah, that's correct.
14   Q.   Let's go to the next page.  And was the doctor
15 assigned by the FDA -- what was the name of the doctor that was
16 assigned by the FDA to review the drug?
17   A.   I think the primary on the medical was Linda Golden.
18   Q.   And when you say "the primary on the medical," what
19 does that mean?
20   A.   Well, there are primary reviewers.  There may be
21 multiple reviewers for each -- the new drug application --
22 we're looking right now at the medical review, the medical
23 clinical data.  But the new drug application will have an
24 animal data section, a manufacturing section, an environment

1  section.  There's many sections.  And although many people may
2  work on each section, generally someone is designated as the
3  primary reviewer or the author of the review.
4        MS. LITTLEPAGE:  Let's turn to page 8 on the bottom.
5  Can you pull up this paragraph here (indicating)?
6  BY MS. LITTLEPAGE:
7    Q.   We don't have a very good copy.  Okay.  Looks better
8  pulled up.  Does Dr. Golden, as she went through the medical
9  officer's review, talk about breast cancer and about the fact
10 that it's a major health problem in the U.S.
11   A.   Yes.
12   Q.   And does she indicate that "In the postmenopausal
13 population, even small increments in the relative risk of
14 breast cancer have great public health significance"?  So even
15 if the drug is increasing the breast cancer risk just a little
16 bit, that has great public health significance?
17   A.   Well, it does during this time frame.  This is in '95,
18 so it's the advent of the first of the baby boomer population
19 getting older and going through menopause, so it would have a
20 significant influence, because there was -- the population grew
21 so much at that point.
22   Q.   And does she indicate that "The true effect of HRT on
23 breast cancer incidence and mortality must be considered the
24 single most important safety issue concerning this class of

Page 1805

1 drugs"?

2    A.  Yes.

3    Q.  Okay.  And we talk about FDA Island.  At this point,

4 has Wyeth, by asking for Prempro to be approved, landed

5 squarely on FDA Island?

6    A.  Yes.

7    Q.  And as a part of this approval of Prempro, does the

8 FDA -- let me ask you this this way:  Does the FDA now have

9 authority over Wyeth because they're on FDA Island?

10   A.  Yes.  For this product, yes.

11   Q.  They're no longer out here with their grandfathered

12 Premarin; they're on FDA Island?

13   A.  Correct.

14   Q.  What does the FDA say to Wyeth as they have authority

15 over them in terms of approving Prempro?  And let me hand you

16 Plaintiffs' Exhibit 287.

17       THE COURT:  Is this a good time for a break?

18       MS. LITTLEPAGE:  Yes, it is.

19       THE COURT:  All right.  Ladies and gentlemen, we'll

20 take our noon recess now.

21       During this recess, please do not discuss this case

22 amongst yourselves or with anyone else; do not express or form

23 any opinions until it's finally submitted to you for decision;

24 do not read, look at, or listen to any media coverage, should

Page 1806

1 there be any; and finally, do not consult any outside resources

2 for any information about any of the issues about the case.

3 We'll be in recess until 1:30.

4       (The following proceedings were had outside the

5 presence of the jury.)

6       THE COURT:  The jury has retired.  Anything, counsel?

7       MS. LITTLEPAGE:  No, Judge.

8       THE COURT:  I've got a judge's meeting over the noon

9 hour, and I've got to go to my accountant's office to try to

10 take care of some stuff.  I'll try to be back by 1:15 if

11 something comes up.  If there is, just let the office know, and

12 hopefully, I'll be back by then.

13       We're in recess.

14       (A luncheon recess was taken from the hour of

15 12:01 p.m. to the hour of 1:34)

16             -oOo-

17

18

19

20

21

22

23

24

Page 1807

1    RENO, NEVADA, TUESDAY, SEPTEMBER 18, 2007, 1:34 P.M.

2             -oOo-

3

4       THE COURT:  Counsel and the jury are present.  You can

5 resume.

6       MS. LITTLEPAGE:  Thank you, Judge.

7 BY MS. LITTLEPAGE:

8    Q.  Dr. Blume, let me hand you what has been marked as

9 Plaintiff's Exhibit 287 and ask you if you can identify that as

10 a Wyeth document?

11   A.  Yes, I can.

12       MS. LITTLEPAGE:  Judge, we move to admit Plaintiff's

13 287.

14       MR. WEBB:  No objection.

15       THE COURT:  287 is admitted.

16       (Plaintiff's Exhibit 287 admitted at this time.)

17 BY MS. LITTLEPAGE:

18   Q.  Okay.  And let's go -- does this indicate that the

19 document that is attached is being distributed to a whole

20 number of Wyeth employees?

21   A.  Yes.

22   Q.  Let's look and see what's being distributed, which is

23 page four of this document.  And page four of the document

24 is -- let's pull up and look at the date.  The date is

Page 1808

1 December 30th, 1994.  And what is this document?

2    A.  This is the agency's, the FDA's approval letter for

3 the Wyeth NDA number 20303, which is the -- which is the single

4 tablets.

5    Q.  Okay.  So it's Wyeth's -- it's the FDA approving

6 Wyeth's application to sell E plus P?

7    A.  Yes.

8    Q.  And at this point that Wyeth -- is Wyeth firmly on FDA

9 island?

10   A.  Yes.

11   Q.  And let's turn to the second page and see what the FDA

12 tells Wyeth about this approval.  And can we just blowup these

13 two right here.  Yeah.  All right.

14       I'm going to want to talk about this paragraph.  Can

15 we capture it, because we're missing a couple of words on this

16 side.  These two paragraphs right here and here.

17       Okay.  First of all, does the FDA talk to Wyeth in

18 this approval letter about two phase four commitments, here and

19 here?

20   A.  Correct.

21   Q.  What is a phase four commitment?

22   A.  In product development, we refer to the stage of

23 development as stages 1, 2, 3 or 4.  And phase four is the one

24 that is reserved for a requirement that is given to you when

Page 1809

1 the drug is approved as a condition of that approval.

2     So we do phase -- we do studies that are called phase

3 1, 2, and 3 before approval, phase 4 is a commitment you must

4 do following approval.

5  Q.  Has the FDA asked Wyeth to commit as a part of getting

6 their drug approved to study the lowest effective dose of the

7 drug for bone issues?

8  A.  Yes.

9  Q.  So the first commitment look at lower dosis, right?

10  A.  Correct.

11  Q.  Now, the second commitment that the FDA asks is that

12 Wyeth commit to conduct a comprehensive investigation of breast

13 cancer risk, right?

14  A.  Correct.

15  Q.  Tell the jury what's important about this document

16 that Wyeth is being told:  Your drug is approved with the

17 commitment that you do a comprehensive investigation of breast

18 cancer?

19  A.  FDA was, as a condition for the approval, FDA was --

20 as we've said, there's two studies.  One is to see if lower

21 doses will be effective.  And the second is that as phase four

22 post approval to do an overview, a comprehensive investigation,

23 an overview on the combination therapy on breast cancer.

24  Q.  Before lunch, we talked about the fact that Linda

Page 1810

1 Golden's review had said that breast cancer is a really serious

2 issue and we need answers.

3  A.  Yes, the single most important.

4  Q.  The single most important issue.  And in connection

5 with Linda Golden's comments, the FDA has made Wyeth to commit

6 to getting comprehensive answers about the breast cancer issue?

7  A.  Correct.

8  Q.  Now, does the FDA have the authority to tell Wyeth, we

9 want you to commit to this kind of study, because now Wyeth is

10 on FDA island?

11  A.  Yes.

12  Q.  Is that yes?

13  A.  Oh, sorry.  Yes.

14  Q.  Okay.  So in your opinion, was it known and understood

15 by the FDA at this time that there wasn't a definitive answer

16 about breast cancer issues with these drugs?

17     MR. WEBB:  Objection.  Objection as to the what the

18 FDA definitively knew, your Honor.  Object to the form of the

19 question.

20     THE COURT:  I think you need to rephrase it.

21 BY MS. LITTLEPAGE:

22  Q.  Based on your review of the documents, do you have an

23 opinion whether the FDA understood that there were still breast

24 cancer issues with these drugs that needed to be answered?

Page 1811

1  A.  Well, FDA was very clear of their review of the breast

2 cancer issues.  In several of the correspondences dealing with

3 both the IND and the NPA, even the final approval package noted

4 that the breast cancer issue remained unanswered.  So, yes, I

5 think it's clear.

6  Q.  All right.  We talked before lunch about studies.  And

7 I want to talk specifically about breast cancer studies.  If a

8 drug company sees a number of red flags or signals about breast

9 cancer, what types of studies can the company do to answer

10 those issues?

11  A.  For breast cancer studies, or for any -- really any

12 type of safety study that a company is considering, there are

13 several major categories of study types that can be done.

14     In this particular instance, I'm not sure if the jury

15 has heard yet about the different type of databases that are

16 available.

17  Q.  Yeah.  Let me ask about this.  The jury saw this in

18 opening statement, and there's a toolbox analogy, that was my

19 analogy, but is it a good analogy to say there's a number of

20 different ways to look at this issue?

21  A.  Yes, that's true.

22  Q.  And you just raised one, a database study.  What would

23 a database study be?

24  A.  Well, all of us who belong to HMO insurance programs

Page 1812

1 or PPO insurance programs, employer-type of health care

2 benefits, many of the large insurance databases, maintain

3 databases that can be purchased.  The Kaiser group, the Blue

4 Cross Blue Shield, Aetna, all of them have databases that drug

5 companies may purchase.  And very valuable, because you can

6 look at the people that are participating in these databases

7 and develop studies to examine those women or -- who were

8 prescribed in this case E plus P, follow them over time as

9 their health records are tracked.  You can compare them with

10 control women who were the same age, try to compare them as

11 closely as possible, but who did not get estrogen plus

12 progestin.  And that's the example of a database, an insurance

13 database.

14  Q.  Let me hand you what has been marked as ML192,

15 Plaintiff's Exhibit 192, and ask you if this is an example of a

16 database study?

17  A.  Yes.

18     MS. LITTLEPAGE:  Judge, we move to admit Plaintiff's

19 Exhibit 192.

20     MR. WEBB:  No objection.

21     THE COURT:  It's admitted.

22     (Plaintiff's exhibit 192 admitted at this time.)

23 BY MS. LITTLEPAGE:

24  Q.  So when we talk about one of the tools in the

Page 1813

1 toolbox -- let's see first.  The data is April of 1990?

2    A.  Correct.

3    Q.  And -- April of 1990.  And did these authors in April

4 of 1990, Dr. Glass and Dr. Hoover look at a database?

5    A.  Yes.  They were using a -- as I mentioned earlier, the

6 Kaiser database is a commonly used database.  And within the

7 Kaiser database, they actually have a tumor registry.  And that

8 means the insurance carriers now are having subsets of their

9 database for specifically different types of tumor tracks that

10 you can follow.

11    Q.  Did Dr. Glass and Dr. Hoover check to see whether

12 breast cancer in this country had been rising between 1960 and

13 1985?

14    A.  Their goal -- yeah, 1990.  They were interested in

15 tracking from the Kaiser database, the overall raise of reports

16 in the database of breast cancers with time.

17    Q.  What age of women was the largest increases seen in?

18    A.  They looked at various blocks in their paper, but the

19 one they're reporting here were in those women who were

20 60 years of age or older.

21    Q.  If we go down a little bit, April, let's see -- did

22 they also look at receptor status, whether the cancers were

23 hormone receptor positive?

24    A.  Right.  By then, science had advanced to the point

Page 1814

1 that we were looking at those cancers that responded to the sex

2 hormones, those that did not, and they were tracking not only

3 the number, but also the types.

4    Q.  And what did they find in this database study?

5    A.  Well, in addition to the increase, and they focused on

6 the increase in the older women, they were looking at receptor

7 assay sensitivity.  And they found that the incidence of

8 estrogen -- let's see.  We observed the incidents of estrogen

9 receptor negative cancers rose to 22 to 27 percent.  And they

10 were focused on the ten-year period, mid '70s to the mid '80s,

11 and they contrast that.

12      So those are the ones that weren't responsive, weren't

13 the -- the growth wasn't fueled by estrogen.  And they compared

14 that to those tumors that were fueled by estrogen in that they

15 had estrogen receptor positive and that raised over

16 100 percent, 131 percent.

17    Q.  Okay.  Now, these authors don't look to see who is

18 taking hormones, but they do indicate that it may be hormonal

19 factors that account for this increase in hormone positive

20 breast cancer?

21    A.  Yes, they do note that.

22    Q.  Now, could Wyeth, this author has raised an issue,

23 we're seeing older women get more breast cancer, older women

24 get hormone positive breast cancer?

Page 1815

1    A.  Right.

2    Q.  Could Wyeth have gone into the Kaiser database and

3 linked up the data to see:  Are these women taking our drug?

4    A.  Yes.

5    Q.  And would that have been an appropriate thing for

6 Wyeth to do, especially in light of what Dr. Glass and Dr.

7 Hoover have found?

8    A.  Yes, I think so.  And I think Wyeth participated in

9 Kaiser database, so they would have had access to it.

10    Q.  Let me hand you that document, Plaintiff's

11 Exhibit 8010.

12      Mr. Bartlett, do you have this one, 8010?

13      THE CLERK:  I do have it marked.

14      MS. LITTLEPAGE:  Okay.

15 BY MS. LITTLEPAGE:

16    Q.  Let me hand you what has been marked as 8010 and ask

17 you if you've seen this document.  Judge, we moved to admitted

18 Plaintiff's Exhibit 8010.

19      MR. WEBB:  I have no objection.

20      THE COURT:  It's admitted.

21      (Plaintiff's Exhibit 8010 admitted at this time.)

22 BY MS. LITTLEPAGE:

23    Q.  Does this document show an agreement between Kaiser,

24 and Ayerst, which is Wyeth, to share Kaiser database?

Page 1816

1    A.  Yes.

2    Q.  Kaiser's information?

3    A.  Yes.

4    Q.  So we have an agreement between Kaiser Permanente and

5 the company that we're here with now to share the information

6 Kaiser is creating.  And let's look at the second page and see

7 what date this agreement was entered into.

8      On what date did Wyeth have access to Kaiser

9 information?

10    A.  I guess it's September 7th, since Kaiser signed after

11 Wyeth, but September 7th.

12    Q.  1977?

13    A.  '77.

14    Q.  So since 1977, Wyeth could have gone into the Kaiser

15 database and done a study like Dr. Glass and Hoover or followed

16 up on Dr. Glass and Hoover's study?

17    A.  Or tracked both sets of women within the study, yes.

18    Q.  And the jury has also heard about databases like SEER,

19 S-E-E-R.  Is that a publically available database that Wyeth

20 could have accessed?

21    A.  Yes.  SEER is publically available and it tracks

22 cancer incidences in the United States for long periods of

23 time.

24    Q.  Have you seen documents that show Wyeth's access to

Page 1817

1 Blue Cross databases?

2    A.   Yes.

3    Q.   So at some point, was it feasible for Wyeth to have

4 gone and looked at any of these databases and looked at breast

5 cancer issues?

6    A.   Yes.

7    Q.   Okay.  Let me ask you about another kind of study, a

8 questionnaire study.

9    A.   Okay.

10   Q.   Tell the jury what a questionnaire study is.

11   A.   A questionnaire study, on its surface, when I explain

12 it will seem rather simple, put you can get quite an amount of

13 information from the questionnaire study.  It's just what it

14 sounds like.  People are mailed questionnaires and they may

15 be -- may be mailed to them at home, may be given to them when

16 they visit their doctors.  It's a questionnaire about the

17 health status of a particular group of people, say, in this

18 case, menopausal women.

19        And the questionnaire is sent to them, they fill it

20 out.  Sometimes the patient alone fills it out, sometimes the

21 doctors weighs in it, but nonetheless it's a questionnaire.

22        And at various points in time in the future, it is

23 updated and it's a way of tracking large groups of people,

24 large populations over time with information relevant to

Page 1818

1 whatever it is you're studying.

2    Q.   And do you recall a study called the Million Women

3 Study?

4    A.   Yes.

5    Q.   And can you tell the jury a little bit about that

6 study and what it found?

7    A.   Yeah.  That's probably the most commonly recognized

8 one when we talk about these kind of studies.  Because, you

9 know, it seems surprising you could get a million people

10 participating in a questionnaire study, but that's exactly what

11 happened in Europe.

12        And they tracked these women for periods of time and

13 were tracking a variety of issues, but among the issues was

14 their health on estrogen therapy and different disease states,

15 including breast cancer.

16   Q.   And did the Million Women's find information about E

17 plus P use, the combination use, and breast cancer?

18   A.   Yes.

19   Q.   And this was done in Britain and England?

20   A.   Yes.

21   Q.   And did this study show an increased risk of breast

22 cancer for women taking the combination drug?

23   A.   It did.

24   Q.   And that study was published in 2003?

Page 1819

1    A.   Three.

2    Q.   So this was published after the WHI study?

3    A.   Yes.  And it had been ongoing for sometime, but it was

4 published at that time.

5    Q.   Now, could Wyeth have done a questionnaire study in

6 the '80s or the '90s looking at breast cancer and these issues?

7    A.   Yes.  I think so.

8    Q.   Let me hand you what has been marked as Plaintiff's

9 Exhibit 342 and ask you if this is a Wyeth document?

10   A.   It is.

11        MS. LITTLEPAGE:  And, Judge, we move to admit

12 Plaintiff's Exhibit 242.

13        MR. WEBB:  I have no objection.

14        THE COURT:  It's admitted.

15        (Plaintiff's Exhibit 242 admitted at this time.)

16 BY MS. LITTLEPAGE:

17   Q.   And the cover indicates the word Seasons and it says

18 published by Wyeth-Ayerst?

19   A.   Yes.

20   Q.   Can you tell me what is Seasons magazine and why Wyeth

21 published it?

22   A.   Wyeth put together the concept of this magazine.  I

23 think it was every month -- I think it was every other month,

24 that women that had been prescribed hormone therapy would

Page 1820

1 receive this -- would receive this magazine and it was intended

2 to provide them, I believe, with information that may prove

3 valuable to them at this time in their life.  Issues about

4 health, relevant issues for women who would be taking hormone

5 replacement therapy.

6    Q.   And if we turn to page four of this document -- and

7 this was a free magazine?

8    A.   Yes.

9    Q.   They didn't pay to it; it got mailed to them for free?

10   A.   Exactly.

11   Q.   And does it indicate that Seasons is a bimonthly,

12 every other month magazine offered free to women taking

13 Premarin, Prempro, Premphase?

14   A.   All three of them.

15   Q.   Here, in order to mail this Seasons magazine out,

16 Wyeth has access to the names and addresses of these women to

17 get these magazine?

18   A.   Yes, of course.

19   Q.   And these women receiving the magazine, would be

20 taking either E alone or E plus P?

21   A.   Yes.

22   Q.   And if we turn to page six, does it indicate that by

23 January of 1996, Wyeth has almost a million and a half women

24 receiving this magazine every other month?

1  A.  Yes, 1.4 million.

2  Q.  And then they delete some patients, that I guess have
3  stopped the drug or aren't qualified, and they end up by
4  January of 1996 with a million women getting the drug --
5  getting the magazine?

6  A.  Correct.  A million still getting it, yes.

7  Q.  Now, could Wyeth in your opinion have attached to the
8  back of this magazine a questionnaire and asked these women
9  that are taking their drug:  How is your health?  Are you
10  getting breast cancer?  And tracked them as a part of this
11  magazine?

12  A.  Yeah.  It seems like it would have been an efficient
13  way of doing it.  They already had the names, so they could
14  have attached it with these magazines, uh-huh.

15  Q.  And the British government got a million women to
16  answer a questionnaire and got some significant information in
17  2003?

18  A.  They did.

19  Q.  Could that same information have been gathered by
20  Wyeth earlier?  Was it feasible for Wyeth to gather that
21  information earlier if they had used the database they already
22  had?

23  A.  Yeah.  I think so.  Yes.  I believe so.  Early '90s,
24  beginning of the '90s.

1  Q.  Okay.  The next type of study that we talked about a
2  little bit this morning is patient population studies where you
3  take a patient population and you look, you track them going
4  forward like Dr. Budoff, Pennywise Budoff?

5  A.  Uh-huh.

6  Q.  Why would you want to do a patient population study
7  and what information could you gather from it?

8  A.  Well, we talked a few minutes ago about the databases
9  that are available through insurance companies.  And all of us
10  are probably at some point or another in one of those
11  databases.

12      Many of the large medical centers, the teaching
13  hospitals, especially those who have multiple medical schools,
14  also maintain databases that one can access.  And they're
15  valuable sources of information for a pharmaceutical company,
16  because not only can you be tracking them for safety
17  information, but you can use it to develop a study plan to
18  watch your product and compare it with, perhaps, a competitor's
19  product or people who aren't taking any drugs at all.

20      And you can do it in one of two ways.  And this -- it
21  sounds simplified, but it is.  You can either look at the
22  patients kind of what I call, kind of looking backwards, look
23  at patients who have already received the drug in the past and
24  see what happened to them over time and compare them.  And I'm

1  making it sound very simple, but statisticians are involved in
2  this, and you use control patients that are the same age and
3  the same gender so you have a control group.  And you compare
4  over time what happened with them as they took the drug and
5  what events occurred.

6  Q.  Let me stop you there.  So that would be, you sort of
7  stop time right here, and then you look at these patients and
8  what they took and whether they got breast cancer in the past?

9  A.  Sure.  We can say in 2007, I'm going to go back to the
10  database in 1997, track all the people who were put on a
11  particular drug at that particular time, develop a control
12  group, and tell me what happened between 1997 and today, how
13  did they do for whatever you were interested in.

14  Q.  That would be basically taking the patient population
15  and look at them backwards?

16  A.  That's the way I look at it, looking backwards.

17  Q.  The option of looking forward, and that would be like
18  Dr. Budoff was recommending, let's take my patients and follow
19  them year by year and see what happens.

20  A.  Right.  And the other way of looking at it is to say:
21  Okay, it's 2007 and I'm going to purchase this database or this
22  insurance company's database.  And I'm going to develop a study
23  design that I'm going to follow people from 2007 to 2017.  And
24  I'm going to have enrollment criteria.  I'm want to look at

1  people who are women middle-age to some age range women, all
2  the criteria you want to apply to them.

3      The only difference between them, for example, may be
4  some are getting post menopausal hormone therapy and some are
5  not, or you can compare it to competing products whatever
6  you're interested in hearing.

7      But in this case, you've defined the criteria up
8  front, who you want to look at, and then you follow them going
9  forward.  So you're waiting for data coming in instead of
10  looking backward at data already available.

11  Q.  From reviewing Wyeth's documents, did Wyeth have the
12  ability to do a patient population study either looking
13  backwards or looking forward in the '80s and '90s?

14  A.  Yes.

15  Q.  And one example we showed the jury was Dr. Budoff
16  asking for funding?

17  A.  Right.

18  Q.  Let's turn to another kind of study, which is a
19  WHI-like study.  And the jury has heard this is called a
20  randomized clinical trial.  And explain briefly what that
21  means.

22  A.  In this type of study, you're actually enrolling
23  specific patients into the study.  It's not taking the Kaiser
24  database and I'm going to follow whoever happens to be in the

1 Kaiser health plans who fits my criteria.

2       In this situation, you're going to develop a protocol
3 and meet with doctors across the country or study centers and
4 they're going to be enrolling patients in this study
5 specifically for your protocol.

6       So the term control, you're controlling which patients
7 get in study and their activities while they're on the study.
8 It's called randomized simply because you try to enroll -- you
9 have a statistician who helps you design it so that equal
10 numbers of -- the patient groups are as equal as you can make
11 it.

12      For example, if you had a placebo group, you wouldn't
13 want all of the very old patients in the placebo group and
14 comparing them to the young patients in the active treatment
15 group.

16      Randomize means I try to compare for important things,
17 age, in this case, maybe the date menopause started, how long
18 they've been on hormone therapy, whatever is important for this
19 particular study, someone is designing it so they're randomized
20 over the various groups.

21      So at the end of the study, you can say:  I have a
22 difference in the group who got drug X.  This is my difference,
23 liver enzymes, who have had liver problems.  And I think it's
24 because of the drug, because I've tried to control on the front

1 end everything else that might contribute to this liver enzyme
2 problem.

3       So that's an example of a randomized control trial.
4 It's prospective in that you design it and do it in the future
5 and you're really controlling what women go into a study,
6 unlike a database, where your simply looking at data on whoever
7 happens to be in the Kaiser health plan.

8   Q.  Okay.  And we've heard that the WHI study was a very
9 large study.

10  A.  Yes.

11  Q.  How many arms did the study have to make it a very
12 large study?

13  A.  Well, the Women's Health Initiate over the years has
14 looked at a variety of things with interest in women's health
15 care.  In this particular study, they had a placebo group, they
16 had a group that was getting estrogen alone, a group that was
17 getting estrogen plus progestin, multiple groups.

18  Q.  And did they have an exercise and diet arm, a vitamin
19 D arm?

20  A.  Vitamin D, yes, that's correct.  So when the WHI was
21 conceived, they were interested in a variety of issues that
22 could impact women's health.

23  Q.  So when we talk about it being a large study, that
24 means the whole study with all the arms?

1   A.  Yes.

2   Q.  Tell me about the E plus P arm.  I mean, was the E
3 plus P harm so huge that it could never have been done before?

4   A.  No.  I don't think so.  Because if you look at the
5 publications that relate specifically to combination therapy
6 for Prempro, for our interests today, the Prempro, I think it
7 was a total of around 16,000 women were assigned to either
8 the -- now, this -- who would we be interested in?  We would be
9 interested in the women who were getting placebo compared to
10 the women who were getting combination therapy.

11  Q.  And is there a way -- when we say WHI-like study,
12 Wyeth wouldn't have needed in the '80s or '90s to look at
13 vitamin D or exercise and diet or any of these other arms?

14  A.  Not to answer the specific question of is there's a
15 specific risk with E and P therapy, no.

16  Q.  Focusing on the arms and the type of study that Wyeth
17 could have done earlier, could Wyeth have gone out and hired a
18 company to do this study?

19  A.  Yes.  I mean, the government hired a company to do the
20 WHI study.

21  Q.  Okay.  Let's look at that.  And I'll hand you what has
22 been marked as Plaintiff's Exhibit 228.  Is this a Wyeth
23 document?  Doctor, is it a Wyeth document?

24  A.  Yes, it is.

1       MS. LITTLEPAGE:  We move to admitted 228.

2       MR. WEBB:  No objection, your Honor.

3       THE COURT:  It's admitted.

4       (Plaintiff's Exhibit 228 admitted at this time.)

5 BY MS. LITTLEPAGE:

6   Q.  Just to orient ourselves, this is a Wyeth internal
7 document from Dr. Sasson, we've seen him before, talking about
8 the WHI dated January of 1993.  And it's cced to a number of
9 people, including Mr. Essner, who we talked about this morning?

10  A.  Yes.

11  Q.  Does this document indicate that the government didn't
12 actually go and do the WHI study themselves, but they hired a
13 facility to do the study?

14  A.  Yes, they did.

15  Q.  Paid them a check?

16  A.  Yes.

17  Q.  And what facility did the government hire?

18  A.  They picked a group in Seattle, Fred Hutchinson Cancer
19 Center.

20  Q.  Was it feasible for Wyeth 10, 15 years earlier to have
21 gone to a facility like Fred Hutch, written them a check, and
22 said:  Do a study like this for us.

23  A.  Yes.  And during this time frame, in our -- in the
24 pharmaceutical world, there is a group of companies that

1 function, whose business it is to help pharmaceutical companies

2 do trials. And they're generally referred to as contract

3 research organizations, and often times these are separate

4 businesses, separate companies, and pharmaceutical companies

5 use them to be arms and legs.

6 And they will -- the company -- the pharmaceutical

7 company will generally write their protocol, what they want,

8 but our studies are often times done nationwide, because you

9 want to look at your drug at all different parts of the

10 country.

11 And we will hire one or two of these groups who

12 literally function as arms and legs. And they set up study

13 centers, different parts across the country, and they assist in

14 getting patients enrolled in the centers, helping the study

15 centers monitor the patients, bringing them in for scheduled

16 visits. They often time will help with data entry, data

17 accumulation. And companies use them.

18 So in addition to the Fred Hutchinson Center, there

19 were at that time, and remain today, a variety of groups that

20 pharmaceutical companies avail themselves to do these types of

21 studies.

22 Q. Is it an excuse, is it an appropriate excuse for a

23 drug company to say: We couldn't have done this study because

24 we didn't have enough people or scientists or a big enough

1 computer or anything like that?

2 A. Well, it's been my experience that often times

3 companies will use these types of outside contract research

4 organizations, rather than their scientists, because they want

5 to maintain a distance. They don't want to be challenged later

6 that your scientists were orchestrating the study. It's sort

7 of a third-party distance to be able to ensure objectivity. So

8 they're commonly used, yes, they could have been used.

9 Q. Now, a study like this with 16,000 women, would it be

10 appropriate to ask Wyeth to fund a study that would be, you

11 know, this large?

12 A. Sure.

13 Q. Why? Why should Wyeth have spent this kind of money

14 and is it a lot of money and why should they have done this?

15 A. Well, I think it would have been appropriate to ask

16 them to do it, because it was their market. I mean, Premarin

17 is their product. Obviously, Prempro is also their product.

18 They could certainly -- they were able to do a study.

19 I mean, they have the financial, obviously,

20 wherewithal to do that type of study. So I see it as their

21 obligation to do that kind of study.

22 Q. And have you looked at the Wyeth documents to satisfy

23 yourself that Wyeth could have afforded --

24 A. Yes.

1 Q. -- for example, to do these kinds of studies?

2 A. Yes.

3 Q. Give us an example as to why you say they could have

4 afforded it?

5 A. Well, I believe there's a document in the database

6 that Wyeth had said that had they so chosen, they could have

7 funded -- they had the financial wherewithal to have done the

8 WHI study. I'm really not talking about the whole WHI study.

9 I'm talking sort of a modified one in which the areas of

10 interest would be a placebo group and an E plus P group, so

11 that would have been a fraction, obviously, of the whole huge

12 study.

13 Q. And did Wyeth have, for example, budgets for different

14 things that they could have used that budget to fund this

15 study?

16 A. Yeah. I think that one of the documents that are in

17 the database indicate the E plus P placebo arm would have

18 probably been around $250,000 -- $250 million to have run that

19 study. Sorry. Excuse me. $250 million to run that study.

20 And certainly Wyeth has already said they had the money to do

21 the whole WHI study. But I think between two and three hundred

22 million is their annual marketing budget.

23 Q. Okay. So on any given year, did Wyeth have a

24 marketing budget of more than $200 million to market these

1 drugs?

2 A. That's my understanding from the records, yes.

3 Q. Okay. So in any given year, could they have taken the

4 money, instead of doing ads and pamphlets and marketing

5 materials, could they have taken this same money and financed a

6 WHI-like study that would have lasted years?

7 A. Yes, or they could have taken a portion of it each

8 year that the study was ongoing.

9 Q. Because the 250 million was actually designed over an

10 eight or ten-year period?

11 A. Exactly. Exactly. So it wouldn't have had to be all

12 one lump sum.

13 Q. Would it be unreasonable for you to expect a drug

14 company to use one year's marketing budget to do a study that

15 would answer a safety issue?

16 A. I don't think so. I don't think it's unreasonable.

17 Q. We talked this morning about how since 1983, Wyeth had

18 the right to do studies when they did them IND, right?

19 A. Correct.

20 Q. In the 1980s, were there drug companies doing large

21 studies to answer safety issues?

22 A. Yes. In the '80s, you were starting to see products

23 approved, not only for initial uses, but for expanded uses that

24 involved large numbers of patients. There's -- there were

Page 1833

1 studies with 30,000, 40,000 patients in studies.

2    Q.   And can you give us an example of a study that was
3 done in the '80s or '90s that would have been large like what
4 we're talking about like with a WHI-like study?

5    A.   When the -- yeah.  When the lipid lowering products
6 were first marketed, they were approved to lower lipids.  The
7 companies who make them, the Lipitor and Zocors you see on TV
8 everyday, they wanted to make a statement, not only do they
9 lower lipids, but it would lead to increased long-term health
10 benefits, less heart attacks or less cholesterol.  They had to
11 do studies, actual use studies, that say, yes, there is a
12 consequence to these lowered lipids.  And those studies were
13 big studies.  Those were done in the late '80s to follow 30,000
14 patients over time to say, you know what, it made a difference.
15 Those patients who were on the drug that had lipid control had
16 less heart attacks, or less secondary heart attacks.

17       Another thing that I found interesting is baby aspirin
18 is a grandfathered drug.  Asprin has been around since the
19 1800s.  But a study was done with a large number of patients,
20 because they wanted to say that baby aspirin was helpful to
21 prevent heart attacks.  You see it on every aspirin bottle, for
22 heart health and it's on TV all the time for heart health.

23       And that was a big study that was done.  It started in
24 the '70s and went into the '80s.  It was actually called the

Page 1834

1 Aspirin Secondary Reinfarction Study.  But what they were
2 looking for those people who take a baby aspirin a day, they're
3 already had one heart attack, well, taking a baby aspirin a day
4 actually helped prevent subsequent heart attacks.  So that was
5 done during that time frame as well.

6    Q.   We said that this study could have been done by hiring
7 a company, cost wasn't an issue.  What about knowing what the
8 dose was to study?  What happens when a company says, there's
9 all these different doses, throws their hands up, and say, I
10 can't do a study, because I don't know what dose to use.  What
11 is your answer to that?

12    A.   Well, there's a variety of ways to approach it.  Some
13 of my experience has been that the company will say:  I'm going
14 to pick the dose that is the most commonly used dose in the
15 United States.

16    Q.   The company would know that because they're selling
17 it?

18    A.   And they're getting the records all the time.  They
19 know exactly what -- the product has multiple strengths.  We
20 know exactly what strengths are the lead seller, second lead,
21 so you can pick the most popular product.

22    Q.   Let me ask you that:  Because you're selling it and
23 looking at the IMS data to see what the doctors are
24 prescribing?

Page 1835

1    A.   Yes, you can tell from IMS data which strength is the
2 leading, what order the strengths are, which one doesn't sell
3 much, which one is the big seller.  You can pick -- one way of
4 doing it, if you're interested, would be if most people are
5 on -- if you have a clear since sense that one dose is
6 50 percent or something of the patients might make sense to do
7 that.

8       Another way, and the one that I have the experience
9 with, is you pick the dose for a safety study that is the --
10 it's the highest strength of the doses being used.  And the
11 idea of that is:  I'm worried about a safety issue.  And I
12 market my products, say, in three strengths.  If you're going
13 to do a study, a rigid way to do the study would be to say:
14 Okay.  The worse case is I'll take the dose, the highest dose,
15 and I'll run the study with the highest dose.  And if I don't
16 see any problems with the highest dose, then it's pretty good
17 news that we won't have problems with the lower dose.

18       And sometimes companies will start with a higher dose,
19 get a feel for the data, and then implement a second wave in
20 where they do maybe a lower dose.  And they look at the higher
21 dose and the lower dose, and you can kind of do a frame.  And
22 say:  This is the data with the highest dose out there and here
23 is the data with the lowest dose out there.

24    Q.   Is it ever appropriate for a company facing the red

Page 1836

1 flags that we talked about to say that we can't do a study
2 because we don't know what the dose is?

3    A.   I don't think so, not when the product is already on
4 the marketplace and they have an idea of what women are using
5 or what patients are using of their product.

6    Q.   Okay.  Let me hand you -- now, we talked about all of
7 these studies, and were all of these studies feasible, in other
8 words, feasible for Wyeth to conduct in the '80s and '90s after
9 they had the right to do studies?

10    A.   Yes.  Well, some of the database studies are just
11 paper work studies, they could have done those any time.

12    Q.   Since 1977, when they had access to the Kaiser
13 database?

14    A.   Right.  Right.

15    Q.   Now, let me -- do new studies generate new warnings
16 and new information about a product?

17    A.   They can.

18    Q.   Let me hand you what has been marked as Plaintiff's
19 Exhibit 8420, and ask you if you recognize that as a Wyeth
20 document.

21    A.   I do.

22       MS. LITTLEPAGE:  Judge, we move to admitted
23 Plaintiff's Exhibit 8420.

24       THE COURT:  Any objection?

Page 1837

1    MR. WEBB:  No objection.
2    THE COURT:  No objection?
3    MR. WEBB:  No objection.
4    THE COURT:  It's admitted.
5    (Plaintiff's Exhibit 8420 admitted at this time.)
6  BY MS. LITTLEPAGE:
7    Q.   And can you tell the jury, is this the 2007 label or
8  package insert for E plus P?
9    A.   Just one second.  Yes, the revision date is January
10  2007.
11    Q.   All right.  So that's the most current label or
12  package insert.  And so has this information that's being given
13  to patients and to doctors changed since the WHI and the
14  Million Women and all the other studies that have come out
15  since 2002?
16    A.   Yes.  When you do a study, oftentimes the insert
17  changes as additional data are generated.
18    Q.   And are there new warnings in this 2007 label?
19    A.   Yes.
20    Q.   Okay.  Let's look, first, at the first page.  And
21  before we blow it up, there seems to be a big box around some
22  information right under the name of the drug.  What is that?
23    A.   Again, not very scientific, it's called a black box
24  warning.

Page 1838

1    Q.   And what is a black box warning?
2    A.   I know you usually see inserts are these long, skinny
3  things that come with your products that nobody can even read.
4  This is what it looks like when it's typed in regular print.
5  And it's a standard format that we have to follow when we write
6  an insert or we change an insert.  So there's a method to the
7  madness when you see these crazy inserts.
8        A black box warning is a warning or information that
9  you obviously want to spotlight, you want to highlight it.  And
10  it can be bolded or in a black box.  And it's to catch the eye,
11  because it's been deemed important enough that they want to
12  make sure -- do everything they can to make sure it's observed.
13    Q.   Because they want doctors to sort of focus on it, is
14  it right below hormone therapy name of the drug?
15    A.   Yes.
16    Q.   Is this in the drug industry considered the strongest
17  warning a drug can have?
18    A.   Yes.
19    Q.   Did Prempro get a black box warning after the WHI?
20    A.   Yes.
21    Q.   Okay.  Let's look at the first -- let's look at the
22  first two right there.  That's good.  Okay.  The first
23  sentence -- and this is Wyeth's warning, right?
24    A.   This is for Prempro, yes.

Page 1839

1    Q.   For Prempro and it's Wyeth?
2    A.   Yes.
3    Q.   Let's make clear that this is what Wyeth is saying on
4  Prempro.  And does this document indicate, the first sentence:
5  Estrogens and progestins, the combination product, should not
6  be used for the prevention of cardiovascular disease or
7  dementia?
8    A.   Correct.
9    Q.   Now, did this information appear on the Prempro label
10  for the first time after the WHI study?
11    A.   WHI examined both of these, yes.
12    Q.   WHI looked at both cardiac issues and cognitive or
13  dementia issues?
14    A.   Yes.
15    Q.   And after the WHI study came out, I want you to assume
16  the jury has already heard that they showed a potential cardiac
17  risk and they showed a potential dementia risk.  After those
18  studies came out, did this warning get on the drug?
19    A.   Yes.
20    Q.   Does it also talk about the Women's Health Initiative
21  and the fact that it found increased risks of invasive breast
22  cancer, among other things?
23    A.   Yes.  The way the black box works is the black box
24  kind of gives you the points they want you to see.  And then

Page 1840

1  they give you, we call them tag lines, they give you reference
2  where you can get additional information on these issues in
3  various parts of the insert.  So they're telling the doctor
4  shouldn't be used for cardiovascular, if you want more
5  information, go to the section that says -- entitled Clinical
6  Studies or the Warnings section.
7    Q.   Okay.  Now, the jury has heard, I think, but let me
8  reinforce with you, the WHI study was stopped because the
9  breast cancer incidence in the E plus P arm?
10    A.   Correct.
11    Q.   Explain what that means.  What does it mean that the
12  study was stopped because of breast cancer?
13    A.   When you do a clinical trial, especially when it's
14  going to be over some period of time, a long period of time,
15  what companies do is -- when a study is done, companies are
16  blinded to what's going on with the study.  And I don't know if
17  the jury has heard about blinding.
18    Q.   They haven't, so tell us.
19    A.   Okay.  There's different levels of blinding.  When we
20  give people sugar pills that look just like the regular pills,
21  because we don't want the patients to know what they're getting
22  and we don't want the doctors to know what they're getting,
23  because it may impact their observations.
24        If you're in a hypertension study and you know you're

1  getting the placebo, your blood pressure may go up because you
2  know you're getting the placebo.  So we blind the patient and
3  the doctor, because we don't want the doctor -- we want him or
4  her to be looking unbiased, as to what he or she and the
5  patients think.
6       Generally, a drug company who is doing a study has no
7  idea what is going on during the course of the study.  The drug
8  company employees can't influence the study.  We write the
9  protocol and interact with FDA on the protocol, but after that,
10  it's sort of hands-off, because the drug company can't be
11  influencing what happens in their studies.  Even the studies
12  that aren't the WHI-type studies, even the studies we do for
13  our NVA's.
14       So, literally, at the end of the study, millions and
15  millions of dollars go into the study, and you have no idea
16  what is going to come out at the end.  However, for safety
17  reasons, you can't put somebody on a investigational product
18  and say:  Okay.  I'll see you in ten years.  We've got to have
19  safety monitoring.
20       So what is done, is we create these safety monitoring
21  boards.  They're independent people, they don't work for the
22  drug company, they're not being paid by who could benefit from
23  the drug, anything like that, independent scientists.
24       And there's a schedule set up and they come in and

1  they review safety data.  The doctors are seeing the patients.
2  They're sending data to whatever center is doing the study and
3  say, here's the blood pressure, here's the mammogram, whatever
4  the study is being done.
5       And this data safety monitoring board, they're sitting
6  back saying:  Okay.  We've got three groups in this study.  Are
7  we seeing signals?  Is one group looking different than another
8  one on a certain issue?
9  Q.  Let me stop you there.  Was the WHI safety monitoring
10  board specifically looking for breast cancer because this study
11  was designed to look at the breast cancer risk?
12  A.  Cardiovascular and breast cancer risk.
13  Q.  Heart benefit versus breast cancer risk?
14  A.  Right.
15  Q.  That was the design of the study?
16  A.  Exactly.
17  Q.  And what happened in the study when they looked at the
18  breast cancer issue?
19  A.  Well, this safety board was empowered to be looking at
20  the data over periods of time and tracking any changes.
21       Now, before anything gets started, you -- nothing is
22  left to whim during these studies.  All of this is thought out
23  from the front end.  And we have what is called stopping goals.
24  And what a stopping goal says is:  I'm going to have a safety

1  monitoring board and they're going to look at whatever you're
2  interested, liver failure, or breast cancer, whatever it is.
3  And when they see it, and it's defined, if the difference among
4  the group is X, the study stops.  There's too great a risk or
5  however it's defined on the front end, there's these stopping
6  goals.
7       In the case of WHI, the breast cancer frequency
8  reached whatever predefined criteria they had set up that the
9  study was called for a stop.  There was more than they had
10  anticipated of breast cancer so the study was halted.
11  Q.  And when a study is stopped like this, and everything
12  is unblinded, we then cannot get long-term data from the study
13  because the study is over?
14  A.  In a long-term study, that's the problem.  You only --
15  once the study is stopped, it's over.  You only have the data
16  up to the point it's being stopped.
17  Q.  Okay.  And, okay, we're talking about the black box
18  and the fact that it gives information about the WHI.  And did
19  the WHI look at breast cancer, but also find information about
20  some of these other things, strokes and blood clots and some of
21  these other things that are in this warning?
22  A.  Exactly.  They found that the cardiovascular, certain
23  cardiovascular events had reached a point that could not be
24  continued, and the breast cancer had reached that point.

1  Q.  And if we go down a little bit more, let's look at
2  this last paragraph in the black box.  Does the black box
3  warning, the one that is supposed to get the doctor's attention
4  also say that because of the risks, estrogens with or without
5  progestins should be prescribed at the lowest effective doses
6  and for the shortest duration, consistent with treatment goals
7  and risks?
8  A.  Right.
9  Q.  If you go down a little bit more, under Description,
10  does this 2007 document indicate that there's now some low-dose
11  products that Wyeth has brought to market?
12  A.  I think it was in 2003.  I think it was 2003 that
13  Wyeth introduced the two new products Prempro Low, and those
14  consist, one was .3 milligrams and 1.5 milligrams, so they
15  reduced both.  And the other one was also 1.5, but .45
16  milligrams of the conjugated estrogens.
17  Q.  This first pages indicates that there's now two lower
18  dose options for Prempro that were approved back in 2003 after
19  the WHI.
20  A.  Correct.
21  Q.  Let me stop there a minute and ask you a question
22  about that.  When Wyeth wanted to get the lower dose Prempro
23  approved -- hold on.  Let me hand you what's been marked as
24  plaintiff's 605.  And ask you, when Wyeth was looking to get

Page 1845

1 the lower dose approved, did they ask the FDA for the right to
2 sell that lower dose using a new name?
3    A.  Yes.  Initially, they proposed a different name, yes.
4    Q.  And what was the name that Wyeth proposed that they
5 wanted to call this new product?
6    A.  Premia.
7    Q.  And at that time, did Wyeth take the position with the
8 FDA that low-dose Prempro was a new and different product that
9 justified a new name?
10    A.  Right.  That was their proposal.
11    Q.  That was Wyeth's position?
12    A.  Right.
13    Q.  Did the FDA allow Wyeth to call it Premia?
14    A.  No, they didn't allow it.  That's consistent with FDA.
15 Generally, once a product has a name, you may put qualifiers on
16 it, half-strength, once-a-day, low-dose, but generally they
17 insist that you keep the original name of the product.
18    Q.  I want to assume that the jury has heard that
19 after approval, Wyeth had a marketing campaign called Go Low
20 With Prempro launching the low-dose Prempro.
21    A.  Right.
22    Q.  At least Wyeth's position was it should be called
23 Premia, but the FDA said no?
24    A.  That's my understanding, yes.

Page 1846

1    Q.  Is there something called exclusivity, how many years
2 exclusivity you have on a drug that talks to this issue?
3    A.  Yes.  You try, when -- obviously, when you're
4 developing a new drug product, you'll hope that you get
5 approval for it, and when you get approval for it, you'd like
6 to have some period of time to market the product without
7 competition.
8        So companies can either try to apply for a patent on
9 their product.  That's one way of having exclusivity, if you
10 can have the Patent Office grant you a patent, and that's
11 separate from the FDA.
12    Q.  Let me stop you.  Wyeth applied for a patent on
13 low-dose Prempro?
14    A.  I think so, yes.
15    Q.  What other ways you can take the position, this is a
16 new product, it's not the old product, it's something
17 brand-new?
18    A.  Well, there's a relatively new option available that
19 is called the FDA exclusivity.  Several years ago, I don't know
20 how much detail you want on this, but several years ago, some
21 new rules came into play for getting drugs approved and what
22 benefits companies can get with certain approvals and financial
23 requirements for having FDA review your products.
24    Q.  Let me ask you this:  Does the exclusivity issue mean

Page 1847

1 a company's representing a product is new and different?
2    A.  What it means is the FDA agrees that for new strengths
3 or new uses, that FDA required that clinical studies had to be
4 done to justify the product.  You cannot get exclusivity unless
5 FDA required clinical trials to support whatever the newness
6 is.  In this case, it was new strengths.
7        If you did, had a product and you had a whole
8 brand-new use for it, you might be able to get exclusivity for
9 it, because FDA required actual clinical trials.  And that's
10 called FDA exclusivity.
11    Q.  So this just means that the FDA is agreeing on some
12 level that it's a new product?
13    A.  New data were required to have it approved.
14    Q.  And did the FDA allow exclusivity of low-dose Prempro,
15 acknowledging it was a different product?
16    A.  My understanding is they did give exclusivity.
17    Q.  Not a new name, but they got exclusivity?
18    A.  Right.  And the name issue is really not unique to
19 just Prempro.  Once a product has a name, to avoid confusion in
20 the marketplace, you're generally are stuck with that name.
21    Q.  Let's go back to the 2007 label.  We talked about the
22 fact that it includes low-dose.  Can we turn to page 20?  And I
23 want to talk to you now about indications and usage at the
24 bottom of page 20.

Page 1848

1        First of all, tell the jury what is an -- what does
2 this section of the label deal with?
3    A.  Well, there's a standard format in all labels, and one
4 of the standard sections is indications, and it simply means
5 what is the drug -- what has it been approved to be used for?
6    Q.  Okay.  And let's -- and now since the WHI study and
7 the other studies that came out, has the indications changed on
8 this new lower dose product?
9    A.  Yes, somewhat, they have.
10    Q.  The first indication is the same, vasomotor hot
11 flashes?
12    A.  Yes.
13    Q.  The second one, vaginal atrophy, says:  When
14 prescribing solely for treatment of symptoms of vulvar and
15 vaginal atrophy, topical vaginal products should be considered?
16    A.  Yes, first.
17    Q.  First of all, what's a topical vaginal product?
18    A.  Topical just means applied to the skin.
19    Q.  Creams?
20    A.  Creams, lotions.
21    Q.  So does this indicate that before you use this drug
22 for vaginal issues, you should try the creams first?
23    A.  Yes.  The prescriber is being put on notice, before
24 you jump to this product, you might want to first try estrogen

Page 1849

1 cream or lotion.

2    Q.  And that's new?

3    A.  Yes.

4    Q.  Since the studies of WHI and Million Women?

5    A.  Right.

6    Q.  Let's talk about the prevention of osteoporosis.  When

7 prescribing solely for the prevention of post menopausal

8 osteoporosis therapy should only be considered for women at

9 significant risk of osteoporosis and for whom nonestrogen

10 medications are not considered to be appropriate.

11       What's different about this indication?

12    A.  Well, the label is now giving this as a -- as a --

13 it's not a first use.  It doesn't have a first use option.  The

14 label is saying there are ways of addressing osteoporosis,

15 other ways of addressing osteoporosis.

16       And you should limit -- to the doctor, the FDA is

17 saying, okay, prescriber, hold the Prempro for those women who

18 are at risk, significant risk of the osteoporosis, and for whom

19 the doctor has decided the other options aren't an option, they

20 aren't appropriate.

21    Q.  So you have to try the other things, have them not

22 work, and then you can use this as a second option or a last

23 resort option?

24    A.  It's an effort to limit first use as first initial

Page 1850

1 therapy, yes.

2    Q.  And that's different since the WHI and the other

3 studies that came out?

4    A.  Yes.

5    Q.  All right.  Let's turn to page 23.  And let's look at

6 the breast cancer warnings.  All right.  Let's highlight first

7 the first paragraph:  In some studies, the use of estrogens and

8 progestins has been reported to increase the risk of breast

9 cancer.  The most important randomized clinical trial providing

10 information about this issue is the WHI.  And it says:  The

11 results from observational studies are generally consistent

12 with those of the WHI clinical trial.

13       Do you agree with that, that generally consistent WHI,

14 other studies were showing this increased risk?

15    A.  Yes.  There were observational studies that had shown

16 this risk prior, yes.

17    Q.  And then does this indicate -- anything in this

18 paragraph that says the majority of studies show no association

19 or studies go one way and the other, anything like that?

20    A.  That's no longer in the label.

21    Q.  Okay.  Now, it also says:  The excess risk increased

22 with duration of use.

23    A.  Right.

24    Q.  Tell the jury what that means.

Page 1851

1    A.  That the observed incidents of breast cancer got

2 higher, the incidence was higher the longer the women had been

3 on estrogen and progestin.

4    Q.  What does that mean for a drug that's supposed to be

5 taken long-term for bone benefit or brain benefit or heart

6 benefit?

7    A.  Well, for any long-term use, combined with the use of

8 the drug long-term is an increasing, a crescendoing, increasing

9 risk of breast cancer.

10    Q.  Every year the woman is on the drug, her risk goes up

11 and up and up?

12    A.  Right.  Recognizing that WHI was stopped, but up to

13 the point it was stopped if the duration increased, the risk

14 increased.

15    Q.  And then it says:  In these studies, the risk of

16 breast cancer was greater and became apparent earlier with the

17 E plus P versus estrogen alone, right?

18    A.  Yes.

19    Q.  And then if you go down to the bottom, this last

20 sentence down here.  Let's look at this.  In the WHI trial,

21 invasive breast cancers were larger and diagnosed at a more

22 advanced stage in the E plus P group compared with the placebo

23 group.  Right?

24    A.  Correct.

Page 1852

1    Q.  Again, would that be important information for a

2 patient know, that not only does my risk increase with every

3 year, but if I get diagnosed with breast cancer, it's going to

4 be invasive, and it's going to be larger, and it's going to be

5 at an advanced stage?

6    A.  Yes, farther along.  Yes, it's important to know that.

7    Q.  If Wyeth had done the studies we've talked about, all

8 the different kinds of studies in the toolbox, all of this

9 warning, this information have been on the Prempro product or

10 the E plus P product 10, 12, 15 years earlier?

11    A.  Well, you can't change the labeling until you have the

12 data.  And you can't have the data until you do the study.

13 Yes, I think that if studies had been done earlier, we would

14 have had more information to get into the label and the label

15 could have been changed.  Labels change in concert with time,

16 because we gather more data over time.  So yes.

17    Q.  Let me hand you what has been marked as Plaintiff's

18 Exhibit ML 3406.  And ask you, Dr. Blume, is this a publication

19 of the WHI breast cancer results?

20    A.  It's one of them, yes.

21       MS. LITTLEPAGE:  Move to admitted Plaintiff's

22 Exhibit 3406.

23       MR. WEBB:  No objection.

24       THE COURT:  It's admitted.

1          (Plaintiff's Exhibit 3406 admitted at this time.)

2   BY MS. LITTLEPAGE:

3     Q.   Okay.  And is this one of the WHI publications dealing

4   with the E plus P arm and the issue of breast cancer?

5     A.   Correct.

6     Q.   Okay.  Let's turn to page eight.

7     A.   Okay.

8     Q.   Now, you said that one of the problems -- can we pull

9   up this chart right here?  One of the problems with having a

10  study that stops early is that you don't have long, ongoing

11  data.  Did the authors, did the WHI investigators go back and

12  look -- pull up a little bit and see the title of this graph.

13  Go back and look and see if any of the women in the study had

14  used hormones before they got in the study to try to get more

15  data for more lengths of years?

16    A.   That was one of the goals, yes, of this article.

17    Q.   What did the WHI investigators find in the E plus P

18  arm for women who, with their prior use and their use in the

19  WHI, had seven years of exposure to the drugs?

20    A.   Well, that the risk -- the risk change was a duration

21  of prior use.

22    Q.   Goes up every year?

23    A.   Yes.  Right.  It goes up every year.  And the risk in

24  this -- yes, the most right-hand side table was that the risk

1   was 3.08.

2     Q.   Now, WHI could not tell us what the risk was for a

3   woman who was in it like Ms. Scofield, 15 years like one of

4   these plaintiffs.  That can't be information the WHI can give

5   us, because it was stopped earlier?

6     A.   No.  Yeah, they cannot do it.  The stopping rules

7   required that the use in those patients -- the patients who

8   were getting E plus P was over, they couldn't take it.  So we

9   don't know.

10    Q.   All we can tell is if you go back and look at prior

11  use, the best data we can get is seven years.

12    A.   With this study, yes.

13    Q.   Can you help us understand what a relative risk of

14  3.08 means to a lay person?  I mean, what does that risk mean?

15  You want to come --

16    A.   It would be easier if I just --

17         MS. LITTLEPAGE:  Judge, may she step down?

18         THE COURT:  Yes.

19  BY MS. LITTLEPAGE:

20    Q.   Let's see if I can pull it forward.  And see if I can

21  do some math.

22    A.   This is just really simple and this is what it all

23  comes down to.  This is really easy.  What we're saying is when

24  we compare a study in which some patients are getting a drug

1   and some aren't.  We are looking at a side effect.  And we say:

2   What's the rest in the group who received the drug and the risk

3   of the group who didn't?

4          In this particular example you saw, we said the risk

5   was a 3.08.  That's the ratio, the ratio of the people who are

6   exposed to the drug, to not exposed was three.  All right.

7          Of course, you're thinking, same thing we think:  What

8   does that mean?  What does that mean in the real world?  What

9   does it mean as an exposure risk?

10         So epidemiologists, who I don't know if you heard of

11  epidemiologists or people who look at diseases and drug effects

12  over populations.  Put it in the real world.  What does it mean

13  to us today?

14         So we have a calculation that we do that is simple and

15  what it says is:  Okay.  What does it mean to the women in this

16  particular instance who are going to get this drug?  Give us a

17  handle on it.  And it's a very simple formula.  So I don't know

18  if you've heard from any of the epidemiologists yet.  All it

19  does is really boil down to a very simple formula.

20         The formula is you take the risk and minus one and

21  divide by the risk.  So in this case, it would be three minus

22  one over three is two over three.  Okay.  What does that mean?

23  Okay.  This is called the attributable risk.

24         What can we attribute to whatever we were studying?

1   What can we -- what does that mean?  Here's what it means.  It

2   means, this is two-thirds, .67.  Right.  Okay.  It means for

3   every 100 women, starting with this risk factor of 3.0, for

4   every 100 women, two requirements, for every 100 women who

5   receive the drug, in this case Prempro, received the drug, and

6   who developed breast cancer, so I'm not talking about all the

7   women who are post menopausal in the United States.  I'm

8   talking about the group of women who received the drug and who

9   developed breast cancer.

10         What the calculations are is that 67 of those 100

11  women who were on the drug and who developed breast cancer when

12  it's a risk, relative risk of 3, 67 of them, their drug --

13  their breast cancer was the result of taking the drug.

14         So an attributable risk, take the attributable risk,

15  do a simple math here, what you -- what an epidemiologist would

16  tell you when they talk about attributable risk, okay for those

17  100 women sitting there who took the drug and who developed

18  breast cancer, the calculations would lead to two out of the

19  three, 67 out of the 100 of them, developed the cancer as a

20  result of taking the drug.

21         Conversely, 67 of the 100 would not have developed

22  cancer had they not been exposed to the drug.

23    Q.   Okay.  So attributable risk means what risk you

24  attribute to the drug?

1    A.   Whatever you're studying, in this type of study, if
2 you have a drug, a disease state.  In this particular case, the
3 attributable risk translates, when we deal with this factor,
4 which is the factor of the women that were on E and P for
5 long-term, changes with whatever you're studying, but for those
6 women who took it more than seven years, as an example, then
7 the risk was three.
8    Q.   So what we saw in the Anderson paper is the relative
9 risk for seven years was the three and the numbers were going
10 up?
11    A.   Right.
12    Q.   What we can't tell from WHI is what the numbers would
13 be for 10 years or 15 years?
14    A.   We don't know.  The study was stopped.
15    Q.   At least for the minimum of seven years, if you
16 calculate that down, 67 women out of every 100 who took the
17 drug and got breast cancer, the drug caused the breast cancer?
18    A.   Right.  The attributed -- 67 of those women, the drug
19 is attributed to the cancer.
20    Q.   Got it.  Okay.  Thank you.  Okay.  Now, we were
21 talking about low-dose Prempro and we said earlier in the day
22 that a drug is both the pills and the label.  That makes a
23 drug?
24    A.   Uh-huh.

1    Q.   The old dose Prempro, old Prempro would have been old
2 dose plus old label, right?  That would be old Prempro, the
3 before WHI Prempro?
4    A.   Yes.
5    Q.   Now, since WHI, has the dose changed to be offering
6 lower doses?
7    A.   Yes.  There are two new doses.
8    Q.   And has the label changed?
9    A.   Yes.
10    Q.   Now, for the old dose, old dose can no longer be sold
11 with an old label.  That product is gone?
12    A.   Oh, yeah, you cannot use the old label anymore.  No.
13    Q.   So if we look at old dose and new label, that's a new
14 product?
15    A.   Yes.  The labeling -- the instructions for use have
16 different -- are now different than they used to be.
17    Q.   Let's look at sales of old dose.  How have the sales
18 of the old levels of estrogen and progestin changed since WHI?
19    A.   I recall that I saw IMS data is marketing data that
20 tracks drugs, that tracks your sales for you.  But I think in
21 my data file, in the database I was given, it only went to
22 maybe spring of 2005.  The database were cut off at that point.
23 And I think at that point, I only recall the .625 dose.  And I
24 think that from the beginning of whenever the IMS database

1 started, years and years ago, for Prempro to that point, the
2 market had fallen about 90 percent.
3    Q.   Okay.  So for old dose, there's a 90 percent drop in
4 sales?
5    A.   Yeah.  I think that's in total prescriptions, yes.
6    Q.   And now did you look at the IMS data to show that the
7 lower doses with the new label is being described by doctors?
8    A.   Yes.  The newer doses weren't approved until 2003, so
9 we only have about a year's worth of data for the new dose.  So
10 the -- I don't have 2006 or the beginning of 2007 database for
11 it.
12        But as I recall for the year or so that I have with
13 the .3 and the .45, the new ones, I think if you add together
14 the .3 and the .45, they're equal to the .625.
15    Q.   Okay.  Let me ask you about something -- give me one
16 second.
17        Let me ask you while we see if we can fix my computer
18 problems.  I was going to show you a slide that the jury has
19 seen in opening statement from Wyeth where the representation
20 was made that Wyeth did a number of breast cancer studies,
21 conducted all kinds of breast cancer studies.
22        First, let me ask you:  Did Wyeth, Wyeth, ever do a
23 breast cancer study, database, questionnaire, patient
24 population, WHI-like where they did it to answer the breast

1 cancer issues?
2    A.   Where the goal of the study was to address -- one of
3 the goals of the study was to address breast cancer risk?
4    Q.   Correct.
5    A.   No, they have not.
6    Q.   Never?
7    A.   Not that I could find in the database.
8    Q.   Okay.  Well, let me ask you this:  If I just put a
9 bunch of studies on the board, if I just write up studies, how
10 would a jury know whether the study was a breast cancer study
11 or a heart study, a low-dose study, a study for some other
12 reason?
13    A.   Just in general?
14    Q.   In general.
15    A.   Well, if you had the study report in front of you, or
16 the study analysis, or a publication about the study, I think
17 the easiest way would be to go to that section of the report
18 that says what the goals of the study were.  The study was
19 constructed or designed to assess whatever.  And, generally, it
20 will tell you that they enrolled certain patient numbers to the
21 accomplish those goals.
22    Q.   Okay.  So, first of all, if the jury is going to
23 assess whether breast cancer studies were really done, would
24 they need to look and see what the goal or the design or the

1 purpose of the study is?

2    A.  Right.  And studies may have more than one goal.  You

3 may be looking at a drug to see if it's effective for some

4 disease and at the same time you've powered or enrolled enough

5 patients so you can also be checking to see if you can see a

6 particular adverse event during the course of the study.

7       And that would both be defined in your introduction to

8 your study.  I'm trying to do this and this and I put this

9 number of patients in the study so I can accomplish this with

10 some degree of scientific and statistical certainty.

11    Q.  And would a second goal be looking to see if you're

12 studying the combination product, the actual product that is at

13 issue in this case?

14    A.  Yes, of course.  Yes.

15    Q.  So if there's listed a bunch of studies that deal only

16 with estrogen, would that be a breast cancer study on E plus P?

17    A.  No.

18    Q.  Now, what if the answer is, well, I call it a breast

19 cancer study because we did mammograms.

20    A.  Uh-huh.

21    Q.  Does just doing a mammogram in a study make it a

22 breast cancer study?

23    A.  No.  For -- if these are studies using post menopausal

24 women, you will do mammograms before you do a study, do a

1 mammogram before you start a study with them and certainly do a

2 mammogram after you finish the study.

3       The FDA guidance for post menopausal women requires

4 that mammograms be done for various studies.  The New York

5 Academy of Science which produces most of our study outlines

6 insists that mammograms be done.  It's prudent on companies for

7 liability robes.

8       I haven't seen a post menopausal study, long-term

9 study using post menopausal women that hasn't involved a

10 mammogram, along with other tasks.  I'm sure that you would

11 want to do laboratory tests to make sure they're not anemic or

12 don't have leukemia or lymphoma.  Those kind studies would

13 traditionally be done before you would enroll a potential at

14 risk patient in a study.

15    Q.  So let me ask you this:  If I did blood tests, if I'm

16 going to study and I draw their blood and I do a mammogram and

17 take their weight, can I call that a leukemia study because

18 leukemia might show up?

19    A.  No.  Just because you measure their CDC, measure their

20 hemoglobin, and that, you can't use it as a marker for leukemia

21 study.  Obviously, you're tracking to see if a drug would

22 causes leukemia, you would be powering, which simply means you

23 would enter patients in, enough patients in that you anticipate

24 would be needed to actually develop the leukemia.  Not a marker

1 for the leukemia, a blood level going down.

2    Q.  Let me ask you that question.  Let me get back to

3 mammograms.  Just because a study does mammograms, does all

4 tell us about the study, that they're doing a study in post

5 menopausal women?  Does all post menopausal women in a study

6 always get mammograms?

7    A.  It's been my experience.  I mean, you want to do that.

8 You want to look over the course of the study for that patient

9 to see if there's any changes.  Some sponsors will do one

10 mid-term.  If you have a fairly long study going, and you

11 notice a change in a mammogram, some protocols will not allow a

12 woman to continue in that study, because, remember, we've

13 randomized the study, she may impact the study, because she's

14 had a change in her breast health.

15    Q.  So because you're knot looking for breast cancer, if

16 she has an abnormality, she might actually get dropped out of

17 the study?

18    A.  She could, depending on how protocol is orchestrated.

19 Similarly, if she was entered into the study and she had to

20 have normal liver enzymes or kidney enzymes, and during the

21 course of the study, they go up some amount, she may be

22 eliminated, because her liver enzymes or kidney enzymes went

23 up.

24    Q.  Okay.  And last of all, you said something about

1 powering.  Tell us what powering a study means?

2    A.  When you do a study, you got to the get the

3 statisticians involved at this point, because they are the ones

4 who tell you how many patients you have to study to see if you

5 have a risk from the drug.  If I -- you know, let's just make

6 up an example.  20 out of a thousand people -- 20 thought of a

7 thousand United States residents may develop lymphoma.  Okay.

8 If I were going to be looking to see if my drug increased the

9 amount of frequency of lymphoma, I would have to put enough

10 patients in that study and follow them for enough period of

11 time to say, look, in the placebo group, the normal rate of

12 lymphoma risk is this, and mine was whatever the statistician

13 says has to be higher.  So something's different in my group

14 that received the drug.  And I studied it for a lung enough

15 period of time that I can say something is different in the

16 patients who receive the drug and I'm testing for lymphoma, and

17 I'm doing biopsies and I'm doing all the specialized tests you

18 do for lymphoma patients, the only thing different I can

19 attributed that increased lymphoma to is the fact that the

20 patient group received the drug.

21       Conversely, if you're trying to protect against

22 lymphoma and one group is significantly later, the only thing I

23 can attribute it to is that drug protected against lymphoma.

24       But the study has been specifically designed to

1 specifically look for that end point. If I finish the study
2 and all I've done is blood counts, I can't say I don't have any
3 problems with lymphoma, I don't have any problems with
4 leukemia, because I wasn't specifically looking for it.
5     Q.  Got it. Okay. Now, did you look at depositions taken
6 of the Wyeth medical doctors and scientists where they were
7 asked in the deposition the question: Did Wyeth do breast
8 cancer studies?
9     A.  Yes.
10    Q.  So not Wyeth's lawyers talking, but where the
11 scientists and the medical doctors from Wyeth were asked
12 whether they did breast cancer studies?
13    A.  Yes.
14    Q.  I want to go through a few of them. I'm not going to
15 go through all. Did you review the deposition of Dr. Marc
16 Deitch, Senior Advisor to Medical Affairs?
17    A.  Yes.
18    Q.  And was Dr. Deitch asked under oath in his sworn
19 testimony: Do you recall a single study done by Wyeth between
20 1976 and 1999 that looked to address the issue of the
21 relationship between estrogen replacement therapy or
22 combination replacement therapy and breast cancer? And he
23 responded: Nothing that I can recall right now. No, I can't.
24    Was he then asked: Do you recall a single study

1 between 1991 and 1999 in combination therapy that looked at
2 long duration or dose response in connection with breast
3 cancer? And again, he said: I don't recall.
4     Have you ever seen a single study, single study done
5 by Wyeth that would answer the question about the connection
6 between hormone replacement therapy and breast cancer? And Dr.
7 Deitch said: Again, I don't recall.
8     Did you review this in forming your opinions in this
9 case?
10    A.  I did review his deposition.
11    Q.  And would you agree with me, that when asked, did
12 Wyeth do breast cancer studies, Dr. Deitch did not recall a
13 single study.
14    A.  Yes.
15    Q.  Dr. Harold Marder, Senior Vice President of Global
16 Medical Affairs, again, a medical doctor. Did you review his
17 medical testimony?
18    A.  Yes.
19    Q.  Where he was asked: Now, you are aware that Premarin
20 is known to cause endometrial cancer in women who has an intact
21 uterus if it's prescribed in an unopposed fashion. That's
22 single estrogen and endometrial cancer?
23    A.  Correct.
24    Q.  And he says: Unopposed estrogens, yes, will have a

1 tendency to cause endometrial hyperplasia and there's a higher
2 incidence of endometriosis carcinoma, that's cancer, in women.
3     A.  Yes.
4     Q.  The next question is: All right. In terms of your
5 years of employment and involvement at Wyeth, are you aware of
6 any study that was ever conducted internally to determine
7 whether or not the combination of estrogen and progestin could
8 cause cancer elsewhere in the body? And what was Dr. Marder's
9 response?
10    A.  He wasn't aware.
11    Q.  Okay. So looking at Dr. Marder, when he was asked
12 whether Wyeth had done breast cancer studies, his response was
13 no as well, he couldn't recall.
14    Dr. Pamela Cobb, Director of Global Medical Affairs
15 for Wyeth. Was she asked: Is it true that Wyeth has never
16 performed a long-term clinical trial to -- that's a human
17 study, right?
18    A.  Correct.
19    Q.  -- to determine the risk of breast cancer for women
20 who used its combination therapy, correct? Isn't that true?
21 And her response was: To my knowledge, that is true.
22    But the point, Dr. Cobb, is that Wyeth never performed
23 that test, correct? And the answer is: Wyeth never did a
24 breast cancer trial per se, no.

1     Did you review this in forming your opinions?
2     A.  Yes.
3     Q.  And when Dr. Pamela Cobb, Director of Global Medical
4 Affairs was asked if Wyeth had done a breast cancer study, was
5 her answer no as well?
6     A.  Correct.
7     Q.  I'm only going to do one more. I know this is kind of
8 tedious. Dr. Gerald Fisher Senior Vice President of Drug
9 Safety. Was he asked: I want to know if Wyeth independently
10 sponsored, supported, developed and did their own testing, not
11 NIH, not the government, not outside, but Wyeth do their own
12 independent testing long-term, five years or greater, on human
13 subjects for Prempro? And his answer was: Not that I'm aware
14 of.
15    So on July 8th of 2002, that's the day the WHI was
16 published --
17    A.  Right.
18    Q.  -- we've established that there were no independent
19 studies performed by Wyeth on either humans or animals using
20 Prempro five years or greater. Is that true? And his response
21 was: No, to my knowledge, I can't say there were no long-term
22 studies. To my knowledge, I don't know of any studies that
23 were five years of duration or longer that Wyeth independently
24 executed in animals or people.

Page 1869

1      Did you review that testimony?

2   A.  I did.

3   Q.  And, again, when Dr. Gerald Fisher, Senior VP of Drug

4   Safety was asked, did Wyeth do breast cancer studies, his

5   response was he didn't know of any long-term studies.

6      I won't go through them, but did you also look at the

7   deposition testimony of Dr. James Pickar, Assistant Vice

8   President of Women's Health, asked similar questions?

9   A.  I did.

10  Q.  And again did he answer that he did not know of a

11  single study done by Wyeth on breast cancer?

12  A.  That's correct.

13  Q.  Dr. Joseph Sonk, Vice President of Regulatory Action,

14  again, a medical doctor for Wyeth, answering the same

15  questions, giving the same answers?

16  A.  Yes.

17  Q.  Do you agree looking at all these documents, with all

18  these medical directors and medical doctors from Wyeth, that

19  Wyeth did not do a breast cancer study to answer the unanswered

20  breast cancer risk issues?

21  A.  I don't think they did.

22  Q.  And do you think that's appropriate?

23  A.  No.

24  Q.  Why not?

Page 1870

1   A.  Because the threat, the concern with breast cancer has

2   been appreciated for sometime, and there are a variety of ways

3   to look at breast cancer. And knowledge can evolve. I mean,

4   you can do many studies over time and amplify your label as

5   each new piece of information comes into play. And it was

6   Wyeth's product. Wyeth controlled the post menopausal

7   marketplace. Prempro was the post menopausal marketplace. So

8   it was their product, since their product was being used by

9   most of the people for post menopausal therapy.

10  Q.  And was Prempro the majority of the combination

11  market? In other words, did Wyeth basically own the

12  combination post menopausal market?

13  A.  That's my understanding.

14  Q.  And, in fact, were these drugs, Prempro and Premarin

15  some of the best drugs, the biggest selling drugs for Wyeth?

16  A.  Yes.

17  Q.  And was Wyeth making more than $2 billion a year on

18  these drugs at certain points?

19  A.  That's my understanding prior to WHI.

20  Q.  And you said that there were a number of different

21  studies they could have done. Were some of them easy and

22  inexpensive like adding a page to the questionnaire for the

23  Seasons magazine?

24  A.  Yes. I tried to explain that with these different

Page 1871

1   studies, there were different levels of complexity and

2   different levels of expense. But as each of those studies are

3   done, more and more information is gathered. We've shown

4   examples from each of those type studies how pieces of

5   information were put together.

6   Q.  And when we talk about a drug and I want to make sure

7   we're talking about old Prempro dose with the old label,

8   because that's really what was sold to these women. Okay. Old

9   Prempro dose and old label?

10  A.  Okay.

11  Q.  When we talk about these drugs, in light of what

12  actual studies have found, WHI, Million Women's, Dr. Colditz,

13  all those other studies, in your opinion for old Prempro with

14  the old label, do the risks outweigh the benefits?

15  A.  You're talking about the old product?

16  Q.  Yes.

17  A.  No.

18  Q.  I'm sorry?

19  A.  The risks outweigh the benefits.

20  Q.  The risks outweigh the benefits. Now, could -- we've

21  heard, obviously, already that menopause is not a

22  life-threatening disease. It's a time in everybody's life.

23  Was one option for these women, if they had understood the

24  risks, to just take nothing, take no drug at all?

Page 1872

1   A.  Yes.

2   Q.  Is that an option for every woman going through

3   menopause?

4   A.  Yes.

5   Q.  Because menopause doesn't make you sick, it's not a

6   disease that has to be treated?

7      MR. WEBB:  Can I object to the leading questions. The

8   entire last 20 minutes has been nothing but leading questions.

9      THE COURT:  The questions have been a little leading.

10  Let's try to avoid those.

11     THE WITNESS:  Yes, as miserable as the hot flashes may

12  be, they are not life-threatening, so an option would be to

13  suffer with it and not take any drug.

14  BY MS. LITTLEPAGE:

15  Q.  So a safer alternatives to taking old Prempro with

16  the old label would be to do nothing, right?

17  A.  That's one option.

18  Q.  Could another alternative have been to take a lower

19  dose for a very short duration, couple of months?

20  A.  Sure.

21  Q.  And the jury's heard that after 1996 when Fosamax was

22  approved was another alternative for bone issues to take

23  Fosamax?

24  A.  Well, for the osteoporosis, yes.

Page 1873

1   Q.   So for bone issues, there were alternative, safer
2   drugs?
3   A.   Yes.
4   Q.   Heart issues, could they have taken statins?
5   A.   A variety -- there were a variety of cardiovascular
6   products.
7   Q.   And so, again, in your opinion, were there safer
8   alternatives that had the studies been done, had the
9   information been known, that these women could have used
10  instead of old Prempro with the old label?
11  A.   Well, in addition to those alternatives, yes, they
12  could have used a lower dose for a shorter period of time in
13  addition to those nonPrempro-type alternatives.
14  Q.   And would you agree with me that a drug whose risks
15  outweigh its benefits is an unreasonably dangerous drug?
16  A.   Yes, that's the definition of it, yes.
17      MS. LITTLEPAGE:  I have nothing further.
18  BY MS. LITTLEPAGE:
19  Q.   Are the opinions you expressed today held and offered
20  to a reasonable degree of medical certainty?
21  A.   Yes.
22  Q.   And in your opinion, is the old Prempro product
23  unreasonably dangerous in light of the risks and benefits that
24  we know about that drug?

Page 1874

1   A.   That we know today, yes.
2   Q.   And that we could have known a decade, 15 years
3   earlier, if studies had been done?
4   A.   If the data had been available, yes.
5      THE COURT:  Counsel approach for just a second.  I
6   have a jury question I marked as Exhibit H.
7      MR. WEBB:  I have no objection to the question.
8      THE COURT:  If you want to attempt to ask it,
9   Ms. Littlepage.
10  BY MS. LITTLEPAGE:
11  Q.   I will.  The jurors have raised -- let me ask you a
12  question: Are the opinions you expressed today held to the
13  reasonable degree of scientific and regulatory certainty?
14  A.   Yes.
15  Q.   Let me ask you a question that apparently the jurors
16  raised that apparently I should have covered.  When you talk
17  about E plus P, we have talked in terms of Prempro as being one
18  of the estrogen products, correct?
19  A.   Right.
20  Q.   Are there other estrogen products, although not
21  exactly the same as Premarin?
22  A.   Yes.
23  Q.   Okay.  And the jurors have heard that Premarin comes
24  -- is derived from pregnant horses' urine, pregnant mares'

Page 1875

1   urine?
2   A.   Correct.
3   Q.   Is that what makes Premarin unique from the other
4   estrogen products is because it comes from the horse product?
5   A.   Yes.  Makes it different, yes.
6   Q.   Now, with the P, we talked about Provera being one of
7   the key products, MPA?
8   A.   Right.
9   Q.   Did Wyeth have a P product called Cycrin?
10  A.   Yes.
11  Q.   Was Cycrin basically exactly Provera?
12  A.   Yes, it was the bioequivalent to Provera, yes.
13  Q.   Were there other P products, generic Ps, in other
14  words, not branded like a generic MPA?
15  A.   I'm not certain what years they were approved, but I
16  think there were other ones.
17  Q.   Okay.  And then did Wyeth take these two products, the
18  Premarin and the MPA and put them into one pill, Prempro?
19  A.   Eventually.  Initially, they marketed the convenience
20  pack which was a Prempro tablet and Provera tablet.  And then a
21  year later, they had developed one tablet that contained both
22  of them.
23  Q.   When they marketed the two tables, did they market
24  Premarin and their own product Cycrin?

Page 1876

1   A.   Yes.
2   Q.   Which is the same as Provera?
3   A.   Yes, they did.
4   Q.   So the question is:  Is Upjohn's Provera and Ogen the
5   same as estrogen and progestin?  And I didn't put Ogen on
6   there.  Is Ogen an estrogen that is not from the horse product,
7   from the horse urine?
8   A.   I don't think it is.
9   Q.   But is it an estrogen?
10  A.   It's -- it's a member of the estrogen -- it's the same
11  nucleus as the estrogen family, yes.
12  Q.   But a different composition?  It's not from the same
13  products?
14  A.   Exactly.
15  Q.   So the next question is:  Do they have the same
16  formula, and Ogen would not have the same formula than
17  Premarin, because it comes from a different source?
18  A.   Right.  Premarin is actually -- it's a bunch of
19  different estrogens from the horse's urine.  It's not one pure
20  type of estrogen.  There's several different ones in the horse
21  urine.
22  Q.   All put together?
23  A.   Combined together, yes.
24  Q.   Aside from Wyeth's E plus P, are there other products

1 available in the market with the exact same formula?  Let me

2 ask that two ways:  Was there ever another combination pill

3 exactly like Prempro ever approved?

4     A.  I think at one time, for a period of time, there was a

5 product that was considered to be bioequivalent to Prempro and

6 that is no longer marketed.

7     Q.  Okay.  So today, can we agree that the only

8 combination product would be Prempro and actually what we're

9 talking about today is the lower doses with the new label?

10    A.  Prempro is the combination of the -- it's still the

11 horse -- derived from the pregnant mare urine, yes.

12        MS. LITTLEPAGE:  I hope that answers your question.  I

13 think it did.  With that, I have nothing further.  Thank you,

14 Dr. Blume.

15        THE COURT:  All right.  This may be a good time to

16 take the afternoon recess.  It's a little earlier than we

17 usually do, but it's probably a nice breaking point.  I have a

18 couple of things to discuss with counsel during the recess, so

19 we'll take a little longer than usual.  We'll take about

20 25 minutes.  We'll come back at 25 minutes of 4:00.

21        Ladies and gentlemen, during this recess, please do

22 not discuss this case among yourselves or with anyone else.

23 Please do not form or express any opinions regarding the

24 ultimate outcome until it's submitted to you for decision.  Do

1 not listen to any media coverage, should there be any.  And,

2 finally, do not consult any outside resources for any

3 information about the issues in this case.

4        See you in about 25 before 4:00.

5        (The following proceedings were held outside the

6 presence of the jury.)

7        THE COURT:  Counsel, anything that -- you want to take

8 up with me during this recess?

9        MS. LITTLEPAGE:  No, Judge.

10        THE COURT:  Just a couple of quick things.  I have

11 looked through the photographs that were provided to me.  I

12 think the photographs, the nonsurgical-type photographs provide

13 a reasonable chronicle of the lives of these various women and

14 picture them in generally their conditions of health, weight

15 and appearance throughout their lifetime.  I think they're

16 reasonable.  They're not particularly overly dramatic or

17 sympathetic.  I think they're reasonable and I'll allow those.

18        As to the post-surgical photographs, I think they're

19 not too extreme.  And there's only, at least as far as I can

20 see, I only see four photographs.

21        MS. LITTLEPAGE:  Yes, Judge, that's it.

22        THE COURT:  I don't think that they're too many or

23 that they're overly extreme, drastic or prejudicial.  And I

24 think that they are probative and that their probative value

1 outweighs any possible prejudice or any of the other concerns

2 that are set forth in the statute.  So I'm going to allow those

3 as well.

4        Anything else right now?

5        MS. LITTLEPAGE:  No, Judge.

6        MR. WEBB:  Can I have that note back?  Can I look at

7 it again, in case I want to follow up?

8        THE COURT:  He's got it.  All right.  That being the

9 case, then -- oh, at some point in time, we don't need to do it

10 now, but at some point in time, if you want to discuss the

11 instructions that I gave you yesterday, if you've had a chance

12 to look at those and make any changes or if you want to use

13 them or not use them, we can talk about that maybe in the

14 morning or something.

15        MR. WEBB:  That's fine.  We're ready to do that.

16        THE COURT:  Just whenever you're ready, just let me

17 know.

18        MR. WEBB:  Okay.

19        THE COURT:  I think that's about it.

20        MS. LITTLEPAGE:  Judge, the only issue that we don't

21 have to do now, maybe we can take it up at the end of the day

22 is tomorrow we will be using Dr. Colditz' deposition.  We'll be

23 reading as much foundation as the court feels we need to.  And

24 so if you could give us guidance by the end of day, that would

1 be great.

2        THE COURT:  I think I told you yesterday what I would

3 admit without foundation and what I would not.  So I think if

4 you wanted to begin to lay that foundation with his testimony

5 or with any witness, whoever you plan to do that with, if you

6 want to lay the foundation and then inquire whether or not I

7 think that's adequate, if that's what you're suggesting, I'll

8 be happy to tell you.

9        MS. LITTLEPAGE:  Okay.

10        THE COURT:  Is that what you had in mind?

11        MS. LITTLEPAGE:  We had given you a transcript of what

12 the world was.  We obviously don't want to read the world, if

13 the court doesn't feel we need the world, but we can start.

14        THE COURT:  I'd prefer to do that, rather than just

15 read the dry testimony.  I've already read I don't know how

16 many hundreds, thousands of pages of stuff, as you know.

17        MS. LITTLEPAGE:  Okay.

18        THE COURT:  Mr. Webb, were you going to say something?

19        MR. WEBB:  No.

20        THE COURT:  Okay.  See you in about 20 minutes.

21        (Break taken at 3:18 p.m.)

22        THE COURT:  Jury is present, counsel are here.

23        Go ahead.

24  ////                          ////

1           CROSS EXAMINATION

2 BY MR. WEBB:

3   Q.  Thank you, your Honor.

4     Doctor, we have not met.  My name is Dan Webb, and I'm

5 one of the lawyers representing Wyeth during the course of this

6 proceeding, and I have some questions I would like to ask you

7 about your testimony.

8     Let me start with one of the jurors had a question and

9 I think you answered it, but I just want to make sure.  Am I

10 correct what I understood you to say in response to Ms.

11 Littlepage's question about the juror's question, after Prempro

12 came on the market as a combined E and P product, am I correct

13 after that happened up until today that is a unique product and

14 there is no other E and P product in the market at all that has

15 the exact same formula; is that correct?

16   A.  It is my understanding that there is not a generic

17 equivalent approved of Prempro, yes.

18   Q.  Is the answer to my question yes?

19   A.  Yes, I don't believe there is a generic equivalent

20 approved yet.

21   Q.  There is no other product that has the exact same

22 formula in the marketplace that women can go out and use; is

23 that correct?

24   A.  I believe -- Yes, I believe that there has not been an

1 approved generic yet.

2   Q.  Let me ask you a question, during the course of your

3 testimony there were times that Ms. Littlepage would show you a

4 Wyeth Company internal document and you then would interpret it

5 or read it, and then you would tell the jury oh, that is a red

6 flag and one flag would go into this little box.

7     Do you recall that happening today?

8   A.  Yes.

9   Q.  Okay.

10     And do you recall -- Let me ask you this question, as

11 you think back on those internal documents that you tried to

12 interpret and read to this jury to show these red flags, were

13 there some occasions when you intentionally were trying to

14 deceive the jury on what the true meaning of the documents

15 were?

16   A.  No.

17   Q.  Let me ask you this, let me go through a couple of

18 issues.

19     Do you recall this morning you were shown some

20 documents, some Wyeth internal company documents from the mid

21 1990s and you told the jury that Wyeth had developed a

22 dismissive strategy regarding a scientific article regarding

23 breast cancer risks authored by Dr. Steven Cummings, do you

24 recall that testimony this morning, Doctor?

1   A.  I recall the discussion regarding the Cummings

2 abstract.

3   Q.  Are you trying to suggest to the jury that regarding

4 Dr. Cummings' study that Wyeth as a company actually developed

5 a business policy to conceal or minimize or dismiss Dr.

6 Cummings' study, is that what you're communicating to the jury

7 as an expert witness in this trial?

8   A.  Well, I think what I said is that there was a meeting,

9 and I was looking at a document where there was a meeting with

10 Wyeth attendees and the PR group that had discussed that option

11 and that at least one Wyeth employee had noted that in his

12 notes, but I think that I also said that if that had been

13 followed through, if they had indeed done that, employed a

14 dismissive strategy, then it would have been wrong.

15   Q.  Am I correct the reason you said that is because at

16 the time you were testifying to the jury you actually knew that

17 Wyeth did not have a dismissive policy, and in fact Wyeth went

18 out of its way to publicize and call to the attention of the

19 scientific community the Cummings article; is that correct?

20   A.  No.

21     The reason I said it is because I had searched the

22 database for two different things.  I looked to see if any of

23 the activities from that meeting had progressed, and then I

24 looked to see if there was anything in the Wyeth database where

1 Wyeth had disclaimed any events, chastised anyone, took issue

2 with any of those, and I couldn't find anything on either side.

3 So that is why I said if they had intended to have a dismissive

4 strategy it would have been wrong.

5   Q.  But are you now aware -- You have told the jury about

6 all these thousands and hundreds of thousands of documents that

7 you reviewed; is that correct?

8   A.  Yes.

9   Q.  Including my company's documents; is that correct?

10   A.  Wyeth's documents, yes.

11   Q.  Wyeth's documents; is that correct?

12   A.  Yes.

13   Q.  And do you recall seeing a document in which Wyeth

14 went out of its way to publicize at a scientific seminar the

15 very article that you say Wyeth had a dismissive strategy as

16 to?

17   A.  What I said was if they had it would have been wrong

18 and I do recall a scientific conclave where they invited

19 several individuals to talk about the bone density issue, yes.

20   Q.  When you testified this morning to the jury about the

21 dismissive strategy, you actually knew that Wyeth did not

22 implement a dismissive strategy; is that correct, you knew that

23 this morning when you testified?

24   A.  Well, I knew that they had had a conclave.  I wasn't

Page 1885

1 asked about the conclave, and I also said that had they chose
2 to follow the advice their PR group it would have been wrong.
3    Q.   But you already knew they hadn't -- Did you already
4 know when you testified this morning that Wyeth had decided not
5 to follow that strategy and to do the exact opposite, did you
6 know that when --
7    A.   I queried the database for that specifically and could
8 not find specific responses to that meeting by the Wyeth
9 executives, but I did know that they did have a conclave. I do
10 know that they changed the European database regarding narrow
11 framed women. It didn't change in the United States. It
12 didn't change in their labeling in the US, but I did discuss
13 today that they did change it in Europe, although not in the
14 United States.
15    Q.   Let's show the jury exactly what happened regarding
16 the so-called dismissive strategy regarding Dr. Cummings that
17 Ms. Littlepage showed you these documents about this morning.
18       First of all, let's start with Dr. Cummings study.
19 His co-author and co-investigator was a Dr. Jane Cauley; is
20 that correct?
21    A.   I think. I think I have the document.
22    Q.   In fact I will -- Let me show you. I think the
23 document was offered into evidence. I have it as DX 345, which
24 is the same as Plaintiff -- Just call it DX 345. It's the

Page 1886

1 Cummings study.
2       I take that back, no, that is the wrong number. Call
3 up DX 1589, which is the Cummings study that is now in
4 evidence. It will come up on your screen.
5       Do you see it on the screen or if you want to look at
6 it, whatever you're more comfortable.
7       MS. LITTLEPAGE: It's not in evidence, but I don't
8 have any objection to putting it in.
9       MR. WEBB: Can I offer it?
10       MS. LITTLEPAGE: Of course.
11       MR. WEBB: I offer it into evidence.
12       Your Honor, I will offer into evidence Defense
13 Exhibit 1589, give a copy to counsel. I will also give another
14 copy to the witness so you have a hard copy right in front of
15 you.
16       THE COURT: That exhibit is admitted.
17       Do you have everything?
18       THE CLERK: Yes, your Honor.
19       (Defendant's Exhibit 1589 was admitted into evidence.)
20 BY MR. WEBB:
21    Q.   Now, if we look that the -- Is that the Dr. Cummings
22 article that you were talking about, the dismissive strategy,
23 that Wyeth had a dismissive strategy?
24    A.   I think what I said is that had they followed the

Page 1887

1 advice of their paid PR group and employed a dismissive
2 strategy it would have been wrong.
3    Q.   Is this the article?
4    A.   I was only referring to the abstract when I was
5 discussing this.
6    Q.   Is this the underlying article?
7    A.   Yes, it is one of the articles.
8    Q.   I have it up on the screen. Steve, can you call out
9 the authors up there, I think.
10       We see that the first named author and study
11 investigator is Dr. Jane Cauley, C-a-u-l-e-y.
12       Do you see that?
13    A.   Yes.
14    Q.   Are you familiar with Dr. Cauley?
15    A.   If this is the one from the public health group.
16    Q.   Are you familiar with her?
17    A.   Yes.
18    Q.   She is one of the study investigators and authors; is
19 that correct?
20    A.   She is the first author.
21    Q.   By the way just so the jury understands, this
22 particular study actually did not study hormone therapy and
23 breast cancer risk; is that correct?
24    A.   This study was an examination of density across older

Page 1888

1 women, bone mineral density.
2    Q.   Because actually if we go to the second page, Steve go
3 to the second page of the article, and go down about right
4 here, Steve, if you can, blowup from there, maybe halfway down
5 there. Go up a little higher, Steve. That is fine.
6       Doctor, I am going to -- If I read this correctly, it
7 says, "Because use of estrogen replacement therapy," do you see
8 where I'm reading on the screen?
9       "Because use of estrogen replacement therapy could
10 confound the association between BMD" -- What does BMD mean?
11    A.   Bone mineral density.
12    Q.   "And breast cancer, we excluded women reporting
13 current estrogen replacement therapy at baseline leaving 97
14 confirmed breast cancer cases and 6,757 controls."
15       So at least according to the authors they actually
16 excluded women who were reporting current estrogen replacement
17 therapy; is that correct?
18    A.   If they were on therapy.
19    Q.   As far as that study is concerned, if you then go to
20 the document, I believe, that was shown to you by Ms.
21 Littlepage this morning was tabbed -- Can I call it, Steve, DX
22 345, which I think is a plaintiff exhibit that was offered, but
23 let me pull it up.
24       I think this was offered into evidence; is that

Page 1889

1 correct?

2       MS. LITTLEPAGE:  It is.

3       MR. WEBB:  Your Honor, there are going to be times

4 when I have a DX number in my materials and a PX number was

5 offered this morning.  I will reoffer these exhibits, if that

6 doesn't bother the Court, so it's in evidence, or if not I will

7 make sure I get the right plaintiff exhibit number?  This is in

8 evidence.

9       THE COURT:  Let's just use one exhibit, if we can.

10       The clerk, you can't see the faces he is making behind

11 the screen there.

12       MR. WEBB:  I will go look.

13       I'm not doing what he just made a face about there, so

14 I won't do that.

15       THE COURT:  Let's just refer to one exhibit.

16 BY MR. WEBB:

17   Q.   Can you put the front page of that document up, Steve?

18       This document has been offered into evidence this

19 morning during your direct examination and maybe we can just --

20 If you go up to the top, what this is, it's a memo that was

21 written to a person at Wyeth, two people named Jeff Buchalter

22 and Ellen Geisel from two people who worked for an outside

23 consulting firm; is that correct, is that your understanding?

24   A.   It was a public relations group that Wyeth employed.

Page 1890

1   Q.   This is not an Wyeth employee or this is an outside

2 consulting firm that is writing a memo to Wyeth; is that

3 correct?

4   A.   That is my understanding.

5   Q.   And they are writing a memo about this Cummings study

6 that we just looked at; is that correct?

7   A.   That is my understanding.

8   Q.   Then you showed the jury, you decided to call to the

9 jury's attention under strategy, if we can go down further on

10 the page, Steve, see under strategy.  You decided to tell the

11 jury about this two prong strategy.

12       Do you recall that this morning?

13   A.   I answered questions regarding it, yes.

14   Q.   And then Ms. Littlepage was calling your attention so

15 you answered the questions; is that correct?

16   A.   I did.

17   Q.   And you talked about a dismissive strategy to downplay

18 the value of the study, the Cummings study by dismissing its

19 contribution to the literature, et cetera.

20       Do you recall recalling the jury's attention to this

21 dismissive strategy of Wyeth?

22   A.   I recall discussing this, yes.

23   Q.   Now, when you did that this morning and you were

24 testifying, did you already know in your mind as you were

Page 1891

1 talking to the jury that to suggest to the jury that Wyeth

2 actually adopted this policy was clearly contradicted by the

3 evidence you had seen?

4   A.   Well, I think that what I said was that I couldn't

5 find documents that they had proceeded or that they had

6 dismissed the group, that they had added it to their core data

7 sheet for European prescribed medications, and it hadn't been

8 added to the United States labeling.

9   Q.   We're talking about the Dr. Cummings study.

10   A.   Well, I was talking in a larger frame of bone mineral

11 density and any correlation that might have with risk progress

12 breast cancer.

13   Q.   You told the jury this morning -- Go back up to the

14 first part.

15       You told the jury this part that you were reading off

16 a strategy that dealt with the Cummings study; isn't that

17 correct?

18   A.   Yes, and then the conversation segwayed into the core

19 data sheet and the absence of it in the United States data

20 sheet.

21   Q.   As far as the Cummings study is concerned, when you

22 told the jury this morning about a dismissive strategy, did you

23 already know that that did not happen?

24   A.   I knew that there had been a publication and I knew

Page 1892

1 that Wyeth had not included that information in their US label.

2   Q.   Doctor, do you know whether or not -- Did you learn

3 from reviewing all of Wyeth's documents that you told the jury

4 that you spent so much time reviewing, that during the mid

5 1990s once a year Wyeth sponsored a major scientific symposium

6 on various topics, did you see that in the documents that you

7 reviewed?

8   A.   I did and some were cited in my report.

9   Q.   As part of your expert work on this case, did you

10 learn that if you look at the date on this memo, March 27th,

11 1996, this is the memo that you showed the jury; is that

12 correct?

13   A.   Yes, I responded to questions about this memo.

14   Q.   You responded to questions about this dismissive

15 strategy memo; is that correct?

16   A.   That the PR group had recommended, yes.

17   Q.   And at that time did you know that three months later,

18 just three months later, four months later, I'm sorry in July,

19 in July of 1996 Wyeth sponsored a scientific symposium in which

20 Wyeth invited Dr. Cauley, the lead author on the study to come

21 and present the study to a large group of international

22 scientists, did you learn that?

23   A.   I knew that, and they are talking about this in this

24 memo.

Page 1893

1    Q.  Let's look at what happened.

2        If we go to tab 11, can I get tab 11?  I'm going to

3  show the witness Wyeth Defense Exhibit 7969 and give a copy to

4  counsel and hand the document, Doctor, to you.  This is Wyeth

5  Exhibit 7969 and just ask you to -- Let's start by asking you

6  to look at the document.

7        Your Honor, should I give you a copy?

8        THE COURT:  If you have an extra one.

9        MR. WEBB:  I do have extra copies.

10       THE COURT:  This is not in evidence yet, is it?

11       MR. WEBB:  It's not.  I will offer it.

12  BY MR. WEBB:

13   Q.  Is this a document that during the course of doing all

14  your expert work on this case that you had a chance to come

15  across at some point?

16   A.  Yes, I recall this.

17   Q.  This is the 10th Annual symposium on the Long-Term

18  Effects of Estrogen Deprivation, it was a scientific symposium

19  that took place in Santa Fe, New Mexico; is that correct?

20   A.  Santa Fe.

21   Q.  Is that correct?

22   A.  Yes.

23   Q.  And you learned from examining this document that this

24  was a program sponsored by Wyeth; is that correct?

Page 1894

1    A.  Yes.

2        MR. WEBB:  Now I offer it into evidence, your Honor.

3        MS. LITTLEPAGE:  No objection.

4        THE COURT:  It's admitted, Exhibit 7969.

5        (Defendant's Exhibit 7969 was admitted into evidence.)

6  BY MR. WEBB:

7    Q.  Now, if we would go to the second page of the

8  document, if I could do that, Steve, we see the presentations

9  that are going to be made; is that correct, at this seminar

10  that Wyeth sponsored, do you see that?

11   A.  Yes.

12   Q.  In fact, there was a welcome by this Mr. Essner who

13  you talked about; is that correct?

14   A.  Yes.

15   Q.  What I want to call to your attention, if you go down

16  a little bit further, does it appear that Wyeth itself, just

17  keep going on down, that's fine, Wyeth actually was having

18  presentations made to all of these scientists on the subject

19  matter of estrogen replacement and breast cancer; is that

20  correct?

21   A.  Yes, among other issues, yes.

22   Q.  Among other issues.

23       So Wyeth had brought speakers in to address all these

24  scientists that attended this symposium to talk about -- three

Page 1895

1  different speakers to talk on the subject matter of breast

2  cancer and hormone therapy; is that correct, at least does that

3  appear to be what it says on the page that I have on the screen

4  right now?

5    A.  Three speakers for breast cancer.

6    Q.  Thank you.

7        Did it happen to be that one of those speakers is Dr.

8  Cauley and that she is speaking about the study --

9    A.  Yes.

10   Q.  -- that you said Wyeth had a dismissive policy about;

11  is that correct?

12   A.  Well, I think what I said is if they had had a

13  dismissive policy it would have been an inappropriate position.

14   Q.  So the fact that Wyeth actually had an organized

15  scientific symposium and that Wyeth invited Dr. Cauley to talk

16  to all these scientists about this particular study she did, do

17  you consider that to be a responsible thing by a responsible

18  pharmaceutical company?

19   A.  That they invited --

20   Q.  Yes.

21   A.  Yes.

22   Q.  Thank you.

23       Now, let me go to another example.  Do you recall this

24  morning at some point I heard you refer to some documents, I

Page 1896

1  think two documents from the Eastern Cooperative Oncology

2  Group, you identified a couple of documents and told the jury

3  that Wyeth actually had a policy against doing breast cancer

4  studies.  Do you recall that testimony this morning?

5    A.  Yes.

6    Q.  You showed a couple of documents to the jury from this

7  group called ECOG and you told the jury that Wyeth actually had

8  a policy to not study the breast cancer issue, do you recall

9  that?

10   A.  I'm going to find it.  I will find --

11   Q.  Okay.

12   A.  -- the document.

13       I have two documents up here related to ECOG.

14   Q.  They are both in evidence.  I think the first one you

15  were shown was Plaintiff's Exhibit 251; is that correct?

16   A.  I don't remember which order, but I have 251.

17   Q.  You have 251?

18   A.  I do.

19   Q.  This is in evidence.  Can I call up Plaintiff's

20  Exhibit 251?

21       Now, let's look at what this document is.  Can you

22  tell the jury, this is an internal memo of Wyeth; is that

23  correct, that you called to the jury's attention this morning?

24   A.  Yes.

Page 1897

1  Q.  And it's dated December 8th, 1993 and it's to a David
2  Dodd from a Kerri Smith Cox and it says re ECOG, they call that
3  ECOG, did I say that correctly?
4  A.  Eastern Cooperative, yes.
5  Q.  Breast cancer trial.
6      Let's look at what this says.  Let's read it carefully
7  to see what kind of policy that this letter indicates Wyeth
8  had.  It says, "The Eastern Cooperative Oncology Group has
9  received funding to conduct a study of HRT in women post breast
10 cancer taking tamoxifen"; is that correct, did I read that
11 correctly?
12 A.  I think so.
13 Q.  So let's slow down for a minute.
14     What that memo is saying is that this group, this
15 Eastern Cooperative group, they want to get funding to conduct
16 a study of women who already have breast cancer and they want
17 to use HRT with them; is that correct?
18 A.  In women after breast cancer who are taking tamoxifen.
19 Q.  This is a group of women who have already been
20 diagnosed with breast cancer.  They are in treatment.
21 Tamoxifen is one of the treatments; is that correct?
22 A.  That is my understanding.
23 Q.  And they have already had breast cancer and now this
24 group wants to take that group of women who have already had

Page 1898

1  breast cancer and now give them HRT?
2  A.  Yes.
3  Q.  Okay.
4      Now, Wyeth in this letter said that, "We had refused a
5  request to supply the drug consistent with company policy"; is
6  that correct?  Do you see that?
7      That is what you called to the jury's attention this
8  morning; is that right?
9  A.  Yes.
10 Q.  And you told the jury that that told you that Wyeth
11 had a policy not to test or study HRT for breast cancer; is
12 that correct?
13 A.  Well, I think I was referring to two documents.  I was
14 referring to both when I made that comment.
15 Q.  Fine.
16     But now that you have looked at this -- By the way,
17 obviously Wyeth is not going to provide its drug to women who
18 already have breast cancer because the FDA label says it's a
19 contraindication that women with breast cancer should not be
20 using HRT; isn't that correct?
21 A.  Well, the label did say that and the FDA workshop also
22 said the year preceding this that those studies should be done.
23 Q.  I'm sorry, did the label -- Does the label approved by
24 the FDA say that women with breast cancer should not use this

Page 1899

1  product?
2  A.  Yes.  There is two different issues here.
3  Q.  But let me stick with the first issue.
4      Does the label, Wyeth's label have a
5  contraindication -- I will just show it to you.  Withdraw the
6  question.  Can I have tab 174?
7      Doctor, I'm going to hand you what is marked as Wyeth
8  Defense Exhibit 29, just ask you to look at it.  I will ask
9  you, does this appear to be the 1992 Physician's Desk
10 Reference?
11     Can I have that one document back up, the ECOG
12 document.  The document I have just handed you, Defense
13 Exhibit 29, this is the 1992 Physician's Desk Reference; is
14 that correct?
15 A.  Yes.
16 Q.  And I showed you the 1992 because that is about the
17 same time period of this 1993 document, do you see, the ECOG
18 communication is 1993?
19 A.  I have two ECOGs, but there is one December of '93.
20     MR. WEBB:  Thank you.
21     I would like to offer into evidence Defense Exhibit
22 Number 29.
23     MS. LITTLEPAGE:  No objection.
24     THE COURT:  It's admitted.

Page 1900

1      (Defendant's Exhibit 29 was admitted into evidence.)
2  BY MR. WEBB:
3  Q.  Steve, can I call that up now?
4      What you now have before you is the Physician's Desk
5  Reference, and if you go inside what I have provided you is the
6  Premarin FDA approved label, do you see that?
7  A.  Yes.
8  Q.  And is there a section on the label that is called
9  contraindications?
10 A.  Yes.
11 Q.  And could you go to that page which -- Steve, it's, I
12 think, three pages in.  There you go, and there is down at the
13 left-hand on the left-hand column there is a section of the
14 label called contraindications; is that correct?
15 A.  Yes.
16 Q.  Would you tell the jury what does that mean in a drug
17 label?
18 A.  I had told you that indications means uses, and contra
19 means just what you think, when not to be used.
20 Q.  So the FDA's label, the drug label that had been
21 approved by the FDA said on the face of it that one of the
22 contraindications where it should not be used would be in
23 "women who have known or suspected cancer of the breast," do
24 you see that, "except in appropriately selected patients being

Page 1901

1 treated for metastatic disease," do you see that?

2    A.   Yes.

3    Q.   Now, you became aware that because of the -- because

4 of what is on the label Wyeth had a policy that it would fund

5 different types of breast cancer -- Strike the question.

6         Wyeth had made a decision that it shouldn't provide

7 its drugs, its own product to studies that are going to be used

8 in women who already have breast cancer; is that correct?

9    A.   Yes.

10        The reason I keep saying I have two e-mails or two

11 documents rather is that in one it says that it's their policy

12 for studies involving breast cancer, so it just says breast

13 cancer.  In another one it's talking about women who have had

14 breast cancer with estrogen.

15   Q.   But Doctor, I take it you can be fair to Wyeth, can't

16 you?

17   A.   I think so.

18   Q.   You know what was said in those letters.  Wyeth had a

19 policy to not provide its medication to studies that were going

20 to test the medication in woman who already had breast cancer,

21 is that fair?

22   A.   I think that is true.

23        I'm just pointing out to you there was also a memo

24 that says it was their policy against just plain breast cancer,

Page 1902

1 so it's a little confusing by the documents.

2    Q.   But you knew, Doctor, that the policy Wyeth was

3 talking about -- Doctor, you knew it because you had seen --

4 Wyeth had already provided a hundred million of its pills to

5 WHI by this time?

6    A.   Yes.

7    Q.   Had it?

8    A.   Yes.

9    Q.   So Wyeth didn't have a policy not to provide its

10 medication to breast cancer studies?

11   A.   I'm just pointing out in the two ECOG documents

12 provided to me there is a little confusion in that policy, and

13 when I was answering the question about doing the study I was

14 very clear to say that it was secondary to the FDA suggesting

15 that those studies were now in order.

16   Q.   So if you want to be critical of Wyeth, so be it, but

17 Wyeth decided that because the label says it shouldn't be used

18 with women who already have breast cancer, when Wyeth decided

19 we really shouldn't provide the drug to people when they are

20 only testing women with breast cancer, that wasn't an

21 unreasonable thing for Wyeth to do, was it?

22   A.   I don't know.

23        Given that they had -- the FDA had impanelled a group

24 of experts and it was their consensus that those studies should

Page 1903

1 be done, I don't know.

2    Q.   Well, when you say you don't know, just so the jury

3 understands the truth, Wyeth was not -- Wyeth did and has

4 provided its drugs to people studying breast cancer; is that

5 correct?

6    A.   Well, they did provide it to WHI.  That study involved

7 the breast cancer evaluation.

8    Q.   You just told the jury, you said it had a breast

9 cancer adverse end point?

10   A.   I'm just repeating that.  It did have a breast cancer

11 evaluation.

12   Q.   You knew when you gave this testimony this morning

13 that Wyeth had already provided a hundred million pills to that

14 study, didn't you?

15   A.   Right, right, but the topic was using it in women who

16 had had breast cancer, could you then look at that subset and

17 the FDA had suggested that that would now be a reasonable

18 study.

19   Q.   But this morning when you told the jury that Wyeth had

20 a policy not to study breast cancer, you knew the policy was

21 not that, it was a policy not to provide its pills to a study

22 where the women already had breast cancer, did you know that

23 this morning when you testified?

24   A.   I just can't answer that with a yes or no.

Page 1904

1         I have two conflicting documents and a series of

2 depositions that were shown that said they didn't do any breast

3 cancer studies.

4    Q.   You don't think you were trying to deceive or mislead

5 the jury in any way this morning?

6    A.   No, I think I was very clear with the documents that

7 were provided to me.

8    Q.   Now, as far as Wyeth supporting studies on breast

9 cancer with its medication, let me show you -- Can I have tab

10 213?

11        Doctor, I'm going to hand you Defense Exhibit 195 and

12 ask you to look at this document.  This is a Wyeth document

13 dated September 10th, 1992 that relates to the subject matter

14 of providing the WHI study with the hormone therapy products;

15 is that correct?

16   A.   Yes.

17        MR. WEBB:  And I offer it into evidence.

18        MS. LITTLEPAGE:  No objection.

19        THE COURT:  Defense Exhibit 195 is admitted.

20        MR. WEBB:  Thank you.

21        (Defendant's Exhibit 195 was admitted into evidence.)

22 BY MR. WEBB:

23   Q.   Now, this document is actually dated September 10th,

24 1992.  That is before those ECOG memos that you showed the

1 jury; is that correct?

2 A.   Yes, September '92 with shipment planning for April of

3 '93, yes.

4 Q.   It's dated before the ECOG memos?

5 A.   Yes, '92 comes before '94.

6 Q.   Thank you.

7     Now, what we see here is that -- Steve, can you scroll

8 down towards the bottom.  This confirms -- Go back up to the

9 top.

10    The people carrying out the WHI study are people

11 connected to the National Institutes of Health; is that

12 correct?

13 A.   Yes.

14 Q.   And so this is a letter from Wyeth to William Harland,

15 who is associate director of disease prevention at the National

16 Institutes of Health; is that correct?

17 A.   Yes.

18 Q.   It's about re, the Women's Health Initiative, WHI,

19 drug supply; is that correct?

20 A.   Yes.

21 Q.   And if you go down, scroll down, we don't need to

22 spend a lot of time, you see that WHI has made a request and

23 Wyeth has agreed to provide what adds up to about a hundred

24 million pills; is that correct?

1 A.   Let's see, yes.

2 Q.   And go to the next page.

3     The reason the pills are important is because you need

4 to have the pills in order to be able to carry out the study;

5 is that correct?

6 A.   Well, it saved NIH from having to purchase them.

7 Q.   Did Wyeth also provide the placebo, manufacture a pill

8 that looked like the real pill, but wasn't?

9 A.   Yes, they agreed to do the placebo.

10 Q.   So Wyeth agreed not only to provide to the government

11 the real pill, but because the government needed to have a fake

12 pill, a placebo that looked like the real pill to make the

13 study successful, Wyeth did that, too?

14 A.   Yes.

15 Q.   And by the way, in the work that you have done on this

16 case as an expert witness, you can take that down, Steve, did

17 you see evidence that the WHI was very grateful and felt that

18 Wyeth had been very generous in supporting the WHI study?

19 A.   I'm sure there was a thank you note sent for them

20 providing the pills, yes.

21 Q.   Do you think it was a responsible thing for Wyeth to

22 do as a pharmaceutical company to provide not only the pills,

23 but the placebo to help this study get carried out?

24 A.   Commonly done.  Yes, it's appropriate for them to do

1 that.

2 Q.   That is the act of a responsible pharmaceutical

3 company?

4 A.   Yes, it was going to be their commitment what they

5 needed to do -- Yes, what they were able to do in lieu of doing

6 their own study, yes.

7 Q.   This is the study that you told the jury turned out to

8 be such a big deal; right?

9 A.   Yes, it was a big deal.

10 Q.   I take it the fact that Wyeth did it, does that mean

11 to you Wyeth acted as a responsible company when it provided

12 the medication?

13 A.   Yes, I think providing it saved the government from

14 having to purchase it, yes.

15 Q.   Now, let me go to a little different subject.

16    I want to ask you some questions about how your

17 testimony relates to the three plaintiffs that we have in our

18 case here.

19    I noticed that you did not mention their names or say

20 anything about them during the course of your testimony; is

21 that correct?

22 A.   No, I just met them this morning.

23 Q.   That's fine.

24    Let me ask you this, as far as the basic claims in

1 this case that the breast cancers of those three plaintiffs was

2 caused by Wyeth's hormone therapy drugs, you're not a medical

3 doctor?

4 A.   No.

5 Q.   And we have been calling you doctor, as we should,

6 because you have a PhD in pharmacology; is that correct?

7 A.   Yes.

8 Q.   So the jury focuses, you don't have a medical license

9 and you can't treat patients and don't treat patients, is that

10 fair to say?

11 A.   Yes, yes, and yes.

12 Q.   I know I'm saying the obvious, but you don't prescribe

13 medications; is that correct?

14 A.   It is correct that I do not.

15 Q.   And as far as this particular case is concerned, you

16 have not reviewed the medical records of these three

17 plaintiffs; is that correct?

18 A.   I have not.

19 Q.   You have not reviewed the testimony of the physicians

20 for these three plaintiffs to find out why those treating

21 doctors prescribed Wyeth's hormone therapy products to these

22 three plaintiffs, you have not read that testimony, have you?

23 A.   I have not.

24 Q.   I'm sorry.

1    A.   I have not.

2    Q.   And you have not read the testimony of the three

3  plaintiffs themselves as to why they took hormone therapy?

4    A.   No.

5    Q.   And you understand one of the major issues we're

6  litigating in this case is the issue as to whether these three

7  plaintiffs were adequately warned about a potential risk of

8  breast cancer, do you understand that we're litigating that

9  issue?

10   A.   I really don't know anything about the specifics of

11 this case.

12   Q.   You have not examined the deposition testimony of

13 either the doctors who treated these plaintiffs or the

14 plaintiffs on the issue of what warnings they may or may not

15 have received; is that correct?

16   A.   It is true that I have not.

17   Q.   Okay.

18        Now, you talked this morning about an issue about off

19 label promotion of drugs.  Do you recall that?

20   A.   Yes.

21   Q.   Am I correct you have not looked into the issue of

22 whether the physicians in this case prescribed hormone therapy

23 for these three plaintiffs for any off label use, you have not

24 read their testimony on that issue; is that correct?

1    A.   I haven't read their testimony on any issue.

2    Q.   And the reason you have not mentioned the three

3  plaintiffs is simply because your testimony, you have no

4  specific knowledge about the evidence that relates to these

5  three plaintiffs; is that correct?

6    A.   That is true, I do not.

7    Q.   Now, the last question that you answered when Ms.

8  Littlepage was asking you questions today, I think the last

9  question today was you told the jury that the opinions, all

10 these opinions that you have given the jury about all the

11 things that Wyeth did wrong, that you said those opinions were

12 based on a reasonable degree of regulatory certainty.

13        Do you recall just saying that about twenty minutes

14 ago?

15   A.   I think so.

16   Q.   And the agency that regulates Wyeth is the FDA; is

17 that correct?

18   A.   Yes.

19   Q.   You have testified in the past that the rule book or

20 the playbook that a pharmaceutical company must follow is in

21 the Code of Federal Regulations, have you said that in the

22 past?

23   A.   Yes.

24   Q.   That is true, isn't it?

1    A.   Well, there is the CFR, the US Code, there is FDA

2  guidances.  There is a variety of issues.

3    Q.   Am I right, do the FDA regulations appear in the Code

4  of Federal Regs called CFR, the Code of Federal Regulations?

5    A.   Yes.

6    Q.   I notice that while you have been testifying as far as

7  what FDA rules that have been violated by my client that is the

8  basis for your testimony here over the last day, you have not

9  called to the jury's attention or showed them any rules that

10 you say my client violated, at least up until now; is that

11 correct?

12   A.   I don't specifically recall that.

13        I think I talked about what the requirements are for

14 pharmacovigilance, and I discussed Wyeth's response to

15 pharmacovigilance, but other than that I don't recall any.

16   Q.   All this testimony that you have given to this jury

17 that my client did things wrong, I take it that you're not just

18 making up some standard, there must be some objective standard

19 of care you are basing your opinion on in order to provide

20 these opinions to this jury; is that correct?

21   A.   Yes, and we discussed today the three tiers of those

22 standard of care, one of which is the FDA.

23   Q.   Well, then, as far as trying to show the jury what is

24 the actual objective rule or standard that you're basing these

1  opinions on -- Let's take the opinion that you told the jury

2  that my client should have done a WHI-like study ten or

3  fifteen years earlier, that opinion, do you recall that

4  opinion?

5    A.   Yes, or other studies, yes.

6    Q.   That opinion, is that based on some written standard

7  of care that I could show the jury what you're basing your

8  opinion on?

9    A.   Well, it will take a few minutes to explain that

10 answer.

11   Q.   Is the answer yes?

12   A.   Well, it's hard to answer it as a yes or no, but I

13 will try.

14        Yes, it is based.  As I discussed today, FDA is not

15 empowered now to demand all of the post-marketing

16 pharmacovigilance work that it would like or feels is needed in

17 order to ensure the safe marketing of the products.  They have

18 requested that additional authority several times.  It is

19 currently being petitioned again in this Congress.  FDA has

20 asked for that because they say that without that specific

21 authority they cannot demand the studies or labeling changes

22 that they feel are necessary.

23        At this time much of the pharmacovigilance assignments

24 or the post-marketing assignments are up to the company or up

1 to the association that the company belongs to to decide what
2 they need to do.  The FDA's requirement is you will look for
3 signals and you will do the studies to address and provide
4 information regarding those signals.
5     So my comments were that the FDA does not have that
6 authority right now and instead relies upon companies to do it.
7 Q.  So I guess -- I want to show -- because you have been
8 on the stand for hours talking about my client did all these
9 things wrong, I want to show the jury something in writing,
10 some objective standard that you're basing these opinions on,
11 and so let me start with the FDA.
12     Are there FDA regulations, are there FDA regulations
13 that set forth some clear standard or rule that you say is the
14 basis for your opinion about my client should have tested in a
15 different way?
16 A.  In that the FDA said you will conduct post-marketing
17 surveillance.  There are no specific requirements that the FDA
18 is empowered to do.
19 Q.  Whatever you say it is, I'm going to give you the Code
20 of Federal Regulations that have the FDA rules in them, and I
21 want to give you -- This is the 2007 Code of Federal
22 Regulations, and I'm going to put it up here.  Can you show us
23 in here whatever the rule is that you say my client violated or
24 creates the standard of care that Wyeth did something wrong

1 because it didn't test sooner like with the WHI study, I want
2 to be able to put it up on the screen and show the jury
3 whatever you're relying on?
4 A.  I don't know how to answer that.
5     I think I have told you that the FDA does not have the
6 power to enforce that.  The FDA has been telling Wyeth to
7 examine breast cancer issues since the late '70s and early
8 '80s.  The job wasn't done until the government did the study
9 that finally gave the definitive answer, but until the FDA is
10 allowed to insist upon companies to do that, they have to rely
11 on the company to do what is appropriate.
12 Q.  But just twenty years ago you told the jury that
13 your opinion, all your opinions are based to a reasonable
14 degree of regulatory certainty.  I have given you the
15 regulations, they are right here, and I want to know where the
16 certainty is in that book, in those books, some rule I can put
17 up on the board and show the jury that you say was violated?
18     MS. LITTLEPAGE:  Judge, I object.
19     There is no requirement that she find a regulation in
20 order for the jury to find Wyeth did something wrong, and the
21 implication of the question --
22     THE COURT:  What is the objection?
23     MS. LITTLEPAGE:  Relevance, argumentative.  If I could
24 think of other things, I would.  It's not appropriate, because

1 there is no requirement that she do that.
2     THE COURT:  I think it's relevant to some of the
3 issues on cross-examination.  I will allow it.
4 BY MR. WEBB:
5 Q.  You told the jury that you got a reasonable degree of
6 regulatory certainty.  I want to know where in these books,
7 these federal regulations where is that certainty?
8 A.  Mr. Webb, I will explain it again.
9 Q.  Can you just answer?
10 A.  It isn't and that is why the FDA is so desperate to
11 get that extra authority, because now they must rely on the
12 worthiness, on the scientific studies conducted really
13 voluntarily at will by a company to answer crucial health
14 issues, and FDA doesn't want that any more.  They want that
15 authority.
16     The fact that they are before Congress again and
17 requested another Congressional hearing on this is because it
18 isn't in these books.  If it were in this book they wouldn't be
19 doing what they are doing to gather this extra authority.  They
20 have to rely on the companies.
21     My opinion is that they have been relying, asking
22 Wyeth to do that for twenty years and the final data were not
23 provided until 2002 when the government did it.  That is the
24 basis of my regulatory opinion.

1 Q.  I understand your opinion, but you don't mind if I try
2 to find -- Do you agree that behind every opinion there should
3 be facts, or do you agree with that proposition?
4 A.  I do, but you're asking to prove a negative.  FDA is
5 very clear, they don't have the authority to demand this.  They
6 can't issue a warning letter or shut a company down because
7 they don't have the authority to do it at this time.  They are
8 pleading for this.
9 Q.  But when you just told the jury -- I heard you tell
10 the jury that you're basing your opinions to a reasonable
11 degree of regulatory certainty, and so all I'm asking is
12 whatever the regulation is you're relying on, it's not in the
13 FDA regs; is that correct?
14 A.  No, they are pleading for additional power.
15 Q.  If it's not here, then the other thing that I heard
16 you tell the jury this morning that there was something called
17 a Pharmaceutical Industry Code of Conduct that you were relying
18 upon to support your opinions; is that correct?
19 A.  Well, I was relying upon it because Wyeth included it
20 in their database and Wyeth subscribed to that code.
21 Q.  As far as trying to find something in writing that we
22 can show the jury that you're basing your opinions on, is there
23 something in that industry pharmaceutical code that you're
24 basing your opinion on, your opinions regarding when Wyeth

1 should have done some kind of study and you say because they

2 didn't do it they did something wrong?

3    A.  Yes, and it's in our documents and it's cited in my

4 report.  That document indicates that FDA standards are to be

5 considered minimal standards and that companies who are part of

6 this association will strive, must do additional work as

7 signals appear and do whatever additional studies are needed,

8 and they note that the FDA is sort of the front level, basement

9 standard, minimum standard.

10    Q.  So there is something in that pharmaceutical -- as far

11 as trying to see -- If I want to find the actual words that

12 create the standard, they are in that pharmaceutical code?

13    A.  For the association, that is their bylaws.

14    Q.  Let me see if I can find that code.  Can I have tab

15 220?

16       By the way, as far as the FDA and those federal

17 regulations that I just showed you, there is nothing in there

18 that you could show us, can you show me a document that you

19 have seen in all these thousands of documents where the FDA

20 asked Wyeth to do this breast cancer study that you say should

21 have been done earlier?

22    A.  The FDA has discussed it -- There are several

23 documents where they have said there is inadequate breast

24 cancer information.

1    Q.  Can you show me the document where the FDA asked Wyeth

2 to do the breast cancer study and Wyeth refused to do it?

3    A.  Well, certainly in the review that we did today, the

4 FDA's medical review of the Prempro NDA and the Prem Pack NDA.

5    Q.  Wyeth agreed to do that study?

6    A.  It's an example of where FDA told them to do a study.

7    Q.  Show me a document where the FDA told Wyeth go out and

8 do this breast cancer study and Wyeth refused?

9    A.  Wyeth didn't do the study.  The government did the

10 study.

11    Q.  We will come to that, but you have testified in the

12 past Wyeth didn't do that study because the FDA decided that

13 the WHI study would be a better substitute; is that correct?

14    A.  I think there is more to that story than that, but

15 yes.

16    Q.  But Wyeth didn't break that commitment, Wyeth -- We

17 will come to that, but tell me other than the Prempro approval,

18 that we will come back to, tell me any document you have seen

19 where Wyeth refused to do a breast cancer study when the FDA

20 asked them to do it?

21    A.  The FDA and NIH has been saying there is inadequate

22 breast cancer information.  I think it was in 1983 they said a

23 study needed to be done and I haven't seen a study.

24    Q.  Can you show me the document?

1    A.  I think we showed it today, in 1983.

2    Q.  Listen to my question.

3       I'm looking for an FDA document where the FDA asked

4 Wyeth to do a breast cancer study and Wyeth refused?

5    A.  Well, without playing semantics there are several

6 documents where Wyeth was put on notice that they needed to do

7 a study and the reality of it is they never did the study.

8       Now, is there a document that specifically says that

9 we refuse to do what FDA asked, We are not going to do a breast

10 cancer study, I don't know.  I don't know if there is an

11 absolute refusal in the documents.  The reality of it is there

12 have been twenty years worth of meetings and opinion leaders

13 and researchers in the field saying we desperately need to know

14 more about breast cancer and the reality of it is the breast

15 cancer study wasn't done.

16    Q.  We will come to that topic.

17       Let me stick for a moment on where I can find the

18 rules or the code of standard that you're applying to Wyeth's

19 conduct so we can decide and compare Wyeth's conduct to it.

20       You identified the pharmaceutical industry code as one

21 that contains the language?

22    A.  First I relied on the fact that the FDA said they are

23 not empowered to demand these studies and they are asking for

24 that power.

1    Q.  Did you just tell me a moment ago that in the

2 pharmaceutical industry code we will find the standard?

3    A.  No, I said there are three tiers and one of those is

4 FDA, and one is the pharmaceutical code.  Wyeth has said there

5 is three internal codes, the pharmaceutical association code

6 and the FDA's standards.

7    Q.  I will hand you what I have marked as Defense

8 Exhibit 18741, which I believe is the Code of Pharmaceutical

9 Marketing Practices, and ask you when you testified this

10 morning that a pharmaceutical code existed that you were basing

11 your testimony on, is this what you were referring to?

12    A.  Just a second.

13       Yes.  In part, yes.

14       MR. WEBB:  As far as the language in here -- I will

15 offer this exhibit into evidence.

16       MS. LITTLEPAGE:  No objection.

17       THE COURT:  All right, the exhibit number was Defense

18 Exhibit DX 18741?

19       MR. WEBB:  Yes, your Honor.

20       THE COURT:  It's admitted.

21       (Defendant's Exhibit 18741 was admitted into

22 evidence.)

23 BY MR. WEBB:

24    Q.  Now it's in evidence.

1    I want to see what language in here creates the
2 standard of conduct or the regulation that you say Wyeth
3 violated, because it didn't do a study earlier?
4    A.  Well, it says that --
5    Q.  What page are you on and I will put it on the screen?
6    A.  I will go through several of these pages.
7       It says that the pharmaceutical -- On the very first
8 page, pharmaceutical industry --
9    Q.  Maybe we should start by explaining what is the Code
10 of Pharmaceutical Marketing, what is this?
11    A.  The PRMA, the Pharmaceutical Research Manufacturers of
12 America, have an association which many of the large
13 pharmaceutical kind of companies belong to and use as a forum
14 for developing policy, means of exchanging information, a
15 variety of issues, and Wyeth is a member of this.
16       In fact, I think at the time relevant to this Wyeth's,
17 I guess CEO, I'm not sure what he was, was actually the head of
18 this marketing association, and there are many members.  Most
19 of them are research intensive companies looking at NDA type
20 products.  Today it's also a company that does biologics, but
21 at that time it was mostly a company that did NDA products and
22 it makes up for themselves what they believe their obligations
23 are for a variety of issues.
24    Q.  You wanted to go to the first page, did you say?

1    A.  We can start here.
2    Q.  Go ahead.
3    A.  They say the obligations of the industry are
4 identified below.
5    Q.  I will go to the first page and we will try to read
6 along with you.
7       Where are you reading from?
8    A.  I'm going to go through the document in different
9 places, and they are very careful to say that as an industry
10 they should be conscious of their special position and eager to
11 fulfill all obligations in a free and fully responsible manner,
12 okay.
13       You are to fulfill all of them, not just the ones that
14 FDA puts a gun to their head to do.
15    Q.  Just so I understand, I'm looking for the language
16 that creates the standard?
17    A.  It's in several places, if you will let me continue.
18    Q.  Go ahead.
19    A.  Okay.
20       It says that they want to produce products that they
21 can base their claims on valid scientific evidence for
22 therapeutic indications and conditions for use, to provide
23 scientific information with objectivity, to use complete candor
24 in dealing with public health officials and healthcare

1 providers, to comply with the regulations of FDA and other
2 agencies.
3       Then they go on to discuss things that they should do
4 to comply with those general goals, those general mandates that
5 they have placed upon themselves, and that comes under general
6 principles and the next page.
7       One of the things that they say they must do are
8 post-marketing and surveillance studies should be conducted on
9 a scientific and educational basis.  They should not be
10 conducted simply as a means to promote a product when there is
11 little or no scientific educational basis.
12    Q.  What page are you reading on now?
13    A.  I'm continuing on.  I guess it's the third page.
14    Q.  Go on.
15    A.  And that company's assist in the conduct of patient
16 public studies, patient awareness programs for their products.
17       So I think in there what they are saying is it's up
18 to -- They are putting upon themselves the requirements to
19 conduct post-marketing studies, to conduct post-marketing
20 surveillance, and to have complete candor, complete
21 truthfulness in discussing their product with practitioners and
22 to generate the scientific information needed with objectivity
23 and scrupulous regard for the truth.
24    Q.  I thought you were going to point to something

1 specific that set forth specific criteria as to when studies
2 need to be conducted.  Does that exist in there?
3    A.  This is an overview of what they are committing to do
4 as members of this association.  I think many of the things
5 that I have touched upon are directly, bear directly upon the
6 Prempro situation and the doing, the conducting, the conduct or
7 failure to conduct a study.
8    Q.  Just so I understand, is there anywhere in there that
9 that code sets forth specific criteria as to when certain types
10 of studies need to be done?
11    A.  No, it says --
12    Q.  Is the answer no?
13    A.  Because they say that these are the obligations of our
14 industry.
15    Q.  Now, another one of the major opinions that you told
16 the jury about other than testing is that you have expressed
17 the opinion that Wyeth's hormone therapy drugs, those products,
18 the risks outweigh the benefits for most women; is that
19 correct?
20    A.  Well, I think I said that the old labeling where there
21 was no restriction on use or duration, that the risks may
22 outweigh the benefits.
23    Q.  Let me ask you this, I'm going to -- I will give you a
24 copy.

Page 1925

1      You have an expert report that you prepared; is that
2  correct?
3      A.  Yes, I have prepared -- Yes.
4      Q.  You prepared it?
5      A.  Of course.
6      Q.  I actually have a copy.  I have a copy of your report
7  and I will just read it off and you tell me if it's correct.
8      A.  May I have a copy?
9      Q.  I will give it to you.
10      Your Honor, this is marked actually as a defense
11  exhibit.  I don't intend to offer it, just so what I'm showing
12  the witness is her expert report and it's 8235, and first of
13  all I will ask you if that appears to be your expert report?
14      A.  Yes.
15      Q.  Actually I think my handwriting is on that one, so I
16  will give you a clean copy because we may need to use it
17  occasionally.
18      I will hand you the same exhibit.  You can look at it
19  and confirm that that is your expert report, is it?
20      A.  It is the February 2006, yes.
21      Q.  Could you go to page 58.
22      Are you on page 58?
23      A.  Yes.
24      Q.  There is a heading in your report called Inadequacy of

Page 1926

1  the Premarin Prempro Label.
2      Do you see that?
3      A.  I do.
4      Q.  Let me read the first sentence.  It says your opinion
5  is, "From at least 1975 to 2002 Wyeth failed to adequately warn
6  prescribing doctors, practitioners and patients that the harms
7  of Premarin and MPA" -- That is progestin; is that correct?
8      A.  It's medroxyprogesterone acetate, yes.
9      Q.  "That the harms of Premarin and MPA outweigh the
10  benefits for many, if not most women."
11      That is what you state there; is that correct?
12      A.  Yes.
13      Q.  That was your opinion and it's still your opinion
14  today; is that correct?
15      A.  Yes.
16      Q.  Okay.
17      Now, I want to clarify that is exactly what your
18  opinion is.  Now, would you agree with me -- Obviously that
19  opinion, that opinion that you have given the jury in this case
20  is exactly the opposite of what the FDA concluded and
21  determined; is that correct?
22      A.  Can you explain that to me?
23      Q.  I'm just asking, do you agree with me that that
24  opinion that we just read off to the jury, that the risks

Page 1927

1  outweigh the benefits for most women, that is exactly the
2  opposite of what the FDA determined when Prempro was approved;
3  is that correct?
4      A.  I don't know how to answer that.
5      It was approved with a caveat that a breast cancer
6  study must be done and when a breast cancer study was finally
7  done, as you saw this morning, the labeling changed
8  dramatically.  The labeling now is appropriate.
9      Q.  Why don't we just see what the FDA said when they
10  approved the drug.
11      I think it's Plaintiff's Exhibit 287, which was
12  admitted into evidence this morning.  If you could call up
13  Plaintiff's Exhibit 287 and you probably have it in your pile
14  there is my guess.  Steve, the same exhibit is Defendant
15  Exhibit 434, if that is easier.
16      You were shown this document this morning, the FDA
17  approval document.  Do you recall seeing this this morning?
18      A.  I do.
19      Q.  Steve, can you go into the actual letter that the
20  FDA -- The next page, so go to the next page.
21      We're looking at now the actual FDA approval of
22  Prempro you told the jury which was on December 30th, 1994; is
23  that correct?
24      A.  For the separate ingredients, yes.

Page 1928

1      Q.  And let's go down to the approval language, and if we
2  go down to the paragraph that says, "We have completed the
3  review of this application."
4      It says, "We have completed the review of this
5  application, including the draft labeling submitted on these
6  dates for Prempro, Premphase, et cetera, and have concluded
7  that adequate information has been presented to demonstrate
8  that the drug products are safe and effective for use as
9  recommended in the submitted draft labeling.  Accordingly this
10  application is approved effective on the date of this letter."
11      Now, when the FDA approves a drug under the
12  regulations, they can only approve drugs if they have been
13  demonstrated to be safe and effective.  You have testified to
14  that in the past; is that correct?
15      A.  That is law.
16      Q.  That is the law?
17      A.  Yes, that sentence is in every approval letter.
18      Q.  I understand.
19      So the FDA has to conclude that the drug is safe and
20  effective or it cannot approve the drug; is that correct?
21      A.  Yes, yes, since 1962, safe and effective.
22      Q.  You have testified in the past and it's accurate that
23  the word safe actually means that the benefits outweigh the
24  risks; is that correct?

Page 1929

1    A.   It can mean that, yes.

2    Q.   So the word safe actually has a meaning, it's in the

3 FDA regulations; is that correct, what the word safe means?

4    A.   I don't know if it's still in there or not, I don't

5 know.

6    Q.   In any event you're aware that the FDA uses the word

7 safe to mean that the benefits outweigh the risks; is that

8 correct?

9    A.   Yes, yes.

10   Q.   Now, Steve, could I have 236, the one that I talked to

11 you about that just compares?

12       What I have done is put on a piece of paper, you just

13 told us on the left is what you -- from your expert report what

14 you have given this jury to be your opinion, that the harms of

15 Premarin and progestin, MPA, outweighed the benefits for many,

16 if not most women, that is what you have told the jury, that is

17 your opinion in this case, and on the right the FDA has

18 concluded exactly the opposite, that in fact those drug

19 products are safe and effective as recommended.

20       Do you at least see what I have on the screen?

21   A.   Yes, I see the screen.

22   Q.   By the way, am I correct as far as -- You talked quite

23 a bit this morning about the FDA and what it does and does not

24 do.

Page 1930

1        Am I correct that because of all of your years of

2 experience in working and interacting with the FDA that as an

3 expert in this case it is your fundamental belief that the FDA

4 is committed to protecting the public health; is that correct?

5    A.   Yes.

6    Q.   And you have reached that opinion because of your

7 experience; is that correct?

8    A.   Yes.

9    Q.   And it is your belief as an expert in this case based

10 on all of your years of experience and interaction with the

11 FDA, you believe that in protecting the public health the FDA

12 hires qualified professional scientists and doctors to work at

13 the FDA; is that correct?

14   A.   I think they make an effort to do that, yes.

15   Q.   So my question is that when the FDA approved Prempro

16 at this time and concluded that they are safe and effective for

17 use, you believe that the FDA made that decision as part of its

18 commitment to public health; is that correct?

19   A.   Wow, I don't know if they had that in mind when they

20 made the decision.

21   Q.   Pardon me?

22   A.   I don't know what was in their mind when they made the

23 decision.  The NDA was ready to be approved.

24   Q.   You just told the jury based on all your years of

Page 1931

1 experience you believe the FDA to be firmly committed to

2 protecting public health; is that correct?

3    A.   I think they are committed to that.

4        I have never had the FDA say to me I'm approving your

5 application because I am committed to protecting public health.

6 Generally they say I'm approving it because the NDA is ready to

7 be approved.

8    Q.   We will get into more detail, but the fact is you do

9 believe the FDA is committed to protecting public health and

10 they hire good scientists to do that; is that correct?

11   A.   I think within the boundaries that they have been

12 given by Congress that they are able to do that.

13   Q.   When they approved Prempro as an agency committed to

14 public health, you have no reason to doubt -- As far as you

15 know they were still committed to improving public health when

16 they approved this, weren't they?  Do you have any reason to

17 doubt that?

18   A.   No.

19   Q.   As far as what we see on the screen as those two

20 opinions, yours and the FDA's, because you have reached the

21 opposite opinion are you telling the jury that you think that

22 your opinion should be accepted over the FDA?

23   A.   No, of course that is not what I'm saying.

24       What I'm saying is, I think it was obvious today, that

Page 1932

1 Wyeth was put on notice for many years that they needed to do a

2 breast cancer study.  Because an adequate study wasn't done

3 prescribers and their patients never fully appreciated the risk

4 of breast cancer until 2002.

5        So between 1975 and 2002 the labeling didn't -- The

6 labeling failed to provide the true breast cancer risk, because

7 the labeling didn't have the data to put in there for the true

8 breast cancer risk.  Had the studies been done earlier and we

9 had appreciated the true breast cancer potential, the breast

10 cancer risk, then the labeling prior to 2002 could be the much

11 improved labeling that we have today.

12   Q.   I'm not sure if I -- I'm going to ask it again and see

13 if I can get it right.

14       When I look at what your opinion is versus the FDA's

15 opinion, do you believe that when the FDA made -- By the way,

16 when the FDA made this decision on December 30th, 1994, am I

17 correct you believed the FDA made the proper decision; is that

18 correct?

19   A.   Well, I think given the unusual circumstances

20 associated with Premarin and Cycrin or Provera, and the fact --

21 Yes, they made the decision because for the first time FDA

22 would have an ability to regulate the combination product.  The

23 products were already being used in combination by millions and

24 millions of patients.  This approval allowed the FDA to bring

1 Wyeth, if you will, onto FDA island.

2        So yes, I think it was appropriate to approve it with

3 the caveat that finally a breast cancer study needs to be done.

4    Q.   So you believe that the FDA was correct when the FDA

5 concluded, after they reviewed all this information which I'm

6 going to take you through, but after they reviewed all the

7 information that they had and the FDA reached the conclusion on

8 the right-hand side of this chart that this drug -- these drug

9 products are safe and effective for use as recommended in the

10 submitted draft labeling, you believe that the FDA did the

11 correct thing when they approved this; is that right?

12    A.   Yes, because it finally gave FDA a forum for the

13 combination product, and when they had that forum they insisted

14 that Wyeth do a breast cancer study.

15    Q.   And even though you now agree that the FDA made the

16 proper decision, you have come to the exact opposite opinion on

17 the left-hand side?

18    A.   No, I didn't come to the exact opposite.

19        What I'm saying is that had the studies been done

20 twenty years earlier the labeling could have provided the

21 correct breast cancer information, and if the correct breast

22 cancer information had been available the labeling could have

23 certainly been much more instructive than it was -- than didn't

24 occur until 2002.

1        So from 1975 until 2002 we didn't have the information

2 because the studies weren't done, and if we don't do the

3 studies you can't know if you have good news or bad news.  So

4 we didn't know we had all the bad news.  The labeling failed to

5 instruct prescribers and their patients.  Once we had the bad

6 news, then the new labeling adequately reflected the risks.

7    Q.   You don't see any inconsistency between what you're

8 telling the jury and what the FDA concluded?

9    A.   I see what you're trying to say, but I'm saying what

10 is behind what I wrote in a hundred some plus page report is

11 that the information wasn't available.

12    Q.   Let's talk about it.

13        When the FDA approved this label or approved this drug

14 in December of 1994, because of all the work you have done in

15 this case you're aware that the FDA did a very thorough job in

16 determining what all of the scientific studies had said about

17 the breast cancer risk, is that fair?

18    A.   Yes, and after they did that they said we needed a

19 definitive breast cancer study.  We don't know the risk.

20    Q.   When they approved this drug, when they approved the

21 drug, had the FDA before -- If the FDA did not want to approve

22 the drug they didn't have to, did they?

23    A.   Correct.

24    Q.   When the FDA approved the drug, do you believe that

1 the FDA had read and was -- and had learned about all the

2 studies that had been done up to that time about breast cancer?

3    A.   Well, I only know what they summarized in the medical

4 officer's review.

5    Q.   It appeared pretty thorough, didn't it?

6    A.   There were several studies and at the conclusion of

7 those studies they said the single most important risk with the

8 combination product is breast cancer and a definitive study

9 needs to be done.

10    Q.   And the warning label -- And they wanted a warning

11 label that warned about the risk; is that correct?

12    A.   Well, of course, it's cancer.  It would have to be in

13 the warnings.

14    Q.   And it was, wasn't it?

15    A.   Of course, it had to be.

16    Q.   We will go through the warning.

17        By the way, as far as comparing you to the FDA, am I

18 correct you recognize as an expert in this case that you are

19 not -- Strike the question.

20        As far as the FDA making this decision because it was

21 committed to public health, you're not suggesting that your

22 opinion is because you are committed to public health, are you?

23    A.   I don't understand that question at all.

24    Q.   The reason you have reached this opinion here on the

1 left is not because of a commitment to public health, it's

2 because you're being paid by the plaintiffs as an expert; is

3 that correct?

4    A.   I don't know how to answer that question.

5    Q.   Well, can you answer it yes or no?

6    A.   I elected to work with the plaintiffs.  I pick cases

7 that I work on based on what I think the science is.  I charge

8 the same amount for my FDA work as I do for product -- as I do

9 for litigation.  So I make the sample amount of money if I'm

10 working with an attorney or if I'm working with a

11 pharmaceutical client and litigation isn't a very big

12 percentage of what I do.

13    Q.   I'm not suggesting that you have done anything wrong

14 or improper.  You have been paid what you have been paid.

15        All I'm trying to bring out is that the FDA had to

16 reach this opinion based on commitment to public health and you

17 base your opinion on the fact that you're being paid as an

18 expert in this case; is that correct?

19    A.   No, I based it on what my review of the documents

20 were.

21        I don't work any differently with plaintiffs

22 attorneys than I do when I work with your firm.

23    Q.   Wait a minute, the reason you're reaching these

24 opinions, you were hired as an expert witness; is that correct?

Page 1937

1    A.   Yes, and you heard the way I go about it.  If I didn't
2  agree with their opinions we would have rejected the
3  opportunity to work with them.
4    Q.   How much have you been paid by -- How much has your
5  company been paid to date just so we have it in the record?
6    A.   I think over the last two years, gee, I don't know, I
7  think around 200,000.
8    Q.   Well, are you -- Are you talking about the total
9  amount?
10    A.   Yes.  I don't remember.  It's been three years of
11  documents.
12        MS. LITTLEPAGE:  May we approach?
13        THE COURT:  While we're here at side bar I do have a
14  note from a juror, question, but let's deal with your issue
15  first.
16        We're off the record.
17        (A discussion was held at the bench out of the hearing
18  of the reporter.)
19        THE COURT:  Ladies and Gentlemen, just for the record
20  I have given counsel a Court's exhibit, a note from a juror,
21  has a question.  I don't know if counsel will be able to get to
22  it tonight before we recess, but if you think you can --
23        MR. WEBB:  Sometimes we end up consulting with each
24  other to answer questions.  Maybe we can do this first thing in

Page 1938

1  the morning.  Is that acceptable to the Court?
2        THE COURT:  I think so.
3        Ladies and Gentlemen, it's five of.  It might be a
4  good time to take our break.  Like I said, I don't have a
5  criminal calendar in the morning so I'm not going to have 35
6  criminal cases like I did have.  So we can start again tomorrow
7  morning at 9:00 o'clock.  We will be in recess until that time.
8        Ladies and Gentlemen, during this recess please do not
9  discuss this case among yourselves or with anyone.  Do not
10  read, look at or listen to any media coverage, should there be
11  any.  Please do not form or express any opinions about the
12  ultimate outcome until it's submitted to you, and finally do
13  not consult outside resources for information about the issues.
14        See you at 9:00 o'clock.
15        (The following discussion was held outside the
16  presence of the jury.)
17        THE COURT:  All right, sit down, please, if you wish
18  to.
19        Anything else right now?
20        MR. WEBB:  No, your Honor.
21        THE COURT:  You want to come back in the morning a
22  little earlier, probably should.
23        MS. LITTLEPAGE:  Yes, I would like to because I would
24  like to have the Court's guidance how to deal with this.  I do

Page 1939

1  not want to violate the motion in limine on other cases, but I
2  have some concerns with the impression that has been left.
3        THE COURT:  Let me think about it and we will meet at
4  8:30.
5        We're in recess.
6        (Proceedings adjourned, 4:57 p.m.)
7                        -oOo-

Page 1940

1  STATE OF NEVADA    )
                      )  ss.
2  COUNTY OF WASHOE   )
3
4      WE, CECILIA VOHL, STEPHANIE KOETTING and JANET MENGES,
5  Official Reporters of the Second Judicial District Court of
6  the State of Nevada, in and for the County of Washoe, do
7  hereby certify:
8      That as such reporter, we were present in Department
9  No. 9 of the above court on said date, time and hour, and we
10  then and there took verbatim stenotype notes of the
11  proceedings had and testimony given therein.
12      That the foregoing transcript is a full, true and
13  correct transcription of my said stenotype notes, so taken
14  as aforesaid.  That the foregoing transcript was taken down
15  under our direction and control, and to the best of our
16  knowledge, skill and ability.
17      DATED:  At Reno, Nevada, this 18th day of September,
18  2007.
19
                        Cecilia Vohl
20          CECILIA VOHL, NV CCR #246
21          Stephanie Koetting
            STEPHANIE KOETTING, NV CCR #207
22
            Janet Menges
23          JANET MENGES, NV CCR #206
24

# EXHIBIT 22C

Page 1941

```
 1  Code: 4185
 2
 3
 4
 5
 6      IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
 7            IN AND FOR THE COUNTY OF WASHOE
 8         BEFORE THE HONORABLE ROBERT H. PERRY, DISTRICT JUDGE
 9                        -oOo-
10  ARLENE ROWATT, PAMELA FORRESTER, and
    JERALDINE SCOFIELD,
11
           Plaintiffs,      Case No. CV04-01699
12
           vs.              Dept. No. 9
13
    WYETH,
14
           Defendant.   /
15
16      VOLUME VIII, PAGES 1941 THROUGH 2206
17
           TRANSCRIPT OF PROCEEDINGS
18
                 JURY TRIAL
19
          Wednesday, September 19, 2007
20
                RENO, NEVADA
21
22  Reported By: CECILIA VOHL, NV CCR #246, RPR, CRR, CCP
            DIANNE M. BRUMLEY, NV CCR #205
23          STEPHANIE KOETTING, NV CCR #207, RPR
24
```

Page 1942

```
 1        A P P E A R A N C E S
 2  For the Plaintiffs:
 3                    And
    LITTLEPAGE BOOTH          WHITE, MEANY & WETHERALL LLP
 4  BY: RAINEY C. BOOTH, ESQUIRE   BY: PETER WETHERALL, ESQ.
    And ZOE LITTLEPAGE, ESQUIRE   3185 Lakeside Drive
 5  327 E. Romana Street    Reno, Nevada 89509
    Pensacola, FL 32502
 6
                   ~*~
 7
    For the Defendant
 8  Wyeth Pharmaceuticals,
    Inc.:
 9
10  WILLIAMS & CONNOLLY LLP    LEWIS AND ROCA, LLP
    BY: HEIDI K. HUBBARD, ESQUIRE  BY: LEIF REID, ESQUIRE
11  And MATTHEW V. JOHNSON, ESQ.   5355 Kietzke lane
    725 Twelfth Street, N.W.   Suite 200
12  Washington, D.C. 20005    Reno, NV 89511
13  And            And
14  WINSTON & STRAWN LLP      WILSON, SMITH, COCHRAN,
    BY: DAN K. WEBB, ESQUIRE    DICKERSON
15  ERIK W. SNAPP, ESQUIRE    A Professional Corporation
    NATHAN HOFFMAN, ESQUIRE    BY: KATHY A. COCHRAN, ESQUIRE
16  35 West Wacker Drive      1700 The Financial Center
    Chicago, IL 60601        1215 Fourth Avenue
17                  Seattle, WA 98161-1007
18
19                -oOo-
20
21
22
23
24
```

Page 1943

```
 1           I N D E X
 2  WITNESSES FOR THE PLAINTIFF       PAGE
 3  CHERYL D. BLUME
       Cross-Examination (Resumed) by Mr. Webb    1956
 4     Redirect Examination by Ms. Littlepage    2015
       Recross-Examination by Mr. Webb       2073
 5  Further Redirect Examination by Ms. Littlepage  2115
       Further Recross-Examination by Mr. Webb    2119
 6
    ARLENE FAYE ROWATT
 7  Direct Examination by Ms. Littlepage     2121
    Cross-Examination by Ms. Cochran       2184
 8
 9           E X H I B I T S
10  DESIGNATION          MARKED ADMITTED
11  Plaintiffs' Exhibit 83      -   2052
12  Plaintiffs' Exhibit 134A     -   2054
    Plaintiffs' Exhibit 154      -   2022
13  Plaintiffs' Exhibit 168      -   2027
14  Plaintiffs' Exhibit 192      -   2026
15  Plaintiffs' Exhibit 205      -   2029
16  Plaintiffs' Exhibit 337      -   2042
17  Plaintiffs' Exhibit 348      -   2036
18  Plaintiffs' Exhibit 1178     -   2043
19  Plaintiffs' Exhibit 9031     -   2157
20  Plaintiffs' Exhibit 9033     -   2161
21  Plaintiffs' Exhibit 9053     -   2184
22  Plaintiffs' Exhibit 10425    -   2060
23  Defendant's Exhibit 126     -   1972
24
```

Page 1944

```
 1        E X H I B I T S (CONTINUED)
 2  DESIGNATION          MARKED ADMITTED
 3  Defendant's Exhibit 221     -   1979
 4  Defendant's Exhibit 275     -   2111
 5  Defendant's Exhibit 0368     -   2082
 6  Defendant's Exhibit 388     -   2086
 7  Defendant's Exhibit 438     -   2089
 8  Court's Exhibit J       2063 -
 9  Court's Exhibit K       2119 -
10
11            -oOo-
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1   RENO, NEVADA, WEDNESDAY, SEPTEMBER 19, 2007, 8:30 A.M.

2                      -oOo-

3

4       (Whereupon, the following proceedings were had

5   outside the presence of the jury.)

6       (Note: Ms. Hubbard is not present at this time.)

7       THE COURT:  Good morning.  Be seated.

8       MR. WEBB:  Good morning, Your Honor.

9       THE COURT:  We're in session outside the presence.

10   I knew there was a couple things we were talking about

11   last night.  What's the first thing you want to address?

12       MS. LITTLEPAGE:  Judge, first, we looked at your

13   proposed instructions.  They seem fine.  We ask that if you're

14   going to read them, to read them -- I mean, if Mr. Webb wants

15   this morning -- or, if not, we move back to redirect, but

16   before this witness leaves the stand, because it makes sense

17   for the Court to put what she's saying -- it's not anything

18   different than what she said, but -- he has one that just

19   defines and one that says "manufacturers may not market or

20   promote."

21       MR. WEBB:  We had a couple minor suggestions that I

22   think --

23       THE COURT:  Did you show them to Ms. Littlepage?

24       MR. WEBB:  Yeah.  There you go, Your Honor.

1       Your Honor, the reason you can see the only -- I think

2   the only change we made was that the statement, I think, that

3   you had made about labeling -- or, the labeling may not include

4   information about its unapproved uses, I don't think that's

5   correct.  In fact, our label actually has lipid information in

6   the label, which relates to cardiovascular benefits, because

7   the FDA -- it's there, anyway, between the FDA -- it's in the

8   label, and the people who know more than I about this have told

9   me that if you look at the law and the regulations that -- so

10   what we're proposing is that you would say "drug manufacturers

11   may not" -- you take out "label" -- "may not market or promote

12   a drug for a use that has not been approved by the FDA."  We

13   would leave out the next sentence and then would leave it the

14   way you have it.

15       THE COURT:  And any problem with the definition?

16       MR. WEBB:  Just one second.

17       What (addressing Mr. Snapp)?

18       (A discussion was held off the record.)

19       MR. WEBB:  Anyway --

20       THE COURT:  I got that sentence right out of a case

21   that I cited.

22       MS. LITTLEPAGE:  I looked at the case, Judge, and I

23   think the second sentence is as important as the first.

24       THE COURT:  What I'm saying is, I remember -- I don't

1   have the case -- maybe I do, actually.

2       Can I see the copy that I gave you of the longer

3   instruction?  Either one, I don't care.

4       MS. LITTLEPAGE:  I just wrote on it.

5       THE COURT:  I don't care.

6       MS. LITTLEPAGE:  Oh, this is his version.  Sorry.

7       THE COURT:  You know, I think that language came out

8   of that 2007 case.  Well, I'll tell you what, let me --

9   hopefully, we'll have a couple of minutes.  How long is this

10   witness going to be here?

11       MR. WEBB:  For a while.

12       THE COURT:  But all morning, probably?

13       MR. WEBB:  Probably most of the morning.

14       THE COURT:  I'll look at it during the recess.

15       MR. WEBB:  And we'll take another look at the case.

16   You're talking about a 2007 case?

17       THE COURT:  I think so.  I just don't remember off the

18   top of my head, and I have those cases, but I don't have them

19   out here.  They're in my -- at my desk.  So I'll take a look at

20   it.

21       Now, in the proposal, you say "drug manufacturers may

22   not label" -- is that -- are you adding that word -- it's

23   underlined, but --

24       MR. WEBB:  Yes, that's my understanding.  We're

1   adding --

2       THE COURT:  It says the same thing, kind of, doesn't

3   it?

4       MR. WEBB:  It does, Your Honor.  And I need to check

5   on one thing because I may have a misunderstanding of

6   something, and if I can check on that before I make a mistake.

7   I may be misremembering what I was told, and I need to check on

8   it.

9       THE COURT:  I'll look at it during the recess, and if

10   I think you're correct, I'll let you know.  But I really kind

11   of think -- if you look at it, it says just about the same

12   thing.  If they can't label it for a use that's not been

13   approved, then its labeling may not include information about

14   its own approved usage.  Same thing.

15       MR. WEBB:  Let me take a look at it, Your Honor.

16       THE COURT:  All right.  I'll look at that.

17       What next?

18       MS. LITTLEPAGE:  Judge, yesterday afternoon, Mr. Webb

19   was talking to the witness about how much money she earned.

20   But instead of just talking to her about how much money she

21   earned, he prefaced it with, you're being paid to be here, you

22   are paid for your testimony.  Paid, paid, paid.  You're not

23   here for public health.  You're not here because it's the right

24   thing to do.  It's, you're here because you're being paid, and

1 then, wham, we get hit for a $200,000 number in this court. I

2 saw some of the jurors flinched.

3        THE COURT: I flinched --

4        MS. LITTLEPAGE: I flinched.

5        THE COURT: -- because I thought she was talking about

6 this case.

7        MS. LITTLEPAGE: Well, because the question was not

8 asked about this case. What he asked her was, how much have

9 you been paid in the last two years, and she answered honestly.

10 But now, I'm in a flinch-reaction mode. He knew that that's

11 not this case. He didn't phrase his question to this case, and

12 it got prefaced --

13       THE COURT: I don't think it was intentional.

14       MS. LITTLEPAGE: I don't think it was intentional

15 either, Judge. I'm not in any way saying it was. What I'm

16 saying is, I am stuck now with, you are here because you're

17 paid, and then a big, large number came out. I'd say a lot

18 things for $200,000.

19       So, you know, I feel like I am -- I recognize it's

20 their motion in limine, but I feel like what happened opened

21 that motion in limine, and I really feel like I have to, on

22 redirect, go back and just discuss with her that the $200,000

23 was for looking at the documents and preparing an expert report

24 for the litigation, and that in this case, she has spent -- you

1 know, I don't think she's billed yet, but I asked her last

2 night to go add up her hours just getting ready for this case

3 and come in this morning with her estimate for this case only.

4        But I do believe I should be allowed to establish that

5 200,000 was for the litigation, and I think she hasn't even

6 billed for this case, but her anticipated billing will be

7 whatever it's going to be.

8        MR. WEBB: I don't think the -- sorry.

9        THE COURT: Well -- I'm sorry for cutting you off. I

10 should hear what you have to say before I tell you what I

11 think.

12       MR. WEBB: Maybe I should listen to you before I tell

13 you what I think.

14       THE COURT: Well, I don't think we can refer to

15 litigation. I think we can solve it by saying, have you done

16 other work concerning hormone therapy and its relationship to

17 whatever. And when you gave us the $200,000 figure, did that

18 include that other work, and can you tell us how much you have

19 or anticipate you will bill for working on this case, something

20 like that. I don't want to -- I do not want to get into the

21 fact that there's still litigation.

22       Do you think that works?

23       MR. WEBB: That's fine. The only caveat -- and I can

24 work this out with Ms. Littlepage. I actually have some bills

1 that she's provided. That amount of money, which I'm not

2 trying to challenge her on it, is not correct. The amount is

3 actually about 315,000 as of a few months ago. I've got her

4 bill. But rather than me -- well, I don't know whether -- you

5 can talk to your witness. There seems to be a difference. I'm

6 not trying to challenge her on it, but I don't think that

7 amount is correct.

8        MS. LITTLEPAGE: My understanding, Judge, is that

9 amount is for the generic work. She bills generically towards

10 the litigation fund that is paid for by all the plaintiffs'

11 lawyers, and then she bills individually. She goes to testify

12 in an individual case.

13       The problem is, if we now start talking about it, she

14 has a right to say no, that was the Nelson case, that was the

15 Daniel case, that was the Simon case.

16       MR. WEBB: I'll leave it alone. I'll leave the

17 $200,000 alone.

18       THE COURT: I don't want to go there.

19       MR. WEBB: Fine.

20       THE COURT: That's dangerous. All right. Anything

21 else we need to do?

22       MS. LITTLEPAGE: Yes, Judge.

23       THE COURT: All right.

24       MS. LITTLEPAGE: We still had not gotten a ruling from

1 you about the small part of Dr. Colditz's testimony where he

2 talks about speaking to the medical director from Wyeth and

3 Wyeth's telephone call to him.

4        THE COURT: Is he next?

5        MS. LITTLEPAGE: I think he'll be this afternoon. The

6 depo will be this afternoon. So we just need to get an answer

7 from the Court.

8        THE COURT: Well, I haven't decided that quite yet.

9 You're talking about the part where the director says, well,

10 the stocks dropped a couple points?

11       MS. LITTLEPAGE: Yes.

12       MS. LITTLEPAGE: And then there was a subsequent letter

13 that addressed -- was -- I can't remember. I think it was

14 sales, wasn't it?

15       MS. LITTLEPAGE: Yeah, prescription drops. The first

16 break is fine, Judge.

17       THE COURT: I've got that right here. Yeah, right

18 here. I wanted to take a look at that in the context of the

19 letter.

20       MS. LITTLEPAGE: If you would like to do it at the

21 first break, that's fine, Judge, or even at lunch. We just

22 need to --

23       THE COURT: Yeah, let me just -- let me look at it

24 again. I have a feel for it, but I want to look at one of

1 the -- there's one other issue I haven't looked at yet, and I

2 want to do that. So I'll give you -- remind me, I'll give you

3 a heads-up either at the break or at noontime.

4      Okay. What else?

5      MS. LITTLEPAGE: Judge, we had talked before trial

6 about the possibility of doing interim summation, 10 or 15

7 minutes a side. Next Monday, we will have been in trial two

8 weeks. It's probably going to be pretty close to the halfway

9 mark. I was wondering if the Court would entertain a short

10 interim summation from both sides Monday morning.

11      THE COURT: Well, maybe. Let's see where we are. Do

12 you think we're about -- be about halfway by Monday?

13      MS. LITTLEPAGE: We're hoping to rest on Tuesday.

14      THE COURT: And --

15      MR. WEBB: If they rest on Tuesday, then we'd probably

16 have about the same length of trial for our evidence.

17      THE COURT: So we're making pretty good progress.

18      MS. LITTLEPAGE: We're making some rapid progress. We

19 are rushing.

20      MR. WEBB: But if we're trying to keep rushing -- Your

21 Honor, I've never really believed that the interim arguments --

22 and if you're going to be in a trial for three or four months

23 on a long case, that interim arguments have a lot more value.

24 And this case is reasonably short, and we're getting to -- it

1 doesn't matter. If you decide you want us to do it, I'm not

2 going do debate it, but I don't know that we need interim

3 arguments. At least, that's my thought.

4      THE COURT: Well, I'll think about it a little bit. I

5 don't know -- I don't know about the jury, but to me, you know,

6 I've certainly learned lot in the last week and a half about

7 the issues in the case, and I think the jury is picking up it

8 too.

9      I would say, I suppose, that I have a little concern

10 about Ms. Starr, the elderly lady, and just would like counsel

11 to kind of keep their eye open as well. I'm not sure if

12 she's --

13      MS. LITTLEPAGE: I'm not sure she also can hear a lot

14 of it, Judge. She has hearing issues, and she's very far from

15 the witness, and I think she kind of tunes out because she

16 can't hear. You don't want to yell at everybody else for her

17 to hear.

18      THE COURT: So just be thinking about that.

19      MR. WEBB: We will.

20      THE COURT: The first alternate is the lady with

21 diabetes, Ms. French. She's taking notes. She's very

22 attentive. Might think about that.

23      MR. WEBB: We will.

24      THE COURT: I would have excused Ms. Starr if we

1 hadn't been running out of jurors, I think.

2      All right. Anything else?

3      MR. SNAPP: Your Honor, just one last thing.

4 Ms. Littlepage informed us that she intends to play or read the

5 deposition of Diane Mitrione, and we had some objections that

6 we filed, I believe, on Monday with respect to those deposition

7 excerpts and we'd just ask for a ruling on those at the lunch

8 hour. I don't think we'll get to that before lunch. So it

9 would be --

10      THE COURT: I don't think I've seen that one. I've

11 seen about everything else, but --

12      MR. SNAPP: I believe I have an extra copy.

13      THE COURT: Good. Why don't you give it to me because

14 I don't think that one is --

15      MR. SNAPP: Here it is, Your Honor. I don't think

16 there's any need for that before the lunch hour, but if Your

17 Honor wants to look at it now, of course.

18      THE COURT: Yeah, I don't think I've seen this before.

19 All right. I'll look at it.

20      MR. SNAPP: Thank you.

21      THE COURT: What else?

22      MR. WEBB: I don't think there's anything else before

23 the jury, Your Honor.

24      THE COURT: Okay. Well, let's -- let's just stand

1 easy and do what you need to do, and we'll sit here for a

2 minute and look at this and bring the jury in at 9:00 if

3 they're all here.

4      (A brief recess was taken at the hour of 8:47 a.m.)

5      (The jury is now present.)

6

7           C H E R Y L   D.   B L U M E,

8      called as a witness, having been previously

9           duly sworn, testified as follows:

10

11      THE COURT: Good morning. Be seated.

12      All right. Mr. Webb?

13

14           CROSS-EXAMINATION (RESUMED)

15

16 BY MR. WEBB:

17      Q.  Thank you very much, Your Honor. Doctor, let me pick

18 up where we left off yesterday. Just as we recessed, there was

19 a question from a juror, and let me try to ask you a couple

20 questions.

21      The documents that you have reviewed in reaching your

22 opinions in this case that -- the documents you reviewed that

23 relate to hormone therapy, the case-related documents that you

24 reviewed and you're basing your opinions on, you got from the

Page 1957

1 plaintiffs; is that correct?

2    A.  Well, the records that I have reviewed that came from

3 Wyeth or are relating to Wyeth employees all came from the

4 plaintiffs' attorneys.

5    Q.  And you did not meet with defense attorneys and ask

6 them or receive any documents from defense attorneys; is that

7 correct?

8    A.  No.

9    Q.  Thank you.  In fact, now, all of the opinions that you

10 have expressed to this jury and that are in your expert report

11 and that you told the jury about yesterday, you reached all of

12 those opinions after you became a paid expert in this case; is

13 that correct?

14    A.  I wrote the report after I became an expert in this

15 case, but as I outlined yesterday, the procedure that we have

16 is to review the documents and to meet at least twice with the

17 requesting counsel before we decide to accept a case.  Some of

18 the work that I reviewed was information that our office

19 gathered and I reviewed prior to accepting the case.

20    Q.  But prior to being contacted by Plaintiffs' lawyers,

21 the opinions that you've told the jury about hormone therapy,

22 you did not have those opinions and you had not done the work

23 before you ultimately were contacted by Plaintiffs' attorneys;

24 is that correct?

Page 1958

1    A.  The only hormone therapy work I had done prior to

2 being contacted by them were some work with oral contraceptives

3 using estrogen and progesterone and some work with progesterone

4 alone for various disease states.

5    Q.  Is the answer to my question "yes"?

6    A.  Well, yes, I worked with estrogen and progesterone,

7 but no, I did not review any of the documents relating

8 specifically to Prempro prior to working with the plaintiffs'

9 attorneys.

10    Q.  Thank you.  Now, as far as -- let me go back.

11       Could I have Chart 236 called up.

12       Where we were yesterday when we recessed, we were

13 asking questions about the FDA approving Prempro as a safe and

14 effective medication, and in your opinion, that you told the

15 jury that it's -- that the harms of Premarin outweigh the

16 benefits, if not for most -- for many, if not most, women.

17       Do you agree -- and I think you testified in the past

18 that you agree that the FDA is more knowledgeable about its own

19 regulations and its own requirements than you are; is that

20 correct?

21    A.  Gee, I don't know how to answer that.  I'm sure

22 they're well versed in their own regulations, yes.

23    Q.  Have you testified in the past that you do not feel

24 that there's any situation in which you believe you would know

Page 1959

1 about the FDA regulations than the FDA does?

2    A.  Well, I think that firms who market the product always

3 know more about their products, but specifically with the

4 regulations, I would think the FDA would be well versed.

5    Q.  And as far as the basic issue of whether this decision

6 by the FDA that the risk outweighed the benefits, as far as

7 that decision by the FDA, the FDA is in a better position to

8 make that decision than you are; is that correct?

9    A.  Well -- and as I said yesterday, I agreed with that

10 decision in 1994.  By agreeing to approve this application,

11 FDA, for the first time, had a forum by which they could

12 regulate the combination of estrogen and progesterone in

13 postmenopausal women.  So yes, I think that decision was

14 correct, given that they now would have a chance to have more

15 authority over those products than they ever had and because,

16 with that application approval, they included the requirement

17 that there must be more information relating to breast cancer,

18 and they specifically noted in their medical review that the

19 single, most safe- -- single, most important safety concern

20 with this approval is the incidence of breast cancer.

21    Q.  That's what I want to ask you about.  You and I -- you

22 agree that the FDA made the proper decision here when they

23 approved it, and if I understand it, you agree that if the

24 FDA -- if the FDA believed that Wyeth should do more breast

Page 1960

1 cancer tests, the FDA could have required that before they

2 issued this approval; is that correct?

3    A.  Well, the FDA can do whatever the FDA so chooses.

4    Q.  Well, have you testified in the past that if the FDA

5 had wanted to require Wyeth to do more breast cancer testing,

6 it could have required them to do so before the approval; is

7 that correct?

8    A.  The FDA can choose to do whatever they want, including

9 not approve an application.

10    Q.  Is the answer "yes" to my question?

11    A.  Well, I'm trying to explain.  Yes, the FDA has -- can

12 do whatever they want.

13    Q.  So, all the opinions you expressed to the jury for

14 several hours yesterday that you -- it's your opinion that

15 Wyeth had not done adequate testing for the breast cancer risk;

16 do you recall that testimony yesterday?

17    A.  Yes, I don't think adequate attention was paid to

18 breast cancer from 1970 forward by Wyeth.

19    Q.  And when the FDA approved Prempro in December of 1994,

20 the FDA did not require, for example -- strike that question.

21       You told the jury yesterday that Wyeth should have

22 done a WHI-like test much earlier, as early as 1983; is that

23 correct?

24    A.  Or any type of studies prior to 2002, yes.

1   Q.  So -- and you agree -- do you agree with me, so the
2   jury understands, that when the FDA approved this drug label,
3   the WHI study was already ongoing; is that correct?
4   A.  Yes, it had started.
5   Q.  And at the time that the FDA approved this drug and
6   found it to be safe and effective and that the benefits
7   outweighed the risks, you agree that if the FDA had wanted to
8   require Wyeth to do a WHI test before approval, the FDA could
9   have done that; is that correct?
10  A.  Well, the approval came at the end of 1994.  And as
11  you say, WHI was already up and running, so what FDA required
12  was an additional breast cancer study, and FDA suggested that
13  they do -- set up a case control -- five- to ten-year case
14  control study.
15  Q.  What's the answer to my question?
16  A.  Yes, they could have required it, but the study was
17  already up and running for two years prior to this.
18  Q.  And, in fact, you've testified in the past, you
19  actually think it was reasonable for the FDA to approve Prempro
20  without requiring Wyeth to do a WHI-type study?
21      Have you testified to that in the past, if you
22  remember?
23  A.  Well, I don't specifically remember.  But I agree with
24  that because of the timing and the circumstances and what had

1   or hadn't happened over the previous 20 years.
2   Q.  Okay.  Now, so when the -- now -- and as far as with
3   what the FDA did in approving -- in making this decision on
4   December 30th, 1994, you told the jury yesterday that in
5   connection with your work on the case, you had reviewed the FDA
6   regulatory record in this case; is that correct?
7   A.  Yes, what was available to me either through the Wyeth
8   database, the Wyeth file cabinets, or what I was able to access
9   either through Freedom of Information or the private freedom of
10  information group.
11  Q.  And based on your experience, for example -- well,
12  yesterday, Counsel, Ms. Littlepage, showed you the final FDA
13  summary basis for approval report by Dr. Golden.  Do you
14  remember that yesterday?
15  A.  Yeah, that was the medical officer's summary.  Yes.
16  Q.  The medical officer's summary.  Do you recall seeing
17  that yesterday?
18  A.  Yes, of course.
19  Q.  And in reaching your opinions in this case, did you
20  carefully review what Dr. Golden did to see if she did her job
21  correctly?
22  A.  Yes, I reviewed the document.
23  Q.  And am I correct, you believe that Dr. Golden did a
24  good job; is that correct?

1   A.  Well, as you say, the FDA would know their regulations
2   better than I do, but based on what I reviewed in the document,
3   it appeared that the study -- the one study that was submitted
4   had been fully reviewed, along with the literature.
5   Q.  And in fact, explain to the jury the -- this approval
6   that we see on the screen now, this followed a two-year
7   investigation or review by the FDA after Wyeth filed its
8   original request called an NDA; is that correct?
9   A.  I think the NDA -- yeah, that's -- it was a fairly
10  efficient review.  I think it was about two years.
11  Q.  Tell the jury what an NDA is again.
12  A.  Well, an NDA again stands -- just what it sounds like
13  -- new drug application, and it's an assembly that the company
14  who wants to sell the product prepares, and it includes a wide
15  variety of topics.  We've been discussing that the clinical
16  study that Wyeth did to look at endometrial cancer -- the
17  clinical study, but it also includes that they have to do any
18  animal work, their chemistry and manufacturing work, review of
19  what's known about the individual ingredients, engineering
20  issues, environment issues; a wide variety of issues are pulled
21  together and submitted to the FDA, and we call it a new drug
22  application, and it's divided by the various areas of review,
23  medical, animal, manufacturing, chemistry, those types of
24  things.

1   Q.  And I don't intend to get into a lot of detail, but
2   let me ask you this question:  Based on all that you reviewed,
3   do you recall now that this new drug application -- in effect,
4   Wyeth is filing something with the FDA as -- to start the
5   process to see if the FDA will eventually approve the drug; is
6   that correct?
7   A.  Well, yes.  When you file a new drug application, the
8   goal is to see if it can be approved.
9   Q.  And when Wyeth filed the NDA for Prempro, which you
10  have reviewed carefully, it was -- was it 174 volumes of
11  information?
12  A.  Well, I think one place it said that.  I think another
13  document said closer to 200 volumes.
14  Q.  And you've looked at all that; is that correct?
15  A.  I have.  I have not focused a lot on the manufacturing
16  or environment issues because that really isn't my area.
17  Q.  And I'm not going to ask you about that.  I don't
18  think that's relevant, and I'm leaving that alone.
19      As far as -- just as far as the FDA doing its job, it
20  got 174 volumes of information, and after it got that, it spent
21  two years interacting and reviewing that information before it
22  finally approved the drug on December 30th, 1994; is that
23  correct?
24  A.  Yes.  Two years.

1    Q.   And you actually know some of the men and women at the
2  FDA that were involved in this process; is that correct?
3    A.   Sure.
4    Q.   And, for example, the actual approval which I showed
5  you yesterday, I think, was signed by Dr. Sobel?
6    A.   Solomon Sobel.
7    Q.   What's his first name?
8    A.   Solomon.
9    Q.   You know Dr. Sobel; is that correct?
10   A.   I do.
11   Q.   And you believe him to be a competent scientist; is
12 that correct?
13   A.   Yes.
14   Q.   And you believe that as far as you know, he's the one
15 that actually signed off -- what's his title, by the way?
16   A.   I'm going to see what it was at that time.  He had
17 several at the time.  He may have been director of that
18 division or director of that particular cluster division.  I
19 don't recall.
20   Q.   I can pull it up, if you like.
21       Can I have Defense Exhibit 434, Steve?  I think it was
22 introduced into evidence, which is the actual approval by the
23 FDA.
24       And if we go to the last page of this document, I

1  think it's -- I have it on the screen, if that helps you.
2    A.   At that point, he was the director of that particular
3  division.  He had not moved to the office.
4    Q.   And you know him and you believe him to be a competent
5  and professional scientist; is that correct?
6    A.   I would have no reason to think otherwise.
7    Q.   Okay.  And I believe another -- as this -- was
8  involved in the -- you saw indications in the regulatory record
9  that a Dr. Carl Peck, who, I believe, is head of the Center For
10 Drug Evaluation and Research.  He was involved in evaluating
11 and approving Prempro; is that correct?
12   A.   I think so.
13   Q.   And you know Dr. Peck; is that correct?
14   A.   I haven't worked with him since he's become a
15 consultant for the drug companies, but I did work with him
16 while he was at the FDA.
17   Q.   And you have no reason to doubt his competence and
18 ability as a trained scientist, do you?
19   A.   Well, I worked not with -- with his FDA work.
20   Q.   Pardon me?
21   A.   I have no reason to doubt his FDA work.  I haven't
22 reviewed that much of his work as an expert witness.
23   Q.   But in your entire review of the two years that the
24 FDA spent in looking at this NDA and evaluating the

1  information, you believe, based on your experience, they did a
2  good job; is that correct?
3    A.   Well, again, I don't have any reason to think
4  otherwise, based on the information I was provided and attained
5  independently.  It was a fairly quick review; two years during
6  that time.  That's a pretty quick review.  But I have no reason
7  to think that it wasn't, and I think the FDA did exactly what
8  they needed to do to get Prempro onto FDA Island.
9    Q.   And as far as the issue that we're dealing with in
10 this case, which is breast cancer and the breast cancer risk,
11 based on the record that you have reviewed, did it appear to
12 you that the FDA paid very close attention and became well
13 informed on the breast cancer issue?
14   A.   Well, I have the materials that are in this summary
15 medical review.  What you cannot access are the individual FDA
16 records of the literature.  And I couldn't find them in your
17 database, so I don't think you were able to access them either,
18 because generally, they're not released by FDA, but I did
19 review what was summarized in the literature in this.
20   Q.   You're talking now about Defense Exhibit 223, the --
21 actually --
22   A.   Mine says Plaintiff 288.
23   Q.   Plaintiff 288.
24       Can I call Plaintiff 288 up, if I might, Steve.

1        You're talking about Dr. Golden's report; is that
2  correct?
3    A.   I was specifically answering your question about
4  reviewing the literature.
5    Q.   Yes.  I'm just -- as far as the review of the
6  literature, if you go -- this is Dr. Golden's report that I
7  have on the screen.
8    A.   Yes, sir.
9    Q.   And did you notice that Dr. Golden, when she
10 recommended approval, she actually discusses the breast cancer
11 risk information in her report; is that correct?
12   A.   Oh, of course.
13   Q.   And if we go to page 6 of this -- Steve, can I go to
14 page 6 of this document.  I think it's page 6.  Is that page 6
15 of the document?  Yeah.  Could you call out -- call out the
16 bottom of the page there.
17       And do you see that, at the second paragraph on page 6
18 of this -- Dr. Golden's report, she walks through what she
19 views as being literature and scientific studies regarding
20 breast cancer risk.  Do you see that on page 6?
21   A.   Just one second.
22   Q.   Sure.
23   A.   My pages are out of order.  Yes, I have it.
24   Q.   So, based on your entire -- I can kind of short-cut

1 this, I think.  Based on your entire review of the regulatory

2 record, is it your view, based on what you've seen -- all you

3 can testify to is what you've seen -- you believe the FDA did a

4 good and professional job in evaluating the breast cancer risk?

5    A.  I do.  And I agree with her last sentence -- or,

6 conclusion where she concludes "The true effect of HRT on

7 breast cancer mortality and incidence must be considered the

8 single, most important safety issue concerning this drug."

9    Q.  Did anyone disagree with that at all?

10   A.  No, and that's her following the review of her

11 literature, yes.

12   Q.  And what the FDA did then -- so, in fact, are you

13 aware -- am I correct -- and, again, we can short-cut this.

14 When you reviewed the records, the documents you've seen, did

15 you notice a number of documents that indicated that over the

16 years -- strike the question.

17       You've reviewed depositions of Wyeth company

18 representatives, you told us; is that correct?

19   A.  Yes.

20   Q.  And you are aware that Wyeth company representatives,

21 in depositions, have clearly stated that they accept and

22 believe they have an obligation to understand the risk of their

23 products; you saw that testimony?

24   A.  Yes, we went through that yesterday.

1    Q.  Yes, you did.  And that Wyeth's executives and

2 representatives agree that they have a duty to follow up and

3 monitor and understand the risk of their drug products,

4 including hormone therapy; did you see such testimony?

5    A.  Yes, I gave that testimony yesterday.

6    Q.  I know.  And in connection with that, did you also,

7 then, in looking at the records in this case, see that Wyeth,

8 periodically -- in keeping up on the breast cancer risk

9 information, would periodically, itself, notify the FDA of what

10 it was finding?

11   A.  I -- I noted that they submitted references in their

12 annual reports.

13   Q.  When you say "references," Wyeth disclosed to the FDA

14 in their annual reports information about breast cancer risk;

15 is that correct?

16   A.  It's regulation.  You must.

17   Q.  But even going back before the approval -- let's go

18 back through the years, okay, before the -- before Prempro was

19 approved.  As studies were being done over the years about

20 hormone therapy and breast cancer risk, did you see documents

21 in the record that you reviewed that indicated that Wyeth

22 periodically would send letters to the FDA or memos to the FDA

23 updating the FDA on what Wyeth at least believed were the

24 studies that were being done by the scientific community on the

1 breast cancer risk issue?

2    A.  I do recall that they sent a letter to FDA regarding

3 their plans to do a study, and with that was an update on what

4 was in the literature.  And I do recall in their annual updates

5 that they summarized the literature.

6    Q.  Well, let me show you some examples and see if you

7 remember these.

8       Can I get Tab 17, Kara?

9       Thank you.  Doctor, I'm going to give you a document

10 that is marked as Defense Exhibit 126, which I'll ask you just

11 to look at it, yourself.

12       First of all, maybe I should start by just -- this is

13 a letter from Wyeth -- or from Ayerst, which is part of Wyeth;

14 is that correct?

15   A.  Yes, 1979.

16   Q.  And just to -- maybe you can quickly look at it.

17       Do you recall seeing this document when you did all

18 your expert work in this case and you're reviewing all these

19 documents you told the jury about yesterday?

20   A.  Yeah, this is for estrogen only, and I believe I saw

21 this.  I think this was mixed in with the estrogen plus

22 progesterone documents.

23       MR. WEBB:  I offer it into evidence, Your Honor.

24       MS. LITTLEPAGE:  No objection.

1       THE COURT:  It's admitted.

2       THE CLERK:  What number was that?

3       MR. WEBB:  The exhibit is 126.

4       THE CLERK:  Thank you.

5       (Defendant's Exhibit 126 was admitted into evidence.)

6 BY MR. WEBB:

7    Q.  Now, if you go -- can I call that up, Steve, if I

8 might.

9       And this letter is dated April of 1979; do you see

10 that?

11   A.  Yes.

12   Q.  Okay.  And it's from Wyeth, is that correct,

13 Dr. Perdue?

14   A.  Yes.

15   Q.  And this letter is being sent to Dr. John Guerigian at

16 the FDA; is that correct?

17   A.  Yes.

18       MR. WEBB:  And if we go down to the bottom paragraph

19 of the letter, Steve -- there you go.  Thank you.

20 BY MR. WEBB:

21   Q.  So the jury -- what Wyeth is doing on this date, it

22 tells the FDA, "We have recently collected what we believe to

23 be pertinent papers that have evaluated the relationship

24 between the use of exogenous estrogens for the menopause and

1 breast cancer.  These papers and their brief summaries are
2 included in this submission for your information."  Did I read
3 that correctly?
4    A.  Yes.  There was at one time a practice that companies
5 would have -- and this is for the estrogen NDA, because there
6 was no estrogen-plus-progesterone at that time, and they were
7 submitting an abstract of an upcoming report.  In fact, this is
8 what we discussed yesterday, the Drs. Glass and Hoover report,
9 and they were giving an update to that abstract and attaching
10 to that other articles.
11    Q.  And so, is this what a responsible pharmaceutical
12 company should do, is to keep the FDA advised about what they
13 understand to be potential risks of their products?
14    A.  Well, the regulations have changed over a time.  There
15 was a time in the late '70s and early '80s where we were
16 required to submit to the FDA upcoming presentations, upcoming
17 abstracts.  I don't know for the Prempro NDA, back in 1979,
18 what relationship Wyeth worked out with the FDA about
19 pre-submitting or post-submitting abstracts to be presenting at
20 meetings, but this appears to be one such submission.
21    Q.  Is the answer to my question "yes"?
22    A.  Yes.
23    Q.  Thank you.  Now, did you -- by the way, did you see --
24 did this refresh your recollection that periodically Wyeth

1 would send to the FDA updates on what it viewed to be breast
2 cancer risk studies?
3    A.  Well, as I said earlier, I do recall that they
4 submitted the literature as required in the annual reports, and
5 I do recall a couple interactions where they pre-submitted
6 abstracts or convention presentations, but I don't know what
7 was required for them to do that with FDA as relates just to
8 Premarin in the late '70s.
9    Q.  Let me ask you, based on what you saw, do you believe
10 it's a good thing for Wyeth to periodically update the FDA on
11 breast cancer risk information?
12    A.  Well, I always think it's a good thing to follow what
13 you're required to do with the agency, and we are required to
14 update the FDA on any -- on all literature relating to our
15 products, so I think it was appropriate for Wyeth to follow the
16 regulations and to update the FDA, as required.
17    Q.  Is the answer to my question "yes"?
18    A.  Yes, I think it was a good idea that they follow the
19 regulations.
20    Q.  Thank you.  Now, let me talk about the label.  When
21 the FDA approved Prempro to be sold in the marketplace, the FDA
22 had to eventually come to some decision on what the warning
23 label would say to doctors and patients about the breast cancer
24 risk; is that correct?

1    A.  Yes.
2    Q.  Okay.  And in this particular situation involving
3 Prempro and the breast cancer risk, did you come across some
4 documentary evidence that you reviewed as part of the
5 regulatory record that indicated to you that the FDA became
6 heavily involved in making the final decision as to what the
7 label would actually say about the breast cancer risk of
8 Prempro?
9    A.  Yes.  I reviewed all of the interactions back and
10 forth from the time that Wyeth first submitted the draft
11 labeling to the final.
12    Q.  And I don't -- I don't need to go into a lot of
13 detailed based on -- well, let me show you the end -- you told
14 the jury yesterday that it's common that there's some back and
15 forth between a pharmaceutical company and the FDA on trying to
16 work out the exact warning language on any particular product;
17 is that fair to say?
18    A.  Well, if I limited it to warnings, I didn't mean to do
19 that, because it's back-and-forth interaction on all sections
20 of the insert.
21    Q.  I'm talking about -- because we're dealing with an
22 issue of breast cancer warning in this case, I'm going to try
23 to limit my questions to that.  Has your experience been over
24 the years that when a pharmaceutical company, Mylan or any

1 company you've been experienced with, when you -- when you
2 interact with the FDA, ultimately the FDA has -- the FDA gets
3 to make the final decision on what the warning label says about
4 a risk; is that correct?
5    A.  Yes.  The FDA -- the label is part of the NDA package.
6       MR. WEBB:  And can I call up -- it's in evidence as
7 Defense Exhibit 34.
8 BY MR. WEBB:
9    Q.  This is the -- this is at the time of the launch of
10 the product in 1995.  I believe this is the label that was
11 approved by the FDA.
12       And if I could go to the warning section, Steve, and
13 call that out on the screen.
14       Can you see where I've called on the screen that
15 breast cancer warning?
16    A.  Yes.
17    Q.  You're familiar with that and you looked at it and
18 showed the jury yesterday; is that correct?
19    A.  Yes.
20    Q.  In connection with the actual language that we have
21 here dealing with warning doctors about the risk of breast
22 cancer, the warnings say "All warnings below pertain to the use
23 of this combination product"; do you see that?
24    A.  Yes.

1    Q.   That's referring to the combination of estrogen and
2  progestin, is that correct, the E and the P?
3    A.   Yeah.
4    Q.   Is that the combination product?
5    A.   Yes.
6    Q.   Okay.  And so doctors are being advised and warned
7  that what we're about to tell you about breast cancer applies
8  to the combination product E and P; is that correct?
9    A.   Yes.  The information starts with estrogen and then
10  moves to estrogen plus progestin.
11   Q.   That's why the warnings say "All warnings below
12  pertain to the use of the combination product."  Do you see
13  that?
14   A.   Yes.
15   Q.   Okay.  And then we start by talking about, based on
16  experience with estrogens and/or progestins, and then we have
17  induction of the lignan neoplasms.  What is that referring to?
18   A.   Cancer tumors.
19   Q.   And then we see what is said about breast cancer:
20  "Some studies have reported a moderately increased risk of
21  breast cancer (relative risk of 1.3 to 2.0) in those women on
22  estrogen replacement therapy taking higher doses and in those
23  taking lower doses for prolonged periods of time, especially in
24  excess of ten years.  The majority of studies, however, have

1  not shown an association in women who have ever used estrogen
2  replacement therapy."  Then it goes on to talk about
3  progestins.  Is that correct?
4    A.   Yes, now we talk about the combination.
5    Q.   "And the effect of added progestins on the risk of
6  breast cancer is unknown, although a moderately increased risk
7  in those taking combination estrogen-progestin therapy has been
8  reported.  Other studies have not shown this relationship.  In
9  a one-year clinical trial of Prempro, Premphase and Premarin
10  alone, five new cases of breast cancer were detected among
11  1,377 women who received the combination treatments, while no
12  new cases were detected among 347 women who received Premarin
13  alone.  The overall incidence of breast cancer in this clinical
14  trial does not exceed that expected in the general population."
15       Now, the warning on breast cancer that we -- that I
16  just read off, did you see in the regulatory record that the
17  FDA, itself, became heavily involved and made a final
18  determination as to how that should read?
19   A.   Yes, I tracked the chronology of the evolution of this
20  label.
21   Q.   And did I summarize it correctly?
22   A.   Well, there was a lot of last-minute preparation, as
23  there always is with a label, but yes, the FDA was involved up
24  until the last minute.  It's the last sentence being added.

1    Q.   In fact, I can show you the document -- at the end of
2  the day, the FDA made some final statements that they wanted
3  these changes made in the label.  Wyeth agreed, and that became
4  the final label; is that correct?
5    A.   I -- I think it happened that way, yes.
6    Q.   Okay.  Well, in fact, let me show you the document, if
7  there's any question.
8        Can I have -- let me have Tab 22.
9        I'm going to show you what has been marked as
10  Defendant's Exhibit 221, and I'll hand this to you, Doctor, ask
11  you to examine it.  And my question will be, does this appear
12  to be a document that relates to the topic you and I are
13  discussing, which is, what happened as far as the FDA approving
14  the final language of the label that we just had before the
15  jury?
16   A.   I think there might be one more iteration because this
17  one does not have the final verbiage for the breast cancer
18  information in it.
19       MR. WEBB:  Well, let me -- well, I'll offer the
20  exhibit into evidence.
21       MS. LITTLEPAGE:  No objection.
22       THE COURT:  It's admitted.  221?
23       MR. WEBB:  Yes, it is 221, Your Honor.
24       (Defendant's Exhibit 221 was admitted into evidence.)

1        MR. WEBB:  Steve, can I call up page 221.
2  BY MR. WEBB:
3    Q.   What you see in this document is there's an exchange
4  of information between a person named Christina Kish, K-i-s-h,
5  who is with the FDA, and an employee of Wyeth named JoAnne
6  Bissinger, B-i-s-s-i-n-g-e-r; is that correct?
7    A.   Yes.
8    Q.   And if you go to the next page of this document, this
9  is actually a memo from Ms. Kish of the FDA.  Do you see that?
10   A.   Yes.
11   Q.   It's dated December 28th, 1994?
12   A.   Yes.
13   Q.   And she's sending it to this employee at Wyeth whose
14  name is JoAnne Bissinger; is that correct?
15   A.   Yes.
16   Q.   And she said "The following are the required labeling
17  changes for your NDA."  And then she goes on to talk about how
18  these revisions can be made.  Do you see that?
19   A.   Yes.
20   Q.   And if we then go into the document to the page that
21  is -- Steve, it's 005.  We want to see -- as far as this issue
22  that you and I have been talking about, about the breast cancer
23  risk, do you see where it says "warnings"?
24   A.   Yes.

Page 1981

1    Q.   And where it says -- this is the language you and I
2  were just talking about that's in the final warning label; is
3  that correct?
4    A.   No.
5    Q.   Well --
6    A.   This is different than what Wyeth proposed back on the
7  day after this, so this isn't the final iteration.
8    Q.   Well, go through it so that we'll show the jury.  My
9  question to you is whether or not the exact words that are here
10 appear in the warning label.
11   A.   No, they're different.
12   Q.   Well, do you see here where the FDA is telling Wyeth
13 how the first sentence should read?  Do you see that?
14   A.   Yes.
15   Q.   And you see that, do you not?
16   A.   Yes.
17   Q.   Okay.  Now, Steve, come back out.  Then it says -- no,
18 not -- Wyeth -- do you see as far as what the FDA is saying
19 these sentences should read, it says "WA" -- Wyeth-Ayerst --
20 "concurs"; do you see that?
21   A.   Yes, for the first three, I see that.
22   Q.   And then did those three -- maybe I can -- did those
23 three paragraphs end up in the label verbatim?
24   A.   I believe the first three did.

Page 1982

1    Q.   Okay.  So those -- the way the FDA wanted these to
2  read are verbatim, the way the FDA made this decision, and
3  Wyeth agreed to put it in the label; is that correct?
4    A.   Yes, for those three.
5    Q.   Well, let's go down to the fourth one.  Tell the jury
6  what happened with the fourth one.
7    A.   Well, the FDA had asked that the paragraph read "In a
8  one-year study of Prempro, Premphase, five new cases of cancer
9  were developed among the 1300 women receiving the combo, while
10 no new cases developed among the women receiving Premarin."
11       And Wyeth changed that they didn't want the word
12 "developed" from Prempro; they wanted the word changed to
13 "detected"; so, five new cases were detected in the
14 combo-treated women, but none were detected in the women
15 receiving the controls.
16       And then Wyeth added the final sentence that is in
17 the -- that was in the final insert that "The overall
18 incidences of breast cancer in this study do not exceed the
19 general population."  Those were Wyeth's changes the day before
20 approval.
21   Q.   And the FDA agreed with that?
22   A.   After Wyeth submitted it, it did appear in the final
23 label, but those were Wyeth's changes.
24   Q.   But as far as -- can I come back to the warning label,

Page 1983

1  itself, Steve, which is the one I just -- there you go.
2        You're talking now about this -- the issue about how
3  to describe this one study is at the end of this paragraph; is
4  that correct?
5    A.   It's the one study that was submitted to the NDA.  The
6  changes were made to that paragraph, yes.
7    Q.   And the language that we went through as far as what
8  the relative risk is and what the progestin language is, that's
9  the language the FDA said it wanted in the label; is that
10 correct?
11   A.   It's the language about the estrogen alone, and then
12 the language summarizing what was known in the literature was
13 the same.  It was the information relating to the actual Wyeth
14 study that changed.
15   Q.   It's the language that the FDA said they wanted in the
16 label, and Wyeth agreed, and it's in the label; is that
17 correct?
18   A.   Well, it is in the final label, but the differences
19 were proposed on the day before approval by Wyeth scientists,
20 and FDA agreed to those changes.
21   Q.   No, I'm sorry.  I'm talking about the first --
22 everything in this paragraph here (indicating), the first
23 paragraph regarding the relative risk, 1.3 to 2.0, this
24 paragraph is verbatim with what the FDA wanted; is that

Page 1984

1  correct?
2    A.   Yes, relating to estrogen alone.  I think that's what
3  was similar in the Premarin label already, yes.
4    Q.   Is this what the FDA said they wanted?
5    A.   I don't know how that evolved exactly, but that's what
6  was in the next-the-to-last memorandum from the FDA, yes.
7    Q.   We just looked at it.  That was the memo where
8  Ms. Kish said this is the language that the FDA wanted; is that
9  correct?
10   A.   Yes.  I just don't know what was in the original one
11 that Wyeth proposed.  We'd have to go all the way back.  But
12 that was in the next-to-the-last memo.
13   Q.   And the language about progestin here, did Wyeth put
14 it in exactly the way the FDA stated?
15   A.   The "effect of adding progestin" paragraph is the
16 same.
17   Q.   Thank you.
18   A.   Well, the first sentence is -- I'm sorry, the first
19 sentence is the same, not the whole paragraph, no.
20   Q.   The sentence about "The effect of added progestins on
21 the risk of breast cancer is unknown, although a moderately
22 increased risk in those taking combination estrogen-progestin
23 therapy has been reported.  Other studies have not shown this
24 relationship."  That -- up to that point, is that the exact

1 language the FDA said they wanted, Doctor?

2   A.   Well, if you look at your document on page 4, FDA said

3 "The effect of added progestins on the risk of breast cancer is

4 unknown, although the moderately increased risk in taking

5 combination has been reported." That's all they say in their

6 paragraph.

7   Q.   Is it -- did Wyeth put it in the label verbatim?

8   A.   Up to that point, yes.

9   Q.   Thank you.  Now, as far as Wyeth acting as a

10 responsible pharmaceutical company and doing what a responsible

11 pharmaceutical company is expected to do, as far as monitoring

12 the science that is developing regarding risk of its products,

13 as far as Prempro is concerned, am I correct -- you agree that

14 Wyeth has every right to rely upon scientific studies that

15 examine the breast cancer risk information regardless of what

16 scientist did the study; is that correct?

17   A.   Could you elaborate?

18   Q.   I'll repeat the question -- I'll rephrase.

19       Have you testified in the past that you agree that

20 whether the company sponsors the study or whether the company

21 just makes itself aware of the scientific study, both provide

22 useful and important information to the pharmaceutical company?

23   A.   Oh, of course.  Yes, of course.

24   Q.   Do you agree with that?

1   A.   All data are important, but you can't rely on a study

2 if the study were done inappropriately or with an inadequate

3 study design, but all data are important.

4   Q.   And it's important for Wyeth, as a pharmaceutical

5 company, to not only pay attention to its own scientific

6 studies, but it should pay attention to other scientific

7 studies conducted by other scientists that are not connected to

8 the company; is that correct?

9   A.   It's required.  It's required by FDA that we all do

10 that, yes.

11   Q.   And in connection with doing that -- for example,

12 yesterday, you talked about all of these signals about hormone

13 therapy and breast cancer risk; do you recall that testimony?

14   A.   Of course.

15   Q.   Because of all the work that you've done in this case

16 as an expert, you are aware that the entire scientific

17 community was aware of those signals and, over the years, has

18 done extensive testing of the issue of breast cancer risk and

19 hormone therapy; is that correct?

20   A.   Well, no.  I have no idea what the entire scientific

21 community is aware of.

22   Q.   Well, let me ask you a question about that.  As I

23 understand what you told the jury yesterday, you read -- have

24 you read all of the medical literature that you are aware of

1 that relates to the issue of scientific tests being conducted

2 on hormone therapy products over the past 30 years or so?

3   A.   I certainly have tried.

4   Q.   Well, okay.  That's part of what you told us yesterday

5 that you did; is that correct?

6   A.   Yes, but I don't know what the entire scientific

7 community is aware of.  I know what I read and I know what

8 literature FDA must have had and they summarized in their

9 review, but I don't know what all the scientific community was

10 aware of.

11   Q.   Fair enough.  You've at least tried to read, to the

12 best of your ability, all of the scientific studies performed

13 on hormone therapy in the past 30 years; is that correct?

14   A.   Well, that I was able to access.  I read the ones that

15 were in the database, and our library -- I think we have almost

16 4,000 articles that deal with estrogen and progesterone

17 together or alone.

18   Q.   And you told the jury yesterday that one thing that

19 was very important to you was to make sure that we stay focused

20 on the scientific studies that were done on the combination

21 product E and P.  Do you recall that testimony yesterday?

22   A.   Not specifically, but I would agree that it's

23 important to focus on the product being marketed, yes.

24   Q.   And what happened is that doctors started prescribing

1 the combination of E and P after the endometrial cancer issue

2 came up in the mid-1970s; is that correct?

3   A.   Yes.

4   Q.   And you became aware that these so-called signals that

5 you're talking about that you told the jury, these signals were

6 recognized by a lot of scientists and that there's a lot of

7 studies that have been done over the past 30 years just on that

8 one issue of E and P and whether or not there's a breast cancer

9 risk; is that correct?

10   A.   I'm confused.  Are you talking about the 1970 studies?

11   Q.   I'm talking about -- let me repeat my -- over the last

12 30 years, there has been a substantial number of scientific

13 studies that you have seen that have, in one way or another,

14 examined the issue of E and P and breast cancer risk?

15   A.   There have been several different types of studies,

16 and I outlined those in my report.

17   Q.   In fact, in order to give your opinion to the jury

18 about whether the studies that have been done that Wyeth either

19 did or Wyeth relied upon because other scientists did them,

20 have you actually counted up or prepared any chart that would

21 show the jury what the total number of E and P studies that

22 have been done to date over the past 30 years that have

23 examined in one way or another the issue of E and P and breast

24 cancer risk?

1  A.  I have never showed a jury a list such as that.

2  Q.  Have you tried to prepare such a list so that you'd be

3  well informed to render your opinions in this courtroom?

4  A.  Yes, I have a record of such a list, yes.

5  Q.  And did you find that as of now, the current time,

6  there's approximately, I think, 74 scientific studies published

7  in peer-reviewed scientific articles that address the issue in

8  one way or another of E and P and breast cancer?

9  A.  I don't recall the specific number.  I know there are

10  many studies that looked at E and P together.  Most of those

11  studies were not specifically designed as breast cancer

12  studies.  I think my number is closer to about 65, but yes, I

13  have looked at those studies.

14  Q.  Well, let me give you a list that I prepared, which

15  I'll use with probably another witness, but I want to see where

16  we disagree.  Okay?  So let me try to do it that way.

17  You think it's about 65?

18  A.  That's my general recollection.

19  Q.  Fair enough.  And I don't know that that difference

20  matters that much, but let me just show you the list.

21  I'll get you an exhibit number here in just a minute.

22  Kara, it's 240.

23  I'm going to hand you what's been marked as

24  Defendant's Exhibit 18750.

1  And, Doctor, what I've given you is an exhibit that we

2  have put together that would indicate that there are 74 studies

3  been conducted over the last 30 years, or so, specifically

4  addressing the issue of studies that in one way or another

5  examined the risk of breast cancer.

6  You indicated you thought it was more like 65.  I'm

7  not trying to quarrel.  Are there some studies I have on my

8  list there that you think should be taken off that come to your

9  mind so we can talk about it?

10  A.  Well, I guess it will come down to what we consider

11  studies that examine breast cancer.  I don't consider studies

12  that simply do mammograms and are intended for some

13  different -- some different end point to be breast cancer

14  studies.  And there are studies on here where the authors have

15  said these are not intended to be breast cancer studies.

16  So I would -- some of the ones that you have on your

17  list we've already discussed.  And while they may have done

18  mammograms, they are certainly not intended to discern risk of

19  breast cancer.

20  Q.  Does it appear that your 65 studies that you think

21  exist -- which I'm not quarreling with -- they appear to be

22  here, to the best of your knowledge?

23  A.  Yes, anything that dealt -- you've included articles

24  where I have pulled altogether; for example, you have two

1  different articles for HERS, and I combine it as one study.

2  It's the same study.  You have multiple articles relating to

3  the WHI study.  I combine them all as one because it's one

4  study.  You have multiple dealing with the Nurses' Health

5  Study.  I combine them as one because it's simply additional

6  information about the same study.  So we're probably very

7  close.

8  MR. WEBB:  That's fair enough.

9  Your Honor, I think I should -- I can't offer it with

10  this witness because I don't think I have the right witness, so

11  I'll do it with another witness.

12  BY MR. WEBB:

13  Q.  We're very close, but there's a few studies on there

14  that you disagree with?

15  A.  I don't disagree.  I think they should be counted

16  separately.  I agree that these are studies that examined E

17  plus P for something; for example, you have the PEPI study, and

18  you know very well it was a study to look at cholesterol

19  levels, and we have the HERS study here, and your own document

20  says it was not intended anyway to look at breast cancer but

21  was intended to look at secondary cardiovascular events.  So I

22  agree that they were E and P.  I just don't agree they were

23  intended to look at the risk of breast cancer.

24  Q.  You believe this chart should have more like -- based

1  on what you just told me, it's your belief the chart should be

2  more like 65 and not 74?

3  A.  No, no.  Two things:  I have 65 of all studies that

4  looked at E and P for something that had mammograms in there.

5  I don't agree that there's 65 studies that looked at E and P

6  were intended as breast cancer risk studies.  I don't agree

7  with that.  I think the documents in your own database and the

8  information provided by the actual investigators to these

9  studies would agree that they were not intended for breast

10  cancer analysis.

11  Q.  I'm not going to debate that issue.  Whether they

12  were -- whatever they were doing, they at least examined the

13  breast cancer issue; is that correct?

14  A.  Well, they, of course, did mammograms.  They were

15  dealing with postmenopausal women.

16  Q.  Is the answer to my question "yes"?

17  A.  Yes, because they were dealing with postmenopausal

18  women.

19  Q.  Now, by the way, that list -- do you recall that a

20  number of those studies have been cited by the FDA -- did Linda

21  Golden cite a number of those studies when she issued her

22  approval memo?

23  A.  Well, she did, but if you recall at the end, she said

24  that the study -- that these studies do not address the answer.

1  We still don't have an answer to E and P and breast cancer.  It

2  remains the single, most important risk for this product, and

3  for that reason, she did not agree that the studies submitted

4  by Wyeth answered the question and required another breast

5  cancer study.

6      Q.  Is the answer to my question "yes"?

7      A.  Yes, she cited them and concluded that they still

8  needed to do a study.

9      Q.  Okay.  I'll repeat.  Yes, she reviewed them but

10  concluded a study was necessary because the question of breast

11  cancer remained unanswered.

12      Q.  And that the WHI study was ongoing at that time; is

13  that correct?

14      A.  It --

15      Q.  At the time of her report.

16      A.  Yes, but at that time, they were still requiring an

17  additional study.

18      Q.  Well, we just went through that, and I've come back to

19  it.

20      At the time of the approval, the FDA did not require

21  another -- any other test by Wyeth before approval; is that

22  correct?

23      A.  They required it as -- I explained to the jury

1  yesterday what a Phase IV study meant, and they required it as

2  a Phase IV study.

3      Q.  Is the answer to my opinion question "yes"?

4      A.  Well, Phase IV refers to --

5      Q.  No, my question was, at the time of approval, unlike

6  your testimony, the FDA did not conclude that Wyeth should do

7  any other study before the approval; is that correct?

8      A.  Well, let me repeat.  Yes, the FDA concluded that the

9  study could be delayed until following approval.  But the study

10  was required following approval because the information

11  provided in the NDA failed to address the issue of breast

12  cancer risk.

13      Q.  And we'll come to that study -- the WHI study was

14  ongoing at the time of the approval; is that correct?

15      A.  Yes.

16      Q.  Okay.  And as far as your testimony that a WHI-like

17  study should have been done sooner, as far as that testimony,

18  do you agree that the WHI study that ultimately went forward

19  was not going to go forward until the FDA approved the study?

20      A.  Yes, I believe there was an IND submitted, yes.

21      Q.  Okay.  And one of the issues that the FDA was dealing

22  with was that what had happened between the 1970s and '80s as

23  doctors were prescribing a combination of E and P together, the

24  combination product -- you've seen indications that the doctors

1  out here in America that were doing this, they were using all

2  kinds of dosage levels and regimens -- in fact, you've seen

3  documents, there may have been as many as 70 different types of

4  regimens that doctors were using when they were putting these

5  two together; is that correct?

6      A.  Yes.

7      Q.  And one of the things that the FDA was doing is the

8  FDA -- before you're going to take 16,000 women and put them

9  into a study that's going to use this combination product, the

10  FDA said we better make sure we know what is the lowest

11  effective dosage of this, P, before we start giving this drug

12  to 16,000 women; is that correct?

13      A.  Well, I don't recall a specific record from FDA on

14  that.  But I recall that information was exchanged in the IND

15  regarding the formulation to be used.

16      Q.  Just so I know, did you become aware, from looking at

17  the regulatory record, that the reason that the WHI study

18  actually got underway in, what, 19- -- and it actually got

19  started -- well, when did it get started?

20      A.  I think it was in progress for several years before

21  among the various agencies, but I think it was 1992.

22      Q.  That's right.  1992.  The reason it actually got under

23  way is that, in late 1991, the FDA advised NIH that was doing

24  the study of the exact amount of P that should be used in the

1  study; is that correct?

2      A.  I think so.

3      Q.  Okay.  And at that time, after the FDA -- and when the

4  FDA advised the NIH that they had determined the right amount

5  of P, do you remember that amount was?  If you remember,

6  was it 2.5?

7      A.  It was either 2.5 or 5.  I think it was 2.5.

8      Q.  In fact, 2.5 was the dosage -- was the level

9  ultimately that NIH used?

10      A.  I think so, yes.

11      Q.  And once that was determined -- and by the way, did

12  you also learn that the reason that the FDA was able to tell

13  the WHI folks how much P to use was because Wyeth was providing

14  confidential information to the FDA about a study it was doing

15  called the pivotal Prempro study.  Did you see indications of

16  that?

17      A.  To what are you referring, the NDA study?

18      Q.  I'm referring to, during the time that Wyeth was

19  conducting the pivotal study, was Wyeth periodically advising

20  the FDA of what it was learning about the right amount of P to

21  go into this product?

22      A.  Oh, I think so.  You're required to.  You must give

23  updates to the FDA.

24      Q.  And did you see that the FDA -- based on what Wyeth

1 was telling the FDA, the FDA then decided to tell WHI the right

2 amount of P to use is 2.5 milligrams, in your study?

3    A.   That was the dose that was selected.

4    Q.   Now, in connection with that -- and that's what --

5 when the study finally went forward with these 16,000 women,

6 with this combination of E and P, when that study went forward,

7 they -- WHI actually used the 2.5 milligram amount of

8 progestin; is that correct?  If you remember.

9    A.   I think so, but I'll check right now.

10        Yes, .625 and 2.5.

11   Q.   Thank you.  Now, you told the jury yesterday that one

12 of your criticisms of Wyeth --

13   A.   Although, you know the study did go forward before

14 that combination was approved, so it was with a

15 yet-to-be-proven combination.

16   Q.   Right.

17   A.   .625 and 2.5 was an unapproved combination.

18   Q.   The FDA looked at the result of the pivotal study and

19 what it was showing about the lowest effective dosage, and then

20 the FDA told WHI what to use; is that correct?

21   A.   Yes, based on the information they have today, yes.

22   Q.   You told the jury yesterday one of your criticisms of

23 Wyeth was that Wyeth did not do a questionnaire-type study of

24 hormone therapy and breast cancer risk, and you were critical

1 of Wyeth for that; is that correct?

2    A.   Well, it was critical and wondered why they didn't do

3 a questionnaire study that tracked the women who were receiving

4 their products over a period of time and track the incidences

5 of breast cancer risk.

6    Q.   When you told the jury that yesterday, were you aware

7 that Wyeth actually had become involved in funding what might

8 have been the largest questionnaire study called the Nurses'

9 Health Study?

10   A.   Of course.

11   Q.   The Nurses' -- so the jury understands, when you told

12 the jury yesterday Wyeth didn't do a questionnaire study, were

13 you aware that Wyeth had provided $750,000 to the Nurses'

14 Health Study, which was probably the largest questionnaire

15 study conducted that looked at breast cancer and hormone

16 therapy?

17   A.   Well, the nurses -- the Nurses' Health Study was

18 designed for a variety of reasons, used much younger women, and

19 would not be intended to look solely at breast cancer;

20 although, at the end, they did look at breast cancer because so

21 many young women who would not be taking it for postmenopausal

22 hormone therapy were involved in that study.

23   Q.   Let me break it down.  Was the Nurses' Health Study a

24 questionnaire study?

1    A.   It was a questionnaire study designed to follow nurses

2 over long periods of time and look at a wide variety of their

3 health issues.  I think women in their twenties and thirties

4 were involved in that study and -- including older women, as

5 well, and it was meant to look at heart issues, skeletal-muscle

6 issues over time, to look at developments of various types of

7 cancers, so it was a well-being questionnaire study.

8    Q.   So the answer to my question is yes, it was a

9 questionnaire study?

10   A.   It was a questionnaire study to look at various ages

11 of women, yes.

12   Q.   Did Wyeth provide funding for the study?

13   A.   They did provide some small amount, yes.

14   Q.   $750,000?

15   A.   Well, yes, that's a small amount for the Premarin in

16 the marketplace.

17   Q.   Was it a good thing that Wyeth -- when the people that

18 were running that study went to Wyeth and Wyeth gave them

19 $750,000, are you critical of Wyeth for doing that?

20   A.   Oh, I'm always supportive, as I've said in all of my

21 earlier testimony, of companies participating in science that

22 they believe that is well-designed and important.  I always

23 think companies should support that.  I encourage all of our

24 clients to support science.

1    Q.   And the last question on that:  Did that questionnaire

2 study -- did it examine the issue of hormone therapy and breast

3 cancer?

4    A.   It did on a variety of issues.

5    Q.   Thank you.

6    A.   And found an increased risk of breast cancer in women

7 taking the E and P.

8    Q.   And that's what they found, isn't it?

9    A.   Yes.

10   Q.   And Wyeth helped fund that study?

11   A.   Wyeth provided some amount of money at the front end

12 of that study, yes.

13   Q.   Now, in connection with -- you've talked -- or, told

14 the jury a fair amount about, at the time that Prempro was

15 approved by the FDA as being safe and effective, the FDA

16 required, and Wyeth agreed, to do what is called a Phase IV

17 study; is that correct?

18   A.   Yes.

19   Q.   And you know, from looking at the documents in this

20 case, that what Wyeth agreed to do was to carry out what was

21 called at that time a case control breast cancer study once

22 Prempro was established in the marketplaces, and there was

23 enough people taking Prempro so you could carry out an adequate

24 study; is that correct?

Page 2001

1  A. I think that was proposed, yes.

2  Q. And so the jury understands, when Prempro is first

3  coming on the market, the FDA recognized, and Wyeth recognized,

4  that you couldn't start a study the next day because -- a case

5  control study because there wouldn't be enough women yet taking

6  the product; is that correct?

7  A. Well, there wouldn't have been enough women taking the

8  Prempro product. This -- women had been taking the Prempro

9  components of estrogen and progesterone together for many, many

10  years.

11  Q. Well, did you see documents -- did you read documents

12  over in the regulatory record that indicated to you that, at

13  that time, both the FDA and Wyeth understood that it would take

14  up to eight to nine years before Wyeth would even start the

15  study because it would take that much time for enough people to

16  be taking Prempro; is that correct?

17  A. For their formulation, that is correct.

18  Q. Well, that's what the FDA asked -- that's what the FDA

19  asked them to do?

20  A. Well, of course. Once they came on FDA Island, they

21  would have the ability to ask them to do that for Prempro.

22  Q. And Wyeth agreed to do that; is that correct?

23  A. Yes, it was a condition of approval.

24  Q. And you've seen documents, have you not, that at the

Page 2002

1  time that -- at this time in '92, '93, 1992 -- sorry, take that

2  back. I apologize. My mistake.

3  At the time of 1995, 1996, 1997, in that time period,

4  you've seen documentary evidence of discussions between Wyeth

5  and the FDA as to whether the FDA started to believe that it

6  might be better to have Wyeth satisfy this Phase IV study by

7  then participating in WHI; is that correct?

8  A. Well, yes, I've seen the documents. Actually, it was

9  mentioned in the approval in 1994 that FDA -- it's written in

10  Linda Golden's summary that you mentioned that they did not

11  believe the WHI would be adequate for the question that the FDA

12  had regarding breast cancer, and hence, why Wyeth was given a

13  requirement, even though WHI was already started in 1994.

14  Then I do recall a year or so after the approval --

15  Wyeth had notified FDA a year or so after the approval that

16  they had a protocol outlined and requested another meeting, and

17  at that meeting, when they were discussing the protocol, there

18  was a debate among the FDA, among Dr. Golden and Dr. Stadel, of

19  whether, given the time frame, they would get any new

20  information, considering the WHI was already up and running.

21  And years and years before that, Wyeth had agreed to

22  support the $2.7 million commitment of resources for the

23  tablets and capsules -- tablets and placebos.

24  So I think that Dr. Golden and the epidemiologists

Page 2003

1  were concerned that the WHI wouldn't be able to satisfy the

2  breast cancer requirement, but Dr. Stadel thought it might be

3  able to.

4  And following that meeting, Wyeth proposed that their

5  commitment of the $2.7 million be used as their fulfillment of

6  their Phase IV requirement for that study, and eventually, FDA

7  did agree to that.

8  Q. And you testified in the past that you actually agreed

9  that that decision made by Wyeth and the FDA seemed to you to

10  be a reasonable decision; is that correct?

11  A. I do, because so much time had elapsed -- it was

12  already two years or so after approval -- and that if they

13  wanted to only look at the actual Prempro formulation, it would

14  be years in the future. And as it turned out, the WHI --

15  Q. Was the answer to my question "yes"?

16  A. Yes, but it requires an explanation.

17  Q. All I want -- did you -- have you testified in the

18  past that you believe that it was a reasonable decision that

19  was made by the FDA and Wyeth to handle it this way? Have you

20  testified to that in the past?

21  A. Yes, given the reasons I also elaborated in the past.

22  Q. Now, staying with the subject matter of WHI -- and

23  yesterday, you recall spending a fair amount of time during

24  your direct examination explaining to the jury what the results

Page 2004

1  of the WHI study were?

2  A. Yes.

3  Q. Do you recall that?

4  A. Yes.

5  Q. And you recognize that the issue that -- one of the

6  major issues we're dealing with in this case relates to the

7  breast cancer issue? You understand that, generally?

8  A. Yes.

9  Q. And you understand the case is about breast cancer?

10  A. Yes.

11  MR. WEBB: Can I call back up on the screen

12  Exhibit 34. That's the warning label, Steve. And go to the

13  warning section.

14  BY MR. WEBB:

15  Q. Just to remind the jury and -- before WHI, before the

16  WHI study results came out that you talked about yesterday,

17  what I've placed on the screen is that, at least the relative

18  risk -- the magnitude of the risk, at least in this first

19  sentence says "Some studies have reported a moderately

20  increased risk of breast cancer (relative risk 1.3 to 2.0) in

21  those women on estrogen replacement therapy," and it goes on to

22  explain and complete the sentence. Do you see the sentence I'm

23  calling your attention to?

24  A. Yes.

1   Q.  I'm focusing in on what was in the warning label
2  before -- before WHI, the relative risk, at least reported, is
3  1.3 to 2.0.  Do you see that?
4   A.  Yes.
5   Q.  Now, as far as the magnitude of the breast cancer
6  risk, that's what was reported before.  As far as the magnitude
7  of the breast cancer risk, were you trying to suggest to the
8  jury yesterday that the WHI study broke new ground and
9  established a relative risk somewhere about 1.3 to 2.0?
10   A.  I think what I was saying is that the WHI had to be
11  stopped early because of the breast cancer risk but did have
12  enough time to look at the breast cancer risk in various groups
13  of patients -- various groups of women, and one of the things
14  that it was interested in looking at was the --
15   MR. WEBB:  Your Honor, I'm going to interrupt.  This
16  is not answering my question, and I'm going to be here for a
17  year.  Strike that.  That's improper.
18   Your Honor, respectfully, I think the witness is not
19  answering my question, and I move to strike.  I'm trying not
20  to interrupt.  I'm moving to strike the last answer.
21   I think most of these questions can be answered yes or
22  no.  Counsel has a right to clarify them.
23   THE COURT:  I'm not sure whether they can be answered
24  yes or no.  Some of them, I think, could have been.

1   Rephrase your question, and we'll see where we go.
2  BY MR. WEBB:
3   Q.  Do you agree with me -- let me ask the question this
4  way:  Do you agree with me that the investigators that actually
5  carried out the WHI study, after they got the WHI breast cancer
6  results, those investigators, in written articles and
7  statements, concluded that WHI established as the breast
8  cancer risk, as far as magnitude of relative risk, was about
9  the same as had been reported earlier in observational studies
10  before WHI?  Do you recall seeing that in -- what the
11  investigators reported their studies showed?  Do you recall
12  seeing that?
13   A.  I will agree that I saw it, and I will agree that the
14  overall risk that was reported, which included women who had
15  never even taken the drug and women who were on it for very
16  short periods of time, were similar to observational studies.
17   What WHI gave us --
18   MR. WEBB:  Your Honor, I'm going to object.  That's
19  answered my question.
20   THE COURT:  Well, you know, I think that the label
21  that you're talking about is talking about estrogen
22  replacement.  I think that the WHI talked about things in
23  addition to that and specified different groups of people.
24   THE WITNESS:  Yes.

1   THE COURT:  And because of that, I'm not sure that you
2  can compare one to the other and require a "yes" answer.
3  That's my problem with the question.
4  BY MR. WEBB:
5   Q.  Well, let me -- well, did you see the investigators --
6  did the investigators, themselves, state -- did they state that
7  they believe what they established with the WHI was consistent
8  with earlier observational studies?  Do you recall that?
9   A.  They said that over the entire population of women who
10  participated in this study.
11   Q.  And let me show you an example of that, if I could, of
12  where they said it.
13   Can I have Tab 60.
14   I'm going to hand you a document that was actually
15  introduced into evidence by the plaintiffs as an ML exhibit
16  number.
17   I don't know -- do you know what your ML exhibit
18  number is?
19   MS. LITTLEPAGE:  Which one is it?
20   MR. WEBB:  This one right here.  I'll give you a copy.
21   MS. LITTLEPAGE:  That's fine.
22  BY MR. WEBB:
23   Q.  I'm going to hand you what is marked as -- was marked
24  yesterday by Ms. Littlepage, and it is the -- it is a July 2,

1  '02, report by the investigators who carried out the WHI study
2  that I believe you looked at yesterday.  And you can tell me if
3  that appears to be the case.
4   A.  It is.
5   MR. WEBB:  And can I call up the first page of that
6  document up, Steve?
7   THE COURT:  Just for the record, what is the -- is
8  this the same one that was admitted yesterday?
9   MR. WEBB:  It is.  I'm looking for the number from
10  Ms. Littlepage.
11   MS. LITTLEPAGE:  I have it, but I believe, actually,
12  this one was admitted with Mr. Jones.  It would have been
13  Friday or Thursday, but --
14   MR. WEBB:  I'll get the number, Your Honor.  This is
15  in evidence.
16   THE COURT:  All right.  We agree that it's in
17  evidence.
18   MS. LITTLEPAGE:  We agree that it's in evidence.  It's
19  -- just so the record is clear, it's the July 2002 Risks and
20  Benefits of Estrogen Plus Progestin Healthy Postmenopausal
21  Women, and it is in evidence.
22   THE COURT:  All right.
23  BY MR. WEBB:
24   Q.  If you would, Steve -- so this is the July report of

1 the WHI study results; is that correct?

2    A.   Yes.

3    Q.   And if we go into the document --

4    A.   I'm sorry; yes; this is the first report, yes.

5    Q.   Is that correct?

6    A.   Yes.  The first study -- report.

7    Q.   You go into this document -- go to page -- Steve,

8 could you go to the page that's Exhibit Number 10 on mine.

9 It's actually --

10      And I called out some language which -- can we call

11 that out of these documents?

12      Sometimes they're hard to read.  It says -- this is in

13 the study, and this is a statement by the study investigators;

14 is that correct?

15   A.   I'm sorry, your page?

16   Q.   It's the page that's -- it's actually page 330 of the

17 article itself, so you'll find it.  And then why don't you look

18 at it, and then I'll ask you a question.

19      Are you there?

20   A.   I'm on the page.  Just one second.

21   Q.   Go ahead.

22   A.   Yes, I'm there.

23   Q.   The study authors -- the investigators for WHI said

24 "The 26 percent excess of breast cancer is consistent with

1 estimates from pooled epidemiological data which reported a

2 15 percent increase for estrogen plus progestin use for less

3 than five years, and a 53 percent increase for use for more

4 than five years.  It is also consistent with the nonsignificant

5 27 percent increase found after 6.8 years of follow-up in

6 HERS."  Do you see that?

7    A.   I do.

8    Q.   Did I read that correctly?

9    A.   I think so.

10   Q.   Now, if we just show the jury what those numbers mean.

11 when the investigators -- am I blocking this?

12      JUROR NO. 7:  You're all right.

13 BY MR. WEBB:

14   Q.   When the investigators said that, the 26 percent

15 excess of breast cancer, they're talking about, if you put that

16 into what we've been calling a relative risk, that would be

17 1.26; is that correct?

18   A.   Yes.

19   Q.   And so that's what these investigators are saying,

20 anyway, that they got from WHI.  And then they go on to say

21 they're comparing it to estimates from earlier epidemiological

22 data; is that correct?

23   A.   Yes.

24   Q.   And they say, based on that earlier data -- that

1 earlier data reported a 15 percent increase for estrogen plus

2 progestin use for less than five years.  So, less than five

3 years from the earlier studies, if you put that in relative

4 risk, that's 1.5; is that correct?

5    A.   Yes.

6    Q.   Okay.  And then they go on to say that -- and a

7 53 percent increase for use for more than five years in those

8 earlier studies; is that what they say?

9    A.   Yes.

10   Q.   And that would be 1.53 in the earlier studies for more

11 than five years; is that correct?

12   A.   1.53.  And it should be 1.15.

13   Q.   Oh, you're right.  I made a mistake.  1.15.  Thank

14 you.

15      So, now, can we pull back up the label that we just

16 had up, Steve?  And the warning section.

17      So, the label, at least, that we just went through in

18 the first sentence appoints a relative risk of 1.3 to 2.0; is

19 that correct?

20   A.   For estrogen alone.

21   Q.   Is that correct?

22   A.   For estrogen alone.

23   Q.   And -- thank you.  Now, let me ask you about -- you

24 can take that down, Steve.

1      You talked -- yesterday, I believe, you talked about

2 an issue about -- that the WHI study resulted in a -- the

3 current label for Prempro after WHI that advises using a lowest

4 dose for the shortest duration, and you showed that to the jury

5 yesterday; do you recall that?

6    A.   Yes, in the black box.

7    Q.   Okay.  And -- but -- just, so is it correct that

8 before WHI came out, if we look at the pre-WHI labels for

9 Prempro, they also recommended to doctors that they should use

10 the lowest dose for the shortest duration; is that correct?

11   A.   Almost all drugs say that:  Use the lowest amount for

12 the shortest period of time.  My comments were directed to what

13 FDA required to go into the black, bolded box warning.

14   Q.   Is the answer to my question "yes"?

15   A.   Yes, with the explanation I'm --

16   Q.   Before WHI, Wyeth already had in its warning label --

17 in its label that doctors should use the lowest dose for the

18 shortest duration; is that correct?

19   A.   I'm sure it would, yes.

20   Q.   Thank you.

21   A.   Very few pharmaceutical products do not include that.

22   Q.   Now, yesterday, you told the jury -- you talked about

23 off-label promotional issues; do you recall doing that

24 yesterday in your testimony?

1    A.  I think it was yesterday.  I don't know.  I think it
2  was Tuesday.  Maybe Monday.
3    Q.  During your testimony?
4    A.  Sometime.
5    Q.  You talked to the jury about the topic of off-label
6  issues; do you recall that?
7    A.  Yes.
8    Q.  And you then just volunteered about some case in which
9  some -- the FDA takes this very seriously and someone got fined
10 $600 million; do you remember saying that?
11   A.  I think so.
12   Q.  Were you trying to suggest that was Wyeth?
13   A.  No.
14   Q.  It wasn't Wyeth, was it?
15   A.  Just -- nor did I -- I was just was using an example
16 that when this happens, it is a serious offense.  I had been
17 questioned if there could be civil fines.  I see yes.  And in
18 fact, the company also had to sign a corporate integrity
19 statement.  To my knowledge, that hasn't happened to Wyeth.
20   Q.  That's another company; it has nothing to do with this
21 case; is that right?
22   A.  And I didn't say it was Wyeth.
23   Q.  Is it some other company that has nothing to do with
24 the case?

1    A.  It is some other company.
2      MS. LITTLEPAGE:  Judge, may we approach?
3      MR. WEBB:  I'll strike the question.
4      THE WITNESS:  I can only say that it is some other
5  company.
6  BY MR. WEBB:
7    Q.  Well, let me ask you this way:  Am I correct, what --
8  based on what -- Wyeth has never been accused by the FDA of
9  off-label promotion; is that correct?
10   A.  I think there have been some DDMAC correspondences
11 relating to off-label.
12   Q.  Can you show those to us?
13   A.  No.  I don't have them up here.  They haven't been
14 provided.  I think there has been some off-label complaints.
15   Q.  I don't know where those are, so can you show those to
16 the jury?
17   A.  Ms. Littlepage is saying we can.
18   Q.  Has the FDA ever fined Wyeth for off-label promotional
19 activities?
20   A.  I don't know if its progressed to that point.  I don't
21 know.  I don't think so.
22     MR. WEBB:  Thank you.
23     I have no more questions, Your Honor.
24     THE COURT:  All right.  Excuse me just a minute.

1      (A discussion was held off the record.)
2      THE COURT:  Go ahead.
3
4           REDIRECT EXAMINATION
5
6  BY MS. LITTLEPAGE:
7    Q.  We're going to start and then we're probably going to
8  take a break so the court reporters can change.
9      And in the break, I'll print some of the DDMAC letters
10 that are in your report so we can talk about it.
11     THE COURT:  I'm just now told that the other court
12 reporter is here.
13     MS. LITTLEPAGE:  Oh, okay.
14     THE COURT:  So, ladies and gentlemen, this is probably
15 a good time to take our morning break.  We'll be in recess for
16 20 minutes or quarter of.
17     During this recess, please do not discuss this case
18 amongst yourselves or with anyone else; do not form or express
19 any opinion about the ultimate outcome until it's submitted to
20 you for decision; do not read, look at, or listen to any media
21 coverage, should there be any; and do not consult any outside
22 resources for any information about the case.
23     We'll see you about quarter of.
24     Counsel, remain just for a minute.

1      (The following proceedings were had outside the
2  presence of the jury.)
3      THE COURT:  The record should reflect the jury has
4  retired.
5      Be seated, if you care to.  This will just take a
6  second.
7      Counsel, I think it might be very helpful to the jury
8  if you could relate the risk -- the risk statistics, for
9  example, of the kind you see on the first page of the document
10 that the defense just used, the risk and benefits of estrogen
11 plus progestin to the percentages that you find on page 330 of
12 that same document, because in one place they're talking about
13 1.6 and various other decimal points, and in other instances,
14 they're talking about percentages.  And I think I understand
15 how that works, but I don't think the jury does, so you might
16 want to do that.
17     All right.  We'll be in recess, then, until quarter
18 of.
19     (A brief recess was taken at the hour of 10:25 a.m.)
20     THE COURT.  Be seated.  Counsel and the jury are
21 present.  Go ahead, Ms. Littlepage.
22     MS. LITTLEPAGE:  Thank you, Judge.
23 BY MS. LITTLEPAGE:
24   Q.  Okay.  I want to talk, first of all, about some issues

1 that -- before the break, you were talking to Mr. Webb about

2 two issues, the WHI study and whether Wyeth had ever received

3 criticism from the FDA about their cardiac or heart issues.

4 Let me talk first about the WHI.

5       There was some questions for you about, I think the

6 way it was phrased was what was the final result or the full

7 result, the full result of the WHI.  Do you recall that?

8   A.  Yes.

9   Q.  And was there a relative risk number, and I think Mr.

10 Webb wrote it up as 1.26, for the whole WHI result?

11  A.  Yes.

12  Q.  Explain to the jury what are some issues about that

13 number when they consider it in terms of what the study showed,

14 it was stopped earlier and what this number actually means.

15  A.  Okay.  Relative risk, as we talked about yesterday, is

16 simply a comparison of what the adverse event was in the group

17 that got medicine compared to the group that didn't get

18 medicine.  That's the easy way of comparing it, so the ratio

19 was 1.26 and that's a 26 percent difference.

20       But what it means in this particular case is that was

21 the risk observed over all of the women who were originally

22 going to be in the E plus P part of the study compared to their

23 control comparisons, but let me explain to you what we have to

24 do when we do a study.

1       We are required that we do several sets of

2 calculations, and one of the sets is called the intent to

3 treat, what we call the all comers, and what you have to do is

4 you have to include in that comparison everyone who was entered

5 into the study.

6       They have to be in the study whether they took one

7 dose of the drug, no dose of the drug, whether they complied

8 with the protocol.  It's a comparison of everyone who was

9 enrolled in the study.

10  Q.  All right.  And this number is the all women?

11  A.  Yeah, the all comers, everyone who was originally

12 going to participate in the study.

13  Q.  Let me stop you there a second.  And did this number

14 include women, as you said, who took one pill and dropped out?

15  A.  It has to include someone who might not even have

16 taken any, yes.

17  Q.  All right.

18  A.  Or at least one, okay?  And the problem with that

19 number, and we required -- all scientific studies will start

20 off looking at the intent to treat.  You have to be careful

21 with it, though, and you have to look at other comparisons for

22 additional scientific information, and the reason is the all

23 comers analysis includes people who may not have been compliant

24 with the protocol.

1       In this case, in the WHI case that Mr. Webb was

2 talking about, over 40 percent of the women who were in the E

3 and P arm weren't complying and were not compliant with the

4 protocol in taking the drug, so we do additional analyses then

5 to look at what are the analyses when you only look at the

6 people who were good volunteers, were compliant in both the

7 group getting the active drug, the Prempro, and the patients

8 who were good patients who were in the control group.

9   Q.  Let me stop you there.  In the WHI study, did 40

10 percent of the women at some point not do what they were

11 supposed to be doing, not take the drug?

12  A.  Exactly.

13  Q.  But they are included in this overall number?

14  A.  Yeah, that's everybody.  That number must be

15 everybody, the intent to treat.

16  Q.  And scientists know that when they read it that when

17 they read this number, that this is a number that includes --

18  A.  Right.

19  Q.  -- people who didn't do what they were supposed to do?

20  A.  Right.  The group that is the compliant group, the

21 ones who did everything right according to the protocol are

22 often called the preferred analysis or the per protocol group,

23 the compliant group, and in this case just with everybody in

24 the study, that number goes from 1.26 I think to 1.49, so you

1 see the significance of the women who didn't take the drug.

2       What I was trying to address in my earlier testimony

3 is that's the second calculation that you do.  First you do

4 everybody, then you do the ones who were compliant.  Then you

5 say, okay, this was a big study, I'm interested in looking at

6 the different groups within the E and P group and the different

7 groups within the placebo with regard to how long they had been

8 on the drug because we're always interested in does the

9 duration, does how long you take the drug impact the adverse

10 event.

11       So the analysis that I was trying to get to is and

12 that are in the other WHI publications, and to me at least, the

13 real significance of the WHI study is that it was a real study,

14 it was the real deal kind of study, and even though it was

15 stopped because of the breast cancer risk, enough women went

16 into it for a long enough period of time and there were enough

17 women who had previously been on E and P therapy that we could

18 look at the impact of duration of use on breast cancer risk.

19  Q.  And did we, I think it was yesterday, show the graph

20 of women who were in the study and who had had prior hormone

21 therapy use, and was WHI able to give us numbers up to seven

22 years?

23  A.  Yeah, they were only -- since it was stopped early,

24 the most we could do was get numbers up to seven years.

1   Q.   And I think yesterday we looked at the chart and the
2   relative risk for women who took it for seven years was 3.08?
3   A.   Right, and we won't have a number for more than that
4   because the study had to stop because of the increased breast
5   cancer, but that -- so when you look at these numbers, and the
6   point I was trying to make is, you can't take 1.26 number and
7   say, oh, that's just like everything else we saw in the
8   literature because while the 1.26 is, it included everybody
9   that ever got signed up for the study, the real science, the
10  per protocol science is the 1.49, and for the women who took
11  the drug for periods of time, that risk went up and up and up,
12  and of course, it stopped because the study had to stop, but at
13  the point that it stopped, it had already doubled up to 3.08
14  and that was the calculation I did yesterday to show what that
15  meant in women who indeed take the drug that long and who were
16  diagnosed with breast cancer.
17  Q.   And so for this case, I want you to assume that women
18  in this case took the drug for seven, ten, and 15 years.  Based
19  on the graph we saw from WHI as the numbers go up every year,
20  for these women who took it longer, we don't know how high
21  their relative risk would be, but we do know it would be even
22  higher than the three?
23  A.   We do.
24  Q.   And that's the information WHI gave the medical

1   community?
2   A.   Exactly.
3   Q.   The second issue that Mr. Webb talked to you about
4   right before the break was FDA and heart promotion, whether
5   Wyeth could promote their drug for heart, and I wasn't able to
6   print them all, but I printed some on the break.
7        Let's start with the first one, Plaintiff's Exhibit
8   154 and ask you, Dr. Blume, is that -- is this a document sent
9   to Wyeth from the FDA dealing with this issue of the FDA and
10  heart promotion?
11  A.   Yes.
12       MS. LITTLEPAGE:  I move to admit Plaintiffs' 154.
13       MR. WEBB:  I have no objection.
14       THE COURT:  It's admitted.
15       (Plaintiffs' Exhibit 154 was admitted into evidence.)
16  BY MS. LITTLEPAGE:
17  Q.   Okay.  Let's look at the first two paragraphs.  Can
18  you go high enough up so we can at least see the date?  This is
19  291, and again, this is coming from the Food and Drug
20  Administration, right?
21  A.   Yes.
22  Q.   To the Director of Marketed Products for Wyeth?
23  A.   Yes.
24  Q.   And is there a division of the FDA that does just

1   this, interacts with the company on promotion and marketing
2   issues?
3   A.   Yes, drug advertising.
4   Q.   Okay.  Now, it appears that Wyeth has submitted a
5   magazine called Seasons, and we talked about that, to the FDA
6   for review?
7   A.   Correct.
8   Q.   Now, can a company do this, can a company send in
9   something they're going to disseminate and have the FDA look at
10  it and give them comments?
11  A.   Yes, and it takes a variety of forms, depending on the
12  products, the company, their interaction with the FDA.
13  Generally your initial volley of advertising is cleared.  With
14  some firms, FDA insists that you pre-submit everything.
15  Q.   But I think actually sometime today or later in the
16  week, the jury is actually going to hear some deposition
17  testimony from a Wyeth executive on this issue, but let me just
18  ask you so we can orient ourselves.
19       A drug company can submit stuff to the FDA ahead of
20  time for them to look at their advertising, but in many
21  circumstances, they can just put it out there?
22  A.   Exactly.  Usually when you're first approved, they ask
23  to see what you're planning, but in other instances, you only
24  need to sometimes submit it after it's gone into the field or

1   even in some circumstances at the time of the annual report
2   that I talked about earlier.
3   Q.   Okay.  So actually the ad could run in a nationwide
4   magazine and it would not have been sent to the FDA first to be
5   looked at?
6   A.   Oh, yes.  FDA issues many letters about ads they saw
7   on TV or they picked up in a magazine, yes.
8   Q.   Okay.  And this one is a letter coming back from the
9   FDA saying that they've looked at this draft magazine called
10  Seasons, and we talked about that, that was a free magazine
11  that went out to women, right?
12  A.   Yes.
13  Q.   Okay.  If you turn to the third page, and do you see
14  where it says, "The fourth letter"?
15  A.   Yes.
16  Q.   Now, at this point, the FDA is telling Wyeth the
17  fourth letter discusses cholesterol and fats, right?
18  A.   Yes.
19  Q.   "We have concern that the issue of the magazine in
20  which this letter would appear would discuss or imply the use
21  of Premarin to decrease cardiovascular events in postmenopausal
22  women.  Since this type of indication is not an approved
23  indication for this product, it would potentially cause
24  Premarin to be misbranded."

1   A.   Correct.

2   Q.   So first of all, is this a letter indicating that FDA

3 is telling Wyeth don't talk about cardiac benefit?

4   A.   Right.

5   Q.   And what does this "would potentially cause Premarin

6 to be misbranded" mean?

7   A.   Well, when a product -- when a promotional material or

8 materials relating to a drug are used by a company that are for

9 indications that's not approved for, then the labeling that is

10 a component of the drug product forces the product to be

11 misbranded because that promotional material would suggest uses

12 not approved by FDA.

13   Q.   And if we go down to the next paragraph, does the FDA

14 at this point tell Wyeth, "We view this campaign in its

15 entirety to be a form of extremely insidious hidden persuasion.

16 To entice the consumer into a situation that requires use of

17 one brand of prescription drug product is an insidious

18 marketing ploy masquerading as concern for the health of

19 postmenopausal women," that's what the FDA wrote?

20   A.   Correct.

21   Q.   Any question in your mind after receiving this letter

22 that a drug company would know the FDA doesn't want you talking

23 about heart benefit?

24   A.   It wouldn't be a question in my mind.

1   Q.   So let's look at the next one.  Let me hand you what's

2 been marked as Plaintiffs' Exhibit 192.  Again, is this now a

3 Wyeth internal memorandum about information they've received

4 from the FDA?

5   A.   Yes.

6   MS. LITTLEPAGE:  We move to admit Plaintiffs' Exhibit

7 192.

8   MR. WEBB:  I have no objection.

9   THE COURT:  All right.  It's admitted.

10   (Plaintiffs' Exhibit 192 was admitted into evidence.)

11 BY MS. LITTLEPAGE:

12   Q.   Let's look at this and let's look at the date.

13   Q.   April, '92.

14   Q.   And I actually took one out of order, so I'm going to

15 skip a little space here.

16   Does this internal document indicate that on the issue

17 of promotion and advertising, they have received an FDA letter

18 concerning several Premarin promotional pieces?

19   A.   Correct.

20   Q.   And that the FDA has requested that Wyeth revise those

21 materials?

22   A.   Correct.

23   Q.   And let's look and see what the FDA's comments are on

24 the second page.  Right here, this paragraph right here, "FDA

1 claims that the tabular list discussing changes in cholesterol

2 levels which occur in the menopause is misleading because it

3 implies that estrogen treats cholesterol changes and that there

4 is a cardiovascular benefit with the use of Premarin," right?

5   A.   Correct.

6   Q.   Wyeth received a second letter from the FDA saying do

7 not talk about cardiac benefit; is that right?

8   A.   That is correct.

9   Q.   Any question in your mind after receiving the FDA

10 letter referenced in this letter that Wyeth knew they shouldn't

11 be promoting the cardiac benefit?

12   A.   No, no question.

13   Q.   I skipped one, so let me go back and hand you what's

14 been marked as Plaintiffs' Exhibit 168.  Again, is this a Wyeth

15 internal document?

16   A.   It is.

17   MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'

18 168.

19   MR. WEBB:  I have no objection.

20   THE COURT:  It's admitted.

21   (Plaintiffs' Exhibit 168 was admitted into evidence.)

22 BY MS. LITTLEPAGE:

23   Q.   What's the date of this one?

24   A.   July of '91.

1   Q.   And let's see the first paragraph.  Again, it's an

2 internal document from Wyeth, and let's see, it looks like

3 someone from Wyeth has gone and met with Ken Feather of the

4 Division of Drug Marketing, Advertising and Communication.

5 That's the FDA division?

6   A.   Exactly.

7   Q.   And I think you call it DDMAC because that's what it

8 stands for, Division of Drug, Marketing, Advertising and

9 Communication, and if you go down to the second paragraph,

10 right there, "We then briefly discussed," does it indicate that

11 Wyeth points out to Mr. Feather that another drug company has

12 been having a dinner and a cocktail hour where the title of the

13 dinner was "Cardiovascular Benefits of Estrogen Replacement

14 Therapy"?

15   A.   Correct.

16   Q.   So Wyeth is riding out another drug company saying,

17 look, they're talking about cardio benefits and estrogen,

18 right?

19   A.   Yes.

20   Q.   And what does Mr. Feather respond?  Mr. Feather from

21 the FDA, what does he tell Wyeth about the FDA's position on

22 this issue?

23   A.   That this approach would be a problem.

24   Q.   Problem for the division?

Page 2029

1   A.  For the FDA, yes.

2   Q.  So it's a problem to talk about cardiac, right?

3   A.  Right, that is correct.

4   Q.  So would there be any question in your mind that a

5   drug company, after talking to the FDA and hearing this, would

6   know not to go out and talk about cardiac and hormone therapy?

7   A.  No.  They were placed on notice.

8   Q.  That same paragraph, does Mr. Feather also note that

9   there was particular concern in the division regarding the

10  discussion of cardiovascular benefits of estrogen replacement

11  therapy?

12  A.  Correct.

13  Q.  So he makes a point of telling Wyeth what the division

14  thinks?

15  A.  Correct.

16  Q.  Let's go to the next one, Plaintiffs' Exhibit 205, and

17  Dr. Blume, can you confirm that is a letter received by Wyeth

18  from the FDA concerning heart promotion?

19  A.  Correct.

20      MS. LITTLEPAGE:  I move to admit Plaintiffs' Exhibit

21  205.

22      MR. WEBB:  I have no objection.

23      THE COURT:  It's admitted.

24      (Plaintiffs' Exhibit 205 was admitted into evidence.)

Page 2030

1  BY MS. LITTLEPAGE:

2   Q.  And what's the date of this document?

3   A.  July 21st, 1992.

4   Q.  Okay.  And again, getting information from the Food

5  and Drug Administration being sent directly to Mr. Victoria

6  from Wyeth?

7   A.  Correct.

8   Q.  And again regarding submission of promotional

9  materials?

10  A.  Correct.

11  Q.  Let's go down to the -- here we go.  "Further, the

12 information in the booklet regarding estrogen and cholesterol

13 may misleadingly imply that there is a proven benefit of

14 Premarin in regard to risk of coronary heart disease.  For

15 these reasons, the brochure should not be used unless or until

16 it is revised.  Please inform us of your intentions."  That's

17 what the FDA tells him?

18  A.  Correct.

19  Q.  So on this date, does the FDA say do not talk about

20 cardiac benefits?

21  A.  Correct.

22  Q.  That's all I could print on the break, but I'll tell

23 you there's going to be another witness that's going to talk

24 about some of the other letters.

Page 2031

1   A.  Okay.

2   Q.  But can we at least establish as of this point that

3   every couple of months, Wyeth is receiving letters from the FDA

4   saying do not talk about cardiac benefit in your postmenopausal

5   hormone therapy drugs?

6   A.  I agree.

7   Q.  Let me ask you a couple questions that Mr. Webb raised

8   and one was actually a juror question.  The question was, how

9   are the documents looked at and selected for what we show the

10  jury, so let me start with, first of all, how did you get

11  documents?  You told us you got documents from a hard drive.

12  A.  We did, a searchable hard drive.  I think the initial

13  had 850,000 documents, upwards of multiple millions of pages,

14  but luckily we were able to filter it by topic and be able to

15  search the data base, so I was able to -- the attorneys had

16  outlined their areas, their different areas, so I was able to,

17  before we went forward, was able to search the data base and

18  get a glimpse inside the Wyeth data base as well as the

19  publicly available documents that Wyeth had in their data base

20  addressing those various topics.

21  Q.  And did you understand that the documents that we

22  shipped to you on the hard drive was documents Wyeth had

23  produced in discovery in the litigation?

24  A.  Yes, exactly.

Page 2032

1   Q.  Now, when you -- you and I talked several times on the

2   phone before you came here to talk in this case?

3   A.  Yes.

4   Q.  And did you identify for me which documents you felt

5   were the best examples of red flags and asked me to print them?

6   A.  Well, yes.  What I've been asked to do was to look at

7   the documents from the perspective of someone who has been in

8   industry and that's the way I approached it.

9       Looking at documents prior to approval, looking at

10  post approval documents, interactions between Wyeth and the

11  agency, interactions between Wyeth and other scientists,

12  analyses of adverse events, analyses of the literature, so I

13  was kind of asked to pretend that I was inside the industry and

14  to track documents that I thought may or may not be important

15  relating to -- primarily mine was estrogen plus progesterone

16  and breast cancer risk.

17  Q.  And in fact, did you and I talk about a whole number

18  of red flags that we could talk to the jury about?

19  A.  Yes.  I pulled several documents out by different

20  categories.

21  Q.  And in fact, did we then go back through and narrow it

22  even more because --

23  A.  Right, I would have been here a week if we had gone

24  through everything, so we pulled out ones that tried not to be

1 duplicative and pulled out ones representative of the various

2 points that I thought were important and wanted to pursue.

3    Q.   And so you didn't bring your hard drive to Reno, you

4 asked us -- you told us which documents you wanted copies made

5 of?

6    A.   Yes, in my report I cite these documents and many

7 others that are illustrative of the point, yes.

8    Q.   Now, there was some questions yesterday afternoon by

9 Mr. Webb about your involvement in the litigation.  You have

10 been doing this work, looking at these millions of pages of

11 documents and depositions for more than two years?

12   A.   Yes, over two years.

13   Q.   And it's not just you, I think you told us the first

14 day you have researchers and assistants and 20 people or

15 something?

16   A.   Yes.

17   Q.   Let me ask you, first of all, do you and all your

18 assistants charge the same hourly rate if you work for a lawyer

19 or if you work for a drug company, or if you work for a lawyer

20 representing a drug company?

21   A.   Yes, we -- from the very beginning, we decided that --

22 I know that some consultants charge more for litigation work,

23 but we decided from the very beginning we have different rates

24 within the company for different employees, but we charge the

1 same thing for those employees whether they're working on a

2 product development project, preparing for FDA, or working on

3 patent cases or on these types of cases in which patients have

4 been harmed, so it's one rate, so we make the same amount in

5 that office every day no matter what we're working on.

6    Q.   And there was some discussion of how much your company

7 had earned in the last two years looking at hormone therapy.  I

8 just want to be clear, that is not work you did in this case on

9 behalf of these three women?

10   A.   We haven't billed anything yet for this case because

11 it's just been in the last week or two.

12   Q.   Okay.  And so what would be your time and the cost of

13 your time and your company's time be what you've done in

14 the last couple of weeks deciding which documents you thought

15 would be appropriate for the jury and coming here obviously to

16 testify?

17   A.   For just this case?

18   Q.   For just this case.

19   A.   Well, without expenses, it will probably be somewhere

20 around 20,000.

21   Q.   And that's the last couple of weeks you and I working

22 and deciding which documents you thought would be appropriate?

23   A.   Yeah, approximately that, including trial days, yes.

24   Q.   Including the fact you've been here for --

1    A.   Three days.

2    Q.   Okay.  Let me ask you, can you -- Mr. Webb asked you a

3 bunch of questions about some documents related to the Cummings

4 study, and the Cummings study was a study where there was a

5 finding of increased breast cancer risk for thin or lean women,

6 women of a thin body build?

7    A.   Yes.

8    Q.   And did -- this is a document that Mr. Webb asked you

9 a lot about because I think the questions he asked were, isn't

10 it true that this document was written by the P.R. group that

11 had been hired by Wyeth, the public relations group?

12   A.   Yes, that's my understanding.

13   Q.   And then it was sent to senior executives of Wyeth?

14   A.   Yes.

15   Q.   So this document was actually written by a third

16 party?

17   A.   Yes.

18   Q.   And then there was some questions asked of you about

19 this document with the implication that these ideas and these

20 concepts were only the public relations company's concepts,

21 right?

22   A.   I think that was the intent of the questions.

23   Q.   Now, did you look in the Wyeth data base to see if

24 Wyeth fired this public relations company for making these

1 kinds of representations?

2    A.   Yes.  As I said yesterday, I did try to search for

3 documents following that meeting to see if Wyeth was adequately

4 upset or horrified with the suggestions that they had written

5 to the P.R. group, asked them to take a different approach,

6 dismissed them, and as I said yesterday, I just couldn't find

7 any of those types of documents.

8    Q.   And what the P.R. group was recommending was a

9 dismissive strategy that Wyeth should downplay the value of the

10 study and distance itself from the study, right?

11   A.   Yes.

12   Q.   Now, let me hand you what's been marked as Plaintiffs'

13 Exhibit 348 and ask you if you've seen that document.

14   A.   Yes.

15        MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'

16 Exhibit 348.

17        THE COURT:  Any objection?

18        MR. WEBB:  No objection, your Honor.

19        THE COURT:  It's admitted.

20        (Plaintiffs' Exhibit 348 was admitted into evidence.)

21 BY MS. LITTLEPAGE:

22   Q.   Let's look at Plaintiffs' Exhibit 348.  Is this a

23 handwritten document --

24   A.   Yes.

1   Q.  -- by Jeff Buchalter, the executive from Wyeth, on his
2   Prempro stationery?
3   A.  Correct.
4   Q.  So we don't have to have any question here whether
5   this was written by a third party or not, this is Wyeth's own
6   executive's handwriting about the Cummings article, right?
7   A.  That's correct.
8   Q.  So let's look a little closely at what this says.  The
9   first thing is he's writing to the breast cancer working group,
10  and we saw that reference on the first document.
11  A.  Correct.
12  Q.  "Please find attached two abstracts from Dr.
13  Cummings," and then here's what the Wyeth executive writes.
14  "Please keep these confidential, do not discuss with anyone
15  outside of Wyeth-Ayerst."
16  A.  Correct.
17  Q.  So that's what he writes in his own handwriting?
18  A.  Right.
19  Q.  So at least Wyeth isn't writing in their own
20  handwriting let's tell doctors, let's tell patients, right?
21  A.  That's correct.
22  Q.  And let's go on a little bit and see what he says to
23  Shellie Winkler.  She was the other person who was on the first
24  document, Jeff Buchalter and Shellie Winkler?

1   A.  That's correct.
2   Q.  And he writes to her, "Note conclusions," note the
3   conclusions of the abstract, "We must be prepared to deal with
4   the press so headlines do not read warning."  Right?
5   A.  Correct.
6   Q.  That's what the Wyeth executive wrote in his own
7   handwriting about this issue.  Now, let's look further in time
8   and see what Wyeth actually did with this information.  You
9   told us yesterday that this information ended up being put in
10  the label in Europe so European doctors and women could know
11  this?
12  A.  Correct.
13  Q.  Now, let me ask you about the U.S. label.  Did Wyeth
14  ever take Dr. Cummings' information that they told European
15  doctors and women about and put it in a Dear Doctor letter in
16  this country?
17  A.  I searched the data base for that.  I could not find a
18  companion information in the U.S.
19  Q.  What about a U.S. Dear Doctor letter, did they ever
20  issue a Dear Doctor letter and say, hey, Doctor, Dr. Cummings
21  has found some very important risk information, be careful of
22  thin and lean women on this drug?
23  A.  I couldn't find them.
24  Q.  And just in case we don't know whether Wyeth

1   understood what Dr. Cummings' information was, let's look at
2   the other document Mr. Webb used, and this is an annual
3   symposium that Wyeth puts on once a year about estrogen
4   deprivation?
5   A.  Correct.
6   Q.  And invited to this symposium are researchers and
7   scientists?
8   A.  Correct.
9   Q.  Not the prescribing physicians from Reno, but
10  researchers and scientists?
11  A.  That's my understanding, yes.
12  Q.  And at this symposium, did Dr. Cauley who was the
13  other doctor with Dr. Cummings present to the researchers, the
14  scientists and to Wyeth, Wyeth was there at their own meeting?
15  A.  Yes.
16  Q.  And does she state the same conclusion that had been
17  in the Cummings abstract at this meeting?
18  A.  Yes.
19  Q.  That their findings suggest that the risk of breast
20  cancer associated with hormone replacement therapy may have
21  been substantially underestimated, that's her words, because
22  osteoporosis is a primary indication for its use.
23  A.  Correct.
24  Q.  So no question Wyeth knew this information, she told

1   them at their own symposium?
2   A.  That's right.
3   Q.  They just didn't tell American doctors or American
4   women.  Let me talk to you now about the ECOG issue that Mr.
5   Webb talked to you about.  This was a group that approached
6   Wyeth and wanted them to give drug for a study?
7   A.  Correct.
8   Q.  And this drug involved breast cancer survivors?
9   A.  Yes.
10  Q.  Before ECOG asked for this request, had the FDA
11  advisory committee recommended that just these types of studies
12  be done?
13  A.  Yes.
14  Q.  Now, Mr. Webb implied that it would be completely
15  unreasonable for a drug company to agree to give drug in this
16  type of a study, that was his implication?
17  A.  Yes.
18  Q.  Do you agree with that implication?
19  A.  Not in these circumstances, no, not when the FDA has
20  suggested the trial and the fact that another company was
21  willing to do it.
22  Q.  Okay.  So we're not talking about outside the realm of
23  possibility; another drug company, Upjohn, had agreed to supply
24  Provera and Ogen, right?

1   A.   Well, Ogen is another estrogen, yes.

2   Q.   And the investigators wanted to use Premarin and

3   Premarin, because it comes from the mare's urine, is a unique

4   product?

5   A.   Correct.

6   Q.   And that's the drug they wanted to use?

7   A.   Correct.

8   Q.   Now, the other thing that Mr. Webb wanted to talk to

9   you about was the WHI study, and the questions on that were

10  that Wyeth gave drug to the WHI?

11  A.   Yes.

12  Q.   And that is true?

13  A.   Correct.

14  Q.   And I think he said now, wouldn't the government have

15  been so grateful that we gave drug, do you remember those

16  questions?

17  A.   I do.

18  Q.   Let me hand you what's been marked as Plaintiffs'

19  Exhibit 337 and ask you if this is an internal Wyeth

20  document -- a Wyeth document.  We move to admit Plaintiffs'

21  Exhibit 337.

22       THE COURT:  Any objection?

23       MR. WEBB:  No objection.

24       THE COURT:  It's admitted.

1       (Plaintiffs' Exhibit 337 was admitted into evidence.)

2   BY MS. LITTLEPAGE:

3   Q.   Let's look at that.  We're talking about the Women's

4   Health Initiative, and this document is a Power Point

5   presentation done by Dr. Pickar, a senior executive at Wyeth?

6   A.   Correct.

7   Q.   And let's look at what Dr. Pickar talks about in terms

8   of the Women's Health Initiative, and he indicates that Wyeth

9   is going to contribute 2.7 million, right?

10  A.   Correct.

11  Q.   And I think Mr. Webb made a big deal about telling you

12  that Wyeth gave 100 million pills to the WHI, right?

13  A.   Yes.

14  Q.   My math is not very good, but it looks to me that that

15  means that Wyeth -- it costs Wyeth .027 of a penny to make one

16  of these pills?

17  A.   Correct.

18  Q.   Their entire financial obligation to this study was

19  2.7 million dollars?

20  A.   Correct.

21  Q.   And I think you told us yesterday that their marketing

22  budget for a year was more than 200 million dollars?

23  A.   Correct.

24  Q.   So all of these pills, this huge commitment to the WHI

1   study was less than one percent of their marketing budget?

2   A.   That's correct.

3   Q.   And let me ask you a little bit about what a company

4   gets in return for this kind of investment.  Let me hand you

5   what's been marked as Plaintiffs' Exhibit 1178 and ask you, Dr.

6   Blume, is this a Wyeth document?

7   A.   It is.

8       MS. LITTLEPAGE:  We move to admit Plaintiffs' Exhibit

9   1178.

10      MR. WEBB:  I have no objection.

11      THE COURT:  It's admitted.

12      (Plaintiffs' Exhibit 1178 was admitted into evidence.)

13  BY MS. LITTLEPAGE:

14  Q.   All right.  Let's look at this document.  It's a Wyeth

15  document, March 31st, 1992 talking about the Women's Health

16  Initiative, right?

17  A.   Correct.

18  Q.   And --

19      THE CLERK:  Your Honor, sorry to interrupt.  I need a

20  copy of that one.

21      MS. LITTLEPAGE:  Sorry.

22  BY MS. LITTLEPAGE:

23  Q.   Does this document indicate that when Wyeth is

24  considering whether they should give these drugs, whether they

1   should be a part of this study, that for drug companies,

2   there's a real advantage to being the one who gives drug?

3   A.   Well, with an NIH study, that's true.

4   Q.   And Wyeth recognizes that?

5   A.   Yes.

6   Q.   They recognize that the notoriety and the prestige

7   associated with this study will certainly offset the cost of

8   the drug supplied?

9   A.   Yes.

10  Q.   So they're not concerned they're going to be making

11  this huge financial investment; they're going to get all this

12  great P.R.?

13  A.   That's true.

14  Q.   And then they go on to say that actually, they expect

15  that if they give drug, not only will they get good public

16  relations, but they might get a nonvoting seat on the Steering

17  Committee?

18  A.   Right.

19  Q.   What does that mean?

20  A.   Well, to be able to listen in or even participate, the

21  Steering Committee allows you to interact with those people who

22  are kind of the leaders, movers and shakers of the study, be

23  part of the ongoing discussions, ongoing progress of it, so it

24  would be an interesting place to be able to sit in on that

1 committee and certainly a chance to interact with them and

2 monitor the progress of the study.

3    Q.   So can we agree that when Wyeth is considering whether

4 to give drug, they understand that there's a lot of advantages

5 to them if they do this?

6    A.   Of course, of course.

7    Q.   Now, you were asked some questions about standards,

8 and yesterday you and I were very clear when we went through it

9 that there's three levels of standards.  You start with the

10 minimum which is the FDA rules, right?

11   A.   Correct.

12   Q.   And then a drug company also may join in association

13 and hold themselves to those standards?

14   A.   Correct.

15   Q.   And then a company actually has their own standards?

16   A.   Correct.

17   Q.   And Mr. Webb asked you some questions about that,

18 about these standards and could you point to something that

19 says you knew Wyeth should be held to these standards.

20       Let's look at -- you talked about the fact that you

21 had reviewed Dr. Michael Dey's testimony?

22   A.   Correct.

23   Q.   To orient the jury, Dr. Michael Dey is the president

24 of Wyeth Pharmaceuticals?

1    A.   Correct.

2    Q.   Highest person in that division?

3    A.   Yes.

4    Q.   Let's look at what Dr. Dey testified under oath.  "As

5 president of this division, do you agree that Wyeth has a duty

6 to monitor their drugs; in other words, to keep looking at the

7 drugs for problems, to see if problems come up"?  His answer

8 was yes?

9    A.   Yes.

10   Q.   You reviewed this when you came to talk about the

11 company standards?

12   A.   Yes.

13   Q.   "Another thing that is a duty to follow-up, if you're

14 looking for problems either in the literature or just out there

15 and you see a problem, you see a risk, one of the

16 responsibilities of your company is to follow-up and understand

17 that risk, evaluate that risk," and he responded, "That's

18 correct, we do that, too."  Wyeth accepting the standard as

19 their own?

20   A.   Correct.

21   Q.   Would you agree that if a safety issue comes up, Wyeth

22 has a duty to follow-up even so far as to do a study, right?

23   A.   Correct.

24   Q.   And Dr. Dey agreed that Wyeth would follow the

1 science?

2    A.   Correct.

3    Q.   "Another thing you're not supposed to do is you're not

4 supposed to go out and minimize the risks, lead doctors into

5 thinking that a risk isn't very important or isn't significant.

6 That's part of your obligations," and he accepts on behalf of

7 Wyeth that their job is to fairly represent both the effects,

8 the efficacy, effectiveness, and the safety of their products?

9    A.   That's correct.

10   Q.   "You're supposed to accurately describe the risk," and

11 he said that's correct?

12   A.   Correct.

13   Q.   "Can you agree with me, sir, that you are not

14 permitted to promote your drug for a use that is not approved"?

15 And his answer?

16   A.   He agrees, yes.

17   Q.   "Do you, sir, on behalf of Wyeth, accept that those

18 are the duties and the responsibilities of your company to

19 their drugs, including your estrogen and progestin drugs," and

20 he responded, "Those are some of our responsibilities and

21 duties."

22   A.   Correct.

23   Q.   Exactly what you told the jury yesterday?

24   A.   Yes.

1    Q.   The standards that you hold Wyeth to are Wyeth's own

2 standards?

3    A.   Correct.

4    Q.   Let me ask you about this slide that Mr. Webb talked

5 about, and I believe he was trying to imply that there was a

6 discrepancy between you and the FDA and that you and the FDA

7 were not in agreement.

8        Let me ask you this:  After the WHI study -- I know,

9 your face popped up.  After the WHI study, after the truth was

10 known, do both you and the FDA agree that warnings, labeling,

11 risk information is very different?

12   A.   Oh, of course.

13   Q.   In what way?

14   A.   Once the study had been done and we appreciated the

15 risk, breast cancer, then as we discussed yesterday, the

16 labeling changed dramatically.

17       The labeling included the emboldened expand the black

18 box which said that Prempro is associated with increased

19 cardiovascular risk, breast cancer, dementia, use it for the

20 shortest amount of time.  If you're going to use it in the

21 indications, I think for the first couple indications it says

22 don't use this until you've tried some lesser therapy such as

23 creams and ointments.  It says now for osteoporosis, do not use

24 it and only use it in those women in whom alternative therapies

Page 2049

1 didn't work or aren't suitable, and the warnings and risk
2 information changed dramatically.
3     Q.   So do you now agree, do you and the FDA both agree
4 that these drugs should be used lowest dose, shortest possible
5 duration?
6     A.   Yes.
7     Q.   Let me ask you, the issue of breast cancer risk for
8 the product E and the product E plus P, do we know now that
9 E plus P has a different risk than E?
10    A.   Yes.
11    Q.   And is it higher or lower than the single product?
12    A.   It's greater, it's higher.
13    Q.   So is it appropriate to look at estrogen only studies
14 talking about breast cancer to understand the breast cancer
15 risk of E plus P?
16    A.   We know that we can't extrapolate the estrogen alone
17 data to estrogen, plus progestin as it relates to breast
18 cancer.
19    Q.   Well, it looks like that's what Wyeth was trying to do
20 this morning, so I just want to clear something up.  Wyeth this
21 morning showed the jury this letter that Wyeth sent, Ayerst
22 sent in 1979 and then there was a stack of articles attached
23 and Mr. Webb, I believe, was implying that this showed Wyeth's
24 understanding of the breast cancer risk for E plus P, so I want

Page 2050

1 to go through it.
2         This letter indicates that Wyeth has recently
3 collected what we believe to be pertinent papers that evaluate
4 the relationship between the use of estrogen and breast cancer,
5 right?
6     A.   Yes.
7     Q.   That's what this letter deals with, and in fact, if
8 you go through the documents that were attached, and I'll just
9 go through them very quickly.  This is estrogen use and the
10 risk of breast cancer; postmenopausal cancer as a result of
11 estrogen treatment.  Any idea why Mr. Webb was asking you about
12 a bunch of estrogen documents?
13    A.   No.
14    Q.   Effective long-term estrogen administration to women
15 following hysterectomy; the impact of long-term estrogen
16 support; menopausal estrogens and breast cancer, exogenous
17 estrogens and breast cancer; breast tumors in relation to
18 postmenopausal estrogen therapy; the pill, estrogens, and the
19 breast.
20        So let me see if I can make it clear because I'm not
21 sure Wyeth has got it.  We're here on an E plus P case talking
22 about the breast cancer risk of E plus P?
23    A.   Correct.
24    Q.   You understand that?

Page 2051

1     A.   I do.
2     Q.   And what we talked to the jury about was E plus P and
3 breast cancer?
4     A.   Yes.
5     Q.   Not estrogen and breast cancer?
6     A.   Correct.
7     Q.   Okay.  There were some questions asked of you today
8 that I want to be sure we understand.  Why Wyeth is out here
9 selling Premarin, selling its P product or knowing that
10 Premarin is sold with another P product, does Wyeth have any
11 authority to come into the water and say Wyeth, you must do a
12 study?
13    A.   FDA would not have the authority for the combination
14 product.  The Premarin and Prempro situation, given the dates
15 and the necessity for combining two old ones, is a very unique
16 situation.  This is not the routine type of new drug approval
17 or new drug history leading up to an NDA.
18        When Wyeth wanted to have a fixed combination of an
19 NDA that actually covered what was going on, women were already
20 taking estrogen.  Premarin was a huge product and it was
21 learned that it was causing the uterine cancer, so you had to
22 combine them.  That population was already out there taking the
23 two individual ingredients, a very unique situation.
24        When Wyeth came and wanted to combine the products,

Page 2052

1 officially combine them with the goal of having a convenience
2 pack first and then one pill, it required interaction with NDA
3 because the two together had never been officially approved.
4     Q.   Let me hand you what's been marked as Plaintiffs'
5 Exhibit 83 and ask you if this is a Wyeth document?
6     A.   Yes.
7        MS. LITTLEPAGE:  I move to admit Plaintiffs' Exhibit
8 83.
9        MR. WEBB:  I have no objection.
10       THE COURT:  Eight-three is admitted.
11       (Plaintiffs' Exhibit 83 was admitted into evidence.)
12 BY MS. LITTLEPAGE:
13    Q.   Let me ask you this as it comes up.  Because this is
14 such a unique situation, I think I've heard you say in the past
15 this really could never happen again because it was a unique
16 situation of these two older drugs?
17    A.   Where one was a huge product, Premarin is a huge
18 product at that time being advertised for long-term use and
19 it's combined with another agent that's there to prevent an
20 adverse event, it's a very unusual situation given that they
21 were both old products.
22    Q.   All right.  So when we're talking about what power the
23 FDA has, because the implication this morning was that the FDA
24 at any time could have come to Wyeth and said you have to do a

1 study on E plus P, so I want to talk about the FDA's power at

2 certain points in time, and let's start here in 1985.

3      If we orient ourselves, by 1985, Wyeth has permission

4 to study in humans, right, they got that in 1983?

5   A.  Yes.  There was an IND, yes.

6   Q.  So by 1983, Wyeth can do studies.  In 1985, had Wyeth

7 filed a paper NDA asking the FDA for permission to sell E plus

8 P in a blister pack?

9   A.  Exactly.

10   Q.  And had the FDA told Wyeth FDA opinion that clinical

11 trials will be necessary for approval?

12   A.  Right.

13   Q.  Okay.  So just to be clear, by 1985, Wyeth knew FDA

14 wants studies in E plus P, right, that's what they knew?

15   A.  Correct.

16   Q.  But could FDA make them do it?

17   A.  No, they can't make you file an NDA.

18   Q.  And in fact, Wyeth didn't?

19   A.  Well, initially when they filed the NDA, what this is

20 referring to is Wyeth had requested that they not be required

21 to do studies, but because, as I said earlier, these products

22 were already in use, and Wyeth had requested -- what's a paper

23 NDA is sort of a crazy term that we use in the industry and

24 when we refer to paper, we're referring to literature,

1 scientific literature, and asking for substitution of

2 literature for actual trials, and what Wyeth had proposed when

3 they initially wanted to do the NDA was not do a study, but so

4 many people were on the product and there was enough literature

5 out there to justify these people on the product, they wanted

6 to not do a study, but instead submit literature in lieu of

7 actual studies with a fixed combination, and FDA denied that.

8   Q.  So let's go forward in time just a little bit and let

9 me show you what I've marked as Plaintiffs' Exhibit 134A, and

10 again, do you recognize this document?

11   A.  I do.

12      MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'

13 134A.

14      MR. WEBB:  No objection.

15      THE COURT:  Admitted.

16      (Plaintiffs' Exhibit 134A was admitted into evidence.)

17 BY MS. LITTLEPAGE:

18   Q.  I'm trying to build a time line here to understand

19 what Wyeth knew and what the FDA could do at certain times.

20   A.  Okay.

21   Q.  This is a transcript from February of 1990 of an

22 advisory committee that the FDA held?

23   A.  Yes.

24   Q.  And at this meeting, if you go to the next page, the

1 advisory committee met for two days and discussed various

2 issues dealing with hormone replacement therapy, breast and

3 endometrial cancer associated with hormone replacement therapy.

4 That was their sort of topics, right?

5   A.  Correct.

6   Q.  And they had presentations and they looked through

7 articles and science stuff and they evaluated this issue,

8 right?

9   A.  That is correct.

10   Q.  If you go to question two on the next page, was the

11 FDA specifically asked -- this advisory committee specifically

12 asked, does the addition of progestin to estrogen therapy alter

13 the risk of breast cancer, right?

14   A.  Correct.

15   Q.  So very important question, advisory committee has

16 asked if you take E alone, or you take E plus P, do you have a

17 different breast cancer risk?

18   A.  Correct.

19   Q.  Wyeth is at this meeting, right?

20   A.  Yes.

21   Q.  And they have copies of the minutes of the meeting in

22 their file?

23   A.  They do.

24   Q.  And what does the committee respond at that time?

1   A.  That there were not enough available data to answer

2 the question.

3   Q.  So despite what Wyeth's lawyers say, can we establish

4 by this document that Wyeth knew that there was insufficient

5 data to answer the question of E plus P because the FDA

6 advisory committee told them that?

7   A.  Yes.

8   Q.  Now, the FDA can't force Wyeth to do a study, but they

9 can certainly say a study is needed?

10   A.  Correct.

11   Q.  And that's what they did, they said a study is needed?

12   A.  Yes.

13   Q.  Okay.  And then if we fast forward to 1994, for the

14 first time does Wyeth actually enter FDA island and say we want

15 Prempro approved?

16   A.  Correct.

17   Q.  So the first time the FDA could tell Wyeth what to do

18 was when Wyeth moved to get Prempro approved?

19   A.  Yes.

20   Q.  And at that time in 1994, did the FDA say do a study?

21   A.  Yes.

22   Q.  And the language we looked at yesterday was do a

23 comprehensive investigation, that was the FDA's language,

24 right?

1   A.   Correct.

2   Q.   So no question that throughout this almost decade,

3 Wyeth knew studies were needed, Wyeth knew the FDA wanted them

4 to do studies, and the first time the FDA had the power to

5 speak, it said, do a study?

6   A.   Correct.

7   Q.   Now, there were some questions asked of you about

8 labeling, and again, FDA's power on labeling, language -- let's

9 look at that issue, FDA and labeling.  Does the FDA write

10 labels for companies?

11   A.   It's never been my experience that they wrote any

12 labels for me.  As they say, they don't create, they just edit.

13   Q.   So they do not create, they edit, right?

14   A.   Right.

15   Q.   And is this a negotiation, the company proposes

16 language, FDA negotiates with them?

17   A.   Yes.

18   Q.   You go back and forth?

19   A.   Correct.

20   Q.   Let me hand you what's been marked as Plaintiffs'

21 Exhibit 10425 and ask you if you know this document.

22   A.   Yes.

23       MS. LITTLEPAGE:  Judge, we move to admit Plaintiffs'

24 Exhibit 10425.

1       MR. WEBB:  Your Honor, this is a third party document

2 written by a law firm.  As far as I know, this is a hearsay

3 document.

4       MS. LITTLEPAGE:  Judge, let me hand you a copy.  Hold

5 on.

6       THE COURT:  Yeah, let me see a copy.  Give me a second

7 to look at this.

8       MS. LITTLEPAGE:  Judge, I'm interested in the first

9 two paragraphs.  Actually, it's really only the second

10 paragraph, but the first sentence of the first paragraph

11 explains who is writing it and why I believe it's an admission.

12       THE COURT:  Why you believe it's an admission.

13       MS. LITTLEPAGE:  I believe an attorney can bind a

14 company.

15       THE COURT:  All right.  Without disclosing the

16 content, can you give me a general idea what you're offering

17 this for?

18       MS. LITTLEPAGE:  Yes, Judge.  The implication from Mr.

19 Webb was that the FDA wrote the label for Prempro, and I

20 believe this witness is entitled to now show that that's not

21 what happened, that's never what happened and Wyeth knows it's

22 not what happens and it took that position back in 2000.

23       MR. WEBB:  Your Honor, I absolutely did not -- I told

24 the jury, or I asked the witness whether or not the FDA became

1 heavily involved in the process.  I did not say, nor suggest,

2 that they write the original label.  I didn't say that.  In

3 fact, the witness and I agreed that the original label is

4 written by Wyeth, but then the FDA got heavily involved.  That

5 was my point.  This doesn't relate to that.

6       MS. LITTLEPAGE:  Judge, I believe in opening statement

7 Mr. Webb told the jury --

8       THE COURT:  Let me ask you a question.  Will you

9 stipulate that the FDA does not write the label, that the drug

10 manufacturer does?

11       MR. WEBB:  Your Honor, I'll stipulate to what this

12 witness testified to, that there's an initial draft done by the

13 pharmaceutical company.  In this case she's already testified

14 to exactly what happened in this case.

15       We went through the documents, so that evidence is in

16 the record right now as to what happened in this particular

17 situation as far as what happened.

18       MS. LITTLEPAGE:  Judge, it was my impression that Mr.

19 Webb was attempting to in his opening statement and then in

20 cross-examination of Dr. Blume, was stating that the FDA had

21 written this label and Dr. Blume's position is clear that the

22 FDA does not write labels and this document indicates Wyeth

23 knows that the FDA does not write labels, it's a negotiation

24 process, and I think it's important for me to establish that.

1       THE COURT:  All right.

2       MR. WEBB:  Your Honor, I very clearly asked this

3 witness to show her that Wyeth wrote the original draft and

4 then the FDA became heavily involved, and I won't repeat her

5 testimony, but she explained exactly what happened.  This

6 doesn't relate to that.  This is a lawyer writing on behalf of

7 three different pharmaceutical companies.

8       THE COURT:  All right.  I'll allow the letter.  I

9 think it does clarify some things that were said.  It's

10 admitted.

11       (Plaintiffs' Exhibit 10425 was admitted into

12 evidence.)

13 BY MS. LITTLEPAGE:

14   Q.   Let's go to the top and -- first of all, let's see

15 that it's being written to Dr. Susan Allen.  Do you know

16 Dr. Allen with the FDA?  You know she works for the FDA?

17   A.   I know at one time she worked for the FDA.  I don't

18 recall a lot of interactions with her.

19   Q.   And it's written November 7th, 2000?

20   A.   Yes.

21   Q.   And it's about labeling changes for hormone

22 replacement therapy?

23   A.   Correct.

24   Q.   If you go to the first sentence, does this document

Page 2061

1 indicate that this attorney is writing on behalf of
2 Wyeth-Ayerst?
3    A.   Correct.
4    Q.   Go down to the second paragraph, April.
5        Let's highlight this whole second paragraph. "What
6 Wyeth's position to the FDA in 2000 is that under the new drug
7 application review system, applicants propose labeling
8 language, right, and that's what you're here saying, the
9 company writes the label," right?
10   A.   Correct.
11   Q.   "The FDA reviews the company's language"?
12   A.   That's correct.
13   Q.   "Thus, as a practical matter, changes in labeling
14 generally result from a negotiation process that recognizes and
15 respects the different expertise and perspectives of the
16 applicants," that's the drug companies, "And the agency,"
17 that's the FDA, right?
18   A.   Correct.
19   Q.   "It is not consistent with the law for the FDA simply
20 to dictate proposed language for an applicant's labeling
21 without providing a meaningful opportunity for dialogue between
22 the applicant and the agency," right?
23   A.   Correct.
24   Q.   That was Wyeth's position?

Page 2062

1    A.   Correct.
2    Q.   And that's consistent with what you're here to tell
3 the jury is that the company writes the label, the FDA reviews
4 it, and there's a negotiation?
5    A.   Yes.  It kind of changed my procedure after I read
6 this letter.  Generally when the FDA dictated something, to me,
7 we kind of just did it, but after seeing this, we may become a
8 little bit more interactive.
9    Q.   Let me ask about another topic that Mr. Webb covered
10 and that's the concept of the Nurse's Health Study.  You were
11 asked some questions about the Nurse's Health Study?
12   A.   Correct.
13   Q.   That was not a study just in postmenopausal women, it
14 was a study of nurses?
15   A.   Exactly.
16   Q.   Whatever age the nurse was?
17   A.   Exactly.
18   Q.   And it looked at a number of different issues as those
19 nurses moved forward in time?
20   A.   That's correct.
21   Q.   Now, the principal investigator for that study was
22 Dr. Graham Colditz?
23   A.   Correct.
24   Q.   I want you to assume with me the jury is going to

Page 2063

1 actually hear from Dr. Colditz on the Nurse's Health Study.
2    A.   Okay.
3    Q.   Now, Mr. Webb talked to you about the fact that Wyeth
4 had given $750,000 to that study?
5    A.   Correct.
6    Q.   Do you know that that amount of money was given over
7 ten years and amounted to less than one percent of the cost of
8 that study?
9    A.   Yes.
10   Q.   Thank you, Dr. Blume.
11       THE COURT:  I have a question from the jury, if you'd
12 approach, please.  It's marked as Court's Exhibit J.
13       (Court's Exhibit J was marked for identification.)
14 BY MS. LITTLEPAGE:
15   Q.   The question is about the European labeling, and will
16 you bring up Plaintiffs' Exhibit 811?  Did we talk to the jury
17 about the core data sheet which is used for the body of
18 information that the company knows about, but it's also used
19 for the European labeling?
20   A.   Yes.
21   Q.   I'm just looking at it to make sure I get the right
22 page, but I think it's Page 8.  April, can you go to Page 8?
23 Go down a little bit.  Let me see.  No, it's not eight.
24       It should be Page 5.  Go to the next page, Page 6.  If

Page 2064

1 we go down on the issue of breast cancer in the core data
2 sheet, the SPC, go down a little bit, April.  This language
3 here, can you highlight that first part right there?
4        Now, is this the actual language that was given to
5 European doctors and European patients?
6    A.   The core data sheet is a document that companies
7 provide that is to be a balanced review of the information that
8 they have regarding their product, and there are requirements
9 for how frequently it must be updated or updated when
10 significant new information becomes available.
11       That information is included in a nice, tidy document
12 about their product.  That information then forms the basis of
13 the European labeling, the European alerts that are used,
14 public regulatory positions that may be circulated regarding
15 the product.
16   Q.   And so this information, this increased risk was found
17 mostly for women with a lean or normal body build rather than
18 for obese women, was information that was given to European
19 doctors, but never appeared in the U.S. label?
20   A.   It was not in the U.S. label, that's correct.
21   Q.   Thanks.  That's all I have.
22       THE COURT:  All right.  We've got a couple minutes, do
23 you want to wait until after lunch?
24       MR. WEBB:  That's fine.

1      THE COURT:  Ladies and gentlemen, we'll take our noon

2  recess.  We'll be in recess until 1:30.

3      During this recess, please do not discuss this case

4  among yourselves or anyone else.  Do not read, look at or

5  listen to any media coverage should there be any.  Do not form

6  or express any opinions about the ultimate outcome of this case

7  until it's finally submitted to you for decision, and do not

8  consult any outside resources for any information about the

9  issues in the case.  We'll see you at 1:30.

10      Counsel remain, please.

11      (The following proceedings were had outside the

12      presence of the jury.)

13      THE COURT:  Counsel, do you want to take up some of

14  the issues that we talked about earlier?

15      MS. LITTLEPAGE:  Yes, Judge.

16      THE COURT:  Let's start with the jury instruction.

17  Wyeth has offered one entitled Wyeth defendants proposed,

18  revised instruction.  It begins with the sentence, "Drug

19  manufacturers may not label."  I've marked that as defendants'

20  offered one.

21      I don't think it says anything different than the

22  instruction that I prepared and the instruction that I

23  prepared, the sentence that I included in there, the second

24  sentence beginning with, "Its labeling may not include," the

1  source for that language comes from a number of cases, U.S. ex

2  rel Hess v. S-a-n-o-f-i - S-y-n-t-h-e-l-a-v-o, Inc., that's

3  2006 West Law, 1064127, Eastern District of Missouri, 2006 and

4  it cites the Washington Legal Foundation v. Henney,

5  H-e-n-n-e-y, case, 202 Fed 3rd, 331, D.C. Circuit 2000.

6      The language that was repeatedly cited in that and in

7  other cases that I'm looking at here, for example, Franklin vs.

8  Parke-Davis which is 147 Fed sub 2nd 39 is also from the Henney

9  case.  The language that is repeatedly cited says, "The

10  manufacturer illegally misbrands the drug if the drug labeling

11  includes information about its unapproved uses."  That's where

12  I got the language.  That's the instruction I'll give.  This is

13  defendants' offered instruction.  I want to mark that.

14      MR. SNAPP:  Your Honor, just one additional proposal

15  if you're willing to listen.

16      THE COURT:  Yeah, I'm -- yeah.

17      MR. SNAPP:  We understand that the language that you

18  just quoted is in the case law.  We're very concerned that it's

19  going to create an impression in the jury's mind that a drug

20  label can include any information other than information about

21  its FDA approved uses.

22      That's the way it reads literally, so all we're

23  suggesting if we're going to include that language, and I know

24  your Honor said you're going to, we'd like to suggest that a

1  sentence be inserted immediately after that just says,

2  "Labeling May, however, include other information in addition

3  to a product's indications or uses."

4      I just don't want the jury to be confused because

5  there's an awful lot of information in these labels other than

6  information about its approved uses.  There's a lot of

7  information that's required actually by the regulations and I

8  have the regulations if you'd like to see them, your Honor.

9      THE COURT:  Yeah, I better because I want to make sure

10  that what I say is correct.

11      MR. SNAPP:  Your Honor, I'm handing you 21 CFR 201.56

12  which is general requirements on content and format of labeling

13  for human prescription drugs, and this section of the CFRs lays

14  out a whole list of different types of information that's

15  required to be included in the label.  It goes well beyond just

16  the approved indications.

17      There's a lot of information in there, and that's the

18  word that we're concerned about in your Honor's sentence, the

19  second sentence of your proposed instruction.  The word

20  "information" leaves the jury with the impression that the only

21  information that can be included in the label is information

22  regarding the approved indications for the drug and we're just

23  concerned that we don't want to mislead the jury.

24      There's always, your Honor, 21 CFR 310.515.  Your

1  Honor is familiar with this from the other context.  I believe

2  it has to do with patient package inserts for estrogen products

3  and that also requires particular types of information to be

4  included in the label that go well beyond just information

5  related to the approved indications for the drug.

6      THE COURT:  I'll look at them over the noon hour.

7      MR. SNAPP:  Thank you.

8      THE COURT:  The other issue was to do with Dr.

9  Colditz's testimony and I'm not sure if within the context of

10  that testimony we're also considering the letter, Plaintiffs'

11  Exhibit 1239, December 14th, 1990 written to Dr. Stampfer,

12  S-t-a-m-p-f-e-r, by Mark Dietch of Wyeth.

13      MS. LITTLEPAGE:  Judge, that letter is not a part of

14  our depo designations.  I believe the letter is going to be

15  discussed later on with one of the Wyeth representatives when

16  they come, but I showed you the letter just to show you that

17  Dr. Colditz wasn't saying anything that is so out of the realm

18  of possibilities seeing that Dr. Dietch had actually written

19  something similar in the letter, and that letter is not

20  discussed in the depo designation.

21      THE COURT:  All right.  What we're considering I think

22  is the language that begins at Page 807 of the deposition.  It

23  basically goes from 807 over to 811 and then picks up at 1007

24  and goes to the end.  Am I right about that, having to do with

Page 2069

1 this phone conversation?

2      MS. LITTLEPAGE:  I believe that's correct.  I don't

3 have my copy.

4      THE COURT:  I just want to make want that --

5      MR. SNAPP:  I think that's right, your Honor.  It's

6 807 all the way through -- I'm trying to find it in the

7 transcript, your Honor.

8      THE COURT:  It looks like it begins at 807, line 21,

9 where it asks, "Were there other occasions when you had contact

10 with Wyeth."

11      MR. SNAPP:  Yes, your Honor.

12      THE COURT:  Let me understand without putting my own

13 interpretation on it.  Let me understand why you're offering

14 this part of this testimony.  What does it show?

15      MS. LITTLEPAGE:  Judge, I believe, and you haven't

16 heard much testimony about it yet, but there will be a number

17 of examples during the trial of where breast cancer issues were

18 raised and we believe Wyeth did not respond appropriately, like

19 the Cummings article, that there wasn't the sort of -- the

20 conduct that you would expect from a drug company when people's

21 health is at stake is to take that information and sort of say,

22 all right, let's get to the bottom of it, let's do another

23 study, let's do a Dear Doctor letter, let's get you on a

24 podium, let's have a press conference, and we offer this as an

Page 2070

1 example of when Dr. Colditz released his breast cancer study

2 findings.  He did get a call from Wyeth, he got a call from

3 Wyeth's medical director, and instead of saying any of those

4 other things, we're going to do a Dear Doctor letter, we want a

5 comment from you, we want to do a press release, their response

6 was you've hurt our stock, and it is at least some evidence

7 that this company is not a company that wants to receive breast

8 cancer information or welcomes that information.

9      THE COURT:  All right.  Go ahead.

10      MR. SNAPP:  I think, your Honor, we addressed this in

11 comments before and we've addressed it the last couple times

12 we've discussed this particular transcript excerpt.

13      Any probative value here is clearly outweighed by the

14 undue prejudice to Wyeth.  This has nothing to do with this

15 expert's opinions.  It doesn't support his opinions.  It's

16 clearly just an attempt to throw mud against the wall and

17 see what sticks, your Honor.

18      THE COURT:  I think it sticks.  I'm going to allow it.

19 I think that the description and the purpose of it being this

20 was not an opinion, this is a fact statement about something

21 that was said, and I think it's something that -- whether the

22 jury will put any stake in it or not, I don't know, but I think

23 it's something that deals with the reaction of criticism or the

24 reaction of adverse information by Wyeth at relevant times, so

Page 2071

1 therefore I will allow it.

2      Let's see, was there something else?  I know, there

3 was -- we might as well get to this, too.  This morning you

4 gave me objections to the designation of Diane, D-i-a-n-e,

5 M-i-t-r-i-o-n-e, and I've reviewed those as well.

6      With regard -- I'm looking at the index that you made

7 here.  The first objection is to Pages 393, line 11 to 393,

8 line 20 on the grounds that published materials not are relied

9 upon by plaintiffs and their physicians.  I've already

10 previously indicated that it's relevant for several reasons.

11      One, it tends to show the kind of information that was

12 published and promulgated to the medical community and the

13 scientific community both with regard to what was in it and

14 what wasn't in it; that ultimately it was designed to get to

15 the public for the same reasons, what was in it, what wasn't in

16 it; and the effect that marketing materials would have on

17 scientific opinion in general, and also to show the knowledge

18 of the information contained in the marketing materials, so

19 Pages 393, line 11 to 393, line 20 will be allowed.

20      Page 395, line three, to 395, line seven, that is

21 cumulative.  I'll sustain that.  Page 397, line three, to 397,

22 line eight, that's again to exclude marketing materials not

23 relied upon by plaintiffs or their docs.  I've already

24 indicated I'll allow that.  Page 393, line 23, to 394, line

Page 2072

1 three, that is cumulative and I'll sustain that.  I think

2 that's it, isn't it?

3      MR. SNAPP:  Yes, your Honor.

4      THE COURT:  All right.  Anything else?

5      MS. LITTLEPAGE:  That's it, Judge.

6      THE COURT:  We'll be in recess until 1:30.

7      (The noon recess was taken from 12:11 p.m. to

8 1:31 p.m.)

9                    ***

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    RENO, NEVADA, WEDNESDAY, SEPTEMBER 19, 2007, 1:30 P.M.
2                              ***
3
4         THE COURT:  The jury is present, counsel is present.
5    Be seated.
6         MR. WEBB:  May I proceed, your Honor?
7                RECROSS EXAMINATION
8    BY MR. WEBB:
9    Q.   Doctor, I'm going to limit my questions just to issues
10   raised by Ms. Littlepage in connection with this last series of
11   questions that she asked you about.
12        Let me start with this:  Ms. Littlepage was asking you
13   some questions about what were the actual relative risk for
14   breast cancer numbers that came out of the Women's Health
15   Initiative study.  Do you recall those questions?
16   A.   I do.
17   Q.   And what I'd like to do is one way we can find out
18   what those are is that you testified a little bit earlier in
19   your testimony that the Prempro label that was developed and
20   put into the label after WHI you said was appropriate.  You
21   told us that yesterday; is that correct?
22   A.   Yes.
23   Q.   So if we look at that post WHI label that you said was
24   appropriate, does it set forth the relative risks that were

1    determined by the WHI study?
2    A.   Can you show me a copy of it?
3    Q.   I will.  Do you remember if it did?
4    A.   I don't specifically recall if it had the new sets of
5    numbers for the risk.  I don't know.
6    Q.   I'm going to show it to you.  It's actually -- it's in
7    evidence as Plaintiff Exhibit 8420.  Do you have copies there,
8    or I'll put it on the screen.  Can we call up Plaintiffs'
9    Exhibit 8420?  And do you find it in your pile there?
10   A.   I have it.
11   Q.   So if we want to -- if you go into the document --
12   actually, in my document it's Page 23.  Call out the breast
13   cancer warning language.
14        What we're now looking at is this is the Prempro label
15   after the WHI study; is that correct?
16   A.   Yes.
17   Q.   So now let's see what the Prempro label, what numbers
18   the -- I'm blocking the screen with this.  I apologize.
19        So if we want to know what the Prempro label says
20   about these relative risk numbers, I'm just going to read it
21   and tell me if I read it correctly, but right now in this
22   paragraph here, and can you call that paragraph out?
23        What the WHI -- after WHI, the Prempro label says, "In
24   the estrogen plus progestin sub study, after a mean follow-up

1    of 5.6 years, the WHI sub study reported an increased risk of
2    breast cancer.  In this sub study, prior use of estrogen alone
3    or estrogen plus progestin combination hormone therapy was
4    reported by 26 percent of the women.  The relative risk of
5    breast cancer was 1.24, 95 percent NCI 1, and you see those
6    numbers there, do you see that?
7    A.   Yes.
8    Q.   So we see the first relative risk reported is 1.24; is
9    that correct?
10   A.   Yes.
11   Q.   I think you told the jury this morning you called that
12   the overall breast cancer risk that came out of the WHI study?
13   A.   For the intend to treat.
14   Q.   Is that correct?
15   A.   Yes, for the intend to treat population.
16   Q.   So 1.24, and then it goes on to say, "And the absolute
17   risk was 41 versus 33 cases per 10,000 women-years for estrogen
18   plus progestin compared with placebo respectively."
19        Then it goes on, "Among women who reported prior use
20   of hormone therapy, the relative risk of invasive breast cancer
21   was 1.86."  Could I highlight that, Steve?  "And the absolute
22   risk was 46 versus 25 cases per 10,000 women-years for estrogen
23   plus progestin compared with placebo."
24        So the second relative risk that is reported that came

1    out of the WHI study is a relative risk for women who reported
2    prior use of hormone therapy and that's a relative risk of
3    1.86; is that correct?
4    A.   Yes.
5    Q.   Then the next -- if we go on, "Among women who
6    reported no prior use of hormone therapy, the relative risk of
7    invasive breast cancer was 1.09," thanks, Steve, "and the
8    absolute risk was 40 versus 36 cases per 10,000 women-years for
9    estrogen plus progestin compared to the placebo."
10        So the third relative risk number that is reported in
11   the Prempro label that came out of the WHI study was 1.09 and
12   that's for women who reported no prior use of hormone therapy;
13   is that correct?
14   A.   Yes.
15   Q.   Okay.  And the relative risk number that you talked to
16   the jury about this morning of 3.08, that does not appear in
17   the Prempro label; is that correct?
18   A.   Not in the current label, but it appears in the WHI
19   publication that I quoted from.
20   Q.   Is the answer to my question it does not appear in
21   this label; is that correct?
22   A.   In this label, it does not appear.
23   Q.   Well, this is the Prempro -- this is the label after
24   WHI which you told the jury was appropriate; is that correct?

1    A.  It is, because it provides more information about
2  breast cancer.  Perhaps the label will be amplified as we've
3  accumulated this additional information.
4    Q.  Are you telling me the label is not appropriate?
5    A.  No.  I'm saying that the label reflects our knowledge
6  that there's an increased breast cancer risk.  What I said
7  today was that we know that 1.86 number can be further
8  subdivided according to the exact number of years that women
9  took breast cancer, and if it's seven years or more, the risk
10  is three.
11    Q.  But that number you're using, 3.08, does not appear
12  anywhere in the Prempro label; is that correct?
13    A.  That number -- that is correct, and the number that
14  does appear is for all women, regardless of how long they were
15  on prior breast cancer -- or I'm sorry, regardless of how long
16  they were on prior therapy.  The number I did was a sub set of
17  that number for those women who had been on it for seven years.
18    Q.  And your number does not appear anywhere in there?
19    A.  No, it's in the publication from the WHI authors.
20    Q.  Now, let me talk about another topic that
21  Ms. Littlepage inquired about was you showed some letters.  You
22  talked to the jury about some letters that the FDA sent to
23  Wyeth dealing with cardiovascular promotion issues.  Do you
24  recall that?

1    A.  Yes.
2    Q.  It happened about an hour ago, hour-and-a-half ago?
3    A.  Yes.
4    Q.  I want to talk about those letters and show the jury
5  what actually happened with those events.  Can I call up,
6  Steve, this is Plaintiff Exhibit 154 that was introduced into
7  evidence and was shown to this witness by Ms. Littlepage.
8        Do you recall this document being shown to you about
9  an hour, hour-and-a-half ago?
10    A.  Yes.
11    Q.  And I want to -- this is a letter from the FDA; is
12  that correct?
13    A.  Yes.
14    Q.  And it's to James Morrison who is director of
15  regulatory affairs at Wyeth, correct?
16    A.  Joseph Morrison, yes.
17    Q.  It's a letter to a gentleman named Mr. Morrison at
18  Wyeth?
19    A.  Yes.
20    Q.  And the date of the letter is February 25th, 1991; is
21  that correct?
22    A.  Yes.
23    Q.  Now, if you look at the first paragraph, the FDA says,
24  "They are replying to your submission," that's a Wyeth

1  submission, do you see that?
2    A.  Yes, of course.
3    Q.  So you've looked at the underlying letters and
4  correspondence.  What that's referring to is that Wyeth
5  submitted to the FDA certain plans that it had for a
6  promotional campaign regarding the Seasons magazine; is that
7  correct?
8    A.  Yes.
9    Q.  And we can tell, this is a direct -- it's in draft
10  form and Wyeth has sent it to the FDA for the FDA to review; is
11  that correct?
12    A.  I believe that's the case.
13    Q.  But it says right here, "Which contained information
14  your firm plans to use," is that correct?
15    A.  Yes.
16    Q.  It's your understanding it had not been used, Wyeth
17  was basically prescreening this with the FDA to get the FDA's
18  reaction; is that correct?
19    A.  Yes, we discussed that.
20    Q.  And what happened is that you told the jury this
21  morning, and Steve, can we go to the third page of the letter?
22  You go up here and it says, the fourth letter -- right here,
23  the fourth letter -- you pointed out to the jury that there's
24  basically -- the FDA said, "The fourth letter," referring to

1  some promotional material, "Discusses cholesterol, fats, et
2  cetera.  We have concern that the issue of the magazine in
3  which this letter would appear would discuss or imply the use
4  of Premarin to decrease cardiovascular events in postmenopausal
5  women.  Since this type of indication is not an approved
6  indication for the product, this would potentially cause
7  Premarin to be misbranded."  Do you see that language?
8    A.  Yes.
9    Q.  Let's talk about that for a moment.  There were
10  studies that showed that Premarin, and Premarin is estrogen
11  alone; is that correct?
12    A.  Yes.
13    Q.  There were studies that showed that Premarin, E, would
14  actually have -- I'll just shortcut, would have a favorable
15  benefit on lipids; is that correct?
16    A.  Yes.
17    Q.  Okay.  And lipids are blood fats; is that correct?
18    A.  Yes.
19    Q.  What's the difference between lipids and cholesterol?
20    A.  Cholesterol and triglycerides are considered lipids.
21    Q.  And so the FDA is telling Wyeth we don't think you
22  should be talking about lipids and cholesterol; is that
23  correct?
24    A.  Yes.

1   Q.  And by the way, if you go back to the front page of
2 this letter.  Because you've told us you're pretty familiar
3 with FDA procedures, this is what I think in the technical
4 jargon is known as an untitled letter; is that correct?
5   A.  It used to be called those, yes.
6   Q.  There's a hierarchy -- when the FDA wants to interact
7 with a pharmaceutical company and tell them they're maybe doing
8 something wrong, there's a hierarchy of things the FDA does; is
9 that correct?
10   A.  At various points in times they've had codes for
11 letters, yes.
12   Q.  And maybe they don't call it this any more, but at one
13 time -- back at this time, this is what's known as an untitled
14 letter; is that correct?
15   A.  Yes, there's no heading on it, yes.
16   Q.  It doesn't say this is not a warning letter?
17   A.  It's an untitled letter.
18   Q.  Is there something called a warning letter?
19   A.  Yes.  That is not a warning letter.
20   Q.  That's not a warning letter, and then if they send you
21 a warning letter and you don't do what they want, sometimes
22 they can do an investigation; is that correct?  The FDA can do
23 an investigation?
24   A.  The FDA can pretty much do whatever they want, but

1 yes, they can do one when you get a warning letter.
2   Q.  And they can take it one step further and proceed with
3 administrative action and give a fine?
4   A.  Seizure, injunctions, yes.
5   Q.  So Wyeth responded -- you've seen the evidence.  Wyeth
6 responded to the FDA; is that correct?
7   A.  Yes.
8   Q.  Let's show the jury that.  Can I have defense Exhibit
9 0368?  I'm going to hand you what is marked as defense Exhibit
10 0368, Doctor, and just ask you to look at it, and ask you if
11 you recognize this as being the response to the FDA.
12       If you look at the first paragraph, where it's responding
13 to the February 14th submission which then led to -- the
14 February 25th letter is the one we just looked at; is that
15 correct?
16       THE COURT:  I don't believe this is in evidence yet.
17       MR. WEBB:  Your Honor, I offer this into evidence.
18       MS. LITTLEPAGE:  No objection.
19       THE COURT:  It's admitted.
20       (Defendant's Exhibit 0368 was admitted into evidence.)
21       THE WITNESS:  I'm sorry, the previous letter was what
22 date?
23 BY MR. WEBB:
24   Q.  The one we just looked at, the one you just had in

1 your hands was February 25th.
2   A.  Yes, okay.  They're responding to both February 14th
3 and February 25th.
4   Q.  Is that correct, is that what it appears to you?
5   A.  Yes.
6   Q.  And by the way, I take it that Wyeth -- when Wyeth
7 gets a letter from the FDA, you would expect a responsible
8 pharmaceutical company to respond to the FDA; is that correct?
9   A.  I would hope so, yes.
10   Q.  If you go into this document to the third page --
11 Steve, can you call up, if you would, the third page -- it's
12 actually Page 4 of the document.  That's it.
13       Look at paragraph eight where Wyeth is telling the
14 FDA, "We have deleted all references to cholesterol, fats, et
15 cetera, in the fourth physician letter.  A copy of that revised
16 letter is also included."  Do you see that?
17   A.  I do.
18   Q.  So Wyeth appears to be responding to the FDA by saying
19 we will do exactly what you told us to do regarding that issue;
20 is that correct?
21   A.  Of course.
22   Q.  And then if we take it to the next issue, could I have
23 defense Exhibit 0700?  Steve, don't put this up yet, I haven't
24 offered it into evidence.

1       I hand you what is marked defense Exhibit 0700 and ask
2 you if this appears to be the FDA letter back to Wyeth telling
3 Wyeth that the FDA agrees with the changes that Wyeth has
4 agreed to make?
5   A.  I don't know.  The FDA letter doesn't reference any --
6 reference a telephone inquiry.  I can't link the letter you
7 gave me with this letter.
8   Q.  Did you see any indication -- by the way, the Seasons
9 campaign ran for ten years after this; is that correct?
10   A.  I knew it was several years.
11   Q.  Several years, and there never was one complaint from
12 the FDA about what we said in our promotional material, was
13 there?
14   A.  Regarding Seasons?
15   Q.  Yes.
16   A.  I don't recall any right now after the article --
17 after the magazine was corrected according to FDA's demands.
18   Q.  It was actually corrected -- before anything was ever
19 sent out to anybody, Wyeth corrected it pursuant to what the
20 FDA requested regarding this cholesterol/lipid issue; is that
21 correct?
22   A.  It would have to or run the risk of being misbranded,
23 yes.
24   Q.  You've looked at the materials.  Did they correct it?

1    A.   Yes, they would have had to and they did.

2    Q.   Now, you were then shown a second FDA interaction with

3  Wyeth on the same cholesterol issue.  Can I call up plaintiff

4  Exhibit 0192?  And you'll find that in your pile.

5  Ms. Littlepage showed it to you this morning.

6         Do you recall this morning Ms. Littlepage showing you

7  this internal Wyeth correspondence about attached is a copy of

8  an FDA letter of April 14th, 1992 concerning several Premarin

9  promotional pieces directed to health care professionals.  "FDA

10 requests that we revise our promotional materials to reflect

11 their comments described below," do you recall seeing that this

12 morning?

13   A.   Yes.

14   Q.   If you go into the page -- go into the document

15 several pages to the page marked 003 which I think

16 Ms. Littlepage showed you this morning.  It's actually -- it's

17 the page -- if you go to where it says -- according to this

18 memo, "The FDA claims that the tabular list discussing changes

19 in cholesterol levels which occur in the menopause is

20 misleading because it implies that the estrogen treats

21 cholesterol changes and that there is cardiovascular benefit

22 with the use of Premarin," do you see that?

23   A.   Yes, I see it.

24   Q.   Does that appear to be the same cholesterol issue that

1  was referred to in the other?

2    A.   I think the FDA is complaining about a different set

3  of promotional materials.

4    Q.   Regarding cholesterol issues; is that correct?

5    A.   Yes.  It appears that there were cholesterol claims

6  made on other promotional materials as well.

7    Q.   And Wyeth responded to this; is that correct?  Have

8  you seen that in the evidence you looked at?

9    A.   I have.

10   Q.   And can I have defense Exhibit 0388?  Steve, don't put

11 this up yet because it's not in evidence.  I'm going to hand

12 you what's marked as defense Exhibit 0388 and ask you to

13 examine it and tell me if this appears to be Wyeth's response

14 to the FDA issue.

15   A.   Yes.

16   Q.   I offer it into evidence, your Honor, as defense

17 Exhibit 388.

18       MS. LITTLEPAGE:  No objection.

19       THE COURT:  It's admitted.

20       (Defendant's Exhibit 388 was admitted into evidence.)

21 BY MR. WEBB:

22   Q.   Steve, can I put that up on the screen if we could for

23 the jury?  So Wyeth is responding to that last FDA inquiry and

24 Wyeth is showing that they're responding to that letter dated

1  April 14 which contained several comments and then Wyeth goes

2  on to give its response; is that correct?

3    A.   Yes.

4    Q.   And if you go to the third page of the document and if

5  you go down to where it says B, Wyeth tells the FDA,

6  "Wyeth-Ayerst agrees to delete cholesterol changes from the

7  tabular graphic so as to avoid any implication that estrogen

8  treats cholesterol changes.  As noted above, the brochures and

9  language sheets will be revised and replaced."  Do you see

10 that?

11   A.   Yes.

12   Q.   And on this issue, did the FDA respond to Wyeth -- do

13 you remember seeing from the materials that you looked at, did

14 the FDA respond to Wyeth and agree to the changes that Wyeth

15 was proposing, or the deletion?

16   A.   As I recall, Wyeth again promised to stop the

17 cholesterol advertisements and agreed in this one that they

18 would revise and replace the brochures and language sheets.

19 They promised the FDA they would do that and the FDA agreed

20 with the second corrective action plan.

21   Q.   And then what happened is that when Prempro came to

22 market, it was decided by the FDA that it wanted that

23 cholesterol and lipid information right on the face of the

24 label of Prempro; is that correct?

1    A.   Well, by then there had been additional information

2  relating to the trial that's being discussed now and they were

3  able to get it into the label, yes.

4    Q.   So is the answer to my question yes?

5    A.   Yes, they were able to get information regarding

6  cholesterol and lipids.

7    Q.   Can I call up defense Exhibit 34 which is the Prempro

8  label of 1995 after the product went into the market, and

9  you've seen this document before.

10       I'm going to call out -- there's a section right here

11 where we see the actual lipids discussed; is that correct?

12 It's actually -- if you go down -- can you go back to where you

13 were before on the first page?  Go down to the bottom of the

14 page.

15       They talk about information regarding lipid effects,

16 do you see that?

17   A.   Yes.

18   Q.   And it goes on to discuss the results of a clinical

19 trial and they discuss basically the lipid and cholesterol

20 effect; is that correct?

21   A.   Yes.

22   Q.   And then if you go up to the next column, just go to

23 the next column in the label itself, we actually see a table

24 that sets forth the lipid effects that have now been placed in

Page 2089

1 the label by the FDA; is that correct?

2    A.   Yes, the lipid effects are in the label.

3    Q.   And then do you recall based on the work that you've

4 done in this case that Wyeth and the FDA began discussing what

5 kind of promotional materials would be appropriate to launch

6 Prempro, do you recall seeing documents discussing that?

7    A.   Do I recall seeing documents about how they could

8 structure their advertising campaign?

9    Q.   Yes.

10   A.   Yes.

11   Q.   And I'm not trying to make this a memory test.  I'll

12 show you the document if you need it.

13   A.   I would like you to.

14   Q.   Let me show you -- can I have defense Exhibit 438?

15 I'm going to hand you what I have marked as defense Exhibit

16 438 and ask you -- don't put it on the screen yet, I haven't

17 offered it, Steve, and ask you to look at it.

18       Is this a correspondence from the FDA back to Wyeth

19 discussing launch materials for Prempro?

20   A.   Yes.

21       MR. WEBB:  And I offer it into evidence.

22       MS. LITTLEPAGE:  No objection.

23       THE COURT:  It's admitted.

24       (Defendant's Exhibit 438 was admitted into evidence.)

Page 2090

1 BY MR. WEBB:

2    Q.   Thank you, your Honor.  We call up the first page.

3 This is a letter from the FDA to Wyeth; is that correct?

4    A.   Yes.

5    Q.   And it's dated March 14, 1995, and you can read the

6 introduction, "This letter is in response to Wyeth-Ayerst's

7 January 9, 1995 and January 11th, 1995 submission of proposed

8 launch materials."  Do you see that?

9    A.   I do.

10   Q.   Then if we go into this document a bit further, can we

11 go to Page 3 of the document, Steve?  And down at the bottom

12 where it says, "DDMAC recommends," do you see at the bottom of

13 the letter, tell the jury then what says DDMAC, what is DDMAC?

14   A.   As I said this morning, it's the division of drug --

15 it's the advertising group at FDA.  It's the group that

16 monitors promotional materials, TV ads, journal ads.

17   Q.   And at this point in time, it says, "DDMAC recommends

18 including additional pages on endometrial protection and lipid

19 profile as in the Prempro brochure," is that correct?

20   A.   Yes, you've read it correctly.

21   Q.   Does it appear that by this time, the FDA actually

22 wants Wyeth's promotional materials to include information

23 about cholesterol and lipids?

24   A.   Perhaps you could give me the visual aid to which

Page 2091

1 they're referring.  They're referring to a specific

2 advertisement here.

3    Q.   Let me -- it's not attached to this exhibit, so I

4 don't have that.  But can I ask you, do you know whether or

5 not -- when it says, "DDMAC recommends including additional

6 pages on endometrial protection and lipid profile," what does

7 that mean to you?

8    A.   I would have to see the visual aid to understand the

9 concept of additional pages versus information, but it appears

10 the FDA is asking for additional information regarding the

11 lipid profiles and protection against -- I would assume against

12 uterine cancer.

13   Q.   Go to the next page on Page 4 and if you go down where

14 it says Page 5 here, Steve, underneath that.  We see again on

15 Page 5, "DDMAC suggests including an additional page on lipid

16 profile, including the lipid chart for balance."  Do you see

17 that?

18   A.   Yes.

19   Q.   Now, in the work that you've done in this case, have

20 you reviewed the Prempro launch promotional materials?  Did you

21 see those materials?

22   A.   I did see some.  I'm not familiar with this specific

23 OBG visual aid.  There's no number on here, so I'm not sure to

24 which specific aid this is referring.

Page 2092

1    Q.   My question is, did you see Prempro launch promotional

2 materials?

3    A.   I did see some of them, yes.

4    Q.   And did you see that those promotional materials

5 include lipid and cholesterol information?

6    A.   Yes.  They don't include cardiovascular promotional

7 material, but they do note the results from the PEPI trial on

8 lipids.

9    Q.   Thank you.  Now, I want to go to another topic that

10 Ms. Littlepage talked to you about this morning which is the

11 Cummings study.

12       Can I call up -- what's the plaintiff exhibit number?

13 I think it's defense Exhibit 1589 that is in evidence that I

14 offered yesterday, your Honor.  So this is the Cummings study

15 that you talked about again this morning; is that correct?

16   A.   Yes.

17   Q.   And this study -- you mentioned this study in

18 connection with thin women and breast cancer risk; is that

19 correct?

20   A.   Well, yes, I think that was part of a discussion with

21 bone mineral density, yes.

22   Q.   And where in this study do you see any reference to

23 thin women having an increased breast cancer risk?

24   A.   I think I was referring to the information that the

1 author presented to Wyeth at the meeting that we also went put
2 on the screen yesterday in which the author, Dr. Cauley, also
3 discussed the problem with thin women being at an increased
4 risk for breast cancer, so the author herself presented that to
5 Wyeth at the meeting that we put up.
6   Q.   Are you looking at the exhibit I have on the screen?
7   A.   No, I was explaining the answer that I gave you
8 yesterday or this morning.
9   Q.   Is this the -- do I have the right study, the Cummings
10 study?
11   A.   I believe it's one of the bone mineral density
12 studies, yes.
13   Q.   Show me what page in that study there's any reference
14 to thin women having additional breast cancer risk.  Just tell
15 us where to go.
16   A.   I'll have to read through the study, but again, I was
17 referring to the author's direct statements to Wyeth at the
18 meeting that you highlighted the day before, but it will take
19 me a minute or two to read through the study.
20      THE COURT:  Counsel, while we're taking this little
21 break, we have another juror question.  Share that with
22 Ms. Littlepage, please.  It's marked Court's Exhibit L.
23      MS. LITTLEPAGE:  K.
24      (Court's Exhibit K was marked for identification.)

1      MR. WEBB:  I'll ask it as soon as I get done.
2      THE WITNESS:  I actually did find it.  The author
3 states that, "Our findings suggest that the risk of breast
4 cancer associated with hormone replacement therapy may have
5 been underestimated by previous investigators because
6 osteoporosis is a primary indication for its use."
7 BY MR. WEBB:
8   Q.   Actually, if we're talking about women who are
9 actually taking -- Steve, can we go to the Page 004, and Steve,
10 could you go up and call out the top portion of the exogenous
11 column and can you start yellow highlighting here, Steve, where
12 it says "assuming.
13      What the author actually says here is that assuming
14 that -- BMD stands for bone mineral density; that correct?
15   A.   I think so, yeah.
16   Q.   "Assuming that BMD reflects endogenous estrogen
17 levels," what does that refer to?
18   A.   There's circulating estrogen levels.
19   Q.   "Women with osteoporosis would have had relatively low
20 endogenous estrogen levels and so the addition of estrogen may
21 not increase the risk of breast cancer."  Did I read that
22 correctly?
23   A.   Yes, they are referring to estrogen.
24   Q.   And if you go back to the previous page, 03, and if I

1 could call out that begins with, "The association between BMD."
2 No, that's not actually where I want to go.
3      Go to Page 02.
4      MS. LITTLEPAGE:  Do you have another copy of that
5 article?
6      MR. WEBB:  I'll get a copy of it.  We'll find a copy
7 for you.
8      MS. LITTLEPAGE:  That's fine.  Thank you.
9 BY MR. WEBB:
10   Q.   If you go to page marked 02.  Actually, Steve, I'm
11 over here under the results, if you could call that out.  Do
12 you see where -- start highlighting here where it says, "The
13 mean BMD," Steve.
14      "The mean bone mineral density was significantly
15 higher among breast cancer cases than controls at all BMD
16 sites.  The mean body weight and BMI tended to be higher among
17 the cases."  Do you see that?
18   A.   Yes.
19   Q.   When it says -- what is BMI?
20   A.   Body mass index.
21   Q.   It said, "The mean body weight and BMI," so the weight
22 of the body and the BMI tended to be higher among the cases,
23 the word cases is referring to the people who had breast
24 cancer; is that correct?

1   A.   I have to check that because they excluded patients --
2 I'm just going to have to read this article, because they
3 excluded patients in part of this study who were taking hormone
4 replacement therapy.  I'm going to have to read through the
5 whole article.
6   Q.   I'm just asking you about the word cases.  The cases
7 is referring -- you have cases and controls; is that correct?
8   A.   Yes.  I just don't know -- I have to study it because
9 I know that the author reported to Wyeth that the risk was
10 underestimated in lean women, so I need to read through this --
11 I'll need to read through this article to see in which groups
12 they omitted the patients who were taking hormone replacement
13 therapy in order to give a full answer.
14   Q.   Do you want me to wait, is that what you're asking?
15   A.   If I could have time to read this whole article, of
16 course.
17   Q.   Okay.
18   A.   Yes.  It says, "Because use of estrogen replacement
19 therapy could confound the data between BMD and breast cancer,
20 we have excluded women who were reporting current estrogen
21 replacement therapy at baseline," so this study excluded women
22 who were taking estrogen.
23   Q.   Right, I brought that out yesterday when I was
24 questioning you; is that correct?

1    A.  I don't recall that, but this survey was predicated
2  upon women who weren't under estrogen therapy.
3    Q.  But I'm trying to deal with the issue of whether this
4  article has anything to do with thin women and increased breast
5  cancer.
6        Actually, can we turn to the -- there's actually a
7  chart in here.  Go to Page 03 if we could, and Steve, can you
8  call out the table there called characteristics about halfway
9  down?  And do you see the characteristic called body weight and
10  BMI, do you see that?
11    A.  Yes.
12    Q.  Steve, I actually need you to go back up to the top so
13  we can see the heading right up there.
14        Do you see the two columns are called the control
15  column, controls, and the incident of breast cancer cases, do
16  you see that?
17    A.  Yes.
18    Q.  If we go down to the issue of body weight and BMI,
19  what you find, we can just read the chart, is that the breast
20  cancer number of cases has a higher body weight than the
21  control group, 69.9 versus 67.6, do you see that?
22    A.  Yes, it is different, yes.
23    Q.  And BMI, the body mass index right underneath it, it's
24  the same thing, the people who have breast cancer have a higher

1  BMI at 26.5 than the people who are in the control group who
2  don't have breast cancer; is that correct?
3    A.  Well, there's no difference between those groups.
4    Q.  You mean statistically different?
5    A.  Yeah, the P value here.  There's no difference between
6  them.
7    Q.  Now, the reason I'm asking you questions about this
8  thin woman issue is because this morning you gave some
9  testimony to the jury about the European label and thin women,
10  do you recall that?
11    A.  Yes.
12    Q.  And I'd like to ask you some questions about the
13  testimony that you gave the jury this morning on that issue.
14        Now, this morning you showed the jury this document
15  called the core SPC for hormone replacement therapy.  Do you
16  recall that?
17    A.  Yes.
18    Q.  Can I call up that exhibit which is plaintiff Exhibit
19  0811?  In this document this morning, you talked about an issue
20  about the European label and thin women.  Do you recall talking
21  about that issue?
22    A.  Yes.
23    Q.  Okay.  Let's show the jury what we're looking at here.
24  On the first page, when it says core SPC, tell the jury what

1  does SPC refer to?
2    A.  It generally is the summary of product
3  characteristics.
4    Q.  And it has a code here or letter CPMP, what does that
5  refer to?
6    A.  The CPMP is a group within the European regulatory
7  authorities.
8    Q.  And this document you're looking at contains -- if we
9  look at the first part of the document, it actually contains
10  what are in effect recommendations from what is the equivalent
11  of the European FDA; is that correct?
12    A.  Well, it's part of the European regulatory
13  authorities, yes.
14    Q.  And they're making some recommendations and then Wyeth
15  is commenting on the recommendations; is that correct?
16    A.  Yes.
17    Q.  Is that right?
18    A.  Yes.
19    Q.  So if we go over to the page that's actually Page 6 of
20  15, and this document -- well, actually go to the page before
21  that.
22        This document shows that the Europeans are
23  recommending a warning that relates to thin women; is that
24  correct?

1    A.  Yes.  I'm having trouble seeing it on my screen.
2    Q.  Okay.  When you told the jury that this European label
3  has a recommendation for thin women, can you show me where you
4  were talking about, where you were referring to?
5    A.  Well, I'll need a copy of it.  I can't read my screen.
6    Q.  It's an exhibit that was shown to you today by
7  plaintiff.
8    A.  I know, I don't have a copy of it.
9    Q.  I'll get you a copy.  It's tab 326.  This document is
10  in evidence and I'll just give you another copy of what
11  Ms. Littlepage handed you this morning.
12    A.  Oh, that I have.
13    Q.  I thought that's what you wanted.
14    A.  I'm sorry, I thought you were referring to a second
15  document.
16    Q.  So you have the document that Ms. Littlepage showed
17  you this morning; is that correct?
18    A.  Yes.
19    Q.  And you told the jury that the European label folks
20  wanted to put in something about thin women and breast cancer;
21  is that correct?
22    A.  Yes.
23    Q.  Show us where that is.
24    A.  I was referring to the sentence that says, "The

1 increased risk was found mostly for women with lean or normal
2 body builds rather than for obese women."
3    Q.  Fair enough.  Now, Wyeth then -- if you go to the next
4 page, Wyeth made comment about that, is that correct, back to
5 the European authorities?  Do you see on the next page where it
6 says -- go to the top, just show the whole page.  Wyeth makes
7 comments; is that correct?
8    A.  Yes.
9    Q.  And if you go down to Wyeth's comments, let me go down
10 here to the paragraph on the bottom, can you see that?  Call
11 that out, Steve.
12       "Wyeth made comments to the European authorities, more
13 definitive information regarding the risk of breast cancer with
14 estrogen or estrogen-progestin therapy is anticipated at the
15 conclusion in 2006 of the National Institutes of Health,
16 Women's Health Initiative, the largest prospective clinical
17 trial of postmenopausal women and estrogen use, which is
18 looking at the effects of estrogen on the brain, heart, breast
19 and other tissues."
20       So Wyeth is telling the European authorities you're
21 going to get more definitive information coming out of WHI; is
22 that correct?
23    A.  Well, that's the final paragraph.  The first paragraph
24 is Wyeth's comments, "The possible relationship between body

1 mass index and the risk of breast cancer is based on the recent
2 study which found that women with small body mass, less than
3 24, had a significant increased risk to have breast cancer
4 diagnosed while using estrogens."
5    Q.  Steve, can you go up to where she's reading?  Just
6 show us where you're reading.
7    A.  It's the first sentence.
8    Q.  "A possible relation between body mass index and risk
9 of breast cancer is mainly based on results from a recent
10 study," is that where you're reading?
11    A.  Yes, of course.
12    Q.  Now, Wyeth goes on to say, if we're going to find out
13 whether there's in fact a true relationship between thin women
14 and increased breast cancer, we ought to wait and see what WHI
15 tells us; is that correct?
16    A.  Well, what they say is that more information is
17 coming.
18    Q.  And do you see here where Wyeth -- if you go down
19 here, and can I start with, "In discussing the issue of BMI."
20 Wyeth tells the European authorities, "In discussing the issue
21 of BMI in relation to breast cancer, the authors noted that
22 there is a potential for confounding between BMI and use of HRT
23 since lighter postmenopausal women are more likely than heavier
24 women to use HRT and are at an otherwise lower risk of breast

1 cancer than heavier women of the same age and childbearing
2 history."  Do you see that?
3    A.  Exactly, and that's what explains the increased risk
4 in lean women, because without estrogen therapy, lean women are
5 at a lower risk.
6    Q.  I understand --
7    A.  I'm just explaining why that was so important, that
8 finding.
9    Q.  You're telling us the theory, but when Wyeth said
10 let's wait to see what happens with WHI, you've read WHI and
11 you are aware that WHI did not conclude that there's any
12 increased risk with thin women and breast cancer; is that
13 correct?
14    A.  Yes, but what my comments were is -- what would have
15 been appropriate is in the United States, a Dear Doctor letter
16 would have gone out and a Dear Doctor letter, as I said
17 yesterday, is intended when there's new information, and a
18 company is always able when they're presenting the data to the
19 doctor to say look, doc, you know what, here's some
20 information to support it, here's some information that might
21 negate it, we might be doing additional studies, but the
22 important thing is, Doctor, you get this information and you
23 use it in your life as you decide about your patients.
24       The comment was they knew this from the study.  This

1 information was put in the core data sheet, and my comments
2 were the appropriate letter should have been sent to the
3 doctors and Wyeth, of course, was free to say a bigger study is
4 coming, there may be data to support this, not support it, but
5 you know what, Doctor, it's up to how you use this
6 information because only you know your patients.
7    Q.  Doctor, do you remember the question this morning from
8 Ms. Littlepage when she brought out from you that the European
9 label had the thin woman warning and the U.S. label did not, do
10 you recall giving that testimony just this morning?
11    A.  Yes, I recall that we discussed the new core data
12 sheet.
13    Q.  And were you trying to suggest to the jury that
14 because it was in the European label, it ought to be in the
15 U.S. label?
16    A.  What I said was we are required when we know
17 information about our product to share that information.
18 Frequently what firms do is we'll compile a Dear Doctor letter
19 and say we have this data.
20       Even if they say we don't know what it means, but
21 Doctor, you need to know about it and that was my comment.  It
22 should have been -- the United States doctors, the doctors in
23 Reno or wherever, should have been provided with this
24 information.

1    Q.   Are you saying it should have been in the U.S. label?

2    A.   They could have put it in the label.  They could have

3 talked to the FDA about putting it in the label.  They could

4 have put it in a manner similar to this.  We've seen this, stay

5 tuned, more data to follow.

6    Q.   And if that had been put in the label, it would have

7 been wrong?

8    A.   Well, it would have been --

9    Q.   Based on the WHI study; is that correct?

10    A.   It would have been the information available at that

11 time.  Labeling is a living organism.  FDA will define to you

12 all the time the label changes as you accumulate science.

13        You see many examples where a label will say we think

14 this is okay, this is what we have so far.  Then you'll see a

15 revision later and say, you know, we have one study that shows

16 this, one study that shows that.  Commonly that happens, and

17 the company is responsible for keeping that label current.

18    Q.   And do you think it would be appropriate to put into a

19 warning label a warning based on a study that had all these

20 confounding factors?

21    A.   You'll always have those confounding factors because

22 women of the leaner and thinner, slender frames are at a lower

23 risk.  That's always going to be a confounding factors.

24        There's many confounding factors when studying

1 postmenopausal women.  It's age, their hormone levels are

2 changing, lean body mass, higher body mass.  You can't escape

3 that when you're studying postmenopausal women, but the point

4 is, this is what we had, and if it meant that there could be

5 some doctors who might think twice before they put a leaner

6 woman on the therapy, then I believe it at least merited in the

7 United States a Dear Doctor letter.

8    Q.   I want to know, is it your opinion -- are you telling

9 this jury that you think a thin woman warning should have been

10 put into the Prempro label before the WHI study, is that what

11 you're telling the jury?

12    A.   I think what I'm telling the jury repeatedly --

13    Q.   Can you answer my question?  Are you or are you not?

14    A.   I can answer it if you'll let me.

15    Q.   I will let you, but I'm just asking -- you go ahead.

16    A.   Okay.  I think the doctors should have been informed

17 that this was out, and Wyeth should have accumulated the

18 information, could have interacted with the agency and said to

19 the agency this is important information, should we put it in

20 the label now?  If the FDA said says no, no.  If the FDA says

21 go ahead and put it in as initial introductory information and

22 we're going to be holding here for the WHI, then you can do

23 that.

24    Q.   Educate the jury for a moment on the concept of

1 problem of overwarning in a label -- let me finish my question.

2 Have you seen FDA guidance positions on whether or not the FDA

3 is concerned about putting warnings in labels that actually

4 overwarn and then cause people to overreact when there's no

5 science to support it; is that correct?

6    A.   Well, I think you're referring to label fatigue and

7 label fatigue is a concern the FDA has.  Your label is a

8 living, ever-changing document, and you want the label to be

9 relevant to the doctor, so you can't have a label that's 200

10 pages long where you put everything in the label that ever

11 happened to any woman that was ever in the study or ever took

12 the drug anywhere, so you can't have a label like that.  Nobody

13 would read it, so FDA warns against this.

14        However, we are talking about breast cancer here.  We

15 are not talking about nausea or dizziness-GYN when you stand up

16 too quickly.  We're talking about breast cancer.  This was a

17 finding that suggested there may be a particularly vulnerable

18 sub group.

19    Q.   In one study?

20    A.   Well, your NDA was based on one study.

21    Q.   Let me ask you this, Doctor:  When all Wyeth said to

22 the European authorities is, maybe we ought to wait to see what

23 happens with WHI, did WHI -- WHI concluded that it did not find

24 a relationship of increased breast cancer risk with thin women;

1 is that right?

2    A.   It did say that, but that was years later.  What we're

3 talking about --

4    Q.   But am I correct about that?

5    A.   Yes, information later showed that, but we didn't know

6 that for ten years.

7    Q.   And in the label today -- you called the label the WHI

8 label -- strike that.

9        The Prempro label today, after WHI, which you called

10 the appropriate label does not have a warning for thin women

11 having an increased breast cancer risk; is that correct?

12    A.   It does not based on the information we know now, but

13 there are other studies that showed it did and if it were

14 important for even one woman or one doctor, then it deserved a

15 Dear Doctor letter.

16    Q.   And that is a decision, though, that I guess the FDA

17 makes and you don't make; is that correct?

18    A.   Companies make the decisions.  Whether they go to the

19 FDA, companies -- I have never been told by the FDA no, don't

20 send a Dear Doctor letter, you're overreacting, don't do it.

21 No, I've never had that experience.

22    Q.   It's not in the warning label today, is it?

23    A.   Because additional information --

24    Q.   Is it?

Page 2109

1    A.   Information evolves.

2    Q.   Is it in the warning label?

3    A.   It isn't today, but the doctors deserve to know when

4  there was only one study what that study showed for a risk such

5  as breast cancer.

6    Q.   Doctor, let me move on to another issue that you

7  talked about during your direct-examination.  You told the

8  jury -- in fact, Steve, can I call up defense Exhibit 126 that

9  Ms. Littlepage showed the witness during her last examination?

10       You were critical this morning of Wyeth in April of

11  1979, Wyeth provided to the FDA a collection of papers that

12  evaluate the relationship between the use of exogenous

13  estrogens for menopause and breast cancer and you looked at

14  these and said, well, those are all estrogen studies.  Do you

15  recall that this morning?

16    A.   I recall discussing -- I very clearly said in 1979

17  there was only the Premarin NDA, and these studies are a

18  required component of what we must do with the FDA when there's

19  a new article or a new promotion coming and you summarize the

20  literature.  What I'm critical of is using estrogen data to

21  extrapolate the E plus P.

22    Q.   Well, all Wyeth -- so Wyeth is telling --

23  Ms. Littlepage showed you the studies that are attached and you

24  said those are all estrogen studies; is that correct?

Page 2110

1    A.   Right, so they aren't relevant to E plus P.

2    Q.   But let's go back to the first page.  We're talking

3  about 1979.

4    A.   So they could have only submitted it to the Premarin

5  NDA because there was no Prempro NDA.

6    Q.   That's correct.  But as time went on, you've seen the

7  evidence -- Wyeth when it continued to update the FDA on

8  estrogen issues, as E and P studies came out, Wyeth then

9  provided those to the FDA; is that correct?

10    A.   We were required.  We have to submit at periodic times

11  our summaries of the literature that we didn't generate.  Yes,

12  they fulfilled their requirements.

13    Q.   Thank you.

14    A.   They submitted the literature they needed to submit.

15    Q.   I noticed this morning Ms. Littlepage has this island

16  called FDA island.

17    A.   Yes.

18    Q.   When did you adopt this phraseology -- is this your

19  terminology or Miss Littlepage's?

20    A.   People were referring to Rockville oftentimes, whether

21  you're in or out of FDA jurisdiction, you'll hear Rockville

22  referred to as FDA island.  You'll hear FDA referred to whether

23  you're in or on FDA planet.  It's a commonly used description.

24    Q.   Did you pick up using that after Ms. Littlepage was

Page 2111

1  using it in your testimony here today?

2    A.   I talked to her about using FDA planet, FDA world.

3  Whether she came up with FDA island and I agreed with it, or if

4  I also added that, I don't know.  I usually use the FDA planet.

5    Q.   By the way, one last point.  This morning were you

6  trying -- I think you attempted to try to minimize Wyeth's

7  contribution to the Nurse's Health Study.  Do you recall that?

8    A.   No.  I acknowledged that they provided some financial

9  support, yes.

10    Q.   And it was a good thing, wasn't it?

11    A.   It's always good to support science.

12    Q.   Let's look and -- can I have defense Exhibit 275?  If

13  you want to know what the people that ran the study thought,

14  let me show you an exhibit.  Defense Exhibit 275, I'll hand it

15  to you.  I offer it into evidence.

16       MS. LITTLEPAGE:  No objection.

17       THE COURT:  275 is admitted.

18       (Defendant's Exhibit 275 was admitted into evidence.)

19  BY MR. WEBB:

20    Q.   This is a letter from Harvard Medical School at

21  Brigham and Women's Hospital regarding Wyeth's contribution to

22  the Nurse's Health Study; is that correct?

23    A.   Yes.

24    Q.   And at least it appears if we read this letter it's

Page 2112

1  dated December 10th, '01, the people who are involved in this

2  study at least said to Wyeth they actually thought that Wyeth's

3  contribution helped them carry on the important work which we

4  began 25 years ago, do you see that?

5    A.   Yes.  It's customary when you do a study to send a

6  thank you note to anyone who helped, be it financially or with

7  drugs, or even if they helped you with statistics, yes.

8    Q.   And you're not trying to minimize Wyeth's contribution

9  or the fact that it's a good thing, are you?

10    A.   I think it's always important for companies to support

11  research with their product.  I think the comment that was made

12  was that the contribution to the Nurse's Health Study was a

13  small contribution of the overall Nurse's Health Study.  Wyeth

14  was not carrying the financial burden of that study.

15    Q.   You may have thought $750,000 small.  Apparently

16  the folks that ran the study thought it was enough to thank

17  Wyeth for helping them carry on their work; is that correct?

18    A.   I'm sure everyone who participated in the study would

19  have received a letter like this.  These are standard letters.

20    Q.   I have no more questions.

21       THE COURT:  Will counsel approach, please?  We have a

22  jury question.

23       (A discussion was held off the record.)

24  ////                    ////

1 BY MR. WEBB:

2     Q.   Doctor, let me ask you a question.  It's actually a

3 juror question.  When both myself and Ms. Littlepage have been

4 sometimes asking you about relative risk and attributable risk,

5 what is the difference between relative risk and attributable

6 risk?  And you can address your answer to the jury.

7     A.   That's a great question.  Somebody was actually

8 listening to me.  Relative risk is the division.  The

9 enumerator would be the risk of the event, what percent of

10 people in the treated group got breast cancer, liver disease,

11 whatever it is you're studying, and you divide that by the risk

12 or the number of patients -- the percentage of patients in the

13 placebo group, the control group, who got the same disease,

14 okay?

15       So if 20 percent got it in the group who got the drug

16 and ten percent got it in the group that got the placebo, the

17 division would be a relative risk of two.

18       Attributable risk is one more little step.  You need

19 the relative risk to calculate the attributable risk, and the

20 calculation is that you take the relative risk and you minus

21 one and then you divide it by the relative risk, so in our case

22 that we just did, two minus one would be one, divided by two,

23 so one-half, 50 percent.  Now, what does that mean?

24       The relative risk just gives you the ratio.

1 Attributable means, okay, once you have that ratio, what can

2 you attribute the impact of the drug?  And the attributable

3 risk would say if you had a ratio of 50 percent, for every 50

4 people who took a drug and got liver cancer, then for every 100

5 people who took a drug and got liver cancer, the attributable

6 risk says that 50 percent of them, half of them got it because

7 they were on the drug.

8       An example I gave you yesterday was the attributable

9 risk of three, and using -- for the women who received

10 combination therapy and WHI for the longest period, I think it

11 was seven years, and that number in the WHI article that came

12 out was three, so if you take three and minus one is two, and

13 two divided by three is two-thirds, so what you would say, what

14 the authors say, the epidemiology articles that talk about

15 attributable risk, you can then say, okay, two out of three are

16 67 percent of the women.  Not all women, but of the women who

17 take estrogen plus progesterone for seven years and who

18 developed the breast cancer, that breast cancer in those women

19 were secondary to taking the drug.  The attributable risk is

20 that the incident is due to the exposure of the drug, and

21 that's what it stands for.

22       MR. WEBB:  Thank you.

23       THE COURT:  I need the note.  And tell me about the

24 document I gave you, too.

1       MS. LITTLEPAGE:  Fine, Judge.

2       MR. WEBB:  Your Honor, can we briefly be heard on this

3 document?

4       THE COURT:  I'm just trying to -- earlier I was told

5 that we wanted to do it while this witness was still here.

6       MS. LITTLEPAGE:  We can do it as soon as she's done.

7 I don't want it to be too far --

8       THE COURT:  Then we'll deal with it at the recess.

9       MS. LITTLEPAGE:  I only have a few questions, but this

10 is important.

11             FURTHER REDIRECT EXAMINATION

12 BY MS. LITTLEPAGE:

13     Q.   The Cummings issue, and let me tell you why it's

14 important because obviously Miss Scofield is a very thin, lean

15 woman, very important for the jury to understand what Wyeth

16 knew about this issue.

17       Let's talk about Dr. Cummings, and I built these very

18 fast so they're not beautiful, but I think I understood what

19 you were telling the jury.

20       What Dr. Cummings found was generally you find a

21 relative risk I think you told the jury comparing hormone

22 therapy users to a background rate.  That's what you would call

23 the increased risk?

24     A.   Right.

1     Q.   Now, what Dr. Cummings looked at was whether the

2 background rate of breast cancer for high bone density or low

3 bone density women were different?

4     A.   Right.

5     Q.   And he found that low bone density women had a lower

6 background rate?

7     A.   Background, correct.

8     Q.   So his conclusion was that what you really have to

9 look at for a thin or lean woman is how much the risk increases

10 from them taking hormone therapy?

11     A.   Correct.

12     Q.   Is that what you were trying to explain?

13     A.   Right.

14     Q.   It's not beautiful, but does that sort of explain --

15     A.   Right.  The lean woman are at a lower baseline risk

16 for breast cancer, so it's important to recognize that when

17 they take the E plus P, that their change, their increase in

18 risk is greater because they start at a lower rate, so they are

19 at an enhanced risk.

20     Q.   So for a thinner, lean woman in menopause, she

21 actually has a lower chance of getting breast cancer than a

22 higher bone density woman or just a regular background woman?

23     A.   At background, yes.

24     Q.   So her risk goes up much more from taking these drugs?

1   A.  Yes, in the balance of the population, right.

2   Q.  And is that what Dr. Cummings stated in his

3 conclusions, that his findings suggested that the risk of

4 breast cancer associated with hormone replacement therapy may

5 have been substantially underestimated?

6   A.  Exactly.

7   Q.  Because of this?

8   A.  Exactly.

9   Q.  And that these findings have implications on the use

10 and interpretation of bone densitometry and the balance of

11 risks and benefits of hormone replacement therapy?

12   A.  Correct.

13   Q.  That's his conclusion?

14   A.  Yes.

15   Q.  Okay.  Now, you said, and I will talk to other

16 witnesses about this, but let's just confirm.  We've now seen

17 that Dr. Cummings has this finding.  Mr. Webb then asked you

18 about the core data sheet from Europe.

19   A.  Right.

20   Q.  And when Wyeth is talking in the core data sheet about

21 this issue, they actually cite the European government to

22 another study?

23   A.  Right.

24   Q.  The Schairer study?

1   A.  Right.

2   Q.  Which also found by Dr. Cummings, right?

3   A.  Correct.

4   Q.  I promise I will not go into these, but can you just

5 confirm that there are a number of studies that also found thin

6 or lean women have an increased risk of breast cancer from

7 these drugs, like the Collaborative Group and Magnusson?

8   A.  You are correct.

9   Q.  In fact, one of the only studies that didn't find it

10 was the WHI because it stopped early?

11   A.  Correct.

12   Q.  So all we can say about the WHI is after the short

13 time the WHI study was done, they didn't find what a number of

14 other studies found?

15   A.  That is true.

16   Q.  And Wyeth -- at least this document indicates Wyeth

17 knew at this point not just about Cummings, but also about the

18 Schairer study because they cited it?

19   A.  They quoted it, yes.

20   Q.  That's all I have.

21   THE COURT:  You get the last bite.

22   MR. WEBB:  It's going to be a very small bite.

23 ////                          ////

24 ////                          ////

1   FURTHER RECROSS EXAMINATION

2 BY MR. WEBB:

3   Q.  I just had one question, Doctor, because you've talked

4 about Dr. Cummings.  Can I call back up just very quickly

5 defense Exhibit 1589, the actual Dr. Cummings and Dr. Cauley

6 study.  If I go over to the page that's Bates 004, and I just

7 want -- you just told the jury if it's correct, Dr. Cummings

8 right here, his statement, "Assuming that bone mineral density

9 reflects endogenous estrogen levels, women with osteoporosis

10 would have had relatively low endogenous estrogen levels and

11 so, this is Dr. Cummings statement, "So the addition of

12 estrogen he says may not increase the risk of breast cancer.

13 "Do you see that?

14   A.  Yes.  That was a theory that perhaps women who had the

15 tiny frame, the lean frame had lower circulating estrogen

16 levels, so maybe they would be at a reduced risk at baseline.

17   Q.  And by the way, as far as his theory that it would

18 not -- that it may not increase the risk of breast cancer, at

19 least after the WHI study, the Europeans took it out; is that

20 correct?

21   A.  I think that they did -- I think there was a revision

22 when WHI came out.

23   Q.  Thank you.

24   THE COURT:  May this witness be excused?

1   MS. LITTLEPAGE:  Yes.

2   MR. WEBB:  Yes, your Honor.

3   THE COURT:  Thank you for coming, ma'am.  You're

4 excused.  Next witness, please.  Perhaps you could inform me as

5 to the --

6   MR. WEBB:  Mr. Snapp is -- do you want to do that

7 right now?

8   THE COURT:  If it's something that he can do by

9 interlineation, I'll look at it and that way I can be thinking

10 about it.  I just thought you could take a pencil and write in

11 what you want.

12   MR. SNAPP:  Okay.

13   THE COURT:  That way we can save some time.  Next

14 witness, please.

15   MS. LITTLEPAGE:  Judge, we call Arlene Rowatt.

16   THE COURT:  Ms. Rowatt, raise your right hand.

17

18     A R L E N E   F A Y E   R O W A T T,

19       having been duly sworn,

20     was examined and testified as follows:

21   MS. LITTLEPAGE:  Judge, we have a medical expenses

22 stipulation that I would ask the Court to -- do you have it, to

23 read to the jury?  You can read it on all three women at this

24 point.

# EXHIBIT 23

### ESSNER PREMPRO LAUNCH, 4_2_95

The merger with Lederle has created a genuine mega company and although the process of merging two large organizations is rarely pretty, we've done it quickly and we've done it well.

When I look at the merger, I see benefits in three areas. First in terms of size and scale. Second in terms of synergy, and third and in the long run most important, in terms of people.

First to talk about scale and size, we're the number two company today in dollar sales in the United States. We have the broadest line of drugs in the pharmaceutical industry and we're already far and away the largest company in the United States when it comes to the number of prescriptions dispensed. Simply put, we supply more prescription drugs than anybody. We believe that particularly when it comes to dealing with managed care, in the future this scale, this size gives us a real advantage.

Now the term synergy is one that gets thrown around a lot these days and has become a bit of a buzz word. But in the case of Wyeth-Ayerst and Lederle, the term really applies. Really two kinds of synergies apply here. First, obviously, is the cost savings that can be achieved by eliminating duplication of effort. We've seen that there are many areas in which costs and redundancies can be eliminated and still end up with an organization which is stronger than either of its parts. And that's clearly the case here.

ESSNER PREMPRO LAUNCH, 4_2_95                                    - 1 -

Confidential Pursuant to Confidentiality Order

MMSVC001-000001

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0001

But in the long run, our focus can't only be on achieving cost savings. We must build a stronger, more durable, more powerful organization. Here is where we see the tremendous fit between Wyeth-Ayerst and Lederle really paying off.

For example, look at our Pediatric Division. When you take the Lederle Praxis vaccines, the Wyeth-Ayerst Nutritionals, and Pediatric Pharmaceuticals from both organizations, you end up with a $700 million business that is guaranteed to outperform either of the two companies operating independently.

These same kind of benefits also apply to our generic division. When it comes to our Giant Pharmaceutical Products Division to which each of you in the room this morning belong, there are also a number of similar product and customer based synergies that will help us today and in the future.

But even more important than scale and size and synergy is people. In the long run, years from now it will be people that make the difference. I can tell you that I'm very pleased with what I've seen from the Lederle sales organization so far. I've seen great esprit de corps and an eagerness to get down to work and show what they can do. It reminds me just a little of the spirit that the Robins sales organization brought with them in 1991 that added so much to the company.

With Wyeth and Ayerst and Lederle and our account managers each playing their role, I don't see how the launch of Prempro can be anything other than a major success.

ESSNER PREMPRO LAUNCH, 4_2_95                                    - 2 -

Confidential Pursuant to Confidentiality Order                                    MMSVC001-000002

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0002

(APPLAUSE)

I've already talked about the great breadth of our product line, and you may also be aware that we have more one hundred million dollar products in our line than any other company. And you're all aware of how many new products we've launched together over the last six years, and you're certainly aware of how well these new products have done. But with all of that, we've always said that one product is different, that one product is special, that one product is our most important asset and our most important priority.

Indeed, the effort that Wyeth-Ayerst has put behind Premarin has resembled a Holy War, a Crusade, more than a typical pharmaceutical marketing effort. With sales of three quarters of a billion dollars, with a base of clinical experience which no product can match, with its status as the most prescribed drug in any category, with its 75% marketshare, and most important, with its tremendous potential for growth from new indications and new users, nothing else is Premarin.

(APPLAUSE)

On Monday of last week I attended a talk by Dr. Bernadine Healey who was, up until recently, the head of the National Institutes of Health, and is widely regarded as one of the country's leading figures in the field of health and health policy.

In her talk, Dr. Healey made predictions about the nature of healthcare and healthcare delivery in the United States. She

ESSNER PREMPRO LAUNCH, 4_2_95                              - 3 -

Confidential Pursuant to Confidentiality
Order

MMSVC001-000003

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0003

gave her thoughts about the impact of managed care on healthcare, the tremendous consequences of the aging population on medical care, and the impact of genetic research, and even gene therapy in the diagnosis and treatment of many diseases.

The part of her speech that most interested me, and I think will also interest you, was her prediction regarding women's healthcare. Dr. Healey who, as many of you know, was the prime impetus behind the Women's Health Initiative, the study which is now assessing the role of Premarin and Prempro in preventing cardiovascular disease in women, made the prediction that in the very near future there is going to be a revolutionary increase in the use of hormones to prevent and treat a variety of conditions in older women.

She said in front of a large group of pharmaceutical executives that women starting on HRT at menopause and staying on it for the rest of their lives will become the rule, and that this will have a dramatic and positive effect on women's health.

Dr. Healey asked the audience to imagine what it means for women to be taking HRT, and we know that means Prempro, for 30 or 40 years, and I ask you to imagine the same thing. This revolution in the use of HRT that Dr. Bernadine Healey not only predicts but advocates is starting right here in this room this morning.

(APPLAUSE)

This fulfillment of the true promise of HRT is now possible to a very great extent because of the tremendous commitment that

ESSNER PREMPRO LAUNCH, 4_2_95                                        - 4 -

Confidential Pursuant to Confidentiality Order

MMSVC001-000004

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0004

Wyeth-Ayerst has given to the field of women's health and of E-ERT and HRT in particular.

Premarin, unlike most drugs, which as they grow older tend to become outmoded and less useful, has become more and more exciting as it becomes better and better understood.  New indications in cardiovascular disease and to other areas will almost surely be coming, and the launch of Prempro Premphase will be an important step in finally providing an easy to use and clinically validated regimen for women and their physicians.

And, remember, we've already filed the NDA for the single tablet versions of Prempro and Premphase, and with a little luck we'll have them on the market next year.

In the 53 years that Premarin has been on the market, things have not always gone smoothly and the outlook has not always been so bright.  But the company has stayed behind the product with remarkable tenacity.

Right now as you're aware, there is the possible threat of a generic conjugated estrogen.  In September of last year, a company called Duramed filed an application for a generic conjugated estrogen product.  I don't have much more to tell you about that ANDA right now, other than to say that this product, to the best of our knowledge, does not contain the same components as Premarin.  In my view, a product that is not compositionally the same as Premarin by definition cannot be bioequivalent and cannot be equivalent in any other way.

ESSNER PREMPRO LAUNCH, 4_2_95                              - 5 -

Confidential Pursuant to Confidentiality
Order

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0005

I want to assure you that we are doing everything in our power to make sure that this generic product or any other generic product which is not proven to be the same as Premarin is not labeled as interchangeable with Premarin.

While the importance of this to Wyeth-Ayerst is obvious to everyone in this room, there is also an important public health issue here. If an unproven product different from Premarin is substituted for Premarin, and you know in many states and in many managed care plans, pharmacists have no choice but to substitute a generic if one is approved. Women cannot be assured of the same safety and efficacy that they know they get with Premarin and especially in diseases like osteoporosis and with the safety concerns around the use of estrogen this in the long term can have disastrous consequences.

I'm very pleased to tell you that we are now not alone in expressing this point of view. Many prestigious individuals and organizations have come out in the past several weeks in public support of this position. Members of Congress, such as Patty Murray from Washington, Olympia Snow from Maine, Barbara Boxer from California, Nita Lowey from New York, Bill Bradley from New Jersey, Barbara Mikulksi from Maryland, as well as several other senators and congressmen have directed letters to David Kessler, head of the FDA, to express their concerns about the potential approval of a generic which is not the same as Premarin.

Other groups with a deep concern for women's health issues have communicated similar messages. The Society for the Advancement

ESSNER PREMPRO LAUNCH, 4_2_95                                    - 6 -

Confidential Pursuant to Confidentiality Order

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0006

of Women's Health Research, the National Consumers League, the
Center for Women Policy Studies, the Jacobs Institute for Women's
Health, and the Women's Legal Defense Fund are just a few of the
groups who have let their opinions on this subject be known to
FDA.

On the medical side, groups such as the American College of
Obstetrics and Gynecology, ACOG, the National Osteoporosis
Foundation, and many other important groups have also weighed in.

Among the most vocal groups is the APhA, the American
Pharmaceutical Association, the leading professional pharmacy
organization in the United States.  You know that the APhA in the
past has had no hesitation in expressing points of view critical
to the pharmaceutical industry, but that makes their support even
more meaningful. Their letter to FDA was so powerful, I wanted to
quote just a few words from it this morning.

John Ganz, the  Executive Vice President of the APhA, wrote to
David Kessler:

> Caution is also warranted because Federal Medicaid
> Law and private health insurance practices will
> likely cause large numbers of American women to be
> switched from the innovator to the new generic
> conjugated estrogen.  America's pharmacists do not
> want FDA to put them in a position where they can
> only be paid for dispensing a product in which
> they have little confidence. While pharmacists are

ESSNER PREMPRO LAUNCH, 4_2_95                              - 7 -

Confidential Pursuant to Confidentiality
Order

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0007

anxious to provide the most cost effective therapy
for their patients, their first consideration must
always be the provision of high quality products
and services.

Finally, Dr. Ganz wrote:

FDA approval of a generic product lacking each of
the components with known or suspected estrogenic
activity would establish a dangerous precedent.

The team that has worked on this issue, people from our Women's
Healthcare Institute, from our Regulatory Affairs Department,
from our Legal group, from our Pharmaceutical Development group,
from Public Affairs, and of course from sales and marketing, have
done an absolutely fantastic job. In fact, this is the single
finest effort I've seen behind a product in my career.

(APPLAUSE)

Although there is still a long battle ahead, I think we now have
very good reasons for optimism. Likewise, the Prempro Premphase
launch has been the subject of intense effort for many years.
Going back to 1988, when the research effort that led to Prempro,
Premphase was begun, we've only had one thing in mind, and that
was exactly what we're doing here this morning. Turning this
next step in the 50-year history of Premarin over to you.
Nothing could be more appropriate than that.

ESSNER PREMPRO LAUNCH, 4_2_95                                    - 8 -

Confidential Pursuant to Confidentiality
Order

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0008

This is the event we've been preparing ourselves for.  This is the event that all of the thinking and planning has been aimed at.  We've built one of the strongest sales organizations in the United States and we've gotten better and better as each year has gone by.

Five years ago our sales organization was ranked in the top ten companies.  Over the last few years, we've improved to the top five, and last year we were rated number two.  Now number two out of the 30 or so major companies in the industry sounds pretty good, but I'm not going to rest at number two and I know you won't either.

Our process of mergering and restructuring, I believe, has resulted in a sales force even stronger than the one that was rated number two last year.  For the first time in our history, we can honestly say that everyone in our sales organization was selected for the position they hold.  Every territory is filled with a proven performer.  Every manager at every level has been hand picked for their job.  We really have brought together the best of the best.

One field in which we are clearly the best is in the field of women's healthcare.  We make more calls, generate more scripts, offer more services, have more expertise than any other pharmaceutical company.  In fact, last year a major independent study of 10,000 physicians named us clearly the number one company in this field.  I think there used to be another company

ESSNER PREMPRO LAUNCH, 4_2_95                                  - 9 -

Confidential Pursuant to Confidentiality Order

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0009

with a strong reputation in women's healthcare, it started with an O I think, but we've long since left them in the dust.

But with Prempro and Premphase, we have an opportunity to achieve something much bigger. We have the opportunity to start the HRT revolution that Dr. Healey predicted. We can make real the full promise of HRT to create in the near future a world where the majority of women will start HRT at menopause and continue on it for the rest of their lives. A world where women will get the full medical benefit of replacing the estrogen lost after menopause and the full protective effect of MPA.

Imagine the impact that will have on the diseases of osteoporosis and the potential impact on cardiovascular disease, the leading killer of women. It doesn't take much of an imagination to visualize the impact of this revolution on Wyeth-Ayerst. With a dramatic increase in the use of HRT and with Prempro and Premphase even more dominant in HRT than Premarin is in ERT, I tell you that the one billion dollar sales goal for the Premarin family will be merely a starting point.

Now if you're going to start a revolution with Prempro and Premphase, we recognize that the usual tools we use to launch new products, as good and time tested as they are, may not be enough. We've already seen in how this meeting is getting started that we're doing things a little differently.

I don't to give away everything right now, but I think you'll see that in the launch of these products nothing has been held back.

ESSNER PREMPRO LAUNCH, 4_2_95                           - 10 -

Confidential Pursuant to Confidentiality
Order

MMSVC001-000010

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0010

Case 3:04-cv-01373-JBA    Document 120-5    Filed 11/30/11    Page 168 of 427    ☒013

The marketing plans and the tools you'll be trained to use are of the highest quality.

You know that in the past, we've usually avoided special compensation plans for individual products but we've broken this rule too.  And you'll learn at this meeting about a special incremental incentive program (APPLAUSE) - one thing very special about this program is that all of our sales representatives will be able to participate because we believe everyone in our sales organization can participate in the launch of Prempro and Premphase.

So in closing, let me say that these  products and this launch are among the most important things we have ever set out to do together.  Our futures in a very real sense are dependent on the success of our efforts.  In a larger sense, we have never had a greater chance to affect the health of women in the United States and Puerto Rico.

Usually, standing up in front of you at a meeting like this, getting ready to launch a new product, there's a tremendous excitement but also a little anxiety, a little uncertainty about whether or not we'll actually achieve the aggressive goals we always set for ourselves.  I can honestly say that all the excitement is there but absolutely none of the uncertainty. There is…

(APPLAUSE)

ESSNER PREMPRO LAUNCH, 4_2_95                           - 11 -

Confidential Pursuant to Confidentiality
Order

MMSVC001-000011

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0011

There is simply no organization in the world better equipped to create the HRT revolution than the people of Wyeth-Ayerst.  I have absolutely no doubt that the people in this room this morning, the best of the best, are going to make this meeting, this launch, and Prempro and Premphase milestones in the history of women's healthcare and milestones in the history of Wyeth-Ayerst.

Thank you.

ESSNER PREMPRO LAUNCH, 4_2_95                                    - 12 -

Confidential Pursuant to Confidentiality Order

MMSVC001-000012

HRT PLAINTIFFS' EXHIBIT # 6558 PAGE 0012

# EXHIBIT 24

Page 1

```
 1 page 1121
 2  1        IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
 3  2              WESTERN DIVISION
    3 IN RE: PREMPRO PRODUCTS LIABILITY  MDL No. 1507
 4                  No. 4:03CV01507
    4
 5          * * * * * * * * *
    5 DONNA SCROGGIN,
 6        Plaintiff,    Individual Case
    6   v.          No. 4:04CV01169 WRW
 7  WYETH and its divisions; PHARMACIA
    7 & UPJOHN COMPANY LLC; WYETH
 8  PHARMACEUTICALS, INC.; and ESI LEDERLE,
    8        Defendants.
 9  9
   10  Tuesday, February 12, 2008 - Little Rock, Arkansas - 8:20 a.m.
10 11
   12        TRANSCRIPT OF TRIAL - VOLUME 7
11        BEFORE THE HONORABLE WILLIAM R. WILSON, JR.,
   13        UNITED STATES DISTRICT JUDGE, and a jury
12 14
   15  APPEARANCES:
13 16  On Behalf of the Plaintiff:
          MR. ERIK BRETT WALKER
14 17      Hissey, Kientz & Herron, P.L.L.C.
15        16800 Imperial Valley Drive
16 18      Suite 130
17        Houston, Texas  77070
18 19
19     MR. JAMES A. MORRIS, JR.
20 20    MR. STEVE M. FARIES
21        Brent Coon & Associates
22 21      11614 Bee Caves Road, Suite 220
23        Austin, Texas  78738
24 22
25 23
26 24
27 25                    [CONTINUED]
```

Page 2

```
 1 page 1122
 2  1  APPEARANCES CONTINUED:
    2 On Behalf of the Wyeth Defendants:
 3        MR. F. LANE HEARD, III
    3     MR. STEPHEN L. URBANCZYK
 4     MR. RICHMOND MOORE
    4     MR. MATTHEW V. JOHNSON
 5        Williams & Connolly
    5     725 Twelfth Street, N.W.
 6        Washington, D.C.  20005-5901
 6
 7     MS. LYN PEEPLES PRUITT
    7     Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
 8        425 West Capitol Avenue, Suite 1800
    8     Little Rock, Arkansas  72201-3525
 9  9  MR. NATHAN E. HOFFMAN
          Winston & Strawn LLP
10 10      35 West Wacker Drive
          Chicago, Illinois  60601-9703
11 11
   12 On Behalf of the Upjohn Defendants:
12     MS. ELIZABETH ROBBEN MURRAY
   13      Friday, Eldredge & Clark
13        Regions Center
   14      400 West Capitol Avenue, Suite 2000
14        Little Rock, Arkansas  72201-3493
   15
15     MR. CHARLES P. GOODELL, JR.
   16      Goodell, DeVries, Leech & Dann, LLP
16        Commerce Place
   17      One South Street
17        Suite 2000
   18      Baltimore, Maryland  21202
18 19  MS. PAMELA YATES
          MR. ANDREW K. SOLOW
19 20      Kaye Scholer LLP
          1999 Avenue of the Stars
20 21      Suite 1700
          Los Angeles, California  90067-6048
21
22 22
23 23
   24        Proceedings reported by machine stenography and displayed
24 25 in realtime; transcript prepared utilizing computer-aided
   26   transcription.
27 25
```

Page 3

```
 1 page 1123
 2  1      I N D E X - VOLUME 6 (February 11, 2008)
 2  WITNESSES
 3  FOR THE PLAINTIFF:      Direct  Cross  Redirect  Recross
 3
 4  DONNA SCROGGIN          1131   1146   1206     1218
 4    [Continued]
 5  5
 5  SUZANNE PARISIAN        1223
 6  7
 8
 7  9  EXHIBITS:                      RECEIVED:
10  Plaintiff's Exhibit 10428.......................... 1142
 8  Plaintiff's Exhibit 10429.......................... 1144
11  Defendant Wyeth's Exhibit 94...................... 1153
 9  Defendant Wyeth's Exhibit 88...................... 1158
12  Plaintiff's Exhibit 10430.......................... 1225
10  Defendant Wyeth's Demonstrative Exhibit 13 Withdrawn....... 1267
13  Defendant Wyeth's Demonstrative Exhibit 15.......... 1267
11  Plaintiff's Exhibit 134-A.......................... 1290
14  Plaintiff's Exhibits 6302, 6304, 1419, 1341, 1660
12     and 6274.......................... 1322
15  Plaintiff's Exhibit 950-A through 950-L.......... 1327
13  Plaintiff's Exhibit 10132.......................... 1348
14  Plaintiff's Exhibit 10126.......................... 1349
15  Plaintiff's Exhibit 10388.......................... 1351
16  Plaintiff's Exhibit 10385.......................... 1352
17  Plaintiff's Exhibit 10166.......................... 1362
18  Plaintiff's Exhibit 10189.......................... 1366
19  Plaintiff's Exhibit 10197.......................... 1369
20  Plaintiff's Exhibit 10114.......................... 1371
21  Plaintiff's Exhibit 10116.......................... 1372
22 20
23 21
24 22
25 23
26 24
27 25
```

Page 4

```
 1 page 1124
 2
 3  1    (Continuing at 8:20 a.m., jury not present.)
 4  2        THE COURT: Pretrial issue?
 5  3        MR. MOORE:  Judge, we don't want to delay the start of
 6  4  the trial today.  We have our objections to Dr. Parisian that we
 7  5  filed last night.
 8  6        THE COURT:  I haven't seen it.
 9  7        MR. MOORE:  I'll hand it to you.  It's been filed
10  8  electronically.  Do you need a copy?
11  9        THE COURT:  Is that an extra copy?
12 10        MR. MOORE:  It's not an extra one.  It's my copy.
13 11  We've already had one hearing on Dr. Parisian.  We've gone
14 12  through many of these documents already.  We don't believe that
15 13  this is necessary -- I believe we shouldn't be having another
16 14  hearing to go through many of these same documents again.  It's
17 15  going to delay the trial.  Note we do have our objections to
18 16  these and --
19 17        THE COURT:  What's going to delay the trial?
20 18        MR. MOORE:  Hearing these objections.
21 19        THE COURT:  No, it's not.
22 20        MR. MOORE:  Okay.
23 21        THE COURT:  I'm going to bring the jury in at 8:30.
24 22  We'll go over them as quickly as we can.  We'll get as far as we
25 23  can, and I'm bringing the jury in.
26 24  Plaintiff's Exhibit 550.
27 25        MR. MORRIS:  This is a document called, "Perspectives
```

Page 5

page 1125

1 in HRT." It's an internal Wyeth document, and it has --
2 THE COURT: Just a minute. Would you ask Matt to step
3 in.
4 Have I ruled on this?
5 MR. MORRIS: No, you haven't. It's under advisement.
6 What Wyeth has suggested to you is that this is a marketing
7 document, and it is not. It is a summary out of the internal
8 files of Wyeth of meetings they held concerning a number of
9 issues, everything from the heart to osteoporosis to breast
10 cancer risk. I'll show it to you. It's here on the board right
11 now.
12 This happened in June of 2000.
13 THE COURTROOM DEPUTY: Wait. It's not up yet.
14 MR. MORRIS: And I am happy to redact anywhere that it
15 mentions the word "market."
16 The reason that it's relevant, your Honor, is, they go
17 through the major themes, and as you can see on this page, the
18 first one is osteoporosis, and then central nervous system,
19 cardiovascular --
20 THE COURT: Let me ask the defendant, if they redact
21 the marketing, do you still have an objection?
22 MR. HOFFMAN: Yes, your Honor. Actually, you just
23 ruled on this the other day, your Honor. You ruled it out. I
24 can show you the transcript portion on it, if you like. It's at
25 page 599.

Page 6

page 1126

1 THE COURT: Read it to me.
2 MR. HOFFMAN: 599, you said, "Portions on estrogen
3 deficiency can be read to the witness, but the document cannot
4 be published to the jury or admitted into evidence." And then
5 you said, "Here's what I've ruled," and you quoted your prior
6 ruling. Quote, "'I'll tell you what my ruling is going to be.
7 I feel a ruling coming on. I'm going to allow you to show these
8 documents to a witness'" --
9 THE COURT: I remember it. I'm going to stand by
10 this.
11 MR. MORRIS: Let me show your Honor, because I didn't
12 get to show you last time, the particular part of document that
13 I intend to discuss with the witness and I think should be
14 published to the jury.
15 On this last page, if you can see, it says breast cancer,
16 by Stampfer. "There are reasons to believe there are causative
17 effects of estrogen for breast cancer. I think it's a cause."
18 THE COURT: You can have a witness read that, and if
19 you want to blow up the transcript and use it in closing
20 argument, you may do so. I'm standing by my previous ruling and
21 saving your exception.
22 What about 862? I thought I'd excluded that.
23 MR. MOORE: Plaintiffs have agreed to withdraw that.
24 THE COURT: Okay. What about 866?
25 MR. JOHNSON: Your Honor, I think that's similar to

Page 7

page 1127

1 the other day. Your Honor said, "I'm going to keep that out
2 with respect to Dr. Parisian. I may admit it in with another
3 exhibit. I have to study it."
4 MR. MORRIS: If that's the IARC statement, they've
5 taken the position that nobody else out there is saying that
6 this causes breast cancer, and IARC has found that it's a
7 carcinogen to the breast.
8 THE COURT: Well, I've already excluded it. Now you
9 ask -- is this -- I mean, why is it listed if I've excluded it?
10 MR. MORRIS: Well, we -- I don't know why it's listed
11 other than we want to take another run at trying to get it in.
12 MR. FARIES: Your Honor, the reason why it's been
13 previously excluded --
14 THE COURT: You need to get over to the mike.
15 MR. FARIES: Your Honor, there's been this contention
16 that the exhibit that we've seen so far is this draft version,
17 and what we've been able to -- what we have available is the
18 2007 published, in print version from IARC, and we have the
19 website to show that it's been published and we have a copy of
20 the entire published manuscript. So now what we're dealing
21 with, we have an updated version that's published that we're
22 ready to go with.
23 THE COURT: I'm going to stay by my ruling. I'll
24 study it. I might change my mind, but it's unlikely.
25 All right. 950-A. It says I have it under advisement.

Page 8

page 1128

1 MR. MORRIS: These are the series of documents
2 involving Wyeth's involvement with a group called DesignWrite
3 where they sent out their own outline to DesignWrite.
4 DesignWrite developed a manuscript. They sent it down to an
5 author, a doctor in Australia named John Eden. John Eden is
6 mentioned in a number of Wyeth documents as attending their
7 meetings. Eden writes an article that's favorable to Wyeth on
8 the HRT and breast cancer issue. It's published in the American
9 Journal of Obstetricians and Gynecologists, and there is no
10 disclosure that Wyeth had anything to do with it.
11 MR. HOFFMAN: Your Honor, here's the problem: When we
12 had the pretrial arguments, you'll recall that this is
13 actually -- I don't know if your Honor can see this, but this
14 is -- this is actually a publication from May of 2003. So we
15 are now three years past Ms. Scroggin's diagnosis and being off
16 hormone therapy, and you actually expressed serious reservations
17 at that time. You held your ruling, but I'll just reference for
18 the Court that on page 118, pretrial, you said, "I'm struggling
19 with the issue. I'm having a real problem. I do have a problem
20 with the 2003 publication that may have gone back and touched on
21 things in 2001, long after she had been diagnosed. I'm having a
22 problem in understanding. I'm still having a hard time seeing,
23 and" --
24 THE COURT: When did I take this under advisement?
25 MR. HOFFMAN: I'm sorry?

Page 9

page 1129

1    THE COURT:  When did I take this under advisement?
2    MR. HOFFMAN:  This was on November 26.
3    THE COURT:  Why wasn't this brought up last Friday?  I
4  mean, why wasn't this document right here brought up Friday?
5    MR. MORRIS:  I don't know, your Honor, other than this
6  is the appropriate witness for this information.  But can I just
7  speak to one part of its relevance?
8    THE COURT:  Yes.
9    MR. MORRIS:  This is the opposite of a subsequent
10  remedial measure, the opposite of it.  Rather than going in and
11  making repair to the product, what they're doing, even in 2003,
12  is continuing to try to influence physicians that there is not a
13  causal relationship.  They made the argument in opening
14  statement that we need to keep these things in context.  This
15  keeps it in context for the jury that even in 2003, they're
16  still trying to influence people to believe that there is a
17  small and insignificant risk, and they've used that term
18  throughout the trial.  And that's why these documents are
19  relevant.
20    THE COURT:  All right.  Well, I obviously can't get to
21  them before 8:30.  Are there any of the documents on the rest of
22  this that are agreed upon by the parties?  And just call those
23  off real quickly, and then I'm going to have to look over the
24  rest of them.  We'll have to try to have a hearing, I've cut the
25  lunch hour down to an hour today, but I may have to go back to a

Page 10

page 1130

1  longer -- we may have to have this hearing at the lunch hour.
2    MR. MORRIS:  All of the 2005 and 2007 labels I agree
3  are out.
4    THE COURT:  Well, which ones are they?
5    MR. JOHNSON:  Your Honor, I believe those are PX 862,
6  which we already -- which was already brought up.  On the fourth
7  page or fifth page, PX 6500 on page 4 --
8    THE COURT:  Wait a minute.  What -- 6500.  Okay.
9    MR. JOHNSON:  And PX 8420 on page 5.
10    THE COURT:  All right.  Well, my question to Wyeth is,
11  why was this not dealt with last Friday?
12    MR. JOHNSON:  Your Honor, this is -- this is the third
13  go-around, third set of disclosures that we've received for
14  Dr. Parisian.  We've objected --
15    THE COURT:  When did you receive them?
16    MR. JOHNSON:  These we received the 10th, late night
17  on the 10th.
18    THE COURT:  All right.  Well, we're going to be in
19  recess.  We'll get the jury in.  I guess we'll hear this at
20  lunch.
21    MR. URBANCZYK:  Your Honor, would it be helpful if we
22  brought lunch in for the jury?  It's raining, cold --
23    THE COURT:  I don't believe so, no.
24    MR. URBANCZYK:  I just wanted to make sure you knew it
25  was available.

Page 11

page 1131

1    MR. GOODELL:  I just wanted to -- fine.  I have an
2  issue I want to raise at that hearing as well, your Honor.
3    THE COURT:  We're in recess, briefly.
4    (Recess at 8:29 a.m., until 8:35 a.m., jury present.)
5    THE COURT:  Good morning.  Be seated, please.
6    Hearts and minds?  Not pure, raise your hand.  Let the
7  record reflect, no hands raised.
8    You may proceed.
9    MR. MORRIS:  Thank you, your Honor.  I'll re-call to
10  the stand Donna Scroggin.
11    THE COURT:  I'll remind you you're still under oath.
12    DONNA SCROGGIN, PLAINTIFF, PREVIOUSLY DULY SWORN
13    DIRECT EXAMINATION [Continuing]
14  BY MR. MORRIS:
15  Q.  Donna, good morning to you.
16  A.  Good morning.
17  Q.  I want to go through with you this issue concerning your
18  family history, and, first of all, did you have an occasion to
19  go to a doctor named Kent McKelvey?
20  A.  Yes, I did.
21  Q.  For what purpose did you go to Dr. McKelvey?
22  A.  For the genetic testing.
23  Q.  Do you recall when you first went to Dr. McKelvey?
24  A.  No, sir, I don't.
25  Q.  Was it last year or was it many years ago?

Page 12

page 1132

1  A.  It wasn't long ago.
2  Q.  All right.  And during the course of meeting with
3  Dr. McKelvey, did you all have a discussion or an interview
4  concerning your family history?
5  A.  Yes, sir, we did.
6  Q.  All right.  I want to show you a record out of the files of
7  Dr. McKelvey, and I believe these are in evidence.  This is --
8  well, I don't have a plaintiff's exhibit number on it.
9    MR. MORRIS:  Is it part of Joint Exhibit No. 1?
10    MR. FARIES:  For McKelvey?  Yes.
11  BY MR. MORRIS:
12  Q.  This is a record that he made based on a conversation
13  presumably with you.
14  A.  Yes, sir.
15  Q.  And just so that we can orient the jury, this would be you;
16  right?
17  A.  Right.
18  Q.  And then this would be your mom.
19  A.  Right.
20  Q.  Correct?
21  A.  Correct.
22  Q.  And how many sisters did your mom have?
23  A.  Two.
24  Q.  All right.  Would that be Judy and Jean?
25  A.  Yes, sir.

Page 13

page 1133

3   1   Q.   And then she had two brothers; correct?
4   2   A.   Right.
5   3   Q.   And do you remember what those brothers' names were?
6   4   A.   Raymond and Joe, Billy Joe.
7   5   Q.   And those would have been your uncles; correct?
8   6   A.   Correct.
9   7   Q.   Your uncles and your aunts.
10  8   A.   Yes.
11  9   Q.   Now, I'd like to ask you about this line below.  I believe
12  10  the circles represent females because it has you as a circle and
13  11  your mom as a circle, and then the squares represent males.  Do
14  12  you see that?
15  13  A.   Yes, sir.
16  14  Q.   And on this line, do you remember the names of any of your
17  15  cousins that were daughters and sons of Judy?
18  16  A.   She has one daughter.
19  17  Q.   Okay.  And what's that daughter's name?
20  18  A.   Susie.
21  19  Q.   Susie.  All right.  To your knowledge, has Susie ever had
22  20  breast cancer?
23  21  A.   No, sir.
24  22  Q.   What about Judy?  Has Judy ever had breast cancer?
25  23  A.   No, sir.
26  24  Q.   Okay.  So I'm going to mark in orange no breast cancer.
27  25       All right.  What about the sons of Judy?  Did any of them

Page 14

page 1134

3   1   have breast cancer?
4   2   A.   Oh, no.
5   3   Q.   Okay.  Then we get over to Jean.  Do you know for sure,
6   4   sitting here today, that Jean had ovarian cancer?
7   5   A.   I know she had female cancer.
8   6   Q.   All right.  Do you know what specific organ?
9   7   A.   I'm not real sure.  It was either ovarian or -- I'm not
10  8   sure what the other one's called.
11  9   Q.   Okay.  And at the time that you were having this interview
12  10  with Dr. McKelvey, did you have any greater knowledge than you
13  11  have today regarding Jean?
14  12  A.   Well, no, not really.  I mean, she's my aunt.  She doesn't
15  13  have cancer, breast cancer.
16  14  Q.   She doesn't have breast cancer.  We know that.  Is she
17  15  still alive?
18  16  A.   Oh, yes, sir.
19  17  Q.   All right.  And have you ever reviewed any of her medical
20  18  records?
21  19  A.   My Aunt Jean?  No.
22  20  Q.   To your knowledge, did Dr. McKelvey review any of her
23  21  medical records?
24  22  A.   No, sir.
25  23  Q.   Okay.  But we know she doesn't have breast cancer; right?
26  24  A.   Correct.
27  25  Q.   And then she has two daughters and a son.  What are her

Page 15

page 1135

3   1   daughters' names?
4   2   A.   Tracy and Dana.
5   3   Q.   And those are your first cousins?
6   4   A.   Yes.
7   5   Q.   And do Tracy or Dana have breast cancer?
8   6   A.   No, sir.
9   7   Q.   And there's one brother.  Do you know who that is?
10  8   A.   David.  He doesn't have cancer.
11  9   Q.   Okay.  And we get over here, and we've got two brothers.
12  10  What is the brother that has the children?
13  11  A.   Billy Joe.
14  12  Q.   Billy Joe?
15  13  A.   Yes, sir.
16  14  Q.   And do you know the names of Billy Joe's daughters and
17  15  sons?
18  16  A.   Martha and Terry, Douglas, and -- I don't see him much.
19  17  Q.   Another brother you can't remember right now.
20  18  A.   Right now I don't know.
21  19  Q.   That's okay.  For the two ladies that are your first
22  20  cousins from Billy Joe, do either one of them have breast
23  21  cancer?
24  22  A.   No, sir.
25  23  Q.   And what about the two sons?
26  24  A.   No.  They don't, huh-uh.
27  25  Q.   Now, of all those first cousins, do any of those folks have

Page 16

page 1136

3   1   children?
4   2   A.   Yes, they do.
5   3   Q.   Are any of their children over the age of 20?
6   4   A.   Yes, sir.
7   5   Q.   Are any of them as old as 30?
8   6   A.   Could be.
9   7   Q.   To your knowledge, do any of the children of your first
10  8   cousins have breast cancer?
11  9   A.   No.
12  10  Q.   Now, you've heard the genetic cancers are more likely to
13  11  occur in premenopausal or younger women.  As far as you know,
14  12  have there been any premenopausal cancers in your first cousins
15  13  or their children?
16  14  A.   Not that I've ever known of, no.  My cousin that's next to
17  15  me, Raymond Glenn, he has a daughter, but she's -- he's right
18  16  under me.  He's probably in his 60s, so I would think that she
19  17  would be in her 30s, perhaps, or a little older.  I don't know.
20  18  But she doesn't have cancer.
21  19  Q.   Okay.  Now, moving up the ladder from your mom.  And your
22  20  mom's name is Edith Christine Horn; correct?
23  21  A.   Correct.
24  22  Q.   We can say that none of these folks had breast cancer, the
25  23  brothers and sisters of Edith did not have breast cancer;
26  24  correct?
27  25  A.   Correct.

Page 17

page 1137

1 Q.  And if we go up here to your grandma on your mom's side,
2 her name was Pearl; correct?
3 A.  Correct.
4 Q.  Did Pearl ever have breast cancer?
5 A.  No, sir.
6 Q.  And then in Dr. McKelvey's records, he seems to indicate
7 that Pearl's sister had breast cancer.  Who would Pearl's sister
8 have been?
9 A.  She doesn't have any sisters that had cancer.
10 Q.  Okay.  Do you even know the name of Pearl's sister?
11 A.  Right now I can't think of it.  I know she had three
12 sisters, but none of them had cancer.
13 Q.  Okay.  She had three sisters.  So it would be important to
14 know these other sisters.  But to your knowledge none of them
15 had cancer?
16 A.  No.
17 Q.  Breast cancer?
18 A.  Breast cancer.  Correct.
19 Q.  How did you go about verifying that?
20 A.  Through my mother.
21 Q.  All right.  Is Pearl still living?
22 A.  No, sir.
23 Q.  Are any of them still living?
24 A.  I don't believe so.
25 Q.  So how is it that Dr. McKelvey happened to come upon that

Page 18

page 1138

1 in his records and make a notation that Pearl had a sister that
2 had breast cancer?
3 A.  I have no idea.
4 Q.  Just a mistake that occurs?
5 A.  Yes, sir.
6 Q.  For the record, do you have breast implants?
7 A.  No, sir, I don't.
8 Q.  Have you ever had breast implants?
9 A.  No, sir, I don't.
10 Q.  Remember the record from Dr. Harrington?
11 A.  Yes, sir.
12 Q.  And what did it say?
13 A.  Oh, it said I had breast implants.
14 Q.  And was that a mistake?
15 A.  Yes, sir.
16 Q.  Was that false?
17 A.  True.  Yes, sir.  It was false.
18 Q.  Now, we go to your grandpa, and -- on your mom's side.
19 This is Herman; correct?
20 A.  Yes, sir.
21 Q.  Did Herman ever have breast cancer, to your knowledge?
22 A.  No, sir.
23 Q.  And how many sisters and brothers did Herman have?
24 A.  He had three sisters and three brothers, I think.
25 Q.  Okay.  Right here we have noted one brother and three

Page 19

page 1139

1 sisters.  So there would have been, actually, another brother
2 and another brother; correct?
3 A.  I think so, yes, sir.
4 Q.  Okay.  And we know about Nita and Lavonne, and what was the
5 other daughter's name?
6 A.  Peggy.
7 Q.  Nita, Lavonne, and Peggy, and the defendants call this a
8 cluster of cancers, but we know that, at least according to your
9 memory from the mother and the family history, that Nita had
10 breast cancer and so did both of her daughters; correct?
11 A.  Correct.
12 Q.  Did your grandfather's other sisters have daughters?
13 A.  Yes, sir.  I think there was two on one of them.
14 Q.  All right.  There's Lizzy, and who was the other sister?
15 We have Nita, Lizzy.  Do you remember who this is?
16 A.  I don't think her name was Lizzy.
17 Q.  All right.  Well, he has it written in as Lizzy.  So that
18 might be a mistake?
19 A.  I don't recall their names.
20 Q.  Okay.  But it's your recollection that one of them had two
21 daughters?
22 A.  Yes.
23 Q.  Do you know that either one of those daughters had breast
24 cancer?
25 A.  I've never heard that they had.

Page 20

page 1140

1 Q.  Did either of these two other sisters have breast cancer?
2 A.  No, sir.
3 Q.  What about these brothers?  Did either one of the brothers
4 have breast cancer?
5 A.  No, sir.
6 Q.  Did either one of the brothers have daughters or sons?
7 A.  Yes, but I don't remember how many.  I think it was three
8 or -- three daughters, but none -- no cancer, I don't think.
9 Q.  All right.  Assuming that one of these brothers had three
10 daughters, to your knowledge, did any of those daughters have
11 breast cancer?
12 A.  No, sir.
13 Q.  To the best of your knowledge, is that an accurate
14 assessment up to the third-degree relatives of what potential
15 breast cancer history you have?
16 A.  Yes, sir.  I think my grandmother had a sister named Zelphi
17 that had five daughters, but they had no cancer in their family.
18 Q.  Zelphi, would that be over on this side?
19 A.  Right.
20 Q.  Because your grandmother would be Pearl, so --
21 A.  Zelphi, Walsie, and Fronie, I think was her name.
22 Q.  All right.  So we've got Fronie, Walsie, and who was the
23 other one?
24 A.  Zelphi.
25 Q.  Zelphi.  And Zelphi had --

Page 21

page 1141

1  A.  I think Zelphi had the -- three or five daughters.  I can't
   remember.  None of those had cancer.
2  Q.  We'll go with three.  Did any of them have cancer?
   A.  No.
3  Q.  Breast cancer?
   A.  No.  Right.  No.  Walsie had a son.
4  Q.  Did he have breast cancer?
5  A.  No.  And Fronie, I think, had two, two daughters, and no
   cancer.
6  Q.  Okay.  Now, Uncle Herman had two parents.  Do you know --
   I'm sorry, Grandpa Herman for you, Uncle Herman for -- well,
   let's see.  Grandpa Herman.  He had Mom and Dad up here.  Do you
   know by any chance what your grandparents' names were?
7  A.  James Herman.
8  Q.  Right.
9  A.  I mean, that's my grandfather's name.  His name was James
   Mitchell, but I can't remember his middle name, and then
   Magalene Mitchell.
10 Q.  Did either Magalene or James have breast cancer?
11 A.  No, sir.
12 Q.  We left out this brother right here.  Did any of your dad's
   brothers have breast cancer?
13 A.  No, huh-uh.
14        MR. MORRIS:  Your Honor, I'd like to mark this as an
15 additional exhibit.  What's our next exhibit number, Steve?

Page 22

page 1142

1  Ms. Johnson?
2        THE COURTROOM DEPUTY:  Yes.
3        MR. MORRIS:  Do you know what our next exhibit number
4  is?
5        THE COURTROOM DEPUTY:  Yes, if you'll give me a
6  minute.  10428.
7        MR. MORRIS:  Tender it to opposing counsel for
8  objections, your Honor.
9        MS. PRUITT:  No objections.
10       MS. MURRAY:  No objection.
11       THE COURT:  It will be admitted if there's not any
12 objection.  No objection.  Admitted.
13       (Plaintiff's Exhibit 10428 received in evidence.)
14 BY MR. MORRIS:
15 Q.  When you went through the BRCA testing, did you do the
16 first two sessions, the BRCA I and the BRCA II?
17 A.  Yes, sir.
18 Q.  And what were the results of those?
19 A.  They were negative.
20 Q.  All right.  And then after you found out that those were
21 negative, did you go back and do some additional testing?
22 A.  I believe so.
23 Q.  Okay.  Did you do the CHEK-2 and the BART test?
24 A.  Right.  Yes, sir.
25 Q.  And what were the results of both of those?

Page 23

page 1143

1  A.  It was negative.
2  Q.  Yesterday I had asked you some questions about the effects
3  of having breast cancer and how it impacted you, and I have a
4  couple of photos that are in this folder.
5  A.  Uh-huh.
6  Q.  We're not going to show these on the ELMO or on the screens
7  or anything, but they're being tendered so if the jury wants to
8  see how you appear today, they have that opportunity.  And I
9  just want you to look inside the envelope and tell me if this
10 fairly and accurately depicts the appearance of your chest
11 today.
12       MS. PRUITT:  Your Honor, we've stipulated that these
13 pictures fairly and accurately depict the way she appears.
14       MR. MORRIS:  All right.
15       THE COURT:  All right.  Both defendants have so
16 stipulated.
17       MR. MORRIS:  All right.  Do we have these marked as an
18 exhibit already, Steve?
19       THE COURT:  How many of them are there?
20       MR. MORRIS:  There are just two.
21       MR. FARIES:  There's three.
22       MR. MORRIS:  There's three.
23       THE WITNESS:  Is there three?  I just don't --
24       THE COURT:  Make sure we've got an exhibit number on
25 them.

Page 24

page 1144

1        MR. MORRIS:  I guess we can mark it as Plaintiff's
2  Exhibit No. 10429?
3        THE COURTROOM DEPUTY:  Yes, sir.
4        THE COURT:  Admitted.
5        MR. MORRIS:  Thank you, your Honor.
6        (Plaintiff's Exhibit 10429 received in evidence.)
7  BY MR. MORRIS:
8  Q.  The jury is going to have to consider an issue in this
9  case, assuming they get to the damages question in the case,
10 Donna, and one of the things they have to decide is whether or
11 not going through this surgery and going through breast cancer
12 and having both your breasts removed has been a cause of mental
13 anguish to you.  That's a question they have to decide, give
14 some thought to.
15       Can you explain to the jury how your life is different
16 because of what you had to go through than what it would have
17 been otherwise?
18 A.  Well, for one thing, I'm disfigured.  I can't wear certain
19 clothes.  I have scars.  I don't have my breasts anymore, and
20 it's very sad.  I wish I had them back, and it's just caused me
21 a lot of -- a lot of depression and -- I can't wear sleeveless
22 blouses or sleeveless dresses or low-cut dresses.  I have a scar
23 from the port.  I have places where there's no feeling at all
24 under my arms, and when I shave, I can't feel what I'm doing.
25 There's other places in my upper body that are no feeling.  I

Page 25

page 1145

3  1  just wish that I could have them back.
4  2  Q.  Can you explain to the jury why you didn't have
5  3  reconstruction?
6  4  A.  I was afraid, and I was older, and I didn't want to go
7  5  through any more pain of having to do that.
8  6  Q.  Had you been through a good deal of pain from the time that
9  7  you had the surgery and up until the time that you completed all
10  8  of your treatments?
11  9  A.  Yes, sir.
12  10  Q.  If the warning label had said not only does this pose a
13  11  risk for breast cancer, but it can also pose a risk for heart
14  12  attacks, strokes, DVT, which is deep vein thrombosis, would you
15  13  have taken this drug?
16  14  A.  No.
17  15  Q.  Would those additional risks have been information that you
18  16  wanted to know?
19  17  A.  Well, of course.
20  18  Q.  Finally, Donna, from time to time over the years, have you
21  19  had friends that have joked around with you?
22  20  A.  Well, I've joked around a little bit, yes, sir.
23  21  Q.  All right.
24  22  A.  Telling them I look like Buddha.
25  23  Q.  And do they get a good laugh out of that from time to time?
26  24  A.  Oh, yeah.
27  25  Q.  But nonetheless, when you get home and you're in those

Page 26

page 1146

3  1  quiet times and you think about looking like Buddha --
4  2  A.  Uh-huh.
5  3  Q.  -- how does that impact you?
6  4  A.  Well, it doesn't feel too good.  It's very demeaning.  And
7  5  sad.
8  6      MR. MORRIS:  Your Honor, I'll pass the witness.
9  7      CROSS-EXAMINATION
10  8  BY MS. PRUITT:
11  9  Q.  You going to be all right, Ms. Scroggin?
12  10  A.  Yes.  Thank you.
13  11  Q.  Good morning.
14  12  A.  Good morning.
15  13  Q.  We've had an opportunity to meet before, haven't we?
16  14  A.  Yes.
17  15  Q.  And do you remember when we met?
18  16  A.  I do.
19  17  Q.  And I was taking your deposition, wasn't I?
20  18  A.  Right.
21  19  Q.  And Mr. Morris asked you some questions yesterday about the
22  20  process of giving your deposition.  Do you recall that?
23  21  A.  Yes, I do.
24  22  Q.  And you said that we started your deposition at about eight
25  23  in the morning.  You probably just misspoke, but we started at
26  24  ten.
27  25  A.  Oh, okay.

Page 27

page 1147

3  1  Q.  And I just want the ladies and gentlemen of the jury to
4  2  understand that we took a lot of breaks during your deposition.
5  3  Do you remember that?
6  4  A.  We had breaks, yes.
7  5  Q.  And we took a long lunch?
8  6  A.  Had lunch, yes.
9  7  Q.  Okay.  And I was courteous and kind to you in all of my
10  8  questions, wasn't I?
11  9  A.  You were what, ma'am?
12  10  Q.  I was courteous to you?
13  11  A.  Of course.  Of course.
14  12  Q.  And you answered those questions as truthfully and honestly
15  13  as you could; is that right?
16  14  A.  I did.
17  15  Q.  And you were under oath at that time.
18  16  A.  I was.
19  17  Q.  You've been here in the courtroom this whole trial; is that
20  18  correct, ma'am?
21  19  A.  Yes, I have.
22  20  Q.  And, Ms. Scroggin, you've heard the clips of your testimony
23  21  from your deposition that I played for the ladies and gentlemen
24  22  of the jury in opening, didn't you?
25  23  A.  Yes, I did.
24  24  Q.  And you stand by those statements that you made in your
27  25  deposition and that the jury heard on those clips, don't you?

Page 28

page 1148

3  1  A.  Oh, I did say that.
4  2  Q.  Those are the things that you said; is that right?
5  3  A.  Well, we had -- you had a film of me saying that, so --
6  4  Q.  Yes, ma'am.  And my question to you today is, and you stand
7  5  by those statements; is that right, ma'am?
8  6  A.  Well, what were they?  I can't remember.
9  7      MS. PRUITT:  Let's play them.
10  8      [Videotaped deposition being shown in open court, as
11  9  follows:]
12  10  [BY MS. PRUITT:]
13  11  Q.  If there had been some type of warning in the labeling that
14  12  suggested that you would be at a slightly increased risk for
15  13  breast cancer from taking the medication, would you have taken
16  14  it?
17  15  A.  Slight risk?  Yes, I would have taken it.
18  16  Q.  If there had been a discussion of there perhaps being a
19  17  moderately increased risk of you getting breast cancer from
20  18  taking hormone therapy, would you have taken the medication?
21  19  A.  Yes.
22  20  Q.  So is it correct for me to say, Ms. Scroggin, that for you
23  21  to make a determination not to take the medication, there would
24  22  have had to have been something that says it causes breast
25  23  cancer?
26  24  A.  True.
27  25  [BY UNIDENTIFIED MALE VOICE:]

Page 29

page 1149

3   1   Q.   What if breast cancer had been a side effect of taking
4   2   Prempro, or hormone therapy?
5   3   A.   You know, I think I told you that I would take it, and it
6   4   would have to say, "Causes cancer."  I was unaware of -- I guess
7   5   I just didn't pay attention.
8   6   Q.   If it had said that by taking this drug, you were at risk
9   7   for developing breast cancer as a side effect, would you have
10  8   taken that drug?
11  9   A.   Yes.
12  10  Q.   Okay.
13  11  A.   Risk.
14  12  Q.   If you thought by taking a hormone therapy product that you
15  13  were going to be at risk for developing breast cancer --
16  14  A.   Uh-huh.
17  15  Q.   -- would you -- would you have still taken it?
18  16  A.   Yes, I guess so.  It would have to say, "Causes cancer."
19  17  Q.   So shy of something saying, "Causes cancer," you would
20  18  still take it?
21  19  A.   I probably would have, yes.
22  20        [End of videotaped deposition clip.]
23  21  BY MS. PRUITT:
24  22  Q.   My question to you today, Ms. Scroggin, you stand by those
25  23  statements that you gave under oath in October of 2005; is that
26  24  correct?
27  25  A.   Yes.  It should have said -- should say one way or the

Page 30

page 1150

3   1   other.  Either it does or it doesn't.
4   2   Q.   Okay.  Now, I think you told the ladies and gentlemen of
5   3   the jury yesterday that you don't remember conversations that
6   4   you had with Dr. Kuperman about the risks and benefits of the
7   5   medications; is that correct?
8   6   A.   I don't remember.
9   7   Q.   And so you're not telling the ladies and gentlemen
10  8   of the jury that Dr. Kuperman never discussed any of the risks
11  9   associated with the hormone therapy; you're just telling them
12  10  that you don't remember whether he did or not.  Is that right?
13  11  A.   I don't remember, but I don't think we ever did discuss any
14  12  risks associated with any of the drugs.
15  13  Q.   So your testimony today is not that you don't remember --
16  14  your testimony is, you don't remember the conversations; right?
17  15  A.   I don't, no.
18  16  Q.   But you don't think he told you about any risks?
19  17  A.   I don't think he ever told me anything about a risk.
20  18  Q.   Were you here during the time that Dr. Kuperman gave his
21  19  testimony on the stand?
22  20  A.   I was.
23  21  Q.   Did you hear him discuss the things that he talked with his
24  22  patients about?
25  23  A.   I know he would talk to me if it was a great -- if it said
26  24  that I would get cancer, yes.  I know he would talk to me and
27  25  tell me.

Page 31

page 1151

3   1   Q.   Did you -- excuse me.  I didn't want to interrupt.
4   2   A.   That's okay.  Go ahead.
5   3   Q.   Do you need to finish?
6   4   A.   I'm through.
7   5   Q.   Along the way while you were seeing Dr. Kuperman,
8   6   Ms. Scroggin, did you hear him talk about the information he
9   7   received about studies concerning breast cancer?
10  8   A.   No.
11  9   Q.   You didn't hear him say that on the stand?
12  10  A.   I heard him, but he never has, I don't think, ever talked
13  11  to me about any risks or anything about a risk associated with
14  12  taking these drugs.
15  13  Q.   And as a physician, you rely on him to tell you about the
16  14  risks associated with taking the drugs; is that correct?
17  15  A.   I do.
18  16  Q.   And you would rely on him to tell you about serious risks
19  17  that might be associated with the medication; is that right?
20  18  A.   I do.
21  19  Q.   Even if those serious risks were small, if they were
22  20  serious, you'd want to know about them; is that right?
23  21  A.   Well, I think that he would tell me if there was a great
24  22  risk, yes.
25  23  Q.   And you would want him to tell you if there was not just a
26  24  great risk, but if there were serious risks associated with
27  25  medicines that you were going to be taking?

Page 32

page 1152

3   1   A.   Of course.  I trust my doctor.
4   2   Q.   Now, you've been here through the trial and you saw the
5   3   information that was provided to Dr. Kuperman by Wyeth through
6   4   the label; is that correct?
7   5   A.   Would you repeat that?
8   6   Q.   Yes, ma'am.  You were here and you saw that the information
9   7   provided by Wyeth to the doctors -- you saw the labels, didn't
10  8   you?
11  9   A.   Yes.
12  10  Q.   And are you also aware that Wyeth provided information to
13  11  patients that took the products that they manufacture?
14  12  A.   Yes.
15  13  Q.   And did you see in opening where I put up a slide that said
16  14  every time you had a prescription filled, that you got a patient
17  15  insert with your prescription?
18  16  A.   Yes.
19  17  Q.   And I believe you've said that it was your practice to
20  18  review those materials; is that correct?
21  19  A.   I do read them.
22  20  Q.   And so is it fair for the jury to assume that you read the
23  21  Premarin insert and the Prempro insert at least once over the
24  22  course of the 90 times that you filled the prescription?
25  23  A.   That I read it?
26  24  Q.   Yes.  At least once over the 90 times?
27  25  A.   Oh, yes.  Of course.

Page 33

page 1153

3 1  Q.  That you filled it.  Okay.

4 2      MS. PRUITT:  Your Honor, we have moved in Defendant's

5 3  Exhibit 94, which if we haven't moved it in, we want to.  It's

6 4  the patient information for Premarin.

7 5      MR. MORRIS:  Your Honor, I need to know, first of all,

8 6  what year, and I'd like for them to provide the --

9 7      THE COURT:  What's the number on the document?

10 8      MS. PRUITT:  DX 94.

11 9      THE COURT:  Show it to plaintiff's counsel, if you

12 10  will, please, ma'am.

13 11      MR. MORRIS:  No objection, your Honor.

14 12      THE COURT:  Admitted.

15 13      (Defendant Wyeth's Exhibit 94 received in evidence.)

16 14      MS. PRUITT:  Your Honor, may I ask the Court's

17 15  permission to pass these to the jury so they will each have a

18 16  copy to refer to as we move through this?

19 17      THE COURT:  You mean 12 copies of that?

20 18      MS. PRUITT:  Yes, sir.

21 19      THE COURT:  That will be all right, but be sure and

22 20  take the copies up.

23 21      MS. PRUITT:  Yes, sir.  I intended to.

24 22      THE COURT:  Make sure we just have the exhibit left.

25 23      MS. PRUITT:  May I have the ELMO, please, ma'am.

26 24      THE COURTROOM DEPUTY:  Yes.

27 25  BY MS. PRUITT:

Page 34

page 1154

3 1  Q.  Do you see here down at the bottom, Ms. Scroggin, that

4 2  there's a date on this of September 16, 1992?

5 3  A.  Right.

6 4  Q.  And you started taking Prempro during the year 1992; is

7 5  that correct, ma'am?

8 6  A.  Prempro?

9 7  Q.  I'm sorry.  Premarin in 1992.

10 8  A.  I mean, I started taking that in '92.

11 9  Q.  Okay.  And then back over here to the front side of the

12 10  label where it begins, do you see the section entitled,

13 11  "Estrogen Drugs"?

14 12  A.  Yes.

15 13  Q.  And it says, "Estrogens have several important uses but

16 14  also some risks.  You must decide, with your doctor, whether the

17 15  risks of estrogens are acceptable in view of their benefits.  If

18 16  you decide to start taking estrogens, check with your doctor to

19 17  make sure you are using the lowest possible effective dose.  The

20 18  length of treatment with estrogens will depend upon the reason

21 19  for use.  This should also be discussed with your doctor."

22 20      Is that what this says about the estrogen drugs?

23 21  A.  Is that what?

24 22  Q.  Is that what that says under the title, "Estrogen Drugs"?

25 23  A.  Yes.

26 24  Q.  And so you would have probably read that during the time

27 25  you were taking Premarin; is that right?

Page 35

page 1155

3 1  A.  Yes.

4 2  Q.  And the next section is, "Uses of Estrogen," and this says,

5 3  "To reduce menopausal symptoms."  And that's why you were using

6 4  the estrogen; is that correct?

7 5  A.  Right.

8 6  Q.  Now let's look down at the bottom under the section, "When

9 7  Estrogens Should Not be Used."  And if I can refer you, it

10 8  states, "If you have had cancer.  Since estrogens increase the

11 9  risk of certain cancers, you should not take estrogens if you

12 10  have ever had cancer of the breast or uterus."

13 11      And then down here, "When they are ineffective.  Sometimes

14 12  women experience nervous symptoms or depression during

15 13  menopause.  There is no evidence that estrogens are effective

16 14  for such symptoms."

17 15      "There is no evidence that this is so and such long-term

18 16  treatment may carry serious risks."

19 17      Did I read that correctly?

20 18  A.  Right.

21 19  Q.  And that would have been information that during the period

22 20  of time you were taking Premarin, you might have read in the

23 21  label?  Is that correct, Ms. Scroggin?

24 22  A.  Yes.

25 23  Q.  "Dangers of Estrogens."  I'll refer you down here to,

26 24  "Cancer of the breast."

27 25      "Some studies have suggested a possible increased incidence

Page 36

page 1156

3 1  of breast cancer in those women taking estrogens" --

4 2      MR. MORRIS:  Let me object, your Honor, under the rule

5 3  of optional completeness, have her read the entire section and

6 4  not mislead the jury.

7 5      MS. PRUITT:  I'll be glad to read the entire section,

8 6  your Honor.

9 7      THE COURT:  Are you talking about just reading the

10 8  next paragraph?

11 9      MR. MORRIS:  No, the first paragraph where she skipped

12 10  over it, where it says, "The majority of studies have shown no

13 11  association with the usual doses" --

14 12      THE COURT:  Whoa, whoa.  Run it down.  Let me see the

15 13  first paragraph.

16 14      MR. MORRIS:  The first sentence after, "Cancer of the

17 15  breast," Judge.

18 16      MS. PRUITT:  Here it is.

19 17      THE COURT:  Go ahead and read the whole thing.

20 18  BY MS. PRUITT:

21 19  Q.  "Cancer of the breast.  The majority of studies have shown

22 20  no association with the usual doses used for estrogen

23 21  replacement therapy and breast cancer.  Some studies have

24 22  suggested a possible increased incidence of breast cancer in

25 23  those women taking estrogens for prolonged periods of time and

26 24  especially if higher doses are used."

27 25      Did I read that correctly?

1 page 1157

2

3 1 A. That's what it says.

4 2 Q. And then if you go down to the paragraph about, "Abnormal

5 3 blood clotting," it suggests, "Taking estrogens may increase the

6 4 risk of blood clots. These clots can cause a stroke, heart

7 5 attack, or pulmonary embolus, any of which may be fatal."

8 6      Now, all of those things are listed under the category,

9 7 "Dangers of Estrogens." Is that correct?

10 8 A. That's what it says.

11 9 Q. And if you read the word "dangers," you would understand

12 10 that that meant this was a danger and you needed to pay

13 11 attention to it?

14 12 A. It says danger.

15 13 Q. Let's move down to, "Reducing Risk of Estrogen Use."

16 14      "See your doctor regularly. While you are taking

17 15 estrogens, it is important that you visit your doctor at least

18 16 once a year for a physical examination. If members of your

19 17 family have had breast cancer or if you have ever had nodules or

20 18 abnormal mammograms, you may need to have more frequent breast

21 19 examinations."

22 20      Did I read that correctly?

23 21 A. Right.

24 22 Q. And then further down, it tells the reader to be alert for

25 23 signs of trouble. Is that correct?

26 24 A. Right.

27 25 Q. And it mentions breast lumps.

1 page 1158

2

3 1 A. Right.

4 2 Q. And then under, "Other Information," "Some physicians may

5 3 choose to prescribe another hormonal drug to be used in

6 4 association with estrogen. This would be a progestin. "There

7 5 are possible additional risks that may be associated with the

8 6 inclusion of a progestin in estrogen treatment."

9 7      Now, this is all information that you would have read in

10 8 the Premarin label from 1992 to 1996 while you were taking it;

11 9 is that correct?

12 10 A. Like I said, I would have trusted my doctor to help me.

13 11 And to tell me about any --

14 12      MS. PRUITT: Your Honor, we move into evidence

15 13 Defendant's Exhibit 94. It's been admitted? I'm sorry.

16 14      MR. MORRIS: No objection, your Honor.

17 15      THE COURT: Admitted.

18 16      MS. PRUITT: Now I would like to move into evidence

19 17 Defendant's Exhibit 88, which is the Prempro patient insert for

20 18 1996 while Ms. Scroggin was taking it.

21 19      MR. MORRIS: May I look at it first, your Honor?

22 20      THE COURT: You may.

23 21      MS. PRUITT: Sure.

24 22      MR. MORRIS: No objection, your Honor.

25 23      THE COURT: Admitted.

26 24      (Defendant Wyeth's Exhibit 88 received in evidence.)

27 25 BY MS. PRUITT:

1 page 1159

2

3 1 Q. Now, do you recall when you received your prescriptions for

4 2 Prempro, Ms. Scroggin, that every time you opened up the foil

5 3 pack with the medication in it, there was this patient insert?

6 4 A. Yes.

7 5 Q. And it was your practice to read those, as you've told the

8 6 jury; correct?

9 7 A. Yes.

10 8 Q. I would like to direct your attention to the front page on

11 9 information for the patient and refer you down to the second

12 10 paragraph, which says, "Estrogens have several important uses

13 11 but also some risks. You must decide, with your doctor, whether

14 12 the risks of estrogens are acceptable when weighed against their

15 13 benefits. The length of treatment with estrogens can vary from

16 14 woman to woman. Check with your doctor to make sure you are

17 15 using the lowest possible effective dose."

18 16      Did I read that correctly?

19 17 A. Right.

20 18 Q. And then under, "Uses of Estrogen." The sentence says, "If

21 19 you are not taking hormones for other reasons, such as the

22 20 prevention of osteoporosis, you should take Prempro only as long

23 21 as you need it for relief from your menopausal symptoms."

24 22 Is that right?

25 23 A. Right.

26 24 Q. And then down here again, it says, "Who Should Not Use

27 25 Estrogens," and it has the same language in it as the Premarin

1 page 1160

2

3 1 label. Is that correct?

4 2 A. "If you have had cancer."

5 3 Q. Yes. Since estrogens increase the risk of certain types of

6 4 cancer, you should not use it if you have had cancer. Is that

7 5 correct?

8 6 A. Right.

9 7 Q. It goes on to tell you when they don't work. It says

10 8 estrogens do not relieve the symptoms of nervousness or

11 9 depression. "There is no evidence for these claims and such

12 10 long-term estrogen use may have serious risks."

13 11 Is that correct?

14 12 A. Yes.

15 13 Q. And then down in the risks section, "Risk of Estrogens

16 14 and/or Progestins." Do you see that to be talking about the

17 15 risk of estrogens and the risk of progestins; correct?

18 16 A. Yes.

19 17 Q. It says, "Cancer of the uterus." And down here, "However,

20 18 additional risks may be associated with the inclusion of a

21 19 progestin in estrogen treatment. "

22 20      Did I read that correctly?

23 21 A. Right.

24 22 Q. Now, flipping over to other risks -- first let's look up

25 23 here. It says "cancer increase alone to estrogen and progestin.

26 24 It says "and a possible increase in breast cancer risk" when you

27 25 add a progestin. "Usually, the smaller the dose and the shorter

Page 41

1  page 1161

2

3  1  the duration of treatment, the more these effects are minimized.

4  2  Check with your doctor to make sure you are using the lowest

5  3  effective dose and only for as long as you need it."

6  4      Did I read that correctly?

7  5  A.  Yes.

8  6  Q.  And the next risk that's discussed under the risks sections

9  7  is cancer of the breast.  "Most studies have not shown a higher

10  8  risk of breast cancer in women who have ever used estrogens.

11  9  However, some studies have reported that breast cancer developed

12  10  more often (up to twice the usual rate) in women who used

13  11  estrogens for long periods of time (especially more than ten

14  12  years)."

15  13  A.  Is this the one -- which is this for, now?

16  14  Q.  This is Prempro.

17  15  A.  Prempro.  Okay.

18  16  Q.  "Some studies have reported a somewhat increased risk, even

19  17  higher than the possible risk associated with estrogens alone."

20  18      And that's the information you would have had when you read

21  19  this patient insert about cancer of the breast; is that correct?

22  20  A.  Okay.

23  21  Q.  Now, let's look down at the next risk discussed.  "Abnormal

24  22  blood clotting."

25  23      "These problems may include a stroke (by cutting off blood

26  24  to the brain), a heart attack (by cutting off blood to the

27  25  heart), a pulmonary embolus (by cutting off blood to the lungs)

Page 42

1  page 1162

2

3  1  or other problems.  Any of these conditions may cause death or

4  2  serious long-term disability.  However, most studies of low-dose

5  3  estrogen use by women do not show an increased risk of these

6  4  complications."

7  5      Now, Mr. Morris asked you earlier if the label had said

8  6  something about heart attack or stroke or abnormal clotting, you

9  7  wouldn't have taken it, and this paragraph specifically

10  8  discusses stroke, doesn't it?

11  9  A.  It says "may include a stroke" or --

12  10  Q.  It specifically discusses --

13  11  A.  Or heart attack.  "May include."

14  12  Q.  So it discusses the possibility of a stroke; is that

15  13  correct?

16  14  A.  "May include a stroke."

17  15  Q.  Possibility of a heart attack; is that correct?

18  16  A.  Heart attack.

19  17  Q.  And pulmonary embolus, which means the blood is cut off to

20  18  the lungs.

21  19  A.  Uh-huh.

22  20  Q.  And any of these risks could be fatal.  Is that what it

23  21  tells you?

24  22  A.  That's what it says.

25  23  Q.  Now, in the section on reducing the risk of estrogen/

26  24  progestin.  It tells you to see your doctor regularly.  "If

27  25  members of your family have had breast cancer or if you have

Page 43

1  page 1163

2

3  1  ever had breast lumps or an abnormal mammogram, you may need to

4  2  have more frequent breast examinations."

5  3  A.  Uh-huh.

6  4  Q.  Is that what it says?

7  5  A.  Yeah.

8  6  Q.  And up at the top, it says to reassess your need for

9  7  treatment.  "You and your doctor should reevaluate whether or

10  8  not you still need estrogens at least every six months."

11  9      Is that what that says?

12  10  A.  Right.

13  11  Q.  It tell us to be alert for signs of trouble.  And then down

14  12  here it refers to breast lumps, "Possible breast cancer."  Is

15  13  that correct?

16  14  A.  "Possible breast cancer."  Yes.

17  15  Q.  And then in other information, it tells you that there are

18  16  additional risks, including a possible further increase in

19  17  breast cancer which may be associated with long-term estrogen

20  18  use.

21  19      Do you see that, ma'am?

22  20  A.  Risk, yes.

23  21  Q.  And then down here in the bold, it tells you, "You are

24  22  cautioned to discuss very carefully with your doctor or

25  23  healthcare provider all the possible risks and benefits of

26  24  long-term estrogen and progestin treatment as they affect you

27  25  personally."

Page 44

1  page 1164

2

3  1      Did I read that correctly?

4  2  A.  Right, right.

5  3  Q.  And then let's look at the date down here.

6  4  A.  '95.

7  5  Q.  November 15, 1995.  You began taking Premarin -- I mean

8  6  Prempro in 1996; is that correct?

9  7  A.  Right.

10  8  Q.  Now, this is the information that when you in your practice

11  9  read the label that you would have had available to you; is that

12  10  correct?

13  11  A.  Right.

14  12  Q.  And this is the information, similar information was

15  13  provided to your doctor.  Did you see that in the trial earlier?

16  14  A.  Yes.

17  15  Q.  And you told the ladies and gentlemen of the jury that your

18  16  memory is not -- yesterday that your memory is not that good.

19  17  A.  No, not anymore.

20  18  Q.  Okay.  And so would it be fair to say that if Dr. Kuperman

21  19  or Kuperman discussed these things with you, that you might not

22  20  remember them?

23  21  A.  That's true, but if it -- I'm sure it would probably ring a

24  22  bell with me if I thought it was -- would cause me any harm.

25  23  Q.  Now, after reading those patient information inserts and

26  24  then listening to your testimony that we played in the clip

27  25  earlier, is it correct for me to say, Ms. Scroggin, that you

Page 45

page 1165

3  1  were willing to accept a small to moderate increased risk of
4  2  breast cancer to alleviate the menopausal symptoms that were
5  3  giving you so much trouble?
6  4  A.  Yes.
7  5  Q.  Was Dr. Kuperman correct in his description of when you
8  6  came to visit him and at what different times you asked for
9  7  certain things and had questions about your hormone medications?
10  8  A.  Yes.
11  9  Q.  Do you recall that when you first went to him, that you had
12  10  gone to a different doctor, who had prescribed hormone therapy
13  11  for you?
14  12  A.  Yes.
15  13  Q.  And do you recall that you took Ogen and Provera for the
16  14  first several years after you went back to Dr. Kuperman?
17  15  A.  Yes.
18  16  Q.  And it wasn't until 1992 that you were prescribed Premarin;
19  17  is that right?
20  18  A.  I believe so.
21  19  Q.  Okay.  And in 1992 when you were prescribed Premarin and
22  20  Provera, did you ask Dr. Kuperman to put you on it on a
23  21  continuous basis?
24  22  A.  Or just Premarin and --
25  23  Q.  Or Premarin and Prempro?
26  24  A.  Yes.
27  25  Q.  And is the reason you asked him to put you on it

Page 46

page 1166

3  1  continuously is because you wanted to not have a period anymore?
4  2  A.  Well, that's what I -- that's what I asked him, that I
5  3  didn't want to take -- have a period anymore, but I was still
6  4  having hot flashes and so I continued to take the hormone
7  5  therapy.
8  6  Q.  If you hearken back -- and I'll show you the record if I
9  7  need to.  If you hearken back to the time you visited
10  8  Dr. Kuperman in 1989 when you were already on Ogen and Provera,
11  9  you heard Dr. Kuperman, and you saw me point out to the jury
12  10  note that said you had a question of him about whether if you
13  11  took it continuously, you would not have your periods anymore.
14  12  Do you remember that?
15  13  A.  Right, right.
16  14  Q.  And then he decided not to prescribe it to you that way.
17  15  Do you remember that?
18  16  A.  I'm not sure.
19  17  Q.  Okay.  And then, moving forward, when you came in 1992, did
20  18  you tell Dr. Kuperman that you didn't want to have periods
21  19  anymore?
22  20  A.  Right.
23  21  Q.  Could he do something about that?
24  22  A.  Right.
25  23  Q.  And that's when he prescribed you Premarin and Provera on a
26  24  continuous basis?
27  25  A.  Right.

Page 47

page 1167

3  1  Q.  And then in 1996, did you go to Dr. Kuperman and say you
4  2  wanted to take one pill?
5  3  A.  Right.
6  4  Q.  And then he put you on the Prempro; is that right?
7  5  A.  Correct.
8  6  Q.  And then in 1999, you had some return of some hot flashes.
9  7  Do you recall that?
10  8  A.  Yes.
11  9  Q.  And so you went in to see Dr. Kuperman; is that right?
12  10  A.  Right.
13  11  Q.  And he took you off of the Prempro; is that right?
14  12  A.  Right.
15  13  Q.  And put you on estrogen and Provera again?
16  14  A.  Right.
17  15  Q.  Because he was trying to increase your dose to manage your
18  16  symptoms.
19  17  A.  True.
20  18  Q.  And that's what you wanted him to do, was try to help you
21  19  manage your symptoms.
22  20  A.  Correct.
23  21  Q.  Now, there's also a point in time that after you quit
24  22  taking hormone therapy and you were seeing Dr. Hagans and
25  23  Dr. Kuperman during that time, your hot flashes returned; is
26  24  that correct?
27  25  A.  I think so.

Page 48

page 1168

3  1  Q.  Okay.  I showed this record to the jury earlier.  Let's
4  2  take a look at it.
5  3  August 31, 2000.  That was apparently your first visit to
6  4  Dr. Harrington; is that right?
7  5  A.  To Dr. Harrington?
8  6  Q.  Yes.
9  7  A.  Yes.
10  8  Q.  And when you went to see Dr. Harrington -- she is the one
11  9  that prescribed tamoxifen for you; right?
12  10  A.  Correct.
13  11  Q.  So when you went to see her on August 31, 2000, you were
14  12  not taking tamoxifen; is that correct?
15  13  A.  No, I was not.
16  14  Q.  You were having hot flashes?
17  15  A.  I don't recall.
18  16  Q.  Okay.  If you'll take a look down at these medications, did
19  17  you understand that you were being prescribed Megace by either
20  18  Dr. Kuperman or Dr. Hagans to help control your hot flashes?
21  19  A.  I don't recall who gave me that.
22  20  Q.  And what I'm trying to get to, for the jury to understand,
23  21  is, you were having hot flashes during the period of time where
24  22  you were not taking tamoxifen; is that right?
25  23  A.  I guess so.  I can't remember.
26  24  Q.  Is it correct for me to say, Ms. Scroggin, that you smoked
27  25  for 37 years a pack and a half a day?

page 1169

3  1   A.  Well, I didn't start out smoking a pack and a half a day.
4  2   Q.  The reason I've asked it that way, I've looked back in your
5  3   medical records, and the references all suggest a pack and a
6  4   half a day.
7  5   A.  Toward the end, I was very addicted.
8  6   Q.  So if the records show earlier than towards the end that
9  7   you were smoking a pack and a half a day, do you think they
10 8   would be accurate?
11 9   A.  Yes.
12 10  Q.  And it's also correct for me to say that you've never had
13 11  any children; is that correct?
14 12  A.  No, I didn't.
15 13  Q.  And apologies to you and to everyone when we have to talk
16 14  about this term "obesity."  You understand we're just talking
17 15  about it in the sense of a medical term?
18 16  A.  Yes.
19 17  Q.  And that we're talking about how it relates to breast
20 18  cancer?
21 19  A.  I understand that.  Yes.
22 20  Q.  And so it's an issue in the case.
23 21  A.  Yes.
24 22  Q.  So I apologize that we have to talk about it.  The things
25 23  you don't ask women are how old they are and how much they
26 24  weigh, and you've been asked both.  You've also been asked how
27 25  tall you were.  But obesity is an issue in this case, so I want

page 1170

3  1   to ask you some questions about it.  Okay?
4  2   A.  Okay.
5  3   Q.  Now, there's been some suggestion that hormone therapy
6  4   caused all your problems with weight.  Is it correct for me to
7  5   say, Ms. Scroggin, that you had severe back problems and back
8  6   surgeries beginning in the late 1980s?
9  7   A.  I had surgery in 1990 and '91.
10 8   Q.  Okay.  And the problems that led up to the surgery were
11 9   happening in the late 1980s; is that correct?
12 10  A.  Well, yes, I guess so.  '89.
13 11  Q.  And so then you had two laminectomies, procedures which
14 12  caused you a great deal of pain; is that correct?
15 13  A.  The first surgery that was by a doctor, he didn't do it
16 14  correctly, so I had to have another one.
17 15  Q.  Okay.
18 16  A.  Which was by Dr. Sayer, and he fixed the problem that the
19 17  other doctor had done to me.
20 18  Q.  And as a result of those back surgeries, you had to stop
21 19  your physical activities, like your dancing.  You couldn't do
22 20  that after your back surgeries?
23 21  A.  Well, I didn't do it directly after, no.  I still dance a
24 22  little, but not much.
25 23  Q.  Okay.
26 24  A.  But I did bowl, but I quit that.
27 25  Q.  And you quit bowling due to your back injuries, and then

page 1171

3  1   you had a motor vehicle accident, unfortunately, right after
4  2   that; is that correct?
5  3   A.  I don't recall how long ago after that it was, but I did --
6  4   I did have a lady ran into the back of me.
7  5   Q.  And those things together caused you to have a period of
8  6   time of really about from 1990 all the way up until the time you
9  7   were diagnosed with breast cancer where you were not as
10 8   physically active as you had been in the past.
11 9   A.  That's correct.
12 10  Q.  Also, is it correct for me to say that you quit smoking the
13 11  year before you were diagnosed with breast cancer?
14 12  A.  I think it was then.  It could have been sooner, but I
15 13  don't know.  I'd have to check the records.
16 14  Q.  Let's take a look at Dr. Kuperman's record dated March 23,
17 15  2000.  And he notes that the patient has stopped smoking and has
18 16  gained 19 pounds of weight.  Do you see that?
19 17  A.  I do.
20 18  Q.  And so when you stopped smoking in 1999, it's correct that
21 19  you gained quite a bit of weight after that happened.
22 20  A.  I did gain some weight, yes.
23 21  Q.  And that would have been -- you were diagnosed in July of
24 22  2000 with breast cancer; is that correct?
25 23  A.  Correct.
26 24  Q.  And so this weight gain that occurred would have been
27 25  within a year before you were diagnosed with breast cancer?

page 1172

3  1   A.  Right.
4  2   Q.  Now, you have also been told, Ms. Scroggin, that you had
5  3   dense breasts; is that correct?
6  4   A.  Yes.
7  5   Q.  And you were told that before you ever started taking
8  6   hormone therapy, by your physicians; is that correct?
9  7   A.  I don't know.
10 8   Q.  Okay.  Do you recall when you gave your deposition on
11 9   October 5 -- 7 or 8 -- 21.  October 21, 2005, and I talked to
12 10  you about that?
13 11  A.  Yeah, I think so.
14 12  Q.  And do you recall telling me that your doctors had told you
15 13  your breasts were dense before you started taking hormone
16 14  therapy?
17 15  A.  I don't remember that, but I guess so, yeah.
18 16  Q.  Do you have any reason to believe that's not the case?
19 17  A.  No, I don't.  I don't have any reason.
20 18  Q.  And you probably didn't know this unless you had seen your
21 19  mammographic reports, but let me show you this report.
22 20  A.  Uh-huh.
23 21  Q.  This is one of your mammographies in 1993, done by
24 22  Radiology Consultants.  The reading doctor is Robert Fincher,
25 23  and he notes in his impression that this patient is in a high-
26 24  risk category due to the fact she is nulliparous.  Do you see
27 25  that?

Page 53

page 1173

1 A.  I do.
2 Q.  And nulliparous means you haven't had any children?
3 A.  Okay.
4 Q.  Were you aware before you filed this lawsuit that you were
   at a high-risk category for breast cancer due to the fact that
   you hadn't had any children?
7 A.  No.
8 Q.  Were you aware before you filed this lawsuit that you were
   at an increased risk for breast cancer from gaining weight
10  during the menopausal years?
11 A.  No.
12 Q.  Did you know before you filed this lawsuit that you might
13  be at an increased risk for breast cancer as a result of
14  smoking?
15 A.  No.
16 Q.  Now, is it correct for me to say, Ms. Scroggin, that you
17  filed this lawsuit because you think your breast cancer was
18  caused by hormone therapy?
19 A.  That's correct.
20 Q.  Before you filed the lawsuit, did you ask Dr. Kuperman,
21  your gynecologist, if he thought hormone therapy had caused your
22  breast cancer?
23 A.  No.
24 Q.  Before you filed this lawsuit, did you ask Dr. Hagans, your
25  breast surgeon, if he thought hormone therapy caused your breast

Page 54

page 1174

1  cancer?
2 A.  I don't think so.
3 Q.  Before filing this lawsuit, did you ask your cancer doctor,
4  Dr. Harrington, if she thought hormone therapy caused your
5  breast cancer?
6 A.  I don't think so.
7 Q.  Did you ever have a conversation with any doctor before you
8  filed this lawsuit about whether hormone therapy had anything to
9  do with your breast cancer?
10 A.  I don't think so.
11 Q.  Now, do you recall telling us in the deposition that your
12  mother had hot flashes?
13 A.  Yes.
14 Q.  And do you recall how you knew that?
15 A.  I think she told me.
16 Q.  And I think you said she told you on more than one occasion
17  that she was having hot flashes; is that correct?
18 A.  I don't recall that.  I just -- I know she told me.
19 Q.  You know she told you?
20 A.  Well, yeah.  I think she told me.  Yeah.
21 Q.  And you don't have any reason to believe that what she was
22  telling you back then was incorrect, do you?
23 A.  No.
24 Q.  Now, I wanted to talk to you just a little bit about this
25  issue of genetics.

Page 55

page 1175

1 A.  Genetics?  Okay.
2 Q.  Family history.
3 A.  Right.
4 Q.  Now, is it correct that you went to UAMS, to the cancer
5  genetics department?
6 A.  Correct.
7 Q.  And you were sent there by your lawyers?
8 A.  By who?
9 Q.  Your lawyers.
10 A.  Who?
11 Q.  Your lawyers.
12 A.  Oh, my lawyers.  I can't hardly hear.  I'm sorry.
13 A.  I'm sorry.  Is this --
14 A.  Yes.
15 Q.  Is this better?
16 A.  Yeah, a little better.
17 Q.  You were sent there by your lawyers?
18 A.  Yes.  That's better.  Yes.
19 Q.  And one of the things that was discussed with you there in
20  the counseling session was that they were going to be taking a
21  family history; is that correct?
22 A.  Correct.
23 Q.  And you filled out a sheet in your handwriting when you got
24  there; is that right?
25 A.  True.

Page 56

page 1176

1 Q.  And it says, "Chief complaint.  Describe the reason for
2  your visit."
3     Is that correct?
4 A.  This is at Dr. McKelvey's office?
5 Q.  Yes, ma'am.  Yes, ma'am.
6 A.  Okay.  My chief complaint?
7 Q.  Says right up here UAMS, Dr. McKelvey.
8 A.  My chief complaint.  Okay.
9 Q.  And these words are what doctors sometimes use:  FHX.  That
10  means family history.
11 A.  Okay.
12 Q.  Of breast.  And there's a little "c-a" there.  Family
13  history of breast cancer.
14 A.  I didn't fill that out.  That's not my writing.
15 Q.  Excuse me?
16 A.  That's not my writing.
17 Q.  So somebody asked you why you were there?
18 A.  I guess.  I don't know.  I don't remember that.  But I
19  think they knew I was there to have those tests.
20 Q.  Okay.  And so you knew that you were there to tell them
21  about all the members of your family that had had breast cancer;
22  right?
23 A.  Well, I knew I was there for the tests.
24 Q.  And when they started asking you about family history, they
25  asked you not just about breast cancers, but about all other

1 page 1177

2

3 1   cancers, on both your mother's side of the family and your
4 2   father's side; is that right?
5 3   A.  Right.
6 4   Q.  And you filled this sheet out to the best of your ability?
7 5   A.  Right.  This is -- this is my medical history.  Right.
8 6   Uh-huh.
9 7   Q.  Okay.  We'll get to the other.  There's a second sheet.
10 8   A.  Right.
11 9   Q.  But when they handed you the sheet, you filled it out to
12 10  the best of your ability.
13 11  A.  I did.
14 12  Q.  And then after they got the sheet and looked at it, you sat
15 13  down with the genetic counselor and discussed your family
16 14  history?
17 15  A.  Yes.
18 16  Q.  In detail; is that correct?
19 17  A.  Right.
20 18  Q.  And you and he sat across from one another or sat down at a
21 19  table; is that right?
22 20  A.  Right.
23 21  Q.  And as you talked to him, he wrote out notes about what you
24 22  were saying; is that correct?
25 23  A.  Right.
26 24  Q.  Did he begin to draft the pedigree that Mr. Morris was
27 25  showing you?

1 page 1178

2

3 1   A.  Right.
4 2   Q.  And you were sitting there with him when that was done; is
5 3   that correct?
6 4   A.  I was.
7 5   Q.  Now, one thing I want to point out before I move off this
8 6   record, you were taking aspirin in a low dosage and your heart
9 7   doctor told you to take it; is that correct?
10 8   A.  Right.
11 9   Q.  Are you still taking that?
12 10  A.  Well, I try to.  Sometimes I forget to do it, but -- I am
13 11  taking -- taking that, yeah.  Try to.  I try to remember to do
14 12  it.
15 13  Q.  In my opening, there was a chart that was displayed for the
16 14  ladies and gentlemen of the jury that said that there was a
17 15  relative risk from taking aspirin of 1.84, that you could get
18 16  bleeding in the brain or have a stroke.  Were you aware of that?
19 17  A.  No.
20 18  Q.  And so this is a risk that you and your doctor assessed as
21 19  a small risk so that he wanted you to take it to help your
22 20  heart?
23 21     MR. MORRIS:  Let me object, your Honor.  Lack of
24 22  foundation.  What she said in opening is not evidence, and in
25 23  terms of the label, if the label says that --
26 24     THE COURT:  Just a minute.  Well, that's true.
27 25  Sustained.

1 page 1179

2

3 1   BY MS. PRUITT:
4 2   Q.  Did your doctor discuss taking aspirin, your heart doctor
5 3   discuss taking aspirin with you?
6 4   A.  I don't go to him all the time.  He just said it would be a
7 5   good idea to take it, to avoid anything happening to you.  I
8 6   don't know.
9 7   Q.  Okay.  Now, in this section where it says mother's extended
10 8   family -- and Mr. Goodell showed this yesterday.  This is your
11 9   handwriting here.  Is that correct?
12 10  A.  Right.
13 11  Q.  And you filled that out before you ever talked with the
14 12  genetic counselor; is that correct?
15 13  A.  I think so.
16 14  Q.  And is it fair for the jury to understand that after you
17 15  filled that out, that the genetic counselor fleshed out that
18 16  information in more detail with you?
19 17  A.  Yes.
20 18  Q.  Got the names of individuals and the ages and so forth?
21 19  A.  Right.  I want to correct something on that at the bottom.
22 20  Q.  Right.  At the bottom?
23 21  A.  Yes.  There's not a family history of diabetes in my
24 22  family.  I'm the only one that's got diabetes.
25 23  Q.  Okay.  And you're talking about the question at the bottom
26 24  that says, "What other conditions run in your family?"
27 25  A.  Right.

1 page 1180

2

3 1   Q.  Is it your testimony to the ladies and gentlemen of the
4 2   jury that diabetes does not run in your family?
5 3   A.  No, it does not.
6 4   Q.  Does heart disease?
7 5   A.  Well, my grandfather died of a heart -- heart attack.
8 6   Q.  Does high cholesterol?
9 7   A.  Oh, my mother's got high cholesterol, and I do, too.
10 8   Q.  And does stroke run in your family?
11 9   A.  I can't recall who has had a stroke, but I believe so.
12 10  Q.  Okay.  And you understood -- you understand the question,
13 11  "What other conditions run in your family?"  Right?
14 12  A.  Yes.
15 13  Q.  Now, after you and the genetic counselor sat down, do you
16 14  recall reading the notes from that session?  Have you seen your
17 15  medical records from the genetics session?
18 16  A.  Well, I can't recall.
19 17  Q.  Let's put that up and show it to you.  UAMS Medical
20 18  Oncology Clinic, genetic counseling consultation.  Do you see
21 19  that?
22 20  A.  Right.
23 21  Q.  June 1, 2007.
24 22  A.  Right.
25 23  Q.  Now, let's look down here at family history.  "Ms. Scroggin
26 24  does not have any siblings."  Is that correct?
27 25  A.  I do not.

page 1181

3  1  Q.  "Her father died at 32 with Bright's disease.  Is that
4  2  correct?
5  3  A.  Right.
6  4  Q.  "She had one paternal aunt who died at 80 from a lung
7  5  disease."  Is that correct?
8  6  A.  That's on my dad's side.  Yes.
9  7  Q.  "No paternal family history is known."  Is that correct?
10 8  A.  I don't know any.  No.
11 9  Q.  "Ms. Scroggin's mother had colon cancer at age 50 and then
12 10  breast cancer at age 79."  Is that correct?
13 11  A.  Right.
14 12  Q.  "She is now 87."  Was that correct at the time?
15 13  A.  At the time.
16 14  Q.  "There are two maternal aunts and two maternal uncles.  One
17 15  aunt, Jean, is still living.  She had ovarian cancer at age 45.
18 16  Jean has three healthy children."
19 17      Is that correct?
20 18  A.  I think so.  I'm not sure of -- I think it's ovarian
21 19  cancer, but it could be female organs or something.  I'm not
22 20  sure if it's ovarian or not.  I think I was told that, but I
23 21  can't remember.
24 22  Q.  "The other aunt is deceased (cause unknown) and has five
25 23  children who are still living."  Is that correct?
26 24  A.  Right.
27 25  Q.  "Her Uncle Joe died at age 73 from kidney failure."  Is

page 1182

3  1  that correct?
4  2  A.  Right.
5  3  Q.  "He had a pituitary tumor and colon resection, but details
6  4  of those problems are unavailable."  Is that correct?
7  5  A.  Right.
8  6  Q.  "Ms. Scroggin's maternal grandfather had a sister who died
9  7  of breast cancer in her 60s."  Is that correct?
10 8  A.  Right.
11 9  Q.  Would that be Nita?
12 10  A.  Yes.
13 11  Q.  "She had two daughters that both had breast cancer."  Is
14 12  that correct?
15 13  A.  Right.
16 14  Q.  "One of those cousins was diagnosed with breast cancer at
17 15  age 32 and then had a second breast cancer in her 60s."  Is that
18 16  correct?
19 17  A.  Right.
20 18  Q.  And the person who had cancer diagnosed at 32 and then it
21 19  came back in her 60s was Peggy; is that right?
22 20  A.  Right.
23 21  Q.  And the other cousin, the daughter of Aunt Nita who had
24 22  breast cancer, her name was Lavonne; is that right?
25 23  A.  I beg your pardon?
26 24  Q.  The other was Lavonne?
27 25  A.  Lavonne?  Right.  Peggy's cancer, the second cancer she had

page 1183

3  1  was because her doctor did not take it all out, and it came
4  2  back.
5  3  Q.  And as you were going through counseling with the genetic
6  4  counselor, you were told, "The patient's personal history and
7  5  family history are suggestive of a hereditary form of cancer."
8  6  Is that correct?
9  7  A.  That's what it says, yes.
10 8  Q.  And that's what you were told; right?
11 9  A.  I don't remember him saying that to me.
12 10  Q.  "The patient was counseled about the risks and benefits of
13 11  genetic testing in general."  Were you counseled?
14 12  A.  Yes.
15 13  Q.  And you were given the contact information and encouraged
16 14  to call if you had any questions or concerns?
17 15  A.  Yes.
18 16  Q.  You were also asked to sign an informed consent for
19 17  hereditary cancer and genetic testing; is that correct?
20 18  A.  I was what, now?
21 19  Q.  Were you asked to sign a consent form for the testing?
22 20  A.  Oh, yes.
23 21  Q.  This is the first page of that form, and it says -- where
24 22  it says, "If your results come back negative" -- do you see
25 23  that?
26 24  A.  Yes.
27 25  Q.  -- "you may still be at greater than average risk for

page 1184

3  1  hereditary cancer due to a genetic predisposition that cannot be
4  2  detected by this test, either in the genes you were tested for
5  3  or in another gene linked to hereditary cancer."  Did I read
6  4  that --
7  5  A.  I don't recall getting this form, but --
8  6  Q.  Okay.  Well, this is the first page of it.
9  7  A.  Okay.  I don't recall getting this.
10 8  Q.  Let's look at the second page of it.  And this says,
11 9  "Patient consent statement."
12 10  A.  Right.  Is this the same form?
13 11  A.  Yes, ma'am.  It's the second page.
14 12  A.  Okay.  Okay.
15 13  Q.  Is that your signature?
16 14  A.  Yes, it is.
17 15  Q.  And did you sign that on --
18 16  A.  I did.
19 17  Q.  -- June 1, 2007?
20 18  A.  That's what it says, yes.
21 19  Q.  And so you would have received both the first page and the
22 20  second page of this form; is that right?
23 21  A.  I guess so.  Yes.
24 22  Q.  And did I read the sentence correctly that you may still be
25 23  at a greater than average risk for hereditary breast cancer due
26 24  to genetic predisposition?
27 25  A.  Yes.

Page 65

page 1185

3  1  Q.  Because we can't detect it by this test, either in these
4  2  genes or in another gene?
5  3  A.  Yes.  That's what it says.
6  4  Q.  And the second page of the form, the limitations, it says,
7  5  "Genetic testing clarifies cancer risks for only those cancers
8  6  related to the genes analyzed."
9  7  A.  Right.
10 8  Q.  Is that correct?
11 9  A.  Right.
12 10 Q.  And then you went back and had a second meeting, and this
13 11 was with Dr. McKelvey; is that correct?
14 12 A.  Yes.
15 13 Q.  And this record reflects you had a 30-minute consultation
16 14 that day?
17 15 A.  Okay.
18 16 Q.  Do you recall that?
19 17 A.  Yes, I think so.
20 18 Q.  And Dr. McKelvey reflects that he reviewed that the patient
21 19 has a history of breast cancer, and there is also a family
22 20 history of breast, ovary, and colon cancer; is that correct?
23 21 A.  Right.
24 22 Q.  And after that second meeting, do you recall that you were
25 23 sent a letter from the University of Arkansas Medical Science
26 24 Arkansas Cancer Research Center signed by Dr. McKelvey and the
27 25 genetic counselor?

Page 66

page 1186

3  1  A.  Right.
4  2  Q.  Do you remember the letter?
5  3  A.  Well, no, I don't.
6  4  Q.  Okay.  Let's look at it.  Is that the letter that you
7  5  received from the Arkansas Cancer Research Center?
8  6  A.  Okay.
9  7  Q.  It's addressed to you; is that right?
10 8  A.  Right.
11 9  Q.  And that's your address?
12 10 A.  Right.
13 11 Q.  And this says, "This letter is a summary of the information
14 12 that was discussed."  Correct?
15 13 A.  Right.
16 14 Q.  And it says, "For review."  "You reported a family history
17 15 significant for your mother having colon cancer at age 50 and
18 16 breast cancer at age 79.  You also have a maternal aunt that had
19 17 ovarian cancer at age 45.  There are two maternal great aunts
20 18 that had breast cancer in their 60s, and two maternal second
21 19 cousins that have had breast cancer (one was bilateral).  The
22 20 diagnoses of your family members were by your report and were
23 21 not confirmed with pathology reports."
24 22      Did you read this letter when you got it?
25 23 A.  I did.
26 24 Q.  Is that paragraph correct for review?
27 25 A.  Oh, yes.

Page 67

page 1187

3  1  Q.  And it tells you, "Many factors can increase the
4  2  probability that cancers may be hereditary, that is, run in
5  3  families.  Some of these factors are early onset of cancer
6  4  (under age 45), breast cancer in both breasts in an individual,
7  5  ovarian cancer at any age, the same cancer in two or more close
8  6  relatives, and related cancers (for example, breast and ovarian)
9  7  found in the same family or individual in the family."
10 8  A.  Yes.  That's what it says.
11 9  Q.  And as you described your history for the ladies and
12 10 gentlemen of the jury today, those many factors exist in your
13 11 family tree; is that correct?
14 12 A.  They're what?
15 13 Q.  They exist in your family tree, the factors I just read
16 14 off?
17 15 A.  The breast cancer, yes.
18 16 Q.  And early onset in Peggy; correct?
19 17 A.  Right.
20 18 Q.  And breast cancer in both breasts for you; right?
21 19 A.  Right.
22 20 Q.  And for Peggy?
23 21 A.  I understand that, yes.
24 22 Q.  And do you have the same cancer, breast cancer, in more
25 23 than one individual on your mother's side of the family; is that
26 24 right?
27 25 A.  What, now?

Page 68

page 1188

3  1  Q.  You have breast cancer in more than one individual on your
4  2  mother's side of the family?
5  3  A.  Right.
6  4  Q.  Now, after all the negative tests came back, you went back
7  5  and talked to Dr. McKelvey for a third time, or a third visit;
8  6  is that correct?
9  7  A.  Yes.
10 8  Q.  And at that time, it was October 31, 2007.  And he says,
11 9  "Given that there are no changes in the family history to
12 10 indicate another genetic syndrome, further genetic testing at
13 11 present would likely have low clinical utility.  Questions were
14 12 answered.  Patient understands she remains at elevated risk of
15 13 future cancer due to her personal and family history and should
16 14 continue with preventative healthcare screening as recommended
17 15 by her primary physician."
18 16      Is that what Dr. McKelvey related to you after the tests
19 17 came back negative?
20 18 A.  Right.
21 19 Q.  Can you see that from there?
22 20 A.  Yes.
23 21 Q.  So is it correct that Great Aunt Nita had breast cancer?
24 22 A.  Right.
25 23 Q.  And she died from breast cancer; is that right?
26 24 A.  I think so.
27 25 Q.  And is it correct that Great Aunt Nita did not take E plus

page 1189

1  P?
2  A.  I don't have any knowledge of that.  I'm not -- I don't
3  know.
4  Q.  Well, let's think about it.  If you went back to her
5  generation, she was born around about 1900; is that right?
6  A.  Could be.
7  Q.  And if she was born around the 1900s, by the time she was
8  menopausal age, doctors weren't prescribing E plus P.
9  A.  Okay.
10  Q.  If that's correct, then we can assume that Great Aunt Nita
11  was not taking E plus P; right?
12  A.  Okay.
13  Q.  Now, let's talk about Peggy.  Peggy had breast cancer in
14  both breasts; correct?
15  A.  Right.
16  Q.  And Peggy did not take E plus P; is that correct?
17  A.  I have no knowledge of that.
18  Q.  Peggy got breast cancer when she was 32 years of age.  So
19  she wasn't menopausal; is that right?
20  A.  I don't know.
21  Q.  Most 32-year-old women don't take E plus P; is that
22  correct?
23       MR. MORRIS:  Let me object.  She is not an expert on
24  what people take historically in terms of E plus P.  I've
25  allowed some of this, but, your Honor, there's no foundation for

page 1190

1  this.
2       THE COURT:  Sustained.
3  BY MS. PRUITT:
4  Q.  Did your mother have breast cancer?
5  A.  Yes.
6  Q.  And your mother didn't take any hormones; is that correct?
7  A.  No.
8  Q.  You verified that information that your mother didn't take
9  hormone therapy by talking with her; is that correct?
10  A.  Yes.
11       MS. PRUITT:  I have no further questions.  Thank you.
12       THE COURT:  I'll tell you what, while you're getting
13  set up, why don't we take a break.  We'll start back at ten
14  after by the clock on the wall.
15       Don't talk about the case or anybody involved in it,
16  members of the jury, and don't make up your mind.  Consciously
17  avoid it.
18       Let the jury stand out.  Everyone else remain seated.
19       (Jury exited the courtroom.)
20       THE COURT:  Jury is out.  We're in recess.  You can be
21  at ease.
22       (Recess at 9:55 a.m.)
23       REPORTER'S CERTIFICATE
      I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
24
25                    Date:  February 12, 2008
25  Christa R. Newburg, RDR, CRR, CCR
    United States Court Reporter

page 1191

1       (Continuing at 10:12 a.m., jury present.)
2       THE COURT:  You may proceed.
3            CROSS-EXAMINATION
4  BY MS. MURRAY:
5  Q.  Ms. Scroggin, I'm Betsy Murray.  We also met at your
6  deposition back in October of 2001.  Is that correct?
7  A.  That's correct.
8  Q.  And just as Lynn Pruitt was courteous to you, I hope I was
9  also during that time.
10  A.  Yes.
11  Q.  I want to talk with you, go back a little bit, to before
12  Ms. Pruitt was asking you about in the 1992 time frame when you
13  wanted to stop having a period.  Do you recall her questions?
14  And she talked with you about Premarin and progestin.  I'd like
15  to back up, if we can, just a little bit, back to 1989, in that
16  neighborhood, when you first started taking estrogen and
17  progestin.  Are you with me?
18  A.  Uh-huh.
19  Q.  And even at that time, you had information that some
20  studies said there was a small risk of breast cancer in using
21  hormone therapy and some studies said there wasn't any.
22  Correct?
23  A.  I don't remember.  I don't remember reading anything.
24  Q.  Okay.  I believe Dr. Kuperman said he prescribed Ogen.
25  A.  Well, he wasn't the one that prescribed that to me.  I

page 1192

1  don't recall who the doctor was that did that.
2  Q.  And I think we talked in your deposition.  There was a
3  notation in Dr. Kuperman's records that said Dr. Studdard,
4  Dr. James Studdard had prescribed it to you sometime in '88.  Do
5  you recall those records?
6  A.  No, ma'am, I don't.
7  Q.  Do you recall Dr. Studdard?
8  A.  No, I don't.
9  Q.  Do you recall any discussion with Dr. Studdard?
10  A.  No.  No, ma'am.  I'm sorry.
11  Q.  And as you sit here today, do you recall ever reading a
12  label for Ogen?
13  A.  No, I don't.
14  Q.  Do you recall ever reading any label for Provera?
15  A.  I'm sure I did.
16  Q.  Well, do you remember it?
17  A.  Well, I remember probably that there no -- there was a
18  risk, but --
19  Q.  A risk of breast cancer?
20  A.  Right.
21  Q.  Right.  And on the Ogen label -- and I believe this was
22  introduced with Dr. Kuperman and you were here, and I'd like to
23  look at it, if we could.  And this is Plaintiff's Exhibit 9278.
24  A.  This is the Ogen label?
25  Q.  Yes, ma'am.

page 1193

3 1  A.  Okay.

4 2  Q.  And you took Ogen from sometime in '98 [sic] until sometime

5 3  in '92.  Correct?

6 4  A.  You mean '89?  '89?

7 5  Q.  '89 to '92.

8 6  A.  Right.

9 7  Q.  And what I want to talk with you about is, we were talking

10 8  about the Physicians' Desk Reference.  Do you recall that with

11 9  Dr. Kuperman?

12 10  A.  Right.

13 11  Q.  And these exhibits that have the labeling in them from the

14 12  Physicians' Desk Reference, it contains -- you know it contains

15 13  both the labeling for the doctor, or information for the doctor

16 14  and for the patient.  Correct?

17 15  A.  I didn't know that.  You mean it has the same label?

18 16  A.  No.  It has information for the doctor and then it has

19 17  information for the patient.

20 18  A.  Oh, okay.

21 19  Q.  And you've looked at PDRs before, haven't you, just

22 20  generally?

23 21  A.  PDR?

24 22  Q.  A Physicians' Desk Reference.

25 23  A.  I've never looked at one.

26 24  Q.  Let's look at the information for Ogen, and this is from

27 25  the 1989 PDR.  And you see where it says, "Information for the

page 1194

3 1  patient"?

4 2  A.  Yes.

5 3  Q.  See if I can make that large enough.  With my copy, I don't

6 4  want it so large that you can't read it.  And do you see -- is

7 5  this refreshing your memory at all?

8 6  A.  For Ogen?  No.

9 7  Q.  All right.  Let's go down and look at the -- and this says

10 8  that most estrogens seem to have similar properties and risks.

11 9  Do you see that?

12 10  A.  No.  Oh, yeah.  Where are you reading?

13 11  Q.  Right here (indicating).

14 12  A.  Okay.

15 13  Q.  And then it tells you that if you want to know more, beyond

16 14  this leaflet, to ask your doctor.  Is that correct?

17 15  A.  Right.  Right.

18 16  Q.  And then it talks -- we're going to the bottom of the

19 17  middle column on this page.  Do you see where it talks about

20 18  "dangers"?

21 19  A.  Right.

22 20  Q.  And it talks about cancer of the uterus; that if you take

23 21  estrogens, you might be at an elevated risk for cancer in the

24 22  uterus.  Is that correct?

25 23  A.  Increased risk, yes.

26 24  Q.  And somewhere you learned at that time that you needed to

27 25  take a progestin because of that risk.  Is that correct?

page 1195

3 1  A.  Well, no.  I didn't really know that.

4 2  Q.  Well, someone told you -- and we'll look at your

5 3  deposition.  Do you recall telling me in your deposition that

6 4  you remember someone telling you it was important to take both

7 5  pills?

8 6  A.  Right.

9 7  Q.  And let's look, if we can, then in the third column of the

10 8  Ogen label back in '89.  And it talks about -- we're still in

11 9  "dangers of estrogen," okay?  Let's look at No. 2, the second

12 10  thing that the manufacturer listed.  And that would be "Other

13 11  possible cancers."  Do you see that, Ms. Scroggin?

14 12  A.  I do, yes.

15 13  Q.  And it reports on animal studies about the development of

16 14  tumors in the breast, cervix, vagina, or liver, when given for a

17 15  long time.  Do you see that?

18 16  A.  Did I know that?

19 17  Q.  Do you see that now on the label?

20 18  A.  I do now, yes, uh-huh.

21 19  Q.  And you had this Ogen label from 1989 -- every month from

22 20  1989 through early '92.  Correct?

23 21  A.  I'm sure I did, but I just -- I don't -- I'm sure I read

24 22  it, but I don't remember.

25 23  Q.  And after it talks about the animal studies, the Ogen label

26 24  for the patient says, "At present time," 1989, "there's no good

27 25  evidence that women using estrogen in the menopause have an

page 1196

3 1  increased risk of such tumors, but there's no way to be sure

4 2  they do not.  And one study raises the possibility the use of

5 3  estrogens in the menopause may increase the risk of breast

6 4  cancer many years later."  Do you see that?

7 5  A.  I do.

8 6  Q.  And that was information available to you on a monthly

9 7  basis from 1989 until sometime in early '92.  Correct?

10 8  A.  Right.

11 9  Q.  It went on to discuss that "If members of your family have

12 10  had breast cancer or if you had breast nodules or abnormal

13 11  mammograms (breast x-rays), your doctor may want to carry out

14 12  more frequent examinations of your breasts."  Is that correct?

15 13  A.  Right.

16 14  Q.  And in 1989, your mother had not yet had breast cancer.  Is

17 15  that correct?

18 16  A.  Right.

19 17  Q.  But you were aware of Aunt Nita and your mother's cousins,

20 18  Peggy and Luanna, I think her name was?

21 19  A.  Lavonne.

22 20  Q.  Lavonne?

23 21  A.  Right.

24 22  Q.  You were aware of their experiences with breast cancer even

25 23  before 1989.  Correct?

26 24  A.  I don't remember.  Only with Peggy, if I did.  I didn't

27 25  know about Lavonne or --

Page 77

page 1197

```
 3  1  Q.  Or Nita --
 4  2  A.  -- or Nita.
 5  3  Q.  -- who died of breast cancer?  When did she die?
 6  4  A.  I don't recall.  I don't know.
 7  5  Q.  How old was she?
 8  6  A.  I don't know that.
 9  7  Q.  You told the genetic counselor she was 60.
10  8  A.  Well, I called my mother, or my aunt, and they told me.
11  9  Q.  Did you ever meet your Aunt Nita?
12 10  A.  Yes.
13 11  Q.  Do you recall her death?
14 12  A.  No.
15 13  Q.  You had just told Ms. Pruitt, I thought, that she was born
16 14  sometime probably in the 1900s.
17 15  A.  Well, she said that, I didn't.
18 16  Q.  You don't know when she was born?
19 17  A.  When she was born?
20 18  Q.  Yes.
21 19  A.  No, I don't know.
22 20  Q.  You at least knew of Peggy who had cancer occur two
23 21  times --
24 22  A.  Right.
25 23  Q.  -- before 1989.
26 24  A.  I don't know when her cancer was.  I have no idea.  She was
27 25  my second cousin.  You know, I didn't -- she wasn't my first
```

Page 78

page 1198

```
 3  1  cousin.  She was my second cousin.
 4  2  Q.  She was your mother's first cousin?
 5  3  A.  Right.
 6  4  Q.  And you recall at your deposition I asked you if any of
 7  5  your cousins had had breast cancer, and you answered "Cousins?
 8  6  No," when I asked you.  Do you recall?
 9  7  A.  Yes.  I was speaking of my first cousins.  I'm closer to
10  8  them than I am my second cousins.
11  9  Q.  But I didn't limit my questions to first cousins, did I?
12 10  A.  Well, I didn't know that.
13 11  Q.  Let's talk about, if we can, on the Provera label.  At the
14 12  same time, you took Provera cyclically, did you not?
15 13  A.  Provera?
16 14  Q.  Provera cyclically.  And let's review what that is.  When
17 15  you first started taking estrogen, you were prescribed an
18 16  estrogen for the whole month, and then you took a progestin for
19 17  the 16th through the 25th day.  Is that correct?
20 18  A.  I think I recall something like that, yeah.
21 19  Q.  And that's when you kept having menstrual periods.
22 20  Correct?
23 21  A.  Okay.
24 22  Q.  After you took a progestin, you would have a menstrual
25 23  period.  Correct?
26 24  A.  Okay.
27 25  Q.  Do you recall that or do you not?
```

Page 79

page 1199

```
 3  1  A.  No, I don't.  I don't remember.
 4  2  Q.  And you actually -- you don't know -- we talked about with
 5  3  Dr. Kuperman that he did not insist that when you go to the
 6  4  pharmacy that you get Provera.  Correct?
 7  5  A.  No, he didn't insist.
 8  6  Q.  And the pharmacist, at least in Arkansas, they offer you
 9  7  generics.  Correct?
10  8  A.  Right.
11  9  Q.  And you don't know whether you were taking actually Provera
12 10  or a generic from '89 until I think it was like '93.  Is that
13 11  correct?
14 12  A.  No.  I took the Provera.
15 13  Q.  You don't have any pharmacy records, do you?
16 14  A.  No.  But I know I took Provera.  I didn't take a generic.
17 15  Q.  You don't have any pharmacy records about that, do you?
18 16  A.  I don't know if that's a time when Rosedale or -- I don't
19 17  know.
20 18  Q.  No, ma'am.  My question is a little bit different.  You
21 19  don't have any pharmacy records from that time period, do you?
22 20  A.  No, I don't.  No.
23 21  Q.  And in '99, when Dr. Kuperman took you off of Prempro,
24 22  which has the estrogen and progestin in one pill, when he took
25 23  you off of that and made you go back to two pills --
26 24  A.  Uh-huh.
27 25  Q.  -- your records do show generic then during part of that
```

Page 80

page 1200

```
 3  1  time, don't they?
 4  2      MR. MORRIS:  Objection.  Lack of foundation.
 5  3  BY MS. MURRAY:
 6  4  Q.  Have you looked at your pharmacy records?
 7  5      THE COURT:  Sustain the objection.  Go ahead.
 8  6  BY MS. MURRAY:
 9  7  Q.  Have you reviewed your pharmacy records?
10  8  A.  I looked at those that I sent in, but I know I had some
11  9  that were not there.
12 10  Q.  But you haven't looked at them?
13 11  A.  What do you mean by that, have I not looked at them?  The
14 12  sheet or --
15 13  Q.  Sitting here today, you can't tell the jury one way or the
16 14  other whether those exhibits showed generics or not.  Correct?
17 15  A.  Yes.  I didn't take a generic.
18 16  Q.  Let's look at the Provera label.  And we're looking at it
19 17  '89.
20 18      MS. MURRAY:  And that, Your Honor, was Plaintiff's
21 19  Exhibit 9263 that was introduced in Dr. Kuperman's testimony.
22 20  BY MS. MURRAY:
23 21  Q.  And do you recall your progestin --
24 22      COURTROOM DEPUTY:  Is your mike on?
25 23      MS. MURRAY:  Yeah.  No, it's connected to me, but it's
26 24  not on.  I've been yelling in here.  Can you all hear me?  Now
27 25  you can.  Okay.
```

Page 81

page 1201

BY MS. MURRAY:

1 Q.  When you got your progestin, Provera, filled, you also got
2 patient information, didn't you?
3 A.  Yes.
4 Q.  And did you read -- you sitting here today don't recall
5 reading it one way or the other?
6 A.  Well, I read some of them.  Not all every time I got them.
7 I read some of them, yes.
8 Q.  Some of the labels of medicines or some of the labels of
9 the progestins, or what?
10 A.  Well, yeah, some of the Provera labels I read.
11 Q.  And the patient information is different.  That was the
12 progestin you were taking, wasn't it?
13 A.  Would you repeat that?
14 Q.  Your progestin labels were not the same as your estrogen
15 labels, whether your estrogen was Ogen or Premarin.  Your labels
16 for your progestins were different.
17 A.  I don't understand that.  How were they different?  I don't
18 know.
19 Q.  You don't know?  Well, do you recall anything from the
20 label?
21 A.  What?  The Provera label?
22 Q.  Yes, ma'am.
23 A.  No, not really.  I just remember that they just said a
24 risk.

Page 82

page 1202

1 Q.  All right.  And as you sit here today, your recollection is
2 they told you about a risk of breast cancer?  Not a cause, a
3 risk?
4 A.  Yes.
5 Q.  All right.  Under the "Warnings for women," -- you can take
6 your time on that, but I don't believe that there is a mention
7 of the breast cancer.
8 A.  I don't see it.  I don't see any.
9 Q.  It does say that "Progesterone and progesterone-like drugs
10 are used to treat menstrual disorders, to test if the body is
11 producing certain hormones, and to treat some forms of cancer in
12 women."  You do see that, don't you?
13 A.  Right.
14 Q.  I want to ask you a little bit more on this form you filled
15 out that Ms. Pruitt talked with you about.
16 A.  Okay.
17 Q.  And that's part of the joint exhibit.  And to refresh your
18 memory, it's from Dr. McKelvey's offices.  Do you recall that?
19 A.  Okay.  Yes.
20 Q.  And you said the family history of breast cancer, that's
21 not your writing.  Do you know whose it is?
22 A.  No.  You mean the chief complaint?
23 Q.  Yes.
24 A.  No, I don't know whose writing that is.
25 Q.  Let's make sure.  On this medical history, is that yours?

Page 83

page 1203

1 A.  Yes.
2 Q.  And on the drugs you were taking -- and this was June 1,
3 2007.  Correct?
4 A.  Yes.
5 Q.  Now, is that correct?
6 A.  Well, I don't take Vytorin anymore.
7 Q.  You don't take Vytorin anymore?  Are you taking the
8 generics for Vytorin?
9 A.  No, I'm taking another cholesterol drug.
10 Q.  But the Effexor that you told them you were taking for
11 breast cancer, that's correct?
12 A.  Right.
13 Q.  And the metformin is for your diabetes?
14 A.  Right.  I take Actoplus, too.
15 Q.  And that diabetes was diagnosed in 2003, I believe you said
16 yesterday.
17 A.  Right.
18 Q.  And the tramadol, is that a generic for Ultram?
19 A.  Yes.
20 Q.  And Ultram is pain medicine you've been taking for many
21 years.  Correct?
22 A.  Right.
23 Q.  And lisinopril, is that your blood pressure medicine?
24 A.  Yes, that's a generic.
25 Q.  And your mother also has high blood pressure, doesn't she?

Page 84

page 1204

1 A.  Yes.  I think so.
2 Q.  Any other members in your family?  And you understand when
3 I say "family," aunts, uncles, cousins, first or second, all of
4 those, do any of them have high blood pressure, or do you know
5 if they had it?
6 A.  I don't know.
7 Q.  You're also taking Actoplus Met, that's for your diabetes,
8 and Vytorin for high cholesterol?
9 A.  I don't take that anymore.
10 Q.  And the aspirin that Ms. Pruitt spoke with you about?
11 A.  Right.  But I don't take that every day, though.
12 Q.  And I want to go, if we can, back to that last page.
13 A.  Right.
14 Q.  Are you with me?
15 A.  Yes.
16 Q.  And it talks about -- it asked you after they'd been
17 through the cancer, asked you about other medical problems, it
18 asked you, "What other conditions run in your family?"  Correct,
19 Ms. Scroggin?
20 A.  I didn't read that right.  I'm sorry.
21 Q.  You corrected today and said diabetes.  There isn't anybody
22 else, not your mom, not her family, to your knowledge, not your
23 dad's family, nobody in the family line has had diabetes?
24 A.  Not that I know of.  None that I know of.
25 Q.  On heart disease, you said that ran in the family.

Page 85

page 1205

1 Correct?

2 A. Right. I think so. My grandfather had that.

3 Q. Anyone other than your grandfather? And I want to include
4 all the people you talked about today.

5 A. My grandmother Scroggin had hardening of the arteries, but
6 I don't know if that's the heart or not.

7 Q. But you do know your grandfather had heart disease?

8 A. My mother's father.

9 Q. Your mother's father?

10 A. He died of a heart attack.

11 Q. Is there anyone else in the family that you and Mr. Morris
12 discussed today that had, to your knowledge, high cholesterol?

13 A. Well, sitting right here today, I can't remember anyone but
14 myself. My mother may have it. I don't know.

15 Q. And you also listed in answer to this question of what runs
16 in the family, stroke. How many people in this extended family
17 you discussed with Mr. Morris today had strokes?

18 A. I don't know. I can't remember. I don't know.

19 Q. Can you name one, even if you don't know their full name,
20 so and so's daughter or son or this cousin or that?

21      MR. MORRIS: Your Honor, can I object on the basis of
22 relevance?

23      THE COURT: What is the relevance?

24      MS. MURRAY: Your Honor, these are other things that
25 she has identified as runs in her family, and she has spent a

Page 86

page 1206

1 great deal of time talking about how all the people in the
2 family who didn't have this and didn't have breast cancer, and I
3 think we're entitled to know how many people --

4      THE COURT: Overruled, barely.

5 BY MS. MURRAY:

6 Q. Can you tell the jury how many people had strokes?

7 A. I can't -- I can't, no.

8      MS. MURRAY: Your Honor, that's all the questions we
9 have.

10      THE COURT: Redirect?

11      MR. MORRIS: Yes, Your Honor.

12          REDIRECT EXAMINATION

13 BY MR. MORRIS:

14 Q. Donna, you were asked some questions by both counsel about
15 the warning labels, and the jury will have those at the
16 conclusion of the case, and they've been given some to look at.
17 Sitting here today, do you remember specifically reading the
18 language in the warning labels during the years that you were
19 taking the HRT?

20 A. Yes.

21 Q. All right. And in these labels where it says the warning
22 section, if you did, in fact, read it, would you have read the
23 whole warning?

24 A. Well, I tried to.

25 Q. You wouldn't have just picked out a sentence or two?

Page 87

page 1207

1 A. No.

2 Q. Where it says in this warning label in 1995 in Prempro that
3 "Most studies have not shown a higher risk of breast cancer in
4 women who have ever used estrogens," would you have relied on
5 that sentence?

6 A. Yes.

7 Q. And would that have been reassuring to you that most of the
8 studies didn't show a relationship?

9 A. Right.

10 Q. And in any of these labels where it goes through and it
11 says that the risk of breast cancer is unknown, would you have
12 relied upon that?

13 A. I would have, yes.

14 Q. When they told you other studies have not shown it, would
15 you have relied on that?

16 A. I would.

17 Q. And you had an opportunity to hear Dr. Kuperman's view of
18 the warnings in the label. Do you remember that at trial?

19 A. Yes.

20 Q. In fact, I asked him: "All right. And I know it's hard
21 going back to a conversation you don't specifically recall, but
22 in that time frame, '89 --

23      MS. MURRAY: Objection, Your Honor. Reviewing
24 Dr. Kuperman's testimony is not proper.

25      MR. MORRIS: Oh, they went over it with her in

Page 88

page 1208

1 cross-examination, Your Honor.

2      THE COURT: Overruled.

3 BY MR. MORRIS:

4 Q. It says, "But in that time frame, '89 up through '92" --

5      THE COURT: A little louder and little slower.

6 BY MR. MORRIS:

7 Q. A little louder? Okay. "When you began prescribing the
8 Premarin and Provera, what were the risks that you would have
9 discussed with her of taking hormone therapy?" And he says,
10 "One of the risks when taking estrogen and progestin would be
11 that that combination and that dosage was not sufficient to
12 control her hot flashes, which was the major reason that I gave
13 her the medication." I said, "All right." He says, "Number
14 two, she might have some spotting. She might have breast
15 soreness. She might have increased irritability. A whole host
16 of different complications. But the major thing, when she was
17 taking the medication, please report any irregular spotting or
18 bleeding while taking the medication."

19      In reviewing what his testimony was, not prompted by me, I
20 asked him, What did you tell her, what would you have told her
21 during that time frame, does he mention anywhere in that
22 risk of breast cancer?

23 A. No, sir.

24 Q. And during his testimony, do you recall that I went through
25 the label with him on numerous occasions and how he would point

page 1209

1 out to me, "But the next sentence says that other studies have
2 said that it doesn't cause breast cancer"?  Do you recall that?
3 A.  Yes, sir.
4 Q.  Any time during the period that you were taking these
5 medications, do you remember him sitting down and saying, "There
6 is a significant risk of breast cancer.  You need to be aware of
7 it"?
8 A.  No, sir.
9 Q.  I asked him about the '96 Prempro label, and I asked him,
10 "So walking away from that label in 1996, would you have still
11 felt like this issue was unresolved?"  And what was his answer?
12 A.  "Absolutely."
13 Q.  Then I asked him, "Did it appear that there was a leaning
14 in terms of the evidence whether it's for cause or against
15 cause?"  And what did he say?
16 A.  "The majority of cases was against it, and if there was a
17 relationship, it was a very small relationship."
18 Q.  All right.  And then he says, "And did not imply
19 causality."  And I asked him, "Being a careful physician as you
20 are, Doctor, you've been in practice a long time, the last thing
21 that you would want to do as a physician is prescribe something
22 to one of your patients that could cause cancer?"  And what did
23 he say?
24 A.  "Do no harm.  Yes, sir."
25 Q.  "And do no harm is part of your creed, is it not?"  And

page 1210

1 what did he say?
2 A.  "Absolutely, sir."
3 Q.  Now, with regard to the issues concerning your
4 grandfather's sisters and those two daughters and whether or not
5 they took any type of hormone therapy, do you know one way or
6 another whether or not they did?
7 A.  No, I don't.
8 Q.  Okay.  And in terms of what these defendants knew about the
9 relationship between breast cancer and their products, back
10 during that time frame, did you have any knowledge of that
11 information when you began taking the product?
12        MS. PRUITT:  Objection, Your Honor.  Lack of
13 foundation.  She doesn't know.
14        THE COURT:  Overruled.  Exception saved.
15 A.  No.
16 Q.  And they've gone through the warning label with you.  As a
17 layperson, do you appreciate any difference between the words
18 "risk," "association," or "cause"?
19 A.  Would you say that over again?
20 Q.  As a layperson, do you appreciate any difference between
21 the terms "risk," "association," or "cause"?
22 A.  Do I appreciate?
23 Q.  Do you recognize a difference, in your mind?
24 A.  Oh, yeah, I guess so.
25 Q.  Okay.  What does "risk" mean to you?

page 1211

1 A.  Not a very high -- high level.
2 Q.  Do you have a risk of having a car accident today?
3 A.  Yes.
4 Q.  Because you're going to drive later.  Correct?
5 A.  Right.
6 Q.  You have a risk that something from one of the space
7 shuttles could fall out of the sky and hit your car?
8 A.  Right.
9 Q.  I guess there is a risk of that.  Do you have a risk that
10 when you get home your house will have burned down?
11 A.  I hope not, but yes.
12 Q.  But do you have any reason to really believe that part of
13 the space shuttle is going to fall on your car or that your
14 house is going to burn down?  Do you have any real reason to
15 believe that those things will occur?
16 A.  No, sir.
17 Q.  And if you're a safe and careful driver, do you have any
18 reason to believe that you're going to have a car wreck today?
19 A.  No, I don't.
20 Q.  When you were being prescribed this particular combination
21 of drugs, did you want a clear picture of the risks and
22 benefits?
23 A.  I did.
24 Q.  And prior to the time that you were diagnosed with breast
25 cancer, had anybody ever told you there was a real risk of

page 1212

1 breast cancer?
2 A.  No, sir.
3 Q.  And do any of these warning labels convey to you a real
4 risk of breast cancer?
5 A.  No, sir.
6 Q.  Do any of them convey to you that there may be a causal
7 relationship?
8 A.  No, sir.
9 Q.  Do any of them even talk in terms of cause?
10 A.  No, sir.
11 Q.  Now, you were asked some questions about your pharmacy
12 records.  I want to show you your pharmacy records which are in
13 evidence.  And the pharmacy may not have had some of the early
14 records.  Correct?  Is that what your testimony was?
15 A.  Well, there is a place where they couldn't find some.
16 Q.  Okay.  I want to start with 1993.  And it shows that you
17 had a prescription of Premarin and Provera.  Do you see that?
18 A.  Yes.
19 Q.  There's a little code number under here, 00009-0064-04.  Do
20 you see that?
21 A.  Right.
22 Q.  All right.  That's for Provera.  Do you recall taking the
23 brand name Provera?
24 A.  Yes.
25 Q.  Do you recall during this time frame ever taking any type

Page 93

page 1213

1  of generic Provera?
2  A.  No, I don't.
3  Q.  And we know, and I think the defendants will stipulate,
4  that Premarin did not have a generic, ever has.  So did you take
5  Premarin?
6  A.  Yes.
7  Q.  When we look at the code on Provera, we go down to the next
8  prescription, the number is the same.  Correct?
9  A.  Yes, sir.
10  Q.  When we go down to the next Provera prescription in '93,
11  the number is the same, isn't it?
12  A.  I can't see that.
13  Q.  Oh, I'm sorry.  Let me push up.  All right.  The number is
14  the same?
15  A.  Is it the top one?
16  Q.  No, the number right under the Provera, 00009-0064-04.
17  A.  Yes.
18  Q.  And down here in '93, it's the same.  Correct?
19  A.  Right.
20  Q.  Here it's the same.  Correct?
21  A.  Right.
22  Q.  And every time it notes Provera.  Correct?
23  A.  Right.
24  Q.  And then if we go further into '93, the number is the same.
25  Correct?

Page 94

page 1214

1  A.  Right.
2  Q.  Come down, and here it's the same.
3  A.  Right.
4  Q.  All right.  Here it's the same.  Correct?
5  A.  Right.
6  Q.  Here it's the same.  Correct?
7  A.  Right.  Right.
8  Q.  Here it's the same.  Correct?
9  A.  Correct.
10  Q.  Here?
11  A.  Correct.
12  Q.  All right.  Now we're into '94.  When we go into '94, at
13  the top, the Provera number is the same.  Correct?
14  A.  Correct.
15  Q.  Correct?
16  A.  Correct.
17  Q.  It's the same here in '94, in June.
18  A.  Right.
19  Q.  We go down and we get into August of '94, is the number the
20  same?
21  A.  Right.
22  Q.  All right.  Is the number the same?
23  A.  Right.  Right.
24  Q.  And then you began taking Prempro, according to our
25  records, which are the best that we have, in May of '97.

Page 95

page 1215

1  Correct?
2  A.  Yes.
3  Q.  And you took that for a period of a couple of years and
4  then you came back and you took Premarin and Provera again.
5  A.  Right.
6  Q.  And just so that we're clear, at the time that you took
7  your last prescriptions of Provera, the records note this
8  number, which is 0009-286-03.  It says Provera, though.  Right?
9  A.  Right.
10  Q.  And that's the same number that's used here in 2000.
11  Correct?
12  A.  Right.
13  Q.  It says Provera.  Then it says Provera up here, also.
14  A.  Right.
15  Q.  And it says Provera here?
16  A.  Right.
17  Q.  And Provera here?
18  A.  Right.
19  Q.  And Provera here?
20  A.  Right.
21  Q.  Now, in 2000, this number, the 0009-0064-04 number, is the
22  same number you were taking back here in the '90s, early '90s.
23  Correct?
24  A.  Yes.
25  Q.  And that's the same number in March of 2000.  Correct?

Page 96

page 1216

1  A.  Right.
2  Q.  Same in January of 2000.  Correct?
3  A.  Correct.
4  Q.  December of '99.
5  A.  Correct.
6  Q.  The same number back in November of '99.
7  A.  Correct.
8  Q.  October, same number?
9  A.  Correct.
10  Q.  Then we do see a medroxyprogesterone acetate number, and
11  that looks different.  Correct?
12  A.  Yes.
13  Q.  So is it possible that on a couple of occasions in '99, you
14  may have gotten medroxyprogesterone acetate as a generic?
15  A.  What is that?
16  A.  The same substance that's in Provera.
17  A.  That's in Provera?
18  A.  A generic of Provera.
19  Q.  Okay.
20  Q.  Were you ever told that you were taking Cycrin?
21  A.  I saw that on a board.
22  Q.  All right.  And are you aware that Cycrin is a
23  medroxyprogesterone acetate that was made by Wyeth?
24  A.  No.
25  Q.  You just didn't know that?

Page 97

page 1217

1 A. No, I didn't know that.
2 Q. All right. Suffice it to say, throughout the years, at
3 least from '93 up until 2000, the estrogen side of the product
4 that you took was always a Wyeth product. Correct?
5 A. Yes.
6 Q. You took Premarin, Prempro, and then Premarin again, on the
7 estrogen side?
8 A. Right.
9 Q. On the MPA side, the records show that you took Provera.
10 Is that correct?
11 A. Correct.
12 Q. You may have taken Cycrin. Correct?
13 A. That's what it says.
14 Q. All right. And then there are a couple that look like they
15 might be generics, and we don't know about those, we'd have to
16 look at the codes. Is that fair?
17 A. Yes. I don't recall those --
18 Q. Did you take these products continuously over the years as
19 they were prescribed to you by your doctor?
20 A. Yes.
21 Q. Now, if Wyeth had known that there were studies that
22 suggested a relationship between their products and breast
23 cancer, and if Upjohn had known that the combination of their
24 product with Wyeth's product posed a risk of breast cancer and
25 that studies had suggested that, would you have expected these

Page 98

page 1218

1 two companies to research and study it on their own so that
2 women like you could get a clear picture?
3        MS. MURRAY: Objection, Your Honor. Well, leading,
4 and argumentative, also.
5        THE COURT: Too long.
6 BY MR. MORRIS:
7 Q. What did you want from these companies, Donna?
8 A. I would hope that they would either say it does or it
9 doesn't cause cancer.
10        MR. MORRIS: Pass the witness.
11        RECROSS-EXAMINATION
12 BY MS. PRUITT:
13 Q. Ms. Scroggin, as a layperson, you appreciate what the term
14 or the word "danger" means, don't you?
15 A. I do.
16 Q. And you appreciate what the term "fatal" means, don't you?
17 A. Fatal? Yes.
18 Q. Yes, ma'am. And you appreciate the phrase that breast
19 cancer develops up to twice the usual rate, potentially? You
20 understand what that means, don't you?
21 A. Say that again.
22 Q. That breast cancer develops up to twice the usual rate in
23 women --
24 A. I understand that.
25 Q. You understand that, don't you, ma'am? Thank you very

Page 99

page 1219

1 much.
2        RECROSS-EXAMINATION
3 BY MS. MURRAY:
4 Q. Ms. Scroggin, based on Mr. Morris's questions with the
5 pharmacy records, you now understand that at times you have
6 taken generic progestins. Correct?
7 A. The two that he showed me, I didn't remember and didn't
8 know about.
9 Q. So your testimony earlier that you never took generics,
10 that was not correct?
11 A. I didn't -- I didn't know. I don't recall taking that.
12 Q. And the numbers that he told you identified if it was
13 Provera rather than an MPA, you agree with that. Correct?
14 A. Right. But I don't remember taking that other two that
15 were on there.
16 Q. I understand. And you didn't have any pharmacy records
17 that you brought with you before '94?
18 A. No, I don't have any.
19 Q. Mr. Morris wanted to pick out some testimony about what
20 Dr. Kuperman said concerning his conversations with you. Do you
21 recall that?
22 A. I recall, yes.
23 Q. And I'd like to also show you some. Dr. Kuperman was with
24 us a while.
25 A. Okay.

Page 100

page 1220

1 Q. All right. And see if you can read along with me like you
2 did with Mr. Morris.
3 A. Okay.
4 Q. And the question -- and I believe Ms. Pruitt asked the
5 question, actually. "Now, along the way while Ms. Scroggin was
6 taking hormone replacement therapy, you would have discussed
7 with her this issue about a possible association between hormone
8 therapy and breast cancer?" And what was his answer?
9 A. "Yes."
10 Q. And then the question was: "And you would have told her
11 that there were studies that show no increased risk?" And
12 answer, "That's correct." That was page 820. On page 821,
13 question: "And some studies showed an increased risk?" Answer,
14 "That is correct." "And so she would have had the information
15 that was contained in the label that we have -- you have had
16 shown to you today. Is that right?" Answer, "Yes."
17        Did I read Dr. Kuperman's testimony on what he discussed
18 with you correctly?
19 A. That he had --
20 Q. Did I read that testimony correctly, ma'am?
21 A. Oh, yes, uh-huh.
22 Q. Thank you.
23        MS. MURRAY: No other questions.
24        THE COURT: Jury questions?
25        You may stand down. Thank you, ma'am.

Page 101

page 1221

1    Call your next witness, please.
2       MR. MORRIS: Plaintiff would call Dr. Suzanne
3  Parisian.
4       THE COURT: The lawyers will approach while the doctor
5  is taking the stand.
6    (Bench conference reported as follows:)
7       THE COURT: I realize that time is of the essence, but
8  I think I'm going to send the jury out and I think I'm ready to
9  rule on several of the exhibits. So I'm going to send them out
10  and come back with the jury out and read my ruling, to the
11  extent I can. And y'all can consult with the doctor in light of
12  those rulings. Does anybody have any objection to that?
13       MR. MORRIS: No, Your Honor.
14       MR. GOODELL: No, Your Honor.
15       THE COURT: Okay.
16    (Whereupon, proceedings continued in open court as
17  follows:)
18       THE COURT: Ladies and gentlemen, we're going to take
19  a short recess. It will be at least ten minutes, could be 15.
20  The lawyers are going to try to educate me a little bit again.
21  Don't talk about the case or anybody involved in it, and do not
22  start making up your mind. Consciously avoid it.
23    Let the jury stand out. Everyone else, remain as you are.
24    (Whereupon, the jury exited the courtroom and proceedings
25  continued in open court as follows:)

Page 102

page 1222

1       THE COURT: The jury's out. We're in recess.
2    (Recess at 10:57 a.m.; continuing at 11:08 a.m., jury not
3  present.)
4       THE COURT: The exhibits that I do not reference now I
5  will have a brief hearing on during the noon hour. The
6  following are the defendants' objections to the form that the
7  plaintiff's revised this list of exhibits.
8    Is the doctor out of the courtroom?
9       MR. MORRIS: Yes, Your Honor.
10       THE COURT: Dr. Parisian.
11    Plaintiff's Exhibit 550, I ruled on 2-6 of this month, and
12  I believe I ruled again yesterday. The witness will be
13  permitted to read relevant sections of the document, but the
14  document itself may not be published to the jury or admitted as
15  an exhibit. Plaintiff's Exhibit 862 I understand is withdrawn.
16  Plaintiff's Exhibit 866, as I ruled on the 7th, is sustained as
17  to Dr. Parisian. Plaintiff's Exhibits 950-A through -L, I'll
18  hear brief argument on this during the lunch hour today. 1097,
19  I ruled on the 8th that it is sustained, and I again rule that
20  with the following caveat. I will allow on redirect examination
21  you to ask if, in fact, they were funded by whoever they're
22  shown to be funded by, without using the documents. You may be
23  able to get through from another witness. I don't know.
24  We'll see. Plaintiff's Exhibits 1341, 1420, 1660, 6274, 6302,
25  6304, 6333, 6400, are sustained on failure to follow the

Page 103

page 1223

1  pretrial long list procedure. Perhaps further grounds, but I'll
2  rule on that. 6500 is withdrawn. 7423, brief argument will be
3  heard during the lunch hour. On 8058, the objection's
4  overruled. 8070 is sustained, but with the same caveat I gave
5  on the 7th. Quote, "I'm going to say you may be able to use it
6  in rebuttal or you may be able to use it in cross-examination.
7  Right now it's out." 8085, sustained. References to Seasons
8  magazine were excluded and also failure to follow the pretrial
9  long list procedure. 8151 excluded with the same caveat I gave
10  on November the 26th of last year. Well, I'm going to exclude
11  this with the stipulation, and the only way I will let this in,
12  if you stipulated and then said it, but it really squeezes it.
13  As long as it's a straight stipulation, I'm excluding it. It
14  gets into some real 403 problems. All right. 8420 is
15  withdrawn. 9599, I'll hear brief argument on this during the
16  lunch hour. It is so ordered.
17    Let's bring the jury in.
18    (Whereupon, the jury entered the courtroom and proceedings
19  continued in open court as follows:)
20       THE COURT: Everyone please rise while the jury
21  enters. If you'll just wait right there, we'll swear you in.
22       THE WITNESS: Yes, sir.
23       THE COURT: Would you raise your right hand, please,
24  ma'am.
25    SUZANNE PARISIAN, PLAINTIFF'S WITNESS, DULY SWORN

Page 104

page 1224

1       THE COURT: Have a seat, please. Be seated.
2          DIRECT EXAMINATION
3  BY MR. MORRIS:
4  Q.  Would you, please, state your full name for the ladies and
5  gentlemen of the jury?
6  A.  My name is Dr. Suzanne Parisian.
7  Q.  And, Dr. Parisian, can you give the jury the benefit of
8  your educational background?
9  A.  I am a physician. I am board certified in anatomical and
10  clinical pathology. I've also been an ER physician and a
11  general practitioner.
12  Q.  And can you give us a rough estimate of when you began
13  practicing medicine?
14  A.  Oh, gosh. A long time ago. Back in the '80s. I finished
15  medical school in '79.
16  Q.  All right. And I'd like to show you what we've previously
17  marked -- and I'm not sure of what the number is on this, your
18  CV. I don't think there's any objection. Let me get a number.
19       MR. URBANCZYK: No.
20       MR. MORRIS: There's no objection to it, Your Honor.
21       THE COURT: What's the number?
22       MR. MORRIS: Let's see. What was the last sequential
23  number?
24       COURTROOM DEPUTY: 10430.
25       MR. MORRIS: 10430.

Page 105

page 1225

3  1        THE COURT:  Admitted.
4  2        (Plaintiff Exhibit 10430 received in evidence.)
5  3  BY MR. MORRIS:
6  4  Q.  Do you recognize this?
7  5  A.  Yes, sir.
8  6  Q.  We need the screens.  Do you recognize this as your
9  7  curriculum vitae?
10  8  A.  Yes, sir.
11  9  Q.  And in terms of your educational history, it details that
12  10  you were a general practitioner, and then you did some emergency
13  11  medicine, and then you were a general practitioner.
14  12  A.  Those were all working places.  Those weren't education.
15  13  I'm getting paid for all those.
16  14  Q.  Right.  I understand that's your work history.  I apologize
17  15  if I misspoke.  And then it gets up to your employment history
18  16  with the government.  Have you been employed by the United
19  17  States government?
20  18  A.  Yes, sir.  I was employed by the Food & Drug
21  19  Administration.
22  20  Q.  All right.  This shows that from August 1991 to July of '95
23  21  you had a clinical staff appointment to the Office of the
24  22  Medical Examiners of the Armed Forces.  What's that?
25  23  A.  Well, they have the final sign-out responsibilities for
26  24  deaths that occurred to military personnel, FBI, Secret Service,
27  25  people who died in some way associated with the military or the

Page 106

page 1226

3  1  government.
4  2  Q.  And so what was your job duty and responsibility during
5  3  that time frame?
6  4  A.  Was to sign out causes of death.
7  5  Q.  And then when we get back to the front page of your CV,
8  6  from April of 1993 to November of 1993, it notes that you're a
9  7  medical officer in the Division of Reproductive, Abdominal, Ear,
10  8  Nose, and Throat, and Radiology.  Is that correct?
11  9  A.  Correct.
12  10  Q.  And was that within the Food & Drug Administration?
13  11  A.  Yes, sir.
14  12  Q.  Okay.  Then it also shows that during the same time period,
15  13  August of '91 to '93, you were a medical officer.  What does
16  14  that mean?
17  15  A.  A medical officer in a different office.  It was involved
18  16  with products that were already on the market.
19  17  Q.  All right.  Can you give us examples of products that were
20  18  on the market that you would have had involvement with?
21  19  A.  Products that were being sold.  One of them was a
22  20  continuous bore anesthesia device.  I had everything from heart
23  21  defibrillators to syringes to -- at that time, we were directly
24  22  involved with the breast implants, different types of implants
25  23  that would go in people's jaws called TMJ implants.  Heart
26  24  devices that had failed, valves that had failed.  Some of them
27  25  were combination drug/device types of issues.  Some of them were

Page 107

page 1227

3  1  alternative medicine issues.  I was the FDA's person for that,
4  2  dealing with acupuncture, needles, and all kinds of other things
5  3  that were popular in those days.
6  4  Q.  What was your rank in the FDA?
7  5  A.  I eventually was a lieutenant commander.  So I was in the
8  6  public health service.  So I was in the FDA, but I had a Navy
9  7  uniform on.  I was in the public health service.  When you hear
10  8  about the Surgeon General, I was in the Surgeon General's group.
11  9  So I had a rank just like Navy.
12  10  Q.  Where did you live during that time frame?
13  11  A.  I lived in the Washington, D.C. area.
14  12  Q.  All right.  And then from 1993 to 1995, what was your
15  13  assignment?
16  14  A.  There I was the chief medical officer.  This area of FDA
17  15  has only ten medical officers, and so I got to be the chief of
18  16  the ten medical officers, and that involved training the staff
19  17  in doing clinical trials and various things that the FDA does.
20  18  Q.  And since 1995, how have you been employed?
21  19  A.  I have had my own consulting company called M.D. Assist,
22  20  Incorporated.
23  21  Q.  All right.  And does this curriculum vitae list all of your
24  22  prior work as it involves drugs and devices and publications
25  23  that you've had, and those types of issues?
26  24  A.  Yes, sir.
27  25  Q.  Lectures and activities?

Page 108

page 1228

3  1  A.  Yes, sir.
4  2  Q.  And during your period of time at the FDA -- we'll get into
5  3  a description, if you can help the jury and help us understand a
6  4  little bit more about the FDA.  But during the time that you
7  5  were at FDA, did you become familiar with the regulations
8  6  governing the way FDA operates?
9  7  A.  Yes, sir.
10  8  Q.  Were you also involved in the enforcement of the
11  9  regulations from the standpoint of your work in the medical
12  10  devices unit?
13  11  A.  Yes, sir.
14  12  Q.  During the course of time that you worked at FDA, did you
15  13  ever have any involvement as it related to pharmaceutical
16  14  products?  And I'm talking about pills.
17  15  A.  Yes, sir.
18  16  Q.  Explain to the jury what involvement you had.
19  17  A.  There would be combination drug/devices.  The division
20  18  between a drug and device isn't as clear-cut as it sounds.  Like
21  19  you hear of drug-eluting stents, those are medical devices, but
22  20  they give off drugs.  There are certain types of products that I
23  21  would have had the medical officer that had to apply and to
24  22  adhere to drug regulations, in terms of getting approval.  So
25  23  you had to be familiar with both sets of regulations and
26  24  requirements for the drugs and devices.  And there's a lot of
27  25  overlap.  There are some differences, obviously, between a pill

Page 109

page 1229

3 1  and a device, but you had to know generally what the act
4 2  required in terms of labeling and marketing and what a
5 3  manufacturer could do.
6 4  Q.  And along that time period, the regulations that you
7 5  reviewed on a routine basis involving medical devices, were many
8 6  of those regulations overlapping regulations that also dealt
9 7  with pharmaceutical products?
10 8  A.  Yes.  The regulations come from what they call the Food,
11 9  Drug, and Cosmetic Act, and that's what Congress says that the
12 10  FDA should do, and so a lot of it is interpreted specifically
13 11  for device or a drug in terms of the way it's going to look on
14 12  the label.  But many of the regulations, particularly what a
15 13  medical officer would do and look at, are the exact same.
16 14  Q.  Since the time that you left FDA, have you had an occasion
17 15  to review cases and serve as an expert witness in cases
18 16  involving pharmaceutical products?
19 17  A.  Yes.
20 18  Q.  And what are some of the pharmaceutical products that
21 19  you've investigated and looked at the documents and given
22 20  opinions about?
23 21  A.  Primarily, Vioxx.  That would be the first one.  Also
24 22  phenylpropanolamine, that would be another product.  And, of
25 23  course, this group, Upjohn's product Provera I've testified
26 24  about.
27 25  Q.  All right.  And what about with regard to Wyeth's product

Page 110

page 1230

3 1  Premarin and Prempro?
4 2  A.  This is the first time I'm talking about Wyeth's product.
5 3  Q.  Okay.  Have you given depositions about Wyeth's products?
6 4  A.  Yes.  I've given five depositions for this case.
7 5  Q.  And in the course of your work in this case, have you
8 6  billed the lawyers?
9 7  A.  Yes, sir.
10 8  Q.  And what is your hourly rate?
11 9  A.  375 for study, and I believe 400 something for coming to
12 10  court here to appear.
13 11  Q.  All right.  Your company, M.D. Assist, does it do work
14 12  other than expert witness type work?
15 13  A.  Yes.  It also works with manufacturers to bring new
16 14  products to the market through the FDA.
17 15  Q.  Can you give the jury the name of some of the manufacturers
18 16  you've worked for?
19 17  A.  I have worked for Johnson & Johnson in the past.  I tend to
20 18  work for small companies at this point in time.  When you do
21 19  this type of work, working for plaintiffs, you tend to end up
22 20  mainly with small companies.  And so I have companies that are
23 21  involved, two of them are with breast screening, breast cancer
24 22  screening products.
25 23  Q.  And when these companies hire you, what is their primary
26 24  interest and what type of work do they want you to perform for
27 25  them?

Page 111

page 1231

3 1  A.  They want me to give them information about how to get
4 2  approved or cleared or on the market.  I usually am starting in
5 3  a company that's still doing clinical trials, so they have to
6 4  know what kind of clinical trials they need to know.  They need
7 5  to know what the law requires and what the hoops and whistles
8 6  are going to be that they have to go to the FDA through in order
9 7  to get on the market.
10 8  Q.  All right.  Now, let's talk a little bit about the FDA
11 9  globally.  And I'm going to write down -- and you may not be
12 10  able to see exactly what I write, but I want the jury to see it.
13 11  What is the jurisdiction of the FDA?
14 12  A.  You mean what type of products?
15 13  Q.  Right.
16 14  A.  Oh, they regulate foods, drugs, cosmetics, biologics,
17 15  animal products.
18 16  Q.  Okay.  A little slower.  Foods, drugs.
19 17  A.  Uh-huh.  Devices.
20 18  Q.  What else?
21 19  A.  Cosmetics.
22 20  Q.  And what else?
23 21  A.  Biologics.
24 22  Q.  What is a biologic?
25 23  A.  It would be a product that's actually made from something
26 24  that's living.  Sort of like vaccines would be your typical
27 25  biologic that you think about.  There are new biologic products

Page 112

page 1232

3 1  that are genetically engineered products, gene products.  So
4 2  those would be biologics.
5 3  Q.  How many employees are at the Food & Drug Administration?
6 4  A.  And there's also animal products.
7 5  Q.  And what would that mean, animal products?
8 6  A.  That would be drugs and devices and biologics for animals,
9 7  in terms of what veterinarians would use, the types of products
10 8  you would use on animals.  Recently there's been a lot of
11 9  emphasis on the pet food contamination.  That would be under
12 10  veterinary products.
13 11  Q.  And how many employees are at the Food & Drug
14 12  Administration, roughly?
15 13  A.  Oh, we're talking about thousands of employees, because not
16 14  only do you have the central FDA, you also have district
17 15  offices, so you'd have people in like major cities that are your
18 16  inspectors.  Now they're starting to have them international,
19 17  around the world, inspectors.  So you're talking at least, what,
20 18  40,000 people, for the whole FDA.
21 19  Q.  For the whole FDA.  When we get to the division of drugs,
22 20  does it have a specific name?
23 21  A.  That's the Center for Drug Evaluation.
24 22  Q.  And is it sometimes referred to as CDER?
25 23  A.  Yes.
26 24  Q.  And how many employees are at CDER?
27 25  A.  I believe there's about a thousand employees, close to like

Page 113

1 page 1233
2
3 1 -- close to 800. That's the biggest of the review centers.
4 2 Q. And what is the job of CDER?
5 3 A. Well, the job of CDER primarily is to bring new products to
6 4 the market, to get them out to the public, and to keep unsafe
7 5 products from being on the market. And they also have a
8 6 function to monitor the products that are out there in terms of
9 7 safety issues.
10 8 Q. And in terms of monitoring for safety issues, how many
11 9 employees fulfill that function?
12 10 A. There's 40 in the drug research and evaluation. So for --
13 11 the FDA, and particularly CDER, is skewed to bring new products
14 12 to the market. There's not as much emphasis put on safety.
15 13 That is primarily the function of the manufacturer.
16 14 Q. Now, in terms of the number of drugs that are on the
17 15 market, how many drugs are on the market?
18 16 A. The latest I've seen is 11,000.
19 17 Q. And so we have roughly 800 to a thousand people at CDER
20 18 overseeing 11,000 drugs?
21 19 A. Well, they bring out -- those 800 would bring out about a
22 20 hundred new drugs a year, so they're reviewing the New Drug
23 21 Applications, the 800. The 40 are looking at all the drugs that
24 22 are out there.
25 23 Q. All right. Now, you said that they're reviewing the New
26 24 Drug Applications. Are you familiar with the thing called the
27 25 Prescription Drug User Fee Act?

Page 114

1 page 1234
2
3 1 A. Yes, PDUFA.
4 2 Q. What is PDUFA?
5 3 A. PDUFA began in 1992, and it was a way, basically, to bring
6 4 drugs to the market faster by supplying money, fees, to the FDA,
7 5 particularly the Center for Drugs at that time, to encourage
8 6 them to review the applications quicker. So all of a sudden in
9 7 '92 you had time limits put on in terms of how quickly FDA had
10 8 to get these applications reviewed. And in return for the fees,
11 9 FDA gets the money. So every year, the amount of money that's
12 10 coming from PDUFA to fund the FDA has increased, so now about 50
13 11 percent of the funding of Center for Drugs comes from the fees
14 12 from manufacturers.
15 13 Q. Have Wyeth and Upjohn paid PDUFA fees to the FDA?
16 14 A. Well, yes. When you put in a supplement, with any clinical
17 15 data particularly, you have to pay PDUFA fees. Plus, they pay
18 16 also for their registration for their facilities, and how large
19 17 their market is, in terms of drugs, they pay an annual fee.
20 18 Q. And so the manufacturers are allowed to actually pay cash
21 19 to the FDA to speed up the approval of new drugs?
22 20         MR. URBANCZYK: Objection, Your Honor. Leading and
23 21 incorrect.
24 22 BY MR. MORRIS:
25 23 Q. How does it work?
26 24 A. Well, the FDA -- in '92, the emphasis on the customer
27 25 became manufacturers, because they're given the fees at the

Page 115

1 page 1235
2
3 1 requirement that the industry is happy with their performance.
4 2 So if the FDA meets the performance criteria, then the fees
5 3 continue to be paid. But the fees were actually to speed up the
6 4 availability of new drugs to the public.
7 5 Q. Now, is PDUFA still in effect?
8 6 A. Yes.
9 7 Q. While I'm here, with regard to the status of the
10 8 manufacturers, you mentioned a moment ago that there are not a
11 9 whole lot of employees at CDER who perform the safety function,
12 10 that you rely upon the manufacturer to do that?
13 11 A. Correct.
14 12 Q. All right. So whose duty is it under the Food & Drug
15 13 Administration's regulations, whose duty is it to test the
16 14 product to determine if it's safe in humans?
17 15 A. Well, if you're talking about a new product, then it would
18 16 be the manufacturer submitting a New Drug Application today.
19 17 They provide -- they do the testing, and then they would provide
20 18 that information to FDA in an application to say, FDA, do we
21 19 meet the standard for being able to be marketed for an
22 20 indication?
23 21 Q. All right. Once the product is on the market, does the
24 22 manufacturer have a continuing duty under the Food & Drug
25 23 Administration regulations to be aware of studies on their
26 24 product?
27 25 A. Yes, of course. There's no way that the FDA has the access

Page 116

1 page 1236
2
3 1 to all the information that a manufacturer would have about
4 2 their drug. The FDA is the government body. Their main
5 3 function is approval, and there is some postmarketing. But the
6 4 life cycle of the drug actually belongs primarily to the
7 5 manufacturer. They're the ones that are required to have
8 6 written procedures in place to do what they call
9 7 pharmacovigilance, where they're supposed to watch their
10 8 product. The FDA gets called into issues when there's a major
11 9 issue that gets identified. But they don't have the time or
12 10 resources to monitor everyone's drugs.
13 11 Q. You just mentioned a term, "pharmacovigilance." Can you
14 12 tell the jury what that term means?
15 13 A. Pharmacovigilance means -- well, pharma, drug; vigilance,
16 14 watching. So you're supposed to watch your drug after it's
17 15 put on the market and to determine if it's safe and effective
18 16 and meets the requirements of the act. If there's something
19 17 that is different or you're hearing of new reports or new
20 18 injuries that may not have occurred when you first put it on the
21 19 market, then you're required to update your labeling to warn
22 20 physicians to try to take action so people don't get hurt with
23 21 that product.
24 22 Q. Has the Food & Drug Administration provided guidance for
25 23 industry on the issue of pharmacovigilance?
26 24 A. Yes, there's guidance documents out. Every manufacturer
27 25 has to have their written procedures for doing this. It's been

page 1237

3 1  around as long as there's been drugs, really, that you're
4 2  supposed to watch what happens to your drug.
5 3  Q.  Okay.  And if a pharmaceutical company became aware that
6 4  their product was routinely being used in combination with
7 5  another manufacturer's product, does that trigger any duty?
8 6  A.  Well, you're required, as a manufacturer, to provide
9 7  adequate warnings and instructions for use under the act.  That
10 8  would be 21 U.S.C. 502(f)(1) and (2).  And so if you know that
11 9  there is an actual risk or something that needs to be warned,
12 10  you're required to provide guidance whether to not use the
13 11  product or to tell the person about what they need to do in
14 12  order to adjust so that the product remains safe and effective.
15 13  Q.  Do pharmaceutical companies actually perform postmarketing
16 14  studies?
17 15  A.  Yes, they do.
18 16  Q.  All right.  And have you been familiar in this litigation
19 17  with Upjohn performing postmarketing studies?
20 18  A.  Yes, they have done some studies.
21 19  Q.  And, in fact, the jury heard from Mr. Carlson, or
22 20  Dr. Carlson at Upjohn, and they went through a number of studies
23 21  between about 1982 to 1995 addressing the issue of their product
24 22  and whether or not it would protect against endometrial cancer.
25 23  Have you had occasion to review those studies?
26 24  A.  Yes.  And those would be called efficacy studies.  A
27 25  manufacturer has to show a product is effective for something

page 1238

3 1  before they go to the FDA to try to get approved for that.  So
4 2  those are the types of studies you do to try to determine what
5 3  the drug -- what kind of claims you can make and what it's
6 4  effective for.
7 5  Q.  And let me ask you, in terms of those studies, just
8 6  specifically those Upjohn studies that they did between '82 and
9 7  '95, were any of those studies focused on the issue of whether
10 8  or not the combination of estrogen and progestin can cause
11 9  breast cancer?
12 10  A.  No.
13 11  MR. GOODELL:  Excuse me, counsel.  May we approach,
14 12  please?
15 13  THE COURT:  You may.
16 14  (Bench conference reported as follows:)
17 15  MR. GOODELL:  You'll recall that counsel, we had an
18 16  argument about a chart of all the different studies that Upjohn
19 17  had done, and I objected to that chart because this witness in
20 18  her deposition had only said she reviewed ten studies.  Now
21 19  what has happened is a back door way of trying to get her to
22 20  comment on all the studies by making a vague reference to
23 21  studies that Dr. Carlson referred to.  We have no evidence that
24 22  this witness actually looked at those studies or they're any of
25 23  the ten, and now counsel has said all the studies that we did
26 24  during this time period, were any of them directed to breast
27 25  cancer.  It violates what Your Honor has ruled and it violates

page 1239

3 1  what she is permitted to testify to because of what she has said
4 2  in her deposition about what she reviewed.
5 3  MR. MORRIS:  Not at all.  She has reviewed these
6 4  studies, and in her deposition she said she reviewed the
7 5  studies.  And with regard to that, the questions --
8 6  THE COURT:  Just a minute.  Is that true, she said it
9 7  in the deposition?
10 8  MR. GOODELL:  I quoted for you that she said, "I
11 9  looked at ten studies."  You asked Mr. Morris, "Is that true?",
12 10  and he said, "I don't know anything beyond that."
13 11  MR. MORRIS:  Well, as to the ten studies, she can
14 12  certainly speak to those.
15 13  MR. GOODELL:  What ten studies?
16 14  THE COURT:  She can speak to those?
17 15  MR. MORRIS:  Sure.
18 16  THE COURT:  That's all you're referring to?
19 17  MR. MORRIS:  That's all I'll refer to.
20 18  MR. GOODELL:  Are these the ten studies?  We have no
21 19  idea what ten studies she'd looked at.
22 20  THE COURT:  I'll ask him to identify them then.
23 21  MR. MORRIS:  That's fine.
24 22  (Whereupon, proceedings continued in open court as
25 23  follows:)
26 24  BY MR. MORRIS:
27 25  Q.  Dr. Parisian, in one of your depositions that they took of

page 1240

3 1  you, the folks at Upjohn, and the folks at Wyeth, too, one of
4 2  the questions they asked you was how many of these Upjohn
5 3  studies back during that time period you'd reviewed.  How many
6 4  had you reviewed?
7 5  A.  Well, I've done various depositions, and I know that I'd
8 6  read -- by the last deposition, I'd read all the documents that
9 7  they have.  They had a list of all the studies they had, and I'd
10 8  gone through them all; Duro-Med, Ogen, the different time
11 9  periods.  So, yes, I've read them all.
12 10  Q.  And with regard to the Provera studies, have you read all
13 11  those?
14 12  A.  Yes, the information that I've been provided to read about
15 13  them.
16 14  Q.  All right.  And with regard to that information, have you
17 15  run across one study whose duration was more than two years?
18 16  A.  No.  Plus their own employees have testified that they
19 17  didn't do any breast cancer studies.
20 18  Q.  So with regard to that period of time that they were
21 19  actually doing in-house studies, have you run across any studies
22 20  that addressed whether or not E plus P is related to breast
23 21  cancer?
24 22  A.  No.
25 23  Q.  Now, if the companies suggest to the jury that there was
26 24  not a capacity or ability to perform these studies in the early
27 25  '80s, have you reviewed documents that rebut that suggestion?

Page 121

page 1241

1  A.  Yes.

2  Q.  Can you --

3  A.  Plus, I was around in the early '80s.  It would have been

4  easy for them to have done studies.

5  Q.  Were companies routinely doing studies?  And by that I mean

6  case control studies, cohort studies, and randomly controlled

7  trials.  Were they doing those types of studies and trials, and

8  I'm talking about corporations like Wyeth and Upjohn, in the

9  1970s?

10  A.  Yes.

11  Q.  Were they doing studies like that in the 1980s?

12  A.  Yes.

13  Q.  Were they doing studies like that in the 1990s?

14  A.  Yes.

15  Q.  What is a drug company's responsibility if they become

16  aware that there's evidence out there that their product may be

17  associated with a harm?

18  A.  To --

19       MR. URBANCZYK:  Your Honor, may I approach the bench?

20       (Bench conference reported as follows:)

21       MR. URBANCZYK:  That question, Your Honor, is

22  objectionable because it was not related to an FDA requirement.

23  Your order specifically limits Dr. Parisian's ability to talk

24  about a duty to test insofar as she has cited federal

25  regulations.  That's the limit of her ability to talk about a

Page 122

page 1242

1  duty to test, according to your ruling.

2       THE COURT:  Hang on just a minute.

3       MR. MORRIS:  I'll be happy to show her 21 C.F.R.

4  501(c).

5       THE COURT:  Okay.

6       (Whereupon, proceedings continued in open court as

7  follows:)

8  BY MR. MORRIS:

9  Q.  Dr. Parisian, I'd like to show you a federal regulation,

10  and ask you, first of all, if you can identify this?

11  A.  Yes.

12  Q.  All right.  And this one is which regulation?

13  A.  This is 21 C.F.R. 201.56.  It's about requirements for

14  labeling.

15  Q.  And this is where FDA tells the drug manufacturers what

16  needs to be in the label.  Correct?

17  A.  It's one of the places, yes.  And they're specifically

18  talking about prescription drug labels, which would be your

19  product insert, that 201.100(d).

20  Q.  And below 201.56, what does (a) state that they should

21  provide?

22  A.  "The labeling shall contain a summary of the essential

23  scientific information needed for the safe and effective use of

24  the drug."

25  Q.  Then what does it say?

Page 123

page 1243

1  A.  "The labeling shall be informative and accurate and neither

2  promotional in tone nor false or misleading in any particular."

3  Q.  Not supposed to be misleading.  Correct?

4  A.  Correct.

5  Q.  Then what does it say?

6  A.  "The labeling shall be based whenever possible on data

7  derived from human experience.  No implied claims or suggestions

8  of drug use may be made if there is inadequate evidence of

9  safety or a lack of substantial evidence of effectiveness.

10  Conclusions based on animal data but necessary for safe and

11  effective use of the drug in humans shall be identified as such

12  and included with human data in the appropriate section of the

13  labeling, headings for which are listed in paragraph (d) of this

14  section."

15  Q.  And below these are the paragraphs that the jury has seen in the

16  labels, the description, the clinical pharmacology, indications

17  and usage, contraindications, warnings, et cetera.  Correct?

18  A.  Correct.

19  Q.  Is there a difference between a contraindication and a

20  warning?

21  A.  Yes.

22  Q.  What does contraindication tell the doctor?

23  A.  A contraindication says don't use it for anything.

24  Q.  All right.  Don't use it if the patient has already had a

25  previous illness, for instance?

Page 124

page 1244

1  A.  Yes.

2  Q.  Then I want to show you another federal regulation and ask

3  you if you've seen this one before.  Have you seen that before?

4  A.  Yes, sir.

5  Q.  And which regulation is this?

6  A.  This is the follow-up one after the other one, 21 C.F.R.

7  201.57.  It talks about the specific requirements for what

8  should be in the label.

9       THE COURT:  If you will, talk just a little slower.

10       THE WITNESS:  Yes, sir, I will.  Thank you.  I'm

11  sorry.  I'll calm down.

12  BY MR. MORRIS:

13  Q.  And if we turn to the next page on the specific

14  requirements, and we come down to the section on the labeling,

15  it says, "This section shall also contain the following

16  information."  What does it say?

17  A.  "If evidence is available to support the safety and

18  effectiveness of the drug only in selected subgroups of the

19  larger population with a disease, syndrome, or symptom under

20  consideration, example, patients with mild disease or" -- I

21  can't read the little part there.  Slide it over.

22  Q.  "... or patients in a special age group."

23  A.  "... a special age group, the labeling shall describe the

24  available evidence and state the limitations of usefulness of

25  the drug."

page 1245

3 1  Q.  Okay.  Then if we go down to No. 3 below, what does it say?
4 2  A.  "If there are specific conditions that should be met before
5 3  the drug is used on a long-term basis, or if the indications for
6 4  long-term use are different from those for short-term use, the
7 5  labeling shall identify the specific indications for each use."
8 6  Q.  So what responsibility does that put on manufacturers like
9 7  Wyeth and Upjohn if they know that their products are being used
10 8  together for long durations?
11 9  A.  They're required to provide adequate instructions and
12 10  warnings about the use, particularly when you switch to
13 11  long-term use versus short-term use, which is what it was
14 12  approved for.
15 13  Q.  And assume with me that these manufacturers are aware that
16 14  patients are taking the combination in excess of ten years on
17 15  many occasions, would simply studying the drug for two, three,
18 16  four, five years be a sufficient fulfillment of their duty?
19 17  A.  No, because this is -- cancer is a latency issue, it will
20 18  take longer than two years usually to develop, so you would want
21 19  to have a longer term study, about ten years, maybe.  And as
22 20  you've heard, the WHI actually had it appear in 4.4 years.  But
23 21  a cancer study would have to be a longer term study than two
24 22  years.
25 23  Q.  And given what we've talked about earlier -- I just want to
26 24  refresh the jury's memory on this.  For a case control study,
27 25  could you do a case control study looking at a ten-year duration

page 1246

3 1  without it taking ten years to do it?
4 2  A.  Yes, particularly when it's been on the market for a long
5 3  time.  I mean, we didn't discuss that these are two very old
6 4  drugs.
7 5  Q.  And with regard to these drugs, if you were to perform a
8 6  case control study, what does that entail?
9 7  A.  Retrospect looking at the populations that are already out
10 8  there and the reports of cancer and trying to find people that
11 9  match up, in terms of looking for a difference in the
12 10  populations.
13 11  Q.  All right.  And was there data available on the issue of
14 12  combination usage that these companies could have looked at
15 13  after 1975?
16 14  A.  Yes.
17 15  Q.  Was there data available in '80?
18 16  A.  Yes.  And the FDA asked for that data, but it never came
19 17  forward.
20 18  Q.  Was there data available in '85?
21 19  A.  Yes.
22 20  Q.  Now, going on further in the regulations, in the warnings
23 21  section, what do the requirements say with regard to warnings?
24 22  A.  Shall I read it?
25 23  Q.  Yeah.  If you'd read the highlighted section, if you can.
26 24  A.  "Warnings:  Under this section heading, the labeling shall
27 25  describe serious adverse reactions and potential safety hazards,

page 1247

3 1  limitations in use imposed by them, and steps that should be
4 2  taken if they occur.  The labeling shall be revised to include a
5 3  warning as soon as there is reasonable evidence of an
6 4  association of a serious hazard with a drug; a causal
7 5  relationship need not have been proved."
8 6  Q.  Let's take this first section.  With regard to that
9 7  section, when is the manufacturer's duty triggered under the
10 8  regulations?
11 9  A.  As soon as there is reasonable evidence of an association.
12 10  Q.  What does it mean when it says "a causal relationship need
13 11  not have been proved"?
14 12  A.  It means that you don't have to determine, as, say, in a
15 13  randomized controlled study, that there's a causal relationship.
16 14  Typical associations are seen in observational studies.  So
17 15  they're saying that you don't have to do a randomized controlled
18 16  study in order to change your labeling.  Also, the other way --
19 17  Q.  Say that one more time.  Can you clarify what you mean that
20 18  you don't have to do an RCT to change your label?
21 19  A.  Well, when it talks about a causal relationship, at the FDA
22 20  you think of a causal relationship being determined in a
23 21  randomized controlled study.  Another way to do a causal
24 22  relationship is to give a person a drug, and if the problem
25 23  happens again, then you can say it's a cause and effect.  But
26 24  they're saying that you don't even need that.  You just need to
27 25  have some association, which can usually be found in an

page 1248

3 1  observational type of a study, that this product is associated
4 2  --
5 3      THE COURT:  A little slower, please, ma'am.
6 4      THE WITNESS:  Yes, sir.
7 5      That this product is associated with this problem.  So it's
8 6  saying that you can use the standard of an association.  You
9 7  don't need to do a whole clinical trial to make sure that some
10 8  bad thing would happen to somebody.  It's hard to do a clinical
11 9  trial to enroll a person, you know, to see if you're going to
12 10  drop dead.  They don't like to sign up for that.
13 11      THE COURT:  You may need to take some breaths as you
14 12  go along.  You're talking a little faster than I can listen.
15 13      THE WITNESS:  I'm sorry.
16 14  BY MR. MORRIS:
17 15  Q.  You mentioned observational studies.  When we say
18 16  "observational studies," are we talking about case control
19 17  studies and cohort studies?
20 18  A.  Yeah, observational studies are case controlled studies,
21 19  databases, they can be questionnaires, they can be even patient
22 20  populations.  Some doctor can use his own patient population to
23 21  see if there's a risk.
24 22  Q.  And when the regulations say "association of a serious
25 23  hazard," do you have an opinion as to whether or not breast
26 24  cancer would be contemplated as a serious hazard?
27 25  A.  Yes, sir, it would be.

Page 129

page 1249

1 Q. And just for the record, if I ask you questions that call
2 for scientific opinions, would you agree to base those on
3 reasonable scientific probability?
4 A. Yes, sir.
5 Q. Okay. And reasonable medical probability?
6 A. Sure.
7 Q. Now, down further we see another section. What does this
8 state?
9 A. "Special problems, particularly those that may lead to
10 death or serious injury, may be required by the Food & Drug
11 Administration to be placed in a prominently displayed box."
12 Q. We've talked with the jury about the black box warning that
13 was on Premarin and Prempro for endometrial cancer. Is that the
14 type of warning that this section is suggesting?
15 A. Yes. A box calls attention to it immediately when someone
16 looks at it.
17 Q. And would breast cancer be a special problem that may lead
18 to death or serious injury?
19 A. Yes, based on my medical training and my training at the
20 FDA and to a reasonable degree of medical certainty, cancer
21 would be a serious injury that could potentially lead to death.
22 Q. All right. And does it also include sections on what you
23 should do in the event that you have animal data that suggests
24 carcinogenesis?
25 A. Yes, it does.

Page 130

page 1250

1 Q. And what does the labeling requirement say regarding animal
2 data?
3 A. Well, depending on how the animal data relates to human
4 beings, they can place it in different areas in terms of calling
5 attention to it, and they can put it in a black box, if that's
6 the strongest information about that risk. There's some things
7 you can't test in humans that you may have information in
8 animals, and those would be one of the things that you're
9 required to put in a black box, like anthrax. Not many people
10 want to sign up for an anthrax study, but you can test it with
11 animals.
12 Q. During your tenure at FDA, were you responsible or did you
13 have as part of your job responsibility reviewing studies and
14 coming up with ideas concerning labeling?
15 A. Yes. In the Office of Compliance, I was required to review
16 labeling and see if it was consistent with the regulations.
17 Oftentimes I was given clinical studies to see if it actually
18 fit with the labeling. So, yes.
19 Q. And who does the draft of the product labeling that
20 ultimately goes with the product? Who does the first draft?
21 A. The manufacturer. Labeling at the FDA is a negotiated
22 process. The FDA doesn't write labeling, and it has to
23 negotiate the best labeling that it can for the public.
24 Q. So in terms of labeling, first draft is from the
25 manufacturer. Is that correct?

Page 131

page 1251

1 A. Yes.
2 Q. Now, in terms of this negotiated experience, who provides
3 the data to the FDA in terms of the safety of the product and
4 any potential harms?
5 A. The manufacturer. The FDA just receives the information
6 that's provided from the company, and then that information they
7 try to capture in the final labeling.
8 Q. And in terms of the 40 employees that are working in the
9 safety and surveillance section at CDER, if the corporation, the
10 manufacturer was not coming before the FDA to either gain a New
11 Drug Application, a supplemental application, some extension of
12 the product, would those employees at FDA ever have a reason to
13 look at the science concerning that product?
14 A. Not necessarily. The 40 reviewers that we're talking about
15 get their working orders from the review center for new drugs.
16 So they do consultation at the request of the new drug
17 reviewers. So if they had -- unless someone in new drugs had a
18 question, they would probably not be the ones to routinely
19 review the information, particularly of an old drug.
20 Q. All right. Let's talk about Premarin. When was Premarin
21 approved for usage in postmenopausal women, based on your review
22 of the records in this case?
23 A. 1942. Something older than me.
24 Q. At the time that Premarin was approved in 1942, did the FDA
25 exist?

Page 132

page 1252

1 A. It existed, but it did not exist like we think of the FDA
2 today. The requirement -- the Food, Drug, and Cosmetic Act was
3 passed in 1938, so the FDA then was primarily involved in a
4 safety review; was it manufactured safely? The regs in 1938 had
5 been made to respond to a patient's death from a product that
6 had some ethylene glycol in it in the patients that died. So
7 the primary focus of the FDA in those days was safety.
8 Q. Okay. And when Premarin was approved in 1942, what would
9 FDA have considered in terms of determining whether or not it
10 was safe and effective?
11 A. Well, they wouldn't have considered about effectiveness.
12 They just basically looked at the marketing application and
13 determined that it was safe to be used in human beings.
14 Q. At that time, did the FDA require manufacturers to submit
15 clinical trials, Phase I, Phase II, Phase III trials, that were
16 done in human beings that proved that the product was safe and
17 effective?
18 A. No. Those types of trials actually didn't exist for the
19 FDA until around 1985.
20 Q. All right. So from '42 to 1985, it wasn't routine to have
21 Phase I through III trials?
22 A. No. The process was finally designed and finalized in the
23 regulations in '85.
24 Q. All right. Now, in 1942, when they began marketing
25 Premarin, when was the next date that the FDA would have looked

1 page 1253

2

3 1  at the safe and effective use of the product and whether or not

4 2  it was still a safe and effective product?

5 3  A.   There was a change in the law in 1962 where there was -- I

6 4  don't know if you recall -- there was the thalidomide crisis.

7 5  Babies were being born in Europe, particularly, from a drug

8 6  called thalidomide.   So at that point in time, Congress changed

9 7  the law to require that a product had to be found to be both

10 8  safe and effective.   So that was the first time that efficacy,

11 9  what was a product good for, came into as a requirement for

12 10  manufacturers.   So the way Congress and FDA handled all the

13 11  drugs that had been approved before 1962 is that they did a

14 12  retrospective review called a DESI review, D-E-S-I, Drug

15 13  Efficacy Study --

16 14        THE COURT:   A little slower.

17 15        THE WITNESS:   Drug Efficacy Study Implementation,

18 16  DESI.

19 17        THE COURT:   All right.   We're going to break for the

20 18  noon hour.   We'll try to start back at 1.   Don't talk about the

21 19  case or anybody involved in it, don't start making up your mind.

22 20  Consciously avoid it.   Let the jury stand out.   Everyone else,

23 21  remain as you are.

24 22        (Whereupon, the jury exited the courtroom and proceedings

25 23  continued in open court as follows:)

26 24        THE COURT:   Jury's out.   We'll be in recess about five

27 25  minutes or so, and then I'll hear you on the documents that I

1 page 1254

2

3 1  have not yet ruled on.

4 2        You may stand down.

5 3        THE WITNESS:   Thank you.

6 4        (Recess at 12:02 p.m.; continuing at 12:13 p.m., jury not

7 5  present.)

8 6        THE COURT:   All right.   We're back on the record.

9 7  We'll go first to Plaintiff's Exhibit 9599.

10 8        MR. WALKER:   Judge, I hate to do this, but can I make

11 9  one comment before we start on that exhibit, please?

12 10        THE COURT:   On this exhibit?

13 11        MR. WALKER:   Yes, sir.   The Court said that many

14 12  exhibits were excluded for not following the proper procedures

15 13  regarding the long list.   But the Court's own order of November

16 14  23 says that exhibits not on the short list, meaning the ones

17 15  from the long list, simply have to be disclosed 30 hours in

18 16  advance and get a ruling from the Court.   And we did that.   We

19 17  disclosed them 30 hours in advance and sought a ruling from the

20 18  Court on them, which is what the Court's order mandated.

21 19        THE COURT:   All right.   Let's go to Plaintiff's

22 20  Exhibit 9599.

23 21        MR. JOHNSON:   Your Honor, there's good news.

24 22  Plaintiff's counsel approached on the break and said 9599

25 23  they're not intending to use any longer.

26 24        THE COURT:   Is that true?

27 25        MR. WALKER:   Yes, sir.

1 page 1255

2

3 1        THE COURT:   All right.   Let's go to Plaintiff's

4 2  Exhibit 7423.

5 3        MR. JOHNSON:   And, Your Honor, plaintiff's counsel has

6 4  also represented that that exhibit, they do not intend to use

7 5  that exhibit, PX 7423.

8 6        MR. WALKER:   Yes, sir.

9 7        THE COURT:   All right.

10 8        MR. JOHNSON:   Thank you.

11 9        THE COURT:   Now we'll go back over to page 2, starting

12 10  up at the top, 950-A, strategic publications development

13 11  meeting, and so on and so forth.   Are all those essentially the

14 12  same, as far as argument?

15 13        MR. WALKER:   Yes, sir.

16 14        THE COURT:   All right.   Tell me why you think they're

17 15  admissible.

18 16        MR. WALKER:   The Court admitted these documents in

19 17  both the Reeves and the Rush case on the grounds that they're

20 18  documents that show that Wyeth's response to adverse studies

21 19  that came out of the literature was not to study and not to

22 20  warn, but to engage in a counteract or a rebuttal by retaining

23 21  doctors to write rebuttal articles against these studies.   The

24 22  Court did not have any problem with that level of admissibility.

25 23  The Court's only concern at the last hearing was the timing of

26 24  this particular document.   The reason that this document is

27 25  being shown, these series of documents, is because they are a

1 page 1256

2

3 1  situation where we can prove each step in the process that

4 2  occurred.   The retaining of the doctor, the cutting of the

5 3  check, having DesignWrite, the consulting firm, find the doctor,

6 4  draft the document.   We have the original draft that they sent

7 5  to the doctor to sign off on.   We have every step to show that

8 6  this is the way this process took place.   But we know it's a

9 7  process that has taken place for many, many years, including the

10 8  time that this plaintiff was on the drug.

11 9        MR. HOFFMAN:   Nathan Hoffman on behalf of Wyeth.

12 10        Your Honor, the problem is, while that may be interesting,

13 11  it's not relevant to the case, because there's no connection to

14 12  any claim here.   Now, they don't only have the time frame issue,

15 13  which is 2003, but if you take a look at their failure --

16 14        THE COURT:   Why is this different from the other two

17 15  cases?

18 16        MR. HOFFMAN:   Well, Your Honor --

19 17        THE COURT:   Do you think I made a mistake in the other

20 18  two?

21 19        MR. HOFFMAN:   Your Honor, I'm not sure if Mr. Walker's

22 20  recollection is correct.   I looked at the transcript.   I may be

23 21  mistaken, but I thought the representation was it was going to

24 22  be connected up to the case in Reeves or in Rush somehow, and

25 23  the doctor's already been on and off the stand here and I don't

26 24  think they showed it to him.   I don't think there's any

27 25  testimony that he has seen or relied upon this article in any

page 1257

1  way.
2      MR. WALKER:  I made the same argument in Reeves as I
3  made in this case right now.
4      MR. HOFFMAN:  Your Honor, moreover, when we look at
5  the time issue here, to be clear on where we are, we showed Your
6  Honor this demonstrative exhibit back in November.  If you look
7  at the time frame, we're talking about a May 2003 publication.
8  Mrs. Scroggin is off of hormone therapy for three years.  In
9  terms of a failure to test or a failure to warn, it simply not
10 there.  So this has nothing to do with any claim in this case.
11 What this has to do with is plaintiff's counsel --
12     THE COURT:  A little slower.
13     MR. HOFFMAN:  Plaintiff's counsel is trying to say
14 that there's some sort of reasonableness issue, and somehow
15 reasonableness is a claim in this case, so let's go back and
16 look what Mr. Morris said pretrial.  Three times:  How
17 reasonable this company is.  That should go to reasonableness of
18 their conduct.  And you asked him, "Let me ask you this.  Assume
19 they did this in 2001, 2002, and 2003, assume they got a
20 ghostwritten article that was contrary to the truth and was able
21 to manipulate it to get it published, how would that go to their
22 negligence with respect to this plaintiff?"  Mr. Morris answers,
23 "With respect to this plaintiff, that particular article would
24 have no effect.  I'll grant that to Your Honor.  The point is,
25 the reasonableness of the company and their duty to test."

page 1258

1      Now, of course, as Your Honor knows, the problem is,
2  there's no reasonableness claim.  And with respect to
3  Dr. Parisian, who they want to use this document with, your
4  order from November 21, 2000, it's docket 389, specifically
5  says, "Dr. Parisian will not be permitted to talk about or refer
6  to what an ethical or responsible pharmaceutical company does or
7  would do."  And that's exactly what they're trying to do here.
8      THE COURT:  Mr. Walker?
9      MR. WALKER:  Well, counsel says that reasonableness is
10 not a claim in the case.  Negligence is a claim in the case.
11 It's a principal claim.  And the essence of negligence is
12 reasonableness.
13     THE COURT:  Objection overruled on each of these
14 documents.  Exception saved.
15     Have we covered all the documents now?
16     MR. MOORE:  Your Honor, this is not a document.
17     THE COURT:  Well, just a minute.  I'll get to you in
18 just a minute.
19     State again why you say you didn't violate the long list
20 rule, Mr. Walker?
21     MR. WALKER:  Because the long list rule says that if a
22 party wants to use a document from the long list, they must
23 disclose the document to the adversary 30 hours in advance and
24 not use the document until the Court has ruled on its
25 admissibility.

page 1259

1      THE COURT:  What says the defendant in response to
2  Mr. Walker's contention that I did not properly apply the long
3  list rule?
4      MR. MOORE:  Well, Your Honor, we had the hearings back
5  in December, and as you recall, with more documents than not,
6  plaintiff's response was "Long list, long list, put them on the
7  long list."  In other words, we're not going to take them up
8  pretrial and during the time that Your Honor had set for it.  So
9  what that order contemplates is a couple of select documents
10 that they want to bring off the long list.
11     THE COURT:  Maybe I wasn't precise enough.  But is it
12 true that I said you can bring it up by giving the other side 30
13 hours' notice?
14     MR. MOORE:  That's right.  And that's what they did,
15 they put it on their disclosure list, we filed our objections.
16 They never sought a pretrial ruling.  We filed our objections.
17 We brought it up to Your Honor this morning before court, and
18 just noted we still have our objections.  They have not sought a
19 ruling on these documents.  So it's their burden to seek a
20 ruling on the documents.  And that's what I was saying this
21 morning.  We filed our objections, they're on the record.
22 Plaintiffs have not met their burden of getting a ruling of
23 admissibility, so they can't use them.  So we're not sandbagging
24 or --
25     THE COURT:  Well, here's my problem.  If I made a

page 1260

1  rule -- and I thought I made it tighter than this, but
2  Mr. Walker tells me I didn't.  If I said he could bring it off
3  the long list, or any party can bring it off the long list by
4  notifying the other side at least 30 hours before they're going
5  to offer it, then how do I get around that ruling now if I've
6  made it?  I mean, they gave 30 hours' notice.
7      MR. MOORE:  That's right, and we objected.
8      THE COURT:  I know.  It looks to me like the long list
9  is not a proper ground for me to exclude it since they gave
10 30 hours' notice.
11     MR. MOORE:  I think it is, Your Honor, with respect to
12 a wholesale moving of items from --
13     THE COURT:  I made a mistake in allowing this, but --
14 I mean, I don't like getting all these documents with a 30-hour
15 notice, but if I said they can do that, how can I say now you
16 can't do it?
17     MR. MOORE:  Well, Your Honor, I think if they would
18 have been reasonable about the amount of documents they wanted
19 to move from the long list, one or two or three --
20     THE COURT:  I agree with you, I think it is unfair to
21 give that many.  But I still don't see how, if that's what my
22 ruling was, I don't see how I can keep it out on that basis.
23     MR. MOORE:  Right.  And that's not the only objection
24 we have.
25     THE COURT:  I know you have other objections.  I've

page 1261

1 ruled only on the long list objection.

2     MR. MOORE:  Okay.  As I said, Your Honor, we believe

3 there are too many coming off the long list, they didn't meet

4 their burden of seeking admissibility before the witness came on

5 the stand.  But you're correct that they didn't --

6     THE COURT:  Whoa.  All I need right now on the long

7 list ruling I made, do you agree with Mr. Walker that I said to

8 get it off the long list you've got to give 30 hours' notice

9 before you offer it?

10     MR. MOORE:  Yes.

11     THE COURT:  All right.  Then they have not violated

12 that rule, have they?

13     MR. MOORE:  Correct.

14     THE COURT:  Let's go to the other objections.  I guess

15 we have to go back over all of these.  Let's go to -- I was

16 wrong in that ruling.  It's obvious.

17     MR. WALKER:  Most of these involve the same issue,

18 Judge, and I think can be handled in one fell swoop.

19     THE COURT:  All right.  Let me see.  1341.

20     MR. WALKER:  By the way, all eight of these, Judge,

21 involve the issue of funding to ACOG and NAMS that you allowed

22 us to discuss with Dr. Kuperman, but said we'd have to wait

23 until another witness who had seen the documents before we could

24 actually seek to introduce the documents.

25     MR. JOHNSON:  Your Honor, you ruled on PX 1097.  You

page 1262

1 ruled last week.  You ruled earlier this morning that you would

2 issue the same objection -- I mean, the same ruling.  The same

3 subject matter for each and every one of these documents.

4     THE COURT:  All right.  What about 1341?

5     MR. JOHNSON:  It's the same issue as 1097.

6     MR. FARIES:  That's not correct.

7     MR. JOHNSON:  1097 is a letter about ACOG.  1341 --

8     THE COURT:  Wait just a minute.  Do I have 1097?

9     MR. JOHNSON:  I have a copy of it, Your Honor.

10     THE COURT:  Okay.

11     MR. JOHNSON:  That's the one you excluded last week

12 and again this morning.

13     THE COURT:  I excluded that, that's true.

14     MR. JOHNSON:  Yes, Your Honor.  And 1341 --

15     MR. WALKER:  But there's a caveat to the exclusion.

16 You said we can use it on redirect without using the document --

17 without introducing the document itself into evidence.

18     THE COURT:  That's correct.

19     MR. JOHNSON:  Right.  So the subsequent documents,

20 starting with PX 1341, go to the identical issue, funding of

21 ACOG.  Now, we have additional -- --

22     THE COURT:  What about the same ruling then?

23     MR. JOHNSON:  I thought that I was saying.

24     MR. WALKER:  With all due respect, Your Honor excluded

25 this 1097 because it's a patient brochure the patient hadn't

page 1263

1 gotten.  These documents are internal memoranda from Wyeth

2 describing the particular funding that they gave to ACOG and

3 NAMS, which is different than a patient brochure which,

4 undoubtedly, the Court excluded because it is marketing evidence

5 that's not relied upon by the doctor.

6     THE COURT:  Let me see 1341.

7     MR. WALKER:  Yes, sir.

8     MR. JOHNSON:  I have a copy of it, Your Honor.

9     THE COURT:  I'm sure I've got it, but I'm not good at

10 keeping up with documents, as you've probably noticed.

11     MR. JOHNSON:  We have additional objections, Your

12 Honor, to that document.

13     THE COURT:  All right.  Give me the additional

14 objections to 1341.

15     MR. JOHNSON:  This is beyond the scope of this

16 witness's expert opinion.  This witness has not in neither her

17 report nor in her deposition, nor will she be able to say here

18 today, that any funding of ACOG violated any type of FDA

19 regulation whatsoever, was contrary to any established or

20 objective rules.  All she can say about it is, well, this is

21 something an ethical company doesn't do; doesn't give

22 unrestricted grants to organizations like ACOG.  So this witness

23 has not provided that opinion.  And to the extent she has, it

24 has been ruled out by the Court, I believe, Your Honor.

25     MR. WALKER:  Well, I think the Court's limitations on

page 1264

1 Dr. Parisian's testimony relate to her discussing the company's

2 conduct and whether it's reasonable or unreasonable or negligent

3 or not negligent.  And the Court has indicated that her

4 conclusions regarding particular acts have to stem from FDA

5 regulations.  However, Judge Jones expressly ruled that in

6 looking at documents, given how voluminous they are from Wyeth,

7 that this particular witness, Dr. Parisian, can explain

8 documents and what they show so long as she doesn't get into an

9 expert evaluation of whether those documents show reasonableness

10 or unreasonableness, absent reliance on the FDA regulations.

11     THE COURT:  Give me an example of what you think she

12 should be able to testify to as to 1341.

13     MR. WALKER:  1341 -- I'm sorry, Judge.

14     THE COURT:  Beg your pardon?

15     MR. WALKER:  I'm sorry.

16     THE COURT:  For what?

17     MR. WALKER:  That this is taking --

18     THE COURT:  Hit dog hollers.  The dog that got hit

19 hollers.

20     MR. WALKER:  This is a document which shows it's just

21 one of the Wyeth --

22     THE COURT:  When you have a court reporter from

23 Brooklyn, you have to explain everything to her.  Put that in

24 the record.  All right.

25     MR. WALKER:  This is just one document that explains

Page 145

page 1265

3  1    one payment Wyeth made to the American College of Gynecology.
4  2    The only thing she can say, or what she'll testify to is this is
5  3    one of a number of payments that Wyeth made to support the
6  4    activities of the American College. And it's just factual
7  5    testimony in which -- without really know
8  6    what this is. If we just introduced this into evidence without
9  7    testimony, the jury would look at this and say, Why did they
10 8    introduce this?
11 9        THE COURT: What is the relevance of introducing this?
12 10       MR. WALKER: Because Dr. Kuperman said that his
13 11   opinions, and Wyeth spent a great deal of time eliciting his
14 12   opinions on whether there's a causal relationship between E plus
15 13   P and breast cancer, and he identified two sources for his
16 14   opinions. He says, I rely on the ACOG materials that I get sent
17 15   periodically and I rely on the North American Menopause
18 16   Society's activities, principally, and that's where my
19 17   conclusions came from.
20 18       MR. JOHNSON: Your Honor, I think Mr. Walker just said
21 19   what I expected him to say, which is he wants to establish
22 20   certain facts. But an expert is not a chute that you dump
23 21   documents down to establish facts. An expert gives opinions.
24 22   He hasn't connected the facts that he wants to establish to any
25 23   opinion she's going to make in this case. He's just simply
26 24   using an expert to try to establish something -- I mean, there's
27 25   a Wyeth witness coming --

Page 146

page 1266

3  1        THE COURT: You don't think it's relevant that they
4  2    paid money to ACOG?
5  3        MR. JOHNSON: Well, it may be relevant to the case,
6  4    but it's not relevant to her opinions. She's not going to say
7  5    their payment to ACOG, under FDA regulations, that violated
8  6    their obligation to provide adequate warnings. You know,
9  7    there's no nexus whatsoever to her opinions. They can ask a
10 8    fact witness about these documents, and they'll have an
11 9    opportunity to do that. But this expert is not the witness for
12 10   it.
13 11       MR. WALKER: They made this objection in their Daubert
14 12   motion. They said she should not be allowed to go through Wyeth
15 13   documents and interpret what some of the passages from the
16 14   documents mean.
17 15       THE COURT: In other words, all you're going to do is
18 16   introduce this to show they did make payments to ACOG?
19 17       MR. WALKER: That's correct.
20 18       THE COURT: I'm going to allow it over the objection.
21 19   You had a facial expression there. Would you like to
22 20   verbalize it?
23 21       MR. JOHNSON: No, sir. Thank you.
24 22       THE COURT: Anything else? We're in recess.
25 23       MR. MOORE: Wait a minute, Your Honor.
26 24       THE COURT: You had a point?
27 25       MR. MOORE: I did. This is just a correction of the

Page 147

page 1267

2  1    record yesterday with respect to the demonstrative exhibits.
3  2    Wyeth identified three demonstrative exhibits: Demonstratives
4  3    16, 17, and 18. They contain learned treatise material. Your
5  4    Honor took those under advisement. Wyeth agrees to withdraw
6  5    those demonstrative exhibits. We consulted with the plaintiff,
7  6    and they don't object, obviously. Then Wyeth Demonstrative
8  7    Exhibit 13 was inadvertently admitted. It should have been
9  8    Demonstrative Exhibit 15. And plaintiffs have agreed to that as
10 9    well.
11 10       THE COURT: Get with Ms. Johnson to make sure we have
12 11   those numbers right. We're in recess.
13 12       (Defendant Wyeth Demonstrative Exhibit 13 withdrawn.)
14 13       (Defendant Wyeth Demonstrative Exhibit 15 received in
15 14   evidence.)
16 15       (Recess at 12:33 p.m.)
17 16       C E R T I F I C A T E
18 17   I, Eugenie M. Power, Official Court Reporter, do hereby
19 18   certify that the foregoing is a true and correct transcript of
20 19   proceedings in the above-entitled case.
21 20
22 21
23 22
24 23   _____   Date: February 12, 2008
25   Eugenie M. Power, RMR, CRR, CCR
26 24   United States Court Reporter
27 25

Page 148

page 1268

3  1    (Continuing at 1:03 p.m.)
4  2        THE COURT: You may proceed. Good afternoon.
5  3    BY MR. MORRIS
6  4    Q   Dr. Parisian, before the lunch break we were talking
7  5    about Premarin's history, and I believe that you had left off
8  6    explaining what happened in 1962 with the DESI review. And I
9  7    believe you were telling the jury what the definition of DESI,
10 8    D-E-S-I, is. What was that?
11 9    A   Drug safety -- no, drug study safety -- no, Drug Efficacy
12 10   Study Implementation. There you go.
13 11   Q   All right. And sometimes --
14 12       THE COURT: Time out.
15 13       MR. MORRIS: Okay. Thank you, Your Honor.
16 14   BY MR. MORRIS
17 15   Q   Can you explain what the FDA's review consisted of, of
18 16   drugs that had already been approved like Premarin?
19 17   A   The Congress said that they wanted FDA to go back and
20 18   look at all the drugs that had been put on the market before
21 19   1962 and determine what they were effective for because they
22 20   were marketed, they were deemed us safe. And so FDA had to
23 21   come up with some mechanism to look at all these drugs and try
24 22   to figure out what their indication was because that wasn't
25 23   something that was required that the FDA determine before '62.
26 24   So they did what they called the DESI review, which was they
27 25   made a contract with the National Academy of Science and their

1 page 1269

2

3  1  experts who knew about certain areas of drugs, and they would

4  2  review the printed literature for types of drugs to figure out

5  3  what they were effective for.  So they didn't do new clinical

6  4  studies on all the drugs on the market.  They just looked at

7  5  what their literature supported that something was effective

8  6  for, and then they would make recommendations, which the FDA

9  7  would then look at and determine if, indeed, a product was

10 8  effective.  Some products actually were removed from the market

11 9  because they couldn't find anything that they were effective

12 10  for.

13 11  Q    And with regard to Premarin, when that occurred in 1962,

14 12  was there any change in the label that had been on Premarin at

15 13  that point?

16 14  A    Not really Premarin.  Premarin kept the menopausal

17 15  indications.  So it didn't have that primary change.  Provera

18 16  had the bigger change.

19 17  Q    Now, in 1975, roughly around 1975, did scientists become

20 18  aware that Premarin was causing endometrial cancer?

21 19  A    Yes.  It was a, it was -- there were two studies that

22 20  were published in the New England Journal of Medicine.  One, I

23 21  believe, was the Kaiser database, and another was Dr. Ziel.

24 22  And the silent -- the increase in endometrial carcinoma was

25 23  being reported in the medical literature and with the use, of

26 24  long-term use of Premarin.

27 25  Q    And what type of warning was placed in the labeling after

1 page 1270

2

3  1  1975 for this risk of endometrial cancer?

4  2  A    The prolonged use had an increased risk of endometrial

5  3  carcinoma.

6  4  Q    And we were looking at the regulations earlier, and they

7  5  talk about the boxed warning.  Did they put a boxed warning

8  6  around the endometrial cancer issue?

9  7  A    Yes.  It was a significant issue.  It was a case where

10 8  the FDA had data to support that the -- there was a association

11 9  between estrogen, primarily Premarin, which was being

12 10  prescribed, and endometrial carcinoma.  So when FDA has data

13 11  like that to say that there is an actual relationship, then

14 12  they use that information to try to compel the -- that that

15 13  kind of a warning is put in all similar types of drug products.

16 14  Q    Your work at the FDA when you were reviewing labels and

17 15  reviewing products for safety, did you have an occasion to

18 16  become familiar with review of epidemiological studies?

19 17  A    Yes.  We had to use -- all the centers of the FDA, we use

20 18  epidemiological studies.  I had a group of epidemiologists that

21 19  I worked for on certain issues, and we will try to find out

22 20  data to support that there may be a safety issue.

23 21  Q    And have you had an occasion during the course of

24 22  preparation for this trial to review the epidemiology that

25 23  existed concerning estrogen and progestin and their

26 24  relationship to breast cancer?

27 25  A    Yes.

1 page 1271

2

3  1  Q    During the course of that review, did you also review a

4  2  number of epidemiological studies concerning estrogen and

5  3  endometrial cancer?

6  4  A    Yes.

7  5  Q    Did you have an occasion to review studies that involved

8  6  estrogen alone and the issue of breast cancer?

9  7  A    Yes.

10 8  Q    With regard to your review of that, those studies over

11 9  the years, have you also had an occasion to see documents --

12 10  and I am talking about Wyeth documents and Upjohn documents --

13 11  that reference epidemiological studies?

14 12  A    Yes.

15 13  Q    Did the corporations rely upon epidemiological studies to

16 14  furnish them information about potential risks in their

17 15  products?

18 16  A    Yes.

19 17  Q    Now, I want to show you first an article from 1959.  This

20 18  is entitled "Prolonged Estrogen Therapy in Postmenopausal

21 19  Women" by Stanley Wallach, No. 6.  Have you seen this before?

22 20  A    Yes.

23 21  Q    If we go to the second page, can you see up in the

24 22  right-hand corner where it was published?

25 23  A    It was in JAMA, Journal of the American Medical

26 24  Association.

27 25  Q    All right.  And with regard to what was going on here, if

1 page 1272

2

3  1  you can read that top paragraph that I have put a little red

4  2  thing around?

5  3  A    Finally, the records of 292 postmenopausal women who

6  4  received estrogen therapy for more than 12 months were studied

7  5  in regard to:

8  6      1. The modes, results, and side effects of therapy;

9  7      2. The efficacy of estrogen therapy in the menopausal

10 8  syndrome;

11 9      3. The effect of prolonged therapy on the incidence and

12 10  course of postmenopausal osteoporosis; and

13 11      4. The incidence of breast and genital carcinoma during

14 12  prolonged estrogen therapy.

15 13  Q    Once again, what year is this?

16 14  A    '59.

17 15  Q    Were the researchers at least looking at breast cancer

18 16  also?

19 17  A    Yes.

20 18  Q    And if we pull over here to the last page, what was the

21 19  conclusion reached way back in 1959 in this small case control

22 20  study?

23 21  A    The fear -- do you want me to read that highlighted area?

24 22  Q    Please.

25 23  A    "The fear that breast and cervical carcinoma may result

26 24  from the therapy appears to be unfounded.  However, the

27 25  incidence of endometrial carcinoma in this group of patients is

Page 153

page 1273

3 1   many times the normal incidence."
4 2 Q    And that was a retrospective study of the results on 292
5 3   postmenopausal women, correct?
6 4 A    Correct.
7 5 Q    Now, would 292 women in a case control study be large
8 6   enough to detect, say, a relative risk of 2?
9 7 A    I don't believe so.
10 8 Q    Or a relative risk of 1.5?
11 9 A    It depends.  It depends.
12 10 Q    How would you characterize this in terms of the size of a
13 11   case control study that would be the proper design to look at
14 12   the issue of breast cancer?
15 13 A    For breast cancer?
16 14 Q    Yes.
17 15 A    Oh, it would be not large enough for breast cancer.
18 16 Q    All right.
19 17 A    And you also need to know the ages.  You would need to
20 18   know the length of time the women had been on certain dosing,
21 19   and there is biases that you would have to introduce -- address
22 20   in the study.  But you could do that; that wouldn't be hard.
23 21 Q    For instance, the jury has heard the terms of use --
24 22   current use, past use.  Would that be important?
25 23 A    Yes.
26 24 Q    Why would that be important?
27 25 A    Well, the two issues with the type of products we are

Page 154

page 1274

3 1   talking about are dose and duration.  How much did they
4 2   receive, and for how long a time?  The longer you receive that
5 3   particular dose, the greater increase to your risk.  So if a
6 4   person had never used it, well, they wouldn't be in here as
7 5   people taking hormones.  But if they had used it occasionally
8 6   and then stopped using it, well, their dosing and duration is
9 7   reduced.  If a person has used it continuously in a cyclic
10 8   fashion for 20 years, their dosing is different from someone
11 9   who may have had a short dose.  So it affects this type of a
12 10   product that we're talking about.
13 11 Q    And if we turn to the last page of this document, who
14 12   does it say this study was supported by in 1959?
15 13 A    This study was supported in part by grants from the
16 14   United States Public Health Service, the American Cancer
17 15   Society, and Ayerst Laboratories, New York.
18 16 Q    Ayerst Laboratories.  That's the same as Wyeth, correct?
19 17 A    Yes.
20 18 Q    Are you familiar with the term "safety signal"?
21 19 A    Yes.
22 20 Q    What is a safety signal?
23 21 A    A safety signal would be something that would notify you
24 22   that you need to look at a safety issue.  It's a flag that we
25 23   say, Hey, wait, you need to look at this issue more and see if
26 24   there is a safety issue here.  So it can be something very
27 25   simple.  It can be something large.  This would be a safety

Page 155

page 1275

3 1   signal about endometrial carcinoma in '59.
4 2 Q    And so in 1959, were they at least looking at the issue
5 3   of breast cancer from your review of this document?
6 4 A    Yes.
7 5 Q    Would this be a signal to the company in reviewing this
8 6   that there was at least some consideration that the product may
9 7   be causing endometrial cancer?
10 8 A    Yes.
11 9 Q    And would that serve as a safety signal for them to go
12 10   look at their product and study it further?
13 11        MR. URBANCZYK: Objection.  Leading.
14 12        THE COURT: Sustained.
15 13 BY MR. MORRIS:
16 14 Q    Let me ask you the question this way.  What -- what
17 15   impact should that have had on the corporation back in 1959?
18 16 A    Well, a company that supports a study that comes up with
19 17   a conclusion that there is potentially a risk of endometrial
20 18   cancer would usually follow up to see if perhaps that's true.
21 19 Q    Would you consider this to be a red flag?
22 20 A    Yes.  And that would be equivalent to a safety signal.
23 21 Q    You mentioned a moment ago that, by 1975, the endometrial
24 22   cancer crisis was known about through Dr. Ziel's and Finkle,
25 23   correct?
26 24 A    Correct.
27 25 Q    Do you know of any study that was done in that time frame

Page 156

page 1276

3 1   that addressed the issue of breast cancer as it relates to
4 2   Wyeth's Premarin?
5 3 A    No.
6 4 Q    I want to show you a document that has been previously
7 5   admitted.  I apologize for coughing.  Actually, it's a series
8 6   of documents, and I will show them to you.  They're already in
9 7   evidence -- 26, 27, and Plaintiff's Exhibit No. 30 -- and ask
10 8   you if you have seen these documents before.
11 9 A    Yes, sir.
12 10 Q    And do those documents reference any particular study
13 11   that had come out discussing the relationship between Premarin
14 12   and breast cancer?
15 13 A    You mean the Hoover, Gray, Cole, and MacMahon?
16 14 Q    Yes.
17 15 A    Pardon?
18 16 Q    Was the Hoover study a study that dealt with breast
19 17   cancer?
20 18 A    Yes.
21 19 Q    And do those documents address Wyeth's response to it?
22 20 A    Yes.
23 21 Q    And what year did those documents come out?
24 22 A    1976.
25 23 Q    All right.  I'm going to show you these on the overhead
26 24   so the ladies and gentlemen of the jury can follow along, and
27 25   His Honor.  Beginning in chronological order in March of 1976,

page 1277

3  1   there is discussion about the plans of Wyeth in relationship to
4  2   the Hoover study, and what were the plans that Wyeth had
5  3   initiated in response to the Hoover study?
6  4  A   You mean No. 1 there?
7  5  Q   Yes.
8  6       MR. URBANCZYK:  Objection, Your Honor.  This has
9  7   been gone over with the jury on two different occasions.  It is
10 8   repetitive.  Asked and answered.
11 9       MR. MORRIS:  This goes to the core of this
12 10  particular witness's testimony.
13 11      MR. URBANCZYK:  This witness is not qualified to
14 12  testify on this topic, Judge, by your ruling.
15 13      THE COURT:  Move through it quickly.  Objection
16 14  overruled, barely.
17 15      THE WITNESS:  Okay.
18 16  BY MR. MORRIS
19 17  Q   Let me ask you this question to preface this.  At the
20 18  FDA, what is the FDA's position on corporations, manufacturers
21 19  of pharmaceutical products who, rather than studying their
22 20  product, decide to either ignore the studies that are coming
23 21  out or engage in an active refutation of the results?
24 22      MR. URBANCZYK:  Objection, Your Honor.  No
25 23  foundation.
26 24      MR. MORRIS:  That's what I am asking her for, is
27 25  foundation:  What is the FDA's position on that?

page 1278

3  1       THE COURT:  I'm going to overrule it.
4  2  BY MR. MORRIS
5  3  Q   You may answer.
6  4  A   In this period of time, the FDA said that this was
7  5   passive action on the company and that they were ignoring the
8  6   types of studies that need to be done, and they were actually
9  7   reprimanded in this period of time.
10 8       MR. URBANCZYK:  Objection, Your Honor.  Move to
11 9   strike.  Could I approach, please?
12 10      (Bench conference reported as follows:)
13 11      MR. URBANCZYK:  Your Honor, at this time I move for
14 12  a mistrial.  You --
15 13      THE COURT:  That's too stout a remedy.
16 14      MR. URBANCZYK:  You specifically ruled out the
17 15  document she is referring to on endometrial cancer.  You ruled
18 16  it out in all three trials.  The reprimand that they are
19 17  referring to has nothing to do with breast cancer, has nothing
20 18  to do with this case, and you have ruled it out.  And this is
21 19  a -- this is an intentional effort to circumvent the Court's
22 20  rulings, and I move for a mistrial.
23 21      MR. MORRIS:  Your Honor, I had no intention
24 22  whatsoever.  I had no idea that she would throw out that
25 23  response.
26 24      THE COURT:  What do you suggest as a remedy?
27 25      MR. MORRIS:  A curative instruction that any

page 1279

3  1   reprimand they received was with regard to endometrial cancer.
4  2   If you want to mention the remedy --
5  3       THE COURT:  What I will say is that --
6  4       I beg your pardon?
7  5       MR. URBANCZYK:  I have another suggestion,
8  6   Your Honor, besides Mr. Morris's.
9  7       THE COURT:  What I plan on doing is saying that the
10 8   reprimand had nothing to do with any of the issues in this case
11 9   and strictly disregard it.
12 10      MR. MORRIS:  Fine.
13 11      THE COURT:  Motion for mistrial is denied because I
14 12  believe it's too strong a remedy for the error.
15 13      (Return to open court.)
16 14      THE COURT:  Ladies and gentlemen, the reprimand that
17 15  was referred to had nothing to do with any of the issues in
18 16  this case.  None of them.  So you are to totally disregard that
19 17  reference.
20 18  BY MR. MORRIS
21 19  Q   With regard to these documents from 1976, did it appear
22 20  that Wyeth was conducting a retrospective study?
23 21  A   That's what it said there.
24 22  Q   And with regard to review of the science, did it appear
25 23  that Wyeth -- what level of knowledge did Wyeth display in
26 24  these documents with regard to their understanding of the
27 25  possible association between estrogen and breast cancer?

page 1280

3  1       MR. URBANCZYK:  Objection, Your Honor.  This witness
4  2   is not qualified to comment on what Wyeth's document --
5  3   objection on improper question of an expert witness.
6  4       MR. MORRIS:  In providing her opinions in this case,
7  5   she has to rely on the facts and the data that's provided to
8  6   her, Your Honor, and I am merely asking her foundation
9  7   questions that are building towards her ultimate opinion.
10 8       THE COURT:  Objection overruled.  Exception saved.
11 9   BY MR. MORRIS
12 10  Q   What level of knowledge does it appear Wyeth had
13 11  regarding her potential relationship between mammary cancers
14 12  and their product?
15 13  A   Well, they're discussing the specifics of the study.  So
16 14  they know about the breast cancer, the 21 cases, the 8 years,
17 15  and then with only 20 mammary cancers in the treating group, it
18 16  appears doubtful.  So they are actually looking at the data,
19 17  which they should do.
20 18  Q   What level of knowledge does it seem that they have
21 19  regarding epidemiological studies?
22 20  A   They -- No. 6 shows that they are talking about a case
23 21  control study on mammary cancer and that they have -- they --
24 22  it would be helpful from a number of standpoints in resolving
25 23  the questions and doubts that may continue to recur in the
26 24  future.
27 25      So they were aware that they can be used to decide, you

1 page 1281

2

3 1    know, if there is a risk.

4 2    Q    And in terms of retention of public relations expertise

5 3    to balance the copy, does FDA have any jurisdiction over public

6 4    relations firms that may do work for drug companies?

7 5    A    No.  The FDA would only have a jurisdiction over

8 6    advertising in terms of misleading and false advertising.

9 7    Q    But if FDA -- if Wyeth or Upjohn decided to employ a

10 8   public relations firm to issue a press release that pointed out

11 9   what they suspected were all the flaws in a study, would FDA

12 10  have any ability to govern that?

13 11  A    Not really, as long as they provided their accurate label

14 12  attached to the letter or the statement.

15 13  Q    As of 1976, when they received the information about the

16 14  Hoover study and talking about estrogens and even the issues of

17 15  a progestin, did you read that part?

18 16  A    No.  I didn't do that part on there.

19 17  Q    Have you seen it?

20 18  A    Yes.

21 19  Q    Have you reviewed these documents?

22 20  A    Yes.

23 21  Q    And is one of the specific items in the '76 documents,

24 22  The addition of a progestin is unresolved?

25 23  A    Yes.

26 24  Q    Would this have been a red flag to the company or a

27 25  safety signal to the company that they needed to do more

1 page 1282

2

3 1    investigation?

4 2    A    Yes.

5 3    Q    And what was the -- what would be the appropriate

6 4    response when an epidemiological study done by the National

7 5    Cancer Institute suggests there may be a relationship?  What

8 6    would be the appropriate response from the FDA's standpoint?

9 7    A    Well, it follows up.  One of the things a manufacturer is

10 8   supposed to do under the Act, particularly 505-K, is to find --

11 9   to keep reports of experience and information so that if the

12 10  FDA were to have an issue, they could provide information to be

13 11  helpful to the FDA to determine if there was a safety issue

14 12  under 505-E.

15 13  Q    All right.  Now, following 1976, did additional

16 14  literature -- epidemiological literature occur in peer-reviewed

17 15  publications discussing this relationship between estrogen and

18 16  breast cancer and estrogen and progestin and breast cancer?

19 17  A    Yes.

20 18  Q    Okay.  And would all of those epidemiological studies

21 19  have been available to Wyeth?

22 20  A    Yes.

23 21  Q    And did those studies go on up until 2002?

24 22  A    Yes.  And after 2002.

25 23  Q    And would those have served as safety signals to Wyeth to

26 24  further study their product?

27 25  A    Yes.

1 page 1283

2

3 1    Q    Would that have been a red flag to them?

4 2    A    Yes.  It should be.

5 3    Q    Have you seen this document before?  This is a --

6 4    Plaintiff's Exhibit No. 69.  It is a letter regarding the

7 5    Prempak desired labeling in September of 1983.

8 6    A    Yes, I have.

9 7    Q    Briefly, and the jury has heard about this, can you

10 8   briefly explain what was happening in 1983 with regard to

11 9   Prempak?

12 10  A    The company wanted to market a combined product that

13 11  would be an MPA/Provera-type product together in a convenience

14 12  pack for a woman.

15 13  Q    So in 1983, when they make their application for Prempak,

16 14  what is the significance of their desire to market these two

17 15  products together, estrogen and MPA?

18 16  A    Well, it would be to capture the market in terms of these

19 17  two products because now the market is being shared between

20 18  different manufacturers of MPA and Premarin.  Premarin is the

21 19  primary estrogen and so the FDA -- it's the first time they

22 20  have had to be back to the FDA to ask for approval.  The first

23 21  approval was in '42, and now we're going back in '83 for

24 22  approval of a new indication of combined MPA and Premarin

25 23  together.

26 24  Q    From the FDA's standpoint, should you make an application

27 25  to market a product before you have studied it to find out what

1 page 1284

2

3 1    the combination of the two drugs do together?

4 2    A    No.

5 3    Q    Why not?

6 4    A    Well, typically you need to know that the product, the

7 5    dose, the way you are saying it should be prescribed is safe

8 6    and effective.  These are old -- both of these are old products

9 7    that weren't really -- they didn't go through the same

10 8   procedure.  I am talking about MPA, Provera, and Premarin.

11 9   Today if they came with the two drugs together, you would have

12 10  all this information about safety testing, dosing, studies,

13 11  which you didn't need coming at it from a DESI review, but

14 12  typically the FDA doesn't do the testing.  The manufacturer

15 13  should do the testing.  So before you come to the FDA, you

16 14  should make sure it actually is a good product that is safe and

17 15  effective.

18 16  Q    With regard to E plus P, Dr. Parisian, both these are

19 17  approved drugs.  FDA approved Provera back in '59, and Wyeth

20 18  has approval of Premarin from 1942 on.  Why can't we just put

21 19  two approved drugs together and send them out?  Why can't we do

22 20  that?

23 21  A    Well, you can't.  It's one of these kind of situations

24 22  that will bring you back to the FDA to get the label and the

25 23  product approved.  The FDA approves the chemicals, which are

26 24  the drugs, plus the label to tell you how you can legally

27 25  market it in the United States.  These products were actually

page 1285

3  1  being marketed.  Physicians were using them, but there was no
4  2  manufacturer who had been approved by the FDA to market such a
5  3  combination.  So it's a different step.  You have gone from
6  4  those DESI products to a new product.  So this is the first
7  5  time you are coming back to the FDA to ask for approval.
8  6  Q   Are you familiar with Solomon Sobel?
9  7  A   Yes.
10 8  Q   Who was Dr. Sobel?
11 9  A   Dr. Sobel is the director of the division of metabolic
12 10 and endocrine drug products.  I have worked with him on some of
13 11 my issues in cases when I was at the FDA.  I believe he is
14 12 still there.  I am not sure.  But he was head of that division,
15 13 which was actually looking at this product at that time.  In
16 14 1983, Dr. Golden, who you might have heard of -- I don't know.
17 15 She is the primary reviewer.  She works for Dr. Sobel.
18 16 Q   And what was Dr. Sobel's response to the Prempak
19 17 application?
20 18 A   He wanted to have studies and to see what the results of
21 19 the studies were.  There were some benefits known to be gotten
22 20 from giving women estrogen, and he didn't know if adding -- and
23 21 from what I read, that he stated in his documents that, from
24 22 adding Premarin to it -- Provera to it, was going to take away
25 23 some of the benefits and reduce some of the risks.
26 24 Q   And this is an Ayerst memo from 1983 between Dr. Perdue
27 25 and Dr. Somin.  What did they say about Dr. Sobel and this

page 1286

3  1  approval process?
4  2  A   Well, one of the things was whether they would need to
5  3  get clinical data or not if Prempak is equivalent to a
6  4  combination drug.  So they're talking about the types of
7  5  mechanisms in order to get it approved.  And it says, in fact,
8  6  the results of the study that would be needed could turn out to
9  7  be embarrassing.  So there were -- they were discussing what
10 8  could actually occur if they did clinical studies to show the
11 9  combination product before they got approved.
12 10 Q   And what could be embarrassing, from your standpoint as
13 11 an FDA reviewer, if they did studies?
14 12 A   Well, it would be embarrassing, perhaps, if the results
15 13 weren't positive and you didn't get approved.
16 14 Q   So, by 1983, is there a signal in terms of Wyeth's
17 15 knowledge of the combination products used and their duty to
18 16 test the product under the FDA reg's?
19 17 A   Yes.  They know that, to get approved under the FDA
20 18 regulations, you need to have clinical data, and they were just
21 19 approaching getting a clinical study or trying to find out what
22 20 they would need to do to get this combination pack to be
23 21 approved by FDA.  And they obviously know that there may be
24 22 some obstacles ahead in terms of the clinical trials that
25 23 FDA may require.
26 24 Q   And then moving forward to 1988, have you had an
27 25 opportunity to review documents from the files of Wyeth

page 1287

3  1  concerning the Prempak studies?
4  2  A   Yes.
5  3  Q   And what was the result of the Prempak studies that Wyeth
6  4  had been engaging in to attempt to find out answers?
7  5  A   You mean the ones that weren't completed?
8  6  Q   Yes.
9  7  A   They weren't completed.
10 8  Q   All right.  Now, my question is this:  In the mid '80s or
11 9  the early '80s, this time frame '83 to '88, according to your
12 10 review of the documents, was Wyeth large enough, educated
13 11 enough, resourceful enough, long enough in the industry as far
14 12 as the FDA was concerned to accomplish a proper study on the
15 13 combination of estrogen and MPA?
16 14 A   Yes.
17 15 Q   And how do you know that?
18 16 A   Well, just from the review of the records.  In that first
19 17 document in 1983, that was a request of -- eventually a request
20 18 with FDA to do an IND, an investigational new drug evaluation.
21 19 So there actually was a protocol and a design of a study
22 20 agreed upon with FDA.  So the company was going to go and
23 21 proceed to do those studies, but you're talking about a company
24 22 that is a very large company that has a lot of epidemiologists,
25 23 resources in their company that could have easily managed to
26 24 put these studies together.  Plus later with Prempro, FDA
27 25 wanted a Phase IV study and breast cancer review, and they came

page 1288

3  1  up with a study quite quickly, with a protocol to do a study
4  2  that was not that arduous, not that hard to do.  So they could
5  3  have done that.
6  4  Q   What does it say to you, as an expert witness on the
7  5  regulatory front, that Wyeth was not able to get the Prempak
8  6  study done between '83 and '88?
9  7  A   Well, it would show that there is some kind of a break in
10 8  the chain.  It's either that they really are incapable of doing
11 9  a study, which I find very hard to believe, or that e-mail --
12 10 that letter where they don't really think it's going to be
13 11 positive or -- so there is various reasons, which as a
14 12 regulatory person would raise pause as to why they couldn't do
15 13 those studies.  I think one of the --
16 14     MR. URBANCZYK:  Objection, Your Honor.  Move to
17 15 strike.  Speculation.
18 16     THE COURT:  Just a minute.  I believe we better move
19 17 on to the next question.  I will strike that last answer as
20 18 being a little long.
21 19 BY MR. MORRIS:
22 20 Q   With regard to the documents that you have looked at in
23 21 this case, is it a crystal clear fact that Wyeth was unable to
24 22 accomplish the Prempak study by 1988?
25 23 A   Well, that's what they stated to the FDA.  They could not
26 24 accomplish it.
27 25 Q   And with regard to that, was anybody else, to your

1 page 1289

2

3  1  knowledge, doing adequate studies on the dosing and on safety

4  2  and on the other issues related to the combination product?

5  3  A  No.

6  4  Q  Was Upjohn doing studies?

7  5  A  They were doing studies, yes.

8  6  Q  And what were their studies on?

9  7  A  They were studies -- efficacy studies for using

10  8  micronized progestin.

11  9  Q  And in women to do what?

12  10  A  For control of endometrial hyperplasia, efficacy claim.

13  11  Q  All right.  Have you reviewed the internal records from

14  12  FDA and Wyeth concerning the 1990 applications?

15  13  A  Yes.

16  14  Q  After they couldn't get the studies done on Prempak, did

17  15  Wyeth continue to pursue getting the FDA to approve two

18  16  separate pills in one pack?

19  17  A  Yes.

20  18  Q  Okay.  I want to show you what has previously been marked

21  19  as Plaintiff's Exhibit 134-A and ask you if you have seen this

22  20  before.

23  21  A  Yes.  This is an advisory panel meeting in 1990.

24  22  Q  Explain to the jury what an advisory panel is.

25  23  A  The FDA is allowed to have, certainly, panels that advise

26  24  them as to different procedures or whether to approve a

27  25  product.  It's a way for the FDA to have a public meeting,

1 page 1290

2

3  1  present some issues, and get feedback that's nonbinding that

4  2  the FDA can consider.

5  3  Q  And of the members present, who were the invited

6  4  speakers?

7  5  A  Well, under Invited Speakers, Dr. --

8  6  Q  Janet Daling was one of them?

9  7  A  Yes.

10  8  Q  And Robert Hoover?

11  9  A  Yes.  Hoover was there.

12  10  MR. URBANCZYK: Mr. Morris, I have no objection to

13  11  this exhibit.

14  12  MR. MORRIS: Is this not admitted?

15  13  MR. URBANCZYK: We have no objection to it.

16  14  MR. MORRIS: This is 134-A.  Will this be admitted?

17  15  MR. URBANCZYK: No objection.

18  16  THE COURT: Be admitted.

19  17  (Plaintiff's Exhibit 134-A received in evidence.)

20  18  BY MR. MORRIS

21  19  Q  And the date of this meeting was when?

22  20  A  February 7th, 1990.

23  21  Q  Who is Barbara Hulka?

24  22  A  A physician who is the chair of the panel at that time.

25  23  Q  And who is Phil Corfman?

26  24  A  He works for the FDA.

27  25  Q  All right.  And if we look inside this document, what --

1 page 1291

2

3  1  this is a summary of the minutes of the meeting, correct?

4  2  A  Yes, it's a summary.

5  3  Q  What were they discussing and -- in Notation No. 1?

6  4  A  Breast cancer, breast and endometrial cancer associated

7  5  with hormone replacement therapy.

8  6  Q  And it says after the chair opened the meeting and

9  7  Dr. Corfman provided remarks about recent activities of the

10  8  fertility and maternal health drugs group, the chair began the

11  9  open public hearing portion of the agenda.  Now, can you

12  10  explain what an open public meeting portion would be when FDA

13  11  is having one of these meetings?

14  12  A  You're allowed -- you apply before the meeting to say

15  13  that you have a -- that you want to present a piece for

16  14  discussion.  So you have a certain amount of time to present

17  15  your opinions.

18  16  Q  And what questions were being asked?

19  17  A  Well, Question 2:  Did the addition --

20  18  Q  Let me move this down.  I apologize.

21  19  A  Question 1:  Is there sufficient evidence to conclude

22  20  that unopposed estrogen replacement therapy is associated with

23  21  an increased risk of breast cancer in postmenopausal women?

24  22  Q  All right.  And then B?

25  23  A  And B, Do there appear to be differences among different

26  24  estrogens in this regard?

27  25  Q  And what answers were provided on that day in 1990?

1 page 1292

2

3  1  A  Well, A is that it's not conclusive.  Some studies have

4  2  said yes.  Some -- and then B would be that there is

5  3  insufficient data to permit the committee to make a distinction

6  4  among the different types of estrogens.

7  5  Q  And then what was Question 2?

8  6  A  Does the addition of progestins to estrogen therapy alter

9  7  the risk of breast cancer in postmenopausal women?  If so, are

10  8  there differences in this regard among different progestins?

11  9  Q  And how did the committee respond?

12  10  A  The response is unanimously that there are insufficient

13  11  data to answer these questions at this time.

14  12  Q  And then Question 4?

15  13  A  Question 4:  Considering only the breast and endometrial

16  14  cancer, how is it the committee balances the risk of

17  15  endometrial cancer with or without added progestins with the

18  16  possible risk of breast cancer with or without progestins?  The

19  17  committee reiterates its belief that the differ -- progestins

20  18  to estrogen replacement therapy increases -- decreases the risk

21  19  of endometrial cancer, but there are insufficient data

22  20  concerning the effect of added progestins on the possible risk

23  21  of breast cancer with estrogen use to permit a response to the

24  22  question at this time.

25  23  Q  Now, would Wyeth have been aware that this meeting was

26  24  going on?

27  25  A  Yes.

page 1293

3 1 Q    Would they have been in attendance?

4 2 A    Yes.

5 3 Q    Were they in attendance?

6 4 A    Yes.

7 5 Q    And certainly these questions and answers that are being

8 6 asked in 1990 are raising exactly the issue of E plus P and

9 7 breast cancer, correct?

10 8 A    Correct.

11 9 Q    So if they haven't cabbaged on to it yet, by 1990 when

12 10 this meeting took place, was Wyeth aware that this is a

13 11 definite issue with no good data?

14 12 A    Yes.

15 13 Q    In fact, what were the words that FDA used with regard to

16 14 the data?  What did they say it was?

17 15 A    Insufficient.

18 16 Q    Was that a red flag to this company?

19 17 A    Yes.

20 18 Q    And --

21 19 A    Advisory committees use flags, raise red flags to show

22 20 the community and physicians that there is a problem.

23 21 Q    In the Wyeth internal documents, we have seen this

24 22 document.  This is -- has already been marked, and it's in

25 23 evidence, 133.  Have you seen this document before?

26 24 A    Yes, sir.

27 25 Q    And what is the date of this document?

page 1294

3 1 A    February 2nd, 1990.

4 2 Q    And what does it relate to?

5 3 A    To the advisory panel meeting that we were just looking

6 4 at the summary for.

7 5 Q    So the document we were just looking at from FDA took

8 6 place at that advisory committee meeting February 1st, 1990,

9 7 correct?

10 8 A    Correct.

11 9 Q    And what is Wyeth's response in this?  What is

12 10 Fred Hassan, who is president at the time at Wyeth, what does

13 11 he say at the groups?

14 12 A    He said that the goal of the meeting was to make it a

15 13 nonevent, and that is exactly what happened.  And he goes on to

16 14 the third paragraph:  Eventually the various questions that

17 15 this advisory committee could not answer conclusively will be

18 16 answered, and it is our responsibility and very much to our

19 17 benefit for Wyeth-Ayerst to provide the studies, information,

20 18 and insights to ensure that the answers will be accurate and

21 19 balanced.

22 20      THE COURT:  You are going just a little too fast

23 21 still.

24 22      THE WITNESS:  Okay.  Yes, sir.

25 23 Q    So they said something good, that it's good to find, the

26 24 answers will be accurate and balanced.

27 25 BY MR. MORRIS

page 1295

3 1 Q    Where he says up here, "I want to personally congratulate

4 2 you for your contribution to our success at the February 1

5 3 advisory committee meeting on Premarin," would it be successful

6 4 to have a product being marketed where there was insufficient

7 5 data?

8 6      MR. URBANCZYK:  Objection.  No foundation and

9 7 improper assumption.

10 8      THE COURT:  Sustained.

11 9 BY MR. MORRIS

12 10 Q    From the FDA's regulatory standpoint back in 1990, would

13 11 FDA have had access to the internal documents of Wyeth?

14 12 A    No.

15 13 Q    Would FDA have expected Wyeth to take the February 1,

16 14 1990, advisory board meeting seriously?

17 15 A    Yes.

18 16 Q    Did the 1990 advisory board meeting identify the issue of

19 17 E plus P in breast cancer as one where there was insufficient

20 18 data?

21 19 A    Yes.

22 20 Q    Would FDA have considered that to be a success for the

23 21 consumers that were taking that product?

24 22 A    No.

25 23 Q    From the standpoint of public health concerning the

26 24 combination in 1990, was the February 1 meeting a nonevent as

27 25 far as the consumer was concerned?

page 1296

3 1 A    Well, since nothing became of it, yes, it was a nonevent.

4 2 Q    Could it have been an event had the data been embraced

5 3 and studied?

6 4 A    Yes.  And lives could have been saved.

7 5 Q    From a regulatory standpoint, Wyeth's response to this

8 6 meeting of February 1990, does this -- is this reasonable

9 7 conduct on the part of the company?

10 8 A    No.  Not if you are aware that there is safety issues

11 9 with your product.  You should investigate them and try to make

12 10 them -- address it in the labeling or protect people.

13 11 Q    Given these other actions that we have talked about in

14 12 1983 and 1976, where the documents suggest that they wanted to

15 13 refute or mitigate the studies and they can't get a study

16 14 completed, was that reasonable conduct on the part of the

17 15 company?

18 16      MR. URBANCZYK:  Objection.  Leading.

19 17      THE COURT:  I'm going to overrule.

20 18      THE WITNESS:  No, it wasn't.  And we have all these

21 19 flags and nothing being done to try to address what's occurring

22 20 with this product, and the FDA really doesn't have the ability

23 21 to make them do these studies at this time.

24 22 BY MR. MORRIS

25 23 Q    Between 1976 and 1990, based on your review of the

26 24 epidemiology and your knowledge of how studies are conducted

27 25 and can be conducted, was the issue of whether E plus P causes

Page 177

page 1297

3  1   breast cancer knowable?
4  2  A   Yes.
5  3  Q   Had the appropriate studies been undertaken, could it
6  4  have been known?
7  5  A   Yes.  Or you could have warned patients about it in the
8  6  labeling.
9  7  Q   Well, that's what they did, didn't they, in the 1990
10 8  label?
11 9  A   No.
12 10 Q   Oh, come on, Dr. Parisian.  Let's look at it together.  I
13 11 have got the label around here somewhere.
14 12     MR. URBANCZYK:  Your Honor, may I approach the
15 13 bench, please?
16 14     (Bench conference reported as follows:)
17 15     MR. URBANCZYK:  She -- he is about to ask this
18 16 witness about the Premarin label, Your Honor.  Nowhere in the
19 17 expert's report is there a reference to the Premarin label.
20 18 And in her deposition on page -- at page 677, we say -- we say
21 19 this.  Read lines 3 through 18 where she says, "I don't discuss
22 20 the Premarin labeling.  I don't discuss it in my report."
23 21     MR. MORRIS:  That has to be an old transcript,
24 22 before she updated her report.  She has done an updated report
25 23 and --
26 24     THE COURT:  We will take a ten-minute recess and let
27 25 you find it for me.

Page 178

page 1298

3  1     (Return to open court.)
4  2     THE COURT:  We will be in recess for ten minutes,
5  3  ladies and gentlemen.  We will try to start back at 2:00
6  4  o'clock sharp.  We will quit at 4:25 today, if I don't forget.
7  5  And if I start to forget, get my attention.  Don't talk about
8  6  the case or anybody involved in it, and don't start making up
9  7  your mind.  Consciously avoid it.
10 8     Let the jury stand out.  Everyone else remain as you are.
11 9     (Jury exits the courtroom.)
12 10     THE COURTROOM DEPUTY:  We are in recess.
13 11     (Recess at 1:51 p.m.; continuing at 2:01 p.m., jury not
14 12 present.)
15 13     THE COURT:  Have you found anything in rebuttal?
16 14     MR. MORRIS:  Yes, Your Honor.  It's throughout her
17 15 report.  It's very disingenuous for Wyeth to contend that this
18 16 witness has not reviewed the Premarin labeling.  It is
19 17 throughout her report and, in fact, we will show you from
20 18 2006 --
21 19     MS. PRUITT:  Your Honor, should the witness be in
22 20 here?
23 21     THE COURT:  I can't hear you.
24 22     MS. PRUITT:  The witness should probably be outside
25 23 while this is being discussed.
26 24     THE COURT:  That's a good idy.  You probably ought
27 25 to go outside.

Page 179

page 1299

3  1     THE WITNESS:  Thank you.  Okay.
4  2     MR. MORRIS:  Once again, Your Honor.
5  3     THE COURT:  Just a minute.
6  4     MR. MORRIS:  Sorry.  All right.  With regard to
7  5  this, she was deposed in April of 2006, Your Honor, and it
8  6  says, the question asked by Upjohn's counsel:  When did you
9  7  receive additional materials?
10 8     I received additional materials yesterday, particularly
11 9  on Prempro and --
12 10    THE COURT REPORTER:  I'm sorry.  You need to go
13 11 slower.  I can't keep up with you when you do that.
14 12    MR. MORRIS:  I received additional materials
15 13 yesterday, particularly on Prempro and Premarin.
16 14    And what were the materials you received about Premarin?
17 15 Answer:  The labeling about -- Prempro.
18 16    THE COURT:  That's Prempro, yeah.
19 17    MR. MORRIS:  The labeling for Premarin, all the
20 18 different various labels.  Then I received the Blum report,
21 19 Dr. Blum's report, et cetera.
22 20    So this is testimony she gave in a deposition, and then
23 21 we have her expert report, which has been provided to the
24 22 defendants.  I have not been able to go through all 400 pages
25 23 of it, but I can show you several references.  17, she talks
26 24 about because Premarin and Provera were grandfathered drugs,
27 25 blah, blah, blah.  She talks on the next page about Premarin

Page 180

page 1300

3  1  and MPA hormone therapy.  She talks about the role of the
4  2  manufacturer.  It is the drug sponsor, not the FDA, who is
5  3  responsible for adequate drug testing development and
6  4  monitoring and providing warnings.  And she talks about labels
7  5  throughout this paragraph.  And then she starts out and talks
8  6  about the history of Premarin, 1942, grandfathered drug was
9  7  found effective, et cetera.
10 8     THE COURT:  You are going too fast.
11 9     MR. MORRIS:  I'm sorry.  Premarin as a 1942
12 10 grandfathered drug found effective for short-term treatment of
13 11 menopausal symptoms.  And she talks about the DESI review that
14 12 she has gone through, including Premarin, the fact that it's
15 13 without adequate investigation, patient monitoring or FDA's
16 14 approval.  Wyeth began to promote known human carcinogen --
17 15    THE COURT:  Whoa, whoa, whoa.  Too fast.
18 16    MR. MORRIS:  Wyeth began to promote a known human
19 17 carcinogen, Premarin, to physicians for prescription to
20 18 patients as it could be reasonably intended for prolonged
21 19 treatment of estrogen deficiency disease.
22 20    THE COURT:  Hold on.  What does the defendant say?
23 21 It seems to me like it talks about a label a whole lot.
24 22    MR. URBANCZYK:  Your Honor, it doesn't talk about
25 23 the label at all, Your Honor, and I have not objected to
26 24 DESI --
27 25    THE COURT:  Just got through saying:  I reviewed the

page 1301

1  label.
2      MR. URBANCZYK:  Well, she reviewed the label, she
3  said, in April of 2006.  That was before she had been asked to
4  testify or render any opinions against Wyeth.  The first Wyeth
5  report, Your Honor, is July 2nd, 2007.  This is the first
6  report that she renders against Wyeth.  She was deposed 20 days
7  after that, on July 20th, and she was asked:  Are you
8  contending that the labels, the PDR, the product information
9  was inadequate based on the information that did, in fact,
10  exist in the medical community?
11      Answer:  Well, we have got a long time period here.  In
12  terms of Premarin, I haven't discussed the Premarin labeling.
13      THE COURT:  Oops.  What do you say about that?
14      MR. URBANCZYK:  I don't remember discussing it in my
15  report.
16      MR. MORRIS:  He is taking a snippet out of the
17  testimony.  We don't know in what context she said that.
18      THE COURT:  I'm going to sustain the objection.
19  Exception noted.
20      MR. MORRIS:  Well, will Your Honor allow me to go
21  through her report a little more thoroughly?  I didn't know
22  that I was going --
23      THE COURT:  You can do that at the next break, and
24  if you can find anything, I will let you make another short run
25  at it.

page 1302

1      Let's bring the witness in, and the jury, and get going.
2      MR. MORRIS:  They have been provided her report,
3  Your Honor.  I will tell you that, and they have had an
4  opportunity to review it.  And so if it's in here, I hope the
5  Court can keep in consideration --
6      THE COURT:  I told you I will let you make another
7  run at it.
8      MR. MORRIS:  -- the time-wasting effect of this.
9      THE COURT:  I done told you and told you.  I have
10  had the same problem with court reporters and newspaper
11  reporters.  They continuously quote me correctly and in
12  context, much to my embarrassment.
13      Everyone, please rise while the jury enters.
14      (Jury enters the courtroom.)
15      THE COURT:  We need a witness.
16  I'm going to remind you again to speak more slowly.
17      THE WITNESS:  Yes, sir.  I am trying.
18      THE COURT:  Thank you.  Be seated.
19      MR. MORRIS:  Thank you, Your Honor.
20  BY MR. MORRIS
21  Q    There we go.  Dr. Parisian, before we took a break, we
22  had mentioned a label, and I want to show you the 1995 Prempro
23  label.  This is the same that counsel showed the jury
24  earlier.  And in a patient portion of the package, there is the
25  following warning on cancer of the breast.  Now, from an FDA --

page 1303

1  this is an FDA-approved label, correct?
2  A    Yes.  It's an FDA-approved product.  The FDA didn't write
3  the label.
4  Q    Who wrote the label once again?
5  A    Again, it would have been negotiated between the
6  manufacturer and the FDA.
7  Q    All right.  And does this provide a clear warning to
8  women that this product may cause cancer of the breast?
9  A    Clear?  No.
10  Q    In fact, what about this warning is not an indication
11  that this product is definitely associated with breast cancer?
12  A    Well, the way it's written.  This is intended for the
13  woman, and so patient labeling is supposed to be written at the
14  sixth-grade level, which is fairly simple to understand.  And
15  it's kind of confusing as to what is occurring here.
16  Q    And when it begins by stating in the first sentence,
17  "Most studies have not shown a higher risk of breast cancer in
18  women who have used estrogens," would that be something
19  that a patient could rely upon?
20  A    No.  Because it's saying there isn't any risk of cancer.
21  Q    All right.  Could a patient rely upon that and say, Okay,
22  so most studies have not shown a higher risk of breast cancer
23  in women; therefore, I don't need to worry?
24  A    Well, and also --
25      MR. URBANCZYK:  Objection.  Leading.

page 1304

1      THE COURT:  Overruled.
2      THE WITNESS:  It implies that there have been
3  studies actually done to look at this.
4  BY MR. MORRIS
5  Q    And as of 1990, had there been any adequate,
6  well-controlled studies that looked at the right issues on this
7  issue of E plus P in breast cancer?
8  A    No.
9  Q    Had the manufacturers conducted any studies?
10  A    No.
11  Q    Now, getting back to our historical time line here, I
12  want to get back to 1990 with you.  Have you seen this Wyeth
13  internal correspondence?
14  A    Yes.
15  Q    This is Exhibit No. 1265.  This has also been admitted,
16  and what is being referenced in this memo?
17  A    A presentation about breast cancer study results.
18  Q    And it says:  Situation analysis.  What was the
19  situation?
20  A    Dr. Colditz was going to present a study about Premarin
21  and showing an increased risk of breast cancer, 30 percent in
22  current users.
23  Q    And who is Dr. Graham Colditz?
24  A    He is an expert in epidemiology and breast cancer.
25  Q    And has he been studying women and women's health issues

page 1305

3 1 for a number of years?
4 2 A   Yes.
5 3 Q   What is his study -- his famous study?
6 4 A   His famous study?  I don't know what famous study.  He
7 5 has had many, many papers that have been famous studies.
8 6 Q   When he was at Harvard, did he do a large study on
9 7 nurses?
10 8 A   Oh, yes.  The nurses' study, yes.
11 9 Q   What was it called?
12 10 A   The nurses' study.
13 11 Q   Okay.  The Nurses' Health Study?
14 12 A   Yes.
15 13 Q   And with regard to Dr. Colditz's paper, what did they say
16 14 they are going to do?
17 15 A   Well, they have a proposed strategy.
18 16 Q   And what was it?
19 17 A   Be reactive on the cancer issue.  Be prepared to take
20 18 responsive stance towards media covering cancer story with
21 19 accurate, full and balanced information on the issues presented
22 20 in proper context.
23 21 Q   So 1990, when Dr. Colditz writes his study, would that
24 22 have also been a red flag to them that they should do a study?
25 23 A   Yes.  This study, though, is on -- this is one on ERT,
26 24 estrogen.
27 25 Q   Okay.  Are they aware of the E plus P issue?

page 1306

3 1 A   Yes.
4 2 Q   What else did they say?
5 3 A   Be prepared but unobtrusive on site at the SER meeting to
6 4 react to any negative messages with spokesperson and media
7 5 liaison.
8 6 Q   All right.  And I want to move forward to a couple of
9 7 documents, 251 and 265, 1993.  Have you seen these documents
10 8 before, these Wyeth documents?
11 9 A   Yes.
12 10 Q   And what do they involve?
13 11 A   This is a request for funding for studies in women with
14 12 breast cancer.
15 13 Q   Do we sometimes call these the ECOG documents?
16 14 A   Yes.  Because of the name of the group.
17 15 Q   Eastern Cooperative Oncology Group breast cancer study?
18 16 A   Correct.  ECOG.
19 17 Q   And does this pair of documents reference a company
20 18 policy?
21 19 A   Yes.  The company policy is referenced in the two
22 20 letters.
23 21 Q   Now, Wyeth takes the position that the policy was not to
24 22 provide funding for women who are post-breast cancer.  Have you
25 23 heard that before?
26 24 A   Yes.  I have heard that position.
27 25 Q   Let's assume that that is the company policy.  From the

page 1307

3 1 FDA's standpoint, would that be a reasonable thing to do?
4 2 A   The use of hormone replacement therapy for breast cancer
5 3 survivors had been the topic of an advisory panel discussion
6 4 too.  The FDA wanted data on those women too.
7 5 Q   And had they received any data on those women?
8 6 A   No.
9 7 Q   And so would it have been reasonable -- even taking
10 8 Wyeth's explanation that this involves people post-breast
11 9 cancer, would that have been a reasonable action to take under
12 10 the FDA regulations?
13 11 A   Yes.  Since there had been a request for data on that
14 12 particular issue.
15 13 Q   Would it have been reasonable for them, as part of their
16 14 company policy, to deny it -- giving funding or helping out on
17 15 these types of studies?
18 16 A   It would not be something that seems reasonable since
19 17 they're the primary supplier of estrogen.
20 18 Q   Now, by this point in 1993, has any well-controlled case
21 19 study been done to determine whether or not E plus P causes
22 20 breast cancer?
23 21 A   No.
24 22 Q   So around 1994 or in that time frame, did Wyeth apply for
25 23 another approval from the FDA?
26 24 A   Yes.
27 25 Q   And what approval was that?

page 1308

3 1 A   This is where the Prempro product, combination -- first
4 2 it was two pills, and then it became one pill.
5 3 Q   All right.  And did Wyeth have its own
6 4 medroxyprogesterone acetate to add to the Premarin to make the
7 5 product?
8 6 A   Yes.
9 7 Q   So did they go to the FDA and request approval of that
10 8 drug?
11 9 A   Eventually, yes.
12 10 Q   I want to show you -- have you seen this piece of
13 11 internal correspondence, Plaintiff's Exhibit No. 917?
14 12 A   I think so.
15 13 Q   Okay.  And it is dated 10th of March, 1995, and it talks
16 14 about a February 8th meeting where preliminary sample size
17 15 calculations were done and comparative study on incidence of
18 16 breast cancer among those treated with Premarin/MPA?
19 17 A   Correct.
20 18 Q   And they reference a couple of types of studies -- a
21 19 cohort study and a case control study, correct?
22 20 A   Correct.
23 21 Q   To your knowledge, were those ever completed?
24 22 A   No.
25 23 Q   And this is after Prempro has been approved?
26 24 A   Right.  This is their Phase IV study.
27 25 Q   Back here on Table 7, it gives a description of the

page 1309

1 number of cases required for a 95-percent confidence interval
2 and so forth.
3 A    Correct.
4 Q    Is that the type of study that could have been done back
5 in the 1980s?
6 A    Yes.
7 Q    And even in the '70s?
8 A    Yes.
9 Q    Was it reasonable not to perform that kind of study?
10 A    No.
11       MR. URBANCZYK:  Your Honor, move to strike as beyond
12 the scope of what she has been --
13       THE COURT:  Overruled.  Exception saved.
14 BY MR. MORRIS
15 Q    All right.  And then after the approval of Prempro in
16 August of 1995, did Wyeth submit to FDA a Phase IV breast
17 cancer investigation?
18 A    Yes.
19 Q    Now, we have talked about Phases I through III.  Please
20 describe for the ladies and gentlemen of the jury what a
21 Phase IV study is.
22 A    A Phase IV study is a commitment made between a
23 manufacturer and the FDA when a product is to be approved and
24 they need more data, usually safety data, that the company will
25 obtain that information after approval.

page 1310

1 Q    And if you will look at this one carefully, what type of
2 Phase IV breast cancer study was going to be done?
3 A    Case control study.
4 Q    And this is a Wyeth document?
5 A    Yes.
6 Q    And, in fact, if we go back here within the documents,
7 what do they have?
8 A    They have a description of a case control study using
9 Prempro, Premphase, and Premarin.
10 Q    What are the number of subjects they want to look at?
11 A    1500.
12 Q    Okay.  And cases and controls, postmenopausal women ages
13 45 and older?
14 A    Correct.
15 Q    Was all of this information available and capable of
16 being reviewed in the '70s?
17 A    Yes.
18 Q    Certainly in the '80s?
19 A    Yes.  There is nothing new about this type of a study.
20 Q    Anywhere in this document, do you see Wyeth stating, Hey,
21 we have already done all these good studies?  We have already
22 done all these case control studies.  Do they say that to the
23 FDA?
24 A    No.  And the FDA had been asking for it since the '70s,
25 '80s and '90s.

page 1311

1 Q    They told this jury that they studied this for years.
2 They studied this, they sponsored studies, they went out and
3 helped on studies.  Do they reference any of that in this
4 letter?
5 A    No.
6 Q    And then I want to show you this document from November
7 of 1995.  It says:  On Friday, November 3rd, meetings were held
8 with representatives from the FDA and Wyeth-Ayerst regarding
9 labeling revisions for Prempro and our Phase IV commitment to
10 conduct a case control study evaluating incidences of breast
11 cancer, and lists representatives of the FDA.  Are you familiar
12 with some of these folks?
13 A    Yes.
14 Q    Do you know who Linda Golden was?
15 A    She has been the reviewer from the '90s working on trying
16 to get a breast cancer study.
17 Q    Who is Lisa Rarick?
18 A    Lisa Rarick was the acting director, and I believe she is
19 going to be one of the experts coming for the other side.
20 Q    She is going to come testify for Wyeth, correct?
21 A    I believe so.
22 Q    And it says down here the Wyeth-Ayerst representatives
23 who were there were Mr. Bathish and Dr. Pickar, several
24 doctors, a bunch of doctors, right?
25 A    Yes.

page 1312

1 Q    Has Wyeth employed a number of doctors?
2 A    Oh, yes.  They have a lot of doctors.
3 Q    And when we get to this next page and in the next to last
4 paragraph, what was Dr. Golden adamant about?
5 A    You mean the HDL cholesterol levels in Prempro?
6 Q    Right.
7 A    Had to be a concern that if you put the Provera or the
8 MPA, Cycrin at this point, with Premarin that you were going to
9 do negative effects on the cholesterol pattern, lipid pattern.
10 Q    Okay.  And then we go to the next paragraph.  They are
11 talking about the Phase IV study.  Who is Dr. Stadel?
12 A    Dr. Stadel, I believe, was Wyeth's expert.
13 Q    Okay.  Bruce Stadel?
14 A    Yes.  And he had reviewed the Prempro study, and he had
15 suggested that a study be done for breast cancer post-market,
16 post-approval.
17 Q    All right.  Let's go back because --
18 A    I guess not.  Stadel is the wrong one.  I have the wrong
19 name.  Stadel works at the FDA.
20 Q    Bruce Stadel was the medical officer?
21 A    Correct.  That is --
22 Q    In fact, he had the same position that you used to have;
23 although, you had --
24 A    Correct.
25       THE COURT:  Let the record reflect that there is

page 1313

3  1   several viewpoints on the technical difficulties we are having
4  2      at this time. The Court expresses no opinion.
5  3         THE WITNESS: Yes. The Stadel was theirs.
6  4  BY MR. MORRIS
7  5   Q    And what does Stadel say about the Phase IV breast cancer
8  6   study?
9  7   A    Phase IV initiated with Dr. Stadel saying the meeting was
10 8   open to discussion -- oh, will still be a number of years away,
11 9   eight to nine years away, and that several issues needed to be
12 10  considered in the interim.
13 11  Q    Now, he says that the initiation of any study will be
14 12  eight to nine years away; is that correct?
15 13  A    That's what he says.
16 14  Q    Can FDA force a company like Wyeth or Upjohn to go do a
17 15  study?
18 16  A    No. Not a safety study.
19 17  Q    FDA does not have the ability to force them to go do a
20 18  safety study?
21 19  A    That's correct.
22 20  Q    All right. Does FDA have the ability to keep them from
23 21  marketing the product, say "We're taking it off the market
24 22  because you haven't done the safety studies"?
25 23  A    Not really.
26 24  Q    How many times over the last 30 years has FDA ordered a
27 25  drug product to be taken off the market?

page 1314

3  1   A    I believe 1977 was the last time.
4  2   Q    So not since 1977 has FDA ordered a company to take a
5  3   product off the market?
6  4   A    That's correct.
7  5   Q    Now, we all know that other -- there are some products
8  6   that have been withdrawn from the market.
9  7   A    Correct.
10 8   Q    Under what circumstances have those withdrawals occurred?
11 9   A    Those are voluntary withdrawals. The manufacturer
12 10  determines that he wishes to take the product off the market.
13 11  Q    So at this point, is there anything that FDA could do to
14 12  force Wyeth to speed up the process?
15 13  A    No.
16 14  Q    Then on the last page it says in concluding, Dr. Stadel
17 15  suggested the agency and Wyeth-Ayerst meet again in
18 16  approximately six months. Ms. Kish indicated that the FDA
19 17  minutes would note the due diligence of the sponsor in meeting
20 18  the post-approval commitment in spite of the delay in
21 19  initiating the trial.
22 20       An eight to nine-year period due diligence as far as
23 21  the FDA is concerned?
24 22  A    Ms. Kish was speaking for Ms. Kish. That's not an
25 23  official statement of the FDA, and so it -- you know, that's --
26 24  that would be just her statement.
27 25  Q    Would it be reasonable for a company to wait eight or

page 1315

3  1   nine years before they initiate a study if they know of the
4  2   safety hazard?
5  3   A    Well, and they waited since, you know, the '70s to do
6  4   them now. No, it wouldn't be reasonable, but you sell more
7  5   product while you wait.
8  6   Q    Now, did the FDA employ some lawyers?
9  7   A    No. They're on loan from the Department of Justice.
10 8   Q    So as an FDA officer, you didn't have a lawyer right
11 9   around the corner in the building that you could go to and say,
12 10  Hey, there has got to be something we can do about this?
13 11  A    No. You have to get a sign-off from the office of
14 12  general counsel. So that's why the FDA tends to do things
15 13  voluntarily. It is faster.
16 14  Q    Okay. And once again, even at this late stage in 1995,
17 15  whose information is the FDA relying upon to shed some light on
18 16  whether or not E plus P causes breast cancer?
19 17  A    They have to rely on the sponsor, but they have also
20 18  tried to get other studies to be done.
21 19  Q    All right. I want to show you a few documents from 1996.
22 20  The first one is January 31, 1996. This is concerning the
23 21  Cummings abstract. Have you seen this before?
24 22  A    Yes.
25 23  Q    And is it your understanding that Jeff Buchalter is a
26 24  Wyeth employee?
27 25  A    Yes.

page 1316

3  1   Q    And some of the people that they want to contact with
4  2   regard to this Cummings study are Dupont and Bush and
5  3   Nachtigall, correct?
6  4   A    Correct.
7  5   Q    And then tap third-party sources for support, and they
8  6   include ACOG as one of those groups, right?
9  7   A    Yes.
10 8   Q    And then they state what they're going to do in terms of
11 9   the analysis of the data and the position that they're going to
12 10  take down here, correct?
13 11  A    Correct.
14 12  Q    And then a few months later there is a distribution of
15 13  this document to the breast cancer working group, and it has
16 14  Jeff Buchalter's name and Jim Pickar, correct?
17 15  A    Correct.
18 16  Q    He is one of the doctors at Wyeth, is he not?
19 17  A    Yes.
20 18  Q    And this once again is talking about some strategic goals
21 19  that they want to accomplish?
22 20  A    Correct.
23 21  Q    And what does it say down here with regard to the
24 22  Cummings data?
25 23  A    Overshadow Cummings data with focus on an unconventional
26 24  approach to HRT therapy using HRT and breast cancer survivors.
27 25  Q    And what do they say also?

1 page 1317

2

3 1   A    Although intelligence indicates that Cummings will not

4 2   present his data in Amsterdam, a statement from N. Davidson

5 3   will be valuable in helping address future study findings

6 4   indicating a negative relationship between HRT and breast

7 5   cancer.

8 6   Q    All right.  I want to show you one other document.  This

9 7   one is a month prior to that time, March 27, 1996.  And their

10 8   goal was to balance negative coverage by casting doubt on the

11 9   value and validity of the study?

12 10   A    Correct.

13 11   Q    Will you look at the middle of this document and tell us

14 12   what it says there?

15 13   A    Our current objective is in keeping with previous

16 14   negative breast cancer data:  To focus our efforts on balancing

17 15   story copy.

18 16   Q    From a regulatory standpoint, would it have been

19 17   acceptable to the FDA, had they known, for Wyeth to have a

20 18   policy to focus efforts on balancing story copy when the story

21 19   was negative breast cancer coverage?

22 20   A    No.

23 21   Q    Would that have been reasonable conduct on the part of

24 22   this company?

25 23   A    To have tried to negate the study?  No.  They should have

26 24   been trying to find out if there was some validity in the

27 25   study, and they could do that with their own studies.

1 page 1318

2

3 1   Q    And what strategy did they tend to use?

4 2   A    Dismissive strategy.  Downplay the value of the study by

5 3   dismissing its contribution to the literature, simultaneously

6 4   suggesting it may be inappropriately creating a public health

7 5   scare.  Utilize third parties as much as possible to distance

8 6   Wyeth from the study, which is not Premarin specific.

9 7   Q    Even if all of these efforts were targeted at Cummings --

10 8   Cummings studied people who already had breast cancer -- would

11 9   it have been reasonable for them to be taking this attitude

12 10   towards studies dealing with the issue of breast cancer?

13 11   A    No.

14 12   Q    And what does that particular document, the section we

15 13   read there in the middle, what does it tell you about what

16 14   their general company policy was regarding negative breast

17 15   cancer data?

18 16        MR. URBANCZYK:  Objection.  No foundation.

19 17   Speculation.

20 18        THE COURT:  Just a minute.  I believe we need a

21 19   little more foundation.  Sustained.

22 20   BY MR. MORRIS

23 21   Q    Is there anything in the middle part of that document

24 22   that says that the negative breast cancer data has to involve

25 23   cases of women after they have had breast cancer?

26 24   A    No.

27 25   Q    From your review of the documents over the years and

1 page 1319

2

3 1   based on the regulatory experience at the FDA, since the mid

4 2   '70s, 1976 when we first saw those mitigating documents where

5 3   they said mitigating results through the '80s and the '90s, can

6 4   you characterize what Wyeth's position has been regarding data

7 5   that comes out that suggests a link between their products and

8 6   breast cancer?

9 7        MR. URBANCZYK:  Objection, Your Honor.

10 8        THE COURT:  Just a minute.  On what ground?

11 9        MR. URBANCZYK:  Violates the limitations on your

12 10   order on her ability to testify.

13 11        THE COURT:  I reckon we better approach.

14 12        (Bench conference reported as follows:)

15 13        MR. URBANCZYK:  Your Honor, I want to call your

16 14   attention to two of your orders.  One is Document 389.

17 15        THE COURT:  I just got through reading that about

18 16   three minutes ago.

19 17        MR. URBANCZYK:  And the other, Your Honor, is the

20 18   limited exception to this, which Your Honor gave based on

21 19   Judge Jones' order, assuming that she makes reference to

22 20   noncompliance with the CFR.

23 21        THE COURT:  You have to tie it in to the CFR.

24 22        MR. MORRIS:  I said, "based on your knowledge of the

25 23   government regulations."

26 24        THE COURT:  Let me see.  You said "regulatory

27 25   experience."  I think you need to hone it down.

1 page 1320

2

3 1        MR. MORRIS:  Okay.

4 2        THE COURT:  So it's sustained at this time.

5 3        (Return to open court.)

6 4        MR. MORRIS:  May I have the PowerPoint?  May I have

7 5   the ELMO?

8 6        THE COURTROOM DEPUTY:  Do you want to go with the

9 7   ELMO?

10 8        MR. MORRIS:  Yeah.  I will go with the ELMO.

11 9   BY MR. MORRIS

12 10   Q    Dr. Parisian, you and I looked earlier at the Code of

13 11   Federal Regulations, and I want to show you those regulations

14 12   again regarding the warnings.  And it says, Under this section

15 13   heading, the labeling shall describe serious adverse reactions

16 14   and potential safety hazards, limitations in use imposed by

17 15   them, and steps that should be taken if they occur.  The

18 16   labeling shall be revised -- shall be revised to include a

19 17   warning as soon as there is reasonable evidence of an

20 18   association of a serious hazard with a drug.  A causal

21 19   relationship need not have been proved.

22 20        Was there reasonable evidence of an association between

23 21   Wyeth's estrogen and progestin products in the 1970s?

24 22   A    Yes.  There started to be.

25 23   Q    All right.  Certainly, by the 1980s?

26 24   A    Better by the '80s, yes.

27 25   Q    Was there a reasonable association out there?

page 1321

1 A    Yes.
2 Q    Was it being studied?
3 A    Late '80s. No. It wasn't being studied by Wyeth. It
4 was being studied by some physicians.
5 Q    All right. Certainly, by the '90s, was there a
6 reasonable association?
7 A    Yes.
8 Q    And after reviewing their documents from the '70s, '80s,
9 and '90s, do you have an opinion, based on your regulatory
10 experience, this regulation as to whether or not Wyeth was
11 fulfilling its duty to the FDA concerning these products?
12 A    No. They weren't studying it to find out how to make the
13 labeling better so that it would be safer and in compliance
14 with the Act in terms of labeling.
15 Q    In relationship to the actions that they were taking, I
16 asked you earlier about whether or not FDA had any jurisdiction
17 over these consultants that they hired, like marketing
18 companies or whatever, the media companies that would go out
19 and handle media. Does the FDA have any jurisdiction over
20 groups like ACOG, the American College of Obstetricians and
21 Gynecologists?
22 A    No.
23 Q    Does the FDA have any jurisdiction over a group like the
24 North American Menopause Society?
25 A    No.

page 1322

1 Q    I want to show you, because earlier in this case
2 Dr. Kuperman testified that he had relied on publications from
3 NAMS and ACOG. Have you had an opportunity to review in the
4 past the funding Wyeth provided to North American Menopause
5 Society?
6 A    I have seen various documents. I think I have seen this
7 one about this funding for this, yes.
8 Q    And this is in 1998, correct?
9 A    Correct.
10 Q    And how much were they paying?
11 A    $60,000.
12 Q    And that's Plaintiff's Exhibit No. 6302.
13    MR. MORRIS:  And I will show 6302, 6304, 1419, 1341,
14 1660, 6274, 6302, 6304.
15    MR. URBANCZYK:  No objection.
16    THE COURT:  Be admitted.
17    (Plaintiff's Exhibits 6302, 6304, 1419, 1341, 1660, and
18 6274 received in evidence.)
19    MR. URBANCZYK:  No further objection.
20 BY MR. MORRIS
21 Q    I show you another one regarding Premarin, and this again
22 is the North American Menopause Society in the amount of how
23 much?
24 A    25,000.
25 Q    We have 1419, which is a Wyeth-Ayerst finance committee

page 1323

1 authorization for how much?
2 A    250,000, ACOG's annual meeting.
3 Q    1999 ACOG meeting.
4    And I will show you Exhibit 1341, and this is internal
5 correspondence from Wyeth. In 1988, back in 1988, how much to
6 the American College of Gynecology?
7 A    40,000 for their annual meeting guide, for two years.
8 Q    I show you what has been marked as Exhibit 1660. It's a
9 letter to Carrie Smith Cox at Wyeth from the American College
10 of Obstetricians and Gynecologists. It's dated 1995. And what
11 does it say on -- in the underlined section?
12 A    In keeping with the tradition and the terms outlined in
13 our 1981 agreement, ACOG requests the continued support of
14 Wyeth-Ayerst for the 1996 year.
15 Q    Does that give you a time frame as to how long Wyeth had
16 been funding ACOG?
17 A    Well, we know at least 1981 to 1995.
18 Q    And how much was the level of sponsorship for each issue
19 of the magazine?
20 A    18,000.
21 Q    And presumably how many issues per year of the ACOG
22 publication would there be?
23 A    I think there is at least 12.
24 Q    Okay. The ACOG newsletter?
25 A    Yes. I think that's what it is. I am not sure.

page 1324

1 Q    So 12 times 18?
2 A    At least.
3 Q    I show you Exhibit No. 6274. This is 1976 funding to
4 North American Menopause Society for some slim-jim brochures?
5 A    Yes.
6 Q    And how much were those?
7 A    4,000.
8 Q    Here is another one dated 1/6/98. This is Plaintiff's
9 Exhibit 6302 to the North American Menopause Society, and how
10 much was this one for?
11 A    60,000.
12 Q    Another one from '98?
13 A    25,000.
14 Q    25,000. That's Plaintiff's Exhibit 6304.
15    And this one I want to go over with you a little bit.
16 11/4/98, and this is a NAMS slide creation. And how much is
17 the amount for?
18 A    Is that 4,200?
19 Q    Yes.
20 A    Okay. And it says:  This PR was created for the NAMS
21 slide creation for Dr. Nachtigall.
22 Q    Have you seen Dr. Nachtigall's name in some of the
23 documents we saw regarding the Cummings data?
24 A    Yes. And -- yes. And we have seen her name in
25 documents, some of the articles that are being used for support

Page 205

page 1325

1  of the safety of the combined product.

2  Q    And the company that -- the vendor that was requesting

3  this is a company called DesignWrite, correct?

4  A    Correct.  Their name appears through a lot of Wyeth

5  documents.

6  Q    And the person was Karen Mittleman, correct?

7  A    Yes.

8  Q    And this is actually the invoice, is it not, from

9  DesignWrite?

10 A    Correct.

11 Q    And it is dated October 1, 1998?

12 A    Correct.  They were -- DesignWrite was a third party that

13 would produce documents for Wyeth.

14 Q    This is Exhibit No. 6400.  It's a little harder to read.

15 Let me zoom in a little -- or out first.  This is a request

16 regarding Premarin and OCs, it says here:  Program sponsors

17 ten nurse practitioners to attend the 2000 NAMS annual meeting,

18 covering meeting registration, 500 stipend each to help cover

19 travel expenses, and a half-year NAMS membership.  And what was

20 the total cost of that program, if you can tell us?  I will try

21 to zoom in.

22 A    There it is.  25,000.

23 Q    Have you seen this document before, this 1420?

24 A    I think I may have.

25 Q    Okay.  Let me zoom out so you can get a better look at

Page 206

page 1326

1  it.  It's awarding some fellowships.  Are you familiar with

2  that?

3  A    Pardon?

4  Q    Are you familiar with the American College of

5  Obstetricians and Gynecologists having Wyeth-sponsored research

6  grants and fellowships?

7  A    Yes.

8  Q    And are these types of programs programs where

9  information will be provided to doctors?

10 A    Yes, sir.

11 Q    With regard to the publications that ACOG and NAMS may

12 have put out, did FDA have any control over the content of

13 those publications?

14 A    No.

15 Q    If NAMS or ACOG had decided to write an article that was

16 favorable to either Wyeth or Upjohn, would there be anything

17 that FDA could do about it?

18     MR. URBANCZYK:  Objection, Your Honor.  It's beyond

19 the scope of testimony as you limited it today at lunch.

20     THE COURT:  Sustained.

21     MR. MORRIS:  We would next tender Exhibits 950-A

22 through 950-L.  Let's see.  There should be a 950-M, I think.

23     MR. URBANCZYK:  No further objection.

24     THE COURT:  Approach.

25     (Bench conference reported as follows:)

Page 207

page 1327

1     THE COURT:  When you offered the earlier batch

2  before, 6302 I believe it was and some other, Mr. Urbanczyk

3  said "no objection" and then he later said "no further

4  objections," and I didn't make any comment.

5     But I take it that you were meaning that you want to

6  reserve and preserve your earlier objections you made?

7     MR. URBANCZYK:  That's right, Your Honor.

8     THE COURT:  Okay.  I took it that way and your

9  exception is saved and your objection is noted.  Same with

10 these.

11     MR. MORRIS:  All right.

12     MR. URBANCZYK:  Thank you, Judge.

13     (Return to open court.)

14     MR. MORRIS:  So 950-A through L will be admitted,

15 Your Honor?

16     THE COURT:  Yes.

17     (Plaintiff's Exhibits 950-A through 950-L received in

18 evidence.)

19 BY MR. MORRIS:

20 Q    I would like to show you some documents and ask you if

21 you have seen these before.  This is a strategic publications

22 and development meeting that happened June 15th, 2000, and this

23 is out of the files of Wyeth.  The attendees are Wyeth-Ayerst,

24 Jamie DuRocher, Mark Barbee, Steve Strickland, Stephanie Brown,

25 and from DesignWrite, Karen Mittleman.  And what is the

Page 208

page 1328

1  committee doing at this point?

2  A    They're deciding what publications they are going to put

3  out.

4  Q    All right.  So pharmaceutical companies are involved in

5  putting out publications that appear in peer-reviewed journals?

6  A    They can be.  Until recently, they didn't have to

7  disclose that.  There is getting to be more of an emphasis on

8  disclosure.

9  Q    And with regard to this particular meeting, what were --

10 was one of the items that John Eden was suggested as the author

11 of a breast cancer paper questioning the role of progestins as

12 a causative factor?

13 A    Yes.

14 Q    All right.  That's June 15th.  Let's go forward to

15 July 27th, about a month and a half later.  Is this another

16 strategic development meeting?

17 A    Yes.

18 Q    And with regard to this one, had John Eden agreed to

19 author the breast cancer and progestins paper?

20 A    Yes.

21 Q    So who came up with the idea originally to produce the

22 paper questioning the role of progestins as a causative factor?

23 A    It is in Wyeth's document.  It's part of their strategic

24 plan.

25 Q    And I will show you 950-C.  And this is a project

Page 209

page 1329

3  1  assignment form?
4  2  A   Homework.
5  3  Q   And what was the homework that was to be done?
6  4  A   They wanted a manuscript written, according to this, for
7  5  breast cancer and progestins.  They want it submitted in health
8  6  in primary care, and they wanted it to be an eight to ten-page
9  7  manuscript, not including references.
10  8  Q   And in terms of the points to include, what were the
11  9  points that they wanted to include?
12  10  A   Oh, there you go.  Points to Include.  They wanted the
13  11  current literature that has indicated a role of progestins in
14  12  breast cancer among postmenopausal women, mechanisms how
15  13  progestins may influence breast cancer development, why
16  14  progestins may not be responsible for the incidence of breast
17  15  cancer in hormone replacement therapy users.
18  16  Q   So in this Points to Include, are they making any
19  17  suggestion about which way they want the article to lean?
20  18  A   Oh, yeah.  They definitely wanted to show that the
21  19  progestins are not involved in HRT and in breast cancer.
22  20  Q   And who is going to provide the written materials?
23  21  A   DesignWrite.
24  22  Q   Now, does John Eden work for DesignWrite?
25  23  A   No.  Not from what I have seen.  DesignWrite is a third
26  24  party that does writing assignments for Wyeth.
27  25  Q   So you mean this doctor that they're going to have write

Page 210

page 1330

3  1  this paper, he doesn't actually write it?
4  2  A   No, he doesn't write it.
5  3  Q   And it says that the work will begin when?
6  4  A   August 23rd, 2000, upon receipt of instructions and any
7  5  references provided by DesignWrite.
8  6  Q   Okay.  So we move forward to October 3rd, 2000, and what
9  7  is this?
10  8  A   This is a check for a thousand dollars for writing the
11  9  breast cancer and progestins article.
12  10  Q   All right.  And we move forward to July 23, 2001, and
13  11  there is another strategic publications development committee
14  12  meeting, correct?
15  13  A   Correct.
16  14  Q   And what is happening at this meeting?
17  15  A   They're basically going through the status of the papers,
18  16  I believe.
19  17  Q   Okay.  And who was present?
20  18  A   Wyeth's people and DesignWrite's people, Karen Mittleman.
21  19  Q   Okay.  And with regard to this particular document --
22  20  A   There is Eden's down there.
23  21  Q   Right here.  I'm bad when I don't have my highlighted
24  22  copy.  It says, Eden, do progestins have a role in breast
25  23  cancer?  Is that the same document that was referenced in that
26  24  about a year before this?
27  25  A   Yes.  And it's under the heading BC, which is breast

Page 211

page 1331

3  1  cancer, Message.
3  2      THE COURT:  Just a minute.  Why don't we hold it
4  3  right there.
5  4      We will be in recess until 10 after 3:00 by the clock on
6  5  the wall.
7  6      Ladies and gentlemen, don't talk about the case, anybody
8  7  involved in it, and consciously avoid making up your mind.
9  8  Don't even start making up your mind.
10  9      Let the jury stand out.  Everyone else remain seated.
11  10      (Jury exits the courtroom.)
12  11      THE COURT:  The jury is out.  We will be in recess.
13  12  You can be at ease.
14  13      (Recess at 2:56 p.m.)
15  14      C E R T I F I C A T E
16  15  I, Cheryl Bartnett Nelson, Official Court Reporter, do
17  16  hereby certify that the foregoing is a true and correct
18  17  transcript of proceedings in the above-entitled case.
19  18
20  19  _____   Date:  February 12, 2008
21  Cheryl B. Nelson, CRR, RPR, CCR
22  20  United States Court Reporter

Page 212

page 1332

2  1      (Proceedings continuing in open court at 3:12 p.m.)
2      THE COURT:  We're on the record.
3      MR. MORRIS:  Your Honor, we found some more references
4  4  in Dr. Parisian's report concerning Premarin labeling.  In
5  paragraph 204, she talks about the CBE being submitted
5  6  strengthening the Premarin labeling.  She goes down to
7  paragraph 207 and talks about the patient labeling risks of
6  8  estrogens, cancer of the breast as it relates to the Premarin
7  9  label.  And on page 7, she talks about the FDA writing
8  10  regarding its recommendations for Premarin, label
9  11  recommendations for Premarin.  I mean, clearly she has not
10  only
11  12  reviewed it, but she's giving what the FDA has to say about
12  the
13  labeling of Premarin, "Wyeth's response to FDA's labeling
14  14  request provides information about Wyeth's planned marketing
15  of
16  15  Premarin."  And throughout this document, she repeatedly
17  16  mentions the Premarin labeling.  And how can she have opinions
18  17  regarding the Premarin label if she hasn't read it?
19  18      THE COURT:  What says the defendant?
20  19      MR. URBANCZYK:  Your Honor, I didn't say she didn't
21  20  read it.  She said she had rendered no opinions about the
22  Premarin label, and I believe that's actually accurate.  If
23  you
24  22  look at these particular paragraphs, Your Honor, these are
25  23  really just side issues relating to, for example, whether we
26  24  should mention that it's made out of pregnant mares' urine.
27  25  That's not what Dr. Parisian was going to testify about.  And

Page 213

page 1333

1   if you look at paragraph 204, this is about a court -- a
2   conversation between the FDA and Wyeth.  Actually, I don't
3   think it's about the Premarin label.  It's about the Prempro
4   label.  It has to do with the HERS finding and the Ross and
5   Schairer findings which related to estrogen plus progestin and
6   resulted in a letter from Susan Allen to the FDA -- to Wyeth
7   that relates primarily to the Prempro label, not the Premarin
8   label.  I don't have any doubt that Dr. Parisian has read the
9   Premarin label, but she has expressed no opinion in this
report
10   that I'm aware of, and she certainly denied any such opinion
in
11   her deposition regarding the adequacy of the Premarin as
12   opposed to the Prempro label.
13        MR. MORRIS:  May I respond, Your Honor?
14        THE COURT:  No, because I'm going to overrule the
15   objection; exception saved.  Get the jury in and the witness.
16        (Jury enters the courtroom.)
17        THE COURT:  Everybody please rise while the jury
18   enters.
19        Be seated, please.  You may continue.
20   BY MR. MORRIS:
21   Q.  Dr. Parisian, when we took the break, I was up to
22   Plaintiff's Exhibit 950-E.  And this is another strategic
23   publications development meeting between Wyeth and Design
24   Write, July 23rd of 2001, regarding, "Do progestins have a
role
25   in breast cancer?"  What was the concern raised at that time?

Page 214

page 1334

1   A.  The "message with respect to the pipeline products.  Need
2   to reiterate the primary role of progestin in HRT for
3   endometrial safety."  So it's a counterbalance between breast
4   cancer and endometrial safety is their role model there.
5   Q.  Okay.  And we move ahead another month, another strategic
6   development meeting, August once again, Wyeth and Design Write
7   are there.  And was this still on the grid?
8   A.  Yes.
9   Q.  "Do progestins have a role in breast cancer," that's
10   950-F?
11   A.  Yes.  And this is just typical of documents that I've
seen
12   for damage control basically.
13   Q.  And if we move forward to January 28th of '02, there's a
14   committee meeting.  And regarding this particular meeting,
does
15   it outline some of the things that were going on regarding the
16   breast cancer paper?
17   A.  Yes, it does.
18   Q.  And Mr. Barbee, was he one of the persons that was
19   responsible for helping get that done?
20   A.  That's what it states there.
21   Q.  And if we go back and we look and try to find out who Mr.
22   Barbee is, who is he with?
23   A.  He's with Wyeth.
24   Q.  950-H.  No.  Sorry.  Can you describe for the jury what's
25   depicted here in 950-H?

Page 215

page 1335

1   A.  This is a discussion of BC No. 6, which, as we were
2   looking through the memos, it's been the paper that they're
3   working on for Eden is BC No. 6.  And it describes what's
4   supposed to be presented in it.  It's hard to read, but --
5   Q.  I'm going to zoom in on a section.
6   A.  And there's a submission target date of February 2002.
7   And they are basically talking -- or have the list of the
8   status report of what is happening with that manuscript, the
9   different dates.
10   Q.  And so who was the outline being provided to?
11   A.  To Dr. Eden.
12   Q.  Well, before that?
13   A.  No.  It was a Wyeth -- it talks about Dr. Eden further
14   down, I believe, but Wyeth is the client because they
15   commissioned these services from Design Write.
16   Q.  So why would the outline be provided to Wyeth?
17   A.  Well, it's Wyeth's paper.  They are paying the ticket for
18   it, so they are the client.
19   Q.  And then what would happen next?
20   A.  Well, then the outline is sent to the author.  They get
21   feedback from the author.  And Design Write, which is DW, has
22   various things to try to get the manuscript moving along.
23   Q.  All right.  And then it says that the author sent
24   revisions, correct?
25   A.  Correct.

Page 216

page 1336

1   Q.  And the revisions paper was sent to the author -- the
2   revised paper -- I'm sorry -- on 2-11-02, correct?
3   A.  Correct.
4   Q.  Sent to author for submission to the journal 2-21-02,
5   right?
6   A.  Correct.
7   Q.  And then the paper to be submitted to the journal in
March
8   of '02?
9   A.  Right.
10   Q.  That was their plan?
11   A.  That's the plan.
12   Q.  Okay.
13   A.  And they have already selected the journal that it's
14   supposed to be sent to.
15   Q.  Right.  And the journal that they had selected was what?
16   A.  The Archives of Internal Medicine.
17   Q.  Is that a peer-reviewed journal?
18   A.  Yes, I believe it is.  Yes.
19   Q.  Is it the type of journal that a clinician like Dr.
20   Kuperman might read?
21   A.  Oh, yes.
22   Q.  This is what, Doctor?  This is 950-I.
23   A.  This is the manuscript with Dr. Eden's name on it and
24   where he comes from and, you know, where his address and
25   correspondence can be, his e-mail.

Page 217

```
1 page 1337
2  1   Q.  Where is Dr. Eden located?
   2   A.  Australia.
3  3   Q.  So he's from Australia?
   4   A.  Yes.
4  5   Q.  And what's the title?
   6   A.  "Progestins and breast cancer."
5  7   Q.  How many words?
6  8   A.  3,379.  And there's Design Write's Bates number on it.
7  9   Q.  And that's right down here?
8 10   A.  Correct.
9 11   Q.  Now, who would have done the actual writing of this
10 paper?
11 12   A.  Well, the original paper and concept and outline came
12 from
13 13       Wyeth, and then they had what they call ghostwriters write the
14 14       paper for them, and then they got input from Dr. Eden at some
15 15       time, and then it got finalized and sent to a journal.
16 16   Q.  Okay.  And there's the abstract and then the
17 introduction,
18 17       and "Progestins and breast cancer," and it talks about the
19 18       epidemiological studies, correct?
20 19   A.  Correct.
21 20   Q.  All right.  And it talks about the breast cancer
22 detection
23 21       project.  Are you familiar with that?
24 22   A.  I think so.  Where are we?  Yes.  There we are.
25 23   Q.  That was being done by Schairer and colleagues, correct?
26 24   A.  Correct.
27 25   Q.  Also talks about a collaborative group, right?
```

Page 218

```
1 page 1338
2  1   A.  Yes.
   2   Q.  Over here it talks about Ron Ross a little bit?
3  3   A.  Right.  They are going through the literature that's
   4 current at that time.
4  5   Q.  It talks about HRT in high-risk women, correct?
   6   A.  Correct.
5  7   Q.  Talks about the effect on breast density?
6  8   A.  Correct.  That's a major issue in terms of hormone
7  9       replacement therapy and diagnosis of breast cancer.
8 10   Q.  The effect of the progestin schedule?
9 11   A.  Right, the types of progestins that you're giving,
10 whether
11 12       continuous or cyclic.
12 13   Q.  Pretty long paper.
13 14   A.  Conclusions.
14 15   Q.  And they say what about the conclusions?
15 16   A.  "That there has been conflicting epidemiologic evidence
16 17       about the role of progestins in breast cancer.  The majority
17 of
18 18       observational studies have examined estrogen-only regimens and
19 19       those that were able to deduce progestin effects have
20 differing
21 20       results.  Although two recent epidemiologic studies that
22 21       garnered significant attention reported slightly elevated
23 risks
24 22       with HRT, the statistical strength of these conclusions is
25 23       weak, and a clear consensus on progesterone and breast cancer
26 24       risk is lacking."
27 25   Q.  All right.  Then I'll show you Exhibit 950-J, and what is
```

Page 219

```
1 page 1339
2  1       this?
   2   A.  UPS verification, I believe, yes, Dr. Eden's package.
3  3   Q.  It's the package that was sent to Dr. Eden?
4  4   A.  Correct.
5  5   Q.  What does it say?
6  6   A.  "I'm sorry I'm late in getting this to you, but please
7 let
8  7       this serve as confirmation that we are prepared to absorb the
9  8       cost of the package that Dr. Eden will send to the journal."
10       So they are paying for the postage.
11 10   Q.  All right.  And then what about this letter?  Who
12 prepared
13 11       this letter?
14 12   A.  Design Write, but -- yes.
15 13   Q.  But who is it signed by?
16 14   A.  Dr. Eden.
17 15   Q.  And what does this letter concern?
18 16   A.  It concerns the manuscript that he is submitting to
19 17       Archives for Internal Medicine.
20 18   Q.  And he also submitted it somewhere else, didn't he?
21 19   A.  Yes, he did.
22 20   Q.  Where did he submit it?
23 21   A.  Journal of Obstetrics and Gynecology.
24 22   Q.  Is that the type of journal that a practitioner like Dr.
25 23       Kuperman might read?
26 24   A.  Oh, yes.
27 25   Q.  Once again, these letters -- what does it say here?
```

Page 220

```
1 page 1340
2  1   A.  "I am pleased to learn of your intention to publish my
   2       manuscript, 'Progestins and Breast Cancer,' in the American
3  3       Journal of Obstetrics and Gynecology."  And he's saying that
   4       it's in response to the WHI trial that they -- that he's
4  5       submitting.  And there's nothing in there about Wyeth.
5  6   Q.  Is there anything in here about Design Write?
6  7   A.  No.
7  8   Q.  It says if there are any questions, contact him at his
8  9       e-mail address, correct?
9 10   A.  Correct.
10 11   Q.  And I want to show you Plaintiff's Exhibit 950-K.  And
11 can
12 12       you identify this document?
13 13   A.  This is the article that we've been following,
14 "Progestins
15 14       and breast cancer," by Dr. Eden from Sydney, Australia.
16 15   Q.  Okay.  And down here it says, "From the Royal Hospital
17 for
18 16       Women, University of New South Wales," received for
19 17       publication, reprints available, blah, blah, blah, right?
20 18   A.  Correct.  There's no mention of Wyeth's participation.
21 19   Q.  And up here can we see where it was published?
22 20   A.  Volume 188, November -- No. 5, American Journal of
23 21       Obstetrics and Gynecology.  So this would be a peer-reviewed
24 22       article and a peer-reviewed journal.  And that's why you don't
25 23       always know the source of peer-reviewed articles.
26 24   Q.  And then when we get to the last page --
27 25   A.  There we go.  Karen Mittleman, Ph.D., and Stephen Parker.
```

1 page 1341

2 1  So there's no information that it's from Wyeth.

3 2  Q.  No disclosure that Wyeth had anything to do with it?

4 3  A.  Correct.

5 4  Q.  Karen Mittleman, she was the lady that worked at Design

6 5  Write, wasn't she?

7 6  A.  From the documents we've seen, yes.

8 7  Q.  And I want to show you last among these documents, here's

9 8  what we believe is the manuscript that was returned by Dr.

10 9  Eden.  Do you see it?

11 10  A.  Yes.

12 11  Q.  This is 950-L.  And let's go through and see what kind of

13 12  changes he made to the manuscript that was submitted to him by

14 13  Design Write.  When they use the term HRT, what was his

15 14  recommendation?

16 15  A.  I think he is using a different -- "estrogen" in there
and

18 16  "progestin combined therapy."  I can't read --

19 17  Q.  So he wants to change HRT to "estrogen/progestin combined

20 18  therapy"?

21 19  A.  Yes, but I think -- I can't see if that's "estrogen."  It

22 20  doesn't look like it's "Premarin."  I don't know what

23 21  estrogen -- like Ogen.  I'm not sure.

24 22  Q.  He says this improved --

25 23  A.  I guess it's "estrogen."  It's just hard to read a

26 24  doctor's writing.

27 25  Q.  Another change he said, that this improved prognosis

1 page 1342

2

3 1  maybe -- is maybe due in part to surveillance bias --

4 2  A.  Corrected.

5 3  Q.  -- rather than likely?

6 4  A.  Correct.

7 5  Q.  Thought the folks at Design Write were being a little too

8 6  strong.  And then over here, approximately 15 to 25 percent of

9 7  all breast cancers occur in women with a positive family

10 8  history of breast cancer.  What does he say up there in terms

11 9  of that?  Can you read that?

12 10  A.  He's making some reference to Lancet in 2001, something

13 11  "preponderance with recent meta-analysis Lancet."

14 12  Q.  Okay.  And down here, he wants to add another author to

15 13  this citation list?

16 14  A.  Correct.

17 15  Q.  Magnusson?

18 16  A.  Magnusson.

19 17  Q.  No changes there.  And here are a few changes --

20 18  A.  Yes.

21 19  Q.  -- correct?  And then he said, "Add discussion on effect

22 20  of increased breast density or diagnosis, mammogram readings"?

23 21  A.  Correct.

24 22  Q.  And so he made some changes in the paper, correct?

25 23  A.  Yes.

26 24  Q.  But do any of those changes appear -- do any of those

27 25  changes appear to alter the conclusions that were reached by

1 page 1343

2 1  the people at Design Write that wrote the paper?

2  A.  No.  So they're technical changes, but not the conclusion

3 3  change.

4 4  Q.  All right.  Now, we noted that that all started in 1990,

5 5  correct?

6 6  A.  Yes.

7 7  Q.  I'm sorry.  2000?

8 8  A.  2000.

9 9  Q.  I apologize.  2000.  I want to show you a document out of

10 10  the files of Wyeth, and this is Plaintiff's Exhibit 550,

11 11  "Prospectives in ERT/HRT Advisory Board."  And it begins "Day

12 12  One, Friday, June 9th, 2000"?

13 13  A.  Correct.

14 14  Q.  Do you see that?

15 15  A.  Yes.

16 16  Q.  And we go back into the section on breast cancer, who is

17 17  that by?

18 18  A.  Stampfer.

19 19     MR. URBANCZYK:  Your Honor, may we approach on this,

20 20  please?

21 21     (Bench conference reported as follows:)

22 22     MR. URBANCZYK:  Your Honor ruled that Mr. Morris

23 could

24 23  read certain portions of this document relating, I think, a

25 24  couple of days ago to marketing.  And Your Honor allowed him

26 to

27 25  read other portions of the document.  But we have not -- this

1 page 1344

2 1  particular statement, Your Honor, is hearsay.  This is not --

2  this is hearsay.  This is a statement by an expert at a

3 3  conference that has been recorded by Wyeth.  It is not --

4  cannot be introduced for the truth of the fact asserted.  Dr.

4 5  Stampfer is not here.

5 6     MR. MORRIS:  This is a business record of Wyeth's

6 that

7 7  contradicts -- this is using -- being used for rebuttal to

8 8  contradict what they were doing with Dr. Eden at the same

9 exact

10 9  time they had information -- Meir Stampfer.  That 24 goes to

11 10  the notice, it goes to the duty to test, the duty to warn.

12 11     MR. WALKER:  In other words, it's not being offered

13 12  for the truth of the matter asserted.

14 13     THE COURT:  Why doesn't it go to notice?

15 14     MR. URBANCZYK:  Well, Your Honor, they've already

16 15  introduced the articles in 1998 by Dr. Colditz that says it

17 16  causes breast cancer.  We're on notice of that allegation.

18 17     MR. MORRIS:  This rebuts the conduct they are doing,

19 18  the ghostwriting.

20 19     MR. URBANCZYK:  This is not a learned treatise.  This

21 20  is a statement made at a conference being used for the truth

22 --

23 21     THE COURT:  I believe, if nothing else, it's

24 22  repetitive, so I'm going to rule it out.  Save your exception,

25 23  note your objection.

26 24     (Proceedings continuing in open court as follows:)

27 25  BY MR. MORRIS:

Page 225

page 1345

1  Q.  All right.  Earlier we talked about the Premarin warning
2  label?
3  A.  Yes.
4  Q.  And have you reviewed the Premarin label in the past?
5  A.  Yes.
6  Q.  Have you offered opinions regarding the Premarin label in
7  the past?
8  A.  Yes.
9  Q.  Regarding cancer of the breast in this particular
10  warning,
11  it says, "The majority of studies have shown no association
12  with the usual doses used for estrogen replacement therapy and
13  breast cancer.  Some studies have suggested a possible
14  increased incidence of breast cancer in those women taking
15  estrogens for prolonged periods of time and especially if
16  higher doses are used."
17      Is there anything there that in 1992 would have informed
18  the physician regarding the relationship between estrogens and
19  progestins, MPA?
20  A.  No.
21  Q.  Is there any sufficient breast cancer warning conveyed by
22  that regarding the dangers of estrogens plus progestins in
23  1992?
24  A.  No.
25  Q.  All right.  I'd like to turn with you and talk with you a
26  little bit as I'm making the segue to talk to you about Upjohn.

Page 226

page 1346

1  And this will go much quicker.  With regard to Wyeth, let me
2  ask you a couple questions.  Throughout the years, based on
3  the
4  documents that you've reviewed, what we just went through in
5  terms of the documents from John Eden, with regard to
6  documents from the '70s, the '80s, the '90s where they
7  dismiss,
8  distract, from a regulatory standpoint at the FDA, was Wyeth
9  behaving as a reasonable company should under the regulations?
10  A.  No.  There was information to suggest that there was a
11  risk and they weren't pursuing it to find out if there was a
12  risk and then to take the appropriate actions, either do a
13  study or to warn people.  Instead, what we've seen is that
14  they
15  would have programs set up to negate research and studies that
16  actually were done and to try to distract and dismiss the
17  information so that physicians would be led to think that the
18  information wasn't valid.
19  Q.  And is the John Eden set of documents that we just went
20  through and the one that was published in the American Journal
21  of Obstetrics and Gynecology -- was that an example of their
22  efforts to keep the water muddy with regard to this risk?
23  A.  Yes.  I mean, it's all through all of the Wyeth
24  documents.
25  When endometrial cancer had erupted, they lost most of their
26  --
27  they lost half of their sales.  So certainly there was no
28  desire to have cancer of the breast also emerge.  So there was
29  a concerted effort through all of the documents to downplay
30  the
31  breast cancer risks.

Page 227

page 1347

1  Q.  Would it have been perfectly appropriate, if Wyeth had
2  chosen to, to take the product off the market for a period of
3  time?
4  A.  They could have done that.  They could have done the
5  studies.  They could have found out if increasing the exposure
6  of women to estrogen and progestin increased the risk and if
7  perhaps there was a better dosing to do.  They didn't do any
8  dosing studies.  They had a lot of options, not just removing
9  the product, but that would have been one option.
10  Q.  From 1942 to 1998, that whole period, as far as the two
11  defendants that are in this courtroom, which of the two
12  defendants had an approval for the use of this product in
13  menopausal women to relieve their symptoms?
14  A.  Wyeth.
15  Q.  And Wyeth only?
16  A.  Wyeth only.
17  Q.  Now, let's talk about Upjohn.  I want to show you a
18  document that's Plaintiff's Exhibit No. 10132.
19      MR. MORRIS:  And these have been offered and
20  admitted.
21  I don't think there's any objection.  No objection.  Your
22  Honor, will it be admitted?
23      COURTROOM DEPUTY:  I'm sorry, Mr. Morris.  What was
24  the number?
25      MR. MORRIS:  10132.  There's no objection.  Will it
26  be
27  admitted?

Page 228

page 1348

1  THE COURT:  It will be admitted.
2      MR. GOODELL:  Same issue, that no further objection
3  for all of these.
4      THE COURT:  All right.  Exception saved.  Admitted.
5  (Plaintiff's Exhibit 10132 received in evidence.)
6  BY MR. MORRIS:
7  Q.  Have you seen this document before?
8  A.  Yes.
9  Q.  And who is it put out by?
10  A.  Upjohn.
11  Q.  And just for the record, what type of product did Upjohn
12  make?
13  A.  Provera, MPA.
14  Q.  And is Provera a synthetic progestin?
15  A.  Yes.  It's modeled after pig progesterone.  It's not even
16  modeled after human progesterone.
17  Q.  And in the middle of this page, what does William Wenner
18  the M.D., Ph.D. at the Upjohn Company say to the doctors of
19  America regarding the product?
20  A.  That it's potent.  It's 36 times more potent than
21  ingested
22  progesterone, that would be a woman's natural progesterone, 12
23  times as potent as ethisterone, which is another progestin, in
24  inducing withdrawal bleeding in amenorrheic women, in women
25  who
26  aren't having their periods.  These are premenopausal women.
27  If you want to stimulate them to have their period, this is

Page 229

1 page 1349

2

3 1   more potent than all of the products that are out there.

4 2   Q.  It does say that, "By comparison, Provera is thirty-six

5 3   times more potent than ingested progesterone."  Would ingested

6 4   progesterone be the same thing as a woman's endogenous

7 5   progesterone?

8 6   A.  Yes.  That would be natural progesterone.

9 7   Q.  Are you familiar with a thing called the Brook Lodge

10 8   Symposium?

11 9   A.  Yes, sir.

12 10   Q.  And what was it?

13 11   A.  It was a symposium about Provera.  A lot of it deals with

14 12   an injectable Provera called Depo-Provera.  And it was the

15 13   document that was used in the DESI review for getting --

16 14   showing efficacy for Provera.

17 15       MR. MORRIS:  And this is Plaintiff's Exhibit 10126.

18 16   And it's been tendered to opposing counsel.  No objection?

19 17       MR. GOODELL:  No further objection, Your Honor.

20 18       THE COURT:  Admitted.  Noted.

21 19   (Plaintiff's Exhibit 10126 received in evidence.)

22 20   BY MR. MORRIS:

23 21   Q.  When did the Brook Lodge Symposium take place?

24 22   A.  I believe in the early '60s.

25 23   Q.  And if we go inside the document -- we're not going to

26 24   discuss the whole document -- but at least one of the things

27 25   that was being discussed was what?

Page 230

1 page 1350

2 1   A.  The use of progestin for endometrium of surgical

2   castrates.  Those would be women that had their ovaries

3 3   removed.  So they are seeing if they can stimulate it using

4 4   parenteral -- that's injectable -- Provera.

5 5   Q.  Okay.  And they go through a study about that --

6 6   A.  Yes.

7 7   Q.  -- right?  And that's reflected -- I'm sorry -- on page

8 8   147?

9 9   A.  Correct.

10 10   Q.  Now, what is significant about this Brook Lodge

11 Symposium?

12 11   Without having to read this whole document to the jury, what

13 12   was significant about the Brook Lodge Symposium concerning

14 13   progesterone?

15 14   A.  It was not about menopause.  It was about primarily women

16 15   that were premenopausal, and it's the potency of injectable

17 16   Provera, Depo-Provera.

18 17   Q.  When was Provera approved and first put on the market?

19 18   A.  In 1959.

20 19   Q.  And it was for treatment of what?

21 20   A.  Well, it was for treatment of dysfunctional uterine

22 21   bleeding that would be for premenopausal women.

23 22   Q.  A condition called amenorrhea?

24 23   A.  Amenorrhea would mean a woman without a period.  So it

25 was

26 24   primarily for premenopause.  It also had functions in

27 25   pregnancy.

Page 231

1 page 1351

2 1   Q.  I want to show you what's previously been marked as

10388,

3 2   and ask you if you've seen this document?

3   A.  Yes.

4 4       MR. MORRIS:  Will this be admitted, Your Honor?

5 5       MR. GOODELL:  No further objection.

6 6       THE COURT:  Exception saved.  Admitted.

7 7   (Plaintiff's Exhibit 10388 received in evidence.)

8 8   BY MR. MORRIS:

9 9   Q.  Who is this letter from?

10 10   A.  Department of Health, Education and Welfare, Food and

11 Drug

12 11   Administration, 1966.  And it's in regard to a new drug

12   application 11839, which would have been Provera.

14 13   Q.  And what type of new drug application were the folks at

14   Upjohn making to the FDA in 1966?

16 15   A.  Well, in -- they wanted a menopausal use.  This was after

16   the change in the law in 1962 where you had to support that

you

19 17   were effective, you had to get approved for safety and

18   effectiveness.  So they were asking for an indication for

19   hypoestrogenic states.

22 20   Q.  And what did FDA say in 1966 about that?

21   A.  Well, even in '66, they said that it failed to have

22   clinical data to justify that use of this drug.  So this was

23   just the beginning of having to support efficacy, and it did

24   not make the cut.

27 25   Q.  And have you seen this document?  This is 10385.

Page 232

1 page 1352

2 1       MR. MORRIS:  Will it be admitted, Your Honor?

2       MR. GOODELL:  No objection.

4 3       THE COURT:  Admitted.

4   (Plaintiff's Exhibit 10385 received in evidence.)

6 5   BY MR. MORRIS:

7 6   Q.  Have you seen this document?

7   A.  Yes.

9 8   Q.  What's the date of it?

10 9   A.  It's July 31st, 1968.

11 10   Q.  What is this regarding?

12 11   A.  And it's regarding the submission of a supplemental new

12   drug application to the FDA.

14 13   Q.  All right.  And what was the purpose of that supplemental

14   NDA?

16 15   A.  I believe it's combination use.  I'm looking there.  Yes.

16   "Provide for the revised labeling including the deletion of

17   dysmenorrhea and premenstrual tension as indications for use

of

20 18   the drug."

21 19   Q.  All right.

22 20   A.  Dysmenorrhea is painful periods.

21   Q.  And what did the FDA do with this supplemental new drug

24 22   application?

23   A.  They were waiting for the DESI review, if additional

26 24   information relating to the safety or effectiveness of this

27 25   drug, including the report from the National Academy of

page 1353

1 Science, becomes available, revision of that labeling or other
2 action affecting the marketing of the drug may be required.
3 FDA was in this transition period. This is the DESI. So they
4 weren't quite sure what the labels were going to say and they
5 were awaiting for the completion of the DESI review. And it
6 wasn't just for Provera. It was all of the DESI -- the drugs
7 being reviewed by DESI.
8 Q. Okay. Previously we've seen a document from 1977 that
9 suggests that Wyeth was aware that their products were being
10 used in combination with progestins. In your review of the
11 records, did Upjohn become aware at some point that their
12 progestin was being routinely used with estrogen in menopausal
13 women?
14 A. Yes.
15 Q. And why was it being used for that purpose?
16 A. Well, originally it was being used because when you put
17 women on Premarin, they will get bleeding. So you -- for women
18 to stay on Premarin and estrogen, if you include a progestin,
19 it makes it so the woman won't have as much breakthrough
20 bleeding. So from a practical point of view, that's why you
21 began doing it even before the endometrial cancer scare. It's
22 just that women would continue on the drug longer if they
23 weren't having periods. The only good thing about menopause is
24 not having periods. So women weren't really thrilled with
25 having that, so that's why they added progestin.

page 1354

1 Q. Now, during this time frame in the '60s, and then in the
2 '70s, are you aware of any Upjohn study that was done to look
3 at the issue of whether or not the combination causes breast
4 cancer?
5 A. No.
6 Q. Have you seen such?
7 A. No.
8 Q. Have you looked for it?
9 A. Yes. And their own employees say there were no studies
10 done in depositions.
11 Q. I want to show you what we've previously marked as 10178.
12 And this is moving forward quite a bit to 1985. Have you seen
13 this document before?
14 A. Yes.
15 Q. Who is it from?
16 A. FDA.
17    MR. GOODELL: Your Honor, may we approach, please?
18    (Bench conference reported as follows:)
19    MR. GOODELL: Your Honor, I need a little help from
20 you on this. This is an ad -- or this is a letter from the FDA
21 about cancellation for the ad in 1985. We object stringently
22 to the introduction of these. This witness has testified that
23 Upjohn was aware through a variety of sources back in the '60s
24 and '70s that Provera was being prescribed with estrogen. That
25 gives rise to whatever duty she claims existed, the knowledge.

page 1355

1    THE COURT: What is your objection?
2    MR. GOODELL: My objection is that this -- these
3 relate to advertisements that Dr. Kuperman never testified he
4 saw. It relates to communication from the FDA. Now, I want to
5 be clear. We have argued this before and you have ruled
6 against me on this, but it was because the issue was it may
7 relate to the duty of the company to test. She's already
8 testified that we had that duty on the basis of our knowledge.
9 So introducing a series of letters to and from the FDA about
10 objection to advertising that we had is more prejudicial than
11 of benefit given that she's already testified a duty exists.
12    MR. MORRIS: You want to go ahead, Erik?
13    MR. WALKER: First, she hasn't. All she said, they
14 were aware that doctors were prescribing --
15    THE COURT: Objection overruled, but your exception is
16 saved.
17    (Proceedings continuing in open court as follows:)
18 BY MR. MORRIS:
19 Q. Once again, Dr. Parisian, this is September 10th, 1985,
20 and who is this correspondence from?
21 A. From the FDA.
22 Q. And who is it addressed to?
23 A. To Upjohn, to Mr. Ishler.
24 Q. And what was the concern at the FDA concerning Upjohn?
25 A. Well, they had an advertisement that was running, "The

page 1356

1 other half of estrogen replacement therapy." And the FDA
2 wanted that removed from circulation.
3 Q. And why did the FDA want that removed from circulation?
4 A. Because they didn't have an indication for menopause.
5 Q. And what did they say with regard to it not being
6 approved?
7 A. That it was not -- it was not approved as safe and
8 effective for the treatment and reversal of endometrial
9 hyperplasia, which is not an improved indication for your
10 product.
11 Q. All right. Would that document in 1985 from the FDA's
12 standpoint give them knowledge that their products were being
13 used with estrogen products for postmenopausal women?
14 A. Well, they are aware of that. They are advertising it.
15 Q. Okay. What does "The other half of estrogen therapy"
16 mean?
17 A. Well, it would be the Provera with estrogen, E plus P.
18 Q. And if you're going to advertise and market a product for
19 that purpose, do you have a duty under the FDA regs to study
20 it?
21 A. Yes. Yes.
22 Q. So would that have been a red flag to the company?
23 A. Yes.
24 Q. Have you seen documents prior to 1985 where some of the
25 same activity was occurring?

page 1357
1    MR. GOODELL: Objection.
2    MR. MORRIS: We'll get back to it.
3    MR. GOODELL: Your Honor has ruled all of that out.
4    MR. MORRIS: Can I not ask her if she's seen documents
5    and information from --
6    THE COURT: If I ruled it out.
7    MR. GOODELL: Your Honor, I hate to ask --
8    THE COURT: Let's approach.
9    (Bench conference reported as follows:)
10    MR. GOODELL: Your Honor, this document, I made a
11    mistake which I'll have to live with. I thought this was the
12    document which was attached -- no, I'm wrong. Sorry. You
13    ruled specifically on earlier advertisements, advertisements
14    going back into the '60s, and you ruled them out. For the
15    witness to now be permitted to testify about other ads and
16    other documents like this she may have seen --
17    THE COURT: Are you saying I ruled on this document
18    before now?
19    MR. WALKER: No.
20    MR. GOODELL: I'm saying you ruled testimony about
21    other documents. In other words, they tried to introduce other
22    ads and other letters, and Your Honor ruled them out.
23    MR. MORRIS: It's important for me to be able to
24    establish the time when they first were on notice. Now, Your
25    Honor has ruled those documents out. I've maintained all along

page 1358
1    they were absolutely relevant so I can show how far back in
2    time they were doing this.
3    THE COURT: When I rule something out, it's out until
4    you get a bench ruling to the contrary.
5    MR. WALKER: Judge Jones specifically said on the
6    Daubert ruling on Parisian she could talk about the marketing
7    and what the FDA did, she just couldn't introduce the
8    advertisements themselves. That is what he ruled. I'll go get
9    the ruling.
10    THE COURT: It's out. The document is out.
11    MR. WALKER: The documents are, but -- he did say she
12    couldn't talk about the ads, but she could talk about the fact
13    that they did market it for this purpose.
14    THE COURT: Yes. That's true. I've read his ruling
15    and I've adopted it.
16    MR. GOODELL: I think my interpretation of what Judge
17    Jones ruled was that she was entitled to testify that there was
18    an obligation to test. It was not necessary for her to use any
19    advertisements to talk about that. Your Honor has ruled that
20    she could use a few.
21    THE COURT: I agree.
22    MR. GOODELL: I don't think that means they can go
23    back in and say, "I can't show you this advertisement, but I
24    want to talk to you about all of the advertisements."
25    MR. MORRIS: I didn't ask her about --

page 1359
1    MR. GOODELL: Sure you did.
2    THE COURT: He's got the floor. Now you've got it.
3    MR. MORRIS: I wasn't asking about the
4    advertisements.
5    I was asking with regard to the FDA's actions in the past
6    regarding the fact that they were suggesting that this was
7    being used.
8    THE COURT: I'll allow it over your objection.
9    Exception saved.
10    (Proceedings continuing in open court as follows:)
11    BY MR. MORRIS:
12    Q. Are you --
13    THE COURT: Just a minute.
14    MR. MORRIS: I'm sorry. Your Honor.
15    THE COURT: Go ahead.
16    BY MR. MORRIS:
17    Q. Are you aware of FDA letters before this 1985 time frame
18    addressing this same issue of Upjohn suggesting that their
19    product be used in combination with Premarin?
20    A. Yes, and it's not an approved indication.
21    Q. And how far back in your memory does it go that Upjohn was
22    suggesting that the two products be used together?
23    A. Back into the '60s.
24    MR. GOODELL: Same objection, Your Honor.
25    THE COURT: Overruled.
    BY MR. MORRIS:

page 1360
1    Q. What was your answer?
2    A. In the '60s.
3    Q. Okay. I want to show you this document from 1986, and
4    this is a meeting that apparently took place between Upjohn and
5    the FDA staff. Have you seen this one before?
6    A. Yes.
7    MR. GOODELL: Could we get a number, counsel?
8    MR. MORRIS: I'm sorry. This is 10342.
9    BY MR. MORRIS:
10    Q. And what's going on at this meeting.
11    A. There's a discussion according to the memo of the
12    convenience pack, which is a combination of estrogen plus
13    progestin, and the FDA saying it's not an approved indication
14    yet.
15    Q. And what was their convenience pack going to look like?
16    A. Probably about the same as the Wyeth's convenience pack.
17    Q. And what was the time frame that Wyeth was trying to get
18    the Prempak approved?
19    A. Same time frame, in the '80s.
20    Q. So in the mid '80s, these two companies are both trying to
21    get convenience packs approved separately?
22    A. Correct. They are competitors. Even though you see them
23    here together as friends, they were competitors.
24    Q. And what does the FDA say regarding the submitted study
25    protocols?

page 1361

1    A.   Well, the FDA wanted an estrogen-only group.  They wanted
2    regarding the -- plans statistical analysis.  Yes, you have to
3    have statistics to do a clinical trial.  And the FDA wanted to
4    have an estrogen-only group to make it a stronger study to
5    compare.  And the FDA definitely wanted to have information
6    about the potential risks resolved.
7    Q.   So in 1986, the FDA is asking them, or at least
discussing
8    with them, the potential for a study?
9    A.   Correct.
10   Q.   And if we move back, this is a document -- it's hard to
11   tell what the date of this is because somebody has put a "4"
12   where I think the "3" was.  And that -- anyway, we can
13   make what we want of that.  Is this letter from the FDA?
14   A.   Yes.
15   Q.   And is it to Upjohn?
16   A.   Yes.
17   Q.   And what is the purpose of this?  This is Exhibit 10154.
18   A.   This is another article, advertisements seen in
19   Contemporary OBGYN.  And the FDA is asking for cancellation of
20   the advertisement.
21        MR. GOODELL:  Just for the record, Your Honor, just
22   for consistency, we would renew our objection.
23        THE COURT:  Exception saved.
24   BY MR. MORRIS:
25   Q.   And what does the FDA say down here about the what the

page 1362

1    implication is of suggesting that their product be used in
2    combination with estrogen?
3    A.   Implication.  Okay.  "However, until your approved
package
4    insert has been changed to reflect routine concurrent use, you
5    are misbranding your product by promoting it for an unapproved
6    indication."
7    Q.   And you're not supposed to do that?
8    A.   No.  No.
9    Q.   Then we move forward to 1988.  I want to show you what's
10   been marked as 10166.
11        MR. MORRIS:  Any objection?
12        MR. GOODELL:  Can you hold on one second?  I'm sorry.
13   The number, please?
14        MR. MORRIS:  10166.
15        MR. GOODELL:  No further objection, Your Honor.
16        THE COURT:  Exception saved.  Admitted.
17        (Plaintiff's Exhibit 10166 received in evidence.)
18   BY MR. MORRIS:
19   Q.   This is a letter from FDA, correct?
20   A.   Yes.
21   Q.   Once again to the Upjohn Company?
22   A.   Yes.
23   Q.   What is the date of this letter?
24   A.   January 15th, 1988.
25   Q.   So in 1988, what is the -- what is the import of this

page 1363

1    letter?
2    A.   Upjohn had submitted a supplemental NDA application for
3    the combination use, but they had submitted articles, not
4    clinical studies.  The FDA will allow you to do that if the
5    articles are of good enough quality to support that it's
6    adequate and well-controlled studies.  So they submitted 47,
7    and the FDA found only 40 -- four that they could even analyze
8    in terms of this indication.
9    Q.   And let's talk about the four.  No. 1 one was the
10   Nachtigall study.  Is that the same Dr. Nachtigall that's
11   mentioned in the Wyeth documents?
12   A.   Yes.
13   Q.   What does the FDA think of her study?
14   A.   They don't accept it as adequate and well-controlled
15   studies.  There's no treatment group with unopposed estrogen,
16   the small sample size, low incidence of endometrial cancer, no
17   definite conclusions.  So it wouldn't meet the cut for valid
18   clinical evidence.
19   Q.   All right.  What about Hammond?
20   A.   Hammond was designed to detect differences between
21   hypoestrogenic women.  "While the study with its many
22   deficiencies suggests endometrial protection may be afforded
by
23   the sequential addition of progestin to estrogen, further data
24   are needed from a properly designed study whose objective is
to
25   detect differences between estrogen alone and estrogen plus

page 1364

1    progestin."  These are studies for endometrial hyperplasia.
2    Q.   And what do they say about the study?  It wasn't
randomized?
3    A.   Right.  It doesn't make the cut for adequate
4    well-controlled studies.
5    Q.   What about --
6        THE COURT:  Why don't we all just stretch here?  Take
7    a little seventh inning stretch.  Getting late in the day on a
8    dark and gloomy day.  At least it's not lightning and
9    thundering anymore.
10        THE WITNESS:  The sun is not shining in your eyes.
11   BY MR. MORRIS:
12   Q.   Going to the third study.
13   A.   The third study is a Gambrell article.  And it's a study
14   from Wilford Hall, United States Air Force Medical Center,
with
15   a prospective study.
16   Q.   And what does the FDA think about the Gambrell study?
17   A.   This was not a randomized or well-controlled study.  And
18   then it goes on to tell the problems with it.  It says, of the
19   5,563 postmenopausal women in the study, only 80 continued to
20   use estrogens alone.
21   Q.   All right.  And then No. 4?
22   A.   4, "Progestational agents in the Rosenwaks and Wentz
study
23   did not protect patients from development of endometrial
24   hyperplasia."

Page 245

page 1365

1  Q.  So what was the FDA's view in 1988 of the state of the
   epidemiology that had supposedly been done on this issue of
2  whether or not E plus P creates harm?
3  A.  Well, this application was just for endometrial
   hyperplasia for an indication.  And there was not adequate
4  information in the literature to support that indication.
5  Q.  Have you seen the Nachtigall, Gambrell, and Hammond study
   all cited as alleged breast cancer studies?
6  A.  They are not.  They are not alleged breast cancer
   studies.
7  Q.  Okay.  Now, with regard to the approval of Provera to be
8  used in combination as part of a convenience pack, did FDA
   ever
9  approve that?
10 A.  Pardon?
11 Q.  Did FDA ever approve the convenience pack application?
12 A.  There was a convenience pack, but not -- it was not
13 marketed the way it was supposed to be.  It was -- are you
14 talking about the 28 day --
15 Q.  No.  I'm talking about the E plus P.  Was there ever --
16 A.  No.
17 Q.  -- a combination pack of E plus P approved for Upjohn?
18 A.  No.
19 Q.  All right.  And in 1991, are you familiar with this
20 document?
21        MR. GOODELL:  Number, please?
22        MR. MORRIS:  I'm sorry.  This is 10189.

Page 246

page 1366

1        MR. GOODELL:  No further objection, Your Honor.
2        THE COURT:  Exception saved.  Admitted.
3        (Plaintiff's Exhibit 10189 received in evidence.)
4  BY MR. MORRIS:
5  Q.  Have you seen this document before?
6  A.  Yes.  Yes.
7  Q.  And what was this particular document pertaining to?
8  A.  Again, promoting an indication for menopausal patients,
   and they don't have an indication for that.
9  Q.  And what year are we dealing with now?
10 A.  1991.
11 Q.  And what does FDA say to them?
12 A.  "We suggest that this patient profile not be included in
13 the promotional material for Provera.  We remind you the
14 previous discussions that we've had between your firm and this
15 division regarding material which suggests that Provera is
16 indicated for use in postmenopausal replacement therapy for
   the
17 prevention of endometrial hyperplasia."
18 Q.  Now, are you familiar with the lady named Heidi Jolson?
19 A.  Yes.  I know of her.  I don't know her.
20 Q.  Does she work at FDA?
21 A.  She has worked at FDA.
22 Q.  She's going to come as an expert witness for Upjohn to
23 testify to the jury.
24 A.  Yes.

Page 247

page 1367

1  Q.  And we saw those documents back in '84 and '85 and then
   '91.  Now we get to '91.  Are they all addressing the same
2  issue in terms of Upjohn's suggestion that their products
3  should be used in combination with estrogen for postmenopausal
4  women?
5  A.  Yes.  They don't have that indication.
6  Q.  Well, didn't the FDA have the ability to do something to
7  the company?  If you have these repeated incidences from '83,
8  '84, '85, to '91, doesn't that FDA have the ability to go in
9  and do something to them?
10 A.  Not really.  They are doing what they could do.
11 Q.  But isn't FDA supposed to be the watchdog?
12 A.  Well, it is a watchdog for putting new products on the
13 market.  These are -- they don't have the power that most
14 people think the FDA does have.  The -- most of the -- the
   regs
15 have been written up front for putting new products on the
16 market.  There's not a lot of regulations that have been
17 provided for taking products off the market or changing them
   or
18 restricting distribution, especially if the FDA doesn't have
19 data.  If the FDA has data, that's a different story.
20 Q.  Let me ask you particularly about that.  Is there an
21 important distinction to be drawn for the jury between the
   idea
22 of premarket approval of a product and postmarket approval?
23 A.  Definitely.  The premarket --
24 Q.  Postmarket surveillance, I should say?

Page 248

page 1368

1  A.  Well, the premarket is what you typically think of the
   FDA
2  allowing new products on the market.  You have an application.
3  You have, you know, clinical trials done.  You have
   statistics,
4  data.  That would be the post-1962 drug product.  That would
   be
5  more of the 1980 drug product.  You have clinical trials,
   which
6  are not -- they don't show everything.  They will just show
7  enough to support an indication and that you can begin
8  marketing.  Postmarket is really the purview of the
9  manufacturer because they are with the product.  They are
10 selling the product.  And it's their responsibility to follow
11 the product to make sure if there's complaints or problems --
12 even in the best situations now in a clinical trial, you're
   not
13 going to pick up all of the problems that are going to occur
   in
14 a clinical trial to get approved by the FDA.  So the biggest
15 monitoring falls with the manufacturer, not with the FDA.
16 Q.  Given the manufacturer's duty to study and to continue to
17 remain abreast, if they take that duty seriously and they go
18 out and do a study, and the study suggests that, uh-oh, we've
19 got a problem here, it is causing some harm, can the
20 manufacturer suggest a label change?
21 A.  Oh, yes.
22 Q.  Have you ever heard of something called a CBE?
23 A.  Yes.
24 Q.  What is a CBE?
25 A.  It's a changes being effected NDA supplement that a

page 1369

1  manufacturer can go ahead and improve the safety of their
2  labeling before they get FDA approval. It's 21 CFR 314.70, if
3  you want the exact cite. The purpose of the FDA is to protect
   public health, and the same with the Food, Drug, and Cosmetic
4  Act. So it would only make sense if the manufacturer knows
5  there's a safety issue, they would be able to step in before
6  you get to the FDA to save people, to notify doctors, to
7  improve and strengthen your labeling, particularly if it's a
8  new issue that hasn't been necessarily reviewed by the FDA. So
10 they are allowed to do that. Then you notify the FDA after you
11 do it and you get FDA's determination if it's acceptable or not
12 or if they need to update their labeling further.
13  Q. I want to show you Exhibit 10197.
14  MR. MORRIS: Any objection to this one?
15  MR. GOODELL: No further.
16  MR. MORRIS: Will it be admitted?
17  THE COURT: Admitted. Exception saved.
18  (Plaintiff's Exhibit 10197 received in evidence.)
19  BY MR. MORRIS:
20  Q. Here's an interoffice memo from the Upjohn Company. And
21  this is dated May 11, 1993. And if you could, just read that
22  highlighted section right there in the middle.
23  A. "Last year, Kessler," that would be Dr. Kessler, "and
24  several CDER officials were touting this initiative suggesting
25  that the agency might be willing to increase its reliance on

page 1370

1  literature reports in approving off-label use."
2  Q. What do they mean by that, that FDA is going to increase
3  its reliance on literature reports?
4  A. I was actually at the FDA during this time, so I know that
5  they've misinterpreted what the purpose of Kessler's messages
6  were, but they are stating that somehow the bar has been
7  lowered, that things that are occurring off-label, you could
8  supply literature and you'd be able to somehow get FDA's
9  approval or acceptance of an off-labeled unapproved use.
10  Q. Would there be a problem -- if FDA was going to rely on
11  literature and the literature is coming from Design Write and
12  inside Wyeth and inside these companies without any disclosure
13  that they are involved, would the FDA know that those
14  literature reports that they might be relying upon for public
15  health and safety actually came from the drug companies?
16  A. That's a major problem. In terms of the FDA, just because
17  something is published, you just did not take it as being the
18  gospel. You had to try to verify the information and where it
19  came from.
20  Q. I want to show you Exhibit No. 10114.
21  MR. MORRIS: Any objection?
22  MR. GOODELL: Let me look it up.
23  MR. MORRIS: This is the Degge report.
24  MR. GOODELL: No.
25  THE COURT: Admitted.

page 1371

1  (Plaintiff's Exhibit 10114 received in evidence.)
2  BY MR. MORRIS:
3  Q. We're not going to go through this at length. The jury
4  heard Dr. Carlson talk about it a good bit. But are you
5  familiar with the Degge Group report?
6  A. Yes.
7  Q. What was the Degge Group report?
8  A. It was a report that was requested to be done by the Degge
9  Group, which is a group that does epidemiological studies in
10  D.C. about breast cancer in women on birth control pills and on
11  hormone replacement therapy.
12  Q. And Upjohn asked them to do this?
13  A. Yes. It was in preparation for an upcoming FDA panel
14  meeting.
15  Q. And what was the purpose of the Degge Group report?
16  A. To look at the epidemiological information that's already
17  available about breast cancer for estrogen products, which
18  would be contraception and menopause.
19  Q. And this is the proposal that was given to the Degge
20  Group. Did they actually do the report?
21  A. Yes, sir.
22  Q. Okay. And that cost how much, the Degge Group report?
23  A. 12,500.
24  Q. And do you remember how many -- how many studies the Degge
25  Group was able to dig up that dealt with the combination?

page 1372

1  A. I believe it was seven.
2  MR. MORRIS: And I'm next tendering 10116. That was
3  the proposal. This is the final report.
4  MR. GOODELL: I'm sorry?
5  MR. MORRIS: This is 10116, the Degge Group final report.
6  MR. GOODELL: I don't think I have a problem with it. No problem. No objection.
7  THE COURT: Admitted.
8  (Plaintiff's Exhibit 10116 received in evidence.)
9  BY MR. MORRIS:
10  Q. And this is sent to Suzanne Nowak at Upjohn December 17, 1990. And this is regarding the report, correct?
11  A. Correct.
12  Q. What did they find in the report?
13  A. Well, they found that the information was inconclusive and
14  recommended that more studies should be done.
15  Q. And what did they say about current studies that were going on?
16  A. "No current study of postmenopausal replacement therapy and breast cancer promises to avoid all the methodologic pitfalls of past investigations." So there's none that they see coming up that would answer the question.
17  Q. And how long has this question been known about?
18  A. Breast cancer?

page 1373

1  Q.  Yep.

2  A.  We've been seeing it discussed off and on since the '70s,
at least.

4  Q.  Do they go through and give critiques of the articles that
they have reviewed?

6  A.  Yes.

7  Q.  Would that include Ron Ross?

8  A.  Yes.

9  Q.  Would it include the LaVecchia study?

10  A.  Yes.

11  Q.  Okay.  And does it include the PEPI study?

12  A.  Yes.

13  Q.  And do they talk about the breast cancer demonstration
project?

15  A.  Yes.

16  Q.  And they go through their summary and conclusions.  What
do they say regarding their final conclusions?

18  A.  "In total, the seven epidemiological studies of
postmenopausal replacement therapy do not provide conclusive
evidence on the direction or magnitude of the risk relationship
between replacement progestins and breast cancer in
postmenopausal women.  None of the investigations conducted to
date have been able to assess interactions or reveal subgroups
of menopausal women at particularly high risk."  And then it
goes on to say further work is needed in this area.

page 1374

1  Q.  All right.  And in the recommendations, what do they say?

2  A.  "It is apparent from the studies reviewed in this effort
that although some work has been done to assess the role of
progestins in breast cancer, much remains to be accomplished
before any clear understanding of their relationship to breast
cancer, either protective or associated with a risk in some
group is reached."

8  Q.  And, "It is the opinion of the authors that" --

9  A.  "Progress can best be made on the front through both
continued epidemiological research which attempts to isolate
the effects of progestins from other hormones, and takes
advantage of the recruits newly emerging populations for study
and further pursuit of understanding of various progestins on
breast physiology at all stages of the reproductive life."

15  Q.  All right.  So this Degge Group of epidemiologists, would
they have had access to any studies that Wyeth did?

17  A.  Probably so.  Yes.  They did a search of the literature to
find anything they could.  So if there had been an estrogen
plus progestin study done by Wyeth, it would have shown up
there.

21  Q.  So if these are good epidemiologists and doing a good job,
would you have expected them to find Wyeth's studies that
they've sponsored in any studies of the wealth of information, most
studied drug in the history of mankind -- would you have
expected them to find that?

page 1375

1  A.  If there were breast cancer studies, yes.

2  Q.  The fact of the matter is, in 1990, had anyone done a
well-designed controlled study concerning the relationship of
these two drugs to breast cancer?

5  A.  No.

6  Q.  Now, I want to show you the Upjohn label.  I'll represent
to you that this label is from 1989 when my client, Donna
Scroggin, began to take the product.  Have you reviewed this
label before?

9  A.  Yes.

10  Q.  It says, "Beagle dogs treated with MPA developed mammary
nodules," blah, blah, blah, right?

12  A.  Yes.  Not "blah, blah, blah," but, yes.

13  Q.  Not "blah, blah, blah."  What does it say?

14  A.  Well, it talks about the beagle dogs studies that were
done, and these studies were done for Depo-Provera.

16  Q.  All right.  And down here where it says their significance
with respect to humans has not been established, what does that
mean?

19  A.  Exactly what it says, they don't know what it means in
terms of human beings.

21  Q.  In your review of the Upjohn documents, were they aware
from a regulatory standpoint of the possible association
between these products, estrogen and progestin, and breast
cancer prior to 1990?

page 1376

1  A.  Yes.  In fact, they were engaged with a birth control
product with Provera, and they were having to do these beagle
dog studies to address FDA's concerns about breast cancer.

4  Q.  And with regard to that knowledge, based on your review
throughout the years, did they ever conduct a study that was
designed to look at the issue of the combination product and
whether or not it causes breast cancer?

8  A.  No.

9  Q.  Was that reasonable given their continued effort
throughout the years to suggest that these products be used
together?

12  A.  No.

13  Q.  And even though their product is providing a benefit to
women, from the standpoint that it is diminishing the amount of
endometrial cancer that people are being exposed to, is it
appropriate under the government regulations to ignore other
side effects?

18  A.  Yes, because MPA has a lot of effects other than just
progesterone.

20  Q.  Okay.  I asked you, is it appropriate to ignore other side
effects?

22  A.  No, it's not.

23  Q.  Okay.  I know it's getting late in the day and you may be
tired, but let's go through that again because I want to make
sure the jury understands this.

Page 257

page 1377

1     With regard to -- it's fine that it's helping women

2  because it's diminishing the endometrial cancer problem,

3  correct?

4     A.  Correct.

5     Q.  But, nonetheless, even though it provides that benefit,

6  does the FDA still expect corporations who manufacture products

7  to assess the safety outcomes also?

8     A.  Yes.

9     Q.  And was one of the safety outcomes that had been

10  recognized years ago the issue of breast cancer?

11     A.  Yes.

12     Q.  Did Upjohn fulfill its duty in conducting the proper tests

13  and studies to get to the bottom line and give an answer on

14  that issue?

15     A.  No.

16     Q.  Had they done that, would they have been able to provide a

17  proper warning before 1990?

18     A.  Yes.

19        MR. MORRIS:  Pass the witness.

20        THE COURT:  We're going to be in recess with the jury

21  until 8:45 in the morning.  Don't talk about the case, anybody

22  involved in it.  Don't start making up your mind.  Drive home

23  safely, get a good supper, a good night's sleep, good

24  breakfast, and I'll see you back at 8:45 in the morning.

25  Remember, don't talk about the case, don't think about it.

Page 258

page 1378

1     Let the jury stand out.  Everyone else remain seated.

2     (Jury exits the courtroom.)

3        THE COURT:  The jury is out.  I have a telephone

4  conference at 8:00 a.m. in the morning in another MDL case.

5  The lawyers in this case should be available at 8:15 in case

6  something comes up.  If you want to file something, file it by

7  8:30 p.m. tonight, or just don't file it.  We're in recess.  Be

8  at ease.

9     (Proceedings adjourned at 4:24 p.m.)

10         C E R T I F I C A T E

11     I, Judith A. Ammons, Official Court Reporter, do hereby

12  certify that the foregoing is a true and correct transcript of

13  proceedings in the above-entitled case.

14

15

16

17  _____     Date: February 12, 2008

   Judith A. Ammons, RPR, CRR, CCR

18  United States Court Reporter

19

20

21

22

23

24

25

# EXHIBIT 25

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF ARKANSAS
 3                     WESTERN DIVISION
 4  In re:        :  MDL Docket No. 4:03CV1507WRW
 5  PREMPRO PRODUCTS LIABILITY    :
 6  LITIGATION        :        All CASES
 7  _____:
 8
 9  _____
10  In Re:        : COURT OF COMMON PLEAS
11            : PHILADELPHIA COUNTY
12  HORMONE THERAPY ("HT")    :
13  LITIGATION        : NOVEMBER TERM, 2003
14  _____: NO. 0001
15
16       CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
17              VIDEOTAPE DEPOSITION
18
19  DEPONENT:  MICHAEL JAY SCHOENFELD
20  DATE:    Friday, August 3, 2007
21  TIME:    9:44 a.m.
22  LOCATION:  Courtyard by Marriott - Ann Arbor
23        3205 Boardwalk
24        Ann Arbor, Michigan  48108
25  REPORTER:  Michele E. French, CSR-3091, RPR, RMR, CRR
```

Page 2

```
 1  APPEARANCES:
 2    Appearing on behalf of the Philadelphia Plaintiff:
 3      JANET, JENNER & SUGGS, LLC
 4      BY:  GERALD D. JOWERS, JR., ESQUIRE
 5      500 Taylor Street, Suite 301
 6      Columbia, South Carolina  29201
 7      (803) 726-0050
 8      gjowers@medlawlegalteam.com
 9
10    Appearing via telephone on behalf of the MDL Plaintiffs:
11      WILLIAMS LOVE O'LEARY & POWERS, P.C.
12      BY:  MICHAEL L. WILLIAMS, ESQUIRE
13      Suite 450, 9755 SW Barnes Road
14      Portland, Oregon  97225
15      (503) 295-2924
16
17    Appearing on behalf of Wyeth:
18      WINSTON & STRAWN, LLP
19      BY:  MICHAEL A. DEL NEGRO, ESQUIRE
20      1700 K Street, N.W.
21      Washington, D.C.  20006-3817
22      (202) 282-5722
23      mdelnegro@winston.com
24
25                  -- continued --
```

Page 3

```
 1  APPEARANCES:
 2    Appearing on behalf of Upjohn and the witness:
 3      GOODELL, DeVRIES, LEECH & DANN, LLP
 4      BY:  CHARLES P. GOODELL, JR., ESQUIRE
 5      AARON MOORE, ESQUIRE
 6      One South Street, 20th Floor
 7      Baltimore, Maryland  21202
 8      (410) 783-4000
 9      cpg@gdldlaw.com
10      amoore@gdldlaw.com
11
12  Appearing on behalf of Novo Nordisk Pharmaceuticals, Inc.:
13      BAKER, STERCHI, COWDEN & RICE, L.L.C.
14      BY:  KRISTEN A. COOKE, ESQUIRE
15      2400 Pershing Road, Suite 500
16      Kansas City, Missouri  64108-2533
17      (816) 471-2121
18      cooke@bscr-law.com
19
20
21
22
23
24
25                  -- continued --
```

Page 4

```
 1  APPEARANCES:
 2    Appearing on behalf of Barr Laboratories, Inc.,
 3  Barr Research, Inc., and Duramed Pharmaceuticals, Inc.:
 4      ULMER BERNE, LLP
 5      BY:  JACQUELINE R. SHERIDAN, ESQUIRE
 6      600 Vine Street, Suite 2800
 7      Cincinnati, Ohio  45202-2409
 8      (513) 698-5134
 9      jsheridan@ulmer.com
10
11  Appearing via telephone on behalf of Texas physicians:
12      UZICK, ONCKEN, SCHEUERMAN & BERGER, P.C.
13      BY:  ROGER A. BERGER, ESQUIRE
14      550 Westcott, Suite 290
15      Houston, Texas  77077
16      (713) 869-2900
17      rberger@uzickoncken.com
18
19
20
21
22
23
24
25                  -- continued --
```

1   developed by Abbott Laboratories?

2 A   That's correct.

3 Q   Is Abbott a different company than Upjohn?

4 A   It is.  It's located in Chicago, about a hundred miles away.

5 Q   Did you or did Upjohn become aware of the underlying studies

6       that Abbott, or some portion of them, had conducted on Ogen

7       at the time they were developing it and studying it and

8       marketing it?

9 A   Yes, I was part of an evaluation team to have a look at the

10      clinical trial evidence that they had.

11 Q   Do you have just in a general sense, because I don't want to

12      spend any more time on it, but do you have a general sense

13      of the number of patients or the length of time these

14      studies ranged in?

15 A   These studies ranged from one month out to two years, I

16      believe, in duration.  There were about 1,200 patients that

17      were exposed in well-controlled trials.  It looked like a

18      very good set of trials.

19 Q   What was the purpose of you or others at Upjohn reviewing

20      some of this information?

21 A   We were looking at safety and efficacy with regards to the

22      potential acquisition of Ogen.

23 Q   And what did you learn about Ogen or Ogen in combination

24      with MPA during the course of that review?

25 A   That they had adequate -- and, of course, FDA had approved

1       those studies, but the breadth of them gave us an idea about

2       dosing that we would be able to use to make decisions in our

3       own clinical trials, and they seemed to address, as I

4       pointed out, very similar if not the same endpoints.

5           They hadn't really studied continuous combined

6       therapy because that was after the point that they had

7       already launched and hadn't really done studies like we were

8       doing and others were doing at that period of time.

9 Q   I think you mentioned that in -- I think you were asked

10      this, actually -- in 1998, the FDA approved Provera for use

11      in conjunction with estrogens for menopausal use in women

12      with a uterus; correct?

13 A   Right.

14 Q   And that involved a formal application process to the FDA?

15 A   That's correct.

16 Q   Did it involve a formal review of the data?

17 A   It did.

18 Q   Did it involve a formal review of the Upjohn label?

19 A   It did.

20 Q   And approval of the label?

21 A   That's correct.

22 Q   And did that occur in either '97 or '98, according to your

23      best recollection?

24 A   I believe it, right.

25 Q   Were you aware that in the 1980s that the company had, at an

1       earlier time, made a similar application?

2 A   That's correct.

3 Q   Tell me what you recall about that.

4 A   I recall, while the literature, and I pointed out, was very

5       strong with regards to smaller studies and case reports and

6       the literature that would support the clinical use that was

7       present, that is giving Provera to counter the endometrial

8       effects of estrogen on the uterus, was appropriate, that FDA

9       responded by saying we really need to see two

10      well-controlled trials to address that question, that they

11      felt the evidence was suggestive yet still not definitive

12      enough for their standard.

13 Q   Okay.  And so they rejected the application at that time?

14 A   They did.

15 Q   Did Upjohn submit any of its own studies in support of that

16      application?

17 A   Not at that point in time.

18 Q   Did -- do you know what a paper application is?

19 A   I'm aware of what that is, yes.

20 Q   What is that?

21 A   Well, that would be a literature-based application that is

22      based on available literature to petition the FDA to affect

23      the label change.

24 Q   Okay.  And is that what Upjohn had submitted at that time?

25 A   Yes.

1 Q   Was there, in your view, significant literature in the

2       general medical literature which described the effectiveness

3       of Provera in protecting the lining of the endometrium in a

4       situation where estrogen was used?

5           MR. JOWERS:  Objection.

6           THE WITNESS:  Well, not only in the literature, I

7       think it was present in textbooks.

8           MR. JOWERS:  That was an objection.

9           MR. GOODELL:  Let me correct it, I apologize.

10 BY MR. GOODELL:

11 Q   Do you have a recollection of what the general medical

12      literature said during the 1980s about the effect of

13      progestin and Provera in the protection of the lining of the

14      uterus from endometrial hyperplasia and cancer in the

15      context where it was used with estrogens for menopausal

16      symptoms?

17 A   The literature did support that use and described it as an

18      effective use, and I believe textbooks as well were also

19      suggesting that, OB/GYN textbooks.

20 Q   I think you were asked some questions by counsel about this,

21      but did you become aware during that time frame that whether

22      or not it was and had become the standard of medical care to

23      use progestins to protect the lining of the uterus when

24      estrogens were prescribed?

25 A   Well, not only did I understand that from the literature but

# EXHIBIT 26

Scroggin UJ3482

**scroggin case**

---

```
04   A     It is.  It's located in Chicago, about a hundred miles away.
05   Q     Did you or did Upjohn become aware of the underlying studies
06         that Abbott, or some portion of them, had conducted on Ogen
07         at the time they were developing it and studying it and
08         marketing it?
09   A     Yes, I was part of an evaluation team to have a look at the
10         clinical trial evidence that they had.
11   Q     Do you have just in a general sense, because I don't want to
12         spend any more time on it, but do you have a general sense
13         of the number of patients or the length of time these
14         studies ranged in?
15   A     These studies ranged from one month out to two years, I
16         believe, in duration.  There were about 1,200 patients that
17         were exposed in well-controlled trials.  It looked like a
18         very good set of trials.
```

**26. PAGE 225:23 TO 226:24 (RUNNING 00:01:21.735)**

```
23   Q     And what did you learn about Ogen or Ogen in combination
24         with MPA during the course of that review?
25   A     That they had adequate -- and, of course, FDA had approved
00226:01   those studies, but the breadth of them gave us an idea about
02         dosing that we would be able to use to make decisions in our
03         own clinical trials, and they seemed to address, as I
04         pointed out, very similar if not the same endpoints.
05             They hadn't really studied continuous combined
06         therapy because that was after the point that they had
07         already launched and hadn't really done studies like we were
08         doing and others were doing at that period of time.
09   Q     I think you mentioned that in -- I think you were asked
10         this, actually -- in 1998, the FDA approved Provera for use
11         in conjunction with estrogens for menopausal use in women
12         with a uterus; correct?
13   A     Right.
14   Q     And that involved a formal application process to the FDA?
15   A     That's correct.
16   Q     Did it involve a formal review of the data?
17   A     It did.
18   Q     Did it involve a formal review of the Upjohn label?
19   A     It did.
20   Q     And approval of the label?
21   A     That's correct.
22   Q     And did that occur in either '97 or '98, according to your
23         best recollection?
24   A     I believe it, right.
```

**27. PAGE 229:17 TO 231:21 (RUNNING 00:03:24.451)**

```
17   Q     Do you know if Provera is still approved today for that use?
18   A     I believe so.
19   Q     By 1998 -- remind me again, when did you leave Upjohn?
20   A     Around 2000.
21   Q     By 1998, were you familiar with --
22   A     Excuse me, I think February of 2001.
23   Q     Okay.  Fair enough.  So you were still at Upjohn when the
24         approval for Provera came from the FDA for use with
25         estrogen?
00230:01  A    Correct.
02   Q     Were you aware in a general sense of whether the medical
03         literature, what the medical literature said about the
04         effectiveness of Provera to oppose the effects of estrogen
05         during that time frame?
06   A     Other than my own literature, literature from --
07   Q     The general published medical literature about the
08         effectiveness or noneffectiveness of Provera and progestins
09         in preventing endometrial cancer.
10   A     Well, it was even better studied at that point because you
11         had the menopause study group supporting Prempro.  You had
```

# EXHIBIT 27

# OPERATIVE REPORT

**HARTFORD HOSPITAL**

NAME: FRASER, MARGARET                MR #: 311-2455        ACCOUNT #:

OPERATOR: Kenneth A. Kern, M.D.        OP DATE: 11/06/2001
DICTATOR: Kenneth A. Kern, M.D.

**PREOPERATIVE DIAGNOSIS:**  Carcinoma of the left breast.

**POSTOPERATIVE DIAGNOSIS:**  The same.

**OPERATIVE PROCEDURE:**  Left partial mastectomy with needle localization and left sentinel node dissection.

DESCRIPTION OF PROCEDURE:  The patient has carcinoma of the left breast at the 6 o'clock position detected by mammography and not palpable.  A stereotactic biopsy confirmed that this was invasive cancer.  She was brought to the Operating Room after being given a millicurie of technetium-99 sulfur colloid in the subdermal areolar space, where a hot sentinel node was identified on preoperative local scintigraphy.  After a laryngeal mask anesthetic and sterile prep and drape, a transverse incision was made over the axilla.  Three sentinel nodes were identified and all found to be negative, and two additional nodes were taken also for permanent section.  The wound was closed with 4-0 and 5-0 Vicryl.  A transverse incision was made over the wound at 6 o'clock.  The entire primary tumor was removed.  There was a preoperative needle localization placed.  A final second margin was taken around the entire lesion.  Micromarkers were put in place to mark the extent of dissection.  The wound was closed with 4-0 and 5-0 Vicryl.  There were no complications.

Page 1 of 1

# EXHIBIT 28

# HARTFORD HOSPITAL

80 Seymour Street P.O. Box 5037 Hartford, CT 06102-5037
(860) 545-2866 CT REG #HP0254

## Surgical Pathology Report

| | | | |
|---|---|---|---|
| PATIENT NAME: | **FRASER, MARGARET** | SPEC #: | **S01-29378** |
| MED. REC. #: | 3112455 | SEX: | F |
| ACCOUNT #: | 000062281415 | DOB (AGE): | 11/21/1946 (Age: 54) |
| DATE OBTAINED: | 10/26/2001 | LOCATION: | CLP-OP |
| DATE RECEIVED: | 10/27/2001 | SUBMITTING MD: | KENNETH A. KERN, M.D. |
| DATE REPORTED: | 10/29/2001 10:07 | CC: | |

# DIAGNOSIS

**LEFT BREAST, NEEDLE CORE BIOPSY: INVASIVE MAMMARY DUCT CARCINOMA, NUCLEAR GRADE II, HISTOLOGIC GRADE II; RARE FOCI OF INTRADUCTAL CARCINOMA PRESENT, SOLID TYPE; RARE MICROCALCIFICATIONS ARE PRESENT.**

***Electronically Signed Out***
MARK E. LUDWIG, M.D.

## COMMENT
Receptor studies will be performed and an addendum report issued.
88305

## Clinical Diagnosis and History:
Calcification, left breast - ? DCIS.

## Tissue(s) Submitted:
CALCS LEFT BREAST

## Gross Description:
The specimen is received in formalin labeled calcification left breast and consists of 13 fragments of tan-yellow to tan-white soft cylindrical cores of breast tissue ranging from 0.5 x 0.3 cm to 3.1 x 0.3 cm. The specimen is submitted in toto labeled 1A and 1B.

AH

## Procedures/Addenda
**ER/PR**

| | | |
|---|---|---|
| **Date Ordered:** | 10/30/2001 | **Status:** Signed Out |
| **Date Complete:** | 11/4/2001 | **By:** RICHARD W. CARTUN, Ph.D. |
| **Date Reported:** | 11/4/2001 | |

## Interpretation

| | |
|---|---|
| ESTROGEN RECEPTOR IHC ASSAY: | **POSITIVE** |
| PROGESTERONE RECEPTOR IHC ASSAY: | **POSITIVE** |
| MIB-1 (PROLIFERATIVE INDEX) IHC ASSAY: | **INTERMEDIATE/BORDERLINE** |
| c-erbB-2 (HER-2/neu PROTEIN) IHC ASSAY: | **NEGATIVE** |

## Results-Comments
Quantitative and Semiquantitative Analyses:

**MFraser-HartHosp-PD-000004**

**FRASER, MARGARET**            **Surgical Pathology Report**            S01-29378

Estrogen Receptor (clone 6F11)            8/8        Modified San Antonio Score*
Progesterone Receptor (clone PgR636)      4/8        Modified San Antonio Score*
Ki-67 Proliferative Index (clone MIB-1)   30         % Positive Nuclear Area**
c-erbB-2 (HER-2/neu protein)              0+         Semiquantitative Score***

   *0-2/8 is negative; 3/8 is borderline; 4-8/8 is positive.
   **0-12% is low/favorable; 13-35% is intermediate/borderline; $\geq$ 36% is high/unfavorable.
***0+    < 10% any staining
   1+     incomplete faint membranous staining
   2+     complete faint to distinct membranous staining in $\geq$ 10% of cells
   3+     complete distinct to intense membranous staining.

88342x4

                                                      RICHARD W. CARTUN, Ph.D.

---

FRASER, MARGARET                     END OF REPORT                        Page 2 of 2

MFraser-HartHosp-PD-000005

# EXHIBIT 29

Page 1

1          UNITED STATES DISTRICT COURT
            DISTRICT OF CONNECTICUT
2
3 IN RE: PREMPRO PRODUCTS LIABILITY LITIGATION
4
5 MARGARET B. FRASER AND
  JOSEPH T. FRASER
6
       Plaintiffs      CIVIL ACTION NO.
7   VS.              3:04 CV 01373 JBA
8 WYETH, INC. AND
  WYETH PHARMACEUTICALS, INC.
9
       Defendants     MARCH 17, 2010
10
11
12     VIDEOTAPED DEPOSITION OF JEDD F. LEVINE, M.D.
13
   APPEARANCES:
14
15   For the Plaintiffs:
16      BUBALO ROTMAN
          9300 Shelbyville Road, Suite 215
17        Louisville, Kentucky 40222
        BY:  STEVEN B. ROTMAN, ESQ.
18
19   For the Defendants, Wyeth, Et Al:
20      KAYE SCHOLER, LLP
          1999 Avenue of the Stars, Suite 1700
21        Los Angeles, California 90067
        BY:  PAMELA J. YATES, ESQ.
22
23 (Continued)
24        Susan Lemire, Lic #42
          certified Shorthand Reporter
25        Registered Professional Reporter

Page 2

1 APPEARANCES:
2
3    For the Defendants, Wyeth, Et Al:
4       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
          Four Times Square
5         New York, New York 10036
        BY:  CATHERINE B. STEVENS, ESQ.
6
7
     Also Present:  Chris Coughlin, Videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          . . . Deposition of JEDD LEVINE, M.D.,
2   taken on behalf of the Defendants, in the hereinbefore
3   entitled action, pursuant to the Federal Rules of Civil
4   Procedure, before Susan Lemire, RPR, CSR, duly
5   qualified Notary Public in and for the State of
6   Connecticut, at the offices of Connecticut Oncology &
7   Hematology, 200 Kennedy Drive, Torrington, Connecticut,
8   commencing at 9:03 a.m, on March 17, 2010.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              I N D E X
2 Examination by Ms. Yates  . . . . . . . .   Page 6, 216
3 Examination by Mr. Rotman . . . . . . . .   Page 209
4
5        EXHIBITS FOR IDENTIFICATION
6
7 Defendants' Exhibit 1:  Medical Record
8 Defendants' Exhibit 2:  Medical Record
9 Defendants' Exhibit 3:  Medical Report - Dr. Graham
10 Defendants' Exhibit 4:  Medical Report - Dr. Cronin
11 Defendants' Exhibit 5:  Medical Report - Dr. Naftalis
12 Defendants' Exhibit 6:  Time Records
13 Defendants' Exhibit 7:  Medical Records
14 Defendants' Exhibit 8:  Billing Records
15 Defendants' Exhibit 9:  Billing Records
16 Defendants' Exhibit 10:  CD
17 Defendants' Exhibit 11:  Medical Bills
18 Defendants' Exhibit 12:  Chlebowski Report - 2009
19 Defendants' Exhibit 13:  Report - "Breast Cancer Prevention"
20 Defendants' Exhibit 14:  Report - Dr. Levine, 1/28/11
21
22
23
24
25

Page 129

1    Q    There was no reference of BIRADS category three or
2  four, right, Doctor?
3    A    Back in '95 or '96, those mammograms, my
4  recollection is that the reports were silent on that issue.
5    Q    And you've seen no subsequent reports that have
6  her in a BIRADS category 3 or category 4?
7    A    I don't recall that, although I believe one of the
8  mammogram reports shortly prior to her diagnosis, and again
9  I would have to look at that again, I think that was the
10  first time that there was some discussion in the
11  radiologist's report about increased breast density.
12  Whether they alluded to a BIRAD category 3 or 4, I don't
13  remember.
14    Q    Doctor, can you hand me Dr. Cronin's report?
15    A    Uh-huh (handing).
16    Q    I'd like you to turn to page seven.  Do you have
17  some --
18    A    Scribble.
19    Q    Handwriting.  I was going to say handwriting,
20  Doctor.  The top line on that page, Dr. Cronin's report
21  states "I believe her tumor was dependent on estrogen.  It
22  needed estrogen to grow."  And you have crossed out "was
23  dependent on" and you have also crossed out "needed
24  estrogen."  And I would like you to tell me what you have
25  written?

Page 130

1    A    What I wrote?  To the best of my ability to read
2  that, I believe her tumor had strong estrogen dependence and
3  estrogen promoted cancer proliferation in her cancer --
4  promoted proliferation in her cancer, something to that
5  effect.
6    Q    When you state strong estrogen dependence, are you
7  talking about the level of positivity of the estrogen
8  receptor?
9    A    That's one part of it.
10    Q    What's another part of it?
11    A    Well, the, the level of the receptor was high.
12  The criteria used in her pathology report from Hartford
13  Hospital is one that at least today I don't commonly see,
14  but back then was called eight of eight.  So yes, she was at
15  a highly estrogen receptor positive tumor and yes, strongly
16  estrogen dependent.  The other part of that is that her PR,
17  progesterone receptor was also very high in that report.
18  And so that's a second part of the statement.  And so the
19  issue of estrogen promoted proliferation of her cancer, or
20  estrogen -- here I wrote estrogen caused proliferation of
21  her cancer, promoted and caused proliferation of cancer.
22        But in any case, the other part of that, which is
23  that because the PR was also quite high, it reflected to me
24  an intact signaling access for -- an unequivocally intact
25  signaling access of her tumor, and that in a sense the role

Page 131

1  of estrogen or hormones was very significant.  And as I
2  said, or crossed out there, strong dependence.  So a strong
3  dependence is partly because of the high estrogen receptor,
4  and secondly, because the PR was intact, which is part of
5  that access, and is, and PR is a, in a sense is dependent on
6  the ER.
7    Q    All right, Doctor.  If you see a tumor that's
8  strongly ER positive, but low PR positivity, that can
9  indicate to you that that signaling access is not
10  functioning properly, true?
11        MR. ROTMAN:  Objection.
12    A    Not true or not precisely true.  And why would I
13  say that?  Not because he objected.
14  BY MS. YATES:
15    Q    Or because I asked the question.  Okay.  Sorry,
16  Doctor.
17    A    I'm sure there are points we can agree on at some
18  point in time.
19    Q    I'm waiting.
20    A    But the reason is this.  Is that, there are a
21  couple of reasons as I think about this issue because I
22  think it's an important one.  Firstly, from a clinical
23  perspective, do women who have ER positive PR negative
24  breast cancer respond, these are women with clinical cancer,
25  respond to hormone deprivation therapy, say Tamoxifen or

Page 132

1  Aromasin inhibitors in postmenopausal women.  And the answer
2  is yes, they do.  They can respond.  So the absence PR
3  positivity does not preclude the fact that depriving the
4  patient of estrogen stimulation will not have an impact on
5  the growth of their cancer.  That's a clinical point.
6        The other is, and this is -- really goes to
7  mechanism and what is the difference between early tumors
8  and later tumors.  And my definition, a tumor that is
9  clinically detected is actually relatively late, even if
10  it's a small tumor of a centimeter or so.  It's still a
11  billion cells and it's gone through many divisions to get to
12  that point by the time it's detectible by a woman through
13  palpation or even on mammography.
14        So the question is at the outset, a nascent tumor,
15  if you will, is a hormone dependent tumor, is likely both ER
16  and PR dependent.  Or let's say estrogen and progesterone
17  receptors are there.  So during that promotional phase, I
18  would argue that both are intact.  By the time a tumor is
19  detected clinically, a cancer may have gone through -- it
20  has gone through many divisions, mutations.  The PR may not
21  be strongly expressed.  So in terms of whether a -- the
22  presence of, or the absence of progesterone receptor would
23  argue against hormone sensitivity or more specifically an
24  impact of E + P on a patient's tumor, that in my view would
25  not preclude or exclude that conclusion.

# EXHIBIT 30

## Page 1

```
1 page 1986
2  1        IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF ARKANSAS
3  2              WESTERN DIVISION
   3  IN RE: PREMPRO PRODUCTS LIABILITY  MDL No. 1507
4              No. 4:03CV1507
   4
5         * * * * * * * * *
   5  DONNA SCROGGIN,
6         Plaintiff,     Individual Case
   6  v.            No. 4:04CV01169 WRW
7  WYETH and its divisions; PHARMACIA
   7  & UPJOHN COMPANY LLC; WYETH
8  PHARMACEUTICALS, INC.; and ESI LEDERLE,
   8            Defendants.
9  9
   10  Tuesday, February 19, 2008 - Little Rock, Arkansas - 8:35 a.m.
10 11
   12      TRANSCRIPT OF TRIAL - VOLUME 11
11 13    BEFORE THE HONORABLE WILLIAM R. WILSON, JR.,
         UNITED STATES DISTRICT JUDGE, and a jury
12 14
   15  APPEARANCES:
13 16  On Behalf of the Plaintiff:
         MR. ERIK BRETT WALKER
14 17      Hissey, Kientz & Herron, P.L.L.C.
15         16800 Imperial Valley Drive
16 18      Suite 130
17         Houston, Texas  77070
18 19
19         MR. JAMES A. MORRIS, JR.
20 20      MR. STEVE M. FARIES
21         Brent Coon & Associates
22 21      11614 Bee Caves Road, Suite 220
23         Austin, Texas  78738
24 22
25 23
26 24
27 25              [CONTINUED]
```

## Page 2

```
1 page 1987
2  1  APPEARANCES CONTINUED:
   2  On Behalf of the Wyeth Defendants:
3         MR. F. LANE HEARD, III
   3      MR. STEPHEN L. URBANCZYK
4         MR. RICHMOND MOORE
   4      Williams & Connolly
5         725 Twelfth Street, N.W.
   5      Washington, D.C.  20005-5901
6  6  MS. LYN PEEPLES PRUITT
         Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
7  7      425 West Capitol Avenue, Suite 1800
         Little Rock, Arkansas  72201-3525
8  8
   9
9  On Behalf of the Upjohn Defendants:
   10  MS. ELIZABETH ROBBEN MURRAY
10        Friday, Eldredge & Clark
   11      Regions Center
11        400 West Capitol Avenue, Suite 2000
   12      Little Rock, Arkansas  72201-3493
12 13  MR. CHARLES P. GOODELL, JR.
         Goodell, DeVries, Leech & Dann, LLP
13 14     Commerce Place
         One South Street
14 15     Suite 2000
         Baltimore, Maryland  21202
15 16
   MS. PAMELA YATES
16 17  MR. ANDREW K. SOLOW
         Kaye Scholer LLP
17 17     1999 Avenue of the Stars
18        Suite 1700
   19     Los Angeles, California  90067-6048
20
21 21
22     Proceedings reported by machine stenography and displayed
23 22  in realtime; transcript prepared utilizing computer-aided
24     transcription.
25 23
26 24
27 25
```

## Page 3

```
1 page 1988
2  1    I N D E X - VOLUME 11 (February 19, 2008)
   2
3  3  WITNESSES
   FOR DEFENDANT WYETH:   Direct  Cross  Redirect  Recross
4  4
   5  LEWIS A. CHODOSH       1995   2060   2091
5  6
   7
6  WITNESSES
   8  FOR DEFENDANT UPJOHN:  Direct  Cross  Redirect  Recross
7  9
   HEIDI JOLSON          2109   2184   2221   2231
8  10
   11
9  12
   13
10 EXHIBITS:            RECEIVED:
   14
11 Defendant Upjohn Exhibit 526..................2133
   15  Defendant Upjohn Exhibit 320..................2137
12 Defendant Upjohn Exhibit 176..................2144
   16  Defendant Upjohn Exhibit 503..................2146
13 Defendant Upjohn Exhibit 204..................2147
   17  Defendant Upjohn Exhibit 85...................2149
14 Defendant Upjohn Exhibit 245..................2155
15 18  Defendant Upjohn Exhibit 339..................2157
16 Defendant Upjohn Exhibit 340..................2158
17 19  Defendant Upjohn Exhibit 234..................2158
18 Defendant Upjohn Exhibit 238..................2158
19 20  Defendant Upjohn Exhibit 240..................2159
20 Defendant Upjohn Exhibit 293..................2164
21 21  Defendant Upjohn Exhibit 339 and 349...............2184
22 22  Defendant Wyeth Exhibit 2913.....................2236
23 23  Plaintiff Exhibit 8068......................2188
24 Plaintiff Exhibit 10910....................2201
25 24  Plaintiff Exhibit 10144....................2202
26 Plaintiff Exhibit 10177....................2216
27 25
```

## Page 4

```
1 page 1989
2
3  1    (Continuing at 8:37 a.m., jury not present.)
4  2      THE COURT:  I understand we have a problem about a
5  3  witness.  Somebody tell me what it is.
6  4      MR. MOORE:  Good morning, your Honor.  It's not a
7  5  problem with the witness.  The issue is, we object -- we're
8  6  going to object to the introduction of the total fees that our
9  7  expert, Dr. Chodosh, has earned in the overall litigation, as
10 8  opposed to this case.  We believe the only fees that should be
11 9  used on cross-examination are the fees that he's earned on this
12 10  case.
13 11     Although we've turned over his total fees, as your Honor
14 12  ordered, plaintiffs did not turn over their total compensation
15 13  for their experts.  So essentially it's a fairness issue.  We
16 14  didn't ask the total, overall compensation for their experts in
17 15  this case because, among other reasons, your Honor has cautioned
18 16  us not to ask that because it may open the door to introduction
19 17  of the fact that there are 8,000 plaintiffs in this litigation.
20 18  So we didn't ask their experts, "How much have you earned in
21 19  this litigation?"
22 20     So essentially it's a fairness issue.  We think the
23 21  relevant information is what he's earned in this case, and
24 22  that's what should be used on cross-examination.
25 23     THE COURT:  Plaintiff?
26 24     MR. WALKER:  I thought Mr. Heard was coming up here.
27 25  You can't divorce this particular case from the litigation
```

Page 145

1 page 2130

2

3 1   Provera, and I believe they were shown a document, and even the
4 2   previous witness was shown a document suggesting that Provera
5 3   was 36 times more potent than natural progesterones.  How does
6 4   that factor into its use?
7 5   A.  It factors in, but there are other things that factor in,
8 6   and it all kind of washes out at the end.  So the best way to
9 7   think of it is one drug may be more potent than another.  Well,
10 8   that means you can use fewer milligrams of that drug.  So if
11 9   you're comparing, let's say, a synthetic progestin to natural
12 10  progesterone for the same use, maybe for the synthetic
13 11  progestin, you could use five or 10 milligrams versus several
14 12  hundred milligrams, 3- or 400 milligrams for the natural
15 13  progesterone.  So it washes out.  What matters is what the body
16 14  sees what the blood levels are, and potency is just one of
17 15  several things that go into what the actual dose would be.
18 16  Q.  Now, are you aware that in the mid 1970s it was learned
19 17  that menopausal women who were using estrogen were developing
20 18  endometrial cancer at a higher rate?
21 19  A.  Yes, I am.
22 20  Q.  And do you have a recollection as to what level of
23 21  increased risk that was?
24 22  A.  Yes.  Well, FDA reports that in the labels for estrogen
25 23  drug products.  So I believe for women who have a uterus who are
26 24  not on a progestin, the risk is somewhere between two and
27 25  12-fold, and then that risk goes up quite a bit, I think up to

Page 146

1 page 2131

2

3 1   maybe 24-fold in women who have been on prolonged estrogen for a
4 2   great number of years.
5 3   Q.  And did there come a time when physicians learned that by
6 4   prescribing progestins, they could reduce the risk of
7 5   hyperplasia and uterine cancer?
8 6   A.  Yes.  So that would be emerging scientific information in
9 7   the late 1970s, early 1980s.
10 8       MR. GOODELL:  All right.  Now, if you would go to
11 9   slide 6, please.  Mary, if you could switch over for me.
12 10  Q.  I want to talk to you, before we get into specific
13 11  documents, about the subject of FDA guidances and guidelines.
14 12  Can you tell the jury what FDA guidelines are?
15 13  A.  Guidelines are written documents from the FDA that really
16 14  represent their best scientific thinking on a particular issue.
17 15  In this case, it would be an issue about how to label a product
18 16  or how to study a product.  And FDA issues that so that a
19 17  variety of drug companies who make similar sorts of products
20 18  will know what the requirements would be for labeling, as well
21 19  as what kinds of labeling statements will be allowed in their
22 20  product labeling.
23 21  Q.  And when are guidelines issued by the FDA?
24 22  A.  It's on a case by case basis.  Not all drugs that are
25 23  marketed have guidances or guidances about their labeling, but
26 24  in the reproductive area, particularly oral contraceptives, as
27 25  well as hormone replacement therapy, there have been guidelines

Page 147

1 page 2132

2

3 1   or guidances or regulations, actually, for several decades about
4 2   what should go into product labeling, and these are probably
5 3   amongst the most regulated of the drugs in terms of what's
6 4   allowable in the labeling.
7 5   Q.  I would like to show you -- if we could switch back to the
8 6   ELMO -- in 1977, did the Food & Drug Administration issue
9 7   regulations and requirements for labeling for progestins and
10 8   progestational agents?
11 9   A.  Yes, they did.
12 10  Q.  When we talk about progestational drugs, are we talking
13 11  about drugs like Provera?
14 12  A.  Yes, that would include Provera.
15 13  Q.  And what was the subject matter?  And this is Upjohn
16 14  Exhibit 465, which I believe was already admitted.
17 15  A.  I believe in 1977 the concern was in pregnancy, and
18 16  that the belief at that time was that women who were born to
19 17  mothers who had taken progestins during pregnancy, particularly
20 18  in the first four months, could be at risk for cardiac defects.
21 19  Q.  Doctor, I'd like to show you Upjohn Exhibit 526.  This is a
22 20  letter dated April 7, 1986.  Correct?
23 21  A.  Yes, it is.
24 22  Q.  And what is this doing?  Is this seeking approval for use
25 23  of estrogens and progestins?
26 24  A.  It specifically is seeking approval for the use of Provera
27 25  in combination with an estrogen for endometrial protection.

Page 148

1 page 2133

2

3 1   Q.  And by 1986, had studies been conducted to look at the
4 2   issue of whether or not progestins would, in fact, protect the
5 3   uterus from endometrial hyperplasia and cancer?
6 4   A.  There were a number of studies, and that's what was
7 5   included in the supplement.  I think there were 40 some articles
8 6   that were relevant to this issue.
9 7   Q.  Was this what is called a paper supplement?
10 8   A.  Yes, meaning that it's -- the paper refers to the
11 9   literature publications.
12 10  Q.  So is a pharmaceutical company like Upjohn or any other
13 11  company entitled to gather data from published literature, even
14 12  if it might not be its own studies, in support of an application
15 13  such as this?
16 14  A.  Yes.  Within the law, there's a regulatory mechanism, at
17 15  the time it was called a paper NDA, but now it has a different
18 16  regulatory term.  But it allows sponsors who haven't actually
19 17  done these studies and don't have right of reference to the
20 18  studies to submit them to FDA in support of an efficacy claim.
21 19  And FDA will decide on a case by case basis if that's
22 20  appropriate.
23 21      MR. GOODELL:  We would move Exhibit 526 into evidence,
24 22  Your Honor.
25 23      MR. MORRIS:  No objection.
26 24      THE COURT:  Admitted.
27 25      (Defendant Upjohn Exhibit 526 received in evidence.)

Page 185

page 2170

3  1   A.   They were across the board.  There were some studies that
4  2   were neutral, some studies that suggested an increased risk, and
5  3   some studies suggested a protective effect.
6  4   Q.   This is a case controlled study published in 1995
7  5   concluding what?  I'll read it.  "These results are consistent
8  6   with the majority of reports which find no overall increased
9  7   risk associated with the use of replacement hormones.  However,
10 8   in contrast to several other studies, this study did not find
11 9   long-term use to be associated with increased risk.  These
12 10  results do not support a hypothesized effect of combined
13 11  progestin and estrogen use on the risk of breast cancer."  That
14 12  was their finding?
15 13  A.   Yes.
16 14  Q.   And are these reputable researchers?
17 15  A.   Yes, these would be from leading academic institutions.
18 16  Dartmouth, Harvard, Fred Hutchinson?
19 17  A.   Yes.
20 18  Q.   This is a study published in 1995, which we've discussed
21 19  before.  This is by Dr. Graham Colditz, who the jury has heard a
22 20  lot about.  He was a researcher involving many subjects.
23 21  Correct?
24 22  A.   I beg your pardon?
25 23  Q.   He was a researcher involving a number of topics?
26 24  A.   Yes.  I think this is his publication on the Nurses' Health
27 25  Study.

Page 186

page 2171

3  1   Q.   The Nurses' Health Study was a study that went over 20
4  2   years.  Correct?
5  3   A.   Yes.
6  4   Q.   And this was the published results of that in 1995?
7  5   A.   This was at that point in time.  I think there have been
8  6   numerous publications with various periods of follow-up.
9  7   Q.   And Dr. Colditz was testing the hypothesis that the
10 8   addition of progestins, would they, in fact, reduce the risk of
11 9   breast cancer.  Is that correct?
12 10  A.   That's correct.
13 11  Q.   And the results of his study here indicate that they don't
14 12  actually reduce the risk.  Correct?
15 13  A.   That's right.  I think the risk was very similar to the
16 14  risk of women who were on estrogen alone.
17 15  Q.   That's what I wanted to go to.  He gives different numbers
18 16  on the next page, and concludes that when you look at the
19 17  relative risks of women who use estrogen alone and use estrogen
20 18  and progestins, the relative risks do not differ significantly
21 19  from each other, although the point in the numbers differ a
22 20  little bit.  Correct?
23 21  A.   That's correct.
24 22  Q.   And this study, as we've talked about before, I believe,
25 23  was funded, in part, by the National Institutes of Health.
26 24  Correct?
27 25  A.   Yes.

Page 187

page 2172

3  1   Q.   And the American Cancer Society?
4  2   A.   Yes.
5  3   Q.   I just want to talk to you about one other study and then
6  4   we'll end our discussion on this.  The jury has heard about a
7  5   study called "The Collaborative Study" in 1997.  Correct?
8  6   A.   Yes.
9  7   Q.   Can you tell us what that was?
10 8   A.   This was a meta-analysis, meaning it was a study that
11 9   attempted to obtain the actual data from all the relevant
12 10  studies in this field to try to get a handle on this question.
13 11  And I believe that they looked at 51 different studies, and I
14 12  think over 90 percent of the time they were able to get the
15 13  actual data so they could do a variety of analyses trying to,
16 14  again, address the issue of breast cancer risk.
17 15  Q.   All right.  And this indicates that they had looked at
18 16  52,000 women with breast cancer and 108,000 women without breast
19 17  cancer in all of these studies.  Correct?
20 18  A.   Yes.
21 19  Q.   And reanalyzing these 51 studies over a significant number
22 20  of years -- and I apologize.  Let me see if I've got a little
23 21  better copy of that.  They note 80 percent of the women who were
24 22  in all of these extensive studies had used estrogens only.
25 23  Correct?
26 24  A.   Yes.
27 25  Q.   Twelve percent had used progestins.  Correct?

Page 188

page 2173

3  1   A.   I think 12 percent had used --
4  2   Q.   I'm sorry.  Estrogens and progestins.
5  3   A.   Yes, that's right.
6  4   Q.   And they conclude, "There's no significant variation in the
7  5   risk of breast cancer according to the type or dose of estrogen
8  6   used mostly, and no evidence of marked differences between
9  7   preparations containing estrogens alone and estrogens
10 8   containing" -- excuse me -- progestins -- sorry.  "No marked
11 9   evidence of differences between preparations containing estrogen
12 10  alone and preparations containing both estrogen and progestin."
13 11  Correct?
14 12  A.   Yes.
15 13  Q.   Now, in 1994, when the FDA was evaluating the Prempro
16 14  application, did the FDA make any conclusion about whether or
17 15  not another epidemiologic study, another case controlled study
18 16  would answer the question?
19 17  A.   I think they understood what the challenge was.  They did
20 18  request that Wyeth do commit to doing an additional case control
21 19  study, but I think it was acknowledged what the challenges would
22 20  be.
23 21  Q.   And did they raise questions about whether or not even a
24 22  study as extensive as the WHI could answer the question?
25 23  A.   I think they were very skeptical.  There was not an
26 24  expectation that WHI would answer this question.  And I know --
27 25  I can recall there was documentation of discussions between

1  page 2174

2

3   1   Wyeth and the FDA on this issue, and it wasn't felt that

4   2   clinical trials could ever be large enough to address the issue.

5   3   Q.   Now, in 1992, the Degge report is published.  By 1992,

6   4   1991, had the WHI already been undertaken?

7   5   A.   In 1991 is when it was first funded by Congress, and it

8   6   took a couple of years to actually get going.  I believe in

9   7   1993, it started enrolling patients.  But certainly the planning

10  8   stages had been, I believe, since 1989, or maybe even a little

11  9   earlier.

12  10  Q.   Do you know how many different centers were involved in

13  11  the study involving the WHI, Doctor?

14  12  A.   In terms of clinical centers?

15  13  Q.   Yes, ma'am.

16  14  A.   I want to say 42.  It's close to that.

17  15  Q.   Forty-two centers all over the United States?

18  16  A.   Yes.  Forty, 42.

19  17  Q.   Enrolling women and studying them over a period of years?

20  18  A.   Yes, that's right.

21  19  Q.   Do you have an opinion, Doctor, as to whether or not, to a

22  20  reasonable degree of medical certainty, the approval of Provera

23  21  in 1998 was proper and appropriate, including the fact that it

24  22  did not have a breast cancer warning?

25  23  A.   Yes, I believe it was appropriate.

26  24  Q.   And do you have an opinion as to whether or not the issue

27  25  of a breast cancer warning had been evaluated and considered by

1  page 2175

2   1   the FDA over this whole time that we've been talking about?

3   2   A.   Certainly the labeling had been closely looked at by FDA at

4   3   numerous points in time.  The data had been discussed, as well

5   4   as the labeling, with several advisory committees in open,

6   5   public meetings.  So I believe that there was a lot of scrutiny

7   6   on this issue and that it had received close attention.

8   7   Q.   Thank you, Doctor.

9   8       MR. GOODELL:  No further questions.

10  9       THE COURT:  All right.  We'll take a break until 3:30.

11  10  Ladies and gentlemen of the jury, standard admonition.

12  11      Let the jury stand out.  Everyone else, remain as you are.

13  12      (Whereupon, the jury exited the courtroom and proceedings

14  13  continued in open court as follows:)

15  14      THE COURT:  Jury's out.  We're in recess.

16  15      (Recess at 3:13 p.m.)

17  16          C E R T I F I C A T E

18  17      I, Eugenie M. Power, Official Court Reporter, do hereby

19  18  certify that the foregoing is a true and correct transcript of

20  19  proceedings in the above-entitled case.

21  20

22  21

23  22  _____   Date: February 19, 2008

24      Eugenie M. Power, RMR, CRR, CCR

25  23  United States Court Reporter

26  24

27  25

1  page 2176

2   1       (Proceedings continuing in open court at 3:32 p.m.)

2       THE COURT:  Yes.

3   3       MR. WALKER:  Your Honor, this is an exhibit that the

4   5   Court has taken under advisement and told us that we should

4   5   wait until rebuttal to attempt to introduce.  It is the

6   Government Accounting Office report, the GAO report, on

5   7   postmarket surveillance by the FDA.  And it is a report by the

8   independent bipartisan GAO, General Accounting Office, that

6   9   reveals flaws, serious flaws, in the FDA's ability to ensure

10  drug safety after it's already approved a drug.

7   11      Clearly, now is the time for this document on rebuttal.

8   12  It was admitted in Reeves in rebuttal, it was used with Dr.

9   13  Rarick, Wyeth's regulatory expert.  The entire testimony of Dr.

10  Jolson, the entire testimony was simply a claim and support

11  14  for

13  15  that claim that the FDA never told Upjohn to do anything more

14  16  than Upjohn did, and that Upjohn followed all FDA requirements.

16  17  The obvious implication being that if Upjohn didn't do anything

17  18  wrong according to the FDA, that meant Upjohn did everything

19  it

20  19  had to do.

21  20      You know, Your Honor, because you've already instructed

22  21  juries on this, that FDA standards are minimum standards.

23  They

24  22  are not maximum standards.  And this document establishes that

25  23  the FDA standards themselves are flawed, or at least the FDA's

26  24  enforcement of those standards are flawed, and you cannot meet

27  25  FDA standards even if the FDA says you have.  And it is not

1  page 2177

2   1   hearsay as we've established because it is a government office

2   report, official government business reporting.  It is the

3   3   report of the analysis of the GAO.  I think it's been admitted

4   in every other trial.  And it is rebuttal to her testimony

4   that

5   because they did what the FDA said, that that meant they did

5   6   everything they had to do.

6   7       THE COURT:  Mr. Goodell.

7   8       MR. GOODELL:  Thank you, Your Honor.  This document

8   is

9   9   no more admissible now than it was then.

10  10      THE COURT:  Than it was when I admitted it in the

11  11  other trials?

12  12      MR. GOODELL:  Well, I wasn't here then, Your Honor.

13  I

14  13  don't know that I'd have had any more success then.  But

15  here's

16  14  the issue as I see it.  We have a document which talks about

17  15  general procedures at the FDA, sort of like general things

18  16  versus specific things, general construction versus specific

19  17  construction.  And specific construction always rules out.

20  18      It doesn't do any good for the plaintiffs to say, Here is

21  19  a general statement about things the FDA did well or didn't do

22  20  well.  Here we have a specific course of conduct that

23  21  plaintiffs are free to attack that the FDA should have done

24  22  this instead of that.  They shouldn't have approved it because

25  23  they had the information.  That's all fair game.  But it

26  24  relates specifically to the issues in the case.  Nothing in

27  25  this report relates to Provera, Prempro, Premarin, any issue

---

**Page 197**

page 2182

1  questions were --
2      MR. MORRIS:  We can read them.
3      THE COURT:  All right.  Read them to me.
4      MR. MORRIS:  All right.
5      THE COURT:  I have a near photographic memory, but
6  I've about run out of film.
7      MR. MORRIS:  I apologize, Your Honor.  All right.  I
8  asked her beginning actually on page 1232, "For the whole FDA,
9  when we get to the division of drugs, does it have a specific
10  name?"  And she says, "That's the Center for Drug Evaluation."
11      THE COURT:  Whoa, whoa.  Why don't you get over here
12  to the lectern?  Oh, I can read it here.
13      MR. MORRIS:  "And that's -- it's sometimes referred
14  to
14  as CDER?"
15  "Yes."
16      THE COURT:  Slower.
17      MR. MORRIS:  "And how many employees are at CDER?"
18  "I believe that there's about a thousand employees, close
19  to 800.  That's the biggest of the review centers."
20  "And what is the job of CDER?"
21  And it says, "To bring new products to the market to get
22  them public and to keep unsafe products from being on the
23  market, and also they have a function of monitoring the
24  products that are out there in terms of safety issues."
25  "And in terms of monitoring for safety issues, how many

---

**Page 198**

page 2183

1  employees fulfill that function?"  And she says 40.  Now,
2  that's very different than saying that there are only 40
3  people
4  at FDA overseeing safety.  And that was how he postulated the
5  question -- posited the question.
6      THE COURT:  Well, think about it, and I may let you
7  get into it on redirect.  If it does, I'll definitely allow
8  recross.  And it looks like we've got a hairball issue, but
9  you
10  can think about it.
11      MR. GOODELL:  Thank you, Your Honor.
12      THE COURT:  I guess we need a jury and a witness.
13      (Jury enters the courtroom.)
14      THE COURT:  Be seated, please.  We had a little work
15  to do is the reason we're late getting back to you.  Bear with
16  us.
17      MR. MORRIS:  May I proceed?
18      THE COURT:  You may.
19      MR. GOODELL:  Your Honor, I was asked or reminded to
20  reintroduce two exhibits that no one responded to when I
21  introduced them.  I don't think there's any objection.
22      THE COURT:  What are the numbers?
23      MR. GOODELL:  339 and 349.
24      THE COURT:  Admitted.  When you say no one responded,
25  you mean I didn't rule?
26      MR. GOODELL:  Pretty much, Your Honor.
27      THE COURT:  I've got a thin skin now.

---

**Page 199**

page 2184

1      (Defendant Upjohn's Exhibits 339 and 349 received in
2  evidence.)
3              CROSS-EXAMINATION
4  BY MR. MORRIS:
5  Q.  Dr. Jolson, I have a few questions for you.  First of
5  all,
6  in terms of the work that you do, not only have you had an
7  occasion to testify on behalf of Upjohn in the HRT litigation,
8  but you've also testified on behalf of Merck in the Vioxx
9  litigation, correct?
10  A.  No, I did not.
11  Q.  You were hired by Merck to do review in that case,
12  correct?
13  A.  That's correct.  I did some background work for them,
14  yes.
15  I never testified or was deposed.
16  Q.  You've testified in other drug cases, though, haven't
17  you?
18  A.  Not in court, no.  I've been deposed as I have in my
19  expert report.  There were two in my expert report.  I was
20  deposed in this case and deposed in one additional case in
21  2007.
22  Q.  All right.  And in your history at FDA, certainly you
23  became familiar with 21 CFR 201.57, correct?
24  A.  The prescription drug labeling, yes.
25  Q.  And with regard to prescription drug labeling, you will
26  agree with me that in the warnings regulations, it says that,
27  "Under this section heading, the labeling shall describe

---

**Page 200**

page 2185

1  serious adverse reactions and potential safety hazards,
2  limitations in use imposed by them, and steps that should be
3  taken if they occur.  The labeling shall be revised to include
4  a warning as soon as there is a reasonable evidence of an
5  association of a serious hazard with a drug; a causal
6  relationship need not have been proved."  You'll agree that
7  that's the current regulation?
8  A.  Can you show me the date on this because this was changed
9  in 2006?  It's conceptually similar, but I don't know if this
10  is the current version of 201.57.
11  Q.  I've got 2005 on the publication copy.
12  A.  Right.  So this wouldn't be the current version of the
13  prescription drug labeling.  The entire prescription drug
14  labeling was revised in 2006.
15  Q.  You don't dispute that it would have been in effect at
16  the
17  time that the Women's Health Initiative results came in,
18  correct?
19  A.  That's correct.
20  Q.  And it would have been in effect during the 1990s?
21  A.  That's correct.
22  Q.  Okay.  You will agree with me that it is the
23  responsibility of the manufacturer of drugs to test their
24  drugs
25  to determine if they have both efficacy and safety, correct?
26  A.  That's correct.
27  Q.  And that is a function that is fulfilled by the

Page 201

page 2186

1   manufacturer.  And the way that they do that is they begin by
2   looking at things in a petri dish, and then they move to
3   animal
3   studies, and then they get to human studies in the
4   premarketing
4   phase, correct?
5   5   A.  In general, those phases are correct, but the studies
6   aren't necessarily done by the manufacturer.  They could be
6   7   done by the manufacturer, on behalf of the manufacturer, or by
7   8   a third party.  But what matters to FDA is that the results
8   9   are -- studies are high quality and the results are submitted
9   10   to the FDA for review.  But exactly who does the studies isn't
10   11   stipulated in the regulation.
11   12   Q.  So it's okay if a manufacturer decides to subcontract
12   some
13   13   part of the work to a testing laboratory or to, you know, some
14   14   professors or whoever they want to.  The fact of the matter
15   is,
16   15   it's the responsibility of the manufacturer to gather that
17   16   evidence and present it to the FDA, correct?
18   17   A.  That's correct.
19   18   Q.  And you will agree with me that manufacturers were
20   testing
21   19   and studying their products' premarket approval in the 1960s,
22   20   correct?
23   21   A.  That's correct.
24   22   Q.  In the 1970s, correct?
25   23   A.  That's correct.
26   24   Q.  1980s?
27   25   A.  Yes.

Page 202

page 2187

1   Q.  1990s?
2   A.  Correct.
3   3   Q.  And certainly today?
4   A.  Yes.
4   5   Q.  Okay.  And with regard to your comments earlier
concerning
5   6   whether or not we could have resolved this breast cancer issue
6   7   through case-control studies, you will agree with me that the
7   8   endometrial cancer issue involving estrogen in 1975 was
8   brought
9   9   about by two studies that were observational studies by Drs.
10   10   Ziel and Finkle that suggested the increased relative risk of
11   11   endometrial cancer as related to estrogen?  You'll agree with
12   12   that, won't you?
13   13   A.  I'll agree with that, but the important distinction here
14   14   is those were very high relative risks and very consistent
15   15   studies.  The problem with this data base is the relative
16   risks
17   16   are relatively small, many of them are close to 1, and there
18   17   were inconsistencies in the studies.
19   18   Q.  But, nonetheless, you will agree with me that in the mid
20   19   1970s, when the FDA and when the rest of the world saw the
21   20   results from Drs. Ziel's and Finkle's studies, they said, Hold
22   21   on.  We have to change the label, and we have to change
23   22   prescribing practice with this drug?  You'll agree with that,
24   23   won't you?
25   24   A.  I'll agree with that.  And, again, it's the reminder as
26   we
27   25   discussed and is quoted in the FDA labeling that the relative

Page 203

page 2188

1   risks were up to 12 for all users, and with the extended use
2   even higher up to 24, and I believe even higher than that.  So
3   3   a very, very strong high relative risk and very consistent
4   studies, a very different situation than the quagmire with the
5   breast cancer studies.
6   5   Q.  Well, just to be fair, though -- and the jury early on in
7   this case got to see the Ziel and Finkle studies and the
8   relative risks in Ziel and Finkle --
9   9   we've written them down on the board -- were actually around
9   7.
10   Were you aware of that?
11   11   A.  Again, that would fall within that 2 to 12 range that FDA
12   12   quotes in the label.  That's a high relative risk.
13   13   Q.  I'd like to next show you the Government Accountability
14   14   Office report on the FDA from 2006.  And I would tender this
15   to
16   15   opposing counsel for any objections.  It's Plaintiff's Exhibit
17   16   8068.
18   17   MR. GOODELL:  No further objection.
19   18   THE COURT:  Exception saved.  Admitted.
20   19   (Plaintiff's Exhibit 8068 received in evidence.)
21   20   THE WITNESS:  Mr. Morris, is there a hard copy of
22   that
23   21   for me?
24   22   MR. MORRIS:  Yes, ma'am.
25   23   MR. URBANCZYK:  Your Honor, I think we've also noted
26   24   Wyeth's objection to this document.
27   25   THE COURT:  Exception saved.

Page 204

page 2189

1   BY MR. MORRIS:
2   Q.  Now, Congress asked the Government Accountability Office
3   3   to do a report on the FDA due to some problems that had
4   occurred with prescription drugs, correct?
5   A.  Yes.
6   Q.  And the Government Accountability Office is actually a
5   7   government funded office that is in charge of looking at
6   federal agencies in determining which agencies are doing a
6   good
9   job, which agencies have issues, which agencies are not doing
7   a
8   10   good job, correct?
9   11   A.  Not -- I don't think I would summarize it like that.  I
10   12   think they were asked to do an internal review of the FDA.  I
11   13   don't think I would couch it as who is doing a good job and
12   who
13   14   is not.
14   15   Q.  Okay.  Well, here's a March 31, 2006, letter that was
15   sent
16   16   to Congressman Grassley and Congressman Barton.  And it states
17   17   at the bottom, "Problems with the FDA's postmarket drug safety
18   18   program have been raised before.  There have been numerous
19   19   reviews by external and internal groups dating back over 30
20   20   years that have identified problems with the federal
21   21   government's postmarket drug surveillance program and that
22   have
23   22   made recommendations for improvement.  Following passage of
24   the
25   23   Prescription Drug User Fee Act of 1992, additional concerns
26   24   were raised about drug safety.  Under PDUFA, drug companies,
27   25   sponsors, began paying fees to FDA which used the funds to hire

Page 209

page 2194

1 demonstrated the opposite, and found that HRT may in fact
2 increase the risk of heart disease, cancer, and other diseases.
3 A review of the observational studies suggested that selection
4 bias probably accounted for the positive effect of HRT, that
5 is, women who chose to take the hormone replacement drug were
6 different than women who did not. For example, they tended to
7 be healthier and better educated," the healthy woman effect.
8 Q. You're familiar with that, correct?
9 A. I'm familiar with the statement, yes.
10 Q. And then the GAO also found that with regard to
11 postmarketing studies, they say, for example -- it says, "In
12 the absence of specific authority, FDA often relies on drug
13 sponsors voluntarily agreeing to conduct such postmarket
14 studies. But the postmarket studies that drug sponsors agree
15 to conduct have not consistently been completed. For example,
16 one study estimated that the completion rate of postmarket
17 studies, including those that sponsors have voluntarily agreed
18 to conduct, rose from 17 percent in the mid '80s to 24 percent
19 between 1991 and 2003."
20 So at least as far as the Government Accountability Office
21 report is concerned in the studies they looked at, drug
22 companies were not fulfilling their postmarketing duties to
23 test and study their products in almost 75 percent of the
24 cases? Isn't that true?
25 A. Again, this would include all Phase 4 studies, which some

Page 210

page 2195

1 of them would be safety studies, the majority would be for
2 unrelated things.
3 Q. Now, you're here to testify on behalf of Upjohn, correct?
4 A. That's correct.
5 Q. Let's see if we can reach a few agreements and this will
6 make this go a lot quicker. You will agree that in the
7 history of the manufacture of Provera, Upjohn never conducted a
8 case-control cohort or randomly controlled trial looking at the
9 issue of whether or not their product in combination with
10 estrogen caused breast cancer? You will agree with that?
11 A. Yes, I do.
12 Q. You will agree that never in the history up until 1998
13 that they gained approval of use of the product with estrogen,
14 from 1959 until 1998, never did they have a warning in their
15 label that suggested that the use of their product with
16 estrogen could cause breast cancer, correct?
17 A. That's correct. As we discussed, they were never required
18 by FDA, nor was there data to support such a warning.
19 Q. You will agree with me that based on that CFR I showed you
20 just a moment ago, 301.57, (sic) which was in effect in the
21 '90s -- was that in effect in the '80s?
22 A. 201.57?
23 Q. 201.57?
24 A. For part of the '80s, I believe.
25 Q. At least for the time period that it was in effect, FDA

Page 211

page 2196

1 would have expected that if a company had a reasonable belief
2 that their product was causing breast cancer or associated
3 with breast cancer, that they would study that or at least put
4 something in the label, correct?
5 A. If the company had the belief and if the data supported
6 it, but that wasn't the case in this circumstance.
7 Q. And that would be true if their product was routinely
8 being used with another company's product in combination and
9 they knew it, correct?
10 A. Perhaps you could restate that. I missed the question
11 there.
12 Q. The duty to test and the duty to warn applies if the drug
13 company knows that their product is being used with another
14 company's product routinely, continuously by a large number of
15 women, they should study whether or not the combination of the
16 two drugs can harm somebody? You'll agree with that?
17 A. I would say that they have obligations to monitor
18 postmarketing safety. To the extent that there's data that
19 would support a warning, it should go on the label. But the
20 devil is in the details in terms of what sorts of studies would
21 be expected and whether or not it would have been warranted in
22 this situation.
23 Q. Not a truer comment has been made in this trial, Dr.
24 Jolson. The devil is in the details. And the details of the
25 studies, the details of the testing, how to design those

Page 212

page 2197

1 studies, that is the responsibility of the manufacturer,
2 correct?
3 A. In conjunction and discussion with the FDA. No, it's not
4 solely under the responsibility of the sponsor.
5 Q. Now, are you familiar with the protocol that was submitted
6 by Upjohn to the FDA that said, We want to study these two
7 drugs together and see if they increase the risk of breast
8 cancer? Are you aware of a protocol that was submitted to the
9 FDA that the FDA rejected?
10 A. No. I'm not aware of such a protocol, nor am I aware it
11 would have been feasible to do that, but I'm not aware of the
12 protocol.
13 Q. All right. Let me show you a document. And this is
14 Plaintiff's Exhibit 10910. And I'll tender it to opposing
15 counsel for any objections.
16 MR. GOODELL: Your Honor, may we approach?
17 THE COURT: Yes.
18 (Bench conference reported as follows:)
19 MR. GOODELL: This is a document that was on their
20 original list, and then when counsel and I sat down to have a
21 meet and confer, this was in their case. This was moved to the
22 long list. This is a long list document that is not
23 appropriate for cross-examination.
24 THE COURT: Well, now, the fact it's a long list
25 doesn't -- I mean, the long list document can be used for

# EXHIBIT 31

Page 1

1 page 483
2  1      IN THE UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF ARKANSAS
3  2            WESTERN DIVISION
   3  IN RE: PREMPRO PRODUCTS LIABILITY   MDL No. 1507
4           4:03CV01507 WRW
   4
5          * * * * * * * * *
5  DONNA SCROGGIN,
6        Plaintiff,     Individual Case
   6  v.          No. 4:04CV01169 WRW
7  WYETH AND ITS DIVISIONS; PHARMACIA
   7  & UPJOHN COMPANY LLC; WYETH
8  PHARMACEUTICALS, INC.; and ESI LEDERLE,
   8       Defendants.
9  9  Thursday, February 7, 2008 - Little Rock, Arkansas - 8:21 a.m.
   10      TRANSCRIPT OF TRIAL - VOLUME 4
10  BEFORE THE HONORABLE WILLIAM R. WILSON, JR.,
   11    UNITED STATES DISTRICT JUDGE, and a jury
11  12  APPEARANCES:
   13  On Behalf of the Plaintiff:
12  MR. ERIK BRETT WALKER
   14    Hissey, Kientz & Herron, P.L.L.C.
13    16800 Imperial Valley Drive
   15     Suite 130
14    Houston, Texas 77070
   16
15  MR. JAMES A. MORRIS, JR.
   17  MR. STEVE M. FARIES
16    Brent Coon & Associates
   18   11614 Bee Caves Road, Suite 220
17    Austin, Texas 78738
   19
18  On Behalf of the Wyeth Defendants:
19  20  MR. F. LANE HEARD, III
20  MR. STEPHEN L. URBANCZYK
21  21  MR. RICHMOND MOORE
22  MR. MATTHEW V. JOHNSON
23  22    Williams & Connolly
24    725 Twelfth Street, N.W.
25  23    Washington, D.C. 20005-5901
26  24          [CONTINUED]
27  25

Page 2

1 page 484
2  1  APPEARANCES CONTINUED:
   2  MS. LYN PEEPLES PRUITT
3    Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
   3    425 West Capitol Avenue, Suite 1800
4    Little Rock, Arkansas 72201-3525
   4
5  5  On Behalf of the Upjohn Defendants:
   MS. ELIZABETH ROBBEN MURRAY
6  6    Friday, Eldredge & Clark
        Regions Center
7  7    400 West Capitol Avenue, Suite 2000
        Little Rock, Arkansas 72201-3493
8  8
   MR. CHARLES P. GOODELL, JR.
9  9    Goodell, DeVries, Leech & Dann, LLP
        Commerce Place
10  10    One South Street
        Suite 2000
11  11    Baltimore, Maryland 21202
   12  MS. PAMELA YATES
12  MR. ANDREW K. SOLOW
   13    Kaye Scholer LLP
13    1999 Avenue of the Stars
14  14    Suite 1700
15    Los Angeles, California 90067-6048
16  15
17  16
18  17    Proceedings reported by machine stenography and displayed
   19  in realtime; transcript prepared utilizing computer-aided
20  18  transcription.
21  19
22  20
23  21
24  22
25  23
26  24
27  25

Page 3

1 page 485
2  1      I N D E X - VOLUME 4 (February 7, 2008)
   2
3  3  WITNESSES FOR THE PLAINTIFF:  DIRECT  CROSS  REDIRECT  RECROSS
   4  JUSTIN VICTORIA  [CONTINUED]   501   575   694     708
4  5
   6
5  7
   8
6  9  EXHIBITS:              RECEIVED
   10  Plaintiff's Exhibit 31 ...............................p. 502
7  11  Plaintiff's Exhibit 26 ...............................p. 504
   11  Plaintiff's Exhibit 27 ...............................p. 508
8  12  Plaintiff's Exhibit 30 ...............................p. 528
   12  Plaintiff's Exhibit 69 ...............................p. 543
9  13  Plaintiff's Exhibit 146 ..............................p. 546
   13  Plaintiff's Exhibit 1265 ............................p. 548
10  14  Plaintiff's Exhibit 251, 265.........................p. 550
   11  14  Plaintiff's Exhibit 917 ..........................p. 554
12  15  Plaintiff's Exhibit 325 .............................p. 560
   15  Plaintiff's Exhibit 330 .............................p. 561
14  15  Plaintiff's Exhibits 341, 346, 347, 348, 349, 386.......p. 565
16  Defendant Wyeth Exhibits 134, 135, 137-R, 138-R,
   139, 157, 594B, 621, 005, 434, 223, 126-R,
17  17    175-R, 184-A, 184-B, 184-C, 184-D, 220, 229,
   231, 470, 243, 221, 34 ..........................p. 691
18  18  Defendant Wyeth Demonstrative Exhibits 6 - 9 .........p. 691
19  20  Plaintiff's Exhibit 285 ..............................p. 694
21  19
22  20
23  21
24  22
25  23
26  24
27  25

Page 4

1 page 486
2
3  1            P R O C E E D I N G S
4  2      THE COURT:  Good morning.  Yesterday I entered an
5  3  order -- several orders, but the first paragraph of one of
6  4  orders -- I'm going to read it -- "Time - by 7 a.m., tomorrow,
7  5  Thursday, February 7, 2008, (the Lunar New Year), submit your
8  6  joint or respective views of time used and time left.  'Meet
9  7  and confer' about this as soon as the jury is dismissed this
10  8  afternoon."
11  9      Were there such submissions?  I can't find them.
12  10      MR. GOODELL:  No, Your Honor.  I apologize.
13  11      MR. MORRIS:  No, Your Honor.
14  12      THE COURT:  Have the submissions been made?  That's a
15  13  definitive monosyllabic yes or no.
16  14      MR. MORRIS:  No.
17  15      THE COURT:  All right.  Is there something about that
18  16  order that appeared discretionary?
19  17      MR. HEARD:  No, Your Honor.  I'm afraid I'm at fault
20  18  for Wyeth.  I've got a submission to make, I was ready to bring
21  19  over a sheet of paper that lays it out day by day with
22  20  allocations of hours.  I just realized right now I don't have
23  21  it in hand, so I'm going to have someone bring it over.
24  22      THE COURT:  I'm going to make a rule, as my teachers
25  23  used to tell me, when I give an order, I expect it to be met,
26  24  the conditions of it.  There's nothing discretionary about that
27  25  paragraph 1.

Page 18

page 500

1    THE COURT: -- in my opinion.

2    MR. MOORE: That's fine, Your Honor. We do want to be

3  heard on what counsel said about these specific documents.

4  Lunch is fine with us.

5    THE COURT: I'll rule on them during the noon hour.

6  Can't rule now. We'll be in recess until we get the jury in

7  the box.

8    MR. FARIES: Thank you, Your Honor.

9    (Recess at 8:43 a.m., until 8:54 a.m.; jury present.)

10    THE COURT: Be seated, please. Good morning. Hearts

11  and minds, with respect to this case, anybody their heart and

12  mind is not as pure as it was yesterday? No hands being raised

13  again.

14    I understand one member of the jury has had a little --

15  feeling a little indisposed. If you need to leave the

16  courtroom because of that, just take off and we'll recess. You

17  don't even have to get my eye. If you think you're feeling too

18  bad to continue, let me -- we'll -- I'll be happy to consider

19  you on that. I'll leave that up to you. But I don't want

20  you -- if you're too sick to be able to tolerate it, just let

21  me know.

22    You may proceed.

23    MR. MORRIS: Thank you, Your Honor.

24    THE COURT: I've got protection against the sun this

25  afternoon; poker dealer shades.

Page 19

page 501

1    MR. MORRIS: May it please the Court.

2    THE COURT: Surely.

3    MR. MORRIS: Counsel, ladies and gentlemen, good

4  morning.

5    JUSTIN VICTORIA, PLAINTIFF WITNESS, PREVIOUSLY SWORN

6         DIRECT EXAMINATION, [CONTINUED]

7  BY MR. MORRIS:

8  Q. Mr. Victoria, I want to start off by asking you, is it

9  fair for my client, Donna Scroggin, to rely upon the

10  information that's provided by Wyeth Pharmaceuticals regarding

11  their products?

12  A. Certainly -- excuse me. Certainly that would be

13  information that she should rely upon amongst other sources.

14  Q. And if a Wyeth product poses the risk of cancer, it's fair

15  for her to be notified about that? You'll agree with that?

16  A. Yes, I believe so.

17  Q. All right. And if that risk of cancer increases over a

18  period of years, for instance, maybe in the first couple of

19  years, there's not really a risk, but if you get to year 5 or

20  to year 10, there's a more significant risk, she's entitled to

21  know that, too, correct?

22  A. I think the overall risk of breast cancer is important.

23  Exactly what other aspects of that, whether -- the subsections,

24  components, I think, are really better addressed by the medical

25  experts in the company than myself.

Page 20

page 502

1  Q. And that's why the label is intended to go to the

2  physician because the physician understands what the terms

3  relative risk mean and absolute risk and things that laypeople

4  may not know?

5  A. It's certainly one of the aspects, yes. The physician

6  should -- does know more than a layperson.

7  Q. Yesterday we had an opportunity -- and if I can have the

8  ELMO, I'd like to show you what we previously marked as

9  Plaintiff's Exhibit No. 31. See if there are any objections.

10    MR. URBANCZYK: No objections.

11    THE COURT: Admitted.

12    MR. MORRIS: Thank you, Your Honor.

13    (Plaintiff's Exhibit 31 received in evidence.)

14    COURTROOM DEPUTY: Mr. Victoria, do you have it?

15    THE WITNESS: Not yet.

16    COURTROOM DEPUTY: It's not on your screen.

17    THE WITNESS: Searching. I have it. Thank you.

18  BY MR. MORRIS:

19  Q. All right. This is a letter from the Department of

20  Health, Education and Welfare, HEW, Public Health Service, to

21  George Brice dated July 30th, 1976. And it's from a gentleman

22  named Robert Hoover, a doctor at the -- he was the head of the

23  environmental studies section. And during that time, he had

24  conducted a study that seemed to indicate that there may be

25  some issues involving breast cancer. And in this, he states,

Page 21

page 503

1  "This is of course only one study, and certainly does not

2  justify a cause and effect conclusion by itself. However, I

3  believe it does indicate that there may be a problem, that

4  certainly needs more intensive study."

5    Now, you'll agree with me that in 1976, Ayerst Corporation

6  had the ability to study the issue involving estrogens in

7  breast cancer, correct?

8  A. Yes, we had the opportunity to study, to evaluate, to

9  monitor that issue.

10    MR. MORRIS: And I believe No. 28 is already in

11  evidence. Let me just make sure.

12    MR. URBANCZYK: We have no objection to it, even if it

13  isn't.

14    MR. MORRIS: Will it be admitted?

15    THE COURT: If it hadn't been admitted, it is now. If

16  it has, it's readmitted.

17    MR. MORRIS: All right. Thank you, Your Honor.

18  BY MR. MORRIS:

19  Q. I think we did talk briefly about it yesterday, and this

20  is a July (sic) 14, 1976, memo at Ayerst Laboratories from Dr.

21  Stern to a couple of other doctors. And in this memo, they

22  discuss the possible role of estrogens in the cause of breast

23  cancer and the etiology. And he says, "In view of the

24  widespread use of estrogens with or without progestin, there is

25  valid concern as to whether or not the use of exogenous

page 536

1 been done earlier.

2    MR. URBANCZYK:  We are not going to have any trouble
3 with 386.

4        THE COURT:  If you can't do it, well, it's not --

5    MR. URBANCZYK:  386 is okay, and so is 325.

6    MR. FARIES:  325 is okay?

7    MR. URBANCZYK:  They were not -- I think we're
8 really talking about three documents that have come up.  One is
9 48, 49, and 912, Plaintiff's Exhibits.

10        THE COURT:  If we are only talking about three and
11 the others are on the short list, Mr. Morris, I don't see how
12 that can be a problem for you.

13    MR. MORRIS:  Apparently, Mr. Faries has a different
14 list than the documents that I have.

15        THE COURT:  What can I do about that?

16    MR. FARIES:  There is one other that Upjohn has
17 already --

18        THE COURT:  We will be in recess for ten minutes.
19 You-all see if you can get together and get those identified.
20 I say ten minutes.  We will start back at 25 --

21    MR. MORRIS:  Well, Your Honor, my only objection is
22 moving it from the long to the short list.  It's not a
23 relevance objection or anything.

24        THE COURT:  I am not going to move them from the
25 long list to the short list right now.  I have said I would do

page 537

1 that at lunch.

2    MR. MORRIS:  If they will agree, will you?

3        THE COURT:  If they will agree.  So you-all confer.

4 If they don't, we will do it at lunch.

5    (Recess at 10:13 a.m.; continuing at 10:27 a.m.)

6        THE COURT:  You may proceed.

7    MR. MORRIS:  Thank you, Your Honor.

8 BY MR. MORRIS:

9 Q    Mr. Victoria, a corporation like Wyeth that manufactures
10 pharmaceutical products understands that the duty to test and
11 study is related to your ability to provide proper warnings.
12 Will you agree with that?

13 A    Proper information in general, including warnings.

14 Q    And Wyeth does not rely on the Food and Drug
15 Administration to test their products, do they?

16 A    No.

17 Q    And Wyeth does not rely on the FDA to find out the
18 information concerning the risk and benefits of the product.

19 That's information that Wyeth supplies to the FDA, correct?

20 A    Wyeth supplies information to the FDA, but they have
21 other sources themselves for information about products,
22 including our own products.

23 Q    Right.  And that duty is a continuing duty, isn't it?

24 A    Yes.  Once a product is on the market, we have an
25 obligation under the regulations for continued monitoring of

page 538

1 our products.

2 Q    Can't just throw it out there, put it on the market and
3 say, Well, you know, we will just -- we will just let it
4 continue to be sold and, if something bad happens out there,
5 well, you know, we will deal with it when it happens.  You are
6 supposed to proactively look at the science and the medicine
7 and keep aware, correct?

8 A    That's what we do, yes.

9 Q    All right.  And one of the ways that you do that is by
10 doing studies like these case control studies, cohort studies,
11 and randomly controlled trials, correct?

12 A    That's one aspect, yes.

13 Q    And Wyeth has the ability and the money and so forth to
14 do those things, correct?

15 A    Yes, we do.

16 Q    We were talking about this document from 1976.  When we
17 had stopped, we had gotten through Bullet Point No. 5.  And we
18 go to No. 6, and he is reporting on what they had discussed at
19 the last meeting.  And with regard to the case control study on
20 mammary cancer, which is breast cancer, he states:  We have no
21 plans of which I am aware for such a study.  Earlier case
22 control studies, see attached memorandum of April 14th, '76,
23 have failed to show statistically significant increased risk
24 associated with the use of estrogens postmenopausally.  The two
25 studies cited do not, however, prove that an association does

page 539

1 not exist.  They do suggest, however, that any association is
2 likely to be relatively weak.  As I understand it, Drs. Slone
3 and Shapiro do a study under the sponsorship of the NCI --
4 that's the National Cancer Institute, correct, sir?

5 A    Yes, sir.

6 Q    And I continue to feel that we should do everything
7 possible to assure that the Slone-Shapiro study is done as well
8 as any such studies could be done to minimize possible biases
9 and that we should sponsor one or more studies.

10    So at this point, Wyeth did not have plans for their own
11 case control study, but they agreed that they should help
12 sponsor studies, which would mean providing grant money,
13 correct?

14 A    No.  Dr. Perdue said he was not aware of plans for a
15 study.  Obviously if the studies were done, I don't know
16 exactly the timing o the studies again.  I think
17 Dr. Constantine is better able to answer that than I.

18 Q    But I thought we were clear yesterday, and I asked you
19 this question carefully yesterday.  Let me try it one more
20 time.  You will agree with me, sir, that from 1975 all the way
21 up to today, today -- what's today?  Today is February the 7th
22 of 2008 -- Wyeth has never performed a case control study on
23 breast cancer and their products.  That's true, isn't it?

24 A    No.  I don't agree with that.  Wyeth sponsored a number
25 of case control studies looking at breast cancer.  When you use

page 544

1  and endocrine drug products at the FDA, stated he would prefer
2  to wait and see the results of the studies before commenting on
3  the proposed labeling.  In reading this document, can we draw
4  the conclusion that at least by 1983 there weren't sufficient
5  studies to quiet the mind of Mr. Sobel at the FDA on this risk
6  issue or Wyeth would have presented them during this
7  submission?  Can we reach that conclusion?
8  A    Dr. Sobel was concerned about risks and benefits.  He
9  wanted to see data about a specific combination before he, at
10 FDA as a responsible authority, would approve such a specific
11 combination.
12 Q    All right.  And then down here, Dr. Perdue at Ayerst
13 says: An underlying consideration concerning our overall
14 approach to the FDA concerning Prempak has been the importance
15 of avoiding the problems which could arise if the FDA were to
16 take the position that Prempak is equivalent to a combination
17 drug product of the type requiring demonstration that the
18 combination does more than its components in regard to each
19 indication for the combination product.
20     So part of the concern at Wyeth was, look, if FDA looks
21 at this and they say, Well, okay, Premarin is approved by the
22 FDA and Provera is approved by the FDA -- which they were in
23 1983 for different uses, but they were both approved drugs,
24 correct?
25 A    That's correct.

page 545

1  Q    If FDA looks at it and they say, Well, huh, what if you
2  combine these two?  I wonder if the combination of these two
3  might cause a problem that we don't see by one alone.  Then
4  that might require Wyeth, or whoever was trying to get the
5  approval, to come forward with a new drug application, correct?
6  A    I don't think that's what this is talking about, and I
7  don't think that was the concern.  We obviously had to do
8  studies to come forward with a new drug application.  We knew
9  that.  That's why we were doing these studies.
10 Q    All right.  But the studies hadn't been completed yet?
11 A    That's correct.
12 Q    And so here we are eight years after the '76 memos, and
13 we don't have an answer yet.  Let's go on and read down
14 further: To attempt such a demonstration would be very costly,
15 would take many years, and might in the end not prove
16 successful.  In fact, the results of the studies that would be
17 needed could turn out to be embarrassing.
18     It would not be proper and it wouldn't be responsible for
19 a drug company to be worried about whether a study would be
20 embarrassing and place that as a higher priority than the
21 health of women, would it?
22 A    That's not what this memo is saying.  If I might explain?
23 Q    You will have an opportunity when your counsel speaks to
24 you.
25     We can move forward now to December 30th of 1990.  And

page 546

1  this is an internal memo from you, Mr. Victoria, to a list of
2  people: J. Barton, J. Bathish, J. Bissinger, J. Morrison, and
3  S. Sasson.  And it's concerning the --
4      MR. MORRIS:  Let me tender to opposing counsel for
5  any objections.  I apologize.
6      MR. URBANCZYK:  No objection.
7      THE COURT:  Admitted.
8      MR. MORRIS:  No. 146.
9      (Plaintiff's Exhibit 146 received in evidence.)
10 BY MR. MORRIS:
11 Q    And before I get to it, let's just be clear, because I
12 did some things yesterday and I don't know if the jury
13 remembers.  But those Prempak studies that you-all were doing,
14 by 1988 the studies had to be abandoned, correct?
15 A    We could not successfully complete that study, so we
16 moved on to a different study design.
17 Q    All right.  So here we're 12 years later.
18     Let's move forward to 1990.  It says: On Friday,
19 November 30th, 1990, a meeting was convened by Dr. Hite to
20 discuss the plans of IARC, the International Agency for
21 Research on Cancer, to evaluate the carcinogenic risks of
22 estrogen replacement therapy and to provide for the development
23 of a monograph on this issue.  The International Agency for
24 Research on Cancer is a well-respected group that's looked to
25 all over the world to determine what substances are

page 547

1  carcinogenic or not.  Do you agree with that?
2  A    I am not that familiar with IARC.  I don't know what
3  their relative credibility is.
4  Q    All right.  Well, it says that the IARC monograph
5  procedures are outlined on the attached handout from the
6  meeting.  This process should not affect regulatory in that
7  existing labeling for Premarin clearly states the risk of
8  endometrial cancer associated with estrogen replacement therapy
9  and also discusses the possible association of ERT and breast
10 cancer.  Of ERT and breast cancer, right?
11 A    Yes, sir, that's correct.
12 Q    And by that you meant estrogen replacement therapy.  You
13 weren't making any comment on the addition of a progestin?
14 A    I was speaking about Premarin and estrogen therapy alone,
15 yes.
16 Q    All right.  And you state down here below that the charge
17 of that task force is to ensure that IARC does not develop a
18 position on a definitive relationship between breast cancer and
19 estrogen replacement therapy as well as to ensure that
20 conjugated estrogens are not singled out from other estrogen
21 replacement therapies as any difference in terms of
22 carcinogenic risk.  And that's what you stated in 1990,
23 correct?
24 A    Yes, that's correct.
25 Q    And the reason that you didn't want IARC to take a

1 page 552

2

3  1  facts in considering this exhibit.

4  2        You may proceed.

5  3  BY MR. MORRIS

6  4  Q    Now, let's talk about that and make sure that we're clear

7  5  about the difference between a contraindication and a warning.

8  6  A contraindication means that if you already have breast

9  7  cancer, don't take the product.  Right?

10  8  A    That's what the contraindication says, yes.

11  9  Q    Because for whatever reason, if you have got breast

12  10  cancer already, you are not supposed to take this drug,

13  11  correct?

14  12  A    That's what the labeling says, yes.

15  13  Q    That is not a warning that the product may cause breast

16  14  cancer, is it?

17  15  A    No.

18  16  Q    And physicians understand that, don't they?

19  17  A    Physicians understand the difference between the

20  18  contraindication and the warnings and precautions in the

21  19  labeling, yes.

22  20  Q    And in Exhibit No. 251, it's dated December 8th, 1993,

23  21  Carrie Smith Cox, who was an employee of Wyeth, correct?

24  22  A    She was, yes.

25  23  Q    She was writing a memo to David Dodd, and she said:  The

26  24  Eastern Cooperative Oncology Group has received funding to

27  25  conduct a study of HRT in women post-breast cancer taking

1 page 553

2

3  1  tamoxifen.

4  2        And tamoxifen just generally is a estrogen stripping drug

5  3  that sometimes is taken after a woman has breast cancer,

6  4  correct?

7  5  A    Yes.

8  6  Q    Wyeth-Ayerst, W-A, previously refused a request for drug

9  7  supply consistent with company policy.  That's what it says,

10  8  correct?

11  9  A    Yes, sir.

12  10  Q    And will you agree with me that there was a company

13  11  policy during this time frame in 1993 not to provide drugs to

14  12  people that were doing studies on breast cancer?

15  13  A    No.  I absolutely disagree with that.

16  14  Q    I want to show you a later memo from the same lady,

17  15  Carrie Smith Cox, February 9th, 1994.  It says:  David, as we

18  16  discussed, medical matters has reviewed the ECOG breast cancer

19  17  study proposal, and there appears to be little risk in terms of

20  18  potential negative outcome for Premarin.  We continue to

21  19  request support for this study.

22  20        And she says:  There are several studies now in process

23  21  or underway on ERT use in breast cancer survivors.  To date,

24  22  there is a tenuous consensus building that estrogens used in

25  23  ERT have differential impacts on breast cancer and that

26  24  Premarin may have a favorable profile.

27  25        And then you go down and it says:  Upjohn has since

1 page 554

2

3  1  agreed to provide Provera and Ogen.  And then it says:

4  2  Because, however, approval requires somewhat of a change in,

5  3  quote-unquote, company policy, it is expected that senior

6  4  management review will also be required.

7  5        Now, the company policy was, once again, not providing

8  6  drugs for the breast cancer studies, correct?

9  7  A    No.  Wrong.

10  8  Q    All right.  Now, yesterday I went through, and I showed

11  9  you the approval of Prempro, which occurred in late '94.  I

12  10  would like to show you an internal memo, and this is

13  11  Exhibit 917.

14  12        MR. URBANCZYK:  One second, Your Honor.  This is not

15  13  one I have seen before.

16  14        THE COURT:  All right.

17  15        MR. URBANCZYK:  My lawyer tells me no objection.

18  16        THE COURT:  No objection.  It will be admitted.

19  17  (Plaintiff's Exhibit 917 received in evidence.)

20  18        MR. MORRIS:  Thank you, Your Honor.

21  19        MR. URBANCZYK:  You have a lawyer, Your Honor; I

22  20  have lawyers here.

23  21        MR. MORRIS:  Me too.

24  22  BY MR. MORRIS

25  23  Q    This is internal correspondence from Wyeth, March 10th,

26  24  1995, and it says:  As agreed in our 8 February meeting,

27  25  preliminary sample size calculations have been done for a

1 page 555

2

3  1  planned comparative study of the incidence of breast cancer

4  2  among women treated with unopposed Premarin and those treated

5  3  with Premarin and MPA.

6  4        When we say "unopposed Premarin," that's a woman that is

7  5  taking estrogen only, taking the Premarin only.  It's not being

8  6  opposed by the progestin.  Likely, she is a woman who has

9  7  already had a hysterectomy.  Is that fair?

10  8  A    Unopposed Premarin means Premarin alone, estrogen alone.

11  9  Q    And Premarin/MPA would be a combination of Premarin and

12  10  the progestin, medroxyprogesterone acetate, correct?

13  11  A    That's correct.

14  12  Q    Calculations have been done for both a prospective cohort

15  13  study and a retrospective case control study.  This sure makes

16  14  it apparent to me, Mr. Victoria, that Wyeth-Ayerst is talking

17  15  about the design of cohort and case control studies to be done

18  16  by the company.  Would you agree with that?

19  17  A    The statistician here was looking at calculations to look

20  18  at the sample size comparing those various approaches to study

21  19  breast cancer.

22  20  Q    Okay.  So here we are in 1995, and we are discussing the

23  21  design of studies -- cohort study and case control.  Now, if

24  22  Wyeth had already designed and done a good case control study

25  23  on this issue, why in the world don't they mention that and

26  24  say:  We need to look back at the past studies we have done,

27  25  see where the issues are with those.  None of that conversation

Page 74

page 556

3  1   occurs, does it?
4  2   A    Oh, I think that conversation absolutely occurred in
5  3   conjunction with these discussions.
6  4   Q    And in fact, if we go over and look at page 3, they talk
7  5   about the retrospective study and the population that it would
8  6   take and what we would need to look to in terms of finding a
9  7   relative risk of 2, if it, in fact, existed.  And they give
10  8   numbers of cases and controls, those being people that are on
11  9   product and those that are not.  And then back here it actually
12  10  lists a table, Table 7, and it says number of cases required
13  11  for the upper limit of the 95-percent confidence interval.  And
14  12  it says: It was previously shown that 160 total cases would be
15  13  sufficient to provide at least 80-percent power to detect the
16  14  difference between groups if the relative risk is 2 or greater.
17  15  Similarly, it was shown that 440 cases would be sufficient for
18  16  80-percent power to declare a significant difference between
19  17  treatments if the relative risk is 1.5 or greater.
20  18       So you will agree with me that in 1995 the doctors at
21  19  Wyeth and statisticians have figured out that the number of
22  20  people needed to be studied in a retrospective study to give
23  21  them the right confidence interval, to find the right relative
24  22  risk, is in the hundreds of people?
25  23  A    As I am not a physician, I am also not a statistician.  I
26  24  don't know how many patients would have to be enrolled to get
27  25  that number of cases.  Could I see a copy of the document to

Page 75

page 557

3  1   get some perspective here?  I don't recall ever having seen
4  2   this.
5  3   Q    So you will agree, after reviewing the document, that at
6  4   least for the retrospective case control study, a smaller group
7  5   would be necessary for that study, and it's in the hundreds of
8  6   people in terms of the cases, correct?
9  7   A    In terms of the number of cases, but the number of
10  8   subjects appears to be, looking at the bottom, 16,000 or 7,000?
11  9   I am --
12  10  Q    You know that's not true.  If we look back at the
13  11  section, we can read the whole section on retrospective study
14  12  if you like.  You know that that number, when they're talking
15  13  about 16, they're talking about a prospective study, the WHI,
16  14  isn't that true?
17  15  A    I don't -- I am not an expert in statistics.  I don't
18  16  read this memo that way.  I think if you look at Table 8, the
19  17  title of Table 8 says: Population Database Required to Obtain
20  18  100 Cases of Breast Cancer for Observation Periods.  And here
21  19  they range from 7,000 up to 33,000 patients to obtain the
22  20  number of cases.
23  21  Q    And that's for the prospective study.  Down below, if you
24  22  will read with me -- let's read it together.  Under the given
25  23  assumptions, a total of 16,667 women followed for two years
26  24  would yield 100 cases of breast cancer.  The total could be
27  25  reduced to 6,667 if they were followed for five years.  The

Page 76

page 558

3  1   numbers shown in the preceding table can be multiplied as
4  2   necessary, depending on the numbers of cases required for
5  3   desired power.  For example, if 500 cases are needed, then the
6  4   numbers shown in the table would be multiplied by five.
7  5   Presumably, the number of non-cases included in the data would
8  6   be more than adequate to select the required number of
9  7   appropriately matched controls.
10  8        So you would look at that large population to find the
11  9   500 cases, correct?
12  10  A    Yes.  I see that now.
13  11  Q    Okay.  Now, let's talk about that just a minute.  During
14  12  this time frame, Wyeth had at this point submitted its new drug
15  13  application for Prempro, correct?
16  14  A    It was submitted and approved.
17  15  Q    Submitted and approved.  It was approved on December 30,
18  16  1994, correct?
19  17  A    That's correct.
20  18  Q    And we went over that document yesterday, and I want to
21  19  go back.  We had stopped close to the end, and I want to ask
22  20  you about a couple of things.  And then we're almost through.
23  21  It says that the NDA, new drug application, is recommended for
24  22  approval under the following conditions:  The sponsor -- and
25  23  that would be Wyeth -- will conduct a comprehensive Phase IV
26  24  investigation of breast cancer risk in users and nonusers of
27  25  the NDA regimens.  And then it says:  The most feasible

Page 77

page 559

3  1   approach appears to be a large-scale case control study in
4  2   areas in the U.S. where the NDA regimens are used extensively.
5  3        Did I read that correctly?
6  4   A    Yes, sir.
7  5   Q    Now, when we say a Phase IV study, that is a
8  6   post-marketing study, correct?
9  7   A    Yes, that's correct.
10  8   Q    So the product's already on the market, and what they're
11  9   saying to you is: Go out and do a good case control study and
12  10  let's see if we can find out what the answer is on the breast
13  11  cancer issue.  Correct?
14  12  A    Yes.  They have made the decision the product is safe and
15  13  effective on the market.  They want continued study on the
16  14  issue.
17  15  Q    And then further back in the document, it says that -- I
18  16  might have to break this down to get into it.  It says:
19  17  Wyeth-Ayerst should submit analysis for U.S. alone on efficacy
20  18  in lipids and then U.S. versus Europe, the rate and specimen
21  19  insufficient and then analysis of breast cancer.  It says:
22  20  Comparison between treatment groups with comment on information
23  21  about breast cancer status of dropouts as of the end of the
24  22  trial and plan a development for Phase IV studies.  Correct?
25  23  A    That's correct.
26  24  Q    So if Wyeth had done an adequate case control study prior
27  25  to 1995, why in the world would the FDA be telling them, Go

Page 82

page 564

3 1 Q    All right.  And he says in concluding:  Dr. Stadel
4 2 suggested the agency and Wyeth-Ayerst meet again in
5 3 approximately six months.  Ms. Kish indicated that the FDA
6 4 minutes would note the due diligence of the sponsor in meeting
7 5 the post-approval commitment in spite of the delay in
8 6 initiating the trial.
9 7    So even though we can't get this case control study
10 8 going, FDA is telling Wyeth, We note your due diligence
11 9 regardless, correct?
12 10 A    Oh, no.  The case control study is essentially already
13 11 started as soon as the drug is on the market.  You need to wait
14 12 the eight to nine years that Dr. Stadel was saying to gather
15 13 enough exposure to look back, which is exactly what a case
16 14 control study is.  So there was really no delay.
17 15 Q    Well, women had been using this product for over 20 years
18 16 at this point, correct?
19 17 A    No.  Prempro was approved in December of 1994.  That's
20 18 when we received approval to make that specific combination
21 19 available.
22 20 Q    But you knew, as you have already admitted, that back in
23 21 1977 the drugs were being used in combination, did you not?
24 22 A    We were aware that that practice was evolving, and we
25 23 continued to evaluate and study it.
26 24 Q    And you admitted that if you knew that the products were
27 25 being used together, you had a duty to check and see if there

Page 83

page 565

3 1 was a combining effect of the drugs in harming people, correct?
4 2 A    We had to monitor the safety of our drugs, including the
5 3 way it's being used in the marketplace, which is what we did.
6 4    MR. MORRIS:  I next want to tender Exhibits 346,
7 5 348, 349, 341, and 347, and 386.
8 6    MR. URBANCZYK:  Your Honor, all but the last one
9 7 are -- we have no objection to admitting any of these.  All but
10 8 the last one you have ruled that you should give a limiting
11 9 instruction, Limiting Instruction No. 1.
12 10    THE COURT:  All right.  Limiting Instruction No. 1
13 11 that I read earlier?  Is that right?
14 12    MR. URBANCZYK:  Well, let me see.  Maybe --
15 13    THE COURTROOM DEPUTY:  I have it here.
16 14    MR. URBANCZYK:  Yes, that's the one.
17 15    (Plaintiff's Exhibit 341, 346, 347, 348, 349, and 386
18 16 received in evidence.)
19 17    THE COURT:  All right.  This applies, as I
20 18 understand it, to 346, 348, 349, 341, and 347; is that correct?
21 19    MR. MORRIS:  I believe that's correct, Your Honor.
22 20    MR. URBANCZYK:  348, 346 -- may I just confer with
23 21 your courtroom clerk to make sure we're set here?  We're clear.
24 22    THE COURT:  All right.  With respect to 346, 348,
25 23 349, 341, and 347 -- and they will be attached to them when you
26 24 go to the jury room to deliberate -- I am admitting these
27 25 exhibits for a limited purpose.  You should consider it solely

Page 84

page 566

3 1 to determine whether it put Wyeth on notice of a duty to test.
4 2 You should not consider it as evidence for any other purpose.
5 3 BY MR. MORRIS
6 4 Q    So now, by 1995, not only has Wyeth been told by the FDA
7 5 that we want you to do a Phase IV study on the drugs, but Wyeth
8 6 has actually sent the FDA their protocol for what they think a
9 7 good study would be.  I would like to show you a -- this is an
10 8 abstract of an article that was written by a doctor named
11 9 Cummings.  And there are several other authors on this.  And
12 10 J. Buchalter, is that somebody that works at Wyeth?
13 11 A    Mr. Buchalter worked at Wyeth in that period of time,
14 12 yes.
15 13 Q    And this is 4/24/96.  So this is after the Prempro
16 14 approval, and he says:  This is Cummings' abstract for the
17 15 tenth annual conference.  There is an annual conference that
18 16 goes on every year regarding these issues, the use of these
19 17 hormones in postmenopausal women, correct?
20 18 A    Yes.  Wyeth puts together an annual conference of experts
21 19 to look at issues associated with estrogen use.
22 20 Q    And one of the experts that was going to make a
23 21 presentation was Mr. Cummings or Dr. Cummings, and one of the
24 22 conclusions of his study -- and I know it concerned bone
25 23 mineral density and osteoporosis.  But one of the findings was:
26 24 Our findings suggest that the risk of breast cancer associated
27 25 with hormone replacement therapy may have been substantially

Page 85

page 567

3 1 underestimated since osteoporosis is a primary indication for
4 2 its use.
5 3    And this was a concern for Wyeth because, certainly, if
6 4 he is suggesting that the statistics on breast cancer have been
7 5 substantially underestimated, then that could impact whether or
8 6 not the label is correct, correct?
9 7 A    If his hypothesis was correct, that could be an outcome,
10 8 yes.
11 9 Q    It could impact whether or not women had been told the
12 10 right thing by their doctors?
13 11 A    It could call that issue into dispute, yes, if that
14 12 hypothesis was correct.
15 13 Q    And ultimately, I guess, it could impact the number of
16 14 women that might be getting hormone-related breast cancers?
17 15 A    If his hypothesis were correct.
18 16 Q    And so I want to show you a little memo that we found in
19 17 the files from Jeff Buchalter, who was at Extension 5706, to
20 18 the BCA working group, that's the breast cancer working group.
21 19 He says:  Steve Cummings.  Please keep this confidential.  Do
22 20 not discuss with anyone outside Wyeth-Ayerst.
23 21    Mr. Buchalter had gotten some advance information on this
24 22 abstract, correct?
25 23 A    I'm sorry?
26 24 Q    Mr. Buchalter had gotten advance information on the
27 25 abstract?

Page 86

page 568

3  1   A   I presume so, yes.
4  2   Q   And some notes that we have found in the file suggest
5  3   that the Cummings study was an NIH study of ten years, the
6  4   women were 65-plus, and it was prospective.  And in his
7  5   handwritten notes on this page -- we believe this to be the
8  6   handwriting of Mr. Buchalter -- it says:  Dismiss/distract.  Do
9  7   you see that?
10 8   A   I do see it, yes.
11 9   Q   And then we look at a memo of his dated 1/31/96.  This is
12 10  to the breast cancer working group or the breast cancer task
13 11  force meeting.  Wyeth had at this point put together a task
14 12  force on the breast cancer issue, correct?
15 13  A   Yes.  We were --
16 14       MR. URBANCZYK:  Object, Your Honor.  May I approach?
17 15       THE COURT:  Yes.
18 16       MR. URBANCZYK:  Never mind.  We have worked it out.
19 17       THE COURT:  I have just got so many rulings in me.
20 18  I am glad they spared me.
21 19  BY MR. MORRIS
22 20  Q   I may have misspoke earlier, and I want to make sure I am
23 21  perfectly clear about Wyeth's document.  As far as the breast
24 22  cancer task force meeting in January of -- late January of '96,
25 23  will you agree with me that J. Buchalter's name is on this
26 24  document?
27 25  A   Yes.  It seems to be.

Page 87

page 569

3  1   Q   And as far as the action steps that Wyeth was going to
4  2   take, they were going to visit with Cummings first of all,
5  3   correct?
6  4   A   That's what it says, yes.
7  5   Q   And then assess the feasibility of reanalyzing the Dupont
8  6   study, correct?
9  7   A   Yes.
10 8   Q   And Dupont was that chart that Wyeth tended to send out
11 9   with their "Dear Doctor" letters and they would send to
12 10  physicians that included the 40 or 50 studies and it had the
13 11  1.0 in the middle and some of the studies were estrogen-only,
14 12  some of the studies were E plus P, some of them were old, some
15 13  of them were insignificant.  That was the Dupont study,
16 14  correct?
17 15  A   The Dupont study was a meta-analysis of -- my
18 16  understanding, of all the available breast cancer studies that
19 17  he could gather to analyze.
20 18  Q   All right.  And then there was going to be -- they were
21 19  going to tap advocates as potential speakers to the media, and
22 20  that would be people like Dr. Dupont and Dr. Bush and
23 21  Dr. Nachtigall and Dr. Ravnikar.  These are doctors that would
24 22  be willing to come forth and say what they think about the
25 23  issue, correct?
26 24  A   I believe so, yes.
27 25  Q   And then you were going to tap third-party sources of

Page 88

page 570

3  1   support like ACOG?
4  2   A   That's one group mentioned, yeah.
5  3   Q   National Institutes of Health, correct?
6  4   A   Yes.
7  5   Q   And then the field force -- that would be your sales
8  6   force -- you want to have them have communication that includes
9  7   an analysis of the data on Cummings, correct?
10 8   A   Uh-huh.  Yes.  I'm sorry.
11 9   Q   That's all right.  And a backgrounder on breast cancer
12 10  sales training primer regarding putting breast cancer into
13 11  perspective, correct?
14 12  A   Yes.
15 13  Q   And then we mentioned Dupont and then we come down and it
16 14  also says that you want to shift attention to other cancers
17 15  like colon cancer, right?
18 16  A   This is one issue mentioned there, yes.
19 17  Q   And to include the thought that this is just one more
20 18  paper, that WHI is doing the definitive prospective trial,
21 19  correct?
22 20  A   Yes, that's correct.
23 21  Q   And then you wanted to highlight the flaws in the
24 22  Cummings methodology, correct?
25 23  A   One aspect of our efforts, yes.
26 24  Q   And then it says down here that you wanted to emphasize
27 25  the results from PEPI.  Now, surely you weren't going to

Page 89

page 571

3  1   emphasize the results from PEPI as it relates to breast cancer,
4  2   were you?
5  3   A   No.  It doesn't say that.  It says results from PEPI,
6  4   including, obviously, breast cancer, but not exclusively.
7  5   Q   Because PEPI was a three-year study.  It wouldn't have
8  6   been a study that would have given us any real revelations
9  7   concerning the relationship between these hormones and breast
10 8   cancer, correct?
11 9   A   It was a control study of three years.  Like any good
12 10  study, though, it did monitor for risk of breast cancer.
13 11  Q   And then there is a confidential memorandum that was
14 12  distributed to Jeff Buchalter and Ellen Geisel, and this is
15 13  dated March 27, 1996.  And this is from Shellie Winkler and
16 14  Gloria Stone.  They worked for a public relations company that
17 15  has contracted with Wyeth at times, correct?
18 16  A   Yes.  I believe this is a proposal from a public
19 17  relations agency to Wyeth.
20 18  Q   And what they were recommending to Wyeth was the goal was
21 19  to balance anticipated negative coverage by casting doubt on
22 20  the validity and value of the study, emphasizing its aberrant
23 21  results relative to other ERT/breast cancer study results.  And
24 22  it says in terms of the strategy, dismissive strategy.
25 23  Downplay the value of the study by dismissing its contribution
26 24  to the literature based on small number of cases, wide
27 25  confidence intervals, simultaneously suggesting it may be

page 572

3  1  inappropriately creating a public health scare.  Utilize third
4  2  parties as much as possible to distance Wyeth-Ayerst from the
5  3  study, which is not Premarin specific.  And they list the
6  4  head-to-head strategy, what they are going to do with Merck.
7  5      And if we go to the second page, they say, No press
8  6  briefing, over here, on these issues.  And one of the issues is
9  7  breast cancer, correct?
10 8  A    Yes.
11 9  Q    And then when we get down to the dismissive strategy, it
12 10  says:  Select third-party groups' statements, specifically ACOG
13 11  and those other people, NAMS, and appropriate third-party
14 12  spokespeople, specifically Trudy Bush and Leon Speroff.  Those
15 13  are a couple of doctors, correct?
16 14  A    That's correct.
17 15  Q    And essentially this document outlines much of what we
18 16  just saw in the breast cancer task force meeting from 1/31/96,
19 17  correct?
20 18  A    I think that's a proposal from the PR agency.  I don't
21 19  know exactly what actually was done.
22 20  Q    Well, that breast cancer task force meeting that
23 21  Mr. Buchalter was at took place on 1/31/96, on or about that
24 22  date.  This memo is written March 27, 1996.
25 23  A    Okay.
26 24  Q    So at least in that three-month period, nobody had said
27 25  to Jeff Buchalter, Man, you can't just dismiss a study and use

page 573

3  1  a dismissive strategy.  You have to read the study, find out
4  2  what it's all about.  We want to make sure that we're not
5  3  causing breast cancer.  Nobody, nobody told Mr. Buchalter that
6  4  in that three-month period, did they?
7  5  A    I don't know what Mr. Buchalter was told, but I know that
8  6  the study was analyzed and was reported and was discussed
9  7  widely within Wyeth.
10 8  Q    And I want to show you from a month later another
11 9  confidential memorandum, dated April 25th, 1996, to
12 10  Jeff Buchalter, once again from these public relations people.
13 11  And they're saying once again:  Although it is believed that
14 12  Cummings will not present in Amsterdam, it is best to be
15 13  prepared in the event that he does.  Our goal, strategy, and
16 14  tactics are as follows:  Overshadow the Cummings data with
17 15  focus on unconventional approach to HRT therapy using HRT in
18 16  breast cancer survivors.
19 17      Did I read that correctly?
20 18  A    That's what it says, yes.
21 19  Q    She says on the next page:  Although intelligence
22 20  indicates that Cummings will not present his data in Amsterdam,
23 21  a statement from N. Davidson will be valuable in helping
24 22  address future study findings indicating a negative
25 23  relationship between HRT and breast cancer.
26 24      So here you are in 1996, Wyeth is discussing dismissing,
27 25  downplaying another study that's being done.  They haven't

page 574

3  1  gotten theirs up and running yet, their case control study.
4  2  And so at this point, rather than embracing the study and
5  3  saying:  You know, we have heard this repeatedly for 20 years.
6  4  There has been stuff in the literature out there concerning
7  5  breast cancer and HRT.  Maybe we should do a really good study
8  6  and get it done -- Wyeth didn't do that, did they?
9  7  A    No.  Wyeth did a number of studies, and we did not
10 8  dismiss and distract from the Cummings study.  We embraced it
11 9  and analyzed it.
12 10      THE COURT:  Speak a little slower.
13 11      THE WITNESS:  Sorry, sir.
14 12  BY MR. MORRIS
15 13  Q    Then we go to 1997, and this is a memo to Wyeth from
16 14  Lisa Rarick.  She is a lady that's going to show up and testify
17 15  on your behalf, correct, on Wyeth's behalf?
18 16  A    Yes.  Dr. Rarick will testify about her actions at FDA.
19 17  Q    And one of her actions, apparently, was to write Wyeth
20 18  this letter and tell them:  We have completed review of your
21 19  submission and conclude that your support for these prospective
22 20  studies will fulfill the Phase IV commitment and that the
23 21  conduct of the previously discussed case control study is not
24 22  necessary.
25 23      So what Wyeth told the FDA is that we would help provide
26 24  the pills to the WHI and the placebos for the WHI and, as a
27 25  result, FDA said, Okay, if you are going to do that, you don't

page 575

3  1  have to do a case control study, correct?
4  2  A    FDA felt Wyeth's support of the WHI study was a better
5  3  approach to evaluate this issue following the approval of
6  4  Prempro.
7  5  Q    And, in fact, no case control study has ever been done,
8  6  even to today, on this issue by Wyeth.  That's true, isn't it?
9  7  A    I don't agree with that.
10 8      MR. MORRIS:  Your Honor, I will pass the witness.
11 9      MR. URBANCZYK:  Your Honor, could I have two minutes
12 10  or three minutes to set up?
13 11      THE COURT:  You may.
14 12      MR. URBANCZYK:  You won't charge it against my time?
15 13      THE COURT:  I might.
16 14          CROSS-EXAMINATION
17 15  BY MR. URBANCZYK
18 16  Q    Good morning, Ms. Victoria.  Jury knows a little bit
19 17  about you from the plaintiff's questions.  Tell the jury a
20 18  little bit more about yourself.  What is your educational
21 19  background, sir?
22 20  A    Yes.  I have a bachelor's in biochemistry from a science
23 21  and engineering school in upstate New York called Rensselaer
24 22  Polytechnic Institute.  I have a master's of science in natural
25 23  sciences from State University of New York at Buffalo.  And I
26 24  received an MBA in pharmaceutical chemical studies from
27 25  Fairleigh Dickinson University in New Jersey.

Page 210

page 692

1  184-D, 220, 229, 231, 470, 243, 221, 34; Defendant Wyeth
2  Demonstrative Exhibits 6, 7, 8, 9 received in evidence.)
3  BY MR. URBANCZYK:
4  Q.  Just to make sure the record is clear here, you are here in
5  Mr. Morris's case at, what shall we say, his invitation?
6  A.  Kindly.
7  Q.  You were subpoenaed by Mr. Morris to be here.  Is that
8  correct, sir?
9  A.  Yes, sir.
10      MR. URBANCZYK:  I have no further questions.
11      THE COURT:  Let's approach.
12      (Bench conference reported as follows:)
13      THE COURT:  How long do you expect your redirect to
14  be?
15      MR. MORRIS:  Let's see.  Maybe 15 minutes.  No longer
16  than that.  And after that, we had intended to play the
17  videotape of Rodney Carlson.  I don't know how long it is, but
18  we should be able to complete it, hopefully, by 5 o'clock, the
19  videotape.
20      THE COURT:  I'll have to recess at ten till.  I have a
21  meeting tomorrow -- I'm going to speak at the Pulaski County --
22  let me tell you about tomorrow's schedule.
23      MR. URBANCZYK:  This is your speechifying.
24      THE COURT:  What?
25      MR. URBANCZYK:  This is your speechifying.

Page 211

page 693

1      THE COURT:  Yeah, I'm talking to the Pulaski County
2  Bar at noon.  I plan on recessing at 11:45 and coming back at
3  1:15.  And I have a 9:30 revocation hearing.  It is a
4  semi-emergency, no, it's at 8:30 in the morning.  I plan on
5  being through with it in 15 minutes.  Let's see.  The 2 o'clock
6  telephone conference, it shouldn't last over ten minutes.  So
7  that's where I am.  We can go to the video this afternoon when
8  we finish with this witness or we can wait until in the morning.
9      MR. MORRIS:  It might be better to wait until the
10  morning.
11      THE COURT:  Why don't you wait until we get through
12  and see how much time we have left.
13      MR. FARIES:  The Carlson video is substantially longer
14  than what you were thinking when you add in the defense part.
15  So we would be looking at an hour and a half.
16      THE COURT:  On the video?
17      MR. MORRIS:  Yes.
18      THE COURT:  When you add in theirs?
19      MR. URBANCZYK:  Not mine.  We don't do videos.
20      THE COURT:  We'll decide when we get through here
21  whether to start it or not.
22      (Whereupon, proceedings continued in open court as
23  follows:)
24      THE COURT:  You may proceed when the court reporter is
25  ready.  If it didn't get in the record, it didn't happen.

Page 212

page 694

1      MR. MORRIS:  We would move into evidence Exhibit No.
2  285.
3      MR. URBANCZYK:  No objection.
4      THE COURT:  Admitted.
5      MR. URBANCZYK:  I think that's the same as our 220.
6  But no objection.
7      THE COURT:  Admitted.  Same as what?  220?
8      MR. URBANCZYK:  Defense Exhibit 220, I believe, Your
9  Honor.
10      (Plaintiff Exhibit 285 received in evidence.)
11      MR. MORRIS:  May I have the ELMO?
12      COURTROOM DEPUTY:  Yes.
13             REDIRECT EXAMINATION
14  BY MR. MORRIS:
15  Q.  Mr. Victoria, the jury may have already seen this, but I'd
16  like to show it to you, which is an amendment to the pending New
17  Drug Application for the approval of Prempro, dated December 15,
18  1994.  And just so we're clear about the Prempro pivotal trial,
19  the Prempro pivotal trial lasted one year.  Correct?
20  A.  Yes.  The study was to treat patients for one year in
21  duration.
22  Q.  And that's the one that is referenced in the Prempro label.
23  Correct?
24  A.  That's correct.
25  Q.  And in analyzing the five cases of breast cancer that it

Page 213

page 695

1  mentions in the label, the researchers that were doing the work
2  on that looked at a description of the breast cancer cases.
3  Isn't that correct?
4  A.  That's correct.
5  Q.  And they described each one of them.  The first one was a
6  55-year-old woman in the treatment group, and her pretrial
7  mammogram was normal, and in the investigator's opinion, the
8  carcinoma was not drug related.  Correct?
9  A.  That's correct.
10  Q.  The second woman was a 51-year-old woman, and she had a
11  biopsy that revealed infiltrating ductal carcinoma, and she had
12  a mastectomy, and it was the investigator's opinion that the
13  carcinoma was not drug related.  Correct?
14  A.  That's correct.
15  Q.  And then with the third lady, she was 57, and her
16  malignancy was suspected on mammography, and a biopsy revealed
17  an infiltrating ductal carcinoma.  A modified radical mastectomy
18  was performed.  In the investigator's opinion, the carcinoma was
19  possibly drug related.  Correct?
20  A.  That's what the investigator indicated, yes.
21  Q.  And then there are two additional patients who had
22  post-study breast carcinomas, and they talk about one who was
23  49, and that was not drug related, but then there was another
24  woman -- and I don't know if this is the same one, but this
25  woman in treatment group B, and the investigator believed that

# EXHIBIT 32

Page 1

page 1774

1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
2                  WESTERN DIVISION
3  IN RE: PREMPRO PRODUCTS LIABILITY   MDL No. 1507
4                    No. 4:03CV01507

5          * * * * * * * * * *
   DONNA SCROGGIN,
6          Plaintiff,     Individual Case
      v.               No. 4:04CV01169 WRW
7  WYETH and its divisions; PHARMACIA
   & UPJOHN COMPANY LLC; WYETH
8  PHARMACEUTICALS, INC.; and ESI LEDERLE,
           Defendants.
9

10  Friday, February 15, 2008 - Little Rock, Arkansas - 8:45 a.m.

11
12        TRANSCRIPT OF JURY TRIAL - VOLUME 10
11     BEFORE THE HONORABLE WILLIAM R. WILSON, JR.,
13        UNITED STATES DISTRICT JUDGE, and a jury
12
13  APPEARANCES:
14
16  On Behalf of the Plaintiff:
15
17     MR. ERIK BRETT WALKER
16       Hissey, Kientz & Herron, P.L.L.C.
18         16800 Imperial Valley Drive
19          Suite 130
19          Houston, Texas  77070
20     MR. JAMES A. MORRIS, JR.
21  MR. STEVE M. FARIES
22       Brent Coon & Associates
23         11614 Bee Caves Road, Suite 220
22       Austin, Texas  78738
23                    [CONTINUED]
24
25

Page 2

page 1775

1  APPEARANCES CONTINUED:
2  On Behalf of the Wyeth Defendants:
3     MR. F. LANE HEARD, III
      MR. STEPHEN L. URBANCZYK
4     MR. RICHMOND MOORE
         Williams & Connolly
5         725 Twelfth Street, N.W.
          Washington, D.C.  20005-5901
6
   MS. LYN PEEPLES PRUITT
7     Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
       425 West Capitol Avenue, Suite 1800
8     Little Rock, Arkansas  72201-3525
9
10  On Behalf of the Upjohn Defendants:
11
   MS. ELIZABETH ROBBEN MURRAY
12     Friday, Eldredge & Clark
       Regions Center
       400 West Capitol Avenue, Suite 2000
13     Little Rock, Arkansas  72201-3493
14
   MR. CHARLES P. GOODELL, JR.
15     Goodell, DeVries, Leech & Dann, LLP
       Commerce Place
16     One South Street
       Suite 2000
17     Baltimore, Maryland  21202
18  MS. PAMELA YATES
   Kaye Scholer LLP
19     1999 Avenue of the Stars
       Suite 1700
20     Los Angeles, California  90067-6048
21
22
23
24     Proceedings reported by machine stenography and displayed
   in realtime; transcript prepared utilizing computer-aided
25  transcription.

Page 3

page 1776

1       I N D E X - VOLUME 10 (February 15, 2008)
2
3  WITNESSES
   FOR THE DEFENDANT WYETH:  Direct  Cross  Redirect  Recross
4  GINGER CONSTANTINE    1778   1856   1963
5
   EXHIBITS:              RECEIVED:
6  Defendant Wyeth Exhibit 117 and 43.....................1855
   Defendant Wyeth Exhibit 1564...........................1860
7  Plaintiff Exhibit 519-R...............................1926
   Plaintiff Exhibits 8032-A, 6741, 3304, 4703, 6735, 4764.1953
8  Plaintiff Exhibit 337.................................1957
   Plaintiff Exhibit 8021................................1960
9  Plaintiff Exhibits 8022-A, 8023-A, 8024-A, 519-R, 1567,
   and 7871..............................................1962
10  Defendant Wyeth Exhibit 260..........................1974
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

page 1777

1     (Proceedings continuing at 8:45 a.m.; jury present.)
2        THE COURT:  Good morning.  Be seated, please.
3        Hearts and minds?  Any impurities, raise your hand if there
4  is, with respect to this case only.  No hands.
5     Lawyers come up, please.
6     (Proceedings at sidebar as follows:)
7        THE COURT:  I just learned last night that Dr. Hagans
8  is my wife's doctor.  As a matter of fact, she has an
9  appointment with him next week.  I didn't know that.  I'm not
10  going to do anything.  I wanted to let you have that information
11  and let you smoke it in your pipe.  If you want to file
12  anything, enter a motion, that will be fine.
13        MS. PRUITT:  Thank you, Judge.
14        MS. MURRAY:  Thank you.
15     (Proceedings continuing in open court as follows:)
16        THE COURT:  Next witness, please.
17     I have a question from a juror, wants to know if we're off
18  on Monday.  Well, I'm not going to be here.  Y'all are free to
19  hang around the courthouse if you want to.  No.  We'll be off
20  Monday.  And I understand the jury needs a little more than an
21  hour for lunch.  I'll give you an hour and 15 or 20 minutes.  Is
22  that enough?
23     All right.  Next witness.
24        MR. URBANCZYK:  Good morning, Your Honor.  Wyeth calls
25  Dr. Ginger Constantine.

Page 5

page 1778

1    THE COURT:  Come around if you will, please, ma'am.
2    GINGER CONSTANTINE, DEFENDANT WYETH WITNESS, DULY SWORN
3    THE COURT:  Doctor, if you will take the witness stand
4    over here, please.  And speak right into the mike.
5        DIRECT EXAMINATION
6    BY MR. URBANCZYK:
7    Q.  Good morning, Doctor.  Would you start by telling the jury
8    your name, please.
9    A.  Ginger Constantine.
10   Q.  Is that on?
11   A.  Hello?
12   Q.  Yeah.  And your name is?
13   A.  Ginger Constantine.
14   Q.  What is your profession?
15   A.  I am a physician.  I'm a rheumatologist by training, and
16   I'm the vice president of women's health and bone repair
17   clinical research for Wyeth.
18   Q.  So you work at Wyeth?
19   A.  I work at Wyeth.
20   Q.  And where is your office located?
21   A.  In Collegeville, Pennsylvania, a small town outside of
22   Philadelphia.
23   Q.  How long have you worked for Wyeth?
24   A.  About 12 years now.
25   Q.  Do you live in Pennsylvania?

Page 6

page 1779

1    A.  I do.
2    Q.  Do you have family?
3    A.  We do.
4    Q.  What's your family?
5    Q.  What is my family?
6    Q.  Yeah.
7    A.  They are great.  I have a husband, who is also a physician.
8    And we have two children, a 15 year old and a 19 year old boy.
9    Q.  You mentioned you were a rheumatologist as a doctor.  Are
10   you board certified in that specialty?
11   A.  Yes.  I'm board certified in internal medicine and
12   rheumatology.
13   Q.  Tell us what rheumatology is.
14   A.  Rheumatology is the study of bone and joints, things such
15   as osteoporosis, osteoarthritis, diseases such as autoimmune
16   diseases, rheumatoid arthritis, osteoarthritis, lupus, you may
17   have heard of connective tissue diseases, a host of diseases.
18   Q.  Where did you go to medical school, Doctor?
19   A.  I went to Temple University.
20   Q.  And did you have additional medical training after medical
21   school?
22   A.  I did.
23   Q.  Tell us about that.
24   A.  I did an internship and a residency and then a chief
25   residency at Hahnemann University, which is now Drexel, in

Page 7

page 1780

1    Philadelphia.  Then I went on into some basic research called
2    bench research at Thomas Jefferson University.
3    Q.  Did you ever practice medicine?
4    A.  Yes.  I practiced medicine for ten years.
5    Q.  Tell us about the nature of your practice when you
6    practiced medicine.
7    A.  It was predominantly about a hundred percent rheumatology,
8    mostly adults.  Occasionally I would take care of a child if one
9    of my patients would ask me to see one of their children, but it
10   was predominantly adult rheumatology.
11   Q.  In that practice, did you become familiar, either in
12   medical school or your practice, with hormone therapy?
13   A.  Yes.
14   Q.  And what familiarity did you have with it, or did you use
15   it, or how did you interact with it?
16   A.  Well, we certainly learned a lot about estrogen and
17   estrogen therapy in medical school.  It's a wide area of
18   education.  And then in my practice, I was treating patients
19   with osteoporosis.  That's one of the diseases that falls under
20   the area of rheumatology.  And at the time that I was in
21   practice, there really wasn't any approved agent except for
22   estrogen Premarin and then eventually Prempro.  While I was in
23   practice, some additional agents came onto the market for the
24   treatment of osteoporosis.
25   Q.  Did you counsel your patients about hormone therapy?

Page 8

page 1781

1    A.  I did.
2    Q.  Did you prescribe hormone therapy?
3    A.  I did not.  I recommended hormone therapy, but I didn't
4    prescribe, because women really needed to have mammograms, good
5    breast exams, and internal exams.  And sometimes they needed to
6    have endometrial biopsies, which are procedures as a
7    rheumatologist that I did not perform in my office.
8        And the other thing is, it is very important when a woman
9    has her mammograms to make sure that you compare them to
10   previous mammograms, so that I would recommend that she see
11   either her OB/GYN or primary care physician, whichever she would
12   receive her care from, so that they could have consistent
13   follow-up and be able to do these comparisons.
14   Q.  Now, this chart we have up here, Doctor, says that you were
15   in the position you are in now from approximately 2000 to
16   present.  But you first started working at Wyeth on a part-time
17   basis in 1993.  Correct?
18   A.  Yes.  I believe '92 or '93.
19   Q.  Why did you decide to go from your practice of treating
20   patients to working for a pharmaceutical company?
21   A.  I loved clinical medicine.  I loved taking care of
22   patients.  But we also had two small children at the time, and I
23   was in solo practice.  I was the kind of physician who worked
24   seven days a week.  I did not have an associate.  So for family
25   life, I decided to go into pharmaceuticals.  The other thing

Page 9

page 1782

3 1  that I was hoping was at the time, we really needed -- the
4 2  number of products that we had to take care of osteoarthritis
5 3  and osteoporosis were very, very limited.  There's been a huge
6 4  increase in the number of agents that we've had over the last 15
7 5  years, fortunately.  So when I was in practice, I really wanted
8 6  to dedicate myself to try to find new medicines, which is what I
9 7  do.
10 8  Q.  In what division is the women's healthcare division that
11 9  you refer to here?
12 10  A.  I work in what's called clinical research and development.
13 11  Pharmaceutical companies are set up in different ways.  There's
14 12  -- and not all pharmaceutical companies are set up in the same
15 13  manner.  But Wyeth is set up so we have what's called a medical
16 14  affairs group and a clinical research and development group.
17 15  And I'm currently in the clinical research and development
18 16  group.
19 17  Q.  What is the function of that group?
20 18  A.  To develop new prescription medications.
21 19  Q.  When you took over the position that you did in the year
22 20  2000, did you become responsible for hormone therapy products,
23 21  including Premarin and Prempro?
24 22  A.  Yes, I did.
25 23  Q.  And in that position, did you become familiar, or did you
26 24  become additionally familiar with the literature and the science
27 25  relating to those products?

Page 10

page 1783

3 1  A.  I did.  And I certainly had known a lot of the science.
4 2  But I hadn't realized, when I was in practice, how much
5 3  additional science there was and how much additional information
6 4  there was.  And it really was massive.  And it took me a long
7 5  time in this job to try and master that.  I'm still trying to do
8 6  that.
9 7  Q.  And the effort to become familiar with these products, did
10 8  that include also becoming familiar with the labels?
11 9  A.  Yes.
12 10  Q.  And did you do that as part of your job, or did you do that
13 11  for litigation?
14 12  A.  I missed the last part of your question.
15 13  Q.  Did you become familiar with these subject matters, the
16 14  literature, the labels, the science, as a part of your job or to
17 15  testify in court?
18 16  A.  Oh, as part of my job.
19 17  Q.  Doctor, I would like you to give the jury a brief preview
20 18  of what you will be testifying about today.  You and I worked on
21 19  these charts.  And if you would just briefly tell the jury what
22 20  it is you want to cover today.
23 21  A.  There are four major areas that I would like to go through.
24 22  And that is that Wyeth has conducted, supported, and monitored
25 23  scientific studies that have examined hormone therapy and breast
26 24  cancer risk and that our labels do accurately reflect that
27 25  science that was described, and that the cancer -- and that the

Page 11

page 1784

3 1  breast cancer risk is based on science, and all risks in labels
4 2  should be based on science.
5 3      Also, number three is that the Women's Health Initiative,
6 4  or WHI, confirmed what was already known about the extent of
7 5  breast cancer associated with hormone therapy, certainly with
8 6  regard to the combined therapy, and that Prempro and Prempro
9 7  still remain -- I'm sorry -- Premarin and Prempro still remain
10 8  very important options for women.
11 9  Q.  Going to the first point, Doctor, can you give the jury a
12 10  sense of the amount of studies and research that has been done
13 11  generally on these products?
14 12  A.  There has been a massive amount of research in estrogen and
15 13  estrogen and progestins.  It's been -- there are just so many
16 14  areas to look at.  Remember that estrogen binds to what we call
17 15  an estrogen receptor.  And estrogen receptors are found
18 16  throughout the body.  They are found in just about every tissue
19 17  of the body.  So the area of research and the area of study is
20 18  just extensive.
21 19  Q.  We have put together a slide, Dr. Constantine.  Can you
22 20  just briefly review that for the jury and explain what is being
23 21  said here?
24 22  A.  There are over 3,000 scientific articles on Premarin and
25 23  Prempro.  Now, these aren't all breast cancer articles.  They
26 24  look at different areas as well.  There's over 60,000 articles
27 25  in the medical literature about hormone therapy, so that

Page 12

page 1785

3 1  wouldn't just be Premarin and Prempro.  That could be other
4 2  estrogens.  There are a lot of other estrogens and progestins
5 3  currently on the market and have been on the market for quite a
6 4  while, and Wyeth has conducted over 180 studies.  We either have
7 5  conducted or supported them.  And this has involved over 180,000
8 6  women, 600 scientists, at over 250 institutions or universities.
9 7  And they are published in over 50 different medical journals.
10 8  Q.  To be clear, to reiterate a point that you made, these are
11 9  not all about breast cancer.  We're going to get to those in a
12 10  minute.
13 11  A.  That's correct, absolutely correct.  This is not all about
14 12  breast cancer.
15 13  Q.  Has -- to your knowledge, has the FDA made any statements
16 14  about the amount of studies that have been done on hormone
17 15  therapy?
18 16  A.  Yes.  They also agree that there is a great deal of
19 17  information.
20 18  Q.  Are you familiar with this statement?
21 19  A.  Yes.  This is a quote that they say, the most extensively
22 20  researched product in the United States.
23 21  Q.  This is from PX 304.  This is a statement made in the
24 22  context of a Prempro letter.  But this is about Premarin; is
25 23  that right, or do you know?
26 24  A.  Yes, yes.  That's my recollection.
27 25  Q.  We've been talking about the amount of studies that have

Page 13

page 1786

3  1   been done.  Did Wyeth -- what kind of roles did Wyeth play in
4  2   the various studies about Premarin and Prempro hormone therapy?
5  3   A.  There are different ways that a pharmaceutical company can
6  4   be involved in supporting research or doing studies.  One is to
7  5   conduct a study.  Another is to do what we call support --
8  6   there's different kinds of support.  Either you can give pills.
9  7   You can give money.  You can give something called an
10  8   unrestricted grant to an investigator or to a university, or you
11  9   can monitor studies.  Sometimes we sit on committees to help
12  10   plan studies.  Sometimes we use our scientific knowledge or our
13  11   databases to help investigators in universities.  So there are
14  12   multiple ways and multiple type of studies that we can help to
15  13   support.
16  14   Q.  When we say that Wyeth conducted, what do we mean by Wyeth
17  15   conducted studies?  How does Wyeth conduct a study?
18  16   A.  Well, if you think of a conductor, like a conductor in an
19  17   orchestra, that's basically what we are.  We are the conductor.
20  18   We write.  We decide that there's a certain question that needs
21  19   to be answered.
22  20      So say we want to know if there's an increased incidence of
23  21   breast cancer.  So we'll decide what the best way of doing a
24  22   study such as that is.  So say we want to look at vasomotor
25  23   symptoms.  We'll decide the best type of study to do, to see if
26  24   our product works, because you don't want to give somebody
27  25   something that doesn't work.

Page 14

page 1787

3  1      So we write the rule book, which is called a protocol.  And
4  2   it's a very specific guideline on how to carry out a study.  And
5  3   then we go out and we find investigators or sites, doctors,
6  4   university centers, and we ask them if they would like to
7  5   participate, if they think that they have patients who would
8  6   like to participate in our studies.  Obviously, you can't force
9  7   people to participate.  They have to be informed.  And then let's say we
10  8   have an informed consent and know what they are doing.
11  9      So we basically orchestrate the protocol.  And oftentimes
12  10   we'll work with outside investigators or doctors to help us get
13  11   that protocol or the rule book correct.  And then we go to
14  12   different sites.
15  13      So, for example, I'm doing a study now on osteoporosis
16  14   where I have over 200 sites, meaning doctors' offices and
17  15   hospitals around the world.  So the doctors call their patients
18  16   and see if their patients want to participate in the study.  It
19  17   wouldn't be ethical for me to open my door and say, Why don't
20  18   you come on in?  I'm going to do a study on you.  I would know
21  19   the result.  I would know the patient.  So this way I'm blinded
22  20   to the result and the patients.  And this way the investigator
23  21   will perform the study.  And then we help to collate that data
24  22   with the investigator's review of that.
25  23   Q.  Mr. Victoria was here earlier and I think made a like
26  24   comment to the fact that Wyeth doesn't conduct studies in the
27  25   sense we don't have 10,000 patients down in the basement of

Page 15

page 1788

3  1   Wyeth.
4  2   A.  No, we don't.  But we definitely conduct studies.  He may
5  3   never have, because he's not in that department.  But I have
6  4   conducted many studies.
7  5   Q.  Do you agree, Dr. Constantine, that it is Wyeth's
8  6   responsibility to conduct, support, or monitor research and
9  7   studies on the safety and efficacy of its products?
10  8   A.  Yes, absolutely.
11  9   Q.  And in your opinion, has Wyeth fulfilled that
12  10   responsibility with respect to Premarin and Prempro?
13  11   A.  Yes, it has.
14  12   Q.  Doctor, we've talked about the different types of studies
15  13   that doctors and scientists can do to evaluate something like
16  14   the risk of breast cancer and hormone therapy use.  And at
17  15   opening statement I promised an explanation of the various kinds
18  16   of studies.  But I'm going to ask you to do that since I'm not
19  17   the expert.  And we've prepared this chart together.  Tell the
20  18   members of the jury what a case control study is briefly.
21  19   A.  A case control study is what's considered an observational
22  20   study.  So the kind of study I just described to you, where the
23  21   doctors go and get their patients, you are going to see that in
24  22   a minute.  That's called a randomized clinical trial.  A case
25  23   control study is something where you are just observing what's
26  24   going on in the population.  You are not giving patients pills.
27  25   You are not affecting their treatment.  You are just observing

Page 16

page 1789

3  1   what's going on in the general population.
4  2      So let's use our breast cancer risk for example.  Say we
5  3   want to look at the risk of breast cancer.  We may go to a
6  4   hospital, and we go to their pathology department, and we look
7  5   and say, we want to find a thousand patients who have had a
8  6   diagnosis of breast cancer.  And we get that information on a
9  7   thousand patients from that hospital.  And then let's say we
10  8   need to compare them to somebody, because we know there's a
11  9   background incidence of breast cancer in the general population,
12  10   unfortunately.  So let's compare them to a matched population.
13  11   So we want to study women who came into that hospital for some
14  12   other reason.
15  13      For example, there's a study in the literature that went to
16  14   the hospital and looked at all of the mammogram reports or all
17  15   of the histology, the path reports, for breast cancer patients.
18  16   And then they compared them to other patients, what they call
19  17   control patients.  And you go back.  And then you look at the
20  18   histories to see if maybe people -- the people who got breast
21  19   cancer were more likely to have taken hormone therapy or not.
22  20   Now, you can't affect what the patient had taken.  You are just
23  21   observing what happened in a population.
24  22   Q.  Dr. Constantine, Dr. Austin told us that a well done case
25  23   controlled study needs at least three things.  It needs enough
26  24   women, number one, using a formulation that you want to test
27  25   and, three, for enough years; that they have patient use, enough

page 1790

1 patients, the right formulation, for enough years.  Do you agree
2 with him essentially?
3 A.  I think that's part of it.  You can't predict -- we can't
4 say, you know, Mrs. X had to have taken this product.  We're
5 observing what those patients took.  They already,
6 unfortunately, have gotten breast cancer.  So we're going back
7 and looking at their medical histories.  We're looking
8 backwards.  So we can't predict what they would have taken.  But
9 those are components of something that would be very nice to
10 have.
11 Q.  If Dr. Austin's criteria apply, could Wyeth or anyone have
12 performed a well done case controlled study on Prempro and
13 breast cancer in the eighties or early nineties?
14 A.  Well, Prempro wasn't approved until 1995, the end --
15 December of 1994.  So, obviously, you can't study the effect of
16 Prempro if it hasn't been on the market.  People would have had
17 to have taken that agent and then have developed breast cancer,
18 and then you go to the hospital and check what those biopsy
19 reports stated and then go back and get their medical history.
20 So you can't go backwards on something that doesn't exist.
21 Q.  Has Wyeth, nevertheless, conducted or supported case
22 controlled studies on hormone therapy?
23 A.  Absolutely.
24 Q.  And have others?
25 A.  Yes.  There are many case control studies.  There's a lot

page 1791

1 of case control studies.
2 Q.  What's the next kind of study?
3 A.  That's a cohort study.  And this, again, is observational.
4 Sometimes it is tough to understand the distinction.  And some
5 studies aren't quite clear between one and two here, these two
6 studies.  So I kind of like to link these together.  They are
7 observational.  It's what's going on in the general population.
8 So a cohort study, basically what you are doing is, say I'm
9 in my practice and I want to do a study to see what will happen
10 to somebody who takes hormone therapy.  And I want to compare
11 them to other people, because you always have to do a
12 comparison, because we know that breast cancer occurs in a
13 general population.
14 So let's say I look at a hundred people who are taking
15 hormone therapy, and I match them maybe on age and weight and
16 maybe family history, some other factors, to people who are not
17 taking hormone therapy.  And I just watch what they do.  I watch
18 what happens over time.  It's called a cohort.  Each one of
19 these is a cohort, and you are following them perhaps going
20 forward.  And I can't affect, as a pharmaceutical company or
21 even as the doctor, what they are doing, because I'm doing a
22 cohort study.  I'm just watching what happens to them.
23 Now, oftentimes patients will start an agent and stop it
24 and change it or go to another dose.  And that's very common.
25 And patients should have the right to do that.  We shouldn't

page 1792

1 make them, say, well, you have to take this dose, because you
2 signed up for this study.  I mean, that would be unethical.  So
3 patients have to be able to do what's best for their health with
4 their doctors.  But that would be -- those two are called
5 observational studies.
6 Q.  What are one or two of the largest cohort studies that have
7 studied postmenopausal women, breast cancer, and hormone
8 therapy?
9 A.  There have been several.  There's Leisure World.  There's
10 Nurses' Health.
11 Q.  And has Wyeth supported those cohort studies?
12 A.  Yes.  And there are many that have not been supported by
13 Wyeth.  There's a lot of cohort studies.
14 Q.  Now, you've talked a little bit about randomized control
15 trials -- clinical trials.  Can you just briefly summarize what
16 they are?
17 A.  That's what I talked about, where we're the conductor, and
18 you have -- when it is randomized, it means there could be a
19 placebo arm.  So let's say we're giving Premarin or Prempro, and
20 there's a placebo.
21 Q.  A placebo is a sugar pill?
22 A.  That's a common term for it.  And what we have to do is we
23 have to match those pills.  So we not only manufacture the
24 active pill, but we have to manufacture the placebo to look just
25 like that.

page 1793

1 And manufacturing these things is not easy.  This is not
2 just, well, I'm going to throw some pills in a bucket and send
3 them to the doctor.  What happens is we have to do them in
4 blocks of randomization, because when you are doing a study, you
5 want to make sure that the patients who come into the clinic,
6 that say Mrs. X gets the placebo; Mrs. Y, who comes in next,
7 gets the active drug.  And you rotate back and forth.  And this
8 is all done with specific packaging.  Numbers are kept.
9 Q.  Does the patient know what he or she is getting?
10 A.  No.
11 Q.  Does the doctor?
12 A.  Now, it is a randomized double-blind trial.  That means the
13 patient doesn't know what they are getting, and the doctor
14 doesn't know what they are getting.  And the whole reason for
15 that is because you don't want any bias.  You don't want people
16 or the doctor to think that, well, I'm just going to ignore this
17 side effect, because I think it's the drug, or I don't think
18 that's a side effect, because she's on placebo.  So to keep the
19 study pure and honest, we keep it what we call a double-blind
20 randomized placebo controlled trial.
21 Q.  And has Wyeth conducted or supported randomized controlled
22 trials?
23 A.  Yes.  That's predominantly what I do.
24 Q.  Have others done those trials?
25 A.  Many.

Page 21

page 1794

3   1   Q.   And the last is a meta-analyses.  And we're going to talk a
4   2   lot about meta-analyses today for the sake of the jury's time.
5   3   Tell us about those.
6   4   A.   What a meta-analysis does is an investigator will pose a
7   5   specific question.  So remember, whenever you do a study, you
8   6   have a question, you want an answer to a question, or it's
9   7   what's called a hypothesis.  So here a doctor or investigator
10  8   may say, I want to know if all these studies in the world, if we
11  9   combine them all and look at the same method pretty much in the
12  10  studies, is there an increased risk of breast cancer?  So a
13  11  meta-analysis kind of compiles many of these studies that are
14  12  done into either one number, or you will see some examples of
15  13  meta-analyses.
16  14  Q.   Has Wyeth conducted or supported meta-analyses?
17  15  A.   Yes.
18  16  Q.   And have others?
19  17  A.   Yes.
20  18  Q.   Doctor, have you helped prepare a slide that lists some of
21  19  the studies that Wyeth has conducted or supported that examined
22  20  hormone therapy?
23  21  A.   Yes.
24  22  Q.   And is this the slide?
25  23  A.   Yes.
26  24  Q.   Now, this is very specifically identified as studies that
27  25  examined hormone therapy in breast cancer.  Are every one of

Page 22

page 1795

3   1   these what some people might call breast cancer studies?
4   2   A.   No.
5   3   Q.   Explain what you mean when you say they examined breast
6   4   cancer.  And just give a brief overview of the different types.
7   5   A.   Well, the observational studies can pose the question
8   6   looking at a risk of breast cancer.  Sometimes an investigator
9   7   may want to look at the general safety of a product.  And with
10  8   HRT, whenever you say I'm going to look at the safety, you are
11  9   looking at breast cancer as well.  So the observational studies,
12  10  you can pose that as the objective or a question.
13  11      In a randomized clinical trial, you can't say, I'm just
14  12  going to study breast cancer.  When we do a randomized clinical
15  13  trial, we're giving somebody medication.  So we're putting
16  14  somebody on a medicine that they would not normally have been
17  15  taking.  So we have to be providing that person with a benefit.
18  16  We can't just say, take these pills.  I want to know if you are
19  17  going to get breast cancer.  You know, first of all, who is
20  18  going to sign up for that study?  And, you know, second of all,
21  19  it wouldn't be ethical.
22  20      So when we do a study like that, the first question has to
23  21  be a real question.  Am I protecting your endometrium?  Am I
24  22  treating your vasomotor symptoms, your hot flushes?  Am I
25  23  preventing osteoporosis?  And, in addition, we're looking at
26  24  breast cancer.
27  25  Q.   Okay.  Doctor, we've talked in this trial earlier about a

Page 23

page 1796

3   1   study that came out in 1976 by Dr. Hoover that raised the
4   2   possibility of an association between estrogen and breast
5   3   cancer.  Did Wyeth -- what did Wyeth do, among other things, in
6   4   response to that issue?
7   5   A.   Wyeth -- you know, this was a long time ago.  But Wyeth
8   6   looked at multiple things that they needed to do to try and get
9   7   the answer and to try and figure out whether the finding was
10  8   real.  You know, we often know that sometimes you will see a
11  9   study, and you will hear one result; you hear a study, you will
12  10  hear another result.  And that's why it's important to do
13  11  multiple studies and in multiple methods too.
14  12  Q.   The jury has seen Defendant's Exhibit 117.  You are
15  13  familiar with the fact that in 1978 Wyeth formed -- Wyeth's
16  14  predecessor, Ayerst, formed a committee on Premarin and breast
17  15  cancer?
18  16  A.   Yes.
19  17  Q.   And you have reviewed the records of this committee?
20  18  A.   I have.
21  19  Q.   And what were the initial areas of concentration of this
22  20  committee?
23  21  A.   They looked at the Hoover study.  Then they decided that
24  22  they needed to look at some different areas, such as determining
25  23  the status of government studies.  So we know that the NIH and
26  24  the CDC, the Centers for Disease Control, often fund studies.
27  25  So governmental studies are very, very good to look at.

Page 24

page 1797

3   1   Department of Defense may fund something.  So they wanted to
4   2   look at the status of government studies.  And sometimes things
5   3   haven't yet been published, so they are trying to get that
6   4   information.
7   5      They wanted to -- there was a study that they were already
8   6   pending -- that they were already planning, and they were
9   7   looking into the decision on whether to go forward with that
10  8   study and preparing a prospective study protocol.
11  9      So they had been looking at these retrospective types of
12  10  studies.  But now they wanted to go and look forward, giving
13  11  somebody medication or following a cohort, following those
14  12  people who were out in the world already taking medication.
15  13     In addition, they looked at a literature review.  They did
16  14  a computer literature search.  And, you know, a computer
17  15  literature search, that doesn't sound like such a big deal.  But
18  16  you have to remember that back in the seventies, a computer
19  17  literature search was a pretty big deal.  And they looked at a
20  18  symposium with experts.
21  19  Q.   Doctor, did the committee follow up on each one of these
22  20  areas?
23  21  A.   They carried out every one of these things.
24  22  Q.   Okay.  This is a chart I showed the jury in opening
25  23  statement.  And I represented this was a time line of the 19
26  24  studies that we've identified here as scientific studies
27  25  conducted or supported by Wyeth examining hormone therapy and

page 1798

1 breast cancer risks.  Is this an accurate depiction of that time
2 line?
3 A.  Yes.
4 Q.  So that includes a study going way back as early as 1959?
5 A.  Yes.  Now, you have to realize that in 1959 Prempro wasn't
6 around, so you couldn't study Prempro in 1959.  Provera or MPA
7 was just being approved at that time.  That was a study that
8 looked back a long time.  So all of these studies look at
9 perhaps different dosage, different formulations, but what
10 people were taking at the time.  The randomized controlled
11 trials looked at what we were marketing or getting ready to have
12 approved.
13 Q.  Okay.  And I see that we have included the WHI itself over
14 here on the right from 1993 to 2004.  Did Wyeth provide support
15 to the WHI?
16 A.  Yes, we did.
17 Q.  We'll get into that a little bit later.  Doctor, are you
18 familiar -- these are the summit of studies that Wyeth conducted
19 or supported that examined breast cancer.  We've talked about a
20 lot of articles in this courtroom.  I'm not sure we've covered
21 all of them.  But how many articles or studies are there in the
22 world's literature on E plus P therapy and breast cancer that
23 predated the publication of the WHI study in July of 2002,
24 studies examining breast cancer and E plus P therapy from the
25 beginning of time until that time?  How many studies are there

page 1799

1 in the literature?
2 A.  There may be more.  But there's about, you know, more than
3 50, about 57, 58.  There may be more than that.  You know, I
4 continue to find studies that I didn't know about way back when,
5 things that may not be in computer databases, before I was born.
6 Q.  You counted 57?
7 A.  I counted about 57.
8 Q.  Now, are all of these about Premarin and Prempro?
9 A.  No.
10 Q.  Just to be sure, I didn't ask you about -- just about
11 Premarin or Prempro.  Are studies about other forms of hormone
12 therapy relevant to the analysis?
13 A.  They are relevant.  If we wanted just to answer the
14 question on Premarin and Prempro, we would want to look at
15 studies of just Premarin and Prempro.  But there's a lot of
16 information to be gained from other products, also estrogen and
17 progestin products.  And many patients, many subjects, don't
18 just take Premarin and Prempro.  They may take other products
19 over time as well.  So it's important to try and look at what
20 the world use of a product is.
21 Q.  And do these 57 studies include case controlled studies?
22 A.  Yes.
23 Q.  Do you have any idea of lots?  A few?  Do you have any idea
24 of how many?
25 A.  About 23.

page 1800

1 Q.  How about cohort studies?  How many different cohort
2 studies are there in that count?
3 A.  I think in this there was about 21.
4 Q.  And meta-analyses?
5 A.  There were probably about six or seven.
6 Q.  We're going to talk -- and randomized controlled trials?
7 A.  About six.
8 Q.  To put this in context, Dr. Constantine, based on your
9 experience, is this a large or a small volume of studies?
10 A.  This is a lot of studies for one combination and one organ.
11 Remember that there are many -- we said there are many estrogen
12 receptors through the body.  So we're also studying effects on
13 many other systems as well.
14 Q.  We said they are not all about Premarin and Prempro.  Are
15 they all conducted in the United States?
16 A.  No.  There are many that have been performed in Europe.
17 There are some very good cohort -- some very good computer
18 system studies in Sweden, and they have a lot of information.
19 Now, they tend to use products other than Premarin and Prempro.
20 They often use some other agents.  So it's sometimes difficult
21 to extrapolate that information.  But we look at it all, and we
22 include it all.  And when we talk to the FDA, we include all of
23 that information in our reports.
24 Q.  Are some of these studies large and some small?
25 A.  Some are large, and some are small.  There are all

page 1801

1 different size studies.
2 Q.  How about duration?  Are there some that study women using
3 short-term and some using it long-term?
4 A.  Yes.
5 Q.  If you define long-term as five years or more,
6 approximately how many of these studies would have looked at
7 women using estrogen plus progestin for longer than five years?
8 A.  Probably about 15, 16, 17, something like that, 17.
9 Q.  Actually, is that the number for ten years, for greater
10 than ten years, 15 to 17?
11 A.  That would be greater than ten, yeah.
12 Q.  Greater than five?
13 A.  Oh, greater than five?  Between five and ten, it would be
14 probably around 20, 30, something like that.
15 Q.  Doctor, we're going to evaluate -- you and I are going to
16 evaluate the literature by looking at meta-analyses.  Correct?
17 A.  Yes.
18 Q.  And we have been talking here in this courtroom a lot about
19 relative risk and confidence intervals.  And I would like, if
20 you would, please, to help us and help the jury out with this
21 from sort of a basic standpoint.  I am showing you what here?
22 A.  You are showing me a page out of an article.  This
23 particular article is by a lady by the name of Trudy Bush, who
24 was at the University of Maryland.  And this is -- each one of
25 these little lines represents one of the studies, say, one of

1 page 1802

2

3 1   these 57 studies that we're talking about.

4 2   Q.   And you and I have extracted, just for demonstrative

5 3   purposes, four different kinds of results from this study.

6 4       And if you wouldn't mind, Doctor, I would like you to come

7 5   down here, if that's all right, Your Honor.  There's a hand-held

8 6   mike here.

9 7       Referring to this --

10 8       THE COURT:  Okay.

11 9       MR. URBANCZYK:  Referring to this and to the board and

12 10  to the screen, would you help the jury with these concepts?

13 11      THE COURT:  Doctor, keep in mind the jury must hear

14 12  and the court reporter must hear what you say, and the rest of

15 13  us would like to.

16 14      THE WITNESS:  Okay.  All right.  Okay.

17 15  BY MR. URBANCZYK:

18 16  Q.   This is the chart?

19 17  A.   All right.  This is the chart.  I don't know if you can

20 18  see.  I don't know if you have a sample article just to show

21 19  what this will look like.  Basically this is a page in an

22 20  article.

23 21  Q.   I'm sorry.  I don't, but I'll get it.

24 22  A.   Each one of these is a name.  So, for example, this is an

25 23  article by a lady by the name of Sellers.

26 24  Q.   Dr. Constantine, I'm sorry.  This is where this comes from.

27 25  A.   Okay.  I need an extra hand.  I'm sorry.  So this would be

1 page 1803

2

3 1   a copy of an article.  It comes in -- maybe this is a monthly or

4 2   a weekly periodical, a journal, that doctors would get in their

5 3   office.  And this has the title of the article:  "Hormone

6 4   replacement therapy and breast cancer, a qualitative review."

7 5       And then as we read through it, basically what she's done

8 6   is she's doing this meta-analysis, where she's taking all these

9 7   studies, and she's looking to see if she can figure out whether

10 8   there's an increased risk or a decreased risk if you look at all

11 9   these studies.  So it is kind of safety in numbers.  You have

12 10  lots and lots of patients in all of these studies.  And each one

13 11  of these is a particular study, all maybe of different durations

14 12  or different sizes.  So this is a reference that you would see

15 13  in the references to each study.

16 14  Q.   This is the chart that we have?

17 15  A.   And this is just blown up from that, just because it would

18 16  be hard for you to see from that.

19 17  Q.   What are we showing on the screen?

20 18  A.   Okay.  So on the screen is a representation of that point.

21 19  Is there a pointer or something?  I'm not tall enough.  You can

22 20  point to it is.

23 21  Q.   I'll do it.

24 22  A.   Okay.

25 23  Q.   I'll be Vanna.

26 24  A.   You are doing a great job, Vanna.  I'll take a point one.

27 25  Q.   Stop laughing.

1 page 1804

2

3 1   A.   I'm sorry.  So basically what you've done is we want to

4 2   give an example of something that has a decreased risk, an

5 3   increased risk, and no increased risk.

6 4   Q.   So we have Gambrell.  What's the next one?

7 5   A.   So you have Gambrell.  Do I need to do something to get

8 6   that up here?

9 7   Q.   Gambrell, Kaufman.

10 8   A.   Then your next one is Kaufman.  You have on the screen

11 9   there the article by Kaufman in 1991.

12 10  Q.   What's the next one?

13 11  A.   Then there's an article by Palmer from 1991 and an article

14 12  from Persson in 1999.  The reason we picked these is this way we

15 13  can have a discussion about increase, decrease, and no increase.

16 14  Q.   So what can we see first?

17 15  A.   All right.  So what you see is the orange dots that we have

18 16  represented here is called a relative risk.  That's sometimes

19 17  referred to as a point estimate.  The relative risk -- and I

20 18  don't know if you can see these kind of darker black dots in the

21 19  article.  This is what the relative risk is.  So you've probably

22 20  heard a lot about a relative risk of 1.24.  And a 1.24 would be

23 21  a number that maybe falls somewhere in here.  Okay?

24 22  Q.   What is a relative risk?

25 23  A.   A relative risk is basically a ratio of one thing, say HRT,

26 24  compared to controls.  And it's basically the ratio of events.

27 25  So if we know that there's an increased risk of breast cancer in

1 page 1805

2

3 1   the background population and we want to know how many breast

4 2   cancers may occur in women who take HRT, what we look at is the

5 3   difference.  It's the ratio of the difference between those two.

6 4   If there is no difference, the lines, they are right on top of

7 5   each other, that would be a one.  So a ones means they are the

8 6   same.  If the line --

9 7   Q.   If the dot?

10 8   A.   I'm sorry.  If the dot is below one -- is this what you use

11 9   for this thing?

12 10  Q.   I don't think so.

13 11  A.   Okay.  Don't worry about it.  If the dot is below one, so

14 12  the orange dot that you have there of Gambrell, now you could

15 13  look at that, and you could say the relative risk here is

16 14  decreased, so he found a decreased risk of breast cancer, which

17 15  is indeed what he reported in his article.

18 16      Let's go to Dr. Kaufman next.  Okay.  Dr. Kaufman -- thank

19 17  you.  Dr. Kaufman is the second dot.  And he has a slightly

20 18  increased relative risk.  Now, if we looked at that we could

21 19  say, well, it looks like that's increased.  But what we want to

22 20  know is whenever we do a study, we know that there's some

23 21  variability.  And if we repeat that study, we're not going to

24 22  get that same exact point.  There's going to be some variability

25 23  in that point.  And what we want to know is what's the

26 24  confidence that if we repeat that study that point is going to

27 25  come out exactly at that point.

Page 33

page 1806

1       And I kind of liken this to a football game, two teams.
2   You have team A and team B.  Team A loses ten games.  Team B
3   loses nine games.  The ratio is that one game.  The relative
4   risk is that difference.
5       Now, if I wanted to root for a team next year, what do I
6   think the confidence that I have in that team winning the next
7   year and the year after is going to be that one game difference?
8   Probably a lot of variabilities.  It depends who the players
9   are.  It depends on the weather.  It depends on whether somebody
10   breaks their leg.
11       Same thing happens in clinical studies.  It depends on what
12   patient you have in there.  It depends what other medical
13   factors that patient has.  So what we do is we try and figure
14   out what the confidence is that we have that that point is
15   accurate.  And we say that within 95 percent confidence
16   interval, 95 percent of the time we're pretty confident that
17   that point is going to fall within this range.
18       So you see a line.  So you see the dot and then the line.
19   Okay?  The tighter that line, the more confident you are,
20   because it is within a smaller range.  It means that you studied
21   probably a larger population of patients.
22   Q.   And what is the significance of the line in relationship to
23   the number one?
24   A.   Okay.  So if the line, if the dot and the line fall below
25   one, you are pretty confident that that's a decrease.  If the

Page 34

page 1807

1   dot and the line fall above, say on Persson, you are pretty
2   confident that that was an increase.  And if the dot and the
3   lines cross one, you say there was no increase and there was no
4   decrease.  They are pretty much the same.  Okay?
5   Q.   Does that mean not statistically significant?
6   A.   No statistically significant difference.  Well, we'll get
7   to that.
8   Q.   Now, stay there, Dr. Constantine, because in Mr. Morris's
9   case, he showed a chart that was attached to a January 2000
10   Wyeth "Dear Doctor" letter.  And does this chart -- does the
11   explanation that you just gave, sort of contained in the
12   explanation there, would you read that to the jury?
13   A.   "This chart summarizes the results of many epidemiologic
14   studies evaluating the potential risk of breast cancer with
15   estrogen or hormone replacement therapy.  The squares," which
16   we've talked about, "indicate the relative risk.  And the lines
17   surrounding each square represent the 95 percent confidence
18   intervals reported in each study.  A statistically significant
19   increased risk is one where the corresponding confidence
20   interval does not overlap one."
21   Q.   So if you were looking at this and counting positive and
22   negative and neutral results, positive increases, decreases, and
23   not statistically significant neutral results, you wouldn't just
24   look at the dots, on what side of the line they were?
25   A.   No.  That would be very inaccurate.  It would be like

Page 35

page 1808

1   looking at our football team and just looking at that one season
2   and then being able to repeat that.
3   Q.   Okay.  So if we were to look at statistically significant
4   increased risks of breast cancer versus either a decrease or no
5   statistically significant risk, we would be looking at this
6   study?
7   A.   Yes.
8   Q.   One?
9   A.   Yes.
10   Q.   Two?
11   A.   Yes.
12   Q.   Three?
13   A.   Yes.
14   Q.   Four?
15   A.   Yes.
16   Q.   Five?
17   A.   Yes.
18   Q.   Six?
19   A.   Correct.
20   Q.   Six out of all these?
21   A.   Right.
22   Q.   And the rest of them are either no statistically
23   significant risk or a reduced risk?
24   A.   Right.
25       MR. MORRIS:  Objection, Your Honor.  That's a complete

Page 36

page 1809

1   absolute mischaracterization.
2       THE COURT:  Just a minute.  Just a minute.
3       Overruled.  You can cover it on cross.
4       MR. MORRIS:  Thank you, Your Honor.
5   BY MR. URBANCZYK:
6   Q.   Did I accurately describe the analysis of these results?
7   A.   Yes.
8   Q.   Would you do it so that the jury understands that that's --
9   that's your analysis?
10   A.   Yes.  So you have one, two, three, four.  I would have to
11   see if that actually touches the line.  Five.  I would have to
12   see if this one touches the line too.  Six, seven.  So it is
13   between seven and eight, depending on -- I can't tell from this
14   graphic whether they are actually crossing or touching the line.
15   If it touches the line, if it hits one, meaning it crosses one,
16   it's not statistically significant.  It means that it's within
17   the realm of going on either side of that line.  When you have a
18   very small risk of something, this is exactly what you see.  If
19   you see things that kind of dance, sometimes you see an
20   increase, sometimes you see a decrease.
21   Q.   Go ahead and take the stand, Doctor.  Thank you.
22       MR. URBANCZYK:  I'm sorry?
23       THE COURT:  Your witness is thirsty.
24       MR. URBANCZYK:  I should have been more gallant.
25       THE WITNESS:  Thank you.

1 page 1810

2

3  1  BY MR. URBANCZYK:

4  2  Q.  You are welcome. Let's talk about some of the

5  3  meta-analyses, Doctor. Tell us what that picture shows.

6  4  A.  So this would be -- we saw an article a minute ago. This

7  5  would be the title of an article by a Ph.D. named William

8  6  Dupont. What he did was he looked -- this article was published

9  7  in 1991. And he looked at 28 studies, at least 75,000 women.

10  8  Q.  This is Defendant's Exhibit 1304. I think you have a copy

11  9  of it, maybe the second, the third document down. And this is

12  10  what we're talking about; right, this exhibit?

13  11  A.  Yes.

14  12  Q.  And what is Dr. Dupont doing?

15  13  A.  So he states that he conducted -- we conducted a

16  14  meta-analysis of the literature concerning breast cancer and

17  15  estrogen replacement therapy.

18  16  Q.  And he depicts the results of those studies?

19  17  A.  He does.

20  18  Q.  And this is in the article?

21  19  A.  This is in the article. So it would be -- I believe this

22  20  one is for the second page of the article.

23  21  Q.  And this is demonstrating what we've talked about?

24  22  A.  Yes.

25  23  Q.  And what does he conclude?

26  24  A.  He says that overall women who took 0.625 milligrams or

27  25  less -- this is estrogen alone -- of conjugated estrogens had a

1 page 1811

2

3  1  risk of breast cancer that was 1.08 times that of women who did

4  2  not receive this therapy. And now he is giving that confidence

5  3  interval. So we know that 0.96 is less than one, so it is not

6  4  statistically significant, because it crosses that line. So it

7  5  goes from less than one to a little bit over one, so it is

8  6  crossing the line. It is not decreased, and it is not

9  7  increased. The combined results from the multiple studies

10  8  provide strong evidence that menopausal therapy consisting of

11  9  .625 milligrams per day or less of conjugated estrogens does not

12  10  increase breast cancer risk.

13  11  Q.  Talk about this meta-analysis.

14  12  A.  So this is another meta-analysis done by a Dr. Colditz.

15  13  And here he's looked at E and E plus P, estrogen and estrogen

16  14  and progestin. They are not all Premarin, and they are not all

17  15  Provera, remember, because a lot of these are observational

18  16  studies. This was published in 1993. They looked at 31

19  17  different studies of at least 50,000 women. I would like to

20  18  just say, the estimates of the women, sometimes it was difficult

21  19  to see -- what I did was take the minimum number of women. It

22  20  may have been more women, but I didn't want to overestimate,

23  21  because sometimes some of the articles may have published on the

24  22  same population.

25  23  Q.  And he has a similar chart on his -- this is what he's

26  24  doing. Tell the jury what he's doing there.

27  25  A.  He combined -- it says his objective was to combine data

1 page 1812

2

3  1  from published reports of the relation between estrogen use and

4  2  breast cancer. We specifically addressed the hypothesis that

5  3  the addition of progestins to estrogen therapy reduces the risk

6  4  of breast cancer. So remember that prior to 1993, there was a

7  5  theory that progestins actually decreased the risk of breast

8  6  cancer. There was some studies that had shown there was -- a

9  7  study that had shown that.

10  8  Q.  Did Wyeth commission this meta-analysis?

11  9  A.  We did. Because, you know, you just can't rely on one

12  10  study, especially when you have risks that are kind of bouncing

13  11  around. So we commissioned him to do this. And this is a

14  12  similar chart. This is the article, and then within the article

15  13  is this chart.

16  14  Q.  I got it. And what is his conclusions?

17  15  A.  And his conclusion basically is that the data on the use of

18  16  estrogen plus progestins combined from four studies indicate

19  17  that the risk is not reduced and that the overall relative risk

20  18  is 1.13. So what he did in this study was he pulled out the

21  19  estrogen and progestin studies. So although he looked at 31,

22  20  they certainly were not all estrogen and progestin.

23  21  Q.  And what was his conclusion?

24  22  A.  "Although these results exclude a large effect of hormone

25  23  therapy on the risk of breast cancer, we are unable to rule out

26  24  some risk associated with current or long-term estrogen use."

27  25  Q.  And this was supported, as you say, by Wyeth?

1 page 1813

2

3  1  A.  Yes, it was.

4  2  Q.  Tell us about the next one.

5  3  A.  This is another meta-analysis by Valerie Beral. And she

6  4  had both estrogen and estrogen and progestin articles in her

7  5  meta-analysis. This was published in 1997. She looked at 51

8  6  studies of at least 160,000 women.

9  7  Q.  What was she attempting to do?

10  8  A.  The relation between the risk of breast cancer and the use

11  9  of hormone therapy has been investigated in many epidemiologic

12  10  studies. The Collaborative Group on Hormone Factors in Breast

13  11  Cancer -- that's the name of her group -- has brought together

14  12  and reanalyzed the worldwide data on this topic.

15  13  Q.  And what does she find?

16  14  A.  And she found that the relative risk was 1.35 for women who

17  15  had used HRT for five years or longer. So now she's doing a

18  16  subgroup. The average duration of use in this group was about

19  17  11 years. So that 1.35 here would be statistically significant.

20  18  So that relative risk is on the upside of one.

21  19  Q.  What about this one? This is the one we talked about, I

22  20  think, just briefly before. Tell us about this one.

23  21  A.  This was the Bush meta-analysis that we put up there as the

24  22  example. She looked at both estrogen and estrogen with

25  23  progestin. This was published in September of 2001. She looked

26  24  at 45 estrogen studies and 20 E plus P. So now, as time is

27  25  going on, progestin is being used more. So as time goes on,

Page 41

page 1814

1 they can look at more use of progestin.

Q.   And what was she attempting to do?

A.   To assess whether recent epidemiologic evidence supports an association between the use of estrogen replacement therapy or hormone replacement therapy and the risk of breast cancer.

Q.   And this is the chart that we've been discussing; correct, Doctor?

A.   Correct.

Q.   If you look for findings of a statistically significant decreased risk -- those are the two on the chart, do you agree, that show a statistically significant decreased risk?

A.   That's correct.

Q.   If you look for a statistically significant increased risk, are those the two?

A.   That's correct.

Q.   And the rest you would characterize as what?

A.   Being neutral and not an increase, not a decrease, fairly similar.

Q.   The dots are on one side of the line or the other.  But is it the confidence interval?

A.   If it crosses that one line, it means that by chance it could be either on one side of the line or the other side of the line, confidence --

Q.   So is this an accurate reflection then of what that line, what that analysis was, of the E plus -- 20 E plus P studies?

Page 42

page 1815

A.   Yeah.  She found a significant risk of about 10 percent, less than one; about 80 percent, they were not statistically significant; and 10 percent of greater than one.

Q.   And what was her conclusion?

A.   "Although a small increase in breast cancer risk with hormone therapy or an increased risk with long duration, 15 years or more, cannot be ruled out, the likelihood of this must be small, given the large number of studies conducted to date."

Q.   This was a study that was also supported by Wyeth?

A.   As well as the Department of Defense.

Q.   Doctor, we have gone through the meta-analyses and examined many, many different studies.  I know there was some overlap.  Some of the meta-analyses studied the same study, but many, many studies.  What did those studies collectively say about the relationship between hormone therapy and breast cancer as of 2001?

A.   As of 2001, that if there was an increased risk, that the risk was quite small.

Q.   Why did so many of the studies go either side of the line or within that, around the line?  Why is that?

A.   Because when we have a very small risk, it's very hard to detect, especially with something that occurs commonly in the population.  And, unfortunately, breast cancer is a fairly common occurrence.  So to detect a difference in the incidence of breast cancer in the population can be very difficult to do.

Page 43

page 1816

Q.   And if it's a very small risk, if it dances around one, some studies are going to show an increase.  Some are going to show a decrease.  I mean, that's the data.  The data is the data.

Q.   Does this mean that the studies were inadequate?

A.   No, no.

Q.   Does it mean that the risk was completely unknown?

A.   No.

Q.   What does it mean?

A.   Well, it means that we've identified a potentially increased risk and that that risk is a small risk, and it was somewhere between 1.3 to 2.  Now, we didn't say it was .8, or whatever Dr. Gambrell had found, to 2.  We suggested that based on all these studies with E plus P there was an increased risk.

Q.   Outside the courtroom, like the one we're in here, have you heard scientists or doctors say that all of these studies before WHI were the wrong studies or were inadequate?

A.   No, not at all.

Q.   Let's go to the second point.  Doctor, do you believe that the Wyeth labels accurately described the breast cancer risk based on that science?

A.   Yes, I do.

Q.   Now, the jury has spent a long time with these warnings, so I'm going to just ask you, this is the principal Premarin breast cancer warning in the relevant time period?

A.   Yes.

Page 44

page 1817

Q.   And this is the principal Prempro breast cancer warning in the relevant time period?

A.   Yes.  That's correct.

Q.   And you are pointing out the identification of some studies that have reported a moderately increased risk of breast cancer.  Do you have your little pen there?

A.   I think I left it up there.

Q.   Here.  I have it.  Circle the numbers that are in there.

A.   Okay.  So here you see -- well, my football analogy --

Q.   Can you do it?  There you go.  Pretty good.

A.   The relative risk of 1.3 to 2.

Q.   You did better than Dr. Kauff in circling it.  But if you want to eliminate that, you just have to click the bottom left of the slide.  There you go.

And this is another warning or another precaution in the Prempro label, which talks about the addition of a progestin.  Correct?

A.   Yes.  That's correct.

Q.   Now, this says unknown.  Is the risk completely unknown?  What is that attempting to characterize?

A.   Well, it characterizes the fact that we don't have an exact point estimate, that we know that the number is somewhere in there.  But we can't tell you exactly where that point estimate is going to fall.

Q.   Give me an example.

Page 45

page 1818

1 A.  Okay.  Again, I use football, because my kids are very much
2 into sports.  And my son -- I've used this example when we've
3 talked about this.  But my son played football.  And I can
4 remember, he was in about an 11 to 13 year old group.  And I was
5 sitting in the stands with some moms.  And one of the moms
6 looked at me, and there was a kid from another team who came on.
7 He just looked huge.  And the mom said, "How old do you think
8 that kid is?"  I said, "I don't know."  Well, I knew he had to
9 be between 11 and 13, but I didn't know what his exact age is.
10 And we know that this is within a range.  We know that the range
11 is less than a relative risk of two.  But we don't know the
12 exact number.
13 Q.  Okay.  There was also some advice in these labels, which
14 I'm just going to pass over quickly, Doctor, about using the
15 lowest effective dose for the shortest period of time.  We
16 showed these to Dr. Parisian actually and Mr. Victoria.  But you
17 will agree that both the Premarin label and the Prempro label
18 gave that kind of advice.  Correct?
19 A.  That's correct.
20 Q.  Here's the Premarin label.
21 A.  Correct.
22 Q.  And here is the first Prempro label.
23 A.  That's correct.
24 Q.  Now, in 1998, was a different dosage of Prempro approved?
25 A.  Yeah.  So in 1998, there's now a different dose, so you can

Page 46

page 1819

1 say to use the lowest dose.  You couldn't say that in '95,
2 because for Prempro there was only one dose available.
3 Q.  So now, in 1998, there's advice on the Prempro label about
4 dosing?
5 A.  Correct.
6 Q.  Okay.  Let's go to the third point.  Tell us what that
7 means.
8 A.  Wyeth confirmed what was already known about the extent of
9 breast cancer risk -- I'm sorry.  WHI, the Women's Health
10 Initiative, confirmed what was known about the breast cancer
11 risk associated with hormone therapy.
12      THE COURT:  Talk just a little slower if you will,
13 please.
14      THE WITNESS:  I'm sorry.
15 BY MR. URBANCZYK:
16 Q.  You've been doing pretty well until now.  We've heard
17 testimony in this trial about Wyeth's Phase 4 commitments to do
18 a retrospective study on Prempro and that that -- that that
19 commitment was fulfilled by the FDA by virtue of Wyeth's
20 support of the WHI study.  In your opinion, Doctor, was the WHI
21 study a superior investigational tool to the retrospective study
22 that was proposed and agreed to by the FDA and Wyeth in 1994?
23 A.  Yes.
24 Q.  Tell us why.
25 A.  It was an additional tool.  It was an additional way to be

Page 47

page 1820

1 able to look at this.
2 Q.  Before the WHI was completed, did the investigators, the
3 WHI investigators, have a prediction of what the outcomes would
4 be?
5 A.  Yes, they did.
6 Q.  Does this -- does this depict that prediction?
7 A.  It does.
8 Q.  Tell the ladies and gentlemen of the jury about this
9 article.  This is done by Jacques Rossouw?
10 A.  Yes.
11 Q.  This is Defendant's Exhibit 1527.  This is a 1996 article?
12 A.  Correct.
13 Q.  What does he say about breast cancer?
14 A.  The projection -- now, this was before the study took
15 place.  When you plan a study, you have to project what you
16 think the difference is going to be, because you have to have
17 enough patients to be able to show that difference.  If you
18 don't have enough patients, then it's tough to show that
19 difference.  So based on all of the previous research and all of
20 the previous studies, they predicted that the risk would be 1.3,
21 the relative risk.  So that would be that dot above three.  And
22 they didn't know whether it would be statistically significant.
23 They didn't plan confidence intervals at that point.
24 Q.  What about, did they have the prediction with respect to
25 Premarin and Prempro?

Page 48

page 1821

1 A.  So they predicted for ERT users, estrogen replacement, and
2 PERT, progestin and estrogen.  And they predicted that it would
3 be the same, that it would be 1.3 for both.
4 Q.  All right.  Incidentally, tell us what their hope was with
5 respect to coronary heart disease.
6 A.  They had hoped -- and remember, when we talked about doing
7 a randomized clinical trial, the Women's Health Initiative was a
8 randomized clinical trial.  When we do that, you have to give
9 somebody benefit.  And the question that was actually being
10 asked, the benefit question, was does estrogen decrease
11 cardiovascular risk?  And there had been a lot of data in the
12 literature, a lot of what we call those observational studies,
13 which showed that women who took estrogen or estrogen and
14 progestins had a decreased risk of cardiovascular disease.  So
15 the question here was trying to prevent cardiovascular disease.
16 That was the primary efficacy endpoint, the primary benefit that
17 we were going to give to the patient.  And then they were
18 looking at the safety.  Specifically they looked at a lot of
19 different things in Women's Health Initiative.  But one of them
20 was breast cancer.
21 Q.  What was the result of WHI in terms of estrogen plus
22 progestin and breast cancer?  What number did they report?
23 A.  For estrogen?
24 Q.  Estrogen plus progestin.
25 A.  Estrogen plus progestin, the number was 1.24.

page 1822

3  1  Q.  And the study was stopped early?
4  2  A.  Yes, it was.
5  3  Q.  Is that correct?  Why was it stopped early?
6  4  A.  It was stopped early for several reasons.  One was, by the
7  5  time that they had the data here, they also had data showing
8  6  there was not going to be a benefit for cardiovascular, that it
9  7  wasn't preventing cardiovascular disease.  What you have to
10 8  remember is that the average age of women in the Women's Health
11 9  Initiative was 63, which is about ten years, a little more than
12 10 ten years older than the average age of menopause.  Most people
13 11 become menopausal around age -- the mean age is about 51, 52.
14 12 The reason the WHI chose -- and I use the word "older"
15 13 gently -- but an older population was because more people who
16 14 are older get cardiovascular disease, so that you could
17 15 hopefully use fewer patients to show that difference.
18 16 So when they looked at the data, they saw there was not
19 17 going to be a benefit for cardiovascular disease.  And if you
20 18 are not going to give a benefit and you have this risk, then you
21 19 really just can't continue the study.
22 20 Q.  Okay.  Have you prepared a slide, Doctor, that compares the
23 21 1.24 risk with the risk found in some of the earlier studies?
24 22 A.  Yes.
25 23 Q.  So what are we showing here?  This is the number --
26 24 A.  So we talked about all those meta-analyses.  And what we
27 25 had put into our label was based on a lot of that information.

page 1823

3  1  And the relative risk that we had in our Prempro label was 1.3
4  2  to 2.0.
5  3  Q.  In some studies?
6  4  A.  Yes.  In some studies.  We say some studies showed an
7  5  increase, some showed a decrease.  And we put the relative risk
8  6  in some was 1.3 to 2.
9  7  Q.  How does that compare with the WHI results?
10 8  A.  The WHI result, the point estimate is a little bit lower,
11 9  but I wouldn't tell you that that's a lower number.  I would say
12 10 that that confidence interval, that they all cross, and so it
13 11 certainly is consistent with what was in our label.
14 12 Q.  And have you prepared -- how did the investigators of WHI
15 13 evaluate the results of their study with the prior studies?
16 14 A.  They felt that it was fairly similar.
17 15 Q.  All right.  This is from the article that was first
18 16 published in July of 2002, Defendant's Exhibit 2108.  What do
19 17 they say?
20 18 A.  They say that the relative risk of breast cancer found in
21 19 the WHI is consistent with estimates from pooled epidemiological
22 20 data, citing the results of the Beral meta-analysis.  We saw
23 21 that one a few minutes ago.  And it was also consistent with a
24 22 nonsignificant 27 percent increase found after 6.8 years of
25 23 follow-up in HERS.
26 24 Q.  We've heard about HERS.  That's a study that Wyeth
27 25 conducted?

page 1824

3  1  A.  We conducted that study.
4  2  Q.  Was the breast cancer data from that study published in
5  3  peer-reviewed journals?
6  4  A.  Yes, it was.
7  5  Q.  And relied upon by world scientists as valid data?
8  6  A.  It is.
9  7  Q.  Then in 2003, when the final results were published, Dr.
10 8  Chlebowski says what about the results?
11 9  A.  The magnitude of the increased breast cancer risk observed
12 10 with estrogen plus progestin in this clinical trial, WHI,
13 11 closely parallels the observational results, so all of these
14 12 studies looking at populations.
15 13 Q.  We've prepared a chart, have we not, Doctor, that helps to
16 14 compare the risks that were observed in the WHI between Prempro
17 15 users in the trial and non-Prempro users?  Correct?
18 16 A.  Uh-huh.
19 17 Q.  This was actually a subject of a discussion yesterday that
20 18 the jury saw on a videotape of Dr. Colditz.  Would you please
21 19 tell the jury what this is depicting?
22 20 A.  So the yellow circle, this would be a hundred percent of
23 21 people.  And the risk of breast cancer, if you had a hundred
24 22 percent of people, would be 0.3 in a population who doesn't use
25 23 hormone therapy.  So in a general population, the risk of breast
26 24 cancer, unfortunately, is 0.3 percent.  Then on the right panel
27 25 is those who use estrogen.  That increase from these studies

page 1825

3  1  would be a 0.4 percent risk.
4  2  Q.  Now, this says the study was conducted for about 5.6 years
5  3  of follow-up.  A number of women in this study had used hormone
6  4  therapy in prior years.  Correct?
7  5  A.  That's correct.
8  6  Q.  And for how many years had they used it?
9  7  A.  They could have used it for 25 years.
10 8  Q.  So this number includes all women in the study, both people
11 9  who had used it before and people who were using it for the
12 10 first time in this study?
13 11 A.  Yeah.  In fairness, it could include people who had dropped
14 12 out early as well.
15 13 Q.  Okay.  And is it correct that the difference between the
16 14 two results is less than one-tenth of 1 percent?
17 15 A.  Yeah.  It is a very tiny percent.
18 16 Q.  When we're talking about 1.24, have we prepared a chart
19 17 that tries to put that into context with other risks that we
20 18 encounter in our daily lives?
21 19 A.  Yeah.  I think this is very important, because we learned,
22 20 especially when I was in medical school, you sit in a course,
23 21 and you talk about a disease, and you think everybody in the
24 22 world has the disease and the disease is really common.  And if
25 23 we're talking a lot here about breast cancer and this potential
26 24 increase, we need to put it into context.
27 25 So if you look, say, at what looks like an orange bar, this

page 1826

1 is the occurrence of hemorrhagic strokes from taking aspirin.
2 And that relative risk would be higher. So we know that many of
3 us take aspirin. I don't know, you know, how many of us know
4 anybody who has ever had a hemorrhagic stroke from it. So it is
5 a very rare event. So that 1.24 is rare. I'm not discounting
6 it. Breast cancer is important. But we're just trying to put
7 it in perspective.
8     If you can look in relation to, say, for example, Tylenol
9 and liver damage, that relative risk would be 2.78. And you can
10 see the large risk from lung cancer and smoking.
11 Q.   Doctor, the WHI study stopped after 5.6 years of follow-up.
12 Has there been an analysis done by the WHI investigators to
13 determine what they might have expected to have seen regarding
14 the breast cancer in the WHI study had the arm not been stopped?
15 Has there been a trend analysis?
16 A.   Yes, there has.
17 Q.   What were the results of that trend analysis?
18 A.   Well, what we know is there have been some analyses done.
19 We know that the risk of breast cancer didn't take off in the
20 later years. We know it didn't continue to escalate. And they
21 did another analysis where they looked at previous users of
22 hormone therapy. And even when you look at that, that trend
23 wasn't increased.
24 Q.   So is it not likely that the relative risk would have just
25 continued to get bigger and bigger as the years went on?

page 1827

1 A.   No. The data that they have shown, it's unlikely. And I
2 think, you know, with all the years of estrogen therapy in the
3 population, we would know that. You know, all these
4 meta-analyses, some of these study people for 25, 30 years.
5 Q.   Dr. Constantine, Dr. Austin described this number as a
6 misleading number. Do you agree with him?
7 A.   No.
8 Q.   Is this the number that is well accepted and well
9 publicized by many third-party publications and scientists?
10 A.   Yes.
11 Q.   Now, Dr. Austin did mention some other numbers. I'm going
12 to write them down here. We're going to talk about each one of
13 them. He mentioned a 3.08. He also mentioned a 3.09 and 3.56.
14 And he says those came from WHI. And then he also, from the
15 Million Women's Study, mentioned 4.99. I would like to talk to
16 you about those numbers if I could, please. Let's take a look
17 at those numbers one at a time.
18     Could I have the ELMO, Mrs. Johnson.
19     I'm showing you, Doctor -- I think you have it in front of
20 you -- Defendant's Exhibit 7231. This is an article by, among
21 others, Dr. Garnet Anderson. And the number 3.08, I believe,
22 comes from right there. I should have had a yellow highlighter
23 so you could see it. But is that correct?
24 A.   That's correct.
25 Q.   Do you agree that that is a valid depiction of the relative

page 1828

1 risk found in the Women's Health Initiative?
2 A.   No. It absolutely is not.
3 Q.   And explain to the jury why that's so. And why is it
4 there?
5 A.   Okay. This is something called subgroup analyses. There
6 are important things to look at. It is important information to
7 get subgroup analyses, because it helps us to ask additional
8 questions. But the primary information that is always used and
9 is the most valid is what you set out to study, so which is the
10 entire population. Can you move that? Scooch that down a
11 little bit. Thank you.
12 Q.   You want them all there?
13 A.   That's terrific. Thank you. So what we're looking at is
14 this panel here. Does that work? Can I write on here or no?
15 Q.   I think you can. Can you?
16 A.   I have it. Okay. So we're looking at this panel where the
17 X is. And this is called an analysis of invasive breast cancer
18 in adherent participants with any prior hormone use. So
19 adherent usually means compliant, that they took their pills.
20 And you can see -- I'm going to just kind of put some Xs here.
21 That's the hormone line. And then what you can see is -- oh, I
22 think I can change this color. You told me that, didn't you?
23 Q.   Upper left for the change of color.
24 A.   I'm sorry?
25 Q.   Upper left corner to change the color.

page 1829

1 A.   Upper left. Okay. I'm going to sit and play with this.
2 Okay. All right. This is the placebo line. Okay. Now, what
3 this is saying is that the women who took placebo and had
4 previously taken hormone therapy basically did not get breast
5 cancer. And one could make the statement that breast cancer had
6 been prevented in those women. I don't think that would be an
7 appropriate statement to say.
8     Let's look at the placebo group in the upper panel. Okay?
9 And I'm going to draw that one in blue. So placebo is blue.
10 And here is the placebo group. Let me make sure. I'm sorry.
11 How do I erase?
12 Q.   Go to the bottom left.
13 A.   Bottom left.
14 Q.   That's all right. Go ahead.
15 A.   Okay. All right. I'm sorry.
16     THE COURT: You need to speak into the mike there if
17 you will, please.
18 BY MR. URBANCZYK:
19 Q.   Are you suggesting that the placebo line here is the
20 outlying line?
21 A.   What I'm showing you is how can you have two different
22 placebo groups? They took sugar pills. So just look at what
23 your risk, your relative risk -- if I compared the blue line to
24 the blue line, my relative risk for those two placebo groups
25 would be close to that 3.08. So that tells --

page 1830

3 1      THE COURT: Excuse me. Go ahead and finish your
4 2  answer. Then we'll take a break. Go ahead and finish your
5 3  answer.
6 4      THE WITNESS: Okay. So what that tells me is that the
7 5  appropriate line to use would not be that bottom placebo line,
8 6  because, remember, what our relative risk is it's the ratio
9 7  of the one -- does that show up, the white?
10 8  BY MR. URBANCZYK:
11 9  Q. Yeah, yeah.
12 10  A. Of the one to the other. That's what our relative risk is,
13 11  our one to the other. So this is a sub-analysis. There's a lot
14 12  of bias. Maybe patients dropped out of the trial. Maybe
15 13  patients didn't remember if they were taking hormone therapy.
16 14  But that's a very unusual curve. And the usual curve for
17 15  placebo patients is pretty much what we see in the top panel.
18 16  That's usually the rate of breast cancer in a background
19 17  population. Now --
20 18      THE COURT: You can finish your answer after the
21 19  break.
22 20      All right. Ladies and gentlemen, is there anyone on the
23 21  jury who does not remember the standard admonition? No hands
24 22  are raised. The standard admonition is in effect. We'll start
25 23  back about 20 after by the wall clock. Let the jury stand out.
26 24  Everyone else remain seated.
27 25      (Jury excused.)

page 1831

2 1      THE COURT: The jury is out. We're in recess. Be at
2  ease.
3 3      (Recess at 10:04 a.m.)
4 4      REPORTER'S CERTIFICATE
5 5      I certify that the foregoing is a correct transcript from
6      the record of proceedings in the above-entitled matter.
7 6
8 7          Date: February 15, 2008.
9      Elaine Hinson, RMR, CRR, CCR
10 8  United States Court Reporter
11 9
12 10
13 11
14 12
15 13
16 14
17 15
18 16
19 17
20 18
21 19
22 20
23 21
24 22
25 23
26 24
27 25

page 1832

3 1      (Continuing at 10:24 a.m.)
4 2      THE COURT: You may continue.
5 3      MR. URBANCZYK: Thank you, Your Honor.
6 4  BY MR. URBANCZYK:
7 5  Q. Dr. Constantine, are you familiar with the sworn
8 6  deposition testimony of Dr. Garnet Anderson, the author of this
9 7  paper?
10 8  A. Yes.
11 9  Q. All right. We were -- she was asked about Figure 1,
12 10  which is the chart we have been discussing, in a deposition
13 11  that was taken of Dr. Anderson in November of 2006. I refer
14 12  you to page 36 of that and ask you to read it.
15 13  A. Starting --
16 14  Q. The yellow. With the yellow.
17 15  A. Now, going back to Figure 1 again on page 8.
18 16  Q. That's this.
19 17  A. Okay. Does insensitivity analysis in the lower
20 18  right-hand corner, where you looked at adherence participants
21 19  with any prior hormone use, you get an unweighted hazard ratio
22 20  of 3.08. Is this -- am I right that this was statistically
23 21  significant?
24 22      Her answer was: Well, the P-value there was .0002, if my
25 23  glasses are working appropriately.
26 24      Right.
27 25      I don't put as much confidence in these sensitivity

page 1833

3 1  analyses as I do the primary ones. They are based on the
4 2  assumptions and the carryover effect, and they're based on an
5 3  assumption that women stop taking their -- it's cut off --
6 4  Q. I'm sorry. Taking their pills.
7 5  A. -- in random fashion, that it's not related to the
8 6  outcome of interest here.
9 7  Q. And she doesn't put as much confidence in these
10 8  sensitivity analyses as I do the primary ones. What was the
11 9  primary one?
12 10  A. That would be the 1.24, and she is the author of this
13 11  paper.
14 12  Q. And she is deposed, actually, back a year before. Here
15 13  is a deposition of Dr. Garnet Anderson in October of 2005.
16 14  Direct your attention to pages 120 and 121, and here there is a
17 15  questioning about the upcoming paper that was published in
18 16  2006. Will you tell the ladies and gentlemen of the jury --
19 17  read this for the ladies and gentlemen of the jury.
20 18  A. So the question was: Okay. Among the future studies
21 19  that you discussed with Mr. Williams, is there a plan to do an
22 20  analysis based upon compliance with a randomization instead of
23 21  intent to treat?
24 22      The answer: Well, most of our publications have included
25 23  a small analysis of that sort. We don't put as much confidence
26 24  in them.
27 25  Q. Go ahead.

page 1834

3  1   A    Why do you favor intent-to-treat analyses?  It preserves
4  2   the unbiasedness of the randomization.
5  3   Q    Okay.  And read the highlighted portion above that.  I am
6  4   sorry.
7  5   A    Sorry.  So we did that more of an exploratory kind of
8  6   analysis.  We feel strongly that the intent to treat is what we
9  7   should base our assessment on.
10  8  Q    And that's the -- what number is that?  What's the
11  9  intent-to-treat number?
12  10  A    1.24.  So intent to treat means including everybody, and
13  11  the reason for that is you get rid of any bias by doing that.
14  12  Q    So as between the 1.24 number and the 3.08 number, what
15  13  is Dr. Anderson's preferred -- preference for -- what is the
16  14  valid number?
17  15  A    The 1.24.
18  16  Q    And not 3.08?
19  17  A    That's correct.
20  18  Q    The other numbers Mr. Morris and Dr. Austin pulled from
21  19  the Anderson paper comes from this chart, 3.09 and 3.56.  Would
22  20  you tell the ladies and gentlemen of the jury what those
23  21  numbers are and whether those are numbers that are worthy of
24  22  the weight that Dr. Austin gave to them?
25  23  A    Well, we want to look at every number, but you certainly
26  24  wouldn't pick two numbers.  There is 12 different numbers here,
27  25  all representing two different things.  And so what apparently

page 1835

3  1   he pulled out was a particular year, and you just wouldn't look
4  2   at one year of data in a study that's going for several years.
5  3   It would --
6  4   Q    Do you have an analogy for that?
7  5   A    Yes.  A football analogy.  It would be like trying to
8  6   figure out who won the game in the third quarter, or who lost.
9  7   You just -- you need the entire game.  You need all of the
10  8  data.
11  9  Q    And this is just the data from one year?  That's like the
12  10  second quarter score?  That's like the total score in the
13  11  second quarter?
14  12  A    Of just the second quarter.  You would have ignored the
15  13  first quarter and the fourth quarter.  Just looking at the
16  14  second quarter.  Just looking at one time point.  And what was
17  15  very interesting in the Women's Health Initiative, in Year 5
18  16  there was a decrease in the placebo group from what you would
19  17  expect in a general population of breast cancer -- general --
20  18  of people who get breast cancer in the general population.
21  19  Q    Any explanation for that?
22  20  A    We don't.  There have been some articles and a lot of
23  21  discussion about it, and we don't know why.  And that's why you
24  22  do large studies and you look at all the data because sometimes
25  23  you have a chance finding.
26  24  Q    Doctor, there was some suggestion that the sixth-year
27  25  finding is low because there were a bunch of dropouts.  Is that

page 1836

3  1   a valid characterization of why that number is going down?
4  2   A    It's possible except that we have some additional data,
5  3   and certainly we have many other studies which would suggest
6  4   that -- you know, you can't go from year to year.  And I
7  5   wouldn't say that the risk went down based on that piece of
8  6   data.  That wouldn't be appropriate either.  You have to look
9  7   at the entirety of the data set to keep it pure.
10  8  Q    So as between the intent to treat, 1.24, and the year --
11  9  the individual year data, what would be the more valid number?
12  10  A    The 1.24.  And I don't believe the authors ever pulled
13  11  out any of those numbers to discuss, even in their article.
14  12  They certainly showed the data, but --
15  13  Q    The jury has heard from Dr. Graham Colditz.  When
16  14  Graham Colditz describes the WHI to his peers, what does he
17  15  describe as the results of WHI?
18  16  A    The 1.24.
19  17  Q    I want to show you a book chapter, Defendant's Exhibit
20  18  7996, of a book in 2006 with Graham Colditz -- by
21  19  Graham Colditz.  And he has a chart of studies that he
22  20  published here, and what does he say the results of the WHI are
23  21  for E plus P?
24  22  A    1.24.
25  23  Q    And when he talks about the results, what does he report
26  24  the results to be?
27  25  A    1.24.

page 1837

3  1   Q    And are you familiar with the National Cancer Institute?
4  2   A    Yes.
5  3   Q    And the National -- is that a reputable organization?
6  4   A    Yes, it is.
7  5   Q    And when the National Cancer Institute describes the
8  6   results of the WHI, what number do they say?
9  7   A    1.24.
10  8  Q    Incidentally, I notice that they also talk about your
11  9  study, the HERS study?
12  10  A    Yes, they did.
13  11  Q    And that's not -- that's not a breast cancer study, but
14  12  it's a study that examined and reported significant data on
15  13  breast cancer; is that correct?
16  14  A    That's correct.  Because we had a primary that was a
17  15  randomized control trial where we had to have a benefit that we
18  16  were trying to provide.
19  17  Q    And while we're on the subject of -- there was a -- WHI
20  18  also studied Premarin alone, did it not?
21  19  A    Yes, it did.
22  20  Q    And the results of the Premarin alone, WHI study, was
23  21  what?
24  22  A    0.77.  So it's actually a lower number, but if you look
25  23  at that confidence interval, it just crosses the 1.  It's 1.01,
26  24  so it's just on the other side.  So we don't say that estrogen
27  25  alone decreases breast cancer.  We just say that it didn't

page 1838

```
3  1  increase breast cancer.
4  2  Q   And when the WHI authors -- WHI investigators talk about
5  3  their study, I show you Defendant's Exhibit 8963 and 8964 which
6  4  is a symposium in December of 19 -- 2007.  What do they
7  5  describe the results of WHI as?
8  6  A   So this is by Dr. Chlebowsky, who is the author of the
9  7  WHI breast cancer paper, and he reports his data as being 1.24.
10 8  Q   Dr. Austin also endorsed the Million Women Study and
11 9  pulled the 4.99 number out of the Million Women Study.  What is
12 10 the prevailing view in the medical and scientific community
13 11 regarding the validity of the Million Women Study?
14 12 A   There has been a lot of controversy and a lot of
15 13 criticism by the medical community of that study.  That was a
16 14 study that was done in Europe, and it had a lot of potential
17 15 flaws.
18 16 Q   I refer you to Defendant's Exhibit 2194, an editorial.
19 17 Tell the ladies and gentlemen of the jury what that editorial
20 18 is titled.
21 19 A   "The Study with a Million Women and Hopefully Fewer
22 20 Mistakes."  That's by Professor Genazanni.
23 21 Q   And if you look at Exhibit 6849, we have a paper by
24 22 Dr. van der Mooren and Frank.  What do they say?
25 23 A   Obviously, the MWS was not representative for the general
26 24 UK population.  Its design was inferior compared with previous
27 25 studies, and several observations were biologically not
```

page 1839

```
3  1  plausible.  The fact that this study is indeed very large does
4  2  not simply justify that rules and guidelines for evidence-based
5  3  medicine should be denied.
6  4  Q   And if we look at Defendant's Exhibit 6966, a critique of
7  5  the Million Women Study by Malcolm Whitehead and
8  6  Richard Farmer, what do they say?
9  7  A   It is our opinion that there are major flaws in the
10 8  design of this study, and these flaws explain in part why the
11 9  risk estimates are not in agreement with those from other
12 10 studies and appear to be inconsistent with the known biology of
13 11 breast tumor.
14 12 Q   And what do they conclude?
15 13 A   The Million Women Study reports a weak association
16 14 between HRT use and breast cancer.  The results are not
17 15 consistent with those from many other studies.  In particular,
18 16 there are a few studies that show an increase associated with
19 17 estrogen-only therapy.  We conclude that the study should not
20 18 be interpreted as indicating that HRT either causes or
21 19 accelerates the growth of breast tumors.
22 20 Q   And finally, Defendant's Exhibit 5983, an article about
23 21 the Million Women Study -- an editorial or letter to the
24 22 editor.  What did the author say there?
25 23 A   In view of our concerns, we await further data from
26 24 randomized controlled trials before accepting the Million Women
27 25 Study collaborators' conclusions with respect to the
```

page 1840

```
3  1  associations between use of HRT and incidence of and mortality
4  2  from breast cancer.
5  3  Q   All right.  So as between the randomized control trial,
6  4  WHI, 1.24, and the Million Women's Study, which is the more
7  5  valid result?
8  6  A   WHI.  Certainly a randomized controlled trial would be
9  7  more valid.
10 8  Q   The results of the WHI on Premarin alone, the fact that
11 9  they showed no increased risk, was that consistent with what
12 10 was previously thought about estrogen therapy?
13 11 A   Well, there had been some studies which showed a decrease
14 12 and some showed an increase.  So it certainly is within that
15 13 range.  That confidence interval crosses 1, meaning it
16 14 overlaps.  It's lower than we might have thought.
17 15 Q   That was a pleasant surprise?
18 16 A   Well, it's always nice to know that some things -- that a
19 17 risk isn't increased; that's for sure.
20 18 Q   Dr. Kuperman, Kuperman, treating physician in this case,
21 19 referred without showing the jury because he didn't have it,
22 20 the NAMS report.  I want to show you what has been marked as
23 21 Defendant's Exhibit 8501, position statement of the North
24 22 American Menopause Society, and tell the jury what he says
25 23 about breast cancer.
26 24 A   Breast cancer risk increases with EPT use beyond five
27 25 years.  In absolute terms, this increased risk was rare in WHI,
```

page 1841

```
3  1  being 4 to 6 additional invasive cancers per 10,000 women per
4  2  year who used EPT for five or more years.  Studies have not
5  3  clarified whether the risk differs between continuous or
6  4  sequential use.  Women in the ET arm of WHI demonstrated no
7  5  increased risk of breast cancer after an average of 7.1 years
8  6  of use, with 8 fewer cases of invasive breast cancer for 10,000
9  7  women per year of ET use.
10 8  Q   And I know this is NAMS, but is this consistent?  Is that
11 9  statement consistent with the science?
12 10 A   Yes, it is.
13 11 Q   Doctor, are you aware of the Ravdin paper; that is, the
14 12 paper that examines the relationship comparing the decline in
15 13 hormone therapy prescriptions after WHI or recently with a
16 14 decline in the reports of breast cancer?
17 15 A   Yes.
18 16 Q   What, has that been the subject of many papers and
19 17 discussions?
20 18 A   There has been a lot of debate.  We have really looked at
21 19 this issue very carefully.  We have spoken to Dr. Ravdin, and
22 20 it's an area that we are following up on and we are very
23 21 actively interested in.
24 22 Q   Have there been any conclusions that have been reached
25 23 about what the relationship, what --
26 24 A   No.  Dr. Ravdin doesn't have a conclusion, as well.
27 25 Q   Is it too early to draw a conclusion in your opinion?
```

1 page 1842

2

3 1 A   I think it is.  I think a lot of us have different ideas

4 2 and hypotheses, but there is no conclusion that can be drawn.

5 3 Q   Are you familiar, for example, that Dr. Li, expert that

6 4 they cite, disagrees that there is a relationship?

7 5 A   Yes.  He actually found --

8 6       MR. MORRIS:  Let me object, Your Honor.  That's not

9 7 at all correct.  It's hearsay.

10 8 BY MR. URBANCZYK

11 9 Q   Are you familiar with Dr. Li's article in December

12 10 of 2007?

13 11      THE COURT:  That question and answer withdrawn?

14 12      MR. URBANCZYK:  Yes.

15 13 BY MR. URBANCZYK

16 14 Q   Are you familiar with Dr. Li's critique of the hypothesis

17 15 in a paper he wrote in December of 2007?

18 16 A   Yes.  And he contradicted that finding.

19 17 Q   Dr. Constantine, there has been a lot of discussion

20 18 about -- in this case about causation.  Does hormone therapy

21 19 cause breast cancer?

22 20      MR. MORRIS:  Objection.  Lack of foundation.  This

23 21 witness is a rheumatologist and an executive with Wyeth.  There

24 22 is no foundation that she has the proper credentials to provide

25 23 an expert opinion on --

26 24      THE COURT:  Overruled.  Exception saved.

27 25      THE WITNESS:  No.

1 page 1843

2

3 1 BY MR. URBANCZYK

4 2 Q   Dr. Austin said it's the fact that hormone therapy causes

5 3 breast cancer is beyond a reasonable medical doubt.  Do you

6 4 agree with that?

7 5 A   I do not agree with that.

8 6 Q   What is the current prevailing belief in the medical and

9 7 scientific community regarding this issue?

10 8      MR. MORRIS:  Same objection.  Lack of foundation.

11 9      THE COURT:  Overruled.

12 10      THE WITNESS:  That estrogen therapy may have -- help

13 11 preexisting lesions or preexisting breast cancers to grow, that

14 12 they allow the continued growth of a preexisting cancer, but it

15 13 doesn't cause breast cancer.  And we know that breast cancers

16 14 will grow in the absence of estrogen therapy.

17 15 BY MR. URBANCZYK

18 16 Q   Are you aware of the fact that, in addition to

19 17 Dr. Austin, Dr. Colditz and Dr. MacMahon, both Harvard

20 18 epidemiologists, hold the view that hormone therapy causes

21 19 breast cancer?

22 20 A   Yes.  I have seen it written, and some do say that.  The

23 21 vast majority don't say that.  I have seen that particularly in

24 22 epidemiology articles and with people who are epidemiologists,

25 23 not necessarily by people who treat patients.  Epidemiologists

26 24 look at a general population.  That's what epidemiology is.

27 25 They're not looking at an individual patient.

1 page 1844

2

3 1 Q   Have the authors of the WHI reports concluded that

4 2 hormone therapy causes breast cancer?

5 3 A   No.  They have not stated that.

6 4 Q   Have the authors of the Million Women Study said that

7 5 hormone therapy causes breast cancer?

8 6 A   No, they have not said that.

9 7 Q   Are you familiar with --

10 8      MR. URBANCZYK:  Let me go back to the slide show,

11 9 Mrs. Johnson.  I am sorry.

12 10 BY MR. URBANCZYK

13 11 Q   Are you familiar with the statement by Dr. Chlebowsky in

14 12 2003?

15 13 A   Yes.

16 14 Q   And what is that saying?

17 15 A   The fact that the cancers developed after a

18 16 shorter-than-predicted interval suggests an effect on growth of

19 17 established breast cancers.

20 18 Q   And are you familiar with the statement by Dr. Ravdin?

21 19 A   Does menopausal hormone therapy cause breast cancer?

22 20 Probably not.

23 21 Q   And is that consistent with the general prevailing view?

24 22 A   Yes.

25 23 Q   Is Dr. Austin's theory supported by valid scientific

26 24 data?

27 25 A   No.

1 page 1845

2

3 1 Q   If there is an increased incidence in breast cancer in

4 2 the Prempro arm of the WHI, 8 per 10,000 women years, what

5 3 would account for that difference?

6 4 A   Maybe detection, earlier detection.  We know that women

7 5 may get more mammograms when they take estrogen or

8 6 estrogen/progestin therapy.  That has been looked into in WHI

9 7 and was not found to be true, but there may be closer

10 8 attention.  So there is a lot of different reasons, but --

11 9 Q   But is it, but do you -- do you agree or disagree with

12 10 the view of Dr. Austin that it -- estrogen can -- estrogen plus

13 11 progestin takes an abnormal cell and turns it into a

14 12 malignancy?

15 13 A   No.  The malignancy is already there.  The cancer is

16 14 already there.  The question is, does the estrogen help it to

17 15 continue to grow?  Does it allow the preexisting lesion to

18 16 continue to grow?  And that is what we believe is most likely

19 17 occurring if this increased risk is seen in some patients.  It

20 18 does appear that there is an increased risk with E plus P, and

21 19 it appears that that increased risk is because of a growth --

22 20 allowing the continued growth of the preexisting lesion.

23 21 Q   And that's what Dr. Chlebowski said?

24 22 A   That's pretty much what most scientists are saying.

25 23 Dr. Ravdin and Dr. Chlebowsky, they have devoted their lives to

26 24 study of breast cancer and cellular mechanisms and cellular

27 25 biology, and that is the theory that we call most biologically

Page 73

page 1846

1  plausible.  We know that cancers don't occur overnight.  We
2  know that cancers become visible by mammography.  We know that
3  it takes a long time, and I think you may have heard about that
4  or you will be hearing about that.
5  Q    They will be.  Can you tell in any individual woman,
6  Doctor, whether hormone therapy influenced the growth of her
7  tumor?
8        MR. MORRIS:  Objection.  Lack of foundation.
9        THE COURT:  Overruled.  Exception saved.
10  BY MR. URBANCZYK
11  Q    Can you tell in any individual woman whether hormone
12  therapy influenced the growth of her tumor?
13  A    Absolutely not.  You can't tell.
14  Q    Do menopausal women have endogenous levels of
15  estrogen/progestin on their own?
16  A    Yes.  All post-menopausal women maintain some estrogen.
17  We don't have as much estrogen as we become more
18  postmenopausal, but everybody has some estrogen.
19  Q    All right.  If estrogen and progestin did influence the
20  growth of a preexisting tumor, would there be any way to tell
21  the difference between the effect of a woman's own estrogen and
22  progestin or what she took in a pill?
23  A    Absolutely not.
24  Q    Do estrogen receptor-positive and progestin
25  receptor-positive tumors need hormones to grow?

Page 74

page 1847

1  A    No.  They can grow in the absence of hormones, and we
2  know that the vast majority of tumors are estrogen
3  receptor-positive and progestin receptor-positive.
4        MR. MORRIS:  Let me object once again to a lack of
5  foundation.  We have a rheumatologist testifying about breast
6  cancer like she is an oncologist.
7        THE COURT:  Let's approach.
8        MR. URBANCZYK:  I am finished with that line of
9  questioning.
10       THE COURT:  Withdraw the last question?
11       MR. URBANCZYK:  No.
12       THE COURT:  Let's approach.
13       (Bench conference reported as follows:)
14       THE COURT:  At one time we, a general practitioner
15  could testify about any area of specialty in Arkansas.  The
16  legislature passed a medical malpractice reform bill that says
17  you have to have a specialist in that specialty.  And this is
18  not a medical malpractice case, so I don't know what the rule
19  is on that.
20       MR. URBANCZYK:  Well, Your Honor --
21       MR. MORRIS:  Here is --
22       MR. URBANCZYK:  Okay.
23       MR. MORRIS:  May I make my objection first?
24       THE COURT:  Wait a minute.  May I have the floor?
25  Everybody accept me is required to have a poker face, and I try

Page 75

page 1848

1  to have one when the jury can see you.  Y'all can make a face
2  when your back is to the jury if you want to.
3        So I don't know whether that's applicable here or not.
4        All right.  Now, I am --
5        MR. MORRIS:  The Court is well aware of the Daubert
6  standard for testimony by an expert witness.  He is soliciting
7  expert testimony from this witness, and one of the foundations
8  from Daubert is that the witness be qualified in that
9  particular area.  And so as the Court mentioned, you can't have
10  a general practitioner come in and talk about cancer; likewise,
11  you couldn't have a rheumatologist come in and talk about how
12  cancer grows and the receptors, et cetera.  That's not an area
13  of expertise.
14       MR. URBANCZYK:  Two things, Your Honor.  For the
15  last eight years, she has been solely responsible for Premarin
16  and Prempro and all the clinical data.  She has reviewed every
17  one of these studies.  She is now an expert in the hormone
18  therapy and its effect in women.  She has been identified as an
19  expert in this case.  She has been deposed as an expert in this
20  case on these issues, and there has been no Daubert motion
21  filed in a timely fashion with respect to this woman's
22  testimony.
23       THE COURT:  Allow the testimony.  Overruled.  Save
24  your exception.
25       (Return to open court.)

Page 76

page 1849

1  BY MR. URBANCZYK
2  Q    Dr. Constantine, Dr. Austin suggested that an increased
3  risk of breast cancer with hormone therapy multiplies the risk
4  of breast cancer in a woman with family history.  Do you agree
5  with that?
6  A    Absolutely not.
7  Q    What do the studies show?
8  A    There have been a couple of studies which showed a slight
9  increase.  The majority of studies do not show any increase
10  and, in fact, Dr. Colditz, in his meta-analysis, looked at ten
11  different studies and did not see an increase.
12  Q    Mr. Morris suggested, by his questioning earlier in the
13  trial, that hormone therapy caused an increase in
14  Ms. Scroggin's weight.  What is the scientific evidence
15  regarding hormone therapy use and weight?
16  A    There is not an increase.  Unfortunately, we all age
17  as -- we all do age.  And we all gain weight as we get older,
18  and a lot of times people feel if they take something and they
19  gained weight, it could be the agent.  But if we look at the
20  randomized clinical trials, we see there was not any weight
21  increase with hormone therapy.
22  Q    Let's go to the fourth point.  Do you believe that
23  Premarin and Prempro remain important treatment options for
24  women?
25  A    I do.

page 1850

3  1   Q    What are the approved indications for -- principal
4  2   approved indications for Premarin and Prempro today?
5  3   A    The treatment of moderate to severe vasomotor symptoms,
6  4   hot flushes.  When we say moderate to severe, it's not mild.
7  5   It's not if you have a little flush.  It's the kind of hot
8  6   flush that stops you dead in your tracks, makes women have to
9  7   wake up in the night and change their nightgowns, awakens you
10 8   from your sleep.
11 9   Q    I put something on here about vasomotor symptoms.  Is
12 10  that accurate?
13 11  A    Yes.  It can affect your mood and sleep disturbances.  So
14 12  it is something for many women that's an important option.  Not
15 13  every woman needs it.  Not every woman is symptomatic, but
16 14  there are many who are.
17 15  Q    And is -- let me ask you this.  Doctor, is there --
18 16  Dr. Naftalis earlier suggested that there was a correlation
19 17  between menopausal symptoms and levels of estrogen; in other
20 18  words, that women with lower estrogen levels have symptoms as
21 19  opposed to women with higher levels.  Do you agree with that?
22 20  A    No.
23 21  Q    I want to touch briefly on that.  Dr. Naftalis cited --
24 22  I'm not going to change -- an article by a Dr. Deitcher, and
25 23  she said it was a Wyeth article, as supporting her proposition.
26 24  Do you know Dr. Deitcher?
27 25  A    I do.

page 1851

3  1   Q    Does Dr. Deitcher work at Wyeth?
4  2   A    She does.  She works in our discovery, the basic research
5  3   area.  So I develop products in humans, and she looks at the
6  4   compounds before we would put them into humans.
7  5   Q    And did you review this article before it was published?
8  6   A    I did.
9  7   Q    And do you agree with Dr. Naftalis that this article
10 8   supports her theory?
11 9   A    No.  That would be a mischaracterization of that paper.
12 10  And if we just think logically about estrogen levels and age,
13 11  we know that the older a woman gets, the further she gets from
14 12  the menopausal period when she becomes menopausal, the less
15 13  estrogen she has.  And that's a known fact.  So an 80,
16 14  90-year-old woman has less estrogen than a 51 or 52 or
17 15  54-year-old woman.  We know that 80 or 90-year-old women rarely
18 16  get hot flushes, so it's not related to the estrogen level.  I
19 17  have particularly done an enormous amount of research trying to
20 18  figure out what the actual cause of hot flushes is, and we are
21 19  trying to develop some medicines for that.  But it's certainly
22 20  not related to serum or estrogen levels in the blood.  We think
23 21  it's probably related to change or a fluctuation.
24 22  Q    Have you reviewed the literature that have explored this
25 23  question?
26 24  A    Yes.
27 25  Q    And has a consensus developed in this literature

page 1852

3  1   regarding the question that Dr. Naftalis was talking about?
4  2   A    Yeah.  It's pretty well accepted that it's just not
5  3   related to estrogen.
6  4   Q    Is this a valid summary of the consensus of those
7  5   studies?
8  6   A    It absolutely is.
9  7   Q    Read it to the jury.
10 8   A    There is no relationship between hot flushes and
11 9   unusually low hormone levels.  Women with hot flushes do not
12 10  have lower hormone levels than women without hot flushes.
13 11  Q    And how effective is Premarin and Prempro for the
14 12  treatment of vasomotor symptoms?
15 13  A    Extremely.
16 14  Q    And how about vaginal atrophy?  What is vaginal atrophy?
17 15  A    It's dryness.  The vagina and the endometrial wall have
18 16  estrogen receptors, and the moistness of the vagina is enhanced
19 17  by estrogen.  And we -- the cells actually change as women get
20 18  older, and these -- the cells that protect the vagina from
21 19  irritation change.  So vaginal atrophy, meaning the cells can
22 20  atrophy, can kind of die off, occurs and some women will have
23 21  vaginal bleeding and cracking and be very uncomfortable.
24 22  Q    And is Prempro and Premarin effective for the treatment
25 23  of vaginal atrophy?
26 24  A    Very effective.
27 25  Q    Is there any more effective treatment for vasomotor

page 1853

3  1   symptoms in the market today than Premarin or Prempro or
4  2   estrogen therapy?
5  3   A    No.  I keep trying to develop one, and I can't.
6  4   Q    Okay.  What about osteoporosis, Doctor?  Is it effective
7  5   in preventing osteoporosis?
8  6   A    Extremely effective.
9  7   Q    What is osteoporosis?  Quickly, this is not a case about
10 8   osteoporosis.  I want you to explain what their indications
11 9   are.
12 10  A    It's just that it's important in the treatment of
13 11  osteoporosis.  What you can see here is normal bone on your
14 12  left-hand panel.  On the right-hand panel, you can see the
15 13  cross struts are basically degrading, being destroyed, and
16 14  that's what happens with estrogen deficiencies.  This is what
17 15  happens post menopause.
18 16  Go to the next slide.
19 17  Q    Does it happen quickly?
20 18  A    Very quickly.  So this is actually a bone biopsy from
21 19  someone at baseline and one year later, post menopause.  And
22 20  that is what can happen.  It doesn't happen to everybody, but
23 21  it does happen to many women.  And this is a very effective
24 22  agent for preventing that.
25 23  Q    Doctor, we have talked about the benefits and some of the
26 24  risks.  Can you explain to the jury why Wyeth continues to make
27 25  this medicine available to the medical community even though it

Page 81

page 1854

1  carries some serious risks?
2  A    Unfortunately, every medicine has some serious risks, and
3  what we have to do is to weigh the benefits and the risks of
4  the product.  This product has clear benefits for the people
5  who take it for those indications.  It has very, very clear
6  benefits -- 90-95 percent reduction in hot flushes, treatment
7  of vaginal atrophy, and improvement in bones.  Unfortunately,
8  all products that I know of have some adverse or some potential
9  side effects.  And what we have to do is to weigh those side
10  effects and, if you can remember that slide that we saw earlier
11  putting that relative risk into context with the hemorrhagic
12  stroke in aspirin and the liver cancer and Tylenol, we look at
13  that potential risk and put it into context.  And we look at
14  the overall benefit, and we say the vast majority of women who
15  take these agents -- the vast, vast majority will do well and
16  have a benefit.
17      And our job is to try and provide options to women and to
18  their physician.  And it's a very important conversation that
19  women have.  They have to know the potential risks.
20  Q    Let me stop you.  If a medicine has risks, as all
21  medicines do, what is the responsibility of the pharmaceutical
22  company?
23  A    Our responsibility is to study it, to make sure it's been
24  well studied, to provide the accurate information to the
25  physicians so that they can give it to their patients and so

Page 82

page 1855

1  that they can counsel their patients.  This is one of the most
2  difficult areas to counsel women on.  It's a very important
3  option.  I know many women, I have many friends and a very,
4  very difficult decision for women to make, but the point is
5  that it's important and it's an important option.  You know, if
6  we took aspirin away from people because of that small risk of
7  hemorrhagic stroke, many of us would walk around with
8  headaches.
9      So I think that it's an important option for women, and
10  we know that it is very effective and has benefits that
11  outweigh the risks.
12  Q    In your opinion has Wyeth fulfilled its responsibilities
13  both to study this medicine and to accurately describe the
14  benefits and the risks in its labels?
15  A    I honestly believe that we have.
16  Q    Okay.  Have we now covered the four points that you
17  wanted to cover?
18  A    Yes.  Thank you.
19      MR. URBANCZYK:  All right.  Pass the witness.
20      Oh, before I do that, Your Honor, I would like to offer
21  into evidence Defendant's Exhibit 117, which is that one about
22  the Premarin Breast Cancer Committee, and then the 1998 Prempro
23  label.
24      MR. MORRIS:  No objection, Your Honor.
25      THE COURT:  Admitted.

Page 83

page 1856

1      MR. URBANCZYK:  And that's Defendant's Exhibit 43.
2      (Defendant's Exhibits 117 and 43 received in evidence.)
3      THE COURT:  I believe I just admitted 117 and 43; is
4  that correct?
5      MR. URBANCZYK:  Yes, you did, Your Honor.
6          CROSS-EXAMINATION
7  BY MR. MORRIS:
8  Q    Good morning, Dr. Constantine.
9  A    Good morning, Mr. Morris.
10  Q    You had an occasion to testify previously in hormone
11  therapy cases, correct?
12  A    Yes.
13  Q    In fact, you testified this past fall in Reno, Nevada in
14  a case involving three women there, correct?
15  A    Yes, that's correct.
16  Q    You also testified in the Simon trial in Philadelphia
17  back in April and May, correct?
18  A    That's correct.  I don't remember the time frames.
19  Q    And in those trials you testified live in front of the
20  jury like this; is that correct?
21  A    That's correct.
22  Q    You testified in the Daniel case, correct?
23  A    No.  That would be incorrect.
24  Q    You did not testify in Daniel?
25  A    No.

Page 84

page 1857

1  Q    What about in the Reeves trial?  Did you testify in the
2  Reeves trial?
3  A    Yes, I did.
4  Q    And you also testified in the Rush trial?
5  A    That would be correct.
6  Q    And your testimony in all those trials was similar to
7  what you presented today for the jury, correct?
8  A    Probably.
9  Q    And prior to hormone therapy, you also have testified in
10  trials involving other Wyeth products, correct?
11  A    That would be correct.
12  Q    You have testified in trials involving the product
13  fen-phen, correct?
14  A    That's correct.
15      MR. URBANCZYK:  Your Honor, may we approach on this,
16  please?
17      (Bench conference reported as follows:)
18      MR. URBANCZYK:  Your Honor, that violates --
19  expressly violates one of your orders in motion in limine, and
20  I ask for a mistrial.
21      THE COURT:  Denied on the mistrial.
22      Did I not expressly rule out any reference to fen-phen or
23  other products?
24      MR. MORRIS:  I don't recall that.  I will withdraw
25  it.

Page 85

page 1858

```
 1     THE COURT:  I'm going to strike it and tell the jury
 2  to disregard it because I am virtually certain that I have
 3  entered such an order.  If I haven't, I do now.
 4     (Return to open court.)
 5     THE COURT:  Ladies and gentlemen, the last question
 6  and answer are stricken.  What happened in any other drug case
 7  is not material to this case.  Disregard it.
 8  BY MR. MORRIS
 9  Q    Suffice it to say you have given depositions also, have
10  you not?
11  A    Yes.
12  Q    And can you give the jury a rough idea of how many times
13  you have been deposed?
14  A    I don't know.  12, 10.  10, 12.
15  Q    All right.  And in your preparation for your testimony
16  today, obviously you have met with the lawyers for Wyeth,
17  correct?
18  A    Very briefly.
19  Q    You have met with them many times in the past, correct?
20  A    I have met with them in the past.
21  Q    All the way back to before 2002, you have met with
22  lawyers for Wyeth, correct?
23  A    Regarding?
24  Q    Regarding litigation issues involving this drug.
25  A    I think I would have to disagree with that.
```

Page 86

page 1859

```
 1  Q    Would it have been after 2002 that you began meeting with
 2  the lawyers?
 3  A    Yes.  I would think so.
 4  Q    And you are still employed by Wyeth, correct?
 5  A    I am.
 6  Q    And so with regard to your presence here today before the
 7  jury, certainly the executives at Wyeth are aware you're here?
 8  A    Yes.
 9  Q    The president of the company would be aware you are here?
10  A    I don't know that's true.
11  Q    Well, the CEO might be aware that you are here?
12  A    He might.  I don't know.  I don't know.
13  Q    But nonetheless, they would have the ability to review
14  the transcript of whatever you said here, correct?
15  A    I would doubt that they would do that.
16  Q    Well, let's look at some historical documents and see if
17  we can agree on some things.  You have had an occasion to
18  review many of the historical documents that have been found in
19  this litigation, correct?
20  A    Well, many of them I was aware of because of my job.
21  Q    Okay.  That's fine.  I want to show you --
22     MR. MORRIS:  May I have the ELMO?
23  BY MR. MORRIS
24  Q    I want to show you what has been marked and admitted as
25  Plaintiff's Exhibit No. 28, and this is a memo -- can you see
```

Page 87

page 1860

```
 1  it now?
 2  A    I can.  Thank you.
 3  Q    This is a memo from 1976 from a Dr. Stern to Drs. Givner
 4  and Deghenghi.  And it says:  In view of the widespread use of
 5  estrogens with or without progestin, there is valid concern as
 6  to whether or not the use of exogenous estrogen leads to an
 7  increase in the incidence of breast cancer.
 8     Now, when you testified earlier about the use of
 9  estrogens, you weren't suggesting to the jury that these
10  products were not used widespread in the mid '70s, were you?
11  A    No.  I don't think I said that at all.  As -- progestins
12  were not widespread in the '70s.
13  Q    Well, you will agree that there were 10 million
14  prescriptions, at least in the mid to late '70s?
15  A    I don't know that that's true.
16  Q    Well, all right.
17     MR. MORRIS:  Your Honor, we would tender Plaintiff's
18  Exhibit 1564.  There is no objection.
19     THE COURT:  Be admitted.
20     (Plaintiff's Exhibit 1564 received in evidence.)
21  BY MR. MORRIS
22  Q    I want to show you the Premarin family prescription
23  trends, and over here on the left side it says 10,000, 20,000,
24  30,000.  And that's in -- you add an additional three zeros to
25  that, correct, in this type of --
```

Page 88

page 1861

```
 1  A    I think that's what that represents, yes.
 2  Q    So this would be 10 million, 30 million, 40 million,
 3  50 million, and it says total cumulative prescriptions will be
 4  1 billion by December 2001, correct?  Is that correct?
 5  A    Yes.  This is prescriptions, not patients.
 6  Q    I understand.
 7  A    Okay.
 8  Q    But we know that in 1975, '78, it reached 20 million.
 9  Then there was a dip for about five years to 1981 where it got
10  back down to about 10 million.  Then it increased steadily from
11  there, going up dramatically in the '90s, correct?
12  A    The number of prescriptions, yes; not the number of
13  people.
14  Q    So getting back to the issue that we were discussing, I
15  would like to show you page 2 of that June 14, 1976, memo.  And
16  even at that point these doctors were saying that one might
17  consider that the presence of both estrogen and progesterone
18  receptors in a tumor indicates that the tumor can and does
19  respond to estrogen; whereas, E positive/PR negative indicates
20  that the tumor, in spite of the presence of estrogen receptor,
21  does not bring about estrogenic responses.  Did I read that
22  correctly?
23  A    You did.  They are suggesting that you can consider that.
24  They are thinking about the issue, which is a good thing.
25  Q    They are thinking about the issue, and that's a good
```

1 page 1862

2

3  1    thing.  I am not arguing with you.

4  2        Then we get down to the middle, and it says:  The

5  3    possible role of progesterone in the etiology of breast cancer

6  4    is another area that needs clarification.  Correct?

7  5  A    Yes.

8  6  Q    And etiology means whether or not there is a

9  7    relationship, right?

10  8  A    Yes.

11  9  Q    Then we know that in 1977 -- and this is Plaintiff's

12 10  Exhibit 1057.  It's been admitted -- the doctors say that many

13 11  practicing gynecologists are introducing sequential progestins

14 12  into their estrogen replacement regimens in postmenopausal

15 13  women.  Some have considerable experience with this treatment

16 14  modality.

17 15        Now, if they had experience with this treatment modality,

18 16  would that suggest that at least some practitioners had been

19 17  doing this customarily before 1977?

20 18  A    Had been doing what --

21 19  Q    Using --

22 20  A    -- customarily?

23 21  Q    Using progestins in addition to estrogen.

24 22  A    In a sequential way, yes, some -- certainly some had.

25 23  That's certainly true.

26 24  Q    And then it says, Unfortunately, the number of published,

27 25  well-designed studies is small or practically nonexistent,

1 page 1863

2

3  1    correct?

4  2  A    That's what that says.

5  3  Q    So the folks at Wyeth acknowledged in 1977 that they knew

6  4    that some use was going on where doctors were using estrogens

7  5    and progestins together, correct?

8  6  A    Yes.

9  7  Q    Then if we look at the Defendant's Exhibit 117 that

10  8  Mr. Urbanczyk just had admitted, this is dated June 1, 1978,

11  9  correct?

12 10  A    That is correct.

13 11  Q    And this was the Ayerst committee on Premarin and breast

14 12  cancer, correct?

15 13  A    That's correct.

16 14  Q    And it says the committee met on Friday, May 26, 1978,

17 15  and it says who was in attendance.  And it says, Following a

18 16  general review of published literature on epidemiology of

19 17  breast cancer and government-funded studies on estrogen and

20 18  breast cancer, the discussion concentrated on areas of

21 19  potential involvement for Ayerst.  And they talk about

22 20  identifying the literature and then update on estriol, and have

23 21  our CRAs provide information on breast cancer studies in their

24 22  respective areas.  Obtain lists of studies funded by American

25 23  Cancer Society and government agencies.  And then it says, Do a

26 24  prospective study in postmenopausal women to determine

27 25  estrogenic susceptibility of breast cancer.

1 page 1864

2

3  1        So in 1978, Wyeth was considering doing a prospective

4  2    study, the type that you mentioned, which would be a randomly

5  3    controlled trial, correct?

6  4  A    That's correct.

7  5  Q    And then it says:  Obtain the histopathological data on

8  6    breast cancer patients and studies conducted by Hammond and

9  7    Gambrell.  And then it says:  Consult with experts to assist in

10  8  a design of an appropriate prospective study, correct?

11  9  A    That's correct.

12 10  Q    So Wyeth knew in 1978 that it was possible to do a

13 11  prospective study and that is feasible to discuss the

14 12  design of one with the epidemiologist?

15 13  A    Well, they thought it was possible to do it, and they

16 14  certainly tried to do it.

17 15  Q    Now, during the years 1983 to 1988 -- the jury has

18 16  already heard this -- a study was attempted on Prempak, but

19 17  because of difficulties apparently getting people registered,

20 18  the study was never completed; is that correct?

21 19  A    The study was initiated.  They had a lot of enrollment

22 20  issues in the study, and you are correct.  The study was not

23 21  completed.  It eventually became -- turned into another study

24 22  that was completed.

25 23  Q    All right.  And as far as the ability to get the study

26 24  done back in that time frame, there is no indication that has

27 25  been made to the jury that Wyeth didn't have the know-how, the

1 page 1865

2

3  1    money, the expertise to properly design the study and get it

4  2    done.  It wasn't a lack of those things that caused the study

5  3    to get done -- not to get done, correct?

6  4  A    I think the experience -- when you say "know-how," I am

7  5    not exactly sure what you mean.  But the experience in doing

8  6    large randomized clinical trials was very different than it is

9  7    today.  We have very different technologies today.  Let me give

10  8  you one small example.  In that time frame, doctors couldn't

11  9  advertise.  I don't know how many of you remember that, but

12 10  doctors didn't advertise back then.  And a lot of large

13 11  randomized studies today depend on advertising to get patients

14 12  to come in for a clinical trial.

15 13        So they had a lot of difficulty getting patients in and

16 14  enrolled in that trial.  So when you say know-how, I don't know

17 15  that -- how experienced we were.  And we actually -- and there

18 16  were some articles suggesting that the know-how that

19 17  accumulated on doing these types of studies over the years

20 18  really led to our ability to eventually do WHI.

21 19  Q    Well, the fact of the matter is, you had the know-how to

22 20  convince the Food and Drug Administration in 1962 through a

23 21  DESI review that your product was safe and effective for use in

24 22  women for menopausal symptoms and osteoporosis.  You had that

25 23  know-how, didn't you?

26 24  A    Well, I think every company did.  Obviously, as

27 25  technologies have changed, standards of drug approval have

page 1866

3 1 changed. There is something called, and I think what you are
4 2 referring to, the DESI review. Fortunately, things have gotten
5 3 a lot more stringent in drug approvals today than 40 or 50 or
6 4 60 years ago.
7 5 Q     And one of the reasons that things have gotten a lot more
8 6 stringent today is because the drug companies weren't
9 7 conducting the studies they should have been conducting to
10 8 determine safety, and so somebody else had to get involved like
11 9 the federal government; is that true?
12 10 A     I think that's a total mischaracterization.
13 11 Q     Well --
14 12 A     I think capabilities and characterizations have changed.
15 13 We have computers today. How do you keep track of 10,000
16 14 patients without a computer? Technologies have changed
17 15 greatly. Sending out the tablets, FedEx -- our world has
18 16 changed from the '40s and the '50s and the '60s.
19 17          MR. MORRIS: Let me object to the nonresponsive
20 18 portion of it.
21 19          THE COURT: Overruled.
22 20 BY MR. MORRIS
23 21 Q     Certainly science was sophisticated enough in the 1970s
24 22 to ascertain that your product, Premarin, was causing
25 23 endometrial cancer; isn't that true?
26 24 A     The -- when you have a large risk, you need many fewer
27 25 patients. If you look at those studies, the size of the

page 1867

3 1 studies are much, much smaller than what would be needed to
4 2 look at a risk such as this with breast cancer, a very small
5 3 risk that flip-flops on the line.
6 4 Q     Let me try it one more time. Certainly, the scientific
7 5 knowledge and ability to study the issue of Premarin and its
8 6 relationship to endometrial cancer was well enough developed in
9 7 the mid '70s that we were able to ascertain that Premarin was
10 8 causing endometrial cancer; isn't that true?
11 9 A     Yes. Given the size of that response, yes.
12 10 Q     Now, during your direct examination, you went through and
13 11 you talked about some studies that Wyeth had done and we will
14 12 get to that in just a minute. I don't have that particular
15 13 slide with me right now. So we will talk about this chart
16 14 right here. This is the Dupont chart. You are familiar with
17 15 it, correct?
18 16 A     I am.
19 17 Q     Right? Is this the -- is this the Dupont compilation of
20 18 studies?
21 19 A     This is from the Dupont article, but this is a different
22 20 chart.
23 21 Q     This is a different chart?
24 22 A     It's different appearing.
25 23 Q     I apologize. I didn't mean to talk over you. Is this
26 24 one the same one that's attached to that "Dear Doctor" letter
27 25 that is from 2000?

page 1868

3 1 A     Yes. But the graphic is different than what's in the
4 2 chart is what I am saying, in the paper. It's the same data
5 3 essentially the same information.
6 4 Q     What's different between this one and the one that's in
7 5 the "Dear Doctor" letter that I have tendered for the jury?
8 6 A     Would you -- I haven't seen your "Dear Doctor" letter.
9 7 If you just want to hand me that so that --
10 8 Q     Let me make sure if I have it or not. Here it is. I
11 9 will do that. Here you are, Doctor?
12 10 A     Thank you. And, I'm sorry, your question was?
13 11 Q     Are they the same?
14 12 A     You have lost me. Is what the same?
15 13 Q     I'm sorry. Is this board --
16 14 A     The same as what you just handed me?
17 15 Q     Yes.
18 16 A     This board is the same as the chart. It's different than
19 17 what you had represented in your original question.
20 18 Q     All right. Now, if I understand your testimony
21 19 correctly, if the line on either side of the dot touches the
22 20 middle line, then that means that the study is not
23 21 statistically significant.
24 22 A     If it, if the number is 1, if it includes 1, it is not
25 23 statistically significant. If it crosses 1 -- I'm sorry. If
26 24 it crosses 1, it is not statistically significant. So if it
27 25 includes that No. 1, it is not statistically significant.

page 1869

3 1 Q     Okay. So we're clear, so if it touches 1, would that
4 2 mean that it's made contact with 1, so it's not statistically
5 3 significant?
6 4 A     It would depend what the authors reported. That's why I
7 5 wanted to look at your graphic. I can't tell from that if it's
8 6 including 1 or if it's 1.01. That's a little fuzzy. If you
9 7 want to show me the actual --
10 8 Q     I don't think you can tell any better on mine, but I will
11 9 show it to you. You are welcome to look at it. I want to make
12 10 sure we can be as close to right as we can.
13 11 A     Thank you.
14 12 Q     You're welcome.
15 13 A     So it looks like those include 1. We could go back to
16 14 the original article to be -- you know, to be precise, but it
17 15 does look like it is including 1.
18 16 Q     So if it includes 1, it is not statistically significant,
19 17 correct?
20 18 A     That would be correct.
21 19 Q     And if it's not statistically significant, then that says
22 20 something to the researcher and to the doctor that is reading
23 21 the article about the reliability of the article, correct?
24 22 A     No, no. That's an important fact. We find a lot of
25 23 things in science that are not statistically significant, and
26 24 that's important information as well.
27 25 Q     Okay. So for the ones that are not statistically

page 1870

3 1  significant that we pointed out, if part of the information
4 2  contained in those is an increased relative risk of breast
5 3  cancer, that is important information, correct?
6 4  A  Yes, it is.
7 5  Q  So the number of studies that I pointed out to the jury
8 6  the other day on the right side would have important scientific
9 7  information, correct?
10 8  A  All the information on there is important.
11 9  Q  Okay.
12 10  A  Every piece of it is important.
13 11  Q  So if I counted up the number of times that the
14 12  statistical number was over 1 and the number of times that
15 13  statistical was under 1, that would be important information to
16 14  consider, correct?
17 15  A  It would, but you wouldn't just be able to use the dot to
18 16  make that assumption.  You need the dot with the confidence
19 17  interval so you know how much confidence you have in that dot.
20 18  Q  Right.  And when we look at the ones where the dot and
21 19  the line are both over 1, those are statistically significant,
22 20  correct?
23 21  A  That's correct.
24 22  Q  So does that mean that they have a higher level of
25 23  reliability than the ones that are not statistically
26 24  significant?
27 25  A  No.  Absolutely not.

page 1871

3 1  Q  So they're all reliable?
4 2  A  Well, you have to look at the study.  For example, the
5 3  one -- I think it was the one you pointed to.  I might have
6 4  looked away -- the one with the longer confidence interval, you
7 5  would think that had less reliability because we talked about
8 6  that dot could be anywhere in that line.  The tighter, the
9 7  smaller that line, the more confidence you have that that point
10 8  is accurate.
11 9  So when I would look at that, and I -- I can't remember.
12 10  I think that's the Thomas paper.  You know, we would have to go
13 11  back and look at the Thomas paper and look at the methods and
14 12  understand the paper.  The important thing is that you are
15 13  giving the physicians that information.  You are giving them
16 14  the reference, which have been attached, so that they
17 15  could go back and look at that study.  But you are trying to
18 16  give them a summary.  Doctors are very busy.  It's a good thing
19 17  to do.  You give them a summary of the information.
20 18  Q  And you will agree that in terms of statistical
21 19  significance, we have one, two, three, four, five, six, seven
22 20  that reach statistical significance on the right side?
23 21  A  That's --
24 22  THE COURT:  We are going to take a break.  We will
25 23  be in recess until 25 till.  Let the jury stand out with the
26 24  standard admonition.  Everyone else remain as you are.
27 25  (Jury exits the courtroom.)

page 1872

3 1  THE COURT:  The jury is out.  This break is based
4 2  upon a note from a juror.  We're in recess until 25 till.  Be
5 3  at ease.
6 4  (Recess at 11:22 a.m.; continuing at 11:36 a.m.)
7 5  THE COURT:  You may proceed.
8 6  MR. MORRIS:  Thank you, Your Honor.
9 7  BY MR. MORRIS:
10 8  Q  Dr. Constantine, before we took that brief break, we were
11 9  talking about this particular exhibit that I will refer to as
12 10  the Dupont graph, I guess you would call it.  You will agree
13 11  with me that there are a number of studies within the graph
14 12  where they examine patients who were only on estrogen, correct?
15 13  A  Yes.  There are some.  This is not from the Dupont paper.
16 14  That's --
17 15  Q  Okay.  Okay.  It's not from the Dupont paper.  Have you
18 16  ever heard it referred to as the Dupont graph or anything like
19 17  that?
20 18  A  I have not.
21 19  Q  Did Dr. Bill Dupont have anything to do with this?
22 20  A  I don't know.
23 21  Q  He has worked for Wyeth from time to time as a thought
24 22  leader or consultant, hasn't he?  Dr. Dupont?
25 23  A  I don't know whether he has.  Not to my knowledge.
26 24  Q  Okay.  Well, from time to time Wyeth, when medical
27 25  articles are coming out or something that, you know, is of

page 1873

3 1  concern for them in the press, oftentimes they will go to
4 2  thought leaders, people like Leon Spiroff and Trudy Bush and
5 3  Lila Nachtigall.  And you are familiar with that, aren't you?
6 4  A  I think you have mischaracterized it.  We often go to
7 5  outside investigators to help clarify issues, to help us plan
8 6  things, to help us plan studies.
9 7  Q  Because those people, if they're prominent in their
10 8  profession -- for instance, Spiroff in the field of obstetrics
11 9  and gynecology -- and they're well recognized in the world, if
12 10  he can come out and say something that's favorable for a Wyeth
13 11  product, that will influence a lot of physicians out there,
14 12  won't it?
15 13  A  I don't know whether that's true or not.  I think
16 14  physicians should be able to look at the literature, but that
17 15  wouldn't be what our goal would be.  It would be to try and
18 16  have accurate information presented.
19 17  Q  And you will agree with me that clinicians, like
20 18  Dr. Kuperman in this case, oftentimes are busy with their
21 19  patients all week examining ladies, doing whatever treatment
22 20  they need to do, and quite frankly, for them to keep up with
23 21  all the world's literature on a particular topic is pretty much
24 22  a task that's beyond most routine practitioners.  Will you
25 23  agree with that?
26 24  A  I think most routine practitioners read in their
27 25  specialties.  I certainly hope that they do.  I know I do, and

page 1874

3  1  my husband does.  So I would disagree that they don't keep up.
4  2  I think they do their best.  I agree with you that it is very
5  3  difficult for physicians in a busy practice to read every day.
6  4  That's why the purpose of this is very useful for somebody.
7  5  Q    And when you mention meta-analyses to the jury, a
8  6  meta-analysis is looking backward at studies that have already
9  7  been done that are either case control, cohort, or RCTs,
10  8  correct?
11  9  A    Yeah.  Usually they're looking at epidemiologic studies,
12  10  but they can combine them as well.
13  11  Q    And so when we say Wyeth did six meta-analyses, what
14  12  those meta-analyses were were accumulations of prior studies
15  13  that had been done and, putting those all together, coming up
16  14  with an answer; isn't that true?
17  15  A    Yeah.  I am not sure that we said that we did six
18  16  meta-analyses.
19  17  Q    Okay.  Well, I thought I heard that on direct
20  18  examination.
21  19  A    There have been six certainly.  Certainly many more than
22  20  six, but on this particular topic.
23  21  Q    And you will agree with me that when you showed the
24  22  ladies and gentlemen of the jury this particular slide -- and
25  23  the only one I have is this exhibit exchange copy.  It's kind
26  24  of hard to read, but I will do the best I can for the folks on
27  25  the jury.  Over here where it begins in 1959, I showed the jury

page 1875

3  1  the Wallach paper the other day.  And you will agree that that
4  2  particular study was designed to look at endometrial cancer
5  3  and, as a matter of fact, it was primarily an estrogen study.
6  4  You will agree with that, won't you?
7  5  A    I agree with part of your answer and disagree with part
8  6  of your answer.  It was not designed as an endometrial study.
9  7  It was an elegant study for its time.  It looked at many
10  8  things.
11  9  Q    Well, the one that I have did not state any breast cancer
12  10  data whatsoever.  Do you have a different copy than the one
13  11  that I have that is entitled "Prolonged Estrogen Therapy in
14  12  Postmenopausal Women" by Stanley Wallach?  Do you have a
15  13  different copy?
16  14  A    I think we are talking about this same article, and what
17  15  you can see there, if you go to the methodology, is -- would I
18  16  be able to have a copy of the article?  Maybe I have it here.
19  17  Q    I only have one copy.
20  18  A    So I can find this section quickly for you, that's all.
21  19  But it will give the objective and it says here -- for example,
22  20  you have the incidence of breast cancer.  It's looking at many
23  21  issues.  You had it highlighted there.  So it's looking -- here
24  22  you go.  Here is bone.  Just turn -- and we can look at all the
25  23  different things that the article looked at.  It did look at
26  24  the -- there is a table of cervical and endometrial.  It did
27  25  not find any endometrial cancers with Premarin.  It did with an

page 1876

3  1  old product that people may have heard of DES,
4  2  diethylstilbestrol.
5  3  Q    And there are summary and conclusions, Doctor.  It says a
6  4  25-year retrospective study of the results of prolonged
7  5  estrogen therapy in 292 postmenopausal women showed that
8  6  serious side effects were infrequent and necessitated
9  7  discontinuation of the therapy in only 5 percent of the
10  8  patients.  I read that correctly, right?
11  9  A    Yes, you did.
12  10  Q    And we can go through the rest of the summary and
13  11  conclusions.  Excellent results were obtained in the treatment
14  12  of menopausal syndrome and postmenopausal osteoporosis.  One
15  13  case of uterine cervical carcinoma and none of breast cancer
16  14  occurred during prolonged estrogen therapy.
17  15  Now, there is no data at all in this paper that talks
18  16  about E plus P.
19  17  A    That would be incorrect.
20  18  Q    Show me where in the article they report data of how many
21  19  people were taking E plus P?
22  20  A    So --
23  21  Q    Is it --
24  22  A    I could find it much faster if you give me the paper.
25  23  Q    Is that in the paper?
26  24  A    It is in the paper.  It's on the left-hand side of --
27  25  Thank you very much.

page 1877

3  1  Here we go.  Under Modes of Therapy.  Okay.  So it goes
4  2  through the different types of estrogens that were given.
5  3  Remember, this goes back to World War II.  So this was a study
6  4  going back 25 years from 1959.  It was a retrospective study,
7  5  and that's why I said it was very elegant for the time, for
8  6  that time period.  And you can see that they used estradiol,
9  7  estradiol implants, long-acting preparations, and that it goes
10  8  on to talk about after 1945 -- I think you have it highlighted
11  9  there.  These preparations -- maybe I can use my little
12  10  highlighter here for you.  In here.
13  11  After 1945, these preparations were gradually replaced by
14  12  orally given diethylstilbestrol, and you can see Premarin, 1.25
15  13  to 5 milligrams.  And down to the paragraph you have
16  14  highlighted.  In addition to being given estrogen replacement
17  15  therapy, 16 women were given progestational agents, and ethynyl
18  16  testosterone.  Obviously, they couldn't study MPA because MPA
19  17  hadn't been on the market in this time frame.  So -- and you
20  18  had highlighted the breast cancer result on one of your
21  19  previous pages, I think.  Remember, you had --
22  20  Q    Please take a look at it and tell me if they parse out
23  21  the difference between breast cancer in the E group and the E
24  22  plus P group.
25  23  A    Well, they wouldn't have had enough patients, but they
26  24  looked at everybody; and that's how you start studying things.
27  25  Q    So the point is, in 1959, though, at least as far as this

Page 105

page 1878

```
 1  Wallach paper is concerned, they didn't draw a distinction
 2  between estrogen-alone therapy and E plus P in any reporting of
 3  breast cancer results?
 4  A    That would be correct.  That would be correct, but they
 5  certainly studied it and reported on it.
 6       MR. MORRIS:  Let me object to the nonresponsive
 7  portion of it.
 8  BY MR. MORRIS:
 9  Q    You would agree with me that 16 patients would be not --
10  would be a small number and an insignificant number to do a
11  breast cancer study.  You would agree with that, wouldn't you?
12  A    Well, it's not an insignificant number if you think about
13  where they were starting from in 1959 and looking backwards for
14  25 years.  It's an important piece of information if you had a
15  very large risk.  Even with 16 patients, they may have seen
16  something, and fortunately, they didn't.  But it's a piece of
17  information, and the fact is was estrogen and was estrogen and
18  progestin being studied and was the company supporting that?
19  Yes.  Were the products available then?  Going back 25 years,
20  no, they weren't.
21  Q    Well, Premarin certainly was.  Premarin was available in
22  1959, wasn't it?
23  A    And Premarin was studied in here.  We just looked at
24  that.
25  Q    Right.  And you are well aware that Prempro -- or
```

Page 106

page 1879

```
 1  Provera, medroxyprogesterone acetate, came on the market in
 2  1959, didn't it?
 3  A    But this is a retrospective analysis.  We talked about
 4  it's an observational study.  They looked back 25 years and
 5  looked at the records and --
 6  Q    I understand, and the jury appreciates that.
 7       THE COURT:  One at a time, please.  One at a time.
 8  BY MR. MORRIS:
 9  Q    But if you could try to confine your answers to my
10  questions, I would appreciate it just so we can get through
11  this.
12       What we know from Wyeth's own graph that they showed the
13  jury and asked the jury to rely upon is that between 1959 and
14  1968, a period of nine years, Wyeth didn't sponsor anything
15  during that time frame or conduct anything on the issue of
16  breast cancer and its estrogens.
17  A    I'm sorry.  I can't --
18  Q    Based on this graph -- I am asking you, based on this
19  graph, does it disclose that there was anything done between
20  '59 and '68?
21  A    No, not on this graph.
22  Q    Okay.  You will agree with me that there are a number of
23  things on this graph that are estrogen only.  Burch and Byrd,
24  those were all estrogen-only studies, you will agree?
25  A    Yes.  That's why we have the E there, for estrogen.
```

Page 107

page 1880

```
 1       THE COURT:  Hold that thought.  We are going to be
 2  in recess for dinner until 10 after 1:00.
 3  Ladies and gentlemen of the jury, standard admonition.
 4  Let the jury stand out.  Everyone else remain as you are.
 5  (Jury exits the courtroom.)
 6       THE COURT:  We're in recess.  Be at ease.
 7  (Recess at 11:48 a.m.)
 8           C E R T I F I C A T E
 9  I, Cheryl Bartnett Nelson, Official Court Reporter, do
10  hereby certify that the foregoing is a true and correct
11  transcript of proceedings in the above-entitled case.
12
13  _____    Date:  February 15, 2008
14
15  Cheryl B. Nelson, CRR, RPR, CCR
16  United States Court Reporter
```

Page 108

page 1881

```
 1  (Proceedings continuing in open court at 1:11 p.m., jury
 2  present.)
 3       THE COURT:  Good afternoon.  You may proceed.
 4       MR. MORRIS:  Thank you, Your Honor.
 5  BY MR. MORRIS:
 6  Q.   Dr. Constantine, before the lunch break -- and sorry this
 7  is getting so chopped up -- but we had discussed this graph.
 8  And I had Wyeth's board that I had put up.  Do you remember
 9  that, this one?
10  A.   Yes.
11  Q.   And I had asked you if this was a Dupont graph, and you
12  said you had never heard it called that or anything.  Do you
13  remember that?
14  A.   That's correct.
15  Q.   That was your line of testimony.  I'd like to show you
    the
16  PowerPoint that I was provided for today's testimony for you
17  from Wyeth.  It's called "Dupont Meta-analysis."  And if we
18  look at it, and we look at the one from 2000, if we go up to
19  about 1989 where we get to Bergkvist --
20  A.   Would you be able to provide me with a copy of that?
21  Q.   I actually don't.  I only have this -- this is the only
22  one that your counsel gave me.
23  A.   I have the Dupont article here if you just have that
24  graphic, but I'll try and follow you.
25  Q.   Well, let's just -- I just want to be clear with the jury.
```

page 1882

1    This is Wyeth's slide, correct?
2    A. The one that you have on the ELMO now?
3    Q. Yes.
4    A. Yes. And that is the Dupont meta-analysis. That is not
5    the same as what you had up there.
6    Q. Right. What I have up there, what Wyeth has up there --
7    A. You don't have anything up there now.
8    Q. I understand. It's right here.
9    A. Okay. I'm sorry.
10    Q. But what's been added to -- there are a few studies that
11    have been added to it, correct, whatever is in this 2001 letter
12    you sent out to doctors?
13    A. The 2001 letter -- and it really would be more helpful if
14    I had a copy because there is a letter attached to this, I
15    believe, explaining what it is. And this is a compilation of
16    several articles that had recently been published subsequent, I
17    believe, to the Dupont. So this incorporates much of Dupont,
18    but this is not the Dupont meta-analysis. And I think if you
19    look at that letter, it clarifies that issue.
20    Q. All right. Well, let's just look real quickly, if we can,
21    up through 1989. Dupont has Mack, Dupont has Hoover, Dupont
22    has Casagrande. They left out Byrd in this one. But they both
23    have Wynder. They added Jick to this one, right?
24    A. Yes.
25    Q. Took out Ravniher. They have Hoover. Both have Hoover.

page 1883

1    Both have Kelsey. Both have Thomas. Both have Hulka. Both
2    have Gambrell. And they added in Hulka -- no, we've already
3    mentioned Hulka. Sherman, Horwitz, and Stewart. Suffice it to
4    say, many of the same studies are contained in what is
5    Plaintiff's Exhibit No. 5775 as what is contained in the
6    Wyeth's slide Dupont meta-analysis. Correct?
7    A. It's not all the same because the one that you have in
8    front of you incorporates some additional studies. And some of
9    the studies that aren't on there, actually, the relative risks
10    were below the one line, and there were some asterisks on one
11    of these. If I could see a printout of it, I could probably
12    tell you a little bit better. And I think the asterisk there
13    refers to something.
14    Q. All right. Nonetheless, in your opinion, do you believe
15    that the Dupont meta-analysis from 1991 was relied upon in
16    forming the chart that was attached to the 2000 "Dear Doctor"
17    letter?
18    A. Certainly in part.
19    Q. Okay. So I wasn't crazy when I called this Dupont to
20    think that they are similar types of charts?
21    A. Well, I wouldn't speak to your mental status, but I would
22    speak to the fact that they are not the same.
23    Q. We'll leave that to Mr. Urbanczyk to speak to my mental
24    status.
25    All right. Now, I want to show you -- I know on a Friday

page 1884

1    afternoon this is going to be exciting. I want to show you
2    some articles. And I will represent to you that those are the
3    articles that are referenced in the exhibit that the jury has
4    in front of them right now, which is Plaintiff's Exhibit No.
5    5775. We may be able to go through these pretty quick. I
6    don't know if we will or not, but let's try.
7    Since you have them in front of you, and that's about half
8    of them, Mr. Faries is putting the remainder in date order. We
9    didn't get that done before we got here, but we're going to get
10    it done. Can we agree the Mack study was estrogen only?
11    A. I'd have to look at the section. My recollection from the
12    timing, it probably was. I'll agree with you, but I would feel
13    more comfortable if we could look.
14    Q. Please look because we're going to rely on this data.
15    This is data that I will present to the jury in closing
16    argument. It is data that I was challenged to prove by Wyeth's
17    counsel when I tried to introduce it earlier with Dr. Austin.
18    So I want to make sure that we are crystal clear on these
19    facts. So if you would, look at the Mack and tell me whether
20    or not you agree that it's E only.
21    A. I'm not sure that in this article they actually
22    distinguished it, but let me see if we can turn to the HRT
23    section. Do you have it pulled up there?
24    Q. There is no HRT section.
25    A. They do talk about HRT. They looked at it.

page 1885

1    Q. Tell me where.
2    A. Well, I'm using HRT synonymously with ERT. So look for
3    the estrogen section in there.
4    Q. Tell me where.
5    A. Okay. Estrogens were usually taken in the form of
6    conjugated estrogen tablets. So in that time frame, oftentimes
7    they used the terms synonymously, but, so far, I don't see
8    progestin, so -- actually, it might be easier if we go to the
9    Dupont meta-analysis.
10    Q. No, ma'am. No, ma'am.
11    A. But that's just estrogen alone.
12    THE COURT: Just a minute. Whoa. Re-ask the
13    question, if you will.
14    BY MR. MORRIS:
15    Q. Will you agree with me -- and I've given you a copy of the
16    paper -- that the Mack study in front of you is an estrogen
17    only study?
18    A. I think it probably is, but if -- there's an easy way that
19    we could determine, and that would be to actually look at the
20    Dupont meta-analysis, the other --
21    THE COURT: If you will, when he asks a question,
22    answer it as narrow as you can. If it needs to be fleshed out,
23    I'm sure Mr. Urbanczyk will do it in his redirect examination.
24    BY MR. MORRIS:
25    Q. In the event that any of the jurors don't think I'm being

Page 113

page 1886

1  fair with you, let's look down here.  They talk about use of
   estrogens, ever use, and at least five years before.  Nowhere
2  in that graph does it talk about the use of progestins.
3  A.  I will agree with you.
4  Q.  The same is true on table 3, no use of estrogens before
5  five years.  They don't mention progestins anywhere?
6  A.  I agree with you.
7  Q.  Go to table 4, relative risk, estrogens ever used,
8  correct?
9  A.  That's correct.
10  Q.  No mention of progestins.  All right.  Let's go to the
11  next one.  Hoover, 1975.  Will you agree with me that the
12  Hoover study was an estrogen alone study?
13  A.  Yes.
14  Q.  Next, Casagrande.  Will you agree with me that Casagrande
15  was estrogen alone?
16  A.  That is my recollection.  I would feel more comfortable
17  if
18  we could double check, but I really understand from time --
19  Q.  Let's take a look at it.
20  A.  It's just sometimes this will have a section on the
21  treatment group.  It looks like they are just talking about
22  estrogen here.  And that's how we had represented this as
23  well.
24  Q.  Let's go to Wynder.  Will you agree that this is estrogen
25  alone?
   A.  It most likely was from the time frame.

Page 114

page 1887

1  Q.  Let's go to Jick.  Will you agree that Jick is E alone?
2  A.  Jick is on the Dupont, so I'm just going to use this to
3  save time and will make the assumption that if it's on the
4  Dupont meta-analysis that we represented E alone, that it is,
5  so I would make that representation, yeah.
6  Q.  Okay.  What about Ross?
7  A.  Let's see.  Which Ross is this?  There's several of these
8  papers.  Some of them we know that -- I don't know what he
   says
9  in this paper, but in this cohort, they did use estrogen and
10  progestin.  I don't know what he says in this particular --
11       MR. MORRIS:  Let me object to the nonresponsive
12  portion of that answer.
13       THE COURT:  Sustained.  Strike the answer.
14  BY MR. MORRIS:
15  Q.  We're looking at Ross 1980.  I have put the Ross paper
16  from 1980 entitled "A case-control study of menopausal
   estrogen
17  therapy and breast cancer."  You're welcome to look through
   it.
18  Will you agree with me that this was estrogen use alone?
19  A.  Yes.
20  Q.  Hoover, 1980, will you agree that's E only?
21  A.  Yes.
22  Q.  Kelsey, 1981, will you agree that's E only?
23  A.  I don't remember Kelsey.  Let's see.  That looks -- they
24  have diethylstilbestrol in this one.  It's on the Dupont
25  meta-analysis, so I would say, yes.

Page 115

page 1888

1  Q.  Thomas, 1982?
2  A.  As is Thomas, so I would say, yes.
3  Q.  Hulka, 1982, is that E alone?
4  A.  Yes, it is.
5  Q.  And Gambrell?
6  A.  That's E plus P.
7  Q.  E and E plus P, correct?
8  A.  That would be correct.
9  Q.  And Gambrell is the study where they didn't control for
10  age, correct?
11  A.  They often don't in a cohort study.  Yes, that would be
12  correct, I believe.
13  Q.  And they were not randomized?
14  A.  It's a cohort study.
15  Q.  So they were not randomized?
16  A.  No, you wouldn't.
17  Q.  The jury has heard a lot about Gambrell.  We can come
   back
18  to it if you like.  We'll put E plus P by Gambrell.  Okay.
19  Sherman, will you agree Sherman is E only?
20  A.  Yes, based on the representation of the Dupont
21  meta-analysis.
22  Q.  Well, you have the actual paper there.  If you have any
23  doubt in your mind, tell me now.  You've had an opportunity to
24  look at it.
25  A.  Well, I do have doubt in my mind.  And I can express why

Page 116

page 1889

1  if you like.
2  Q.  Anything in that paper that suggests it's anything other
3  than E only?
4  A.  Obviously with the number of papers that exist on
   estrogen
5  and estrogen and progestin, I haven't memorized every dosage
6  form and every paper.  That's why we have the paper, so we can
7  look at it.  It takes time to do that.  That's why I am
8  uncomfortable just stating it, but because it's on the Dupont
9  meta-analysis, I'm willing to say probably not.  My hesitation
10  also comes from something else, if you would like me to
   clarify
11  that.
12  Q.  Your counsel will have an opportunity to take you back on
13  redirect.
14  A.  Okay.
15  Q.  Horwitz and Stewart.  Will you agree that that is an E
16  only study?
17  A.  Yeah, but I think I'm out of order with you, but go
18  ahead.
19  Q.  Hiatt, will you agree that Hiatt is estrogen alone?
20  A.  I will agree to it with the same concerns.
21  Q.  Well, if you're going to have qualifications, I want to
   be
22  careful about this because the jury is going to need to rely
23  upon this information at the conclusion of the case.  The fact
24  of the matter is, these papers do not report on E plus P use.
25  They are reporting on estrogen only use, isn't that true, the
   ones that are estrogen only we've gone through thus far?

Page 117

page 1890

1   A.   My -- may I state my concern?
2   Q.   Answer my question.
3   A.   I don't know.  I haven't memorized every --
4        THE COURT:  I'll instruct witnesses.  Just ask
5   questions.
6        MR. MORRIS:  I apologize.
7        THE COURT:  Thank you.
8   BY MR. MORRIS:
9   Q.   With regard to my question -- and you're welcome to read
10  the paper.  We have the time to do it.  And if you need to
    read
11  the entire paper, just tell me and we'll do that.  Without
12  reading the paper, by looking at sections in the paper, would
13  that help you know whether or not they had reported on
14  progestin use?
15  A.   Not necessarily, no.
16  Q.   Okay.  All right.
17  A.   Well, I'm sorry --
18  Q.   Let's slow it down.
19  A.   With regard to whether they reported.  If we read the
20  paper, yes.  But the concern remains whether -- and we can
21  discuss it --
22  Q.   Just tell me what your concern is, Dr. Constantine.
23  What's your concern here?
24  A.   The term of art in these days in these early years was
25  "estrogen use."  And people didn't distinguish estrogen and

Page 118

page 1891

1   progestins.  What we talked about earlier is that in an
2   observational study, you're going back and you're looking at
3   what patients are taking.  And oftentimes they were taking
4   estrogen and progestin, you don't know.  The amount of
5   progestin that they would have been taking in this time frame
6   would have been small amounts, so I would agree with you that
7   it would be very difficult to parse out the progestins and
8   the -- from the E plus Ps.  So if they are in there, they are
9   going to be combined into one number.  That's my concern.
10  Q.   The fact of the matter is, at least as far as Gambrell
    was
11  concerned, Gambrell looked at E plus P and reported on E plus
12  P, didn't he?
13  A.   He did, but that's because that was a prime question that
14  he was asking in his study.  The term of art in these days
15  oftentimes was estrogen alone, and people didn't distinguish
16  whether they used E or E plus P.  When I used to talk about
17  putting somebody on estrogen, I didn't say, I'm going to put
18  you on E plus P.  I said, I'm going to put you on estrogen, or
19  I'm going to suggest that.  Oftentimes it meant that they were
20  going to receive E plus P and they would see their doctors
21  about that.  And you will see -- I believe Dr. Colditz
    actually
22  refers to that.  You will see that cited in some articles that
23  that was the term of art.
24  Q.   The fact of the matter is, these papers that we put in
25  front of you right now, when they report -- many of the times

Page 119

page 1892

1   during the study, they will report whether the woman has had a
2   hysterectomy, or whether she has not, won't they?
3   A.   Yes, they often do.
4   Q.   We know that after 1975, many of the women who had not
    had
5   a hysterectomy were prescribed E plus P, correct?
6   A.   The use started to increase, yes.  But there was some E
7   plus P use prior to that period of time.  We saw that in
8   Walloch in 1959.
9   Q.   I understand that.  My point is that after 1975, there
10  were a number of women that began taking E plus P because of
11  the endometrial cancer concern, correct?
12  A.   That would be correct.
13  Q.   And so when you say this time frame, we're talking about
    a
14  decade here from '75 up to '84.  There are a substantial
    number
15  of women that are taking E plus P who have intact uteruses
16  during that time frame, correct?
17  A.   The numbers started to increase.  It was still relatively
18  small compared to the estrogen alone users.
19  Q.   You had 20 million prescriptions of estrogen in 1975.
    You
20  had at least 10 million prescriptions in 1980.  The jury has
21  seen an article that suggests that there are a large number of
22  women out there who haven't had a hysterectomy.  So for the
23  women that haven't had a hysterectomy, after this time frame,
24  we can assume if they had conscientious obstetricians and
25  gynecologists, that they would have been prescribing E plus P

Page 120

page 1893

1   to those women, correct?
2   A.   No.  You can't make that assumption because there were a
3   lot of theories at that time.  There were many women who would
4   stay on estrogen therapy for a short period of time, and there
5   are many even today that believe if you're on the agents for a
6   short period of time, that they don't need progestins.  So you
7   can't make the assumption.  And I guess because of my science,
8   I'm uncomfortable making an assumption.  That's all.
9   Q.   Dr. Constantine, with regard to these studies where they
10  don't parse out, even accepting -- if the jury accepts
11  everything you say is true with regard to the fact most of
12  these probably had E plus P in them than E alone --
13  A.   That's not what I represented.
14  Q.   Well, whatever.  But, regardless, if we know about that,
15  having that knowledge, the one thing that we can agree upon is
16  that none of these studies have reported on the difference in
17  breast cancer risk between E users and E plus P users?  Can we
18  agree on that?
19  A.   Yes, absolutely.
20  Q.   Okay.
21  A.   There.  You got it.
22  Q.   Finally found a point of agreement.  What about Normura?
23  Can we agree that's an E only?
24  A.   The same reservation holds for Normura based on what I
25  know about that study.  It's a very interesting study that

1 page 1894

2  1  looked at neighborhoods, actually.

2  Q.  And when we get into Normura and we look over here, they

3  3  talk about replacement estrogen use among breast cancer cases

4  4  -- this is on page 51.  They say estrogen user, and then they

5  5  look at the duration of time.  And the number of cases, at

6  6  least less than 8 years, was 29, 22 cases, 8 to 16 years, and

7  7  44.  Correct?

8  8  A.  Yes.

9  9  Q.  Let me show you McDonald and the rest.

10  10  A.  Thank you.  Glad we decided not to read them.

11  11  Q.  All right.  Will you agree that McDonald is an E only

12  12  study?

13  13  A.  Yes.

14  14  Q.  Will you agree that Brinton is an E only study?

15  15  A.  My same concerns hold here, but it is listed on the

16 Dupont

17  16  chart as an E only.  So I will agree that they don't parse it

18  17  out.

19  18  Q.  Well, the fact of the matter is, if we look inside the

20  19  Brinton paper on Page 828, and we go to table 2 where they

21 talk

22  20  about relative risk of breast cancer associated with regimen

23  21  and preparation of menopausal hormone use, we go down to the

24  22  table 3, relative risks of breast cancer associated with

25  23  menopausal hormone preparation used longest and total years of

26  24  use, preparation used longest, they go through Premarin,

27  25  Premarin, Premarin, Premarin, Premarin unknown dose, Premarin

1 page 1895

2  1  with methyltestosterone, that's a different product, correct?

2  A.  It is different.  It's serving the purpose there for the

3  3  progestin.

4  4  Q.  Diethylstilbestrol, and that's not in combination with

5  5  Premarin, is it?

6  6  A.  You're correct.

7  7  Q.  So there's no listing whatsoever of medroxyprogesterone

8  8  acetate, correct?

9  9  A.  That's correct.

10  10  Q.  What about Buring, B-u-r-i-n-g?  Is that an E only case?

11  11  A.  They certainly don't parse out the difference between E

12  12  and E plus P.

13  13  Q.  What about Wingo?

14  14  A.  I would agree because I think these are hysterectomized

15  15  ladies.

16  16  Q.  Kathryn Hunt?

17  17  A.  This is hormone replacement therapy, HRT, on this one.

18 So

19  18  we'd have to look at this one.

20  19  Q.  This was a cohort of British women, wasn't it?

21  20  A.  I'm sorry?

22  21  Q.  This was a cohort of British women?

23  22  A.  Yes.

24  23  Q.  And if we go inside and we look at the discussion

25 section,

26  24  it states that HRT has been taken by large --

27  25  A.  I'm sorry.  There is -- to save us time, there is

1 page 1896

2  1  progestin in this one.

3  2  Q.  There's progestin, but is there progestin in combination

4  3  with estrogen?

5  4  A.  Yes.

6  5  Q.  Where?

7  6  A.  Go to table 3.

8  7  Q.  Okay.

9  8  A.  It's at the bottom of page 623.

10  9  Q.  Got it.

11  10  A.  See down there Premarin and norethisterone?

12  11  Q.  Where is that?

13  12  A.  No. 2.

14  13  Q.  Norethisterone?

15  14  A.  Norethisterone is a progestin.

16  15  Q.  Is that the same thing as medroxyprogesterone acetate?

17  16  A.  No.  This is what they tend to use in Europe.

18  17  Q.  Well, the issue for this jury is the combination of

19  18  Premarin and medroxyprogesterone acetate.

20  19  A.  Well, many of the papers, as we pointed out, have been

21  20  done -- some of them are done with different preparations,

22 some

23  21  of them have been done with different progestins.

24  22  Q.  Is it okay to translate the results of this finding to a

25  23  case where we have Premarin and MPA?

26  24  A.  I think that the results are important results for

27  25  building upon it.  I think that the data may be different data.

1 page 1897

2  1  And I think if you're -- if we want to just study Premarin and

3  2  MPA, then this would be appropriate.  Many patients have taken

4  3  different formulations such as I believe is in this case of

5  4  different products, so that it is good to see the different

6  5  products that maybe would be applicable.

7  6  Q.  Because sometimes there's what we call a class effect,

8  7  correct?

9  8  A.  There is something called a class effect.  We certainly

10  9  know that there is not a decreased risk with the foreign

11  10  products.  If anything, there's data to suggest that the risk

12  11  is lower with Premarin and Prempro than many of the foreign

13  12  products.

14  13  Q.  Okay.  So we'll call that E plus norethisterone?

15  14  A.  There were a couple of others in there, too.

16  15  Q.  Okay.  All right.  What about Rohan and McMichael?  Do

17 you

18  16  agree that's an E only study?

19  17  A.  I don't see any report of them separating out,

20  18  distinguishing E and E plus P.

21  19  Q.  William Dupont, can we agree that's E only?

22  20  A.  Is this the meta-analysis we looked at, or is this --

23  21  Q.  This is --

24  22  A.  This is the earlier paper.

25  23  Q.  -- the 1988 paper.

26  24  A.  Yes, I would agree with that.

27  25  Q.  Mills, 1989, can we agree that's an E only paper?

page 1898

1  A. Well, this is HRT again.  They are reporting on HRT, which

2  usually is a combination, although sometimes those terms can be

3  interchanged as well.

4  Q. Well, if we go inside this one, you go to page 595, turn

5  over there, it says, "The questionnaire utilized in this study

6  was completed in 1976 before any major changes in prescribing

7  practices occurred.  The addition of progestational elements

8  had also not yet become common."  So given that time frame,

9  would you suspect that the majority of these users were

10  estrogen only users?

11  A. I would say that for all of these, that the majority is

12  estrogen.

13  Q. All right.  Okay.  We know that Bergkvist -- we talked

14  about that -- was E and E plus P, correct?

15  A. Yes.

16  Q. And Bergkvist, for the combination arm, reported a 4.4

17  relative risk, correct?

18  A. In this particular study.

19  Q. It was a small group, only ten people, correct?

20  A. Is this the correct Bergkvist paper, because later on

21  Bergkvist recants that number.  Yeah, this is the one you have

22  on here.  What I don't understand is that confidence interval.

23  It doesn't look correct.  He drew it though.  Good drawing.

24  Q. That's my drawing.  That's my drawing.

25  A. It's good.

page 1899

1  Q. Thank you.

2  A. You did a good job.  You made the confidence interval --

3  THE COURT:  Let's move on.

4  BY MR. MORRIS:

5  Q. Now, with regard to Kaufman, this is a part of the Dupont

6  also, and 99 percent of the users in this were E only,

7  correct?

7  A. Is this the paper where they tried to study and they

8  actually have a paragraph to the fact that they could not get

9  enough E plus P patients to evaluate?  I believe this is the

10  one that has that.  So they did look at it, but they could not

11  find enough subjects who had been using it.  So that would be

12  E plus P as well in there.

13  Q. Palmer, will you agree that Palmer is an estrogen only

14  study?

15  A. Predominantly it's going to be estrogen.  But this -- this

16  one does have on table 1 progestins as well.

17  Q. Okay.  And on the estrogens taken with progestins, there

18  were four cases, right?

19  A. We don't know what the denominator is from that.

20  We'd have to read through the paper to figure it out.

21  Q. The unopposed estrogens were 94.  Conjugated estrogens

22  were 60.  So it would be 154.  And then 8 more, that would be

23  162.  21 unspecified would be 183.  And then more than one type

24  would be 188.  And another 16 would be 204.  So 204 estrogen

25  users against 4 progestin, right?

page 1900

1  A. Well, that's the number of cases and controls.  That's not

2  the number of users of the drug that they looked at.

3  Q. Well, do you see something where it says the users of E

4  plus P?

5  A. As I say, we would have to look through the paper.  We

6  know they studied E plus P in here, but we'd have to see if

7  they have a denominator.  I don't remember.

8  Q. Well, when they report -- they report, in table 3,

9  duration of use of unopposed estrogens for replacement among

10  postmenopausal women; table 4, duration of unopposed conjugated

11  estrogens for replacement.  Is there any table where they

12  report on anything other than unopposed conjugated estrogen

13  users?  Table 5 is unopposed conjugated estrogen users?

14  A. Well, in the paper, they do separate out the data.  They

15  did an estimated relative risk.  If you look at the results on

16  page 1388, they say the estimated relative risk for use --

17  Q. Where are you looking?

18  A. On page 1388.

19  Q. 1388.

20  A. Under the results section.

21  Q. Okay.

22  A. And they give a relative risk for E plus P.

23  Q. The estimated relative risk for use of estrogens with

24  progestins was .6, two cases and one control had used the

25  combination for 5 or more years.  Would that be reliable data?

page 1901

1  A. They only found two cases.  You have to know what the

2  denominator is.  If they came up with a relative risk with a

3  confidence interval that's that tight, they must have had a

4  substantial number of people where they could do that

5  analysis.

6  Otherwise, the confidence interval would be huge.

7  Q. Let's look through this and see other than this one graph

8  where they say there are four estrogens taken with progestins

9  in the cases, 14 controls -- controls would be people that

10  didn't take the product, correct?

11  A. Yes, it's not four people who took it.  They found four

12  cases of breast cancer.  In the four cases, they found -- they

13  found four cases of breast cancer in people who had taken E

14  plus P.  That wasn't their universe of E plus P users.

15  Q. Can you look through it and see if there is a universe

16  that is mentioned in this article?

17  A. Well, what we do know is they looked at 1,214 controls,

18  and they matched them to cases in their neighborhood.  This is

19  an interesting paper.

20  Q. The best that I can find --

21  A. Here you go.  7 percent had taken progestins, so 7 percent

22  of the population that they looked at.

23  Q. Where does it say 7 percent?

24  A. Just look in the abstract on page 1386.  Now you know why

25  I want to look through these carefully.

26  Q. And I'm giving you every opportunity to do that.  Let the

Page 129

page 1902

1   record reflect that.
2   A.  Okay.
3   Q.  Abstract --
4   A.  In the abstract, in the very top part, the second -- like,
5   the third sentence.
6   Q.  We'll call that E plus P?
7   A.  I would.
8   Q.  93 percent were E only, right?
9   A.  That's correct.
10  Q.  All right.  I'm sorry.  Was that Palmer we just went through?  It was Palmer?
11  
12  A.  Yes.
13  Q.  Let me make a correction then.  E plus P.  What about Risch and Howe?
14  
15  A.  That also has progestin in it.
16  Q.  And Schairer does, right?
17  A.  Yes.
18  Q.  We know that Colditz does, right?
19  A.  Yes.
20  Q.  And LaVecchia, this was a Wyeth-sponsored study, wasn't it?
21  
22  A.  There are two LaVecchias.  One was and one was not.
23  Q.  Do you know if this was the one that was, or the one that wasn't?
24  
25  A.  This, I believe, is the one that was not.  Is this the '95

Page 130

page 1903

1   paper?
2   Q.  Yes.
3   A.  The earlier paper, I believe, was the one that was sponsored.
4   
5   Q.  Okay.  So you sponsored the first one?
6   A.  We can find that out real fast.
7   Q.  And LaVecchia does have some E plus P in it, doesn't he?
8   A.  Yes, he does.
9   Q.  And he also says if we go inside LaVecchia, the small absolute numbers, particularly of users of estrogen-progestin combinations, also precluded any meaningful inference on different types of preparations.  Did I read that correctly?
10  
11  
12  
13  A.  You did.
14  Q.  So if there is use -- this is a study that was done in Italy, correct?
15  
16  A.  That's correct.
17  Q.  What about Schuurman?
18  A.  Well, this is from the Netherlands.  They use the term HRT
19  
20  in this.  But they don't use very much MPA in the Netherlands, if that is at all helpful.  But they say HRT.
21  
22  Q.  Okay.  They never describe the preparations in Schuurman, do they?
23  
24  A.  I don't believe so, but I'd have to look at it more carefully.
25  Q.  And then Stanford, is that E plus P?

Page 131

page 1904

1   A.  Stanford, this group has several papers as well, I believe.  Yes, they do.  They do.  There's some on page 139, they have a relative risk.
2   
3   
4   Q.  Once again, if we go inside that paper and we look at the estrogen-progestin HRT use, for 5 to 7 years, we had 16 cases, and for greater than or equal to 8 years, we had 8 cases, right?
5   
6   
7   A.  Correct, in the cases.  And then in the controls, there were 15.  So here they do give an odds ratio.
8   
9   Q.  Okay.  And then Polly Newcomb.  Is she E plus P?
10  A.  I believe she is.  And she talks about hormone replacement
11  
12  therapy.  So, yes, she does.  She is.  Do you want the table?
13  A.  She states on page 79, "Finally, although this was a large
14  
15  study, statistical power was nonetheless limited in some subgroup evaluations, most notably the analyses of longer term progestin supplementation."  Correct?
16  
17  A.  That would be correct.
18  Q.  We've already mentioned Schairer.  We know that was E plus
19  
20  P, right?
21  A.  Yes.
22  Q.  And we know that Ron Ross' paper was E plus P also, correct?
23  
24  A.  There is some.  It's not totally.
25  Q.  Okay.  Now, this is the data that Wyeth sent out to doctors in a "Dear Doctor" letter in February of 2000, correct?

Page 132

page 1905

1   A.  Yes, that's my understanding.
2   Q.  And Wyeth would have been well aware of this data from the
3   
4   standpoint of being able to read the studies like you and I have just done, correct?
5   
6   A.  Yes.
7   Q.  Wyeth has epidemiologists on board at their headquarters or in their offices, right?
8   
9   A.  There are some.
10  Q.  There are some.  There are many medical doctors, correct?
11  A.  Yes.
12  Q.  How many medical doctors does Wyeth employ?
13  A.  I don't know.  A lot.  In research and development, there are many.  I don't know how many.
14  
15  Q.  Hundreds?
16  A.  I don't know.
17  Q.  Okay.
18  A.  I don't know.
19  Q.  How many PhDs does Wyeth have?
20  A.  A lot.
21  Q.  A lot.  How many master's level folks?  Lots?
22  A.  I don't know.  I'm sure a lot.
23  Q.  All right.  So they would have had this information and Wyeth would have been able to scrutinize the studies, look at whether or not they were reporting on E alone, or E plus P, correct?
24  
25

Page 133

page 1906

1    A.  Yeah.
2    Q.  Wyeth could have done that in 2000?
3    A.  And they did.
4    Q.  Wyeth could have scrutinized these studies and looked at
5    the duration of usage, correct?
6    A.  We did.
7    Q.  Wyeth could have scrutinized these studies and looked at
8    the dosages that were being used, correct?
9    A.  Yes.
10   Q.  And Wyeth certainly had the ability to see how many people
11   were being followed, correct?
12   A.  Yes.  And we did follow all of that.  Obviously we did
13   because we sent out the letter.
14   Q.  I want to show you just so the jury is clear, there were a
15   couple of papers -- this is a Ron Ross paper that was actually
16   done from 2000 also, right?  And it just may not have been
17   published by the time that that "Dear Doctor" letter went out.
18   This is February of 2000 and I think the "Dear Doctor" letter
19   went out in February of 2000.  So they may not have gotten this
20   one on the list yet.  Is that fair?
21   A.  I think it's on there.
22   Q.  Okay.
23   A.  I believe it's there.
24   Q.  Okay.  All right.  Let me show you a couple that are not
25   on the list.  These have been talked about a little bit.

Page 134

page 1907

1    You're familiar with Dr. Persson's article?
2    A.  Yes.
3    Q.  And this is an article from 1999, correct?
4    A.  Yes.
5    Q.  And they say, "We conclude that long-term use of E plus P
6    combined replacement therapy may increase the risk of breast
7    cancer," correct?
8    A.  Yes.
9    Q.  And if we turn inside the paper, look at table 3, breast
10   cancer risk after hormone replacement therapy based on all 198
11   incident cases, relative risk estimates were 1.7, correct, for
12   6 plus years of estrogen plus progestins?
13   A.  That's correct.
14   Q.  And then another one that wasn't contained is the
15   Magnusson article.  You're familiar with it?
16   A.  Yes.
17   Q.  And Magnusson was printed in 1999, correct?
18   A.  It was.
19   Q.  I don't know what that was.  It wasn't me.  I promise.  I
20   always admit it.  My kids would get me otherwise.
21   This was from 1999 also, right?
22   A.  Yes.
23   Q.  I won't even ask you to pull my finger.
24   And if we go inside the Magnusson article, this additional
25   data is on odds ratios and/or 99 percent confidence intervals

Page 135

page 1908

1    of breast cancer in relation to use of E plus P therapy in
2    postmenopausal women.  And for the longer duration users, from
3    61 to 120 months, and greater than 120 months, the odd ratio on
4    estrogen and progestin was 2.43 and 2.95, correct?
5    A.  Yes.  This is one where if you look at table 1, the
6    information is very well-broken out if you're interested in
7    Premarin and Prempro because this is one of those -- last few
8    have been foreign studies where they did not use Premarin and
9    MPA.
10   Q.  And over here where they talk about estrogen-progestin
11   therapy in postmenopausal women, greater than 60 months, they
12   put the odds ratio at 2.68 for those within one year prior to
13   the index date, correct?
14   A.  That's what this shows.
15   Q.  And for those with continuous estrogen and continuous
16   testosterone-derived progestin, the odds ratio was 5.36 for
17   those that used it for more than 120 months, right?
18   A.  Right.  And that's why I said this data -- if anything,
19   the Premarin and Prempro data is lower than these types of
20   preparations that are used in Europe.
21   Q.  Now, Wyeth had both of these articles in their -- they
22   were both in the world's literature at that time.  And Wyeth
23   could have included those in its amended chart that it sent out
24   regarding the breast cancer studies, correct?
25   A.  Yes.  There are several other papers that are not on here

Page 136

page 1909

1    as well.  I'm not sure what the rationale for putting something
2    on this particular chart was or was not.  I did not participate
3    in that.  But several of those other papers had lower relative
4    risks.
5    Q.  And so when we get back -- I want to make sure that I'm
6    right now.  On this document, you'll agree with me that the
7    Leisure World cohort study, it's listed as E and E plus P.  Can
8    you tell the jury how many of the users were E alone versus E
9    plus P in Leisure World?
10   A.  Again, the majority in that time frame was E.  There is a
11   paragraph, if you want to hand me that paper, and I can show
12   you the exact amount.
13   Q.  I'll let Mr. Urbanczyk clear that up with you.  We have
14   established that Burch and Byrd was E alone.  We have
15   established that Hulka was E alone.  We established that
16   Horwitz and Stewart was E alone, correct?
17   A.  Yes, that's how they are designated on this chart.
18   Q.  And then with regard to PEPI, PEPI was a three-year study,
19   right?
20   A.  That's correct.
21   Q.  The Prempro pivotal trial was a one-year study, right?
22   A.  Yes.
23   Q.  HERS and HERS II were designed to look at cardio, correct?
24   A.  As well as other safety endpoints.  And as we've seen it's
25   been reported, the breast cancer results have been reported to

1 page 1910

2 1    the public.

2           THE COURT:  Hold it just a minute.  I need to speak

3 to

3      the lawyers a minute.

4 4      (Bench conference reported as follows:)

5 5           THE COURT:  I'm going to take a short break, and I

6 6    want you to talk to your witness and tell her not to say

7 7    anything like, I can explain that or I can show you.  She's

8 had

8      enough experience not to do that.  I don't want him to call on

10 9    me and I don't want to scold her.  Talk to her.  Tell her I'm

11 10   not scolding her.  I want to be conscientious she doesn't need

12 11   to volunteer anything.

13 12        MR. URBANCZYK:  We're anxious to get done, Judge.

14 13        THE COURT:  Ladies and gentlemen, we'll be in recess

15 14   until 10 after on that clock.

16 15      (Jury exits the courtroom.)

17 16        THE COURT:  The jury is out.  We're in recess.

18 17      (Recess at 2:01 p.m.)

19 18           C E R T I F I C A T E

20 19   I, Judith A. Ammons, Official Court Reporter, do hereby

21 20   certify that the foregoing is a true and correct transcript of

22 21   proceedings in the above-entitled case.

23 22

23 23   _____  Date: February 15, 2008

25      Judith A. Ammons, RPR, CRR, CCR

26 24   United States Court Reporter

27 25

1 page 1911

2

3 1      (Continuing at 2:10 p.m., jury present.)

4 2           THE COURT:  Will the lawyers approach, please.

5 3      [Bench conference reported as follows:]

6 4           THE COURT:  This is a note from the jury.  I'm just

7 5    wanting y'all to take what action you deem appropriate.

8 6         MR. MORRIS:  Okay.

9 7         MR. URBANCZYK:  We'll cover it.

10 8        MR. GOODELL:  Did I get here too late?

11 9        THE COURT:  We're not going to tell you what we said.

12 10     [Continuing in open court:]

13 11        MR. MORRIS:  May I proceed?

14 12        THE COURT:  You may proceed.

15 13   By the way, the question from the juror has been passed on

16 14   to the lawyers.

17 15   BY MR. MORRIS:

18 16   Q.  With regard to this study from 1986, La Vecchia, and it's

19 17   one of the ones that Wyeth claims that it conducted or

20 18   supported, do you know whether or not Wyeth drafted the protocol

21 19   for La Vecchia?

22 20   A.  No, I don't.

23 21   Q.  You don't know?

24 22   A.  I'm sorry.  My speaker was off.

25 23   I don't believe that we did.

26 24   Q.  So that would be no.

27 25   With regard to Hulka in 1982, do you know if Wyeth drafted

1 page 1912

2

3 1    the protocol for that study?

4 2    A.  I don't believe so.  We worked with her.  There was a

5 3    coordinated effort.  She -- I've seen documents where she sent a

6 4    request.

7 5    Q.  With regard to Nachtigall, '68-78, did you write the

8 6    protocol for that?

9 7    A.  No.  These would be studies we supported.

10 8    Q.  With regard to Hammond, '79, did you write the protocol for

11 9    that?

12 10   A.  I don't believe so.  I believe this was support.

13 11   Q.  For Burch and Byrd, '71, '74, and '77, did you write the

14 12   protocol for that?

15 13   A.  Not that I know of.

16 14   Q.  With regard to Wallach back in '59, did you write the

17 15   protocol for that?

18 16   A.  Not that I know of.

19 17   Q.  Now, of course you didn't write the protocol for the

20 18   Nurses' Health Study.  That was done at Harvard; correct?

21 19   A.  That's correct.

22 20   Q.  With regard to Horowitz and Stewart, did you write the

23 21   protocol for that?

24 22   A.  Not to my knowledge.

25 23   Q.  Now, you did not write it for Colditz; correct?

26 24   A.  That's correct.

27 25   Q.  So when we're talking about protocols that were designed by

1 page 1913

2

3 1    Wyeth, Wyeth designed the Prem-Pak/Prempro Pivotal Trials;

4 2    correct?

5 3    A.  Yes.

6 4    Q.  What about Leisure World?  Was this one that you all

7 5    designed?

8 6    A.  No.  We supported.

9 7    Q.  HERS.  You did HERS, didn't you?

10 8    A.  Yes.  But none of these would we have done independently.

11 9    We work with outside investigators.  So there was a whole HERS

12 10   panel.  There was outside investigators for Prem-Pak.

13 11   Q.  Okay.  We understand.  With regard to PEPI, was PEPI --

14 12   that was an NIH study; yes?

15 13   A.  Yes, but I believe we had members on the committee, so we

16 14   worked with that.

17 15   Q.  Okay.  Then Wyeth did HOPE; yes?

18 16   A.  Yes.

19 17   Q.  And Wyeth did WISDOM; right?  Or not?

20 18   A.  We worked with the investigators, but, no, that would be

21 19   very similar to the WHI.

22 20   Q.  Okay.  Well, you definitely didn't design the protocol for

23 21   WHI, did you?

24 22   A.  No, but we did participate in their steering committees,

25 23   similar with WISDOM.

26 24   Q.  Okay.  And then I left out Dr. Bush.  Did you actually do

27 25   the protocol for Dr. Bush?

1 page 1914

2

3 1  A.  No, not to my knowledge.

4 2  Q.  We're talking about Dr. Trudy Bush; right?

5 3  A.  Yes.

6 4  Q.  I'll show you what we've marked previously as Plaintiff's

7 5  Exhibit No. 8155.  The jury has seen something similar to this.

8 6  I want to show you in 8155 a meeting agenda from October 29 of

9 7  1997.  Are you familiar with these?

10 8  A.  I've seen these before.

11 9  Q.  And the purpose of this was to develop a breast cancer

12 10  manuscript; correct?

13 11  A.  I think the purpose of this is to update a timeline.

14 12  Q.  Okay.  So --

15 13  A.  I wasn't looking at your highlight.  I'm sorry.

16 14  Q.  "Breast cancer manuscript."  "DesignWrite to send author

17 15  letter to Dr. Creasman."

18 16       And further down, DesignWrite to follow up initial contact

19 17  with Dr. Nachtigall; correct?

20 18  A.  Yes.

21 19  Q.  And then if we turn to the next page, in the Premarin

22 20  publication plan, the meeting recap from June 23 and 30 of 1998,

23 21  "The paper with Dr. T. Bush that is currently in progress,

24 22  'Postmenopausal Estrogens and Breast Cancer:  A Differing View,'

25 23  will replace the 'Myths and Misperceptions of the Role of ERT in

26 24  Breast Cancer' manuscript"; correct?

27 25  A.  That's what that says.

1 page 1915

2

3 1  Q.  And this is something that Wyeth was developing with

4 2  DesignWrite.  Wyeth actually did the outline, and then

5 3  DesignWrite was going to write the article; correct?

6 4  A.  I would think that's a mischaracterization.  Usually the

7 5  author will work with the company to tell them what they want to

8 6  have in their paper.

9 7  Q.  And then if we move forward, Premarin publication plan,

10 8  Wednesday, January 28 of 1998, there was a follow-up meeting

11 9  with Trudy Bush and an outline for a paper submitted for review.

12 10  And it says, "Karen is waiting to hear from Trudy regarding

13 11  approval of outline and other projects."

14 12       Karen would be Karen Mittleman; correct?

15 13  A.  Yes.

16 14  Q.  And Jeff is to give DesignWrite the go-ahead after internal

17 15  meetings.  Jeff would be Jeff Solomon that worked at Wyeth;

18 16  right?

19 17  A.  I don't know.  I would imagine, but I don't have firsthand

20 18  knowledge.  I've seen the document.

21 19  Q.  Okay.  And then if we move on through the document,

22 20  December 5, 2000, there's a meeting recap, and the attendees at

23 21  that from Wyeth-Ayerst were Jamie Durocher, Mark Barbee, Alice

24 22  Conti, Pam Cobb, Gail Goldsmith, and from DesignWrite, Karen

25 23  Mittleman and Bernie Janas; correct?

26 24  A.  Yes.

27 25       MR. URBANCZYK:  Your Honor, may we approach, please?

1 page 1916

2

3 1       THE COURT:  Yes.

4 2       [Bench conference reported as follows:]

5 3       MR. URBANCZYK:  I don't recognize this exhibit number.

6 4  What I have as 8155 is an NIH press release.  I don't -- I don't

7 5  know that this has been a document that we've ever been

8 6  identified on.  I don't know if it's on the short list, I don't

9 7  know if it's on the long list.

10 8       MR. MORRIS:  This is on the long list.  8155 and

11 9  8155-A are on the long list.

12 10       MR. MOORE:  It may be on the long list.

13 11       MR. MORRIS:  The rule is, on cross-examination of

14 12  their witnesses, I can use anything from the short or long list

15 13  that hasn't been excluded.

16 14       THE COURT:  Y'all need to get together right now and

17 15  see if it's on the long list.

18 16       MR. URBANCZYK:  If you can check if it's on the long

19 17  list -- go ahead.

20 18       THE COURT:  Right now.  Let's find out.

21 19       MR. MOORE:  This is the long list, your Honor.  Has

22 20  8155, which is an NIH press release.  It does not have 8155-A,

23 21  which is what that is.

24 22       MR. URBANCZYK:  Well, maybe they have a different long

25 23  list.

26 24       MR. MOORE:  This is their long list they filed with

27 25  the Court.

1 page 1917

2

3 1       MR. URBANCZYK:  Well, is it at the bottom, at the end?

4 2  Is it at the end?

5 3       MR. MORRIS:  I know that this is a document that has

6 4  been disclosed.

7 5       THE COURT:  What?

8 6       MR. MORRIS:  I know that this is a document that has

9 7  been disclosed, that was part of our disclosure.

10 8       THE COURT:  Well, it's got to be on the list, though,

11 9  for them -- I mean, it -- they probably produced a million

12 10  copies of documents.

13 11       MR. MORRIS:  Millions of documents.  Millions of

14 12  documents, and --

15 13       THE COURT:  Do you have a motion?

16 14       MR. URBANCZYK:  If it's not on the long list, your

17 15  Honor, it would be a motion to strike its use for this witness.

18 16       MR. MORRIS:  I don't know how I can object to that if

19 17  it's not on the long list, your Honor.

20 18       THE COURT:  Well, has your man, your computer man

21 19  checked it?

22 20       MR. MORRIS:  He's checking right now.  I don't know.

23 21       MR. MOORE:  I'll confer with him.

24 22       THE COURT:  That's the one we're talking about, isn't

25 23  it?

26 24       MR. MORRIS:  It's supposed to be 8155-A.

27 25       MR. URBANCZYK:  Not the same document.

1 page 1918

2

3  1          THE COURT:  Sustain the objection.

4  2          MR. MORRIS:  Okay.  Yes, sir.

5  3      [Continuing in open court:]

6  4 BY MR. MORRIS:

7  5  Q.  Doctor, do you recall during direct examination, you went

8  6  through Garnet Anderson's deposition with Mr. Urbanczyk, and you

9  7  all pointed out some things in Dr. Anderson's deposition to

10 8  suggest that Dr. Anderson was comfortable with the 1.24 number

11 9  but wasn't comfortable with the underlying numbers, or the

12 10 subgroup numbers.  Do you remember that?

13 11 A.  I think I just read what she stated, that she thought that

14 12 the 1.24 would be the better number and that she did not like

15 13 non intent to treat analyses.

16 14 Q.  You all pointed out the point where she said she didn't

17 15 have much confidence, or something along those lines?

18 16 A.  I think her words speak for themselves.

19 17 Q.  All right.  Well, let's look at this next page after where

20 18 you left off.

21 19     The questioner asks:  "You say you don't -- you don't give

22 20 as much confidence to these numbers, but you still -- you're

23 21 still confident about them, aren't you?"

24 22     And she answers:  "I thought it was worth looking to get a

25 23 sense of what adherence might be -- the effect adherence might

26 24 be having here."

27 25     And the next question that was asked was:  "Well, but, I

1 page 1919

2

3  1  mean, you published -- you didn't just look at it.  You

4  2  published in the scientific journal.  Doesn't -- doesn't that

5  3  mean that it has some scientific importance?"

6  4      And her answer was:  "I think it has some value, correct."

7  5      And then he asks her:  "And to get back to my question,

8  6  isn't the unweighted hazard ratio of 3.08, isn't that

9  7  statistically significant under conventional definitions?"

10 8      And she says, "Definitely."

11 9      Right?  Is that right?

12 10 A.  Yes.

13 11 Q.  And he asks:  "With a p-value of .0002, that means the

14 12 possibility that this is a result of just chance is very, very

15 13 small."

16 14     And the answer was:  "Yes."

17 15     Correct?

18 16 A.  Yes.

19 17 Q.  Have you read the entire deposition of Dr. Anderson?

20 18 A.  I have not seen her entire deposition.  I believe she's

21 19 given several.

22 20 Q.  You're familiar with Dr. Clark's critique that he wrote

23 21 following the WHI, aren't you?

24 22 A.  I'd have to look at it.

25 23     MR. URBANCZYK:  Your Honor, objection to reference to

26 24 this paper.

27 25     MR. MORRIS:  No, it's not Christina Clarke.  It's a

1 page 1920

2

3  1  different Clark.

4  2          MR. URBANCZYK:  Okay.

5  3          MR. MORRIS:  All right.

6  4 BY MR. MORRIS:

7  5  Q.  I want to go back to Dr. Anderson's paper real quick,

8  6  because you showed the jury something, and I want to make sure

9  7  that they fully understand what these graphs are showing before

10 8  we get away from it.

11 9      Now, you remember this page; right?

12 10 A.  You don't have everything on here.

13 11 Q.  Do you remember this page?

14 12 A.  No, not this page, I don't.

15 13 Q.  This is the page that was out of the actual article, page

16 14 8.

17 15 A.  Maybe there's something that's not showing up on my screen.

18 16 Q.  Well, this is all I have.  Just follow along with me, if

19 17 you will.  See if you can answer my questions.  Okay?

20 18     In the upper left-hand corner, what is being looked at in

21 19 this graph is invasive breast cancer participants with no prior

22 20 hormone use.  Correct?

23 21 A.  Yes, that's correct.

24 22 Q.  And what they're looking at is, they're looking at the

25 23 entire group of people that were in WHI; correct?  This is not

26 24 the sensitivity group.

27 25 A.  No.  That would be incorrect.

1 page 1921

2

3  1  Q.  All right.  I'll use Mr. Urbanczyk's copy, which is exactly

4  2  like mine.  It says, "Invasive breast cancer participants with

5  3  no prior hormone use."  That's what it says; correct?

6  4  A.  That's what that says.  That's not the entire population.

7  5  Q.  If you go down below, they say, "Sensitivity analysis of

8  6  invasive breast cancer in adherent participants with no prior

9  7  hormone use."

10 8      And that's what it says over here; correct?  "Sensitivity

11 9  analysis of invasive breast cancer in adherent participants with

12 10 any prior hormone use."

13 11 A.  If you look at the titles, you're reading two different

14 12 things.

15 13 Q.  I am reading two different things.

16 14 A.  This is a different subgroup analysis.

17 15 Q.  These people had no prior --

18 16     THE COURT:  One at a time.  One at a time.

19 17     MR. MORRIS:  I'm sorry.

20 18 BY MR. MORRIS:

21 19 Q.  These people had no prior hormone use; these people had

22 20 prior hormone use.  Right?

23 21 A.  I apologize, but we can't see where you're pointing on

24 22 this.  But those two bottom graphs do have that.

25 23 Q.  Okay.  So the jury can't see when I put my finger up here?

26 24 A.  All that we are seeing right now is the bottom right panel.

27 25 Q.  Okay.

page 1922

1 A. Just because of the magnification.
2 Q. Okay. Well, let's make sure that I'm not misrepresenting
3 anything, because I sure wouldn't do it.
4 A. I'm not suggesting that you are. I just couldn't see it.
5 Q. If we go to the top, if we look at the two graphs at the
6 top, those are both concerning invasive breast cancer,
7 participants with no prior use on the left and with any prior
8 use on the right. And my question to you is, those two pertain
9 to the entire group of people in WHI. Isn't that true?
10 A. All four pertain to the entire group. There's subgroup
11 analyses of the entire group. The entire -- this is a subgroup.
12 Each one of these is a different component of the entire group.
13 So you have the 1.24, and each one of these is looking at a
14 subgroup. I can point it out if it's easier.
15 Q. The top two -- isn't it true that the top two would make
16 mention that they were part of the sensitivity analysis if they
17 were part of the sensitivity analysis? Isn't that true?
18 A. I'm not sure what your question is. This is -- I don't
19 understand your question.
20 Q. The question is real simple. As to the two top graphs,
21 what she is discussing is the entire domain of people, and in
22 the bottom two, she is discussing the sensitivity analysis of
23 the subgroups.
24 A. So you mean if you combine the top two graphs? Is that
25 what you're suggesting?

page 1923

1 Q. If you can't answer my question, don't answer my question.
2 A. I'm trying.
3 Q. The fact of the matter is, as you know, she went on to
4 discuss in her deposition the difference between a weighted
5 analysis and an unweighted analysis. Are you aware of that?
6 A. Yes. Well -- yes.
7 Q. She was asked about Dr. Clark's critique: "In this section
8 labeled Invasive Breast Cancer 2002 Paper, he's criticizing the
9 WHI publication because, as he says here, 'There was no
10 significant difference in invasive breast cancer risk between
11 the placebo group and the E plus P group.' I guess, first of
12 all, do you agree that there was no statistical -- there was no
13 significant difference?"
14 And her response was, "No, I don't. And -- so let me
15 explain."
16 Correct?
17 A. That's what this says. I'd have to figure out what all
18 this is about. I don't know.
19 Q. The questioner says. "Sure."
20 And she answers. She says: "We've actually gone through
21 the basis of this difference already. And that is, in the 2002
22 paper, we summarized the effects on all the major disease
23 outcomes that we were monitoring in that trial, and we used the
24 same statistical methodology for all of them, which was an
25 unweighted analysis. That unweighted analyses -- analysis for

page 1924

1 breast cancer gave equal weight to the events that occurred
2 early; the day after a woman was randomized, a breast cancer
3 difference that occurred there had the same weight as breast
4 cancer differences that occurred later. So that gave us the
5 unweighted hazard ratio of 1.26 at the time we stopped the
6 trial."
7 And then she goes down to say, "But the protocol-defined
8 weighted analysis, using the weights in the graph that we
9 already discussed, that was highly statistically significant,
10 and the p-value was .003."
11 She goes down, "So we used the more conservative unweighted
12 analysis. And many people have been confused then, thinking
13 that the real breast cancer result was not real."
14 MR. URBANCZYK: Objection, your Honor. This question
15 is too long.
16 THE COURT: It is.
17 MR. MORRIS: Can I just go to the next question and
18 answer, your Honor?
19 THE COURT: Beg your pardon?
20 MR. MORRIS: Can I go to the next question and answer?
21 THE COURT: Yes.
22 BY MR. MORRIS:
23 Q. "You're convinced that the breast cancer result was real?"
24 And her response at the top was: "I am."
25 Correct?

page 1925

1 A. That's what that reads. I have to be honest, I haven't
2 followed you, but --
3 Q. And the reason that that's significant is, when we look at
4 these graphs, when we see the unweighted people, that includes
5 people that were randomized the day after they started
6 treatment. And you wouldn't expect them to have cancer in a
7 day, would you? No?
8 A. Certainly not related to the product. We certainly do see
9 breast cancers occurring that become detected on mammography
10 throughout the course of a study.
11 Q. But every time we look at the weighted average, which is
12 looking at people at a more mean level, the numbers are much
13 higher: 1.7 off the 109 down here, and for the sensitivity
14 analysis of breast cancer in adherent participants with any
15 prior hormone use, the weighted Z level was 3.72. Isn't that
16 true?
17 A. You're talking apples and oranges here. A Z is not a
18 relative risk. You're looking at very different statistical
19 findings.
20 Q. You were talking apples and oranges when you compared this
21 top graph for the jury to the bottom graph, because we're
22 talking about two different groups of people. Isn't that true?
23 A. I would disagree with that.
24 THE COURT: Just a minute.

Page 153

page 1926

1   [Reviewing realtime screen.]
2   Overruled.
3      THE WITNESS:  I disagree with your statement.
4      MR. MORRIS:  519-R is the next exhibit.  Do you want
5  to check and make sure?
6      MR. URBANCZYK:  No objection.
7      THE COURT:  Admitted.
8      (Plaintiff's Exhibit 519-R received in evidence.)
9  BY MR. MORRIS:
10   Q.  I want to show you a document out of the files of Wyeth.
11  There's a draft from 2/2/00, February 2 of 2000, and this was
12  the Breast Cancer Containment and Communications Committee.  It
13  says, "Second article in a month associating HRT use with
14  increased breast cancer risk."  It says, "Trend will continue of
15  women demanding to be removed from therapy or declining to start
16  therapy."  "Accumulating weight of 'evidence' creates
17  uncertainty --" and I can't read that next word.  "Inaction,"
18  right?  "-- among healthcare professionals, especially those who
19  avoid confrontation with patients."
20      It would not have been appropriate, Dr. Constantine, in
21  2000, for Wyeth to see a paper in the literature that is
22  suggesting a breast cancer risk and to respond to it by saying
23  let's contain that article and let's do whatever we can to
24  accumulate some evidence to the contrary?  That wouldn't have
25  been proper, would it?

Page 154

page 1927

1   A.  I think if that would have been done, that would be
2  improper, but that -- that's not what was done.  I can tell you
3  that.  And I think you've misread that document, by the way.
4   Q.  And in this particular document, some of the people that
5  they talk about going to -- and this is in 2000, mind you.
6   A.  Mr. Morris, will I be able to have a copy of that?
7   Q.  I believe your counsel has a copy of it.
8      MR. MORRIS:  Did we give counsel a copy of it?
9  BY MR. MORRIS:
10   Q.  Here we go.
11   A.  Thank you.
12   Q.  Some of the people that you want to contact are Speroff and
13  Nachtigall, and to investigate/provide perspectives for
14  statements issued by organizations, including ACOG; correct?
15   A.  That's what that says.
16   Q.  And Ketchum, they're a public relations firm, aren't they?
17   A.  Yes.
18   Q.  They work for Wyeth from time to time?
19   A.  They do.
20   Q.  When we look back here to the participants that were
21  involved in that, you're one of the participants, weren't you?
22   A.  That's what that says, but I don't recognize this.  That's
23  why I needed to see it.  I don't know what this is, if it's
24  something from an outside organization, if somebody called.  Do
25  you have a cover page on this or anything?

Page 155

page 1928

1   Q.  Let me show you one other document.  It's Plaintiff's
2  Exhibit 1567.  There was a Premarin advocate meeting back in
3  1989, and it was held in Portugal.  One of the things that was
4  being discussed back in 1989 was the question of the addition of
5  a progestin to estrogen therapy.  It says it was the most
6  discussed and certainly the most controversial subject in the
7  meeting; is that correct?
8   A.  That's what that says.
9   Q.  And it says, "As you stated in your memo, there is some
10  prejudice against 19 norethisterone derivatives among some
11  physicians, and this prejudice is based primarily on clinical
12  data on oral contraceptives.  There is a genuine concern that
13  the progestins added to hormone therapy will negatively impact
14  the cardioprotective benefits provided by estrogen alone."
15   And it says that Dr. Malcolm Pike took his usual position
16  in this issue and stated that he is aware that a publication in
17  the August issue of the New England Journal of Medicine will
18  provide data that shows the addition of a progestogen to hormone
19  replacement therapy doubles the risk of breast cancer in women
20  receiving HRT.
21   Will you agree with me that he was probably referring to
22  the Bergkvist article?
23   A.  He may well have been.
24   Q.  Then on the next page, regarding Dr. Pike, it says, "Yes,
25  Dr. Pike continued to bring up the subject of menopause therapy

Page 156

page 1929

1  and breast cancer.  It was mentioned by some Wyeth-Ayerst
2  executives that this would be the last meeting sponsored by
3  Wyeth-Ayerst to which Dr. Pike would be invited."
4   A.  I see that, but I know that Dr. Pike has subsequently been
5  invited to meetings.
6   Q.  So he has been invited back?  Do you know whether or not
7  he's come to any?
8   A.  I don't know, but I've seen that he was -- I do believe
9  that he attended one of the annual meetings, but I'd have to
10  double-check that.  But I know that he has been invited back.
11   Q.  All right.  Then I've got a couple more documents, and then
12  we'll be through.
13   This is a paper that you authored; right?  "Estrogens in
14  Postmenopausal Women:  Recent Insights."  Ginger D. Constantine
15  and James Pickar?
16   A.  Yes.
17   Q.  And Dr. Pickar is also an employee of Wyeth?
18   A.  Yes, he is.
19   Q.  And it discloses Wyeth research; correct?
20   A.  Yes, it does.
21   Q.  And it was published in the Current Opinion in Pharmacology
22  in 2003.  Is that true?
23   A.  Yes.
24   Q.  And this paper says, "In addition, we highlight new
25  research findings and approaches, and suggest future directions

Page 157

page 1930

3 1  HT may take, including the use of lower doses of estrogens and
4 2  progestins."
5 3      Correct?
6 4  A.  Yes.
7 5  Q.  There's a section on cardiovascular disease.  Then there's
8 6  a section over here on breast cancer; right?
9 7  A.  Yes.
10 8  Q.  You cite that the 1997 Collaborative Group reanalysis from
11 9  51 epidemiological studies reported a relative risk for breast
12 10  cancer of 1.31 for long-term HT users.  Right?
13 11  A.  Yes.
14 12  Q.  And it says, "Conversely, a review published in September
15 13  2001 reported that there was not sufficient evidence to conclude
16 14  that HT increases the risk of breast cancer."
17 15      So that's still important data for you all to be telling
18 16  the public and the doctors after WHI; right?
19 17  A.  Yes.
20 18  Q.  And then, "Since 2002, case control and cohort studies, as
21 19  well as one randomized trial, have all reported an increase in
22 20  the relative risk of breast cancer with longer duration ET/HT
23 21  similar to that reported by the Collaborative Group."
24 22      Right?
25 23  A.  That's correct.
26 24  Q.  And it's important for Wyeth to make sure that the doctors
27 25  continue to believe that the risk is small at 1 to 1.5, 1.3.  If

Page 158

page 1931

3 1  we can keep it in that range, that's an acceptable range for
4 2  most doctors.  They're still willing to prescribe it if it's in
5 3  that range.
6 4      MR. URBANCZYK:  Objection.  Too long and
7 5  argumentative.
8 6  BY MR. MORRIS:
9 7  Q.  Isn't that true?
10 8      THE COURT:  Whoa.  Just a minute.
11 9      [Reviewing realtime screen.]
12 10      Do you understand the question?
13 11      THE WITNESS:  I do.
14 12      THE COURT:  Overruled.
15 13  A.  I would totally disagree with that, and I would disagree
16 14  with how you characterized that.  What we do and what I have
17 15  done and what I did in this paper was to report the science and
18 16  report it accurately, and that's our job.
19 17  Q.  Well, it wouldn't be accurate to report on 51
20 18  epidemiological studies and say that they reported a relative
21 19  risk for breast cancer at 1.31 for long-term HT users if among
22 20  those 51 studies, 40 of them were E only.  That wouldn't be a
23 21  fair characterization, would it?
24 22  A.  What we have taken is the statement from the Collaborative
25 23  Group.  The Collaborative Group, you see the references?
26 24  There's reference 64, reference 65.  These are references from
27 25  the Collaborative Group study.  And basically we're doing a

Page 159

page 1932

3 1  review of the literature for physicians.  And then we go on to
4 2  WHI.
5 3  Q.  You then state, "Studies that examined the outcomes of
6 4  women who used ET/HT have generally documented improved
7 5  survival, possibly caused by favorable tumor biology, resulting
8 6  in less aggressive tumors."
9 7      There was a doctor here yesterday who suggested there's a
10 8  good cancer.  I was a little shocked when I heard him say that,
11 9  but I understand his point.  He was saying that, you know, some
12 10  cancers are not as fast growing, and is it --
13 11      MR. URBANCZYK:  Your Honor, excuse me.  I object to
14 12  this.  This is testimony and argument.  It's not questions.
15 13      MR. MORRIS:  It's prefacing my question.
16 14      MR. URBANCZYK:  I move to strike the testimony, the
17 15  argument, and the speech.
18 16      MR. MORRIS:  I'm allowed to ask a hypothetical based
19 17  on testimony.
20 18      THE COURT:  Overruled.  Exception saved.
21 19  BY MR. MORRIS:
22 20  Q.  When you're reporting that they've generally had favorable
23 21  tumor biology resulting in less aggressive tumors, is that
24 22  suggesting then to the doctors that if, in fact, the HRT is
25 23  causing breast cancer, it's causing a better kind of tumor than
26 24  the ones that could hurt you really bad, kill you?
27 25  A.  Well, that -- you have several parts to your question.  May

Page 160

page 1933

3 1  I answer the parts?
4 2  Q.  You may.
5 3  A.  Okay.  First of all, this is from the papers, and you see
6 4  the reference in the paper.  There is a substantial amount of
7 5  data that does suggest that people who have taken HRT or ERT
8 6  have a more favorable outcome, and there are a lot of studies
9 7  which show a decrease in mortality in people who have taken
10 8  estrogen.  So we're looking at two different things, perhaps an
11 9  increased risk, but perhaps a better survival and mortality.
12 10  Now, we don't want anybody to get breast cancer, and we don't
13 11  think that it's good for anybody to have that.  If you're
14 12  unfortunate enough to get it, then there is a substantial amount
15 13  of literature to suggest that these tumors are more favorable
16 14  tumors if you've been unfortunate enough to have it.
17 15      In your statement, you talked about causing, and nowhere in
18 16  this document is it speaking about that.
19 17  Q.  Now, it says, "A recent case control study in Australia
20 18  found that ET/HT use after diagnosis reduced tumor recurrence by
21 19  up to 40 percent."
22 20      Did I read that correctly?
23 21  A.  Yes, and that's correct.
24 22  Q.  Then you talk about the WHI trial.  And you start over
25 23  here, and you say, "In the initial report from WHI, the hazard
26 24  ratio for breast cancer was 1.26 after 5.2 years and was similar
27 25  in magnitude to that of two previous observational trials."

page 1934

```
 3  1    Then you talk about subgroup analysis.  You say, "In
 4  2  subgroup analysis of the WHI, the increased incidence of breast
 5  3  cancer was confined to women who had used HT before entering the
 6  4  study."
 7  5    And what's important about that is, because the Women's
 8  6  Health Initiative study only went on for 4.4 years on average
 9  7  use, if you looked at the women that had been on HRT before they
10  8  began the study, you could look at a longer duration; isn't that
11  9  right?
12 10  A.  Yes.  There are some people in this study who have taken
13 11  HRT for 25 years, or even more.
14 12  Q.  And you would not have been able to look at that if you had
15 13  not looked at the subgroup of prior users, current users;
16 14  correct?
17 15  A.  It's a subanalysis.
18 16  Q.  That's right.  And so that's how you're going to get data
19 17  on what's happening on long-term treatment, because the WHI,
20 18  even though it says it went 5.6 years, the usage was only 4.4;
21 19  correct?
22 20  A.  That's an average.  There are people who went longer in the
23 21  trial, who took it for -- who had a mean duration of use of up
24 22  to seven years within the Women's Health Initiative.
25 23  Q.  And getting back to it, it says before entering the study,
26 24  with the hazard ratio varying according to the extent of prior
27 25  use, hazard ratio of 2.13 for women with less than five years of
```

page 1935

```
 3  1  prior use, versus a hazard ratio of 4.61, 95 percent nominal
 4  2  confidence interval, for women with five to ten years of prior
 5  3  use.  Correct?
 6  4  A.  That's what that says.  May I respond and clarify that?
 7  5  Q.  Your counsel will have a perfect opportunity to have you
 8  6  explain that.
 9  7    One of the people that you cite in your study was a
10  8  Dr. John Eden, who wrote an article called "Progestins and
11  9  Breast Cancer" in the American Journal of Obstetrics and
12 10  Gynecology.  Are you familiar with Dr. Eden?
13 11  A.  I know of his work.
14 12  Q.  And you know also that that particular article was one that
15 13  he wrote with the assistance of Wyeth and DesignWrite?
16 14  A.  I did not write that paper.
17 15  Q.  Well, one thing that we do know when we look at this paper
18 16  that you wrote is that you were assisted by Karen Mittleman.
19 17  Isn't that true?
20 18  A.  Yes.  Karen is an editor.  She helps us put our concepts
21 19  together and helps us to write the paper.  We edit them.  We
22 20  tell her what we want to have in there.  But she is basically
23 21  somebody who helps us to edit things.
24 22  Q.  I'm going to show you what we previously marked Plaintiff's
25 23  Exhibit 7871.  This is from Dr. Pickar, June of 1995.  It says
26 24  "urgent" on the front page.
27 25    MR. MORRIS:  Do we have a copy for the witness?
```

page 1936

```
 3  1    MR. URBANCZYK:  Your Honor, we need to approach on
 4  2  this document.
 5  3    [Bench conference reported as follows:]
 6  4    THE COURT:  How much longer do you expect cross to be?
 7  5    MR. MORRIS:  Maybe about ten more minutes,
 8  6  depending on -- were you able to validate whether or not we had
 9  7  the Trudy Bush articles on the long list?
10  8    MR. FARIES:  We are putting them together now.  There
11  9  was some confusion, but we're finding them individually.  7871
12 10  is on the long list.  It's been duly disclosed and provided to
13 11  defendants, as well as --
14 12    MR. URBANCZYK:  I understand, but 7871, your Honor,
15 13  was subject to a ruling by you.  You said it would be admissible
16 14  if during the trial -- you had two points:  If during the trial
17 15  Wyeth refers to studies or testing drugs not similar or
18 16  identical to the drugs in this case, regardless of whether they
19 17  were done overseas, or, two, plaintiffs have an expert who will
20 18  say that the findings of the studies of the products mentioned
21 19  in Plaintiff's 7871 through 7875 would have been relevant to the
22 20  drugs in this case.
23 21    Then you say parenthetically, "This seems like it would be
24 22  difficult for the plaintiff to establish in view of Dr. Austin's
25 23  testimony in the Reno trial.  If plaintiff can't meet either one
26 24  of these tests I've set forth above, the documents will not be
27 25  admissible.  We'll see how it develops."
```

page 1937

```
 3  1    That was your ruling.
 4  2    MR. MORRIS:  And I will tell the Court that they have
 5  3  brought into question during direct examination studies that
 6  4  were done in Europe.  She's testified about them.  We just went
 7  5  over it in cross-examination a little while ago when we were
 8  6  talking about norethisterone and --
 9  7    THE COURT:  Slower.  Slower.
10  8    MR. MORRIS:  Norethisterone and the other drugs that
11  9  were -- I asked her, is there a class effect, and she says we
12 10  don't think so, blah, blah, blah.  This has been -- the door has
13 11  well been open to this document.
14 12    MR. FARIES:  Your Honor, may I just add that there was
15 13  significant criticism that Mr. Urbanczyk got out of the witness
16 14  regarding the Million Women Study, which was a foreign study.
17 15  So as it stands now, they've cast doubt on anything occurring
18 16  overseas, and this is one of the documents that comes in to help
19 17  rebut the position that they've taken and presented.
20 18    MR. URBANCZYK:  That's precisely the opposite.
21 19  They've brought in the other studies.  We've criticized the
22 20  Million Women Study and pointed out that the foreign studies
23 21  were with other products and not pertinent here.  We did not
24 22  produce any foreign study in our direct of this case.
25 23    THE COURT:  I believe I'll let them get into it, but
26 24  I'll note your objection, save your exception.
27 25    [Continuing in open court:]
```

Page 165

page 1938

1  BY MR. MORRIS:
2  Q.  Dr. Constantine, going back to Plaintiff's Exhibit 7871,
3  this is a fax transmission going to the Premarin Studies Review
4  Committee on January [sic] 8, 1995, from Dr. Pickar at Wyeth.
5  Is that the same Dr. Pickar that you authored the paper with?
6  A.  Yes.
7  Q.  Attached is a memo from June of 1995, June 8, from
8  Dr. Pickar to a number of people. And it says, "For your
9  reference, I have attached the outline of the proposed
10  mammographic density study submitted by Dr. Gilbert. This study
11  was to be performed using mammograms obtained from a previous
12  Wyeth placebo-controlled study using Prem-Pak C. As you may
13  remember, the PSRC did not approve Dr. Gilbert's proposal."
14  "Currently the UK is attempting to resolve our corporate
15  concerns with Dr. Gilbert. Attached is a fax I received today
16  through Dr. Julio Casoy," C-a-s-o-y, "from Dr. James Parker, the
17  Associate Medical Director of the UK, outlining options."
18  "Because of the urgency of the situation, I am requesting
19  that you review Dr. Parker's fax and provide me with your
20  comments and recommendations as quickly as possible."
21  And then here's another urgent fax. And it gets to this
22  document, June 6, 1995. And this is, "Dear Dr. Casoy," from
23  Wyeth Laboratories. You can see at the top to Dr. Julio Casoy,
24  from Dr. James Parker at Wyeth Laboratories.
25  "Further to yesterday's Premarin teleconference, please

Page 166

page 1939

1  find below options for consideration in further managing the
2  Gilbert/Premarin/Mammography issue. As stated, we shall await
3  comments from U. S. Management before taking any further
4  action."
5  "We secure an agreement that any publication restricts
6  itself to a technical discussion of current methodology for the
7  evaluation of mammograms versus the digitized approach studied."
8  "For absolute clarity and to avoid any future
9  misunderstandings, it must be further agreed that there should
10  be no review of issues currently under discussion in literature
11  elsewhere reviewing HRT and breast cancer."
12  Then it says, "If points (1) and (2) are secured, without
13  objection from Dr. Gilbert, consideration could then be given to
14  points (4) and (6)..."
15  "U. S. Management prohibits the release of codes to
16  Dr. Gilbert."
17  Dr. Gilbert wanted to review mammograms, and Wyeth made it
18  extremely clear to him that he could do so only under the
19  limitations where there would be no discussion of literature
20  involving HRT and breast cancer. Now, you will agree with me if
21  that, in fact, was what was going on, that's a restriction on
22  his ability to investigate this issue independently. You'll
23  agree with that, won't you?
24  A.  I've never seen this. I have no idea what this is. If you
25  want to give me the components, I can look at it and tell you.

Page 167

page 1940

1  All I can tell you is that we have mammograms, we certainly
2  have outside investigators who are authors on our papers who
3  review the data. I don't know who Dr. Gilbert is. I don't know
4  any of the facts.
5  That office that you're talking about is from Taplow, which
6  is in the UK. I don't know what you're talking about, but what
7  I can tell you is what we do.
8  Q.  Well, the objective of the study was a "Quantitative
9  evaluation of mammographic density from digitized mammograms in
10  premenopausal women receiving hormone replacement therapy." And
11  the background was that "Oestrogens and other hormones are known
12  promoters of breast cancer. Thus, it has been suggested that
13  long-term hormone replacement therapy may promote the
14  developments of breast cancer. However, the risk of developing
15  breast cancer in women on HRT is uncertain. Epidemiologic
16  studies have produced conflicting data with evidence of
17  increased risk, decreased risk, or no additional risk."
18  And no doubt whoever is writing this, the doctor that's
19  writing this, could have gotten that information from the
20  Collaborative Group, could have gotten it from Dupont, from the
21  meta-analysis, because certainly if you review those types of
22  things, the evidence is conflicting. Isn't that true?
23  A.  I didn't hear the last part of your question. The evidence
24  is --
25  Q.  Conflicting.

Page 168

page 1941

1  A.  Yes. But all within a fairly narrow range.
2  Q.  They then say, "Mammographic parenchymal patterns tend to
3  change with aging. The breast undergoes involutional change,"
4  or less density; right?
5  A.  Involutional change, yes. If you would give me a copy of
6  this to look at, it might help me, because it's not --
7  Q.  I thought we did. Did you not? I'm sorry.
8  A.  I apologize. There you are.
9  A.  Thank you.
10  Q.  Okay. It says, "The breast undergoes involutional change
11  with increasing deposition of deposed tissue resulting in
12  progressive reduction in mammographic density."
13  And that's what happens to a woman when she goes through
14  menopause. Because she produces less estrogen and progesterone,
15  her breasts tend to become less dense. Is that true?
16  A.  For many women, that's true. Not for all.
17  Q.  Not for all. "There is a subjective increase in density of
18  mammographic parenchymal patterns in women on HRT."
19  What we know about HRT is, the combination of the E plus P
20  replaces the woman's former E plus P that she made on her own,
21  and it increases or maintains the density in the breast some of
22  the time. Isn't that true?
23  A.  It's a fairly simplistic response, actually. Estrogen
24  levels in the breast and progesterone levels may not really go
25  down much in comparison to the serum. But for the most part,

page 1942

3  1   you can see an increase in density, a small increase.

4  2   Q.  So what the researchers were looking to do here was to look

5  3   at those patterns and see if they could determine something

6  4   about the progression of cancer.  Correct?

7  5   A.  I guess.  I'd have to look at this.

8  6   Q.  And I'll show you 8022-A.  Here.

9  7   A.  Thank you.

10 8   Q.  This is Exhibit 8022-A, and it's from -- to Jeff Buchalter

11 9   from Libby Brown, consultants' meeting, December 1, 1994.

12 10      And it says, "Enclosed are the following items related to

13 11  the above-named meeting:  An overview statement of objectives;

14 12  tentative workshops/chairs; a tentative agenda.  I am providing

15 13  these for you to react to so that we can continue to move

16 14  forward on this event."

17 15      And it says, "My concerns about the program are as follows,

18 16  not necessarily in order of priority."

19 17      "Time is very short."

20 18      "Dr. Lobo is unable to chair."

21 19      We need to determine topics and faculty ASAP."

22 20      "The contract needs to be signed with the hotel."

23 21      And, "I am out of the office, though not out of touch..."

24 22      And then if we go to the next page, it says, "'Cutting

25 23  Edge' Consultant Conference on Hormone Replacement Therapy,

26 24  'Advances in Hormone Replacement Therapy.'"

27 25      It says, "The above-named conference will bring together 20

page 1943

3  1   influential academic obstetricians/gynecologists (plus

4  2   additional faculty) to participate in a meeting wherein they are

5  3   exposed to some of the most recent findings on the effects of

6  4   postmenopausal estrogens and progestins."

7  5      Right?

8  6   A.  That's what that says.

9  7   Q.  And the workshops, one of the speakers was going to be

10 8   Trudy Bush; correct?

11 9   A.  That's what it looks like.

12 10  Q.  Okay.  And Wyeth people are involved.  That's Dr. Deitch.

13 11  He used to be the medical director at Wyeth; right?

14 12  A.  He was in the medical affairs department.

15 13  Q.  Mike Dey.  He's one of the top executives at Wyeth, isn't

16 14  he?

17 15  A.  Yes.

18 16  Q.  And then on December 2, 1994, it says, "Accompanying this

19 17  note are changes, or suggested changes, to the proposed agenda

20 18  for the consultants' meeting, which are the outgrowth of my

21 19  meeting this morning with Jim Pickar."

22 20      "Jim admits that his choice of Arthur Herbst may seem a

23 21  strange one, but he feels that he is a person of stature, who

24 22  could help set a high tone for the meeting.  He is basically an

25 23  oncologist --" and then you see this line that runs from

26 24  "oncologist" up to this word:  "No."  "-- though he is Chair of

27 25  OBG at the University of Chicago.  He also felt that Isaac

page 1944

3  1   Schiff would be a very good choice, certainly one more related

4  2   to HRT, if he will work with us.  I can talk to the Medical

5  3   Center Manager if you like."

6  4      And then the note below is, "Please see if Schiff can work

7  5   meeting for a workshop.  No way having an oncologist chair this.

8  6   No, no, no, no, no."

9  7      Oh, I'm sorry.  I left out the best part for you.

10 8   "Please see if Schiff can work meeting for a workshop.  No

11 9   way having an oncologist chair this.  No, no, no, no, no."

12 10     Now, we got this out of the files of Wyeth, and you will

13 11  agree with me it would be highly inappropriate for Wyeth to

14 12  suggest that an oncologist not be involved in the review of

15 13  issues involving HRT.  You would agree that that would be

16 14  inappropriate, wouldn't you?

17 15  A.  I don't know anything about this document.  I have never

18 16  seen the document before.  What I can -- you know, the only

19 17  thing I can tell you is, I'm looking at the agenda, and I don't

20 18  see topics related to oncology, but I can't tell you what's

21 19  behind this.

22 20     I certainly can tell you that we have oncologists at our

23 21  meetings.  I meet with oncologists.  I invite them to our annual

24 22  meeting.  And if there was an oncologic issue, yes, I would

25 23  agree with you that we should have oncologists participate.

26 24  Q.  Now, we know, if we go back to that 1978 memorandum that I

27 25  showed the jury when we began discussing this, we know that that

page 1945

3  1   proposed randomly controlled trial that the doctors talked about

4  2   in 1978 that Wyeth had the ability to design, they've seen the

5  3   stipulation where Wyeth says they have plenty of money to do

6  4   that.  We know that never got done by Wyeth, don't we?

7  5   A.  That is an incorrect representation.

8  6   Q.  It's not an incorrect representation.  WHI was done by the

9  7   National Institutes of Health without any design help from

10 8   Wyeth.  Isn't that true?

11 9      MR. URBANCZYK:  Objection.  Argumentative.

12 10     THE COURT:  I believe she can answer that yes or no.

13 11  Overruled.

14 12  A.  That would be an incorrect statement.  Actually, Wyeth

15 13  helped a great deal with the WHI.  We opened up our IND so they

16 14  could use the information that we had to help build that trial.

17 15  Several of the trials that we had done previously and supported,

18 16  WHI built upon that data, and they've even commented on that and

19 17  published with regard to that, and we can show you that

20 18  publication.

21 19     In addition, the WHI investigators presented me with an

22 20  award, thank you for an award, and I accepted it and --

23 21     MR. MORRIS:  Let me object to the nonresponsive

24 22  portion of this.

25 23     THE COURT:  That's a tad more than yes or no.  Try to

26 24  narrow your answer to that, if you would.

27 25     THE WITNESS:  The answer was a firm no.

page 1946

1  BY MR. MORRIS:
2  Q.  All right.  Let me ask you another question then.  You
3  can't show the ladies and gentlemen on this jury one randomly
4  controlled trial done on this issue specifically by Wyeth prior
5  to WHI, can you?
6  A.  HERS.
7  Q.  HERS was not a breast cancer study.  They've seen that.
8  A.  Well, neither is WHI.  No randomized controlled trial is
9  what you call a breast cancer trial.  The trials have to look at
10 something that provides benefit for a patient.  And a random --
11       THE COURT:  All right.  Let's take a break.  We'll be
12 in recess until half past by that clock.  Standard admonition.
13       Let the jury stand out.  Everyone else remain seated.
14       (Jury exited the courtroom.)
15       THE COURT:  We're in recess until half past.  Be at
16 ease.
17       (Recess at 3:15 p.m., until 3:30 p.m., jury not present.)
18       THE COURT:  You probably ought to go outside.  Yes,
19 ma'am.  Thank you.
20       (The witness exited the courtroom.)
21       THE COURT:  I understand there's an issue.
22       MR. MORRIS:  Yes, sir.  Your Honor, let me explain
23 what we're doing here.  With regard to the witness's testimony,
24 the witness has testified that they were a substantial factor in
25 the WHI, Wyeth was, and so I intend to show her this document

page 1947

1  from Dr. Pickar.  This is Plaintiff's Exhibit No. 337.  If you
2  go over to this particular page, they talk about Premelle, which
3  was the name that they had thought about before they came up
4  with Prempro.  It talks about the WHI Study, and their projected
5  investment was $2.7 million.  So this is a $700 million study.
6  They're doing 2.7 million, which is a minuscule part.  That's
7  the point that we're making.
8      And then next I would like to show the witness --
9      MR. URBANCZYK:  I have no objection to that one, that
10 page.  I have no objection to that page.
11      MR. MORRIS:  I'd like to be able to show them the
12 whole document.
13      MR. URBANCZYK:  I believe your Honor has ruled some of
14 that out.  We can check.
15      MR. MORRIS:  I'd like to be able to show them this
16 document, which is Plaintiff's Exhibit 8021, which shows that in
17 November of 2000, they were authorizing $3.55 million for an
18 upgrade of cars for their sales force, to compare the two.
19      MR. URBANCZYK:  Your Honor, I stand corrected on 337,
20 if that's the number.
21      THE COURT:  Which one is that?
22      MR. URBANCZYK:  That's the one that -- the first one
23 he showed.  You have ruled that admissible, and we will not
24 further object.  So that's the one that he showed you.
25      On the proposed expenditure of money for upgrades to cars,

page 1948

1  your Honor, that is labeled a draft.  And that never happened.
2  It was not approved, it was not signed, it didn't happen.  So
3  I -- and I'm not -- this is not the right witness to throw these
4  up at.  You know, Mr. Morris in a last-ditch attempt is throwing
5  up a lot of documents that are not really properly presented to
6  this witness.  She doesn't know about them.  She hasn't seen
7  them.  Her name's not on them.  And he's just speechifying [sic]
8  about them, and I think it's improper.
9       THE COURT:  Yeah, there has been too much editorial in
10 the questions, and I -- even some where I've overruled the
11 objection, there were some editorials.  For example, you said,
12 "I was shocked," or surprised, when a doctor said there was a
13 good cancer, or something like that.  That's editorial.  So cut
14 those out.
15      I'm still thinking about this one about the car expense.
16      MR. URBANCZYK:  It's also, your Honor, a document that
17 postdates this case by a couple years.  It's 2001, it's about
18 the sales force, which is not a relevant issue in this case.
19 It's a proposal that was never adopted.
20      MR. MORRIS:  We're not offering it for the truth of
21 whether or not it was adopted, your Honor.  I'm offering it for
22 comparison sake so the jury has some benchmark in their mind of
23 what the contribution to WHI was compared to contributions to
24 their sales force, other things that they do in the corporation,
25 so they can have some benchmark.  2.7 million sounds like a lot

page 1949

1  of dollars to this jury, but when you compare it against the
2  size of the study at $700 million --
3       THE COURT:  Of course, you can show that one.  What --
4  why would this witness be a person to -- I'll tell you what I'm
5  going to allow.  I'll allow you to ask her, after you've shown
6  her the one about how much they're going to show, they're going
7  to pay, and how much the whole project costs, I'll allow you to
8  ask her, at about that same time, your company proposed whatever
9  it was for upgrading of cars.  If she knows the answer to that,
10 she can answer it yes, or she can say no.  I don't think she is
11 the one to get into the document.  You might find somebody later
12 that can authenticate it, but I don't believe that --
13      MR. MORRIS:  I don't believe I'm going to have anybody
14 later to come, because I don't believe they're going to call
15 anybody else.  This is the last company witness they're going to
16 call.  If I don't get to ask her, I don't --
17      THE COURT:  You can ask her --
18      MR. MORRIS:  She's an executive of the company.  She
19 is VP of women's health.  This is a high-level executive in this
20 corporation.
21      THE COURT:  I'm going to allow it.  Is she the last
22 company witness?
23      MR. URBANCZYK:  Yes.
24      THE COURT:  I'm going to allow it over objection.
25 I'll allow you to show her the document.  I don't know what else

page 1950

3 1  is in there besides that.  But I don't think the rest of that is
4 2  relevant.  You can show it on the board.  But I'm not going to
5 3  introduce it into evidence unless the rest of the stuff in there
6 4  is relevant.
7 5      MR. MORRIS:  Well, I can redact whatever your Honor
8 6  doesn't feel is proper.
9 7      THE COURT:  That's my ruling.  Exception saved.  All
10 8  right.  Let's bring her in.
11 9      MR. URBANCZYK:  Before you do that, there's a couple
12 10  other -- Mr. Morris has now proposed several other exhibits off
13 11  the short list, a number of -- off the long list.  Excuse me.  A
14 12  number of them that relate to -- that are proposals from third-
15 13  party vendors, they are very similar --
16 14      THE COURT:  For this witness?
17 15      MR. URBANCZYK:  Yeah.  They're very -- it's cross-
18 16  examination, your Honor, and I'm not objecting because it
19 17  wasn't -- it was only on the long list.  I'm not objecting to
20 18  that.  But this has never been ruled on by your Honor.  I
21 19  believe in a similar case, maybe with Doctor -- with Dr. Austin
22 20  or Dr. Naftalis or Dr. Parisian, you limited her to reading a
23 21  portion of this document as opposed to, you know, showing it on
24 22  the board and introducing it.
25 23      THE COURT:  What is the document?
26 24      MR. URBANCZYK:  This is similar, in fact, to a
27 25  document, Exhibit 550, that you ruled it out.  Well, I'm not

page 1951

3 1  sure that it is similar, but it had to do with --
4 2      THE COURT:  You're talking about some other witnesses
5 3  now.  I asked you what is the document, and you said it's
6 4  similar to something.  What is this document?  Show it to me on
7 5  Johnny ELMO there.
8 6      MR. URBANCZYK:  There's a series of documents, your
9 7  Honor.  There's Plaintiff's Exhibit 8032-A that is talking about
10 8  a meeting agenda with manuscripts.  There's a --
11 9      MR. MORRIS:  Can I --
12 10      THE COURT:  I see a hand there.
13 11      MR. MORRIS:  Can I respond?  I mean, earlier when I
14 12  was putting up the Trudy Bush and DesignWrite documents, they
15 13  objected and said --
16 14      THE COURT:  All I'm trying to do is see the document
17 15  to know what it is.
18 16      MR. MORRIS:  Well, I understand.  That's what I'm
19 17  telling you, because you've already seen it.  You saw it a
20 18  little while ago when we had the bench conference and they said
21 19  it's not on the long list.  We have gone back and we have found
22 20  that it was on the long list, just under a different number.
23 21  And so now he is trying to make a substantive objection when
24 22  it's something that's clearly off the long list, and I want your
25 23  Honor to understand that.
26 24      THE COURT:  I probably would have recognized it,
27 25  but in any event --

page 1952

3 1      MR. URBANCZYK:  Well, your Honor --
4 2      THE COURT:  What is the objection?
5 3      MR. URBANCZYK:  My first objection, it wasn't on the
6 4  long list because it wasn't under the number.  But now they've
7 5  gone back and they have found that portions of the document are
8 6  listed in the long list under eight or nine different exhibits.
9 7  And they relate to meetings of the Premarin publication plan in
10 8  '98 to 2000 relating to proposed articles.  And I don't know
11 9  that this witness is the proper person to bring it up to, but I
12 10  object to them as being not relevant, as not having anything to
13 11  do with Dr. Kuperman in this case.
14 12      THE COURT:  What is the relevance?
15 13      MR. MORRIS:  The relevance is, they have just put up
16 14  this long list of studies, including Trudy Bush, and said that
17 15  these are studies that Wyeth has supported and conducted.  This
18 16  particular witness, we have now connected her to DesignWrite and
19 17  Karen Mittleman, and so certainly it's appropriate for me to go
20 18  back and say, well, Trudy Bush also was assisted in writing her
21 19  articles by DesignWrite, as was --
22 20      THE COURT:  Objection overruled.  Exception saved.
23 21      MR. MORRIS:  Your Honor, I need to -- I think those
24 22  are my copies.
25 23      MR. URBANCZYK:  No, no.  This one is.
26 24      MR. MORRIS:  Do you have my copies?  I hope somebody
27 25  has my copies.

page 1953

3 1      Your Honor, I'd like to move into evidence several of these
4 2  exhibits.  Can I do that now, or do I need to wait for the jury?
5 3      THE COURT:  No.  Let's wait until the jury goes home,
6 4  at about 15 till five.
7 5      MR. MORRIS:  Okay.  Thank you, your Honor.
8 6      THE COURTROOM DEPUTY:  Are you ready for the jury,
9 7  Judge?
10 8      MR. URBANCZYK:  Can we get the witness?
11 9      (The witness entered the courtroom.)
12 10      THE COURT:  Everyone please rise.
13 11      (Jury entered the courtroom.)
14 12      THE COURT:  Be seated, please.
15 13  BY MR. MORRIS:
16 14  Q.  Dr. Constantine, we were talking earlier about Trudy Bush,
17 15  and I just wanted to discuss this document with you.  This is
18 16  8032-A, 6741, 3304, 4703, 6735, and 4764.
19 17      MR. MORRIS:  Are there any objections?
20 18      MR. URBANCZYK:  No further objections, your Honor.
21 19      THE COURT:  Admitted.  Exception saved.
22 20      (Plaintiff's Exhibits 8032-A, 6741, 3304, 4703, 6735, and
23 21  4764 received in evidence.)
24 22      MR. MORRIS:  Where is the witness's copy, Steve?
25 23      THE COURTROOM DEPUTY:  Mr. Morris, what was that very
26 24  first number?
27 25      MR. MORRIS:  8032-A.

Page 181

page 1954

3  1      THE COURTROOM DEPUTY:  That's all I needed.  Thank
4  2  you.
5  3  BY MR. MORRIS:
6  4   Q.  I want to run through this real quick.  As for 8032-A, this
7  5  is 10/29/97, and we started to go through this earlier.  There's
8  6  a breast cancer manuscript, DesignWrite meeting that's taking
9  7  place at this time.  And one of the papers identified is "Myths
10  8  and Misperceptions of the Role of ERT in Breast Cancer";
11  9  correct?  Is that right?
12  10  A.  That's what that says.
13  11  Q.  DesignWrite is to follow up initial contact with
14  12  Dr. Nachtigall.  Correct?
15  13  A.  On a separate paper, yes.
16  14  Q.  And then on 6741, there's a Premarin publication plan
17  15  meeting recap, and it says that the paper with Dr. T. Bush that
18  16  is currently in progress, "Postmenopausal Estrogens and Breast
19  17  Cancer:  A Differing View," will replace the "Myths and
20  18  Misperceptions of the Role of ERT in Breast Cancer" manuscript.
21  19  Is that correct?
22  20  A.  That's what this says.
23  21  Q.  Then on December 5 of 2000 at one of the strategic
24  22  publications development meetings attended by Wyeth-Ayerst and
25  23  DesignWrite's Karen Mittleman, they once again on the breast
26  24  cancer message, they mention Dr. Nachtigall's update and Trudy
27  25  Bush's paper that was sent to Obstetrics and Gynecology;

Page 182

page 1955

3  1  correct?
4  2  A.  Yes.
5  3  Q.  Then later, in January of 1998, there was a DesignWrite
6  4  meeting with Wyeth, and there was a follow-up on a meeting with
7  5  Trudy Bush, outline for paper submitted for review.
8  6      It wasn't uncommon for Wyeth to prepare the outline;
9  7  correct?
10  8  A.  I think Trudy would prepare the outline or suggest the
11  9  outline, and I think that's what it's saying there.
12  10  Q.  It says that Karen is waiting to hear from Trudy regarding
13  11  approval of outline and other projects.  So that seems to
14  12  suggest to me that somebody other than Trudy had prepared the
15  13  outline, because --
16  14      MR. URBANCZYK:  Objection, your Honor.  It doesn't
17  15  matter what it seems to Mr. Morris.  That's editorializing.
18  16      MR. MORRIS:  I'm asking a question.
19  17      THE COURT:  You had too much of a frowny face when you
20  18  made that objection.
21  19      MR. URBANCZYK:  I'll do it with a smiley face, your
22  20  Honor.
23  21      THE COURT:  I'm going to sustain -- let's cut the
24  22  editorial.
25  23  BY MR. MORRIS:
26  24  Q.  Will you agree with me that when she says Karen is waiting
27  25  to hear from Trudy regarding approval of the outline, that

Page 183

page 1956

3  1  certainly doesn't say to the jury drafting of the outline.
4  2  You'll agree with that, won't you?
5  3  A.  I didn't know what the status of an outline was, whether
6  4  Trudy had worked with Karen, what revision you're on.  I think
7  5  you're some months later.  After six months, I would think that
8  6  there had been an outline somewhere there.
9  7  Q.  Then if we get to this graph on 6735, it shows, "Estrogens
10  8  and Breast Cancer:  A Differing View," T. L. Bush.  Apparently
11  9  it gives her phone number.  And then over here it was submitted
12  10  to the American Journal of Medicine and Contemporary OB/GYN.  Is
13  11  that correct?
14  12  A.  I would assume so.  I can't read the top there, but I think
15  13  that's what you're -- that's what it says.
16  14  Q.  Here at the top, it says, "Publication plan tracking
17  15  report."
18  16  A.  The page is folded.  I just couldn't read the column.
19  17  Q.  I apologize.
20  18      How about that?  Can you read that?
21  19  A.  Okay.  Yeah.
22  20  Q.  It says, "Target journal/date submitted."  Correct?
23  21  A.  Yes.  That's correct.
24  22  Q.  And then if we go to the last page, for strategic
25  23  publication plan tracking report, it shows, "Hormone Replacement
26  24  Therapy and Breast Cancer:  A Qualitative Review," T. L. Bush,
27  25  Obstetrics and Gynecology.  Correct?

Page 184

page 1957

3  1  A.  Yes.
4  2  Q.  And this indicates that it was rejected by JAMA and then
5  3  submitted to OB/GYN; correct?
6  4  A.  Yes.
7  5  Q.  And that happens occasionally; right?
8  6  A.  It happens a fair bit with authors' papers, with all
9  7  authors.
10  8  Q.  And you were talking about Wyeth's support for WHI.  Do you
11  9  remember that?
12  10  A.  Yes.
13  11  Q.  And isn't it true that WHI cost over $700 million to
14  12  conduct, somewhere in that range?
15  13  A.  That's what I've heard.
16  14      MR. MORRIS:  And this is Exhibit No. 337.  I'll tender
17  15  it to opposing counsel for any objections.
18  16      MR. URBANCZYK:  No objection.
19  17      THE COURT:  Admitted.
20  18      MR. MORRIS:  Thank you, your Honor.
21  19  (Plaintiff's Exhibit 337 received in evidence.)
22  20  BY MR. MORRIS:
23  21  Q.  This is from Dr. Pickar.  He's the guy you authored that
24  22  paper with; right?
25  23  A.  That paper you showed earlier?  Yes.
26  24  Q.  And this goes through Premarin and the most-studied
27  25  estrogen, the objective of Premarin research.  And the

1 page 1958

2

3 1   objectives were to expand the indications, bone, cardiovascular,

4 2   and brain, get line extensions.  Correct?

5 3   A.  Yes.

6 4   Q.  It says, "We are writing history."  Correct?

7 5   A.  Yes.

8 6   Q.  And it gets over here and talks about Premelle.  At one

9 7   point, before they decided on a final name, they were going to

10 8   call Prempro Premelle; correct?

11 9   A.  I believe that's true.  I'm not sure if this is the foreign

12 10   name.  But I believe you're correct.

13 11   Q.  Because it was Premarin MPA in four doses/two regimens.  So

14 12   it was a combination product combining Premarin and MPA;

15 13   correct?

16 14   A.  That's what it is, yes.

17 15   Q.  Then it talks about the HERS, the replacement study;

18 16   correct?

19 17   A.  Yes.

20 18   Q.  And that was to be a secondary prevention of cardiovascular

21 19   disease paper?

22 20   A.  That was the --

23 21   Q.  Or project.

24 22   A.  I'm sorry.  I thought that was the question.

25 23   Q.  A projected investment to completion of that one was going

26 24   to be 40 million bucks; right?

27 25   A.  That is what we call direct cost.  Actually, the cost would

1 page 1959

2

3 1   be almost double that to do these studies.

4 2   Q.  So maybe 80 million?

5 3   A.  Probably closer to that.

6 4   Q.  To do HERS?

7 5   A.  Probably even more than that at the end of the day.

8 6   Q.  And then you were going to do some medical research in the

9 7   United Kingdom; correct?

10 8   A.  Yes.

11 9   Q.  And that's where the Million Women Study was done; right?

12 10   A.  Yes, and this, I think, would be referring to the WISDOM

13 11   study, which would have been the European counterpart to WHI.

14 12   Q.  And when we get over here to WHI, the product Premarin or

15 13   Premelle -- because it had an estrogen-only arm, and then it had

16 14   the combo arm; correct?

17 15   A.  Yes.

18 16   Q.  The projected investment was 2.7 million; correct?

19 17   A.  Again, that would be direct costs.  There would be

20 18   additional -- that's probably closer for that, but we did spend

21 19   additional monies for WHI as well.  We supported one whole

22 20   substudy.

23 21   Q.  And about the same time that you were putting 2.7 million

24 22   into WHI, I'd like to show you Plaintiff's Exhibit 8021.

25 23        MR. MORRIS:  And I would tender it to opposing counsel

26 24   for any objections.

27 25        MR. URBANCZYK:  No further objections.

1 page 1960

2

3 1        MR. MORRIS:  Will it be admitted?

4 2        THE COURT:  Admitted.  Exception saved.

5 3        (Plaintiff's Exhibit 8021 received in evidence.)

6 4   BY MR. MORRIS:

7 5   Q.  This is a finance committee authorization from November 1

8 6   of 2000, and the operating expense listed was 3.55 million.  And

9 7   it says authorization is requested to enhance the Premarin sales

10 8   force incentive plan for the first half of 2001.  To motivate

11 9   representatives toward immediate action, a car upgrade will be

12 10   initiated, a special one-time car upgrade for the sales force at

13 11   the cost of 3.55 million.

14 12        Did you receive -- I doubt that you would have received a

15 13   car, since you're not part of the sales force; right?

16 14   A.  Nobody received that, and as you can see, that wasn't

17 15   signed off.  Somebody threw out a proposal, probably a sales

18 16   representative, and it wasn't done and it wasn't approved.

19 17   Q.  But nonetheless, Wyeth certainly, as they've stipulated in

20 18   this litigation, had plenty of money to do studies through the

21 19   years.  You'll agree with that.

22 20   A.  Yes.  We've done many studies through the years.

23 21   Q.  Okay.  With regard to the issue of the combination, have

24 22   you been able to run across any literature or any documents in

25 23   this case that suggest that Wyeth had communications with Upjohn

26 24   where the two companies would get together and study whether or

27 25   not the common use of their products together was causing breast

1 page 1961

2

3 1   cancer?

4 2   A.  We undertook the studies independently.  I don't know if

5 3   there had been correspondence.  You know, I just am not privy to

6 4   that, going back at that time.  But we certainly undertook

7 5   studies.

8 6   Q.  Will you agree with me that the folks at Upjohn would have

9 7   been as equally able to access the medical literature during the

10 8   period of time from the '70s all the way up to 2000 as Wyeth?

11 9   A.  Yes.  And I would assume that they did that.

12 10   Q.  And during the same period of time, if we go from, say,

13 11   1975 up to 1995, December 30, 1994, during that entire period of

14 12   time, Wyeth did not have an approval for the use of estrogen and

15 13   MPA together; correct?

16 14   A.  We were working on the approval at that time.  Also at that

17 15   time, we were studying that combination in those three large

18 16   studies.

19 17   Q.  Well, I tried to be accurate with my question.  I'll ask it

20 18   one more time.  From the period of 1975 up until December 30 of

21 19   1994, Wyeth did not have an approval from the FDA for the use of

22 20   Premarin with medroxyprogesterone acetate in combination;

23 21   correct?

24 22   A.  That's correct.  That's why it was being studied.

25 23   Q.  Throughout that time, Upjohn didn't have an approval from

26 24   the FDA for the use of progestin with your estrogen or anyone

27 25   else's; correct?

page 1962

1  A.  You don't have to have that, obviously.  They're
2  independent products, and each product can stand on its own.
3  Physicians have the right to utilize the product together.  We
4  felt that it was important to try and study it in a consistent
5  manner, and that's why we did those studies, to try and get an
6  indication to use the two.
7  Q.  So just so I'm clear, you didn't have to have that approval
8  to study these products together and find out if they hurt
9  people, did you?
10  A.  At the time that we were studying them, we did not have the
11  approval.  We were not marketing anything.  You are absolutely
12  correct.  We were studying them without a product on the market.
13  We had Premarin, and there was also MPA independently approved.
14      MR. MORRIS:  So, your Honor, I will move into evidence
15  at this point additional exhibits that I've identified with this
16  witness.  That includes 8022-A, 8023-A, 8024-A, 519-R, 1567,
17  7871.
18      THE COURT:  What says the defense?
19      MR. URBANCZYK:  No -- I think we've had no further
20  objections to that, your Honor.  Those have been identified.
21      THE COURT:  Admitted, with exceptions saved.
22      (Plaintiff's Exhibits 8022-A, 8023-A, 8024-A, 519-R, 1567,
23  and 7871 received in evidence.)
24      MR. MORRIS:  I'll pass the witness.
25      MR. URBANCZYK:  I'm going to have a happy face, your

page 1963

1  Honor, because it's almost the end of the day.  But I've got
2  another witness, if you want to go till six.
3      THE COURT:  I'll leave that up to a vote of the jury.
4          REDIRECT EXAMINATION
5  BY MR. URBANCZYK:
6  Q.  Dr. Constantine, we have a question relating to the risk
7  numbers for estrogen and estrogen plus progestin.  The question,
8  I'm going to read it, and then we'll try to break it down.  If
9  estrogen -- if the estrogen rate of breast cancer is .77 risk,
10  why is estrogen plus progestin high risk of 1.24 if there is no
11  risk of E plus P?
12      There may be some confusion.  What is the relative risk of
13  breast cancer with the use of Premarin alone?  That's the
14  point --
15  A.  The .77, yes.
16  Q.  That's below one.
17  A.  Yes.
18  Q.  But it's not statistically significant.
19  A.  That's correct, until it crosses the line.
20  Q.  So what do we say about the risk of Premarin alone from the
21  WHI Study?
22  A.  It does not increase the risk of breast cancer.
23  Q.  The risk reported by the WHI for Prempro, which is estrogen
24  plus progestin, is what number?
25  A.  1.24.

page 1964

1  Q.  All right.  If those are real numbers, 1.24 for estrogen
2  plus progestin and .77 for estrogen, why are those different, or
3  what would -- what would be an explanation for the difference?
4  A.  Well, the difference, obviously, is that the progestin is
5  in the second -- was in the second arm of E plus P.
6  Q.  All right.
7  A.  So you had the estrogen-alone arm, meaning that there was
8  an estrogen group and a placebo group, and an estrogen and
9  progestin arm, and a placebo group.
10  Q.  And I understand that there are different populations, and
11  it's -- is it -- can you be confident that they are real --
12  those are real differences?
13  A.  Well, we say that there's no increase with the estrogen
14  alone, and we say that there is a small increase with the
15  estrogen and progestin.
16  Q.  At least as reported by WHI.
17  A.  As reported by WHI.
18  Q.  Okay.  And the difference would be the difference, one's an
19  estrogen, one's a combination?
20  A.  That's correct.
21  Q.  Is 1.24, it's above one.
22  A.  That's correct.
23  Q.  So it's an increased risk?
24  A.  Yes.
25  Q.  Is it considered in the medical community, scientific

page 1965

1  community, as a high risk?
2  A.  No.  It's a very small risk.  It's a very, very small risk,
3  and it's considered to be rare, a rare finding.  That's where we
4  showed that graph, trying to put it into context, for example,
5  for aspirin or Tylenol use.
6  Q.  And that's the circles that we saw that Dr. Colditz talked
7  about, the .2 percent versus .4 percent?
8  A.  That's correct.
9  Q.  You know, the jury heard a statistic which I want to make
10  sure that they're not confusing, they heard a statistic that
11  over a lifetime, a woman has a one in eight chance of getting
12  breast cancer.  Those numbers from the WHI were much smaller
13  than that.  How do you -- what are those numbers portraying, the
14  .3 percent and the .4 percent, or 03 percent and 04 percent,
15  compared to the one in eight chance a woman has lifetime?
16  A.  We do it per thousand women, so --
17  Q.  Okay.  Per -- over a five-year period?
18  A.  Over a five-year period, yes.
19  Q.  Not a lifetime?
20  A.  No, no, this is not over a lifetime.  Can I clarify
21  something else --
22  Q.  Yes.
23  A.  -- actually?
24  Q.  Yes.
25  A.  Just about the 1.24.  They heard a number earlier about

Page 193

page 1966

1  1.26 as well, which would cause confusion.  In the original WHI,
2  they published an article, and they published 1.26 originally.
3  They went back, and when they -- and they did their first
4  analysis at 5.2 years.  They then went back and looked at 5.2
5  years, so you'll see two different numbers.  One was 1.26, one
6  was 1.24, and it's the same data set, though, just to allay any
7  confusion.
8  Q.  And if there is an increased risk of 1.24 with Prempro,
9  combination estrogen plus progestin --
10  A.  Yes.
11  Q.  -- then we do not say, we cannot say there is no risk with
12  E plus P, can we?
13  A.  That's correct.
14  Q.  Okay.
15  A.  That's not what we're saying.
16  Q.  Okay.  Mr. Morris took you through some of the meta-
17  analyses that we talked about, and he asked you about the doses
18  and the kind of medicines that were being used that were
19  reported in the Dupont meta-analyses, and you said you were a
20  little uncomfortable, and I want you to tell the jury what you
21  were uncomfortable about.
22  A.  In the past, and even somewhat today when we talk about
23  estrogen therapy, the term of art certainly previously was to
24  say, "I take estrogen.  I take estrogen therapy."  Even when
25  people did questionnaires, we'd give them a questionnaire,

Page 194

page 1967

1  "Which estrogen do you take?"  They would also point to their
2  progestin.  We didn't usually say, "Do you take estrogen and
3  progestin?"  So the term of art is estrogen.  Oftentimes in a
4  title in an article, it will say breast cancer and estrogen
5  therapy.  Within that article, oftentimes are estrogen as well
6  as estrogen and progestin data.
7  For example, one of the studies that we supported, the
8  Hammond study, says estrogen in the title, but then when we
9  looked at it, estrogen and progestin was in the article.
10  So it's a term of art and I was just uncomfortable on this
11  stack of articles --
12  THE COURT:  A little slower, please.
13  THE WITNESS:  I'm sorry.
14  -- stating that absolutely there was no E plus P.
15  BY MR. URBANCZYK:
16  Q.  But so there's no doubt, Dr. Constantine, when you and I
17  talked about the Dupont meta-analysis, that was clearly
18  identified in our slides as a study purporting to be of estrogen
19  alone?
20  A.  Yes.  And that's why I kept trying to go back to that
21  Dupont, to see which article --
22  THE COURT:  Just a yes or no will be all right.
23  THE WITNESS:  Yes.
24  BY MR. URBANCZYK:
25  Q.  And is it not the case -- is it so also, Doctor, that the

Page 195

page 1968

1  other three meta-analyses that we talked about, Colditz, Beral,
2  and Bush, '93 Colditz, '97 Beral, 2001 Bush, clearly identified
3  that they were studying both estrogen and estrogen plus
4  progestin?
5  A.  Yes.
6  Q.  All right.  And there was a reference to some articles, one
7  article by Persson and one article by Magnusson, that Mr. Morris
8  suggested had not been included in one of the charts.  Were
9  those -- were those articles included in the Bush meta-analysis
10  of 2001?
11  A.  Yes.
12  Q.  We saw those; right?
13  A.  We did.
14  Q.  Those were the ones we circled.  Okay.  So those were
15  disclosed in Wyeth-supported publications?
16  A.  That is correct.
17  Q.  All right.  Do you know Dr. Bush?
18  A.  Well, she is deceased.  I did know her.
19  Q.  You did know her?
20  A.  I did know her.
21  Q.  Is she someone who would be a mouthpiece for Wyeth?
22  MR. MORRIS:  Let me object.
23  THE COURT:  Sustained.
24  BY MR. URBANCZYK:
25  Q.  Did you view her as an independent scientist?

Page 196

page 1969

1  A.  She definitely was a very independent scientist.
2  Q.  Subject to influence by Wyeth, to your knowledge?
3  A.  No.
4  Q.  I want to point out to the jury and to you,
5  Dr. Constantine, that this is the article, it's Defense Exhibit
6  2010, and this is the qualitative review by Trudy Bush; correct?
7  A.  That's correct.
8  Q.  And there is full disclosure, is there not, that Wyeth
9  helped to fund this article?
10  A.  As well as the Department of Defense.
11  Q.  Right.  And is there also an acknowledgment of the help of
12  Karen Mittleman?
13  A.  Yes, and several other people who I don't know.
14  Q.  So there's no hiding Wyeth's involvement with the study?
15  A.  No.  She was a very forthright person.
16  Q.  You were asked about the Leisure World, and Mr. Morris said
17  I could ask you about it.  This is the Leisure World -- a paper
18  from the Leisure World study.  I wanted just to see if this is
19  the paragraph that you were looking at in terms of inclusion in
20  that study of women on the combination therapy.
21  A.  Yes.
22  Q.  And what does that say?
23  A.  It said that 13 percent of the estrogen users were using
24  progestogen.
25  Q.  Okay.

Page 197

page 1970

3 1  A.  And it just goes up over time, which is what we would have
4 2  anticipated.
5 3  Q.  So it is true that the Leisure World study studied both
6 4  estrogen and estrogen plus progestin?
7 5  A.  Yes, it definitely did.
8 6  Q.  Mr. Morris pointed out that Wyeth did not participate in
9 7  the protocol drafting of a number of the observational studies
10 8  early.  Did Wyeth participate, nevertheless, in the protocols of
11 9  randomized controlled trials?
12 10  A.  Yes.
13 11  Q.  And those are the trials.
14 12  A.  Absolutely.
15 13  Q.  In the hierarchy of studies in terms of what gives the best
16 14  data, what is the most rigorous and highest quality study of the
17 15  four that we discussed?
18 16  A.  The randomized clinical trials.  They're the most difficult
19 17  to do, they're the most tedious to do, and they generally take
20 18  the longest period of time to do.
21 19  Q.  All right.  And Wyeth was involved in those protocols?
22 20  A.  Absolutely.
23 21  Q.  You were asked a lot of questions about Dr. Anderson's
24 22  tables.  I'm not going to go back over them, but there was a
25 23  series of questions about Dr. Anderson wanting to be
26 24  conservative.  What was that all about in terms of what
27 25  Dr. Anderson's bottom line was concerning the right number from

Page 198

page 1971

3 1  WHI?
4 2  A.  Dr. Anderson was stating that the intent to treat
5 3  population was -- meaning the whole population that you look at
6 4  was the appropriate population, the 1.24 was the appropriate
7 5  number.  I think in the texts that we saw at that point, that
8 6  was before the updated WHI, so that would have been the 1.26
9 7  number.  But it's -- it eventually changed to the 1.24.
10 8       And then what she went on to say is, when she was asked
11 9  about the validity of those four graphs, she said that, yes, it
12 10  was statistically significant, that bottom graph was, but that
13 11  she was uncomfortable using that and maintained that the 1.24 or
14 12  1.26 would be the appropriate number.
15 13  Q.  And that was because of the strange results in the placebo
16 14  group?
17 15  A.  Well, and I think in her statement she alluded to the fact
18 16  that you lose randomization, meaning that there are certain
19 17  biases that come in in doing a subanalysis when you look at
20 18  data, we call it data mining, and you just keep looking and
21 19  looking.  For example, if you're asking patients about whether
22 20  they had previously taken hormone therapy, they may not always
23 21  remember.  So there are certain biases in that.
24 22  Q.  You were shown some documents about the breast cancer
25 23  containment and communication.  This is a draft.  Is this a
26 24  Wyeth document?
27 25  A.  Not to my knowledge.  That's why I asked for a cover sheet.

Page 199

page 1972

3 1  I really didn't know what this is.
4 2  Q.  And do you have any idea whether -- why you're listed as a
5 3  participant?
6 4  A.  No.  I have no idea what this is and whether this list is
7 5  even attached to this.  That's why I was just trying to get some
8 6  context.
9 7  Q.  If Mr. Morris was trying to suggest that the company was
10 8  desirous of withholding information or suppressing information
11 9  about the two studies that this is the subject, would he have
12 10  been correct?
13 11  A.  That would be incorrect.
14 12  Q.  Okay.  In fact, the very letter that Mr. Morris has spent a
15 13  lot of time on, Plaintiff's Exhibit 5775 -- let me make sure
16 14  I've got it here -- is what?
17 15  A.  This is the cover letter that went with that relative risk,
18 16  the thing that he was writing the E and the E plus P on.  So --
19 17  Q.  What is this a letter -- what is this letter about?
20 18  A.  I'm sorry.  It's a "Dear Doctor" letter.  It's sending all
21 19  this information to the doctors.
22 20  Q.  It's about the two articles?
23 21  A.  Yes.  It's about the two articles.  It's about the
24 22  literature of breast cancer, trying to educate physicians.
25 23  Q.  So in February of 2000, there's a -- February 2, there is a
26 24  proposal which is characterized in any way you want to
27 25  characterize it but, in fact, Wyeth did the opposite?

Page 200

page 1973

3 1  A.  That's correct.  Oftentimes you'll see proposals from
4 2  outside groups, I guess who are well-meaning, to suggest that we
5 3  do something or another.  The important thing to remember is
6 4  what we actually do.  And this is what we actually did.
7 5  Q.  Also, I want to show you another thing that we actually
8 6  did.  This is Defense Exhibit 260.  I believe you've seen this,
9 7  Doctor.  This is a memorandum which I think we can conclude from
10 8  the documents that are included in sometime after February of
11 9  2000.  Do you recognize this document?
12 10  A.  Not like this.
13 11  Q.  Okay.  Let me --
14 12  A.  I apologize.
15 13  Q.  -- give it to you, see if you can recognize it, and I'll
16 14  show it to the jury.
17 15  A.  Yes, I do.
18 16       MR. URBANCZYK:  Okay.  I move this into evidence, your
19 17  Honor.
20 18       MR. MORRIS:  I would only object to the extent that it
21 19  does contain some learned treatises.
22 20       MR. URBANCZYK:  Okay.  That's fair.  We'll take the
23 21  learned treatises out.  They are listed by citations, so we can
24 22  take them out.
25 23       THE COURT:  If he takes them out, no objection?
26 24       MR. MORRIS:  No objection.
27 25       THE COURT:  If you take them out, no objection.

page 1974

1 Admitted.
2      (Defendant Wyeth's Exhibit 260 received in evidence.)
3 BY MR. URBANCZYK:
4 Q.  Tell the ladies and gentlemen of the jury what this
5 document is.
6 A.  This is a document to the sales force, these drug
7 representatives who would sell Premarin, from the vice-president
8 of clinical affairs for Wyeth.  He was in the medical affairs
9 group.
10 Q.  This is Dr. deVane?
11 A.  Dr. Phillip deVane.  He's a cardiologist.
12 Q.  Dr. Phillip deVane is the same person who signed the "Dear
13 Doctor" letter in February of 2000; is that correct?
14 A.  That's correct.
15 Q.  What is Dr. deVane doing in this memo?
16 A.  He is attaching recent publications regarding the potential
17 risk of breast cancer with hormone therapy, HRT, and dates the
18 articles to look at the current debate regarding estrogen and
19 progestin regimens.  And he states that while the articles do
20 not all come to the same conclusion, they do agree that whatever
21 the risk of breast cancer is, the magnitude of the risk is
22 similar.
23 Q.  Then would you read the last -- the last two sentences
24 starting with, "You may."
25 A.  "You may, however, leave it with healthcare professionals

page 1975

1 so that they can review the differences in the findings, the
2 relative risks, and draw meaningful conclusions.  The articles
3 should help them determine the clinical relevance of the studies
4 to better counsel their menopausal patients."
5      We were actually giving these articles out to our sales
6 force to be able to leave with the doctors.
7 Q.  Doesn't sound like containment to me.  Does it to you,
8 Doctor?
9 A.  Not to me.
10 Q.  You were shown a document about somebody in the company
11 suggesting that Dr. Pike no longer be invited to meetings.  Do
12 you remember that document?
13 A.  I do.
14 Q.  Do you know, in fact, that Dr. Pike was invited back to
15 meetings?
16 A.  I did know that he was invited.
17 Q.  And do you know this document, Defense Exhibit 3124, dated
18 June 1991 about a meeting in Vancouver, British Columbia, which
19 is after that memo in which Dr. Pike is, in fact, a presenter?
20 A.  That's correct.  I just couldn't remember the timing.  I
21 knew he had come back.
22 Q.  Okay.  And do you know that Dr. Pike was invited to the
23 seventh annual --
24 A.  Yes.
25 Q.  -- Estrogen Conference?

page 1976

1 A.  I didn't remember the number.  I did know that he had been
2 invited to several.
3 Q.  Mr. Morris showed you an article that you wrote in which
4 you reported the results of a subanalysis of 4.61 relative risk,
5 and you asked whether you could explain that, and he said I'd
6 have to do it.  So would you tell the ladies and gentlemen of
7 the jury what that was, that 4.61 number in your article.
8 A.  That was one of the highest relative risks in the article,
9 and I felt that it was important to look at duration, because
10 duration has been a question.  That article was published and
11 based on the original Women's Health Initiative data.  So I
12 included that 4.61 number in my paper and the paper with
13 Dr. Pickar.
14      Subsequently, the WHI investigators updated their data, so
15 they went from the 5.2 year to the 5.6 year, and that's when
16 they went from the 1.26 to the 1.24.  And that 4.6 number came
17 way down to 2 point something.  We can show it to you in one of
18 the papers.
19      But one of the other things that is interesting is, there
20 was not a lot of people in this very, very long duration
21 category, and just taking a few people out or adding a few
22 people changed that relative risk very drastically.
23      So it was pointing out a couple of things for us.  One,
24 that the real number is not 4.61.  I published that 4.61 because
25 that was the best information I had at that time.  And it has

page 1977

1 been updated to about 2 point something.  I don't remember the
2 exact number.
3 Q.  Okay.  You were asked about a proposal --
4      MS. PRUITT:  You have your notes up on the ELMO.
5      MR. URBANCZYK:  Probably shouldn't be there.  My cheat
6 sheet here.
7      THE WITNESS:  I didn't think I had written that.
8      MR. URBANCZYK:  No, no.  That's just notes to myself.
9 BY MR. URBANCZYK:
10 Q.  Mr. Morris showed you PX 7871, something about a study
11 proposed by a Dr. Gilbert from the UK; correct?
12 A.  Yes.
13 Q.  And one of the things that was -- Dr. Gilbert was
14 proposing, I take it, was to use for her study mammograms
15 obtained from a previous Wyeth placebo-controlled study using
16 Prem-Pak C.  Doctor, when you are doing a study, are there rules
17 about using data obtained in another study and taking that data
18 from another study and using it without the patient's permission
19 in a second study?
20 A.  It is unethical.  You have to -- when a patient or a
21 subject joins a trial, we have something called an informed
22 consent, and they are told what they're signing up for and what
23 their data is going to be used for.  And the informed consent
24 may not have included and certainly I know did not include
25 mammographic density in that trial.  So if they didn't have

page 1978

1 informed consent, they could not have used the data. It
2 wouldn't have been ethical for the patients.
3 Q. And does that appear to be part of the concern of
4 Dr. Pickar?
5 A. It did, but, quite honestly, I needed to look through here.
6 The other thing it looked like they were suggesting was
7 something in premenopausal women, which also confused me. I saw
8 that in part of the document, but --
9 Q. Did it appear from anything you saw in this document that
10 this was a direct study of hormone therapy and breast cancer?
11 A. No. That the original study was?
12 Q. No, that the -- Dr. Gilbert's study. Or was it merely a
13 density study?
14 A. It looked like it was a mammographic density study. But
15 this is the first time I've seen it. I have not had a chance to
16 read this document.
17 Q. Doctor, you were shown Plaintiff's Exhibit 8022-A. It
18 looks like a continuing medical education proposal that Wyeth
19 was considering. This is the one where there was talk about not
20 having an oncologist. Do you see anything in this document
21 regarding the presentation that was being worked on that had
22 anything to do with cancer?
23 A. No, and that was the only thing I could assume is, I'm not
24 sure why you would have an oncologist chair this session, but if
25 there was oncology questions, you certainly would have an

page 1979

1 oncologist there. These were lipid questions and, it looked
2 like, CNS questions.
3 Q. Has Wyeth consulted with oncologists with oncology
4 questions?
5 A. Very frequently.
6 Q. Do you have oncologists on your staff?
7 A. We have a whole oncology division. We certainly develop
8 products for oncology.
9 Q. Mr. Morris showed you this document which talks about a
10 projected investment of 2.7 million. That's the -- is that the
11 direct marginal costs of manufacturing those pills?
12 A. I think that's just the direct cost of the pill. It
13 doesn't include everything else that it takes, what we call the
14 indirect costs. But there were a lot -- as I stated, there was
15 a whole substudy of probably more than $20 million that we
16 spent.
17 Q. What about the factory that was used and the people that
18 were used to manufacture? Is that included in that 2.7 million?
19 A. Not to my knowledge, but --
20 Q. In addition, Doctor, what was the practical value to the
21 NIH of supplying, for example, single-pill Prempro before it was
22 even available on the market?
23 A. Well, to manufacture tablets is a huge deal. It's very
24 costly to set up a plant. And you can't manufacture estrogen on
25 the same manufacturing line that you have for other medications.

page 1980

1 They have to be kept separately. You have to keep them in a
2 sterile field, because we need hoods so that we can protect the
3 workers from any dust and any hormonal products, especially if
4 there's somebody who may be pregnant or something like that.
5 Q. Was Prempro even available commercially at that time?
6 A. No. So we were specially manufacturing Prempro, and, in
7 addition, we were manufacturing a matching placebo. So it's the
8 manufacturing, the equipment, the site, the packaging. There's
9 a lot more involved than just the cost of a tablet.
10 Q. And what was the practical effect, Doctor, of allowing the
11 NIH to reference, to take advantage of the Prempro Pivotal Trial
12 information that you had submitted to the FDA? First of all,
13 was that pivotal trial information at the time you submitted it
14 to the FDA, was that confidential and proprietary?
15 A. It was.
16 Q. Not available to anybody in the world except the FDA?
17 A. No.
18 Q. And your allowing the NIH to reference that had what
19 practical effect?
20 A. Well, it saved them an enormous amount of time and effort
21 and money and manpower, and it got that study going a lot
22 faster.
23 Q. When you were studying the combination product in 1983 to
24 1988, Mr. Victoria talked about that, with two approved
25 products, were you nevertheless required to get FDA approval

page 1981

1 under an IND to conduct those studies?
2 A. Yes.
3 Q. And was the NIH similarly required before it could conduct
4 the WHI to have an IND and get FDA approval?
5 A. Yes. An IND is a file that you have to open up. It's a
6 large amount of work. It's called an Investigational New Drug
7 Application, and it has an enormous amount of information about
8 how you manufacture the pills, what the animal model is, just --
9 Q. And let me just ask you, so the FDA -- the NIH needed an
10 IND approval from the FDA. Would the FDA have approved the
11 NIH's use of Prempro without the data that you had given the FDA
12 to assure them of the safety and efficacy of Prempro?
13 A. No. They would have to have somehow created it on their
14 own.
15 Q. Could the WHI, in effect, then have been done at all
16 without Wyeth support, in your opinion?
17 A. I don't believe so, certainly not in that time frame. And
18 that's what they told us. They gave us an award and basically
19 stated that without us, it could not have been done.
20 Q. And, last question, did you or anybody else at the company
21 get a Lexus as a result of that proposal?
22 A. No, no.
23 Q. That proposal was not adopted?
24 A. It was not. And the form that was shown wasn't signed off
25 on.

Page 209

page 1982

1     MR. URBANCZYK:  No further questions.
2     THE COURT:  You may stand down.  May this witness be
3  excused?
4     MR. URBANCZYK:  Yes.
5     THE COURT:  You may stand down.  Thank you, ma'am.
6  You are excused.
7     MR. URBANCZYK:  Could we go to the sidebar, your
8  Honor?
9     [Bench conference reported as follows:]
10    MR. URBANCZYK:  I have three options to offer you,
11  your Honor:  One is that we call it a day right now, at the
12  start of a three-day weekend, and two is that I put on an hour
13  and 20 minutes of boring videotaped testimony about ACOG, which
14  I really don't want to do.  Or, three, that I start my next
15  witness.  Your Honor, the problem with that is, she is long.
16  It's Lisa Rarick.  We'll not finish her today.  She cannot come
17  back on Tuesday.  So I've asked Mr. Morris if it's all right to
18  let her go home today and bring her back on Wednesday.  I can
19  assure your Honor we are ahead of schedule.  Mr. Goodell and I
20  have chatted, and I think we have three or four more witnesses
21  total.
22    THE COURT:  Is Wednesday all right with you?
23    MR. MORRIS:  Yes, sir.
24    THE COURT:  What are you going to do Monday?
25    MR. URBANCZYK:  Monday is the holiday.

Page 210

page 1983

1     THE COURT:  Tuesday.
2     MR. URBANCZYK:  We've got a couple of witnesses.  I
3  don't know that we've yet had to disclose them.  We have two
4  witnesses for Tuesday.
5     MR. GOODELL:  We'll fill up Tuesday.
6     THE COURT:  Just two?
7     MR. URBANCZYK:  This witness was -- I think that will
8  be a day.  In fact, your Honor let me say this:  We really have
9  to get those two witnesses on and off in a day because neither
10  one of them can stay over on Wednesday.
11    THE COURT:  Oh, yes, they can.
12    MR. URBANCZYK:  Then I will have to personally pay for
13  a private jet to get them out of here Wednesday morning.  If you
14  make me do that, I will do it.  She can't come back, and I would
15  hate to have her start for half an hour.  She is going to
16  introduce herself and cough a few times, and we're going to take
17  her off, and she wouldn't be able to --
18    THE COURT:  What do you say about quitting now?
19    MR. MORRIS:  I'm okay with that.  I'm fine, your
20  Honor.
21    THE COURT:  All I want to warn you is that I'm
22  instructing the jury at 8:45, no later than 8:45, hopefully
23  earlier, Friday.
24    MR. GOODELL:  We'll meet that.
25    MR. URBANCZYK:  I promise we'll meet that.

Page 211

page 1984

1     MR. MORRIS:  I hope we get there before that.
2     MR. URBANCZYK:  We hope so, too.
3     THE COURT:  Me, too.  All right.  We'll recess.
4     MR. URBANCZYK:  Thanks.
5  [Continuing in open court:]
6     THE COURT:  Ladies and gentlemen, as I've heard
7  preachers say, let me tell you something before I talk to you.
8  I want to specifically caution you about reading anything about
9  this case in the newspaper, if it's in there, or listening to it
10  on the radio or watching it or listening to it on television.  I
11  don't have any idea whether it will be or not, but it would be a
12  violation of your oath and it would be a bad thing, because
13  y'all are getting the relevant evidence and better than anybody
14  else in the world here in the courtroom.  And so don't let any
15  outside influence get to you.  Don't talk about the case.  Don't
16  make up your mind, start -- consciously avoid making up your
17  mind.  I want you to have a good weekend, with a holiday Monday,
18  and we'll start back with you at 8:45 Tuesday morning.  All
19  right.  I'm going to let y'all stand out.
20    Everybody else remain as you are.
21    (Jury exited the courtroom.)
22    THE COURT:  Mr. Heard, you haven't said anything all
23  day.  I was fixing to compliment you, but it looks to me like
24  you're fixing to say something.
25    MR. HEARD:  Your Honor, before we leave on this

Page 212

page 1985

1  holiday weekend, I knew that the thought that had been in all of
2  our minds all day was, what would George Washington have done
3  with the motion to strike punitive damages?  Failing to have an
4  answer to that question, we did the next best thing, and we
5  looked up what Judge Woods had done in the aircraft accident
6  case and then what Judge Eisele did when he picked up the case.
7  We submitted a brief this morning that addressed the question
8  raised yesterday about there being any procedural irregularity
9  in what your Honor did in Rush.
10    So we submit that for your Honor's consideration, because
11  we believe there's sound authority for what you did in Rush and
12  what would be appropriate here.
13    THE COURT:  Thank you.  I've got my mind charged with
14  those issues.
15    Anything else?
16    All right.  Y'all have a good weekend, to the extent trial
17  lawyers can have a good weekend during a trial, which ain't
18  much.
19    Be at ease.  We're in recess.
20    (Weekend recess at 4:30 p.m.)
21        REPORTER'S CERTIFICATE
22    I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.
23
24        Date:  February 17, 2008
24  Christa R. Newburg, RDR, CRR, CCR
   United States Court Reporter
25

# EXHIBIT 33

Page 1

```
1 page 2238
2  1        IN THE UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF ARKANSAS
3  2                WESTERN DIVISION
   3  IN RE: PREMPRO PRODUCTS LIABILITY  MDL No. 1507
4                    No. 4:03CV01507
   4
5         * * * * * * * * *
   5  DONNA SCROGGIN,
6              Plaintiff,     Individual Case
   6    v.             No. 4:04CV01169 WRW
7  7  WYETH and its divisions; PHARMACIA
       & UPJOHN COMPANY LLC; WYETH
8  8  PHARMACEUTICALS, INC.; and ESI LEDERLE,
   9              Defendants.
9 10
       Wednesday, February 20, 2008 - Little Rock, Arkansas, 10:27 a.m.
10 11
12        TRANSCRIPT OF JURY TRIAL - VOLUME 12
11        BEFORE THE HONORABLE WILLIAM R. WILSON, JR.,
   13       UNITED STATES DISTRICT JUDGE, and a jury
12 14
13 15  APPEARANCES:
14 16  On Behalf of the Plaintiff:
15 17     MR. ERIK BRETT WALKER
16        Hissey, Kientz & Herron, P.L.L.C.
17 18       16800 Imperial Valley Drive
18        Suite 130
19 19       Houston, Texas  77070
20 20     MR. JAMES A. MORRIS, JR.
21        MR. STEVE M. FARIES
22 21       Brent Coon & Associates
23          11614 Bee Caves Road, Suite 220
24 22       Austin, Texas  78738
25 23                    [CONTINUED]
26 24
27 25
```

Page 2

```
1 page 2239
2  1  APPEARANCES CONTINUED:
   2  On Behalf of the Wyeth Defendants:
3  3    MR. F. LANE HEARD, III
         MR. STEPHEN L. URBANCZYK
4  4    MR. RICHMOND MOORE
         Williams & Connolly
5  5     725 Twelfth Street, N.W.
         Washington, D.C.  20005-5901
6  6
       MS. LYN PEEPLES PRUITT
7  7    Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
         425 West Capitol Avenue, Suite 1800
8  8     Little Rock, Arkansas  72201-3525
   9
9 10
       On Behalf of the Upjohn Defendants:
10 11
       MS. ELIZABETH ROBBEN MURRAY
11 12    Friday, Eldredge & Clark
         Regions Center
12 13    400 West Capitol Avenue, Suite 2000
         Little Rock, Arkansas  72201-3493
13 14
       MR. CHARLES P. GOODELL, JR.
14 15    Goodell, DeVries, Leech & Dann, LLP
         Commerce Place
15 16    One South Street
         Suite 2000
16 17    Baltimore, Maryland  21202
17 18  MS. PAMELA YATES
       Kaye Scholer LLP
18       1999 Avenue of the Stars
19 19    Suite 1700
20       Los Angeles, California  90067-6048
21 20
22 21
23 22
24
25 24      Proceedings reported by machine stenography and displayed
26       in realtime; transcript prepared utilizing computer-aided
27 25  transcription.
```

Page 3

```
1 page 2240
2  1         I N D E X - VOLUME 12 (February 20, 2008)
   3
       WITNESSES
   3  FOR THE DEFENDANT WYETH:  Direct  Cross  Redirect  Recross
4  4  LISA RARICK         2264   2306  2356   2369
   5  FOR THE DEFENDANT UPJOHN:
5  6  MICHAEL SCHOENFELD,
       BY VIDEO DEPOSITION      2375
6  7
   8
7      EXHIBITS:                    RECEIVED:
   9  Defendant Wyeth Exhibit 2927...........................2268
8      Defendant Wyeth Exhibit 752............................2291
10  Plaintiff Exhibit 10525.................................2308
9      Plaintiff Exhibit 172...................................2325
11  Plaintiff Exhibit 1351..................................2326
10  Plaintiff Exhibits 10438-A and 10439-A...............2350
12  Defendant Wyeth Exhibit 428..........................2363
11  Plaintiff Exhibit 475...................................2369
12 13  Plaintiff Exhibits 1495, 963, 1351, 284, 290, 324, 345...2374
13  Plaintiff Exhibit 10493...............................2376
14  Defendant Upjohn Exhibits 0843 and 0202..............2376
15 15  Defendant Upjohn Proposed Instruction 1 proffered.......2397
16       Defendant Upjohn Proposed Instruction 2 proffered.......2400
17 16  Defendant Upjohn Proposed Instruction 3 proffered.......2418
18 17  Jury Instructions Conference...........................2241
19       Jury Instructions Conference...........................2378
20 18
21 19
22 20
23 21
24 22
26 24
27 25
```

Page 4

```
1 page 2241
2
3  1     (Proceedings continuing at 10:27 a.m.; jury not present.)
4  2        THE COURT:  Good morning.  We're going to have a
5  3   little session here on the record regarding closing
6  4   instructions.  I believe the first issue we ought to address is
7  5   how do we refer to the drugs in this instruction, Premarin (with
8  6   progestin), Prempro, or Provera (with estrogen).  That's
9  7   plaintiff's choice.  I believe the defendants want "Premarin,
10 8   Prempro, or Provera."  Anybody want to do a little brief
11 9   argument on this point?
12 10        MR. WALKER:  Your Honor, when the question asks what
13 11  caused her injury or what led to the injury that Ms. Scroggin
14 12  had, we believe the question or the instruction should say
15 13  "Premarin (with progestin) and Provera (with estrogen) and
16 14  Prempro."  If the question asks whether the companies failed to
17 15  adequately warn, then it should just say "Premarin, Provera, or
18 16  Prempro," because the warnings would be on the individual drugs.
19 17  And so we're just asking about whether the warnings on the
20 18  particular drugs were adequate.
21 19       But there is no claim in this lawsuit that Provera by
22 20  itself caused any injury to Ms. Scroggin.  And there's no claim
23 21  in this lawsuit that Premarin caused any injury to Ms. Scroggin
24 22  by itself.  It is only when the two are used in conjunction that
25 23  they produced injury.  So the instructions that deal with what
26 24  caused her injury or brought it about should reference Premarin
27 25  and Provera together and Prempro separately.
```

Page 5

page 2242

1    MR. HEARD:  Your Honor, I don't believe this is an
2  all-or-nothing proposition.  And we may have agreement on the
3  principal place where this is used.  On page 11, Instruction No.
4  11 --
5    THE COURT:  If it is going to be some things in one
6  and one in another, why don't we just go through the
7  instructions and take them up when we get there.
8    MR. HEARD:  I think we had probably better.
9    THE COURT:  All right.  We have Closing Instruction
10  No. 1.  Are there any objections?  If so, sing out.
11    MR. HEARD:  No objection.
12    THE COURT:  No. 2.
13    MR. HEARD:  No objection.
14    THE COURT:  No. 3.
15    MR. HEARD:  No objection.
16    THE COURT:  No. 4.
17    THE COURT:  No. 5.
18    MR. HEARD:  No objection.
19    THE COURT:  No. 6.
20    MR. HEARD:  No objection.
21    THE COURT:  No. 7.
22    MR. HEARD:  No objection.
23    THE COURT:  8.
24    MR. HEARD:  No objection.

Page 6

page 2243

1    THE COURT:  No. 9.
2    MR. HEARD:  No objection.
3    THE COURT:  All right.  Now we're down to 10.  Any
4  objections?
5    MR. HEARD:  Yes, Your Honor.
6    MS. MURRAY:  Yes, Your Honor.
7    THE COURT:  The first paragraph and the second
8  paragraph, I believe the defendants object to "promotes" and
9  "promote."  Is that correct?
10    MR. HEARD:  Your Honor, this is the only one on which
11  I'm going to bend your ear at any length.  But I would like to
12  address --
13    THE COURT:  Well, don't make it at great length.
14    MR. HEARD:  Your Honor, our objection to this one --
15  and I think I can state it differently, because things have
16  changed -- is I think that as Your Honor gave it in Reeves and
17  Rush, there is an Erie problem, there's a fairness problem,
18  there's an evidence problem in this particular case.
19    I say there's an Erie problem, because while the Eighth
20  Circuit says that the federal court controls the form, format of
21  instructions, of course, you are guided by Arkansas substantive
22  law on this.  And we think that on this question of what defines
23  a proximate cause the AMI 501 clearly covers all forms of cause
24  and that it's no accident, Your Honor, that we've now got 40 --
25  what's it -- 46 years under AMI, and we can't find a case.  And

Page 7

page 2244

1  we don't think the plaintiffs can cite a case in which the court
2  has ever found it necessary or appropriate to amend that
3  language and found the words "producing cause" inadequate to
4  describe the plaintiff's theory of the case.
5    So the first thing we say is that's adequate.  And that's
6  very close if it's not the substantive law of Arkansas.
7    The second thing, Your Honor -- and Your Honor always asks,
8  Well, what's really at stake here?  We think that what's at
9  stake is there's a fairness issue, that the Court is privileging
10  the plaintiff's theory of the case when it singles out the word
11  "promotion" and it specially defines it, because it is not a
12  legal term.  And we would stake our position on the fact that
13  the Court ought to be instructing and defining legal terms, not
14  defining the scientific jargon of the case.  I don't use that
15  pejoratively.  But it is the science of the case.  And the Court
16  shouldn't be singling out one of the many terms and privileging
17  it by defining it, particularly since the "producing cause"
18  covers the waterfront.
19    Now, Your Honor, the last point is an evidentiary point.
20  The plaintiffs will say, as they have said many times, Well,
21  promotion is our theory of the case.  Well, fine.  But it's for
22  the jury -- it's for them to prove it.  It's for the jury to
23  assess these three different experts who have used the term on
24  their side and decide whether those experts are consistently
25  using the term and decide whether what the experts say is, in

Page 8

page 2245

1  fact, a cause that starts cancer from the get-go or a cancer
2  that catches it somewhere in the middle of the process or what
3  they are describing as something that happens at the very end of
4  the process.  That's, Your Honor, why in our brief we quote Dr.
5  Naftalis, Dr. Austin, and Dr. Colditz at length.  And here I've
6  only excerpted part of what they say.
7    Your Honor, there's not just one fair interpretation that
8  can be given to this language.  Dr. Naftalis says, "It turns it
9  into cancer."  And we go back to her deposition, and we cite at
10  least four or five times where we see an explication of this.
11  She says, "It causes changes in the cell.  It causes genetic
12  changes in the cell," whereas Dr. Austin is saying, "This is
13  like a work order.  This is a work order that starts the whole
14  process."  And Dr. Colditz talked about it in this trial as the
15  development of -- making the development of the cancer happen.
16    So they may want to argue that the jury should interpret
17  that as meaning it's aggravating some condition that's already
18  all on the way.  But, Your Honor, other jurors could read this
19  same testimony and say, it sure sounds to us like starting it
20  from the get-go, particularly when Dr. Austin says four times in
21  two answers, "It starts the cancer."
22    So, Your Honor, that's the last -- that's the last problem
23  is Your Honor is, in effect, coming down on one side of a
24  question that could be interpreted differently.
25    And by that, let me turn Your Honor's attention to the

Page 9

page 2246

1    exact language Your Honor used, if you were inclined to still
2    stick with what you did. Your Honor said, "A promoting cause
3    means aggravation." That sure sounded to us like Your Honor is
4    telling the jury when these experts use that term, they mean
5    this, and that it would -- if Your Honor -- we don't think you
6    should be defining "promotion" at all, but that if you did, it
7    ought to be neutrally defined so that you are saying there's
8    something left for the jury to decide, and you would be defining
9    a promoting cause as one that in a natural and continuous
10   sequence aggravates, and so that it would be balanced, if you
11   were using both of these terms in the instruction, you have
12   defining a producing cause too. We find it strange to have
13   "producing" in there and to only define for the jury this term.
14   But --
15        THE COURT: All right. I have your position.
16        MR. HEARD: Okay.
17        MS. MURRAY: Your Honor, we join in that. 501 is
18   somewhat sacrosanct, I think. I could not find cases where the
19   Supreme Court even considered a change. And I don't think this
20   change that they are asking for is proper any more than in a
21   fire case if you had an accelerant. Would you say "accelerant"
22   means this or define some term of art not a legal term? We
23   think it's an unfair and confusing comment on the evidence in
24   favor of one party's theory. We believe 501 should be given as
25   is in the AMI.

Page 10

page 2247

1        THE COURT: Thank you. Plaintiff? What about the one
2    on the left there, Mr. Walker?
3        MR. WALKER: The AMI definition?
4        THE COURT: Yeah.
5        MR. WALKER: Federal law is a little different than
6    state law. Under Eighth Circuit precedent, federal courts are
7    not only allowed but obliged to tailor the instructions to fit
8    the facts of a particular case.
9        THE COURT: I know. But what's wrong with that one?
10       MR. WALKER: Well, I tell you what's wrong, Judge,
11   is that when you use the word "cause" in the traditional sense,
12   the first thing that pops into someone's head is starts the
13   whole process rolling. And --
14       THE COURT: Yeah. But what about that last paragraph
15   there?
16       MR. WALKER: Well, I think the last paragraph is not
17   that far different from what you have right now. I mean, I
18   don't see that much difference in that last paragraph.
19       THE COURT: Since they are proposing that as an
20   alternate, why don't I say that? I mean, I realize they are
21   still saying I ought to give 501 cold and stark.
22       MR. WALKER: Well, I believe that you have an
23   additional language in your instruction that said the jury
24   is to consider the full extent of the injuries sustained even
25   though the degree of injury is found to have been proximately

Page 11

page 2248

1    caused by the aggravation of a condition that already existed,
2    which is additional information that is an accurate recitation
3    of the law to the paragraph that they have given there. I mean,
4    I think theirs is somewhat synonymous. It doesn't contain
5    everything that your instruction contains. But I don't think
6    there's anything that they can complain about on your
7    instruction that also wouldn't apply to that in terms of being a
8    deviation from the AMI. They are both deviations. Why is your
9    deviation any different than the deviation that has been
10   proposed as an alternative?
11       THE COURT: Because the Eighth Circuit is more likely
12   to say, well, they proposed that as an alternative even though
13   they didn't like it. I'm trying to get it so that the Eighth
14   Circuit will like it. It won't hurt me if it gets reversed, but
15   it will hurt one side or the other.
16       MR. WALKER: Well, I don't think you are going to get
17   reversed for your instruction. It is not a comment on the
18   weight of the evidence. You are not indicating that you support
19   the promotion theory.
20       THE COURT: All right. I'm either going to give what
21   I have here or go with this one over here on the left. So let's
22   go down to paragraph -- the next-to-the-last paragraph, where
23   Premarin -- isn't that misspelled? Yeah. Premarin (with
24   progestin) or Prempro. Who objects to that? That's the
25   next-to-last paragraph in Instruction No. 10.

Page 12

page 2249

1        MR. HEARD: Well, Your Honor, not to complicate
2    things, but if Your Honor were to find that there was evidence
3    in the case to justify an aggravation of a preexisting
4    condition -- and that's what this paragraph is talking about.
5    That's 2203.
6        THE COURT: So what is it you object to?
7        MR. HEARD: We object -- if Your Honor is going to
8    find that aggravation is in the case, then we should give 2203
9    in its place, and it should not be part of the proximate cause
10   instruction.
11       Now, to answer Your Honor's direct question, I think if
12   it's given in that place, it is fine for it to say "Premarin
13   (with progestin)."
14       MS. MURRAY: I think I probably should mention that I
15   think in changing this they left out Provera. We do not believe
16   Provera should ever be coupled with Premarin. But I would note
17   it appears they dropped -- we had -- I think the original
18   instruction might have had our product in there separate,
19   Provera.
20       THE COURT: What says the plaintiff?
21       MR. WALKER: It should be Provera instead of progestin
22   since that is the product that's at issue.
23       THE COURT: Wait a minute. How do you say it should
24   read, the last line of the next-to-last paragraph?
25       MR. WALKER: "She had not taken Premarin (with

Page 13

1 page 2250
2
3 1    Provera) or Prempro."
4 2        MS. MURRAY: No.
5 3        MR. WALKER: Because the only question we're asking
6 4    the jury to find is whether Upjohn's conduct and Wyeth's conduct
7 5    proximately caused her injury.
8 6        THE COURT: All right. Now that it would read "taken
9 7    Premarin (with Provera) or Prempro," what says Wyeth?
10 8        MR. HEARD: We'll just preserve our objection.
11 9        MS. MURRAY: Your Honor, we would object to the "with
12 10   Provera." We believe it should be a separate product. It
13 11   should read "taken Premarin," comma, "Prempro," comma, "or
14 12   Provera."
15 13       THE COURT: What says the plaintiff?
16 14       MR. WALKER: There's no evidence in the case that
17 15   Provera by itself is harmful. So if there's a disjunctive --
18 16       THE COURT: All right. Let's go to the next line.
19 17   "The witnesses may have used the terms 'promote,' 'cause,' and
20 18   'proximate cause' in different ways. In determining whether or
21 19   not" -- all right. I know you object to "promote." Your
22 20   exceptions are saved.
23 21       MR. HEARD: Your Honor, our proposal in the filing we
24 22   made last night was that if Your Honor proceeds with this
25 23   paragraph, that you not, again, privilege this term by only
26 24   referring to "promote," but you should say, "The witnesses may
27 25   have used the term 'produce,' 'promote,' 'cause,' and 'proximate

Page 14

1 page 2251
2
3 1    cause' in different ways."
4 2        THE COURT: In other words, you want the word
5 3    "produce" added in there?
6 4        MR. HEARD: I do.
7 5        MR. WALKER: That's fine.
8 6        MR. HEARD: Ms. Johnson, could we have the ELMO just
9 7    for future --
10 8       THE COURT: I beg your pardon?
11 9       MR. HEARD: I was asking Ms. Johnson if we could just
12 10   have the ELMO as we go along.
13 11      THE COURT: All right. Now let's go down to the
14 12   second line, the first full sentence. "In determining whether
15 13   or not Premarin (with progestin) or Prempro."
16 14      MR. WALKER: That should also be Provera, because
17 15   that's what the question is asking.
18 16      MS. MURRAY: Actually, it should be "conduct of the
19 17   defendants," I would think, not --
20 18      THE COURT: "Conduct of the defendants"? Where? What
21 19   line? What paragraph?
22 20      MS. MURRAY: On that second line.
23 21      THE COURT: Second line of what paragraph?
24 22      MS. MURRAY: Of that last paragraph.
25 23      MR. HEARD: She is referring to right here, Your
26 24   Honor.
27 25      MS. MURRAY: Right where you are.

Page 15

1 page 2252
2
3 1        THE COURT: "In determining" -- read it like you would
4 2    have it.
5 3        MS. MURRAY: "In determining whether or not any
6 4    defendants' conduct caused her damage."
7 5        THE COURT: What says the plaintiff?
8 6        MR. WALKER: Well, when you have the words "promote"
9 7    and "produce" and "cause" and "proximate cause," it's the drugs
10 8   that proximately caused the injury. And it just seems confusing
11 9   to talk about it abstractly in terms of --
12 10       THE COURT: Defendant's objection noted, exception
13 11   saved.
14 12       All right. Let's go to paragraph -- Closing Instruction
15 13   No. 11, third line, first paragraph, "Premarin, Provera, or
16 14   Prempro." What says the plaintiff?
17 15       MR. WALKER: We're fine with that, Judge, because each
18 16   drug would have a different warning.
19 17       THE COURT: All right. What says Wyeth?
20 18       MR. HEARD: We agree to it, Your Honor.
21 19       MS. MURRAY: We do too.
22 20       THE COURT: All right. Go down to the third line at
23 21   the bottom of page 11. It says the plaintiff wants to add
24 22   "fully aware of the dangers from using Premarin (with Provera),
25 23   Prempro, or" -- let's go to the next-to-last line. How does the
26 24   plaintiff submit that ought to read, the next-to-last line?
27 25       MR. WALKER: I'm sorry, Judge.

Page 16

1 page 2253
2
3 1        THE COURT: The next-to-the-last line on page 11,
4 2    Instruction 11.
5 3        MR. WALKER: "However, if you find" -- I'm sorry.
6 4        THE COURT: No. It says, "aware of the dangers from
7 5    using Premarin (with Provera), Prempro, or Provera."
8 6        MR. WALKER: The "or Provera" should be taken out.
9 7        THE COURT: What says the defendants on that line?
10 8       MR. HEARD: Agreed.
11 9       MS. MURRAY: Your Honor, we believe that "or Provera"
12 10   should stay in and the "with Provera" should be out.
13 11      THE COURT: Exception saved.
14 12      MS. MURRAY: Or they should say "with progestin,
15 13   Premarin (with progestin)," because other progestins were used
16 14   with the Premarin.
17 15      THE COURT: Exception saved.
18 16      MR. HEARD: I'm sorry, Your Honor. I misspoke. I
19 17   join in Ms. Murray's objection.
20 18      THE COURT: Exception saved. The next-to-last line.
21 19      MR. WALKER: We wanted to add the word "fully." In
22 20   two of the Eighth Circuit cases Wyeth cites in their brief to
23 21   the Court, the word "fully" was used when this was given in the
24 22   court case, if the plaintiff was fully aware of the dangers.
25 23      And the reason that that's important in this case is
26 24   because we do have a continuum of knowledge of breast cancer
27 25   risk from trivial, trivial risk to substantial risk. And if you

page 2254

1 don't have the word "fully" in there, the jury could think that
2 if someone was aware that there was any miniscule risk of breast
3 cancer that their entire claim is barred.  And so since two of
4 the cases that Wyeth cites do use this exact language precisely,
5 but with the word "fully" before the word "aware," we think that
6 would be appropriate.
7     THE COURT:  I'm taking that under advisement.
8     All right.  Plaintiff objects to No. 13.  Isn't that right
9 out of the statute?
10     MR. WALKER:  Yes.  But there's an exception.  The
11 second line of the statute, Judge, says that this provision does
12 not apply to claims based on express warranty or
13 misrepresentation.  This is a products liability statute.  There
14 are three types of product liability claims:  Design defect,
15 manufacturing defect, and marketing defects.
16     The only product liability claim that ever involves
17 misrepresentation is a failure-to-warn claim.  There are no
18 other product liability claims that involve misrepresentation.
19 We've Shepardized that statute.  And every case that references
20 the statute and every secondary source that references it talks
21 about design defect.  It has not ever been applied to failure to
22 warn.
23     The whole theory of our case is that the knowledge -- we
24 don't claim that the knowledge at the time was inadequate.  We
25 claim that the warnings that Wyeth had at least were adequate

page 2255

1 based on the knowledge at the time, but Wyeth should have -- or
2 they could have been changed, but Wyeth should have done more
3 study, and they would have discovered the dangers of their
4 product.
5     This instruction as worded says, if everybody else was
6 doing it that way, then Wyeth and Upjohn were okay to do it that
7 way.  First, the statute doesn't say that.  The statute just
8 says that knowledge of the time is one factor a jury can
9 consider.  It doesn't say they can't consider anything else.
10 And, second, that statute doesn't apply in a case where the
11 theory of the case is that these companies that were the
12 innovators of these two products should have done studies that
13 would have revealed the harms of them.  They are now hiding
14 behind the rest of the industry, when they were the ones who
15 innovated the product and had the obligation to do the studies
16 that they are saying, well, you know, nobody else studied, so
17 we're all absolved of liability.
18     THE COURT:  What says the defendant?
19     MS. MURRAY:  Your Honor, there is no express warranty
20 or misrepresentation claim in this case going to the jury.  They
21 pled fraud.  They are now saying, oh, that's just a failure to
22 warn.  A fraud, misrepresentation, is not the same as a claim of
23 inadequate warning based on negligence or, you know, just an
24 inadequacy.  The statute says they may consider.  It is not
25 limited to a strict liability.  It's to any products liability

page 2256

1 claim.  It is not -- it does not say, both this and the next
2 instruction -- they are allowed to consider that in assessing
3 the liability.
4     THE COURT:  All right.  Does Wyeth adopt that?
5     MR. HEARD:  We do, Your Honor.
6     THE COURT:  All right.  I haven't made up my mind yet.
7 Let's go to No. 13.  Same?
8     MR. WALKER:  Well, yes.  Judge, this doesn't come out
9 of the statute at all.  I mean, this is just their modification,
10 their adoption of what they would like an instruction to say
11 based on the statute.
12     THE COURT:  Whoa.  Wait a minute.  116-104.
13     MS. MURRAY:  We deleted those practices that do not
14 apply to the issues in this case.
15     MR. WALKER:  Nothing in the statute uses the word
16 "labels."
17     MS. MURRAY:  It is the customary standards, telling
18 the jury what standards we're talking about.
19     THE COURT:  We're looking at No. 13?
20     MR. WALKER:  Yes, Your Honor.
21     THE COURT:  All right.  I'll take this one under
22 consideration.
23     No. 14.  Any objections?
24     MR. WALKER:  No objection unless they decide not to
25 have a comparative negligence question for Ms. Scroggin.  This

page 2257

1 is an instruction about her negligence.  If they decide not to
2 have that instruction or jury question, then this instruction
3 should be removed.
4     THE COURT:  All right.  Do y'all agree with that?
5     MR. HEARD:  We agree.
6     MS. MURRAY:  We agree.
7     THE COURT:  No. 15.
8     MR. WALKER:  We're not going to push.  We objected to
9 this, arguing that it is redundant and it's inconsistent with
10 comparative negligence.  We recognize Your Honor disagrees with
11 us on that.
12     THE COURT:  All right.  Do you want to make an
13 objection?
14     MR. WALKER:  Objection.
15     THE COURT:  Exception saved.
16     MR. WALKER:  Thank you.
17     THE COURT:  All right.  No. 16.  Plaintiff objects to
18 "adequately labeled."  What would you say should be there rather
19 than "adequately labeled"?
20     MR. WALKER:  I don't know.  We objected.  I think
21 ultimately in the end we said that we couldn't think of any
22 better language.  And it just didn't make it to this final
23 version.  But it does sound awfully like the Court is saying FDA
24 approval means that the products were adequately labeled.  Then
25 the next paragraph says, but you can find the FDA standards are

Page 21

page 2258

3  1  inadequate.  It seems somewhat -- there seems to be a little
4  2  tension between the two paragraphs.  I'm just not positive of
5  3  how it can be reworded.
6  4      THE COURT:  I'm going to go to 17.
7  5      MR. HEARD:  Your Honor, I needed to address the second
8  6  paragraph, because while Your Honor has made yourself clear on
9  7  our legal objection, which is that minimum standards is not the
10 8  law, there is a separate consideration here, which is
11 9  evidentiary.  It's based on Your Honor's ruling.  And because of
12 10 Your Honor's ruling, the evidence came out a certain way.
13 11     Dr. Parisian is the liability expert who spoke about the
14 12 standards that Wyeth and Upjohn violated.  And Your Honor held
15 13 her to testifying that Wyeth and Upjohn violated the FDA
16 14 regulations.  And I have the testimony here.  In the interest of
17 15 time, I can pass up pages, where no less than ten times, each
18 16 time Dr. Parisian was questioned about whether Wyeth or Upjohn
19 17 violated a duty, the questioner, Mr. Morris, was quite specific,
20 18 twice because Your Honor directed him to do so, to tie his
21 19 question to the FDA regulation.  And the witness, in turn, tied
22 20 it to the FDA regulation, so that the only standard in evidence
23 21 is the FDA regulations, unlike Reeves and unlike Rush, where the
24 22 plaintiffs argued that FDA standards were minimum, and they
25 23 said there was a higher standard which the companies didn't
26 24 meet.  Here the only standard --
27 25     THE COURT:  I have your point.  What says the

Page 22

page 2259

3  1  plaintiff?
4  2      MR. WALKER:  Well, two things.  First, the restriction
5  3  was on Dr. Parisian, not on what evidence could come into the
6  4  trial.  The jury decides negligence.  This is not a medical
7  5  malpractice case, where there's law that says that you have to
8  6  have a doctor come in and testify about the standard of care.
9  7      THE COURT:  Objection overruled.  Exception saved.
10 8  Upjohn adopts the objection.  Their objection is overruled,
11 9  exception saved.  All right.  Do you have anything extra?
12 10     MS. MURRAY:  No.  Both the legal and the evidentiary
13 11 objection.
14 12     THE COURT:  Both of them, in toto, Upjohn adopts it.
15 13     MS. MURRAY:  Thank you.
16 14     THE COURT:  No. 17, plaintiff objects to the
17 15 instruction unless it includes language to the effect that it is
18 16 illegal for drug companies to promote off-label use.  Just a
19 17 minute.  Let me reread this instruction.
20 18     All right.  I'm going to take it under advisement.
21 19     MR. WALKER:  And we think, Judge, this is a clear
22 20 comment on the weight of the evidence, especially with the
23 21 comments about how it is proper for doctors to do this and all
24 22 of this.  We don't think the instruction belongs there.  They
25 23 can argue this.  And in the alternative, we would propose --
26 24     THE COURT:  All right.  No. 18.
27 25     MR. WALKER:  We had objected before.  We understand

Page 23

page 2260

3  1  the Court has gone against us.  We just want our objection
4  2  preserved.  We think it is inconsistent with -- or we think it
5  3  is repetitive with the other instructions.
6  4      THE COURT:  Exception saved.  No. 19.
7  5      MR. HEARD:  Your Honor, our objection, there's both a
8  6  familiar aspect and an alternative proposal to make.
9  7      THE COURT:  All right.  Why don't you submit those,
10 8  and we'll have to have another session on instructions, because
11 9  we have to get the jury in here.  Do you have a written
12 10 proposal?
13 11     MR. HEARD:  I do.  And we're going to come back to the
14 12 rest of these, because there's one other general objection to
15 13 make for the record.  And I can save it for later if we're
16 14 coming back.
17 15     MR. WALKER:  We're almost done.  There's only a couple
18 16 of issues left.
19 17     THE COURT:  All right.  We'll get to it when we can.
20 18     MR. HEARD:  I'll hand this --
21 19     THE COURT:  Hand it to my lawyer if you will.
22 20     MS. MURRAY:  We had submitted an instruction about
23 21 Ogen.
24 22     THE COURT:  About what?
25 23     MS. MURRAY:  About Ogen and instructing the jury that
26 24 the manufacturer of the Ogen that she ingested is not a
27 25 defendant.

Page 24

page 2261

3  1      THE COURT:  Don't forget to bring that up in the next
4  2  session.
5  3      MS. MURRAY:  We will.  Your Honor, the defendants had
6  4  one other thing we wanted to bring up with you outside the
7  5  presence of the jury.  It has to do with the time remaining.  We
8  6  believe that the defendants have three more, one video, two live
9  7  witnesses.  One is a Wyeth specific.  One, the video, is
10 8  Upjohn's.  And then we have Dr. Stovall from Memphis as a final.
11 9      From an e-mail last night from the plaintiffs, it appears
12 10 that they are going to object on timing in that.  And we wanted
13 11 some guidance from the Court.  This will all be over, we
14 12 believe, by noon on Thursday.  But we wanted a discussion now
15 13 with the Court as we proceed as far as time.  We think we've
16 14 done a good job --
17 15     THE COURT:  What is the problem?
18 16     MR. WALKER:  Well, they have less than three hours of
19 17 total examination time left, if they are going to reserve 50
20 18 minutes each for rebuttal.  Judge, we --
21 19     THE COURT:  Fifty minutes?
22 20     MS. MURRAY:  For closing.
23 21     MR. WALKER:  For closing.  They want 50 minutes for
24 22 each defendant for closing, which the Court has allowed them to
25 23 have.  And that comes out of their 30 hours.  We streamlined our
26 24 case.  We cut two Upjohn corporate representatives from
27 25 deposition reading so we could meet the Court's time limits.  We

Page 25

page 2262

1   cut out a live witness, the mother of Donna Scroggin.  We did
2   all of that to meet this Court's time limits that they gave to
3   the plaintiff.  And we're going to meet the time limits.  If
4   they go over in their case-in-chief --
5       THE COURT:  Wait a minute.  Both defendants have a
6   total of three witnesses left.  Is that correct?
7       MS. MURRAY:  Correct, one video, two live.
8       THE COURT:  How long is the video?
9       MS. MURRAY:  The video, our part of it is an hour, and
10  theirs is maybe ten minutes.
11      THE COURT:  So that's an hour and ten minutes.
12      MR. WALKER:  I'm sorry.
13      THE COURT:  What's the problem?
14      MR. WALKER:  They have just over two hours of
15  examination remaining in total between them.  That includes the
16  live witness, Dr. Rarick, who is a regulatory expert.  They want
17  to call -- Wyeth wants to call a doctor, Dr. Stovall, an OB/GYN.
18  And they have these two videotapes.  They will greatly exceed
19  their 30 hours if they do that.  If they stay within their 30
20  hours' total time, including closing argument, meaning that
21  these four witnesses are done in just over two hours of their
22  examination, that's fine.  But if they are saying we want to go
23  over our 30 hours, that's not fair to us, given that we
24  streamlined our case to make sure we met the 30-hour limit.
25      THE COURT:  Are you going over 30 hours?

Page 26

page 2263

1       MS. MURRAY:  We will.  We'll go over by about an hour
2   and a half to an hour and 45 minutes, it looks like.  I think,
3   you know, I think having two defendants in this case, getting it
4   all done still within the days the Court has allowed has taken a
5   lot.  And in fairness, if we go over the 30 hours by that
6   amount, we believe that's necessary to put on the case to rebut
7   what they were allowed to put in and to present both defendants'
8   cases, Your Honor.  It's an hour and 45 minutes, I believe, you
9   know, edging to two hours extra.  And in a two and a half, three
10  week trial --
11      THE COURT:  I keep learning in these trials.  I'm
12  going to have presumptive time limits on each witness next time.
13  We have approximately, what, six hours?  It will be five hours
14  today and how much in the morning?
15      MS. MURRAY:  Then it would be in the morning -- we
16  believe Dr. Rarick and the video of Michael Schoenfeld, our
17  witness, that can be accomplished today.  And there still
18  may even be time for us to meet with Ms. Johnson and the parties
19  do the housekeeping required on all the exhibits before they go
20  to the jury.  Tomorrow we would have Dr. Thomas Stovall, a
21  case-specific expert whose direct, I'm not sure -- 45 minutes to
22  an hour.  And then we're done, and they have cross.
23      THE COURT:  I'll give you 45 minutes period on it.
24  Pare it down to that.
25      MS. MURRAY:  Tomorrow morning?

Page 27

page 2264

1       THE COURT:  Yeah.  If you want to call Ms. Scroggin's
2   mother, you may do so.
3       MR. WALKER:  Your Honor, we may do that.
4       THE COURT:  All right.
5       MS. MURRAY:  Thank you, Your Honor.
6       THE COURT:  We're in recess.  Let's get the jury in.
7       (Recess from 11:02 a.m. until 11:05 a.m.; jury present.)
8       THE COURT:  Hearts and minds -- be seated.  Be seated.
9   Hearts and minds?  Anybody's fouled up a little in relation to
10  this case?
11      No hands.  You may proceed.
12      MR. URBANCZYK:  Thank you, Your Honor.  Wyeth calls
13  Dr. Lisa Rarick.
14      THE COURT:  All right.
15      LISA RARICK, DEFENDANT WYETH WITNESS, DULY SWORN
16          DIRECT EXAMINATION
17  BY MR. URBANCZYK:
18  Q.  Good morning, Dr. Rarick.
19  A.  Good morning.
20  Q.  Tell the jury your name.
21  A.  My name is Lisa Rarick.
22  Q.  And are you a doctor?
23  A.  Yes.  I'm a medical doctor.  I'm an MD.
24  Q.  What kind of doctor are you?
25  A.  I'm an obstetrician/gynecologist.

Page 28

page 2265

1   Q.  Doctor, you are called here as the third person from the
2   FDA.  How many years did you spend at the FDA?
3   A.  Correct.  I'm an OB/GYN.  But I started working in the FDA
4   in 1988 and worked there for 15 years.
5   Q.  We'll get into that in a bit.  But would you give the jury
6   a brief overview of your educational background?
7   A.  Sure.  I grew up in Southern California.  I went to both
8   college and medical school at Loma Linda in Southern California.
9   I then moved to Washington D.C., to Georgetown University, where
10  I spent four years as an OB/GYN resident.  The last year of
11  that, as the slide shows, I was the administrative chief
12  resident.  They choose somebody to be in charge of all the
13  residents administratively, and that was the year for me.  I
14  then stayed at Georgetown as an instructor.  I had a practice as
15  well as instructing medical students and residents in obstetrics
16  and gynecology.
17      During that time I started working, visiting the FDA
18  initially as a visiting scientist, volunteering.  Then I started
19  working there late in 1988 part time, then over the next couple
20  of years did less and less in the practice world and more and
21  more at FDA and was full time at the end of '89.  For the next
22  14 years, I was full time at FDA.
23  Q.  Are you board certified in obstetrics and gynecology,
24  Doctor?
25  A.  Yes, I am board certified.  I maintain that certification,

Page 29

page 2266

1 1  yes.

2 2  Q.  In your practice in the eighties, did you have experience

3 3  with counseling patients and prescribing hormone therapy?

4 4  A.  Oh, absolutely.  Certainly as a resident, and then as a

5 5  practitioner at Georgetown, I saw women who were there for

6 6  symptoms and needs for hormone therapy.

7 7  Q.  What sources of information were available to obstetricians

8 8  and gynecologists in the eighties regarding the risk and

9 9  benefits of hormone therapy?

10 10  A.  Sure.  During the time that I was prescribing, certainly I

11 11  learned about hormone therapy, both in medical school and in my

12 12  residency.  One is required to understand the literature.  You

13 13  read textbooks.  You are taught.  You read labels.  And then, of

14 14  course, in terms of prescribing to women, you need to have those

15 15  discussions and be well aware of information about hormone

16 16  therapy.

17 17  Q.  What did you know at that time about the risk of breast

18 18  cancer with hormone therapy?

19 19  A.  Oh, sure.  There had been a lot of studies looking at

20 20  hormone therapy and breast cancer risk.  Some of them were

21 21  showing a small increased risk.  Some of them were showing maybe

22 22  a prevention.  That information was well known in my medical

23 23  community.

24 24  Q.  You began at the FDA on a part-time basis in 1988?

25 25  A.  Yes.  At the beginning it was part time.

Page 30

page 2267

1 1  Q.  Why did you go to the FDA?  What was the attraction?

2 2  A.  Again, I started there visiting as just a visiting

3 3  researcher from Georgetown to do some research and publications

4 4  with them.  But it came to me that I very much enjoyed the

5 5  public health aspects of their work, as we'll get into the

6 6  Center for Drugs is interested in protecting the American

7 7  people.  They look at population-based information and make

8 8  decisions about medications, in this example for the entire

9 9  community of women in this case rather than just one case at a

10 10  time, as a doctor does.

11 11  Q.  Doctor, the jury has heard quite a bit about the FDA, so

12 12  I'm not going to belabor this.  But does this accurately depict

13 13  the various centers of the FDA?

14 14  A.  Yes.  I think you are now aware there's an FDA

15 15  commissioner's office, and then there are six centers.  The one

16 16  that we're going to talk about the most is the Center for Drugs.

17 17  Q.  Is that where you were positioned for the 15 years?

18 18  A.  Yes.  For almost.  My last year, I was in the

19 19  commissioner's office.

20 20  Q.  All right.  Do you know Dr. Parisian?

21 21  A.  No.  I don't know Dr. Parisian.  She was in a different

22 22  center, as you can see here.  She was in the Center for Devices

23 23  and Radiologic Health.

24 24  Q.  Doctor, I want to ask you if you could identify a copy of

25 25  your resume, which is Defendant's Exhibit 2927.  I believe Mr.

Page 31

page 2268

1 1  Morris has been given a copy.

2 2  A.  Yes.  This is my CV from June of 2007.

3 3      MR. URBANCZYK:  I would offer this into evidence, Your

4 4  Honor.

5 5      MR. MORRIS:  No objection.

6 6      THE COURT:  Admitted.

7 7      (Defendant Wyeth Exhibit 2927 received in evidence.)

8 8  BY MR. URBANCZYK:

9 9  Q.  Let me take you through your 15 years at the FDA very

10 10  briefly, Doctor.  I want to tell the jury the various jobs

11 11  you had and briefly what responsibilities were entailed.  This

12 12  is your first position?

13 13  A.  Correct.  As I mentioned, I'm an OB/GYN.  So I joined the

14 14  FDA officially in the group that reviewed drugs for women,

15 15  reproductive drugs.  And that group of drugs was originally in a

16 16  division called metabolic and endocrine drugs.  So that's where

17 17  I started my work as a reviewing medical officer.

18 18  Q.  And you were there for seven years?

19 19  A.  Correct.

20 20  Q.  Were you colleagues there with Linda Golden?

21 21  A.  Oh, yes.  Everybody looking at women's health drugs,

22 22  reproductive drugs, was in a team in that division.  And Dr.

23 23  Golden was one of my peer colleagues.

24 24  Q.  What was your next position?

25 25  A.  Then we realized there were a lot of activity in

Page 32

page 2269

1 1  reproductive and urologic or male reproductive health drugs.

2 2  And we made a new division in 1996.  I became its first division

3 3  director.

4 4  Q.  We've heard from Dr. Heidi Jolson.  What was her position

5 5  in this time period?

6 6  A.  Oh, yes.  She had also been a medical officer in another

7 7  division.  And she joined me in 1996 as my deputy director.

8 8  Q.  What was your next position?

9 9  A.  Then I spent three years as that division director.  Then I

10 10  moved to the next rung of the ladder.  I was a deputy director

11 11  in the Office of Drug Evaluation II.

12 12  Q.  Just give the jury a brief understanding of what that is.

13 13  A.  Sure.  Just so we don't misunderstand that slide, that

14 14  bottom level of divisions, there's 15 across there.  And at the

15 15  time that I moved up the ladder, each office of drug evaluation

16 16  managed three divisions of drugs.  So Office of Drug Evaluation

17 17  II had metabolic and endocrine.  It had the pulmonary and

18 18  allergy drugs, and it had the critical care and anesthesia drugs

19 19  management.

20 20  Q.  All right.  What was your next position?

21 21  A.  In my next position, I worked in the Office of the Center

22 22  Director.  This was an effort to have a center-wide initiative

23 23  for internal quality assurance.  So in that job I was challenged

24 24  to work across all of the center to make sure that reviews were

25 25  done consistently across all the divisions and Office of Drug

page 2270

1 Safety and Advertising, everybody that worked in the Center for
2 Drugs, to have a consistent approach to the review, approval,
3 and oversight.
4 Q. So this is in the top office of the Center for Drug
5 Evaluation and Research?
6 A. Yes, correct.
7 Q. Who was the director?
8 A. I reported directly to Dr. Woodcock, who was the center
9 director.
10 Q. And then what was your next position?
11 A. In my next position, I moved to the Office of the
12 Commissioner. I was in the Office of Women's Health. This is a
13 small staff in the commissioner's office. And I was the medical
14 officer. There's only one. But my title was medical officer.
15 Q. Why did you leave the FDA, Dr. Rarick?
16 A. I left the FDA in the summer of 2003. As you can see, I
17 actually enjoyed my career at FDA very much. I learned a lot
18 there. I think they do an excellent work there. But I left. I
19 had remarried. I had been a single parent for most of my time
20 there. When I remarried, it occurred to me that I could spend
21 more time with my husband and family, work part time if I left
22 the FDA.
23 Q. What have you done since you left the FDA?
24 A. Yes. I have been working fewer hours. I've been working
25 as a consultant to pharmaceutical companies, some in drug

page 2271

1 development, labeling review, oversight, what they deal with
2 when they would deal with the FDA, and, of course, in some
3 litigation work.
4 Q. And what is your hourly rate that you charge for
5 consulting, Dr. Rarick?
6 A. I charge $500 an hour.
7 Q. Do you charge that for all the consulting work you do?
8 A. For most of it. I do have some small clients, start-up
9 firms, etc., that don't pay me the 500. We negotiate a less
10 rate. I also do some work for free for some women's health
11 advocacy groups.
12 Q. But, otherwise, it is $500 an hour?
13 A. Yeah.
14 Q. Have you, in addition to working with us in this
15 litigation, have you worked in other cases?
16 A. Yes, I have.
17 Q. Could you tell the jury about those briefly?
18 A. Oh, sure. I initially worked on one case for Hoffmann-La
19 Roche. That's about four years ago. Then I also did some work
20 on the Vioxx litigation.
21 Q. When was the last time you testified in the Vioxx case?
22 A. February of last year.
23 Q. That drug was withdrawn from the market, wasn't it?
24 A. Oh, yes. That drug was withdrawn before I joined that
25 litigation in 2004.

page 2272

1 Q. Is it fair to say the allegations and circumstances there
2 are different from this case?
3 A. Yes.
4 Q. Are you -- I think you did say you were still licensed and
5 board certified as --
6 A. Yes. I mentioned I'm board certified. I also have my
7 license to practice in Maryland and in DC.
8 Q. And have you stayed current with the literature and science
9 regarding hormone therapy?
10 A. Sure. I have kept up hopefully on all the hormone therapy
11 literature. Along with reviewing that for my own needs, OB/GYNs
12 like myself take an exam every year to remain board certified.
13 Q. You were first contacted by Wyeth, I believe by me, in
14 September of 2003. Is that correct?
15 A. That is correct.
16 Q. What was your -- was that the first call you received
17 concerning this litigation?
18 A. No. A few days before I got a message from you, I also
19 received a voice mail from a plaintiff's attorney firm.
20 Q. Do you know who that was?
21 A. The name was April Cowgill.
22 A. I think Ms. Cowgill is sitting right there next to Mr.
23 Walker.
24 A. Hi.
25 Q. Have you ever met?

page 2273

1 A. Yes, we have.
2 Q. And what did she say, and what did you say?
3 A. Well, it was a series of voice mails. As I mentioned, her
4 messages were first. I think I picked up the phone first with
5 you in terms of having a conversation. When I did reach Ms.
6 Cowgill, I believe I was put through to an attorney who asked me
7 if I would be willing to review cases of failure to warn about
8 breast cancer and hormone therapy.
9 Q. What did you say, or what did you think you would say?
10 A. Well, as I mentioned, I also had spoken with you. I was
11 aware -- actually I was surprised that there was such
12 litigation, because, of course, in my experience with the FDA, I
13 was familiar with Wyeth. I was familiar with the labeling of E
14 plus P products. I was familiar with the breast cancer
15 literature and the warnings in the labeling. So I was surprised
16 that there could be such a case. I think I specifically told
17 that firm I wasn't available.
18 Q. We had not met when I called you, had we?
19 A. No, we had not.
20 Q. But you had -- I take it you had certain opinions about
21 these products and the FDA involvement in these products at the
22 time I called you?
23 A. Yes.
24 Q. Okay. What did I ask you to do after that?
25 A. Sure. Mr. Urbanczyk called and asked me if I would be

1 page 2274

2

3 1 willing to look at not just what I knew of Wyeth and the history

4 2 for Premarin and Prempro, but to look at all the relevant

5 3 documents back to the seventies and into the present, to review

6 4 both the Wyeth files, what they knew of the FDA files and

7 5 reviews, to review advisory committees and transcripts that had

8 6 occurred, to review the labeling, and to review the studies,

9 7 etc., that were involved in breast cancer risk and hormone

10 8 therapy.

11 9 Q.  As a result of that review, have you formulated or at least

12 10 reconfirmed the opinions that you held?

13 11 A.  Yes.  Of course, since I had some experience, I wanted to

14 12 go into that review and look at that information with a new eye,

15 13 step away from my role of being at the FDA, receiving

16 14 information from Wyeth and others, but look at it from a new

17 15 perspective, which is, okay, what's in the Wyeth files, what was

18 16 the FDA aware of, what was the FDA not aware of, etc., to see

19 17 that everything had been submitted appropriately, reviewed

20 18 appropriately, and that the actions that the FDA took and the

21 19 actions that Wyeth had done were appropriate.

22 20 Q.  And the opinions that you are going to offer today, do you

23 21 hold them, Dr. Rarick, to a reasonable degree of medical and

24 22 scientific probability?

25 23 A.  Yes, I do.

26 24 Q.  Aren't you really just here to defend what you did and the

27 25 FDA did in that time period?  Let me put it this way.  Are you

1 page 2275

2

3 1 familiar with the term -- I'm not going to say it out loud --

4 2 but the term "CYA"?

5 3 A.  I am familiar with that.

6 4 Q.  Isn't that what you are just doing here today?

7 5 A.  I appreciate that question.  And, again, as I mentioned, I

8 6 certainly was at the FDA for 15 years.  I was aware of Wyeth and

9 7 these products.  And there were times when I was a

10 8 division director where I actually had authority to take action

11 9 about these products, whether it be a new indication or a new

12 10 label or ask for new studies.  I did have that authority.

13 11 Again, I tried to step out of that role and experience and look

14 12 at the whole regulatory history and the whole history of

15 13 development and oversight of this product to make sure that I

16 14 wasn't just basing this on my own experience.

17 15 Q.  We'll get into that in just a little bit more.  But how

18 16 much -- you have testified in other hormone therapy trials, have

19 17 you not?

20 18 A.  Yes, I have.

21 19 Q.  Several, as I recall?

22 20 A.  Yes.

23 21 Q.  Not all of them, but --

24 22 A.  Correct.

25 23 Q.  Most of them?

26 24 A.  Not all of them.  Most of them.

27 25 Q.  How much -- before you agreed to testify, how many hours

1 page 2276

2

3 1 did you take to review the Wyeth documents and the regulatory

4 2 documents?

5 3 A.  I think that I would say about 200 or more hours was spent

6 4 in the review of documents.

7 5 Q.  All right.  And since that time, including all of the

8 6 testifying and traveling that you've done, how many hours have

9 7 you spent total?

10 8 A.  I've spent a total on this litigation of 440 or 450 hours.

11 9 Q.  That's over what time period?

12 10 A.  Four and a half years.

13 11 Q.  That comes to about what in terms of fees that you billed

14 12 us?

15 13 A.  I have taken $220,000 over that four and a half years.

16 14 Q.  I want to touch on a couple of things that were talked

17 15 about by Dr. Parisian.  She mentioned the 1992 advisory

18 16 committee meeting in which the FDA was looking at the

19 17 contraindication against hormone therapy used in women with

20 18 breast cancer.  She did not attend that meeting.  Did you attend

21 19 that meeting?

22 20 A.  Absolutely.  I was at that advisory committee in 1992.

23 21 Q.  Doctor, I want you to assume that Dr. Parisian indicated

24 22 that the FDA as a result of that meeting and at that meeting

25 23 indicated they wanted studies done on the use of hormone therapy

26 24 in women with preexisting breast cancer.  Is that an accurate

27 25 characterization of what the FDA's position was back then?

1 page 2277

2

3 1 A.  Actually, that's completely opposite of the intent of that

4 2 meeting.  Like Wyeth, FDA was getting pressure to allow studies

5 3 in women who had breast cancer to be tested, to have been put on

6 4 hormone therapies and see if they had recurrences faster than

7 5 those that aren't.  FDA had always said, no, you cannot do those

8 6 studies in a contraindicated population, women who have breast

9 7 cancer.  We were getting lots of pressure from groups to allow

10 8 those studies to proceed.  We had an advisory committee

11 9 basically to help us with our outside experts to tell us what

12 10 they thought about that idea.  And as you may or may not know,

13 11 there continues never to have been an FDA-approved study on

14 12 breast cancer patients and hormone therapy.

15 13 Q.  All right.  Are you familiar with another topic, with ACOG,

16 14 the American College of Obstetricians and Gynecologists?

17 15 A.  Yes.  I'm a member of the American College.

18 16 Q.  When you were at the FDA, did you have interaction with

19 17 ACOG?

20 18 A.  Yes, I did.  ACOG and the FDA have a relationship.  And

21 19 when I was in the FDA's division that dealt with these drugs, I

22 20 was the liaison to ACOG's GYN practice committee.

23 21 Q.  Did you have any experience with, in that capacity, with

24 22 creating technical bulletins and other ACOG professional

25 23 materials?

26 24 A.  Yes.  During those years, it was the practice committees

27 25 who wrote and revised and modified the technical bulletins, the

page 2278

3 1   committee opinions, and other practice guidelines that came out
4 2   of ACOG.  So we met twice a year.  I was the FDA liaison to
5 3   answer any questions about FDA happenings.  And I saw their
6 4   process of revising their technical bulletins on a three-year
7 5   cycle.
8 6   Q.   During that time, and even now, are you aware, or were you
9 7   aware that companies like Wyeth would from time to time make
10 8   contributions to ACOG?
11 9   A.   Yes.  Companies -- many companies dealing with women's
12 10  health would make contributions to ACOG and other professional
13 11  societies.
14 12  Q.   So it wasn't Wyeth alone?
15 13  A.   No.
16 14  Q.   Based on your professional experience, did this grant money
17 15  affect ACOG's views of the science?
18 16  A.   I consider ACOG an unbiased objective group who is trying
19 17  to put together the best information they can for their
20 18  constituents.
21 19  Q.   Does the FDA acknowledge and regulate contributions by
22 20  companies like Wyeth to organizations like ACOG?
23 21  A.   The FDA has very specific guidance for companies about the
24 22  types of things that they can send money to.  If it's
25 23  promotional, there's certain rules about that.  If they are
26 24  simply giving money in something that's called an unrestricted
27 25  grant, so that, for example, ACOG can use the money for whatever

page 2279

3 1   they wish, the FDA stays out of that.
4 2   Q.   We've heard a lot of numbers about the FDA.  How many total
5 3   employees are there in the FDA?
6 4   A.   Total employees in the entire all six centers and the
7 5   Office of the Commissioner, it is about 9 to 10 thousand.
8 6   Q.   How many in the Center for Drug Evaluation and Research?
9 7   A.   The last time I looked at the 2005 numbers, there were
10 8   2,200 employees in CDER.
11 9   Q.   And how many of those, Doctor, concern themselves with the
12 10  safety of drugs, either pre or postmarketing?
13 11  A.   Well, the way I look at it, everybody in the Center for
14 12  Drugs is concerned about safety.  If you read the mission, it's
15 13  to protect the public health.  And if you look at the work that
16 14  they are doing, from early drug development to postmarketing
17 15  oversight, everybody is concerned about safety.
18 16  Q.   Any lawyers around the FDA?
19 17  A.   There are many lawyers at the FDA.  The Office of Chief
20 18  Counsel itself has at least 80 lawyers.  Then there are the
21 19  lawyers in various parts of the Center for Drugs.
22 20  Q.   Did you ever have trouble as a medical officer finding a
23 21  lawyer to ask a question about?
24 22  A.   I never had a problem finding a lawyer.
25 23  Q.   Just briefly tell the jury, were you involved personally in
26 24  Premarin and Prempro approval?
27 25  A.   No.  As I think you will see, I was not the primary

page 2280

3 1   reviewer for Prempro in 1993 and 1994, and even in 1995 and
4 2   1998, when it was reviewed and approved.  I certainly know these
5 3   folks, but I was not the reviewer.
6 4   Q.   You know Dr. Sobel, Dr. Corfman, Dr. Golden, Dr. Stadel?
7 5   A.   Sure.  As you see, Dr. Sobel was the director of that
8 6   division I initially joined.  And we were still part of his
9 7   division.  Phil Corfman was my supervisor.  Dr. Golden, I
10 8   mentioned, was a peer of mine.  Dr. Stadel is a renowned medical
11 9   officer and epidemiologist who also participated.
12 10      THE COURT:  If you will, talk just a tad slower.
13 11      THE WITNESS:  I'll try.  Thank you.  And the rest of
14 12  the reviewers, this is a whole team of people who would be
15 13  looking at this application.
16 14  BY MR. URBANCZYK:
17 15  Q.   Have you and I prepared the key points that you would like
18 16  to make to the jury today?
19 17  A.   Yes.
20 18  Q.   Are these they?
21 19  A.   Yes.
22 20  Q.   Would you explain?  Just briefly tell the jury what they
23 21  are.
24 22  A.   Sure.  I'll explain that Premarin and Prempro were
25 23  adequately tested and accurately labeled and that they are safe
26 24  and effective medicines today.
27 25  Q.   Okay.  So before we get to the first point, Doctor, let me

page 2281

3 1   put up the board that I have shown to plaintiff's counsel about
4 2   drug development in general.  I don't want to prolong this, Dr.
5 3   Rarick.  But does this -- do you want to come down?  Come down.
6 4   All right.  Thank you.  Does this schematic briefly overview the
7 5   FDA's involvement in the various phases of drug development?
8 6   A.   Yes.  Okay.  This was, yes, just to try to capture,
9 7   hopefully quickly, the types of things that the FDA and
10 8   companies are doing throughout drug development.  This Phases 1,
11 9   2, and 3 we would call an investigation on new drugs submission.
12 10  And then the NDA is a new drug application.  It's reviewed and
13 11  goes into Phase 4 if it's approved.  And I would just like to
14 12  point out that the FDA talks to companies early.  These things
15 13  are submitted.  And even though it just shows submission here,
16 14  every trial and every result is submitted to the FDA.  So that
17 15  team is continuing to look at safety and effectiveness.  They
18 16  then get a complete submission from the company with everything
19 17  they know about their drug.  The FDA reviews it.  They don't
20 18  have to approve it.  But if they approve it, they continue to
21 19  look at it.  That same team of medical officers and
22 20  statisticians and experts are looking at all the studies and
23 21  safety information that comes in after.
24 22  Q.   These represent tests in humans; correct, before approval?
25 23  A.   Correct.
26 24  Q.   Can a company do that without FDA approval?
27 25  A.   Not at all.  You cannot put a new drug into humans without

page 2282

1 submitting an application to the FDA.  And then at each phase at
2 each protocol -- what do you want to call it -- each study that
3 you are proposing comes into the FDA reviewers.  They look at
4 it, determine if it is safe to proceed, and allow a company to
5 do the next study that they are proposing.
6 Q.  Can you give us and the jury an understanding of how many
7 drugs enter this phase?
8 A.  Sure.
9 Q.  And end up getting to this phase?
10 A.  Yeah.  A whole bunch of work is done over here if it is not
11 in humans.  And then let's choose a hundred drugs that the FDA
12 allows to proceed in Phase 1.  About 80 of those will be shown
13 to be safe to proceed to Phase 2.  And about 20 of all of those
14 drugs will eventually have enough information and enough trials
15 to become a new drug application.
16 Q.  Is the NDA approval process something that is monitored and
17 an account made to look at FDA's performance?
18 A.  Oh, yes.  If you are speaking of the PDUFA drug?
19 Q.  Well, I'm looking -- go ahead.  Back up, Doctor.  There's a
20 screen.  Tell the jury what this is.
21 A.  This is just to emphasize that new drug applications are
22 not automatically approved.  There's no just rubber stamp,
23 you've done everything, so you are approved.  The FDA takes its
24 job very seriously.  The Center for Drug looks --
25         THE COURT:  A little slower, a little slower.

page 2283

1         THE WITNESS:  Looks at that information.  And as you
2 can see from the years '93 to 2005, about 20 to 40 percent of
3 new drug applications that are reviewed are actually approved.
4 BY MR. URBANCZYK:
5 Q.  That's of the 20 that get through the Phase 3 process?
6 A.  Exactly.  Of the hundred that start, 20 get submitted, and
7 about 20 to 40 percent of those can be approved.
8 Q.  Dr. Rarick, we went over the Prempro development time line
9 in some detail with Mr. Victoria.  Do you know Mr. Victoria, by
10 the way?
11 A.  Yes, I do.
12 Q.  You've had a chance to review this.  Is this an accurate
13 reflection of the general time line?
14 A.  Yes.
15 Q.  Let me just raise a couple of issues with you.  When you
16 were either studying or practicing in the eighties obstetrics
17 and gynecology, when did the use of progestin with estrogen
18 become commonplace?
19 A.  Certainly while I was a resident, in the years '84 to '88,
20 there was still a lot of discussion about if progestins were
21 necessary or other endometrial safety things could be done, what
22 the dose should be, what the regimen should be, and various
23 people were prescribing different regimens.
24 Q.  We've prepared a slide.  How many different doses and
25 regimens of E plus P were used during that time period?

page 2284

1 A.  I think I looked at a 1993 survey that showed just for
2 conjugated estrogens and medroxyprogesterone acetate there were
3 over 70 different regimens being prescribed.
4 Q.  And you say this became commonplace to prescribe one of
5 these doses of regimens in the mid to late eighties?
6 A.  Probably right in about the mid to late eighties, yes.
7 Q.  Does the fact that there were so many different regimens
8 being used, commonplace for only a few years, did that have an
9 impact on the ability to conduct a case control study looking at
10 long-term estrogen plus progestin use in the United States?
11 A.  Well, sure.  You've probably seen that there was a lot of
12 literature trying to look at case control studies and other
13 types of observational studies.  And, again, it was very
14 difficult during those years to get a very clear analysis of
15 women who had actually been taking a similar regimen over a long
16 period of time.
17 Q.  Were there, nevertheless, studies being done?
18 A.  Oh, yes.
19 Q.  By Wyeth and others?
20 A.  By Wyeth and others, yes.
21 Q.  We've heard a lot about the FDA advisory committee meeting
22 in June of 1991 that was convened for two days to specifically
23 address estrogen plus progestin.
24 A.  Yes.
25 Q.  Were you present at that meeting?

page 2285

1 A.  Yes, I was.
2 Q.  Does the slide that we have prepared together accurately
3 depict some of the decisions and questions and answers that the
4 FDA received from this committee?
5 A.  Yes.  Exactly.  Again, an advisory committee is convened
6 when the FDA wants their outside experts to give them advice.
7 This committee listened to the evidence about E plus P.  And
8 they were asked should all women be taking this, should the FDA
9 consider approving a specific regimen.  And these are the
10 answers.
11 Q.  Okay.  When the FDA received the NDA for Prempro from
12 Wyeth, what was their ultimate decision?
13 A.  The FDA looked at the new drug application from Wyeth in
14 '93, '92 and then in '93, and approved it at the end of December
15 of '94.
16 Q.  Is this, Dr. Rarick, from Defendant's Exhibit 223, which is
17 in evidence, is this the authorization to approve Premarin and
18 Prempro signed by the individuals you've described?
19 A.  This is the medical officer's review.  Dr. Golden is
20 signing her recommendation to approve the product.  And it's
21 cosigned here by the division director, by Bruce Stadel, who we
22 mentioned, and by Dr. Corfman.
23 Q.  How would you characterize Dr. Golden's review of the
24 Prempro NDA based on your review of the records?
25 A.  Sure.  Dr. Golden was a very careful critical reviewer, who

page 2286

3  1  looked very thoroughly and critically at information and raised

4  2  important questions throughout her reviews and memos throughout

5  3  the years.

6  4  Q.  We've seen evidence that in 1993, for example, Dr. Golden

7  5  was quite skeptical about the approvability of this product.

8  6  Are you familiar with that document?

9  7  A.  Yes, I am.

10  8  Q.  Were there things that intervened that happened during the

11  9  Prempro approval process, from '93 to '94, that Dr. Golden may

12  10  have considered or did consider?

13  11  A.  Right.  Mr. Urbanczyk is referring to a memo you may have

14  12  seen where Dr. Golden describes why she doesn't want to review a

15  13  new drug application on Prempro.  It includes a lot of

16  14  information about pharmacokinetics and a paragraph about her

17  15  long-term safety concerns.  And then you can see then in

18  16  December of '94 her memo that recommends approval.  Just to try

19  17  to help you understand what was happening in the intervening

20  18  time, they, of course, had had a scientific discussion at the

21  19  advisory committee earlier.  And also these sorts of studies

22  20  also had been completed during the time she was reviewing the

23  21  application.

24  22  Q.  I notice that one of these is the Colditz meta-analysis

25  23  that Wyeth supported.  Was that cited by Dr. Golden in her

26  24  medical officer's review?

27  25  A.  Yes, it was.

page 2287

3  1  Q.  And these other things also occurred between the time that

4  2  Dr. Golden expressed her skepticism and her approval.  Correct?

5  3  A.  Correct.

6  4  Q.  All right.  And the jury has seen this.  Are these some of

7  5  the studies that Dr. Golden considered and cited in support of

8  6  her approval of Prempro?

9  7  A.  Sure.  These are the ones she specifically mentions in her

10  8  memo.  Of course, she had access to any number of studies.  But

11  9  these are the kinds of studies that she specifically mentions in

12  10  her memo about breast cancer risk.

13  11  Q.  Doctor, we've heard from Dr. Parisian.  And Dr. Parisian,

14  12  in response to my question:  "You do not criticize the FDA's

15  13  decision to approve two-pill Prempro in 1994.  Correct?"  She

16  14  says:  "Correct."  You will agree with that?

17  15  A.  I do.

18  16  Q.  Is it your opinion, was there adequate testing for the FDA

19  17  to approve Prempro in December of 1994?

20  18  A.  Absolutely.

21  19  Q.  Do you consider the approval of Prempro to have been an

22  20  advance for women's health?

23  21  A.  Oh, definitely.  Wyeth was the first company that submitted

24  22  information to the FDA that met the standard to say what was the

25  23  appropriate dose of both components for long-term use to protect

26  24  a woman's endometrium.

27  25  Q.  I think Dr. Golden has -- I mean Dr. Parisian has agreed

page 2288

3  1  that Wyeth kept the FDA informed of the breast cancer literature

4  2  that was available to it.  And do you agree with that?

5  3  A.  Yes, I do.

6  4  Q.  All right.  And the jury has seen this slide with Mr.

7  5  Victoria very briefly.  Is this an accurate depiction of the

8  6  concept that Wyeth kept the FDA informed about breast cancer

9  7  risk information?

10  8  A.  Yes.  And I just want to remind you that the FDA, along

11  9  with receiving information from Wyeth, it's also receiving an

12  10  annual report from Wyeth on its products both in INDs and NDAs.

13  11  It is also receiving its own information from other companies on

14  12  these types of products.  It is also looking at the literature

15  13  itself.

16  14  Q.  All right, Doctor.  Are you familiar with the consideration

17  15  by the FDA in 1998 of an application by Wyeth to seek approval

18  16  of Prempro with a slightly higher dose of medroxyprogesterone

19  17  acetate?

20  18  A.  Sure.  That actual dose was included in its first

21  19  application but was not approved.  Further testing was

22  20  requested, further analyses.  And in 1998 the other dose, the

23  21  higher dose of the MPA component, was reviewed and approved in

24  22  1998.

25  23  Q.  Okay.  And did the FDA at that time consider the world

26  24  literature on breast cancer?

27  25  A.  Oh, definitely.  This is Dr. Van der Vlugt's memo.  She was

page 2289

3  1  now the medical officer.  Dr. Golden had left the division.  And

4  2  she goes on to describe her review of the literature.

5  3  Q.  Okay.  Would you just read to the jury the pertinent

6  4  portions of this paragraph?

7  5  A.  Sure.  This is about the impact of exogenous hormones on

8  6  the risk of breast cancer.  It says:  "Many cohort and case

9  7  controlled studies of women using HRT have been conducted.  In

10  8  addition, several meta-analyses have been published to attempt

11  9  to clarify these results."

12  10  Q.  All right.

13  11  A.  And then she goes on:  "With long-term use, greater than

14  12  ten years, there may be a slight increase of developing breast

15  13  cancer, but other biological factors, in other words, family

16  14  history, diet, smoking, etc., must be considered."

17  15  Q.  Now, when I questioned, or maybe it was Mr. Goodell who

18  16  questioned Dr. Parisian, in response to a question about

19  17  studies, she said:  "No, I don't think that one more study that

20  18  would be well done could answer the question."  Do you agree

21  19  with that statement?

22  20  A.  I do.  In fact, I think of this more as a quote of Dr.

23  21  Golden.  And her memo makes the same comment, that one more

24  22  observational study would not answer the question.

25  23  Q.  We have talked some, actually at some length about the

26  24  Phase 4 commitment that Wyeth agreed to after the Prempro was

27  25  approved.  And the FDA conditioned Prempro approval on a Phase 4

Page 53

page 2290

1 1  commitment.  Isn't that correct?

2 2  A.  Correct.  Every time the FDA takes an approval action, they

3 3  have the opportunity, a very clear opportunity, to change the

4 4  label or ask for more studies.  And those are called Phase 4

5 5  commitments.

6 6  Q.  And I think the jury may have heard yesterday in

7 7  cross-examination that some Phase 4 commitments or a substantial

8 8  number of Phase 4 commitments are never fulfilled.  Did Wyeth

9 9  fulfill its Phase 4 commitment to study breast cancer?

10 10  A.  Yes, it did.

11 11  Q.  All right.  We've seen this letter in which -- I guess

12 12  that's you who said that?

13 13  A.  That would be me.

14 14  Q.  Just tell the jury briefly what you were proving here, how

15 15  you went about getting that decision.

16 16  A.  Right.  I shouldn't take individual credit.  This is my

17 17  signature on a letter.  That same team that would have looked at

18 18  the new drug application and continued looking at studies would

19 19  have reviewed the submission that described the Women's Health

20 20  Initiative, how that enrollment was going, the status of that

21 21  study, and asking if that would fulfill the Phase 4 commitment.

22 22  The team reviewed that, gave me their recommendation, and I

23 23  agreed that that submission, that the support for those studies

24 24  would fulfill the Phase 4 commitment.

27 25  Q.  And I think we've seen that Dr. Parisian agrees that even

Page 54

page 2291

3 1  today the FDA considers Wyeth's Phase 4 commitment to be

4 2  fulfilled.  Correct?

5 3  A.  That is correct.

6 4  Q.  And I will hand you what is Defendant's Exhibit 752, which

7 5  is a copy of a current Web site that the FDA has.  Does that

8 6  reflect the FDA view as of today, that the Phase 4 breast cancer

9 7  commitment that Wyeth made is fulfilled?

10 8  A.  Yes.  It describes the commitment as to conduct a

11 9  comprehensive investigation of breast cancer risk in users and

12 10  nonusers of the NDA regimens.  And it states that it's

13 11  fulfilled.

14 12       MR. URBANCZYK:  I offer this into evidence, Your

15 13  Honor.

16 14       MR. MORRIS:  No objection.

17 15       THE COURT:  Admitted.

18 16       (Defendant Wyeth Exhibit 752 received in evidence.)

19 17  BY MR. URBANCZYK:

20 18  Q.  Dr. Rarick, why did the FDA favor the WHI trial over a case

21 19  controlled study?

22 20  A.  Oh, well, there's several reasons.  First, the WHI study

23 21  was ongoing even at the time of Prempro's approval, so the

24 22  results were going to come in much sooner than any kind of case

25 23  control study would come in.  Second, you've probably heard, a

26 24  randomized controlled trial is the gold standard for trying to

27 25  answer a scientific question.

Page 55

page 2292

3 1  Q.  Explain why the WHI was going to be finished before a case

4 2  controlled study that Wyeth might have been able to do.

5 3  A.  Again, even as you see the wording of that commitment, it

6 4  was envisioned that once the NDA was approved, women would then

7 5  be prescribed that actual specific regimen called Prempro.  And

8 6  you would have to have enough women who took it for a long

9 7  enough time to be able to do what's called an observational

10 8  study, to be able to do a study.  I think the FDA described in

11 9  further conversations that they expected at least an eight to

12 10  nine year time to go by so enough women would be taking the

13 11  product so that when you did a survey or you did a questionnaire

14 12  or you looked for breast cancer numbers, you had enough people

15 13  who had actually taken that product.  So they wouldn't have

16 14  expected that study to even start for eight to nine years.  Of

17 15  course, the results of such a study would take even longer.

18 16  Q.  All right.  Let me switch to labeling, Dr. Rarick.  Are

19 17  there -- we've seen a lot -- we've seen some of this from Dr.

20 18  Jolson and I believe maybe even Dr. Parisian.  Are there federal

21 19  requirements for prescription drug labeling?

22 20  A.  Yes, there are.  These are described here.  There's various

23 21  sections of the label.  The FDA describes this in regulations as

24 22  to each of these sections.  And the FDA has a final say on the

25 23  words, the content, and the format of labeling.

24 24  Q.  Now, with respect to the Prempro label, do you agree with

27 25  Dr. Parisian that the FDA reviewed and approved every word of

Page 56

page 2293

3 1  the Prempro breast cancer warning?

4 2  A.  Yes.

5 3  Q.  And do you agree with Dr. Parisian that the FDA cannot be

6 4  criticized for approving that label in 1994?

7 5  A.  Yes, I do.

8 6  Q.  And not in 1995 either.  Correct?

9 7  A.  Or not in 1998.

10 8  Q.  And in 1998, when they approved the second dose of Prempro,

11 9  they could have -- could they have required Wyeth to have

12 10  conducted more tests?

13 11  A.  As I said, every time the FDA takes an official action like

14 12  that, that's its most clear opportunity to add new requirements

15 13  or make new Phase 4 commitments.  If the FDA had felt that some

16 14  further study was necessary, whether it be for breast cancer or

17 15  any other questions, they could have asked for it at that time.

18 16  They did not.

19 17  Q.  Doctor, I think the jury has seen these in slides.  But I

20 18  made boards of them.  You've helped me, I think.  Does this

21 19  slide, which is --

22 20  A.  That one is Prempro.

23 21  Q.  This one is Prempro.  And it is Defense Board 44.  Mr.

24 22  Moore is going to scold me for not having done enough

25 23  identification of this.  This is Prempro?

26 24  A.  Yes, it is.

27 25  Q.  This is Premarin?

Page 57

page 2294

1 A. Correct.
2 Q. This is Defense Demonstrative 56. Correct?
3 A. I don't know the number.
4 Q. I'm representing it to you. That's good.
5 A. Okay.
6 Q. It is 56. Take my word for it. Do these represent the
7 various places in the label which correspond to the places in
8 the label that the FDA requires certain information to be
9 contained?
10 A. Exactly. As you can see from this label, breast cancer
11 information isn't in just one spot. It is actually reiterated
12 in various ways throughout the labeling.
13 Q. Do you have an opinion whether Premarin and Prempro labels
14 accurately conveyed the benefits and risks?
15 A. I believe they do.
16 Q. And did the Premarin and Prempro labels accurately reflect
17 the science at the time?
18 A. Yes.
19 Q. And was the information about breast cancer in the
20 appropriate sections of both labels?
21 A. Yes.
22 Q. Let me talk to you about WHI. Characterize the WHI for the
23 jury in terms of its size and its precedence.
24 A. Sure. I'm sure you've already heard a bit about the
25 Women's Health Initiative. But it was a huge undertaking from

Page 58

page 2295

1 the National Institutes of Health, one of the branches which was
2 attempting to look at long-term use of estrogens and estrogens
3 plus progestins compared to placebo, about unknown long-term
4 benefits.
5 Q. Okay. Would you say that it was the largest randomized
6 controlled trial on women ever?
7 A. Absolutely. It's the longest that I can think of and the
8 largest to look at this question.
9 Q. And were there certain things that -- first of all, the NIH
10 conducted this. Did the NIH have an IND, and did they need to
11 get permission from the FDA to conduct this study?
12 A. Sure. You may know that the Women's Health Initiative was
13 first going to be funded by the NIH in 1991. They had
14 conversations with the FDA around 1992 so that they could begin
15 their studies in the end of '92, early 'in 93. And I know it
16 sounds funny, but even a government agency that's looking at a
17 new indication or a new use has to also have an IND, even if
18 they are using approved products.
19 Q. And what was required before the FDA would approve a study
20 of that size and complexity?
21 A. Sure. For anybody to do such a large and long study, the
22 FDA has certain requirements. First you have to establish that
23 you have a reason to do a long-term study and also that you have
24 an appropriate dose, a lowest effective dose, you might want to
25 call it. So, for example, the Lindsay study, which was a study

Page 59

page 2296

1 published in the eighties, allowed for the labeling of Premarin
2 to state what the appropriate dose would be for a long-term
3 indication like osteoporosis prevention to help women not lose
4 bone. That study was done and published. The FDA agreed on
5 that dose could be in the label in 1986. And Wyeth funded the
6 Lindsay study.
7 The next question that the FDA would ask is, okay, now we
8 have a good low dose that we know can be used for a long time.
9 But how can we enroll women who are at risk of osteoporosis in a
10 long-term study and not give them the product and ask them to
11 on placebo? That doesn't seem right. You also have to have a
12 new hypothesis so you are not enrolling woman and then depriving
13 them of a proven therapy.
14 So in 1985 to the present, there's been something called
15 the Nurses' Health Study, which has been a large study looking
16 at women going forward, over a hundred thousand women, going
17 forward to explore their health. In that study they showed
18 there might be a cardiovascular benefit to women using hormone
19 therapy.
20 Q. Was that required before the FDA would allow this
21 experiment to go forward?
22 A. Well, yes, again, because otherwise you would be depriving
23 women of a known therapy. And you need to enroll women who
24 don't need it to protect their bone. You need to enroll women
25 while you are asking a new question.

Page 60

page 2297

1 Q. Is it ethical, Doctor, or would the FDA allow a randomized
2 control trial whose sole purpose was to examine whether it
3 harmed people?
4 A. No. That is not a trial design that's acceptable. You
5 don't take women who may not get any benefit and simply ask them
6 to take a possible risk.
7 Q. And then briefly describe the next steps, because I think
8 the jury may have actually heard these.
9 A. Sure. The other requirement would be, if you are going to
10 take an estrogen for a long time --
11 THE COURT: You need to go just a little slower.
12 THE WITNESS: Okay. I apologize. If you are going to
13 ask women to take an estrogen for long term, you also have to
14 make sure you are protecting them from the known risk of
15 endometrial cancer or other endometrial changes. So it was
16 imperative that a company do studies to show that you could use
17 an estrogen plus a progestin for long term and prevent that
18 risk. Wyeth, of course, was the leader in this field. They did
19 two studies to develop this. Prem-Pak was the first. It was at
20 a higher dose, and showed of both the estrogens and the
21 MPA. And then they did what we call the Prempro pivotal trial,
22 which showed that the .625 of conjugated estrogens could be
23 combined with an appropriate dose of MPA for long-term safety on
24 the endometrium.
25 BY MR. URBANCZYK:

page 2298

3 1  Q.  What did the NIH feel was necessary in addition before it
4 2  would conduct the WHI?
5 3  A.  Again, since the WHI was an unprecedented study in women
6 4  and asking lots of women to enroll in a placebo controlled
7 5  trial, they believed and published their belief that they needed
8 6  to do a pilot study to make sure they could even enroll such a
9 7  study.  And they asked a few questions early in that study to
10 8  answer before they would enroll a large study.
11 9  Q.  Okay.  And you've already characterized, I think, point one
12 10  here about Wyeth's involvement in the steps.  How would you
13 11  characterize Wyeth's contribution to WHI?
14 12  A.  Again, their contribution was imperative for the WHI to
15 13  actually happen.  NIH had to have an IND.  They had to be able
16 14  to reference all the information that was known for what became
17 15  Prempro to be able to use that in their trial.  They had to have
18 16  a manufacturer who could make the product and make placebo and
19 17  supply that to the company, to the trial.
20 18  Q.  Dr. Parisian admitted that without Wyeth allowing the NIH
21 19  to reference the IND the NIH could not have conducted this study
22 20  with Prempro.  Do you agree with that?
23 21  A.  Exactly.  Prempro wasn't even approved at the beginning of
24 22  Women's Health Initiative.  It was definitely under an IND.  And
25 23  without Wyeth's permission to use that as their reference, they
26 24  would have had to wait for the approval to use the product.
27 25  Q.  And Dr. Parisian testified that she is not arguing the WHI

page 2299

3 1  should have been done any sooner.  Do you agree with that
4 2  statement?
5 3  A.  Absolutely.  It was surprising it could get started when it
6 4  did without an approved product.  And I would agree that nobody,
7 5  including Wyeth or the NIH, could have done it any earlier.
8 6  Q.  Could any case controlled study attempted in the nineties
9 7  given us the same information that the WHI has given us?
10 8  A.  Well, it depends on how you look at that.  There were lots
11 9  of case controlled studies in the eighties and nineties that
12 10  gave us information that was put in the label about the
13 11  potential breast cancer risk.  But, no, a case control study is
14 12  never going to answer the question like a randomized controlled
15 13  trial will.
16 14  Q.  That brings us to a good point.  We saw the labels.  We saw
17 15  the label of Prempro back in the 1996-1999 time frame.  And what
18 16  relative risk numbers are described there?  And what is that
19 17  number based on?
20 18  A.  Correct.  This is from the Prempro review that we looked at
21 19  from Dr. Golden and her labeling recommendations, where she
22 20  concludes that the relative risk of breast cancer in Prempro
23 21  users is about 1.3 to 2.0.
24 22       THE COURT:  Just a minute if you will.  Ladies and
25 23  gentlemen, we're going to take a break either now or at 15
26 24  minutes from now.  Does anybody need it now?  If so, raise your
27 25  hand.

page 2300

3 1       All right.  Continue, if you will, please.
4 2  BY MR. URBANCZYK:
5 3  Q.  All right.  What was the findings reported by the
6 4  investigators of WHI?
7 5  A.  They found a relative risk over five years of 1.24.
8 6  Q.  And we've heard a lot of numbers in this courtroom.  In
9 7  your opinion, is this the valid relative risk number that was
10 8  reported by the WHI investigators?
11 9  A.  I think it's the best study that could possibly be done on
12 10  this question.  I would agree with its conclusion of 1.24.
13 11  Q.  Just to put it in context, how does that compare with some
14 12  other commonly understood breast cancer risk factors?  Let's
15 13  take naturally dense breasts.
16 14  A.  Sure.  There is commonly known risk factors that increase
17 15  your risk for breast cancer.  Women with naturally dense breasts
18 16  on mammograms would have a 4.0 to 5.0 increased risk of breast
19 17  cancer, so four to five.
20 18  Q.  What about no children, nulliparity?
21 19  A.  Yes.  If you've never had a full-term pregnancy, that can
22 20  also increase your risk for breast cancer to almost two.  I
23 21  think it is about 1.7 to 1.9.
24 22  Q.  What about obesity?
25 23  A.  Obesity can increase the risk to 1.45.
26 24  Q.  What about smoking, a history of smoking of one pack more
27 25  than 20 years?

page 2301

3 1  A.  That's around 1.3 to 1.4.
4 2  Q.  Doctor, let me move to the last point.  In your opinion,
5 3  are Premarin and Prempro safe and effective medicines?
6 4  A.  Yes, they are.
7 5  Q.  And that was the FDA's conclusion, Dr. Golden's conclusion,
8 6  Stadel, and Dr. Corfman and Dr. Sobel's conclusion in 1994.
9 7  Correct?
10 8  A.  Correct.  And when I say safe, it is a term used by the
11 9  FDA.  It is a boilerplate term.  Safe and effective means that
12 10  the benefits outweigh the risks when used according to the
13 11  label.
14 12  Q.  When you say boilerplate, are you belittling that finding?
15 13  A.  Oh, no.  I'm sorry.  I don't mean to say that.  I just
16 14  think those words jump out at me sometimes because, of course,
17 15  all drugs have risk.  But this is the way the regulations are
18 16  written, that the FDA determines that a drug is safe and
19 17  effective.  And how that's interpreted is according to the
20 18  label.
21 19  Q.  Do you agree -- I said that in opening statement -- that
22 20  no -- that all medicines have risks, some very serious risks?
23 21  Do you agree with that?
24 22  A.  Definitely.
25 23  Q.  And so how does the FDA or a physician go about determining
26 24  whether the drug is safe and effective?
27 25  A.  Oh, yes.  As the FDA does every day and the CDER reviewers

Page 65

page 2302

1  do every day, they make a determination of risks versus
2  benefits.  And they do their best to make sure information about
3  both those things, risks and benefits, are in the label.
4  Q.  We've talked a little bit about aspirin.  If you look at
5  the -- if you look at the label for aspirin, what are the
6  benefits, what are the risks, some of them?
7  A.  Right.  If you are thinking of aspirin, you can use aspirin
8  to prevent a second heart attack if you've had a heart attack.
9  You take a baby aspirin every day, for example.  Many of us use
10  aspirin or drugs like it for headaches and other pains.  Again,
11  if you look at that label, it will tell you that that same
12  component that makes your blood thin by taking aspirin can also
13  make you have bleeding problems in your stomach, in your brain,
14  have strokes.  So there's a lot of risks to taking aspirin.
15  Q.  What about Prempro and Premarin, Dr. Rarick?  What are the
16  principal benefits of those products?
17  A.  Sure.  You always have to think about the drug as a whole,
18  both risks and benefits.  The benefits of Prempro and Premarin
19  are as they are labeled.  They work very well for women with
20  debilitating moderate to severe vasomotor symptoms.  Some people
21  think of them as night sweats.  They also work to help women
22  with vaginal atrophy that is bothersome.  Of course, they can be
23  used to prevent bone loss.
24  Q.  What about the risks, Doctor?  Are there some risks with
25  Premarin and Prempro?

Page 66

page 2303

1  A.  Oh, yes.  We've been discussing breast cancer risks all
2  along, I'm sure, as you know.  If you saw that label, it's not
3  the only thing that's in the label.  There are other things
4  listed.
5  Q.  Okay.  Is it fair to say that with respect to this product
6  that you are of the view the proven benefits of this product
7  outweigh the small risks?
8  A.  Oh, absolutely.  And it is an individual decision for each
9  patient.
10  Q.  Well, that gets me to a point.  When a pharmaceutical
11  manufacturer markets a medicine that has proven benefits, small
12  risk, what is the obligation of that pharmaceutical company with
13  respect to the doctor?
14  A.  Sure.  Well, the obligation is, as you've seen here, to
15  continue to do the appropriate studies, to continue to monitor
16  studies that are being done, submit those to the FDA, revise
17  labeling as necessary, get new indications if that's
18  appropriate, then even after approval to continue to monitor
19  safety, both in their own studies as well as looking at other
20  studies, again making sure that the labeling is accurate and
21  addresses the science.
22  Q.  Doctor, based on everything that you know, based on your
23  years at the FDA and your hundreds of hours of evaluating this
24  record, do you have an opinion as to whether Wyeth complied with
25  FDA laws and regulations?

Page 67

page 2304

1  A.  Yes.  They did comply.
2  Q.  And how about with all FDA -- with the FDA requirements
3  relating to these issues?
4  A.  Yes.  I would say they either met or exceeded the usual FDA
5  requirements for both drug development and oversight.
6  Q.  And do you have an opinion, I guess, whether Wyeth behaved
7  reasonably from a regulatory perspective?
8  A.  Did it behave reasonably?  Yes.
9  Q.  Okay.  Has the FDA ever asked Wyeth to conduct a study that
10  Wyeth refused to do with respect to these products?
11  A.  Not that I'm aware of.
12  Q.  And has the FDA ever suggested that these products be
13  withdrawn?
14  A.  Not that I'm aware of.
15  Q.  Have we covered the points that you would like to -- that
16  you and I decided we would make to the jury?
17  A.  Yes.
18        MR. URBANCZYK:  I have no further questions.  Thank
19  you, Doctor.
20        THE COURT:  Do you want to take a break now, or do you
21  want to start your cross?
22        MR. MORRIS:  We can take a break.
23        THE COURT:  Whatever you want to do.
24        MR. MORRIS:  Let's take a break.
25        THE COURT:  Let's be in recess until 21 after by the

Page 68

page 2305

1  clock there on the wall.  Let the jury stand out with the
2  standard admonition.  Everyone else remain as you are.
3        (Jury excused.)
4        THE COURT:  The jury is out.  We're in recess.  You
5  can be at ease.
6        (Recess at 12:06 p.m.)
7            REPORTER'S CERTIFICATE
8      I certify that the foregoing is a correct transcript from
9  the record of proceedings in the above-entitled matter.
10
10            Date:  February 20, 2008.
12  Elaine Hinson, RMR, CRR, CCR
11  United States Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 page 2306

2

3 1   (Continuing at 12:20 p.m., jury present.)

4 2       THE COURT:  You may proceed with cross.

5 3       MR. MORRIS:  Thank you, Your Honor.

6 4   Good morning, or, actually, afternoon.  May I have the

7 5 ELMO?

8 6       COURTROOM DEPUTY:  Yes.

9 7           CROSS-EXAMINATION

10 8 BY MR. MORRIS:

11 9 Q.  Dr. Rarick, my name is Jim Morris.  You and I have not met

12 10 before, have we?

13 11 A.  Correct.

14 12 Q.  And with regard to any discussions that may have taken

15 13 place before you decided who you were going to testify for, you

16 14 and I never had any conversation, did we?

17 15 A.  Correct.

18 16 Q.  Okay.  And I'd like to talk to you a little bit about your

19 17 resume.  It's been marked and it's in evidence, and it shows

20 18 that when you went to work at the FDA, you went into the Division

21 19 of Reproductive and Neurological Drug Products.  Correct?

22 20 A.  No.  It's the one above that.

23 21 Q.  Okay.  You started off in the Division of Metabolism?

24 22 A.  No.  You need to go a little farther up on my CV to the

25 23 beginning of my career.

26 24 Q.  Here we go.  All right.  '88 to '95, Division of Metabolism

27 25 and Endocrine Drug Products.  Is that correct?

1 page 2307

2

3 1 A.  Yes.

4 2 Q.  And would that division have been in charge of overseeing

5 3 women's health products like Premarin and Prempro?

6 4 A.  Correct.

7 5 Q.  And would Provera have also been one of the products that

8 6 you would have overseen?

9 7 A.  In that division?

10 8 Q.  Yes.

11 9 A.  Yes.  That division reviewed that, yes.

12 10 Q.  I'd like to show you what's previously been marked as

13 11 Plaintiff's Exhibit No. 10525.

14 12 A.  Thank you.

15 13       MR. GOODELL:  Your Honor, may we approach on this?

16 14   (Bench conference reported as follows:)

17 15       THE COURT:  What is this?

18 16       MR. GOODELL:  This was the document that counsel

19 17 showed us yesterday, which I appreciate.  This is a long list

20 18 document, which is not relevant to the current consideration.

21 19 But this is beyond the scope of anything she's talked about in

22 20 her direct.  He's going to ask her questions about Provera,

23 21 which is not the subject of any of her testimony in this case.

24 22       MR. MORRIS:  Your Honor, she has given clear testimony

25 23 on direct examination that there weren't enough prescriptions

26 24 out there for them to do adequate studies back in the '70s,

27 25 '80s, '90s.  This is a document where Upjohn looked at exactly

1 page 2308

2

3 1 estrogens and Provera and listed in 1984 the amount of people in

4 2 the hundreds of thousands that were taking it during that time

5 3 frame.  It is to rebut her testimony.

6 4       THE COURT:  Objection overruled, exception saved.

7 5   (Whereupon, proceedings continued in open court as

8 6 follows:)

9 7       MR. MORRIS:  Your Honor, we move 10525 into evidence.

10 8       THE COURT:  Admitted.  Exception saved.

11 9   (Plaintiff Exhibit 10525 received in evidence.)

12 10 BY MR. MORRIS:

13 11 Q.  Dr. Rarick, this is a document out of the files of Upjohn,

14 12 and it is entitled, "Provera Tablets, Situation Analysis,

15 13 Year-To-Date, October/November, 1986."  Do you see that?

16 14 A.  Yes, I do.

17 15 Q.  And in the bottom right-hand corner, if I can get it up

18 16 there far enough, you can see the plaintiff's exhibit number

19 17 and the page number.  And if you would, I'd like for to you turn to

20 18 page 38.

21 19   Now, one of the things that I think I heard you contend in

22 20 direct examination was that, gee, we couldn't have studied these

23 21 products back then because there weren't enough people using

24 22 them.  And this particular document, on page 38, has a Table 10,

25 23 and it states, "Oral estrogen usage in the treatment of

26 24 menopausal therapy with and without oral progesterones."  Do you

27 25 see that?

1 page 2309

2

3 1 A.  Yes, I do.

4 2 Q.  And the source is a company called "MDTI/IMSPACT."  And

5 3 these numbers that are listed in these columns are in the

6 4 hundreds of thousands.  Do you see that?

7 5 A.  How do you get -- oh, I see, the total in hundreds of

8 6 thousands, yes.

9 7 Q.  Total in hundreds of thousands.  And when we look at

10 8 estrogen and Provera -- and they broke it down estrogen without

11 9 progestogens, estrogen with progestogens, estrogens and

12 10 Aygestin, estrogens and Amen, estrogens and Norlutate, estrogens

13 11 and other progestogens, and then they actually focused in on

14 12 estrogens and Provera.  And in March of 1984, there were 299,000

15 13 prescriptions at that point.  Correct?

16 14 A.  I don't know if this is counting prescriptions, but it's

17 15 about whatever IMSPACT was measuring, yes.

18 16 Q.  And then if we go up to September of '84, there were

19 17 476,000.  Correct?

20 18 A.  Correct.  You don't know what regimen of Provera and

21 19 estrogens, but, yes.

22 20 Q.  We go to September, 592,000.  Correct?

23 21 A.  Exactly.

24 22 Q.  And September of 1986, there were 908,000 prescriptions of

25 23 estrogens and Provera.

26 24 A.  I don't know if those are prescriptions or pills.  I can't

27 25 tell from this.

page 2310

1 Q. The fact of the matter is that there were adequate numbers
2 of women taking these products during the 1980s, that had Wyeth
3 been motivated, or Upjohn been motivated to do studies, they
4 could have gone out and found appropriate candidates. Isn't
5 that true?
6 A. And they did.
7 Q. Okay. All right. And they did. You said that you've
8 reviewed all the studies in the case and you've looked at all
9 the documents. Correct?
10 A. I've tried to re-review the literature for breast cancer
11 risk. I'll remind the jury, all those studies were submitted to
12 the FDA, reviewed by an entire team of people. But, yes, I've
13 attempted to look at them again.
14 Q. I want to make sure the jury fully understands what's going
15 on here. This says, "Development and Approval of Prempro."
16 Correct?
17 A. Yes.
18 Q. Now, you understand that Prempro is a combination pill that
19 contains Premarin, pregnant mare's urine, and
20 medroxyprogesterone acetate in one pill? You understand that,
21 don't you?
22 A. Yes, it's a fixed combination product.
23 Q. And so to suggest to the jury that Wyeth files E and P IND,
24 that was Prem-Pak, correct, two separate pills? Isn't that
25 true?

page 2311

1 A. Correct. That's the kind of information you need to
2 proceed to a fixed dose combination.
3 Q. The fact of the matter is, Prem-Pak had nothing to do with
4 Prempro. The jury has seen the document where Wyeth says
5 internally that if we label this as a new product, we might have
6 to do additional studies. They were two different things,
7 correct, Prem-Pak and then Prempro?
8 A. Well, science had moved during the Prem-Pak trial to lead
9 to the Prempro trial, if that's what you mean.
10 Q. Well, you said to the jury in direct examination that Wyeth
11 did two studies.
12    MR. MORRIS: And in closing argument, I'll show you
13 the exact transcript.
14 Q. And you said Wyeth had completed two studies, the Prem-Pak
15 study and the pivotal trial. Do you remember that testimony?
16 A. Well, they've completed a lot of studies, but in terms of
17 the Prempro approval in 1994, the trials that were submitted
18 were the Prem-Pak information, the Prempro trial, as well as the
19 preliminary information from PEPI, if that's what you're asking.
20 Q. If you would, try to confine yourself to my question. Did
21 you say --
22    MR. URBANCZYK: Objection, Your Honor.
23    MR. MORRIS: I apologize.
24    THE COURT: Overrule the objection. But it would be
25 probably better to ask me to tell the witness to do that, but

page 2312

1 I'll let you go on.
2    MR. MORRIS: Thank you, Your Honor. I apologize.
3 BY MR. MORRIS:
4 Q. With regard to Prem-Pak, the fact of the matter and the
5 truth is, in 1988, Wyeth abandoned the Prem-Pak study because
6 they couldn't get the thing completed. Isn't that true?
7 A. They met with FDA in 1988 to discuss the status and agreed
8 to terminate that study and begin discussions of the Prempro
9 pivotal trial, yes.
10 Q. There was no sufficient data generated by Prem-Pak by 1988
11 that even addressed the issue of whether or not the combination
12 was causing breast cancer. Isn't that true?
13 A. Do you want me to discuss the Prem-Pak trial?
14 Q. No, I want you to answer my question. You can say yes or
15 no. Is it true that by 1988, the study that they did on
16 Prem-Pak generated no valuable information about whether or not
17 the combination caused breast cancer? Isn't that true? Yes or
18 no?
19 A. If that study failed in its -- it was an endometrial safety
20 study, correct.
21 Q. So it failed. So to say it's a development and approval of
22 Prempro, what it was, it was an attempt to try to get the two
23 pills used together, without ever looking at the breast cancer
24 risk. Isn't that true?
25 A. The development and approval of Prempro was about

page 2313

1 endometrial safety, and it was a crucial study to have started
2 --
3    THE COURT: Just a minute, just a minute. Can you
4 answer whether that's true or not true, what he just asked? If
5 you can't, just say, "I can't answer it."
6    THE WITNESS: It wasn't a study about breast cancer.
7    THE COURT: Is what he said true or not true? That's
8 his question.
9    THE WITNESS: It was a long question. Maybe he could
10 ask it again.
11 BY MR. MORRIS:
12 Q. The fact of the matter is, the Prem-Pak trial did nothing
13 to address the issue of whether or not the combination caused
14 breast cancer. Correct?
15 A. Whether it increased the risk of breast cancer, correct.
16 Q. Now, what we know then is that up until 1998 -- 1988,
17 rather -- at this point Wyeth has conducted no tests, no
18 studies, they've done no protocols to prove anything about E
19 plus P in terms of breast cancer. Isn't that true?
20 A. That is not true.
21 Q. Name one study that they had designed or that they had done
22 the protocol for by 1988 that addressed the issue of whether E
23 plus P caused breast cancer.
24 A. That issue could only be addressed during those years with
25 observational studies, which they were both funding and

page 2314

1  supporting and looking at that other folks were doing.
2  Q.  I asked my question very specifically.  You cannot tell
3  this jury of one study, not even one, that Wyeth designed or
4  developed the protocol for by 1988 that dealt with the issue of
5  whether E plus P causes breast cancer?
6  A.  That study wouldn't be possible then.
7  Q.  The fact of the matter is, even up until WHI was completed,
8  the only one that you can point to on this board that they
9  designed or had anything to do with the protocol on is the
10  Prempro pivotal trial, which was a one-year study.  Isn't that
11  true?
12  A.  I'm not sure if HERS or PEPI are on there, but, of course,
13  they had input on both of those trials.
14  Q.  HERS and PEPI are not on here.  And the jury has heard
15  about HERS.  They know it wasn't designed to look at breast
16  cancer risk.  PEPI was a three-year study.  Correct?
17  A.  PEPI was a three-year study --
18       THE COURT:  Let's approach.
19       (Bench conference reported as follows:)
20       MR. URBANCZYK:  I object.
21       THE COURT:  This is a smart, articulate witness, but
22  she is an advocate.  She needs to answer the questions.  And
23  it's led to counsel arguing with her because she doesn't answer
24  the questions directly.  She knows where he's going and she
25  jumps ahead and asks a question.  And I'm going to take a five,

page 2315

1  six-minute recess, and I want you to talk to her.  I am
2  absolutely satisfied points will be addressed on your brief
3  redirect.  Tell her to answer the question, if she can, and if
4  she can't, say, "I can't answer that yes or no or true or
5  false."
6       MR. URBANCZYK:  May I make an objection to the
7  argumentative tone and the speechifying that Mr. Morris is
8  doing, independent of the witness's answer?
9       THE COURT:  I haven't seen much of it that was
10  independent of the witness arguing, but I think they're which
11  probably a proximate cause of argufying.
12       (Whereupon, proceedings continued in open court as
13  follows:)
14       THE COURT:  Ladies and gentlemen, we're going to be in
15  recess five or six minutes.  Let the jury stand out.  Everyone
16  else, remain as you are.
17       (Whereupon, the jury exited the courtroom and proceedings
18  continued in open court as follows:)
19       THE COURT:  Jury's out.  We're in recess.
20       (Recess at 12:38 p.m.; continuing at 12:46 p.m., jury
21  present.)
22       THE COURT:  You may proceed.
23       MR. MORRIS:  Thank you, Your Honor.
24  BY MR. MORRIS:
25  Q.  Dr. Rarick, I'd like to go back and talk to you a little

page 2316

1  bit about the history of Wyeth's issues involving their hormone
2  therapy products.  You will agree that around 1975, the world
3  became aware through a couple of case control studies that
4  Premarin was causing endometrial cancer?  You'll agree with
5  that, won't you?
6  A.  Yes, there were several studies showing an increased risk
7  of endometrial cancer with estrogens alone.
8  Q.  And, in fact, because of that, prescribing practice was
9  changed with regard to estrogen products, and if a woman had an
10  intact uterus, many practicing gynecologists would prescribe a
11  progestin to oppose the estrogen's effect on the endometrium.
12  Correct?
13  A.  Yes, that was one way to handle that issue.
14  Q.  In your review of Wyeth's documents in preparing for this
15  case, some 400 hours of work, did you come across documents that
16  showed that in the late '70s, Wyeth was aware of that issue, or
17  aware of the use of combination products?
18  A.  Yes, they submitted something to the FDA, I believe, in
19  1979 on that topic.
20  Q.  And, in fact, in 1978, are you aware that they actually
21  looked at the idea of doing an RCT on the issue?
22  A.  I don't remember that specific document, but I know they
23  talked to the FDA about that.
24  Q.  Let me show you correspondence from Ayerst Laboratories,
25  June 1, 1978.  This is the Ayerst Committee on Premarin and

page 2317

1  Breast Cancer.  And it says, "The committee met on May 26, 1978.
2  In attendance were," and there were three doctors and a couple
3  of other guys.  It says, "Following a general review of
4  published literature on epidemiology of breast cancer and
5  government-funded studies on estrogens and breast cancer, the
6  discussion concentrated on areas of potential involvement for
7  Ayerst.  Some of the areas identified were," and if we go down
8  to the bullet point No. 5, "Do a prospective study in
9  postmenopausal women to determine estrogenic susceptibility of
10  breast cancer."  Did I read that correctly?
11  A.  Yes, you did.
12  Q.  Now, you're aware that Wyeth never did such a study, did
13  they?
14  A.  Well, I believe that that is a study about actual tissue
15  from the breast and estrogen receptors.  And I don't recall
16  specifically Wyeth supported that work.  I don't remember.
17  Q.  Now I'd like to show you some summary minutes from the Food
18  & Drug Administration, your former employer.
19  A.  Thank you.
20  Q.  This is already in evidence.  This is Plaintiff's
21  Exhibit 134-A.  There was a hearing that you talked about in
22  direct examination that occurred in February of 1990.  Correct?
23  A.  Correct, an advisory committee meeting.
24  Q.  And Wyeth was present at that advisory committee meeting,
25  weren't they?

page 2318

3  1  A.  You can show me where that is, but I believe they were,
4  2  yes.
5  3  Q.  Well, the sponsor normally is at a meeting when their drug
6  4  is under consideration.  Correct?
7  5  A.  Normally?  Usually.  Uh-huh.
8  6  Q.  All right.  You'll agree with me that there were a couple
9  7  of questions asked in 1990.  One of the questions is, "Is there
10 8  sufficient evidence to conclude that unopposed estrogen
11 9  replacement therapy is associated with an increased risk of
12 10 breast cancer in postmenopausal women?"  And then question No.
13 11 2: "Does the addition of progestins to estrogen therapy alter
14 12 the risk of breast cancer in postmenopausal women?  If so, are
15 13 there differences in this regard among different progestins?"
16 14 And the answer of the committee, "The committee responds
17 15 unanimously that there are insufficient data to answer these
18 16 questions at this time."  Is that correct?
19 17 A.  Correct.  You don't want me to explain that, though?
20 18 Q.  You'll have an opportunity on redirect with your counsel.
21 19 And then on question 4, "Considering only the issues of breast
22 20 and endometrial cancer, how does the committee balance the risk
23 21 of endometrial cancer with or without added progestins with the
24 22 possible risk of breast cancer with or without progestins?"  And
25 23 the answer was:  "The committee reiterates its belief that the
26 24 addition of progestins to estrogen replacement therapy decreases
27 25 the risk of endometrial cancer, but there are insufficient data

page 2319

3  1  concerning the effect of added progestins on the possible risk
4  2  of breast cancer with estrogen use to permit a response to the
5  3  question at this time."
6  4       Did I read that correctly?
7  5  A.  Yes, you did.
8  6  Q.  Now, nowhere in the answer to question 4 does the FDA in
9  7  this memo state there are many observational studies that have
10 8  taken place over the last 20 years, and some say it does cause,
11 9  some say it doesn't cause, and some say, well, it may actually
12 10 provide a benefit?  They don't say that, do they?
13 11 A.  You have to read the transcript, not just the questions and
14 12 answers for that discussion.
15 13 Q.  They certainly had an opportunity in the answer to that
16 14 question, if they felt that there were adequate studies that had
17 15 already been performed out there, they could have stated that in
18 16 response to that question and said that it's a small risk, an
19 17 insignificant risk, and we feel like the question is being
20 18 adequately answered.  They could have said that, but they
21 19 didn't, did they?
22 20 A.  Not in that question and answer, no.
23 21 Q.  I'll show you next what is Plaintiff's Exhibit No. 1495.
24 22      (Judge coughing.)
25 23      MR. MORRIS:  Are you okay?
26 24      THE COURT:  I think I'm going to live.  I've got my
27 25 desire to live back.

page 2320

3  1       MR. MORRIS:  We can't lose you now, Judge.  We've got
4  2  to get this thing finished.
5  3  BY MR. MORRIS:
6  4  Q.  I want to show you a memo from February 2, same date that
7  5  that meeting was conducted, 1990, from Fred Hassan.  Do you know
8  6  who Fred Hassan was?
9  7  A.  I don't remember his exact title, but he was an executive
10 8  at Ayerst.
11 9  Q.  And he's writing regarding this meeting.  Up here it says
12 10 "2-1 Advisory Committee Meeting."  He says, "I want to
13 11 personally congratulate you for your contribution to our success
14 12 at the February 1 advisory committee meeting on Premarin.  Our
15 13 goal was to ensure that this meeting was a 'nonevent,' and
16 14 that's exactly what happened."
17 15      Now, the fact that it was a nonevent from the standpoint of
18 16 Wyeth, that would mean that Wyeth was going to be allowed to
19 17 maintain the status quo; nothing good happened, nothing bad
20 18 happened.  Nonevent.  Isn't that true?
21 19 A.  I don't know what that term meant for this memo, but you
22 20 can ask Wyeth.  I assume you did.
23 21 Q.  And when we get down to the final paragraph, it says,
24 22 "Eventually the various questions that this advisory committee
25 23 could not answer conclusively will be answered."  And one of the
26 24 questions that they could not answer conclusively is the
27 25 risk-benefit question on the addition of a progestin, and the

page 2321

3  1  question of whether or not adding a progestin to estrogen caused
4  2  breast cancer.  Isn't that true?
5  3  A.  Correct.
6  4  Q.  "And it is our responsibility and very much to our benefit
7  5  for Wyeth-Ayerst to provide the studies, information, and
8  6  insights to ensure that the answers will be accurate and
9  7  balanced."  Correct?
10 8  A.  Exactly.
11 9  Q.  Because to date they have not done that.  As of 1990, they
12 10 had not provided the information, the studies, or the insights,
13 11 had they?
14 12 A.  I would disagree with that.
15 13 Q.  Well, the FDA sure didn't mention it, did they?
16 14 A.  Again, you'd have to read the transcripts for everything
17 15 that the FDA was considering at that advisory committee, and it
18 16 included lots of study.
19 17 Q.  Is it proper when a study is published in the public domain
20 18 for a drug company to realize, or anticipate that it's going to
21 19 come out, and then to be reactive by either trying to dismiss
22 20 its contribution to the medical literature or to be reactive
23 21 only in the sense that they don't determine whether or not the
24 22 findings in the study are correct?
25 23      THE COURT:  Break that question down.
26 24      MR. MORRIS:  Okay.
27 25 BY MR. MORRIS:

page 2322

1 Q.   Would it be responsible for a drug company, if they see a
2 study in the public domain, to just dismiss the value of the
3 study without doing any research?
4 A.   No.
5 Q.   All right.  And would it be valid for a pharmaceutical
6 company to hire a public relations company to go out and try to
7 influence the public view of that study?
8 A.   I'm not sure what you're referring to.
9 Q.   Well, if they decided to hire a public relations company to
10 enlist thought leaders to go out and speak against the study,
11 would that be a reasonable action for a drug company to take?
12 A.   Well, it's compound.  Companies do hire public relations
13 companies, you know, firms, but I believe the company is then
14 responsible for either doing or not doing what those firms
15 suggest.
16 Q.   All right.  Let's look first in May of 1990.  This is
17 internal correspondence at Wyeth, and they say, "New information
18 obtained late last week finds that Dr. Graham Colditz (fellow
19 investigator of Meir Stampfer) is scheduled to present the
20 results of a study that shows that Premarin increases the risk
21 of breast cancer 30 percent in current users.  In terms of their
22 proposed strategy, it is to be reactive on the cancer issue.  Be
23 prepared to take responsive stance toward media covering cancer
24 story with accurate, full, and balanced information on the
25 issues presented in proper context."

page 2323

1     Now, would that be appropriate?
2 A.   Certainly.  You should be prepared.
3 Q.   And it says, "To be prepared, but unobtrusive on site at
4 SER meeting to react to any negative messages with spokesperson
5 and media liaison."  Would that be appropriate?
6 A.   I think I like the earlier bullet better that said that
7 they were presenting balanced information, and I assume that's
8 what they're referring to here.
9 Q.   And one way that they could provide balanced information
10 would be to go out and do a study.  Correct?
11 A.   Correct.  Yes, they did.
12 Q.   And they could do their own study and say we've looked at
13 this carefully, and we are the experts on women's health, as
14 you've admitted, we did a study and it says something different.
15 They could do that, couldn't they?
16 A.   And they did.
17 Q.   The fact of the matter is, other than the one-year Prempro
18 pivotal trial, you can't tell the jury of any other study that
19 they designed or that they provided the protocol for to address
20 the issue of whether or not the combination caused breast
21 cancer, can you?
22 A.   If you mean randomized controlled trials, correct.
23 Q.   You can't even tell the jury of a case control study that
24 they either designed or did the protocol for prior to 1991, can
25 you?

page 2324

1 A.   I know they funded some and supported some, but I don't
2 know if they wrote the protocol.
3 Q.   But that's the whole problem with this trial.  You know, we
4 keep saying they funded some or supported some.  Where is the
5 beef?  I mean, there is no design, there is no protocol that
6 Wyeth ever did.  All they did was review other people's studies.
7 Isn't that true?
8 A.   No, not at all.  There are a lot of documents of
9 discussions of designs of observational studies that Wyeth was
10 asked if they would fund.  Many of them they did.  And, of
11 course, in looking at those proposals, they would have reviewed
12 the protocols, suggested modifications, if that was appropriate,
13 and had that appropriate discussion with those investigators.
14 Q.   Well, I had Ginger Constantine on the stand the other day
15 and she put up all of the alleged studies that they supported --
16 and the jury will remember this -- and we went through each and
17 every one of them, and I asked her, "Did you design it or did
18 you provide the protocol for it?"  And we put "no" on each and
19 every one of them.  And the jury will see that again at the
20 conclusion of the case.  Have you gone back and conducted such
21 an analysis?
22     MR. URBANCZYK:  Objection.
23     THE COURT:  Don't answer that until he gets through
24 with the objection.
25     MR. URBANCZYK:  I'm objecting to the closing argument.

page 2325

1 It is not time for closing argument.
2     THE COURT:  Sustained.
3 BY MR. MORRIS:
4 Q.   Have you gone back to look and see whether or not Wyeth
5 designed or developed the protocol for any of the case control
6 studies they say they supported?
7 A.   I've only seen proposals from those investigators, and
8 that's true, the proposals would have been the type of study to
9 be done for Wyeth to consider funding, and in that way they
10 would have had comments about it.  But --
11 Q.   Let me show you what's previously been marked as
12 Plaintiff's Exhibit No. 172.  And I don't know that this one is
13 in evidence yet.
14     THE COURT:  Is it in evidence, Ms. Johnson?
15     COURTROOM DEPUTY:  No.
16     MR. MORRIS:  Any objection?
17     MR. URBANCZYK:  No objection.
18     MR. MORRIS:  Will this be admitted, Your Honor?
19     THE COURT:  172 is admitted.
20     (Plaintiff Exhibit 172 received in evidence.)
21     MR. MORRIS:  I'd also move 1351 into evidence, the one
22 I used previously, Your Honor.
23     MR. URBANCZYK:  One second, Your Honor.
24     THE COURT:  Yes, sir.
25     MR. URBANCZYK:  No objection, Your Honor.

Page 89

page 2326

3  1        THE COURT:  Admitted.
4  2        (Plaintiff Exhibit 1351 received in evidence.)
5  3        MR. MORRIS:  Thank you, Your Honor.
6  4  BY MR. MORRIS:
7  5    Q.  I'd like to show you an August 19, 1991 memo, and this is
8  6    regarding in June 1991, an FDA advisory committee meeting is Ron
9  7    Kraus's discussion of as yet unpublished Ron Ross cancer data.
10 8    "Because of the size of the study and the credibility of U.S.C.,
11 9    when it finally is published, the data will receive a great deal
12 10   of attention.  The new data from the study suggests that the
13 11   combination of estrogen plus progestin has a higher relative
14 12   risk of breast cancer than even estrogen alone."
15 13        And then they go down and they show the numbers with regard
16 14   to ever used.  And you understand what "ever used" means, don't
17 15   you, Doctor?
18 16   A.  Correct.
19 17   Q.  "Ever used" could include people that have taken the
20 18   product for three months or six months, couldn't it?
21 19   A.  I don't know how he defined it in this study.
22 20   Q.  But it can be certainly limited to people that may have
23 21   ever used it, maybe used it for a month and got off of it for
24 22   six months, and then used it for another three months and then
25 23   stayed on it for a year and then got off of it for a year.  When
26 24   we talk about "ever used," we're talking about did they ever use
27 25   it.  Correct?

Page 90

page 2327

3  1    A.  It depends on the study.  You have to look at the specific
4  2    publication, how they defined that.  Some studies say "ever
5  3    used" means you used it for more than a certain amount of time
6  4    in your history.  But that's the concept, yes.
7  5    Q.  And in the breakdown of the Ron Ross breast cancer study
8  6    data on HRT as opposed to ERT, they list relative risks for use
9  7    of greater than seven years, less than seven years, and then
10 8    they go less than or equal to .625, and on HRT, on the
11 9    right-hand column, relative risk is 2.4.  Correct?
12 10   A.  There is one group of less than .625 estrogens in HRT, the
13 11   relative risk is listed as 2.4.  Is that the one you mean?
14 12   Q.  Right.  And then if we go down further in analyzing the
15 13   data, positive family history of breast cancer, they put 3.6.
16 14   A.  Well, yes, pointing to the fact that a family history of
17 15   breast cancer increases your risk of breast cancer.
18 16   Q.  And then if we go to the next page, they say, "We should
19 17   start discussing how to handle this now and when it finally hits
20 18   from a sales force and public relations point of view."  You see
21 19   that?
22 20   A.  Yes, I do.
23 21   Q.  Shouldn't the primary response to data that is suggesting
24 22   that your product causes breast cancer, shouldn't the primary
25 23   response be let's find out if it's true, number one, and
26 24   let's protect the women that are taking our product?  Wouldn't
27 25   that be the most reasonable approach?

Page 91

page 2328

3  1    A.  Well, let's start with this isn't a study that says it
4  2    causes breast cancer.  It's reflecting relative risks that are
5  3    consistent with the FDA's review of that exact same information
6  4    presented at that advisory committee, that's where this is from,
7  5    which went into the FDA's determination that the 1.3 to 2.0 was
8  6    an appropriate number to put in the label.
9  7    Q.  Now, did I even ask you that question?
10 8    A.  Well --
11 9    Q.  I didn't ask you that question, did I?  The question I
12 10   asked you is, wouldn't it be appropriate when you see this data
13 11   to, number one, confirm whether or not it's correct, and then
14 12   number two, to make sure you protect the women that are taking
15 13   your product?
16 14   A.  Correct.
17 15   Q.  That would be the appropriate thing to do.  Correct?
18 16   A.  Yes.
19 17   Q.  Now, when we talk about relative risks, I want to show you
20 18   the Provera label that you all had control over at the FDA.
21 19   Right up front in the Provera label is what we call a black box
22 20   warning.  Are you familiar with that?
23 21   A.  Yes, I'm familiar with black box warnings.
24 22   Q.  It is, actually, called a boxed warning.  Correct?
25 23   A.  Correct.
26 24   Q.  And the reason it's a boxed warning is to draw the
27 25   attention of the physician to the information that is provided

Page 92

page 2329

3  1    there.  Correct?
4  2    A.  Correct.
5  3    Q.  Because a boxed warning will tell the physician if this has
6  4    a serious risk of harm in a patient.  Correct?
7  5    A.  Well, the label will reflect other risks too, but black
8  6    boxes have a particular place, yes.
9  7    Q.  And if we look into this one specifically, it says, "One
10 8    study estimated a 4.7-fold increased risk of limb reduction
11 9    defects in infants exposed in utero to sex hormones."  Do you
12 10   see that?
13 11   A.  Yes.
14 12   Q.  You will agree with me that the FDA, in their negotiations
15 13   with Upjohn on this label, felt that it was appropriate and
16 14   appropriate to list a 4.7 relative risk in a pregnancy warning
17 15   as far as Provera was concerned.  Correct?
18 16   A.  Correct.
19 17   Q.  And it would be perfectly appropriate if the evidence shows
20 18   that Prempro causes a 4.99 relative risk in some women for
21 19   tubular cancer, it would be appropriate to put that in a black
22 20   box, wouldn't it?
23 21   A.  That data would be reviewed by the FDA and the FDA would
24 22   determine if a black box was appropriate.
25 23   Q.  Now, you talked about Wyeth's requirements in relationship
26 24   to Prempro, and you will agree that FDA said, "As part of our
27 25   approval of Prempro, Wyeth, you will go do a case control study

1 page 2330

2

3 1  on the issue of whether or not the combination causes breast

4 2  cancer"?

5 3  A.  I would not agree with that.

6 4  Q.  Let me show you Plaintiff's Exhibit 284.  And this is

7 5  internal correspondence from Wyeth-Ayerst, dated December 2,

8 6  1994, and it's regarding "Telephone Contact - NDA No. 20-303 -

9 7  FDA Request for Clinical Data Analysis."  And it says,

10 8  "Dr. Stadel indicated that the division would like Wyeth-Ayerst

11 9  to provide a tentative statement of intent regarding some type

12 10  of prospective breast cancer study.  And he mentioned that the

13 11  Women's Health Initiative is addressing cardiovascular effects.

14 12  But he does not believe the WHI will adequately address breast

15 13  cancer.  He indicated that although there are data from many

16 14  small case control studies, this issue has not been resolved.

17 15  He stated that he was not asking for a clinical trial, but a

18 16  population-based case control study of newly diagnosed breast

19 17  cancer."

20 18      Now, did the folks at Wyeth that wrote that memo, did they

21 19  just misunderstand their telephone conversation with the FDA as

22 20  to the willingness or the requirement that they do a case

23 21  control study?

24 22  A.  Well, this was about 18 days before they received their

25 23  letter, which exactly stated what their Phase IV commitment

26 24  should be.

27 25  Q.  All right.  Let's look at 288.  The jury's had an

1 page 2331

2

3 1  opportunity to see this one before.  Have you seen this?  This

4 2  is February 16, 1995.

5 3  A.  Yes.

6 4  Q.  And this includes the medical officer's review.  Correct?

7 5  A.  Yes.  A review in '94 and a memo, I believe, from '93.

8 6  Q.  And one of the things that the medical review officer found

9 7  on this issue was that "Even small increments in the relative

10 8  risk of breast cancer have great public health significance."

11 9  Correct?

12 10  A.  Exactly.

13 11  Q.  And that "As such, the true effect of HRT on breast cancer

14 12  incidence and mortality must be considered the single most

15 13  important safety issue concerning this class of drugs."

16 14  Correct?

17 15  A.  Correct.

18 16  Q.  And then they also state that "It is doubtful that even the

19 17  WHI/RCT has sufficient statistical power to clearly define the

20 18  relationship between HRT and breast cancer."  Correct?

21 19  A.  Correct.

22 20  Q.  And if we go back in the document, after the November

23 21  internal meeting, it says, "Wyeth-Ayerst should submit:

24 22  Analyses of breast cancer.  (A), comparisons between treatment

25 23  groups, with comment on information about breast cancer status

26 24  of dropouts as of the end of the trial and plan for the

27 25  development of a Phase IV study."  Correct?

1 page 2332

2

3 1  A.  Yes.  I don't have the document, but I believe this is in

4 2  response to an FDA request.  Yes.  You didn't give me that.

5 3  Q.  And then finally one of the things that Dr. Golden says in

6 4  her letter of 2-19-93 is that "In addition, the long-term safety

7 5  profile of combination Premarin/MPA treatment, especially

8 6  regarding breast cancer risk and cardiovascular disease, are not

9 7  available from the data here submitted.  However, the long-term

10 8  safety of the combination treatment for human use cannot be

11 9  assured based on the current submission."  Correct?

12 10  A.  Correct.

13 11  Q.  Then I'll show you a letter from January 9 of 1995 from the

14 12  FDA, Food & Drug Administration, to Wyeth-Ayerst Laboratories,

15 13  and they say, "We also refer to your previous commitment to

16 14  conduct a Phase IV study to determine whether or not concomitant

17 15  medroxyprogesterone acetate may reduce the lowest effective dose

18 16  of Premarin at bone target tissue.  We further refer to

19 17  additional Phase IV commitment made in a December 30

20 18  telefacsimile to conduct a comprehensive investigation of breast

21 19  cancer risk in users and nonusers of the NDA regimens at

22 20  appropriate and reasonable cost.  The most feasible approach

23 21  appears to be a case control study in areas of the United States

24 22  when and where the NDA regimens are used extensively."

25 23      So was the FDA not suggesting to them that they should do a

26 24  Phase IV case control study?  I mean, is this just wrong?

27 25  A.  The language is that the Phase IV commitment is to conduct

1 page 2333

2

3 1  a comprehensive investigation of breast cancer risk in users and

4 2  nonusers.  It is correct that the FDA did not believe that the

5 3  Women's Health Initiative would get off the ground and enroll

6 4  enough women to have the power that it was suggesting it would

7 5  have in its protocol for breast cancer, and they thought that

8 6  the most feasible approach with this new approval was to ask for

9 7  a case control study.  We can go through the further documents

10 8  about that discussion with the FDA, if you'd like.

11 9  Q.  And then at the conclusion of the letter, Wyeth is reminded

12 10  that their PDUFA fee is due.  Correct?

13 11  A.  The letter triggers the remaining 50 percent of the fee

14 12  assessed for this application.

15 13  Q.  Now, you know that Wyeth never did that case control study.

16 14  You'll agree with that?

17 15  A.  Correct.  We had discussions with Wyeth about potential

18 16  protocols for that, and then had a discussion --

19 17      THE COURT:  I believe you can answer that either you

20 18  did or you didn't.

21 19  A.  I'm sorry.  They did not do that study, no.

22 20  Q.  Now, just for completion sake, there's a letter from

23 21  Wyeth-Ayerst, dated November 1995, and the issue they're

24 22  addressing is "On Friday, November 3, 1995, meetings were held

25 23  with representatives from the FDA and Wyeth-Ayerst regarding

26 24  labeling revisions for Prempro and our Phase IV commitment to

27 25  conduct a case control study evaluating incidences of breast

page 2334

1 cancer." They talk about everybody that was there. And this is
2 the one where Dr. Stadel says, "The initiation of any study
3 would still be eight to nine years away." And I think that what
4 you said in direct examination is that we would have to wait
5 eight or nine years to see a proper population of these people
6 using the two drugs. You didn't mean to leave that impression,
7 did you?
8 A. I said using the fixed dose combination, the approved
9 Prempro that had been established as the appropriate regimen and
10 dose.
11 Q. You will agree with me that in performing a case control
12 study, researchers can go back and they can look at hospital and
13 medical records and pick out the people who are taking Premarin
14 at .625 and medroxyprogesterone acetate, whether it be Provera
15 or some other generic MPA, at 2.5, and they can include those
16 people in their analysis. Isn't that true?
17 A. You didn't read the whole commitment that said -- it said
18 it had to be the NDA regimen --
19 THE COURT: Just a minute. Why don't you restate the
20 question. It was a little too long.
21 MR. MORRIS: It's hard to state this shortly. I'll
22 try again and be precise.
23 THE COURT: I'll tell you what you do then is just
24 read the question. You can read it off the deal there so we can
25 get it exactly and see if you can answer it.

page 2335

1 MR. MORRIS: Your Honor, it doesn't have anything to
2 do with this particular paragraph, in terms of the question.
3 Let me ask it again. I'll try to ask it shorter.
4 THE COURT: Okay.
5 BY MR. MORRIS:
6 Q. Isn't it true that when researchers perform case control
7 studies, that they go back and they look at medical records or
8 hospital records? Isn't that true?
9 A. They can.
10 Q. And isn't it true that, in doing that, they could look back
11 at women who had taken Premarin at .625 and medroxyprogesterone
12 acetate at 2.5 and they could analyze data from that population?
13 Isn't that true?
14 A. And they did, yes.
15 Q. The answer is isn't it true they can do that, that they can
16 do that?
17 A. You mean pick out that regimen out of the 70 that were
18 being prescribed and try to find those patients?
19 Q. I understand your position in the case, Dr. Rarick, you
20 know. But we've also seen documents that suggest that hundreds
21 of thousands of women were on this product, and we've had
22 testimony that 80 percent of the prescriptions of Premarin with
23 the progestin were Premarin and Provera.
24 MR. URBANCZYK: Objection. Misstates the evidence.
25 MR. MORRIS: That does not misstate the evidence.

page 2336

1 It's in the record.
2 THE COURT: Whoa, whoa, whoa. All right. I'm going
3 to ask this question, and if you can't answer it yes or no, tell
4 me.
5 THE WITNESS: Okay.
6 THE COURT: I'm just quoting the question. I don't
7 ask questions myself. The question was posed: "And isn't it
8 true that, in doing that, they could look back at women who had
9 taken Premarin at .625 and medroxyprogesterone acetate at 2.5
10 and they could analyze data from that population? Isn't that
11 true?" Can you answer that yes or no?
12 THE WITNESS: I cannot answer it the way it is asked.
13 THE COURT: You cannot?
14 THE WITNESS: No.
15 THE COURT: Okay.
16 BY MR. MORRIS:
17 Q. Let me ask you the question this way. Isn't it true those
18 researchers can go back and they can look at women's records who
19 were taking .625 of Premarin and 2.5 of medroxyprogesterone
20 acetate, look at how long they were taking it and find out if
21 they had any health consequences as a result? Isn't that true?
22 A. If you'd like me to explain why I can't answer that
23 question, it would help.
24 Q. That's all right.
25 A. Okay.

page 2337

1 Q. Let's just be clear. You've testified live in court in
2 cases involving Vioxx on behalf of Merck, haven't you?
3 A. Yes, I've testified to regulatory aspects of the Vioxx
4 story, yes.
5 Q. In the Vioxx story, you were testifying on behalf of Merck,
6 and you were telling juries like this one that Merck didn't do
7 anything wrong in the Vioxx litigation. Isn't that true?
8 A. I don't know what you mean by "do anything wrong." I
9 haven't found a perfect organization yet. Again, my testimony
10 there was very specific about specific regulatory aspects of
11 Merck and FDA's dealings.
12 Q. And your testimony was to the jury that Merck did not
13 violate any of the FDA standards or any of the FDA rules. Isn't
14 that true?
15 A. My testimony was, from my review, Merck was compliant with
16 the FDA regulations, yes.
17 Q. Then I'll show you this letter from Wyeth-Ayerst to the
18 Food & Drug Administration, August 24, 1995, and this is
19 regarding the Phase IV commitment from the case control study,
20 and they even included a protocol synopsis to the FDA, didn't
21 they?
22 A. Yes. This was the topic of the discussion in that November
23 meeting.
24 Q. And in your review of the documents, you have not found any
25 such letter where Wyeth proposed a protocol synopsis to the FDA

1 page 2338

2

3  1  of a study of the combination on breast cancer in the 1970s or

4  2  the 1980s.  Isn't that true?

5  3  A.  No, those type of studies weren't done under an IND.

6  4  Q.  I'll show you what's previously been marked as 345.  This

7  5  is a confidential memorandum from March 27, 1996, between Wyeth

8  6  employees and their public relations company.  And this is

9  7  regarding some Cummings data that was going to be released.

10  8  You're familiar with the Cummings data?

11  9  A.  Yes.  It was about bone mineral density.

12 10  Q.  One of the concerns was that the Cummings data was going to

13 11  suggest that the breast cancer risk had been underestimated.

14 12  You've seen documents that say that, haven't you?

15 13  A.  Yes, I've seen the abstract and the paper.

16 14  Q.  And Wyeth's response to this, their goal was to "Balance

17 15  anticipated negative coverage by casting doubt on the validity

18 16  and the value of the study, emphasizing its aberrant results

19 17  relative to other ERT/breast cancer study results."  Correct?

20 18  A.  The beginning where you said this was Wyeth's goal is

21 19  incorrect.  This was their discussion with an outside firm, I

22 20  believe as you described it.

23 21  Q.  And the jury has seen documents involving this same man,

24 22  Mr. Buchalter, and this same company, from 1994, from later in

25 23  1995.  In fact, I'll show you one, if you'd like to see it.

26 24  Here's a December 1, 1994 Consultants Medical Examination

27 25  meeting between Jeff Buchalter -- have you seen this document

1 page 2339

2

3  1  before?

4  2  A.  Yes, I have.

5  3  Q.  And this is the one where if we turn back here, talking

6  4  about who they're going to invite to speak at the consultants

7  5  meeting, somebody had the lame brained idea of inviting an

8  6  oncologist, and they said "No."  And down here, "No way having

9  7  an oncologist chair this.  No, no, no, no, no."  Are you

10  8  familiar with that?

11  9  A.  Yes, I've reviewed this entire document, and the meeting

12 10  was not about oncology.

13 11  Q.  They just used that word, it was just a mistake?

14 12  A.  I'm sorry.  The issue was having an oncologist chair a GYN

15 13  meeting, I believe.

16 14  Q.  Well, that's the point though.  OB/GYNs need to know

17 15  whether or not the product they're prescribing causes cancer,

18 16  don't they?

19 17  A.  It doesn't say they're not going to discuss risks.  It says

20 18  they don't want an oncologist chair it.  It's neither here nor

21 19  there.

22 20  Q.  Yes, it is here nor there.  If we're going to discuss

23 21  whether or not something causes cancer, the appropriate person

24 22  to render that opinion is an oncologist.  You'll agree with

25 23  that.  Correct?

26 24  A.  I believe if the agenda was about oncology, they would have

27 25  invited presenters who were oncologists, absolutely.

1 page 2340

2

3  1  Q.  You'll agree with me -- you're an OB/GYN.  You don't

4  2  diagnose and treat cancer conditions, do you?

5  3  A.  It depends if they're cancers of the reproductive tract,

6  4  such as ovarian and endometrial and fallopian tube or cervical

7  5  or vaginal.  So certainly gynecologists treat cancer.

8  6  Q.  You're not an oncologist, are you?

9  7  A.  No, I'm not an oncologist.  No.

10  8  Q.  No one would go to you, an OB/GYN, if they had cancer and

11  9  they needed treatment.  They would go to an oncologist.  Isn't

12 10  that true?

13 11  A.  That's not at all true.  There are GYN oncologists that

14 12  have specialty training, and almost every general OB/GYN

15 13  diagnose and treat endometrial cancer, ovarian cancer, cervical

16 14  cancer, vaginal cancer, vulvar cancer.

17 15  Q.  Have you ever treated breast cancer?

18 16  A.  Well, there used to be some generalists that would diagnose

19 17  and do the biopsies, yes, and then they would refer them to

20 18  breast cancer specialists.

21 19  Q.  It would be a breach of the standard of care for an OB/GYN

22 20  to go perform breast surgery on a woman who had breast cancer,

23 21  wouldn't it?

24 22  A.  Oh, I don't think that would be considered a breach.  It is

25 23  not the standard currently.

26 24  Q.  Now, it also says, "Our current objective is in keeping

27 25  with previous negative breast cancer data:  To focus our efforts

1 page 2341

2

3  1  on balancing story copy."  Now, here they're suggesting that

4  2  there was a previous -- "Our current objective is in keeping

5  3  with previous negative breast cancer data:  To focus our efforts

6  4  on balancing story copy."  Would you agree with me that this at

7  5  least suggests, this memo, that in the past, the way that Wyeth

8  6  has approached negative breast cancer data is rather than study

9  7  it, rather than go out and do their own tests, is just see what

10  8  they can do to balance it in the media so that people remain

11  9  confused?  Isn't that true?

12 10  A.  Again, this is the public relations concepts and goals.

13 11  Wyeth-Ayerst did not do that.  I mean, I should say they

14 12  certainly focused and balanced information, but they didn't do

15 13  the things that were suggested in this memo.

16 14  Q.  It says, "Dismissive Strategy.  To downplay the value of

17 15  the study by dismissing its contribution to the literature."

18 16  See that?

19 17  A.  Correct.

20 18  Q.  So one way that they can do that is to leave the Cummings

21 19  study and any data out of whatever they send out to OB/GYNs

22 20  about whether or not there's breast cancer risks, they can just

23 21  leave it out, couldn't they?

24 22  A.  I don't know if that would be one option, but I know that

25 23  they invited Cummings to speak to them, and this publication was

26 24  published.  They didn't somehow hold that up, if that's what

27 25  you're suggesting.

page 2342

1 Q. And another thing that they do is they go to third-party
2 organizations, see if they can get some help from there. Down
3 here under "Dismissive Strategy - Track 1 tactics. Select
4 third-party group statements, specifically ACOG, AMWA, NAMS,
5 WHI." They want to select specific statements from those
6 organizations that refute Cummings. Isn't that true?
7 A. The public relations firm is suggesting this to Wyeth,
8 correct.
9 Q. "Dupont breast cancer data white paper." That was
10 something they suggested. Correct?
11 A. Correct.
12 Q. And that was something Wyeth did, the jury's seen the
13 document from 2000 where they used the Dupont information.
14 You're aware of that, aren't you?
15 A. I don't know exactly which document you're referring to.
16 Q. "Letter to science/medical/trade journalists, setting the
17 record straight for estrogen. Press release expressing
18 Wyeth-Ayerst's position aggressively. Third-party statements
19 provided proactively." Would it be appropriate for them in
20 managing the press to contact a company like DesignWrite,
21 prepare an outline for DesignWrite, have them send it out to an
22 author to develop a manuscript, and then publish that manuscript
23 without disclosing that Wyeth was behind it? Would that be
24 appropriate?
25 A. Are you asking about these bullets?

page 2343

1 Q. No, I'm asking about ghostwriting. Would it be appropriate
2 for them to do that?
3 A. I'm sorry. I was concentrating on the memo you were
4 showing me. And now you're asking me about a different topic?
5 Q. It says journals, talks about journals there, publishing
6 things in journals.
7 A. If you could show that one to me again, I would be happy to
8 answer it.
9 Q. Just can you answer my question? Would it be appropriate
10 for them to contact third-party organizations like DesignWrite,
11 have them draft a manuscript and find an author, publish it in
12 peer-reviewed journals without disclosing that Wyeth was behind
13 the original idea? Would that be appropriate, from the FDA
14 standpoint?
15 A. I'm sorry. I keep getting mixed up with the bullet you
16 showed me, but I can respond to that now.
17 The idea of hiring third-party professional writers and
18 asking authors to sign those and asking those authors to be
19 responsible for their content is very common practice.
20 Q. It's not a good practice, is it, Dr. Rarick? Because if
21 you're an OB/GYN out there like Dr. Kuperman who relies on the
22 Journal of Obstetrics and Gynecology, and he said that in his
23 testimony, that he relies on that specific -- I think I've got
24 it here. Let me show it to you. Dr. Kuperman testified when I
25 asked him, "What would you have relied upon? What else would

page 2344

1 you rely on in terms of information sources to properly counsel
2 your patients?" And he says, "Information from the American
3 College of Obstetrics and Gynecology." Then he says, "Journals
4 in my profession, such as Gynecology and Obstetrics, as well as
5 the American Journal of Obstetrics and Gynecology."
6 Now, if Wyeth has not disclosed as having involvement in
7 the articles that appear in these journals, then Dr. Kuperman
8 would not be able to weigh whether or not there's a bias in the
9 article in favor of Wyeth's position, would he?
10 A. Oh, I believe journals have rules about providing financial
11 interest information. Every journal has different rules. I
12 believe the American Journal, that the author who signed that
13 paper would have to describe their financial interests,
14 according to their rules.
15 Q. Well, the fact of the matter is, if the people at the
16 journal are not told by DesignWrite that Wyeth was behind it,
17 they'd never know, would they?
18 A. The authors are expected to submit the manuscripts,
19 correct.
20 Q. Lastly, you testified that you were the liaison to the
21 American College of Obstetricians and Gynecologists for the FDA.
22 Correct?
23 A. I was one. There was a liaison for the obstetrics
24 committee, and I was the liaison for the GYN practice committee.
25 Q. When you were working at the FDA, were you aware of the

page 2345

1 amount of funding that Wyeth provided to ACOG every year?
2 A. As I described, the FDA doesn't have regulations about
3 unrestricted grants.
4 Q. Well --
5 A. So, no, the FDA doesn't keep track of that information.
6 Q. Let me show you this document. This is Plaintiff's
7 Exhibit 1419.
8 THE COURT: Just a minute. My Ouija board is not
9 working. We'll take care of it at the break.
10 BY MR. MORRIS:
11 Q. This is Exhibit No. 1419. And we know in 1999 that Wyeth
12 received a finance committee authorization for $250,000 for the
13 upcoming annual meeting of ACOG in Philadelphia. Were you aware
14 of that?
15 A. Yes. Many companies submit, or provide money to ACOG for
16 their large annual clinical meeting each year.
17 Q. Is there any pharmaceutical company that is a greater
18 financial contributor to ACOG than Wyeth?
19 A. I don't know.
20 Q. The answer to that is "no."
21 A. I don't know where you're getting that data.
22 Q. With regard to the next, it says, "These preliminary funds
23 will be needed to preempt our competitors, such as" --
24 MR. URBANCZYK: I just read the transcript, Your
25 Honor. I'm sorry. May I approach the bench?

page 2346

1    (Bench conference reported as follows:)
2        MR. URBANCZYK:  Mr. Morris asked Dr. Rarick whether
3    Wyeth was the largest contributor.  She said, "I don't know."
4    Mr. Morris then said, "The answer to that question is 'no.'"  I
5    move to strike that.  I would say that you admonish Mr. Morris.  This
6    is the same kind of tactics that the plaintiffs employed out in
7    Nevada.  They are the testifier.  That is inappropriate conduct
8    and I'd ask it be stricken.
9        THE COURT:  That is.  You shouldn't have said that,
10   and I'm going to strike it.
11       How much more cross do you have?
12       MR. MORRIS:  Two minutes.
13       MR. URBANCZYK:  She's doing a good job being
14   responsive.
15       THE COURT:  Being nonresponsive.  You know, if she's
16   going to be there much longer, I'm fixing to ask her to have
17   another session with you.  I know how to stop her from doing
18   that, but I don't want to.
19       MR. URBANCZYK:  She said "I don't know" to that
20   question.
21       THE COURT:  She did all right on that one.  She is an
22   advocate.  But I don't want to -- I hate like heck to scold a
23   witness, but if she's not going to be there much longer, I'm not
24   going to have you talk to her about it.
25       (Whereupon, proceedings continued in open court as

page 2347

1    follows:)
2        THE COURT:  Just a minute.  Disregard the last
3    question and answer, please, ladies and gentlemen of the jury.
4    BY MR. MORRIS:
5    Q.  Were you aware when you were acting as the liaison to ACOG
6    at FDA that Wyeth was contributing large sums of money to them
7    every year?
8    A.  I'm aware that many companies contributed to the annual
9    clinical meeting.
10   Q.  And you understand that one of the things that they do at
11   these meetings is they sponsor educational programs which would
12   be of educational benefit to the physicians, and a doctor like
13   Dr. Kuperman, who is an OB/GYN, member of ACOG, he might be at
14   that meeting.  Correct?
15   A.  Yes.
16   Q.  And so he's getting fed at least some amount of information
17   from Wyeth.  Correct?
18   A.  From ACOG you mean?
19   Q.  Well, from ACOG.
20   A.  From ACOG, yes.
21   Q.  And it says, "These sponsored educational programs would be
22   of educational benefit to the physicians, help ACOG to make the
23   first ever annual clinical meeting a great success, and help our
24   company with the opinion leaders as well as the practicing
25   OB/GYNs."  Correct?

page 2348

1    A.  That's what that says, yes.
2    Q.  Are you familiar with the Million Women study?
3    A.  Yes.
4    Q.  And with regard to the Million Women study, you will agree
5    that data derived from the Million Women study was reliable and
6    helpful in terms of our understanding of issues regarding these
7    products?
8    A.  I think it is what it is and provided information as
9    published.
10   Q.  And you realize that Wyeth has relied on the Million Women
11   study in the past?
12   A.  I'm not sure what you're referring to.  Can you show me?
13   Q.  Yeah, I'll show you in just a second.  Yesterday in the
14   courtroom, one of Wyeth's witnesses testified that the Million
15   Women study had lots of flaws, was unreliable, and that it just,
16   basically, wasn't a good study.  Do you agree with that?
17   A.  Well, I think it had a lot of issues in terms of its
18   design.  As I guess you already know, it was a large survey type
19   of study in many women around the world, I believe mostly in the
20   U.K., if I recall, and Europe.  And, again, the design flaws
21   were simply that they weren't asked very often about their
22   hormone use.  I think they were asked at the beginning of the
23   survey.  Then they were followed for a certain amount of time to
24   look for breast cancer.  Again, the kinds of things that you
25   would be concerned about from that study is whether the people

page 2349

1    were reporting appropriately the products they were using.  Of
2    course, for the U.S., many of the products that were being used
3    in the Million Women study aren't approved here.  There was a
4    large group of --
5        THE COURT:  I believe that's enough on that point.
6    Next question.
7        THE WITNESS:  I'm sorry.  He asked me about the flaws.
8    BY MR. MORRIS:
9    Q.  I'd like to show you Exhibit 10438.
10       MR. URBANCZYK:  It has not been identified before.
11       MR. MORRIS:  It's on the long list.  Correct?
12       MR. URBANCZYK:  I don't know.  Hang on a second,
13   Mr. Morris.
14       Your Honor, we have an Exhibit 10438, which is not this
15   one.
16       THE COURT:  Why don't you all meet and confer right
17   there and see what the deal is.  If you can't work it out, we'll
18   have a bench conference.
19       MR. URBANCZYK:  We've got to get the right number.  I
20   don't have an objection to the use of the document, as long as
21   it's properly numbered, and we'll get that taken care of outside
22   the presence of the jury.
23       THE COURT:  That's a responsibility of yours in
24   getting that taken care of.
25       MR. URBANCZYK:  Mine, Your Honor?

page 2350

```
 1       MR. MORRIS:  10438, Your Honor.
 2       THE COURT:  10438 for the time being, at least until
 3  --
 4       THE WITNESS:  I was handed two.
 5       MR. MORRIS:  10438-A, and the next one is 10439-A.  I
 6  believe that's also been tendered.
 7       MR. URBANCZYK:  Right.
 8       MR. MORRIS:  Any objection?
 9       MR. URBANCZYK:  No.
10       THE COURT:  Both are admitted.
11       (Plaintiff Exhibits 10438-A and 10439-A received in
12  evidence.)
13       MR. MORRIS:  Thank you, Your Honor.
14  BY MR. MORRIS:
15  Q.  10438-A is a Medical Affairs Information Letter concerning
16  Premarin, dated June 2004.  Correct?
17  A.  Correct.
18  Q.  And one of the things that they do with these Medical
19  Affairs Information Letters is they report from time to time to
20  their staff people, Zone Six, Zone Seven, Zone Eight, Zone Nine,
21  also I guess to some of these other organizations, results of
22  studies.  Correct?
23  A.  That looks like what this is, yes.
24  Q.  And one of the authors of this study was Valerie Beral and
25  Gillian Reeves for the Million Women study collaborators.
```

page 2351

```
 1  Correct?
 2  A.  Correct.
 3  Q.  And on the article summary, it says, "The Million Women
 4  study is an observational study designed primarily to
 5  investigate the health outcome of ET/HT in over a million women
 6  in the United Kingdom."  Is that what it says?
 7  A.  That's what it says.
 8  Q.  And then if we go to the next page, it goes to the
 9  conclusion, it states, "In the Million Women study, a
10  significant reduction in the risk of fracture was observed in
11  the postmenopausal women receiving ET/HT.  These data further
12  support the ET and HT findings of the Women's Health Initiative.
13  In these two studies, reduction in clinical hip, vertebral,
14  and total osteoporotic fractures was demonstrated in healthy
15  postmenopausal women receiving ET and HT."  And then they list
16  the references.  Correct?
17  A.  Correct.
18  Q.  So in telling their staff people about the favorable
19  results of the Million Women study as to osteoporotic issues, no
20  one in this M.A.I.L. sets forth all the flaws of the Million
21  Women study, do they?
22  A.  No, it's not described in detail.
23  Q.  And that's the same thing that is confirmed in 10439-A,
24  correct, fracture data?
25  A.  Yes, this is about the fracture data from a published
```

page 2352

```
 1  report.
 2  Q.  And finally I want to show you what has previously been
 3  marked as Plaintiff's Exhibit No. 386, and this is from the
 4  Department of Health & Human Services, the Food & Drug
 5  Administration, and it's signed off by you.  Correct?
 6  A.  Yes, correct.
 7  Q.  And it says, "We have completed review of your submission
 8  and conclude that your support for these prospective studies
 9  will fulfill this Phase IV commitment, and that conduct of the
10  previously discussed case control study is not necessary."  Did
11  I read that correctly?
12  A.  Yes, you did.
13  Q.  And the studies that you were talking about in terms of
14  their support were the Women's Health Initiative and the Women's
15  International Study of Long-Duration Estrogen After Menopause.
16  Right?
17  A.  Correct.
18  Q.  You will agree that the Women's Health Initiative was a
19  National Institute of Health study.  Correct?
20  A.  Yes, with support from Wyeth.
21  Q.  How much did the Women's Health Initiative cost?
22  A.  I don't know about the cost, but the support was for the
23  IND reference and the provision of pills and placebo.
24       THE COURT:  All he asked about was the cost.
25       THE WITNESS:  I couldn't tell you the exact cost of
```

page 2353

```
 1  the entire trial.
 2  BY MR. MORRIS:
 3  Q.  Would you quibble with the $700 million figure that has
 4  been proved in this court?
 5  A.  I just can't answer that question.
 6  Q.  And if Wyeth's contribution of Prempro by giving the pills
 7  and the placebos to the trial was 2- or $3 million, that would
 8  be a fraction of the 700 million.  Correct?
 9  A.  Financial support, yes.
10  Q.  And they didn't design the protocol for the WHI, did they?
11  Wyeth did not design the protocol.  Isn't that true?
12  A.  I believe they had input into the protocol, just as the FDA
13  did.
14  Q.  As far as any documents, you don't have any documents to
15  show this jury that show that Wyeth helped design the protocol
16  for the WHI, do you?
17  A.  As I recall from the FDA's review of comments on that
18  protocol, there were revisions suggested by Wyeth, but I'd have
19  to -- I don't know if -- I can't think of a document off the top
20  of my head.
21  Q.  The NIH paid for the WHI with taxpayer dollars because
22  they're a governmental entity, aren't they?
23  A.  Yes, the NIH is funded by the taxpayers.
24  Q.  So our taxpayer dollars were required to conduct a study
25  that Wyeth could have done, by their own admission, in the '70s,
```

1 page 2354

2

3 1  the '80s, and the '90s.  Isn't that true?

4 2  A.  Oh, no, we've all agreed that trial could not have been

5 3  done earlier.  Your expert agreed.

6 4  Q.  We haven't all agreed to that.

7 5  A.  Dr. Parisian agreed.

8 6  Q.  Dr. Parisian, her whole testimony will be looked at again

9 7  carefully by this jury.  The fact of the matter is, the evidence

10 8  in this case shows that in the 1970s, as we've already looked at

11 9  --

12 10       THE COURT:  Is this a question?

13 11       MR. MORRIS:  Yes, sir.

14 12  BY MR. MORRIS:

15 13  Q.  You're not going to retract your prior testimony that in

16 14  1978, Wyeth proposed doing a clinical trial in their own

17 15  memorandums concerning the combination of these drugs and breast

18 16  cancer?  You're not going to retract that, are you?

19 17  A.  My testimony was they were suggesting a tissue study of

20 18  estrogen sensitivity.

21 19  Q.  You weren't there in 1978, were you?

22 20  A.  You showed me the memo, sir.

23 21  Q.  You weren't there in 1978, were you?

24 22  A.  No, I simply reviewed the record.

25 23  Q.  And you'll agree that as of the time that the Women's

26 24  Health Initiative results came in early in 2002, that Wyeth

27 25  itself had never designed or come up with a protocol for a

1 page 2355

2

3 1  randomly controlled trial that had a specific endpoint the

4 2  question of whether or not the combination causes breast cancer.

5 3  Isn't that true?

6 4  A.  In a randomized controlled trial, correct.

7 5  Q.  For that matter, neither had Upjohn.  Correct?

8 6  A.  Correct.

9 7  Q.  The Women's Health Initiative results came in in July

10 8  of 2002.  Correct?

11 9  A.  The preliminary information was available in July of 2002,

12 10  yes.

13 11  Q.  And all the speculation that had occurred prior to 2002

14 12  that this product would be beneficial for the heart and

15 13  beneficial for Alzheimer's, all of that was disproved by the

16 14  WHI.  Isn't that true?

17 15  A.  I wouldn't say it was disproved, but, no, the WHI did not

18 16  show the expected cardiovascular prevention -- reduction of

19 17  risk.

20 18  Q.  And the truth of the matter is, at least according to the

21 19  FDA documents, they didn't think WHI was strongly powered enough

22 20  to give any specific data on the breast cancer issue.  Isn't

23 21  that true?

24 22  A.  I think that's a mischaracterization of those statements.

25 23  Q.  But the fact of the matter is, when WHI came back, it

26 24  showed a statistically significant increased risk of breast

27 25  cancer in women that were taking the product.  Correct?

1 page 2356

2

3 1  A.  As predicted, yes.

4 2  Q.  And with regard to the subgroup numbers, when we look

5 3  beyond the intent-to-treat population and look at the women that

6 4  were specifically on the product, the subgroup numbers showed

7 5  that over five years, the risk is 3.56.  Isn't that true?

8 6  A.  You're talking about the Anderson publication in those

9 7  trials?

10 8  Q.  And Chlebowksi.  Both of them used that number.

11 9  A.  That's a subgroup analysis.  We can debate whether that's a

12 10  placebo effect issue.

13 11  Q.  They reported the 3.56, didn't they?

14 12  A.  Correct, in that paper, yes.

15 13       MR. MORRIS:  Pass the witness.

16 14       THE COURT:  Anybody need a break now?

17 15       REDIRECT EXAMINATION

18 16  BY MR. URBANCZYK:

19 17  Q.  Let's recover several points, Dr. Rarick.  Just so the

20 18  record is clear, the Prem-Pak trial, which was begun in 1983,

21 19  involved what dose?  Do you recall?

22 20  A.  The Prem-Pak trial was a study of 1.25 milligrams of the

23 21  Premarin component, and I believe --

24 22       THE COURT:  Ma'am, hold it just a minute.

25 23  (Court confers with law clerk.)

26 24       THE COURT:  Excuse me.  Go ahead.

27 25       THE WITNESS:  And in combination with a ten-milligram

1 page 2357

2

3 1  MPA dose given cyclically for, I believe, 14, 15 days each

4 2  cycle.

5 3  BY MR. URBANCZYK:

6 4  Q.  And that study was terminated after mutual agreement

7 5  between FDA and Wyeth in 1988.  Correct?

8 6  A.  Correct.  You want me to explain that?

9 7  Q.  Why was it terminated?

10 8  A.  Sure.  As you saw, they started that study after

11 9  discussions with the FDA about the protocol.  In 1983, they

12 10  attempted to enroll that study.  During that trial period, the

13 11  Lindsay study was published that showed .625 milligrams was an

14 12  appropriate dose for long-term use.  So, first, the dose being

15 13  prescribed in that study at 1.25 was not the correct dose.  We

16 14  also saw that practitioners were beginning to prescribe even

17 15  less of the MPA component also.  We had lots of discussions --

18 16       THE COURT:  Just a little slower, little slower,

19 17  please.

20 18  A.  I'm sorry.  These trials were very difficult to perform

21 19  also because of the FDA's requirement for multiple endometrial

22 20  biopsies.  And you probably haven't had a discussion about what

23 21  that entails, but especially in the '80s, before a newer

24 22  technology came along, these were very uncomfortable procedures,

25 23  for women to have tissue removed from their endometrium.  It was

26 24  a very difficult study to recruit.  After discussions with the

27 25  FDA, changing the dose to .625 milligrams for chronic use,

page 2358

3 1   changing the dose of the MPA, and also allowing for the newer
4 2   technology for biopsies, it allowed Wyeth to do the study called
5 3   Prempro pivotal trial.
6 4   Q.   You've been asked about a couple of different advisory
7 5   committees, and I think Mr. Morris misspoke when he said you and
8 6   I had discussed the 1990 advisory committee.  We were discussing
9 7   the June '91.
10 8   A.   That's correct.
11 9   Q.   But with respect to the 1990 advisory committee where the
12 10  advisory committee reported that there was insufficient data at
13 11  that point to evaluate breast cancer with E plus P, you said you
14 12  wanted to explain that, and Mr. Morris said I could give you an
15 13  opportunity.  What did you mean by that?
16 14  A.   Again, and even when you look at the '91 results, the
17 15  advisory committee and the FDA and the presenters at that
18 16  committee meeting are there to discuss for an entire day all the
19 17  information that's known, all the case control studies, any
20 18  other kinds of studies that are available, and then the
21 19  committees are asked specific questions, as you saw.  When the
22 20  FDA asked the question, "Are there sufficient data?", and the
23 21  committee answered, "There is insufficient data," I mean, I was
24 22  there, I remember the discussions.  It wasn't that there was no
25 23  data.  There was a whole day's discussion of data.  The question
26 24  about --
27 25          THE COURT:  Slower.

page 2359

3 1   A.   The answer that the data is insufficient involved the fact
4 2   that since the risk, if it was there, was so small to have
5 3   increased over estrogen alone in this example, that some studies
6 4   showed a small increase, some studies and hypotheses said it
7 5   should prevent breast cancer, and the committee felt that there
8 6   was insufficient data to say definitively what the risk of the
9 7   additional P was.
10 8   Q.   In connection with that advisory committee, Dr. Rarick, I
11 9   think the jury has already seen Defense Exhibit 175.  And I'd
12 10  just like to remind you, you've seen this document too, as well,
13 11  have you not?
14 12  A.   Yes, I have.
15 13  Q.   This is a letter from Wyeth to Dr. Corfman, and it is
16 14  regarding the upcoming February 1, 1990 advisory committee.
17 15  A.   Correct.
18 16  Q.   And what is this document?
19 17  A.   This is a document that's a review of the literature
20 18  published since 1976.  They'd previously submitted a report in
21 19  the '70s of a similar review between the -- examining the
22 20  possible relationship between breast --
23 21          THE COURT:  A tad slower, if you will, please.  Get
24 22  deep breaths.
25 23  A.   -- examining the possible relationship between breast
26 24  cancer and hormone replacement therapy.
27 25  Q.   Was Wyeth providing to the FDA a review of the worldwide

page 2360

3 1   literature on breast cancer?
4 2   A.   Correct.
5 3   Q.   Wyeth wasn't trying to hide that literature, was it?
6 4   A.   Correct.
7 5   Q.   And were there studies that the FDA considered at that
8 6   advisory committee in 1990?
9 7   A.   Yes.
10 8   Q.   And by 1991, when the advisory committees met again to
11 9   discuss E and P, had there been more studies done?
12 10  A.   Yes, there had, and there would be another submission of
13 11  material to review.
14 12  Q.   What did the FDA conclude in 1991?  What did the advisory
15 13  committee conclude in 1991 with respect to the overall
16 14  risk-benefit of E and P therapy in postmenopausal women?
17 15  A.   They were specifically asked if there were adequate data to
18 16  know about the risks and benefits of the combination, and they
19 17  said, yes, there was sufficient information to make that
20 18  risk-benefit decision.
21 19  Q.   And then in 1994, when Dr. Golden approved Prempro, was
22 20  there even more breast cancer data?
23 21  A.   Right.  When Dr. Golden recommended approval and Dr. Sobel
24 22  approved it, she reviewed the information again.
25 23  Q.   And did Dr. Golden cite studies that had been published
26 24  after the 1990 advisory committee hearing relating specifically
27 25  to estrogen plus progestin and breast cancer?

page 2361

3 1   A.   Yes, she does.
4 2   Q.   And was one of those the meta-analysis that Wyeth
5 3   supported, done by Dr. Colditz in 1993?
6 4   A.   Correct.
7 5   Q.   You've been asked about whether Wyeth designed a study for
8 6   the purpose of examining breast cancer.  I just want to make
9 7   sure we're all clear about this.  Can a randomized control trial
10 8   be designed principally to examine breast cancer?
11 9   A.   No.  It's designed for discovering effectiveness and then
12 10  all safety needs to be looked at in a randomized controlled
13 11  study.  You wouldn't want to miss there was another risk that
14 12  you simply missed because you didn't write it in as the primary
15 13  outcome.
16 14  Q.   Was breast cancer examined as a safety outcome in every
17 15  randomized controlled trial that Wyeth wrote and conducted?
18 16  A.   Yes.
19 17  Q.   And is there any of those randomized controlled trials that
20 18  lasted longer than five -- that was a long-term study of more
21 19  than five years?
22 20  A.   Yes.  That would be the HERS study.  There was a HERS I and
23 21  a HERS II, and I believe the total use was around an average of
24 22  6.7 years.
25 23  Q.   And there were breast cancer results published in
26 24  peer-reviewed literature from that study.  Correct?
27 25  A.   Oh, yes.  There were mammogram findings from that study, as

page 2362

1 well as breast cancer collection and description.

2 Q.   And that was a study that Wyeth conducted.   Is that not so?

3 A.   That is correct.

4 Q.   And they didn't personally conduct it, but it was their

5 study.   Correct?

6 A.   Correct, that was their study.

7 Q.   Mr. Morris showed you a document, Plaintiff's Exhibit 172,

8 which was a discussion about, I guess, Dr. Ross's, or somebody's

9 testimony at the advisory committee hearing in 1991.   Correct?

10 A.   Correct.

11 Q.   I couldn't help but notice that Dr. Ross says that for

12 users greater than seven years with ERT, the risk was 1.3.

13 Correct?

14 A.   Correct.

15 Q.   And that is consistent with the Prempro label.   Correct?

16 A.   Correct.

17 Q.   And with combination hormone therapy, he says with use

18 greater than seven years, the relative risk is 1.24.

19 A.   Correct.

20 Q.   And that was in 1991.   Correct?

21 A.   Correct.

22 Q.   And that's what the WHI confirmed, is it not?

23 A.   Yes, it is.

24 Q.   Now, Mr. Morris asked you about Wyeth's Phase IV

25 commitment, and I just want to make sure we're all on the same

page 2363

1 page on this.   Dr. Stadel asked Wyeth to give a statement of

2 intent about supporting breast cancer studies.

3 A.   Correct.

4 Q.   And I think we've had marked, previously marked, but if

5 not, I'll identify it as Defense Exhibit 428, which is a

6 December 15 letter from Wyeth to Dr. Sobel, which, in part,

7 addresses that intent statement, does it not?

8 A.   Correct.

9 Q.   You've reviewed this document?

10 A.   Yes.   This is how Phase IV commitments are discussed.

11       MR. URBANCZYK:   I would like to move this in evidence,

12 Your Honor, if it hasn't been.

13       MR. MORRIS:   No objection, Your Honor.

14       THE COURT:   What's the number?

15       MR. URBANCZYK:   Exhibit 428.

16       THE COURT:   Admitted.

17       (Defendant Wyeth Exhibit 428 received in evidence.)

18 BY MR. URBANCZYK:

19 Q.   I'd like to address and see if you can read this to the

20 jury, please, page two of this document.

21 A.   Can you move it down a little ways?

22 Q.   Yes, I can.   I'm sorry.

23 A.   So this is a letter two weeks after that telephone

24 conversation in December.   "In addition, based on the

25 teleconference with Dr. Stadel on November 22, it is our

page 2364

1 understanding that the division wishes a statement of intent

2 regarding Wyeth-Ayerst's efforts to explore the issue of breast

3 cancer with the use of combination hormone replacement therapy

4 (HRT)."   Shall I continue?

5 Q.   Yes, please.

6 A.   "As you know, Wyeth-Ayerst is committed to the support of

7 research in women's health, including that related to the

8 advancement of health in postmenopausal women.   As part of that

9 commitment, Wyeth-Ayerst is currently supporting two large

10 multicenter research programs:   HERS and the lower dose

11 Premarin/MPA program.   We certainly recognize that breast cancer

12 is a significant risk for postmenopausal women, and acknowledge

13 that analyses of epidemiological data have yielded conflicting

14 results with regard to that risk in women using hormone

15 replacement therapy.   Therefore, Wyeth-Ayerst has and continues

16 to support research studies addressing this issue.

17 Specifically, Wyeth-Ayerst has made a major commitment to the

18 Women's Health Initiative study.   This study has both

19 observational and clinical components designed to, in a

20 significant way, address concerns related to breast cancer.

21 Additionally, we are a contributor to another major study

22 providing data from a large cohort of women, the Nurses' Health

23 Study.   This study also significantly contributes to the

24 understanding of breast cancer risk in postmenopausal women

25 receiving HRT.   We would be pleased to meet with FDA to discuss

page 2365

1 ways in which we may work together in a joint continuing effort

2 to support research in this important area, particularly with

3 regard to combination hormone replacement therapy."

4 Q.   Is this the statement and commitment of a responsible

5 pharmaceutical company to the FDA, do you believe?

6 A.   Yes.

7 Q.   And was there an agreement with the FDA 15 days later to

8 conduct a study regarding breast cancer and Prempro?

9 A.   Correct.   We've read that Phase IV commitment and

10 comprehensive study of breast cancer.

11 Q.   And at the time in 1994, the FDA had expressed some doubt

12 about whether WHI would have enough power to yield the answers

13 to that question.   Correct?

14 A.   Correct.

15 Q.   And when you say "power," what does that mean?

16 A.   Sure.   The Women's Health Initiative, when it was designed,

17 those investigators published a paper saying that they were

18 looking at numbers of women to try to rule out a relative risk

19 of 1.3 for breast cancer.   They felt that the Women's Health

20 Initiative, if they could perform it in the numbers they were

21 suggesting, would be able to answer that question of a possible

22 1.3 increased risk.   What I'm saying about the FDA and the

23 comments about the WHI, is not that they -- if those numbers

24 really worked out that the NIH was able to actually perform this

25 study, they would agree that they could rule out that risk of

Page 129

page 2366

1  1.3.  The FDA's concern was that that study would not get
2  recruited to, that there wouldn't be enough women that stayed in
3  the study to be able to actually complete that study.  What we
4  did when we had the discussions about that commitment with Wyeth
5  was realize that NIH was actually able to recruit the numbers of
6  patients that they said they were going to, and that those women
7  were staying on the study.  So that by the time 1997 came and we
8  looked at how WHI was actually going, we realized they were
9  going to reach their goal of being able to answer the question
10  with significant power about breast cancer.
11  Q.  Let me just stop you and ask you about that document that
12  Mr. Morris asked you, Defense Exhibit 231.  This is the next
13  meeting with the FDA after the Phase IV commitment, isn't it, to
14  discuss that commitment?
15  A.  Correct.
16  Q.  And you are listed as present, Dr. Rarick, at that meeting.
17  Correct?
18  A.  Yes, I was there.
19  Q.  And is it correct that Dr. Stadel understood and that the
20  FDA understood that a case control study of Prempro, looking
21  back on use of Prempro to determine breast cancer, was going to
22  take another eight or nine years because of the need to have
23  women on that study, on that regimen?
24  A.  Correct.
25  Q.  You were asked --

Page 130

page 2367

1        THE COURT:  Let's approach, please.
2    (Bench conference reported as follows:)
3        THE COURT:  How much more?
4        MR. URBANCZYK:  Five minutes.
5        MR. MORRIS:  I'd like the Court to consider its issue
6  on time.  You've given them 45 more minutes tomorrow morning.  I
7  know they're probably well close to being over their time limit
8  already, and it impacts how the plaintiff would have presented
9  her case.  I don't want to call somebody now --
10        THE COURT:  Say that again.  I don't understand your
11  point.
12        MR. MORRIS:  That we would have liked to have
13  additional time in plaintiff's case, and they're going further
14  and further beyond the time limit.  They only had probably two
15  hours of time, as of today.  And --
16        THE COURT:  I've addressed that issue first thing this
17  morning.
18        MR. MORRIS:  All right.
19        THE COURT:  Cut her off if she goes over.
20        MR. URBANCZYK:  I will, Your Honor.
21    (Whereupon, proceedings continued in open court as
22  follows:)
23  BY MR. URBANCZYK:
24  Q.  Let me jump to the end.  Did the FDA change its mind about
25  the adequacy and power of the WHI to answer the breast cancer

Page 131

page 2368

1  question?  Yes or no?
2  A.  Yes.
3  Q.  Okay.  And that was done in 1997?
4  A.  Correct.
5  Q.  And that's after the WHI had been fully recruited and was
6  underway?
7  A.  Correct.
8  Q.  And, Doctor, one last question, I think.  The Cummings
9  article, have you had a chance to read that article?
10  A.  Yes, I have.
11  Q.  First of all, in the records that you've reviewed, was
12  there any evidence whatsoever that Wyeth took any reactive
13  reaction to that paper?
14  A.  Only that they invited Cummings to speak to their
15  committee, and I think he was present at other Wyeth-sponsored
16  events.
17  Q.  I want you to look at this -- I want you to look at the one
18  paragraph from this particular article.  This is the article by
19  Cauley and Cummings that was the subject of questions.
20  A.  Yes.
21  Q.  I want you to look and tell the ladies and gentlemen of the
22  jury whether this article studied hormone therapy, women on
23  hormone therapy and the risk of breast cancer.
24  A.  No.  It excluded women on hormones.
25  Q.  And lastly, with respect to this proposed contribution of

Page 132

page 2369

1  $250,000 to the 1999 ACOG meeting.  This is an unsigned request
2  for funding, isn't it?
3  A.  It appears to be, yes.
4  Q.  So we don't know whether this was actually done?
5  A.  Correct, we don't.
6        MR. URBANCZYK:  No further questions.
7        MR. MORRIS:  Just a couple, Your Honor.
8        THE COURT:  All right.
9            RECROSS-EXAMINATION
10  BY MR. MORRIS:
11  Q.  Doctor, you mentioned HERS.  I'd like to show you what's
12  previously been marked as Plaintiff's Exhibit No. 475.
13        MR. MORRIS:  I'll tender it to opposing counsel for
14  any objections.  No objection?  Will it be admitted, Your Honor?
15        MR. URBANCZYK:  No objection, Your Honor.
16        THE COURT:  What's the number?
17        MR. MORRIS:  475.
18        THE COURT:  Admitted.
19    (Plaintiff Exhibit 475 received in evidence.)
20  BY MR. MORRIS:
21  Q.  This is a confidential draft of a memo, May 7, 1999,
22  regarding the post-HERS publication strategy, and it talks about
23  "HERS was a randomized, double-blinded, placebo-controlled
24  trial to evaluate the efficacy" --
25  A.  I'm sorry.  I can't see the whole thing.

Page 133

page 2370

3 1  Q.  I'm sorry.  "To evaluate the efficacy and safety of hormone
4 2  replacement therapy."  Correct?
5 3  A.  Correct, for recurrent coronary heart disease.
6 4  Q.  "As treatment to protect against recurrent coronary heart
7 5  disease."  And one of the key findings that they list in this
8 6  memo is that the statistical power of the study was affected by
9 7  the following:  "(A), the length of follow-up was less than
10 8  projected in the protocol, and there was a higher dropout rate
11 9  than expected."  Correct?
12 10  A.  That's what this says.  I don't know if this is referring
13 11  to HERS or HERS II.
14 12  Q.  It's 1999.  It says up here, "The primary objective of HERS
15 13  was to evaluate the efficacy of HRT as a treatment to protect
16 14  against recurrent CHD in women with established CHD.  However,
17 15  there are sub-studies on parameters such as bone, venous
18 16  thromboembolism, breast and gynecological cancer, and cognition
19 17  as secondary endpoints.  It is important to note that HERS was
20 18  not designed to evaluate these parameters."
21 19  A.  Yes, as primary endpoints, correct.
22 20  Q.  And then down on "Breast and Gynecological Cancers," they
23 21  state, "No statistically significant difference in the
24 22  occurrence of breast, endometrial, and other cancers was seen
25 23  between the HRT and placebo groups.  However, HERS was not
26 24  designed to determine the impact of HRT on cancer incidence."
27 25  Isn't that true?

Page 134

page 2371

3 1  A.  That's what that states, yes.
4 2  Q.  And with regard to the Cummings abstract, when they talk
5 3  about the Cummings abstract in the documents from Mr. Buchalter
6 4  that I showed you, if you look down to the bottom of the
7 5  abstract, it says, "Our findings suggest that the risk of breast
8 6  cancer associated with hormone replacement therapy may have been
9 7  substantially underestimated since osteoporosis is a primary
10 8  indication for its use.  These findings have implications on the
11 9  use and interpretation of bone densitometry and the balance of
12 10  risks and benefits of hormone replacement therapy."  Correct?
13 11  A.  That's what he says in his abstract.  It contradicts
14 12  himself in his publication.
15 13  Q.  Well, when they were talking about dismissing and
16 14  distracting, they were talking about doing that with the
17 15  abstract.  Correct?
18 16  A.  The public relations group?
19 17  Q.  Yeah.
20 18  A.  I don't know if they were looking at both or not.
21 19     MR. MORRIS:  Pass the witness.
22 20     THE COURT:  Jury questions?  Approach.
23 21  (Bench conference reported as follows:)
24 22     THE COURT:  You all read that.
25 23     MR. URBANCZYK:  That's a good question.  I'll ask it.
26 24     THE COURT:  What says the parties?
27 25     MR. URBANCZYK:  I'll ask the question.

Page 135

page 2372

3 1     MR. WALKER:  It's his recross.
4 2     MR. URBANCZYK:  He just passed the witness.
5 3     MR. MORRIS:  I would ask the Court to ask that
6 4  question of the witness.  I would prefer to have the Court ask
7 5  the question.
8 6     THE COURT:  I'm going to ask it.
9 7     MR. URBANCZYK:  That's fine.
10 8     MR. MORRIS:  It's okay with me.
11 9     THE COURT:  Any objection?
12 10     MR. URBANCZYK:  No.
13 11     MR. MORRIS:  No, sir.
14 12  (Whereupon, proceedings continued in open court as
15 13  follows:)
16 14     THE COURT:  Question by a juror.  "If Premarin was put
17 15  out for marketing in 1942 and Provera was put on the market in
18 16  1959, and FDA knew that Premarin and Provera were being used
19 17  together in 1979, why didn't the FDA not make Wyeth do a study
20 18  on E and P with information on Premarin and Provera before
21 19  putting Prempro on the market?"
22 20     Do you know the answer to that?  Can you answer that?
23 21     THE WITNESS:  Well, they did make -- well, I shouldn't
24 22  say "make."  Wyeth did --
25 23     THE COURT:  First, can you answer that?
26 24     THE WITNESS:  Yes, I think so.
27 25     THE COURT:  Okay.

Page 136

page 2373

3 1     THE WITNESS:  Wyeth was required to do appropriate
4 2  studies before they could put Prempro on the market.
5 3     THE COURT:  Any follow-up questions?
6 4     MR. URBANCZYK:  No.
7 5     MR. MORRIS:  No, Your Honor.
8 6     THE COURT:  You may stand down.  Thank you very much.
9 7     THE WITNESS:  Thank you, Your Honor.
10 8     THE COURT:  Ladies and gentlemen, don't talk about the
11 9  case, anybody involved in it, and don't start making up your
12 10  mind.  We'll be in recess until 25 till, by this clock.
13 11     Let the jury stand out.  Everyone else, remain seated.
14 12  (Whereupon, the jury exited the courtroom and proceedings
15 13  continued in open court as follows:)
16 14     THE COURT:  The jury's out.  We're in recess.  Be at
17 15  ease.
18 16     MR. MORRIS:  Can I admit some documents on the record
19 17  before we take a recess?
20 18     THE COURT:  Yeah.
21 19     MR. MORRIS:  These are documents that I just used.
22 20  And I'll hand them to defense counsel, if you want to look at
23 21  them.
24 22     MR. URBANCZYK:  Your Honor, we don't have any
25 23  objections.  Some of these will carry with them a limiting
26 24  instruction, pursuant to your Court's earlier orders.
27 25     THE COURT:  You're responsible for putting the

page 2374

1 limiting instruction. Call them off.
2     MR. MORRIS: Let me go through the numbers, Your
3 Honor. Beginning with 172, 1495, 963, 1351, 284, 290, 324, 345,
4 10438-A, and 10439-A.
5     THE COURT: All right. Do all of those have a
6 limiting instruction?
7     MR. URBANCZYK: No, not all of them.
8     THE COURT: You all need to get together and figure
9 out which ones do, and if there's a dispute, let me resolve it.
10     MR. MORRIS: Will they be admitted, Your Honor?
11     THE COURT: Yes. Admitted, admitted.
12     (Plaintiff Exhibits 172, 1495, 963, 1351, 284, 290, 324,
13 345, 10438-A, 10439-A received in evidence.)
14     THE COURT: We'll be in recess until 20 till. I
15 changed it five minutes.
16     (Recess at 2:23 p.m.)
17         C E R T I F I C A T E
18     I, Eugenie M. Power, Official Court Reporter, do hereby
19 certify that the foregoing is a true and correct transcript of
20 proceedings in the above-entitled case.
21
22
23 _____  Date: February 20, 2008
24
25 Eugenie M. Power, RMR, CRR, CCR
26 United States Court Reporter
27

page 2375

1     (Continuing at 2:45 p.m.)
2     THE COURT: Next witness?
3     MS. YATES: Yes, Your Honor. Upjohn calls
4 Michael J. Schoenfeld by videotaped deposition. Mr. Schoenfeld
5 was in Upjohn's medical affairs department.
6     THE COURT: This is a videotaped deposition. I
7 talked to you about it earlier. I mean, I described videotaped
8 depositions.
9     (The videotaped deposition of Michael Schoenfeld,
10 Defendant Upjohn's Exhibit 3482, was played in open court from
11 2:45 p.m. until 3:50 p.m.)
12     THE COURT: Ladies and gentlemen, we will be in
13 recess until about five after. Standard admonition.
14     Let the jury stand out. Everyone else remain as you are.
15     (Jury exits the courtroom.)
16     THE COURT: Jury is out. Who is your next witness?
17     MS. MURRAY: Your Honor, I believe Dr. Stovall in
18 the morning will be the next witness.
19     THE COURT: No more evidence this afternoon?
20     MS. MURRAY: No, Your Honor.
21     MR. MORRIS: We would like to tender an exhibit that
22 was offered during the deposition of Mr. Schoenfeld.
23     THE COURT: I may bring the jury back and tell them
24 they can go home.
25     See if we can get the jury back, if they haven't started

page 2376

1 using the restroom yet.
2     THE COURTROOM SECURITY OFFICER: They have.
3     THE COURT: Don't bring them back.
4     MS. MURRAY: We were also thinking that if --
5 tomorrow, if Dr. Stovall goes quickly and we resolve the rest
6 of the jury instruction questions, that we might be able to
7 instruct the jury before dinner tomorrow.
8     THE COURT: I am for it.
9     MS. MURRAY: And do the arguments tomorrow, and the
10 jury might be alerted that they will get the case.
11     THE COURT: What instruction do you have there? I
12 mean, exhibit.
13     MR. MORRIS: The number is 10493, and I don't
14 believe there is any objection.
15     MS. YATES: No objection, Your Honor. We also have
16 a couple of exhibits.
17     THE COURT: Wait a minute. No objection. Admitted.
18     (Plaintiff's Exhibit 10493 received in evidence.)
19     THE COURT: Do you have any more?
20     MS. YATES: Upjohn does. On the short list, Upjohn
21 Exhibits 0843 and 0202, which were both discussed in the
22 videotaped deposition.
23     MR. MORRIS: No objection, Your Honor.
24     THE COURT: All right. Admitted.
25     (Defendant Upjohn's Exhibits 0843 and 0202 received in

page 2377

1 evidence.)
2     THE COURT: We're going to bring the jury back at
3 five after. Isn't that what I told them?
4     THE COURTROOM DEPUTY: Yes, sir.
5     THE COURT: And then I am going to send them home,
6 and we are going to work on instructions.
7     MR. MORRIS: It's my understanding that the
8 defendants get 45 minutes tomorrow morning on direct.
9     THE COURT: What do you need, about ten on cross?
10     MR. MORRIS: Hopefully no more than that.
11     THE COURT: I will give you 15 or 20.
12     THE COURTROOM SECURITY OFFICER: Ladies and
13 gentlemen, the jury. Please rise.
14     (Jury enters the courtroom.)
15     THE COURT: Short break. We are going to start now
16 and go to midnight. No. We -- there is not going to be any
17 more evidence this afternoon, so I brought you back to excuse
18 you. I figured you didn't want to wait 15 minutes to hear
19 that.
20     Remember, don't talk about the case, anybody involved in
21 it. Refrain from starting to make up your mind. Don't read
22 anything about it or listen to anything about it. Keep your
23 mind pure and clear. See you at 8:45 in the morning.
24     Let the jury stand out. Everyone else remain as you are.
25     (Jury exits the courtroom.)

Page 141

page 2378

1  THE COURT: We're going to be in recess for ten
2  minutes. You should have a new set of proposed instructions at
3  that time, and we will go to work on them. Five after.
4  (Recess at 3:54 p.m.; continuing at 4:15 p.m.)
5  THE COURT: Closing Instruction No. 1. I am going
6  to go through them, and sing out if you have an objection. You
7  don't have to say anything if you don't. I will stop when I
8  get to one I know you have an objection. Closing Instruction
9  No. 2, Closing No. 3, Closing No. 4, Closing No. 5, Closing
10  No. 6, Closing No. 7, Closing No. 8.
11  All right. Physically, how are we going to get those
12  limiting instructions attached to the right exhibits?
13  MR. MOORE: Limiting instructions? We have given
14  copies of the limiting instructions to Ms. Johnson.
15  THE COURT: Well, I thought you-all had suggested at
16  one time that you were going to attach them to each exhibit
17  that deserved one.
18  MR. MOORE: That's correct, Your Honor.
19  THE COURT: We will need to get on the record and
20  say that you-all agree on the right ones -- the right limiting
21  instruction has been attached to the right instruction and that
22  no limiting instructions have been attached to one that doesn't
23  need one.
24  MR. MOORE: Okay. That will be fine.
25  THE COURT: We can do that tomorrow.

Page 142

page 2379

1  MR. MOORE: Yes, sir.
2  THE COURT: All right. No. 9, Closing Instruction
3  No. 9.
4  All right. No. 10, the defendants object to promoting --
5  you have got the rendition?
6  MR. HEARD: I do. Your Honor, I want to propose or
7  note two objections, but it's in the matter of making --
8  THE COURT: Just a minute. What you have up there
9  is not what I have got for No. 10; I mean, even without your
10  ink.
11  MR. HEARD: I think it is.
12  THE COURT: I guarantee you it's not.
13  MS. MURRAY: This is what I have.
14  MR. WALKER: It's just halfway down the page.
15  MR. HEARD: Yeah. I am just halfway down the page,
16  Your Honor.
17  MS. MURRAY: I think he wanted your objections.
18  THE COURT: We have to be on the same page. Do you
19  know what the problem is?
20  MR. HEARD: It's my fault. My wrist hit the button.
21  Okay.
22  THE LAW CLERK: See, he is right there.
23  THE COURT: All right. At "existed," you would draw
24  a line down and change the next paragraph. Let me go over and
25  see where it's "suffered."

Page 143

page 2380

1  All right. What does the plaintiff say about that
2  change?
3  MR. WALKER: I can't see it, Judge. I am sorry.
4  THE COURT: Go look over Mr. Heard's shoulder.
5  MR. WALKER: Well, I shudder to make this a pure
6  negligence case. My understanding is, if the jury answers
7  "yes" to Question No. 1, that we prevail on our strict
8  liability -- strict liability claim for failure to warn and
9  negligent failure to warn. And if the jury answers "no" to
10  Question 1, then we lose both our strict liability claim and
11  our negligence claim. So I hate to limit this to negligence
12  here, and I don't know that the jury will know what "but for"
13  means. I don't know why the issue is --
14  THE COURT: What about just taking "negligent
15  conduct" out and put "fault"?
16  MR. HEARD: That's fine.
17  MS. MURRAY: That's fine.
18  MR. MORRIS: It should also read, Your Honor, "but
19  for Wyeth --
20  THE COURT: Whoa, whoa. Let's go one at a time. I
21  can't do two things at once.
22  All right. Put "fault" in there where it says "negligent
23  conduct." The Arkansas Supreme Court's committee condemned "if
24  any," but I will leave it in there.
25  MR. MORRIS: It should also say "Wyeth" and/or

Page 144

page 2381

1  Upjohn," not just "Wyeth or Upjohn."
2  THE COURT: I think that's right.
3  All right. Mr. Heard, do you want to make those changes?
4  MR. HEARD: Yes.
5  THE COURT: I want to make sure my lawyer -- my
6  lawyer says he has got it. Any other objections to No. 10, or
7  changes?
8  MR. HEARD: Your Honor, this would be subject -- and
9  I guess I should do this for the record. This would be subject
10  to the objections we made earlier to the inclusion of
11  "promotion" in this instruction.
12  THE COURT: That exception is saved that you made
13  earlier.
14  MS. MURRAY: And, Your Honor, we join in those
15  objections.
16  THE COURT: Upjohn is with you.
17  All right. Now, 11, I have changed the last paragraph.
18  I put a modified assumption-of-risk language in the last
19  paragraph from AMI 306.
20  MR. HEARD: Your Honor --
21  MR. WALKER: The last paragraph, I think that's
22  fine. We have no objection to the change in the last
23  paragraph, Judge, that Mr. Heard has made.
24  THE LAW CLERK: He went backwards.
25  THE COURT: Oh, you are on 10, and I am on 11.

1 page 2382
2
3 1        MR. WALKER: Yes, sir. We had not talked about the
4 2 last paragraph change that Mr. Heard had made. We don't object
5 3 to it.
6 4        THE COURT: Well, where are you? You don't object
7 5 to what?
8 6        MR. WALKER: Closing Instruction No. 10, page 10,
9 7 the last paragraph at the bottom of the page. I just wanted to
10 8 let the Court know that we do not object to Mr. Heard's change.
11 9        THE COURT: His red ink changes?
12 10        MR. WALKER: Yes.
13 11        THE COURT: Take this out there, and make sure
14 12 that's Mr. Heard's changes.
15 13        MR. WALKER: That's correct.
16 14        THE COURT: All right. If ever a place where the
17 15 devil is in the details applies appropriately, it's in
18 16 instructions.
19 17        All right. Let's go to No. 11 then, and look at the last
20 18 paragraph in 11, which I tailored -- I tailor made during a
21 19 break.
22 20        MR. HEARD: Your Honor --
23 21        THE COURT: I want to make sure everybody has got it
24 22 now.
25 23        MR. HEARD: We have it.
26 24        THE COURT: Have you looked at it, Mr. Morris?
27 25        MR. MORRIS: Yes, sir.

1 page 2383
2
3 1        THE COURT: Let's hear from the defendant. It looks
4 2 like you have an objection.
5 3        MR. HEARD: Your Honor, I do believe this change is
6 4 made -- I believe it's in error, Your Honor. The reason is
7 5 this. The assumption-of-risk instruction in the AMI indicates
8 6 it's to be given only when there is comparative negligence at
9 7 issue. We said we would tell you this afternoon whether we
10 8 were withdrawing that. We have, of course, done it in the
11 9 Reeves and Rush case, and I certainly anticipate we are going
12 10 to do it here so that it would be -- that language would be
13 11 improper.
14 12        The other thing I just want to note is that this language
15 13 which Your Honor gave in the Rush case, which was approved by
16 14 the Eighth Circuit, was --
17 15        THE COURT: Which language are you talking about?
18 16 Instruction No. 11?
19 17        MR. HEARD: The former language in Instruction
20 18 No. 11. The language that you gave in the Rush case and to
21 19 which the plaintiffs object is language that the Eighth Circuit
22 20 affirmed because they said it accurately states Arkansas law as
23 21 to proximate causation. And the case, in affirming, they
24 22 underscored it was about proximate cause.
25 23        What I have on the screen is the decision in Rush. But
26 24 that case and the cases upon which they relied, the Eighth
27 25 Circuit decision in Strong also says this is a correct

1 page 2384
2
3 1 statement of the law as to proximate cause. The Peitzmeier
4 2 case before that says it's proximate cause. The Crook case
5 3 before that case says it's proximate cause. The Krajewski case
6 4 says it's proximate cause. So we would urge Your Honor to
7 5 stand by the language that we know has the imprimatur of the
8 6 Eighth Circuit.
9 7        THE COURT: Now, where would that go? Are you
10 8 saying it would go in Instruction No. 11?
11 9        MR. HEARD: It's where it was before.
12 10        THE COURT: Talking about No. 11 now?
13 11        MS. MURRAY: Yes.
14 12        MR. HEARD: Your Honor put in this sentence in place
15 13 of a sentence that was already there.
16 14        THE COURT: All right. The reason I took out -- I
17 15 didn't follow plaintiff's suggestion saying "she fully
18 16 understood," and I was trying to get it to come up with some
19 17 substitute for "fully understood." I thought this was probably
20 18 about as good as anything. Here is an old --
21 19        MS. MURRAY: The Eighth Circuit liked it the way it
22 20 was before.
23 21        MR. WALKER: They approved it.
24 22        THE COURT: "The law requires prescription drug
25 23 manufacturers to warn physicians who prescribe a drug about its
26 24 risk and to instruct physicians about its safe use. The law
27 25 does not require prescription drug manufacturers to warn

1 page 2385
2
3 1 patients directly about drug risks or to instruct patients
4 2 directly about a drug's safe use. However, if you find from a
5 3 greater weight of the evidence that Ms. Scroggin, before her
6 4 diagnosis of breast cancer, was aware of the dangers from using
7 5 Premarin -- so on and so forth, then you must find for the
8 6 defendants Wyeth and Upjohn."
9 7        Show me the language that the Eighth Circuit approved
10 8 there. You had that up there a minute ago.
11 9        MR. HEARD: Their decision? Here is your language
12 10 right here, Judge.
13 11        THE COURT: What about it? The Eighth Circuit has
14 12 flatly approved it?
15 13        MR. WALKER: They approved it, Judge. They didn't
16 14 suggest that it's the best language that can be used. I wasn't
17 15 in the Rush case and didn't have a chance to argue this, and I
18 16 can't be bound by what the Rush team did. I don't know that
19 17 they explained to the Court that this case is not like one
20 18 where there is just one danger that some event is going to
21 19 happen. There is a continuum of risk involved in this, and a
22 20 jury could interpret this, without the word "fully" there --
23 21 which by the way the Eighth Circuit uses in two of the cases
24 22 Mr. Heard cites, says "fully aware." Without use of that word
25 23 or an instruction like the one Your Honor has given, which we
26 24 agree with, the jury could say, She knew there was this
27 25 minuscule, teeny-weeny risk, that we are supposed to pour her

page 2386

1 out. And that's not the law. And they would probably find her
2 5 or 10 percent comparatively negligent, and yet they're going
3 to pour her out if she just knows there is some risk out there
4 that's trivial for breast cancer.
5     MR. HEARD: There is five decisions in this line,
6 Your Honor, that begins -- ends with Rush, and there is four
7 preceding Eighth Circuit decisions over a 20-year period, all
8 of whom have nearly identical language. Mr. Walker is correct
9 that two of those say "fully aware" and three of them do not.
10 In affirming Your Honor, the Eighth Circuit characterized the
11 law as being "when the plaintiff is independently aware of the
12 dangers."
13     THE COURT: Yeah. But what about the problem of --
14 she could be a little bit aware and, theoretically, if it was
15 comparative fault she could -- they could find her 10 percent
16 at fault because she knew a little bit about it and should have
17 done more. You would pour out -- this language would pour out.
18 How is the jury going to decide how aware she was? Are you
19 saying it doesn't make any difference if you just barely had a
20 hint, that they should pour her out?
21     MR. HEARD: I understand the question Your Honor is
22 posing, but Your Honor is posing it in a framework of relative
23 negligence. And the Court here is saying the issue is on a
24 causation. It breaks the causal chain if the plaintiff is
25 aware of the dangers. That doesn't fully answer Your Honor's

page 2387

1 question.
2     THE COURT: Are you saying it breaks the causal
3 chain if she had a little bit of a hint of knowledge that there
4 might be a danger out there?
5     MS. MURRAY: Your Honor, if I may, I think they can
6 argue what they believe constitutes aware and I think we can
7 argue and I think that the jury can make that decision, but I
8 think it is a causation argument.
9     THE COURT: I think that I ought to make the
10 decision. I don't like the word "fully" because I am not sure
11 that that is not too strong.
12     MS. MURRAY: Yeah.
13     MR. HEARD: Your Honor --
14     THE COURT: She wouldn't have to know every detail
15 of the --
16     MR. HEARD: I am looking back at the case decided in
17 1996. That, in fact, was a case that turned on labels. The
18 plaintiff in that case had read the labels, and therefore, the
19 Eighth Circuit said that the inadequate warning was not the
20 proximate cause of the injuries.
21     We have testimony in this case that the plaintiff read
22 the labels and, of course, the plaintiffs say they were
23 inadequate. So that fits almost to a "T" the language in the
24 Peitzmeier case in 1996, just what's on the screen.
25     THE COURT: That doesn't help me solve my problem.

page 2388

1 I am not going to just give "aware." That's for sure. And I
2 don't want to give "fully aware" because I think that may be
3 too "stout."
4     Put "stout" in quotation marks.
5     MR. HEARD: Well, Your Honor, I guess what I would
6 suggest, if we can, is either take a five-minute break or come
7 back to this at the end, and we will give some consideration
8 to --
9     THE COURT: Let's come back to it again. I may have
10 to think about it tonight. I want to resolve it now, but --
11     MR. MORRIS: Why not keep it in the language of
12 negligence and say "reasonably informed."
13     MS. MURRAY: Because it's a causation and not a
14 negligence issue.
15     THE COURT: Well, that doesn't -- I don't worry much
16 about -- as long as it tells the jury that she had to be more
17 than -- have more than just a hint, that's --
18     MR. URBANCZYK: Lane, "reasonably aware."
19     THE COURT: All right. Let's go to the No. 12.
20     MS. MURRAY: Your Honor, before we move on, we had
21 had an objection on page 12, on Instruction 11, to the first
22 paragraph or first sentence. We object to the excessive
23 language "including risks created by the product being used
24 with another product." I think that's redundant over "intended
25 or foreseeable risks of the use of the product" and unduly

page 2389

1 emphasizes what their theory is about combination. And I have
2 not seen any law cited to support that. That is certainly not
3 what was in the reg's or anything else, and we would object to
4 that. We think that that is an incorrect statement of the law
5 and a comment on the evidence.
6     THE COURT: If the Eighth Circuit upholds me, you
7 are going to see some new law on that point, but I am going to
8 overrule your objection and save your exception.
9     MS. MURRAY: We also object throughout this
10 instruction to where it says "Premarin with Provera" since
11 there is evidence of other MPAs, generics, and other progestins
12 being used.
13     THE COURT: Objection overruled. Exception saved.
14     MR. HEARD: Your Honor, before we leave this
15 instruction -- and maybe there is a little guidance of use in
16 one of the cases. The -- in the Rush decision, in affirming
17 Your Honor, the Court quotes its own decision in the Crook case
18 cited in 2000. This is what's on the screen. This is what
19 Mr. Urbanczyk was suggesting from over here in the gallery.
20 The point there does speak in effect of a danger in which the
21 plaintiff is reasonably aware. Here you will see that they say
22 "one who already knows or reasonably could be expected to know
23 of the dangers." So I think we could probably state, instead
24 of "fully aware," we could say "reasonably aware" --
25     MS. MURRAY: Reasonably.

page 2390

1    MR. HEARD:  -- and it would have support in the case
2    law.
3        THE COURT:  What says the plaintiff?
4        MR. MORRIS:  Yes.  I am okay with that.
5    I am a little concerned about the way the instruction
6    that he just put up reads with regard to awareness, and I have
7    to go back and look at it.  All right.
8        MR. WALKER:  My only concern about "reasonably" is
9    when I, as a layperson, think something -- if they say this was
10   reasonably done, that means a little bit.  If this is
11   reasonably priced, it's cheap.
12       THE COURT:  I am going to use "was reasonably aware"
13   over your objection.
14       MR. WALKER:  All right.
15       THE COURT:  I ain't 100-percent satisfied with that,
16   but it's as good as I -- my mind can come to now.
17       All right.  Let's go to 12.
18       MR. WALKER:  And, Judge, let me talk about 12 and 13
19   together, if I could.
20       THE COURT:  Don't worry about talking about 13
21   because I am not going to give it, over both defendants'
22   objection.
23       MR. WALKER:  Your Honor, this is a case in which
24   we're talking about the two leading manufacturers with the
25   lion's share of the market of this product.  And our

page 2391

1    allegations are that they put their heads in the sand and
2    didn't study the risks of this product, and as a result their
3    warning label, which did reflect the science at the time, was
4    inadequate because it was based on lack of information because
5    of their lack of study.  That's our case in a nutshell.
6    This instruction says to the jury:  Don't consider that,
7    look only at what science existed at the time.  In other words,
8    ignore the fact that the defendants failed to study themselves.
9    You are not to consider that.  You are to look only at what
10   knowledge existed at the time.  Ignore the WHI results.  Don't
11   consider them because you only look at the knowledge that
12   existed at the time the product was put on the market.  The
13   jury has to look at the WHI results and decide whether, if
14   Wyeth and Upjohn had a duty to test and tested, that they would
15   have unveiled similar results and the warnings on their product
16   would have been stronger.
17   Now, the AMI is very clear that it did not incorporate
18   every statutory provision or any, actually, of the statutory
19   provisions of the Product Liability Act of '79.  And it even
20   says that in those circumstances where inserting one of those
21   statutes would be appropriate, the Court can do so; but it's
22   purely discretionary with the Court.  We have also cited an
23   Eighth Circuit case that says specifically that whether this
24   statute is to be used is discretionary with the Court.  This
25   instruction has only been used in design defect cases according

page 2392

1    to the Shepherdization of the instruction -- of the statute.
2    The cases are all design defect cases, as are the secondary
3    sources.
4        And if you look at the statute itself, it clearly applies
5    to design defect when it says, "Consideration may also be given
6    to the customary designs, methods, standards, and techniques of
7    manufacturing, inspecting, and testing by other manufacturers
8    or sellers of similar products."  Nothing about warnings.
9    Nothing about failure to warn.  It's never been applied in that
10   context.
11       But the point is, we have been here for naught for three
12   weeks if your argument that they should have studied is
13   irrelevant because the jury can't consider what additional
14   studies would have generated.  The point of the matter is, all
15   of the other manufacturers of products -- and there weren't
16   many back then -- were tagalongs, copycats, me-toos.  They were
17   the innovators, and if they escape liability because nobody
18   studied, none of the manufacturers, then that would turn the
19   whole principle of negligence on its ear.
20       THE COURT:  What about the fact that it says "as one
21   factor"?
22       MR. WALKER:  In this instruction it says they're not
23   to consider anything else but the state of the knowledge at the
24   time this product was put on the market.
25       THE COURT:  It says "one factor in determining" --

page 2393

1        MR. WALKER:  It says, "You should not consider the
2    state of knowledge at the time she was diagnosed with breast
3    cancer or at any other time," meaning they can't even look at
4    the WHI results to see what adequate studies would have
5    generated.  They are only to look at what was known.
6        THE COURT:  Let me hear from the defendants.
7        Do you have anything else?
8        MR. MORRIS:  The last point that I would like to
9    make on that is with regard to Dr. Parisian's testimony and
10   what would have been a reasonable warning.  If that instruction
11   is given, it's improper for them to even look at that because
12   they're not allowed to consider the state of the knowledge that
13   was generated by the WHI.
14       THE COURT:  Defendant have any new arguments?
15       MS. MURRAY:  We would reiterate what we said before.
16   This is products liability actions.  Under 16-116-102, that is
17   not just defective design or a design defect, it includes
18   warranty.  It includes testing, negligence, labeling.  All of
19   those are comprised and, you know, they are now trying to say
20   this act only applies if it's a design defect case?  And that
21   is just not -- and this is an appropriate part of the law and
22   we have cited it correctly and we are entitled that they may
23   consider that.
24       THE COURT:  I got your point.
25       Anything to add?

Page 157

page 2394

1    MR. HEARD:  Can I write in your book, Betsy?

2    MR. WALKER:  There is actually --

3    MR. HEARD:  May I speak to this, Erik?

4    MR. WALKER:  Yes.  Sorry.

5    MR. HEARD:  I don't understand Mr. Walker's argument

6  as a matter of law because I put it up, the provision of the

7  act, and it defines a product liability action as one involving

8  testing, warning.  And then we turn over two pages, and it says

9  this is the consideration that the jury can give to the

10  evidence.

11    Now, Mr. Walker says he can't prove his case if the jury

12  is instructed in this way, but, of course, they are entitled to

13  prove and argue that, if the proper testing had been done,

14  people would have learned that the risk was higher -- that

15  doesn't require reference to the results of studies that came

16  out in 2004 or '5 or '6.  That would be our argument.

17    THE COURT:  Where is my statute book?  I'm fairly

18  well familiar with this since I was out at the legislature when

19  this was getting passed -- when portions of it were passed back

20  in '79 and before '93.  I agree that the statute is narrow, as

21  Mr. Walker says it does; however, I don't like No. 12.  I think

22  he has a valid point.  I think -- I don't think that accurately

23  states the law based on the evidence in this case.  And I was

24  trying to -- I was thinking about putting a semicolon after

25  "therapy products" and adding some language, but I can't come

Page 158

page 2395

1  up with the language.

2    MR. WALKER:  One thing, Judge, this statute does not

3  forbid you from looking at other evidence.  It says, Rather

4  than looking at the evidence at the time of the injury, you can

5  look at the evidence, the state of the art that exists today.

6  And it does not say, You may not look at the evidence at any

7  other time.  It just says you can consider the state of the

8  art.

9    THE COURT:  Mr. Walker, this is the point though.

10  This statute says that the jury can look at this.  I realize

11  they can look at other evidence, but it says they can look at

12  this.  And so I am dubious about taking it out.

13    MR. WALKER:  Well, if this instruction said, "You

14  may consider the state of the art," but did not forbid them

15  from looking at the knowledge at other times as well, then that

16  would be one thing.  But, you know, it would certainly improve

17  it.  We still would have problems with it, but --

18    THE COURT:  Just a minute.  All right.  Here is the

19  way I propose to do it.  What I want to do is come -- give the

20  first sentence, "As one factor in determining whether Wyeth or

21  Upjohn is" -- 'or' I guess that ought to be -- "liable, you may

22  consider the state of scientific knowledge available at the

23  time Ms. Scroggin was taking hormone therapy products, but" --

24  now what do I say after I say "but"?  I know defendant doesn't

25  want anything said, but what does plaintiff propose?  But you

Page 159

page 2396

1  may consider --

2    MR. WALKER:  But you may consider what knowledge

3  could have been -- or would have been generated by additional

4  studies should you deem they would have been appropriate -- or

5  something to that effect.

6    MR. MORRIS:  Had they been done.

7    THE COURT:  I know you-all object, but I am going to

8  put some language there if I give that first sentence.

9    MS. MURRAY:  Or just give --

10    THE COURT:  And I will let y'all object.

11    MS. MURRAY:  Or just give the first sentence.  It

12  seems to me you're giving an unfair comment in their favor

13  otherwise.

14    THE COURT:  Well, no.  It looks to me like it would

15  even it out.  I am not going to give the second sentence, over

16  both defendants' objections.  Vigorous objections and

17  exceptions noted.

18    MS. MURRAY:  Could we read into the record what that

19  proposed instruction was?  Or I could just tear it out?

20    THE COURT:  You just attach that right to the

21  record.

22    MS. MURRAY:  We would put that as Upjohn proposed or

23  proffer of an additional instruction.

24    THE COURT:  And you have permission to read it if

25  you want to read it.

Page 160

page 2397

1    MS. MURRAY:  Upjohn proposed or proffer of an

2  additional instruction based on Arkansas Code Annotated

3  16-116-104(a)(2).  "You may also consider the customary

4  standards reflected by the labels of similar drug

5  manufacturers -- drugs manufactured by other companies.  You

6  should consider this evidence in light of the information other

7  manufacturers were providing with similar products at the time

8  Ms. Scroggin was taking hormone therapy, not at the time she

9  was diagnosed with breast cancer or any other time."

10    THE COURT:  That's for your record and your

11  objection is noted and your exception is saved.

12    MS. MURRAY:  Proffered 1?

13    THE COURTROOM DEPUTY:  Yes.  Thank you.

14    (Defendant Upjohn's Proposed Instruction 1 proffered.)

15    THE COURT:  All right.  Semicolon after "therapy

16  products; but you may also consider what other knowledge Wyeth

17  and/or Upjohn could reasonably have had at the time."  What's

18  wrong with that?

19    MR. WALKER:  That's fine.

20    MS. MURRAY:  Your Honor, could we ask "if supported

21  by the evidence" because part of it -- part of the argument the

22  defendants have been making is that they have not met -- you

23  know, that's their burden to show that.

24    THE COURT:  I think that's argument, so I am not

25  going to do that.  But I will note that you wanted it, and I

page 2398

1  will deny your motion and save your exception.  Both

2  defendants.

3     All right.  Let's go to -- 13 is out, over objection.

4     All right.  Let's -- what about No. 14?  It's late in the

5  day.  Have defendants made up their mind?

6     MR. HEARD:  We will withdraw it.  It will simplify

7  our discussion of the verdict form.

8     THE COURT:  Upjohn join?

9     MS. MURRAY:  Same.

10     THE COURT:  All right.  14 is withdrawn.

11     15 will be given over plaintiff's objection.

12     16, the word "shall" in the next to last line, the first

13  paragraph, will be changed to "must."

14     MS. MURRAY:  Must?  I'm sorry.

15     MR. WALKER:  I have a couple of words I would like

16  to suggest inserting, Judge.

17     THE COURT:  All right.  I suggest inserting "but"

18  before "compliance" in the second paragraph.

19     MR. WALKER:  Yes.  And I wanted to insert the word

20  "some," "may be considered by you as some evidence."

21     THE COURT:  Where are you?

22     MR. WALKER:  The last sentence or --

23     THE COURT:  Last sentence where?

24     MR. WALKER:  Of the first paragraph, "shall be

25  considered by you as some evidence."  But if you are going to

page 2399

1  put "but" before "compliance," I think that probably --

2     THE COURT:  Okay.  Any other -- on 16, any other

3  comments or objections or protestations?

4     MS. MURRAY:  Our objections made earlier with the

5  defendants, both that there is no evidentiary basis nor a legal

6  basis for that second paragraph.

7     THE COURT:  The second paragraph?

8     MS. MURRAY:  On 16.

9     THE COURT:  Okay.  Your objection is noted.

10     Do you join, Mr. Heard?

11     MR. HEARD:  I do.

12     THE COURT:  Both exceptions saved.  Both objections

13  noted.

14     MS. MURRAY:  Your Honor --

15     THE COURT:  What about plaintiff's position on 17?

16     MR. WALKER:  Judge, this is -- this would be a

17  comment on the evidence.  Why would there be a special

18  instruction here that doesn't relate to a particular cause of

19  action or a particular affirmative defense, but instead states

20  the theme of Upjohn's position, their theme of -- throughout

21  this trial has been that it's okay for physicians to prescribe

22  products off label.  They will argue that to the jury.  They

23  will say, look, you know, we just -- this was something that

24  was done.

25     THE COURT:  Objection sustained.  Upjohn's objection

page 2400

1  is noted to my ruling.  Exception is saved.

2     I guess Wyeth doesn't have any dog in this fight, do you?

3     MR. HEARD:  We do not.

4     THE COURT:  All right.  Let's go to 18.

5     MS. MURRAY:  Your Honor, we would like to offer that

6  as Upjohn Proffered Instruction No. 2.

7     THE COURT:  All right.  Attach that to the record,

8  and make sure you have your record made.

9     (Defendant Upjohn's Proposed Instruction 2 proffered.)

10     THE COURT:  18 given over plaintiff's objection.

11     I have an insertion here that Wyeth wants to add to 19, a

12  paragraph that says, "For her claim to accrue, Ms. Scroggin did

13  not have to know that she must prove by a preponderance of the

14  evidence in the case that hormone therapy did, in fact, cause

15  her breast cancer."

16     What says the plaintiff to that?

17     MR. WALKER:  Did you have that written down

18  somewhere?  Oh, it's right up here.  I just think that's very

19  confusing.  I don't know how I would interpret that if I were a

20  juror.  The standard is that they have to prove.  The person

21  has to know of a probable causal connection.  That's the --

22     THE COURT:  I'm going to give Wyeth another chance

23  to make Eighth Circuit law.  I am not going to give it, over

24  Wyeth's vigorous objection and saved exception.

25     MR. HEARD:  Your Honor, the date in this instruction

page 2401

1  is, I believe, incorrect.

2     THE COURT:  I beg your pardon?

3     MR. HEARD:  The date in this instruction is

4  incorrect.  The lawsuit was filed on April the 7th, 2004.

5     THE COURT:  I have got April 7th.

6     MR. HEARD:  I am looking at one that says October.

7  I'm sorry.

8     THE COURT:  Oh --

9     MR. HEARD:  Maybe I switched back into the wrong

10  set.

11     THE COURT:  I have 2004 and then April 7, 2001; is

12  that wrong?

13     MR. MORRIS:  No.  That's correct.

14     THE COURT:  That's right, isn't it?

15     MR. MORRIS:  That's correct.

16     THE COURT:  You agree, Mr. Heard?

17     MR. HEARD:  Let me get in the right set.  Okay.  I'm

18  with you now.  Sorry.

19     THE COURT:  All right.  Closing Instruction No. 20,

20  any objections?

21     MS. MURRAY:  Your Honor, our same concerning "with

22  Provera".

23     THE COURT:  That is the last line of the --

24     MS. MURRAY:  Third paragraph, it appears.

25     THE COURT:  Last line of the third paragraph?

1 page 2402

2

3 1          MS. MURRAY:  Yes, Your Honor.

4 2          THE COURT:  Your objection noted.  Exception saved.

5 3          MR. HEARD:  Your Honor, I have a further objection.

6 4  In addition to our objection already stated to the third

7 5  paragraph, which is that the evidence doesn't support it, I

8 6  would also object because this is instructing the jury in the

9 7  exact same language the second time.  You have got this

10 8  instruction on page -- it's either 10 or 11.  You are giving it

11 9  a second time here.  That gives undue emphasis.  It's unfair

12 10  and prejudicial.  It doesn't belong in the instructions twice.

13 11          THE COURT:  Okay.  Objection noted.  Exception

14 12  saved.

15 13          MS. MURRAY:  We would join on the sufficiency.

16 14          THE COURT:  Exception noted.  Exception saved.

17 15  No. 21?

18 16  All right.  Let's look at the verdict forms.

19 17          MS. MURRAY:  Your Honor, before that, could I go

20 18  back to 12 and make my record on the last sentence that you

21 19  eliminated that we believe should be included?

22 20          THE COURT:  Page 12 or Instruction 12?

23 21          MS. MURRAY:  It's Instruction 12, page 13.

24 22          THE COURT:  Yeah.  You wanted that sentence in

25 23  there.

26 24          MS. MURRAY:  We believe the last sentence, "You

27 25  should not consider the state of the knowledge at the time she

1 page 2403

2

3 1  was diagnosed with breast cancer or any other time," is a

4 2  correct statement of the Arkansas law based on Arkansas Code

5 3  Annotated Section 16-116-104(a)(1).

6 4          THE COURT:  I can tell by your voice and by your

7 5  visage that you think that ought to be in there earnestly, but

8 6  I am going to deny it and save your exception.

9 7  All right.  Let's go back to 21.  Any objection to 21?

10 8          MR. HEARD:  None.

11 9          THE COURT:  All right.  Let's go over to verdict

12 10  forms.  You have got -- I note Upjohn's objection to the

13 11  language of "Premarin with progestin or Prempro" every time it

14 12  appears, "Provera."

15 13          MS. MURRAY:  This probably points out the problem.

16 14  In the verdict form, you have used "Premarin with progestin;"

17 15  although, you have used it "Premarin" with my client's product,

18 16  "Provera," throughout the instructions.  That's the problem.

19 17          THE COURT:  Oh, what do the plaintiffs say about

20 18  that?

21 19          MR. MORRIS:  The only -- on the jury verdict form,

22 20  Judge, my only concern is the predicate to Question 4.

23 21          THE COURT:  Well, before we get to that, read what

24 22  Ms. Murray just said, and I will come to yours.

25 23          MR. MORRIS:  What did she just say?

26 24          THE COURT:  Read it.

27 25          MR. HEARD:  It's not up here.

1 page 2404

2

3 1          THE COURT:  Can you read it back?

4 2          THE COURT REPORTER:  Sure.  "This probably points

5 3  out the problem.  In the verdict form, you have used 'Premarin

6 4  with progestin;' although, you have used it 'Premarin' with my

7 5  client's product, 'Provera,' throughout the instructions.

8 6  That's the problem."

9 7          MR. MORRIS:  Yeah.  I agree with her.  I think it

10 8  should say "Premarin with Provera or Prempro."

11 9          MR. WALKER:  Yes.

12 10          MS. MURRAY:  No.  It should say --

13 11          THE COURT:  Premarin with Provera or progestin?

14 12          MS. MURRAY:  Progestin.

15 13          THE COURT:  All right.  You agree that it's right in

16 14  Question No. 1; is that correct?

17 15          MR. WALKER:  It's fine the way it is, Judge, because

18 16  Wyeth's obligation was to warn.

19 17          THE COURT:  Whoa, whoa, whoa.  Are you saying it's

20 18  all right in Question No. 1?

21 19          MR. WALKER:  Yes, sir.

22 20          MR. MORRIS:  Whoa.

23 21          THE COURT:  Are you saying we need to go back to the

24 22  instructions and change it?

25 23          MS. MURRAY:  Uh-huh.

26 24          THE COURT:  One at a time.

27 25          MR. WALKER:  I was just explaining to him why I said

1 page 2405

2

3 1  that.

4 2          THE COURT:  I'm talking about Mr. Heard was trying

5 3  to be heard there.

6 4          MR. HEARD:  I am willing to wait until they're all

7 5  done.

8 6          THE COURT:  Well, wait a minute.  I need to know the

9 7  plaintiffs, do you want -- should we go back through the

10 8  instructions and change it all to where it comports with

11 9  Question No. 1?

12 10          MR. MORRIS:  No.

13 11          THE COURT:  Why not?

14 12          MR. WALKER:  Well, let me get to No. 10 first.

15 13          MR. MORRIS:  It's a different issue.

16 14          MR. WALKER:  Judge, if you take proximate cause, for

17 15  instance, Wyeth -- let's distinguish.  The first jury verdict

18 16  question --

19 17          THE COURT:  I can't think abstractly.  Go back to

20 18  the earlier instruction, and show me why it's right back there.

21 19          MR. WALKER:  Instruction No. 10 is a proximate cause

22 20  instruction.

23 21          MS. MURRAY:  That language is out of 10 after

24 22  Mr. Heard's suggested changes and the ones that were adopted by

25 23  the Court.

26 24          MR. MORRIS:  If I may, Judge --

27 25          THE COURT:  Wait a minute.  Wait a minute.

page 2406

3  1  Mr. Walker has the floor, and he has invited my attention to
4  2  Instruction No. 10.
5  3       MR. WALKER:  Can you show me the change in 10,
6  4  Mr. Heard?
7  5       MS. MURRAY:  I can give you an example.  On page 12,
8  6  part of Instruction No. 11.
9  7       THE COURT:  Mr. Walker, go to page -- you say
10 8  page 12?
11 9       MS. MURRAY:  Page 12, the second page of closing
12 10 Instruction No. 11.
13 11      MR. WALKER:  That's fine.  That can be changed to
14 12 "progestin."
15 13      THE COURT:  See, that's the problem.  We need to
16 14 work through all of these.
17 15      Yes.
18 16      MR. MORRIS:  If I may be heard?  As I understand all
19 17 of the instructions up until the verdict form, most of those
20 18 are relating to the causes of action generally against both
21 19 defendants, and that's why they repeatedly say "Premarin,
22 20 Provera and Prempro."
23 21      THE COURT:  I tell you what we are going to do.  We
24 22 are going to go ahead, and I am going to let you and Mr. Walker
25 23 sit down and go through all the instructions and see if you
26 24 agree with the defendant Upjohn on any of them.
27 25      MR. WALKER:  There is only three times that it's

page 2407

3  1  used, Judge.
4  2       THE COURT:  I beg your pardon?
5  3       MR. WALKER:  There is only three times in the
6  4  instructions that they're used.
7  5       THE COURT:  We will address those three times later.
8  6  Make a note of it.
9  7       All right, Mr. Heard.
10 8       MR. HEARD:  Your Honor, our position may be somewhat
11 9  different.  That is, when we get to the verdict form and
12 10 Question No. 1 is exclusively about Wyeth and Question No. 2 is
13 11 exclusively about Upjohn --
14 12      THE COURT:  Let me get to the verdict form.  All
15 13 right.
16 14      MR. HEARD:  The question, then, is whether Wyeth
17 15 adequately warned about its products.  It's argument that the
18 16 warning about Premarin was inadequate because it should have
19 17 taken into account its use with Provera.  But the question for
20 18 the jury is whether we adequately warned about our product, and
21 19 the question for the jury on No. 2 is whether Upjohn adequately
22 20 warned about its product.  And the argument is the warning
23 21 should have taken into account that it was being used with
24 22 another product.  So I don't believe that, either 1 or 2, this
25 23 parenthetical should be in there.  That's not necessarily true
26 24 for the instructions that lead up to it, but it's true for the
27 25 verdict form.

page 2408

3  1       MS. MURRAY:  We would agree with that, Your Honor,
4  2  that the parentheticals don't belong in any of the questions
5  3  for the jury.
6  4       MR. WALKER:  Well, the problem with that is that the
7  5  only argument we have made is that the warnings for use of
8  6  Premarin and progestin together, for use of Premarin and
9  7  Provera together were inadequate.  We have not made any
10 8  allegation that the Premarin warning for use of Premarin is
11 9  inadequate.  So if somebody is just using Premarin, in the
12 10 abstract by itself, the warning is fine.  We are just saying
13 11 that the warning is inadequate because it doesn't warn about
14 12 the dangers of use of this product with progestin.
15 13      MR. HEARD:  That's our point and that's his argument
16 14 and he can make his arguments.
17 15      MS. MURRAY:  And our theory of the case is --
18 16      THE COURT:  There are three out of the four of you
19 17 talking at once now.
20 18      MS. MURRAY:  I'm sorry.
21 19      THE COURT:  Who wants the floor?  Who wants the
22 20 floor?  One at a time.
23 21      MR. WALKER:  We -- Judge, we are arguing not that
24 22 the Premarin warning is inadequate for Premarin sold to women
25 23 who just use Premarin.  We are arguing that the Premarin
26 24 warnings are inadequate --
27 25      THE COURT:  Then how is that Interrogatory No. 1

page 2409

3  1  correct when it has got Premarin in there?
4  2       MR. WALKER:  We are arguing that the Premarin label
5  3  should have warned about the risks of use of Premarin with a
6  4  progestin like Provera.  So the jury needs to know that we are
7  5  not saying that the Premarin warning doesn't adequately warn
8  6  about the harms of Premarin by itself, but it does fail to
9  7  adequately warn about the harms of Premarin when used in
10 8  conjunction with a progestin such as Provera.
11 9       MR. HEARD:  I will respond and Betsy can respond.
12 10      MS. MURRAY:  Yeah.
13 11      MR. HEARD:  The legal question for the jury, when
14 12 it's asked about Wyeth's liability, is did Wyeth adequately
15 13 warn its product.  Its products are Premarin and Prempro.  Did
16 14 we adequately warn?  Their argument, their theory of the case
17 15 is that the Premarin warning was inadequate because it was used
18 16 with another product and, therefore, the warning should have
19 17 taken into account that fact.  But that's argument.  The legal
20 18 question for the jury is, is the Premarin label or the Prempro
21 19 label inadequate, and, therefore, the verdict form should speak
22 20 only of our products when they are asked about our liability.
23 21      MS. MURRAY:  And, Your Honor, we would agree with
24 22 that as far as Provera.  It's a known or knowable risk of
25 23 Provera.  They can argue that this is the law and whether they
26 24 have met it, but the question is, have they shown it had an
27 25 inadequate warning.

page 2410

1    MR. WALKER:  This -- by the way, this is the way it
2 was instructed in the Reeves case.  I don't know about Rush.  I
3 can also tell you that we have briefed --
4    THE COURT:  We didn't have two defendants there,
5 though.
6    MS. MURRAY:  Right.
7    MR. WALKER:  That's true.  I don't know why that
8 would matter, though, in terms of each of these defendants,
9 either one of them being concerned about -- if it stays
10 "Premarin with progestin," it's not specifying their product.
11 But in any event, we have cited the law in briefing to the
12 Court.
13    THE COURT:  I'm going to stay with 1 and 2 and I am
14 going to think about it overnight and I think you need to think
15 about it too, Mr. Walker.
16    MR. WALKER:  Yes, sir.
17    THE COURT:  All right.  No. 3.
18    MS. MURRAY:  We would have the same.  "Provera with
19 estrogen," we would like you to think about that overnight.
20    THE COURT:  Same objection?
21    MR. WALKER:  But there is a difference here, Judge,
22 because here the causal connection is only when Premarin is
23 used with progestin.  That's the only time we have argued that
24 anybody has suggested it could cause breast cancer.
25    THE COURT:  I'm going to leave No. 3 like it is,

page 2411

1 over objection.
2    MR. HEARD:  We --
3    THE COURT:  Just a minute.  Yeah.
4    All right.  Defendant has proposed here for No. 3 -- I
5 think Mr. Heard probably proposed it -- "have defendants proven
6 by the greater weight of the evidence that Ms. Scroggin knew or
7 should have known that her claim accrued before April 7, 2001?"
8    All right.  What's wrong with that language, plaintiff?
9    MR. WALKER:  Can we just have a moment?  We just saw
10 this for the first time.
11    THE COURT:  Think about it.  Cerebrate about it.
12    MR. WALKER:  We will agree to that change.
13    THE COURT:  All right.  What about No. 4?
14    MR. MORRIS:  Your Honor, if I can raise the
15 predicate before No. 4?
16    THE COURT:  What?
17    MR. MORRIS:  If I can raise the predicate before
18 No. 4, the predicate that currently exists says, "If you have
19 answered yes to Questions 1 or 2, answer Question 4."  And I
20 think the proper predicate would be, "If you have answered yes
21 to Questions 1 or 2 and no to Question 3, then answer
22 Question 4."
23    THE COURT:  Don't you want to get a verdict even if
24 you get throwed out later on Question 3?  Why would you want
25 that thrown in there?

page 2412

1    MR. MORRIS:  Well, why would I want to -- want the
2 jury to be confused by thinking that they can answer no to
3 No. 3 and still give us a verdict?
4    THE COURT:  In other words, you want to say, "If you
5 answered No. 3 no, your duties are over"?
6    MR. MORRIS:  That's right.  School's out.
7    THE COURT:  Well, I don't see anything wrong with
8 that.  I will allow you to argue the effect of answering to an
9 interrogatory, but I will put that language in there if you
10 want me to.
11    MR. HEARD:  We would -- I think we object, Your
12 Honor, really just for prudential reasons, efficiency reasons,
13 and likewise, just because if we don't put that stop
14 instruction in there, we are doing what we did the last two
15 times and we know that's okay, so it works.
16    THE COURT:  Back when assumption of risk was a
17 defense, Supreme Court of Arkansas held in a case and I was
18 guilty -- I will have to go to purgatory at least for it.  I
19 wrote the brief in the case where the Supreme Court reversed a
20 case because the -- Sid McMath had told a jury, "If you answer
21 the assumption-of-risk interrogatory yes, Earl Pike won't get a
22 nickel."  And the Supreme Court reversed.  Since that time
23 there is a statute that says you can tell the jury the outcome
24 of -- the result of an interrogatory.  But I will put a note in
25 there:  If you answer no, quit -- over defendants' objections.

page 2413

1 And then I will say, "If you have answered Questions 1 or 2
2 yes, and 3 no, answer Question No. 4" -- over defendants'
3 objection.
4    All right.  What about No. 4?
5    MR. WALKER:  I was looking at case law, and I am
6 concerned about one thing.  The Court has not yet ruled on the
7 punitive damages issue.  If there is only one blank, my concern
8 for both defendants -- my concern is that if we go into a
9 punitive phase and the jury were to award punitives and they
10 were to evaluate it based on a multiplier of the actuals, there
11 would be no division to evaluate the reasonableness.
12    THE COURT:  I think there ought to be a division
13 between the defendants.  Nobody has proposed anything, have
14 you?  You don't expect me to know any law.
15    MR. WALKER:  Well, what we were suggesting -- my
16 understanding is Arkansas may be different.  What we have
17 always done is had a comparative-responsibility question with a
18 total of --
19    THE COURT:  My proposal would be:  If you find both
20 defendants at fault, what -- how do you -- what percentage of
21 fault on each?  I would have to figure out how to word that.  I
22 will let you word it tonight, Mr. Walker.
23    MR. WALKER:  I will do that, Judge.
24    THE COURT:  Any objections?
25    MR. HEARD:  We will go back to the books on this,

Page 177

page 2414

1  Your Honor.  When we looked at this the first time around, we
2  thought it was not appropriate and not justified by the law.
3  And it is joint and several liability.  This is a problem
4  between the defendants.  There are no cross claims here.
5      THE COURT:  I will hear -- you can send me a brief
6  before 9:00 o'clock tonight, both of you, joint briefs and
7  proposed language.  I mean, how are we going to -- suppose they
8  find both of you liable, both defendants liable, and they
9  return a verdict of -- well, I'm not going to use a figure.
10  How are you going to divide it between the defendants?
11      MR. HEARD:  Here is the answer to the problem, Your
12  Honor, the real answer.
13      THE COURT:  Is to direct a verdict for you?
14      MR. HEARD:  No.  There is that, and that's tomorrow.
15  We're not going to, we -- we would urge Your Honor to deal with
16  this question of punitive damages exactly as you did in Rush.
17  The evidence is weaker here, but not to belabor the point, the
18  problem of dividing the damages between Wyeth and Upjohn, if
19  there is a verdict against us both, presents no problem except
20  in the circumstances that Mr. Walker talks about where we go
21  into a second phase.  If there is no second phase --
22      THE COURT:  Why would there be no problem?
23      MR. HEARD:  Because there is joint and several
24  liability.  It's for us to assert claims against one another
25  for contribution, and if we choose not to do so, we work it

Page 178

page 2415

1  out.  We don't expect a problem.
2      MR. MORRIS:  Plaintiff doesn't want to be a part of
3  any contribution litigation that occurs afterward.
4      MR. HEARD:  They don't have a problem.  There is no
5  issue here if Your Honor strikes punitive damages, as we
6  believe you should.
7      MR. WALKER:  And let me just say two things about
8  punitive damages.  First of all, in the Rush case, Wyeth filed
9  a motion to strike the punitive damages claim, and the Rush
10  team never responded with evidence, argument, or anything.
11  Secondly, we have responded to Wyeth's motion with lots of
12  evidence, a written record.  We have not presented all of it in
13  this phase of the trial because we are not allowed to present
14  it at this phase in the trial.
15      THE COURT:  If we don't divide liability in the
16  first stage, why can't we divide it in the second?  It would be
17  the same jury.
18      MR. MORRIS:  There may be a difference between
19  negligence and gross negligence in terms of the proportion of
20  the responsibility.
21      MS. MURRAY:  Gross negligence --
22      MR. MORRIS:  Upjohn can be terribly negligent.
23      THE COURT:  Why can't it be divided in the second
24  phase if I let it go to punitive damages?
25      MR. WALKER:  Here is the reason.  The jury may

Page 179

page 2416

1  find -- let's say hypothetically.  Let's say the jury finds
2  that Upjohn engaged in conscious disregard, but Wyeth did not,
3  and the jury awards them $100 in the first phase.  And then
4  they only find Upjohn liable in the punitive phase.  Then they
5  multiply the hundred times 5 and come up with $500 for punitive
6  damages.  There is no way for the Court of Appeals to evaluate
7  whether or not that's an appropriate multiplier because they
8  don't know how much of the compensatory award was attributable
9  to Upjohn's conduct.
10      So it may be that the jury finds that the division for
11  punitive damage purposes is different from the division for --
12      THE COURT:  That's a pretty persuasive argument.
13  Why don't you give me a paper on it, not too much, by
14  9:00 o'clock, and I will render a decision in the morning.  We
15  start back with the jury at --
16      MS. MURRAY:  One more matter, Your Honor.
17  Mr. Morgan had provided you with a proposed instruction we had
18  submitted concerning Ogen, and the Court has not ruled on that.
19  We are concerned about it because the plaintiff submitted two
20  exhibits --
21      THE COURT:  Have you-all seen it?
22      MR. WALKER:  We have.
23      MS. MURRAY:  Let me show you the exhibits that
24  concern us about this.
25      THE COURT:  I want to make sure that they --

Page 180

page 2417

1      You have got it before you?
2      MR. WALKER:  I do, Judge.
3      MS. MURRAY:  This is Plaintiff's Exhibit 0265 and
4  Plaintiff's Exhibit 0251, Your Honor.
5      THE COURT:  What says the plaintiff to the proposed
6  instruction?
7      MR. WALKER:  Well, the proposed instruction is
8  taking some issue that Upjohn wants to emphasize -- one source
9  of information the plaintiff had that Upjohn wants to emphasize
10  because they think it's a really strong warning, stronger than
11  their own, and bring that to the attention of the jury.
12      THE COURT:  I'm not going to give it, over Upjohn's
13  objection.  Exception saved.
14      MS. MURRAY:  We would ask that at least some sort of
15  limiting instruction then be attached to these two exhibits
16  when they go in saying that the manufacturer --
17      THE COURT:  Submit a proposed limiting instruction,
18  and you submit me a response to it.  You can do the response by
19  7:30 in the morning.  You can get an hour or two of sleep
20  in-between.
21      Anything else?
22      MR. HEARD:  Your Honor, I wanted to note -- Your
23  Honor may already be aware of this.  After the mention of
24  punitive damages when we argued directed verdict last week, we
25  filed one short brief that addressed the procedural question of

Page 181

1  page 2418

2

3  1  the propriety of taking this up and a second short brief, I

4  2  believe yesterday, that addressed this question of the fact

5  3  that there are pending briefs on motion for summary judgment

6  4  with an assessment --

7  5       THE COURT:  Your motion for summary judgment is

8  6  denied, but your exception is saved.

9  7       MS. MURRAY:  Your Honor, we would offer this as

10  8  Upjohn Proposed or Proffered Instruction No. 3.  We would also

11  9  like the record to reflect that we object to the submission of

12  10  any claim or any instructions on any claim on insufficiency of

13  11  evidence.

14  12     (Defendant Upjohn's Proposed Instruction 3 proffered.)

15  13       MR. MOORE:  Your Honor, now is not the right time to

16  14  do this, but we do have some exhibit housekeeping matters that

17  15  we need to resolve.  I didn't know whether maybe before the

18  16  jury comes in tomorrow would be a good time to do that.

19  17       THE COURT:  We will do it right after the jury --

20  18  right before instructions.

21  19       MR. MOORE:  Okay.  Thank you, Your Honor.

22  20       MR. MORRIS:  We also have some, so --

23  21       THE COURT:  I suspected that.

24  22  We are in recess.

25  23  (Proceedings in recess at 5:10 p.m.)

26  24          C E R T I F I C A T E

27  25       I, Cheryl Bartnett Nelson, Official Court Reporter, do

Page 182

1  page 2419

2  1  hereby certify that the foregoing is a true and correct

3  2  transcript of proceedings in the above-entitled case.

4  3

5  4  _____     Date:  February 21, 2008

6     Cheryl B. Nelson, CRR, RPR, CCR

7  5

8  6

9  7

10  8

11  9

12  10

13  11

14  12

15  13

16  14

17  15

18  16

19  17

20  18

21  19

22  20

23  21

24  22

25  23

26  24

27  25

# EXHIBIT 34

Page 1

1 page 74
2  1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
3  2                WESTERN DIVISION
   3
4   IN RE:  PREMPRO PRODUCTS LIABILITY   MDL No. 1507
   4                           No. 4:03CV01507
5  5         * * * * * * * * * *
    DONNA SCROGGIN,
6  6        Plaintiff,      Individual Case
        v.             No. 4:04CV01169 WRW
7  7
    WYETH and its divisions; PHARMACIA
8  8  & UPJOHN COMPANY LLC; WYETH
    PHARMACEUTICALS, INC.; and ESI LEDERLE,
9  9
           Defendants.
10 10
   11  Monday, February 5, 2008 - Little Rock, Arkansas - 8:50 a.m.
11 12
           TRANSCRIPT OF TRIAL - VOLUME 2
12 13     BEFORE THE HONORABLE WILLIAM R. WILSON, JR.,
              UNITED STATES DISTRICT JUDGE
13 14
   15  APPEARANCES:
14 16  On Behalf of the Plaintiff:
15 17     MR. ERIK BRETT WALKER
   16     Hissey, Kientz & Herron, P.L.L.C.
17 18     16800 Imperial Valley Drive
   18     Suite 130
19 19     Houston, Texas  77070
20 20     MR. JAMES A. MORRIS, JR.
21     MR. STEVE M. FARIES
22 21     Brent Coon & Associates
   23     11614 Bee Caves Road, Suite 220
24 22     Austin, Texas  78738
25 23
26 24              [CONTINUED]
27 25

---

Page 2

1 page 75
2  1  APPEARANCES CONTINUED:
   2
3    On Behalf of the Wyeth Defendants:
   3
4     MR. F. LANE HEARD, III
   4     MR. STEPHEN L. URBANCZYK
5     MR. RICHMOND MOORE
   5     Williams & Connolly
6     725 Twelfth Street, N.W.
   6     Washington, D.C.  20005-5901
7  7  MS. LYN PEEPLES PRUITT
    Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
8  8     425 West Capitol Avenue, Suite 1800
    Little Rock, Arkansas  72201-3525
9  9
   10
10 11  On Behalf of the Upjohn Defendants:
   12     MS. ELIZABETH ROBBEN MURRAY
11     Friday, Eldredge & Clark
   13     Regions Center
12     400 West Capitol Avenue, Suite 2000
   14     Little Rock, Arkansas  72201-3493
13 15  MR. CHARLES P. GOODELL, JR.
    Goodell, DeVries, Leech & Dann, LLP
14 16     Commerce Place
    One South Street
15 17     Suite 2000
    Baltimore, Maryland  21202
16 18
17     MS. PAMELA YATES
18 19  MR. ANDREW K. SOLOW
   19     Kaye Scholer, LLP
20 20     1999 Avenue of the Stars
   21     Suite 1700
22 21  Los Angeles, California  90067-6048
23 22
24 23  Proceedings reported by machine stenography; transcript
25  prepared utilizing computer-aided transcription.
26 24
27 25

---

Page 3

1 page 76
2  1      I N D E X - VOLUME 2 (February 5, 2008)
   2
3  3  PLAINTIFF'S OPENING STATEMENT........................... p. 77
   4  DEFENDANT WYETH'S OPENING STATEMENT...................... p. 114
4  5  DEFENDANT UPJOHN'S OPENING STATEMENT.................... p. 144
5  6
6  7
7    WITNESSES FOR THE PLAINTIFF:  Direct Cross Redirect Recross
8  8
9    DON AUSTIN            168
10  9
11 10
12 11
13 12
14 13
15 14
16 15
17 16
18 17
19 18  EXHIBITS:                         RECEIVED
20 19  Plaintiff's Exhibit 8567................................ p. 182
21    Plaintiff's Exhibit 21................................ p. 182
22 22  Plaintiff's Exhibit 7423-C............................. p. 232
23 21
24 22
25 23
   24
27 25

---

Page 4

1 page 77
   2
3  1    (Jury not present.)
4  2        THE COURT:  I apologize for being tardy.  I went to
5  3  vote this morning.  They changed my voting precinct.  I went
6  4  there and there was a long line.  Made me a little tardy.  And
7  5  I've been working on two written orders I've just handed out.
8  6    Any other issues we need to take up before we bring the
9  7  jury in?  Not the ones I ruled on in my order.  I take it there
10  8  are none.
11  9    We'll be in recess until 15 till when we bring the jury in.
12 10    COURTROOM DEPUTY:  The jury's not all here yet.
13 11    THE COURT:  They will be in 15 minutes.  I feel it.
14 12    (Recess at 8:41 a.m.; continuing at 8:50 a.m., jury
15 13  present.)
16 14    THE COURT:  Good morning.  Be seated, please.
17 15    With respect to this case only, no other subject matter,
18 16  this case, your hearts and minds just as pure as they
19 17  were when you left yesterday?  If not, raise your hand.
20 18    Let the record reflect out of a possible 24 hands, none
21 19  were raised.
22 20    Open for the plaintiff?
23 21    MR. MORRIS:  May it please the Court, counsel.
24 22    I imagine the room was typical of a doctor's office; a
25 23  little cold, linoleum floor, lights that are awful bright.
26 24  We've all been there.  And Dr. Hagans walked in and told Donna
27 25  Scroggin, You have breast cancer in both breasts, and the proper

Page 5

1 page 78
2
3   1   thing to do is to remove them.  And Donna Scroggin had to make a
4   2   decision as to her future health.  Because, obviously, if you
5   3   don't get it all, it could come back, there could be bad
6   4   consequences.  It's a hard, cold fact, her injury.  For ten
7   5   years, she took hormone therapy to treat menopausal symptoms.
8   6   Menopausal symptoms ordinarily last a year or two, maybe three
9   7   years.  But her doctor relied upon Wyeth and Upjohn for
10  8   information concerning their drugs.  As well he should have.
11  9   After all, the manufacturer of a product is in the best place to
12  10  know what the risks and what the benefits are of that product.
13  11  The manufacturer has a duty to test its products.  Any of us
14  12  that have worked in companies where products are manufactured,
15  13  we know that there's a duty to test your product to make sure
16  14  it's safe, to make sure that when it gets out there to the
17  15  consumer that it does what it's supposed to and it doesn't harm
18  16  anybody.  We also know there are products that carry with them
19  17  risks, and yet they still have to be produced.  I think about
20  18  the drug warfarin, it's a drug that helps the blood thin, and
21  19  for older people like my father who have conditions where
22  20  they're tending to have blood clots, warfarin is important.  It
23  21  is important for him to have that drug because it helps thin his
24  22  blood.  But also with that drug goes a warning, and the warning
25  23  says that this is rat poison.  If you take too much of it, it
26  24  will kill you.  And he knows that and his doctor knows that.
27  25  And he doesn't have to worry because his doctor has been careful

Page 6

1 page 79
2
3   1   in the way that he prescribes it to him.
4   2       For ten years, Donna Scroggin took estrogen and progestin
5   3   in different forms, and you'll hear about that during the trial.
6   4   No one during those years did an adequate study, an adequate
7   5   test to find out what happens when you put estrogen and
8   6   progestin together.  You see, these two products, when she began
9   7   taking them, were not sold by one company.  They were sold by
10  8   two companies.  And you're going to hear the whole history of
11  9   how the drugs did ultimately come together and gain FDA approval
12  10  in 1995.  But even at that point, there was one unresolved
13  11  question, and that unresolved question was, does it cause breast
14  12  cancer?  Unresolved.
15  13      I want to talk to you a little bit over the next hour about
16  14  what we believe the evidence will show, and at the conclusion of
17  15  the case, we're going to ask you to bring back a verdict for
18  16  Donna Scroggin.  And I know that it's going to take courage
19  17  to do that, it's going to take discernment on your part.  Thank
20  18  God we have an intelligent jury, because you're going to learn
21  19  more about breast cancer and epidemiological studies and science
22  20  and medicine than you probably ever wanted to know.  Over the
23  21  next few weeks, you're going to learn a lot.  And in some ways,
24  22  it's going to be like piecing together a puzzle.  And I'd like
25  23  to make two points very clear at the outset.  I talk about Donna
26  24  Scroggin's breast cancer and the impact it had on her because
27  25  it's a fact.  Not because I want to curry any sympathy with

Page 7

1 page 80
2
3   1   anyone here on the jury.  We're not here for sympathy.  If she
4   2   wanted sympathy, she would go to her family members or her close
5   3   friends, people that she's known and trusted who she can confide
6   4   in with her personal feelings.  That's not what the courtroom is
7   5   about, and we understand that.  We're here for justice.  We're
8   6   here for justice.  Because these folks, their companies, are
9   7   never going to admit to you, they're never going to come up here
10  8   and say, We understood that there was a significant breast
11  9   cancer risk and we warned.  What they're going to tell you is,
12  10  There was a very slight risk and we always knew it, we always
13  11  put it in our label.  And I'm going to show you what the truth
14  12  is.
15  13      The second point that I would like to make to you is,
16  14  yesterday, one of the lawyers for the manufacturers said, "Don't
17  15  take things out of context.  Don't take a document out of
18  16  context.  Let's look at things in context."  Folks, I encourage
19  17  you to do that.  I want you to look at it in context.  I want
20  18  you to look at it in context from the mid '70s when they knew
21  19  their drug Premarin caused endometrial cancer, when they knew it
22  20  caused endometrial cancer, up until the time they stopped taking
23  21  the product.  Let's look at it in context.
24  22      You have some screens in front of you.  You'll get used to
25  23  looking at those during the trial because that's where the
26  24  documents will appear.  Sometimes it may be difficult to see
27  25  things clearly on it.  I encourage you to lean forward if you

Page 8

1 page 81
2
3   1   have to.  And let me tell you a little bit about the case.
4   2       The case is about a combination menopausal drug.  We call
5   3   it E and P.  That's estrogen and progestin.  It's taken by women
6   4   normally when they reach menopause.  Now, let me talk to you a
7   5   little bit about women.  And I'm certainly no expert, and my
8   6   wife will tell you that.  But let me tell you a little bit about
9   7   the way that the issues unfold in this case.
10  8       Women, from the time that they're born up until the time
11  9   that they reach about age 50, have lots of naturally circulating
12  10  hormones, and it's so that they can have babies and so forth.
13  11  Estrogen and progestin is naturally produced by the female body.
14  12  So when women are in their twenties, thirties, forties, they're
15  13  producing lots of estrogen and progestin.  In fact, you will
16  14  hear that we can look at certain things and see which women
17  15  produce more estrogen and which produce less.  For instance, a
18  16  woman that has her menarche, or her period, early, we can say
19  17  that that's a woman that's showing tendency towards producing a
20  18  lot of estrogen.  A woman that has a late menopause, maybe 55 or
21  19  later, we can say that that woman is producing a lot of estrogen
22  20  and progestin.  What is menopause?  Menopause is the cessation,
23  21  or the stopping of her period for a period of a year.  That's
24  22  the clinical definition of it.  So when you stopped having your
25  23  period for a year, and that may occur at age 48, it may occur at
26  24  age 49, 50, somewhere in that ballpark, that's when you're in
27  25  menopause.  Well, when a woman stops producing estrogen and

Page 9

page 82

1 progestin, certain things happen in her body.  She may have
2 night sweats, she may have hot flashes, she may become
3 irritable.  And there are a number of things that go along with
4 it because she no longer has the estrogen and progesterone going
5 through her body and giving her the same sensations that it did
6 premenopause.  Oftentimes I've been asked, Well, we know that
7 these drugs are used in oral contraceptives, and so why do women
8 not get breast cancer as a result of these drugs when they're
9 premenopause, before menopause?  And the best way that I know to
10 explain it to you is this.  When a woman is premenopausal, in
11 her twenties, thirties, and forties, if we had a small cup of
12 dye and we wanted to make an example of what estrogen would look
13 like going into her system, we can take that small cup of dye
14 and we could pour it into, say, a swimming pool, and it would
15 dilute and you wouldn't be able to really see it.  And why?
16 Because we are pouring estrogen into her by pill.  It would be
17 combining with all the other estrogen and progestin that's in
18 her body that's already circulating.  When she reaches menopause
19 and the estrogen production shuts down significantly and the
20 progestin shuts down to an undetectable level, if we took that
21 same cup of dye and we poured it into a wash basin, that would
22 be more reflective, because it wouldn't be like the swimming
23 pool where she has all this estrogen; it would be into a body
24 where she doesn't have a lot of estrogen and progestin and you
25 would be able to see it, it would have a significance.  So these

Page 10

page 83

1 postmenopausal hormones that they're taking by mouth, when
2 they're introduced postmenopausally, it has a significant impact
3 on the woman's health that she would not have experienced
4 premenopausal.
5     We're going to talk about the drug companies in this case.
6 Upjohn is a drug company that we'll talk about.  Wyeth is a
7 company that we'll talk about.  And we're going to talk about
8 the breast cancer.  From these two companies, you will see
9 documents.  We're going to show you some documents from the
10 companies.  We're going to actually look inside their file
11 cabinets.  We had an opportunity to look inside their file
12 cabinets, and we're going to show you the actual documents out
13 of their file cabinets that fit into the context of the case.
14 And so you're going to see some documents from Ayerst
15 Laboratories, from Wyeth-Ayerst, from American Home Products,
16 and from Wyeth.  At the outset, let me tell you, they're all one
17 company.  They're all Wyeth.  Then you will see some documents
18 from Upjohn.  And Upjohn is Upjohn.  So that we have it
19 straight, they're two separate companies.
20     We're going to talk to you about the anatomy of the breast
21 and where breast cancer occurs.  It is important for you to
22 understand at the outset of this case that Ms. Scroggin had
23 breast cancer in both breasts, and in the left breast she had
24 what's called a tubular breast cancer, and it was also a ductal.
25 In the right breast, she had a ductal breast cancer.  We're

Page 11

page 84

1 going to go over the anatomy of where that occurs in the breast.
2 We're going to talk to you about what the science says, the
3 epidemiology says about these products causing those types of
4 breast cancer.  And you'll find that with tubular cancers, the
5 relative risk of these products causing breast cancer of the
6 tubular nature is the highest.
7     We talked a little bit about menopause just a moment ago,
8 and this particular slide illustrates where women are
9 premenopausally and where they are postmenopausally.  You will
10 find that these drugs were prescribed to women literally for the
11 rest of their life.  They would put women -- and OB/GYNs did
12 this because they thought it was safe.  They didn't know that it
13 caused breast cancer.  They didn't have good data to rely upon.
14 And so they would prescribe these drugs, and women just stayed
15 on them.  The doctor would refill it every year.  And Donna,
16 like many women, took it for ten years, thinking, you know, this
17 is good for me, it makes me feel good.  And it's kind of like a
18 drug, if you take it continuously, you wouldn't know when the
19 symptoms ended.  You know?  If you took it for two or three
20 years and then you got off of it, and stayed off of it for maybe
21 six or seven months, you might find, hey, I don't have that
22 menopausal symptoms anymore, I don't need to take this drug.  We
23 believe the evidence will show that that's how it's prescribed
24 today.  Today we look at duration.  Short duration, lowest dose.
25 Why is that important?  Why is that critically important?  The

Page 12

page 85

1 reason it's critically important is what we know about this
2 group of drugs when they're put together, the estrogen and the
3 progestin, over a period of time breast cancer risk increases.
4 So in the first couple of years you might not see much of an
5 increase, but at year five, you'll see a doubling or a tripling
6 of the risk, and when we get to year ten, it may be four to
7 eight times the normal risk that a person would have, that a
8 woman would have.  And understand the studies have taken into
9 consideration family history, they've taken into consideration
10 the other risk factors, like alcohol use.  You will hear from
11 the doctors that smoking is generally not related to breast
12 cancer.  I will tell you at the outset, Donna Scroggin smoked
13 for about 20 years.  She stopped around 1999, 2000, somewhere in
14 that range, and yet that really has nothing to do with this case
15 because smoking is not a causative factor in breast cancer.  I
16 know a lot of people think smoking causes every kind of cancer.
17 It doesn't.  Smoking does cause lung cancer, and we'll talk
18 about that in a little bit.
19     It's going to take me a while before I figure out
20 which way is forward and which way is backwards, so I apologize.
21     Important in the case is going to be your consideration of
22 the case-specific causation.  They're going to argue hard
23 throughout the entire trial that we cannot establish specific
24 causation, plaintiffs cannot prove that it actually caused it in
25 this woman.  And the fact of the matter is, we're going to bring

1 page 86

2

3  1  a board certified oncologist who is going to explain to you the

4  2  specific causation in our case.  And we'll get to that in a

5  3  minute.  The first thing that you need to understand, though,

6  4  first and foremost in the causation equation is the issue of the

7  5  menopausal symptoms.  Because menopausal symptoms, which Donna

8  6  had, and she'll explain those to you, are an indication of

9  7  estrogen deficiency.  They're an indication of estrogen

10  8  deficiency.  To solve that problem, her doctor gave her these

11  9  pills, which increased her levels of estrogen and progesterone.

12  10  You will find out as we go through the trial that the

13  11  combination of drugs causes the cells in the breast to grow at a

14  12  quick rate.  It's called hyperplasia.  It's called breast

15  13  hyperplasia, which leads to breast cancer.  The fact that she

16  14  was estrogen deficient is a marker for you towards finding that

17  15  these particular drugs specifically caused her breast cancer.

18  16       She will also talk to you about vaginal atrophy.  Vaginal

19  17  atrophy is another menopausal symptom that occurs when women

20  18  reach menopause and after that.  She had vaginal atrophy, she

21  19  had hot flashes, she had night sweats.  These were all noted by

22  20  her doctor.  These are pieces of evidence of estrogen

23  21  deficiency.  And what does that mean?  That means that it wasn't

24  22  her own internal hormones that were fueling the breast cancer.

25  23  It was the drugs that the companies produced and manufactured

26  24  that her doctor prescribed to her.

27  25       Let's talk about Premarin first.  Premarin came on the

1 page 87

2

3  1  market in 1942.  In 1942, the United States was engaged in World

4  2  War II.  Many of the other countries were engaged in World War

5  3  II.  And at that time in history, science was somewhat crude.  I

6  4  know we've all heard the story about John F. Kennedy's sister

7  5  who had the lobotomy.  She had a lobotomy in the early '40s.  No

8  6  one in the world would do a lobotomy on somebody today.  But in

9  7  the 1940s, science was somewhat crude, and that's when Premarin

10  8  came on the market.  At that time, the FDA did not go through

11  9  and survey the tests and the studies that the drug companies are

12  10  supposed to perform to determine whether or not this had any bad

13  11  side effects, whether or not it could hurt people.  So in 1942,

14  12  the drug came on the market.  Premarin is pregnant mare's urine.

15  13  That's what it's made from and that's where it comes from.  And

16  14  the way this product is made, they wait until a horse is

17  15  pregnant -- and you'll find out in the testimony that when

18  16  you're pregnant, that's when your body produces the most

19  17  estrogen and progestin.  And that's why oftentimes you'll hear

20  18  women say, after they get through with the morning sickness,

21  19  that I have never felt better than when I was pregnant.  A lot

22  20  of women will say that because they have lots of naturally

23  21  stimulating estrogens and progesterones.  Remember, these are

24  22  hormones, hormones.  And steroidal hormones are what the

25  23  companies were making.  And so, naturally, that phase is the

26  24  best time to gather the estrogen.

27  25  Wyeth will tell you from the witness stand they don't know

1 page 88

2

3  1  everything that's in Premarin, even today.  There is no generic

4  2  of Premarin.  You know why?  Because they don't know what all is

5  3  in it.

6  4       It was indicated for a couple of things, a few things.

7  5  Treatment of menopause symptoms -- and we've listed all of them

8  6  here, and I won't go through them because I've already mentioned

9  7  them -- and prevention of osteoporosis.  The estrogen has the

10  8  ability to strengthen the bones, and so many times it was used

11  9  in women back during the day before there were similar

12  10  alternatives, it was used for prevention of osteoporosis.  But I

13  11  want you to understand at the outset that when we talk about

14  12  Premarin, we're talking about estrogen.

15  13       Now, what we know about estrogen today, after years of

16  14  study, we know that estrogen alone is not a cause of breast

17  15  cancer.  Estrogen alone is not a cause of breast cancer.  It is

18  16  the combination of estrogen and progesterone that causes breast

19  17  cancer.

20  18       In the mid '60s there was a book published on menopause,

21  19  and when that book was published, it got the attention of a lot

22  20  of people.  A lot of people read, and women during the '60s were

23  21  kind of fed up with having to go through menopause, and it

24  22  became popular in the '60s to start taking supplements when you

25  23  reached menopause as a treatment.  And so we saw the usage of

26  24  the drug expand in the '60s.  And most women, whether they had

27  25  had a hysterectomy or not, took estrogen only.  And in 1975, a

1 page 89

2

3  1  couple of doctors wrote two studies that were based on the

4  2  science, based on the ecological data and the epidemiological

5  3  data that they had found that showed that Premarin causes

6  4  endometrial cancer.  Premarin causes endometrial cancer.  So

7  5  what did the companies do at that point?  Do they take it off

8  6  the market?  No.

9  7       The two doctors that discovered it, Drs. Ziehl and Finkle

10  8  were a couple of the doctors, they said that this product is

11  9  causing endometrial cancer, cancer in the uterus below the

12  10  waist.  Now, if you had had a hysterectomy, you wouldn't have to

13  11  worry about taking E alone because you no longer have the organs

14  12  that it causes the hyperplasia.  You'll hear the term, the

15  13  precancerous term is "endometrial hyperplasia," that rapid cell

16  14  growth I talked about a moment ago.  That's what happens.  And

17  15  so what we know is, and the company knew it, and the company

18  16  admitted it at that point back in 1975, they went in and they

19  17  changed their labeling.  And the labeling includes now a black

20  18  box after 1975 that says this product may cause endometrial

21  19  cancer.

22  20       Now, what's the significance of a black box warning in a

23  21  label?  When doctors see it, they know, uh-oh, this is a drug

24  22  that can cause serious harm.  Not just a little side effect, not

25  23  a headache, not vomiting.  It can cause something serious.  So a

26  24  black box warning in a label is important because it lets the

27  25  doctor know, hey, we've got an issue here, and it's a serious

1 page 90

2

3  1  issue, and I need to counsel my patient about it.

4  2      You'll see some testimony from their experts that confirms

5  3  that they all agree that Premarin causes endometrial cancer.

6  4  "Causes."  They use that word, "cause."  We're going to get into

7  5  a battle over semantics during this case, and they're going to

8  6  say, well, risk factor doesn't mean cause, association doesn't

9  7  mean cause.  Cause is different.  The fact of the matter is,

10  8  their experts admit that their product Premarin causes

11  9  endometrial cancer.

12  10     So instead of taking it off the market, instead of taking

13  11  it off and just studying it for a while before you put it back

14  12  on -- my goodness, why couldn't we have done that?  Somebody had

15  13  the bright idea -- and I've got a light bulb up there.  The

16  14  light bulb went off in their head.  And they decided, let's add

17  15  another drug for women who still have a uterus that will protect

18  16  their uterus.  Progesterone.  Progesterone, naturally made in

19  17  the female body up until the point of menopause, then it is

20  18  almost undetectable.  Progestins cause shedding in the lining of

21  19  the uterus.  That's why progestin is part of many birth control

22  20  pills, because it causes shedding in the lining of the uterus so

23  21  you can't conceive.  Well, these doctors had a bright idea, and

24  22  it was a bright idea.  If the Premarin, the estrogen is causing

25  23  growth in the uterus, this hyperplasia, then let's take a

26  24  progestin, which will counteract that and cause shedding of that

27  25  hyperplasia, and she won't have to worry about endometrial

1 page 91

2

3  1  cancer anymore.  All right.  Okay.  So that's what they decided

4  2  to do.  But guess what?  Progestin -- and this has long been

5  3  known -- causes stimulation of the cells in the breast.  So

6  4  exactly what was happening in the endometrium could happen in

7  5  the breast.  It is biologically plausible, and they knew that.

8  6  So the question becomes, did they study it?  Did they determine

9  7  whether or not it would actually do that in practice?  And

10  8  that's a question you're going to get to answer.

11  9      So they added the progestin, and the most popular progestin

12  10  on the market at that time was a product called Provera.

13  11  Provera is made by the folks at Upjohn.  Now, I talked to you a

14  12  moment ago about the indications and usages of Premarin, and I

15  13  told you that Premarin was used for menopausal symptoms and to

16  14  prevent against osteoporosis.  Let me elaborate a little bit

17  15  about that.

18  16     Drugs in America have to go through an approval process

19  17  after 1961 or '62.  About that time, FDA finally got organized

20  18  and efficient and realized we better look at the science.

21  19  Americans are addicted to drugs.  They take drugs all the time.

22  20  We better make sure that they're safe before they go out there.

23  21  Realize, there are 11,000 drugs out there.  There are only

24  22  10,000 employees at FDA.  So it is a big job, big job.  Well,

25  23  one of the things that FDA put in their mandate, is their

26  24  requirements is you cannot market a drug if you haven't proven

27  25  its benefits in the science.  You've got to prove the benefits.

1 page 92

2

3  1  And you can't say your product does something if it isn't proven

4  2  by science.  So Wyeth had satisfied the FDA that their product

5  3  helped reduce menopausal symptoms and that it helped prevent

6  4  osteoporosis.  Upjohn had a product called Provera.  It was for

7  5  treatment of secondary amenorrhea.  Amenorrhea is the inability

8  6  to bleed.  Okay?  That's what it's meant to treat.  It is also

9  7  meant to treat abnormal uterine bleeding due to hormonal

10  8  imbalance in the absence of organic pathology.  Long

11  9  explanation.  But the important thing for you to take away,

12  10  Upjohn did not have an approval for this drug to be used for

13  11  menopausal symptoms in menopausal women.  So it would have been

14  12  inappropriate for a doctor to have said, Okay, you're going

15  13  through menopause, you have trouble with those menopausal

16  14  symptoms, here, take some Provera.  That would have been

17  15  inappropriate because it wasn't indicated for that usage.  The

18  16  FDA had not approved it for that usage.

19  17     So here we are, mid '70s, 1975.  Upjohn had been on the

20  18  market since 1959.  Upjohn's product Provera had been on the

21  19  market since 1959.  From time to time you'll see Provera called

22  20  MPA.  MPA is a short term for medroxyprogesterone acetate.

23  21  Medroxyprogesterone acetate is actually the chemical compound

24  22  Provera.  All right?  It is a synthetic progestin.  It is not a

25  23  natural hormone.  It is a synthetic progestin.  You'll see

26  24  documents that say it's much more potent than a woman's natural

27  25  hormones.  So doctors begin in about 1975 prescribing it in

1 page 93

2

3  1  combination to deal with the endometrial cancer crisis.  You

4  2  will see documents that show as early as 1966, Upjohn had

5  3  requested that the FDA approve this product for use in

6  4  menopausal women.  But the FDA responded back and said, We can't

7  5  do that because you haven't proven that it's beneficial for

8  6  them.  You haven't proven that your product works in it.  You've

9  7  got to go do some studies.  You have to bring us some science

10  8  and proof.  FDA, the Food & Drug Administration, does not test

11  9  these products.  Understand that the FDA is not a building with

12  10  a bunch of doctors in lab coats with beakers and microscopes and

13  11  doing all this testing themselves.  What FDA does is they rely

14  12  upon the manufacturers to guard the hen house.  The manufacturer

15  13  is supposed to come forth with the studies.  We'll talk to you

16  14  about the FDA at length, and you'll find there's an approval

17  15  process that they have to go through for the drugs.  They have

18  16  to test them in animals.  They have to test them in people.  And

19  17  then they're supposed to test them after they're on the market,

20  18  Phase IV studies.  They're supposed to go out to see, does this

21  19  cause any long-term harm?  And we'll find out whether or not

22  20  they fulfilled that.

23  21     In 1977 -- this memo is out of the files of Wyeth, out of

24  22  their file cabinet.  We know that Wyeth in 1977 knew that "Many

25  23  practicing gynecologists are introducing sequential progestins

26  24  into their estrogen replacement regimens in postmenopausal

27  25  women.  Some have considerable experience with this treatment

Page 21

page 94

1  modality.  Unfortunately, the number of published, well-designed
2  studies is small or practically nonexistent."
3     So 1977, Wyeth knows, Upjohn knows that their products are
4  being used together, that it's routine for practicing
5  gynecologists to produce these products and give them to
6  patients in combination.  So what does that do?  That triggers a
7  duty, a duty on the part of both corporations to test the
8  product, to find out what happens.  If we know that many
9  practicing gynecologists are going to do this, and you have a
10  whole population of women out there that are getting these
11  products, we ought to test it in combination.  And who is the
12  best person to test?  The drug company.  Because who knows more
13  about their product than anybody?  The drug company.  Who has
14  the primary responsibility?  The drug company.  Where does the
15  buck stop?  With the drug company.
16     So, from 1975 to 1995, these drugs, estrogen and progestin,
17  the E and the P, are prescribed to women routinely, without FDA
18  approval, that they be used in combination.  Without FDA
19  approval, for all those years, 20 years, it was routine.
20     In 1995, Wyeth was able to get approval on a product called
21  Prempro.  Both products in one pill.  We're going to show you
22  what the FDA said about the concern over breast cancer when they
23  approved this drug in 1995.
24     Let's go back in history a little bit, 1975, a man named
25  Robert Hoover.  Robert Hoover is a doctor -- this might be 1976.

Page 22

page 95

1  I'll tell you, I think it's '76.  It's hard to see.  1976, a
2  gentleman named Robert Hoover worked at the National Cancer
3  Institute, a doctor.  He did a study.  The study seemed to
4  suggest that there may be breast cancer caused by the
5  combination or by estrogen drugs.  Early on, for many years,
6  there was a belief among doctors, in the '70s and early '80s
7  even, that estrogen alone was causing the breast cancer.  That's
8  what they thought.  They thought maybe it's estrogen alone.  But
9  there was also a suggestion from time to time, what about the
10  addition of the progestin?  Maybe adding the progestin is what's
11  causing the breast cancer.  And we see in 1976, he sent this
12  letter to Wyeth-Ayerst, to George Brice at Wyeth, and he says,
13  "This study forms the basis for my previously publicized (before
14  the Kennedy Subcommittee) statement that I had evidence which I
15  interpreted as indicating that menopausal estrogens may be a
16  risk factor for breast cancer."  So 1976, a letter is sent to
17  Wyeth from the National Cancer Institute, by the doctor who went
18  before the Kennedy Subcommittee.  This isn't some harebrained
19  doctor out there doing his own little research.  This is the man
20  at the National Cancer Institute saying to Wyeth we're concerned
21  about whether or not it causes breast cancer.
22     So Wyeth has an internal memo that we found, and it says,
23  "In view of the widespread use of estrogens with or without
24  progestin" -- and there you are, they're mentioning progestin in
25  1976 -- "there is valid concern as to whether or not the use of

Page 23

page 96

1  exogenous" -- and that means outside the body, taken by pill
2  form, not endogenous, but exogenous -- "whether or not the use
3  of exogenous estrogen leads to an increase in the incidence of
4  breast cancer."  That's a Wyeth document.  "One might consider
5  that the presence of both estrogen and progesterone receptors in
6  a tumor indicates that the tumor can and does respond to
7  estrogen."  You will find out that a pathologist can test the
8  tumor and find out whether or not it's being fed by estrogen and
9  progesterone.  Guess what?  Donna Scroggin's tumor is fed by
10  estrogen and progestin.  You will also hear that most breast
11  cancers are fed by estrogen and progestin, and that there are
12  many women that get estrogen and progestin positive breast
13  cancers that never took hormone therapy.  That's all true.  But
14  what we know is that for the subset of women that had menopausal
15  symptoms that started taking this long term, doctors believe
16  that the introduction of these drugs significantly contribute to
17  the cause of the breast cancer.
18     Further on down in this memo, "The possible role of
19  progesterone in the etiology of breast cancer is another area
20  that needs clarification."  So Wyeth understood in '76 that it
21  needs clarification, we have to figure out the role of the
22  progesterone.  So they're admitting in 1976 that they understand
23  the issue.
24     Another memo from 1976.  They go through -- and I'm going
25  to show you this whole memo when we get into the trial.  But one

Page 24

page 97

1  of the things that they say is they should do a case control
2  study on mammary cancer.  "We have no plans of which I am aware
3  for such a study."  But in '76, we know at least at that point
4  that they understand epidemiology.  They're using an
5  epidemiological term "case control study," and we'll talk about
6  what that is.  So in '76, they know we should do a case control
7  study.  They're even saying they should.  Did Wyeth or Upjohn
8  actually test these combinations of E plus P for long-term use?
9  And that's really the point.  All the doctors will tell you that
10  breast cancer does not occur in a day.  It doesn't occur in a
11  week.  It doesn't occur in a month.  It takes years.  And when
12  you're dealing with something like breast cancer, you need to
13  look over a period of years.  You will find that a case control
14  study is a retrospective study that doctors and epidemiologists
15  can perform by looking back at medical records.  They can look
16  back and they can find women that took the drug that got breast
17  cancer and then they look at controls, people that did not take
18  the drug, and they compare the statistics and they come up with
19  a decision.  And they can look back ten years in a case control
20  study.  Does that mean it takes ten years to complete the study?
21  No.  You can do the study in a year.  But you can look back ten
22  years.  And that's the value of a case control study.  It allows
23  you to do it in an immediate fashion.  There are other types of
24  trials.  The gold standard trial that you'll hear about is the
25  randomly controlled trial which can go on where you have people

page 98

1 that take the drug and people that take placebo, and that can
2 last for five, ten, 15, 20 years, and you follow the people.
3 But the initial safety study that you can do, and everybody
4 knows this, is a case control study. During the case you're
5 going to have to ask yourself, where is Wyeth's case control
6 study? Where is the one that Wyeth did? Now, they're going to
7 come in here and say, We supported studies, we sent money to
8 other doctors that were doing studies. They're going to tell
9 you that we did some other studies. Look at the duration of the
10 studies that they may have supported. Most of them are short
11 duration. You're not going to get a result in two or three
12 years, probably not even four on a clinical trial, or five.
13 Listen carefully to the evidence. We have to pay attention to
14 the details.
15       What we'll know about cancer is that cancer, at least what
16 the doctors say, can often begin with the genetic mutation in a
17 cell. And that's why hyperplasia is important. When you have a
18 lot of growth in these cells, whether it be the endometrium or
19 the breast, when that occurs, there's a greater chance for a
20 mutation in a cell. Doctors and scientists now know that cancer
21 begins with a mutation in the DNA and it then proceeds to a
22 condition called hyperplasia, which is where you see a large
23 growth of the cells, then to dysplasia, or what is sometimes
24 called atypical hyperplasia, where it's getting worse, and then
25 to a situation where it's in situ. And by "in situ," we mean it

page 99

1 hasn't invaded the other cells around it, it hadn't gotten into
2 the other areas, it's still confined. You will hear from the
3 doctors that we all may have within us in some part of our body
4 a cell mutation, or a hyperplasia or a dysplasia, that remains
5 asymptomatic until the time we die. We may live to be a hundred
6 and you may have conditions like that within your body and they
7 stay dormant. But if it breaches over the gap and it becomes an
8 invasive cancer, then you've got a real problem, because
9 invasive cancers go beyond the cell walls, they can go into
10 other organs, and, as we all know, these types of invasive
11 cancers can kill you, ultimately. What we know about the growth
12 of cancer is that it's unpredictable. In some people it grows
13 rapidly, in some it grows slowly.
14       Now, how do these drugs work to have any role in this?
15 Well, the doctors will testify that it's simply like putting
16 fertilizer on your grass. You have the yard, and in order to
17 make the grass grow, we need water, sunshine, and sometimes, you
18 know, if you want it to really grow, you might want to put some
19 fertilizer on it. And the way that these drugs affect the cells
20 and cause this condition is much like the fertilizer effect.
21 And you will hear testimony about that. They're going to
22 suggest to you that Donna Scroggin's initial cells were the
23 genetic mutation, hyperplasia, dysplasia, and may have been
24 there before she had breast cancer. May have been there before
25 she took HRT. So it's not our fault. It was there before she

page 100

1 took HRT. That's not the whole story. May have remained a
2 dysplasia or atypical hyperplasia until the day she died at a
3 hundred years old. But it was the introduction of these drugs
4 that stimulated the growth. And how do we know that? Because
5 of the testing of the hormone receptors that were positive.
6 They showed that they were being fueled by the estrogen and
7 progesterone. And where else was she getting the fuel? She's
8 postmenopausal. She had menopausal symptoms. She's not
9 producing it herself. So where is it coming from? It was
10 coming from the drugs.
11       They're going to say, We did five major HT studies. And
12 we're going to look at these in detail. You're going to be
13 tired of the name PEPI and Prempro pivotal trial and HERS by the
14 time we're through. But I want you to look at these studies as
15 we go through them, because you're going to find that they were
16 all of relative short duration, none of them were designed to
17 look specifically at breast cancer. And understand that in a
18 randomly controlled trial, your endpoint, your primary endpoint
19 has to be benefit. You have to be looking to benefit. Does
20 this improve the heart? Does this improve the mind? And the
21 reason that you have to do that is that it would be unethical to
22 test a drug for harm. You can't give a drug to humans thinking
23 that it may cause harm, because if it does, I mean, you wouldn't
24 have any participants. Nobody would want to be in that study.
25 I don't want to be in that study. So all drugs are tested in

page 101

1 RCTs, randomly controlled trials, for benefit. But they also
2 surveyed the harm. And what you will find is in all of these
3 studies that were done, they may have taken a mammography, but
4 none of them really took a careful look at breast cancer. None
5 of them. They were of short duration. By their own admission,
6 they didn't have enough participants. There were different
7 reasons in each one of these studies why they were not designed
8 to show breast cancer risk. And the problem is, Wyeth could
9 have. Wyeth could have carefully looked for the endpoint.
10 Upjohn could have carefully looked for the breast cancer
11 endpoint. But they didn't.
12       So what happened? Why are we here today? July of 2002,
13 some researchers at the National Institutes of Health had been
14 performing a study called the Women's Health Initiative. The
15 Women's Health Initiative was set up to look at postmenopausal
16 hormone use. NIH funded it. It was funded by NIH. NIH is a
17 governmental entity whose tax dollars went to have the Women's
18 Health Initiative. Wyeth will tell you they contributed the
19 pill Prempro, and yes, they did. They also provided the
20 placebos, and yes, they did. Their financial contribution to
21 that was minuscule compared to the cost of this study. The fact
22 of the matter is, the Women's Health Initiative in July 2002 had
23 to be stopped. Because after about 4.4 years of usage, an
24 average number of 4.4 years, they were seeing too many invasive
25 breast cancers. Too many invasive breast cancers. And the

page 102

1 leaders of this study had set up an arbitrary point; if you
2 reach this point, study stops. So the combination arm that they
3 were studying, of the E plus P, was stopped. Now, is the
4 Women's Health Initiative the definitive breast cancer study?
5 No. The Women's Health Initiative was set up as a primary
6 endpoint to see if these drugs helped the heart. Did they help
7 the heart? Well, guess what? They found out that they didn't
8 help the heart. The study was to look at does it help your
9 mind, prevent against Alzheimer's? Guess what? It doesn't.
10 And so the trial was stopped as to the E plus P arm. The
11 estrogen alone arm, it showed no increased risk of breast cancer
12 in that arm. So that was further evidence that there was no
13 increased risk on the estrogen alone, but for the combination
14 there was an increased risk.
15 And this was the study that could make a difference, and it
16 did make a difference. Doctors completely changed the way that
17 they handled these drugs after July 2002. Many people refer to
18 it as the breast cancer alarm. This was the alarm that went off
19 that notified the medical community that there is no more
20 dispute. You know, you've been saying for years that there's
21 controversy among the studies. Some say it can, some say it
22 can't. As of July of 2002, no reasonable doctor anymore takes
23 exception and says it may or may not. We now know that this
24 causes breast cancer.
25 The overall risks exceeded the benefits in the study.

page 103

1 That's very important. Throughout this case, you're going to be
2 looking at what Donna's doctor was doing in terms of prescribing
3 the medication. Was he weighing the risks and the benefits? It
4 is important to understand that all those years Dr. Kuperman was
5 prescribing the drug to Donna Scroggin, he didn't have the
6 information from the WHI. He didn't know it definitively caused
7 breast cancer. He didn't know it wasn't good for the heart,
8 wasn't good for the mind. He didn't know those things. So what
9 was his risk-benefit view? He thought it was beneficial. He
10 thought it was beneficial. He thought he was doing the right
11 thing.
12 You will hear from some researchers that are world-renowned
13 experts. One is Graham Colditz. He's the doctor at Harvard
14 University that set up the Nurses Health Study back in the
15 '70s. Dr. Colditz has been following this issue for years, and
16 you will have an opportunity to see some of his papers that he's
17 authored through the years concerning his belief about the cause
18 of breast cancer.
19 THE COURT: You have about 11 minutes.
20 MR. MORRIS: Thank you, Your Honor.
21 You'll hear from Dr. Don Austin. You'll hear from him
22 today, probably. Dr. Austin is an epidemiologist. He's on the
23 West Coast. He has in the past worked through the SEER
24 database, which is Surveillance Epidemiology and Endpoints
25 Research. It is a database that follows breast cancer, all

page 104

1 kinds of cancer, all over America. And Don Austin has been
2 following this issue since 1975. He was one of the doctors, one
3 of the epidemiologists that brought the ecological data
4 concerning endometrial cancer to the knowledge of the
5 government. He testified in 1975 in front of the FDA that these
6 products were causing endometrial cancer. Premarin is causing
7 endometrial cancer. And he followed the data. And you know
8 what he found? As prescriptions of the drug dropped off after
9 they knew that it caused endometrial cancer, guess what?
10 Endometrial cancer dropped off. That's ecological proof.
11 That's proof towards the causation issue. As the prescriptions
12 went down, the instance of the endometrial cancer went down.
13 You will hear from Dr. Colditz that E plus P causes breast
14 cancer, and it is unequivocal. You will hear from Dr. Brian
15 MacMahon at Harvard, you will hear through his paper -- he's not
16 coming live. But you will read from his paper that E plus P is
17 a known cause of breast cancer. You will read from other
18 journals that the literature indicates a causal relationship
19 between E plus P and breast cancer. This is not some novel
20 theory that a plaintiff's lawyer dreamed up with his one doctor
21 and came in to present as junk science to a jury. These are the
22 world's leading researchers. You will find that it exists in
23 textbooks. Dr. Weinberg's text. Under "hormones," "estrogen
24 and progesterone, breast." "Known or suspected human tumor
25 promoters and their sites of action." It's in the textbooks.

page 105

1 I'll talk to you about case specific causation. There are
2 several products you're going to look at during the course of
3 the trial. When she first began, she was on a different type of
4 estrogen called Ogen. Ogen is not a part of this case. She
5 only took it for a few years. During that time she was taking
6 it in combination with Provera. Then she began taking Premarin.
7 Premarin, as we know, is the estrogen that's Wyeth's product.
8 In about the mid '90s, when Prempro came on the market, she took
9 Prempro for a couple of years, and then, for whatever reason,
10 she went back on Premarin and Provera, the combination, and took
11 that up until the time she got breast cancer. This is a line
12 that shows for 11 continuous years on HRT. We'll be able to
13 show that to you. This goes through her other risk factors.
14 And we will go through that and show you what risk factors she
15 has and what she does not.
16 The way that the growth occurs, as I mentioned to you, is
17 much like a seed being fertilized. We'll talk about that at
18 length.
19 And why are we here? Okay. We're all so clear about the
20 fact that it causes breast cancer, why haven't the companies
21 just come forward and said, We admit it, we blew it, we made a
22 mistake, and we'll compensate her? The reason that we're here
23 today, in my opinion, is because of Edith Horn. Edith Horn is
24 Donna Scroggin's mom. Edith Horn was diagnosed with breast
25 cancer in 1997 at the age of 79, twenty years older than Donna

page 106

```
 1  was when Donna was diagnosed with it.  Now, the companies are
 2  going to come in here and they're going to say, Folks, this is a
 3  genetic breast cancer.  This is a genetic breast cancer.  This
 4  isn't caused by her drugs.  It's by her genetics.  And they've
 5  gone back through the family tree, and in the family
 6  tree, when we get to Donna's grandfather's sister, the
 7  grandfather's sister had breast cancer, as did both of her
 8  daughters.  And you're going to see there's another breast
 9  cancer on the chain where her grandparents are.  And so the
10  defense in the case is going to be this is a genetically induced
11  breast cancer.  And our response to that is, okay, let's study
12  it.  Let's figure out if that's right or not.  Because there is
13  a way to study it.  You can go get genetic testing.
14      Before I talk to you about what the genetic testing results
15  were, I want you to know that in the literature, they've looked
16  at this issue of family cause, and they've considered that in
17  all the studies, and all the studies they controlled for whether
18  or not there are certain women who have breast cancers in their
19  first-degree relatives, and they've looked at that as part of it
20  and it's figured in in the quotient of what is the proper risk.
21  But what we know is that "In contrast, a first-degree family
22  history of breast or ovarian cancer was associated with a
23  stronger increased risk for ER-negative and PR-negative breast
24  cancers."  So family history is more strongly associated with
25  hormone negative breast cancers.  She has a hormone positive
```

page 107

```
 1  breast cancer.  So that's one piece of evidence that you can
 2  consider if you choose to believe that maybe it wasn't just the
 3  genetics.
 4      Secondly, there are genetic studies that can be done.  The
 5  breast cancer 1 gene and the breast cancer 2 gene, BRCA 1 and
 6  BRCA 2.  Donna was tested for BRCA 1, she was tested for BRCA 2.
 7  They were both negative.  If they'd been positive, we
 8  would have dismissed the case.  That's it.  So they said, Well,
 9  there are a couple of other tests out there that you can do.
10  You can do a test called a CHEK-1 -- or a CHEK-2.  I'm sorry.
11  Or you could do a test called the Bart test, the large
12  rearrangement test.  Guess what?  We did those.  What did we
13  find?  For the large rearrangement, no mutation detected.  No
14  mutation detected.  Neither one.  They were both negative.  For
15  the CHEK-2, what did we find?  Negative.
16      Now, these are all the genetics tests that we can do today
17  by today's technology, and it only makes up about 30 percent, or
18  40 percent of the genetics that may exist out there.  There may
19  be another 60 or 70 percent that are unknown that could be
20  identified.  But for everything that we can test for in today's
21  world, she's negative for a genetic mutation.  That argues
22  against the defense that this is a genetically induced breast
23  cancer.  But even if it is, is that the end of the case?  No.
24  Because as I told you in voir dire, producing cause is the
25  standard; a producing cause.  Did these hormones interact with
```

page 108

```
 1  the genetics to cause her breast cancer?
 2      You're going to hear from our breast surgeon, Dr. Elizabeth
 3  Naftalis.  She's an expert witness from Dallas.  She's going to
 4  come in and explain her review of the case, her review of the
 5  case specifics, and she's going to tell you, in her best medical
 6  opinion, it is more likely than not that these drugs contributed
 7  to Donna's breast cancer.
 8      You're going to hear from Dr. Kuperman.  He's going to come
 9  testify why he prescribed it and what his thought process was
10  during the years about the breast cancer connection.
11      You'll hear from Dr. Suzanne Parisian.  She's an FDA and
12  liability expert.  She's going to come in and testify about all
13  of the documents that we have found that suggest that Wyeth and
14  Upjohn knew about this danger and sat on their hands for more
15  than 20 years as women consistently got breast cancer.
16      We know that there's a new drug now called low-dose
17  Prempro.  Shorter duration.  It's a lower dosage.  Is it still
18  on the market?  Yes.  Is it appropriate in some women?  Yes, it
19  is.  Just like warfarin is appropriate for my dad.  But we
20  believe the warning that should exist today should tell
21  patients, black box, this can cause breast cancer, and this can
22  be a real problem for your patient if you're just prescribing it
23  to them for menopausal symptoms.  If you're doing that, just do
24  it for a short duration.
25      You're going to get to see all of the warning labels.
```

page 109

```
 1  Wyeth is going to put their label up here and they're going to
 2  say, We mentioned breast cancer throughout our label.  Ladies
 3  and gentlemen, don't look just at the sound bites.  During the
 4  trial, please analyze the label carefully.  You will find every
 5  time they say that studies have suggested there may be an
 6  increased risk of breast cancer, the next sentence says other
 7  studies have not.  You know what the bottom line is?  It says
 8  that the risk is no greater than that posed by the greater
 9  population.  What does that tell a doctor or patient?  There is
10  no increased risk.  They discuss it, but it's equivocal.  Every
11  time they mention it, they take it away.
12      One other point I want to make to you, look at what section
13  they're talking about when they talk about their label.  The
14  contraindication section says don't give it to somebody that's
15  got breast cancer.  That means don't give it to somebody that
16  has active breast cancer.  It doesn't mean this is a breast
17  cancer warning that it can cause it.  The way that I like to
18  think about it is if I had a cut on my arm, it would be
19  contraindicated to pour salt in it.  You don't pour salt in an
20  open wound because it would aggravate it.  So that would be a
21  contraindication, don't pour salt in the wound.  Does that mean
22  that the salt caused the open wound?  No, absolutely not.  And
23  no doctor thought that it did.
24      We're going to go through the warning labels with you and
25  then we're going to show you what they had in their file
```

page 110

1    cabinet, and you're going to see a lot of documents concerning
2    their thoughts about this.  You're going to see that they wanted
3    to retain public relations experts to help anticipate the
4    potential coverage.  You're going to find they were very worried
5    about publication throughout the years.  This is in 1976, early
6    on.  "It is crucial for us to formulate some plans on what, if
7    anything, can be done to mitigate the possible adverse effects
8    of publication of the Hoover study on menopausal and
9    postmenopausal use of estrogens."  So rather than embracing
10   Robert Hoover's study and saying, Hey, we may have a problem.
11   Let's go study it.  Oh, no.  Heaven forbid.  And I have document
12   after document that I will show you along that line.
13       You'll find that as late as 1995, there was a gentleman
14   named Cummings who wrote a document about breast cancer, and it
15   says, "Our findings suggest that the risk of breast cancer
16   associated with hormone replacement therapy may have been
17   substantially underestimated since osteoporosis is a primary
18   indication for its use."  Substantially underestimated.  What
19   did Wyeth do in 1995 in anticipation of the Cummings study?
20   They came up with some action steps.  They wanted to highlight
21   the flaws in the Cummings study.  They wanted to do a background
22   that said this is just one more paper.  Their goal was to
23   balance the anticipated negative coverage, and their strategy
24   was the dismissive strategy.  The dismissive strategy.  They
25   wanted to select third-party groups, people like the American

page 111

1    College of Obstetricians and Gynecologists, whom they support,
2    and they wanted to go out and do whatever they could to make
3    sure that people did not embrace the studies that were being
4    done by other people that suggested that it caused breast
5    cancer.  Why?  Why?
6        THE COURT:  It's time to wind it up.
7        MR. MORRIS:  I haven't had an opportunity to talk much
8    about Upjohn.  And I will tell you that their product carried no
9    breast cancer warning for women at all.  Their product was not
10   approved for use in combination until '98.
11       I focused a lot on Wyeth, and the reason for that is Wyeth
12   calls themselves a leader in women's healthcare.  They were the
13   only company up until '95 that had an approval of the product
14   for use in postmenopausal women.  I believe you'll see that
15   there's solid evidence against Upjohn also in this case.
16       And I believe at the conclusion of the case, after you've
17   seen all the evidence, it will be clear to you that Donna
18   Scroggin and her doctor were not sufficiently warned about the
19   dangers of these products being used in combination, that these
20   products contributed to cause her bilateral breast cancer and
21   the removal of both her breasts, and you will find that that is
22   a significant injury that deserves compensation.
23       I encourage you throughout the trial to read the documents
24   carefully.  We're going to do our best to present every piece of
25   evidence that we can get in during these three weeks.  I know it

page 112

1    sounds like a long time, but we're looking at 60 years of
2    history.  I want to thank you for your attention this morning
3    and I look forward to trying the case in front of you.
4        THE COURT:  Ladies and gentlemen, we're going to take
5    about an 11-minute break now.  I realize that's a short break.
6    And after the first defendant counsel makes an opening
7    statement, we'll take another short break.  Don't talk about the
8    case or anybody involved in it, don't start making up your mind.
9    We're going to try to start back at five after by that clock
10   there.
11       Let the jury stand out.  Everyone else, remain seated.
12       (Whereupon, the jury exited the courtroom and proceedings
13   continued in open court as follows:)
14       THE COURT:  All right.  I understand Wyeth is going to
15   take 50 minutes and Upjohn 40.  We'll be in recess until five
16   after.
17       MR. URBANCZYK:  Your Honor, just so that the Court is
18   aware, it was our plan that Mrs. Pruitt would take 25 minutes,
19   but I would take 25 minutes, and Mr. Goodell would take 40
20   minutes.  In light of the fact, Your Honor, that Mr. Morris
21   spent 90 percent of his time on Wyeth, I'm not asking that you
22   take more time out of Mr. Goodell, but since Mr. Morris went
23   over five minutes, could we have a total of 55 minutes and let
24   Mr. Morris have 40?
25       THE COURT:  I'm absolutely satisfied, and I'm serious

page 113

1    about this, that 50 is enough.  So your request is denied.
2        MR. URBANCZYK:  We'll do it 25/25.
3        THE COURT:  Beg your pardon?
4        MR. URBANCZYK:  Mrs. Pruitt will take 25 minutes and
5    I'll take 25.
6        THE COURT:  Thank you.  We're in recess.  We'll try to
7    start back at five after.
8        (Recess at 9:55 a.m.)
9            C E R T I F I C A T E
10       I, Eugenie M. Power, Official Court Reporter, do hereby
11   certify that the foregoing is a true and correct transcript of
12   proceedings in the above-entitled case.
13
14
15
16   _____    Date:  February 5, 2008
     Eugenie M. Power, RMR, CRR, CCR
17   United States Court Reporter

page 114

1     (Continuing at 10:10 a.m., jury present, as follows:)

2         THE COURT:  Next?

3         MS. PRUITT:  Thank you, Judge.

4     May it please the Court, Counsel, Ms. Scroggin, Ladies and

5   Gentlemen of the Jury:  I am pleased to be here on behalf of

6   Wyeth Pharmaceuticals.  Along with my colleagues Steve Urbanczyk

7   and Lane Heard, we will be presenting the evidence to you about

8   the other side of the story.

9     Mr. Morris came before you this morning and made a lot of

10  accusations, and I want you to understand, as I told you

11  yesterday, there's much more to this story than what has been

12  suggested.  But before we go any further, please understand that

13  although we intend to demonstrate that Wyeth's products had

14  nothing to do with Ms. Scroggin's breast cancer, we have great

15  sympathy for Ms. Scroggin and for any woman who has gone through

16  breast cancer.  The fact that we intend to defend our case in no

17  way diminishes the sympathy that we feel for her, nor is it

18  intended to minimize anything as far as what she has endured.

19     I've got a short period of time to speak with you today,

20  and I want to talk to you about what we believe the evidence

21  will show.  I want to talk to you about three things:  Number

22  one, Ms. Scroggin's breast cancer was genetic.  Ms. Scroggin

23  would have gotten breast cancer whether she ever took hormone

24  therapy or not.

25     Number two, Wyeth accurately warned Ms. Scroggin and her

page 115

1   doctor of a possible increased risk of breast cancer.

2     And, number three, Ms. Scroggin made a choice to accept a

3   small increased risk of breast cancer because the medicine

4   relieved her menopausal symptoms.

5     And now I want to talk about what evidence will come before

6   you as you listen that will support these points.  I'm going to

7   talk about the first point, that Ms. Scroggin's breast cancer

8   was genetic.

9     Now, ladies and gentlemen, we do not know why many women

10  get breast cancer.  The two greatest risk factors for breast

11  cancer are age and being female.  77 percent of breast cancers

12  are in women over the age of 50.  70 percent of women who get

13  breast cancer have no risk factors other than age and being

14  female.  But in this case, the evidence will show we know why

15  Ms. Scroggin got breast cancer.  She inherited it.  Her breast

16  cancer is part of a cluster of breast cancers on her mother's

17  side of the family that includes seven breast cancers in five

18  women in three consecutive generations with no generation being

19  skipped.

20     Let's take a look at the family tree.  This is a depiction

21  of her family tree.  That figure represents Ms. Scroggin, her

22  father and mother, her aunts, her grandfather and grandmother,

23  her great aunts and uncle, and then her cousins.

24     The next graph depicts all of the family members who were

25  diagnosed with cancer in this family tree.

page 116

1     The next graph depicts, the orange, depicts the family

2   members who were diagnosed with breast cancer.  The yellow

3   depicts the family members who were diagnosed with breast cancer

4   in both breasts.

5     In three generations, there were eight cases of breast

6   cancer that spanned those generations.

7     In addition, two of these women, Ms. Scroggin and her

8   cousin Peggy, had breast cancer in both of their breasts.  The

9   experts will tell you that fact makes this cancer likely to be

10  genetic.  Peggy had breast cancer of an early onset, at the age

11  of 32.  That fact makes this breast cancer more likely to be

12  genetic.

13     Ms. Scroggin's mother, Mrs. Horn, had both colon cancer and

14  breast cancer.  That fact makes this cancer more likely to be

15  genetic.

16     Ms. Scroggin's Aunt Jean had ovarian cancer.  That fact

17  makes this cancer more likely to be genetic.

18     The breast cancers in Ms. Scroggin's family, seven of them,

19  all came down through a common ancestor.  That fact makes this

20  cancer more likely to be genetic.  Ms. Scroggin only has one

21  first-degree relative, her mother, and her mother got breast

22  cancer and her mother didn't take hormone therapy.

23     Ms. Scroggin has no sisters and she has no children, so you

24  look at the family after that.  She had a great aunt who only

25  had two daughters.  The great aunt and both of her daughters all

page 117

1   got breast cancer.

2     We will bring to you the only cancer geneticist that you

3   will hear testify in this trial.  His name is Dr. Noah Kauff.

4   He is a cancer geneticist, this is his area of specialty, and

5   this is what he studies.  Dr. Kauff says that when you have a

6   family like that that has a lot of breast cancers in it, you

7   look at them and you list the probabilities to see what the

8   probability is that these cancers are genetic.

9     And Dr. Kauff looked at this, he looked at what you just

10  have seen on the family tree, and he made an assessment of that.

11  And Dr. Kauff, the expert of cancer genetics and cancer --

12  female cancer genetics, will come and tell you that the

13  likelihood that these seven breast cancers are unrelated to

14  genetics is approximately 1 in 4.4 million that this cluster of

15  breast cancers which includes Ms. Scroggin's breast cancer is

16  not genetic.

17     The plaintiffs say they've done all these tests and it

18  shows up negative.  You've heard the breast cancer gene one, the

19  breast cancer gene two.  They indicate that because they had

20  negative results on these tests, that the breast cancer is not

21  genetic.  But what Dr. Kauff will tell you, he will explain

22  that, he will tell you that only two genes have been identified

23  that can be tested.  Actually, there are a few more than two,

24  but those are the big two.  And he will tell you that these

25  genes are only responsible for a very -- for a part of the

## Page 45

page 118

1 breast cancer genes that cause the disease.

2 In fact, as you look at this graph, Dr. Kauff will tell

3 you, as you heard Mr. Morris say, that in families with clusters

4 like this, the BRCA I and BRCA II genes only account for about a

5 third of hereditary breast cancers. There are other genes

6 responsible, you can see that in the yellow there, unidentified

7 genes responsible for the other 67 percent of hereditary breast

8 cancers. It is likely that one or several of these as yet

9 unidentified genes were involved in Ms. Scroggin's hereditary

10 breast cancer.

11 The fact that we have not yet identified the genes does not

12 mean they don't exist. The fact that we don't have a test for

13 them yet doesn't mean that they don't cause breast cancer. Her

14 treating cancer geneticist, Dr. Kent McKelvey, who found out

15 about this family history when he interviewed her and did tests,

16 after he got all the negative results back, it's in his medical

17 record, which you will have an opportunity to see, he said he

18 counseled the patient and he said the patient understands she

19 remains at elevated risk for future cancer due to her family

20 history, and she should continue with preventative healthcare

21 screening.

22 Her breast surgeon, when he made a decision of treatment

23 for Ms. Scroggin, he decided because of her family history that

24 he was going to perform a bilateral mastectomy, even though her

25 cancer had shown no evidence that it had spread anywhere. He

## Page 46

page 119

1 decided to do a bilateral mastectomy. Now, keep in mind that

2 Dr. Hagans only knew of the mother's breast cancer. In fact, it

3 wasn't until more than three years after this case was filed

4 that anyone other than Ms. Scroggin knew about her complete

5 family history. But Dr. Hagans, based on one member, her

6 mother, having breast cancer, made this medical decision.

7 This is the evidence that describes what the family history

8 means in this case. The facts about Ms. Scroggin's family

9 history answer the question of why she got breast cancer. The

10 facts about her family history meant something to the doctors

11 that treated her, and they mean something inside this courtroom.

12 The proof is, ladies and gentlemen, that Ms. Scroggin would have

13 gotten breast cancer whether she ever took hormone therapy or

14 not, just like her mother did, just like her Aunt Nita did, and

15 just like her cousins did.

16 Let's be clear about what the law says about what the

17 plaintiffs must prove. You will get the instruction, and it

18 does say that there can be more than one cause, but what it says

19 at the end of that phrase is, without which the damage would not

20 have occurred. They must prove to you that she would never have

21 gotten breast cancer had she not taken hormone therapy. We

22 believe the evidence shows just the opposite.

23 Not only did Ms. Scroggin have this striking family

24 history, ladies and gentlemen, but she had numerous other risk

25 factors for breast cancer, all smaller than any risk she may

## Page 47

page 120

1 have been exposed to from taking hormone therapy.

2 The next slide demonstrates that. I'm going to go through

3 these relatively quickly. We'll explain them during the trial.

4 She had dense breasts before she ever took hormone therapy. She

5 had a prior breast biopsy. Age alone, as I've told you, is a

6 risk factor. Nulliparity just means she didn't have any

7 children. You'll see that word. You'll also see it referred to

8 as nulliparous.

9 Gaining weight during your menopausal years puts you at

10 increased risk for breast cancer.

11 Smoking. There is science that supports that in our slide,

12 and we'll bring it to you. But to correct the record,

13 Ms. Scroggin smoked 30 cigarettes a day for 37-1/2 years. Not

14 for 20 years, but for 37-1/2 years.

15 Now, she had all of these additional risk factors, and I

16 want you to see a comparison between these and what the Women's

17 Health Initiative Study showed about a potential risk associated

18 with hormone therapy. All of those risk factors are greater

19 than the risk that this Women's Health Initiative showed might

20 be associated with hormone therapy.

21 Now, those numbers are hard to put into context just seeing

22 them for the first time today. I want to try to demonstrate for

23 you what that 1.24 number means, and I'm going to use the

24 Women's Health Initiative, which is the gold standard, as

25 Mr. Morris referred to. It's a randomized controlled trial that

## Page 48

page 121

1 compared women who had not taken hormone therapy to women who

2 had taken it, and let's see what it said about how small a risk

3 is involved.

4 This graph demonstrates that those women not using hormone

5 therapy, out of that group, .3 percent of them were diagnosed

6 with breast cancer.

7 In the group of women who were using hormone therapy, .4

8 percent of those women were diagnosed with breast cancer.

9 The difference in the two groups, ladies and gentlemen, is

10 less than one-tenth of 1 percent.

11 Any increased risk from hormone therapy is small.

12 Another way to demonstrate it might be to compare it to

13 things you know and are familiar with in today's world. This

14 graph shows that you have a greater risk of getting a

15 hemorrhagic stroke from taking an aspirin every day for your

16 heart than you do from hormone therapy for five years or more.

17 You have a greater risk of having liver damage from taking

18 Tylenol. And, of course, everybody knows that smoking causes

19 cancer, and it goes off the chart. So the risk that they've

20 talked about is small.

21 I want to discuss with you quickly this theory they've

22 suggested to you about estrogen-deficient women, that there is

23 this subclass of women that are estrogen deficient, and when

24 they take hormone therapy, it makes them get breast cancer. I

25 want to talk to you about that and tell you what the evidence is

Page 49

page 122

```
 3  1   going to be.
 4  2       First of all, last time I checked, every woman goes through
 5  3   estrogen deficiency, because by definition, that's what happens
 6  4   to us when we get older.  We all become estrogen deficient.
 7  5   Just because someone has hot flashes, that doesn't tell you what
 8  6   their levels of estrogen are.  Hot flashes come usually in the
 9  7   earlier part of the change, and they come in response to the
10  8   fluctuation of estrogen levels.  They don't mean your estrogen
11  9   level is in the tank.  They come in a response to a fluctuation
12 10   of estrogen levels.  That's why many women have them between the
13 11   ages of 45 and 50.  That's why women who are 60 and 70 years of
14 12   age don't have hot flashes anymore.  That's when they have the
15 13   lowest level of estrogen.  So the theory about estrogen
16 14   deficiency, ladies and gentlemen, doesn't make any sense, and we
17 15   will show you that it's not supported by the scientific or
18 16   medical literature in this case.
19 17       If plaintiff's theory were true, then doctors treating
20 18   women of that age would say then if you're having hot flashes,
21 19   you just don't need to take hormone therapy, and you'll never
22 20   get breast cancer.  And we know that's not so.  What we actually
23 21   know is, most women who get breast cancer are over the age of
24 22   50.  Most women who take hormone therapy don't get breast
25 23   cancer.  And most women who get breast cancer don't take hormone
26 24   therapy.
27 25       We will bring to you the only cell biologist who is
```

Page 50

page 123

```
 3  1   experienced in this area that will talk to you about the
 4  2   development of cancer at the cellular level.  His name is Lewis
 5  3   Chodosh.  Dr. Chodosh will tell you that hormone therapy does
 6  4   not change a noncancerous cell into a cancerous cell.  He will
 7  5   tell you there are several steps that have to occur to change a
 8  6   noncancerous cell into a cancerous cell, and he will tell you
 9  7   that hormone therapy has nothing to do with any of those steps.
10  8       He will tell you that making cells grow faster doesn't
11  9   equal cancer.  The theory that Mr. Morris was saying about the
12 10   fertilizer on the grass making the grass grow, that's really not
13 11   an appropriate analogy, because what Dr. Chodosh will tell you
14 12   is, you can fertilize Bermuda grass all you want to, but it's
15 13   not going to change it into a weed.  And everybody knows that
16 14   weeds don't need a whole lot of water to grow.  They find a way
17 15   to grow.  Dr. Chodosh will tell you that cancer will find a way
18 16   to grow.  That's one of the characteristics of it.
19 17       He also suggested that estrogen receptor positive,
20 18   progesterone receptor positive was a marker for hormone therapy
21 19   causing it.  Well, look at this graph.  The same number of women
22 20   who don't take hormone therapy have estrogen receptor-positive
23 21   cancer, progesterone receptor-positive cancer, the very same
24 22   kind Ms. Scroggin had.  The same number of women had it who take
25 23   it who don't take hormone therapy.
26 24       Men get estrogen receptor-positive, progesterone receptor-
27 25   positive cancer.  And in this case, we have a stark example of
```

Page 51

page 124

```
 3  1   it.  Ms. Scroggin and her mother both got the same type of
 4  2   breast cancer, estrogen receptor positive, progesterone receptor
 5  3   positive.  One of them took hormone therapy and one of them
 6  4   didn't.
 7  5       Dr. Chodosh will tell you that cancers grow through many
 8  6   pathways.  All these questions about estrogen production and
 9  7   estrogen, he will tell you that the tumors themselves can make
10  8   estrogen, if they need it to grow.  We will prove to you that
11  9   she would have gotten breast cancer, whether she ever took
12 10   hormone therapy or not.  It's not our burden to do that.  It's
13 11   the plaintiff's burden to prove to you that she wouldn't have
14 12   gotten breast cancer if she hadn't taken hormone therapy.
15 13       Now, let me talk to you real quickly about our medicines.
16 14   Wyeth's products are Premarin and Prempro.  These are
17 15   prescription medications.  Premarin has been on the market for
18 16   65 years.  Prempro has been on the market for almost 14 years.
19 17   These are older drugs with a well-documented history of risks
20 18   and benefits.  Doctors treating menopausal women today still
21 19   believe they are appropriate drugs and continue to prescribe
22 20   them in the very same doses taken by Ms. Scroggin.
23 21       Menopause is different for every woman.  Not all women need
24 22   medicine.  It's different for every woman.  Some people have
25 23   mild symptoms, some people have no symptoms, some people have
26 24   very severe and disruptive symptoms.  Today Premarin and Prempro
27 25   are the most effective medicines for the treatment of hot
```

Page 52

page 125

```
 3  1   flashes, night sweats, vaginal dryness.  Today.  And women in
 4  2   this country should have options for that treatment if they
 5  3   decide with their doctors that these products are right for them
 6  4   and for their symptoms.
 7  5       I want to go through a timeline real quickly of
 8  6   Ms. Scroggin's hormone therapy use.  In 1983, she comes in and
 9  7   she asks about her hot flashes.  Dr. Kuperman doesn't give her
10  8   hormone therapy because she is still having periods.  She comes
11  9   back again and talks about symptoms in 1985, and he runs a test
12 10   on her to check her estrogen levels, and he chooses not to give
13 11   her hormone therapy, because she is still having her periods.
14 12       She goes apparently to another doctor, and she is
15 13   prescribed hormone therapy, Ogen and Provera.
16 14       She goes back to Dr. Kuperman in 1989, and Dr. Kuperman
17 15   says I will continue on that therapy.  Remember, by the way,
18 16   those two products that she takes from 1988 to 1992 are not
19 17   Wyeth products.
20 18       She takes -- she comes back in and asks for a continuous
21 19   routine of medication so she won't have a period anymore.  She
22 20   requests that.  So Dr. Kuperman puts her on at that point, in
23 21   1992, Premarin and Provera.
24 22       THE COURT:  Five minutes.
25 23       MS. PRUITT:  She then goes in and requests one pill,
26 24   Prempro.  He gives that to her, and her hot flashes return in
27 25   1999.  They come back.  And he takes her off and gives her a
```

Page 53

page 126

1 higher dosage of estrogen because her hot flashes came back. So
2 this is a demonstration of him treating her for the symptoms.
3 She didn't just take this medicine; she took the medication
4 because she needed it.
5     Now, I want to go through what Wyeth's warnings were, and I
6 am going to go through this fast because I don't have very much
7 time left, and I encourage you to read them. I've highlighted
8 things for you. You're going to have them back in the jury room
9 with you. You're going to be able to analyze the warnings up
10 one side and down the other.
11     But what did Wyeth tell doctors about these products? We
12 told them about the benefits, we told them about the risks, and
13 we told them to check their patients periodically.
14     This is the Premarin label. Warnings: Induction of
15 malignant neoplasms. Some studies have suggested a possible
16 increased risk of breast cancer in those women on estrogen
17 therapy taking higher doses for prolonged periods of time.
18 Other studies not shown in.
19     In the Prempro label warnings, and all these warnings
20 pertain to the combination product, we say: Induction of
21 malignant neoplasms, breast cancer, moderately increased risk of
22 breast cancer. Relative risk, 1.3 to 2.
23     We told Dr. Kuperman in our information about the breast
24 cancer risk. Wyeth also told patients about the breast cancer
25 risk. I'm going to go through this quickly because I want you

Page 54

page 127

1 to see a clip at the end.
2     We told Ms. Scroggin, and I want to get to the breast
3 cancer warning, dangers of estrogen, cancer of the breast. We
4 also told her about other fatal, serious side effects due to the
5 product.
6     We told her in that to take it only as long as she needed
7 it. Cancer of the breast, we told the patient, up to twice the
8 usual rate.
9     "You are cautioned to discuss very carefully with your
10 doctor." Told her to be careful.
11     Now, Ms. Scroggin received this more than 90 times while
12 she was taking Premarin and Prempro. What did she decide to do
13 about this issue of accepting a small risk of breast cancer?
14 Let's listen. I asked her in her deposition, and then when I
15 finish asking her, listen for the male voice. The male voice is
16 her own lawyer asking her the questions.
17     [Videotaped deposition being shown in open court, as
18 follows:]
19 [BY MS. PRUITT:]
20 Q. If there had been some type of warning in the labeling that
21 suggested that you would be at a slightly increased risk for
22 breast cancer from taking the medication, would you have taken
23 it?
24 A. Slight risk? Yes, I would have taken it.
25 Q. If there had been a discussion of there perhaps being a

Page 55

page 128

1 moderately increased risk of you getting breast cancer from
2 taking hormone therapy, would you have taken the medication?
3 A. Yes.
4 Q. So is it correct for me to say, Ms. Scroggin, that for you
5 to make a determination not to take the medication, there would
6 have had to have been something that says it causes breast
7 cancer?
8 A. True.
9 [BY UNIDENTIFIED MALE VOICE:]
10 Q. What if breast cancer had been a side effect of taking
11 Prempro, or hormone therapy?
12 A. You know, I think I told you that I would take it, and it
13 would have to say, "Causes cancer." I was unaware of -- I guess
14 I just didn't pay attention.
15 Q. If it had said that by taking this drug, you were at risk
16 for developing breast cancer as a side effect, would you have
17 taken that drug?
18 A. Yes.
19 Q. Okay.
20 A. Risk.
21 Q. If you thought that by taking a hormone therapy product that you
22 were going to be at risk for developing breast cancer --
23 A. Uh-huh.
24 Q. -- you would -- would you have still taken it?
25 A. Yes, I guess so. It would have to say, "Causes cancer."

Page 56

page 129

1 Q. So shy of something saying, "Causes cancer," you would
2 still take it?
3 A. I probably would have, yes.
4     [End of videotaped deposition clip.]
5     MS. PRUITT: Three times in answer to my question, she
6 said she would have taken the product knowing of a risk of
7 breast cancer. Five times in answer to her own lawyer's
8 question --
9     THE COURT: You have about a minute.
10     MS. PRUITT: -- she said she would have taken it
11 knowing of a risk of breast cancer.
12     Eight different times she said she would have taken it,
13 taken it knowing of a risk of breast cancer. She said it eight
14 times, ladies and gentlemen, under oath, because it was then and
15 it is now the truth.
16     Thank you.
17     MR. URBANCZYK: Judge, will you give me a minute or
18 two to set up?
19     THE COURT: Yes.
20     MR. URBANCZYK: Your Honor.
21     Good morning. My name is Steve Urbanczyk, as Ms. Pruitt
22 told you, and with Ms. Pruitt and Lane Heard, it is a privilege
23 to represent Wyeth in this courtroom before you and before Judge
24 Wilson.
25     I want to put those three points that Mrs. Pruitt talked

page 130

1  about up here because I think they -- we think they are the most
2  important points in the case.
3      To win this case, the plaintiffs are going to have to prove
4  that Mrs. Scroggin would not have gotten breast cancer if she
5  didn't take hormone therapy.  But they are not going to be able
6  to do that, for several reasons, including that her cancer was
7  genetic.
8      They're also going to have to prove that Dr. Kuperman was
9  not warned of the risk of breast cancer, but they're not going
10  to be able to prove that either, because Wyeth warned
11  Dr. Kuperman and Ms. Scroggin, and Dr. Kuperman will testify
12  that he knew from other sources as well.
13      And, finally, because Ms. Scroggin knowingly accepted the
14  risk, a small risk of breast cancer, because she needed these
15  medicines for menopausal symptoms.
16      Ladies and gentlemen, if at the end of the trial you
17  believe the evidence supports those three points, then you
18  should -- your verdict should be for the defense.
19      Now, Mr. Morris didn't spend a whole lot of time on all
20  those issues.  He spent a fair amount of time attacking Wyeth, a
21  lot of time attacking Wyeth.  He attacked Upjohn, too, and I'll
22  let Upjohn's counsel take care of that.  We are separate
23  companies represented by separate counsel, and Mr. Goodell will
24  talk to you about Upjohn.  I'm going to talk to you about Wyeth.
25  I think Mr. Morris was trying to make you angry, perhaps,

page 131

1  perhaps asking or hoping you will base your verdict on anger
2  rather than on the facts of the case.  It's hard for me to sit
3  here calmly at some of these points, because I know he knows
4  that a lot of what he said is taken out of context, is half
5  truths, and in some cases is not true at all.
6      Let me -- we're going to address all these through the
7  trial, but let me just show you a couple of examples.  You
8  remember Mr. Morris showed you a letter from Dr. Hoover in 1976
9  informing Wyeth of a potential association between estrogen
10  therapy and breast cancer.  Well, that's true.  But what
11  Mr. Morris didn't tell you, three things:  Number one, that was
12  an association that was known not just by Wyeth.  It was known
13  all over the world.
14      Number two, he didn't tell you that in 1978, Wyeth formed a
15  Premarin breast cancer committee that looked at this issue
16  upside down and backwards and did, in fact, commission studies
17  and monitor studies.
18      Perhaps most importantly what Mr. Morris didn't tell you is
19  that now the science from WHI and from Dr. Li and his own
20  studies say that Premarin alone, estrogen alone, is not
21  associated with an increased risk of breast cancer.  He didn't
22  tell you those things.
23      He also showed you Plaintiff's Exhibit 345, which is a
24  memorandum that is recommending that Wyeth adopt a dismissive
25  policy with respect to an article that was going to come out by

page 132

1  a Dr. Cummings and a Dr. Cauley in 1996.  When he knew and he
2  knows that's not what Wyeth did.  He knows that that was a
3  recommendation from an outside PR vendor, not Wyeth.  He knows
4  that Wyeth rejected that policy and that strategy.  He knows
5  that Wyeth did exactly the opposite.  Wyeth invited the authors
6  of that paper to come to their renowned annual Estrogen
7  Conference to present their findings in public.
8      You know the expression enemy is the confusion of the
9  truth, or confusion is the enemy of the truth?  I think that's a
10  little bit of what was going on in some of the things, and I
11  want you to keep your eye on the evidence in this case.
12      Now, let me tell you what this case is about and what it's
13  not about.  Let me start with what it's not about.  This is not
14  a case about whether we like large pharmaceutical companies.
15  You're going to be fair and impartial to Wyeth and Upjohn as the
16  judge instructed you, just as I know you'll be fair and
17  impartial to Ms. Scroggin.
18      This is also not a case about whether we like everything
19  that every one of our 50,000 employees or our outside vendors
20  ever said in a 25-year period.
21      The plaintiffs are going to show you e-mails or suggestions
22  or isolated documents, internal documents, that are either
23  misunderstood or taken out of context or perhaps even
24  inappropriate, but I ask you to judge Wyeth on what they
25  actually did, not on what one of their employees may have said

page 133

1  at one time or another internally.  You all know what I'm
2  talking about.  You know that you've either written or seen
3  e-mails or suggestions or recommendations that perhaps were not
4  well thought out or were inappropriate or were bad ideas.  And
5  it would be unfair to judge you or your business by those
6  isolated incidents, and it would be unfair to judge Wyeth that
7  way, too.
8      This case is also not about whether medicines are 100
9  percent safe.  That is impossible, unfortunately.  All medicines
10  have risks.  Some of them have very, very serious risks.  You
11  know this from the warnings on the medicines that you use or are
12  in your medicine cabinet or from commercials.  They all have one
13  or two really fine benefits, two or three, but then they all
14  have risks.  It's a long army, a line of risks, and some of them
15  are quite serious.
16      So the responsibility of a pharmaceutical company is to
17  make medicines that have proven benefits, even though they have
18  some risks, and then they warn the doctors about the risks.
19  Remember, these are prescription medicines.  Wyeth doesn't sell
20  it over the counter in a pharmacy.  Wyeth tells the doctors
21  about the risks and benefits, and then it is the responsibility
22  of the doctor in consultation with their patient to determine
23  whether this drug is right for them.  And as Mrs. Pruitt said,
24  that is the doctor's ultimate responsibility, and these
25  medicines are not for every menopausal woman.

page 134

1     Members of the jury, I think the evidence will show that
2 Wyeth fulfilled its responsibilities in this case. Premarin and
3 Prempro have benefited millions of women like Ms. Scroggin, and,
4 yes, they have some risks. These products have been extensively
5 researched over the years. The benefits and risks of these
6 products are well known, and they are accurately described in
7 Wyeth's labels. Unlike some drugs that you've seen in
8 litigation, these products are still on the market, used in the
9 same dose. There are lower doses now, to be sure, but the same
10 dose is still available. It is still used by doctors like
11 Dr. Kuperman for patients like Ms. Scroggin.
12     Let me introduce you to one of our witnesses in this case,
13 Dr. Ginger Constantine. Dr. Constantine is one of the most
14 knowledgeable doctors in the world about hormone therapy, and
15 she will come here to teach us about Premarin and
16 Prempro, about the testing that's been done, about the science
17 and the labels and about the many benefits that are still good
18 options for women.
19     Now, in trying to prove that the warning was inadequate,
20 you're not going to hear the plaintiff say that we didn't warn
21 at all, because we did, and you're not going to hear them really
22 say that the warnings that we gave did not accurately reflect
23 the science at the time, because the warnings did accurately
24 reflect the science at the time. What they're really telling
25 you is that they wanted the science to be different then. They

page 135

1 say there were no tests, no appropriate tests, about E plus P,
2 and that is a problem so that the science wasn't right at the
3 time.
4     Let me tell you that in response to that, we are going --
5 the evidence tell you three things. Number one, Wyeth
6 conducted, supported, and monitored scientific studies that
7 examined hormone therapy and breast cancer.
8     Ladies and gentlemen, there are thousands of articles about
9 studies of Premarin and Prempro. There are tens of thousands of
10 articles about hormone therapy. Premarin and Prempro
11 are only two of the kinds of hormone therapy that are available.
12     Wyeth itself conducted 180 different studies. Now, these
13 aren't studies all about breast cancer. They are studies about
14 all aspects of the products. But they conducted 180 studies.
15     And, you know, when you hear the plaintiff say that there
16 weren't enough studies on Premarin and Prempro, in 1995, the FDA
17 said that Premarin was the "most extensively researched product
18 in the United States." Think of that impressive statement every
19 time the plaintiffs tell you there's not enough studies.
20     Wyeth conducted, supported, or monitored all of these
21 activities.
22     You know, the plaintiffs want to have it both ways. When
23 Wyeth conducts a study, they're going to say, oh, it was the
24 wrong study, it was biased. But then if we don't conduct a
25 study, they're going to say, oh, you should have conducted the

page 136

1 study. Well, you know what? It is important for a company like
2 Wyeth to conduct studies, and we did. But you wouldn't want all
3 studies to be conducted by one company. You want a range of
4 people to study. You want many different research centers and
5 voices to study. That eliminates bias. It's good that the
6 National Institutes of Health, one of the leading research
7 organizations in the world, studied this product. So, yes, it
8 is important for Wyeth to conduct -- to conduct the studies, but
9 it is also appropriate for them to support studies and then to
10 monitor other studies.
11     Plaintiff's counsel, therefore, can't really say there were
12 no studies because there were lots of studies, so what they have
13 to resort to is to say there were really no adequate studies,
14 there were none of the right studies, none of the right studies
15 were done. But plaintiff's counsel in that regard is simply
16 incorrect. You're going to hear about four kinds of studies
17 that can be used to study this subject: Estrogen and
18 progesterone, plus breast cancer. I'm not going to explain it
19 all here. You'll have experts who will tell you about all of
20 them. But they are case control studies, cohort studies,
21 randomized controlled clinical trials, and meta-analyses.
22     And, ladies and gentlemen, the evidence in this case will
23 be that Wyeth conducted or supported all of those kinds of
24 studies, and so did others.
25     From 1959 to 2002, Wyeth itself was involved over a 40-year

page 137

1 period in at least 19 studies that examined breast cancer and
2 hormone therapy, and you see the different types up on the upper
3 left-hand corner there: Case control, cohort, meta-analyses,
4 randomized clinical trials.
5     You see, one of the those studies is the WHI Study, over
6 here on the right, from 1993 to 2004. Wyeth supported that
7 study. In fact, the evidence will be that the Wyeth support of
8 that study was so crucial -- not just pills, ladies and
9 gentlemen, science and other tests -- that the WHI could not
10 have been done without Wyeth's support.
11     There were other studies in addition to those. In fact,
12 the evidence will show you that between 1959 and 2002, there
13 were over 50 studies of estrogen and progestin examining the
14 breast cancer risk. 50 studies, 40-year period. Now, they were
15 not all about Premarin and Prempro. Remember, there's other
16 hormone therapies, so those studies studied some of those. Some
17 were in the U. S. Some were international. Some were short.
18 Some were long. Mr. Morris is incorrect if he says there were
19 no long-term studies. Some were on a small number of women.
20 Some were on a large number of women. But these 50 studies
21 constitute a large body of evidence on this product.
22     And what were the results of these studies? The results of
23 these studies were some of the studies showed a small increased
24 risk. Many studies did not show an increased risk. Some
25 studies even showed a slight reduction in risk. And that was

1 page 138

2

3 1   accurately reflected in the Wyeth labels.

4 2       Now, you might ask yourself, that sounds strange.  Why are

5 3   the results different?  Why are they on both sides of the fence?

6 4   And the answer is because the risk is a small risk, and when you

7 5   have a small risk, the studies will come within a very narrow

8 6   range, and the evidence in this case will show you that all the

9 7   studies came within a very narrow range, and some didn't find a

10 8   risk.

11 9       Does that mean the product wasn't studied?  No.  Does that

12 10  mean that the risk was unknown?  No.  It means that the risk, if

13 11  there is one, is a small risk.

14 12      The argument that there were no good studies before WHI is

15 13  an argument that you will only hear in this courtroom, ladies

16 14  and gentlemen.  Outside this courtroom, you will not hear that

17 15  argument.  No one in the FDA, no one in science, has made the

18 16  argument that plaintiffs are making inside this courtroom.

19 17  There were lots of studies.  They were done by Wyeth and they

20 18  were done by others.  They were the appropriate studies, and

21 19  they all pointed to the fact that if there's a risk, there's a

22 20  small risk.

23 21      In this courtroom, you're going to hear about red flags,

24 22  implying that somehow the information was secret and known only

25 23  to Wyeth.  Outside this courtroom, you don't hear that.  These

26 24  were all published studies.  The world knew about the potential

27 25  association of these products with breast cancer.

1 page 139

2

3 1       Doctors knew it from many sources, not just the Wyeth

4 2   label.  They knew it from medical school, they knew it from

5 3   textbooks, they knew it from articles, they knew it from CMEs,

6 4   they knew it from literature, popular press, the Today Show, and

7 5   the evening news.  Most doctors knew it, many women knew it,

8 6   perhaps even you know it.  The potential risk of breast cancer

9 7   with hormone replacement therapy was no secret.

10 8       Number two, Wyeth's labels accurately described the breast

11 9   cancer risk based on the science.  Now, you're going to see

12 10  them laid in great detail through the trial.  I just want to

13 11  tell you that Dr. Constantine and others will come up and tell

14 12  you why these labels accurately reflected the science that we

15 13  have just reviewed.

16 14      One thing is certain:  There was enough science and enough

17 15  evidence and enough studies to satisfy the FDA in 1994 that

18 16  Prempro was safe and effective, and the FDA saw to it that the

19 17  label accurately and adequately reflected those risks.

20 18      On the issue of the FDA, Wyeth intends to introduce the

21 19  testimony of Dr. Lisa Rarick.  Dr. Rarick was at the FDA and had

22 20  firsthand knowledge of the way the FDA handled the regulation of

23 21  Premarin and Prempro.  And she will come here -- you can't bring

24 22  current FDA employees.  They're not allowed to come and testify.

25 23  So we retained a former FDA employee to come and tell you

26 24  firsthand about how the FDA works and how they regulate it, how

27 25  rigorously they regulated this product.

1 page 140

2

3 1       The plaintiffs have Dr. Parisian as their FDA expert, but

4 2   she worked in medical devices at the FDA.  She didn't work with

5 3   prescription drugs, and she had absolutely no involvement with

6 4   these products until she was hired by plaintiff's counsel.

7 5       Also on the issue of the FDA, we will bring you the

8 6   testimony of Mr. Justin Victoria, who was the head of U. S.

9 7   regulatory affairs at Wyeth when Prempro was approved.  Now, the

10 8   plaintiffs have subpoenaed Mr. Victoria because they want to

11 9   call him and ask him questions first in their case, so --

12 10  Mr. Victoria is here.  And if you would, Mr. Victoria, would you

13 11  please stand up and let me introduce you to the jury.

14 12      This is Mr. Victoria.  And he will testify probably

15 13  tomorrow.

16 14      Thank you, sir.

17 15      Mr. Victoria will show you that in 1994, the FDA approved

18 16  this product, Prempro, as safe and effective for use in

19 17  accordance with the label that they approved.

20 18      Now, you'll hear a lot about the FDA, and you'll hear

21 19  people have varying views and criticisms of them.  But one thing

22 20  cannot be denied:  In this country, it is the FDA, not

23 21  plaintiffs' lawyers and not their experts, who determine whether

24 22  a drug can be sold in this country.  Before a drug can be sold

25 23  in this country, the FDA has the absolute authority to determine

26 24  and must determine that the drug is safe, that the drug is

27 25  effective, and that the label is accurate.  And that power is

1 page 141

2

3 1   ultimate and absolute, and the FDA standards on drug approval

4 2   are the toughest, among the toughest in the world.  Whatever the

5 3   criticisms of the FDA, Mr. Victoria will tell you that the FDA

6 4   was tough on Wyeth when it came to Prempro, and he will tell you

7 5   that at the end of the day, the FDA approved every word of the

8 6   Prempro breast cancer warning.

9 7       So plaintiff's counsel -- we talked about the WHI, and the

10 8   WHI was the biggest study ever done on hormone therapy.  It was,

11 9   it is the gold standard.  A randomized controlled trial

12 10  involving 26,000 women, the best study we will ever have on

13 11  these products.  WHI taught us some new things, but it also

14 12  confirmed some things that we already know, and for this case,

15 13  the important point is that it confirmed what was already known

16 14  about the extent of the breast cancer risk associated with

17 15  hormone therapy.

18 16      Do you remember Mrs. Pruitt showed you that prior studies,

19 17  that some of the prior studies had shown a relative risk

20 18  increase of between 1.3 and 2.0.  The bottom line finding of the

21 19  WHI investigators is that the relative risk was 1.24.  That's

22 20  very consistent.  In fact, that's what the WHI authors said.

23 21  Dr. Chlebowski -- I should be able to pronounce that name better

24 22  since he's Polish -- said for the WHI as an official word, the

25 23  magnitude of the increased breast cancer risk observed with

26 24  estrogen plus progestin in this clinical trial closely parallels

27 25  observational studies.

Page 69

page 142

1   So the WHI was more definite about the risk.  It was less
2   equivocal because it was a randomized controlled trial, but the
3   extent of the risks that it identified was paralleled to what
4   had been reported in the prior studies.
5     Now, plaintiff's counsel may tell you that the real number
6   is not 1.24, it's really much higher than that, and there are
7   more studies that show that.  But, ladies and gentlemen, that's
8   what their experts will tell you inside this courtroom when
9   they're paid hundreds of dollars.  Dr. Colditz is so expensive,
10  they won't even bring him here.  They're going to play his
11  videotape, and inside the courtroom he may say things, that
12  that's not the right number, but outside the courtroom when he
13  writes to his colleagues and the other experts that he deals
14  with, he says the number is 1.24.
15    Now, you're going to see a lot of studies and you're going
16  to see a lot of numbers in the studies as these studies analyze
17  individual years and subgroups, and, ladies and gentlemen, you
18  can find any number you want in some of these studies, in a
19  subgroup analysis or a footnote in a table.  But when you see
20  plaintiffs doing that, think about two things:  The WHI authors
21  themselves said the number was 1.24.  That's the bottom line.
22  That's the valid number from WHI.  And, second, do you remember
23  they quoted this guy named Dr. Li, who said there may be a
24  causal connection?  Well, you know what Dr. Li wrote in January
25  of 2008?  Dr. Li wrote in January of 2008 that one of the kind

Page 70

page 143

1   of -- with one of the kind of cancers that Ms. Scroggin had,
2   ductal, after ten years of combination hormone therapy use, ten
3   years or longer, there was no association between combination
4   hormone therapy and that -- and ductal cancer.
5     So remember that, ladies and gentlemen.  So where are we at
6   the end of the day?  Wyeth warned, based on a huge amount of
7   studies and science conducted by both Wyeth and others, these
8   products and the risks and benefits of these products were well
9   known and they were accurately described, and that is why we say
10  that the proven benefits outweigh the small risks, and that is
11  why these products are still available today in the same doses
12  and used by women like Ms. Scroggin by doctors like
13  Dr. Kuperman.
14    So, members of the jury, that brings me back to the
15  important three points that Mrs. Pruitt talked to you about
16  which we think are the most important points in the case.  We
17  will not be able to present our evidence until plaintiffs finish
18  theirs, which is probably sometime at the end of next week,
19  middle of next week.
20      THE COURT:  You have four minutes.
21      MR. URBANCZYK:  And we will not be able to present,
22  probably argue to you our summation to you until the very end of
23  the trial.  So I ask you until then to please keep an open mind,
24  as the judge has instructed you.  There are two sides to this
25  story.  Listen to the evidence and to the documents, and look at

Page 71

page 144

1   the documents.  Do not be taken in by the arguments or speeches
2   of plaintiff's counsel.  Those are not evidence.  And I believe
3   that at the end of the trial, when you have looked at all the
4   evidence, you will agree with me, you will agree with us when we
5   come back to you and ask you for a verdict for the defense.
6     Thank you.
7       THE COURT:  Ladies and gentlemen, we'll be in recess
8   until ten after by that clock.  We'll try to start back at ten
9   after.  Don't talk about the case, anyone involved in it, and
10  don't start making up your mind.
11    Let the jury stand out.  Everyone else remain seated,
12  please.
13    (Jury exited the courtroom.)
14      THE COURT:  We're in recess until ten after.
15    (Recess at 10:58 a.m., until 11:10 a.m., jury present.)
16      THE COURT:  For Upjohn?
17      MR. GOODELL:  Thank you, your Honor.  Counsel,
18  Ms. Scroggin.  Good morning, ladies and gentlemen.  My name is
19  Charlie Goodell.
20    I think this is on.
21    My name is Charlie Goodell, and with Pam Yates and Betsy
22  Murray, we represent Upjohn.  We appreciate the time and the
23  attention you've given to all counsel in this, and we appreciate
24  the attention you'll give to us in the opening and through the
25  trial.

Page 72

page 145

1     We start with a difficult situation in the case, that
2   nobody would want anybody to be in the situation that
3   Ms. Scroggin is in.  Plaintiff's counsel has correctly
4   acknowledged that this is not a case about sympathy or we
5   wouldn't be here.  But we do feel sympathy, and we do feel
6   sympathy for her.
7     She received news, unfortunately, that hundreds of
8   thousands of women in the U. S. receive every year, and that is
9   the news that she had developed breast cancer.
10    At the end of this case, we are going to ask you to render
11  a verdict for the defense.  There are some disputed issues here
12  that we'll talk about, but I think the first thing we might want
13  to talk about is what isn't disputed, what there isn't any
14  debate about, what we can agree on.
15    There isn't any debate about the fact that in the '80s,
16  Ms. Scroggin had significant menopausal symptoms for which she
17  went to see her doctor, Dr. Kuperman.  She was prescribed
18  estrogen for the treatment of those symptoms.  Estrogen is a
19  very good medication for the treatment of menopausal symptoms.
20  There's no debate about that.
21    There's no debate about the fact that in the human body,
22  estrogens don't work by themselves.  They also work in
23  conjunction with progesterones, and so it was learned that in
24  menopausal situations where you give estrogens alone, that
25  balance was disturbed, and so women would develop something

1 page 146

2

3 1 that's been referred to as endometrial hyperplasia, a fancy name

4 2 for an overgrowth of tissue in the uterus, and that could lead

5 3 to cancer of the uterus.

6 4     No debate about the fact that Upjohn's medicine, Provera,

7 5 is prescribed for a particular purpose. It's not prescribed in

8 6 menopausal women to treat menopausal symptoms. It is prescribed

9 7 to restore that balance and prevent uterine hyperplasia and

10 8 uterine cancer, and it worked. There's no debate about that.

11 9     There's no debate about the fact that Dr. Kuperman, who you

12 10 will hear from, read the medical literature himself, was a

13 11 well-qualified, well-informed doctor, and was aware of a small

14 12 increased risk with breast cancer and advised his patient.

15 13     As it relates to Upjohn, there is no debate about the fact

16 14 that our label did not carry a specific human breast cancer

17 15 warning. No debate about that. If it should have had a

18 16 warning, it would have had a warning, and we'll talk with you

19 17 about why our label is what it was and why that was appropriate.

20 18     Let me start with the frame that we're interested in

21 19 here. Provera was prescribed primarily during the period of

22 20 time 1988 to 1996. There's some months in 2000 where she goes,

23 21 Ms. Scroggin goes back to Premarin and back to Provera, but the

24 22 primary time frame is during this time frame here.

25 23     So as you were asked about in voir dire yesterday, one of

26 24 the things we're going to be talking about is, what was the

27 25 state of medical knowledge at this time. Okay. Here are the

1 page 147

2

3 1 issues, and I'm not used to dealing with these little screens,

4 2 but I think you have the first slide on your screen. These are

5 3 the three issues that we think are important in the case.

6 4     Plaintiff, and this has already been referenced to you, and

7 5 I have some things that are a little repetitive of what Wyeth

8 6 has said, and I'm going to try to move those through real fast.

9 7 But the plaintiff must prove that had Ms. Scroggin not taken

10 8 HRT, she would not have developed breast cancer. We believe

11 9 that is not the situation here, and they cannot prove that based

12 10 upon her genetic background. We'll talk about that.

13 11     Provera was used for a very specific purpose that I've

14 12 mentioned to you, to prevent uterine hyperplasia and cancer, and

15 13 it worked.

16 14     Our label was the result of a review of the medical science

17 15 and set by the FDA. You've heard some comments about the FDA,

18 16 but we're going to take you through the process with us about

19 17 why the label says what it says.

20 18     First let's talk about breast cancer, and these facts have

21 19 been referenced to you and I want to move through these very

22 20 quickly. I have about 40 minutes all together, and I've got a

23 21 lot to cover with you.

24 22     One in eight women will develop breast cancer over the

25 23 course of their lives. The vast majority of those women will

26 24 never have used HRT. Now, you've been told that a certain type

27 25 of tumor, something called an ER/PR-positive tumor, and we'll

1 page 148

2

3 1 talk a lot about what that means, that that's somehow a

4 2 signature of HRT. Well, it isn't. 80 percent of the women who

5 3 develop breast cancer have an ER/PR-positive, meaning estrogen

6 4 receptor, progestin receptor-positive cancer tumor.

7 5     Ms. Scroggin's mom, who we'll talk about, had that very

8 6 type of tumor and did not take HRT. Men themselves develop at a

9 7 much lower rate breast cancer, but also develop ER/PR-positive

10 8 tumors.

11 9     Except in very rare cases -- this is a statement from the

12 10 National Cancer Institute -- no one really knows what the cause

13 11 of breast cancer is in a particular woman. We know, and science

14 12 and medical articles all over have looked and studied the issue,

15 13 and they have tried to identify -- and this is going to be from

16 14 where you're sitting maybe a little bit hard to read, but you'll

17 15 see this as we go through the trial -- a whole series of risk

18 16 factors for breast cancer. What that means is, when scientists

19 17 have studied breast cancer and studied populations of women,

20 18 they have learned that women who have certain characteristics

21 19 have a higher rate of breast cancer than those that don't.

22 20 That's a risk factor.

23 21     It doesn't necessarily mean that the risk factor caused the

24 22 cancer in any particular case, but as a population of women,

25 23 they have that increased risk.

26 24     This is an overlay of the risk factors for Ms. Scroggin.

27 25 We'll talk about these as we go through the trial, and you'll

1 page 149

2

3 1 see that there are a variety of things, including her family

4 2 history, and even including HRT down at the bottom at 1.24.

5 3 This gives you sort of a relative ranking of the things that

6 4 were going on in her life which were typically classified as

7 5 risk factors. But every now and again, the evidence of one

8 6 condition is so strong that it becomes the most likely cause of

9 7 a person's breast cancer, and that is the situation here.

10 8     Now, Ms. Pruitt did a very nice job of going through the

11 9 family history, and I'm not going to spend much time on here,

12 10 but what I want to go over with you, if you'll follow, and I

13 11 hope you can see it, follow the brighter line that leads down

14 12 from great grandfather to great grandmother on the left side to

15 13 great aunt with breast cancer to her two children with breast

16 14 cancer on the left side. On the right side, down to

17 15 Ms. Scroggin's mother, and then down to Ms. Scroggin herself.

18 16     In addition, on the right-hand side, a great aunt with

19 17 breast cancer as well.

20 18     This is a situation that is simply one where breast cancer

21 19 runs in the family. It ran in the family down to her mom, who,

22 20 although older when she developed breast cancer, developed

23 21 ER/PR-positive, the same type of tumor, did not use HRT. This

24 22 whole argument that HRT somehow is a necessary element for the

25 23 development of breast cancer fails when you look at their

26 24 history and how breast cancer runs in that family through

27 25 individuals who never used HRT.

page 150

1    The response of plaintiffs to this is, well, she had some
2  genetic testing and that genetic testing was negative.  Yes to
3  both counts.  Plaintiff's counsel acknowledged in his opening
4  statement that the current level of knowledge -- mind you, this
5  is a new field.  The human genome has been identified for a few
6  years, and every year we are learning more and more and more
7  about genetic testing so that genetic testing that we now have
8  only tests about 30 percent or so of the suspected genetic
9  causes.  That's been acknowledged.
10    Dr. Noah Kauff, who counsel has mentioned and who we will
11  be jointly calling in this case, has done an exhaustive look at
12  her family history.  This is, by the way, not pharmaceutical
13  companies trying to point the finger.  The science is the
14  science.  And we're trying to present to you what we believe is
15  the best science in this case.
16    He will testify as a geneticist.  This is what he does for
17  a living at Sloan-Kettering in New York, one of the premier
18  cancer centers in the country.  That her history of genetic
19  cancer that runs in her family is so strong that it is by far
20  and away the most likely cause of her breast cancer here.
21    As counsel has said, seven breast cancers in five family
22  members through a common ancestor.  HRT has nothing to do with
23  this.
24    All right.  Let's go back.  We're in a situation where a
25  woman is experiencing menopausal symptoms and she comes to her

page 151

1  doctor.  I want to explain a little bit about Ms. Scroggin's
2  general medical history, and as counsel has indicated, when
3  you're in a lawsuit, we give them all of our documents, they
4  give them -- us all of their documents, so there's a complete
5  exchange of information.  We know about their case.  They know
6  about our case, because we want to be able to present it to you
7  fully.
8    And so we know in Ms. Scroggin's case something about her
9  general medical history that is important to you.  The fact that
10  she has a smoking history has been referenced.  In 1984, she
11  appears with her menopausal symptoms, for which she receives
12  treatment.  From '97 to 2000, that whole time, and you'll hear
13  about that as an additional risk factor, she has something
14  called dense breasts.
15    Two surgeries for lumbar pain.  She has high cholesterol
16  and hypertension, which relate to heart disease.  Heart disease
17  also runs in Mrs. Scroggin's family, as does the diabetes that
18  she developed in 2003, which also runs in her family.
19    When she went to Dr. Kuperman in 1989, Dr. Kuperman was a
20  well-qualified, established OB/GYN in this community.  He had
21  been practicing since 1960, had gone to medical school at the
22  University of Illinois, a clinical professor at UAMS, and a
23  member and fellow of the American College of Gynecology, which
24  is the premier organization for gynecologists.
25    Dr. Kuperman will testify that when Ms. Scroggin came to

page 152

1  him as part of his practice, he had developed information and
2  learned about medical issues from a variety of sources, and this
3  is just an example of the sources from his medical training,
4  from his review of the medical literature, from his attendance
5  at medical meetings in his community, from information from the
6  government, as well as information from drug companies.
7    And he was aware at the time that he prescribed HRT to
8  Ms. Scroggin, if you'll read the last part, he was aware and had
9  a discussion with her, on the last line, about the influence of
10  breast cancer, that there was a small risk associated with
11  hormone therapy.  You've heard the clip from Ms. Scroggin.  She
12  was aware of that as well.
13    Why was Provera prescribed?  When Ms. Scroggin goes to
14  Dr. Kuperman in 1988 and 1989, why prescribe Provera?  Well, we
15  know that estrogen was prescribed because of menopausal
16  symptoms.  Over the years in the use of estrogen for menopausal
17  symptoms, because of the balance issue I talked to you a little
18  bit about earlier, if you did not provide progestin as well,
19  the lining of the uterus could develop something called
20  hyperplasia and have an overgrowth.  In some instances, that
21  overgrowth would lead to uterine cancer.
22    Uterine cancer is a real and a live issue in the U. S.
23  This, by the way, doesn't all relate to menopause.  This relates
24  to uterine cancer occurring in women in the U. S. at an alarming
25  rate and resulting in a significant number of deaths each year.

page 153

1  So it is a real, it is a live, it is a serious issue.
2    Provera was originally approved for use in 1959 by the FDA.
3  So by the time Ms. Scroggin comes to her doctor, it is a tried
4  and true medicine.  It's been around a long time.  It has the
5  confidence of doctors.  But in the '70s, doctors are learning
6  that it will serve another purpose.  It's originally approved
7  for abnormal uterine bleeding.  Doctors on their own are
8  learning in the '70s, as endometrial cancer increases with the
9  use of menopausal estrogen, that if they also give a progestin,
10  they will reduce that risk.  This is something doctors learned
11  themselves, as often happens.
12    And so over time, more and more information became
13  available through studies that doctors did that progestins were
14  effective in reducing the risk of endometrial cancer.  And so
15  the leading organization of doctors, the American College of
16  Gynecology, started recommending in 1983 and '88 and '94 and '98
17  and even today that progestin be prescribed with estrogens, for
18  this benefit.  And it's an important benefit, and it's a benefit
19  that Ms. Scroggin received.
20    Now, counsel made a comment to you that I think was an
21  error, actually, and I want to correct it.  He said doctors
22  are -- it's inappropriate for doctors to prescribe a medicine
23  that is off label.  Now, remember, doctors are learning
24  themselves in the '70s and '80s and even '90s that Provera is
25  effective in offsetting endometrial hyperplasia.  It is not at

Page 81

page 154

1  that time approved by the FDA for that purpose. But the FDA
2  clearly and absolutely doesn't regulate the practice of
3  medicine. Doctors are free and it is perfectly appropriate for
4  them to prescribe for the benefit of their patient after
5  reviewing all the risks and benefits. Even the American College
6  during this time was recommending it for doctors to do. It was
7  so important that it actually became the standard of care for
8  doctors to prescribe a progestin when they prescribed an
9  estrogen for menopause.
10     Now, there are some restrictions where it is not formally
11  approved by FDA as to what a drug company can say about it.
12  Even though a doctor is free to prescribe, a drug company is not
13  free to actively promote. And counsel didn't get to this point,
14  but we're going to have a discussion during this case because we
15  and the FDA had a disagreement at different times about what we
16  were able to say, and we resolved those agreements, and we went
17  forward.
18     But the fact of the matter is, this was an important
19  medical use for progestins. And so when Ms. Scroggin came to
20  Dr. Kuperman in 1989 and he decided to prescribe estrogens, he,
21  of course, decided to prescribe a progestin.
22     Let's talk about the label. The Provera label was proper
23  as it was, and it was set by the FDA. You've heard a lot of
24  accusations about testing, what was tested and what wasn't
25  tested. In a 40-minute presentation, I can't really respond to

Page 82

page 155

1  all the accusations except to say that you will hear about what
2  we did on testing.
3     You've heard counsel acknowledge that you couldn't do a
4  trial where you give patients a medicine and then watch to see
5  if they develop a bad reaction. That's unethical to do.
6     What you do is, you do a study where you try to provide a
7  benefit to a patient; in other words, you give progestin along
8  with estrogen to see if the progestin reduces the risk of
9  endometrial hyperplasia. That's an important benefit. And then
10  you follow the patients who are hopefully receiving this
11  benefit, and you see whether or not they are experiencing any
12  adverse events. And the adverse events can be many, including
13  breast cancer.
14     And so Upjohn, appropriately, did the studies that it was
15  supposed to do. It submitted protocols to the FDA for studies,
16  and it followed adverse events that occurred. And you've heard
17  Mr. Urbanczyk tell you that there were an enormous number of
18  studies about breast cancer being done in the medical community,
19  and this company analyzed and followed them.
20     Now, progestins, as I think I've described to you, are
21  different than estrogens. They're prescribed for a different
22  purpose. They're a different chemical composition. And there's
23  different information about them. So, of course, you would
24  expect the labels to be different.
25     I want to talk to you about an issue that we think is

Page 83

page 156

1  relevant here. You've seen a lot of discussion about estrogen
2  and documents and so forth about estrogen, but let me tell you
3  what the issue is. There had been a conventional wisdom,
4  counsel said there are some studies which showed estrogen
5  increased the risk of breast cancer. The vast majority showed
6  it did not, and some even showed it reduced it. But there had
7  been a concern, historically, that there was an elevated risk of
8  breast cancer with estrogen. A concern. A concern that was
9  evaluated properly and addressed properly.
10     The question for us as it relates to Upjohn is does the
11  addition of progestin, Provera being one of the progestins,
12  increase the risk above that that people were concerned with of
13  E, estrogens? Are you with me?
14     In other words, estrogens had been provided to women for
15  the treatment of menopausal symptoms. There was a concern, an
16  unproven concern, an evaluated concern, about whether that
17  increased the risk of breast cancer. The question as it relates
18  to progestin and my client is, when you add progestin to the
19  menopausal regimen, does that increase the risk over that that
20  people were concerned about with estrogen?
21     Let me show you some documents that we'll talk about.
22  Science has demonstrated that adding a progestin reduced
23  the risk of endometrial cancer, of cancer of the uterus. So
24  there was a proposition and a belief that the same way it
25  reduced the risk of uterine cancer, it would reduce the risk of

Page 84

page 157

1  breast cancer.
2     Early studies like this one in 1983 by a Dr. Gambrell
3  talked about that and evaluated the risk of breast cancer with
4  estrogens and didn't find really any significant risk, but
5  determined that when you add a progestin, the risk goes down
6  even further.
7     In 1988, the American College of Gynecology references that
8  fundamental belief during the 1980s that if you reduce the risk
9  of uterine cancer with progestins, you're probably going and you
10  may reduce the risks of breast cancer by prescribing progestins.
11     In 1989, an important article comes out. And what I'm now
12  talking to you about is, what's the information in this time
13  frame? And, mind you, in a 40-minute presentation, I can't
14  possibly talk to you about all the articles, and please don't
15  assume that I am. There are many more articles here, and we all
16  talk about numbers, and there are some articles which are
17  absolutely on and some articles which aren't. But the fact of
18  the matter is, I'm trying to give you a little smattering of
19  what we'll talk about during the trial. And the issue is, does
20  the addition of a progestin increase the risk above that of an
21  estrogen?
22     This article says it might. In 1989. It might. First
23  article. But if you read the fine print of the article, it says
24  that while our raw numbers say there may be a small increased
25  risk, when you analyze them as a statistician does, there's no

Page 85

page 158

1  difference between the numbers.  In other words, they're not
2  statistically different.
3      During this same time frame, articles are being published
4  talking about the uses of progestins and estrogens to treat
5  metastatic breast cancer.
6      What does Upjohn do when they learn about the 1989 article
7  by Dr. Berkgvist, out of Sweden?  Even though it's a small
8  article, was only ten patients.  What do they do?  They
9  commission a very renowned consulting group out of Washington,
10  D. C., of epidemiologists, some of whom worked at the FDA, to
11  look at the literature from around the world, look at
12  everything, and try to address the question of whether or not
13  progestins increase the risk of breast cancer.  Not only do we
14  want you to look, but we want you to publish it.  We don't want
15  this hidden in some file.  Whatever your results are, publish it
16  for the world to see, the medical community to see.  And that's
17  what they did.  And we'll talk a lot about that in this case,
18  and they came up with a couple of conclusions.
19      One conclusion is, to date, there is no consistent evidence
20  of an association between breast cancer and progestins.  But
21  like all good studies, they say more study is needed.  More
22  study is needed.
23      By this time, mind you, remember, a lot of the discussion
24  of the WHI, the largest study ever undertaken on women's health,
25  funded by the National Institutes of Health, is now underway.

Page 86

page 159

1  People know that that evidence and information will be
2  forthcoming and hopefully resolve the issue.
3      Dr. Colditz, who is a plaintiff's expert, is
4  interestingly, they've presented to you what Dr. Colditz's
5  opinion is as of 2007, but Dr. Colditz himself has had an
6  evolution in his thinking based upon studies that he has done.
7  And he did a study in 1993, and he was deposed in this case
8  about that and said -- do you remember the original proposition?
9  The original proposition is, if progestins reduce the risk of
10  endometrial cancer, then there's a logical reason to believe
11  they'll reduce the risk of breast cancer.  And he testified that
12  as of even 1993, that remained a reasonable proposition and
13  position.
14      1995, he followed up with more studies, and he concludes at
15  that point on this issue, he no longer thinks that they do.  And
16  he's drawn a tentative conclusion earlier.  This is his more
17  recent article on it.  By 1995, he doesn't think that progestins
18  actually reduce the risk, but his data don't support them
19  increasing the risk.
20      Even as late as 1997, there is a huge study called the
21  Collaborative Study, and you've been told there aren't any
22  studies, there aren't any studies.  This study reanalyzed the
23  data from 50 different medical studies, and they have data
24  points, and the numbers are a little bit different for estrogens
25  and estrogens plus progestins, but their conclusion is, there is

Page 87

page 160

1  no evidence of a marked difference between an estrogen alone and
2  an estrogen plus a progestin in terms of the risk of breast
3  cancer.
4      The content of the label.  Why does the label say what it
5  does?  Given the time I have, I'm not going to spend time going
6  through all of these, but I want -- and I think the evidence in
7  this case will make clear to you that the FDA is on this.  They
8  are on top of this.  They over the years evaluate the issues
9  again and again and again.  They create their own task force to
10  evaluate the risks with estrogens and the risks with estrogens
11  and progestins, and they do something very unusual.  Usually a
12  company goes to the FDA and there's an individual discussion
13  about what information should be included in a label.  But every
14  now and then -- and, by the way, Provera by the mid '80s is off
15  patent.  There are all kinds of generics out there.
16      So the FDA takes the very unusual step of creating
17  guidelines, and it says for all makers of progestins, we want
18  you to put the same information in your label.  We want doctors
19  to be advised of the same information.  And in 1977, they begin
20  that with a set of guidelines that deal with potential birth
21  defects.  They modify it in 1989, and I'd like you to take a
22  second with me and read this language.
23      The Food and Drug Administration publishes the guidelines
24  that manufacturers of progestins are to follow.  And they say to
25  the manufacturer of progestins, Upjohn being one, FDA advises

Page 88

page 161

1  that compliance with the professional labeling guideline texts
2  for progestational drugs can be relied upon by the manufacturer
3  for meeting labeling requirements.  Wow.
4      In 1992, the FDA revises the guidelines for all
5  progestational drugs, including Provera, again, and they send a
6  letter specifically to Upjohn saying here are the guidelines.
7  Please submit your labeling in accordance.
8      And I want to take a second with you in 1992 and talk about
9  what the FDA declared should be in the label of Provera and all
10  other progestins in this country.  This is about what happens
11  when you combine estrogen and progestin.  Mind you, this is
12  still at a time where the FDA hasn't formally approved either
13  Prempro or Provera or any other medicine to be used in
14  combination with estrogen.  The FDA is aware of the practice.
15  They are aware that it is the standard of medical care, and they
16  want this information in all the labels of the progestin makers.
17  They recommend the regimen that should be given, and in
18  paragraph eight, they tell the manufacturer the risk information
19  that they want included about progestins used in combination
20  with estrogens.
21      They say there are possible risks which may be associated
22  with the inclusion of progestin in estrogen replacement therapy,
23  or regimen, including adverse effects on carbohydrate and lipid
24  metabolism.  Lipids have to do with heart stuff.
25      In 1992, when the FDA says to every progestin maker in the

---

Page 89

1 page 162

2

3  1    country, here is what we want in your label, they do not deem it

4  2    appropriate to have a human breast cancer warning.  And they say

5  3    if you do what we tell you to do, you have met our labeling

6  4    requirements.

7  5       You were shown this -- I'm not going to spend much time on

8  6    it.  We did have data on some animal testing.  This also is in

9  7    the 1992 FDA guidelines that they would like that data included

10  8    in the label, and, of course, we included it.

11  9       In 1997, Upjohn goes to the FDA and says we think we've got

12  10   enough information for you to formally approve the use of

13  11   Provera with Premarin to reduce endometrial hyperplasia.  Mind

14  12   you, the real world of doctors and physicians had established

15  13   this long ago, but the FDA has very technical rules, and that's

16  14   fine.  And the company went to them in 1997 and said, please

17  15   give us formal approval for this as an indication.  And this is

18  16   very important, because in 1998, the FDA looks at all the

19  17   information we present -- and, by the way, we have in part of

20  18   the information we present information about breast cancer.  All

21  19   that is evaluated, and the FDA approves our label.  If you can

22  20   look at the last comment, we submit draft labeling, we go back

23  21   and forth with the FDA, they want this in, they want that out,

24  22   and then they say you have our approval, but your label must be

25  23   identical to what you've submitted.  And that identical labeling

26  24   approved by the FDA also reflects FDA's belief that a human

27  25   breast cancer warning for Provera is not appropriate.

---

Page 90

1 page 163

2

3  1       We will have Dr. Heidi Jolson, who is a former officer and

4  2    senior officer at the FDA, a board certified internist, who will

5  3    come and testify and talk about some of this history and opine

6  4    and tell you why our label was appropriate the way it was.

7  5       Let's go back to where we started.

8  6       THE COURT:  You have about six minutes.

9  7       MR. GOODELL:  Thank you, your Honor.

10  8       It isn't easy to say no to someone who has suffered a

11  9    serious injury where the injury isn't caused by either of these

12  10   two medicines, where the breast cancer is caused by a cancer

13  11   that runs in the family, through a common ancestor with five

14  12   other breast cancers, five other women who have suffered the

15  13   same horrible fate.  We know why this happened.  Hormone therapy

16  14   is not a necessary element in this, just as it wasn't for

17  15   Ms. Scroggin's mom.

18  16      Provera had an important use in this case, a use to prevent

19  17   endometrial cancer, and it did that.  Our label, which did not

20  18   have a human breast cancer label, was appropriate, and we told

21  19   you why.  We told you the interaction with the literature and

22  20   the interaction with the FDA, advising all makers of progestins,

23  21   here's what we want.

24  22      At the end of this -- and I thank you for your attention.

25  23   It's late for lunch, going to lunch for all of us, and I thank

26  24   you very much.  At the end of this, we will ask you for a

27  25   verdict for the defense.

---

Page 91

1 page 164

2  1       THE COURT:  Ladies and gentlemen, we're going to break

3  2    in just a minute for dinner until 1:15, by this clock back here.

4  3    Now, how about this afternoon?  Do we need to quit at 4:45 for

5  4    voting purposes or are we in good shape?

6  5       JUROR NO. 6:  Yes.

7  6       THE COURT:  Okay.  We'll go until 4:45 this afternoon

8  7    then, since it's Election Day.  We'd normally go to five, but I

9  8    don't want anybody to miss an opportunity to exercise the

10  9    privilege of voting.

11  10      All right.  Don't talk about the case or anybody involved

12  11   in it.  Consciously avoid starting to make up your mind.

13  12      Let the jury stand out.  Everyone else remain seated.

14  13      (Jury exited the courtroom.)

15  14      THE COURT:  We're in recess.  The jury is out.  We're

16  15   in recess until 1:15.

17  16      Who is your first witness?

18  17      MR. MORRIS:  Dr. Don Austin.

19  18      THE COURT:  All right.

20  19      (Recess at 11:55 a.m.)

21  20            REPORTER'S CERTIFICATE

22  21      I certify that the foregoing is a correct transcript from

23  22   the record of proceedings in the above-entitled matter.

24  22

25  23            Date:  February 5, 2008

26         Christa R. Newburg, RDR, CRR, CCR

27  24   United States Court Reporter

28  25

---

Page 92

1 page 165

2  1       (Proceedings continuing in open court at 1:17 p.m., jury

3  2    present.)

4  3       THE COURT:  You may proceed.  Good afternoon.

5        You don't have to, but you may.

6  5       MR. MORRIS:  Your Honor, we have an issue that we

7   need

8  6    to take up at side bar regarding some exhibits.

9  7       THE COURT:  Okay.  Come up, please.

10  8       (Bench conference reported as follows:)

11  9       MR. MORRIS:  We have about nine exhibits, some of

12  10   which are on the long list that need to be moved to the short

13  11   list, to be used with this witness.  And we're conferring

14   right

15  12   now with Wyeth to see if that's okay.

16  13      THE COURT:  Okay.

17  14      MR. MORRIS:  And if there are objections to a --

18  15      THE COURT:  If there are objections, we'll have to

19  16   take them up at the first break.

20  17      MR. MORRIS:  All right.  And, Your Honor, one other

21  18   issue I wanted to bring up so as not to impede the flow.

22  19   During Wyeth's opening statement, Mr. Urbanczyk mentioned how

23  20   this product had been beneficial to millions of women.

24  21      MR. WALKER:  Provided substantial benefits to

25   millions

26  22   of women.

27  23      MR. MORRIS:  And in response to that, we believe that

28  24   that opens the door to our discussion of how many people it

29  25   harms per year.

---

Page 93

page 166

```
 1       THE COURT:  You can give me a short written brief on
 2   it tonight and y'all can respond to it, get it --
 3       MR. MORRIS:  Our problem is we don't have a witness
 4   after tonight to put this evidence through.  I can't put it
 5   through anybody other than Dr. Austin, who is the only
 6   epidemiologist I'm calling.
 7       THE COURT:  Well --
 8       MR. WALKER:  There's no other way we can -- they had
 9   cited 258 --
10       THE COURT:  We've got to try the case to this jury.
11       MR. WALKER:  If they say hormone therapy provides
12   benefits to all of these people, it's not going to be simple,
13   they are going to raise cane about it, and it's going to take
14   a
15   long time.
16       MR. MORRIS:  This is in the epidemiology from the
17   Million Women Study.
18       THE COURT:  If I could have had it overnight to think
19   on it, I'd have had time to study it.
20       MR. MORRIS:  We will take that offer then, Your
21   Honor,
22   and we will prepare --
23       THE COURT:  Get them a brief by 8 o'clock.  I know
24   you
25   can be working on it tonight and y'all can have me one by 7:30
26   in the morning.
27       MR. HEARD:  We'll raise something.  This is one of
28   the
29   slides that they've given us for Dr. Austin's testimony today.
```

Page 94

page 167

```
 1       MR. MORRIS:  Let me see it.
 2       MR. HEARD:  Your Honor, we believe this runs afoul of
 3   Your Honor's Daubert ruling that says that Dr. Austin, as well
 4   as Dr. Blume and Dr. Gueriguian, may not give opinions about
 5   Wyeth's failure to test.  This slide indicates an introduction
 6   to a whole segment of testimony saying that Wyeth failed to
 7   test.  You'll see that this slide is immediately followed by a
 8   reference to 19 studies for which they are going to say
 9   studies
10   like this should have been done earlier in time.  Your Honor,
11   our Daubert motion about failure to test addressed Dr. Austin
12   specifically.  Their response did not even mention him or
13   defend his opinions on this ground.
14       MR. WALKER:  Are you talking about the ethical
15   obligations of the drug company motion?
16       MR. HEARD:  The Daubert motion which says -- may I
17   finish?  The Daubert motion which says that none of their four
18   experts, liability experts, could address what a reasonable
19   company should have done.
20       THE COURT:  When I get -- give him the floor.
21       MR. WALKER:  Your Honor said that unless we came up
22   with objective criteria for reasonableness, that the experts
23   couldn't say that they were unethical.  Just saying that they
24   failed to test and were on notice of testing, that's a purely
25   factual issue.  It's not saying they're an unethical drug
26   company for failing to do so.  They are just saying here's the
```

Page 95

page 168

```
 1   signals.
 2       THE COURT:  Objection overruled.  Exception saved.
 3       (Proceedings continuing in open court as follows:)
 4       MR. MORRIS:  Your Honor, the plaintiff would call
 5   first Don Austin.
 6       THE COURT:  Okay.
 7       DON AUSTIN, PLAINTIFF WITNESS, DULY SWORN
 8       THE COURT:  Now, speak into the mike, if you will,
 9   please.
10       DIRECT EXAMINATION
11   BY MR. MORRIS:
12   Q.  Good afternoon, Dr. Austin.
13   A.  Good afternoon.
14   Q.  Would you please tell the folks on the jury where you
15   live?
16   A.  I live in Lake Oswego, Oregon.  It's a suburb of
17   Portland,
18   Oregon.
19   Q.  And are you a doctor?
20   A.  I am.
21   Q.  What kind of doctor are you?
22   A.  I have a degree in medicine.  I'm an M.D.
23   Q.  And when you were studying to become an M.D., can you
24   tell
25   the jury what you did in terms of your educational history?
26   A.  Well, in addition to taking medicine, I also took courses
27   for a master's degree in microbiology so that when I graduated
```

Page 96

page 169

```
 1   from what was then called the University of Oregon Medical
 2   School, I got a medical degree, and then was awarded shortly
 3   after that a degree in -- a master's degree in microbiology.
 4   Q.  The jury has been told that another doctor, a doctor
 5   that's going to appear for Wyeth, is the only cell biologist
 6   they are going to hear from.  Are you, in fact, a cell
 7   biologist?
 8   A.  Well, I used to be a cell biologist.  I stopped
 9   practicing
10   in that area a number of years ago, but I still remember the
11   things that I learned and I use that information all of the
12   time.
13   Q.  Do you also have a specialty in epidemiology?
14   A.  I do.  I have a degree, master of public health,
15   particularly in epidemiology and biostatistics.  It was
16   primarily in epidemiology and a residency in preventive
17   medicine in -- primarily in epidemiology.  And I'm board
18   certified in the college of preventive medicine.
19   Q.  Are you a Ph.D.?
20   A.  No, I am not.
21       MR. HEARD:  Mr. Morris, would it be possible,
22   consistent with what you need to do, to put that easel next to
23   Dr. Austin where we could see it over here as well as the
24   jury?
25       MR. MORRIS:  That's fine with me, Your Honor.  I was
26   trying not to have to walk so far, but that's okay.  I need
27   the
28   exercise.
```

page 170

1       MR. HEARD:  Thank you.
2       MR. MORRIS:  You're welcome.
3   BY MR. MORRIS:
4   Q.  Have you served in the military?
5   A.  I served in the uniform services.  I did not serve in the
6   military.  I served in the U.S. Public Health Service for
7   awhile.
8   Q.  And when did you start that?
9   A.  I served three years starting in 1967 through the summer
10  of 1970.
11  Q.  And during those years, what were you doing for the U.S.
12  Public Health Service?
13  A.  I'm sorry -- through 1969.  Two of those years I was
14  stationed in Kentucky, and my job was to set up -- primarily
    to
15  set up Pap smear programs in the Appalachians, but it
    broadened
16  in the second part of those years to help set up multiphasic
17  screening programs in a number of -- using a number of
18  different modalities to diagnose disease or screen for
    disease.
19  Q.  Okay.  You mentioned a couple of words, multiphasic
20  something?
21  A.  That was the buzz word at the time.  What it means, we
    not
22  only screened for one thing, we screened for a lot of things.
23  So we screened for heart disease, we screened for cervical
24  cancer, we screened for low thyroid, high blood pressure, a
25  number of things like that.

page 171

1   Q.  And what do you mean when you say screened?
2   A.  Well, just like a mammogram is a screening test for
    breast
3   cancer and a Pap smear is a screening test for cervical
    cancer,
4   there are a lot of blood tests that are screens for different
5   kinds of abnormalities, diabetes, or high cholesterol.  And we
6   administered those screening tests.  And if someone came up
7   positive on the screening test, it meant that they should be
8   worked up, evaluated to see whether or not they did, in fact,
9   have the condition or the disease.
10  Q.  Can you explain to the folks on the jury what
    epidemiology
11  is, the study of epidemiology?
12  A.  Yes.  Epidemiology is actually two parts.  One part is
    the
13  study of how diseases are distributed in the population, who
    is
14  more likely to get it and who is not.  And the second part is
15  the study of why it's that way, why some people get it and
    some
16  people don't.
17  Q.  And as an epidemiologist, do you rely upon studies that
18  are done in particular populations with particular exposures
    in
19  order to reach results about those questions?
20  A.  That's right.  Epidemiology, as I mentioned, is a study
    in
21  populations.  So we do use studies, sometimes a large number
    of
22  individuals to represent populations, but we're really
23  interested in knowing -- in knowing what sort of things cause
24  things that we don't want to happen like diseases or abnormal
25  outcomes.

page 172

1   Q.  All right.  I want to show you what we've marked
2   previously as Exhibit 8567, and ask you if you can identify
3   that document?
4   A.  Yes.  This is a biographical sketch in the former NIH
5   format.
6   Q.  And does that detail your professional experience as well
7   as your educational history?
8   A.  Well, it summarizes it, yes.  It's a -- it's a shorter
9   version, yes.
10  Q.  With regard to your work after you got out of the
11  governmental service, what did you do following 1970 in terms
12  of your profession?
13  A.  When I came out of the U.S. Public Health Service, I used
14  the GI bill to go back to school and get my degree in master
    of
15  public health and to continue my residency program.  During
16  that time, I went to school at UC Berkeley for one year,
17  finished my residency there, and then became an employee of
    the
18  State Health Department of California.  Within a short period
19  of time, I became one of the investigators in the cancer
20  epidemiology section, and, within a short time, became the
21  director of the California Tumor registry it was called then.
22  Q.  What year did you begin with the California Tumor
23  Registry?
24  A.  Well, let's see.  That -- I began working for them during
25  1971, and I think it was 1973 that I became -- '2 or '3, I

page 173

1   don't remember which, that I became chief of the California
2   Tumor Registry.
3   Q.  In working at the California Tumor Registry, what was the
4   goal of that organization in terms of the work that you were
5   performing?
6   A.  California had had a cancer registry for awhile and so
7   they were accomplished at some of the technical aspects, and
8   they had a trained staff to be able to collect cancer data and
9   put it in a researchable file.  The National Cancer Institute
10  wanted to set up a long-term surveillance program in the
    United
11  States, they wanted to contract with areas that were able to
12  carry out that task.  And so they contracted with the state of
13  California to carry out a surveillance program in what's
    called
14  the five bay areas -- the five bay area counties of the San
15  Francisco bay area, a population of about 3 million.  And that
16  was the function that we had was to capture, to record, to
    find
17  every case of cancer that was diagnosed in residents of those
18  five counties and put it in a large file and take the
19  identifiers off that file and then submit it to the National
20  Cancer Institute.
21  Q.  And where is the National Cancer Institute housed?  Where
22  is that?
23  A.  It's part of the federal government.  It's -- it has a
24  large campus in Bethesda, Maryland.  And the National Cancer
25  Institute is part of the National Institutes of Health on that

Page 101

page 174

1   campus.
2   Q.   What are ecological trends?
3   A.   Ecological?
4   Q.   Trends?
5   A.   Trends?  The way it's usually used, an ecologic trend just
6   means changes in rates, changes that occur in how prevalent
7   something is or how common something is in a population.
8   Q.   At the California cancer registry, did you follow
9   ecological trends as they related to cancer?
10  A.   We did as a byproduct of collecting that data and making
11  sure that it was -- that it was complete.  That's one of the
12  things that we did was to look at it -- every time a year was
13  complete, we would look at the data and see whether it matched
14  up with the year before, or to see whether or not there were
15  cases that might be missing somehow, or to see whether or not
16  there were extra cases in some category that we hadn't
17  anticipated.
18  Q.   From a public health standpoint, why is that function
19  important?
20  A.   Well, the state of California actually supported our
21  activity.  They paid my salary on this.  It was not paid by
22  the
23  contract with the National Cancer Institute because whether or
24  not the rates are going up or down or changing in a population
25  has a health consequence.  And we need to know whether or not
    there are factors in the environment, factors in the population

Page 102

page 175

1   that are increasing or decreasing that have an effect on the
2   risk of cancer.
3   Q.   In the course of your study in becoming a medical doctor
4   as well as becoming an epidemiologist, were you ever faced
5   with
    classes or instruction that dealt with genetic factors?
6   A.   Yes.  Yes.  It was part of the basic education both as a
7   medical student and as a -- in the microbiology courses.  And
8   then as an epidemiologist, the -- certain aspects of that are
9   always used to help contribute data or to be able to design
10  studies.
11  Q.   And so with regard to genetic factors that may exist and
12  be related to cancer, is that something that you have studied
13  and read about over the years in performing your job as a
14  medical doctor and as an epidemiologist?
15  A.   Yes.  Most of that -- most of that reading and most of
16  that study has been how one measures it as an epidemiologist.
17  For example, there may be genetic changes in a chromosome that
18  might affect the risk of breast cancer, for example.  But as
19  an
    epidemiologist, we wouldn't be measuring that.  We would be
20  measuring the effect in a population or effect in family
21  history.  So we would look at -- family history, for example,
22  is one of the surrogates for a genetic marker.  And we use
23  similar sorts of things with other kinds of cancer, we studied
24  other cancers.
25  Q.   We'll probably get into more detail about this later, but

Page 103

page 176

1   kind of as a foreshadowing for the jury, in most of the
    studies
2   that we've recently seen concerning the combination of
    estrogen
3   and progestin and whether or not those products together
4   contribute to cause breast cancer, have most of the good
5   studies controlled for family history?
6   A.   Those studies in which it was found to contribute to the
7   association that they found with estrogen or progestin, the
8   answer is yes.  In some of the studies, they looked to see
9   whether or not they needed to control for it, and in some of
10  the studies they didn't because it wasn't a confounder, it
11  wasn't mixing up its effect with what they were studying.
12  Q.   Have you had an occasion to review the world's
13  epidemiology concerning this relationship between estrogen and
14  progestin and whether or not it causes breast cancer in women
15  if taken over a significant period of time?
16  A.   Well, certainly a sizeable portion of the world
17  literature.  I'm not certain that I've looked at all of it,
    but
18  most of it, I'm sure I have.
19  Q.   We'll get into some of the specific studies.  Are you
20  familiar with the Women's Health Initiative study that was
    done
21  by the NIH?
22  A.   Yes.
23  Q.   And are you familiar with the figures in that study with
24  regard to increased risk of breast cancer?
25  A.   I am.

Page 104

page 177

1   Q.   And have you reviewed the Million Women Study that was
2   done in England?
3   A.   And is still going on, yes, I have.
4   Q.   Now, can you describe for the jury what they are doing in
5   England?  Are they actually studying a million women?
6   A.   Yes, they are.  They have -- they have essentially
7   recruited a million women by virtue of their health records,
8   women who agreed to have their health records from their
    family
9   doctor.  They have a socialized medicine there, so they can
10  keep track of all of the women.  And they have recruited a
11  million.  And then they follow these women.  They not only
    take
12  into consideration what sort of medications they have had;
    they
13  also look to see what sort of diseases they have had.  And so
14  over time, they are able to find out if there's an association
15  between what they took and what they got.
16  Q.   Was the Women's Health Initiative published in a
17  peer-reviewed journal?
18  A.   Yes.
19  Q.   In fact, it was published in the Journal of the American
20  Medical Association; isn't that correct?
21  A.   That's correct.
22  Q.   And is that a highly-respected journal here in the United
23  States?
24  A.   It's one of the top two journals in the country.
25  Q.   Was the Million Women Study published in a peer-reviewed

page 178

1 journal?
2 A.  That has been published in several journals and, yes --
3 and usually they publish in Lancet or one of the subdivisions
4 of Lancet.  And that's one of the top two medical journals in
5 the world.
6 Q.  All right.  And with regard to those particular
7 peer-reviewed publications, are those generally accepted as
8 reliable in the medical community for the articles they
9 publish?
10 A.  Well, they are generally accepted as being well-studied,
11 well-written, and well-reviewed, yes.
12 Q.  Based on your review of the -- let me ask you this
13 question first.  During the course of the trial, I'm going to
14 ask you some questions that will call upon you to render
15 opinions.  For the opinions that you've already rendered and
16 for the ones you'll render in the future, will you agree to
17 base those upon reasonable medical probability or
18 reasonable scientific probability?
19 A.  Yes.
20 Q.  And that means that the answers that you give that are
21 opinions will be more likely true than not true?  Will you
22 agree with that?
23 A.  I agree with that.
24 Q.  Based on the available evidence that science and medicine
25 have today, does the combination of estrogen, exogenous

page 179

1 estrogen, and exogenous progestins, synthetic progestins, cause
2 breast cancer?
3 A.  Yes.
4 Q.  Is there any serious debate about that issue today?
5 A.  You qualified it by saying serious.  I don't think there's
6 any serious doubt but what it does cause breast cancer.
7 Q.  All right.  I want to go back in time back to the mid
8 '70s.  Were you involved in any kind of investigation on the
9 issue of whether or not estrogen alone, E alone, caused
10 endometrial cancer?
11 A.  Yes.
12 Q.  Can you describe for the jury how you became involved and
13 what your role was?
14 A.  I became involved in that study as a side effect of the
15 fact that we were trying to determine whether the cancer
16 reporting system was working effectively.  And it came to our
17 attention that we were finding more and more cases of cancer of
18 the uterus every year.  Our reporting system began in 1973,
19 although we had also complete data for the same area going back
20 four years, and for one of those data going back ten years.
21 And as we -- after several years' worth of data, in checking
22 the data, we became convinced that it was not just an artifact
23 of the reporting, but, in fact, there was an increase in
24 endometrial cancer -- endometrium is the lining of the
25 uterus -- or there was an increased number of cancers of the

page 180

1 lining of the uterus.
2 And a colleague in Seattle also noticed the same thing
3 there, although their data started a year later than ours, and
4 wanted to ask if I would collaborate with him on a publication
5 about that and what the characteristics were.
6 So we published a paper on the increasing risk of
7 endometrial cancer among women based on our data from the NCI,
8 the National Cancer Institute, surveillance program, which is
9 called the SEER program, Surveillance Epidemiology and End
10 Results.
11 Q.  What does the SEER program do?
12 A.  Basically it collects data from all of the -- at that
13 time, ten areas in the United States.  It covers about -- at
14 that time, about a tenth of the United States with registries
15 similar to the one that I just described to you, collecting all
16 of the cases of cancer in that defined population, making sure
17 that they are not duplicated, that none are missed, and taking
18 the identifiers off and sending them to the National Cancer
19 Institutes where they are put together in one large file.
20 Q.  And so these cases of endometrial cancer were increasing.
21 Were you able to isolate what was causing the increase?
22 A.  We didn't, but it became known that we were seeing an
23 increase in endometrial cancer, and I was contacted by a
24 representative from the Food and Drug Administration who asked
25 if I would come and present those data to a committee, an

page 181

1 advisory committee.  And I, of course, said yes.
2 Q.  I'd like to show you what's previously been marked as
3 Plaintiff's Exhibit No. 21, and ask you if you can identify
4 this document?
5 A.  Well, this is a transcript of the proceedings held by the
6 Food and Drug Administration for the Advisory Committee of
7 Obstetrics and Gynecology.  This was held in December of 1975.
8 And that was the -- that was a meeting at which I presented the
9 data that we had.
10 MR. MORRIS:  If we can, can we go to the PowerPoint?
11 MS. PRUITT:  Mr. Morris, do you have an extra copy of that?
12 MR. MORRIS:  I thought we had furnished you one, but
13 if we haven't, we will certainly get you one momentarily.
14 COURTROOM DEPUTY:  Mr. Morris, has it been admitted?
15 MR. MORRIS:  We're going to move to admit it right
16 now.  Plaintiff's Exhibit 21 is on the short list.  Is it my
17 understanding that whatever is on the short list is already
18 admitted, or do I need to move it into evidence every time?
19 THE COURT:  Probably ought to move it into evidence
20 out of an abundance of caution.
21 MR. MORRIS:  Will do, Your Honor.  And we would like
22 to move in the previous exhibit, which was Dr. Austin's CV.
23 THE COURT:  Biographical sketch?
24 MR. MORRIS:  Yes, sir.

page 182

1    THE COURT:  Any objection to either one of those?
2    MR. HEARD:  No objection, Your Honor, if it's the
3 full
3    transcript.
4    MR. MORRIS:  We tender the full transcript.
5    THE COURT:  Admitted.
6    MR. MORRIS:  Thank you, Your Honor.
7    THE COURT:  Upjohn, no objection?
8    MS. MURRAY:  No objection, Your Honor.  I'm sorry.
9    THE COURT:  Thank you.
10   (Plaintiff's Exhibits 8567 and 21 received in evidence.)
11 BY MR. MORRIS:
12   Q.  With regard to your current work -- and we skipped
12 through
13   some of your qualifications.  I'm trying to speed this along
14   for the jury because I know there's a lot of information for
15   them to gather.  But with regard to your current job, what do
16   you do?
17   A.  Well, I'm retired right now, which means I don't have to
18   do those things that I don't want to do.  And so I don't have
19   to serve on committees in the University and I don't have to
20   continue my role as the director of the epidemiology section
21 in
22   our department at the medical school, but I still teach
23   students.  I teach epidemiology.  I do a little bit of
24   research.  And I also work a small portion of my time at the
25   Veterans Administration on a study that I got started, and
26 then
25   one of their investigators left and there was a -- needed

page 183

1    someone to help complete the study.
2    Q.  And with regard to this particular case, as well as
3    others, have you had an occasion to consult with attorneys
4 like
5    myself to render opinions concerning these issues?
6    A.  Yes.  On some months, that takes a major focus of my
7    attention.
8    Q.  And how much are you charging us on an hourly basis?
9    A.  $400 an hour.
10   Q.  All right.  And for your work as a medical doctor during
11   the days that you were doing work as a medical doctor, would
12   you earn comparable amounts of money doing that?
13   A.  Yes.  As a salaried, tenured professor, I did not charge
14   by the hour, but my salary rate was 183,5-, I think, per year.
15   Q.  All right.  And have you had an occasion to be deposed in
16   these cases by the defense and have they had an opportunity to
17   know your opinions?
18   A.  Yes, several times.
19   Q.  And you've also testified in prior trials?
20   A.  Yes, I have.
21   Q.  Now, what does it mean to be a professor emeritus?
22   A.  It means that they still allow you to keep your
23   appointment with the university even though you are not being
24   paid.  Basically that's what it means.
25   Q.  And which university is it that you were working at?
26   A.  This is Oregon Health and Science University.  It has in

page 184

1    it a medical school, a school of nursing, a dental school, a
2    graduate school, and a school of -- part of -- the school of
3    pharmacology has some programs in that school, too, that
4    university.
5    Q.  You actually teach medical students?
6    A.  Yes, I do.  In fact, I teach them tomorrow.
7    Q.  All right.  We talked about breast cancer data being
8    linked to HRT use.  We'll get to that a little more thoroughly
9    in a moment.  But in terms of this idea of proving causation,
10   causation between an exposure and an illness, are there
11   accepted methodologies about how doctors determine causality?
12   A.  Yes.  Back in the '60s, Sir Austin Bradford Hill was
13 asked
13   to give a talk on that.  And he gave a talk that is now very
14   famous.  And the Bradford Hill criteria sort of stemmed from
15   that even though he cautioned against people just using
16   criteria.  He said what you really have to use is common
17 sense.
18   But the way you determine what causation is is when you have
19   enough evidence that's amassed that convinces you that it's
20   true.  It's the same as how you're convinced that the world is
21   round.  And you have enough evidence that you don't consider
22   alternatives at this point.
23   And there are a number of ways in which you can judge the
24   evidence that's there and -- to see whether or not it is
25   convincing.  And one of them is the strength of the
26   association.  One of them is the consistency of the finding,

page 185

1    not only the consistency within a particular study, but also
2    between studies, among studies.  You find the same thing
3    looking at different populations, by different investigators,
4    using slightly different measurements, do you still come up
5    with the same association.
6    Another one is evidence for a dose response.  What that
7    means is the higher the exposure, does it increase your risk
7 or
8    the severity of the disease in some instances.  Biologic
9    plausibility.  Biologic plausibility means can you explain it,
10   does it fit with what we already know about science.  And this
11   is the most treacherous of all of the criteria because what we
12   know today is different than what we knew ten years ago and is
13   different from what we'll know ten years from now.
14   There are a number of instances in science where people
15   have said:  That just doesn't fit at all with what we know.
16   This can't be true.  And then, as we found out that with some
17   more information, it turned out that it was exactly true.
18   And then temporality, that's a simple sort of a measure,
19   but it means for something to be a cause of something else;
20 the
20   cause has to happen before the effect.  So in some studies,
21   that's a -- that's a concern.  In other studies, the study is
22   set up so that you measure what happened first and then you --
23   what the exposure was, and then you see what happened.  So
24 it's
25   not a concern in some studies.
25   Q.  In terms of the causation that we're discussing right now,

page 186

1  I want to make sure that we're clear about this. You're not a
2  clinician, are you?
3  A. I'm not a clinician.
4  Q. And in terms of -- what is a clinician? If you could
   just
5  briefly tell the jury what a clinician is.
6  A. When I say clinician, I mean a doctor that actually sees
7  patients and touches patients and prescribes treatment. I
8  don't do that anymore.
9  Q. So since you're not working as a clinician in this case,
10 would it be appropriate for you to give an opinion as to Ms.
11 Scroggin specifically?
12 A. Well, since I haven't seen any of her clinical
13 information, that would be sort of a moot point. But I would
14 think you would need a clinician that understood the risk
15 factors and so on to do that.
16 Q. So we have designated you in this case as a -- what we
17 call a generic expert to give general opinions about
18 epidemiology. And so from the standpoint of your role in this
19 case, have you discerned whether or not there is Bradford Hill
20 criteria evidence supporting the link between HRT and breast
21 cancer?
22 A. Well, I have, yes. And I would again caution that Sir
23 Bradford Hill himself said: Don't just rely on these criteria.
24 Use judgment. But, yes, we have looked at those. And I have
25 looked at those and I have determined that it's beyond a

page 187

1  reasonable scientific doubt.
2  Q. All right. Now, I'd like to draw a distinction, if we
3  can, between risk factors and populations and so forth. The
4  defendants mentioned in their opening statement that the two
5  highest risk factors for breast cancer were, No. 1, being a
6  woman, and, No. 2, age. And my question is, does being a
   woman
7  cause a woman to have breast cancer?
8  A. No, it doesn't cause it. It certainly is an enabling
9  factor.
10 Q. She's part of the population that it is most often found
11 in?
12 A. That's right.
13 Q. Does age necessarily cause breast cancer?
14 A. Well, age is what we measure. And it probably represents
15 repeated exposures over a period of time. And since time --
16 age and time are related in that respect, it simply means that
17 the older you get, the more likely you are to have come in
18 contact with things that maybe have damaged some of your DNA.
19 Q. When we're talking about strength of the association,
   what
20 are we talking about there?
21 A. Strength of the association refers to -- you measure it
   in
22 two things. One is, how big is it? Does it increase your
   risk
23 25 times, or 100 times, or a thousand times? That's a very
   big
24 risk. Does it increase your risk by 5 percent or 10 percent?
25 That's a very small risk. And that would not be a strong

page 188

1  association. But the other way to measure it is whether or
   not
2  it is likely to have occurred by chance.
3     So a typical statistical measure that researchers use is
4  what they call a P value or a probability of .05. Is it
   likely
5  that this occurred by chance 5 percent, a P value of .05? If
6  you want to be even more sure, then you say, well, let's only
7  accept associations that could occur 1 percent of the time or
8  one-tenth of a percent of the time. And so the P values are
9  smaller.
10 Some associations could only occur one out of several
11 million times, and those are very strong associations even
12 though they may not increase the risk 100 times or 50 times.
13 It means that there's no real doubt but what they are true.
14 Q. In the transcript of the proceedings that we just
15 referenced a moment ago, did the doctors who spoke to the FDA
16 on the endometrial cancer issue determine a relative risk
   range
17 that they saw represented in the data between Premarin, the
18 estrogen, and endometrial cancer?
19 A. Could you repeat that again?
20 Q. Yes. In the transcript of proceedings -- and we can go
   to
21 it if you would like to look at it specifically on actually
22 page 45 of the transcript.
23    MR. MORRIS: Is there any way I can get the ELMO? Ms.
24 Johnson, may I have the ELMO?
25    THE WITNESS: Yes, I see page 45.

page 189

1  BY MR. MORRIS:
2  Q. First of all, who is Dr. Finkle?
3  A. Both Dr. Finkle and his colleague were researchers at the
4  Kaiser Medical Center in Los Angeles.
5  Q. And Dr. Finkle was appearing on behalf of he and Dr.
   Ziel,
6  correct?
7  A. That's correct.
8  Q. And he says, "I would like to thank the committee for
9  inviting our presentation. The underlying question of the
10 study, is there an increased risk of endometrial cancer among
11 users of conjugated estrogens? The main result is that we
12 estimate a 7.6-fold increase in risk of developing endometrial
13 cancer among users of conjugated estrogens, particularly
14 Premarin." Did I read that correctly?
15 A. You did.
16 Q. And then if we turn to the next page, 46, and we look in
17 the first paragraph, he says, "While the data are somewhat
18 small on this point, they are statistically significant, and
   we
19 estimate that for exposures less than five years the relative
20 risk is 5.6"; is that correct?
21 A. That's right.
22 Q. So on the basis of those relative risk numbers, did the
23 FDA take some action with regard to Premarin in terms of the
24 warnings that were provided?
25 A. Yes. I should mention that it's not just one study, that

Page 117

page 190

1   there were at least three studies that were presented there.
2   They were all case-controlled studies in which they interviewed
3   women who developed endometrial cancer and women who didn't,
4   and find out what differed between them.  They asked them about
5   different lifestyle factors, their childbirth patterns, what
6   they had -- medications they had taken, and their diet and
7   their -- some of them were asked about diet and their weight,
8   height and weight.  But the thing that stood out was the fact
9   that in all three of these studies, they all found the same
10  thing, that women who had taken Premarin in one of the dosages
11  that were common at that time had five to 12 times the risk as
12  a woman -- of a woman who did not, depending upon how long she
13  took it.
14  Q.  And I had asked you whether or not that made a difference
15  to the FDA, and I think your testimony was yes.  What action
16  did the FDA take with regard to endometrial cancer at that
17  point?
18  A.  Well, considering the ecologic data that we had that
19  showed that the risk was going up in a population that was of
20  the age group that was postmenopausal, and the three studies
21  that showed that women who took Premarin were a much higher
22  risk for developing this disease, they required that from that
23  point on, beginning in December or beginning, I guess, in
24  January, the -- that Premarin have a warning with it.  It was
25  one of the -- it was the second time, I believe, in the history

Page 118

page 191

1   of the United States, that they required that every
2   prescription when you pick it up at the drugstore have that
3   warning in it so that women who took it were sure to be able
4   to
5   get that warning.
6   Q.  And did the warning -- I'm sorry.  Did the warning that
7   they placed on Premarin at that time have a black box around
8   it?
9   A.  It did.  It had a black box so you wouldn't miss it.
10  Q.  And the purpose of the black box is to do what?
11  A.  Well, the black box is mostly in the -- was mostly in
12  the -- I don't recall if the warning that went out to patients
13  had a black box around it, but certainly the warning that went
14  out to physicians had a black box around it, and that is to
15  make sure that the physicians knew it, too.
16  Q.  I asked you a little while ago if you had had an
17  opportunity to review the Women's Health Initiative report that
18  was published back in 2002.  Did you have an opportunity to
19  read that report?
20  A.  I've read several reports from the Women's Health
21  Initiative.
22  Q.  I want to show you that report.  First of all, is this
23  what we have on the screen here a copy of the Women's Health
24  Initiative Writing Group Report?
25  A.  Yes.
25  Q.  All right.  And let me see if I can operate this.  Can we

Page 119

page 192

1   see down at the bottom where it was published?
2   A.  This was published in the Journal of the American Medical
3   Association, that's JAMA, yes.
4   Q.  And can you read to the jury what the conclusion was that
5   is stated on this section?
6   A.  "Overall health risks exceeded benefits from use of
7   combined estrogen plus progestin for an average of 5.2-year
8   follow-up among healthy postmenopausal US women.  All cause
9   mortality was not affected during the trial.  The risk-benefit
10  profile found in this trial is not consistent with the
11  requirements for a viable intervention for primary prevention
12  of chronic diseases, and the results indicate that this regimen
13  should not be indicated or continued for primary prevention of
14  coronary heart disease."
15  Q.  So CHD is --
16  A.  Cardiovascular or heart disease, I guess.
17  Q.  When they say the risk-benefit profile found in this trial
18  is not consistent with the requirements for a viable
19  intervention for primary prevention of chronic diseases, that's
20  a mouthful, but what does that mean?
21  A.  There had been some studies before this study was done
22  that suggested that taking Premarin would reduce your risk of
23  heart attacks.  And there were other studies that suggested
24  that it reduced your risk of other things, too.  And so if this
25  would reduce the risk of heart attacks in women, that would be

Page 120

page 193

1   great.  So this study, the primary -- the primary purpose of
2   this study was to see if that, in fact, was true, and, if it
3   was, how much of a preventive factor was it.
4   Q.  In the course of this study, did they also have some
5   secondary endpoints?
6   A.  Well, they monitored -- they monitored a number of
   things.
7   They monitored fractures, they monitored heart disease, they
8   monitored breast cancer, they monitored colon cancer, other
9   things that might possibly be related to the medication.
10  Q.  I'd like to turn to page 13 of the report, I think page 8
11  actually, and show you the section on breast cancer.  And can
12  you explain for the jury what the difference is between ever
13  use, never use, current use, past use?  Can we discuss those?
14  Let's first talk about ever use.
15  A.  Yes, there are a number of ways to measure exposure.  If
16  you recall, I said that you'd expect a dose response if
17  something was a cause.  And so there are a number of different
18  ways to measure exposure, and they are all -- usually, they are
19  usually compared with not being exposed at all.  So for any
20  medication, it would be never use versus some of the other
21  measures, and one of the measures is ever use.  Did you ever
22  take it?  And, of course, that mixes together people that took
23  it a long time ago and people that just started and people that
24  took it for two years or five years or ten years, just did you
25  ever?

page 194

1    Q.  So that would be one day of use -- would that be
included?
2    A.  Well, in most studies, they don't consider one year (sic)
of use as being ever used.  They usually have a requirement
like three months or six months to be included in that group.
3    Q.  So one day would be too short?
4    A.  One day would be too short, I think, in all of the studies
that I've seen.
5    Q.  So we'll say three months?
6    A.  (Nodding head.)  Yeah.  I haven't done a study to see
which ones used which measure, but ever means did you ever, and
usually it was a three month to a six month or something like
that.
7    Q.  All right.  What about never use?
8    A.  They didn't ever use it.  And whatever the cut point was,
if it was three months, then those who used it for less than
three months could be in the never group.
9    Q.  All right.  And what about current use?  What does that
mean?
10   A.  Current means -- current use means are you using it now or
were you using it at the time that a diagnosis was made, for
example.
11   Q.  What about past use?  What does past use mean?
12   A.  Well, past is -- if you take ever use and you subtract
current, then you get past.  It's people that did take it, but
they only took it for a period of time and they weren't taking

page 195

1    it at the time that either they were diagnosed or that the
controls were asked about that time period.
2    Q.  All right.  And is it important to know about the people
that have past use to know if the effect of that past use
continues to put the person at risk down the road even though
they may have quit using the product?
3    A.  It is important to know.  For example, people that smoke
cigarettes and their risk goes up with increasing -- with
increasing exposure, then if they stop, their risk doesn't go
down -- at least for lung cancer, it doesn't go back down to
where it was before they started.  It still stays elevated
compared to people who have never smoked.
4    Q.  All right.  And in terms of hormone therapy, is one of the
things that the researchers wanted to look at is what happens
when a woman gets off HRT in terms of her risk of breast
cancer?
5    A.  Well, the information -- no one has studied that in
detail.  The information that's available suggests that very
quickly after a woman stops taking combined hormone therapy, if
a cancer has not already started and it is not already in the
pipeline, that her risk goes back down to what it was before.
6    Q.  All right.  Now, in the Women's Health Initiative study,
there is a number that the jury has been told with regard to
the invasive breast cancer determination.  And it's in this
chart.  We can look at this chart that's on page 6 of the

page 196

1    Women's Health Initiative.  And if you look in the middle where
2    it's highlighted, it says 1.26.  Do you see this number?
3    A.  Yes, I see it.
4    Q.  And that was the hazard ratio for E plus P when we looked
at the cases of the users versus those who were taking placebo,
correct?
5    A.  That's correct.
6    Q.  And the population that generated that number -- what
population generated the 1.26 number?
7    A.  All of the women that were participants in the two arms
the study, one arm being the arm of taking a placebo and the
other one was the arm of taking the E plus P.
8    Q.  In some later papers we're going to see that that
population is sometimes called the intent to treat population
or intention to treat population.  Are you familiar with that
term?
9    A.  I am.
10   Q.  What does it mean?
11   A.  It means that when you decide to do, as this was, a
randomized clinical trial, what you do is randomize people to
one group or another, the thought being that if there are
unknown things that might affect the risk of a disease, when
you randomly allocate them, they'll balance out because they'll
be the same in both groups.  So then you follow -- you follow
these groups whether or not the groups stay together.  There

page 197

1    are sometimes women who say, I've had enough of this, I'm
getting out of this trial, and they quit.  Nevertheless, you
still try to keep them in the group and you do your study
according to how they were assigned, not whether or not they
stayed in.  That's called the intent to treat or the intention
to treat.  And you compare the two groups.  In this case, they
are using a hazard ratio, which is one measure of a relative
risk.  And a relative risk is: What is the risk of the people
who took the medication relative to those who didn't?  And this
suggests that it's 26 percent higher the way they measured it.
2    Q.  It doesn't look like much of a risk; slight risk, right?
Is that right?
3    A.  Well, that's one of the disadvantages of a randomized
clinical trial is that it's not -- it's an excellent way to
determine whether something increases the risk or not, whether
there's a cause and effect relationship.  It's a very poor way
to determine what the size of the risk is, particularly as in
this case, as an often cited example, when there's a large
group of people who were originally assigned to a group and
decided not to participate afterwards.
4    Q.  You're trying to steal my thunder, aren't you?
5    A.  Pardon me?
6    Q.  You're trying to steal my thunder, aren't you?  I'm joking
with you.  It happens occasionally in courtrooms.
     If we look at the next paragraph here at the top, I want

Page 125

page 198

the jury to see this.  It says that at the time of this
report,
"All women had been enrolled for 3.5 years with an average
followup of 5.2 years and a maximum of 8.5 years.  A
substantial number of women had stopped taking study drugs at
some time, 42 percent of the estrogen plus progestin and 38
percent of the placebo."
    So if 40 percent of the women who were on E plus P during
the study stopped taking their study medications or were not
compliant with the protocol, would that affect the results?
A.  Yes, it would.  You're trying to compare women who took
the medication to women who didn't.  And half of the -- or 40
percent of the women you thought took it didn't take it, so --
or at least during -- for the entire length of the trial.  So
what it does is dilute your estimate of what the effect is.
    Now, even more important is the fact that some of the
women initiated their own hormone use even though they were on
the trial.  So something like 10 percent of the women who were
on the placebo group who were supposed to be getting sugar
pills decided to take medications on their own through their
own doctor.  So here we had some women that were in the group
that was assigned to get -- to get E plus P that are not
getting it, and some women that are assigned to be getting the
sugar pill that are getting hormones.  So in spite of all of
that, they still found an excess risk, enough so that they
stopped the study.

Page 126

page 199

Q.  So even with that flaw -- let me ask you, 40 percent of
the women stopped using their medication or get off of it
during the study, and that wasn't at the suggestion of the
designers of the study or the people that were running it,
correct?
A.  It was not at their suggestion, no.  They did it because
this is an independent country and people do what they want to
do.
Q.  They finally said: The heck with it.  I'm not going to
take it anymore.  And that's okay?
A.  That's okay.
Q.  But the 38 percent of the placebo folks that dropped out,
too, doesn't that just cancel out the 40 percent that were
noncompliant?
A.  No, it doesn't.  It doesn't -- it compounds the problem.
Q.  It compounds the problem.  So let me ask you about this
1.26 number.  Is this a valid number for the relative risk of
women who were taking combination hormone therapy and their
risk of breast cancer if they've taken it more than five
years?
A.  If they've taken it more than five years, the answer is,
no, it is not.
Q.  Would you call it inaccurate?
A.  I would call it misleading for that, as you stated it.
Q.  Is that only your opinion, that it's misleading?
A.  I don't know how many other people think it's misleading,

Page 127

page 200

but that's -- I believe some of the investigators of the
Women's Health Initiative also felt that it was sufficiently
misleading to be able to publish later on what a better
estimate of the size of the risk was.
Q.  Are you familiar with Dr. Garnet Anderson?
A.  I don't know him, but I've read some of his papers.
Q.  It's actually a female.  I thought it was a he, too, but
Garnet Anderson is a female doctor.  And I want to show
you a report that she and other authors who did the Women's
Health Initiative released in 2006.  Have you seen this
article?
A.  Yes, I have.
Q.  And Dr. Anderson and Dr. Chlebowski and Jacques Rossouw,
are those all doctors and authors who worked on the Women's
Health Initiative?
A.  I believe they all are, yes.
Q.  And this was actually published in Elsevier Ireland
Limited and Maturitas?
A.  That was the publisher.
Q.  I'm sorry.
A.  But, yes, Maturitas.
Q.  Maturitas.  I apologize.  I'm not good with French.  Is
this a peer-reviewed publication?
A.  I believe it is.
Q.  And in this particular article, do the authors of the

Page 128

page 201

Women's Health Initiative point out, first of all, that even
given the flaws in the study, over an average of 5.6 years of
followup -- and followup doesn't mean usage, does it?
A.  In this case, it means that they followed them whether
they took it or not.
Q.  So we can be clear, 5.6 was not the average usage.  That
was the average followup of when they watched them, correct?
A.  That's right.
Q.  They say that the breast cancer risk was 1.24, correct?
A.  Right.  And they say it's an average.  It's an average
over 5.6 years.
Q.  Now, they go on to say that after adjusting for
confounders -- and what are confounders?
A.  Confounders are other causes of the same disease, of the
same outcome, that you may inadvertently include in your
measure of exposure and, therefore, capture some of the effect
of that cause also.  And you want to be able to separate those
out.
Q.  And so after adjusting for confounders, what was the
relative risk that they found for E plus P users at that
point?
A.  Well, almost 2, 1.96.
Q.  And then did the authors also look at the subgroups of
people who had been on the product for a period of time before
they came into the study, women that were using it and then
they came into the study?

Page 129

page 202

1    A.  Yes, they did.  And this table here reflects that.
2    Q.  And did they look at the duration of usage to determine
3    what a proper relative risk might be?
4    A.  Yes.  Those who were on it when they started the study
5    before the washout period of the study had a risk that was
6    more
6    than twice, almost three times, 2.78 times higher than the
7    women who did not.  Those who had it less than five years or
8    had been on it less than five years had about a 50 percent
9    excess.  And those who had it more than five years had a
10   little
10   over two and a half times elevated risk.
11   Q.  And then do the authors of the WHI actually talk about
12   this issue, adherence to the study protocol?
13   A.  They did.
14   Q.  And what did they say there?
15   A.  Well, they did a separate analysis called a sensitivity
16   analysis in which they said:  Okay.  Now let's not look at the
17   intention to treat method of analysis.  Let's just look at
18   those people who adhered to the treatment that they were
19   assigned to.  If they followed it, then what's the difference?
20   And then they found out that among prior hormone therapy
21   users,
22
21   the relative risk or the hazard ratio was over three, three
22   times.
23   Q.  And they actually included a graph in this paper, didn't
24   they, on the hazard ratio?
25   A.  Yes, they did.

Page 130

page 203

1    Q.  What happens if you take it more than five years
2    according
2    to the authors of the Women's Health Initiative that
3    supposedly
3    said there's only a 1.24 risk?  What did they say?
4    A.  That it's over three and a half times.
5    Q.  Is the 3.56 number a misleading number for this jury?
6    A.  I'm sorry.  Ask again.
7    Q.  Is the 3.56 misleading in any way for this jury?
8    A.  No.  One has to recognize that the true value is
9    somewhere
9    between 1.18 and 10.73, but the best estimate is 3.56.
10   Q.  And that's for women just that have taken it more than
11   five years.  Has there ever been a good study done on women
12   that have taken the combination in excess of ten years?
13   A.  Yes.
14   Q.  Who did a good study of the women that have taken it in
15   excess of ten years?
16   A.  Well, there are a number of case-controlled studies that
17   looked at that, but the easiest -- probably the largest study
18   is a prospective study called the Million Women Study, the one
19   where they enrolled a million women to follow.  And this was
20   in
20   England.  And they did find out how long women had been on
21   their -- on their treatment.  And then they did a risk
22   analysis
23   according to the duration of use.
24   Q.  And what did they find with regard to women that had
25   taken
24   it more than ten years?
25   A.  I believe the category more than ten years with an average

Page 131

page 204

1    of about 11.2 years as an average, and it was, as I recall,
2    4.99.  These are all breast cancers together, as I recall.
3    Maybe not all.  I'd have to look at the table to be sure.
4    Q.  Now, 4.99, call it 5.
5    A.  Okay.
6    Q.  If we say that the relative risk is 5, explain to the
7    jury -- I know relative risk is a confusing concept, but
8    explain how many times that multiplies the woman's chance of
9    getting cancer, breast cancer.
10   A.  Whatever her baseline risk was just increases it five
11   times.  Whatever risk she started off with, this is five times
12   higher.
13   Q.  Now, assume with me that a patient had a family history
14   of
14   breast cancer --
15   A.  Okay.
16   Q.  -- okay?  That her mom had had breast cancer?
17   A.  All right.
18   Q.  And how would her mother's breast cancer affect her
19   relative risk if we were just saying her mom has breast
20   cancer?
21   A.  Different studies have a different estimate, but a first
22   degree relative, female relative with -- or male relative with
23   breast cancer increases the risk several times.
24   Q.  All right.  Now, for a woman that has a family history of
25   breast cancer, does that mean that the HRT, exogenous
26   estrogens
27   and progestins, that she may be taking would have no impact on

Page 132

page 205

1    her risk of breast cancer?
2    A.  No, it doesn't mean that.  It means that whatever risk
3    she
3    started with, it would increase it five times.
4    Q.  All right.  So if she has an increased relative risk due
5    to family history, it would be multiplied five times according
6    to the current data in that woman; is that correct?
7    A.  It would be multiplied five times what?
8    Q.  Times whatever the increased relative risk was for family
9    history?
10   A.  Yes, that's right.
11   Q.  When we talk about family history, are the breast cancers
12   that most ordinarily show up as being genetically related --
13   are they more often estrogen positive breast cancers, or
14   estrogen negative?  And by that, I mean E plus P positive, or
15   E
15   plus P negative?
16      MR. HEARD:  Your Honor, objection.
17      THE COURT:  Beg your pardon?
18      MR. HEARD:  Objection, Your Honor.  This goes beyond
19   the scope of his report.
20      MR. WALKER:  May we approach, Judge?
21      THE COURT:  I guess we'd better approach.
22      (Bench conference reported as follows:)
23      MR. HEARD:  Your Honor, our objection would be that
24   there is nothing in his expert report that addresses genetic
25   risk or family history.  And that, of course, leads, in turn,

Page 133

page 206

1  we're not clear if he has any credential basis, any Daubert
2  basis, to reach those opinions, but the threshold basis is he's
3  never spoken to epidemiological risk.
4         THE COURT: I don't know.  I don't remember.
5         MR. HEARD: I have his report.
6         MR. WALKER: That's true.  But what happened was Your
7  Honor reopened discovery based on genetic information they
8  found while they tested her and allowed Wyeth to designate a
9  new expert out of time and long after expert reports were due.
10  That's the Kauff expert.  We had an agreement that was stated
11  on the record that our experts could rebut Dr. Kauff rather
12  than us redesignate a new expert.
13         MR. HEARD: I don't know where Mr. Walker thinks
14  there's that agreement.  The standing agreement in the Reeves
15  case, the Rush case, and this case, was the experts could
16  supplement their existing opinions with new documentation so
17  they could take account of the most recent medical articles.
18  They can't offer new opinions.
19         MR. WALKER: This is --
20         THE COURT: I have to see the report.  Do you have the
21  specifics?
22         MR. WALKER: It was a statement in open court where I
23  pointed out --
24         THE COURT: I know, but I need to see it.  If there's
25  not such an agreement, it looks like it's outside of his

Page 134

page 207

1  report.  If it is in his report, it looks like he can testify
2  to it.
3         MR. WALKER: Their expert report came out of time.
4  Their genetic expert came after all experts' reports had been
5  due.  That is rebuttal to a report that came after all of them
6  were due.
7         THE COURT: If it's not in his report, there's not an
8  agreement, I'm not going to allow it.
9         MR. MORRIS: I'll stay away from it and maybe we can
10  clear it up on a break.
11         (Proceedings continuing in open court as follows:)
12         THE COURT: Anybody else need an opportunity to
13  stretch before we start back?  We'll take a break in a little
14  bit.  Anybody need a break right now?
15         Okay.  Go ahead.
16         MR. MORRIS: Thank you, Your Honor.
17  BY MR. MORRIS:
18     Q.  I'd like to go back to the original WHI report with you,
19  if I can, Dr. Austin, and let me zoom in on this a little bit
20  if we can.  In the bottom here, it says female relative had
21  breast cancer.  And there are 1286 of the E plus P group that
22  had a family member with breast cancer, and there were 1175 in
23  the placebo group that had breast cancer.  Do you see that?
24     A.  I see that.  I can't see the headings of the columns,
25  but --

Page 135

page 208

1     Q.  Well, let me go up to the headings.
2     A.  There it is.
3     Q.  I want us to be -- I apologize -- characteristics on the
4  left, and estrogen plus progestin and placebo.  Do you see
5  those?
6     A.  I do.
7     Q.  And in doing that, they look at the age of the group,
8  correct?
9     A.  They look at, yes, the ages, they look at a number of
10  different factors:  Age, race.
11     Q.  And age is important because you wouldn't want to have a
12  bunch of young women in a study with older women when you're
13  looking at menopausal issues, correct?
14     A.  You wouldn't want to have different proportions of them
15  in the two groups.  You wouldn't want to have young women in one
16  group and older women in the other group.
17     Q.  And then they also look at things like race and ethnicity
18  to make sure it's not affecting one race or ethnicity
19  different than another, correct?
20     A.  To make sure that if they have different risks, that they
21  are not affecting the measurement of that difference between
22  the two outcomes, the two exposures.
23     Q.  And then they look at hormone use in those terms that we
24  talked about earlier:  Never, past, and current, correct?
25     A.  Correct.

Page 136

page 209

1     Q.  Then they look at the duration of prior hormone use,
2  correct?
3     A.  Correct.
4     Q.  And then they also look at their weight because weight
5  can be a factor, correct?
6     A.  It can.
7     Q.  Is the thought that women that are heavier tend to
8  produce more estrogen so they are at higher risk?
9     A.  Yes.
10     Q.  All right.  And then they also look at things like
11  smoking and parity and age at first birth and the other things that
12  they might be treated for or have a history of, correct?
13     A.  That's right.
14     Q.  And even taking into consideration the family history,
15  were the women that had family history still at an increased
16  risk of breast cancer posed by these hormones?
17     A.  Yes.  Now, they didn't decide that in that study.  They
18  didn't look separately at women who had a family history of
19  cancer.  But in the Million Women Study, they did.
20     Q.  And what did they find there?
21     A.  That it increased the risk of breast cancer.
22     Q.  All right.
23     A.  I should correct that.  They looked separately at both
24  factors.  And they found, as they did in this study, that they
25  were not confounded, they were not mixed up in their effect.

Page 137

page 210

Q. All right. And just for the record, I would like to show you the Million Women Study, and ask you if you've seen this document before? Have you seen that?

A. I believe so. Is that published in 2000 --

Q. In the Lancet in 2003.

A. Yes.

Q. What was the conclusion they reached in the Million Women Study?

A. "The use of HRT by women aged 60 (sic) to 64 years in the United Kingdom over the past decade has resulted in an estimated 20,000 extra breast" --

Q. Stop right there. I need to make sure that I understand something first. From time to time, do physicians and researchers look at issues concerning excess breast cancers?

A. Yes, and particularly people in public health do.

Q. All right. And with regard to the Million Women Study, did they also look at histology?

A. Yes.

Q. And what is histology?

A. Every type of cancer when they look at it under the microscope, they classify it by what type of cells that are there because cancer has -- there's now at least 105 or 6 different types of cancer. And in the breast, there are probably half a dozen types. But most cancers are of the ductal type, of the duct system, and some of them are lobular

Page 138

page 211

types, and some of them are mixed types, and some of them are tubular types. They just call them these names, but they have a different appearance under the microscope. And it's important because the different types have different treatment implications.

Q. I want to show you a paper by Dr. Reeves and Dr. Beral that was published in the November 2006 issue of the Lancet. Have you seen this paper before?

A. I have.

Q. And are Dr. Reeves and Dr. Beral authors and head of the Million Women Study? Are they people that head up that study?

A. Yes, particularly Valerie Beral.

Q. And when they stratified this particular issue, they stratified it by ductals at the top, and then by lobulars, and then by tubulars, correct?

A. And then by what?

Q. Tubular cancers?

A. Yes.

Q. Are you familiar with tubular cancer?

A. Yes.

Q. And with regard to the relative risk numbers for tubular cancers, what were the numbers that they found in the studies?

A. Well, this is a meta-analysis. This is in addition to their own study, they also looked at other studies, and they looked to see whether or not their study results were

Page 139

page 212

consistent with other people's study result. And then they sort of looked at the combined results. In this particular table, that diamond is the best estimate taking all of the studies together that have looked at this particular type.

Q. And what is the number for the diamond?

A. It's 1.77 for tubular cancer. And the exposure is --

Q. If the exposure is over five years, what is the number?

A. Let me see the heading, please. This is ever versus never, so, of course, that's a pretty poor way to look at it, current versus never.

Q. If we look at the bottom scale, what do you think that that represents?

A. I think it represents relative risk.

Q. Okay. And when we look at the relative risk in current users, which is current versus never users -- okay. Even I have a hard time reading these articles sometimes. Let's get it right. Let's try this again and let's get it right. The column on the left, what does that relate to?

A. This is estrogen-only therapy. This is not E plus P.

Q. Estrogen-only therapy. All right. When we go to the right-hand column, what are we dealing with?

A. Now we're looking at estrogen-progestin therapy, or this is a combination of estrogen plus a progestin.

Q. And when we go down to ever versus never on estrogen plus progestin, what is the number that is most likely right?

Page 140

page 213

A. And now it's 3.57. And this is ever versus -- never versus current. So this is not quite as good as looking at duration, but it's current. It means they are on it right now.

They might have been on it for a year. They might have been on it for 12 years.

Q. Now, would a big drug company like Wyeth or like Upjohn be aware of studies like this?

A. I'd be awfully surprised if they weren't.

Q. It's their product, right?

A. Parts of it, yes.

Q. And so they would be aware that the folks over in Great Britain have taken a look at this issue and the relative risk they have found is 3.57 in ever versus current, correct?

A. Correct.

Q. They would be aware of the subgroup analysis numbers that come from the WHI, correct?

A. Correct.

Q. And so being aware of those numbers that have been published outside this courthouse -- none of those were published for this jury, right?

A. Correct.

Q. Nobody wrote those studies to convince this jury, did they?

A. That's right.

Q. They wrote those studies for the doctors and

Page 141

page 214

```
 1  epidemiologists around the world that are concerned about this
 2  issue, correct?
 3  A.  Correct.
 4  Q.  And so these companies know those numbers, yet they come
 5  in and they tell the jury that the right number is 1.24.  Is
 6  that fair, or not?
 7  A.  It's misleading.  If you're trying to figure out what
 8  your
 9  risk might be, if you take it and if you take it over a long
    period of time, 1.24 doesn't give you the right information
    you
10  need to make an informed decision.
11  Q.  All right.  Can we go back to the PowerPoint?  So is
    there
12  a strength of association concerning E plus P and its cause of
13  breast cancer?
14  A.  It is relatively strong and -- both in terms of the
15  dose -- I mean, in terms of the size of the risk and in terms
16  of the statistical significance, yes.
17  Q.  Are these findings consistent over the years since good
18  studies have been done on this issue?
19  A.  Every -- with one or two possible exceptions, everyone
20  that has looked at exposure over a period of time has found
    the
21  same -- the same association, yes.
22  Q.  Is there evidence for a dose response?
23  A.  Yes, there is because dose -- that's measured two
24  different ways.  One is when you look at duration, which is
25  another way of saying we've got a bigger dose, I took it
```

Page 142

page 215

```
 1  longer, and there's another one which is continuous versus
 2  cyclical because sometimes it's only given for 20 out of 28
 3  days or 21 out of 28 days, something like that, and the other
 4  one is given continuously every day.  And the one that's given
 5  continuously is a bigger dose, so it's combination therapy.
 6  Q.  And for years did doctors suspect that there might be a
 7  dose or duration effect between E plus P and breast cancer?
 8  A.  Some, yes.  There was some evidence to suggest that.
 9  Clear back -- I don't remember when the first one was, but I
10  seem to recall it was like around 1980.
11  THE COURT:  All right.  Let's take a break.  We'll be
12  in recess until 3 o'clock by this clock.
13  Ladies and gentlemen of the jury, don't talk about the
14  case or anybody involved in it.  And consciously avoid making
15  up your mind or start making up your mind.
16  Let the jury stand out.  Everyone else remain seated.
17  (Jury exited the courtroom.)
18  THE COURT:  The jury is out.  We're in recess.
19  (Recess at 2:43 p.m.)
20  C E R T I F I C A T E
21  I, Judith A. Ammons, Official Court Reporter, do hereby
22  certify that the foregoing is a true and correct transcript of
23  proceedings in the above-entitled case.
24  Date: February 5, 2008
    Judith A. Ammons, RPR, CRR, CCR
25  United States Court Reporter
```

Page 143

page 216

```
 1  (Continuing at 3:06 p.m., jury not present.)
 2  THE COURT:  I understand there is another issue
 3  about an exhibit.
 4  MS. MURRAY:  Yes, Your Honor.  Betsy Murray on
 5  behalf of Upjohn.
 6  The plaintiff's attorneys have told us that they intend
 7  to use our slide concerning the family tree, the pedigree, that
 8  Mr. Goodell used in opening with Dr. Austin.  Dr. Austin, in no
 9  report of his that he has ever authored he has discussed
10  genealogy, genetics, hereditary risk factors, any of that, that
11  he was going to offer any opinions in that area as far as
12  expert opinions for the plaintiff.  And we would object that
13  that is beyond the scope, just as the matters that you
14  discussed at sidebar while the jury was present that related to
15  hereditary or genetic --
16  THE COURT:  I have your objection.
17  Response?
18  MR. MORRIS:  We intend to -- we have already proved
19  up through Dr. Austin that he is familiar with the genetic and
20  family history issues that are raised in epidemiological
21  studies.  We intend to show him the family tree and ask him
22  that, in the absence of Mrs. Horn, Ms. Scroggin's mother having
23  breast cancer, which she did not at the time the prescriptions
24  began --
25  THE COURT:  Let me hear rebuttal.
```

Page 144

page 217

```
 1  MS. MURRAY:  Your Honor, further, Dr. Austin was
 2  never identified as a case-specific expert in this matter,
 3  period.
 4  THE COURT:  Well, he has already testified to some
 5  extent about family history, but I am going to sustain the
 6  objection.
 7  MS. MURRAY:  Thank you.
 8  THE COURT:  Maybe the jury is on strike.
 9  Everyone please rise while the jury enters.
10  (Jury enters the courtroom.)
11  THE COURT:  Be seated, please.  Ladies and
12  gentlemen, I apologize for getting started back late.  It's
13  solely my fault, not the lawyers for the parties.
14  MR. MORRIS:  May I proceed, Your Honor?
15  THE COURT:  I beg your pardon?
16  MR. MORRIS:  May I proceed?
17  THE COURT:  You may.
18  BY MR. MORRIS
19  Q  Dr. Austin, we had mentioned earlier a relative risk
20  number of 4.99 and --
21  MR. MORRIS:  May I have the ELMO?
22  That's what we call this contraption, by the way, is the
23  ELMO, for those of you that have never used one.
24  BY MR. MORRIS
25  Q  I want to go back, if we can just briefly, to this
```

page 218

1  article that we talked about, the Gillian Reeves and
2  Valerie Beral article, and turn to the table on cancers by
3  histology.  And we can look at this together.  First on the
4  left side are ductals with estrogen plus progestin -- that's
5  the English spelling of "estrogen," correct?
6  A    That's the generic term for progesterone agents, yes.
7  Q    No.  I was meaning O-E.
8  A    Yes, it is.
9  Q    British spelling.
10       For greater than ten years, what was the relative risk
11  that the Million Women Study found for ductal cancers?
12  A    2.52, and this is with an estimated duration of use of
13  12.  So an average of exposure after 10 years was 12 years.
14  Q    And for tubular cancers, what was the relative risk?
15  A    4.99, for an estimated duration of use or exposure of
16  11.8 years.
17  Q    All right.  Along the lines -- we talked about family
18  history earlier, and I want to show you a diagram that I will
19  represent to you is a representation of how cancer grows.  Have
20  you seen that before?
21  A    Well, I am not sure I have seen that exact one before,
22  but there are a lot of them very like that in textbooks and so
23  on.
24  Q    If a woman had a family history of breast cancer, would
25  her breast cancer begin to grow in the same manner with a cell

page 219

1  mutation and then hyperplasia and dysplasia?  Would it progress
2  along the same lines as this board shows?
3  A    It would probably progress along that same line, but with
4  a person with a genetic risk --
5       MS. MURRAY:  Objection, Your Honor.
6       THE WITNESS:  -- where it says over there with a
7  cell --
8       MR. HEARD:  Objection, Your Honor.
9       THE COURT:  Just a minute.  Overruled.  Well, wait
10  just a minute.  State your objection briefly.
11       MS. MURRAY:  Your Honor, beyond the scope of his
12  expert opinion.
13       THE COURT:  He has already gone into this to some
14  extent, and I am going to allow him to hit it again.
15  Overruled.
16  BY MR. MORRIS
17  Q    Go ahead, Dr. Austin.
18  A    You said:  Cell with genetic mutation.  That doesn't
19  necessarily mean one mutation.  Usually a cancer cell requires
20  more than one hit, more than one mutation in a cell to become a
21  viable cancer cell, but with a genetic risk factor, one of
22  those has already happened.  The woman inherited it, and she
23  needs very few more to get it to grow.
24  Q    What impact would the introduction of postmenopausal
25  hormones, HRT, estrogen plus progestin have on a preexisting

page 220

1  genetic situation like that?
2  A    Well, we don't have to know this information to be able
3  to answer that question because people with family histories of
4  breast cancer have been included in various studies, including
5  the, the Million Women Study and some other studies, and it
6  shows that those risks are independent.  So it means that a
7  person with that genetic factor would have their risk increased
8  by the same amount from the baseline, and their baseline is
9  higher.
10  Q    In terms of considering this issue about whether or not
11  HRT would be appropriate in a woman with a family history,
12  would a doctor look beyond first-degree relatives ordinarily to
13  make that determination?  In other words, would a doctor
14  normally ask a patient:  Does your grandmother or your
15  grandmother's aunt or her cousin or the grandmother's cousin --
16  did any of those folks ever have breast cancer?
17       MR. HEARD:  Objection.
18       MS. MURRAY:  Objection, Your Honor.
19       THE COURT:  Let's approach.
20       (Bench conference reported as follows:)
21       THE COURT:  He has already talked about family
22  history and genetics and so forth.  How is this different?
23       MS. MURRAY:  Your Honor, this is beyond the scope.
24  It's the same as when we were last time here and he started
25  talking about family.  He starts talking about past generations

page 221

1  and --
2       THE COURT:  He has already been testifying about it
3  earlier, and before the last sidebar, he had testified about
4  genetics, family history, and all that sort of thing.  So how
5  is this different?
6       MS. MURRAY:  That was in a general, as far as
7  epidemiologist's way.  He is now talking and trying to testify
8  as an expert on genetics and the genetic risk factor.  That is
9  beyond just epidemiologists.  We look at, you know, family.
10  There is a general factor there.  He is now trying to become an
11  expert in genetics.
12       THE COURT:  Why do you need -- you have already been
13  over family history.  Why do you need to get into this?
14       MR. MORRIS:  I just need to ask one more question,
15  and that is:  When they perform epidemiological studies, do
16  they look beyond the first-degree relatives in terms of
17  assessing someone's family history?
18       THE COURT:  I will allow it.  Objection overruled.
19  Exception saved.
20       (Return to open court.)
21  BY MR. MORRIS
22  Q    When epidemiologists like yourself are gathering data for
23  epidemiological studies, ordinarily do you look beyond the
24  first-degree relatives in determining family history of breast
25  cancer for inclusion of that data in a study?

page 222

1 A    There have been studies that looked at the difference
2 between first-degree relatives, what sort of risk that
3 imparted, and second-degree -- first and second-degree
4 relatives and what increased risk that imparted.  When I was --
5 I think in the mid '80s, the Sixth National Breast Cancer
6 conference, I was asked to present on that very issue about
7 risk factors for breast cancer by the National Cancer --
8 National American Cancer Society.  And so I put together a list
9 of risk factors, and those were two of them that I had to
10 research and present.
11        And it, and -- when investigators look, they look for
12 anything that can provide you with information.  If it turns
13 out that it's not very useful, they don't look at it anymore.
14 I can't say what family doctors do when they talk to their
15 patients, but as a result of that and the subsequent Gail risk
16 factor that came out, most of the emphasis on first-degree
17 relatives.
18 Q    All right.  Now, I want to get back to the PowerPoint
19 with you and ask you some questions about where we were, say,
20 in the 1970s.  In the 1970s, were epidemiologists like yourself
21 able to perform case control studies?
22 A    Were epidemiologists -- yes.  Since the 1950s,
23 epidemiologists have been able to do case control studies.
24 Q    Could you do cohort studies?
25 A    Yes.

page 223

1 Q    In the '70s, could you do RCTs, randomly controlled
2 trials?
3 A    Yes.
4 Q    Could you perform meta-analysis?
5 A    Meta-analysis came along a bit later.  The procedures
6 that are used now came along a bit later in the '80s and so on.
7 Q    All right.  In the '70s, when the endometrial cancer
8 crisis occurred, were the researchers in that context able to
9 find enough patients taking estrogens to make a valid study?
10 A    Well, the ones -- the studies that were done there were
11 case control studies, and in case control studies you don't
12 have to find the number of people that were taking estrogen.
13 You have to find the number of people that developed the cancer
14 that you are interested in, and then you ask them about that.
15 It turns out that there was enough of an exposure difference
16 between the cases and the controls to be able to come up with
17 a -- with an estimate of relative risk.
18 Q    After Wyeth and Upjohn knew that the combination of the
19 two drugs together was being prescribed routinely by
20 obstetricians and gynecologists -- assume with me that year is
21 1977.  After that time did the scientific technology exist --
22 in the population base exist to perform an adequate
23 epidemiological study to determine whether or not the
24 combination of these products caused breast cancer?
25 A    Yes.  Roughly 10 percent of the U.S. population was under

page 224

1 a system that would identify cases of breast cancer.  And in
2 addition, there were a number of HMOs that also identified them
3 for their own purposes through their own records.  So
4 10 percent of the population is plenty enough to do a case
5 control study on things that may lead to breast cancer.
6 Q    Assuming it took them a few years to catch up to the idea
7 and come up to 1980, by 1980 did the technology exist for them
8 to perform that type of epidemiological study to determine the
9 association and, if so, how long would it have taken them to
10 perform that study and determine this?
11 A    If the technology existed and depending upon how large a
12 study you plan would determine how, how long it had to go.  If
13 you included three or four, for example, you may be able to set
14 up the study, carry it out, and do an analysis of the results
15 in about 24 months.
16 Q    So in two years you could have done a case control study?
17 A    Yes.
18 Q    Would it have been possible in 1980 to initiate a cohort
19 study?
20 A    Yes, it would be possible.  You would have to -- there
21 were a number of cohort studies being done.
22 Q    What's an example of one of the ones that was being done?
23 A    In the -- let's see.  One of the examples is a number --
24 a cohort study of people who had had previous cancer of the
25 larynx.  And so they knew who those people were, and they

page 225

1 wanted to do a cohort study to see what the risk is of a second
2 cancer.
3 Q    What about a randomly controlled trial?  Could that have
4 been done in 1980?
5 A    Yes, it could have been done.
6 Q    And with regard to the RCT, if they had begun the study
7 in 1980, how long would it have taken them to get adequate
8 evidence that would have given them an idea of whether or not
9 this causes breast cancer?
10 A    Well, since breast cancer is a relatively rare disease, a
11 cohort study, prospective study, and a randomized clinical
12 trial both would take a lot longer than a case control study.
13 And for a randomized clinical trial, you have to recruit --
14 recruit enough women who are willing to be randomized to either
15 a sugar pill or another pill to -- the, the hormone pill to be
16 able to carry it out.  And it would take -- depending upon the
17 number of women you recruited, it would take either longer or
18 shorter than the Women's Health Initiative.
19 Q    All right.  And we know that the Women's Health
20 Initiative ran roughly from 1996 to 2002 in terms of the actual
21 trial.  It took a few years before that to gather everyone
22 together and get it put together, but let me ask you this.  The
23 Women's Health -- that's about nine years; am I right about
24 that?
25 A    About nine years, yes.

Page 153

page 226

3 1 Q    But did it have to be as big as the Women's Health
4 2 Initiative to get a definitive answer on this issue?  Could you
5 3 have done an RCT with, you know, 5,000 women?
6 4 A    It would take a lot -- well, it would depend on what your
7 5 outcome is.  You have to say, how common is the outcome I am
8 6 looking for.  It would really be unethical to have a randomized
9 7 clinical trial where you are looking to see whether or not you
10 8 caused cancer.  That would be an unethical kind of a trial, but
11 9 it's not unethical to have a trial where you look to see
12 10 whether or not you prevent something, like coronary heart
13 11 disease, which is the -- the Women's Health Initiative.
14 12 So if they were -- if they were going to do a randomized
15 13 clinical trial, it would have to be for some -- to study some
16 14 benefit such as prevention of osteoporosis or prevention of
17 15 something else that they thought might have been a benefit.
18 16 Q    All right.  And so if they had chosen to study that,
19 17 could they have done it on a smaller population than the 26,000
20 18 women that they did the WHI on?
21 19 A    Well, again, it depends on what the outcome is.  But they
22 20 picked a rather common outcome with heart disease, and it took
23 21 that long.
24 22 Q    All right.  Nonetheless, if they had been motivated to
25 23 start an RCT around 1980, could that have been completed in
26 24 reasonable scientific certainty by 1990?
27 25 A    By 1990?

Page 154

page 227

3 1 Q    Yes, sir.
4 2 A    Yes.  About that time there was a, a study of veterans
5 3 who may have been exposed to Agent Orange in Vietnam, and that
6 4 became critically important to the Veteran's Administration.
7 5 They contracted with CDC to do the study.  CDC contracted with
8 6 several areas to carry it out, and it was done in two years.
9 7 Q    All right.  When we talk about biologic plausibility,
10 8 that's one other issue that we haven't talked about yet.  Is
11 9 there biologic plausibility supporting the notion that E plus P
12 10 causes breast cancer?
13 11 A    Yes, there is.  I mean, it's an arguable issue because
14 12 scientific knowledge changes all the time, but if you
15 13 administer the same thing in animals, you find out that it,
16 14 No. 1, they have a higher risk of -- they have a higher
17 15 incidence of breast cancer and, No. 2, the dysplasia that
18 16 happens and the atypia occurs at the same place that the breast
19 17 cancers occur, the same cells.  So it's plausible.  It's
20 18 biologically plausible.
21 19 Q    What impact did the exogenous hormones have on the breast
22 20 tissue?
23 21 A    Well, estrogen itself is believed to be a cause of breast
24 22 cancer.  It stimulates growth and probably increases chances of
25 23 becoming malignant.
26 24 Q    What about estrogen and --
27 25 A    When you compare the two, estrogen plus a gestational

Page 155

page 228

3 1 agent or E plus P has a much higher effect, much stronger
4 2 effect.
5 3 Q    So the effect of the combined is worse than the effect of
6 4 the estrogen alone?
7 5 A    That's correct.
8 6 Q    Would it be important, if you were conducting studies, to
9 7 look at E alone and E plus P separately?
10 8 A    Oh, you wouldn't want to mix them up and -- I mean, you
11 9 could look at both of them so long as you analyze them
12 10 separately, yes.
13 11 Q    All right.  But are all hormones created equal?
14 12 A    No, they are not.
15 13 Q    And would it be important to look at the specific E plus
16 14 P combination in that population to determine whether or not it
17 15 was causing breast cancer?
18 16 A    If you are interested if that formulation was causing
19 17 harm, you would have to look at that formulation.
20 18 Q    So if you pick up a medical article out of one of these
21 19 journals and you begin to read it and the first sentence tells
22 20 you that we studied women who had taken estrogen and it doesn't
23 21 tell you anything about the progestational component, would
24 22 that make a difference to you if you were trying to find the
25 23 answer of what happens if I prescribe E plus P?
26 24 A    Yes, it would.  E plus P, you know you are getting
27 25 estrogen, but you don't know what the result of E plus P would

Page 156

page 229

3 1 be.
4 2 Q    And was there suspicion many years ago that the addition
5 3 of the progestin might be the problem in terms of causing the
6 4 breast cancer?
7 5 A    Yes.  There were several articles that suggested that.
8 6 Q    So if somebody had been inclined to study the E plus P
9 7 people, they could have done that?
10 8 A    Yes.
11 9 Q    In terms of biologic plausibility, we may see some
12 10 slides -- I think the jury saw one in opening where the
13 11 defendants are putting up all the different risk factors that
14 12 women might have for breast cancer, and one of them may have
15 13 been "exposed to fluorescent lighting" and another one was
16 14 "traveling as a stewardess on an airplane."  Have you seen
17 15 those studies?
18 16 A    I haven't seen one relating to fluorescent lighting to
19 17 breast cancer that I recall, but I have seen in the past when
20 18 people were looking at the effect of radiation and particularly
21 19 the effect of radiation from a mammography, how harmful it
22 20 might be, equating is to living in Denver, at a mile-high
23 21 location for a couple of months or being an airline staff and
24 22 being exposed at a higher altitude, closer to the sun and,
25 23 therefore, more solar radiation.
26 24 Q    Is there any biologic plausibility to the notion that
27 25 traveling as a stewardess on an airplane can cause breast

Page 157

page 230

3  1  cancer?
4  2  A    There is biologic plausibility to that, yeah.
5  3  Q    All right.  What about with regard to the fluorescent
6  4  lighting?
7  5  A    There may be, but I am not aware of it.
8  6  Q    So some instances have biologic plausibility, some don't,
9  7  correct?
10 8  A    Right.  There is -- there is some other ones out -- if
11 9  you go to the web and look for causes of breast cancer, you
12 10 will see things like under-arm deodorants and bras with wire in
13 11 them and a number of things like that that have been looked at
14 12 and found not to be the case.
15 13 Q    Is alcohol associated with breast cancer?
16 14 A    Yes.
17 15 Q    And what is the relative risk, if you know, of alcohol
18 16 usage in causing breast cancer?
19 17 A    It raises the risk up to, in some studies, up to twofold.
20 18 But one of the more recent studies suggests that it's primarily
21 19 among women with -- who are taking exogenous estrogen.
22 20 Q    Is smoking considered a risk factor for breast cancer?
23 21 A    Smoking has been looked at a number of times, and there
24 22 have been different results.  It turns out that while one can
25 23 see a -- an increase in risk for women who are exposed to
26 24 secondhand smoke, you don't see much of an increase in risk in
27 25 women that smoke heavily.  And more recently, some of the

Page 158

page 231

3  1  studies have suggested that the effect of tobacco during
4  2  adolescence, when the breasts are developing, is -- has the
5  3  effect of perhaps creating mutations in those breast cells and
6  4  that the breast cells in that time are more sensitive to
7  5  tobacco smoke and to radiation and other carcinogens too.  But
8  6  after the breast is fully developed, and particularly after the
9  7  first pregnancy, smoking has a different effect, which is to
10 8  lower the estrogen levels, and it shortens the time period that
11 9  a woman has periods.  So her menopause occurs earlier, and that
12 10 has just the opposite effect.
13 11     So you can see how you would have to do the study very
14 12 carefully to separate those two effects.
15 13 Q    What about radiation?  Ionizing radiation?
16 14 A    Yes.  That always increases the risk.
17 15 Q    Can you give us an example of ionizing radiation?
18 16 A    X-rays; fluoroscopy, which is not done much anymore; the
19 17 atomic bomb, when it went off in Hiroshima and Nagasaki --
20 18 those are examples.
21 19 Q    And, of course, HRT.  Is HRT a recognized carcinogen?
22 20 A    Yes, it is.
23 21 Q    I want to show you what we have marked previously, and it
24 22 has been admitted, Exhibit 7423-C.
25 23     MR. MORRIS:  And, Your Honor, this has been marked
26 24 and shared with the other side.  Will it be admitted?
27 25     MR. HEARD:  No objection.

Page 159

page 232

3  1     THE COURT:  Admitted.
4  2     (Plaintiff's Exhibit 7423-C received in evidence.)
5  3     MR. MORRIS:  Ms. Johnson, may I have the ELMO?
6  4  BY MR. MORRIS
7  5  Q    I want to show you a letter from Wyeth-Ayerst
8  6  Laboratories on February 22nd, 2000, to healthcare
9  7  professionals, and this is what we sometimes refer to as a
10 8  "Dear Doctor" letter.  Are you familiar with "Dear Doctor"
11 9  letters?
12 10 A    In general?
13 11 Q    Yes, sir.
14 12 A    I know they occur.  I don't get them.  I tend to not to get
15 13 them.  If I do, I toss them generally.
16 14 Q    But do the pharmaceutical companies from time to time
17 15 send out "Dear Healthcare" letters to physicians giving them
18 16 information about recent findings on products?
19 17 A    Yes, they do.
20 18 Q    Because it's fair to say that a clinician, an OB/GYN or a
21 19 general practitioner out there in the local community, might
22 20 not keep up with the epidemiology to the extent that a person
23 21 like you would?
24 22 A    That's true.
25 23 Q    And do drug companies normally have at least some
26 24 department within their company where people look at the
27 25 literature and keep in touch with what is going on out there?

Page 160

page 233

3  1  A    Yeah.  The question there was what?  I am sorry.
4  2  Q    Do the drug companies generally have research departments
5  3  within their organizations that are supposed to keep up with
6  4  the literature?
7  5  A    I don't have any knowledge of what they have.  I assume
8  6  they do.
9  7  Q    All right.  In this "Dear Healthcare Professional"
10 8  letter, they talk about two recent articles in JAMA and one in
11 9  the Journal of the National Cancer Institute that have joined
12 10 the list of epidemiological studies examining the potential
13 11 risks for breast cancer associated with ERT and HRT, and as the
14 12 recognized leader in therapeutic categories, we would like to
15 13 review these recent articles with you.  And this is dated,
16 14 what, February 22, 2000?
17 15 A    Yes.
18 16 Q    They go on to discuss the studies, and they state that
19 17 the available evidence does not warrant significant changes in
20 18 current medical practice.  The reasons are as follows, and they
21 19 say the increase in relative risk remains consistent with the
22 20 product labeling that has guided your prescribing decisions for
23 21 quite some time.
24 22     Did I read that correctly?
25 23 A    You read it correctly.
26 24 Q    And then they discuss that these two studies examine
27 25 patients who were on it in the '80s and '90s and that they may

Page 161

page 234

1 have been prescribed doses higher than today and so forth. And
2 then they state that there is a difference between cyclic
3 therapy and continuous therapy, correct?
4 A    Yes.
5 Q    And then Wyeth has a chart on the next page of the
6 studies and what they see in terms of the relative risks.
7     Do you see that?
8 A    I see that.
9 Q    And they state that most of the risks lack statistical
10 significance.
11     Do you see that?
12 A    I see that.
13 Q    And at the top of this article, they discuss a number of
14 relative risks, and they talk about age of women and so forth.
15 And then they attach to this letter essentially what looks like
16 a meta-analysis, but it is actually just a graph, a bunch of
17 studies reporting risks of breast cancer associated with
18 ERT/HRT.
19     Do you see that?
20 A    I see that.
21 Q    Now, if you would look down the list, it starts with
22 Dr. Maack's study.  Are you familiar with Dr. Maack?
23 A    I am.
24 Q    1975.  And Dr. Hoover in 1976.  Are you familiar with
25 Dr. Hoover?

Page 162

page 235

1 A    I am.
2 Q    Are you familiar with Herschel Jick in 1980?
3 A    I am familiar with Casagrande, Wynder, Jick, Ross,
4 Hoover.
5 Q    Are these all colleagues of yours?
6 A    Yes.  Most of them are.  Not all of them.  Gambrell, I
7 don't know.
8 Q    All right.  And they mentioned one of these in opening
9 statement, Dr. Bergkvist, in 1989.  You are familiar with
10 Dr. Bergkvist's article, are you not?
11 A    No.  I don't know Dr. Bergkvist.
12 Q    Are you familiar with his article?
13 A    Yeah.  Well, not -- I can't recall it at the moment.  I
14 am sure that I have looked at it.
15 Q    All right.  And the conclusion that they reached is the
16 summary of the available data, and it's done on the mean of a
17 1.0.  What is 1.0 from an epidemiological standpoint?
18 A    That's basically the baseline.  It's what everything is
19 compared to.  Whatever your risk is without taking it is 1.0,
20 and whatever your risk is with taking it is some different
21 figure perhaps.
22 Q    Would it matter to know which of these studies are
23 estrogen only and which of these studies are E plus P if you
24 are a doctor trying to make a determination of whether or not a
25 real risk exists?

Page 163

page 236

1 A    Well, in fact, unless your patient had a hysterectomy and
2 so wasn't at risk for endometrial cancer, you would be mostly
3 concerned about E plus P because if you gave that patient
4 estrogen, you would be running a very high risk of endometrial
5 cancer.  So you would want to know what the study showed about
6 E plus P.
7         MR. MORRIS:  May I have the --
8 BY MR. MORRIS:
9 Q    Here is the estimated risk of breast cancer that is in
10 that article.  This is the same chart, and if you took out the
11 cases of E only or studies which have no adjustment for other
12 risk factors, it would leave that number of studies left.  Now,
13 when there is no adjustment for other risk factors, what does
14 that mean?
15 A    It means if there were other causes of breast cancer that
16 you haven't really adjusted your data for so that you can be
17 sure that they're not confounding the results.  For example, if
18 one group you are comparing is older than the other group, that
19 would be an example of not having controlled for age.
20 Q    All right.  Why would that make a difference?
21 A    Pardon?
22 Q    Why would that make a difference?
23 A    Because we know that risk goes up with age.
24 Q    All right.  What would be another example?
25 A    Childbirth patterns.  We know that the earlier the

Page 164

page 237

1 pregnancy, the first pregnancy, the lower the risk.  The more
2 frequent the pregnancies, the longer breast feeding, these are
3 factors that actually all decrease the risk of breast cancer.
4 And so if there were differences of those between the
5 comparison groups that could affect what the results were --
6 Q    What about lack of determining duration of usage?
7 A    Yeah.  That would not be a confounder.  That would be
8 just a poor general measurement rather than a discriminating
9 measurement of dose.
10 Q    What about not determining whether or not the cancers you
11 are looking at are ER positive or ER negative?
12 A    Yes.  Although, I am not sure that people tumbled to that
13 in the '80s.  It's quite clear that the risk is associated with
14 ER-plus cancers.
15 Q    So if we went on and we looked at the estrogen-only
16 statistics, would that tell us anything about E plus P?
17 A    No.  It's quite clear in almost every study that has been
18 published that looked at both of them that E plus P has a much
19 higher risk carried with it than E only.
20 Q    If they mix the statistics in the study and some of the
21 results were E only patients and some of the results were E
22 plus P patients, would that give you a clear picture of the
23 right relative risk?
24 A    Well, since E only has a lower risk with it, if you mixed
25 them together, it dilutes the effect that you can see on E plus

page 238

1   P.

2   Q    So if we take those out --

3        MR. HEARD:  Your Honor, we want to object before we
4   go further with this line of questioning.

5        THE COURT:  What's your objection?

6        MR. HEARD:  Your Honor, there continue to be studies
7   stricken from this exhibit without any testimony about who is
8   striking them.  There is no testimony from the witness that he
9   has evaluated them and stricken them on this basis and --

10        THE COURT:  What is your response?

11        MR. MORRIS:  I will ask him those questions.

12        THE COURT:  All right.  It's sustained at this time
13  pending further questioning.

14        MR. MORRIS:  Okay.

15  BY MR. MORRIS

16  Q    Doctor, over the course of years have you had an
17  opportunity to look at these studies and determine whether or
18  not they had flaws from the standpoint of no confounders,
19  whether or not they mixed E and E plus P in the studies,
20  whether or not they failed to gather the appropriate data in
21  terms of age and in terms of the other factors that you
22  mentioned a moment ago?  Have you had an opportunity to look at
23  those issues with regard to these studies?

24  A    I have.

25  Q    All right.  And have you identified a number of these

page 239

1   studies as being deficient from the standpoint of giving a
2   clear picture as to what E plus P meant in terms of breast
3   cancer risk?

4   A    When I was doing an analysis of the effect of E plus P,
5   when I would look at the article and it didn't differentiate, I
6   would not consider that as being contributory to any kind of
7   analysis of E plus P.  While I can't go down and tell you each
8   one of these by memory, I can tell you the ones that I did look
9   at.  And those -- some of those you have on here, I see.

10  Q    All right.  And by looking at it right now, can you tell
11  us which ones those are?

12  A    Well, the one you have listed, Persson, et al., Schairer
13  et al., Ross, et al., and there are a number of other ones that
14  are not on here that looked at both that I have looked at.

15  Q    Have you looked at a number of studies that we have
16  already marked out?

17  A    I am sorry.  Say it again.

18  Q    Have you looked at a number of studies that we have
19  already marked out on the graph in terms of your past reading
20  and past study on the issue?

21  A    Yes.  I have looked at some of those, yes.

22  Q    And do those studies have the deficiencies that we
23  mentioned a moment ago?

24  A    I would have to go back.  I haven't kept a tally of the
25  different kinds of errors and different kinds of studies.  If

page 240

1   they -- if they weren't looking at the issue I was looking at,
2   I didn't consider them.

3   Q    All right.  But if we wanted to sit here and go through
4   every one of these, we could do that, and we could point those
5   out to the jury rather than doing it in summary fashion,
6   couldn't we?

7   A    We could.

8   Q    And that might take at least the remainder of today and
9   probably another two or three days.  Fair enough?

10  A    It could take a long time.

11  Q    All right.

12        MR. MORRIS:  Your Honor, we're attempting to do this
13  in summary fashion.  If Your Honor wants to sustain the
14  objection, I understand, but we were trying to avoid having to
15  go to each specific one of these articles.

16        MR. HEARD:  Your Honor, we renew our objection to
17  this exhibit, not because we want to spend time going through
18  these one by one, but there is no foundation that Dr. Austin
19  has done the exercise --

20        THE COURT:  Sustained.

21  BY MR. MORRIS

22  Q    In the past, have you looked at the data on the studies
23  that were done in the '70s, in the '80s, and the '90s in terms
24  of the quality of the studies from the standpoint of looking at
25  the right issues and not mixing E plus P with E?  Have you

page 241

1   looked at that?

2   A    I have.

3   Q    All right.  And can you just tell the jury what the
4   quality of the studies are?

5   A    Well, some of the studies early didn't differentiate
6   between E and E plus P.  Most of them didn't differentiate
7   between every use and continuous current use.  Few of them
8   looked at duration of use.  So there was a lot of
9   misclassification according to what the dosage would be.  They
10  had the poorest measures early on, most of them.

11  Q    And during your review of the studies, did you ever see a
12  study that was commissioned and performed in terms of designing
13  the protocol and doing the study by Wyeth?

14  A    Well, I -- not to my knowledge, no.

15  Q    Did you see any case control study that Wyeth conducted
16  to look at the issue of breast cancer?

17  A    Not to my knowledge.  I didn't recognize it if it was.

18  Q    Now, it is ethical to do a case control study looking at
19  harm, is it not?

20  A    Oh, yes.

21  Q    Because you are just looking at medical records and
22  looking backward, correct?

23  A    Correct.

24  Q    Did you see any case control study that was done by the
25  folks at Upjohn to look at the issue of breast cancer caused by

1 page 242

2

3 1  E plus P?

4 2  A    Not to my knowledge.  I didn't recognize it if it was.

5 3  Q    Now, in going through the literature, are you aware of a,

6 4  an article that was written by Herschel Jick in 1979 dealing

7 5  with post-marketing follow-up?

8 6  A    Yes.

9 7  Q    And down at the bottom it says JAMA, November 23rd, 1979?

10 8  A    That's correct.

11 9  Q    In the first paragraph, what does Dr. Jick say, in 1979,

12 10  about post-marketing follow-up?

13 11  A    There is a general but strongly held view that after

14 12  drugs are marketed, additional epidemiologic information is

15 13  needed on their clinical effects, particularly adverse effects.

16 14  Q    And if we move over in this article --

17 15  A    Until --

18 16  Q    There was a disaster approaching practolol drug.  Were

19 17  you familiar with that drug?

20 18  A    No.

21 19  Q    It says:  Until recently, no disaster approaching the

22 20  size of that resulting from practolol has been recognized in

23 21  the U.S.

24 22  Q    What does it next say?

25 23  A    Perhaps the most recent experience of this general kind

26 24  here, before the discovery of the estrogen/endometrial cancer

27 25  relation, has been with lincomycin hydrochloride and

1 page 243

2

3 1  clindamycin phosphate.

4 2  Q    And what does he say with regard to understanding the

5 3  needs for systems?

6 4  A    To understand the needs for systems to obtain additional

7 5  information on adverse drug effects after marketing, it is

8 6  necessary to perceive that these effects may be, 1, recognized

9 7  or unrecognized, 2, common or uncommon and, 3, acute or

10 8  long-term.

11 9  Q    And then what does he say about recognized adverse

12 10  effects?

13 11  A    If an adverse drug effect is known, i.e. recognized to be

14 12  inducible by a particular drug, the task to be performed is to

15 13  quantify its frequency in terms of severity and factors that

16 14  modify the rate.  This task is generally straightforward, and

17 15  techniques to accomplish it have been tested and found to be

18 16  satisfactory.

19 17  Q    So back in 1979, what was Dr. Jick's opinion as to the

20 18  ability of a corporation to perform post-marketing follow-up on

21 19  their drug and whether or not it's causing a harmful effect?

22 20      MS. MURRAY:  Objection, Your Honor.  Hearsay.

23 21      MR. MORRIS:  It's not hearsay, Your Honor.

24 22      THE COURT:  It's a statement made by somebody else

25 23  out of court, offered in this court.  Why is it not hearsay?

26 24      MR. MORRIS:  It's a medical treatise.  It's an

27 25  exception.

1 page 244

2

3 1      MR. HEARD:  Your Honor, I would add an objection on

4 2  the ground stated earlier.  This goes beyond the scope of

5 3  opinion Your Honor has allowed from this witness.

6 4      THE COURT:  All right.  Let's approach.

7 5      (Bench conference reported as follows:)

8 6      THE COURT:  All right.  Of course, a learned

9 7  treatise is hearsay.  I will get to the learned -- but it's an

10 8  exception.  I will get to the learned treatise in a minute.

11 9  What's your "beyond the scope"?

12 10      MR. HEARD:  Your Honor, this is the same objection

13 11  based on your Daubert ruling.  This is, in my view,

14 12  back-dooring testimony Wyeth failed to do what a

15 13  reasonable company would have done in the way of testing.  Your

16 14  Honor has ruled on that Daubert.  Nothing has changed about the

17 15  record.  He doesn't have a basis for testifying what a

18 16  reasonable company does or does not do.

19 17      THE COURT:  All right.  Going further --

20 18      MR. HEARD:  So he has just drawn now another

21 19  doctor's opinion and an article.  That's his sole basis for

22 20  offering that opinion.

23 21      MR. WALKER:  Judge, the notion that your Daubert

24 22  order said that there can be no evidence introduced about

25 23  reasonableness of action is exceeding what your order said.  It

26 24  said that we can't talk about ethics and we can't talk about

27 25  things without providing standards.

1 page 245

2

3 1      THE COURT:  What about this particular witness being

4 2  beyond his scope?

5 3      MR. MORRIS:  It's not.  He has previously stated in

6 4  his priority reports that the ability to do these studies and

7 5  the tools that they need to do them were there in the '80s or

8 6  there in the '70s and that they could have done them had they

9 7  chosen to.  This article is merely the foundation for that

10 8  evidence, 1979.

11 9      (Return to open court.)

12 10      THE COURT:  Ladies and gentlemen, don't talk about

13 11  the case or anybody involved in it.  Don't talk about the case

14 12  or anybody involved in it.  Don't start making up your minds,

15 13  consciously avoid it.

16 14      Let the jury stand out, please.  Everyone else remain as

17 15  you are.

18 16      (Jury exits the courtroom.)

19 17      THE COURT:  The jury is out.  I will let you argue

20 18  it from the lectern.  Quickly.

21 19      MR. HEARD:  Your Honor, without being a broken

22 20  record, the basis of our objection is Your Honor's Daubert

23 21  ruling, which is not about what an ethical company can do.  The

24 22  thrust of the argument was this is industry custom and practice

25 23  evidence that four plaintiffs' experts sought to offer.  They

26 24  argued that Wyeth failed to test as a reasonable company would

27 25  test, and the challenge was:  Tell us what objective reference

Page 173

page 246

```
 1  point these four experts have to give that kind of expert
 2  opinion.  There was none.  And on that basis Your Honor ruled
 3  that without an objective referent, these experts could not
 4  testify to a failure to test.
 5      THE COURT:  Let me hear from Upjohn on the issue.
 6      MS. MURRAY:  Your Honor, we also joined in that
 7  motion that they had filed, and beyond that, he has not
 8  demonstrated any expertise concerning the pharmaceutical
 9  industry, post-marketing -- it's not clear that he had ever
10  seen an article on post-marketing or reasonably relied on it as
11  an epidemiologist.  The Court allowed epidemiology and
12  microbiology over our objection.
13      THE COURT:  Let me hear from the plaintiff briefly.
14      MR. WALKER:  Well, Judge, the point of the issue
15  Mr. Heard raises is what the Court said in its order was that
16  we had to brief the issue of what an ethical company would do.
17  Here is the order, if I could -- now, when we got this order,
18  it didn't have a time limit on it, and we just assumed that at
19  some time prior to trial we would have to do that briefing.
20  And the Court eventually said, You haven't done the briefing,
21  except in the context of your briefing before Judge Jones on
22  Dr. Suzanne Parisian's testimony, and so I am going to limit
23  the scope of what you can present as evidence to what
24  Judge Jones said.  And what Judge Jones said is that we had
25  enough evidence in terms of things like what -- the FDA
```

Page 174

page 247

```
 1  standards, criteria.  So long as we had the criteria, FDA
 2  standards, that Dr. Parisian could testify based upon personal
 3  experience.
 4      So I just am fearful that we are getting into a point
 5  where Wyeth's position is literally that we can't present any
 6  evidence that they acted unreasonably, which means that we
 7  can't present failure to warn or negligence.  I mean, and
 8  that's -- Your Honor's order never went that far.  It just
 9  said:  Brief this issue.  We briefed it before Judge Jones, and
10  he admitted the testimony of Dr. Parisian.
11      THE COURT:  Defendant?
12      MR. HEARD:  Your Honor, here is Your Honor's order.
13      THE COURT:  About a minute each.
14      MR. HEARD:  Here is Your Honor's order,
15  November 21st:  Only Dr. Parisian will be allowed to testify.
16  You say it twice.  This is Dr. Austin.  He was the subject of
17  the motion.  The motion was granted.  There was never even a
18  reply made by the plaintiffs in their briefing saying that
19  Dr. Austin had a basis for his opinions.
20      THE COURT:  Upjohn?
21      MS. MURRAY:  Your Honor, we would join in that and
22  point out that he has not demonstrated any expertise, even here
23  today, about standards applying to pharmaceutical companies.
24      THE COURT:  All right.  We are going to be in recess
25  until ten after.
```

Page 175

page 248

```
 1      MR. MORRIS:  Your Honor, we have one other issue.  I
 2  don't know if you want to hear it right now, but if you were
 3  going to come back and start up trial by saying overruled,
 4  overruled or sustained, sustained, the next issue is we would
 5  like to talk about the Ravdin article with Dr. Austin.  And
 6  that's the one that shows since the time people got off of the
 7  HRT, the breast cancer rates have gone down.  You held that out
 8  of the opening statement, but you said in your order it may
 9  become relevant.  And this is the witness that it will become
10  relevant through because he studies ecological trends as he
11  testified about earlier, and I want him to testify about what
12  Dr. Ravdin's ecological trends show also.  It's peer-reviewed
13  medical literature.
14      THE COURT:  Let me hear from the defendant.
15      MR. HEARD:  Your Honor, the argument is this:
16  Insofar as methodology is concerned, Dr. Austin has the
17  credentials to talk about that kind of methodology.  This
18  specific opinion is trumped by Your Honor's Motion in Limine
19  No. 3 ruling which said evidence of declining sales data after
20  2002 is too prejudicial.  And that's part and parcel of this
21  opinion that Dr. Austin wants to offer.
22      THE COURT:  Upjohn?
23      MS. MURRAY:  Same as Wyeth, Your Honor.
24      MR. WALKER:  That's not true, Judge.  There was
25  never even an argument of prejudice in Wyeth's brief.  The only
```

Page 176

page 249

```
 1  thing they said in their motion to exclude evidence of sales
 2  trends data, the only argument they made was that that evidence
 3  is not relevant to whether the prescribing physician would or
 4  would not have prescribed the product.  In other words, their
 5  motion said, Don't let the plaintiffs use declining sales data
 6  to say that means this doctor wouldn't have prescribed.  That
 7  motion had nothing to do with ecological data.  It doesn't even
 8  mention ecological data.
 9      THE COURT:  All right.  I have got the point.  We
10  will be in recess.  I am going to make it till 15 after now,
11  and we will have the jury back for 30 minutes.  I will send out
12  a ruling.
13      (Recess at 4:01 p.m.)
14      C E R T I F I C A T E
15      I, Cheryl Bartnett Nelson, Official Court Reporter, do
16  hereby certify that the foregoing is a true and correct
17  transcript of proceedings in the above-entitled case.
18
19  _____  Date:  February 5, 2008
20
     Cheryl B. Nelson, CRR, RPR, CCR
21
     United States Court Reporter
22
23
24
25
```

page 250

3   1    (Proceedings continuing at 4:14 p.m.; jury not present.)
4   2         THE COURT:  Of course, it is my ultimate decision.
5   3    But I've consulted with Judge Jones and my lawyer.  Here are my
6   4    rulings.  I don't know how this is spelled.  The Jick's 1979
7   5    ethical pharmacy stuff, that's excluded.  I believe it is beyond
8   6    the scope.  The charts, exhibits for sales trends, will be
9   7    permitted.  Of course, the expert must tie the charts to the
10  8    other data before he can make causation opinions.  And flaws can
11  9    be pointed out on cross.
12  10       All right.  Let's bring the jury in.
13  11       (Jury present.)
14  12            THE COURT:  Be seated, please.  You may proceed.  The
15  13   lawyers had to teach me a little law while you were out, which
16  14   was a pretty hard project for them.
17  15            MR. MORRIS:  Thank you, Your Honor.
18  16       May I have the PowerPoint.
19  17   BY MR. MORRIS:
20  18   Q.  I want to show you this first, Dr. Austin.  Are you
21  19   familiar with this graph?
22  20   A.  I am.
23  21   Q.  And where does it come from?
24  22   A.  This comes from an article that I was lead author on in the
25  23   American Journal of Public Health.
26  24   Q.  And is that a peer-reviewed publication?
27  25   A.  Yes, it is.

page 251

3   1    Q.  When did that come out?
4   2    A.  I believe it came out in 1982.
5   3    Q.  And what is this particular graph illustrating, if you can
6   4    explain to the jury?
7   5    A.  We had been following the increase in the risk of
8   6    endometrial cancer, of uterine cancer.  And in 1975 the rates
9   7    began to fall, or after 1975.  I presented data that we had to
10  8    the FDA in December of 1975.  And in 1976, the data -- the rates
11  9    began to fall.
12  10       And after a number of unsuccessful efforts, I finally got
13  11   some data from a survey of estrogen -- of marketing information
14  12   that showed that in the west coast part of the United States,
15  13   most of which was California, that the prescriptions also fell
16  14   in 1976, in contrast to their peak in 1975.  And the number of
17  15   cancer cases also began falling.  You can see there, the
18  16   smoother peak is the one with cancer cases.  And the one that's
19  17   sort of jagged is the one with estrogen prescriptions.  The
20  18   reason it is so jagged is that it's a relatively small number,
21  19   and they bounce around a little bit.  It is not a nice smooth
22  20   line.
23  21   Q.  So what conclusion did you draw back in 1982 when you had
24  22   the data that with decreasing prescriptions the incidence of
25  23   endometrial cancer also declined?
26  24   A.  Oh, this was very exciting information, because with
27  25   exposure to asbestos or exposure to smoking or other things that

page 252

3   1    increase your risk of a certain type of cancer, your risk stays
4   2    elevated a long time.  And here was what three studies had shown
5   3    was the exposure dropped dramatically and the rate of cancer
6   4    dropped dramatically.  This here is the number.  But there is
7   5    another slide that shows that the rate just came right back down
8   6    too.
9   7    Q.  And was this part of the evidence that convinced everybody
10  8    that the estrogen that was being prescribed during that time
11  9    frame caused endometrial cancer?
12  10   A.  Well, the FDA was, I think, convinced before that, because
13  11   they made their decision.  But I'm not sure that everyone was
14  12   convinced.  This is important for two reasons.  One is that it
15  13   is a -- it is a confirmation.  It's a confirming effect.  It's
16  14   actually what we call in epidemiology one of the other criteria
17  15   for causation as an intervention effect, because if something is
18  16   a cause and you increase that cause, you increase the rate.  If
19  17   you decrease the cause, you decrease the rate.  So this is a
20  18   confirmation of that.
21  19       It's important -- it's important for women, because -- and
22  20   their doctors, because they now know that if they didn't already
23  21   have a cancer started, their risk is going to go back down.
24  22       And the third thing that it was important -- at least it
25  23   was important to me, is because it suggests there was a
26  24   different mechanism that was causing this increase rather than
27  25   the mechanism that asbestos users and the tobacco -- smoking

page 253

3   1    tobacco users.  It is one that I had not seen in a population
4   2    before.  It's one that I had only seen in a laboratory
5   3    experience, and that is the effect of a promoter.
6   4    Q.  Now, you mentioned that you published this paper in a
7   5    peer-reviewed piece of literature.  Have you published many
8   6    papers during the course of your career?
9   7    A.  Well, I published -- I don't know -- maybe a hundred or 120
10  8    or something like that.
11  9    Q.  Have you contributed to any chapters in textbooks?
12  10   A.  Yes.  There's a textbook on cancer epidemiology, and it's
13  11   now in its third edition.  In the first two editions I
14  12   contributed chapters.
15  13   Q.  All right.  With regard to this analysis, have you
16  14   conducted this type of analysis with regard to combination
17  15   hormone therapy and breast cancer?
18  16   A.  I have, yes.
19  17   Q.  And how did you go about conducting that?
20  18   A.  Well, I take it back.  I have not done -- I have not done
21  19   this graph like that for both.  What I have done is look at the
22  20   rates of breast cancer and have seen published information on
23  21   estrogen prescriptions and noted whether or not they coincided.
24  22   Q.  And have you had an occasion to read the peer-reviewed
25  23   medical article published by Peter Ravdin concerning the
26  24   decrease in breast cancer incidence in 2003 in the United
27  25   States?

page 254

3  1  A.  I have.  And he analyzed the same data that I analyzed.  He
4  2  got it into press faster than I did.
5  3        MR. MORRIS:  May I have the ELMO?
6  4  BY MR. MORRIS:
7  5  Q.  I want to show you what we have here and ask you if this,
8  6  in fact, is the Ravdin article.  For whatever reason, it is kind
9  7  of blurry.  Can you read it?  I'm sure there's something here
10  8  that probably tells me how to make this clearer.
11  9  A.  The autofocus is not working, apparently.
12  10  Q.  There we go.  Thank you.  It's nice to have a technology
13  11  person with us.  Tell us about the New England Journal of
14  12  Medicine.  Is that a well respected publication?
15  13  A.  I think we mentioned that as one of the two top medical
16  14  journals in this country.
17  15  Q.  All right.  And in Dr. Ravdin's analysis, he says he looked
18  16  at the SEER data.  That was the data you mentioned earlier where
19  17  you helped create that database.  Correct?
20  18  A.  That's correct.
21  19  Q.  And what were Dr. Ravdin's findings?
22  20  A.  Well, he found that the data in 2003 were substantially
23  21  lower, the rate of breast cancer was substantially lower, than
24  22  it was the year before.  And he went further and picked out the
25  23  year 2005 and found that it was further lower.  It was further
26  24  declined and that the decrease was primarily in women that were
27  25  over the age of 50.  And he noted that the decrease seemed to be

page 255

3  1  related in time to the first report of the Women's Health
4  2  Initiative, when they released the information showing that
5  3  combined therapy increased the risk of breast cancer.
6  4  Q.  Following the release of the Women's Health Initiative
7  5  report in July of 2002, did prescriptions of the product
8  6  Prempro, did they decrease?
9  7  A.  Yes, they did.
10  8        MR. MORRIS:  I think my battery may have gone dead on
11  9  my mike here, Your Honor.  Anyway, I'll use this one.  Can you
12  10  all hear me through this one?
13  11  BY MR. MORRIS:
14  12  Q.  Did Professor Ravdin or Dr. Ravdin, did he prepare a graph
15  13  showing --
16  14  A.  Yes.
17  15  Q.  -- the decline?
18  16  A.  Yes, he did.  That's the graph right there that showed that
19  17  it hit a peak.  In this one it's greater than 50 years of age,
20  18  so it shows a decline in the last few years of data.
21  19  Q.  And, in fact, it looks like the decline began actually
22  20  before 2002, around 2000.  Have you had an opportunity to read
23  21  medical articles that talk about why it would have started
24  22  around 2000?
25  23  A.  Yes.  There was a previous study that looked that was
26  24  attempting to find a protective effect of combined therapy for
27  25  heart disease.  And it turned out in that study that there was

page 256

3  1  no -- there was no benefit for heart disease.  And when those
4  2  data came out, in some parts of the country, in California, for
5  3  example, the rates start falling then.  They had been on a
6  4  continuous rise.  They started falling then.  Nationally, they
7  5  still had a little bit of a rise until the Women's Health
8  6  Initiative came out.  And that study was in 19 -- the one on the
9  7  HERS study was in 1998, the last part or August of 1998.
10  8  Q.  And had doctors already reacted to the HERS report and
11  9  started taking women off of combination HRT?
12  10  A.  I don't know the mechanism.  I just know that the use fell.
13  11  Q.  The use fell.  With regard to that, what is the
14  12  significance from an epidemiological standpoint of decreasing
15  13  rates of breast cancer with decreasing prescriptions?
16  14  A.  Well, as I mentioned earlier with regard to endometrial
17  15  cancer, it's important news for women.  It's important news for
18  16  researchers.  And it's one of the very few risk factors that we
19  17  can do something about.  We can't do anything about age.  We
20  18  can't do anything about whether a person is a female or not.
21  19  But this is something we can do something about.
22  20  Q.  What does it suggest about the issue of whether or not the
23  21  risk of breast cancer goes down for a woman if she gets off the
24  22  HRT?
25  23  A.  Well, that's what I said, it was very important for that.
26  24  It suggests that when a woman goes off, if there's not already a
27  25  cancer in the pipeline, already starting to grow, that it may

page 257

3  1  not -- she may go back to her original risk.
4  2  Q.  Now, were there people in the medical and scientific
5  3  community that said, oh, Dr. Ravdin, please, you are drawing too
6  4  broadly, you are drawing too broadly, the decrease in breast
7  5  cancer is not related to the decrease in prescriptions, it may
8  6  be related to the decrease in, say, mammography?
9  7  A.  Yeah.  There were three hypotheses that have come up to
10  8  explain that.  And one of them is the decrease in the use of
11  9  hormone therapy.  Two other ones.  One of them is that maybe we
12  10  have finally reached a saturation point of screening
13  11  mammography.  In other words, no new women are joining that
14  12  group.  We've reached as high as we can go and so that there's
15  13  no new women coming in with unfound cancers, and all we're doing
16  14  now is the rate has gone back down, because now we've reached a
17  15  level where everybody is getting diagnosed at an earlier stage.
18  16  Q.  And what's the response to that?
19  17  A.  Well, the data don't fit that.  It is not just in the age
20  18  groups.  The decrease is in the over-50 age groups.  In fact, it
21  19  is in the over-55 age groups.  It's not just in the age groups
22  20  that get mammography.  If it were just -- just due to
23  21  mammography, we would find a decline in the later stages,
24  22  because women that haven't been screened before come in for
25  23  their first screening, they are more likely to have a
26  24  cancer, more advanced cancer, than a woman who had been screened
27  25  every year.  And that's not what we find.  We find just the

Page 185

page 258

1  opposite.

2     So anyway, there's a number of different findings that you

3  would expect if that were the explanation.  And we don't find

4  any of them except that we would find the decrease.

5  Q.  What about the issue involving whether or not they have a

6  hormone positive breast cancer or a hormone negative, or the

7  rarer forms of cancer, lobular and tubular, that have been

8  associated with this class of drugs?  What does the data show us

9  on that?  Does it show that all of those are coming down in the

10  same vein with ductals, which are the majority, or does it show

11  that the ones that are usually caused by these drugs are coming

12  down more rapidly?

13  A.  If you divide ductal cancer into those that are estrogen

14  receptor positive and those that are estrogen receptor negative,

15  only the estrogen receptor positives came down.  Estrogen

16  receptor negatives stayed about flat.  If you look at the

17  reduction from lobular cancer, which has a higher risk from E

18  plus P, then ductal cancer, that came down much more than did

19  ductal cancer.  So it just doesn't fit.

20  Q.  So the number one issue that they said may explain the

21  decline, other than HRT, do you feel like it has been adequately

22  dismissed?

23  A.  I feel that it can be adequately dismissed.  There are

24  still people arguing about it in the literature.

25  Q.  Okay.  Number two, screening mammography.  Do people

Page 186

page 259

1  suggest that women are getting fewer mammograms, and therefore

2  that explains the decline in detection?

3  A.  That was one of the issues that Dr. Ravdin addressed in his

4  paper.  And he pointed out that the decline in mammograms could

5  not explain -- could not explain the decline in breast cancers

6  that occurred.

7     It's even more than what he -- what he -- more than what he

8  cited in there.  It can be broken down even more than that, to

9  show that it cannot possibly explain the decrease.

10  Q.  Are you familiar with Christina Clarke?

11     MR. HEARD:  Objection, Your Honor.

12     MS. MURRAY:  Objection.

13     MR. HAERD:  Objection to the document that's on the

14  screen.

15     THE COURT:  I guess we better approach.

16     (Proceedings at the bench as follows:)

17     THE COURT:  What is the objection?

18     MR. HEARD:  We filed a motion as to this document.  It

19  was granted.  It was excluded.  While I'm making this

20  objection --

21     THE COURT:  We don't need to go further if that's

22  true.

23     MR. MORRIS:  I don't know that is true.  I've never

24  seen a motion and an order.

25     THE COURT:  We'll find out whether there is or not.

Page 187

page 260

1     MR. MORRIS:  It's not the typical learned treatise.  I

2  don't know anything about that ruling, Your Honor.

3     MR. WALKER:  Even if it is not a learned treatise --

4     THE COURT:  What?

5     MR. WALKER:  Even the fact that it is not a learned

6  treatise means the article --

7     THE COURT:  If I've already ruled, though.

8     MR. WALKER:  You ruled it is not admissible

9  independently by itself.

10     THE COURT:  Let me see what I ruled.

11     MR. WALKER:  He can rely on hearsay.  He can rely on

12  some scientists --

13     THE COURT:  Just a minute.  I'm trying to read this.

14  Brief it tonight, like everything else.  I'll rule on it in

15  the morning.  Get your objection to me by 7:30.  How late did I

16  give you?

17     MR. WALKER:  Eight.

18     THE COURT:  By eight.  Your response by 7:30 in the

19  morning.  I'll meet with you at 8:15.

20     MR. MORRIS:  All right.

21     (Proceedings continuing in open court as follows:)

22  BY MR. MORRIS:

23  Q.  Doctor, are you satisfied that the data that has been

24  collected on the issue regarding mammograms and whether or not

25  the screening mammography is the attributable reason for the

Page 188

page 261

1  decline in breast cancers is valid or not, and are you satisfied

2  that there's sufficient evidence that suggest that it's not

3  caused by less screening?

4  A.  Yeah.  It's not any complex sort of an analysis.  If you

5  look at a hundred thousand women, usually statistics are in

6  bases of a hundred thousand.  If you look at a hundred thousand

7  women, in 2001 there will be about -- if they are in the age

8  group 55 to 74, there will be about 400 cancers that occur,

9  breast cancers, that occur in a year.  And not all of those were

10  women who had gotten regular screening mammograms, maybe 75

11  percent or so.  So about 25 percent of those cancers were

12  diagnosed in women who didn't get a mammogram, and about 75

13  percent are those that were diagnosed in women who did get a

14  mammogram.

15     Two years later, another hundred thousand women, three --

16  two years later, another hundred thousand women, there's been

17  about a 2 percent decrease in the number of women who got a

18  mammogram.  So the women who didn't get a mammogram the time

19  before still aren't getting a mammogram, and they produce about

20  the same number.  And the women who are getting a mammogram,

21  which is all but 2 percent of the women who got it before, still

22  produce the same amount.  But there's 2 percent in there that

23  didn't get a mammogram.  Well, if they didn't get any cancer,

24  they could only reduce the rate by 2 percent.  But the rate went

25  down 15 percent.  It just doesn't match.

1 page 262

2

3 1   Q.   And so what is the explanation for the drop-off in breast

4 2   cancer after we consider all the factors?

5 3   A.   The only one that fits the data, the only hypothesis that

6 4   the data fit, are that it's exactly the same thing that we saw

7 5   with endometrial cancer.

8 6   Q.   When you take away the HRT, does that take away the breast

9 7   cancer?

10 8   A.   You take away the exposure to E plus P, the rates go down.

11 9   The risk goes down, yes.

12 10   Q.   In opening statement, the jury was shown a quote out of

13 11   Christopher Li's recent paper.  You've reviewed some of Dr. Li's

14 12   papers in the past, have you not?

15 13   A.   When was this published?  This year?

16 14   Q.   This was the one that was published January of 2008.

17 15   A.   Yes.

18 16   Q.   Have you had an opportunity to look at this?

19 17   A.   Yes, I have seen it.

20 18   Q.   And the jury was shown one isolated quote over here on page

21 19   46.  They were shown this quote.  "Current CHT use, even for 10

22 20   years or longer, was not associated with IDC risk," intraductal

23 21   carcinoma, which my client, Ms. Scroggin, has in her right

24 22   breast or had in her right breast.  As far as that quote is

25 23   concerned, does that quote relate to all the studies that are

26 24   done or just to this particular study?

27 25   A.   It applies just to this study.  And if you look at the

1 page 263

2

3 1   table, you can see that there's an alternative way to interpret

4 2   that, because the continuous current CHT use carries with it for

5 3   ductal cases in some instances a 1.6.  That's for greater than

6 4   10 years.  And current continuous use, 1.4.  And the confidence

7 5   interval is 1.0 to 2.5.  Biostatisticians have -- what I

8 6   mentioned, they have a 5 percent probability level that they

9 7   will accept as being significant.  And when you have 1.0 as the

10 8   confidence interval, if it includes 1, that means we can't

11 9   really exclude the possibility that it might be 1.  But this is

12 10   like .05 -- .051.  It is so close to .05 that that's -- that's

13 11   what the 1.0 is, where it rounds off to.

14 12   Q.   What if we look over at lobular and ductal lobular cases?

15 13   What are those relative risks?

16 14   A.   Oh, well --

17 15        MS. MURRAY:  Object.  Your Honor, objection to

18 16   relevance.

19 17        MR. HEARD:  Objection.

20 18        THE COURT:  Ladies and gentlemen, don't talk about the

21 19   case with anybody.  Don't talk about anybody involved in it.

22 20   Don't start making up your mind.  If there's any report about

23 21   this in the paper, don't read it.  Don't watch it on television

24 22   or listen to the radio.  Do not start making up your mind.

25 23   We'll start back at 8:45 in the morning.  Let the jury stand

26 24   out.  Everyone else remain as you are.

27 25        (Jury excused.)

1 page 264

2

3 1        THE COURT:  Doctor, you can stand down if you want to.

4 2   Response to the objection?

5 3        MR. MORRIS:  This is part of the whole picture, Your

6 4   Honor, in terms of what the current relative risk is.  She has a

7 5   ductal cancer.  And there is certainly an explanation with

8 6   regard to it, because she has tubular also.  She has tubular on

9 7   the left.  The lobular/tubular numbers tend to be much closer to

10 8   each other.  And that's what the doctor was just about to get

11 9   into before I was interrupted.

12 10        THE COURT:  Well, they objected.  That's not

13 11   synonymous with an interruption.  At any rate, what's your

14 12   objection?

15 13        MS. MURRAY:  Your Honor, she does not have lobular

16 14   cancer, and that's what he was asking about.  Further, what he

17 15   is doing is simply sticking these articles in front of Dr.

18 16   Austin like he's a news reader.  Dr. Austin is not stating an

19 17   opinion of his own.  He is just reading off the prompter what's

20 18   being put in front of him.  And that's my other further

21 19   objection.  The lobular is not relevant, and it's a news

22 20   reading.

23 21        THE COURT:  What about that?

24 22        MR. MORRIS:  Your Honor had previously ordered that

25 23   Dr. Austin will be permitted to give testimony about detecting

26 24   ILC in the 1980s.  And why would Your Honor not find that it's

27 25   important for him to understand the detection level of ILCs in

1 page 265

2 1   2000 to go along with ecological data?  It's all towards the

2   issue of causation.

3 3        THE COURT:  What's your response?

4 4        MR. HEARD:  Well, that's really brazen, Your Honor.

5 5        THE COURT:  What?

6 6        MR. HEARD:  That is really a brazen misquoting of that

7 7   order and the basis for it.  The opinion that he gave about

8 8   lobular cancer was something he's not even come close to today,

9 9   which is that if you monitored the SEER data in the 1980s, you

10 10   would have seen an increasing proportion of lobular cancers,

11 11   which should have been the signal for Wyeth to test.  You've

12 12   heard none of that today.  Now he's about to testify --

13 13        THE COURT:  I tell you what I'm going to do.  To make

14 14   sure I don't make a mistake, I'm going to let you brief that

15 15   this evening.  Get it in by 8 o'clock, a response by 7:30.  And

16 16   I'll meet with you at 8:15.  Thank you.  We're in recess.

17 17        (Overnight recess at 4:42 p.m.)

18 18              REPORTER'S CERTIFICATE

19 19        I certify that the foregoing is a correct transcript from

20   the record of proceedings in the above-entitled matter.

21 20

22 21              Date:  February 5, 2008.

23        Elaine Hinson, RMR, CRR, CCR

24 22   United States Court Reporter

25 23

26 24

27 25

# EXHIBIT 35

Case 3:04-cv-01373-JBA   Document 120-5   Filed 11/30/11   Page 419 of 427

## REFERENCES

1. Kistner RW, Krantz KE, Lebherz TB, et al: Endometrial cancer: rising incidence, detection and treatment. J Reprod Med 10:1-9, 1973
2. Shanklin DR: Endometrial cancer: a worsening problem. Consultant 14:94-99, 1974
3. Corscaden JA, Gusberg SB: The background of cancer of the corpus. Am J Obstet Gynecol 53:419-431, 1947
4. Damon A: Host factors in cancer of the breast and uterine cervix and corpus. J Natl Cancer Inst 24:483-516, 1960
5. Dockerty MG, Lovelady SB, Foust GT: Carcinoma of the corpus uteri in young women. Am J Obstet Gynecol 61:966-981, 1951
6. Garnet JD: Constitutional stigmas associated with endometrial carcinoma. Am J Obstet Gynecol 76:11-19, 1958
7. Logan WPD: Marriage and childbearing in relation to cancer of the breast and uterus. Lancet 2:1199-1202, 1953
8. MacMahon B: Risk factors for endometrial cancer. Gynecol Oncol 2:122-129, 1974
9. Way S: The aetiology of carcinoma of the body of the uterus. J Obstet Gynaecol Br Emp 61:46-58, 1954
10. Wynder EL, Escher GC, Mantel N: An epidemiological investigation of cancer of the endometrium. Cancer 19:489-520, 1966
11. Miettinen OS: Confounding and effect-modification. Am J Epidemiol 100:350-353, 1974
12. Metropolitan Life Insurance Company: Fifty years of life conservation. Stat Bull Metropol Life Ins Co 40:1-12, 1959
13. Cox DR: The Analysis of Binary Data. London, Methuen, 1970, p 105
14. MacDonald PC, Siiteri PK: The relationship between the extraglandular production of estrone and the occurrence of endometrial neoplasia. Gynecol Oncol 2:259-263, 1974
15. Siiteri PK, Schwarz BE, MacDonald PC: Estrogen receptors in endometrial and breast cancer. Gynecol Oncol 2:228-238, 1974
16. Cramer DW, Cutler SJ, Christine B: Trends in the incidence of endometrial cancer in the United States. Gynecol Oncol 2:130-143, 1974

---

# INCREASED RISK OF ENDOMETRIAL CARCINOMA AMONG USERS OF CONJUGATED ESTROGENS

HARRY K. ZIEL, M.D., AND WILLIAM D. FINKLE, PH.D.

**Abstract**  The possibility that the use of conjugated estrogens increases the risk of endometrial carcinoma was investigated in patients and a twofold age-matched control series from the same population. Conjugated estrogens (principally sodium estrone sulfate) use was recorded for 57 per cent of 94 patients with endometrial carcinoma, and for 15 per cent of controls. The corresponding point estimate of the (instantaneous) risk ratio was 7.6 with a one-sided 95 per cent lower confidence limit of 4.7. The risk-ratio estimate increased with duration of exposure: from 5.6 for 1 to 4.9 years' exposure to 13.9 for seven or more years. The estimated proportion of cases related to conjugated estrogens, the etiologic fraction, was 50 per cent with a one-sided 95 per cent lower confidence limit of 41 per cent. These data suggest that conjugated estrogens have an etiologic role in endometrial carcinoma. (N Engl J Med 293:1167-1170, 1975)

BETWEEN 1962 and 1973, dollar sales of estrogen quadrupled in the United States.[1,2] Conjugated estrogens (Premarin, Ayerst Laboratories) containing principally sodium estrone sulfate constituted the vast majority of the quantity supplied. A recent series of articles by Siiteri and his colleagues[3-5] has suggested that the estrone form of estrogen might be associated with the development of endometrial cancer. Siiteri's theory is consistent with previous data from animal experiments indicating carcinogenicity of estrogen.[6-9] In addition, MacMahon[10] cites clinical and epidemiologic evidence that exogenous estrogen increases the risk of the development of endometrial cancer.

The present work addresses the relation of estrogen to endometrial cancer using the case-control approach. Members of the Kaiser Foundation Health Plan with endometrial cancer who were reported to the tumor registry of the Kaiser Permanente Medical Center, Los Angeles, were compared with control subjects selected from the same Health Plan population and matched for age, duration of Health Plan membership, and area of residence.

## SUBJECTS AND METHODS

### Patients

Between July 1, 1970, and December 31, 1974, the diagnosis of endometrial cancer was made in 94 patients at the Kaiser Permanente Medical Center, Los Angeles, and reported to its tumor registry. The criterion for the definition of endometrial cancer was a pathological diagnosis of endometrial adenocarcinoma or adenoacanthoma; mixed Müllerian sarcoma and choriocarcinoma were excluded.

### Control Subjects

Control subjects were selected in the following way. The membership files of the Southern California Kaiser Foundation Health Plan population were reviewed, and all members in the vicinity of the Los Angeles facility whose record designations ended in arbitrarily selected numbers were identified and listed. From the list, two control subjects were selected for each patient and matched for birth date within one year, area of residence by postal zip code, duration of Health Plan membership (each control subject had been a member at least as long as the associated patient), and potential for the development of endometrial cancer by the control subject's having an intact uterus. The patient and the two control subjects thus constituted a matched triple.

### Record Review

The data source for the 94 matched triples was the clinic record. To avoid information bias that could result from the more probing clinical history taking after identification of the cancer, the following procedure was employed for each matched triple. A medical-records clerk requested all three records from the record room and reviewed those of the control subjects to determine

From the Department of Obstetrics and Gynecology, Kaiser Permanente Medical Center, Los Angeles and the Department of Medical Economics, Kaiser Foundation Health Plan, Southern California Region (address reprint requests to Dr. Ziel at 4900 Sunset Blvd., Los Angeles, CA 90027).

HRT MED LIT 2068.0001

HRT PLAINTIFFS' EXHIBIT M2068 PAGE 0001

EXHIBIT
12

THE NEW ENGLAND JOURNAL OF MEDICINE

whether they had an intact uterus. Subjects without an intact uterus were replaced by selection of others from the original list. The clerk determined the date of diagnosis for each patient, and then the date one year before that diagnosis (the reference date). The clerk concealed all information in the record after the reference date. For control subjects, information recorded during the same period was similarly concealed. The record was then given to an abstractor, who filled out the abstract form without knowing whether the record was that of a patient or a control.

## Results

For any given triple, there were six possible combinations of conjugated-estrogen use: all three were users; the patient and one of the control subjects were users; and so forth. The observed frequencies for each of the six possible combinations for each of the 94 triples are shown in Table 1. These data were used to estimate the risk ratio associated with the use of conjugated estrogens and the etiologic fraction (the proportion of cases due to conjugated estrogens). The (maximum-likelihood) point estimate of the relative risk ($\hat{RR}$) is 7.6.[11]* The significance test statistic ($X^2_1$) is 49 (P << $10^{-8}$).[12] The approximate 95 per cent one-sided lower confidence limit of the risk ratio ($\underline{RR}$) is 4.7.[13] The point estimate of the etiologic fraction ($\hat{EF}$) is 50 per cent.[14] For this parameter, Miettinen's proposed (test-based) computation[15] of the 95 per cent one-sided lower confidence limit ($\underline{EF}$) yields 41 per cent.†

Data on the relation of risk ratio to duration of exposure are given in Table 2. Even with only 1.0 to 4.9 years of use, the point estimate is 5.6, with a corresponding 95 per cent one-sided confidence limit of 2.7. For uses of less than one year's duration, the data are too scanty to be informative.‡

## Discussion

The apparent association between conjugated estrogens use and the development of endometrial cancer requires consideration of several explanations other than causality.

Information bias, particularly bias in ascertaining the use of conjugated estrogens, is an unlikely explanation. The history of such use was ascertained from pre-existing records, which covered at least as many years of care for the controls as for the patients. The original notations on the record, and the subsequent notations used to determine duration of use of conjugated estrogens, were made at least one year before detection of the cancer. Moreover,

---

*The computations for the point estimate and significance test were performed according to Miettinen, 1970[11] and 1969[12] respectively. The 95 per cent confidence interval[13] was computed according to: ($\underline{RR}, \overline{RR}$) = $\hat{RR}^{1 \pm Z_{1-\alpha}/X}$ = $7.6^{1 \pm 1.96 \cdot 6.98}$ = (4.3, 13.4).

†The point estimate of EF was calculated by $\hat{EF}$ = [($\hat{RR}$ − 1)/$\hat{RR}$] (exposure rate of the cases).[14] The 95 per cent confidence interval was calculated by: ($\underline{EF}, \overline{EF}$) = 1 − (1 − $\hat{EF}$) $^{1 \pm Z_{1-\alpha}/X}$ = 1 − (1 − 0.50) $^{1 \pm 1.96 \cdot 6.98}$ = (0.39, 0.59).

‡Data were also recorded on the use of conjugated estrogens by control subjects who had been excluded from the study because of hysterectomy or radiation therapy to the uterus. If the restrictive criterion of an intact uterus in the control subjects had not been applied, the estimated relative risk and etiologic fraction would have been 4.9 and 46 per cent respectively.

---

Table 1. History of Conjugated-Estrogen Use among 94 Patients with Endometrial Cancer and 188 Matched* Control Subjects.

**DISTRIBUTION OF TRIPLES BY USE OF CONJUGATED ESTROGENS**

| PATIENTS' USE OF CONJUGATED ESTROGENS | CONTROLS' USE OF CONJUGATED ESTROGENS | | | |
|---|---|---|---|---|
| | both | one | neither | totals |
| Used | 1 | 16 | 37 | 54 |
| Did not use | 0 | 11 | 29 | 40 |
| Totals | 1 | 27 | 66 | 94 |

| | USED CONJUGATED ESTROGENS | | DID NOT USE CONJUGATED ESTROGENS | | TOTALS |
|---|---|---|---|---|---|
| Exposure rates: | No. | % | No. | % | |
| Patients | 54 | (57) | 40 | (43) | 94 |
| Controls | 29 | (15) | 159 | (85) | 188 |

*The matching criteria were age, area of residence, duration of Health Plan membership, & potential for development of uterine cancer.

---

the method of record abstraction was expressly designed to eliminate bias in the process of extracting data.

As for selection bias, the ascertainment of subjects (patients and controls) does not appear to have depended directly upon use of conjugated estrogens. The vast majority of cases are reported to the cancer registry, regardless of whether the patient used conjugated estrogens, and the controls were selected from a defined population by a procedure that precluded selection on the basis of a history of such use.

Among various potential confounding factors, age, duration of Health Plan membership, and area of residence were controlled by (matching and) stratification. Among other known correlates of risk of development of endometrial cancer,[10] parity, excessive weight, and age at menopause deserve consideration.

In the present data, the risk of endometrial cancer of

---

Table 2. Duration of Conjugated-Estrogens Use* by Patients with Endometrial Cancer and by Control Subjects, with Risk-Ratio Analysis: Point Estimate ($\hat{RR}$), 95 per Cent One-sided Lower Confidence Bound ($\underline{RR}$), and Chi-Square Test Statistic ($X^2_1$).

| GROUP | DURATION OF EXPOSURE (YR) | | | | | |
|---|---|---|---|---|---|---|
| | UNKNOWN | ≥ 7 | 5.0–6.9 | 1.0–4.9 | < 1 | NON-EXPOSED | TOTALS |
| Patients (No.) | 14 | 14 | 9 | 14 | 3 | 40 | 94 |
| Controls (No.) | 6 | 4 | 5 | 10 | 4 | 159 | 188 |
| $\hat{RR}$ | 9.3 | 13.9 | 7.2 | 5.6 | | (1.0)† | |
| ($\underline{RR}$) | 4.2 | 6.0 | 2.8 | 2.7 | | | |
| $X^2_1$ | 22 | 26 | 12 | 15 | | | |
| P | < $10^{-5}$ | < $10^{-5}$ | < .01 | < .01 | | | |

*Duration of use for both patients & controls was defined by difference in yr between date of most recent prescription for conjugated estrogens & date of 1st such prescription given in record. If a first prescription date was given, but subsequent prescription dates were absent, a statement in the record, such as "conjugated estrogens for 5 yr" was acceptable as a statement of duration. If a 1st prescription date was given, but subsequent dates were absent & no summary of conjugated estrogens use was in the record, the duration of use was defined as unknown.

†By definition.

HRT MED LIT 2068.0002

Case 3:04-cv-01373-JBA  Document 205-5  Filed 11/30/11  Page 421 of 427

nulliparas was estimated to be 1.5 times that of parous women, and their rate of conjugated-estrogens use was also somewhat higher. However, the estimate of the confounding risk ratio[16] from subjects with parity recorded (90 per cent of patients and 84 per cent of controls) was as low as 1.18. This small ratio, together with an overall crude risk ratio of 6.7, implies a confounding effect of only $(1.18 - 1)/[6.71/1.18) - 1] = 4$ per cent.

To estimate the confounding risk ratio and confounding effect for subjects with height and weight recorded, Quetelet's index ($Wt/Ht^2$) was employed. The risk of endometrial cancer for the patients in the upper third of the weight index was estimated to be twice that for patients in the lower two thirds, and their use of conjugated estrogens was also slightly higher. Data could be obtained from 89 per cent of the patients and 80 per cent of the controls; the confounding risk ratio, crude risk ratio, and confounding effect were estimated as 1.1, 5.7, and 2 per cent respectively.

The analogous calculations for confounding by the risk factor "age at menopause" were as follows. The risk ratio for endometrial cancer for subjects with an age at menopause of 51 years or more versus those with an age at menopause below 51 was estimated to be 1.3, and the rate of conjugated-estrogens use was slightly lower in the former age group. On the basis of data obtained from 90 per cent of the case records and 70 per cent of the control records, the confounding risk ratio, crude risk ratio, and confounding effect were estimated as 1.08, 5.6, and 2 per cent, respectively.

From these considerations, it is apparent that the observed association between conjugated-estrogens use and the development of endometrial cancer cannot be explained to any appreciable extent by confounding due to age, parity, excessive weight, or age at menopause. It is possible, of course, that there could be a major confounding effect by other, unknown factors that lead to the development of endometrial cancer.

As an overall check on the validity of the method, data were also collected on the use of diazepam (Valium), reserpine, and thyroid drugs by both patients and controls. The point estimates of the risk ratio were 0.7, 0.5, and 0.9, respectively. All these estimates are small in comparison with the estimated risk ratio of 7.6 that was found for conjugated estrogens. In addition, data were collected on the indications given in the record for prescribing conjugated estrogens. Where an indication was recorded (for 54 per cent of patients and 72 per cent of controls), it was "hot flashes" for 72 per cent of patients and 71 per cent of controls, indicating that the reasons for prescribing this drug were similar for patients and controls. Chance is an extremely unlikely explanation, considering the magnitude of the P value.

Causal explanation of the association involves the difficulty of explaining why an association of this magnitude has remained undetected until now. Estrogens have been used extensively only during the last decade or two,[1,2] and if the results of this study are generalizable to all postmenopausal women, there should have been an appreciable increase in the occurrence of endometrial cancer. Specifically, the present data imply that the etiologic fraction for conjugated estrogens has a point estimate as high as 50 per cent, with a 95 per cent one-sided lower confidence limit of 41 per cent. A 50 per cent etiologic fraction would correspond to a 100 per cent increase in the incidence of this cancer. Whether an increase of this order of magnitude has occurred in regions of high estrogen use, such as the one in which this study was conducted, is difficult to assess, but no such increase is believed to have occurred. Analysis of the Second and Third National Cancer Surveys suggests that the incidence of endometrial cancer did not increase appreciably in the United States between 1947 and 1971.[17] The same conclusion holds for England, Wales, and Canada.[18]

Those surveys, however, are affected by a major bias. The incidence rates are in reference to the total female population, whereas the rates should be expressed in reference to women at risk.[18] For the 1950's, the frequency of hysterectomy must be surmised from incidental sources, which suggest that 10 to 15 per cent of postmenopausal women had undergone hysterectomy.[19-22] MacMahon and Worcester[23] and Hammond[24] provide evidence of increased prevalence of hysterectomy in this age group during the early 1960's. Recent national survey data show much higher frequencies and continued increase in the rate of hysterectomy. By 1968, the prevalence of hysterectomy among American women at the age of 60 years was 31 per cent[25]; in the period from 1968-1973, the incidence rate in women 15 years of age or older rose from 6.8 per 1000 woman-years[26] to 8.6 per 1000 woman-years.[27] It is apparent, therefore, that the incidence rate of the development of endometrial cancer for women at risk (those with an intact uterus) has increased dramatically during the past decade or so.

Another difficulty in employing the 1969 and 1971 Third Survey to assess the impact of use of conjugated estrogens on the incidence of endometrial cancer is that the survey may have been performed too early for this purpose. The Kaiser Permanente Medical Center's tumor-registry data are not particularly helpful in settling the question of increase in the incidence of endometrial cancer, owing to uncertainty about the completeness of reporting over time, particularly before 1971. However, the data do indicate a significant increase (uncorrected for hysterectomy) in 1972 to 1974.

Causal interpretation of the association between conjugated-estrogens use and the development of endometrial cancer has some biologic credibility. Carcinogenicity of estrogens has been demonstrated in laboratory animals at various sites,[6-9] including the endometrium.[9] In addition, the cases of endometrial cancer observed in surgically castrated women or in girls with ovarian dysgenesis exceed the expected number,[28-33] and these women receive replacement estrogen therapy. Moreover, endometrial cancer has been found to be associated with high estrogen-producing granulosa-theca ovarian tumors.[34-36]

Recently, Siiteri et al.[3-5] have suggested a theory of hormone conversion that implies a higher level of estrone in

HRT MED LIT 2068.0003

HRT PLAINTIFFS' EXHIBIT M2068 PAGE 0003

women in whom endometrial cancer develops than in those in whom it does not. They found rates of conversion of androstenedione to estrone two to three times as high in women with endometrial cancer or hyperplasia (a precursor of endometrial carcinoma[37,38]) as in women without such cancer. Confirming Siiteri's findings, Schindler and his associates[36] discovered that adipose tissues of patients with endometrial cancer converted androstenedione to estrone nearly four times as fast as those of subjects without cancer.

The evidence for a connection between the use of conjugated estrogens and the development of endometrial cancer seems rather persuasive. Caution is urged, however, in view of the absence of data both from similar epidemiologic studies in other populations and from follow-up studies. Such information is necessary before policy conclusions can be drawn. Further studies are necessary to evaluate the possible relation between the use of other estrogens and endometrial cancer.

We are indebted to our primary consultant, Dr. Olli Miettinen, to Drs. Robert Brook, Brian Henderson, Robert Hoover, Thomas Mack, Malcolm Pike and Noel Weiss, and Mrs. Kathleen N. Williams for criticism of the paper and to the abstractors for the study, David Harrison, Susan Lieberman, Mary Rambo, and Sandra Tyson.

## REFERENCES

1. Shipments of Pharmaceutical Preparations, Except Biologicals, 1962 (US Bureau of the Census Current Industrial Reports, Series M28G [62]-1). Washington, DC, Government Printing Office, 1963
2. Pharmaceutical Preparations, Except Biologicals, 1973 (US Bureau of the Census Current Industrial Reports, Series Ma-28G [73]-1). Washington, DC, Government Printing Office, 1975
3. Siiteri PK, Schwarz BE, Moriyama I, et al: Estrogen binding in the rat and human. Adv Exp Med Biol 36:97-112, 1973
4. Siiteri PK, MacDonald PC: The role of extraglandular estrogen in human endocrinology, Handbook of Physiology. Section 7, Endocrinology, Vol 2, Part I. Edited by RO Greep, EB Astwood. Washington, DC, American Physiological Society, 1973, pp 615-629
5. Siiteri PK, Schwarz BE, MacDonald PC: Estrogen receptors and the estrone hypothesis in relation to endometrial and breast cancer. Gynecol Oncol 2:228-238, 1974
6. Cook JW, Dodds EC: Sex hormones and cancer-producing compounds. Nature 131:205-206, 1933
7. Perry IH, Ginzton LL: The development of tumors in female mice treated with 1:2:5:6-dibenzanthracene and theelin. Am J Cancer 29:680-704, 1937
8. Gardner WU: Tumors in experimental animals receiving steroid hormones. Surgery 16:8-32, 1944
9. Meissner WA, Sommers SC, Sherman G: Endometrial hyperplasia, endometrial carcinoma, and endometriosis produced experimentally by estrogen. Cancer 10:500-509, 1957
10. MacMahon B: Risk factors for endometrial cancer. Gynecol Oncol 2:122-129, 1974
11. Miettinen OS: Estimation of relative risk from individually matched series. Biometrics 26:75-86, 1970
12. Idem: Individual matching with multiple controls in the case of all-or-none responses. Biometrics 25:339-355, 1969
13. Idem: Simple interval-estimation of risk ratios. Am J Epidemiol 100:515-516, 1974
14. Idem: Proportion of disease caused or prevented by a given exposure, trait or intervention. Am J Epidemiol 99:325-332, 1974
15. Idem: Estimability and estimation in case-referent studies. Am J Epidemiol (in press)
16. Idem: Components of the crude risk ratio. Am J Epidemiol 96:168-172, 1972
17. Cramer DW, Cutler SJ, Christine B: Trends in the incidence of endometrial cancer in the United States. Gynecol Oncol 2:130-143, 1974
18. Kinlen LJ, Doll R: Trends in mortality from cancer of the uterus in Canada and in England and Wales. Br J Prev Soc Med 27:146-149, 1973
19. MacMahon B, Feinleib M: Breast cancer in relation to nursing and menopausal history. J Natl Cancer Inst 24:733-753, 1960
20. Lilienfeld AM: The relationship of cancer of the female breast to artificial menopause and marital status. Cancer 9:927-934, 1956
21. Herrell WE: The relative incidence of oophorectomy in women with and without carcinoma of the breast. Am J Cancer 29:659-665, 1937
22. Lane-Claypon JE: A Further Report on Cancer of the Breast, with Special Reference to Its Associated Antecedent Condition. Ministry of Health, Reports on Public Health and Medical Subjects, No. 32. London, His Majesty's Stationery Office, 1926
23. MacMahon B, Worcester J: Age at menopause, United States 1960-1962, Vital and Health Statistics: Data from the National Health Survey, Series II, No. 19. Rockville, Maryland, US National Center for Health Statistics, Health Services and Mental Health Administration, 1966
24. Hammond EC: The early diagnosis of uterine cancer, The Early Diagnosis of Cancer of the Cervix: A symposium held at the University of Hull, 20 March, 1970, as part of the 11th annual general meeting of the British Association for Cancer Research. Edited by JM Riggott. Hull, England, University of Hull, 1971
25. Bunker JP, Brown BW Jr: The physician-patient as an informed consumer of surgical services. N Engl J Med 290:1051-1055, 1974
26. Mead S: Surgical operations in short-stay hospitals, United States, 1968 (DHEW Publication No [HSM] 73-1796). Rockville, Maryland, US National Center for Health Statistics, Health Services and Mental Health Administration, January, 1973
27. Hospital discharge survey data, Monthly Vital Statistics Report (DHEW Publication No [HRA] 75-1120), Vol 24, Suppl 3. Rockville, Maryland, US National Center for Health Statistics, Health Services and Mental Health Administration, May 30, 1975
28. Cutler BS, Forbes AP, Ingersoll FM, et al: Endometrial carcinoma after stilbestrol therapy in gonadal dysgenesis. N Engl J Med 287:628-631, 1972
29. Dowsett JW: Corpus carcinoma developing in a patient with Turner's syndrome treated with estrogen. Am J Obstet Gynecol 86:622-625, 1963
30. Wilkinson EJ, Friedrich EG Jr, Mattingly RF, et al: Turner's syndrome with endometrial adenocarcinoma and stilbestrol therapy. Obstet Gynecol 42:193-200, 1973
31. Dewhurst CJ, De Koos EB, Haines RM: Replacement hormone therapy in gonadal dysgenesis. Br J Obstet Gynaecol 82:412-416, 1975
32. Roberts G, Wells AL: Oestrogen-induced endometrial carcinoma in a patient with gonadal dysgenesis. Br J Obstet Gynaecol 82:417-420, 1975
33. McCarroll AM, Montgomery DAD, Harley JMcDG, et al: Endometrial carcinoma after cyclical oestrogen-progestogen therapy for Turner's syndrome. Br J Obstet Gynaecol 82:421-423, 1975
34. Greene JW Jr: Feminizing mesenchymomas (granulosa-cell and theca-cell tumors) with associated endometrial carcinoma: review of the literature, and a study of the ovarian tumor registry. Am J Obstet Gynecol 74:31-41, 1957
35. Ingram JM Jr, Novak E: Endometrial carcinoma associated with feminizing ovarian tumors. Am J Obstet Gynecol 61:774-789, 1951
36. Mansell H, Hertig AT: Granulosa-theca cell tumors and endometrial carcinoma: a study of their relationship and survey of 80 cases. Obstet Gynecol 6:385-394, 1955
37. Hertig AT, Sommers SC: Genesis of endometrial carcinoma. I. Study of prior biopsies. Cancer 2:946-956, 1949
38. Taylor HC JR: Endometrial hyperplasia and carcinoma of the body of the uterus. Am J Obstet Gynecol 23:309-332, 1932
39. Schindler AE, Ebert A, E: Conversion of androstenedione to estrone by human fat tissue. J Clin Endocrinol Metab 35:627-630, 1972

HRT PLAINTIFFS' EXHIBIT M2068 PAGE 0004

# EXHIBIT 36

1164                    THE NEW ENGLAND JOURNAL OF MEDICINE                    Dec. 4, 1975    Vol.

# ASSOCIATION OF EXOGENOUS ESTROGEN AND ENDOMETRIAL CARCINOMA

Donald C. Smith, M.D., Ross Prentice, Ph.D., Donovan J. Thompson, Ph.D.,
and Walter L. Herrmann, M.D.

**Abstract**   To determine the association between the incidence of endometrial cancer and the use of estrogen in menopausal and post-menopausal women, we retrospectively compared 317 patients with adenocarcinoma of the endometrium with an equal number of matched controls having other gynecologic neoplasms; 152 patients used estrogen, as compared to 54 of 317 controls. Thus, the risk of endometrial cancer was 4.5 times greater among women exposed to estrogen therapy. When estrogen use was adjusted for concomitant variables such as obesity, hypertension, diabetes, parity, referral pattern, age at diagnosis, year of diagnosis and other gynecologic neoplasms, the magnitude of the increased relative risk was associated with several of these variables, and was highest in patients without obesity and hypertension. Exogenous estrogen therapy is associated with an increased risk of endometrial carcinoma, but this increased relative risk is less apparent in patients with physiologic characteristics previously associated with an increased risk. (N Engl J Med 293:1164-1167, 1975)

R ECENT evidence suggests that the relative or absolute risk of endometrial cancer is increasing.[1,2] Furthermore, the range of indications for estrogen therapy in menopausal and post-menopausal women appears to be expanding. We therefore investigated the hypothesis of a causal relation of endometrial cancer and estrogen administration by means of a retrospective study that used a binary logistic regression model for analysis. In addition, the prevalence of characteristics, frequently found in a population at risk for endometrial cancer, was compared with matched samples of patients with endometrial cancer with and without estrogen exposure, and appropriate controls.

## Methods

We examined the records of patients 48 years of age or older in whom the diagnosis of adenocarcinoma of the endometrium was made in 1960-72 after curettage or hysterectomy. A total of 243 cases was obtained from the Mason Clinic and Virginia Mason Hospital, and 74 originated from the University of Washington Medical School Hospital. The sample-size difference reflects the volume of cases seen at the two institutions.

Matched controls were selected at the same institutions from patients with other gynecologic neoplasms. Of the 317 controls 206 had cervical cancer, 88 ovarian cancer, and 23 carcinoma of the vulva. Cases were matched for age at diagnosis (within four years) and year of diagnosis (within two years) to a corresponding control.

Certain factors tend to characterize the population at risk of endometrial cancer. Specifically, the following prevalence ranges have been reported in the literature[3-10]: hypertension (30 to 56 per cent); obesity (28 to 63 per cent), diabetes (9 to 32 per cent); and nulliparity or nulligravidity (19 to 41 per cent). In addition the incidence of endometrial cancer increases with age. The year of diagnosis may also be an important consideration in view of changing indications for, and modes of estrogen administration. The extent to which these factors are related to exposure and discriminate between cases and controls confounds the study of the association of estrogen to endometrial cancer. Such factors may also be related to the magnitude of the association (Miettinen[11] has discussed confounding and effect modification. In addition to those given above, factors taken into account in this study were the referral pattern, type of control and institution. These potential confounding and risk-affecting variables are termed "covariates."

Both cases and controls were identified from site-specific

From the departments of Obstetrics and Gynecology and Biostatistics, University of Washington (address reprint requests to Dr. Smith at the Mason Clinic, 1118 9th Ave., Seattle, WA 98101).

cancer-patients lists supplied by the Washington/Alaska Regional Medical Program. The lists also supplied the information used in identifying the matched control. The medical record was the source of the additional information collected, and the cases or controls designated were excluded only on the basis of inadequate data.

The clinical features were defined as follows: estrogen treatment, with a record of at least six months of estrogen used before endometrial cancer was diagnosed (type of estrogen, preparation and dosage were not limiting factors for inclusion "on estrogen"); hypertension, consisting of a blood pressure of 140/90 mm Hg or higher for patients under 60 years of age or 160/90 mmHg or higher for patients over that age; and obesity — a weight of 130 per cent or greater over upper limits of ideal weight for given height and medium frame.[12]

The analysis concentrates on estimation of the relative risk of endometrial carcinoma for patients treated with estrogen. Results are from the simple "matched-pairs analysis" commonly used. Since several important covariates were not used in the matching, further analysis was indicated. The procedure followed was to model the retrospective probabilities of being "on estrogen" by means of a binary logistic regression model as described by Cox.[13] Regression variables in the logistic model included the covariates listed above, the logistic coefficient in each case being allowed to differ between cases and controls to study effect modification. In addition, the relative risk was allowed to vary with the type of control. This analysis, with or without matching, is direct with use of maximum likelihood and likelihood ratio procedures.[13]

## Results

Of the 317 patients with endometrial cancer 152 satisfied the criteria for being estrogen treated as compared to only 54 of the controls. This finding leads to a completely unadjusted relative risk of 4.5 of endometrial cancer developing among women exposed to estrogen therapy as compared to those not receiving estrogen. A slightly more refined calculation can be based on the 128 pairs discordant for estrogen use. In 113 of these pairs, the patient with endometrial cancer was the estrogen user, as compared to 15 in the control group. This distribution gives an even higher relative risk of 7.5 after adjustment for year and age of diagnosis. Similar simple matched-pairs analysis in subgroups formed by separation for age at diagnosis and year of diagnosis (before and after 1968) produces the following relative risks shown in Table 1. These data suggest an increased risk with time and a decreased risk for patients in whom the diagnosis was made at an older age.

HRT MED LIT 2046.0001

EXHIBIT
13

Table 1. Relative Risks according to Age at Diagnosis and Year of Diagnosis.

| Age at Diagnosis (Yr) | Yr of Diagnosis | |
|---|---|---|
| | Before 1968 | 1968+ |
| ≤64 | 25/4 = 6.2 | 54/6 = 9.0 |
| 65+ | 4/1 = 4.0 | 30/4 = 7.5 |

Relative risk estimates were also found to vary when cases of endometrial cancer were compared to cervical, ovarian, and vulvar controls as individual groups. At Mason Clinic and Virginia Mason Hospital, calculations of the relative risk based on cervical, vulvar, and ovarian control cancers were 7.8 (153), 1.5 (13) and 3.9 (77), respectively, the parentheses enclosing the number of patients for each control neoplasm. Corresponding figures from University of Washington Medical School Hospital were 3.4 (53), 0.6 (10) and 2.8 (11), respectively.

Such a variation suggests that one or more of the neoplasms are associated with estrogen or that the attempt to quantify patient heterogeneity is incomplete. As an example of the latter, socioeconomic class was not included as a covariate. Patients with cervical cancer tend to be of a lower socioeconomic class than those with endometrial cancer and may therefore be less likely to be given estrogens. The omission of socioeconomic status then leads to a somewhat inflated relative risk estimate based on a comparison with controls with cervical cancer.

A comprehensive analysis based on the logistic regression approach is a refinement of the above calculations. In such an analysis, the type of control and the matching variables are simultaneously taken into account, along with the other covariates described above. Table 2 gives the results of fitting the logistic regression model to data from the 486 patients at Mason Clinic and Virginia Mason Hospital. The coefficients noted opposite $z$ estimate the relation between estrogen use and covariates. Throughout Tables 2 and 3 a coefficient whose absolute value exceeds twice the corresponding standard error indicates a significant relation at the 5 per cent level. The significant nega-

tive coefficient ($-0.090$) opposite age indicates that estrogen use decreases with age at diagnosis. Similarly, estrogen use is considerably lower for referral patients. The coefficients opposite $D_2$ measure effect modification. The significantly positive coefficient (0.230) opposite year of diagnosis indicates that the relative risk of endometrial cancer associated with estrogen use increases with age. Similarly, the relative risk associated with estrogen use is lower for hypertensive and obese patients than for patients without those conditions. In fact, the logistic coefficients when expressed as an exponential function (base e) provide multiplicative factors affecting the relative risk. For instance, the estimated relative risk associated with estrogen use for an obese patient is only 0.42 of that for a nonobese patient. Of course, the basic risk of endometrial cancer associated with obesity more than compensates with this reduction, and the apparent effect of estrogen is to increase incidence of endometrial cancer for both obese

Table 3. Logistic Regression Fit for University of Washington Medical School Hospital Data.

| Covariate | Logistic Coefficient | Standard Deviation | Relative Risk |
|---|---|---|---|
| $D_1$-case vs cervical control | 1.982 | 1.078 | 7.26 |
| $D_2$-case vs vulvar control | 1.775 | 1.216 | 0.17 |
| $D_3$-case vs ovarian control | 2.770 | 1.610 | 15.96 |
| $z$ { Yr of diagnosis (-1967) | 0.405 | 0.178 | |
|    Age at diagnosis (<64 yr) | 0.119 | 0.070 | |
|    Obesity | 2.368 | 1.346 | |
|    Hypertensive | -2.011 | 0.964 | |
| $D_z$ { Yr of diagnosis (-1967) | 0.025 | 0.241 | |
|    Age at diagnosis (<64 yr) | 0.013 | 0.090 | |
|    Obesity | 0.504 | 1.572 | |

and nonobese patients. This increase makes the incidence rates more alike than in the absence of estrogen. Similarly, the fitted model indicates that the relative risk associated with estrogen is to be multiplied by 0.23 if the patient is hypertensive, and by 1.26 for every year after 1967 (though some caution should be adopted in extrapolation of the fit to the extremes of the study period). The coefficients at the top of Tables 2 and 3 opposite $D_1$, $D_2$, and $D_3$ are used to test the basic hypothesis of an increased risk of endometrial cancer due to estrogen as based on a comparison with cervical, vulvar, and ovarian cancer controls, respectively. These coefficients have been standardized to apply to a diagnosis in 1967 in a patient at 64 years of age who is not hypertensive or overweight. Highly significant coefficients are observed, giving rise to estimated relative risks of 13.80, 3.75 and 8.58 for patients meeting the standardizing criteria. Covariates mentioned above, not given in Table 2, were found not to add significantly to the regression equation (by likelihood ratio tests).

Corresponding results for nonhypertensive patients at University of Washington Medical School Hospital are given in Table 3. Estimates of the effect of estrogen at the two institutions are generally consistent even though a considerably smaller portion of the patients at University Hospital were estrogen treated. This finding, along with

Table 2. Logistic Regression Fit for Mason Clinic and Virginia Mason Hospital Data.

| Covariate | Logistic Coefficient | Standard Error | Relative Risk |
|---|---|---|---|
| $D_1$-case vs cervical control | 2.624 | 0.513 | 13.80 |
| $D_2$-case vs vulvar control | 1.320 | 0.713 | 3.75 |
| $D_3$-case vs ovarian control | 2.149 | 0.527 | 8.58 |
| $z$ { Referral pattern | -1.317 | 0.367 | |
|    Yr of diagnosis (-1967) | 0.095 | 0.062 | |
|    Age at diagnosis (<64 yr) | -0.090 | 0.025 | |
|    Hypertension | 0.479 | 0.463 | |
|    Obesity | -0.638 | 0.408 | |
| $D_z$ { Referral pattern | 0.513 | 0.495 | |
|    Yr of diagnosis (-1967) | 0.230 | 0.083 | 1.26 |
|    Age at diagnosis (<64 yr) | -0.009 | 0.033 | |
|    Hypertension | -1.463 | 0.616 | .23 |
|    Obesity | -0.874 | 0.528 | .42 |

*Components of $z$ given by referral pattern, hypertension & obesity are indicator variables with values of 1 corresponding to referral, hypertensive & obese patients respectively.

†D is an indicator variable that takes value 0 for controls & 1 for cases.

HRT MED LIT 2046.0002

HRT PLAINTIFFS' EXHIBIT M2046 PAGE 0002

THE NEW ENGLAND JOURNAL OF MEDICINE

the smaller sample sizes, leads to considerably larger standard deviations. In Table 3, sample sizes were not adequate for study of hypertension as a factor that modifies the effect observed, and referral patients were not recorded.

This study does not show a difference between endometrial and vulvar cancer in association with estrogen. A considerably larger sample of patients with vulvar neoplasms would be required to study this question adequately.

The analysis described indicates a significantly increased risk of endometrial cancer associated with estrogen that is highest in patients without hypertension and obesity. This increase should reflect itself in a lower prevalence of hypertension and obesity among patients on estrogen as compared to those not on estrogen therapy. Such a comparison can be based on Table 4, which shows that the clinical profile (presence or absence of the risk factors studied) of the estrogen-treated cases of endometrial cancer are much more normal than those not treated with estrogens. In fact, the difference is both qualitative and quantitative. For instance, not only is obesity more prevalent among untreated cases, but the degree of obesity is also considerably greater among patients classified as obese.

Table 4. Patient Profiles for Cases and Controls in Relation to Estrogen Use.

| CHARACTERISTIC | CASES OF ENDOMETRIAL CANCER (%)* | | CERVICAL, VULVAR & OVARIAN CONTROLS (%)* | | ESTROGEN USERS WITHOUT GYNECOLOGIC NEOPLASMS (%)† |
|---|---|---|---|---|---|
| | NO ESTROGEN | ESTROGEN | NO ESTROGEN | ESTROGEN | ESTROGEN |
| Hypertension | 39.0 | 14.4 | 22.3 | 20.8 | 17.5 |
| Obesity | 62.2 | 28.1 | 35.2 | 20.8 | 21.5 |
| Diabetes | 15.2 | 12.4 | 7.9 | 3.8 | 4.0 |
| Nulligravidity | 24.4 | 19.6 | 18.5 | 28.3 | 17.0 |
| Normal (none of the above) | 16.4 | 49.7 | 41.3 | 47.2 | 54.0 |

*317 patients.  †200 women.

A second comparison group of 200 post-menopausal patients without known gynecologic neoplasms, receiving estrogen, and randomly selected from patient files at Mason Clinic and Virginia Mason Hospital is included in Table 4. The similarity between clinical profiles for controls treated and not treated with estrogens and this group of 200 patients indicates that estrogen was not systematically withheld from patients on the basis of hypertension or other characteristics listed. Furthermore, the similarity between the profiles of the estrogen-treated cases with this comparison group suggests that the estrogen-treated cases in which endometrial cancer developed were not an unusually high-risk group so far as the clinical features listed describe risk of endometrial cancer.

## DISCUSSION

The studies by MacDonald and Siiteri[14,15] provided strong scientific evidence for a causal relation between endogenous estrogen production and endometrial carcinoma.

The role of exogenous estrogen as an etiologic agent in this disease is less clear and much more controversial. To the best of our knowledge, conclusive studies are unavailable. A part of this controversy has involved the incidence of endometrial carcinoma in recent years. Results comparing the data of the second and the third national cancer surveys showed essentially no change in the incidence of endometrial cancer between the years 1947 and 1970.[16] A comparison of this nature is difficult to interpret in view of improved and more widespread technology detecting early endometrial dysfunction and dysplasia, together with more liberal indications for hysterectomy. However, recent data collected by the California Tumor Registry reveal an apparent increase in incidence of 50 per cent for invasive and 100 per cent for in situ lesions from 1969 to 1974 (Donald F. Austin, M.D., M.P.H., chief, California Tumor Registry, San Francisco–Oakland Standard Metropolitan Statistical Area: personal communication).

The present study provides a credible argument for a causative role of exogenous estrogen in the development of endometrial cancer. However, it must be remembered that this study did not address itself to dosage, specific estrogens or treatment schedule. These considerations most certainly will influence the computation of relative risk factors. Thus, the average relative risk factor in the order of 5, as calculated from our data, must be viewed with the consideration that dosage schedules, length of administration and compounds of varying estrogenicity may affect the ultimate risk. In fact, even with the present experimental design, the calculated risk appears to vary significantly as a function of the other criteria under consideration. For example, the exogenous estrogen-induced risk declines in patients who are hypertensive or obese. Dilution of the estrogen effect by distribution of the hormone in adipose tissue or inhibition of the production of endogenous estrogen by administered estrogen may offer a tentative explanation of this phenomenon. Unfortunately, there is incomplete justification at present for such an assumption.

Our data also indicate that the exogenous estrogen-related risk is highest for women classified as normal — i.e., those with none of the "classic" predisposing signs. This observation invites speculation about a maximum but limited risk for any given person — i.e., the concept that contributing factors are cumulative only to a specific upper limit. Some support for this theory can be generated in animal experiments in cancer-sensitive strains, in which a reproducible percentage of tumors will develop after exposure to a variety of carcinogens.

From the data presented emerges a pattern of endometrial carcinoma developing in large numbers of persons who do not possess the previously reported constitutional physiologic features associated with the disease. Coincident with this altered clinical pattern is the increasing use of exogenous estrogen for a wide variety of indications, with an apparently significant relative risk associated with estrogen administration.

HRT MED LIT 2046.0003

HRT PLAINTIFFS' EXHIBIT M2046 PAGE 0003

## References

1. Kistner RW, Krantz KE, Lebherz TB, et al: Endometrial cancer: rising incidence, detection and treatment. J Reprod Med 1:0-1-9, 1973
2. Shanklin DR: Endometrial cancer: a worsening problem. Consultant 14:94-99, 1974
3. Corscaden JA, Gusberg SB: The background of cancer of the corpus. Am J Obstet Gynecol 53:419-431, 1947
4. Damon A: Host factors in cancer of the breast and uterine cervix and corpus. J Natl Cancer Inst 24:483-516, 1960
5. Dockerty MG, Lovelady SB, Foust GT: Carcinoma of the corpus uteri in young women. Am J Obstet Gynecol 64:966-981, 1951
6. Garnet JD: Constitutional stigmas associated with endometrial carcinoma. Am J Obstet Gynecol 76:11-19, 1958
7. Logan WPD: Marriage and childbearing in relation to cancer of the breast and uterus. Lancet 2:1199-1202, 1953
8. MacMahon B: Risk factors for endometrial cancer. Gynecol Oncol 2:122-129, 1974
9. Way S: The aetiology of carcinoma of the body of the uterus. J Obstet Gynaecol Br Emp 61:46-58, 1954
10. Wynder EL, Escher GC, Mantel N: An epidemiological investigation of cancer of the endometrium. Cancer 19:489-520, 1966
11. Miettinen OS: Confounding and effect-modification. Am J Epidemiol 100:350-353, 1974
12. Metropolitan Life Insurance Company: Fifty years of life conservation. Stat Bull Metropol Life Ins Co 40:1-12, 1959
13. Cox DR: The Analysis of Binary Data. London, Methuen, 1970, p 105
14. MacDonald PC, Siiteri PK: The relationship between the extraglandular production of estrone and the occurrence of endometrial neoplasia. Gynecol Oncol 2:259-263, 1974
15. Siiteri PK, Schwarz BE, MacDonald PC: Estrogen receptors and the estrone hypothesis in relation to endometrial and breast cancer. Gynecol Oncol 2:228-238, 1974
16. Cramer DW, Cutler SJ, Christine B: Trends in the incidence of endometrial cancer in the United States. Gynecol Oncol 2:130-143, 1974

# INCREASED RISK OF ENDOMETRIAL CARCINOMA AMONG USERS OF CONJUGATED ESTROGENS

Harry K. Ziel, M.D., and William D. Finkle, Ph.D.

**Abstract** The possibility that the use of conjugated estrogens increases the risk of endometrial carcinoma was investigated in patients and a twofold age-matched control series from the same population. Conjugated estrogens (principally sodium estrone sulfate) use was recorded for 57 per cent of 94 patients with endometrial carcinoma, and for 15 per cent of controls. The corresponding point estimate of the (instantaneous) risk ratio was 7.6 with a one-sided 95 per cent lower confidence limit of 4.7. The risk-ratio estimate increased with duration of exposure: from 5.6 for 1 to 4.9 years' exposure to 13.9 for seven or more years. The estimated proportion of cases related to conjugated estrogens, the etiologic fraction, was 50 per cent with a one-sided 95 per cent lower confidence limit of 41 per cent. These data suggest that conjugated estrogens have an etiologic role in endometrial carcinoma. (N Engl J Med 293:1167-1170, 1975)

BETWEEN 1962 and 1973, dollar sales of estrogen quadrupled in the United States.[1,2] Conjugated estrogens (Premarin, Ayerst Laboratories) containing principally sodium estrone sulfate constituted the vast majority of the quantity supplied. A recent series of articles by Siiteri and his colleagues[3-5] has suggested that the estrone form of estrogen might be associated with the development of endometrial cancer. Siiteri's theory is consistent with previous data from animal experiments indicating carcinogenicity of estrogen.[6-9] In addition, MacMahon[10] cites clinical and epidemiologic evidence that exogenous estrogen increases the risk of the development of endometrial cancer.

The present work addresses the relation of estrogen to endometrial cancer using the case-control approach. Members of the Kaiser Foundation Health Plan with endometrial cancer who were reported to the tumor registry of the Kaiser Permanente Medical Center, Los Angeles, were compared with control subjects selected from the same Health Plan population and matched for age, duration of Health Plan membership, and area of residence.

## Subjects and Methods

### Patients

Between July 1, 1970, and December 31, 1974, the diagnosis of endometrial cancer was made in 94 patients at the Kaiser Permanente Medical Center, Los Angeles, and reported to its tumor registry. The criterion for the definition of endometrial cancer was a pathological diagnosis of endometrial adenocarcinoma or adenoacanthoma; mixed Müllerian sarcoma and choriocarcinoma were excluded.

### Control Subjects

Control subjects were selected in the following way. The membership files of the Southern California Kaiser Foundation Health Plan population were reviewed, and all members in the vicinity of the Los Angeles facility whose record designations ended in arbitrarily selected numbers were identified and listed. From the list, two control subjects were selected for each patient and matched for birth date within one year, area of residence by postal zip code, duration of Health Plan membership (each control subject had been a member at least as long as the associated patient), and potential for the development of endometrial cancer by the control subject's having an intact uterus. The patient and the two control subjects thus constituted a matched triple.

### Record Review

The data source for the 94 matched triples was the clinic record. To avoid information bias that could result from the more probing clinical history taking after identification of the cancer, the following procedure was employed for each matched triple. A medical-records clerk requested all three records from the record room and reviewed those of the control subjects to determine

From the Department of Obstetrics and Gynecology, Kaiser Permanente Medical Center, Los Angeles and the Department of Medical Economics, Kaiser Foundation Health Plan, Southern California Region (address reprint requests to Dr. Ziel at 4900 Sunset Blvd., Los Angeles, CA 90027).

HRT MED LIT 2046.0004

HRT PLAINTIFFS' EXHIBIT M2046 PAGE 0004