UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARGARET B. FRASER and JOSEPH T. FRASER, *Plaintiffs*, v. WYETH, INC. and WYETH PHARMACEUTICALS, INC., *Defendants*. | Civil No. 3:04cv1373 (JBA)<br><br>January 14, 2014 |

**RULING ON POST-TRIAL MOTIONS**

Following a jury trial and a verdict in favor of Plaintiffs Margaret Fraser and Joseph Fraser, Defendants Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. (collectively "Wyeth") move [Doc. # 337] pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on all of Plaintiffs' claims and move [Doc. # 339] pursuant to Federal Rule of Civil Procedure 59 for a new trial and remittitur of the punitive damages award. Plaintiffs move [Doc. # 336] for post-verdict and post-judgment interest. For the reasons that follow, Wyeth's motion for judgment as a matter of law will be denied, its motion for a new trial and remittitur will be denied, and Plaintiffs' motion for interest will be granted in part and denied in part.

**Table of Contents**

I.   Procedural Background .................................................................................................. 2

II.   Motion for Judgment as a Matter of Law [Doc. # 337] ..................................... 4

    A.    Medical Causation ................................................................................................ 4

    B.   Failure to Warn Claim ......................................................................................... 8

    C.    Design Defect Claim ........................................................................................... 12

    D.   Failure to Test Claim .......................................................................................... 15

E.   Negligent Misrepresentation Claim ........................................................................ 16

F.   Punitive Damages ...................................................................................................... 18

III.   Motion for a New Trial and Remittitur [Doc. # 339] ............................................. 22

A.   Spillover Prejudice .................................................................................................... 22

B.   Evidence of Marketing and Other Unrelated Conduct ......................................... 23

C.   Improper Expert Testimony ..................................................................................... 23

D.   Jury Instructions ....................................................................................................... 24

    1.   Design Defect ..................................................................................................... 25

    2.   Failure to Test .................................................................................................... 27

    3.   Negligent Misrepresentation ............................................................................ 27

    4.   Instruction on Preexisting Condition .............................................................. 28

    5.   Punitive Damages Instructions ........................................................................ 29

    6.   Preliminary Jury Instructions .......................................................................... 32

E.   Punitive Damages Verdict ....................................................................................... 32

F.   Manifest Weight of the Evidence ............................................................................ 33

G.   Evidence Regarding Fen-Phen ................................................................................ 33

H.   Untimely Subpoena of Dr. Deitch .......................................................................... 34

I.   The Court's Conduct at Trial .................................................................................. 35

    1.   Questioning and Commentary by the Court .................................................. 36

    2.   Dr. Minkin ......................................................................................................... 39

J.   Remittitur of Punitive Damages Award ................................................................. 40

    1.   Plaintiffs' Contingency Fee Agreement and Litigation Expenses ................ 41

    2.   Due Process Concerns ...................................................................................... 44

IV.   Motion for Post-Verdict and Post-Judgment Interest [Doc. # 336] ...................... 46

A.   Post-Verdict Interest ................................................................................................ 47

B.   Post-Judgment Interest ............................................................................................ 48

V.   Conclusion ........................................................................................................................ 49

## I.    Procedural Background

In their Complaint [Doc. # 1], Plaintiffs claimed that through its manufacture and

marketing of the hormone therapy medication Prempro, Wyeth violated the Connecticut

Products Liability Act ("CPLA") through failure to warn, strict liability for design defect, negligent failure to test, study or investigate, and negligent misrepresentation; breached implied and express warranties; violated the Connecticut Unfair Trade Practices Act ("CUTPA"); and was liable for loss of consortium.  Wyeth moved for summary judgment, which the Court granted in part and denied in part, dismissing Plaintiffs' breach of warranty and CUTPA claims, but leaving all other claims for adjudication.  *Fraser v. Wyeth* ("*Fraser I*"), 857 F. Supp. 2d 244 (D. Conn. 2012).

Following a three–and–a–half week trial, the jury returned a verdict finding Wyeth liable on all of Plaintiffs' claims—failure to provide adequate warnings, strict liability, negligent failure to test, study or investigate, and negligent misrepresentation— and awarded Ms. Fraser $3,750,000 in compensatory damages and Mr. Fraser $250,000 in loss of consortium damages.  (*See* Jury Verdict [Doc. # 275].)  The jury also found that punitive damages should be awarded against Wyeth.  (*See id.*)  In a separate ruling, this Court awarded punitive damages in the amount of $1,769,932.04,[1] based on Plaintiffs' reasonable attorneys' fees and costs.  *Fraser v. Wyeth* ("*Fraser II*"), No. 3:04cv1373 (JBA), 2013 WL 4012764 (D. Conn. Aug. 5, 2013).

---

[1] The final judgment [Doc. # 344] contains a clerical error indicating that the Court awarded punitive damages in the amount of $1,769,832.04.  However, in its ruling on punitive damages, the Court awarded $1,769,932.04 in punitive damages.  *See Fraser II*, 2013 WL 4012764, at *10.  Pursuant to Fed. R. Civ. P. 60(a), the Court "may correct a clerical mistake or mistake arising from an oversight or omission whenever one is found in a judgment, order, or other part of the record.  The [C]ourt may do so on motion or on its own, with or without notice."  Therefore, the Court directs the Clerk to correct the final judgment to reflect the correct amount of punitive damages—$1,769,932.04.

**II.      Motion for Judgment as a Matter of Law [Doc. # 337]**

A court may enter judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  The standard for judgment as a matter of law under Rule 50 "mirrors" the summary judgment standard "such that the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal citations and quotation marks omitted).  However, where a jury has deliberated and returned a verdict, the Court "may set aside the verdict pursuant to Rule 50 only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him [or her].'" *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 456 (2d Cir. 2009) (quoting *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)).

**A.      Medical Causation**

Wyeth first argues that it is entitled to judgment as a matter of law on all of Plaintiffs' claims because Plaintiffs "failed to present a legally sufficient evidentiary basis for a reasonable jury to find that Prempro caused Ms. Fraser's breast cancer."  (JMOL Mem. Supp. [Doc. # 294] at 2.)  Wyeth argues that the expert witnesses upon whom Plaintiffs relied to demonstrate causation, Drs. Roger Graham and Jedd Levine, did not

base their opinions on a reliable method or rely on sufficient, reliable data to rule out Ms. Fraser's endogenous hormones as the cause of her cancer, and that even with the testimony of these experts, the jury's determination that Prempro caused Ms. Fraser's breast cancer was based on speculation.

With respect to Dr. Graham's and Dr. Levine's methodology, Wyeth claims that their "differential diagnosis" approach to opining that Prempro was a cause of Ms. Fraser's cancer lacked any systematic method for ruling out potential causes of her cancer other than Prempro, and thus consisted of unreliable speculation.  At trial, Drs. Graham and Levine based their causation opinion testimony on Ms. Fraser's exposure to Prempro, the characteristics of her cancer, which they described as strongly positive for estrogen receptors, her relatively low overall risk factor profile, and epidemiologic evidence suggesting a link between estrogen plus progestin therapy and breast cancer.  (*See, e.g.*, Trial Tr. Vol. VIII at 1412–14, 1429–45, 1449–52; Trial Tr. Vol. IX at 1628–29, 1646, 1651–73.)  This evidence provided a sufficiently reliable foundation for these experts to eliminate other risk factors as causes of Ms. Fraser's cancer, thus isolating her Prempro use as the most probable cause.  *See Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (admissible differential diagnosis testimony requires that the expert use scientifically valid methodology to rule in the suspected cause and rule out other potential causes for the injury at issue); (*see also* Order on Wyeth's Motion to Strike Causation Testimony of Dr. Jedd Levine [Doc. # 278].)

In arguing that Dr. Graham and Dr. Levine did not rely on sufficient, reliable data to rule out Ms. Fraser's endogenous hormones as the cause of her cancer, Wyeth claims that to have reliably testified that Prempro, rather than her naturally occurring hormones, caused her cancer, these experts needed to "establish a baseline of exposure to hormones under which Ms. Fraser *could not* have developed breast cancer and then establish that she was not exposed to that baseline before taking Prempro." (JMOL Mem. Supp. at 7.) In effect, Wyeth argues that the *only* way that these experts could have reliably ruled out endogenous hormones as the cause of Ms. Fraser's cancer is if they could definitely identify a numerical value for the hormone level that would promote the development of an invasive breast cancer. Although both Dr. Graham and Dr. Levine were unable to provide such a figure at trial, they did testify that based on her reported menopausal symptoms, Ms. Fraser was estrogen deficient at the time she started Prempro, and this fact, combined with the characteristics of her cancer and epidemiologic evidence, helped rule out her own estrogen levels as a cause of her cancer. Specifically, Dr. Graham and Dr. Levine testified that epidemiologic studies such as the WHI and the Nurses' Health Study indicated that women, like Ms. Fraser, who took Prempro for at least five years, and who had low BMIs were at an even greater risk of developing breast cancer when taking Prempro. (*See* Trial Tr. Vol. VIII at 1449–52; 1488–89, 1569–72; Trial Tr. Vol. IX at 1662–67.) Dr. Graham and Dr. Levine testified that they relied on this data, and on Ms. Fraser's individual risk factors as evidenced by her medical records, such as her weight, breast density, estrogen deficiency, and the specific characteristics of her breast cancer, to

6

determine that it was more likely than not that Prempro caused her breast cancer.   Such data and evidence sufficiently and reliably supported their causation opinions.

Wyeth also argues that even if the jurors were permitted to consider the causation testimony of Dr. Graham and Dr. Levine, they would still be left to speculate as to whether Prempro was the legal cause of her breast cancer.  Specifically, Wyeth claims that because neither witness could state for certain that Ms. Fraser did not have breast cancer at the time she began taking Prempro, that she would not have developed breast cancer if she had not taken Prempro, or that some other agent did not cause her breast cancer, there was insufficient evidence to support the jury's verdict in this case.

Despite Wyeth's contentions, Dr. Graham testified that in his opinion Ms. Fraser did not have breast cancer at the time she began taking Prempro, because none of her medical records indicated a presence of the disease, and because the specific characteristics of Ms. Fraser's cancer did not indicate that it had been a cancer in 1996. (*See* Trial Tr. Vol. VIII at 1407.)   Dr. Levine also testified that Ms. Fraser's medical records indicated that she developed ductal carcinoma in situ after taking Prempro, rather than before.  (*See* Trial Tr. Vol. IX at 1634–35.)  The jury could have relied on this testimony to conclude that Ms. Fraser did not have breast cancer at the time she began taking Prempro, even if the witnesses could not pinpoint where exactly she was on the cancer progression diagram at the time she began taking the medication.

Dr. Levine also testified that he estimated that based on her overall profile, Ms. Fraser would have had about a ten percent risk of developing breast cancer even if she

had never taken Prempro.  (*See id.* at 1645–46.)  Dr. Graham similarly testified that Ms.

Fraser had between an 11.4% and a 13.5% lifetime risk of developing breast cancer.  (*See*

Trial Tr. Vol. IX at 1546–50.)  The jury could have relied on this testimony to conclude

that it was more likely than not that Ms. Fraser would not have developed breast cancer in

her lifetime if she had not taken Prempro.

Finally, although neither Dr. Graham nor Dr. Levine could testify to an absolute

certainty that Prempro was the sole cause of Ms. Fraser's breast cancer, both witnesses

testified that based on Ms. Fraser's estrogen deficiency at the time she started taking

Prempro, her other underlying risk factors, her level of exposure to Prempro, the

hormone-receptor-positive nature of her cancer and epidemiological data, that Prempro

was a substantial contributing factor to her breast cancer.  (*See, e.g.*, Trial Tr. Vol. VIII at

1412–14, 1429–45, 1449–52; Trial Tr. Vol. IX at 1628–29, 1646, 1651–73.)   The jury

could have properly relied on this testimony to conclude that it was more likely than not

that Prempro was the medical cause of Ms. Fraser's breast cancer.

Therefore, Wyeth's motion for judgment as a matter of law as to medical

causation is denied.

### B.      Failure to Warn Claim

Wyeth argues that Plaintiffs' failure to warn claim fails as a matter of law because

Prempro's FDA-approved label was adequate as a matter of law and Dr. Blume's

testimony cannot properly be used to challenge the sufficiency of the warning.  Wyeth

further argues that because its duty to warn ran only to Ms. Fraser's prescribing

physician, Dr. Tesoro, and Plaintiffs did not present any "affirmative evidence that a different warning would have changed Dr. Tesoro's decision to prescribe Prempro to Ms. Fraser," Plaintiffs did not establish proximate causation on this claim.   (JMOL Mem. Supp. at 12.)[2]

As the jury was instructed, under the learned intermediary doctrine, Wyeth had a duty to adequately warn Ms. Fraser's prescribing physician, Dr. Tesoro, of the risk and dangers associated with Prempro use.  *See Vitanza v. UpJohn Co.*, 257 Conn. 365, 370 (2001).  An overly broad or confusing warning will not suffice to discharge a prescription drug manufacturer's duty to adequately warn a prescribing physician, *De Souza v. Tap Pharm., Inc.*, 3:03cv2247 (MRK), 2006 WL 1328754, *1 (D. Conn. Jan. 3, 2006), nor is the mere mention or equivocal reference to a particular injury sufficient, *see Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 853 (10th Cir. 2003) ("[M]ere mention of a possible injury . . . is not necessarily adequate."); *Erony v. Alza Corp.*, 913 F. Supp. 195, 200 (S.D.N.Y. 1995) (incomplete package warnings "did not adequately inform users of the potential dangers from used [Duragesic] patches").

At the time Ms. Fraser took Prempro, its label provided the following warning:

---

[2] Wyeth also argues that judgment as a matter of law is warranted because the evidence that Ms. Fraser took Vagifem, an HRT medication, after she was diagnosed with breast cancer, indicates that she would have taken Prempro even if the warning about the risk of breast cancer had been stronger.  However, as Wyeth concedes "whether [Ms.] Fraser may have acted differently if the Prempro warning were written otherwise is irrelevant as a matter of law on the issue of whether Wyeth met its duty to warn" because under the learned intermediary doctrine, the duty to warn ran to Ms. Fraser's prescribing physician, and not to her.  (Defs.' Renewed JMOL Reply [Doc. # 347] at 2.)

> *Breast cancer.* Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2.0) in those women on estrogen replacement therapy taking higher doses, or in those taking lower doses for prolonged periods of time, especially in excess of 10 years. The majority of studies, however, have not shown an association in women who have ever used estrogen replacement therapy.
>
> The effect of added progestins on the risk of breast cancer is unknown, although a moderately increased risk in those taking combination estrogen/progestin therapy has been reported. Other studies have not shown this relationship.

(Defs.' Ex. 34 at 2.)  Wyeth claims that this warning was adequate as a matter of law because it was approved by the FDA on several occasions.  However, at trial, the jury heard testimony from Dr. Cheryl Blume that the statement that breast cancer risk was limited to women taking high doses or to those taking estrogen for prolonged periods of time "is not true" and "was outdated."  (Trial Tr. Vol. IV at 718–19, 733–34.)  Wyeth argues that Dr. Blume's testimony cannot sustain Plaintiffs' claims because her testimony regarding Wyeth's actions was not based on an objective standard.  However, Dr. Blume, based on her extensive experience, testified as to the industry standard of pharmacovigilance (*see* Trial Tr. Vol. II at 202–03), and opined that Wyeth had violated that standard with respect to the Prempro label (*see, e.g.*, *id.* at 737–38 (testifying that the failure to include information regarding the risk of dying from breast cancer in the Prempro label violated the duties of pharmacovigilance and the FDA regulations)).  Therefore, the jury could have properly relied on her testimony to conclude that the Prempro label was misleading and inadequate.

The jury also saw excerpts from Dr. Tesoro's videotaped deposition in which he testified that he was aware of the moderate increased risk of breast cancer when taking E+P.  (Tesoro Dep., Parties' Deposition Designations [Doc. # 250] at 53).  Wyeth argues

that because Dr. Tesoro already knew that Prempro posed a moderate increased risk of breast cancer, even if the Prempro warning was inadequate, Plaintiffs cannot establish that the inadequate warning was the proximate cause of their injuries. *See, e.g., McClamrock v. Eli Lily and Co.*, 504 F. App'x 3 (2d Cir. 2012) (holding that because plaintiff failed to offer evidence that the prescribing physician was unaware that diabetes was a risk associated with Zyprexa when he prescribed it, plaintiff could not show proximate causation). However, when Dr. Tesoro was questioned further regarding the Prempro label, he stated that in his opinion it did not provide "any actual warning of breast cancer" because of the reassuring language stating that some studies had not shown a relationship between E+P and breast cancer. (Tesoro Dep. Tr. at 104–05). Thus, Dr. Tesoro's complete testimony was that although he was aware that the Prempro label in one area discussed a moderately increased risk of breast cancer, he was unaware of the true risk of breast cancer associated with Prempro. Therefore, Wyeth's argument on this ground is without merit.

Wyeth also argues that Plaintiffs failed to establish that a different warning would have would have prevented Ms. Fraser's injuries. In his deposition, Dr. Tesoro testified that if he had been given complete information on the risk of breast cancer, he would have given Ms. Fraser "less of an option to go on it," and possibly would not even have recommended it to her. (*Id.* at 138–39.) He also stated that if the Prempro label had included warnings that the risk of breast cancer was greater in thin women taking Prempro, that breast cancer tumors in women taking E+P were larger and diagnosed at later stages, and that there is an increased risk of breast cancer for each year women stay on the medication, that information would have been "very important" to him and he would have passed it along to Ms. Fraser. (*Id.* at 106–08.) Thus Plaintiff did present

11

evidence that if Dr. Tesoro had been given the proper warnings regarding the risk of developing breast cancer faced by someone like Ms. Fraser, he would have had a different conversation with Ms. Fraser and would have possibly made a decision not to prescribe it. Ms. Fraser also testified that if all of the warnings regarding breast cancer now present in the Prempro's black box label had been passed on to her by Dr. Tesoro, she would not have taken Prempro.  (*See* Trial Tr. Vol. X at 1942.)

Having heard the testimony described above, the jury was not forced to base its verdict on failure to warn on sheer conjecture or surmise, but instead was presented with competent evidence to reasonably find that the Prempro label did not adequately warn Dr. Tesoro of the full risk of breast cancer associated with Prempro, and that if it had, Ms. Fraser would not have taken Prempro.  Wyeth's motion for judgment as a matter of law on Plaintiffs' failure to warn claim is therefore denied.

**C.      Design Defect Claim**

Wyeth argues that it is entitled to judgment as a matter of law on Plaintiffs' design defect claim because that claim is barred by comment *k* to the Restatement (Second) of Torts § 402A, because there was not a legally sufficient evidentiary basis to sustain this claim, and because the Court should have used the legal test for design defect set forth in the Restatement (Third) of Torts: Products Liability § 6(c), under which Plaintiffs' design defect claim fails as a matter of law.

Comment *k* reads in part:

There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. . . . The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is

> not to be held to strict liability for unfortunate consequences attending
> their use, merely because he has undertaken to supply the public with an
> apparently useful and desirable product, attended with a known but
> apparently reasonable risk.

Rest. (2d) Torts § 402A, cmt. (k).  In *Vitanza*, the Connecticut Supreme Court held that "[p]rescription drugs generally fall within the classification of 'unavoidably unsafe' products," and that their manufacturers "can avoid strict liability if the product is 'properly prepared, and accompanied by proper directions and warning.'"  257 Conn. at 375 (quoting Rest. (2d) Torts § 402A, cmt. (k)).  Thus, pursuant to *Vitanza*, Plaintiffs' design defect claim against Wyeth is barred by comment *k* only *if* Prempro was "accompanied by proper directions and warning."   In this case the jury found, as discussed above, that Prempro was not accompanied by a proper warning sufficient to alert Dr. Tesoro of the danger of breast cancer.  Comment *k* therefore does not bar the design defect claim against Wyeth.

Wyeth argues that Plaintiffs lacked a sufficient evidentiary basis to support their design defect claim because they presented "no evidence as to any purported alternative design, no evidence that such a design was FDA-approved and on the market at the relevant time, [and] no evidence that any such alternative was safer and would have prevented Plaintiff's injuries."  (JMOL Mem. Supp. at 29–30.)  Under Connecticut law, however, a plaintiff is not required to prove the existence of a safer alternative design to succeed on a design defect claim.  To prevail on a design defect claim in Connecticut, a plaintiff must demonstrate that the product at issue is unreasonably dangerous under the "consumer expectation" standard "which provides that 'the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as

to its characteristics.'" *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 214 (1997) (quoting Rest. (2d) Torts § 402A, cmt. (i)).   The Connecticut Supreme Court has explicitly rejected the requirement that a plaintiff must prove the existence of a reasonable alternative design.  *Id.* at 215.

Wyeth further argues that the Court erred in applying the consumer expectation test espoused by the Connecticut Supreme Court in *Potter* to this case, claiming that this standard "does not fit a design defect claim regarding a prescription drug—a complex chemical compound that is only available through [] independent medical experts." (JMOL Mem. Supp. at 28–29 n.26.)  The court in *Potter*, however, recognized "that there may be instances involving complex product designs in which an ordinary consumer may not be able to form expectations of safety."  241 Conn. at 219.  The court modified the consumer expectation test for such instances "by incorporating risk-utility factors into the ordinary consumer expectation analysis."  *Id.* at 220.  This modified consumer expectation test allows a jury to consider: "the usefulness of the product, the likelihood and severity of the danger posed by the design, the feasibility of an alternative design, the financial cost of an improved design, the ability to reduce the product's danger without impairing its usefulness or making it too expensive, and the feasibility of spreading the loss by increasing the product's price."  *Id.* at 221.  The Court employed the modified consumer expectation test in this case, and instructed the jury on each of these relevant, but not required factors.  (*See* Jury Inst. [Doc. # 280] at 22–23.)

With respect to the argument that Plaintiffs' design defect claim fails under the design defect test set forth in the Restatement (Third) of Torts: Products Liability § 6(c), Wyeth urges on the Court a design defect standard that has not been adopted by any Connecticut court.   Absent any indication from any court in this state that the

Connecticut Supreme Court would likely adopt Wyeth's proposed design defect instead of the modified consumer expectation test set forth in *Potter*, this federal court, sitting in diversity, declines to do so.  *See Runner v. New York Stock Exchange*, 568 F.3d 383, 386 (2d Cir. 2009) ("[O]ur role as a federal court sitting in diversity is not to adopt innovative theories that may distort established state law.  Instead we must carefully predict how the state's highest court would resolve the uncertainties that we have identified." (quoting *The Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005)).

Wyeth is therefore not entitled to judgment as a matter of law on Plaintiffs' design defect claim.

### D.   Failure to Test Claim

Wyeth argues that it is entitled to judgment as a matter of law on Plaintiffs' failure to test claim because that claim is not an independent tort, but is instead subsumed within Plaintiffs' failure to warn claim.  Plaintiffs do not address Wyeth's argument on the failure to test claim in their opposition.  (*See* JMOL Opp'n [Doc. # 300].)  In their supplemental briefing on Wyeth's renewed motion, Plaintiffs do include a section on Wyeth's arguments regarding failure to test claim.  (*See* Suppl. JMOL Opp'n [Doc. # 345] at 33.)  However, that section consists only of Plaintiffs' statement that they incorporate by reference their original opposition, which did not address Wyeth's argument.  (*Id.*) Nonetheless, in their opposition to Wyeth's motion for a new trial, Plaintiffs do address Wyeth's argument that their failure to test claim was not legally cognizable.  Thus, contrary to Wyeth's contention in its reply brief, Plaintiffs have not abandoned this claim.

Contrary to Wyeth's arguments, Connecticut law recognizes negligent failure to test as a basis for product liability independent from failure to warn.  "The definition of products liability, § 52-57m(b) covers damage caused by the manufacture, construction,

15

design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling any product." *Bogrette v. Clark Equipment Co.*, No. CV 97-0258940S, 1998 WL 252354, at *5 (Conn. Super. Ct. May 8, 1998) (noting that the plaintiff's products liability claim was based on the defendants' "failure to give warning of the dangerous propensities as designed, manufactured or distributed as well as defendant Clark's failure to test and design when defendant knew or should have known of the forklift's potential danger"); *see also Beers v. Bayliner Marine Corp.*, 236 Conn. 769, 772 (1996) ("The plaintiffs claim that their injuries were caused by the defective condition of the boat, and that the defendant is liable for their injuries under inter alia, product liability theories of manufacturing defect, design defect, failure to warn of those defects and failure to test adequately the boat."). *Cf. Densberger v. United Technologies Corp.*, 297 F.3d 66, 70–71 (2d Cir. 2002) (manufacturer has continuing duty to study and warn consumers). Thus, Plaintiffs' failure to test claim was not subsumed in their failure to warn claim. At trial, the jury heard testimony from Dr. Blume that Wyeth breached its duty to test (Trial Tr. Vol. IV at 756 ("[T]here was a failure to warn, and we have seen there was a failure to test because the pivotal data didn't need to wait until 2002, 2003, they could have been done much earlier.").)

Therefore, Wyeth's motion for judgment as a matter of law on Plaintiffs' failure to test claim is denied.

### E.    Negligent Misrepresentation Claim

Wyeth argues that it is entitled to judgment as a matter of law on Plaintiffs' negligent misrepresentation claim because this claim is duplicative of Plaintiffs' failure to warn claim in that it is based on a misrepresentation in the Prempro label and because Plaintiffs did not meet their burden of proving that Wyeth made an express, false

statement of fact, that Wyeth knew or should have known that the statement was false, that Dr. Tesoro relied on the statement, or that the statement caused Ms. Fraser's cancer.

With respect to Wyeth's first argument, the CPLA explicitly states that the term "'[p]roduct liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent." Conn. Gen. Stat. § 52-572m(b). Thus, Connecticut law recognizes a product liability claim for negligent misrepresentation that is distinct from a failure to warn claim. Therefore, Plaintiffs' negligent misrepresentation claim was not duplicative of their failure to warn claim.

A defendant "who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if [it] fails to exercise reasonable care or competence in obtaining or communicating the information." *Glazer v. Dress Barn, Inc.* 247 Conn. 33, 73 (2005) (internal citations and quotation marks omitted). To succeed on their negligent misrepresentation claim, Plaintiffs had the burden of proving that Wyeth made a misrepresentation of fact that it knew or should have known was false, that Dr. Tesoro reasonably relied on that misrepresentation, and that Ms. Fraser suffered harm as a result. *See id.*

As discussed above, Plaintiffs did present evidence that there were multiple misstatements in the Prempro labeling, and that Dr. Tesoro relied on those misstatements in deciding to prescribe Prempro to Ms. Fraser. (*See* Trial Tr. Vol. IV at 718–19, 733–34;

Tesoro Dep. Tr. at 104–05, 138–39).  Furthermore, the jury also heard testimony from Ms. Fraser that she had been influenced by misleading marketing materials for Prempro, and that these advertisements had supported her decision that it would be good for her to take Prempro.  (*See* Trial Tr. Vol. X at 1891–97, 1973.)  The jury could have reasonably relied on this testimony to find that Wyeth made factual misrepresentations upon which Dr. Tesoro relied in deciding to prescribe Prempro to Ms. Fraser, and that Ms. Fraser suffered harm as a result.

Therefore, Wyeth is not entitled to judgment as a matter of law on Plaintiffs' negligent misrepresentation claim.

### F.    Punitive Damages

Wyeth moves for judgment as a matter of law on Plaintiffs' claim for punitive damages, arguing that Plaintiffs failed to present evidence that could form a sufficient evidentiary basis for an award of punitive damages and that such an award would violate Wyeth's right to due process of law.

Under Connecticut law, "[p]unitive damages may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product." Conn. Gen. Stat. § 52-240b.   "The flavor of the basic requirement to justify an award of punitive or exemplary damages has been repeatedly described in terms of wanton or malicious injury, evil motive and violence . . . . Punitive damages may be awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others." *Lydall, Inc. v. Ruschmeyer*, 282 Conn. 209, 245 (2007) (internal citations and quotation marks omitted).  Thus, Plaintiffs had the burden

of proving that Wyeth acted with reckless disregard for the safety of Ms. Fraser in order to succeed on their punitive damages claims.

Contrary to Wyeth's characterization of the record at trial, the jury heard ample evidence based on which they could have concluded that Wyeth acted with reckless disregard in the studying, labeling, and promotion of Prempro, thereby causing harm to Ms. Fraser.  For example, the jury saw an internal document from 1976 that indicated that "there is a valid concern as to whether or not the use of exogenous estrogen leads to an increase in the incidence of breast cancer." (PX28.)  The jury also saw minutes from a 1990 meeting of the FDA advisory committee in which the committee concluded that there still were insufficient data to determine if E+P posed an increased risk of breast cancer.  (See PX134A at 3.)  Dr. Deitch testified that in the intervening twenty-five years, Wyeth had not performed the necessary studies to answer this question.  (*See* Trial Tr. VI at 1086–88.)

Furthermore, the jury also saw evidence that in response to the Collaborative Study, Wyeth instructed its sales representatives not to raise recent news reports covering the study with their doctors, and that if any doctor brought up the study, it instructed its sales representatives to "highlight that these reports say nothing new about HRT and breast cancer and that the long term benefits of HRT still by far outweigh any risks." (PX 20957.)   At trial, Dr. Blume testified that this directive violated Wyeth's duty of pharmacovigilance and expressed her shock at Wyeth's misleading characterization of the study's findings.  (*See* Trial Tr. Vol. IV at 759–60 ("I just can't see how one would get to that point.").)

In fact, Dr. Blume testified extensively that Wyeth had ignored multiple "red flags" regarding the risk of breast cancer posed by E+P.  (*See generally* Trial Tr. Vol. III;

Trial Tr. Vol. IV.)  The jury also heard excerpts of a deposition of Dr. Colditz in which he testified that Wyeth "didn't want to hear" the results of the research they commissioned him to do regarding the correlation between E+P and breast cancer.  (*See* Colditz Dep. Tr., Ex. 2 to Notice of Deposition Designations [Doc. # 186] at 803–10.)  Furthermore, the jury heard testimony that during this entire time, Wyeth was conducting an at times misleading marketing campaign that Ms. Fraser testified made her feel better about her decision to take Prempro.  (*See* Trial Tr. Vol. X at 1891–97, 1973.)

Thus there was evidence at trial that Wyeth consciously ignored warning signs, failed to conduct proper studies, and obfuscated facts, all while aggressively marketing a product the risks of which it did not fully understand.   Therefore, there was sufficient evidence for the jury to conclude that Wyeth acted with reckless disregard for Ms. Fraser's safety and that punitive damages were warranted.

Wyeth next argues that even if there is sufficient evidence to support a punitive damages award, such an award does not comport with the requirements of due process, and that it is therefore entitled to judgment as a matter of law on this issue.   The gravamen of Wyeth's argument is that because it complied with FDA requirements and regulations, and provided a warning of the risk of breast cancer in the Prempro label, its conduct was not so reprehensible that it can be fairly charged with punitive damages.  *See Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1035 (D.C. Cir. 1980) ("An airline may not be condemned as a wanton wrongdoer for conforming to the standards set and the practices approved by the agency charged with the duty of regulating its standards and practices that the agency has found to be in the public interest.").  Here, although the FDA ultimately approved the Prempro label, Dr. Blume testified that Wyeth did not comply with the industry standard of pharmacovigilance and actively avoided performing

20

the studies and tests that would have mandated stronger warnings.  Several witnesses also testified that the Prempro label was reassuring, misleading, and false.  Furthermore, there was evidence that Wyeth purposefully attempted to obfuscate and downplay the risks of Prempro, to the extent that it congratulated itself on turning the FDA advisory committee meeting into a "non-event."  (PX133.)  Such evidence belies Wyeth's claims of making a good faith effort to comply with government regulations.

Wyeth also argues that the Court may not consider evidence of its ghostwriting, marketing, and advertising conduct because Dr. Tesoro did not rely on these materials in prescribing Prempro to Ms. Fraser and because it has a First Amendment right to conduct such activity.  Wyeth relies on *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2002) for the proposition that such evidence should be excluded from the punitive damages analysis.  In *State Farm*, the Supreme Court held that evidence of the defendant's lawful, out-of-state claim processing policies that were completely unrelated to the type of claim at issue in the lawsuit was not an appropriate basis on which to award punitive damages.  *Id.* 422–24.

Here, unlike the dissimilar acts at issue in *State Farm*, the evidence of Wyeth's marketing efforts for Prempro was directly related to the harm suffered by Plaintiffs because it formed a part of a single course of conduct with respect to the specific medication at issue in this case.  Such evidence was relevant to Plaintiffs' strict liability design defect claim without a showing of Dr. Tesoro's reliance because it bore on consumers' expectations.   Furthermore, Ms. Fraser testified at trial that she did in fact view some of the Prempro advertisements and that they made her feel better about her continued use of the drug.  Finally, although Wyeth does have a First Amendment right to promote its products, First Amendment protection does not extend to false or

21

misleading statements.  *See, e.g.*, *United States v. Caronia*, 703 F.3d 149, 165 n.10 (2d Cir. 2012) ("Of course, off-label promotion that is false or misleading is not entitled to First Amendment protection.").  Thus, the jury could have properly considered this evidence in assessing punitive damages without violating Wyeth's due process rights.

Therefore, Wyeth is not entitled to judgment as a matter of law on Plaintiffs' punitive damages claim.

## III.   Motion for a New Trial and Remittitur [Doc. # 339]

"The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "A new trial must be granted if the court determines that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving."  *Santa Maria v. Metro–North Commuter R.R.*, 81 F.3d 265, 273 (2d Cir. 1996).  The grant of a new trial is also appropriate when, "in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998).

### A.   Spillover Prejudice

Wyeth argues that it is entitled to a new trial because as Plaintiffs' claims of design defect, failure to test, and negligent misrepresentation are not legally cognizable as a matter of Connecticut law, it was improperly prejudiced when the jury's attention was drawn to the evidence related to those alleged breaches.  Since the Court has concluded

that Plaintiffs' design defect, failure to test, and negligent misrepresentation claims are independent, legally cognizable claims, this argument is without merit.

### B.  Evidence of Marketing and Other Unrelated Conduct

Wyeth next argues that the Court improperly admitted evidence regarding its marketing and advertising, and that this improperly admitted evidence "infected the entire trial and unfairly prejudiced Wyeth, requiring a new trial on all issues."  (Wyeth's Mem. Supp. New Trial [Doc. # 296] at 11.)  Wyeth argues again, as it did in its motion for judgment as a matter of law, that because Plaintiffs did not establish that Dr. Tesoro relied on any marketing or advertising materials, this evidence was irrelevant to Plaintiffs' claims.  However, as the Court held in ruling on Wyeth's motion to exclude this evidence (*see* Pretrial Tr. Vol. I at 33–35), and as is discussed above, evidence of Wyeth's marketing, advertising, and ghost-writing efforts was relevant to Plaintiffs' strict liability claim under the modified consumer expectation test, as well as to Plaintiffs' punitive damages claim.  *See Guglielmo v. Klausner Supply Co.*, 158 Conn. 308, 315 (1969) ("[I]n a cause of action based on strict liability in tort it is unnecessary for the plaintiff to prove either his privity of contract with the seller or his reliance on any representation or undertaking of the seller.").  Furthermore, Ms. Fraser testified that she did view some advertising for HRT, and that she felt better about her decision to continue taking Prempro based on the claims in those ads.  Therefore, because this evidence was properly admitted, Wyeth's argument regarding undue prejudice is unavailing.

### C.  Improper Expert Testimony

Wyeth argues that it is entitled to a new trial because the Court improperly admitted expert testimony on medical causation from Dr. Levine and Dr. Graham, and on Wyeth's conduct and breach of its legal duties from Dr. Blume. The Court had

occasion to address and reject many of the arguments raised by Wyeth regarding these witnesses both before and during trial.   (*See, e.g.*, Endorsement Order Regarding Evidentiary Matters [Doc. # 204]; Order Denying Motion to Strike the Causation Opinions of Dr. Jedd Levine [Doc. # 278].)   Furthermore, to the extent that Wyeth objects to specific trial testimony given by these witnesses, the Court has addressed those arguments above in its ruling on Wyeth's motion for judgment as a matter of law.   The causation testimony of Dr. Graham and Dr. Levine relied on sufficient scientific methodology and reliable data, and the testimony of Dr. Blume was based on her experience and the objective industry standard of pharamcovigilance.   Therefore, the admission of testimony from these experts was not improper and does not provide sufficient grounds for the granting of a new trial.

### D.      Jury Instructions

Wyeth argues that it is entitled to a new trial based on several errors in the Court's jury instructions.   Specifically, Wyeth argues that 1) the Court should not have charged the jury on Plaintiffs' design defect claim, and that the charge given on that claim was erroneous; 2) the Court should not have charged the jury on Plaintiffs' failure to test claim; 3) the Court should not have charged the jury on Plaintiffs' negligent misrepresentation claim; 4) there was no basis to charge the jury on a preexisting condition; 5) the Court's instructions regarding punitive damages were legally erroneous and the Court committed legal error by failing to give Wyeth's proposed charge regarding punitive damages; and 6) that the Court's preliminary jury instructions were erroneous. (*See* Wyeth's Mem. Supp. New Trial at 18–29, 40 n.61.)

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Cameron v. City of New*

*York*, 598 F.3d 50, 68 (2d. Cir. 2010).  "A jury instruction is proper so long as the charge correctly and sufficiently covers the case to allow the jury intelligently to decide the questions presented to it."  *Bruneau v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, 761 (2d Cir. 1998) *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 55 U.S. 246 (2009).  When determining whether jury instructions were erroneous, the Court must ask "whether considered as a whole, the instructions adequately communicated the essential ideas to the jury."  *United States v. Schultz*, 333 F.3d 393, 414 (2d Cir. 2003) (internal citations and quotation marks omitted).  If an instruction is erroneous, a new trial must be granted, unless the error was harmless.  *See United States v. Bah*, 574 F.3d 106, 114 (2d Cir. 2009).  "An error is harmless only if the court is convinced that the error did not influence the jury's verdict."  *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).  "Where jury instructions create an erroneous impression regarding the standard of liability, it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted."  *LNC Invest., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 463 (2d Cir. 1999).

### 1.    Design Defect

Wyeth argues that the Court should not have instructed the jury on Plaintiffs' design defect claim because, pursuant to comment *k*, Connecticut law does not recognize a strict liability design defect claim for prescription drugs.  However, as discussed above, comment *k* would bar Plaintiffs' claims only if Prempro had been accompanied by a proper warning, which the jury found it was not.  *Cf. Moss v. Wyeth*, 872 F. Supp. 2d 162, 169 (D. Conn. 2012) (holding that comment *k* applies on a case-by-case basis and not as blanket immunity for all prescription drug design defect claims).  Wyeth argues that under the Court's theory, Plaintiffs' design defect claim is subsumed within its failure to

warn claim.  In support of this argument, Wyeth relies on *Mutual Pharmaceutical Co.,* *Inc. v. Bartlett*, 133 S. Ct. 2466 (2013).   However, Wyeth's reliance on *Bartlett* is misplaced.  In *Bartlett*, the Supreme Court held that a state law "warning-based design-defect cause of action" against a generic drug manufacturer was preempted by federal law prohibiting generic drug manufacturers from altering the label for a drug.  *Id.* at 2477. Wyeth focuses on the Court's language indicating that a pharmaceutical manufacturer cannot change the design of a drug "as a matter of . . . basic chemistry" *id.* at 2470, to argue that Plaintiffs' design defect claim was therefore subsumed in its failure to warn claim.  However, *Bartlett* does not hold that a plaintiff cannot bring both a design defect and a negligent failure to warn claim based on improper labeling.  Rather, it recognized that the plaintiff's state-law design defect claim was based on a defective warning. Therefore, the Court concludes that Plaintiffs' design defect claim was properly submitted to the jury.

Wyeth next argues that the design defect instruction submitted to the jury was erroneous, because it included mention of the consumer expectations test, and that the Court should have instructed the jury based on the test set forth in the Restatement (Third) of Torts:  Products Liability § 6(c).  The Court instructed the jury on Plaintiffs' design defects claim as follows:

> To prove that Prempro was defective, Plaintiffs must prove by a preponderance of the evidence that Prempro was an unreasonably dangerous product.  A product is unreasonably dangerous if, at the time of sale, it is defective to an extent beyond that which would be contemplated by the ordinary consumer.
>
> In considering the ordinary consumer's expectations with respect to Prempro you should weigh Prempro's benefits against the risks inherent in its intended or reasonably foreseeable uses.  You must decide whether, in light of Prempro's risks and benefits, a reasonable consumer would consider this prescription drug unreasonably dangerous.  Relevant factors

to this evaluation include the usefulness of Prempro, the likelihood and severity of the risks, including breast cancer, posed by Prempro, the feasibility of an alternative design, and Wyeth's ability to reduce Prempro's danger without impairing its usefulness or making it too expensive. These factors are for your consideration in evaluating the existence of a product defect, however Plaintiffs need not demonstrate any particular factor to prove a defect. In weighing the risks of Prempro against its utility, your focus should be on Prempro itself, and not on Wyeth's conduct.

(Jury Inst. at 22–23.) As the Court held at the summary judgment phase, *see Fraser I*, 857 F. Supp. 2d at 255–57, and in connection with Wyeth's motion for judgment as a matter of law, under Connecticut law, the modified consumer expectations test described in *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199 (1997), and not the test set forth in the Restatement (Third) of Torts: Products Liability § 6(c), applies to Plaintiffs' design defect claim. The Court's instruction accurately conveyed the applicable legal standard to the jury, and therefore Wyeth is not entitled to a new trial on this ground.

### 2.   Failure to Test

Wyeth argues that Plaintiffs' failure to test claim was subsumed by their failure to warn claim and that it was therefore erroneous to charge the jury separately as to this claim. However, an independent claim for failure to test does exist under Connecticut law. *See Beers v. Bayliner Marine Corp.*, 236 Conn. 769, 772 (1996); *Bogrette v. Clark Equipment Co.*, No. CV 97-0258940S, 1998 WL 252354, at *5 (Conn. Super. Ct. May 8, 1998). Therefore, it was not erroneous to instruct the jury as to this distinct claim, and Wyeth is not entitled to a new trial on this ground.

### 3.   Negligent Misrepresentation

Wyeth also argues that Plaintiffs did not have a cause of action for negligent misrepresentation distinct from their failure to warn claim and that it was therefore erroneous to instruct the jury that this was an independent claim. Nonetheless the CPLA

recognizes negligent misrepresentation as a theory of liability distinct from negligent failure to warn.  *See* Conn. Gen. Stat. § 52-572m(b).  Therefore, it was not erroneous to instruct the jury that this was an independent cause of action, and Wyeth is not entitled to a new trial on this ground.

### 4.    *Instruction on Preexisting Condition*

Wyeth next argues that the Court's "preexisting condition" instruction was not warranted by the facts of the case and was unduly prejudicial.   With respect to "preexisting condition," the Court instructed the jury as follows:

> If you find that Ms. Fraser likely had a preexisting abnormal breast cell condition prior to taking Prempro, but that Plaintiffs have proved by a preponderance of the evidence that Prempro substantially contributed to the development of her breast cancer, Plaintiffs will have proved that Prempro was a proximate cause of Ms. Fraser's breast cancer.  However, if you find that Ms. Fraser had already developed invasive ductal breast cancer prior to even taking Prempro, then Plaintiffs will have failed to prove that Prempro was a proximate cause of Ms. Fraser's breast cancer.

(Jury Inst. at 19.)   Wyeth argues that Plaintiffs have not established that this is a cognizable preexisting injury under Connecticut law, that having abnormal breast cells is a universal condition not susceptible to the "eggshell plaintiff" rule, that such a charge is inconsistent with Plaintiffs' claim that Ms. Fraser was at a low risk for breast cancer, and that Plaintiff's promotion theory could have been properly argued to the jury in the general proximate cause instruction.

However, during trial, the jury heard testimony from Plaintiffs' experts regarding Ms. Fraser's abnormal breast cells, the progression of breast cancer, and the promotion of hormone-receptor positive breast tumors similar to Ms. Fraser's.  (*See, e.g.*, Trial Tr. Vol. III at 1404–08.)   Thus, the "preexisting condition" instruction given to the jury was properly tailored to the facts of the case and the parties' competing theories regarding the

28

causation and development of Ms. Fraser's cancer.  The Second Circuit has recognized that "a district court must tailor its instructions to the facts of the case before it."  *United Sates v. Lung Fong Chen*, 393 F.3d 139, 147 (2d Cir. 2004).  Therefore, this instruction was not erroneous.

Furthermore, even if it was an error to give this charge to the jury, Wyeth has not established that it suffered prejudice as a result.  Wyeth argued that the instruction validated the legal and factual theories that Plaintiffs had to prove.   However, the "preexisting condition" instruction is clearly phrased in the conditional, emphasizing that it is up to the jury to determine what facts had been proven.  Furthermore, the jury was instructed multiple times throughout the charge that they were the sole judges of fact.  (*See, e.g.*, Jury Inst. at 5 ("As members of the jury, you are the sole and exclusive judges of the facts. . . . Because you are the sole and exclusive judges of the facts, nothing in the instructions and nothing I have said during the trial reflects any opinion from me as to what your verdict should be.").   Because the Court must consider the instructions as a whole in determining whether an error warranting a new trial was committed, *see Schultz*, 333 F.3d at 414, and because jurors are presumed to follow a court's instructions, *see Shannon v. United States*, 512 U.S. 573, 585 (1994) (noting "the almost invariable assumption of the law that jurors follow their instructions"), Wyeth is not entitled to a new trial on this ground.

5.    *Punitive Damages Instructions*

Finally, Wyeth argues that the Court erroneously charged the jury regarding punitive damages.  Specifically, Wyeth argues that it was legal error to charge the jury regarding deterrence of future wrongful acts by other pharmaceutical companies, and that the Court should have adopted Wyeth's proposed instructions on punitive damages

29

including instructions that 1) the jury could only consider conduct that harmed Plaintiffs and could not consider harms to persons other than Plaintiffs; 2) punitive damages may not be awarded based on lawful conduct; 3) the jury could not consider conduct outside of Connecticut; 4) the jury could not award punitive damages if reasonable people could disagree about the lawfulness of Wyeth's actions; 5) punitive damages are not appropriate where a defendant has complied with applicable government standards; and 6) the jury could not consider data that became available after Ms. Fraser stopped taking Prempro.

The Court instructed the jury that "[p]unitive damages are awarded to punish a defendant for extreme or outrageous conduct that harmed the Plaintiffs, and to deter or prevent a defendant and others like it from committing such conduct in the future. . . . [Y]ou should consider whether punitive damages are likely to deter or prevent other pharmaceutical companies from performing wrongful acts similar to those that Wyeth was proved to have committed."  (Jury Inst. at 30–31.)  Wyeth argues that this instruction violates its right to due process because punitive damages can only be based on harm Wyeth caused to Plaintiffs, and not on deterrence of third parties.  Wyeth further argues that although the Court did instruct the jury to focus on "extreme or outrageous conduct that harmed the Plaintiffs" in determining whether to award punitive damages (Jury Inst. at 30), it should have also included a negative instruction that the jury could not consider harms to other persons.

Under Connecticut law, "the purpose of punitive damages is not merely to deter a particular defendant from future misconduct but to deter others from committing similar wrongs."  *Champagne v. Raybestos-Manhattan, Inc.* 212 Conn. 509, 562–63 (1989).  Contrary to Wyeth's argument, this goal is not inconsistent with the requirement that a defendant be punished only for its actions harming a particular plaintiff.  The jury

instructions given by the Court are similar to the model Connecticut civil jury instructions, *see* Connecticut Civil Jury Instructions, § 3.4-4, *available at* http://www.jud.ct.gov/JI/civil/part3/3.4-4.htm (last visited Jan. 11, 2014) ("Punitive damages are damages awarded not to compensate the plaintiff for any injury or losses but to punish the defendant for outrageous conduct and to deter (him/her) and others like (him/her) from similar conduct in the future.") and also track the model federal jury instructions on punitive damages, *see* Sand, *Modern Federal Jury Instructions*, Inst. 77-5 ("The purpose of punitive damages is to punish a defendant for shocking conduct and to set an example in order to deter him or her and others from committing similar acts in the future.").    In fact, the jury instructions given by the Court are arguably more favorable to Defendant than the model Connecticut instructions, and specifically charged the jury to focus on Wyeth's proved conduct that harmed Plaintiffs.    Thus, this instruction was not erroneous.

With respect to Wyeth's argument that the Court should have used Wyeth's additional proposed instructions outlined above, Wyeth appears to argue that so long as a proposed instruction is an accurate portrayal of the law, a party is entitled to that instruction.  However, a defendant "cannot dictate the precise language of the charge," and even where a defendant's proposed charge correctly states the law, so long as the Court's charge as given does not omit any necessary elements and correctly states the law, there will be no error.  *United States v. Han*, 230 F.3d 560, 565 (2d Cir. 2000).  Taken as a whole, the Court's punitive damages instruction tracked the language of model punitive damages instructions and correctly stated the law on punitive damages both under state law and the constitutional requirements of due process.  Therefore, it was not erroneous

to omit Wyeth's requested punitive damages instructions, and Wyeth is not entitled to a new trial on these grounds.

> 6.   *Preliminary Jury Instructions*

In a footnote at the end of its brief, Wyeth submits that the Court violated Fed. R. Civ P. 51(b) by failing to provide the parties with a copy of the preliminary jury instructions before delivering them to the jury. (*See* Wyeth's Mem. Supp. New Trial at 40 n.61.) Wyeth cites no case in support of this proposition. However, Wyeth objects to the preliminary jury instructions in that they stated that Wyeth's duty to warn ran to Ms. Fraser as well as to Dr. Tesoro, rather than solely to Dr. Tesoro under the learned intermediary doctrine. (*See* Trial Tr. Vol. I at 41.) However, in the final jury instructions, delivered over three weeks later, the Court charged the jury that "Wyeth is excused from warning each patient who receives Prempro; instead it has a duty to warn the prescribing physician of Prempro's dangers." (Jury Inst. at 19.) The final jury instructions further explained that "Plaintiffs must prove by the greater weight of the evidence that Wyeth failed to provide adequate warnings or instructions . . . to Ms. Fraser's prescribing physician, Dr. Michael Tesoro during the time he was prescribing Prempro to Ms. Fraser." (*Id.* at 20.) It was these instructions, rather than the preliminary instructions, that were handed out to the jurors to take with them into their deliberations. Thus, to the extent that the preliminary instructions were erroneous, the Court corrected this error repeatedly in the final jury instructions, which the jury is presumed to have followed. Therefore, Wyeth is not entitled to a new trial on these grounds.

## E.   Punitive Damages Verdict

Wyeth argues that because the Court improperly submitted Plaintiffs' design defect, failure to test, and negligent misrepresentation claims to the jury, it is entitled to a

new trial on all issues according to the dictates of the general verdict rule and in light of the fact that the liability issues were inextricably intertwined with Plaintiffs' punitive damages claim.  However, the Court has determined that each of Plaintiffs' claims was independently cognizable under Connecticut law and was properly submitted to the jury, and therefore Wyeth is not entitled to a new trial on this ground.

### F. Manifest Weight of the Evidence

Wyeth argues generally that the jury's verdict on liability and causation was against the manifest weight of the evidence produced at trial, and that the Court should therefore exercise its discretion under Rule 59 to grant a new trial.  As the Court outlined in its discussion of Wyeth's motion for judgment as a matter of law, there was ample evidence to support the jury's verdict on all issues.   Weighing this evidence independently, and not in the light most favorable to Plaintiffs, *see Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d. Cir. 1992), the Court concludes that the record preponderates in support of Plaintiffs' claims as to causation, liability, and punitive damages.  The jury's verdict did not represent a "miscarriage of justice" and thus Wyeth is not entitled to a new trial on this basis.

### G. Evidence Regarding Fen-Phen

During trial, Plaintiffs' counsel solicited testimony from Dr. Blume regarding the drug Fen-Phen, which Wyeth distributed, and which was eventually recalled from the marketplace due to health risks established by a study conducted after it was originally distributed.   (*See* Trial. Tr. Vol. III at 464-66.)   Wyeth argues that this testimony constituted improper prior bad acts evidence and that its admission generated undue prejudice, especially with respect to punitive damages, warranting a new trial on all issues. However, as Plaintiffs point out, the fleeting reference to Fen-Phen was made in the

context of Dr. Blume's testimony regarding examples of pharmaceutical company behavior that complied with FDA regulations and the duties of pharmcovigilance.  Dr. Blume testified that Fen-Phen's sponsor had properly commissioned a post-release study of the drug, and that Wyeth included the results of the study in its labeling.  (*Id.* at 465–66.)  Thus, at best, this testimony established that Wyeth was a responsible corporation, and at worst it indicated that Wyeth had manufactured a dangerous product in the past.  It did not however, represent evidence of prior bad acts by Wyeth with respect to its duties to test and to warn.  Furthermore, even if the admission of this testimony was in error, the jury was repeatedly instructed that its verdict should be based only on Wyeth's conduct that proximately caused Plaintiffs' injuries.  The Court presumes that the jury followed these instructions absent specific evidence to the contrary.  *See Shannon*, 512 U.S. at 585.  Therefore, Wyeth has not established that it is entitled to a new trial on this basis.

### H.    Untimely Subpoena of Dr. Deitch

On the first day of trial, Plaintiffs subpoenaed one of Wyeth's former executives, Dr. Marc Deitch, to testify live at trial seven days later.  Wyeth moved [Doc. # 213] to quash the subpoena, arguing that Plaintiffs had failed to disclose Dr. Deitch as a trial witness, in violation of the Court's standing pre-trial order, and that they had not provided a reasonable amount of time for Dr. Deitch to comply with the subpoena, in violation of Fed. R. Civ. P. 45.  The Court denied the motion to quash, reasoning that Dr. Deitch's testimony wasn't going to cause any surprise because he had already been deposed and thus "that ground has already been tilled," (Trial Tr. Vol. V at 1017) and because Wyeth's counsel had been given seven days' notice to prepare the witness (*id.* at 1020–21.)  Wyeth now argues that because Plaintiffs' counsel pursued new avenues of

inquiry during their direct examination of Dr. Deitch, Wyeth was unfairly prejudiced by the testimony and a new trial should be granted.

Contrary to Wyeth's contention, Dr. Deitch was disclosed as a potential trial witness in the parties' joint trial memorandum.  In their witness list, Plaintiffs included Dr. Deitch in a list of witnesses whose prior deposition or trial testimony Plaintiffs intended to present at trial.  (*See* Pls.' Disclosure of Trial Witnesses [Doc. # 173-156] at 4.) However, Plaintiffs specifically reserved the right to call any witness on that list live at trial if he or she became available within the meaning of Rule 45.  (*See id.* at 5.) Furthermore, the subpoena was a subpoena *ad testificandum*, rather than a subpoena *duces tecum*, and thus Wyeth did not have to prepare for the introduction of any new documents into evidence.  Wyeth was given a full week to prepare Dr. Deitch as a witness, and had the benefit of his previous deposition testimony to facilitate that preparation. Furthermore, to the extent that Dr. Deitch was subjected to a line of questioning that was not pursued in his deposition, none of the documents or issues referenced in that questioning were raised for the first time at trial in Dr. Deitch's testimony.  Given the parties' extensive history with the subject matter that formed the basis for Dr. Deitch's trial testimony, and given that Wyeth was provided a week to prepare him and rejected the Court's offer of an additional week in which to do so (*see* Trial Tr. Vol. V at 1010), the Court concludes that Wyeth was not so prejudiced by his testimony as to warrant a new trial.

## I.     The Court's Conduct at Trial

Wyeth argues that the Court's conduct during the trial compromised the appearance of impartiality in the courtroom and displayed a clear bias in favor of Plaintiff, thereby improperly influencing the jury's verdict and warranting a new trial.  In

support of this argument, Wyeth focuses principally on two issues:  1) that the Court rephrased leading questions by Plaintiffs' counsel directly to witnesses and commented on witnesses' testimony and 2) that the Court improperly converted Plaintiffs' counsel's objection to Dr. Minkin's testimony into an untimely *Daubert* motion, the ruling on which cannot be squared with the Court's rulings on Wyeth's *Daubert* motions.

      1.       *Questioning and Commentary by the Court*

During trial the Court occasionally rephrased leading question by Plaintiffs' counsel to which Wyeth had objected, rather than sustaining repeated objections while Plaintiffs' counsel attempted to properly formulate the question.  (*See, e.g.,* Trial Tr. Vol. II at 291, 296; Trial Tr. Vol. IV at 625–26.)[3] Furthermore, Wyeth contends that the Court

---

[3] For example, the Court rephrased the following questions at trial:

> Q:     First of all, can you explain what they meant when Wyeth said the indications for Premarin would carry over to Prempro?
> A.     Yes.
> Ms. Roberts:   Your Honor, I object to the question asking her to—
> Mr. Bubalo:   I'll just rephrase it.
> Ms. Roberts:   All right.
> Q:     Do you understand what it means in your profession when they say that the indications would be approved for Premarin?
> The Court:   Would apply to?
> Q:     Would apply to Prempro that were approved for Premarin.

(Trial Tr. Vol. II at 291.)

> Q:     So, what does that mean to you as a pharmacologist in reading a regulatory document like this?
> Ms. Roberts:   Your Honor, I feel compelled to object.  This is a report of someone else's statement asking her to opine on what she thinks this person meant.
> The Court:    I understand that, but to the extent this has meaning to pharmacologists, I think the witness should be permitted to answer.  If it just requires guessing at what Dr. Golden is saying there or meaning there,

improperly commented on the evidence.   (*See, e.g.*, Trial Tr. Vol. VIII at 1555 (commenting that prior deposition testimony didn't look inconsistent when ruling on an objection that it was not a prior inconsistent statement for impeachment); Trial Tr. Vol. IX at 1672 (summarizing witness' testimony in response to an objection).)   Wyeth contends that this conduct gave the jury an impression of the Court's partiality in favor of Plaintiffs.   Wyeth relies on *United States v. Nazzaro*, 472 F.2d 302 (2d Cir. 1973) in support of its argument.   The Court believes that its conduct during trial did not manfest the bias claimed and clearly fell far short of the conduct at issue in *Nazzaro*.   In *Nazzaro*, the court extensively and aggressively questioned the defendant, repeatedly questioned

---

that's different.  Does this statement in the trip report have significance necessary to be translated for the lay public?

Mr. Bubalo:     That's—

Ms. Roberts:    The Court's question I have no problem with.

The Court:      You like my question better?

Ms. Roberts:    I do.

Mr. Bubalo:     Well, I do too.

The Court:      See.

Q:      Would you answer the Court's question, your Honor—I mean—

The Court:      Does the statement in the trip report have significance? Is it necessary to be translated for the lay public with respect to Dr. Golden's statement.

(*Id.* at 296).

Q:      Have they claimed that they actually—

Ms. Roberts:    Objection to leading.

Mr. Bubalo:     I'll rephrase it.

Q:      And concerning the study of breast cancer, have they claimed whether they've studied or not?

Ms. Roberts:    Objection to leading.

The Court:      What is the claim?

Q:      What is the claim?

(Trial Tr. Vol. IV at 625–26.)

the prosecution's witnesses during cross-examination so as to rehabilitate them, and harshly rebuked defense counsel within earshot of the jury.  *Id.* at 307–11.  Here, the Court's questions to witnesses were limited, and the challenged commentary by the Court was brief and made in response to pending objections.   During trial, when defense counsel pointed out that the Court had been rephrasing questions, the Court acknowledged his concerns, explained that this had been done in an effort to move the trial along in an efficient manner, and reduced the extent to which questions were rephrased from the bench going forward.  (*See* Trial Tr. Vol. IV at 652–53.)

"A trial judge in criminal, as in civil cases, may, indeed must, be more than a mere moderator or umpire in a contest between two parties in an arena before him.  He should take part where necessary to clarify testimony and assist the jury in understanding the evidence and its task of weighing it in the resolution of issues of fact."  *United States v. De Sisto*, 289 F.2d 833, 834 (2d Cir. 1961).   The Court had the authority to question witnesses, and had "wide latitude in the management of the courtroom," *United States v. Blackwood*, 456 F.2d 526, 529 (2d Cir. 1972), to ensure the efficient and orderly conduct of the trial.  The Court recognizes that it must exercise this authority and discretion in such a manner as to maintain the appearance of impartiality at all times, and believes that it did so in this case.  To the extent that the Court's conduct could have appeared to favor one party over another, the jury was instructed that "[b]ecause you are the sole and exclusive judges of the facts, nothing in the instructions, and nothing I have said during the trial reflects any opinion from me as to what your verdict should be."  (Jury Inst. at 5.) The Court also specifically addressed the issue of rephrasing questions in the instructions, explaining that the jury "should draw no inference from the fact that on occasion I asked or re-phrased questions for witnesses.  My questions were only to clarify or expedite

matters, not to suggest any opinion as to what your verdict should be." (*Id.* at 9.) Although such a curative instruction will not be sufficient in extreme cases, "in most circumstances a damaging impression may be mitigated by a jury instruction which emphasizes that "comments or questions by the court [are] not to be construed as in any way expressing any opinion or view on the part of the court whatsoever." *Nazzaro*, 472 F.2d at 312 (internal citations and quotation marks omitted).

    2.    *Dr. Minkin*

Wyeth cites the Court's ruling on Plaintiffs' objection to the foundation for Dr. Minkin's testimony as further evidence of the Court's improper bias in this case.  Wyeth argues that the Court improperly converted Plaintiffs' untimely objection into a *Daubert* motion *sua sponte*, and that the Court's decision to exclude Dr. Minkin's testimony, while rejecting Wyeth's similar objections to Plaintiffs' experts illustrates the Court's improper partiality towards Plaintiffs.  The Court has already explained its reasoning as to the exclusion of Dr. Minkin's testimony in its ruling (*see, e.g.*, Trial Tr. Vol. XII at 2284–87 ("Here is the basic problem of how can a gynecologist testify in this whole very difficult area of oncology? . . . So, you may get to the place you want to be, at least in part, by her description of what she does, why she does it, the literature she's reviewed, the difference between risk and cause, and that she'd never prescribe a medication that she believed caused it, et cetera, but that next step of opinion as an oncologist, I'm not satisfied with that.")) on Plaintiffs' objection and in its ruling [Doc. # 279] denying Wyeth's motion for reconsideration, and incorporates that reasoning in the context of Wyeth's motion for a new trial.  To the extent that the Court's ruling can be said to have converted Plaintiffs' objection into a *Daubert* challenge, the Court had the authority to raise *Daubert* concerns *sua sponte.  See, e.g., Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794,

800 (N.D. Ill. 2005) ("*Daubert* stressed the trial judge's obligation to act as a gatekeeper to ensure that expert testimony is reliable.  The insistence on reliability helps to ensure the integrity of the judicial process.  *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir.1989).  That goal is of such obvious and transcendent importance that judges can act *sua sponte* to prohibit testimony that does not pass muster under *Daubert.  O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1094 (7th Cir. 1994).").  To ensure that the jury would not perceive any bias on the basis of this ruling, the Court explained to the jury in the final instructions that the Court's rulings, statements, and questions should not be taken as expressing any opinion as to what the verdict should be (Jury Inst. at 5), and that the Court's "analysis of the merits of objections and rulings on evidentiary disputes have nothing to do with the ultimate merits of the case, and are not to be considered as points scored for one side or the other" (*id.* at 6).  Such instruction was sufficient to avoid any potential prejudice to Wyeth, *see Nazzaro*, 472 F.2d at 312, and thus Wyeth is not entitled to a new trial on this ground.

### J.       Remittitur of Punitive Damages Award

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Systems, Inc. v. Norse Systems, Inc.,* 49 F.3d 93, 96 (2d Cir. 1995).  A judgment cannot be upheld where the damages awarded are "so excessive that it shocks the judicial conscience." *Phillips v. Bowen,* 278 F.3d 103, 111 (2d Cir. 2002).  In assessing whether an award is excessive, it is appropriate to review "awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances." *Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 684 (2d Cir. 1993).

In a separate post-trial ruling, this Court determined that, contrary to Plaintiffs' contentions, under Conn. Gen. Stat. § 52-240b, punitive damages were capped at Plaintiffs' reasonable attorneys' fees and litigation expenses less taxable costs. *See Fraser II*, 2013 WL 4012764, at \*4. The Court awarded $1,769,932.04 in punitive damages, representing one-third of the compensatory damages award as attorneys' fees and Plaintiffs' non-taxable litigation costs. *Id.* at \*9–10. Wyeth argues that this award was excessive and should be remitted as a matter of Connecticut law and as a matter of due process.

### 1.    *Plaintiffs' Contingency Fee Agreement and Litigation Expenses*

In its motion for remittitur, Wyeth raises many of the same arguments that it did in connection with the Court's punitive damages ruling in *Fraser II*. Specifically, Wyeth argues 1) that Plaintiffs waived their right to submit evidence of their attorneys' fess and litigation expenses; 2) that Plaintiffs' claimed litigation expenses should be reduced; and 3) that Plaintiffs' contingency fee agreement is invalid.

With respect to Wyeth's contention that Plaintiffs' waived their right to submit evidence in support of their claimed fees and expenses, the Court considered and rejected this argument in its ruling on punitive damages. *Id.* at \*4–5. In their original briefing, Plaintiffs requested an opportunity to supply evidence of their expenses (*see* Pls.' Reply on Punitive Damages [Doc. # 302] at 1), and a separate round of briefing was filed after such evidence was provided to the Court, giving Wyeth a full opportunity to challenge that evidence and argue against an award based on the contingency fee agreement. The pending motion represents Wyeth's second opportunity to attack that evidence. Thus, there was no waiver and no prejudice. In its supplemental briefing, Wyeth points to no case law or evidence that the Court overlooked in rejecting its waiver argument in

connection with the punitive damages ruling, and the Court sees no grounds for changing that ruling in the context of this motion.

In its briefing on punitive damages, Wyeth argued that several of Plaintiffs' claimed expenses were unreasonable and should not be included as costs in the punitive damages award. The Court excluded several of these costs in setting the amount of punitive damages. *See Fraser II*, 2013 WL 4012764, at *8. The Court also imposed a twenty-five percent across-the-board reduction to Plaintiffs' claimed expenses, due to Plaintiffs' counsel's failure to delineate between taxable and non-taxable fees in the expense report. Wyeth argues again in moving for remittitur that the Court should also exclude from the punitive damages award the other allegedly improper expenses identified in Wyeth's prior briefing. Although the Court did not specifically address these costs, such as witness payments and hotel and meal expenses, the Court exercised its discretion in holding that the exclusion of the fees addressed in the ruling, and the twenty-five percent reduction of the claimed fees, resulted in a sum that represented the Plaintiffs' reasonable costs related to this litigation. *See Label Systems Corp. v. Aghamohammadi*, 270 Conn. 291, 335 (2004) ("If awarded, punitive damages are limited to the costs of litigation less taxable costs, but within that limitation, the extent to which they are awarded is in the sole discretion of the trier."). The Court does not believe that an additional reduction of that sum is warranted or necessary on reconsideration of its determination of Plaintiffs' reasonable litigation expenses in the context of this motion.

Wyeth also renews its contention that Plaintiffs are not entitled to any punitive damages because their contingency fee agreement is invalid under Connecticut law, arguing that it has standing to challenge the validity of the agreement because damages were calculated based on the agreement, and that to hold otherwise would violate Wyeth's

due process rights. As the Court previously held in the punitive damages ruling, based on the reasoning in *Dur-a-Flex, Inc. v. Laticrete Intern, Inc.*, No. CV065014930S, 2010 WL 2822742 (Conn. Super. Ct. June 21, 2010), Wyeth lacks standing to challenge the validity of Plaintiffs' fee agreement because it is neither a party to nor a third-party beneficiary of that contract. *See Fraser II*, 2013 WL 4012764, at *6. Contrary to Wyeth's arguments, such a holding does not violate the fairness requirements of Wyeth's due process rights. Under Connecticut law, a contingency fee agreement is not determinative in setting the amount of punitive damages to be awarded. *See Berry v. Loiseau*, 223 Conn. 786, 831 (1992) (noting that a contingency fee agreement does not limit a court's discretion in fashioning a punitive damages award). Thus, in its ruling, the Court considered many of Wyeth's arguments regarding the validity of the contingency fee agreement, and awarded an amount less than the fee called for in the agreement based on those concerns.

For example, the Court noted that contrary to Wyeth's arguments, the original 2004 contingency fee agreement was valid when it was signed. *See Fraser II*, 2013 WL 4012764, at *6 n.4. That Plaintiffs and their counsel later amended that agreement in the form of the 2013 contingency fee agreement to address a change in law does not render the later agreement invalid. Furthermore, the Court addressed Wyeth's arguments regarding the appellate fee, noted its serious concerns regarding the validity of that provision, and excluded that fee from its award of punitive damages. *See id.* at *7.[4] The

---

[4] Even if a court did determine that the appellate fee provision in Plaintiffs' contingency fee agreement was invalid, this would not necessarily void the entire contract, as that provision may be severable from the rest of the agreement. *See Venture Partners Ltd. v. Synapse Tech., Inc.*, 42 Conn. App. 109, 118 (1996) ("[I]t is the general rule that a severable contract is one in its nature and purpose susceptible of division and apportionment. The determinative test is in ascertaining from the language used, read in the light of the surrounding circumstances, what was the intention of the parties. In determining the severability of the contract, the court looks to whether the contract's

Court similarly excluded the common benefit assessment from the final punitive damages award.  *See id.* at *9.  Thus, although Wyeth did not have the standing to request that the Court invalidate Plaintiffs' contingency fee agreement, it did have an opportunity to challenge that agreement as evidence in support of the punitive damages award.  The Court in fact considered, and accepted several of Wyeth's arguments with respect to the fee agreement.  Therefore, Wyeth's due process rights were not abridged by the Court's punitive damages ruling, and the Court concludes that a further reduction of the punitive damages award based on questions concerning the validity of the contingency fee agreement is unwarranted.

2.    *Due Process Concerns*

In *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the Supreme Court laid out three "guideposts" by which a court should evaluate an award of punitive damages to ensure that it complies with a defendant's due process rights:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Id.* at 575; *Thomas v. iStar Fin., Inc.,* 652 F.3d 141, 148 (2d Cir. 2011).

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *Gore*, 517 U.S. at 575.  The Supreme Court has identified several factors that a court may consider

---

parts and its consideration are common to each other or independent of one another." (internal citations and quotation marks omitted)).  Thus, the Court does not agree with Wyeth's argument that uncertainty regarding the validity of the appellate fee provision justifies a further reduction of the attorneys' fees portion of the punitive damages award.

in determining the degree of reprehensibility.  These include whether:  "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  *State Farm*, 538 U.S. at 419.  Despite Wyeth's arguments to the contrary, an analysis of these factors indicates that Wyeth's conduct was sufficiently reprehensible to justify an award of punitive damages.   The injuries proximately caused by Wyeth's conduct undisputedly involved grave physical injury to Ms. Fraser, the specter of which hangs over her and her family to this day.  Furthermore, as the Court outlined in its ruling on Wyeth's motion for judgment as a matter of law, Wyeth engaged in a long-term campaign to muddy the waters regarding the risks posed by Prempro, directing its sales representatives to obfuscate and mislead doctors regarding the results of recent medical trials, all while failing to perform the necessary studies to clarify the relationship between Prempro and breast cancer.  Such a pattern of behavior indicates an ongoing, reckless disregard for the health and safety of others, beyond mere accident.

With respect to the ratio between the compensatory and punitive damages awarded in this case, the Supreme Court has cautioned that although there is no bright line rule, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  *Id.* at 426.   Thus, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  *Id.* at 425.  Based on this guidance, Wyeth argues that because the $4 million in compensatory damages awarded in this case represents a

substantial sum, "a substantial reduction is amply warranted."  (Wyeth's Supplemental Mem. Supp. New Trial [Doc. # 340] at 31.)   However, this argument ignores the particular facts and circumstances of this case.  Here, the award of punitive damages was directly tied to the harm suffered by Plaintiffs because it represents Plaintiffs' attorneys' fees and litigation expenses, which they need to recover in order to be made whole.  Furthermore, the punitive damages award, which stands at approximately one-third of the compensatory damages awarded by the jury, is well within the outermost limit of the 1:1 ratio recognized in *State Farm* as an appropriate measure in cases where substantial compensatory damages are awarded.

Finally, Wyeth contends that the punitive damages award "dwarfs" the comparable civil penalties, arguing that the Court should compare this case to a CUTPA claim, under which Wyeth would be exempt from liability based on the FDA approval of Prempro's labeling.  However, Plaintiffs brought their claim under the CPLA, and neither side has identified a comparable CPLA case based on which the Court should evaluate the third guidepost.  The fact remains that the punitive damages awarded fell well short of the CPLA statutory cap of twice compensatory damages, and that even in light of the common law limit of attorneys' fees and litigation expenses, the award was further reduced below Plaintiffs' claimed costs and fees.  Therefore, considering the guideposts identified by the Supreme Court, the Court concludes that the award of $1,769,932.04  in punitive damages does not violate the principles of due process, and Wyeth's motion to remit the award is denied.

## IV.    Motion for Post-Verdict and Post-Judgment Interest [Doc. # 336]

Plaintiffs move for an award of post-verdict interest at rate of ten percent per year running from ninety days after the jury's verdict to the date of judgment, pursuant to

Conn. Gen. Stat. § 37-3b(a), and for an award of post-judgment interest pursuant to 28 U.S.C. § 1961.

### A.      Post-Verdict Interest

"In a diversity case, state law governs the award of prejudgment interest." *Schipani v. McLeod*, 541 F.3d 158, 164 (2d. Cir. 2008).  "In contrast, postjudgment interest is governed by federal statute." *Id.* at 165.      The date that judgment was first "meaningfully ascertained . . . is the date that separates for the computation of interest the pre-judgment and post-judgment periods."  *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 103 (2d Cir. 2004).  The parties agree that for the purposes of this litigation, that the date that judgment was first meaningfully ascertained was August 8, 2013, the date that final judgment entered following the Court's ruling on punitive damages. Consequently, Plaintiffs argue that the period of time between the jury's verdict and the entry of final judgment constitutes part of the prejudgment interest period and that Connecticut law should therefore govern whether Plaintiffs are entitled to an award of interest for this period.

The Connecticut post-judgment interest statute, Conn. Gen. Stat. § 37-3b(a), provides that "interest at the rate of ten per cent a year, and no more, shall be recovered and allowed in any action to recover damages for injury to the person, or to real or personal property, caused by negligence, computed from the date that is twenty days after the date of judgment or the date that is ninety days after the date of verdict, whichever is earlier, upon the amount of the judgment."   Thus, Plaintiffs argue that although Connecticut law considers the period between a verdict and a judgment to be a part of the post-judgment interest period, because it is a part of the prejudgment interest period under federal law, and state law governs the award of prejudgment interest, the Court

should apply Connecticut's post-judgment interest statute to award interest for the time period between the jury's verdict and the final judgment in this case.  Wyeth vehemently disputes that such action would be appropriate.

Under Conn. Gen. Stat. §37-3b(b), "[i]f any plaintiff in such action files a postverdict or postjudgment motion or an appeal, the recovery of interest by such plaintiff shall be tolled and interest shall not be added to the judgment for the period that such postverdict or postjudgment motion or appeal is pending before the court."  Here, final judgment did not enter immediately after the jury returned its verdict because Plaintiffs requested punitive damages and additional post-verdict proceedings and motion practice were required for the Court to award punitive damages in accordance with Plaintiffs' request.  Therefore, even if the Court were to accept Plaintiffs' argument and find that state and federal law permitted an award of post-verdict, "prejudgment" interest pursuant to Connecticut's post-judgment interest statute, such an award would not be warranted in this case, because post-verdict interest is tolled during the time a court is ruling on post-verdict proceedings initiated by the plaintiff.  Thus, Plaintiffs' motion for the assessment of post-verdict interest in accordance with Conn. Gen. Stat. § 37-3b is denied.

### B.      Post-Judgment Interest

Post-judgment interest is mandatory and is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment." 28 U.S.C. § 1961(a).  It is computed daily to the date of payment and compounded annually.  *Id.* § 1961(b).  The parties agree that Plaintiffs are entitled to an award of post-judgment interest at the rate

mandated by 28 U.S.C. § 1961(a), accruing daily from August 8, 2013, and compounded annually, on the judgment of $5,769,932.04.  (*See* Wyeth's Opp'n [Doc. # 344] at 2.) Therefore, Plaintiffs' motion for the assessment of post-judgment interest is granted.

**V.     Conclusion**

For the foregoing reasons, Wyeth's Motion [Doc. # 337] for Judgment as a Matter of Law is DENIED.  Wyeth's Motion [Doc. # 339] for a New Trial and Remittitur is DENIED.  Plaintiffs' Motion [Doc. # 336] for Post-Verdict and Post-Judgment Interest is GRANTED with respect to Plaintiffs' request for post-judgment interest, and DENIED with respect to Plaintiffs' request for post-verdict interest.  The Clerk is hereby ordered to correct the final judgment to indicate that punitive damages in the amount of $1,769,932.04 are awarded.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of January, 2014.